**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES FLETCHER JR., | ) | |
| | ) | |
| | ) | Case No. |
| *Plaintiff,* | ) | |
| | ) | |
| *v.* | ) | |
| | ) | |
| JEROME BOGUCKI, ANTHONY | ) | |
| NORADIN, RAYMOND SCHALK, | ) | |
| ANTHONY WOJCIK, UNKNOWN CITY | ) | |
| OF CHICAGO POLICE OFFICERS, and the | ) | |
| CITY OF CHICAGO | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

## COMPLAINT

NOW COMES Plaintiff, JAMES FLETCHER JR., by his attorneys, LOEVY & LOEVY

and JENNIFER BLAGG, and complaining of Defendants JEROME BOGUCKI, ANTHONY

NORADIN, RAYMOND SCHALK, ANTHONY WOJCIK, UNKNOWN CITY OF CHICAGO

POLICE OFFICERS, and the CITY OF CHICAGO and states as follows:

### INTRODUCTION

1.      Plaintiff James Fletcher spent 13 years wrongfully imprisoned for the shooting

death of Willie Sorrell, which occurred on December 21, 1990.

2.      Fletcher had nothing to do with Mr. Sorrell's death, and has always maintained

his innocence.

3.      Not one piece of physical evidence connected Fletcher to the Sorrell murder, and

he had no motive to commit the crime.

4.     Fletcher's arrest, prosecution, and resulting wrongful conviction rested solely on fabricated evidence and false testimony that the Defendants secured through manipulation, coercion, and other improper investigative techniques.

5.     Now exonerated, after over a decade of fighting for his freedom, Fletcher brings this lawsuit seeking justice for the harms the Defendants have caused, and seeking redress for the damage he suffered.

## JURISDCTION AND VENUE

6.     This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

7.     This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

8.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district. The events and omissions giving rise to Plaintiff's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in Plaintiff's conviction.

## PARTIES

9.     Plaintiff James Fletcher is 57 years old. He lives in Chicago, Illinois. At all times relevant to the events described in this Complaint, he was a citizen of the state of Illinois.

10.     At all times relevant to the events described in this Complaint, Defendants Jerome Bogucki, Anthony Noradin, Raymond Schalk, and other unknown law enforcement officers were police officers in the Chicago Police Department.

11.     At all times relevant to the events described in this Complaint, Defendant Anthony Wojcik and other unknown law enforcement officers supervised the officers in the preceding paragraph. These Defendants participated in the misconduct alleged in this Complaint and also facilitated, condoned, approved, and turned a blind eye to the misconduct of the Defendants whom they supervised.

12.     Defendant City of Chicago is an Illinois municipal corporation that is or was the employer of the above-named Defendants. Each of the Defendants named in this Complaint acted during their investigation of the Willie Sorrell murder as agents or employees of the City of Chicago. The City of Chicago is liable for all torts committed by the Defendants pursuant to the doctrine of *respondeat superior*. Additionally, the City of Chicago is responsible for the policies and practices of the Chicago Police Department.

13.     Each and every individual Defendant, known and unknown, acted under color of law and within the scope of his or her employment at all times relevant to this lawsuit. Each of the individual Defendants is sued in his or her individual capacity unless otherwise noted.

## FACTS

### The Crime

14.     On the afternoon of December 21, 1990, two armed men robbed the driver of a delivery truck on the 5600 block of West Madison Street in Chicago.

15.     After the two men fled the truck, the driver, 38-year-old Edward Cooper, pulled out the gun he kept for protection and began firing at the robbers.

16.     The robbers and Cooper exchanged gunfire. In the process, a stray bullet from one of the robbers' guns struck and killed a 65-year-old bystander named Willie Sorrell.

17.     The assailants escaped down Madison Street. Neither of them were apprehended by police.

## The Underlying Police Investigation

18.     After the assailants fled, police spoke to four eyewitness: Cooper, the driver; Sheenee Friend, an eyewitness to the robbery; and Emmett Wade and Terry Rogers, eyewitnesses to the chase.

19.     None of the witnesses identified either of the offenders at the scene and the case went cold.

20.     Five years later, in 1995, Defendants Jerome Bogucki and Raymond Schalk began investigating the Sorrell murder. They had not been involved in the original investigation.

21.     Bogucki and Schalk re-interviewed Cooper in March of 1995. They showed Cooper a photo-array of potential suspects, including a man named Fletcher Clinton. Cooper was unable to identify any of the men as the assailant.

22.     Cooper told Bogucki and Schalk he believed Rogers knew one of the robbers. Cooper also told Bogucki and Schalk that he believed Rogers had a bad drug habit and may have been involved in the crime. Bogucki and Schalk then submitted a stop order for Rogers, which meant if he were arrested, he would be held in custody until they could interview him.

## The Investigation Into Fletcher

23.     Nearly seven years later, in February of 2002, Rogers was arrested, in possession of incendiary material, for arson and criminal trespassing. He was also wanted by the Cook County Sheriff on a drug warrant.

24.     Defendants Bogucki, Schalk and Noradin interviewed Rogers the following day. He was a suspect in the Sorrell shooting, and Defendants questioned him about that crime 12 years earlier.

25.     During the interview, Rogers falsely implicated Fletcher in the crime, claiming for the first time that he had recognized Fletcher as one of the perpetrators.

26.     Rogers' statement implicating Fletcher was false and obviously unreliable, for multiple reasons that were known to the Defendants. First, the only eyewitness descriptions of the perpetrator were of someone with "shoulder-length, Jheri-curl" style hair, but police had evidence that at the time Fletcher had short, non-curly hair.

27.     Second, Rogers was not a credible witness. He had an extensive criminal history, pending criminal charges, and had already made several conflicting statements about the case between 1990 and 2002. Rogers, for example, told Defendants that he had known Fletcher for decades when interviewed in 2002. However, in 1990, he made no mention of Fletcher.

28.     Third, Cooper had told Bogucki and Schalk in 1995 that he suspected Rogers' involvement in the crime, so Rogers had every incentive to shift the blame to another person.

29.     Upon information and belief, Defendants struck an illegal and undisclosed deal with Rogers, wherein they declined to investigate or seek charges for arson, in exchange for his false statement implicating Fletcher.

30.     After Rogers implicated Fletcher, he was released without being charged for the arson and criminal trespassing.

**Defendants Fabricate and Falsify Evidence Against James Fletcher**

31.     Instead of doing the police work necessary to solve the crime, the Defendants focused solely on making a case against Fletcher and conspired amongst themselves to fabricate the evidence necessary to charge him with the crime.

32.     No physical evidence tied Fletcher to the scene. Nor was any incriminating evidence of any kind ever discovered in his possession.

33.     To overcome the lack of proof connecting Fletcher to the shooting, the Defendants manufactured "evidence" that falsely implicated Fletcher for the crime.

34.     This fabrication of evidence included, but was not limited to, unlawfully manipulating witnesses to falsely implicate Fletcher, falsifying police reports, destroying evidence, and unconstitutionally depriving Fletcher of his right to counsel.

35.     None of these improper tactics were documented in police reports, or otherwise disclosed to Plaintiff.

36.     Defendant Wojcik – Detective Bogucki, Schalk, and Noradin's supervisor – participated in these actions, including by monitoring, directing, approving and ratifying them.

**Defendants Manipulate Witnesses to Build a False Case Against James Fletcher**

37.     After interviewing Rogers, Defendants re-interviewed the remaining witnesses to the Sorrell murder: Wade, Friend, and Cooper.

38.     While conducting these interviews, they manipulated and coerced Wade, Friend, and Cooper in an attempt to elicit false identifications of Fletcher as Mr. Sorrell's murderer.

39.     Emmett Wade was interviewed by Defendants on March 12, 2002. At the interview, he was shown only a single photograph of Fletcher, and not a photo-array. The Defendants also told Wade that the man in the photograph was a "bad guy" they wanted to keep off the street. Despite pressure from Defendants, Wade did not identify Fletcher.

40.     Wade had seen the perpetrators, and had told the detectives at the scene in 1990 that he could identify the shooters if he saw them again. His refusal to identify the picture of Fletcher that Defendants showed him was therefore highly exculpatory.

41.     Defendants deliberately concealed the fact that they conducted an identification procedure with Wade, the unlawful tactics they used to try to get him to identify Fletcher, and Wade's refusal to identify Fletcher.

42.     For example, this information was omitted from their police reports.

43.     Instead, Defendants wrote a fabricated police report claiming that Wade did not see the faces of the perpetrators on the day of the robbery, implying that Wade would not have been able to identify – or refute an identification – of Fletcher as the offender.

44.     Sheenee Friend was interviewed by Defendants Bogucki, Schalk and Noradin while in custody for a parole violation on March 9, 2002.

45.     At the interview, she was shown a photo-array. When asked to identify the person who killed Mr. Sorrell, Friend pointed to someone other than Fletcher. In response, Defendants moved her finger to Fletcher's photo and told her that was who did it.

46.     Defendants also told Friend that Fletcher was a really bad, violent man, that needed to be kept off the streets.

47.     The unlawful tactics used with Friend were not included in police reports and deliberately concealed by Defendants.

48.     In addition, the photograph the Defendants chose of Fletcher to show witnesses was unduly suggestive. Defendants knew that Fletcher's appearance in 1990 did not fit the eyewitnesses' initial physical description of the assailant. So, they deliberately used a photo of

Fletcher that was taken in 2002, when he had a different hairstyle that looked more like the witnesses had initially described more than a decade earlier.

49.     When Cooper was re-interviewed by Defendants on February 12, 2002, he was shown a photo-array which contained this same deceptive photograph of Fletcher. Despite the Defendants' manipulation, Cooper told the Defendants that because the robbery had happened twelve years earlier he did not recognize anyone in the pictures.

50.     The Defendants wrote a false police report concealing this information, and instead stated that Cooper picked out a photo of Fletcher and made a tentative identification of him as the perpetrator.

51.     Defendant Wojcik participated in the investigative misconduct above, and signed off on and approved all of the false and misleading statements Defendants included in their reports

## Defendants Fabricate Positive Lineup Identifications By Conducting a Deliberately Tainted Police Line-Up

52.     Defendants then assembled a police line-up that included Fletcher and four other individuals. This line-up was viewed by Cooper and Friend.

53.     The line-up procedures were unconstitutional, unreliable and unduly suggestive.

54.     Defendants had already shown Fletcher's photograph to Friend and Cooper and tried to get them to falsely implicate Fletcher. They knew Fletcher was the Defendants' suspect.

55.     Fletcher was the only person in the lineup whose photo the Defendants had previously shown to the witnesses. In addition, the individuals the Defendants chose to stand in the lineup with Fletcher did not have a similar appearance, causing Fletcher to stand out.

56.     And at the time of the line-up, Fletcher was represented by Attorney Jacqueline Gordon. On the day of the line-up, Gordon arrived at the police station and was prevented from seeing her client for approximately thirty-minutes.

57.     Gordon was eventually permitted to stand in the same room as Fletcher during the line-up procedure, but was not permitted to see or enter the witness room where Cooper and Friend were to view the lineup.

58.     According to Defendants, Friend and Cooper both selected Fletcher in a lineup.

59.     These identifications of Fletcher occurred only because the Defendants manipulated the eyewitnesses and caused them to falsely identify Fletcher.

60.     The fabricated reports and eyewitness identifications discussed above were used to falsely arrest, prosecute, and convict Fletcher of the Sorrell murder.

**Defendants Attempt to Coerce James Fletcher into Confessing**

61.     Prior to his arrest, Fletcher was interviewed by Defendants Bogucki and Schalk.

62.     Fletcher denied committing or participating in the murder of Willie Sorrell.

63.     Despite his denials, Defendants Bogucki and Schalk continued to pressure Fletcher to confess. Defendants Bogucki and Schalk also tried to coax Fletcher into becoming a police informant on their behalf, implying that they would drop him as a suspect in the Sorrell murder if he worked for them.

64.     Once Fletcher made it clear he would not confess *or* act as a police informant, they then threatened him. They told him if he did not confess or work for them, they would pin a false murder charge on him.

65.     The Defendants followed through on their threat. Soon after the Defendants left, Fletcher was arrested and charged for the murder of Willie Sorrell.

**Policy and Practice of Wrongly Convicting Innocent Individuals**

66.     The Chicago Police Department is responsible, by virtue of its official policies, for inflicting miscarriages of justice in scores of incidents like the one endured by Fletcher.

67.     Since 1986, no fewer than 150 cases have come to light in which Chicago police officers fabricated false evidence or suppressed exculpatory evidence in order to cause the convictions of innocent persons for serious crimes they did not commit.

68.     These cases include many in which Chicago police officers used the same tactics that Defendants employed against Plaintiff in this case, including fabricating evidence, concealing exculpatory evidence, manipulating witnesses in order to influence their eyewitness identifications and testimony, and using other tactics to secure the arrest, prosecution, and conviction of a person without probable cause and without regard for the person's actual guilt or innocence.

69.     At all relevant times, members of the Chicago Police Department, including the Defendants in this action, routinely fabricated and manipulated identification procedures to procure suspect identifications that they knew to be inaccurate.

70.     The municipal policy and practice described in this Complaint was recently described in a Federal Bureau of Investigation FD-302 Report of an interview with Assistant State's Attorney Terence Johnson. The Report documents, *inter alia*, that Chicago police detectives would feed information to witnesses and coach them through court-reported and handwritten statements, coerce witnesses into sticking to a detective's theory of the case, physically abuse witnesses, and work together to develop and rehearse false narratives so there were no inconsistencies in the witnesses' stories.

71.     At all relevant times, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by

intentionally secreting discoverable reports, memos, and other information. This concealed material was kept in files that were maintained only at the police department and never disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation rather than being preserved as part of the official file.

72.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

73.     The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established in the cases of, *inter alia*, *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.), *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.), and *Jones v. City of Chicago*, No. 87 C 2536 (N.D. Ill.).

74.     The policies and practices of suppressing exculpatory and/or impeaching evidence at issue in *Rivera*, *Fields*, and *Jones* applied throughout the timeframe from the 1980s through the 2000s, including at the time of the Sorrell murder and investigation at issue here.

75.     In addition, a set of clandestine files related to Area 5 homicides—the same Detective Division involved in this case—was found in the case of *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.). Those files, for a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants.

76.     The policy and practice of suppressing exculpatory and/or impeaching material evidence was alive and well at all relevant times, including at the Area Five Detective Division, during the investigation into the Sorrell murder.

77.     In addition, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

78.     Prior to and during the period in which Plaintiff was falsely charged with and convicted of the Sorrell murder, the City of Chicago also operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. Further, the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

79.     The U.S. Department of Justice recently issued a report finding that there were "engrained deficiencies in the systems CPD uses to provide officers with supervision and training." In particular, on the subject of training, the DOJ concluded that the "CPD's inattention to training needs, including a longstanding failure to invest in the resources, facilities, staffing, and planning required to train a department of approximately 12,000 members, leaves officers underprepared to police effectively and lawfully. Officer errors and misconceptions that result from lack of training are not corrected in the field, because CPD has neither structured supervision in a way that will adequately support officers, nor invested in programs and systems that will detect when officers are in need of help or exhibiting behavior that must be corrected. Officers' ability to stay safe, protect public safety, and police within constitutional standards suffers as a result."

80.     On the subject of supervision, the DOJ concluded among other things that "[i]nstead of encouraging the chain of command to instill proper policing tactics and respect for constitutional policing in CPD officers, CPD provides little incentive, or even opportunity, for supervisors to meaningfully guide and direct CPD officers. CPD provides even less incentive for supervisors to hold officers accountable when they deviate from CPD policy and the law. The City has long known that CPD's direct supervision of officers is inadequate, including through the fact that multiple reports in the last two decades have highlighted deficiencies in CPD's supervisory practices. Yet, City and CPD leadership have not made the necessary reforms to CPD's supervision structure and processes, and community and officer safety suffer as a result."

81.     The DOJ "confirmed that CPD's accountability systems are broadly ineffective at deterring or detecting misconduct, and at holding officers accountable when they violate the law or CPD policy." In particular, the Department of Justice found that the City failed to investigate nearly half of misconduct complaints; where investigations did occur, there were "consistent patterns of egregious investigative deficiencies"; and where misconduct complaints were sustained, discipline was inconsistent and unpredictable.

82.     Similarly, the Chicago Police Accountability Task Force reported in April 2016 that "[g]oing back years, and continuing to the present day, CPD has missed opportunities to make accountability an organizational priority." Between 2004 and 2016, the City paid more than $500 million to settle or pay judgments in police misconduct cases. The City recommended disciplinary action in fewer than 4% of those cases and did not conduct any disciplinary investigations in over half of those cases.

83.     As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department.

Charlie Beck, the former interim superintendent of the CPD, recently acknowledged the existence of the CPD's code of silence. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

84.     Former Mayor of the City of Chicago Rahm Emanuel acknowledged during his tenure that a "code of silence" exists within the Chicago Police Department.

85.     In December 2016, the president of the police officers' union in Chicago admitted that there is a "code of silence" in the Chicago Police Department.

86.     In 2017, the U.S. Department of Justice found that current officers of the CPD and former high-level officials of the CPD acknowledged a "code of silence."

87.     In the case of *Klipfel v. Bentsen*, No. 94 C 6415 (N.D. Ill.), a federal jury found that, as of 1994, the Chicago Police Department maintained a code of silence that facilitated police misconduct.

88.     In *Obrycka v. City of Chicago*, No. 07 C 2372 (N.D. Ill.), a different federal jury found that, as of February 2007, "the City had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

89.     As a result of the City of Chicago's established practices, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. The practices that enable this belief include failing to track and identify police officers who are repeatedly accused of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department.

As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

90.     This includes Defendants in this case. They engaged in such misconduct because they had no reason to fear that the City of Chicago and its police department would ever discipline them for doing so.

91.     These Defendants also worked in Area 5 alongside Defendant Guevara, who has a long history of engaging in the kind of investigative misconduct that occurred in this case, including manipulating eyewitness identifications as well as fabricating and concealing evidence in the course of maliciously prosecuting innocent persons. There are dozens of known cases in which Guevara, his partners, his colleagues in the Area 5 Violent Crimes unit, and other Chicago police officers engaged in the serious investigative misconduct described above. They engaged in such misconduct because they had no reason to fear that their supervisors—including Defendant Wojcik and their other supervisors—would ever discipline them for doing so.

92.     The City of Chicago and its police department also failed in the years prior to Fletcher's conviction to provide adequate training to Chicago police detectives and other officers in many areas, including the following:

a.     The conduct of live lineup, photographic, and other identification procedures.

b.     Preserving material evidence, such as photographic arrays used for identification purposes;

c.     The constitutional requirement to preserve and disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

d. The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses.

e. The risks of wrongful conviction and the steps police officers should take to minimize risks.

f. The risks of engaging in tunnel vision during investigation.

g. The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

93. The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Fletcher's wrongful conviction and his injuries.

94. The city's failure to train, supervise, and discipline its officers, including Defendants Bogucki, Schalk, and Noradin condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Fletcher in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and de facto polices, as alleged above.

95. Moreover, Defendants' supervisors and the City of Chicago also promoted officers that engaged in misconduct. Defendant Wojcik, for example, has been accused of misconduct by citizens of the City of Chicago on numerous occasions, as discussed below. He has been accused so many times that he ranks in the top 8% of officers in terms of the number of times he has been accused of misconduct. Yet, not only did he never suffer any meaningful discipline, he was promoted to a Sergeant, supervising other homicide detectives including the other Defendants in this case.

96.     The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

97.     The policies and practices described in the foregoing paragraphs were also approved the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described herein.

**Defendants' History of Investigative Misconduct**

98.     The investigation into Fletcher was not the first instance of law enforcement abuse and/or misconduct that Defendants Boguck, Schalk, Noradin, and Wojcik engaged in.

99.     For example, in 2004, Defendants Bogucki and Schalk were placed in charge of an investigation into a police shooting, wherein several detectives under their supervision unlawfully detained and physically abused several bystanders who had witnessed the shooting. In the civil trial that commenced following that abuse, the jury returned a verdict against both Bogucki and Schalk, finding that "the alleged violations occurred under [Bogucki and Schalk]'s direction or with their knowledge and consent." *See Warfield v. City of Chicago*, 679 F. Supp. 2d 876, 893 (N.D. Ill. 2008).

100.    Detectives Bogucki was also the lead investigators in the wrongful conviction of Thaddaeus Jiminez in the early 1990s. Arrested at only 13 years of age, Jiminez was wrongfully convicted and sentenced to 45 years in prison for a murder he did not commit. After being exonerated, Jiminez sued Bogucki, Schalk, and four other Chicago police officers, alleging that his wrongful conviction rested solely on fabricated evidence that Bogucki, Schalk, and the other

officers manipulated and coerced. Specifically, Jiminez alleged that the officers used coercive tactics to make witnesses falsely identify Jiminez as the murderer.

101. At trial, the jury returned a verdict in favor of Jiminez against Defendant Bogucki, and awarded him $25 million in compensatory damages. *See Jimenez v. City of Chicago*, 732 F.3d 710, 712 (7th Cir. 2013).

102. The Seventh Circuit affirmed this finding of liability. On appeal, the court characterized the facts of the case as showing that Defendant Bogucki used coercive tactics to fabricate witness identifications. One example of this included Bogucki planting with witnesses the idea that the murderer was wearing a jacket that matched one owned by Jiminez. The court also described Bogucki's decision to show a witness a picture of Jiminez prior to a line-up procedure as "tainting" the identification.

103. Furthermore, Defendants Bogucki and Noradin were accused of physically coercing Corky Terry into a false confession. In 2002, Terry was interrogated by Defendants Bogucki and Noradin in connection to a fatal shooting in his neighborhood. Terry repeatedly denied all involvement in the shooting, after which Bogucki and Noradin physically abused him until he agreed to give a videotaped statement admitting he committed the shooting. This physical abuse included: kicking, punching, grabbing by the hair, and hitting with a phonebook. *People v. Terry*, 2016 IL App (1st) 140555, ¶ 13, 57 N.E.3d 542, 545.

104. Defendant Noradin was also accused of helping cover-up the police shooting of an innocent man in 2015, Erick Fields. In 2011, Erick claims was shot in the stomach by a Chicago police officer, allegedly without provocation. While at the hospital, shortly after he had undergone emergency surgery, Defendant Noradin began questioning Erick about the incident. Erick alleges that Defendant Noradin ignored the information Erick conveyed to him, and instead

relayed a false story to the Chicago Police Department, effectively depriving Erick of his constitutional rights. The case settled shortly before the jury trial was set to commence. *Fields v. City of Chicago*, 1:12-cv-01306 (N.D. Ill).

105.     Defendant Wojcik has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case. In addition to several civil suits lodged against him and governmental investigations into his behavior, Defendant Wojcik is also among a small number of CPD officers with an extraordinarily high number of citizen complaints. At this moment, he has been accused of police misconduct through the citizen complaint process 44 times. The misconduct sustained or alleged against Defendant Wojcik include: physical abuse, abusive interrogation techniques, obtaining false confessions through coercive interrogation techniques, concealing evidence in the course of investigating police misconduct or supervising misbehaving officers, refusing to investigate misconduct by other officers, fabricating evidence, forceful entry into complainants homes without a warrant, and the denial of individuals to their right to an attorney.

106.     Examples of Defendant Wojcik's misconduct include:

a.     His false reporting on the misconduct of Detective Guevara, who himself has a long history of misconduct and abuse. In 2000, Detective Wojcik was assigned to investigate allegations made against Detective Guevara by a defendant named Juan Hernandez. Hernandez had filed a complaint stating that Guevara had framed him for a murder he did not commit, and used improper line-up techniques in the process. Defendant Wojcik stated in a report that Hernandez was not a reliable witness because Hernandez had not alleged Guevara had acted improperly

at his criminal trial. This was not true; eight months before Defendant Wojcik's report, Hernandez had raised that same issue in court.

b.   The role he played as "approving supervisor" in the investigation into Jason Van Dyke, who shot and killed Laquan McDonald in October 2014. As approving supervisor, he ratified police reports which later-released video revealed to be categorically false. These false police reports formed the foundation for what the State's Attorney's Office said was a "conspiracy to conceal the true facts of the events surrounding the killing of Laquan Mcdonald[.]" According to the State's Attorney's Office, these police reports "contained important false information in an attempt to prevent or shape any criminal investigation."

c.   In 1988, the FBI registered a complaint against Defendant Wojcik with the CPD's Office of Professional Standards ("OPS"). The FBI reported that it was conducting an investigation into the alleged extortion of a weapon from a FBI informant. This investigation included arranging the delivery of a firearm from the informant to Defendant Wojcik. The FBI discovered that the weapon's telescopic sight had been removed, and not inventoried by Wojcik or returned to the owner. The OPS investigators concluded there was no evidence of extortion, but did find Wojcik failed to properly inventory the recovered property and had made a "false report" about the incident.

d.   In response to a lawsuit filed against the City of Chicago, OPS investigated eight officers including Defendant Wojcik for their involvement in a wrongful conviction. The suit alleged that in October 1988, these officers forced a Chicago

citizen to sign a false confession following threats by Defendant Wojcik and others.

e.    In September 1989, a citizen filed a complaint with OPS alleging that Defendant Wojcik and others physically and verbally abused him. This included yelling "1 am going to break your fucking arm" and proceeding to twist his arm behind his back until his elbow fractured. It also included throwing him to the ground and kicking him.

f.    In November 1989, a citizen filed a complaint with OPS alleging that Defendant Wojcik had pointed a gun at him, struck his car with a squad car, threw him and another individual to the ground, kicked him and another individual in the face, and punched him and two others in the face.

g.    In March 1991, a citizen filed a complaint with OPS alleging that Defendant Wojcik had punched him in the face during his arrest and while he was being held in an interrogation room. The citizen required medical attention at a hospital. Defendant Wojcik admitted to OPS investigators that he struck the citizen in the face, but claimed he did so "to control him" after he became violent.

h.    In September 1991, Gilbert Renslow sued Defendant Wojcik and the City of Chicago, among others, alleging excessive force. The City settled the matter for $3000. *Renslow v. Chicago*, No. 91 C 5560 (N.D. 111. Jan. 14, 1992)

i.    Defendant Wojcik beat Roosevelt Myles in December 1992 and attempted to force him to falsely confess to a crime that he did not commit. Defendant Wojcik beat Roosevelt with a phone book and a flashlight while he was handcuffed to a

wall and "kept slapping [him] until [he] said [he] will sign a statement."
Defendant Wojcik likewise coerced witnesses into falsely identifying Roosevelt.

j.  On July 2,1994, a citizen filed a complaint with OPS reporting that Defendant
    Wojcik was verbally abusive and threatening during a traffic stop and proceeded
    to use his police car to push the complainant's car into a tree.

k.  In 1994, OPS sustained an allegation against Defendant Wojcik for forcing entry
    into an ex-girlfriend's home, striking the ex-girlfriend's then-boyfriend on the
    head and face, and recommended that he be suspended.

l.  In April 1995, Angel Rosado was arrested and handcuffed to a wall in an
    interrogation room. Defendant Wojcik and another individual asked him about
    homicide. When Angel said he did not know anything about it, the detectives "got
    physical" and "repeatedly smacked" Angel and choked him. The abuse "went on
    for hours." Because Angel was "fatigued and tired of being roughed up" by
    Defendant Wojcik, he "finally went along with [the police] and made a
    statement."

m.  In October 1998 a citizen filed a complaint with OPS reporting that Defendant
    Wojcik had struck an individual on the head with a shotgun during an arrest. The
    victim was treated at the hospital for a laceration to the head, which he told
    doctors was caused by being struck with the shotgun.

n.  In August 1999, a citizen filed a complaint with OPS reporting that Detective
    Guevara had grabbed his face and arms, placed him into a headlock, and elbowed
    him while attempting to force him into a lineup. An OPS investigator himself
    further reported that Detective Guevara had "failed to provide for the safety and

security of [redacted] who was injured in his custody, and failed to seek medical treatment for him[.]" During this same incident, Defendant Wojcik struck the victim in the face five to ten times.

o.  In March 2001, a citizen filed a complaint with OPS reporting that Defendant Wojcik slapped him multiple times on each side of the face, punched him in the stomach, kicked him when he fell to the floor, and grabbed him by the throat. Defendant Wojcik further refused to allow him to speak to an attorney.

p.  In August 2001, Defendant Wojcik arrested Miguel Skerrett, and questioned him about a crime that had occurred at a grocery store. Miguel denied knowledge of the crime and asked to speak to a lawyer, but no lawyer was ever summoned. Wojcik would then interrogate Miguel for a second time, where he struck Miguel, pushed him up against a wall, punched him in the stomach, and kick him in the back after he fell to the ground. At that point Miguel told Defendant Wojcik he would be willing to cooperate with him, so long as he would stop hitting him. Defendant Wojcik then told Miguel what to say, and Miguel provided a false confession.

q.   In August 2001, Phonakone Sangathit was arrested and beaten by two Chicago Police detectives. Defendant Wojcik later came into the room and told Phonakone if he cooperated with the investigation, he would make sure that the Detectives – Bella and Balodimas – would not hurt him or put his hands on him again. When Phonakone told Defendant Wojcik he knew nothing, that he was scared for his life, and that he wanted to call his lawyer, Defendant Wojcik told Phonakone to ""tell me the truth or I will get Bella and Balodimas back in here and they will

beat you until you tell the truth." When Phonakone insisted he knew nothing about the crime, Defendant Wojcik punched him several times in the chest and back of the head, grabbed him by the neck and choked him while slamming his head into a wall. As a result, Phonakone "blacked out." When he woke up, Defendant Wojcik was standing in front of him and said "I'll just say you admitted something to me so they won't have to come back in here and beat you to death."

r.     In March 2004, a citizen filed an OPS complaint reporting he was placed in an Area 5 interrogation room in and Defendant Wojcik held him by the arms while another detective held his legs and a third punched him 15 to 20 times in the ribs.

s.     In July 2005, Janet Yurus was arrested by Defendant Wojcik and others. Janet repeatedly asked for a lawyer, but was denied. While being transported back to the station, Janet was placed unbuckled in the back of a police van. During the drive, he was knocked out of her seat, and suffered a laceration on her face. At the station Defendant Wojcik repeatedly promised Janet she would be released if she told the police "what they wanted to hear." Wojcik "threatened to lock [her] up and charge [her] with murder" for the death of her son, an unrelated incident that had already been determined to be an accident. Defendant Wojcik also threatened to "lock up her daughter and call DCFS to have her grandchildren taken away."

t.     In December 2007, a citizen filed a complaint with OPS alleging that he was held for three days by Defendant Wojcik without charges before he was released.

u.     In 2012, Defendant Wojcik was accused of false imprisonment by the decedent of Steven M. Dick. Steven's special administrator alleged he was falsely charged by the Chicago Police on several misdemeanor counts, and was later granted a bond

for his release. The administrator then alleged Defendant Wojcik refused Steven's release, instead telling him that he would not be released unless he agreed to be admitted to a hospital for a mental condition. Finally, the administrator alleged that Defendant Wojcik drove Steven to the West Side Veterans Hospital, and sought to have him admitted as a psychiatric patient. The parties eventually settled the case. *See Ellwood v. City of Chicago*, 1:08-cv-04586 (N.D. Ill).

v.   Defendant Wojcik was also recently accused by Venus Rodriguez of covering up the physical assault of an off duty Chicago police officer. Venus was at a bar when the Defendant officer attacked her and a male companion. The investigation of the attack was assigned to Defendant Wojcik. However, instead of investigating the case, Venus alleges Wojcik actively deterred her from pursuing the internal investigation or any criminal charges against her attacker. The case is still ongoing. *See Rodriguez v. City of Chicago*, 1:17-cv-07248 (N.D. Ill).

107.   Many civilian complaints have also been filed against Defendants Bogucki, Schalk, and Noradin in connection with their actions as CPD officers.

108.   Defendants Bogucki and Schalk have twice been accused of police misconduct, with the first complaint accusing both of them of supervisory misconduct, and the second complaint co-accusing Defendants Bogucki, Schalk, Noradin, and Wojcik of conducting an illegal search of a civilian.

109.   Defendant Noradin has also been accused of police misconduct 11 times by civilian complainants.

110.   As set for above, the City of Chicago failed to meaningfully discipline its police officers, including Defendants Bogucki, Noradin, Schalk, and Wojcik, for their misconduct.

Defendants engaged in the misconduct set forth in this Complaint because they knew that the City of Chicago and its Police Department tolerated and condoned such conduct.

## Plaintiff's Wrongful Prosecution and Conviction

111.   Between 2002 and 2005, as a result of the Defendants' misconduct and based on the false evidence described in this Complaint, Fletcher was arrested, prosecuted, and convicted for murder.

112.   In the absence of Defendants' misconduct, Fletcher would never have been arrested, indicted, prosecuted, or convicted. At no point in time between 2002 and the present day has there been any credible evidence giving rise to probable cause to suspect Fletcher of Willie Sorrell's murder.

113.   The Defendants' fabrication of evidence was not disclosed to the state prosecutors who brought charges against Fletcher, Fletcher, or his criminal defense attorneys in advance of his criminal trial. In fact, Defendants suppressed all evidence that exonerated Fletcher.

114.   The Defendants used false police reports to cover up their misconduct. They provided those false reports to state prosecutors, and those reports became the basis for charging and prosecuting Fletcher.

115.   Defendants also destroyed evidence that would have exculpated Fletcher.

116.   Defendants also gave false statements to state prosecutors and Defendant Bogucki provided false testimony at Fletcher's criminal trial.

117.   No inculpatory evidence other than the evidence fabricated by Defendants was introduced at Fletcher's criminal trial.

118.   At all times, Defendants suppressed the true circumstances of their identification and lineup procedures. Upon information and belief, this included evidence that Rogers had

worked as a police informant for the CPD in prior criminal cases, and may have received a benefit for testifying for the police in the past. This information was significant and material, and would have shown that Rogers had a reason to name a false assailant.

119.    At all times, Defendant Wojcik was aware of Defendants' misconduct and their fabrication of a case against Plaintiff. As a supervisor, he nevertheless intentionally ignored the Defendants' misconduct and decided to make Plaintiff liable for a crime he did not commit, rather than directing the investigating officers to find the person who had actually committed the crime. In addition, Defendant Wojcik and the other supervisors of the Defendants explicitly authorized their investigative misconduct.

120.    In addition, upon information and belief, the Defendants suppressed and destroyed additional evidence still unknown to Plaintiff, which would also have shown Plaintiff's innocence.

121.    Plaintiff maintained his innocence throughout the proceedings.

122.    However, because of Defendants' false and manufactured evidence, Plaintiff was wrongfully convicted and sentenced to life in prison without parole.

**Plaintiff's Exoneration**

123.    Plaintiff fought hard to prove his innocence. He appealed, filed multiple petitions for state post-conviction relief, and filed a petition for a writ of habeas corpus.

124.    On October 25, 2019, Plaintiff's petition for a writ of habeas corpus was granted, and his conviction was set aside.  The Attorney General's Office did not appeal the decision.

125.    On January 30, 2020, the Cook County State's Attorney dropped all charges against Fletcher.

126.     At the time of his exoneration, Fletcher had been fighting the false charges against him over a decade.

**Fletcher's Damages**

127.     Fletcher spent 13 years of his life in prison for a crime he did not commit.

128.     After his conviction for the Sorrell murder, Fletcher was placed in a maximum security prison. His time in maximum security prison was defined by suffering and harsh conditions. For 13 years Fletcher was threatened and attacked by both guards and inmates, experienced physical injuries, and lived in constant fear of his life throughout his incarceration.

129.     Additionally, the emotional pain and suffering caused by the Defendants' misconduct has been, and continues to be, substantial.

130.     Because of the Defendants' misconduct, Fletcher was taken away from, and missed out on, the lives of his family and his friends. Fletcher was robbed of opportunities to gain an education, to engage in meaningful labor, to develop a career, and to pursue his interests and passions. Because of his wrongful incarceration, Fletcher was unable to spend time with his daughter and son. His mother passed away shortly after he was released, And he could not help care for his father, who has been suffering from Alzheimer's disease.

131.     Fletcher has been deprived of all the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

132.     Fletcher lived in constant emotional anguish, never knowing whether the truth would come out and whether he would ever be exonerated.

133.     In addition to the severe trauma of wrongful imprisonment and Fletcher's loss of liberty, the Defendants' misconduct continues to cause Plaintiff extreme physical and

psychological pain and suffering, humiliation, constant fear, nightmares, anxiety, depression, despair, rage, and other physical and psychological effects. Fletcher has also suffered profound and continuing reputational harm as a result of being labeled a murderer.

## COUNT I

### 42 U.S.C. § 1983 – Due Process
### (Fourteenth Amendment)

134.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

135.    As described in detail above, the Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial and his right not to be wrongfully convicted and imprisoned.

136.    In the manner described more fully above, Defendants fabricated police reports falsely implicating Plaintiff in the crime.

137.    Defendants obtained Plaintiff's conviction using this false evidence, and they failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff during his criminal case.

138.    Defendants also procured supposed eyewitness identifications implicating Plaintiff in the crime, by using unduly suggestive identification techniques during photo identifications and during live lineups. Defendants knew that these identifications were false and unreliable, but they caused them to be used during Plaintiff's criminal trial. These fabricated identifications caused Plaintiff's wrongful conviction.

139.    In addition, Defendants deliberately withheld exculpatory evidence from state prosecutors, Plaintiff, and Plaintiff's criminal defense attorneys, including evidence that an

eyewitness was shown a photo of Fletcher and did not identify him as the perpetrator, as well as evidence that Defendants had manufactured identifications, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

140.    In addition the Defendants concealed, fabricated, and destroyed additional evidence that is not yet known to Plaintiff.

141.    The Defendants' misconduct resulted in the unjust and wrongful criminal prosecution and conviction of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not have and would not have been pursued.

142.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

143.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above.

144.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

## Count II

### 42 U.S.C. § 1983 – Unlawful Detention
### (Fourth and Fourteenth Amendments)

145.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

146.    In the manner described above, the Defendants, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their

employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

147.    In so doing, these Defendants caused Plaintiff to be deprived of his liberty without probable cause and subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

148.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

149.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

150.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

## Count III

## 42 U.S.C. § 1983 – Failure to Intervene

151.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

152.    In the manner described above, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the duty and the opportunity to do so.

153.    As a result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress.

These Defendants had ample, reasonable opportunities as well as the duty to prevent this harm but failed to do so.

154.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

155.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

156.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

## Count IV

## 42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights

157.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

158.    In the manner described more fully above, the Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to fabricate evidence and to detain, prosecute, and convict Plaintiff for the Sorrell homicide, regardless of Plaintiff's guilt or innocence, and thereby to deprive him of his constitutional rights.

159.    In so doing, these co-conspirators agreed to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

160.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

161.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard for the truth and Plaintiff's clear innocence.

162.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

163.     The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

**Count V**

**42 U.S.C. § 1983 – Policy and Practice Claim against the City of Chicago**

164.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

165.     As described in detail above, the City of Chicago is liable for the violation of Plaintiff's constitutional rights because Plaintiff's injuries were caused by the policies, practices, and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago.

166.     At all times relevant to the events described in this Complaint and for a period of time prior and subsequent thereto, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: conducting photographic and live lineup procedures by officers and agents of the Chicago Police Department and City of Chicago; the conduct of interrogations and questioning of criminal suspects; the collection, documentation, preservation, testing, and disclosure of evidence; the writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and maintenance of investigative files and disclosure of those files in criminal proceedings. In addition or

alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department and the City of Chicago, with respect to these subjects.

167.     These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago, including the Defendants.

168.     In additional, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, such as Plaintiff, were routinely deprived of their right to due process. For instance, it was common that suspects were prosecuted based on fabricated evidence, including fabricated eyewitness identifications and eyewitness identifications obtained using manipulated photographic or live lineup procedures.

169.     Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which criminal suspects were denied due process, including but not limited to one or more of the following: (1) suspects were selected during identification procedures by eyewitnesses who had been instructed by police on which suspect to identify; (2) suspects were shown suggestive photo arrays; (3) suspects were shown suggestive live lineups; (4) identification procedures were not accurately documented; and (5) supervisors with knowledge of permissible and impermissible identification techniques did not properly supervise or discipline police officers and employees such that the fabricated and improper identifications continued unchecked.

170.     In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain or preserve evidence or destroyed evidence; and (5) officers pursued wrongful convictions through profoundly flawed investigations.

171.     These widespread practices, individually and together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

172.      The above widespread practices and customs, so well settled as to constitute de facto policies of the City of Chicago, were able to exist and thrive, individually and together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

173.     As a result of the policies and practices of the City of Chicago, numerous individuals have been wrongly convicted of crimes that they did not commit.

174.     In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed

against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

175.     Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## COUNT VI

## State Law – Malicious Prosecution

176.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

177.     In the manner described above, the Defendants, individually, jointly, and in conspiracy with one another, as well as within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

178.     In doing so, the Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

179.     The judicial proceedings were terminated in Plaintiff's favor and in a manner indicative of his innocence when his conviction was vacated and charges against him were dropped in December 2019.

180.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

181.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VII

### State Law – Intentional Infliction of Emotional Distress

182.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

183.    The actions, omissions, and conduct of the Defendants as set forth above were extreme and outrageous.  These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

184.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VIII

### State Law Claim – Willful and Wanton Conduct

185.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

186.    At all times relevant to this Complaint the Defendants had a duty to refrain from willful and wanton conduct in connection with the Sorrell murder investigation.

187.    Notwithstanding that duty, the Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Plaintiff's rights.

188.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT IX

### State Law Claim – Civil Conspiracy

189.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

190.    As described more fully in the preceding paragraphs, the Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

191.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

192.    The violations of Illinois law described in this complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

193.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

194.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT X

**State Law Claim – *Respondeat Superior***

195.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

196.    While committing the misconduct alleged in the preceding paragraphs, the Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

197.    Defendant City of Chicago is liable as principal for all torts committed by its agents.

## COUNT XI

### State Law Claim – Indemnification Pursuant to 745 ILCS 10/9-102

198.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

199.    Illinois statute (745 ILCS 10/9-102) provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

200.    The Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

201.    The City of Chicago is responsible to pay any judgment entered against the Defendants. Plaintiff therefore demands judgment against Defendant City of Chicago, in the amounts awarded to Plaintiff against the individual Defendants as damages, attorneys' fees, costs and interest.

***

WHEREFORE, Plaintiff JAMES FLETCHER, respectfully requests that this Court enters a judgement in his favor and against Defendants JEROME BOGUCKI, ANTHONY NORADIN,

RAYMOND SCHALK, ANTHONY WOJCIK, UNKNOWN CITY OF CHICAGO POLICE

OFFICERS, and the CITY OF CHICAGO, awarding compensatory damages, attorneys' fees,

and costs against each Defendant, and, because they acted willfully, wantonly, and/or

maliciously, punitive damages against each of the Individual Defendants, and any other relief

that this Court deems just and appropriate.

### JURY DEMAND

Plaintiff, JAMES FLETCHER, hereby demands a trial by jury pursuant to Federal Rules

of Civil Procedure 38(b) on all issues so triable.

**JAMES FLETCHER**

BY:     /s/ Mariah Garcia
        *One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Anand Swaminathan
Mariah Garcia
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
mariah@loevy.com

Jennifer Blagg
1333 W. Devon Ave., Suite 267
Chicago, Illinois 60660
(773) 859-0081
jennifer@blagglaw.net