1

```
 1                UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3   JAMES FLETCHER, JR.,              )
                                       )
 4              Plaintiff,             )
                                       )
 5      vs.                            )   No. 20 C 4768
                                       )
 6   JEROME BOGUCKI, et al.,           )   Chicago, Illinois
                                       )   September 28, 2022
 7              Defendants.            )   10:00 o'clock a.m.

 8                  TRANSCRIPT OF PROCEEDINGS -
 9                   Telephonic Motion Hearing
                BEFORE THE HONORABLE ANDREA R. WOOD
10

11   APPEARANCES (Telephonically):

12
     For the Plaintiff:       LOEVY & LOEVY
13                            BY:  MS. MARIAH E. GARCIA
                              311 North Aberdeen Street, 3rd Floor
14                            Chicago, Illinois  60607
                              (312) 243-5900
15

16   For the Individual      HALE LAW, L.L.C.
     Defendant Officers:      BY:  MS. JENNIFER BITOY
17                            53 West Jackson Boulevard, Suite 334
                              Chicago, Illinois  60604
18                            (312) 870-6952

19
     For Defendant           REITER BURNS, L.L.P.
20   City of Chicago:         BY:  MR. PAUL A. MICHALIK
                              311 South Wacker Drive, Suite 5200
21                            Chicago, Illinois  60606
                              (312) 982-0090
22

23

24

25
```

2

1      APPEARANCES (Continued):

2


3      For Respondent Cook Cty.   COOK COUNTY STATE'S ATTORNEY'S OFFICE
       State's Atty's Ofc.:       CONFLICTS COUNSEL UNIT
4                                 BY:  MR. MIGUEL E. LARIOS
                                  50 West Washington Street, Suite 2760
5                                 Chicago, Illinois  60602
                                  (312) 603-1427
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22
                        COLLEEN M. CONWAY, CSR, RMR, CRR
23                          Official Court Reporter
                      219 South Dearborn Street, Room 1918
24                         Chicago, Illinois  60604
                               (312) 435-5594
25                      *colleen_conway@ilnd.uscourts.gov*

1    (Proceedings heard telephonically:)

2        THE COURT:  Good morning.  This is Judge Wood joining

3    the line.  I believe we are ready to call the case, so my

4    courtroom deputy will do that, and then we'll get appearances

5    from counsel.

6        Laritza?

7        THE CLERK:  Calling case 20 CV 4768, Fletcher, Jr.

8    versus Bogucki, et al.; for status.

9        THE COURT:  Okay.  Do we have plaintiff's counsel?

10       MS. GARCIA:  Yes.  Mariah Garcia for the plaintiff.

11       THE COURT:  Okay.  And let's start with counsel for

12   the City.

13       MR. MICHALIK:  Good morning, Your Honor.  Paul

14   Michalik on behalf of Defendant City.

15       THE COURT:  Thank you.  And do we have counsel for

16   our individual defendants?

17       MS. BITOY:  Yes.  Good morning, Your Honor.  Jennifer

18   Bitoy on behalf of the individual defendants.

19       THE COURT:  Okay.  And then I imagine we may have

20   counsel for our subpoena respondent, the State's Attorney's

21   Office?

22       MR. LARIOS:  Yes.  Good morning, Your Honor.

23   Assistant State's Attorney Miguel Larios for the Cook County

24   State's Attorney's Office.

25       THE COURT:  Thank you.

1    Okay.  Let's actually start with the motion that's

2    been filed by the defendants to compel the Cook County State's

3    Attorney's Office to produce the Felony Review folder.

4    As I understand it, the plaintiff supports the

5    request.

6    Attorney Larios, what is your office's general

7    position with respect to the request?  Are you opposing

8    production?

9    MR. LARIOS:  Your Honor, we produced the file but

10   with redactions.  I think their issues were with our

11   redactions.  My concern was producing, you know,

12   personally-identifiable information.

13   THE COURT:  Is that the only thing that's redacting?

14   MR. LARIOS:  I believe so.

15   MS. BITOY:  Yes.  Your Honor --

16   THE COURT:  My impression from the motion to compel

17   was that the redactions were broader than that.  Perhaps --

18   MS. BITOY:  Yes.

19   THE COURT:  -- one of the other counsel can explain.

20   MS. BITOY:  Yes, Your Honor.  Jennifer Bitoy on

21   behalf of the individual defendants.

22   So there's several redactions that were made within

23   the Felony Review folder.  It's victim/witness names and

24   contact information, part of Mr. Fletcher's statement.  And

25   then notes of additional investigation requests and the State's

1    Attorney's Office reasons for continuing the investigation.

2    And then, finally, there are some undated notes by an

3    unspecified author that has been redacted as well.

4              And so we're seeking those redactions to be removed.

5              THE COURT:  And were there any bases provided for the

6    redactions, such as work product privilege or something else?

7              MS. BITOY:  Yes.  The State's Attorney's Office has

8    claimed that the information is protected by work product,

9    which we don't agree with.

10             THE COURT:  Did they provide a separate privilege

11   log?

12             MS. BITOY:  They did provide a privilege log.

13   However, it's a bit vague, and some of the redactions aren't

14   consistent.

15             And so we've sort of -- I know my co-counsel and

16   counsel for the State's Attorney's Office had multiple

17   meet-and-confers, and we've sort of reached an impasse in terms

18   of what the State's Attorney's Office will produce in terms of

19   unredacted -- the unredacted Felony Review folder.

20             THE COURT:  Is the privilege log attached to your

21   motion?

22             MS. BITOY:  It is, Your Honor.

23             THE COURT:  Okay.  Let's see.  Do you know which of

24   the exhibits is the log?

25             MS. BITOY:  I believe it's Exhibit 3.

1      THE COURT:  Yes, I see here.  Okay.

2      And so I see there's a little bit of process

3  privilege that's asserted as well as attorney work product.

4  And a couple of references to HIPAA.

5      Okay.  So what's the overall size of this file?

6      MR. LARIOS:  I believe it's around 30 pages.

7      THE COURT:  Okay.  So, Mr. Larios, my suggestion, if

8  you want to stand on the privilege assertion, would be for you

9  to file a written response to the motion.

10      Since I have the privilege log, and since the file is

11  relatively small, I am going to ask that it be provided to

12  chambers for *in camera* review.  That will be an *ex parte*

13  submission.

14      Since we're talking about claims of privilege, I am

15  not inclined, prior to making a ruling, to require any of that

16  be shared with the other parties.  However, I think that with

17  the privilege assertions, it will be easier for me to make a

18  determination more quickly if we actually have the file.

19      I mean, I also see that there are several items that

20  were withheld based on both work product and deliberative

21  process privilege, so I'd like to get a better sense.

22      Obviously, the deliberative process privilege has

23  different parameters from attorney work product, and the

24  requirements for substantiating the two privileges are a little

25  bit different.  So I think having the opportunity for *in camera*

1    review will make that a little bit easier for me.

2           How much time do you need in order to prepare a

3    written response to the motion that also would include

4    delivering to chambers for *in camera* review the file itself?

5    The unredacted file?

6           MR. LARIOS:  If I could have two weeks, Your Honor?

7           THE COURT:  Okay.  That would take us until October

8    12th.

9           And when you're ready to deliver the potentially

10   privileged materials to chambers, you can actually reach out to

11   my courtroom deputy about the best way to do that.

12          If it's easiest to just hand-deliver a paper copy, we

13   will accept it in that format.  But we also accept deliveries

14   to chambers through a Drop Box-type mechanism.  And Laritza can

15   assist you with that, if that would be your preference.

16          MR. LARIOS:  Okay.  Perfect.  Thank you, Your Honor.

17          THE COURT:  You know, I don't know that a reply is

18   going to be necessary.  I'll offer the opportunity for it.

19          You know, it's difficult, I understand, for the

20   moving party to reply when they don't have access to the actual

21   documents that are being withheld; but if the plaintiff or

22   defendants would like to reply once you've seen the response

23   brief, I'll give the parties an opportunity to do so by October

24   19th.

25          MS. BITOY:  Okay.  Thank you, Your Honor.

1  THE COURT:  Okay.  So that's the new motion.

2  I did want to circle back around to the pending

3  motion regarding the IDOC's subpoena and the audio recordings.

4  And I had a couple of questions for defense counsel

5  before I make a ruling.  Just a couple of things that I wasn't

6  completely certain of.

7  First of all, as I understand it, the current motion

8  is narrowed down to just six witnesses.

9  And let me start by saying that I do believe that the

10  plaintiff has standing to file the motion to quash.  And that

11  even though the privacy interests in recorded phone calls for

12  somebody, in particular, who's in custody and knows that the

13  calls may be listened to for, you know, the interests of the

14  institution, in order to advance, you know, safety or other

15  correctional purposes, among other things, there is still a

16  privacy interest there that's sufficient for standing to oppose

17  the motion.

18  And so I think that's pretty much been the consensus

19  of the courts in this district to consider the issue --

20  "consensus" may be a strong word, but certainly the majority

21  view, and is one that I share -- that I don't see any reason

22  that the plaintiff shouldn't be able to make this motion.

23  The other prefatory statement that I will make is

24  that, of course, just because information is produced in

25  discovery doesn't mean that it's actually going to be

1    admissible at trial, or something that's going to be usable in

2    connection with the litigation.  The standards for discovery

3    are obviously different than the standards for admissibility.

4            Keeping all of that in mind, I had a question for the

5    individual defendants about your desire to get the recorded

6    calls for Jimmy Fletcher, Sr., the plaintiff's father, because

7    it doesn't seem that Mr. Fletcher, Sr. was identified as a

8    potential witness.  Unlike Deborah Sanders who was identified

9    in the initial disclosures.

10           Why is it that the individual defendants have

11   included Jimmy Fletcher, Sr. on your list of people that you

12   think, you know, the recorded calls may be relevant here?

13           MS. BITOY:  So Jimmy Fletcher had testified at

14   plaintiff's criminal trial, and so that's the reason that we

15   had identified him as someone with potential information that

16   we would be seeking his audio-recorded phone calls.

17           THE COURT:  So did you ask for the recorded calls

18   or for everybody who was a witness at the criminal trial that

19   the call logs showed to have had phone calls with the

20   plaintiff?

21           MS. BITOY:  Not every single person, Your Honor.

22   Just someone who we -- you know, Mr. Fletcher's father, and

23   since he was listed.

24           You know, everyone who testified at Mr. Fletcher's

25   criminal trial did not also have phone calls with Mr. Fletcher

1    at IDOC.

2            But Mr. Fletcher, Sr. testified as a witness for the

3    defense in Mr. Fletcher's 2005 criminal trial and has also been

4    listed in the IDOC records as having phone calls with

5    Mr. Fletcher.

6            That's the reason that we identified him as having

7    potential relevant information for purposes of our IDOC motion,

8    since, you know, Mr. Fletcher was --

9            THE COURT:  But Mr. Fletcher, Sr. was not identified

10   in the plaintiff's disclosures as a potential witness.

11           MS. BITOY:  Oh.  Correct.

12           THE COURT:  And what was this -- at a very high

13   level, the substance of his testimony at trial?

14           It indicates that, like the ex-wife, he testified

15   about the plaintiff's appearance at the time of the crime?

16           MS. BITOY:  Correct, Your Honor.

17           THE COURT:  Was he an alibi witness?

18           MS. BITOY:  No.  He wasn't as much of an alibi -- no,

19   he was not an alibi witness.

20           THE COURT:  Did he have any contact with the

21   individual defendants or any of the other investigating

22   officers?

23           MS. BITOY:  No, no.  Not to my knowledge.

24           THE COURT:  And no actual knowledge of the events

25   surrounding the murder?

1    MS. BITOY:  No.  No, that's not why he was called to

2    testify in the criminal trial.

3         You know, and we haven't deposed him or anything, so

4    I don't know the full scope of his knowledge related to the

5    case.

6         But, you know, that's not what he testified to in the

7    underlying trial.

8         THE COURT:  I see.  And Deborah Sanders, on the other

9    hand, was an alibi witness at trial; is that correct?

10        MS. BITOY:  Correct, Your Honor.

11        THE COURT:  And so how was it that she attempted to

12   provide an alibi --

13        MS. BITOY:  That she was --

14        THE COURT:  -- for the plaintiff?

15        MS. BITOY:  -- with the plaintiff, and so she had

16   knowledge of where he was at the time, and so essentially

17   stated that they were together.

18        THE COURT:  So the most direct kind of alibi

19   testimony that you can provide, "He was with me, so he didn't

20   do it."  Okay.  I got it.

21        So it seems to me that Mr. Fletcher, Sr. and Ms.

22   Sanders are differently situated in that Ms. Sanders actually

23   testified to have direct knowledge of whether or not

24   Mr. Fletcher actually committed the offense.

25        And unlike Mr. Fletcher, she's actually identified as

1    a witness in the plaintiff's disclosures.

2           And somewhat unlike Mr. Fletcher, probably

3    Mr. Fletcher would have presumably a much greater likelihood to

4    have things to talk about with the younger Fletcher while he

5    was in custody, other than this case.

6           It's father-son, so I would imagine you would expect

7    regular familial-type communications, offering support, updates

8    on what's going on with family, friends, other people that they

9    may know.  Probably some discussion about what's going on in

10   the underlying criminal case.

11          But it seems to me that for Jimmy Fletcher, Sr., any

12   idea that they would be talking about things relevant to this

13   current civil case is pretty speculative.  It doesn't seem like

14   there's any, you know, report that Mr. Fletcher, Sr. was

15   involved in some way in gathering affidavits, for example, to

16   contrast him with some of the other witnesses.

17          Am I missing something with respect to the relevance

18   of Mr. Fletcher and the sort of relative likelihood that he

19   would be speaking with his son about life in general as opposed

20   to matters related to his wrongful conviction?

21          MS. BITOY:  No.  I think you've covered everything,

22   Your Honor.

23          You know, you know, our position is what I just said.

24   It's -- you know, he testified at Mr. Fletcher's -- his son's

25   underlying criminal trial.  Testified to his appearance and

1    things of that nature.  And as he was a witness in the criminal

2    trial, he would have knowledge of what was going on at the

3    time, him speaking to Mr. Fletcher regarding his criminal case,

4    and things of that matter and of that nature.

5              And so, you know, it's just our position that that

6    would be relevant.  And, you know, those phone calls may

7    contain relevant information for our case.

8              THE COURT:  And what's the volume of calls between

9    the plaintiff and his father?

10             MS. BITOY:  You know, I will have to check on the

11   exact number of phone calls.  I'm sorry, I don't have the exact

12   number in front of me.  I don't think it's very voluminous.

13             THE COURT:  Okay.  Let me ask plaintiff's counsel.  I

14   think Ms. Garcia is on the line for that.

15             MS. GARCIA:  Yes.

16             THE COURT:  First of all, am I correct that you have

17   not identified the elder Mr. Fletcher as a potential witness in

18   this case?  And at this point, you have no plans to do so?

19             MS. GARCIA:  We have not.  And we may introduce him

20   as a damages witness.

21             But, unfortunately, Mr. Fletcher, Sr.'s health is

22   pretty bad, so we're uncertain if he could actually sit for a

23   deposition in this matter, or give testimony.

24             So if he's able to, we may call -- we may list him

25   and call him just for the purpose of damages, but not for, as

1    you've been talking about, the facts of the case or alibis.

2         THE COURT:  Okay.  So for -- I am glad you raised the

3    issue of damages.

4         So Dawon Gardner, or Dawon Gardner -- I'm not sure

5    how the name is pronounced -- was listed as a damages witness

6    by the plaintiff.  And then you just mentioned Mr. Fletcher,

7    Sr. as a potential damages witness.

8         What do you mean when you say "damages"?  Is this a

9    situation where they're just going to potentially testify about

10   just the emotional distress or the current --

11        MS. GARCIA:  Yeah.

12        THE COURT:  How Mr. Fletcher is today versus how he

13   was 20 years ago as a person?

14        MS. GARCIA:  Precisely.  In this -- you know, we had

15   a deposition of Mr. Fletcher's current fiancee, who also was a

16   friend of his prior to his incarceration in this matter.  And

17   as with, potentially, Mr. Fletcher, Sr., we would want to ask

18   him about -- you know, how the impact of getting a life

19   sentence for something that he didn't do impacted him, how he

20   changed over the years, how his demeanor was like when he was

21   incarcerated, what his demeanor was like when he was -- you

22   know, his conviction was vacated.

23        So we would specifically be looking at both his

24   emotional and mental health during that time period and after.

25        THE COURT:  Okay.  So given that the plaintiff would

1    be identifying these folks as witnesses, isn't that a way that

2    this case is distinguished from some of the cases that you

3    cited in your briefs where the defendants were just seeking all

4    of the recorded records; or if they named individuals, it was

5    based on the defendants' own speculation as to what the theory

6    might be?  Whereas here, these are people, at least with

7    respect to Dawon Gardner and now, sort of, Jimmy Fletcher, Sr.,

8    that the plaintiff himself is actually identifying as somebody

9    who might be relevant?

10            MS. GARCIA:  So forgive me, Your Honor.  I haven't

11   had a chance to review the cases that we cited in our brief --

12            THE COURT:  Yeah.

13            MS. GARCIA:  -- recently.  But I think that it's -- I

14   think we cite a few cases that specifically go towards this

15   particular situation, one in which -- I think it was *Simon*, I

16   believe.  Let me see if I can find the actual --

17            THE COURT:  Uh-huh.

18            MS. GARCIA:  -- case heading.  So it was a 2017 case

19   in front of the Northern District.  And similarly, the

20   defendants had asked for just a slew of conversations over a

21   significant period on the basis that these were family members

22   who may have had some sort of information, whether it was, you

23   know, material about the incarceration or material about the

24   investigation, and this court found that that was not relevant

25   in that it was not only burdensome, but seeking privileged

16

1    information that didn't have direct bearing on the case.

2            So though I can review and answer this more fully, if

3    Your Honor would like, I don't think -- I think our case law is

4    on point here, and other courts in this district have found, in

5    similar situations, that the phone calls were not relevant to

6    litigation.

7            THE COURT:  Okay.  No, I don't think I need any

8    further research or submission on point.  Certainly, I'd want

9    to, to the best I can, give the parties some direction today on

10   the motion so that you can proceed in getting what needs to be

11   gotten from the IDOC.

12           So let me start --

13           MR. MICHALIK:  Your Honor, this is Paul --

14           THE COURT:  -- with -- yes?  I'm sorry.  Who is this?

15           MR. MICHALIK:  This is Paul Michalik on behalf of the

16   City.

17           I just wanted to respond to a point that Your Honor

18   was asking about with respect to the damages witnesses.

19           And one of the things that Ms. Garcia said is that

20   these witnesses would be testifying about the plaintiff's

21   demeanor when he was incarcerated versus, you know, afterward.

22           And to the extent that we could depose the damages

23   witnesses, you know, it would certainly be based on their

24   recollection, but what we would have if we had the phone call

25   records, we would have the plaintiff's very own words at the

1   time regarding what he was thinking, what his demeanor was.

2          It would really be the best evidence of that.  And I

3   think that's why it's important for the damages witnesses in

4   terms of, you know, getting those particular phone calls.

5          That's all I wanted to say.  Thank you.

6          THE COURT:  Okay.  And I assume, since the IDOC knows

7   about all of this, and they produced the call logs, that they

8   are maintaining all of the calls so that to the extent the

9   recordings would be disposed of in the ordinary course, that

10  that's not happening for Mr. Fletcher's calls.

11         Is that fair to say?

12         MS. BITOY:  That's fair to say, Your Honor.

13         As far as we know, they -- the IDOC is in possession

14  of these calls.  They just haven't produced them given the

15  litigation that's been going on right now related to that.

16         But yes.

17         THE COURT:  Okay.  So here's how I'd like the parties

18  to proceed.

19         So Dawon Gardner, who is the plaintiff's child, and

20  Jimmy Fletcher, Sr., who is the plaintiff's father, do not

21  appear to have any personal knowledge related to the crime that

22  spurred the original conviction or any misconduct by the

23  defendants.  They also don't appear to have been involved in

24  any alleged misconduct on the plaintiff's part in trying to

25  influence witnesses in order to get affidavits to support the

1    position post-conviction.  It would seem that the only real

2    relevance would be on this issue of damages.

3         It also would seem that both of these defendants are

4    available -- or both of these witnesses, I should say, are

5    available to be deposed so that counsel can get, you know, some

6    idea of exactly what they might say with respect to damages.

7         If their position on damages is simply that the

8    plaintiff was, for example, sad and despondent and frustrated

9    when he was in custody, and then when he was released, he, you

10   know, felt relief or he suffered PTSD, or whatever it might be,

11   I don't know that those are the sorts of damages testimony that

12   require, you know, getting into all of the phone conversations

13   between an individual and their child or their father,

14   especially in this case where one would expect that there would

15   be lots of completely innocuous and perfectly fine reasons that

16   someone would have conversations with their child or their

17   parent while they're in custody.

18        So with respect to those two of the six, Dawon

19   Gardner and Jimmy Fletcher, Sr., my ruling is going to be that

20   the current subpoena -- or that the IDOC will not be required

21   to produce that information for those calls.

22        But after those witnesses are deposed, once the

23   defendants have a more solid basis to know what sort of

24   testimony they might be offering, I would be open to revisiting

25   that decision.  Because I think at this point, even though

1  they're potentially named as witnesses, it's just with respect

2  to the issue of damages without any specific factual, personal

3  knowledge that is likely to be illuminated by going through the

4  phone calls.

5       And I do think that while the privacy interests here

6  is less than it would be for somebody who was not on a recorded

7  line in a custodial setting, and that the privacy interest is,

8  you know, not really directly related, but only indirectly

9  related to the relevance and burden issues that govern the Rule

10 45 analysis, I do think it's worth taking into account here.

11      And I think the fact that there's this familial

12 relationship and nothing really specific related to how this

13 testimony is going to advance the fact-finding inquiry in this

14 case speaks to just whether going through those calls is really

15 proportional to the needs of this case.

16      So at this point, I am not -- I am going to order

17 that the subpoena to the IDOC not include the calls for those

18 two individuals.  However, defendants may request them -- and

19 so without prejudice to them being requested -- if, after the

20 depositions, it becomes clear that there is something specific

21 there that you'd be looking for.

22      Now, the other witnesses are a little different in my

23 view.

24      Deborah Sanders, as I've mentioned, was identified as

25 a witness in the disclosures from the plaintiff.  She was

1 somebody who purported to have firsthand knowledge of whether
2 or not the plaintiff actually committed a crime at the time.
3 So she's a little different. She did testify to that effect at
4 the trial. So she strikes me as different in that there is a
5 specific, particularized reason to want to seek her calls with
6 the plaintiff.

7 Similarly, with respect to Natasha Reeves, Jennifer
8 Blagg, and Yvette Loggins, each of those individuals has been
9 identified as potentially involved in applying pressure to
10 witnesses to get them to provide testimony or affidavits in
11 support of post-conviction or habeas relief, and I think that
12 actually goes very squarely to the circumstances that are at
13 issue in this case. On the one hand, we have the individual
14 defendants who are accused of wrongdoing in trying to secure
15 testimony; and then there's a suggestion that there was also
16 pressure from the other side involving, particularly in the
17 case of Ms. Friend, the same witness in that example.

18 So it seems to me that the defendants have provided
19 specific reasons with respect to those witnesses.

20 In the case of Ms. Sanders, she's actually identified
21 as having knowledge by the plaintiff.

22 But with respect to the other three, including Ms.
23 Reeves, as I understand it, the investigator who had spoken to
24 some of these witnesses, has provided some basis to think that
25 they may have been involved in trying to, you know, pay

1    witnesses not to testify, is one allegation, or pressure them

2    in order to provide an affidavit, et cetera.

3         Ms. Reeves is also identified as a damages witness.

4    So if she were completely similarly situated to Dawon Gardner,

5    my ruling would be the same as it was with respect to Dawon

6    Gardner.  But Natasha Reeves has this additional issue of

7    having been identified as likely a person who allegedly told a

8    witness not to come to court to testify, and I believe also was

9    involved in trying to apply pressure to obtain post-conviction

10   testimony.

11        Now, Attorney Jennifer Blagg.  She is, of course, a

12   bit differently situated than the other three witnesses that

13   fall into this category of potentially using coercive means in

14   order to obtain affidavits for use by the plaintiff in his

15   post-conviction proceeding.

16        And I appreciate the parties' points on both sides

17   about whether or not her communications with the plaintiff were

18   necessarily privileged or not privileged.

19        I believe, in general, that is a difficult argument

20   for the parties on either side to make blindly without having

21   access to the particular communications.

22        Just because an attorney is speaking to a client

23   doesn't mean that the communication is privileged.  Even if

24   they are speaking about something that might be related to

25   representation, that doesn't mean that's necessarily

1    privileged.

2           And there is also a separate factual issue, I think,

3    here about whether or not the plaintiff actually made requests

4    for attorney-client calls consistent with the procedures that

5    have been submitted by the defendants as a supplement to their

6    motion.

7           What I would normally do in a civil case, where a

8    third party has potentially privileged information and has been

9    subpoenaed, is to have the third party provide the subpoenaed

10   information to the party that holds the privilege before

11   producing it to the other side, so that the party that holds

12   the privilege can make an informed decision about whether or

13   not to assert the privilege over those, in this case, calls,

14   but information, more generally.

15          In other words, it's entirely possible that upon

16   listening to some of the recordings, plaintiff's counsel may

17   determine that it actually doesn't have privileged information,

18   meaning it might not have communications for the purpose of

19   obtaining advice on the part of Mr. Fletcher, or it might be

20   something that really is completely irrelevant.  Or, upon

21   matching up calls with dates, there might actually be a basis

22   to claim that Mr. Fletcher made a request for an attorney call,

23   but for whatever reason, it wasn't available to him.

24          Right now, the parties are arguing those points in

25   the abstract.

1    So I am inclined, with respect to the recordings

2  between Mr. Fletcher and Ms. Blagg, to follow a similar

3  procedure that I would in other cases under other

4  circumstances, which is to have the potentially privileged

5  recordings produced to plaintiff's counsel so that they have an

6  opportunity expeditiously to review those recordings and to

7  make an informed assertion of the privilege rather than arguing

8  in the abstract on a blanket basis that they're privileged or

9  they're not privileged.

10    Again, the relevance and the reason to even go into

11  this review of calls is, I think, based on the allegation

12  that's been made -- and, as I understand it, is based on some

13  information that the investigator has come up with --

14  suggesting that Mr. Fletcher's counsel or attorneys may have

15  pressured witnesses to make certain statements, in affidavits

16  or otherwise, in support of the post-conviction proceedings.

17    So I am not suggesting that in every circumstance,

18  somebody's communications with the counsel would be produced in

19  response to the subpoena for recordings, but I think here this

20  is a situation where there is a specific reason that the

21  defendants have for wanting to have access to the recordings

22  between the plaintiff and his counsel at the time, Ms. Blagg.

23    So the order will direct that the subpoena may

24  proceed and that compliance would be ordered subject to the

25  calls identified as being between Mr. Fletcher and Ms. Blagg

1    being produced, in the first instance, to plaintiff's counsel.

2           As the order of the privilege, plaintiff would then

3    have the opportunity to make an informed assertion, if it's

4    appropriate to do so, prior to them being produced.

5           I am going to stop there because I don't know the

6    volume of those calls, and I don't know if there's any

7    logistical or other reason why that's not a feasible way to

8    approach it.  So I'll stop and see if plaintiff's counsel wants

9    to raise any particular reason why that's unworkable.

10          MS. GARCIA:  No, Your Honor.  That's fine.

11          THE COURT:  Okay.  Any concern from defense counsel

12   as to why that would be unworkable for the attorney calls to be

13   provided?

14          I assume from the call logs, and from the information

15   that's provided in the briefing, that you already know, pretty

16   much, which ones are the calls between Fletcher and Ms. Blagg.

17          MS. BITOY:  That's correct, Your Honor.  And we have

18   no, you know, problem with that procedure as well.

19          THE COURT:  Okay.  So yes.  And so if, upon

20   listening, you know, plaintiff's counsel wants to, again, as I

21   said, make an informed privilege argument based on what's

22   actually in these communications, I think that's a different

23   issue.

24          Frankly, I would also be amenable at that point to

25   aversion of a relevance argument with respect to the

1    attorney-client communications.  I just think they're

2    differently situated than the other calls.

3            And even the risk that these might be privileged

4    warrants some additional protections before they're produced,

5    even responsive to a third-party subpoena, and even in a

6    circumstance like this where there has been a claim made that

7    counsel was doing more than perhaps just making the right legal

8    arguments and doing ordinary investigation in connection with

9    securing the plaintiff's release.

10           So that's what I will memorialize in an order with

11   respect to the six.

12           I will say that I am glad that the defendants limited

13   the request just to six people that they could somewhat

14   articulate a reason for seeking the recordings of rather than

15   making a blanket request.

16           I know, initially, it was a blanket request.  It was

17   winnowed down through the meet-and-confer process.  I think

18   that is the correct approach.  I would not have allowed the

19   subpoena to stand just to get all of the recordings because I

20   do think that would be quite disproportionate to the needs of

21   the case.

22           And so I appreciate the fact that defense counsel did

23   seek to limit it to six people that they could articulate a

24   reason for seeking the calls for.

25           Okay.  So that will be how that motion will be

1    addressed.

2          Now, the parties have more time left in discovery,

3    though not a lot.  Your fact discovery deadline is currently

4    November 30th.

5          Have the individual defendants spoken to the IDOC to

6    have a sense of when and how soon they'd be able to produce

7    information responsive to the subpoena?

8          MS. BITOY:  We have not had a specific conversation

9    with the IDOC related to that, Your Honor.  We have received

10   phone calls in other cases from the IDOC and generally were

11   able to get it in a fairly expeditious manner.

12         So we're not really concerned that it would take, you

13   know, a very long time once we're able to subpoena those calls.

14         THE COURT:  Okay.  So here's what I am going to do,

15   is I am going to ask for a status report from the parties.

16   Well, you know, I have a briefing schedule on this other motion

17   that's been set now.

18         Since I do have a briefing schedule on the other

19   motion, I think what I'd like to do is just go ahead and set a

20   further status hearing, in case I require any argument on the

21   motion directed towards the State's Attorney's Office as well.

22         So let's see if we can set a status for sometime

23   around the 1st of November, either the first week of November

24   or that following week.

25         Laritza, if you could take a look at -- and maybe the

1  week of Halloween.  And let's see if we can find a status time.

2          And this is time that could also be used for argument

3  related to the new motion, if necessary.  So let's give them a

4  time slot that's either a little bit bigger or at the end of

5  the call.

6          THE CLERK:  Sure, Judge.  We can do November 3rd at

7  11:00.

8          MS. GARCIA:  That works for plaintiff as well.

9          MS. BITOY:  That works for the officers, Your Honor.

10          MR. MICHALIK:  Okay with the City as well.  Thank

11  you.

12          THE COURT:  Okay.  Mr. Larios, are you still there?

13  And would you be available if I required argument on the motion

14  directed towards the State's Attorney's Office?

15          MR. LARIOS:  Yes, Your Honor.

16          THE COURT:  Very good.  Okay.  So that will be our

17  plan going forward.

18          Thank you for your time this morning, counsel.

19          MS. BITOY:  Thank you, Your Honor.

20          MS. GARCIA:  Thank you, Your Honor.

21          MR. LARIOS:  Thank you.

22          MR. MICHALIK:  Thank you, Your Honor.

23      (Proceedings concluded.)

24

25

1    C E R T I F I C A T E

2

3

4

5            I, Colleen M. Conway, do hereby certify that the

6    foregoing is a complete, true, and accurate transcript of the

7    Telephonic Motion Hearing proceedings had in the above-entitled

8    case before the HONORABLE ANDREA R. WOOD, one of the Judges of

9    said Court, at Chicago, Illinois, on September 28, 2022.

10

11

12        /s/ Colleen M. Conway, CSR, RMR, CRR        12/01/2023

13            Official Court Reporter                     Date
             United States District Court
14           Northern District of Illinois
                  Eastern Division

15

16

17

18

19

20

21

22

23

24

25

Colleen M. Conway, Official Court Reporter