<pre>
 1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   JAMES FLETCHER JR.,                 )
                                         )
 4              Plaintiff,               )
                                         )
 5         vs.                           ) No. 20 CV 4768
                                         )
 6   JEROME BOGUCKI, ANTHONY NORADIN,    ) Chicago, Illinois
     RAYMOND SCHALK, ANTHONY WOJCIK,     )
 7   UNKNOWN CITY OF CHICAGO POLICE      ) January 24, 2024
     OFFICERS, and the CITY OF           )
 8   CHICAGO,                            ) 10:00 a.m.
                                         )
 9              Defendants.              )

10

          TRANSCRIPT OF PROCEEDINGS - TELEPHONIC STATUS HEARING
11
               BEFORE THE HONORABLE ANDREA R. WOOD
12
     APPEARANCES:
13
     For the Plaintiff:     LOEVY & LOEVY
14                          BY:  MR. SEAN STARR
                            311 North Aberdeen Street, 3rd Floor
15                          Chicago, Illinois  60607
                            (312) 243-5900
16                          sean@loevy.com

17   For the Defendants
     Jerome Bogucki,
18   Anthony Noradin,
     Raymond Schalk, and
19   Anthony Wojcik:        HALE LAW LLC
                            BY:  MR. BRIAN J. STEFANICH
20                          53 West Jackson Boulevard, Suite 330
                            Chicago, Illinois 60604
21                          (312) 341-9646
                            bstefanich@halemonico.com
22
     For Defendant
23   City of Chicago:       REITER BURNS LLP
                            BY:  MR. PAUL A. MICHALIK
24                          311 South Wacker Drive, Suite 5200
                            Chicago, Illinois 60606
25                          (312) 982-0090
                            pmichalik@reiterburns.com
</pre>

```
 1   APPEARANCES:   (Continued)

 2   Respondent Cook County
     State's Attorney's
 3   Office:                   COOK COUNTY STATE'S ATTORNEY
                               BY:  MR. MIGUEL E. LARIOS
 4                                  MR. PAUL L. FANGMAN
                               50 West Washington Street
 5                             Suite 2760
                               Chicago, Illinois 60602
 6                             (312) 603-1427
                               miguel.larios@cookcountysao.org
 7                             paul.fangman@cookcountyil.gov

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22
     Court Reporter:          Brenda S. Varney, CSR, RMR, CRR
23                            Official Court Reporter
                              219 South Dearborn Street, Suite 2144D
24                            Chicago, Illinois 60604
                              (312) 554-8931
25                            brenda_varney@ilnd.uscourts.gov
```

1        (Proceedings heard via telephone:)

2            THE CLERK:  Calling the next case, 20 CV 4768,

3    Fletcher, Junior versus Bogucki, et al., for status.

4            MR. STEFANICH:  Good morning, Your Honor.

5            Brian Stefanich for the individual defendants.

6            THE COURT:  Do we have plaintiff's counsel?

7            MR. STARR:  Yes, Your Honor.  Sean Starr on behalf of

8    plaintiff's counsel.

9            THE COURT:  Thank you.

10           MR. MICHALIK:  And Paul Michalik on behalf of

11   defendant City of Chicago.

12           THE COURT:  Thank you.

13           And I believe the pending motions implicate the

14   interests or at least the involvement of the Cook County

15   State's Attorney's Office as well as the IDOC.  I just want to

16   make sure that if we have somebody on the line for those

17   entities that they make an appearance as well.

18           MR. LARIOS:  Good morning, Your Honor.

19           Assistant State's Attorney Miguel Larios on behalf of

20   the Cook County State's Attorney's Office.

21           THE COURT:  Thank you.

22           And then I take it we do not have anybody

23   representing the IDOC with respect to the subpoena.

24           There's a motion by the plaintiff to quash a subpoena

25   or for a protective order with respect to a subpoena for a

1    third party's recorded calls that's been fully briefed.

2           I assume that we don't have anybody other than

3    plaintiff's counsel and defense counsel who are present for

4    purposes of that motion.  Is that fair to say?

5           MR. STARR:  Yeah, that's plaintiff's impression as

6    well.

7           THE COURT:  And, to be clear, the third party whose

8    calls are being sought is Mr. Woodland.

9           Do the parties have any reason to believe that

10   Mr. Woodland or anybody acting on his behalf was hoping to

11   participate in the hearing today?

12          MR. STARR:  This is plaintiff's counsel, Sean Starr,

13   Your Honor.

14          We had previously spoken to Mr. Woodland and informed

15   him that the subpoena had been tendered to IDOC and the calls

16   had been erroneously produced, and he indicated that he

17   objected.

18          We asked if he had counsel, and he said he did not

19   have counsel.  He suggested that he was going to write a

20   letter to the Court, but that is the extent of the

21   communication we had with him.

22          THE COURT:  And he is still in custody; is that

23   correct?

24          MR. STARR:  That is correct.

25          THE COURT:  At which facility is he currently housed,

1    if you know?

2            MR. STARR:  It's Illinois River, Your Honor.

3            Sorry.  It took me a moment.

4            THE COURT:  That's fine.

5            So I did not see any letter or other submission from

6    Mr. Woodland on the docket.  I suppose it's possible that he

7    might have attempted to send something to counsel in the case.

8            From your statements just a moment ago, I take it

9    that plaintiff's counsel, Mr. Starr, you and your colleagues,

10   have not received any submission from Mr. Woodland in an

11   effort to get it to me on this motion?

12           MR. STARR:  We have not, Your Honor.

13           THE COURT:  And then what about the individual

14   defendants' counsel?  Have you received anything, perhaps a

15   letter either objecting to the production, or something

16   directed towards me?

17           MR. STEFANICH:  No, Your Honor.

18           THE COURT:  Okay.  Well, I don't have anything.  I

19   suppose, with the pace at which mail sometimes moves, it's

20   conceivable that something is in transit, but with the

21   briefing of this matter being completed on the 11th of this

22   month, I have to assume that if Mr. Woodland desired to send

23   something in that I would have it by this time.

24           Okay.  Let me address some issues with respect to the

25   state's attorney's office, and then I have a couple of

1    questions with respect to the subpoena for Mr. Woodland's

2    documents, and, hopefully, we can get those matters resolved.

3          First and foremost, just to confirm, the unredacted

4    felony review folder was produced to the parties from the

5    state's attorney's office; is that correct?

6          MR. LARIOS:  Yes, Your Honor.

7          This is State's Attorney Miguel Larios.

8          MR. STEFANICH:  That's correct, Judge.

9          THE COURT:  And so, in those materials, do those

10   materials address or otherwise confirm the extent of the

11   involvement of the two ASAs that the individual defendants are

12   seeking to depose?

13         And I suppose that's a question directed towards

14   defense counsel.

15         MR. STEFANICH:  Sure, Judge.

16         So the felony review folder was drafted by a

17   different ASA, ASA Jennifer Walker.  The two ASAs that we're

18   seeking to depose that are the subject of this motion are ASA

19   Giancola and ASA Bowden.

20         So we received in discovery a document from the

21   state's attorney's office that ASA Giancola drafted that was a

22   memo to her supervisors after Mr. Fletcher's case was sent

23   back to state court after it was granted habeas relief.  And

24   that memo is partially redacted with her recommendation on

25   whether to retry Mr. Fletcher or dismiss the charges.

1    Obviously, the charges were ultimately dismissed.  So that's

2    ASA Giancola.

3         ASA Bowden is the state's attorney who represented

4    the state in Mr. Fletcher's Certificate of Innocence

5    proceeding, so all we have really on ASA Bowden is her

6    appearance at that hearing and some emails between her and

7    plaintiff's counsel essentially scheduling the hearing.

8         At the Certificate of Innocence hearing, ASA Bowden,

9    representing the state, took no position on Mr. Fletcher's

10   petition for a Certificate of Innocence.  So, for that

11   deposition, we don't know if she was the ultimate

12   decision-maker for the state's position, but she's the only

13   person from the record that we know was at least involved.

14        THE COURT:  And do you have any reason to think that

15   either two of the individuals you're seeking to depose were

16   personally involved in interviewing any witnesses or otherwise

17   involved in fact gathering in support of either the decision

18   whether to retry Mr. Fletcher or the decision on whether to

19   oppose his petition for a Certificate of Innocence?

20        MR. STEFANICH:  So I know that my clients, the

21   detectives, were never interviewed when those decisions were

22   being made.  So that's what I know.

23        I guess I have some assumptions on how the state's

24   attorney's office generally conducts reviews for Certificates

25   of Innocence, but I don't know that for sure.  Those are just,

1    I guess, my assumptions.

2           THE COURT:  And where I'm heading with that question

3    is that it seems to me that any opinions or views held by

4    these two individuals on whether Mr. Fletcher is actually

5    innocent is really irrelevant and that the only thing that

6    would be relevant here is if they have actual facts in their

7    possession or are aware of facts that show that he was

8    actually innocent or that somebody else committed the offense

9    or that, presumably, any information that they relied upon to

10   support their decision has been produced in one format or

11   another.

12          So what I'm focusing on is the distinction here

13   between factual information gathered over the course of either

14   the original investigation or in connection with the decision

15   whether to retry him or oppose the Certificate of Innocence as

16   opposed to just an opinion that they may have on whether he

17   actually did it or didn't do it.

18          Do you believe that there is factual information that

19   was gathered in connection with either preconviction or post

20   conviction activities by the state's attorney's office that

21   you would obtain through these two depositions?

22          MR. STEFANICH:  I would say factual information,

23   Judge, yes, but I would also qualify that as factual

24   information, to me, includes what wasn't done.

25          So, for example, in the Certificate of Innocence

1    proceeding, if the state's attorney's office didn't interview

2    a single witness, didn't review the record, didn't interview

3    the victims, didn't gather information from the Conviction

4    Integrity Unit of the state's attorney's office which did

5    interview the victims, I think that would be relevant.

6                THE COURT:  Why?

7                I have a hard time seeing why that's relevant.

8                MR. STEFANICH:  Sure.  Because we are going to have

9    to explain why the Certificate of Innocence was entered, why

10   Mr. Fletcher has this Certificate of Innocence.

11               THE COURT:  But that wasn't the decision of the

12   state's attorney's office; that was the decision of the judge.

13               MR. STEFANICH:  Sure, but the state's attorney's

14   office didn't object.  They took no position.  So, generally,

15   when the state's attorney's office takes no position, it's

16   essentially a proforma order that the judge enters.  There's

17   no adversary proceeding.

18               THE COURT:  Okay.  Let me hear from Mr. Larios.  And,

19   first of all, the papers are a bit vague as to what these to

20   ASAs actually know about the case.  And I think, in the

21   response brief, there's a suggestion that they -- at that time

22   that that was filed -- I know that was back in maybe the fall

23   when the reply was filed -- there was a suggestion that the

24   two ASAs had not been interviewed by counsel in connection

25   with this briefing to know the full extent of their knowledge.

1          Do you know whether they were involved in any fact

2     gathering in connection with the office's decision-making?

3          MR. LARIOS:  Your Honor, this is Miguel Larios.

4          I have included my colleague Paul Fangman who did the

5     briefing on this motion, so I'll defer to him.

6          MR. FANGMAN:  Good morning, Your Honor.  This is

7     Assistant State's Attorney's Paul Fangman.  I just joined the

8     call a little late.  I apologize.

9          THE COURT:  Thank you.

10         MR. FANGMAN:  Thank you.

11         I just heard your questions of Counsel and his

12    answers, and when we filed our motion to quash the subpoenas,

13    we looked at the docket information for ASA Toni Giancola and

14    ASA Christa Bowden, and from what we could see, there were no

15    filings made in this, that one of the ASAs simply appeared in

16    court on the day that the Certificate of Innocence was granted

17    and stated to the judge that the state's attorney's office had

18    no position.

19         So there's no information in the record anywhere that

20    the ASAs did any fact gathering.  There's nothing that's

21    filed.  There's no information about interviews that were

22    conducted.  There's nothing to show that any interviews were

23    conducted.

24         In the absence of any record that shows that there

25    was -- there's no paper at all.  I guess it would be hard to

1    show that there was any fact gathering that took place if

2    there's no evidence of it.

3           If counsel has not -- in all of the document

4    subpoenas that they've issued and received documents from our

5    office, there's no record.  There's no paper record anywhere

6    that any additional work was done in connection with the

7    statement that the state's attorney's office takes no

8    position.  So I guess that's the answer to the inquiry is that

9    nothing happened as far as we know.

10          THE COURT:  And so --

11          MR. STEFANICH:  Judge, if I could just clarify.

12          THE COURT:  Just one quick question.

13          Are the two attorneys still with the state's

14   attorney's office?

15          MR. FANGMAN:  I believe they were at the time we

16   filed the motion.  I would have to check to see at this point.

17          MR. STEFANICH:  Judge, I know ASA Bowden from another

18   case.  I know that she is no longer with the office.  ASA

19   Giancola is still with the office.

20          A point of clarification on the fact-gathering

21   question.

22          I did mention that memo that ASA Giancola drafted to

23   her superiors, so it does seem like she gathered some facts.

24   She doesn't cite to -- there's no, like, legal citations or

25   record cites or anything like that in the memo, but it appears

1   like she's looking at something.  I don't know if she's just

2   looking at the trial file or the habeas petition or the post

3   conviction petitions or what or if she interviewed witnesses

4   or if she got the CIU file, but she does have a memo where

5   she's discussing the facts of the case and ultimately making

6   the recommendation that she made.

7          THE COURT:  So, Mr. Larios, to the extent that either

8   of these attorneys actually interviewed witnesses in order to

9   make a recommendation on whether or not the office should, for

10  example, retry Mr. Fletcher or oppose the Certificate of

11  Innocence, would you agree that what the attorneys were told

12  during those interviews would be discoverable and would be an

13  appropriate thing for them to have to testify about during a

14  deposition?

15         MR. FANGMAN:  Yes.  This is Attorney Fangman.

16         Yes, Your Honor, you're right.  If either of those

17  ASAs interviewed any witnesses and asked fact-based questions

18  and there was any record of the responses, the answer to your

19  hypothetical question would be yes.

20         I would just repeat I don't believe that they did.

21  And that's just my personal opinion.  I know that there's no

22  record that they did.

23         THE COURT:  And why not just ask them?

24         I guess that's why I'm a little perplexed by it.

25         Certainly the one who is still employed at the

1    office, Giancola, why would you not just ask the attorney,

2    "What did you do?  Did you do any fact finding?"  So that

3    you're not having to guess at it?

4         MR. FANGMAN:  I can certainly do that.  We've not

5    been issued -- that's not what Counsel was seeking.  They were

6    seeking a deposition basically as we're talking about now.  So

7    if that's what the Court is directing, I can ask those

8    questions of those two ASAs.

9         THE COURT:  Because it seems to me that not

10   everything that is reasonably likely to be within their

11   knowledge would be covered by a privilege.  And I think you

12   just confirmed that by acknowledging that if they actually

13   went out and maybe they re-interviewed a witness in connection

14   with the decision on whether to retry Mr. Fletcher, which

15   seems like a reasonable thing that you might do, given that

16   the information gathered through that process would seem to be

17   an appropriate deposition topic, even if I think you're right

18   as to other things such as the specific reasons why the office

19   decided not to retry Mr. Fletcher, I would think it would be

20   much more efficient to gather that information or at least

21   find out if such information exists as opposed to having the

22   witness sit for a deposition just to answer those questions.

23   Or, put differently, as it stands now, not knowing whether

24   there's any factual information of that sort in the possession

25   of these witnesses, I might be inclined to say, you know, the

1   defendants get to depose them to ask whether they have any of

2   that information.  But it seems to me that that would not

3   necessarily be a very productive use of anybody's time and

4   resources if some sort of confirmation can be obtained

5   indicating that that sort of information does not exist.

6           MR. FANGMAN:  I agree with you, Your Honor.

7           And just to clarify, certainly any interviews that

8   the ASAs conducted, just like in post conviction processes, if

9   they went out -- if investigators went out and conducted

10  interviews and collected facts, our office would not typically

11  assert deliberative process privilege or be able to.  So if

12  the ASAs conducted interviews with witnesses, we would not

13  assert any -- typically assert any deliberative process

14  privilege.

15          I believe what the briefs in this motion to quash

16  proceeding have focused on is the documents that the ASAs sat

17  at their desks and reviewed, the conversations that they had

18  with their coworkers.  And we certainly would and have

19  asserted deliberative process privilege for the inputs into,

20  let's say, the ASAs' brains when they make that determination

21  or put together that memo.

22          Their own deliberations we would always assert are

23  privileged, but certainly I can ask those questions and report

24  back.  If they conducted any fact-based interviews, again,

25  there's no record of them, so the assumption has to be that

1    they didn't, but I certainly can ask those questions.

2          THE COURT:  To the extent the individual attorneys

3    were aware of facts demonstrating who actually committed the

4    murder, whether it's facts showing that Mr. Fletcher is

5    innocent or facts showing that he is guilty, would you

6    consider that to be something covered by the deliberative

7    process privilege?

8          MR. FANGMAN:  Yes, Your Honor, because the ASAs

9    certainly are aware of facts in the case in their entirety;

10   and asking an attorney their knowledge of facts necessarily

11   involves which facts went into their decision and why and what

12   the order was and what the importance was.

13         So, I mean, I think you can -- obviously, we can all

14   expect that they knew all of the facts that were necessary.

15         THE COURT:  And I don't necessarily think this is

16   what the individual defendants are planning to do if they're

17   allowed to take the deposition, but, hypothetically, if they

18   were to ask a question at a deposition, "In your review of the

19   case file or otherwise, are you aware of any other person who

20   confessed to the killing," would that be subject to the

21   deliberative process privilege?

22         It might be objectionable for other reasons.  You're

23   asking somebody to remember everything in the record,

24   et cetera, but just in terms of the privilege issue, would

25   there be an objection to a question along those lines, in

1   other words, "Are you aware of anyone who was interviewed in

2   connection with this matter who confessed to the killing?"

3          MR. FANGMAN:  I think that the parties can find out

4   that information in a myriad of other ways and not asking

5   those questions of the ultimate decision-makers or the people

6   that were involved in relaying the decision to the Court.

7          I think any time you ask "Were you aware of this

8   fact" or "Were you aware of that fact," again, these are not

9   fact witnesses; these are attorneys that are reviewing the

10  files.  So if there is evidence that somebody else committed

11  the crime or confessed, that evidence would come from the

12  actual, you know, witness or statement or records.  And I

13  believe that defendants already have all of that information.

14         THE COURT:  Yes, certainly in terms of admissibility,

15  it might come from the actual witnesses.  I suppose the

16  question one might have is how do they know who they should be

17  looking at or interviewing as a potential witness.

18         What is the exact objection to identifying who the

19  ultimate decision-maker was with respect to the decision to

20  not oppose the Certificate of Innocence?

21         MR. FANGMAN:  I think that that issue has been

22  litigated, I think, in some other proceedings by my

23  supervisors.  I think that the general objection has always

24  been that the deliberative process privilege covers the

25  decisions and the decision-makers.

1      THE COURT:  So, for example, is there an objection to

2  describing, in general, this is a decision that is signed off

3  on by the state's attorney based on a recommendation from the

4  ASA who reviews the file or however -- I guess I'm curious as

5  to the basis for a general procedure which I'm going to assume

6  is a procedure that's in place for all or most cases that are

7  being reviewed at that stage where habeas relief has been

8  granted.

9      Why is that a deliberative process concern, just what

10  the procedure is?

11      MR. FANGMAN:  Because that goes into the

12  deliberations.  And I think, just generally speaking, the more

13  fine tuned the parties get into this process, the more

14  pressure is placed on the individuals or could be placed on

15  the individuals to determine the outcome.

16      I suspect we've filed the affidavits and we've

17  asserted the deliberative process privilege for the purpose of

18  avoiding influence in the process, the deliberations of

19  whether to prosecute or not.  And I think as we fine tune that

20  and everyone gets fine tuned more into each step of the

21  process, there's more opportunity for the parties to be -- for

22  the state's attorney's office to -- for attempts to influence

23  the decisions of our office.

24      THE COURT:  It's very common, in fact, required

25  typically when people assert a privilege and they prepare a

1   privilege log you identify who was involved in communications.

2          I've received privilege logs from a variety of

3   government agencies over the years where they've asserted the

4   deliberative process privilege and they identify who was

5   involved in the particular communication over which the

6   privilege is being asserted; and you're suggesting that even

7   just identifying the people involved even by their position

8   would have a chilling effect or otherwise undermine the goals

9   of the deliberative process privilege?

10          MR. FANGMAN:  I think that is the argument our office

11  has put forth.  And I guess I don't recall exactly the memo

12  that Counsel references, but, typically, if ASA Bowden wrote a

13  memo, we would generally produce the redacted memo, and it

14  would show who she sent the memo to.  We've always produced

15  that.

16          We've always -- if there's a memo that's written, we

17  produce the names of who it went to, the date, the person who

18  wrote it, and then we redact the memo.  So, in this case, I'm

19  assuming we did produce that already and counsel already has

20  that information.

21          THE COURT:  Okay.  Thank you.

22          Mr. Stefanich, I wanted to give you a chance to

23  respond to any of that that you'd like to briefly, please.

24          MR. STEFANICH:  Yeah.  So, to clarify, again, I think

25  it's two separate things.  One, for ASA Giancola, we do have

1     that memo, and we do know who that memo was sent to.  That

2     portion of the memo wasn't redacted.

3           For ASA Bowden and the Certificate of Innocence

4     proceeding, we don't have any privilege log or correspondence

5     or redacted correspondence to ASA Bowden or from ASA Bowden

6     indicating who was directing her to take no position for the

7     office or anything like that.  So we don't have that

8     information.  We don't think that's covered by the

9     deliberative process.

10          The ultimate decision-maker, I think, is a factual

11    matter.  At least from the individual defendants' point of

12    view, there's no undue influence, at least for the defense,

13    because we don't even know -- the defendants don't even know

14    this is happening.  Right?  We don't know that habeas relief

15    is granted, so we wouldn't even know -- the defendants

16    wouldn't even know that there's a potential that the case

17    would be vacated.  They're just unaware of what's happening on

18    20-year-old cases.

19          So I think that's my response to those questions.

20          THE COURT:  One quick question for you.

21          So are you concerned that you don't actually have all

22    of the factual information from the underlying investigation

23    either pre or post conviction that would either be exculpatory

24    or inculpatory for Mr. Fletcher?

25          MR. STEFANICH:  I think we have everything for the

1   conviction -- the Conviction Integrity Unit process.  And then

2   I think we have everything for the decision.  It's redacted,

3   but I think the memo is the only document that would exist for

4   the decision to not retry Mr. Fletcher.

5          We don't have -- we really don't have anything except

6   the transcript and a couple of emails to and from counsel and

7   ASA Bowden about the Certificate of Innocence proceeding, so I

8   don't know if there's anything that exists.

9          My understanding -- so I don't know if there's

10  anything else that exists.  Obviously, somebody had to tell

11  ASA Bowden to take no position, but I don't know if there

12  would be documents of that.  I don't know if the process is

13  similar to the process when you're going to nolle a case where

14  there would be a memo or if it's just an oral communication.

15  I don't know.

16         THE COURT:  Thank you.

17         Mr. Starr, I don't know the plaintiff's view on all

18  of this.  The briefing has taken place between the individual

19  defendants and the state's attorney's office.

20         Do you want the ability to question these witnesses

21  at a deposition?  Are you supportive of the individual

22  defendants' efforts?

23         MR. STARR:  As we indicated in our response to the

24  motion to quash, we are not taking a position on that.

25         The only thing that we stated in our motion is that

1    we intend -- we don't intend to introduce any evidence about

2    why the Cook County State's Attorney chose not to reprosecute

3    plaintiff or any information about their decision about why

4    they chose to -- their decision regarding the Certificate of

5    Innocence.

6          The only thing that we intend to introduce would be

7    that he wasn't reprosecuted and that he got his Certificate of

8    Innocence.  And so we're going to stand down on whether or not

9    these individual ASAs should be deposed in this case.

10         THE COURT:  Why would it be relevant that he wasn't

11    reprosecuted, given that he has a Certificate of Innocence?

12         So I appreciate that an element that has to be proved

13    here is that the matter was terminated in a manner favorable

14    to him and indicative of innocence.  I think the Certificate

15    of Innocence speaks to that element, but why is the decision

16    whether or not to reprosecute something that you think you

17    should be able to admit at trial?

18         MR. STARR:  I think because of the reason you just

19    outlined, Your Honor.  I mean, I think it is an element of the

20    Certificate of Innocence, and our intention would be to

21    introduce the COI into evidence at trial.

22         And so other than that, the habeas decision exists as

23    it does, and after that, the state chose not to retry that.

24    That decision, I think, is an element of the Certificate of

25    Innocence.  There was no retrial.  There was no decision by

1    the state's attorney to continue the case.

2           THE COURT:  And do you expect that part of what

3    you'll be seeking to prove at trial is actual innocence, given

4    that it's one of the things that might impact the damages that

5    your client's entitled to?

6           MR. STARR:  That's correct.

7           THE COURT:  I'm going to leave that issue for a

8    moment and then turn to the issue of the recordings involving

9    Mr. Woodland and touch on it briefly because I do have other

10   status hearings where the parties are waiting patiently for

11   their turn this morning.

12          And this is plaintiff's motion.  I'm having a hard

13   time seeing how the plaintiff has standing to assert a privacy

14   interest on behalf of Mr. Woodland.  I'm also having a hard

15   time seeing how plaintiff can assert that this is an extremely

16   burdensome request given that, as I understand it, the

17   subpoena has now been narrowed to just seeking the 109 calls

18   to the three other individuals.

19          Is there anything that wasn't in your brief that you

20   would want to add on either of those points, Mr. Starr?

21          MR. STARR:  Sure, Your Honor.

22          I think the thrust of our brief is not so much

23   Mr. Woodland's privacy, though we do address that.  You know,

24   the idea that these calls are surreptitiously -- actually, the

25   calls with Mr. Fletcher suggest that Mr. Fletcher's privacy

1  could, in fact, be at issue here.  We don't think that these

2  are Mr. Fletcher's calls --

3          THE COURT:  Yes, but you didn't make that argument,

4  and you certainly could have.  If you knew that to be the case

5  from your client, you certainly could have argued, by the way,

6  rightly or wrongly, he was actually using somebody else's

7  phone privileges.  And so this is indirectly getting to his

8  conversations, but you didn't argue that.

9          MR. STARR:  Right.  And I think we did in our reply

10 state that these are not his calls, but it's also -- when

11 someone's incarcerated for that length of time, to question

12 them about every single phone call they made and whose

13 credentials they used, if they were always their own, you

14 know, it strains their memory.

15         And so that's the only point that I would make in

16 regards to Mr. Woodland's privacy other than what I've already

17 previously mentioned is that Mr. Woodland told us that he

18 objected and that he did not want his calls being reviewed by

19 any third parties, which, you know, he doesn't have an

20 attorney, he hasn't obviously sent a letter to the Court, as

21 we established.

22         Regarding the burdensome part of it, you know, I can

23 just tell you anecdotally, yesterday, we had a deposition in

24 this case, and it was a witness who you had previously granted

25 the defendants access to plaintiff's calls with.

1    There's 13 calls to this witness.  I personally spent

2    10 hours reviewing these 13 calls, and during the deposition,

3    they asked about 30 seconds of those seven-plus hours of phone

4    calls.  And that was all they used, and it wasn't even a

5    relevant question.

6         We think that given the fact that there's a month

7    left in discovery, the idea that we have to review some third

8    party's calls who did not show any relevance at all in our

9    opinion, it just is not proportionate to the needs of the

10   case, Your Honor.

11        THE COURT:  So with respect to Mr. Woodland's

12   possible desire to not have his calls produced, which I do

13   have some sympathy for, he was incarcerated.  I assume that

14   he, like all prisoners, are informed that their calls are

15   subject to being recorded unless they're attorney-client

16   calls.  There's no expectation of privacy.  I would assume

17   that he's been advised of that.  There might even be signs

18   posted, or it might be in the inmate handbook.

19        And I do think, as narrowed to just these three

20   individuals, Mr. Fletcher, Senior; Ms. Sanders; and LDub and

21   limiting it to 109 calls as opposed to the thousands that

22   plaintiffs reference in the motion to quash -- or I guess

23   maybe it's a motion for a protective order technically rather

24   than a motion to quash, styled as a motion to quash -- it

25   strikes me as less of just a fishing expedition as limited to

1    these individuals.

2           I appreciate that Mr. Fletcher, Senior was one of the

3    individuals for whom I'd previously said calls would not need

4    to be produced between him and the plaintiff here; however, it

5    sounds like subsequent deposition testimony and other

6    investigation have suggested that Mr. Fletcher may have had a

7    role in advancing his son's claimed innocence.  And it is at

8    least noteworthy that he had such significant, in terms of

9    length, conversations with Mr. Woodland.  And the fact that

10   Mr. Woodland or at least somebody using his privileges had so

11   many calls with Ms. Sanders also, I think, is a matter of

12   interest.

13          So I am inclined to allow the production of the 109

14   calls limited to just those calls with just those three

15   individuals, but I am concerned by the fact that Mr. Woodland

16   hasn't had an opportunity to weigh in here.

17          Is there any particular reason why the defendants

18   didn't try to notify Mr. Woodland that this was being sought

19   or otherwise, you know, give him an opportunity to weigh in

20   since he would seem to have privacy interests, to the extent

21   there are any, that are implicated?

22          MR. STEFANICH:  Sure, Judge.  I think the thought

23   process was twofold.  One, we don't think there is a privacy

24   interest.  I think Your Honor is 100 percent right that the

25   Offender Orientation Manual which we attached as an exhibit at

1  Stateville, which is where Mr. Woodland was incarcerated,

2  notifies the inmates that their calls are recorded.  There are

3  signs by the phones that indicate that the calls are being

4  recorded.  And then, you know, when we listened to

5  Mr. Fletcher's calls, at the beginning of every call, there's

6  a prerecorded statement indicating that the calls are being

7  recorded.  So, you know, we don't think there's a privacy

8  interest in the calls that inmates have in these recorded

9  calls.

10          And, secondly, Judge, we think Mr. Fletcher is on the

11  calls and not Mr. Woodland, so that's -- I guess that's the

12  reason.  That was our reasoning.

13          THE COURT:  And I don't know if that's the case.

14          Look, I think that the proffer that's been made

15  regarding the involvement of both LDub and Red Dog in

16  Mr. Fletcher's case provided at least some basis to think that

17  this isn't just a fishing expedition.

18          The fact that Ms. Sanders indicated that she barely

19  knew Red Dog but yet I think there were 42 calls or something

20  along those lines from the person that is now believed to be

21  Red Dog, Mr. Woodland, to Ms. Sanders, given the fact that

22  Mr. Woodland was involved in actually filing FOIA requests in

23  order to obtain information, it certainly seems like there's

24  enough involvement here involving these individuals to support

25  a narrowed request for the calls.

1    Even though it's the responding party who has

2    standing to object to the burdensomeness of a subpoena, I do

3    think proportionality concerns are always something that

4    should be considered.

5    The original scope of the subpoena which I understand

6    would have covered all of the calls I do think is far too

7    overbroad.

8    I do think the offer to limit it to 109 calls for

9    these between Mr. Woodland or a person using his credentials

10   and these other three individuals is a reasonable place to

11   draw a line, so I am going to go ahead and deny the motion to

12   quash with that narrowed scope and noting that to the extent

13   it would have been my preference perhaps for Mr. Woodland to

14   have received a more formal notification of the subpoena and

15   opportunity to weigh in, he did have actual notice of the

16   subpoena and the objection that was being raised.  And, in any

17   case, his privacy interests in these calls is lessened by the

18   fact that these are recorded prison calls.

19   And given the narrower scope and the issues that have

20   been raised about whether it's actually him on all the calls,

21   I don't know whether that's the case or not, but I think

22   that's enough to satisfy me that it's appropriate to move

23   forward and to allow the production.  So I'm going to deny

24   plaintiff's motion to quash.

25   On the motion to quash the deposition subpoenas, I'm

1    going to, for the moment, take it under advisement and issue

2    an order but say this.

3              I expect the order that I issue is going to say some

4    things are covered by a privilege and can't be asked of these

5    witnesses but that there are other things that would be in the

6    universe of acceptable questions.

7              I think once you see where I'm drawing the line --

8    and I'll put that in the order -- it certainly would make

9    sense for Mr. Larios to try to contact these folks or other

10   people in his office who would know the extent of the

11   involvement and just find out if it's even worthwhile to have

12   a deposition.

13             I know that we're approaching the end of discovery.

14   I will allow time for the depositions to go forward, but if

15   these two individuals sign declarations saying, "All I did was

16   go to a court appearance, I didn't do anything else on this

17   case, I have no knowledge of any investigation or internal

18   discussions or whatever it is," hopefully, that person won't

19   have to sit.

20             There's still a question in my mind as to whether the

21   identities of people involved, including the ultimate

22   decision-maker, should be covered by the privilege, but I will

23   indicate that in the order and issue it shortly.

24             Are the depositions of those two individuals -- I

25   take it they're not actually scheduled for dates before

1    January 31st?

2            MR. STEFANICH:  They are not scheduled for dates.

3    The fact discovery deadline is the end of February, too, but

4    the deps are not scheduled.

5            THE COURT:  Okay.  Why did I think it was the end

6    of -- oh, I see.  It is February 29th and my own order.

7            MR. STEFANICH:  Right.

8            THE COURT:  Okay.  So, hopefully, there will be an

9    opportunity to finish that.  So I'll issue that order.

10           There's no further action, I take it, needed with

11   respect to the felony review folder?  Any disputes about any

12   remaining redactions there have been resolved, correct?

13           MR. STEFANICH:  Correct.

14           THE COURT:  And I will set a further status date

15   before the February 29th deadline, maybe the third week of

16   February, to make sure that the additional depositions go

17   forward.

18           Laritza, if you can suggest a date and time.

19           THE CLERK:  Yes, Judge.  We can do February 27th at

20   10:30.

21           THE COURT:  And, Mr. Larios, I don't necessarily

22   expect that you would be needed for that hearing.

23           Does that work for plaintiff's counsel?

24           MR. STARR:  Yeah, I believe so, Your Honor, yes.

25           THE COURT:  And for defense counsel?

1          MR. STEFANICH:  Yes.  Yes, Your Honor.

2          THE COURT:  Very good.

3          And then, just to be clear then, so the motion --

4   plaintiff's motion to quash the subpoena for Mr. Woodland's

5   calls is denied subject to the modifications to the scope of

6   the subpoena discussed on the record.  That will be confirmed

7   in the order.

8          The motion for a protective order for the depositions

9   is taken under advisement.  As I said, I'll put into writing

10  what things I think are acceptable and which ones are not to

11  question these witnesses about and likely set a time frame for

12  the parties to confirm that in light of that, it's still

13  necessary to depose one or both of those attorneys.

14         MR. STARR:  Your Honor, I would be remiss if I didn't

15  mention this, and I don't think this necessarily changes your

16  opinion, but you mentioned regarding the subpoena and the

17  motion to quash the subpoena that Ms. Sanders had no knowledge

18  of Red Dog.  That's not represented in the record, and I don't

19  think defendants represented that as much.

20         What they represented was that she did not know that

21  Red Dog's real name was Albert Woodland.  She certainly knows

22  Red Dog, and the calls they have demonstrate that extensively.

23         So I just wanted to clarify that point so that you're

24  aware that there is not a record that she does not -- she

25  didn't testify to that fact.

1    THE COURT:  No.  Yes.  And I perhaps may have

2    overstated it.

3    My understanding from the briefing is that she knew a

4    person Red Dog, she didn't know Red Dog's real name, that it

5    was Woodland.

6    I thought that the briefing also suggested she'd

7    indicated that she didn't really know Red Dog all that well.

8    And then part of the defendants' position was that that is at

9    least called into question by the few dozen calls from

10   Mr. Woodland to Ms. Sanders, including some that took place

11   after Mr. Fletcher was released from custody.

12   Am I recalling that correctly from the briefing?

13   MR. STARR:  Yes.

14   MR. STEFANICH:  That's correct.

15   THE COURT:  So that was my understanding that

16   informed my decision that I'll allow those calls to be

17   produced.

18   MR. STARR:  Thank you, Your Honor.

19   THE COURT:  Okay.  Thank you all for answering my

20   questions this morning.  I very much appreciate it.  Have a

21   good day.

22   (Proceedings adjourned at 10:52 a.m.)

23                     *    *    *    *    *    *

24

25

1          C E R T I F I C A T E

2

3          I, Brenda S. Varney, certify that the foregoing is a

4   complete, true, and accurate transcript from the record of

5   proceedings on January 24, 2024, before the HONORABLE

6   ANDREA R. WOOD in the above-entitled matter.

7

8

9   */s/Brenda S. Varney, CSR, RMR, CRR*          January 26, 2024

10  Official Court Reporter                        Date
    United States District Court
11  Northern District of Illinois
    Eastern Division

12

13

14

15

16

17

18

19

20

21

22

23

24

25