**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| JAMES FLETCHER JR., | ) | |
| | ) | |
| *Plaintiff*, | ) | Case No. 20−cv−04768 |
| | ) | |
| *v.* | ) | Judge Andrea Wood |
| | ) | |
| JEROME BOGUCKI, ANTHONY | ) | Magistrate Judge Maria Valdez |
| NORADIN, RAYMOND SCHALK, | ) | |
| ANTHONY WOJCIK, UNKNOWN CITY | ) | |
| OF CHICAGO POLICE OFFICERS, and the | ) | |
| CITY OF CHICAGO | ) | |
| | ) | |
| *Defendants*. | ) | |

**<u>DEFENDANT OFFICERS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………………………iv

INTRODUCTION……………………………………………………………………………...1

SUMMARY OF FACTS………………………………………………………………………2

LEGAL STANDARD…………………………………………………………………………10

I.  THE DEFENDANT OFFICERS ARE ENTITLED TO SUMMARY
    JUDGMENT ON FLETCHER'S FOURTEENTH AMENDMENT
    DUE PROCESS CLAIM BASED ON FABRICATED EVIDENCE………………...11

    A.  The Defendant Officers Are Entitled to Summary Judgment on
        Fletcher's Claim of Fabricated Police Reports Because No Police
        Reports Were Introduced As Evidence At His Criminal Trial…………………11

    B.  Defendant Officers Are Entitled to Summary Judgment on Plaintiff's
        Claim of Fabricated Identifications………………………………………………13

        i.    Rogers' Identification of Fletcher Was Never Introduced at
              Fletcher's Criminal Trial …………………………………………………14

        ii.   Wade Never Identified Fletcher.............................................................14

        iii.  Fletcher Has No Admissible Evidence that Friend's
              Identification Was Fabricated……………………………………………15

        iv.   Fletcher Cannot Show that Detectives Bogucki and Schalk
              Manufactured Cooper's Identification And That They Knew
              With Certainty That It Was False………………………………………..20

        v.    Defendants Noradin and Wojcik are Entitled to Summary
              Judgment Because Fletcher Has No Evidence They Were
              Personally Involved in the Alleged Fabrication of Evidence……………23

II. THE DEFENDANT OFFICERS ARE ENTITLED TO SUMMARY
    JUDGMENT ON FLETCHER'S UNDULY SUGGESTIVE PROCEDURE
    CLAIM………………………………………………………………………………...24

    A.  The Defendant Officers Cannot Be Held Liable For the Identification
        Evidence That Was Admitted Against Fletcher at His Criminal Trial…………..24

    B.  The Defendant Officers Are Entitled to Qualified Immunity……………………26

    C.  Fletcher Cannot Establish that Noradin and Wojcik were Personally
        Involved in Any Unduly Suggestive Identification Procedure…………………..26

III. THE DEFENDANT OFFICERS ARE ENTITLED TO SUMMARY
     JUDGMENT ON FLETCHER'S DESTRUCTION AND SUPPRESSION
     OF EVIDENCE CLAIM……………………………………………………………………27

A.      Fletcher's Destruction of Evidence Claim Fails…………………………………27

B.      Fletcher Improperly Recasts His Fabrication Claim as a Brady Claim…………29

C.      Even If Fletcher Could Recast His Fabrication Claim as a Brady
        Claim, the Claim Still Fails ………………………………………………...30

        i.      Rogers…………………………………………………………………31

        ii.     Wade…………………………………………………………………..32

        iii.    Friend…………………………………………………………………33

        iv.     Cooper………………………………………………………………...34

D.      Fletcher Cannot Show Personal Involvement by Detective Noradin
        or Sergeant Wojcik in any Brady or Destruction of Evidence Claim…...............37

IV.     THE DEFENDANT OFFICERS ARE ENTITLED TO SUMMARY
        JUDGMENT ON FLETCHER'S MALICIOUS PROSECUTION CLAIM……………38

A.      Fletcher Cannot Show the Absence of Probable Cause…………………………38

        i.      Fletcher Cannot Rebut the Presumption of Validity of the
                Arrest Warrant or Grand Jury Indictment………………………………38

        ii.     Probable cause existed based on Rogers' identification alone…………..40

        iii.    Alternatively, Rogers' Identification Provided Arguable
                Probable Cause for Fletcher's Prosecution………………………………43

B.      Fletcher Cannot Establish that Any Defendant Officer Commenced
        and Continued His Prosecution………………………………………………....44

        i.      Detective Noradin and Sergeant Wojcik Did Not Commence
                or Continue Fletcher's Criminal Prosecution……………………………45

V.      DEFENDANT OFFICERS ARE ENTITLED TO SUMMARY
        JUDGMENT ON FLETCHER'S INTENTIONAL INFLICTION OF
        EMOTIONAL DISTRESS CLAIM………………………………………………...46

A.      Fletcher's Derivative IIED Claim Fails Because His Malicious
        Prosecution Claim Fails………………………………………………………….46

B.      Fletcher Has No Evidence of Any Extreme or Outrageous Conduct
        by Noradin or Wojcik……………………………………………………………47

VI.     DEFENDANT OFFICERS ARE ENTITLED TO SUMMARY
        JUDGMENT ON FLETCHER'S FAILURE TO INTERVENE CLAIM ………………47

A.      Because There Is No Underlying Constitutional Violation,
        the Defendant Officers are Entitled to Summary Judgment on
        Fletcher's Derivative Failure to Intervene Claim………………………………..48

B.      Fletcher's Failure to Intervene Claim is Not Cognizable Under

Section 1983……………………………………………………………………...48

C.      Fletcher Has No Evidence that Noradin or Wojcik Had a Realistic
        Opportunity to Prevent Any Alleged Constitutional Violation…………………49

VII.    SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF
        THE DEFENDANT OFFICERS ON FLETCHER'S DERIVATIVE
        FEDERAL AND STATE LAW CONSPIRACY CLAIMS…………………………50

A.      The Defendant Officers are Entitled to Summary Judgment on
        Fletcher's Derivative Federal and State Law Conspiracy Claims
        Because There is No Remaining Underlying Violations………………………...50

B.      Fletcher Has No Evidence that Noradin and Wojcik Agreed to
        Be Part of a Conspiracy……………………………………………………………51

CONCLUSION…………………………………………………………………………...52

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 723-24 (7th Cir. 2013)...............................43
*Alvarado v. Hudak*, 2015 WL 2978683 (N.D. Ill. Aug. 20, 2015)...................................30
*Anderson v. City of Rockford*, 2018 WL 2332066 (N.D. Ill. May 23, 2018).......................14
*Anderson v. City of Rockford*, 932 F.3d 494 (7th Cir. 2019)........................................31
*Arizona v. Youngblood*, 488 U.S. 51 (1988).........................................................27
*Barnes v. City of Centralia*, 943 F.3d 826 (7th Cir. 2019) ........................................ 38
*Bianchi v. McQueen*, 818 F.3d 309 (7th Cir. 2016)................................................ 12
*Beaman v. Freesmeyer*, 775 F.3d 500 (7th Cir. 2015)..........................................36, 37
*Beaman v. Freesmeyer*, 2019 IL 122654 .....................................................38, 44, 45, 46
*Blackmon v. Jones*, No. 23-3288, 2025 WL 869045 (7th Cir. Mar. 20, 2025).................24, 25, 26
*Boothe v. Sherman*, 66 F.Supp.3d 1069, 1077 (N.D. Ill. 2014)..................................52
*Boss v. Pierce*, 263 F.3d 734 (7th Cir. 2001).......................................................35
*Boston v. U.S. Steel Corp.*, 816 F.3d 455, 467 (7th Cir. 2016)....................................47
*Boyd v. City of Chicago*, 225 F.Supp.3d 708 (N.D. Ill. 2016)..............................30, 35, 36
*Brown v. City of Chicago*, 633 F.Supp.3d 1122 (N.D. Ill. 2002) ..................................12, 13, 17
*Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015) ........................................... 43
*Cairel v. Alderden*, 821 F.3d 823 (7th Cir. 2016)................................................. 41
*California v. Trombetta*, 467 U.S. 479 (1984)....................................................28, 29
*Carmody v. Bd. of Trs. Of Univ. of Ill.*, 893 F.3d 397 (7th Cir. 2018)...........................18
*Carvajal v. Dominguez*, 542 F.3d 561 (7th Cir. 2008)..........................................31, 33
*Celotex Corp. v. Cartett*, 477 U.S. 317 (1986)....................................................10
*Coghlan v. Beck*, 2013 IL App (1st) 120891.......................................................50
*Colbert v. City of Chicago*, 851 F.3d 649 (7th Cir. 2017).........................................23
*Coleman v. City of Peoria*, 925 F.3d 336 (7th Cir. 2019)..................................... passim
*Daugherty v. Page*, F.3d 606, 612 (7th Cir. 2018) ............................................... 51
*District of Columbia v. Wesby*, 583 U.S. 48 (2018) ............................................. 40
*Doxtator v. O'Brien*, 29 F.4th 852, 864 (7th Cir. 2022)...........................................49
*Drager v. Village of Bellwood*, 969 F.Supp.2d 971, 984 (N.D. Ill 2013)...................50
*Ewell v. Toney*, 953 F.3d 911, 917-18 (7th Cir. 2017) ...........................................50
*Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014)..................................................11
*Fritz v. Johnson*, 209 Ill.2d 302, 317 (2004) ..................................................... 51
*Garcia v. Posewitz*, 79 F.4th 874, 880 (7th Cir. 2023) ........................................... 42
*Gordon v. FedEx Freight, Inc.*, 674 F.3d 769 (7th Cir. 2012)............................... 10
*Goudy v. Cummings*, 922 F.3d 834 (7th Cir. 2019).................................................31
*Gunville v. Webster*, 583 F.3d 979 (7th Cir. 2009)................................................16
*Gustovich v. AT&T Communications, Inc.*, 972 F.2d 845 (7th Cir. 1992)..........................16
*Harris v. Kuba*, 486 F.3d 1010 (7th Cir. 2007)....................................................31
*Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005)........................................... 48

*Hart v. Mannina*, 798 F.3d 578 (7th Cir. 2015)........................................................................ 41

*Hill v. City of Chicago*, 2008 WL 174994 (N.D. Ill. Jan. 26, 2009)...........................28, 29

*Holt v. City of Chicago*, 2022 IL App (1st) 220400 ........................................................ 45

*Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948 (7th Cir. 2021)) ..................... 39

*Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 939 (7th Cir. 2012).......... 51

*James v. Hale*, 959 F.3d 307 (7th Cir. 2020)...................................................................18

*Johnson v. Guevara*, 2025 WL 903813 (N.D. Ill. Mar. 24, 2025 )...................................26

*Johnson v. Myers*, 53 F.4th 1063 (7th Cir. 2022) ........................................................... 39

*Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988)...........................................24, 52

*LaRiviere v. Bd. Of Trs. Of S. Ill. Univ.*, 926 F.3d 356 (7th Cir. 2019)........................... 10

*Lee v. Harris*, 127 F.4th 666 (7th Cir. 2025)) ......................................................... 39, 40

*Logan v. City of Chicago*, 891 F.Supp.2d 897  (N.D. Ill. 2012).....................................23

*Lund v. City of Rockford*, 956 F.3d 938 (7th Cir. 2020) ................................................. 38

*Madero v. McGuinness*, 97 F.4th 516 (7th Cir. 2024).................................................... 38

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 474 U.S. 574 (1986)...................... 10

*McCann v. Mangialardi*, 337 F.3d 782, 789 (7th Cir. 2003)...........................................51

*Merrilees v. Merrilees*, 2013 IL App (1st) 121897................................................... 51

*Mitchell v. Kallas*, 895 F.3d 492 (7th Cir. 2018)..............................................................18

*Moorer v. City of Chicago*, 92 F.4th 715, 721 (7th Cir. 2024) ...................................... 42

*Moran v. Calumet City*, 54 F.4th 483 (7th Cir. 2022) ...................................... 11, 36, 37

*Mwangangi v. Nielsen*, 48 F.4th 816, 825 (7th Cir. 2022) ...................................... 43, 48

*Myvett v. Heerdt*, 2015 WL 12745087 (N.D. Ill. May 28, 2015).....................................30

*Niehus v. Liberio*, 973 F.2d 526, 531-32 (7th Cir. 1992)................................................52

*Patrick v. City of Chicago*, 974 F.3d 824 (7th Cir. 2020)...................................11, 12, 14

*Patrick v. City of Chicago*, 103 F.Supp.3d 907 (N.D. Ill. 2015).....................................30

*People v. Fair*, 159 Ill. 2d 51, 69 (1994)...................................................................42

*Pepper v. Village of Oak Park*, 430 F.3d 805(7th Cir. 2005)..........................28, 31, 38

*Petty v. City of Chicago*, 754 F.3d 416, 423 (7th Cir. 2014)...................................21, 22

*Phillips v. City of Chicago*, 2015 WL 5675529 (N.D. Ill. 2015).....................................30

*Pitts v. Ray*, No. 20 CV 73555 (N.D. Ill. Dec. 12, 2024)..........................................12, 13

*Powell v. City of Berwyn*, 68 F.Supp.3d 929, 942 (N.D. Ill. Sept. 19, 2014)............49-50

*Rivera v. Guevara*, 319 F.Supp.3d 1004, 1056 (2018)...........................................46-47

*Saunders-El v. Rohde*, 778 F.3d 556 (7th Cir. 2015)......................................................30

*Schweihs v. Chase Home Fin., LLC*, 2016 IL 120041......................................................47

*Serrano v. Guevara*, 2020 WL 3000284 (N.D. Ill. June 4, 2020)...................................30

*Schimandle v. Dekalb Cnty., Sheriff's Off.*, 114 F.4th 648, 655 (7th Cir. 2024)...................43

*Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008)........................................................51

*United States v. Cherry*, 920 F.3d 1126 (7th Cir. 2019)...........................................27, 29

*Vance v. Peters*, 97 F.3d 987 (7th Cir. 1986).................................................................26

*Walker v. City of Chicago*, 2025 WL 343471 (N.D. Ill. Jan. 30, 2025) ........................ 12

*Walker v. White*, 2021 WL 1058096, *16 (N.D. Ill. March 19, 2021) ........................... 52

*Washington v. City of Chicago*, 98 F.4th 860 (7th Cir. 2024) ................................. 40, 42

*Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012)........................................14

*Winskunas v. Birnbaum*, 23 F.3d 1264, 1267-68 (7th Cir. 1994)....................................16

*Wrice v. Burge*, 2019 WL 13497046 (N.D. Ill. Oct. 2, 2019).......................................................24

*Young v. City of Chicago*, 987 F.3d 641(7th Cir. 2021) ............................................................. 40

*Zambrano v. City of Joliet*, 2024 WL 432175 (N.D. Ill. Feb. 9, 2024) ................................. 12, 13

## Statutes

Fed. R. Evid. 804(b)(1)(A) and (B)……………………………………………………………23

## Other Authority

Federal Civil Jury Instructions of the Seventh Circuit § 7.14…………………….………………11

## INTRODUCTION

Having been convicted of murder in 1980, James Fletcher ("Fletcher") was paroled in July 1990. Five months after his release, on December 21, 1990, Fletcher participated in an armed robbery of Edward Cooper ("Cooper") and shootout at Madison and Parkside, that led to the death of Willie Sorrell ("Sorrell"). The day of the murder, an eyewitness, Terry Rogers ("Rogers"), told the police that he had heard one of the two offenders call the other offender by the name "Fletcher." However, the police investigation went cold. Fletcher was arrested in 2002 after Rogers told police that the name of one of the offenders was "Jimmie Fletcher" and then identified Fletcher from a photo array. Cooper and another eyewitnesses, Sheenee Friend ("Friend"), also identified Fletcher in photo arrays.

Fletcher was tried by a jury in 2005 and convicted of first degree murder. Because of his previous murder conviction, Fletcher received a mandatory life sentence. On October 25, 2019, the district court granted Fletcher's *habeus corpus* petition on a Confrontation Clause violation, vacated his conviction, and ordered that prosecutors either retry him or dismiss the case within a given time period. On January 29, 2020, the Cook County State's Attorney's Office elected not to retry Fletcher.

Fletcher brought this lawsuit against four police officers: Detectives Jerome Bogucki, Raymond Schalk, Anthony Noradin, and Sergeant Anthony Wojcik (collectively, "Defendant Officers"). After this Court's ruling on the Defendant Officers' motion to dismiss, the following claims remain against the Defendant Officers:

- Count I    Due Process Violation based on fabrication of evidence, utilizing unduly suggestive identification procedures, and withholding exculpatory evidence
- Count III    Failure to Intervene
- Count IV    Conspiracy under federal law
- Count VI    Malicious Prosecution (Illinois state law)

1

- Count VII     Intentional Infliction of emotional distress ("IIED") (Illinois state law)
- Count IX     Civil conspiracy (Illinois state law)

Defendant Officers move for summary judgment on all counts.

## SUMMARY OF FACTS

On December 21, 1990, Cooper was delivering bread to Uncle Remus' restaurant on Madison and Parkside in Chicago, Illinois. (Defendant Officers' Statement of Undisputed Fact ("DSOF"), ¶4). While he was at his bread truck, a woman he knew, Sheenee Friend ("Friend"), approached him. (DSOF ¶13). The two went inside the truck. (DSOF ¶13). Moments later two offenders with guns entered the truck. (DSOF ¶13). Friend was able to escape, but the offenders demanded money from Cooper. (DSOF ¶13). One of the offenders, Fletcher, who Cooper identified at trial, put his gun in Cooper's side while taking money from Cooper's pocket. (DSOF ¶87). The offenders demanded Cooper open the safe in the truck, but Cooper stated he did not possess the keys to the safe. (DSOF ¶88). Fletcher then told the other offender to shoot Cooper, but the other offender did not shoot Cooper. (DSOF ¶88). The offenders then fled the truck. (DSOF ¶¶88; 8). Cooper, armed with a handgun, exited the truck and the offenders fired their guns at Cooper and Cooper returned fire. (DSOF ¶¶88; 8). During the shooting, Sorrell exited the store next to Uncle Remus' restaurant, was hit with a bullet from one of the offenders' gun, and died as a result. (DSOF ¶¶ 9-10).

There was an eyewitness to the shooting, Terry Rogers ("Rogers") who was at the corner of Madison and Parkside selling narcotics. (DSOF ¶¶18; 25). Rogers was interviewed by Detective Michael Fleming on the day of the shooting. (DSOF ¶¶18-20). Rogers told Detective Fleming that while he was at Madison and Parkside he saw his cousin, Cooper, exiting Uncle Remus' restaurant. (DSOF ¶18). Moments later he observed two offenders fleeing Cooper's truck and then he heard

gunshots. (DSOF ¶18). Cooper was chasing after the offenders and Rogers behind Cooper. (DSOF ¶18). During the chase, Rogers heard one offender call the other offender "Fletcher." (DSOF ¶19).

Detective Fleming also interviewed Cooper who reported that after he made a delivery to Uncle Remus' restaurant he talked with Friend in his truck. (DSOF ¶13). Two offenders then approached with handguns and demanded money from Cooper. (DSOF ¶13). The offenders went through his pockets and took money. (DSOF ¶13). Cooper stated that as he chased the offenders, he met his cousin, Rogers, who told him to be careful because he knew the offenders and that they would shoot Cooper. (DSOF ¶14). Detective Fleming reported that one offender was a Black male in his 20s, between five foot eight inches and five foot eleven inches, with a slim build, dark complexion, collar length curls, and wearing a dark Starter jacket, blue jeans, and a black baseball cap. (DSOF ¶ 15).

Detective Fleming interviewed Emmett Wade ("Wade") who was seated in his van at the time of the shooting. (DSOF ¶21). Fleming reported that Wade observed Cooper in a shootout with two unknown Black men and that Wade may be able to identify the offenders if he saw them again. (DSOF ¶21).

In 1995, Detectives Bogucki and Schalk were assigned to work on the investigation and placed a stop order for Rogers. (DSOF ¶23). They were also told by two other detectives that Fletcher Clinton was a potential person of interest. (DSOF ¶21). In March 1995, Detectives Bogucki and Schalk assembled a photo array containing a photo of Clinton and photos of fillers and showed the array to Cooper. (DSOF ¶21). Cooper was unable to identify anyone in the array. (DSOF ¶21).

It was not until February 2002, when Rogers was arrested on an unrelated charge that Detectives Bogucki and Schalk were notified that he was in custody. (DSOF ¶24). Rogers was

brought to Area 5 and questioned about the Sorrell murder. (DSOF ¶24). During this interview, Rogers told Detectives Bogucki and Schalk that one of the offenders was "Jimmie Fletcher," that he had known Fletcher when Fletcher had lived near Latrobe and Parkside, and that they had been incarcerated together in Cook County Jail and Joliet prison. (DSOF ¶¶ 25; 26; 27). Detectives Bogucki and Schalk ran a name search of "Jimmie Fletcher" and discovered Plaintiff. (DSOF ¶29). His criminal history, which the detectives pulled and made part of the investigative file, revealed a prior address for him of 301 N. Latrobe (the intersection of Latrobe and Parkside) and that he had been previously convicted of murder and armed robbery. (DSOF ¶ 26).

Detectives Bogucki and Schalk obtained a photograph of Fletcher from the Illinois Department of Corrections website where he was identified under the alias Arnold Dixon. (DSOF ¶30). The detectives then printed out the IDOC website page of six other photographs of inmates with the last name Dixon which also had their names, dates of birth, height, and weight to create a photo array (the "IDOC photo array"). (DSOF ¶30). Rogers was shown the IDOC photo array and picked out the photograph of Fletcher as one of the offenders. (DSOF ¶¶ 31-32).

Detectives Bogucki and Schalk then went to Cooper's home to interview him and show him the IDOC photo array. (DSOF ¶33). The detectives reported that Cooper related the same account of the robbery and shooting as he had stated to Detective Fleming in 1990. (DSOF ¶33). Cooper picked out Fletcher as looking similar to one of the offenders, but he could not make a positive identification. (DSOF ¶ 33).

On February 21, 2002, Detectives Bogucki, Schalk and Assistant State's Attorney Jennifer Walker ("ASA Walker") went to Graham Correctional Center where Fletcher was incarcerated for an armed robbery conviction to interview him regarding the Sorrell murder. (DSOF ¶36). Fletcher admitted he knew Rogers, but denied involvement in the murder. (DSOF ¶36). Fletcher stated that

4

in 1990 he was selling narcotics at Cabrini Green and his narcotics business was thriving so he did not have to commit armed robberies. (DSOF ¶36).

On March 8, 2002, Friend was interviewed by Detectives Bogucki and Schalk. (DSOF ¶39). During this interview she was shown the IDOC photo array and positively identified Fletcher as one of the offenders. (DSOF ¶40). The next day, Friend was interviewed by ASA Walker and gave a handwritten statement. (DSOF ¶41). In that statement, Friend related that on the day of the shooting she saw Cooper and went to talk to him in his truck. (DSOF ¶41). As she was leaving the truck, two Black men with handguns approached. (DSOF ¶41). One offender grabbed her jacket and tried to get her back inside the truck, but she was able to get away from him and leave the truck. (DSOF ¶41). Friend identified a photograph of Fletcher as the offender who had grabbed her jacket. (DSOF ¶41). Friend observed Fletcher pointing his gun at Cooper, patting Cooper down, and leaving Cooper's truck with money in his hand. (DSOF ¶41). Friend stated she saw Cooper exit his truck with a gun and the offenders began firing their guns at him. (DSOF ¶ 41).

Wade was interviewed at his home by Detectives Bogucki and Schalk. (DSOF ¶46). The detectives reported that Wade stated that he was in his vehicle which was parked behind Cooper's truck and he saw the offenders running towards him. (DSOF ¶46). Cooper came out of his truck and shot at the offenders, but hit Wade's car. (DSOF ¶46). The offenders were also shooting their guns and they shot Sorrell. (DSOF ¶46). The detectives reported that Wade told them he did not see the faces of the offenders. (DSOF ¶ 46).

On March 21, 2002, Judge Sheehan of the Circuit Court of Cook County signed an arrest warrant for Fletcher for the murder of Sorrell. (DSOF ¶51). On April 18, 2002, Assistant State's Attorney Katheen Lanahan ("ASA Lanahan") signed a criminal complaint against Fletcher for Sorrell's murder. (DSOF ¶ 52).

On April 20, 2002, Fletcher was brought to Area 5 to stand in lineups. (DSOF ¶53). Friend and Cooper viewed the lineup separately and each identified Fletcher as one of the offenders. (DSOF ¶54).

On May 8, 2002, ASA Walker took a handwritten statement from Rogers. (DSOF ¶57). In that statement Rogers identified a photograph of Fletcher and stated that Fletcher, with a gun in his hand, approached Cooper. (DSOF ¶58). Moments later, Rogers heard gunshots and saw Fletcher and another individual running with Cooper chasing after them. (DSOF ¶58). In May 2002, both Friend and Rogers testified at a grand jury and both identified Fletcher as an offender. (DSOF ¶¶68; 70). Detective Schalk testified before the grand jury that based on the police reports and "interviews with witnesses" that Fletcher and a co-offender took money from Cooper at gunpoint and fled the scene with Cooper chasing after them. (DSOF ¶71). Fletcher fired his gun at Cooper, gunfire was exchanged, and Sorrell was shot in the head. (DSOF ¶71). A grand jury returned an indictment against Fletcher for the murder of Sorrell. (DSOF ¶72 ).

In June 2002, the State reindicted Fletcher based on the murder statute in place at the time of the offense, 1990. (DSOF ¶73). The State called Assistant State's Attorney Jennifer Gonzalez to testify before the grand jury, who simply read in Detective Schalk's prior grand jury testimony. (DSOF ¶73). In June 2002, Fletcher was indicted on nineteen counts of first degree murder. (DSOF ¶ 73).

Fletcher's criminal case proceeded to a jury trial in February 2005. (DSOF ¶86). Cooper testified that after he made his delivery to Uncle Remus' restaurant, Friend approached him. (DSOF ¶87). As he was opening the door to his truck two offenders forced him inside his truck where they robbed him. (DSOF ¶87). Cooper made in-court identifications of Fletcher as the person who stuck a gun at Cooper's side and who went through his pockets. (DSOF ¶87). When

Cooper told the offenders that he did not have keys to the safe, Fletcher told the other offender to shoot Cooper. (DSOF ¶88). Cooper testified that the offenders fled and that he and Rogers chased after them. (DSOF ¶88). Cooper testified that on the day of the murder, Fletcher had a collar length Jheri curl hair style and was wearing dark pants, a Starter jacket, and a cap. (DSOF ¶ 89).

At trial, Cooper testified that Detectives Bogucki and Schalk showed him a photo array at his house in 2002. (DSOF ¶89). Cooper picked out Fletcher from the photo array as being involved in the crime. (DSOF ¶89). Cooper testified that he did not look at any of the other demographic information that was contained on the IDOC photo array. (DSOF ¶91). Cooper further testified that in April 2002, he viewed a lineup at Area 5, identified Fletcher as one of the offenders, and told the detectives he was 100% sure of his identification. (DSOF ¶92). However, two years later when he was interviewed by Fletcher's investigator, Cooper stated he was only about 75% sure. (DSOF ¶ 92).

Wade testified that he heard screaming and saw Cooper running towards him with a gun in his hand. (DSOF ¶94). Wade testified that Cooper fired his gun and a bullet hit his windshield. (DSOF ¶94). Wade saw people running west with hoodies on, but these individuals did not have guns. (DSOF ¶94). Wade was unable to make any identification. (DSOF ¶94). Wade testified that in 2002 detectives came to his home and showed him pictures, but he was unable to identify anyone. (DSOF ¶95 ).

Friend testified that on the day of the shooting she saw Cooper making a bread delivery. (DSOF ¶96). She went to talk to Cooper in his truck. (DSOF ¶96). As she got off the truck, two men approached, and one man, who she identified as Fletcher, grabbed her arm. (DSOF ¶96). Friend was able to get away from Fletcher, but she remained close enough to see the crime as it unfolded. (DSOF ¶97). Friend saw Fletcher searching Cooper's pockets while the other offender

7

held a gun on Cooper. (DSOF ¶97). The offenders then exited the truck and ran. (DSOF ¶97). Cooper, who had a gun, ran after them and began shooting at the offenders who fired back at Cooper. (DSOF ¶ 97).

Friend testified that in February 2002, she was arrested for a parole violation and taken to Area 5 to be interviewed about the Sorrell murder. (DSOF ¶98). She was asked to view a photo array and she identified Fletcher from the photo array. (DSOF ¶98). Friend testified that she saw writing on the printouts which contained the photographs, but that she did not study the writing. (DSOF ¶98). Friend confirmed that the police did not tell her that one of the individuals in the photo array was the offender, nor did they tell her who to pick out. (DSOF ¶¶98-99). Friend testified that, in April 2002, she viewed a lineup and identified Fletcher. (DSOF ¶99). Friend confirmed that the detectives did not tell her who to identify in the lineup. (DSOF ¶99). Friend testified that she had no doubt at all that Fletcher was the offender. (DSOF ¶ 99).

Detective Bogucki testified that in 1995 he was investigating the Sorrell murder. (DSOF ¶100). He reviewed the reports generated from 1990 and knew that they were looking for two offenders, one of whom was named Fletcher. (DSOF ¶105). In February 2002, he and Detective Schalk spoke with Rogers, after they were notified because of their stop order that Rogers was in custody, showed him the IDOC Photo Array, and then began looking for Fletcher. (DSOF ¶101).

Detectives Bogucki and Schalk then spoke with Cooper at his home, showed him the IDOC Photo Array, and asked him if he recognized anyone. (DSOF ¶101). Cooper picked out one of the photos and said it looked like one of the offenders, but he couldn't be positive. (DSOF ¶ 101).

In constructing the IDOC photo array, Detective Bogucki testified that they used the last name "Dixon" to get the fillers. (DSOF ¶136). Detective Bogucki confirmed that hair style was

not a factor in constructing the IDOC Photo Array, because the IDOC photos were recently taken and the photo array was being administered twelve years after the crime occurred. (DSOF ¶136 ).

Detective Bogucki testified that on April 20, 2002, Fletcher stood in two lineups with four fillers. (DSOF ¶103). Detective Bogucki confirmed that at the time of the lineup, Fletcher's hair was in braids and that none of the fillers had collar-length curls or ponytails. (DSOF ¶104). Detective Bogucki also confirmed that Fletcher is the only person who was in both the lineup and the photo array. (DSOF ¶104 ).

At the close of its case, the State admitted 23 exhibits consisting of 20 photographs, a diagram of the area of the crime, the IDOC photo array, and a testimonial stipulation of the medical examiner. (DSOF ¶ 107).

In his case-in-chief, Fletcher called his father, James Fletcher Sr., who testified that in 1990 Fletcher had short hair, not collar-length curls. (DSOF ¶106). Fletcher's ex-wife, Deborah Sanders, testified that in 1990 Fletcher had a "fade" hairstyle. (DSOF ¶106). Sanders testified that in December 1990, she moved to Mississippi because Fletcher was cheating on her. (DSOF ¶106). Right before Christmas in 1990, she met Fletcher in Memphis, but she was unable to state exactly how many days before Christmas she met him. (DSOF ¶106). Fletcher's half-sister, attorney Jacqueline Cunyon Gordon, testified that she represented Fletcher during the April 20, 2002 lineups. (DSOF ¶106). Gordon testified that she wanted to be in the viewing room with the witnesses, but the police would not let her. (DSOF ¶106). Fletcher also called Detective Schalk in his case. (DSOF ¶106). Fletcher elicited from Detective Schalk that during his March 7, 2002 interview with Friend, Friend stated that she had seen one of the offenders in the neighborhood several times and identified that offender as Fletcher. (DSOF ¶106 ).

9

Rogers was not a witness in Fletcher's criminal trial. (DSOF ¶86). The jury found Fletcher guilty of murder and he received a mandatory life sentence. (DSOF ¶¶106; 111).

In August 2011, Fletcher filed a federal *habeas corpus* petition in the Northern District of Illinois. (DSOF ¶113). In 2019, the district court granted Fletcher habeas relief, finding that Detective Bogucki's testimony at trial that he reviewed the reports in 1995 and learned that "one of the witnesses had provided a name of Fletcher" was a violation of the Confrontation Clause. (DSOF ¶122). The district court ordered that the State either retry Fletcher within 120 days or release him from custody. (DSOF ¶122). The Cook County State's Attorney's Office elected not to retry Fletcher. (DSOF ¶ 125).

## LEGAL STANDARD

Summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party must then come forward with specific facts showing there is a genuine issue for trial. *LaRiviere v. Bd. of Trs. of S. Ill. Univ.*, 926 F.3d 356, 359 (7th Cir. 2019). To satisfy that ultimate burden, the nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 474 U.S. 574, 586 (1986). Instead, he must establish a genuine issue for trial such that a reasonable jury could return a verdict in his favor. *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772-73 (7th Cir. 2012).

I.    **THE DEFENDANT OFFICERS ARE ENTITLED TO SUMMARY JUDGMENT ON FLETCHER'S FOURTEENTH AMENDMENT DUE PROCESS CLAIM BASED ON FABRICATED EVIDENCE.**

In Count I of his complaint, Fletcher asserts a due process fabrication claim under the Fourteenth Amendment for: (1) fabricating police reports; and (2) fabricating witness statements implicating him.

A fabrication of evidence claim has four elements: (1) the defendant knowingly fabricated evidence used against the plaintiff; (2) the evidence "was introduced against plaintiff at his criminal trial;" (3) the evidence was material; and (4) the plaintiff was damaged as a result. *Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020); Federal Civil Jury Instructions of the Seventh Circuit § 7.14. Fabricated evidence is evidence that is "made up; it is invariably false." *Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014). There is a distinction between evidence that was obtained through coercion and evidence that was fabricated because evidence collected by coercive techniques is not necessarily untrue. *Coleman v. City of Peoria*, 925 F.3d 336, 346 (7th Cir. 2019). For Fletcher to succeed on his fabricated evidence claim, he must show that each defendant knew – "with certainty" – that the evidence was false. *Id*. at 345. "This is a high bar to clear." *Id*. at 344. Evidence that merely impeaches aspects of a witness's statement or suggests the officer had reason to doubt the witness's veracity is insufficient. *Id*.

A.    **The Defendant Officers Are Entitled to Summary Judgment on Fletcher's Claim of Fabricated Police Reports Because No Police Reports Were Introduced As Evidence At His Criminal Trial.**

Fletcher alleges that police reports were fabricated, although he refuses to specify which reports he alleges were fabricated and who created them. (DSOF ¶¶138; 139). That alone is enough to grant summary judgment in the Defendant Officers' favor. *See Moran v. Calumet City*, 54 F.4th 483, 497 (7th Cir. 2022) (finding plaintiff's failure to state that a police dispatch log was withheld

11

in response to an interrogatory asking him to "[s]tate the factual basis of the allegation that the defendants deliberately with[held] exculpatory evidence" was not only poor discovery practice, but resulted in waiver of his ability to rely on the dispatch log in support of his *Brady* claim). Even if this Court were to ignore Fletcher's failure to identify which reports he alleges were fabricated, his claim fails because no police reports were introduced into evidence at his criminal trial.

A fabricated evidence due process claim is viable when the fabricated evidence was admitted against the plaintiff at the criminal trial. *Patrick*, 974 F.3d at 835 (finding jury instruction that omitted that the plaintiff bore the burden to prove the fabricated evidence was used against him at his criminal trial was error); *Bianchi v. McQueen*, 818 F.3d 309, 319 (7th Cir. 2016) (holding fabrication claim failed because evidence was not admitted at trial); *Walker v. City of Chicago*, 2025 WL 343471, at *4 (N.D. Ill. Jan. 30, 2025) (stating plaintiff could not premise his fabrication claim on an arrest report "because the arrest report was not admitted at trial…."); *Zambrano v. City of Joliet*, 2024 WL 432175, at *9 (N.D. Ill. Feb. 9, 2024) (holding the "fact that the report did not come into evidence dooms the Fourteenth Amendment claim."); *Brown v. City of Chicago*, 633 F.Supp.3d 1122, 1159 (N.D. Ill. 2022) (holding detectives entitled to summary judgment on fabrication of evidence claim based on police reports because the reports were not introduced as evidence at the plaintiff's criminal trials); Order, *Pitts v. Ray*, No. 20 CV 7355, Dkt. No. 108 at 3 (N.D. Ill. Dec. 12, 2024) (holding "[n]either" piece of allegedly false evidence "were used at trial, meaning they cannot be the basis of an evidence fabrication claim") (attached as Exhibit 1).

Here, it is undisputed that no police reports were admitted at Fletcher's criminal trial. (DSOF ¶107). As such, Fletcher's fabricated evidence claim based on police reports suffers the same "fatal flaw" as the claims of the plaintiffs in *Walker, Zambrano*, *Brown*, and *Pitts* and like

the plaintiffs in those cases, Fletcher's claim cannot survive summary judgment. *See Zambrano*, 2024 WL 532175, at *9 (stating fatal flaw was that prosecution did not use report as evidence at trial).

While the testimony of Detectives Bogucki and Schalk was consistent with police reports, that does not salvage Fletcher's fabrication claim. *Brown* is instructive on this point. In *Brown*, after finding that a fabrication claim based on police reports failed because the reports were not introduced at the criminal trials, the court concluded that even though two detectives testified to a version of events consistent with the reports "makes no difference" because false testimony does not give rise to a constitutional claim since witnesses have absolute immunity. *Brown* 633 F. Supp. 3d at 1159 (citing *Briscoe v. LaHue*, 460 U.S. 325, 327 (1983)); *see also Pitts*, No. 20 CV 7355, at 3 (dismissing the fabrication claim where the allegedly false information was introduced solely through an officer's testimony). *Brown* determined "[t]his is so even when the false testimony is consistent with fabricated but unadmitted police reports." *Id*. at 1160 (citing *Avery v. City of Milwaukee*, 847 F.3d 433, 443 (7th Cir. 2017)).

In sum, Defendant Officers are entitled to summary judgment on Fletcher's due process claim based on fabricated police reports because no police reports were introduced into evidence at Fletcher's criminal trial.

### B.  Defendant Officers Are Entitled to Summary Judgment on Plaintiff's Claim of Fabricated Identifications.

Plaintiff alleges that the Defendant Officers "fabricated the photo identifications and live lineup identifications of Plaintiff" by Rogers, Cooper, and Friend. (DSOF ¶¶138;139). Fletcher also alleges that the Defendant Officers "attempted to fabricate an identification" from Wade. (DSOF ¶139). Fletcher's claim fails because Rogers' identification was not admitted at his trial; Wade never identified him; he has no admissible evidence that Friend's identification was false;

and he cannot establish that the Detectives Bogucki and Schalk knew with certainty that Cooper's identification was false.

          i.      <u>Rogers' Identification of Fletcher Was Never Introduced at Fletcher's Criminal Trial.</u>

To the extent Fletcher's fabrication claim is based on the photo identification[1] by Rogers, it fails because that evidence was not introduced at Fletcher's criminal trial. To prevail on a fabricated evidence claim, Fletcher must establish that the fabricated evidence was introduced at his criminal trial. *Patrick*, 974 F.3d at 835. Rogers did not testify at Fletcher's criminal trial and his identification of Fletcher during the IDOC photo array was never used at the criminal trial. (DSOF ¶86). As such, the fabrication of evidence claim related to Rogers' identification of Fletcher fails. *See Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012) ("[I]f an officer [] fabricates evidence and puts that fabricated evidence in a drawer, making no further use of it, then the officer has not violated due process[.]").

          ii.     <u>Wade Never Identified Fletcher.</u>

Fletcher claims that the Defendant Officers "attempted to fabricate an identification" from Wade. (DSOF ¶139). An "attempt to fabricate," however, is insufficient to support a fabrication of evidence claim. *See Patrick¸* 974 F.3d at 835 (requiring a defendant to knowingly fabricate evidence). Wade testified at Fletcher's criminal trial but told the jury that the police visited his house in 2002 and brought pictures with them, but he was unable to identify anyone. (DSOF ¶¶94-95). Even if a Defendant Officer attempted to fabricate an identification from Wade, Fletcher's evidence fabrication claim fails because Wade did not testify to an identification of Fletcher. *See Anderson v. City of Rockford*, 2018 WL 2332066, *20 (N.D. Ill. May 23, 2018) (concluding that

---

[1] Although Fletcher asserted in an interrogatory that Rogers also made a lineup identification of Fletcher that was fabricated, the undisputed facts show that Rogers never participated in or identified Fletcher in a lineup. (DSOF ¶¶55, 61).

officers' "attempt to fabricate" evidence could not sustain an evidence fabrication claim because the witness did not testify to the fabrication at the plaintiff's criminal trial) (reversed on other grounds). Not only is there no false evidence to base this claim on, nonexistent evidence certainly cannot be material to the trial.

        iii.   <u>Fletcher Has No Admissible Evidence that Friend's Identification Was Fabricated.</u>

Fletcher claims that Friend's identifications of him in the IDOC photo array and lineup were fabricated. Unlike Rogers and Wade, Friend testified to both identifications at Fletcher's criminal trial. (DSOF ¶¶98-99). However, this fabrication of evidence claim still fails because Fletcher has no admissible evidence of any fabrication by any Defendant Officer.

On March 7, 2002, Friend was shown the IDOC photo array and she positively identified Fletcher as one of the offenders. (DSOF ¶40). The next day, Friend gave a handwritten statement to ASA Walker in which she was shown a photograph of Fletcher and identified him as one of the offenders. (DSOF ¶41). On May 1, 2002, Friend testified at the grand jury and identified Fletcher under oath as one of the offenders. (DSOF ¶68). Friend testified that she was "treated real good" by the police and ASA Walker and that no one threatened her or promised her anything for her statement or grand jury testimony. (DSOF ¶69). She later testified at trial that she identified Fletcher from the photo array. (DSOF ¶98). Friend confirmed that the police did not tell her that one of the individuals in the photo array was the offender, nor did they tell her who to pick out. (DSOF ¶99). She further testified that she viewed a lineup and identified Fletcher. (DSOF ¶99). Friend confirmed that the detectives did not tell her who to identify in the lineup. (DSOF ¶99). Friend testified that she had no doubt at all that Fletcher was the offender. (DSOF ¶99).

Friend has never testified that she recants her identifications. Defendant Officers anticipate Fletcher will attempt to create an issue of fact by relying on Friend's purported post-conviction

affidavits. While affidavits can be considered at summary judgment, the facts stated in the affidavits must be admissible to be considered. *Gustovich v. AT&T Communications, Inc.*, 972 F.2d 845, 849 (7th Cir. 1992) (stating courts must consider only evidence that would be admissible at trial when considering summary judgment motion).

Here, the problem for Fletcher is twofold. First, as argued in the Defendant Officers' Motion to Bar Friend from Testifying at Trial, Fletcher should be barred from calling Friend as a trial witness because she was never deposed in this case. It is undisputed that during fact discovery in this case, Fletcher was responsible for serving and deposing Friend, but he failed to do so. (DSOF ¶137). As argued more fully in the motion, there has been no indication from Fletcher that Friend would be available at trial or that the circumstances have changed since the time that Fletcher was unable to serve Friend with a rule to show cause order. After Fletcher's counsel relented near the end of fact discovery and allowed Defendant Officers to attempt to serve Friend. Defendant Officers attempted no less than 28 times but were unsuccessful. As argued in the motion, it would be unduly prejudicial to the Defendant Officers to not get the opportunity to question Friend during discovery, but then allow Fletcher to serve her and present her testimony at trial.

Without Friend's testimony to affirm the affidavits, those affidavits are inadmissible hearsay. *Gunville v. Webster*, 583 F.3d 979, 9985 (7th Cir. 2009) ("A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment."); *Winskunas v. Birnbaum*, 23 F.3d 1264, 1267-68 (7th Cir. 1994) (stating affidavits ordinarily are not admissible at trial because they are hearsay). Fletcher may try to assert Friend is "unavailable" under Federal Rule of Evidence 804, but the affidavits are still not admissible because the Defendant Officers did not have an opportunity to cross-examine her regarding her statements in the affidavits. Fed. R. Evid.

16

804(b)(1)(A) and (B); *Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1161 (N.D. Ill. 2022) (holding post-conviction affidavit from unavailable witness "is hearsay and any claim arising from it is unsupported.").

Thus, the only admissible evidence regarding Friend's photo array identification is her criminal trial testimony, in which she specifically and categorically denied that the police told her who to pick out of the photo array. (DSOF ¶99). Similarly, the only admissible evidence regarding the lineup is from Friend's criminal trial testimony in which she clearly denied the allegation that any detective told her who to identify. (DSOF ¶99). Therefore, Defendant Officers are entitled to summary judgment on Fletcher's claim of evidence fabrication based on Friend's identifications of him.

Assuming *arguendo*, Friend's purported affidavits could be considered for summary judgment, they do not provide competent evidence sufficient to hold any Defendant liable for fabrication. In 2011, Friend signed an affidavit stating that "two police detectives" (she does not identify who) showed her a group of photos and asked her who did the shooting in December 1990. (DSOF ¶116). Friend allegedly pointed at one picture, and the "police" (again, she does not identify who) pointed at a photograph of a different man and said "something like, 'That's right. This is the one." (DSOF ¶116). Further, during the lineup, "they" (again, she does not identify who) allegedly told Friend to pick out who did the shooting, and she simply chose the man the "police pointed" to when she looked at the photographs. (DSOF ¶116). In 2012, Friend signed a supplemental affidavit that stated after talking to Fletcher's attorney, she "realized that I knew additional facts…." (DSOF ¶117). In this affidavit, Friend allegedly stated that when "the police" showed her the photos, "they told me that Fletcher was the one that I should pick." (DSOF ¶117). The police told her that Fletcher was in jail for a robbery and had a violent background and she

thought that Fletcher was "a bad guy." (DSOF ¶117). At the lineup, Friend knew who to pick out because it was the same person who "the police" pointed out to her before. (DSOF ¶117).

Friend's two affidavits do not identify *who* supposedly told her to identify Fletcher. Friend's purported affidavits are riddled with generic phrases like "detectives," "the police," and "they." (DSOF ¶¶116-117). This type of nonspecific "identification" is insufficient to establish the personal involvement necessary for any defendant to be held liable for a constitutional tort. *See James v. Hale*, 959 F.3d 307, 317 (7th Cir. 2020) ("The lack of detail [in the affidavit] vitiates any evidentiary value"); *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018) (stating personal involvement requirement satisfied if constitutional violation occurs at the defendant's direction or with his knowledge or consent). Friend's post-conviction affidavits do not contain competent evidence to hold any Defendant Officer liable for the fabrication of Friend's identification because Friend failed to identify any defendant who fabricated her identifications. *See Carmody v. Bd. of Trs. of Univ. of Ill.*, 893 F.3d 397, 401 (7th Cir. 2018) ("Inferences that are supported only by speculation or conjecture will not defeat summary judgment.").

Moreover, even if Friend had identified a Defendant Officer in her post-conviction affidavits, she subsequently recanted her affidavits and explained why she signed them. In 2015, Friend was interviewed by Investigator Brannigan from the Cook County State's Attorney's Office. (DSOF ¶118). During this interview, Friend stated that she told the truth at the grand jury and when she testified in court. (DSOF ¶118). Friend stated that no detective threatened her or told her who to identify at any time. (DSOF ¶118). Friend stated that she told the detectives the truth when they interviewed her. (DSOF ¶118). Friend stated that the affidavits were not accurate nor truthful, but she signed them "so these people would leave me the fuck alone." (DSOF ¶118). Friend then went through both affidavits and identified which statements were true and false and

18

added any necessary notations. (DSOF ¶¶118-119). Friend's notations reveal that when she was shown the photo array, she pointed at Fletcher's picture. (DSOF ¶119). Friend marked as false the statement that the police pointed out a photo to her and then she wrote the notation "Police didn't tell me who to pick out." (DSOF ¶119). For the lineup, Friend crossed out the reference to the police pointing out an individual, and she wrote that she "picked out the man who I saw shooting." (DSOF ¶119). She also wrote the notation, "I only signed because fletcher Lawyer would not leave me alone." (DSOF ¶ 119).

In the second affidavit, Friend marked as false the paragraph stating that the police told her to pick out Fletcher and that they told her about his criminal background and him being a bad guy. (DSOF ¶120). Regarding the lineup, Friend wrote "the office[r] did not tell who to pick out." (DSOF ¶120). Friend identified as false the paragraph about her not remembering what the offender looked like and noted, "I did remember." (DSOF ¶120). Friend marked as false the paragraph stating that she always wondered if she put the wrong person away and wrote, "I never say it or never thought it." (DSOF ¶120). Again, Friend explained that she "only signed because fletcher Lawyer would not leave me alone." (DSOF ¶120).

Friend's statement to Investigator Brannigan and recantation of her post-conviction affidavits are consistent with her handwritten statement to ASA Walker, her grand jury testimony, and her trial testimony in all of which she identified Fletcher as one of the offenders. Friend's post-conviction affidavits make no mention of her handwritten statement or in any way suggest it was fabricated. Friend's post-conviction affidavits make no mention of grand jury testimony or in any way suggest it was fabricated. Friend's post-conviction affidavits make no mention of her in-court identification of Fletcher nor suggest it was fabricated. Friend's post-conviction affidavits are silent on what, if anything, happened in the three years between Friend's photo array and lineup

identifications and her sworn trial testimony. In contrast, her statements to Investigator Brannigan explain why she signed the post-conviction affidavits, namely, that she was being harassed by Fletcher's attorney and the only way to ensure that she would be left alone was to sign the affidavits. (DSOF ¶¶118-120).

Because Friend should be barred from testifying at trial and because her affidavits are inadmissible hearsay, Fletcher has no admissible evidence supporting his fabrication claim based on Friend's identification.

iv. <u>Fletcher Cannot Show that Detectives Bogucki and Schalk Manufactured Cooper's Identification And That They Knew With Certainty That It Was False.</u>

Fletcher cannot establish that Detectives Bogucki or Schalk manufactured Cooper's identification of Fletcher and that they knew "with certainty" that it was false. *Coleman*, 925 F.3d at 344. In fact, Fletcher cannot even establish that Cooper's identification was false.

Cooper's own testimony itself establishes *at most* that he was unsure of his identification. At trial, Cooper testified that he told a defense investigator he was 75% confident in his identification. (DSOF ¶92). Thus, the evidence at the criminal trial was that he had some degree of uncertainty. At the time of his deposition, Cooper said he was 50% confident in his identification and revealed for the first time ever that part of the basis for his identification was conversations he had with family members of Rogers. (DSOF ¶¶126-127). However, when confronted with specific portions of his trial testimony where he identified Fletcher as the person who stuck the gun in his side, who went through his pockets, who told the other offender to shoot him, and who was the offender with the Jheri curl, Cooper agreed that his testimony was truthful and accurate. (DSOF ¶ 131).

Cooper testified that when he met with the detectives in 2002 he told them that he remembered the lips of one of the offenders. (DSOF ¶126). When Cooper first viewed the IDOC Photo Array, he did not identify anyone because a person's features change after 12 years. (DSOF ¶126). Cooper was then reminded to look at the lips of the people in the photographs because lips do not change. (DSOF ¶126). Once Cooper looked at the lips, Cooper indicated that the lips in the photograph of Fletcher looked just like the lips of the offender, but he could not be 100 percent sure. (DSOF ¶126). In selecting the photograph, Cooper "went by his facial and this guy's lips." (DSOF ¶126). Similarly, at the lineup, Cooper indicated that he was reminded to look at the lips of the lineup participants prior to making an identification and he ultimately identified Fletcher. (DSOF ¶ 126).

None of this establishes that the identification—stated to a 75% degree of certainty at trial—was false. Fletcher also cannot argue that somehow alleged coercion would prove the identification was false or manufactured. There is a distinction between coercive techniques and fabricated evidence, in that coerced testimony is not necessarily fabricated. *Id*. at 346. A reluctant witness "whose testimony an officer must pry out" may be telling the truth despite the measure used. *Id*. Fabricated testimony is invariably false because it is made up by the officer, who knows he is making it up. *Id*.

In *Petty v. City of Chicago*, 754 F.3d 416, 423 (7th Cir. 2014), the plaintiff claimed that the police "manufactured false evidence" and used a "false identification" to prosecute him. In that case, a witness testified that the police tried to make him pick out the plaintiff from a lineup, and that he told the officers he was not sure whether the plaintiff was the offender. *Id*. at 418. He then testified that he was not allowed to leave the police station until he identified the plaintiff from a lineup. *Id*. at 418-19. After reviewing case law distinguishing coercive techniques from evidence

fabrication, the Seventh Circuit concluded that the plaintiff's "claim is a 'coercion' case for which there is no cognizable due process claim, as opposed to an 'evidence fabrication' case where there is a cognizable claim. *Id*. at 422-23. *Petty* reasoned that pressuring the witness to identify the plaintiff as one of the assailants, even after the witness stated he was not sure, and holding the witness against his will, did not make the subsequent identification fabricated. *Id*. at 423. Rather, "it is clear that his case is a coercion case." *Id*.

As *Petty* establishes, even pressuring a witness to make an identification of a suspect does not amount to fabrication, but rather is a "coercion case." Here, the evidence of "coercion" would be officers telling him to look at the facial feature that he had said was distinctive in the perpetrator.

Moreover, Fletcher has insufficient evidence to clear the "high bar" in establishing that Detectives Bogucki and Schalk knew "with certainty" that Cooper's identification was false. *Coleman*, 925 F.3d at 344. The undisputed facts that Detectives Bogucki and Schalk knew at the time Cooper viewed the IDOC photo array were: (1) Rogers initially told Detective Fleming that one of the offenders called the other offender "Fletcher" (DSOF ¶19); (2) Rogers told Detectives Bogucki and Schalk that the offender was Jimmie Fletcher and that he knew him (DSOF ¶¶25-27); (3) Rogers picked out Fletcher from the IDOC photo array (DSOF ¶32); (4) Fletcher confirmed that he and Rogers knew each other (DSOF ¶36); (5) according to Cooper, in 2002, he still remembered the offender's lips (DSOF ¶126); (6) after being unable to make an identification, Cooper was told to focus on the lips and in picking out Fletcher he said, "that look just him – the – the lip – the lip like him" (DSOF ¶126); (7) after making the identification at the lineup he told the detectives that he was positive of his identification of Fletcher was the offender. (DSOF ¶92). Given these undisputed facts, Fletcher is unable to show that Detectives Bogucki and Schalk knew "with certainty" that Cooper's identification of Fletcher was false.

Cooper's own testimony itself establishes at most that he was unsure of his identification. If Cooper himself is unclear on whether his identification was true or false, then Fletcher cannot establish that Detectives Bogucki and Schalk knew "with certainty" that his identification was false.

        v.      <u>Defendants Noradin and Wojcik are Entitled to Summary Judgment Because Fletcher Has No Evidence They Were Personally Involved in the Alleged Fabrication of Evidence.</u>

Individual liability under § 1983 requires personal involvement in the alleged constitutional deprivation. *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017). A casual connection, or an affirmative link, between the misconduct complained of and the official sued is necessary. *Id*. To survive summary judgment a plaintiff must offer some evidence that identifies and attributes the claimed misconduct to each particular defendant in order to meet the burden of establishing that defendant's personal involvement. *Id*. Participating in an investigation, by itself, is not enough to establish personal involvement causing a constitutional deprivation. *See Logan v. City of Chicago*, 891 F.Supp.2d 897, 904 (N.D. Ill. 2012) (plaintiff's evidence that officer was involved in investigation, but had no role in the specific constitutional violation alleged, was insufficient to show personal involvement).

Plaintiff has no evidence connecting Noradin and Wojcik to any of the allegedly fabricated evidence. The undisputed facts show that Detective Noradin was involved with the handwritten statement of Rogers. (DSOF ¶57, 59). However, Plaintiff has no evidence that the handwritten statement was fabricated. Neither Wade, Friend, nor Cooper ever indicated that they spoke to Noradin or had any interaction with him. Fletcher has no evidence to establish Noradin was personally involved in the alleged evidence fabrication and there is no genuine dispute of material fact as to his role in the investigation from which he could be found liable.

Wojcik's involvement in the investigation is even more marginal. Fletcher has no evidence that Wojcik had any interaction with any of the four witnesses. Wojcik's testimony that he had no involvement with the four witnesses is therefore undisputed. (DSOF ¶64). All Fletcher can point to is that Wojcik, who was a sergeant, signed off on police reports authored by others. (DSOF ¶67). But without evidence that Wojcik knew the reports were false, Plaintiff cannot establish personal involvement. *See Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988) (stating supervisory liability requires proof that supervisor "know about the conduct…" complained of); *Wrice v. Burge*, 2019 WL 13497046, *1-2 (N.D. Ill. Oct. 2, 2019) (granting summary judgment in favor of supervisor who did not actively participate in police investigation).

## II.      THE DEFENDANT OFFICERS ARE ENTITLED TO SUMMARY JUDGMENT ON FLETCHER'S UNDULY SUGGESTIVE PROCEDURE CLAIM.

As part of his due process claim, Fletcher advances the theory that he was deprived a fair trial because the Defendant Officers utilized unduly suggestive identification procedures. (DSOF ¶138). This claim fails for a number of reasons. First, the Seventh Circuit recently held that police officers are not liable when an identification obtained by unduly suggestive procedures is admitted at the plaintiff's underlying criminal trial. *Blackmon v. Jones*, No. 23-3288, 2025 WL 869045, *3 (7th Cir. Mar. 20, 2025). Second, the Defendant Officers are entitled to qualified immunity. *Id*. Finally, Fletcher cannot establish that Noradin and Wojcik had personal involvement in the identification procedures.

### A.      The Defendant Officers Cannot Be Held Liable For the Identification Evidence That Was Admitted Against Fletcher at His Criminal Trial.

In *Blackmon*, the plaintiff alleged that photo arrays shown to witnesses and lineups viewed by those witnesses were unduly suggestive violating his constitutional rights. *Id*. at *1. The Seventh Circuit first addressed whether the police violate a suspect's constitutional rights by

24

showing witnesses a suggestive photo array or conducting a suggestive lineup. *Id*. at *2. The Court concluded "[t]hey do not." *Id*. The Seventh Circuit then addressed whether "*the police* violate the suspect's constitutional right to a fair trial by introducing into evidence the results of a suggestive identification." *Id*. (emphasis in original). The Court reasoned that it is prosecutors and judges, not the police, who decide what evidence to seek to introduce and allow into evidence at a suspect's criminal trial. *Id*. Because the police are not responsible for the decisions of prosecutors and judges, the police are not liable for the use of identification evidence obtained by unduly suggestive procedures. *Id*.

In *Blackmon*, the plaintiff filed a motion to exclude the identification testimony, but on the day of the hearing his counsel withdrew it. *Id*. The Seventh Circuit noted that although counsel's reason for withdrawing the motion was not apparent, it made no difference because "counsel's choice cannot be blamed on the officers. [Plaintiff] had an opportunity to keep the testimony out of evidence and did not use it." *Id*.

The Seventh Circuit's decision in *Blackmon* is controlling here. Fletcher's constitutional rights were not violated by showing the witnesses the IDOC Photo Array or by having Cooper and Friend view the live lineup after they viewed the IDOC Photo Array. *Id*. Similarly, the Defendant Officers cannot be liable because of the prosecutor's decision to use the identification evidence and the judge's decision to admit the evidence (although at Fletcher's criminal trial, Fletcher did not object to the evidence). (DSOF ¶93, 100). Like the plaintiff in *Blackmon*, Fletcher withdrew his motions to suppress the identification evidence. (DSOF ¶74-77). Fletcher had an opportunity to keep the identification testimony out of evidence, but chose not to use it and the Defendant Officers cannot be liable for the consequences of that choice. *Id*.

### B.     The Defendant Officers Are Entitled to Qualified Immunity.

In *Blackmon*, as here, the identifications were obtained in 2002. *Id*. at *3. The Seventh Circuit addressed "whether, in 2002…it was clearly established that investigating officers could be personally liable under § 1983 for conducting a suggestive lineup." *Id*. The Court answered that question in the negative finding that "[b]efore 2002 neither this circuit, nor any other, had held that an officer could be liable for employing suggestive identification procedures." *Id*. (citing *Hensley v. Carey*, 818 F.2d 646, 649-50 (7th Cir. 1987)). The Court held that "the absence of a clearly established right entitles the defendants in this case to qualified immunity." *Id*. Like the defendants in *Blackmon*, the Defendant Officers are entitled to qualified immunity, because in 2002 it was not clearly established that investigating officers could be personally liable under § 1983 for conducting suggestive photo arrays or lineups. *Id*; *see also Johnson v. Guevara*, 2025 WL 903813, *24 (N.D. Ill. Mar. 24, 2025) (applying *Blackmon* to hold that police had qualified immunity for using unduly suggestive identification procedures and granting summary judgment for the defendants on those claims).

### C.     Fletcher Cannot Establish that Noradin and Wojcik were Personally Involved in Any Unduly Suggestive Identification Procedure.

Even if Fletcher had a cognizable claim under § 1983 for unduly suggestive identification procedures or that the Defendant Officers did not have qualified immunity, he has no evidence that Noradin and Wojcik were personally involved in the alleged procedures. To establish a defendant's personal liability, the plaintiff must show that the defendant caused or participated in the alleged constitutional violation. *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1986). As explained above, Noradin participated in the handwritten statement of Rogers, for which Fletcher has no evidence that any identification procedure used was unduly suggestive. (DSOF ¶57, 59). Wojcik had no contact with any of the witnesses and thus was not involved in any of the identification procedures.

(DSOF ¶¶64-65). Accordingly, Noradin and Wojcik are entitled to summary judgment on Fletcher's suggestive procedure claim.

## III. THE DEFENDANT OFFICERS ARE ENTITLED TO SUMMARY JUDGMENT ON FLETCHER'S DESTRUCTION AND SUPPRESSION OF EVIDENCE CLAIM.

Fletcher brings a due process claim based on the alleged destruction of the photo array shown to Cooper in 1995 and for the withholding of the circumstances of the identifications of Fletcher by the witnesses under *Brady*. These claims fail. For the destruction of evidence claim, Fletcher cannot establish the photo array was destroyed, there was bad faith on the part of Detectives Bogucki or Schalk, or that the photo array was exculpatory. Fletcher's suppression claim fails as a matter of law because he is improperly attempting to recast his fabrication claim as a *Brady* claim. It also fails on the merits, because Fletcher knew or could have learned of the circumstances of the identifications prior to his criminal trial through the exercise of reasonable diligence.

### A. Fletcher's Destruction of Evidence Claim Fails.

Fletcher alleges that the Defendant Officers violated his due process rights by supposedly destroying the photo array containing Clinton and others (but not Fletcher) shown to Cooper in 1995 (the "1995 photo array"). (DSOF ¶138). Fletcher claims this photo array was destroyed because it was not inventoried, meaning that it was not kept by the police department as impounded evidence. Due process does not "impos[e] on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). Instead, the failure to preserve potentially useful evidence only violates due process when the police act in bad faith. *Id*. To prove that a defendant violated his due process rights by failing to preserve evidence, Fletcher must prove: (1) bad faith by the defendant; (2) that the exculpatory nature of the evidence was

apparent before its destruction; and (3) that he could not obtain the same evidence anywhere else. *United States v. Cherry*, 920 F.3d 1126, 1140 (7th Cir. 2019). Bad faith "requires proof of an official animus or a conscious effort to suppress exculpatory evidence, and necessarily turns on an official's subjective knowledge that the evidence in question had exculpatory value at the time it was lost or destroyed." *Id*. To support a claim, the destroyed evidence must have apparent exculpatory value, meaning it must be conspicuous or noticeable. *California v. Trombetta*, 467 U.S. 479, 489 (1984).

As an initial matter, Fletcher cannot establish that the 1995 photo array was destroyed. While it is undisputed that the 1995 photo array was not inventoried with the Chicago Police Department, meaning it was not kept by the Department as impounded evidence, in this case, does not equate to destruction. At that time, CPD did not require photo arrays to be inventoried if, like here, no identification was made. (DSOF ¶21). Here, there are a series of photographs contained in the investigative file, one of which is a mugshot of Fletcher Clinton, who was the suspect in the 1995 photo array. (DSOF ¶21). The other photographs all contain mugshots from arrests that occurred prior to 1995. (DSOF ¶22). The fact that Detectives Bogucki and Schalk do not remember whether these photographs constitute the 1995 photo array not only is unsurprising, but it does not prove the photographs were destroyed. (DSOF ¶21). Also unsurprising is the fact that Fletcher has no evidence that any person actually destroyed the photo array, including Detective Bogucki or Schalk. *See Pepper v. Village of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005).

Let's assume for a moment that the photo array was destroyed—Fletcher cannot establish bad faith or that the 1995 photo array was exculpatory to Fletcher. The theory Fletcher advances is that the 1995 photo array was exculpatory because of the possibility that his photograph could have been included. However, that is far too speculative to survive summary judgment. *Hill v. City*

28

*of Chicago*, 2009 WL 174994, at *4 (N.D. Ill. 2009) (finding the plaintiff's "mere speculation that [certain reports] may have existed" in a street file "cannot be the basis for his *Brady* claim"). There is simply no evidence that Fletcher's photograph was contained in the 1995 photo array and thus Fletcher cannot show it was exculpatory. *See Trombetta*, 467 U.S. at 486 ("Whenever potentially exculpatory evidence is permanently lost, court face the treacherous task of divining the import of materials whose contents are unknown, and very often, disputed."). Even if Fletcher could establish the photo array was exculpatory and destroyed, he cannot establish bad faith, which is analyzed based on the officer's subjective knowledge at the time the evidence was destroyed. *Cherry*, 920 F.3d at 1140.

Fletcher does not know when the evidence was allegedly destroyed or the officer who allegedly destroyed it, making the task of analyzing bad faith impossible. But in 1995 when Cooper was shown the photo array, Clinton was a possible suspect. (DSOF ¶21). Even if Fletcher happened to be one of the fillers in the 1995 photo array, the detectives had no way of knowing the exculpatory value of the negative identification because it was seven years before Rogers provided Fletcher's name to the detectives. (DSOF ¶25). Moreover, the undisputed facts establish that it was not required policy to inventory or preserve negative photo arrays in 1995, negating any attempt by Fletcher to show bad faith. (DSOF ¶21). There is no evidence that any defendant acted with official animus or a conscious effort to suppress evidence exculpatory to Fletcher.

### B.    Fletcher Improperly Recasts His Fabrication Claim as a *Brady* Claim.

Fletcher alleges that the manufactured and fabricated evidence implicating him in the crime were not "documented" or "otherwise disclosed" to him. (Dkt. #1, Compl. ¶34, 35). Fletcher's *Brady* claim that the Defendants withheld their fabrication of evidence fails as a matter of law. "*Brady* does not require the creation of exculpatory evidence, nor does it compel police officers to

accurately disclose the circumstances of their investigations to the prosecution." *Saunders-El v. Rohde*, 778 F.3d 556, 562 (7th Cir. 2015). A plaintiff is not allowed to recast his fabrication claim into a *Brady* claim. *Serrano v. Guevara*, 2020 WL 3000284, *19 (N.D. Ill. June 4, 2020) ("Failing to disclose falsified evidence, or "keeping quiet" about that evidence, is the same as a fabrication of evidence claim and cannot be recast as a *Brady* allegation."); *see also Boyd v. City of Chicago*, 225 F.Supp.3d 708, 720 (N.D. Ill. 2016) (stating no support for a *Brady* claim where the allegation is not that the defendants suppressed evidence, but that they produced fabricated evidence); *Patrick v. City of Chicago*, 103 F.Supp.3d 907, 915 (N.D. Ill. 2015) (finding plaintiff's "objection to Defendants' conduct appears to be not so much that they suppressed evidence as that the evidence they ultimately produced was fabricated…" and is not appropriately characterized as a *Brady* claim); *Phillips v. City of Chicago*, 2015WL 5675529, at *5-6 (N.D. Ill. 2015 (finding that the officers' non-disclosure of their alleged treatment of witnesses does not amount to a *Brady* violation); *Myvett v. Heerdt*, 2015 WL 12745087, at *6 (N.D. Ill. May 28, 2015) (rejecting *Brady* claim where plaintiff claimed that defendants withheld their fabrication of witnesses' statements); *Alvarado v. Hudak*, 2015 WL 4978683, at *3 (N.D. Ill. Aug. 20, 2015) (dismissing *Brady* claim that alleged officers failed to disclose their misconduct because officer's silence following alleged fabrication of evidence is not a *Brady* violation). Accordingly, the Defendant Officers are entitled to summary judgment on Fletcher's claim that the Defendant Officers did not disclose their alleged fabrication of evidence.

### C. Even If Fletcher Could Recast His Fabrication Claim as a *Brady* Claim, the Claim Still Fails.

Even if the law allowed Fletcher to recast his fabrication claim as a *Brady* claim, the Defendant Officers would still be entitled to summary judgment. To prevail on a civil *Brady* due process claim, a plaintiff must demonstrate that the evidence in question was favorable to him, the

defendant suppressed the favorable evidence, and prejudice ensued because the suppressed evidence was material. *Anderson v. City of Rockford*, 932 F.3d 494, 504 (7th Cir. 2019). Favorable evidence is either exculpatory or impeaching. *Harris v. Kuba*, 486 F.3d 1010, 1016 (7th Cir. 2007). Evidence is suppressed when evidence was not disclosed in time for the defendant to make use of it and that evidence was not otherwise available to the defendant through the exercise of reasonable diligence. *Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008). Suppressed evidence is material if there is a reasonable probability that the jury's verdict would have been different if the evidence had been presented to it. *Goudy v. Cummings*, 922 F.3d 834, 842 (7th Cir. 2019). As this is a § 1983 action, Fletcher must establish that the Defendant Officers are personally responsible for the constitutional violation. *Pepper*, 430 F.3d at 810 (stating individual must have caused or participated in the constitutional deprivation).

      i.    <u>Rogers</u>

As shown above, Fletcher has no evidence that (1) Rogers' statement to Detectives Bogucki and Schalk naming him as the offender; (2) Rogers' identification of him from the IDOC photo array; (3) Rogers' handwritten statement to ASA Walker implicating him; and (4) Rogers' grand jury testimony implicating him were fabricated. Because Fletcher has no evidence of fabrication, he necessarily has no evidence that any Defendant Officer failed to disclose the fabrication.

Fletcher alleged "[u]pon information and belief," that the Defendants "struck an illegal and undisclosed deal with Rogers, wherein they declined to investigate or seek charges for arson, in exchange for his false statement implicating Fletcher." (Dkt. #1, Compl., at ¶29). Fletcher also alleged "[u]pon information and belief … that Rogers had worked as a police informant … in prior criminal cases, and may have received a benefit for testifying for the police in the past." (Dkt. #1,

Compl, at ¶118). However, after years of discovery, Fletcher has no evidence of this supposed deal or that Rogers was a police informant. The only evidence is that no offers were made to Rogers to avoid criminal prosecution in exchange for his assistance in the investigation. (DSOF ¶60). It appears that Fletcher's "information and belief" was nothing more than a hope and a prayer, and Fletcher's speculation about any deal or benefit from testifying is insufficient to survive summary judgment. *Coleman*, 925 F.3d at 345 ("[I]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion).

        ii.    <u>Wade</u>

Fletcher's *Brady* claim that the detectives allegedly failed to disclose that they purportedly attempted to fabricate an identification of Fletcher from Wade fails for two reasons. First, an unsuccessful attempt to fabricate an identification from Wade is not material to Fletcher's criminal trial because Wade did not identify Fletcher at the trial. (DSOF ¶94). Put another way, Fletcher was not convicted because of Wade's identification testimony because no such testimony was adduced at trial. Any potential testimony concerning an unsuccessful attempt to fabricate Wade's identification therefore would not have moved the needle in Fletcher's favor. *See Goudy*, 922 F.3d at 842 (stating materiality is a reasonable probability that the jury's verdict would have been different if the evidence had been presented to it). Wade actually testified at Fletcher's criminal trial that in March 2002, when the police spoke to him they indicated that they had a suspect in the crime. (DSOF ¶95). Fletcher's counsel then asked Wade whether the police pointed out to you which one of these photos was the suspect that. (DSOF ¶95). Fletcher's materiality problem is that the trial court sustained the State's objection. (DSOF ¶95). Fletcher's counsel then asked, whether he knew which one of these pictures was the suspect that the police had in their mind for the shooting? (DSOF ¶95). But again, the trial court sustained the objection. (DSOF ¶95). With the

trial record revealing that the court was not admitting testimony concerning the attempted fabricated identification, Fletcher cannot show that the alleged failure to disclose it would have changed the result of the trial.

Second, the undisputed facts establish that Fletcher obtained information regarding this alleged attempt to fabricate prior to his trial. *Carvajal*, 542 F.3d at 567 (stating in civil case for evidence to be suppressed it cannot be otherwise available to the defendant through the exercise of due diligence). It is undisputed that Wade spoke to Fletcher's criminal defense attorney prior to Fletcher's trial. (DSOF ¶85). After the conversation, Fletcher's criminal defense attorney made the decision to subpoena Wade and intended to call him in Fletcher's case-in-chief. (DSOF ¶85). Reginald Hill, Fletcher's first chair criminal defense attorney, spoke to Wade prior to trial and Wade indicated that the police "told him which one of the perpetrators to pick" as being the offender. (DSOF ¶85). That is in fact what led to the above questions that Fletcher's counsel asked Wade at the criminal trial. As such, Fletcher cannot show that evidence of the alleged attempt to extract a false identification from Wade was suppressed.

iii.   Friend

As with his fabrication of evidence claim, Fletcher cannot avoid summary judgment on his *Brady* claim merely by resorting to Friend's post-conviction affidavits, because as stated above, Friend should be barred from testifying, making her affidavits inadmissible hearsay.

But even if the Court considers the merits of Fletcher's *Brady* claim that Defendant Officers suppressed evidence that they falsified Friend's identification of Fletcher, his claim necessarily fails because he cannot show the information was not available to him in the exercise of reasonable diligence. Fletcher used several methods to contact Friend prior to his criminal trial and discuss her identification. First, Fletcher's father surreptitiously had an acquaintance call

Friend and ask about her identification while he listened. (DSOF ¶79). Friend allegedly indicated that she was at first unsure about her identification, but then the police told her they had a suspect and that he had done things like this before. (DSOF ¶79). This information was relayed from Fletcher's father to his criminal defense attorneys who developed the strategy that if Friend identified Fletcher at trial, Fletcher would call his father or the acquaintance to impeach Friend based on the phone call. (DSOF ¶79). Second, Fletcher's attorneys interviewed Friend prior to trial. (DSOF ¶80, 82). Joe Saltiel, Fletcher's second chair attorney, interviewed Friend over the phone. (DSOF ¶80). Reginald Hill, Fletcher's first chair attorney, interviewed Friend prior to trial and she expressed some doubt to him about whether Fletcher was the offender. (DSOF ¶82).

In addition, Fletcher's family contacted Friend and gave her money not to appear in court. (DSOF ¶81). Although that worked for a time, that approach backfired when Friend was arrested on a warrant for her failure to appear. (DSOF ¶ 86). Fletcher can hardly make a *Brady* due process claim regarding the circumstances of Friend's identification, when his attorneys were able to speak to her, and his family had contact with her, encouraging her not to testify.

    iv. <u>Cooper</u>

Fletcher's *Brady* claim regarding the fabrication of Cooper's identification of Fletcher fails because Fletcher could have discovered the information through the exercise of reasonable diligence. Like Wade and Friend, Fletcher's criminal defense team interviewed Cooper prior to trial. (DSOF ¶78). Cooper told Fletcher's investigator that he could not make a positive identification when he looked at the IDOC photo array in 2002. (DSOF ¶78). Cooper told the investigator that when asked by the detectives if anyone in the array looked familiar, Cooper picked out one photo, but told the detectives he could not be 100 percent sure. (DSOF ¶78). Cooper, who thought the lineup occurred two or three days after the photo array, told the investigator he picked

someone out of the lineup but that he could not be 100 percent sure because the robbery happened so long ago. (DSOF ¶78). Cooper also told Fletcher's investigator that he had heard that Rogers was the person who reported that Fletcher was one of the offenders. (DSOF ¶78).

To be sure, Cooper's current story is different than what he told Fletcher's investigator and what he testified to at Fletcher's criminal trial. But that does not mean under these circumstances Fletcher could not have discovered the story through the reasonable exercise of diligence. As Cooper's deposition testimony reveals, it did not take much effort from Fletcher's current counsel to discover the new details of Cooper's story. Cooper testified that the day before his deposition, he spoke to Fletcher's counsel. (DSOF ¶132). When asked what questions Fletcher's counsel asked him that prompted him to provide the newly disclosed details (that the police pointed out a picture to him,), Cooper responded, he just asked did the police "show me any pictures and stuff?" (DSOF ¶132). Cooper confirmed that it did not take the specific question of "Did the police point out a photo?" for him to tell Fletcher's current counsel that the police pointed out a photo. (DSOF ¶132). Cooper did not testify that any police officer told him not to discuss the circumstances of the identification.

The undisputed facts reveal that Cooper was not an "uncooperative or reluctant" witness. *See Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001) (stating that there are "situations in which it would be nearly impossible" for diligent counsel to discover favorable evidence, like when a witness is uncooperative or reluctant…."). In *Boyd*, the plaintiff made a *Brady* claim that an eyewitness to the shooting told the defendants that the plaintiff was not the shooter. 225 F.Supp.3d at 722. The eyewitness was disclosed as an eyewitness in the police investigation and as an individual who viewed a lineup. *Id*. The *Boyd* court reasoned that the allegedly suppressed statement related directly to the eyewitness' role in the case. *Id*. at 723. "Because the plaintiff's

35

trial attorney could have interviewed [the eyewitness] regarding what she saw at the crime scene and what she said during the lineup, her statements could have been obtained through the exercise of due diligence." *Id*.

Here, Cooper spoke to Fletcher's criminal defense team twice and gave them favorable information, *i.e.*, he was only 75 percent sure of his identification and that he had heard Rogers was the person who said that Fletcher was the offender. (DSOF ¶78, 92). According to Cooper's deposition testimony, all that Fletcher's criminal defense team needed to do was ask him, as Fletcher's current attorney did the day before his deposition, whether the police showed him any photos? (DSOF ¶132). According to Cooper, that would have prompted him to provide the new details about the police pointing out a picture and the statements they made to him. (DSOF ¶132). Unfortunately for Fletcher, his criminal defense team apparently did not ask that basic question. As in *Boyd*, Fletcher cannot sustain a civil *Brady* claim where he could have obtained the allegedly exculpatory evidence through the exercise of reasonable diligence.

Fletcher's *Brady* claim related to the circumstances of Cooper's identification fails for another reason, namely, the prosecution was aware of it. A "plaintiff cannot show that a police officer suppressed evidence if the prosecution was aware of it." *Moran*, 54 F.4th at 492. Once the prosecutor has the exculpatory evidence, the prosecutor's disclosure obligation is triggered. *Beaman v. Freesmeyer*, 775 F.3d 500, 512 (7th Cir. 2015). An "officer generally cannot be held liable for failing to disclose exculpatory evidence if the prosecution obtained that evidence from another source; once the prosecution has the evidence, it is the prosecution's – not the officer's – duty to disclose it to the defense." *Moran*, 54 F.4th at 493.

Assuming for purposes of this motion that Cooper's testimony is true, Cooper admitted he disclosed the circumstances of his identification to ASA Aidan O'Connor, the attorney who

36

prosecuted Fletcher. Cooper claimed that he met with ASA O'Connor at least three times prior to

his trial testimony. (DSOF ¶129). Cooper contended that he told ASA O'Connor that he was only

50 percent sure of his identification of Fletcher. (DSOF ¶129). Cooper also testified that he told

ASA O'Connor that when the police were at his house in 2002, that they told him that Rogers had

given them Fletcher's name. (DSOF ¶129). Cooper also testified that he told ASA O'Connor that

the police pointed out a photograph to him during the photo array. (DSOF ¶129). Once Cooper

told ASA O'Connor these circumstances of his identification, it became her duty to disclose that

information to Fletcher. *See Moran*, 54 F.4th at 493. Because ASA O'Connor knew of this

information, the Defendant Officers had no further duty to disclose it, and Fletcher's *Brady* claim

must fail. *See id*. at 493-94 (finding *Brady* claim failed even though police did not disclose report

because the prosecution team knew of the information contained in report); *see also Beaman*, 776

F.3d at 513 (stating police officers not liable for failing to turn over *Brady* evidence where the

prosecutor had the evidence but did not turn it over to the defense).

> ### D. Fletcher Cannot Show Personal Involvement by Detective Noradin or Sergeant Wojcik in any *Brady* or Destruction of Evidence Claim.

As explained above, Noradin's involvement in the investigation was merely sitting in on

the handwritten statement of Rogers and transporting Fletcher from County Jail. (DSOF ¶57, 63).

As Fletcher has no evidence that Rogers' handwritten statement was fabricated, there is no basis

for a *Brady* claim against Noradin for failing to disclose that alleged fabrication. Fletcher has no

evidence that Noradin was personally involved in the destruction, withholding, or suppression of

any exculpatory evidence. The undisputed facts also establish Sergeant Wojcik had no contact with

any of the witnesses. (DSOF ¶64-66). Fletcher has no evidence that Wojcik destroyed, withheld,

or suppressed any exculpatory evidence. As such, Noradin and Wojcik are entitled to summary

judgment on Fletcher's destruction of evidence and *Brady* claims. *See Pepper*, 430 F.3d at 810

(stating defendant must have caused or participated in the constitutional deprivation).

## IV.     THE DEFENDANT OFFICERS ARE ENTITLED TO SUMMARY JUDGMENT ON FLETCHER'S MALICIOUS PROSECUTION CLAIM.

Fletcher asserts a state law claim for malicious prosecution. (DSOF ¶138). To succeed on

a malicious prosecution claim, a plaintiff must prove: (1) the defendant commenced and continued

an original judicial proceeding; (2) favorable termination of the proceeding; (3) the absence of

probable cause; (4) malice; and (5) damages. *Lund v. City of Rockford*, 956 F.3d 938, 949 (7th Cir.

2020); *Barnes v. City of Centralia*, 943 F.3d 826, 833 (7th Cir. 2019). In this case, Fletcher cannot

establish the absence of probable cause or that the Defendant Officers commenced and continued

the criminal proceeding against him.

### A.     Fletcher Cannot Show the Absence of Probable Cause.

Fletcher cannot show the absence of probable cause. Fletcher was arrested pursuant to a

warrant that a judge signed and approved in March 2002. (DSOF ¶51). The arrest warrant creates

a presumption of probable cause and Fletcher cannot rebut that presumption. Fletcher was also

indicted by a grand jury. The grand jury indictment also creates a presumption of probable cause

that Fletcher cannot rebut. Finally, at a minimum, Rogers' identification of Fletcher creates

arguable probable cause entitling the Defendant Officers to qualified immunity.

### i.     Fletcher Cannot Rebut the Presumption of Validity of the Arrest Warrant or Grand Jury Indictment

Probable cause is an absolute defense to a malicious prosecution claim, so Fletcher carries

the burden of demonstrating that police lacked probable cause to arrest him. *Madero v.*

*McGuinness*, 97 F.4th 516, 522 (7th Cir. 2024); *Beaman v. Freesmeyer*, 2019 IL 122654, ¶ 26.

When a neutral magistrate issues an arrest warrant, courts "presume the validity of the warrant and

the information offered to support it." *Lee v. Harris*, 127 F.4th 666, 672 (7th Cir. 2025) (citing *Johnson v. Myers*, 53 F.4th 1063, 1068 (7th Cir. 2022)). That is, courts presume probable cause. *Johnson*, 53 F.4th at 1068. A plaintiff can rebut this presumption in two ways. First, by showing that that "the warrant application was 'so lacking in indicia of probable cause as to render official belief in its existence unreasonable.'" *Lee*, 127 F.4th at 672. Second, by showing that "the officer who sought the warrant knowingly or intentionally or with a reckless disregard for the truth, made false statements to the judicial officer, and that the false statements were necessary to the judicial officer's determination that probable cause existed." *Id*. These "exceptions are narrowly drawn by design." *Id*. This is because courts must give "great deference to the issuing judge's determination of probable cause." *Johnson*, 53 F.4th at 1069.

Fletcher cannot rebut the presumption of probable cause because he failed to develop any evidence regarding the circumstances of the arrest warrant. The arrest warrant reveals that Judge Sheehan signed the warrant on March 21, 2002. (DSOF ¶51). However, Fletcher has produced no evidence regarding what was included (or not included) in the warrant application or what was testified to in front of Judge Sheehan. Any attempt by Fletcher to speculate as to what was contained in the warrant application and said to Judge Sheehan is just guesswork and insufficient to survive summary judgment. *See Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 960 (7th Cir. 2021) (stating plaintiff must provide more than just mere assertions to defeat summary judgment). Fletcher bears the burden to undermine the presumed validity of the arrest warrant, but he chose not to develop any evidence on this topic. *See Johnson*, 53 F.4th at 1067 (stating plaintiff bears the burden to rebut presumption of arrest warrant validity). As Fletcher has not come forward with evidence to meet his burden, the arrest warrant is presumed valid and establishes probable

cause. The Defendant Officers are entitled to summary judgment on Fletcher's malicious prosecution claim.

Similar to an arrest warrant, "a grand jury indictment is prima facie evidence of probable cause. *Lee*, 127 F.4th at 672. To overcome this presumption, a plaintiff must advance "evidence that law enforcement obtained the indictment through improper or fraudulent means." *Id*. In other words, the plaintiff must show "defendants knew they lacked probable cause to arrest him." *Id*.

Plaintiff has no evidence to overcome the presumptions created by these judicial determinations of probable cause. He must show that the defendants not only provided fraudulent information or misleading omissions but also when removing that tainted evidence from the equation, there was not enough uncontested, reliable evidence to support probable cause as a matter of law. *Washington v. City of Chicago*, 98 F.4th 860, 874 (7th Cir. 2024). He has not done so, and therefore his claim fails.

### ii.    Probable cause existed based on Rogers' identification alone

In this case, Rogers' identification of Fletcher is by itself sufficient to support probable cause, and Rogers has never recanted. Probable cause is a common-sense inquiry requiring only a probability of criminal activity. *Id.* Probable cause "is not a high bar." *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018). It is assessed objectively based on "the conclusions that the … officer reasonably might have drawn from the information known to him." *Young v. City of Chicago*, 987 F.3d 641, 644 (7th Cir. 2021). Probable cause exists where the police officer is aware of facts and circumstances "sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Coleman*, 925 F.3d at 350.

The Seventh Circuit "has held repeatedly that a single eyewitness identification is enough" for probable cause. *Lee*, 127 F.4th at 676 (citing *Gramenos v. Jewel Cos.*, 797 F.2d 432, 439-40

(7th Cir. 1986) and *McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009)); *see also Hart v. Mannina*, 798 F.3d 578, 587 (7th Cir. 2015) (an identification by a single eyewitness can support probable cause for arrest). *Cairel v. Alderden*, 821 F.3d 823 (7th Cir. 2016) is illustrative. That case involved a string of robberies in which the offenders had impersonated police officers. *Cairel*, 821 F.3d at 828. The plaintiffs were pulled over by actual police officers after observing them commit traffic violations. *Id*. The police had a robbery victim come to the scene of the traffic stop for a show-up identification. *Id*. At the scene, the robbery victim expressed uncertainty that the plaintiffs were the offenders and never affirmatively identified them. *Id*. Later, the robbery victim met with a detective and positively identified the plaintiffs as the offenders. *Id*. The robbery victim's description of the offenders, which occurred the night prior to the traffic stop, did not align with the plaintiffs' appearances. *Id*. The victim described the offenders as one Black man and one Hispanic man who was six feet tall, but the plaintiffs were a Black man and a white man who was six feet, five inches tall. *Id*. The detective did not believe these discrepancies to be particularly great given the victim's certainty and the fact that the initial observation occurred at night. *Id*. The Seventh Circuit held that the victim's identification established probable cause even though he "expressed some hesitation" during his identifications and that the identifications "did not match his earlier descriptions very well." *Id*. at 835. *Cairel* reasoned that "it is undisputed that [the victim] did in fact identify [the plaintiffs] as the men who robbed him the night before and that [the victim] remained confident in his identifications after that." *Id*.

Like the victim's identification in *Cairel*, Rogers' identification of Fletcher as one of the offenders established probable cause. At the time of Fletcher's arrest, the detectives knew that in 1990 Rogers told Detective Fleming that he had heard one of the offenders call the other offender "Fletcher." (DSOF ¶19, 20 105). Twelve years later, when Detectives Bogucki and Schalk were

41

able to interview him, Rogers told them that "Jimmie Fletcher," who he knew from prior interactions, was one of the offenders. (DSOF ¶25-27). Although Rogers was not able to explain why he did not tell Detective Fleming that the offender was "Jimmie Fletcher" because he did not remember what he told the detective in 1990 (DSOF ¶28), "[a]n officer need not even believe that a witness is reliable to determine that her statement supports probable cause for an arrest because the assessment of credibility rests with courts, not officers." *Garcia v. Posewitz*, 79 F.4th 874, 880 (7th Cir. 2023). The detectives conducted a name search and discovered Fletcher had prior convictions for armed robbery and murder (DSOF ¶29). *See People v. Fair*, 159 Ill. 2d 51, 69 (1994) (stating a defendant's past criminal history is a proper factor in determining probable cause). Detectives Bogucki and Schalk showed Rogers the IDOC photo array and he identified Fletcher (DSOF ¶32). *Coleman*, 925 F.3d at 351 (noting that even questionable witness identifications are enough to provide probable cause to arrest). Detectives Bogucki, Schalk, and ASA Walker then interviewed Fletcher, who corroborated some of Rogers' information, including that he and Rogers knew each other, but Fletcher provided no explanation as to why Rogers would say he was involved in the crime (DSOF ¶36). *See Moorer v. City of Chicago*, 92 F.4th 715, 721 (7th Cir. 2024) ("[I]dentification by even one eyewitness who lacks apparent grudge against the accused person is sufficient to demonstrate probable cause"). During the interview of Fletcher, his defense to the crime was that he did not need to commit armed robberies because his drug business was so successful. (DSOF ¶36). Detectives Bogucki and Schalk did not need to credit Fletcher's purported defense to the crime since Fletcher was incarcerated for an armed robbery that occurred close in time to the armed robbery of Cooper and murder of Sorrell. *See Washington*, 98 F.4th at 876 (finding officer can properly consider a suspect's evasive and deceptive behavior when questioned by authorities in determining probable cause).

These undisputed facts show there was probable cause to prosecute Fletcher, defeating his malicious prosecution claim.

### iii. Alternatively, Rogers' Identification Provided Arguable Probable Cause for Fletcher's Prosecution.

Rogers' identification created probable cause but Defendant Officers need only demonstrate *arguable* probable cause to prove qualified immunity. *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015). Arguable probable cause exists when "a reasonable officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law." *Mwangangi v. Nielsen*, 48 F.4th 816, 825 (7th Cir. 2022). Arguable probable cause considers whether an officer's subjective beliefs were objectively reasonable, and if a reasonable officer could have mistakenly believed probable cause existed, he is shielded from liability. *Schimandle v. Dekalb Cnty., Sheriff's Off.*, 114 F.4th 648, 655 (7th Cir. 2024). This standard provides "ample room for mistaken judgments' and protects all but the plainly incompetent and those who knowingly violate the law." *Id.*

Here, considering Rogers' initial statement to Fleming that an offender was called Fletcher, his subsequent statement that the offender was "Jimmie Fletcher," the search conducted revealing Plaintiff had prior convictions of armed robbery and murder, and Rogers' identification of Plaintiff from the IDOC photo array, an officer could have reasonably believed that probable cause existed in light of well-established law. (DSOF ¶¶19, 25, 26, 29, 32). Once a defendant raises qualified immunity, the plaintiff bears the burden of defeating it by identifying a closely analogous case or persuading the court that the conduct was so egregious and unreasonable that no reasonable officer could have thought he was acting lawfully. *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 723-24 (7th Cir. 2013). Fletcher has no analogous case finding a constitutional violation under similar circumstances, *see Gramenos*, 797 F.2d at 439-40 (stating a single eyewitness's statement can

support indictment), and has no evidence that any officer engaged in egregious conduct with respect to Rogers. The Defendant Officers are entitled to qualified immunity.

> **B.      Fletcher Cannot Establish that Any Defendant Officer Commenced and Continued His Prosecution.**

Fletcher cannot establish that any Defendant Officer commenced and continued the criminal charges against him. A determination of whether a defendant commenced and continued a prosecution considers whether the defendant's actions proximately caused the prosecution. *Beaman v. Freesmeyer*, 2019 IL 122654, ¶ 41. Liability for commencing or continuing a prosecution extends to all persons who played a significant role in causing the prosecution of the plaintiff. *Id*. at ¶ 43. It turns on "whether the defendant was actively instrumental in causing the prosecution, and the presumption of prosecutorial independence can be overcome by showing that the defendant improperly exerted pressure on the prosecutor, knowingly provided misinformation to her, concealed exculpatory evidence or otherwise engaged in wrongful or bad-faith conduct instrumental in the initiation of the prosecution." *Id*. at ¶ 44.

Fletcher lacks evidence to overcome the presumption of prosecutorial independence. Here, the criminal proceeding was initiated on March 21, 2002, when Judge Sheehan signed an arrest warrant against him for the Sorrell murder. (DSOF ¶51). Prior to the arrest warrant being signed, ASA Walker interviewed Rogers, who, during that interview identified Fletcher as the offender. (DSOF ¶34, 51). Fletcher has no evidence of any wrongful conduct by any Defendant Officer with respect to Rogers' identification of Fletcher to ASA Walker. ASA Walker also interviewed Fletcher who confirmed that he knew Rogers, but denied involvement in the murder because his drug business was so profitable that he did not need to commit armed robberies. (DSOF ¶36). ASA Walker's interview of Fletcher occurred at Graham Correctional Center where he was serving a 25-year sentence for armed robbery. (DSOF ¶29, 36). ASA Walker interviewed and took a

handwritten statement of Friend in which she identified Fletcher as the offender. (DSOF ¶41, 44). It was ASA Walker's decision, not that of the detectives, to take Friend's handwritten statement. (DSOF ¶ ). ASA Walker also interviewed Wade at which time Wade stated he could not identify the offenders. (DSOF ¶47). Five days later, Judge Sheehan signed off on an arrest warrant. (DSOF ¶51). Fletcher has presented no evidence as to what information was provided to Judge Sheehan to obtain the arrest warrant, and therefore, Fletcher has no evidence that any Defendant Officer commenced or continued his criminal prosecution.

Moreover, the criminal complaint was not signed by any Defendant Officer. It was signed by ASA Lanahan on April 18, 2002. (DSOF ¶52). At the time she signed the criminal complaint, ASA Lanahan was assigned to Branch 66 which primarily dealt with cases being prepared for indictment. (DSOF ¶52). Usually in Branch 66, the ASAs would have access to a case's felony review folder. (DSOF ¶52). Fletcher has provided no evidence as to what ASA Lanahan relied on or who she spoke to prior to signing and filing the criminal complaint. *See Holt v. City of Chicago*, 2022 IL App (1st) 220400, ¶ 91 (reasoning that detective did not commence and continue prosecution, in part, because detective did not sign criminal complaint). As such, Fletcher cannot establish that the presumption of prosecutorial independence was overcome.

i.     <u>Detective Noradin and Sergeant Wojcik Did Not Commence or Continue Fletcher's Criminal Prosecution.</u>

No reasonable jury could find that Detective Noradin and Sergeant Wojcik commenced or continued the prosecution. The undisputed facts establish that Detective Noradin's involvement was limited to ASA Walker's interview with Rogers and transporting Fletcher from County Jail. (DSOF ¶57, 62, 63). As Fletcher has no evidence of any misconduct related to Rogers' identification of Fletcher as the offender during that interview, Noradin cannot be found to have engaged in wrongful or bad-faith conduct instrumental in the initiation of the prosecution. *Beaman*,

2019 IL 122654 at ¶ 45. Likewise, Sergeant Wojcik, as a supervisor, merely approved reports drafted by others. (DSOF ¶64-67). There is no evidence suggesting he had any contact with ASA Walker or ASA Lanahan, and in fact, the reports that he approved were both submitted to him and approved by him *after* ASA Walker approved the murder charges and *after* ASA Lanahan signed the criminal complaint. (DSOF ¶51, 52, 67). Like Noradin, Wojcik is entitled to summary judgment because Fletcher has no evidence that his conduct was the cause in fact and a proximate cause of Fletcher's criminal proceeding commencing or continuing. *Beaman*, 2019 IL 122654 at ¶ 24.

Accordingly, the Defendant Officers are entitled to summary judgment on Fletcher's malicious prosecution claim.

## V. DEFENDANT OFFICERS ARE ENTITLED TO SUMMARY JUDGMENT ON FLETCHER'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM.

Fletcher asserts an IIED claim against the Defendant Officers. This claim fails because it is derivative of his malicious prosecution claim for which the Defendant Officers are entitled to summary judgment. If Fletcher's malicious prosecution claim survives summary judgment, then Noradin and Wojcik are entitled to summary judgment because Fletcher has no evidence that they engaged in extreme and outrageous conduct.

### A. Fletcher's Derivative IIED Claim Fails Because His Malicious Prosecution Claim Fails.

Fletcher relies on the same allegations to support his IIED claim as he does for his malicious prosecution claim, namely that he was arrested and prosecuted without probable cause based on fabricated and untrustworthy eyewitness identifications. This makes his IIED claim derivative of his malicious prosecution claim. Since the Defendant Officers are entitled to summary judgment on the malicious prosecution claim because Fletcher cannot establish the

absence of probable cause, they are also entitled to summary judgment on the derivative IIED claim. *See Rivera v. Guevara*, 319 F.Supp.3d 1004, 1056 (granting summary judgment in favor of defendants where IIED claim was derivative of dismissed malicious prosecution claim).

### B. Fletcher Has No Evidence of Any Extreme or Outrageous Conduct by Noradin or Wojcik.

To prove intentional infliction of emotional distress, Fletcher must prove that (1) defendants' conduct was extreme and outrageous; (2) defendants' intended their conduct to inflict severe emotional distress, or knew that there was a high probability that their conduct would inflict such distress; and (3) the conduct caused severe emotional distress. *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 467 (7th Cir. 2016). The conduct must be "so outrageous in character" and "so extreme in degree" as to "go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Schweihs v. Chase Home Fin., LLC*, 2016 IL 120041, ¶ 51.

Fletcher has not marshaled any evidence from which a jury could find that Noradin and Wojcik committed any extreme or outrageous conduct. There is nothing extreme or outrageous about being present at Rogers' handwritten statement when Fletcher has no evidence that it was fabricated. There is nothing extreme or outrageous about transporting Fletcher to the lineup from Cook County Jail when Fletcher admits that no misconduct occurred. There is nothing extreme or outrageous about approving police reports authored by others when Fletcher has no evidence that Wojcik knew or should have known the reports were allegedly false and fabricated. Thus, Noradin and Wojcik are entitled to summary judgment on Fletcher's IIED claim.

## VI. DEFENDANT OFFICERS ARE ENTITLED TO SUMMARY JUDGMENT ON FLETCHER'S FAILURE TO INTERVENE CLAIM.

Fletcher alleges that the Defendant Officers failed to intervene and stop the alleged violations of his constitutional rights. (DSOF ¶138). Fletcher's claim fails for a number of reasons.

First, the claim is derivative and since there is no underlying constitutional violation, this claim necessarily fails. Second, the claim fails as a matter of law because it is attempting to hold the defendants vicariously liable. Third, Fletcher has no evidence that Noradin or Wojcik knew of the alleged constitutional violations so there was no opportunity for them to intervene.

### A. Because There Is No Underlying Constitutional Violation, the Defendant Officers are Entitled to Summary Judgment on Fletcher's Derivative Failure to Intervene Claim.

Failure to intervene is a derivative claim, and because there is no remaining underlying constitutional violation the claim fails. "[I]n order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation." *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005); *see also Coleman*, 925 F.3d at 351 (stating failure to intervene depends on proof of an underlying constitutional violation). As demonstrated above, Fletcher has no remaining constitutional claims, therefore, his derivative failure to intervene claim fails.

### B. Fletcher's Failure to Intervene Claim is Not Cognizable Under Section 1983.

In *Mwawgangi*, Judge Easterbrook, in his concurring opinion, expressed skepticism regarding the viability of a § 1983 failure to intervene claim, going so far as to advise litigants to no longer allow "this questionable theory to pass in silence." 48 F.4th at 834-35. Judge Easterbrook reasoned that since the plaintiff alleged that one officer arrested him without probable cause and if two other officers participated in the arrest, they too could be liable. *Id.* "But if, however, all they did was stand by while [one officer] made an arrest, then what [the plaintiff] seeks is vicarious liability." *Id*. Judge Easterbrook explained that there is no constitutional rule or statute requiring one employee of the government to stop another, and that although "state law [may require] police officers to prevent their fellows from violating suspects' right … § 1983 cannot be used to enforce state law." *Id*. at 834. Section 1983 only supports direct, not vicarious liability. *Id*. (citing *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 676-77 (2009); *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978)).

Fletcher is seeking to hold the Defendant Officers vicariously liable. Yet, the constitution does not create private rights to have public employees protect private interests. *Id*. (citing *Castle Rock v. Gonzales*, 545 U.S. 748 (2005)). Defendant Officers acknowledge that the Seventh Circuit has held that an officer who is present and fails to intervene to prevent other law enforcement officers from infringing on the constitutional rights of citizens, can be liable under § 1983 if that officer had reason to know that a constitutional violation has been committed and if the officer had a realistic opportunity to intervene. *Doxtator v. O'Brien*, 29 F.4th 852, 864 (7th Cir. 2022) (quoting *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)). However, Judge Easterbrook critiques this holding, noting that *Doxtator* did not explain "why this theory of [vicarious] liability is consistent with *Iqbal*, *Vance*, and similar decisions,"' that *Doxtator* relies upon decisions that predate *Iqbal* and *Vance*, and that those "decisions arose in much the same way as today's quotations from *Doxtator*: the plaintiff asserts that intervention is necessary, and the defendants do not provide a substantive response." *Id*. at 843. Thus, Defendant Officers are entitled to summary judgment on Fletcher's failure to intervene claim because it is an improper attempt to seek vicarious liability.

### C. Fletcher Has No Evidence that Noradin or Wojcik Had a Realistic Opportunity to Prevent Any Alleged Constitutional Violation.

Proof of a failure to intervene requires admissible evidence establishing "the [defendant] had a realistic opportunity to intervene to prevent the [constitutional violation] from occurring." *Yang*, 37 F.3d at 285. An officer not present when the constitutional violation occurred cannot be held liable for failing to intervene. *See Powell v. City of Berwyn*, 68 F.Supp.3d 929, 942 (N.D. Ill. Sept. 19, 2014) (granting summary judgment to officer who was not present until after the constitutional violation occurred).

49

Here, Noradin and Wojcik are entitled to summary judgment on Fletcher's failure to intervene claim. Fletcher has no evidence that either Noradin or Wojcik were present when any of the alleged constitutional violations occurred and no evidence that they had a realistic opportunity to intervene. *Id*. Accordingly, Defendants Noradin and Wojcik are entitled to summary judgment on Fletcher's failure to intervene claim.

**VII. SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF THE DEFENDANT OFFICERS ON FLETCHER'S DERIVATIVE FEDERAL AND STATE LAW CONSPIRACY CLAIMS.**

Fletcher's federal and state law conspiracy claims fail. First, these claims are derivative, and as explained above, since there is no underlying violation, the derivative claims must also be dismissed. Second, Fletcher has no evidence to support a conspiracy claim against Noradin and Wojcik.

**A. The Defendant Officers are Entitled to Summary Judgment on Fletcher's Derivative Federal and State Law Conspiracy Claims Because There is No Remaining Underlying Violations.**

Conspiracy claims are not an independent basis of § 1983 liability, but rather they derive from an underlying constitutional violation. *Drager v. Village of Bellwood*, 969 F.Supp.2d 971, 984 (N.D. Ill 2013). Similarly, in Illinois conspiracy is not an independent tort and if the underlying cause of action fails, so too does the conspiracy claim. *Coghlan v. Beck*, 2013 IL App (1st) 120891, ¶ 59. Although conspiracy claims can be alleged under § 1983, they generally "add nothing but needless complexity" to the case. *Ewell v. Toney*, 953 F.3d 911, 917-18 (7th Cir. 2017). Here, as shown above, Fletcher has no surviving underlying federal or state law claims. Therefore, Fletcher's derivative conspiracy claims necessarily fail.

### B. Fletcher Has No Evidence that Noradin and Wojcik Agreed to Be Part of a Conspiracy.

To prove a conspiracy under § 1983, Fletcher must prove that the defendants reached an agreement to deprive him of his constitutional rights, and that a member of the conspiracy took an overt act to deprive him of those rights. *Daugherty v. Page*, F.3d 606, 612 (7th Cir. 2018). He must show the defendants agreed to inflict the constitutional harm. *Id*. In the § 1983 context, conspiracy is a way of proving that a defendant is legally responsible for that violation. *See Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008) (conspiracy is "not an independent basis of liability in § 1983 actions"). A government official is a coconspirator if he voluntarily participates in a "common venture." *McCann v. Mangialardi*, 337 F.3d 782, 789 (7th Cir. 2003). Similarly, under Illinois law Fletcher must prove that two or more people agreed to participate in an unlawful act, and that one of the parties performed a tortious act in furtherance of the agreement that caused an injury. *Fritz v. Johnson*, 209 Ill.2d 302, 317 (2004). Conspiracy is not a separate tort in Illinois either, it is a means of establishing vicarious liability among coconspirators for an underlying tort. *Merrilees v. Merrilees*, 2013 IL App (1st) 121897, ¶ 49. Under both federal and state law, the official need not have agreed on the details of the conspiratorial scheme, but he must understand the "general objectives of the scheme," accept them, and agree, either explicitly or implicitly, to do his part to further them. *Id*. at 789-90; *see Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 939 (7th Cir. 2012) (Illinois law).

No evidence supports Fletcher's claim that Noradin or Wojcik conspired to fabricate identification evidence, to use unduly suggestive identification procedures, to not disclose exculpatory evidence, or to maliciously prosecute Fletcher. Noradin participated in the handwritten statement of Rogers, but Fletcher has no evidence that the statement was fabricated. (DSOF ¶57, 59, 60). Fletcher testified that Noradin may have transported him from Cook County Jail to the

lineup, but Fletcher does not base any of his claims on any conduct that occurred at that time. (DSOF ¶63, 138, 139). It is undisputed that Wojcik had no contact with any of the four witnesses and merely approved police reports as the sergeant. (DSOF ¶64, 65, 67). Without any evidence that Noradin and Wojcik understood the "general objectives of the scheme," and agreed to further those objectives, they are entitled to summary judgment. *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988).

The point of civil conspiracy is to "spread[] the net of liability to additional persons" for a substantive violation. *Niehus v. Liberio*, 973 F.2d 526, 531-32 (7th Cir. 1992). But if all of the underlying claims are not dismissed, a jury could only find Detectives Bogucki and Schalk liable for conspiracy. Those are the same defendants who would face any remaining substantive claim. So the conspiracy would add nothing to this case. It does not rope in another defendant or cover additional conduct, and Fletcher may only recover once for the same injury. *See Boothe v. Sherman*, 66 F.Supp.3d 1069, 1077 (N.D. Ill. 2014) (if state actor defendants violated plaintiff's rights, then the conspiracy charge "adds nothing to the case," as § 1983 plaintiffs may recover only once for each injury). Because any surviving conspiracy claim is redundant to any remaining underlying claim, the jury should not be asked to find liability on separate conspiracy claims. *Walker v. White*, 2021 WL 1058096, *16 (N.D. Ill. March 19, 2021) (finding conspiracy claim redundant to underlying constitutional claim and not having jury decide liability based on conspiracy).

## CONCLUSION

For the reasons stated above, the Defendant Officers respectfully request this Court grant their motion in their favor and against Fletcher on all of Fletcher's remaining claims.

Respectfully submitted,

/s/ *Brian J. Stefanich*

Special Assistant Corporation Counsel
One of the Attorneys for the Defendant Officers

Andrew M. Hale
Brian J. Stefanich
Allyson L. West
Jennifer Bitoy
Hale & Monico LLC
53 W. Jackson Blvd., Suite 337
Chicago, IL 60604
(312) 341-9646

## <u>CERTIFICATE OF SERVICE</u>

I, Brian J. Stefanich, an attorney, hereby certify that on May 6, 2025 I caused the foregoing,

**DEFENDANT OFFICERS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR**

**SUMMARY JUDGMENT,** to be filed with the Clerk of the Court using the ECF system, which

sent electronic notification of the filing on the same day to all counsel of record via the Court's

CM/ECF system.

*/s/ Brian J. Stefanich*