**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| JAMES FLETCHER JR., | ) | |
| | ) | |
| *Plaintiff*, | ) | Case No. 20−cv−04768 |
| | ) | |
| *v.* | ) | Judge Andrea Wood |
| | ) | |
| JEROME BOGUCKI, ANTHONY | ) | Magistrate Judge Maria Valdez |
| NORADIN, RAYMOND SCHALK, | ) | |
| ANTHONY WOJCIK, UNKNOWN CITY | ) | |
| OF CHICAGO POLICE OFFICERS, and the | ) | |
| CITY OF CHICAGO | ) | |
| | ) | |
| *Defendants*. | ) | |

<u>**DEFENDANT OFFICERS' STATEMENT OF MATERIAL UNDISPUTED FACTS**</u>

Defendants Jerome Bogucki, Anthony Noradin, Raymond Schalk, and Anthony Wojcik, through their undersigned counsel, hereby submit their Local Rule 56.1(a)(3) Statement of Material Undisputed Facts in Support of their Motion for Summary Judgment.

**JURISDICTION, VENUE, AND PARTIES**

1.      Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1367. (Defendant Officers' Answer and Affirmative Defenses to Plaintiff's Complaint ("Ans.") at ¶ 7, attached hereto as Exhibit 1). Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to Plaintiff's claims occurred in this district. (*Id.* at ¶ 8).

2.      Plaintiff James Fletcher ("Fletcher") was convicted on February 25, 2005, of first-degree murder for the killing of Willie Sorrell ("Sorrell"). (*People v. Fletcher*, 02 CR 16669, ROP of Criminal Trial ("Crim. Tr."), Jury Verdict at Fletcher 001646:17-20 (Feb. 25, 2005), attached hereto as Exhibit 2).

3.     Detectives Jerome Bogucki, Raymond Schalk, Anthony Noradin, and Sergeant Anthony Wojcik were Chicago police officers employed by the City of Chicago and acting under color of law and within the scope of their employment during their investigation into the murder of Sorrell. (Ex. 1: Ans. ¶¶ 10-11, 13).

## WILLIE SORRELL IS MURDERED DURING THE COMMISSION OF AN ARMED ROBBERY OF EDWARD COOPER

4.     On December 21, 1990, Edward Cooper ("Cooper"), who worked as a delivery driver, was making his bread delivery to Uncle Remus' Restaurant at approximately 1:30 p.m. at 5615 West Madison in Chicago, Illinois. (Ex. 2: Crim Tr., Cooper Testimony, at Fletcher 000935:21-936:5 (Feb. 23, 2005)).

5.     Cooper was accosted by two men, one of whom stuck a pistol in his back or side, and told him, "You know what this is?" to which Cooper responded "yes". (*Id*. at Fletcher 000937:6-12).

6.     Cooper was told to get into his bread truck, which he did, and the two offenders, both armed, followed Cooper into his truck. (*Id*. at Fletcher 000938:16-939:7). Inside the truck, the offenders robbed Cooper of his money. (*Id*. at Fletcher 000938:16-939:1).

7.     The offenders exited the truck and ran west on Madison. (*Id*. at Fletcher 000942:12-18).

8.     Cooper, who kept a gun for protection, exited the truck. (*Id*. at Fletcher 000942:12-24). As the offenders were fleeing, one turned around, and both offenders and Cooper exchanged gunfire. (*Id*. at Fletcher 000942:12-18; 000943:20-944:3).

9.     As the shooting was unfolding, Sorrell was walking out of a liquor store and was struck by gunfire coming from the robbers. (Ex. 2: Crim Tr., Friend Testimony at Fletcher

001022:3-11 (Feb. 23, 2005). The offenders were firing their guns in the direction of the liquor store. (*Id*. at Fletcher 001022:12-13).

10.     Sorrell died from a gunshot wound to his head. (Ex. 2: Crim. Tr., Donoghue Stip. at Fletcher 001109:8-1111:20 (Feb. 24, 2005)).

**THE INVESTIGATION**

**A.     1990 Investigation:**

11.     Officer James Gilger arrived at the scene and interviewed two eyewitnesses: Sheenee Friend ("Friend") and Emmett Wade ("Wade"). (Original Case Incident Report, IND DEF 1410-11, attached hereto as Exhibit 3; Deposition of James Gilger taken on Mar. 14, 2023 ("Gilger Dep.") at 27:21-28:8, 28:16-22, 29:12-25, 43:16-44:9, attached hereto as Exhibit 4). Officer Gilger documented that the offenders were described as follows: (1) male, Black, 20-21 years old, 6'00" tall, 170 pounds, long black hair, dark complexion, wearing a black "Kings" hat, a black Raiders starter jacket, white t-shirt, and blue pants; (2) male, Black, 30 years old, 6'00" tall, 170 pounds, ponytail, dark complexion, wearing a red hat, red "Pistons" starter jacket, and blue plants. (Ex. 3: Original Case Incident Report at IND DEF 1410; Ex. 4: Gilger Dep. at 27:21-28:8, 28:16-22, 29:12-25).

12.     Detective Michael Fleming was assigned to the investigation and went to the crime scene. (Fleming Supplementary Report ("Fleming Rpt.") dated Dec. 21, 1990, City-JF-205, attached hereto as Exhibit 5.) At the scene, Detective Fleming located Cooper who was with the 15th District Tactical Team, after having directed them to an abandoned building which he had followed the offenders to. (*Id*.)

13.     Detective Fleming interviewed Cooper who stated that after having just made a delivery to Remus' restaurant he was approached by Friend, who stepped in his truck to talk.

(Deposition of Michael Fleming taken on Jan. 28, 2023 ("Fleming Dep.") at 36:8-15, 36:23-37:1, 37:6-9, 38:25-39:11, attached hereto as Exhibit 6). At this time, Cooper was approached by the offender who displayed handguns and told him, "Give me your money, its not yours, it belongs to the company, you don't want to get killed for the company money." (*Id*. at 38:25-39:15). Cooper stated that he gave the offenders approximately thirty dollars from his left pant pocket. (*Id*. at 38:25-39:17). Offender #1 then searched him and took approximately $300 from his right pant pocket. (*Id*. at 38:25-39:19). Cooper stated that Friend then ran from the truck and the offenders also fled. (*Id*. at 38:25-39:20).

14.     Cooper told Detective Fleming that he ran after the offenders who were shooting at him. (Ex. 6: Fleming Dep. at 38:25-39:21). While he was chasing the offenders, he met his cousin, Terry Rogers ("Rogers"), who told him to be careful because he knows the offenders and that they would shoot Cooper. (*Id*. at 38:25-39:24).

15.     Detective Fleming reported that one offender was a Black male in his 20s, between five foot eight inches and five foot eleven inches, with a slim build, dark complexion, collar length curls, and wearing a dark Starter jacket, blue jeans, and a black baseball cap. (Ex. 5: Fleming Rpt. at City-JF-204).

16.      Detective Fleming interviewed Friend who stated that shortly before the shooting she was washing her clothes at a laundromat and observed Cooper in his truck. (Ex. 6: Fleming Dep. at 40:10-17). She needed three dollars to purchase bleach and was talking to Cooper in his truck. (*Id*. at 40:10-18).

17.     After shots were fired, Friend stated that she saw Cooper and Rogers chasing the offenders and heard more gunshots. (Ex. 6: Fleming Dep. at 40:10-24). Friend stated that she could identify the offenders if she saw them again. (*Id*. at 40:10-41:1).

18.     Detective Fleming interviewed Rogers who stated that he was standing in a doorway at 5611 West Madison and saw his cousin, Cooper, exiting Uncle Remus' restaurant. (Ex. 6: Fleming Dep. at 37:23-38:4). A few minutes later he saw two offenders exit Cooper's truck in a hurry and then heard gunshots. (*Id*. at 37:23-38:9). Cooper was chasing the offenders and he ran behind Cooper. (*Id*. at 37:23-38:10).

19.     Rogers stated that he looked at one of the offenders and remembers seeing him in the area of Parkside and Madison off and on for the past month. (Ex. 6: Fleming Dep. at 37:23-38:14). This offender is a narcotics user. (*Id*. at 37:23-38:15). While they were running, Rogers heard one offender call the other offender by the name "Fletcher." (*Id*. at 37:23-38:17).

20.     Rogers stated that he could identify at least one of the offenders if seen again. (Ex. 6: Fleming Dep. at 37:23-38:24). Rogers viewed photographs at the police station, but did not identify either offender. (*Id*. at 37:23-38:19).

21.     Fleming interviewed Wade who reported that he was seated in his van when he observed Cooper involved in a shootout with two unknown male Blacks who he may be able to identify if he sees them again. (Ex. 5: Fleming Rpt. at City-JF-00051).

**B.     1995 Investigation**

20.     In 1995, Detectives Jerome Bogucki and Raymond Schalk began investigating the murder of Sorrell. (Deposition of Raymond Schalk taken on May 17, 2023 ("Schalk Dep. I") at 50:9-13, attached hereto as Exhibit 7; Deposition of Jerome Bogucki taken on April 20, 2023 ("Bogucki Dep. I") at 8:13-25, attached hereto as Exhibit 8). The detectives reviewed the file and knew that Rogers reported that one of the offenders called the other "Fletcher." (Ex. 8, Bogucki Dep. I at 175:9-16).

21.     Two other detectives, Detectives Robert Rutherford and Kevin McDonald, provided Dets. Bogucki and Schalk the name Fletcher Clinton as a possible suspect. (Ex. 8: Bogucki Dep. I at 179:8-15; Ex. 7, Schalk Dep. I at 131:22-132:12). In March 1995, Detectives Bogucki and Schalk showed Cooper a photo array containing a photograph of Fletcher Clinton. (*Id*. at 130:14-131:11). Detectives Bogucki and Schalk do not recall what filler photographs were used during the photo array, but Fletcher was not included in the 1995 photo array. (*Id*. at 230:3-6; Ex. 8: Bogucki Dep. I at 171:14-23, 173:3-18). Cooper did not identify Fletcher Clinton or any of the fillers as one of the offenders (Ex. 7: Schalk Dep. I at 188:16-23). In 1995, detectives were not required to inventory a negative photo array. (*Id*. at 123:8-15, 124:19-21; December 23, 2024, Expert Report of Victoria Hurtado ("Hurtado Rpt.") at 10, attached hereto as Exhibit 9).

22.     In the investigative file is a mugshot photograph of Clinton and mugshot photographs of four other individuals all from arrests that occurred prior to 1995. (Mugshot photographs, City-JF-000193-98, attached hereto as Exhibit 10).

23.     Unable to locate Rogers, Detectives Bogucki and Schalk put a stop order on him, meaning that if Rogers was arrested on some other incident and his name was run, an alert would appear that indicated that the detectives wanted to interview him. (Ex. 7: Schalk Dep. I at 206:23-7, 208:13-25).

**C.     February 2002 Investigation**

24.     In February 2002, Rogers was arrested for criminal trespass. (Deposition of Michael Fitzgerald taken on December 6, 2022 ("Fitzgerald Dep.") at 15:3-16:11, 17:20-24, attached hereto as Exhibit 11; Fitzgerald Original Case Incident Report, Fletcher 000432-33, attached hereto as Exhibit 12). Detectives Bogucki and Schalk were notified that Rogers was in

custody and he was brought to the police station for an interview. (Cleared Open Report, City-JF-015245-15253, attached hereto as Exhibit 13).

25.     On February 12, 2002, Rogers told the detectives that before the shooting, he was standing at the southwest corner of Madison and Parkside selling dope. (Ex. 13: Cleared Open Report, City-JF-015249; Deposition of Raymond Schalk taken on October 17, 2023 ("Schalk Dep. II" at 44:16-45:1, attached hereto as Exhibit 14). An individual Rogers knew as "Jimmie Fletcher" approached him and asked if he had any "work" meaning dope. (Ex. 13: Cleared Open Report at City-JF-015249; Ex. 14: Schalk Dep. II at 44:16-45:1). Rogers told Fletcher that he did and Fletcher walked away. (Ex. 13: Cleared Open Report at City-JF-015249). Approximately 15-20 minutes later, Cooper arrived at Uncle Remus' restaurant. (*Id*.) Rogers heard gunshots and observed Fletcher and another individual running from Cooper's truck and saw Fletcher shooting at Cooper. (*Id*.; Ex. 7: Schalk Dep. I at 214:24-215:5; Ex. 8: Bogucki Dep. I at 51:16-18). Fletcher and the other individual ran from the scene with Cooper chasing after them. (Ex. 13: Cleared Open Report at City-JF-015249; Ex. 14: Schalk Dep. II at 44:16-45:1).

26.     Rogers told the detectives that he knew Fletcher from when they lived in the area of Fulton and Latrobe. (*Id*.) Fletcher's criminal history, obtained on February 12, 2002, and included in the investigative file, shows that Fletcher lived at 301 N. Latrobe in 1991. (Pl.'s Criminal History, City-JF-000016, attached hereto as Exhibit 15). It also revealed Fletcher had an arrest for theft in August 1991, an armed robbery arrest in November 1991, and a theft arrest in November of 1991. (*Id*.)

27.     Rogers told the detectives that he and Fletcher were in Cook County Jail and Joliet prison together. (Ex. 13: Cleared Open Report at City-JF-015249).

28.    Rogers was asked about the discrepancies between what he told Detective Fleming and what he told Detectives Bogucki and Schalk, and Rogers responded that he did not recall what he had said in 1990. (*Id*.; Ex. 14: Schalk Dep. II at 45:2-6).

29.    The detectives ran the name "Jimmie Fletcher" through a police database and learned that Fletcher had several arrests, including murder and armed robbery. (Ex. 13: Cleared Open Report at City-JF-015249; Ex. 8: Bogucki Dep. I at 48:9-10; Ex. 7: Schalk Dep. I at 247:11-18). In July of 1990, Fletcher was on parole for a 1980 murder conviction. (Ex. 7: Schalk Dep. I at 247:11-23; Deposition of James Fletcher taken on November 17, 2023 ("Fletcher Dep.") at 34:11-13, attached hereto as Exhibit 20). The detectives learned that Fletcher was incarcerated for an armed robbery conviction for which he was serving a 25-year sentence. (Ex. 13: Cleared Open Report at City-JF-015250; Ex. 8: Bogucki Dep. I at 48:6-8; Ex. 7: Schalk Dep. I at 248:1-13).

30.    The detectives obtained a photograph of Fletcher, who was using the alias Arnold Dixon, from the Illinois Department of Corrections ("IDOC") website and placed that photograph in an array with six other photographs obtained from the IDOC website of similar looking individuals with the last name Dixon. (Ex. 13: Cleared Open Report at City-JF-015250; Ex. 8: Bogucki Dep. I at 142:24-143:11, 143:22-144:1, 147:16-148:1; IDOC Photo Array[1], Fletcher Evidence Inspection 000048-000055 attached hereto as Exhibit 16). The IDOC photographs included the individuals' names, height, weight and dates of birth under the photograph. (Ex. 16: IDOC Photo Array).

31.    Although the detectives could have shown Rogers a single photograph of Fletcher to confirm he was the "Jimmie Fletcher" that Rogers was referring to, they showed him the IDOC Photo Array to make sure Rogers was telling the truth. (Deposition of Jerome Bogucki taken

---

[1] The IDOC Photo Array are the photographs of the photo array. The actual photo array is impounded with the Circuit Court of Cook County.

October 12, 2023 ("Bogucki Dep. II") at 127:2-128:5, attached hereto as Exhibit 17; Ex. 9: Hurtado Rpt. at 13).

32.     Rogers positively identified Fletcher from the IDOC photo array as one of the offenders. (Ex. 7: Schalk Dep. I at 196:12-16).

33.     Detectives Bogucki and Schalk went to Cooper's residence and showed him the IDOC Photo Array. (Ex. 13: Cleared Open Report at City-JF-015250). Cooper picked out the photo of Fletcher and stated Fletcher looked similar to one of the offenders but he could not be positive of his identification. (*Id*.; Ex. 7: Schalk Dep. I at 247:11-23). Detectives Bogucki and Schalk documented Cooper's statement about his identification of Fletcher's photo and specifically reported that Cooper "could not be positive of his identification." (Ex. 13: Cleared Open Report, City-JF-015250; Ex. 8: Bogucki Dep. I at 150:6-10). Detectives Bogucki and Schalk reported that Cooper related the same account of the robbery and shooting as he had previously stated to Detective Fleming in 1990. (Ex. 13: Cleared Open Report, City-JF-015250).

34.     The next day, February 13, 2002, Assistant State's Attorney Jennifer Walker ("ASA Walker") interviewed Rogers. (Ex. 13: Cleared Open Report at City-JF-015250; Felony Review Folder at CCSAO Conflict 003015, attached hereto as Exhibit 18). During this interview, Rogers identified Fletcher in the photo array as one of the offenders. (*Id*.; Deposition of Jennifer Walker taken on Feb. 14, 2024 ("Walker Dep.") at 93:18-95:2, attached hereto as Exhibit 19).

35.     After Rogers' identification of Fletcher as one of the offenders, ASA Walker continued the investigation for the detectives to: (1) interview Fletcher; (2) find Friend, interview her, and have her view a lineup; (3) find Wade, interview him, and have him view a lineup; (4) have Cooper view a lineup; (5) interview Cooper; and (6) double check that Fletcher was not in

custody when the murder occurred. (Ex. 18: Felony Review Folder, CCSAO Conflict 003015, 003018; Ex. 19: Walker Dep. at 25:14-23, 26:3-27:19).

36.     On February 21, 2002, Detectives Bogucki, Schalk, and ASA Walker went to Graham Correctional Center to interview Fletcher. (Ex. 13: Cleared Open Report at City-JF-015250; Ex. 7: Schalk Dep. I at 214:17:23, 253:8-16; Ex: 20: Fletcher Dep. at 48:10-14, 78:18-79:9; Ex. 19: Walker Dep. at 84:6-12). During this interview, Fletcher denied knowledge or participation in the armed robbery or Sorrell's murder. (Ex. 13: Cleared Open Report at City-JF-015250; Ex. 7: Schalk Dep. I at 213:22-214:2; Ex. 20: Fletcher Dep. at 79:10-18). Fletcher stated he did not know what he was doing on December 21, 1990, but knew that he was not in the area of Madison and Central. (Ex. 13: Cleared Open Report at City-JF-015250; Ex. 7: Schalk Dep. I at 216:8-12; Ex. 20: Fletcher Dep. at 80:18-21). Fletcher admitted that he knew Rogers, but did not know why Rogers would say he was involved. (Ex. 13: Cleared Open Report, City-JF-015250; Ex. 20: Fletcher Dep. at 82:9-12, 82:17-83:1). Fletcher stated that he was selling narcotics at Cabrini Green in December 1990, and his narcotics business was doing well so he did not need to commit armed robberies in order to get money. (Ex. 13: Cleared Open Report at City-JF-015250; Ex. 14: Schalk Dep. II at 10:23-11:4; Ex. 20: Fletcher Dep. at 81:2-24).

37.     On February 20, 2002, Detectives Bogucki and Schalk put an investigative alert on Friend "for questioning only" related to the Sorrell homicide. (Ex. 7: Schalk Dep. I 229:16-22; Investigative Alert at City-JF-000131-32, attached hereto as Exhibit 21).

38.     In December 1990, Fletcher was 27 years old. (Fletcher Arrest Report from May 1991 at Ind Def. 1331, attached hereto as Exhibit 22). In May 1991, during an unrelated arrest, Fletcher was described as a male Black, 6 feet tall, and approximately 170 pounds. (*Id.*).

10

**D.     March 2002 Investigation**

39.     On March 7, 2002, Friend was arrested on a parole violation warrant. (Ex. 13: Cleared Open Report at City-JF-015250). Detectives Bogucki and Schalk interviewed Friend at Area 5 on March 8, 2002. (Ex. 7: Schalk Dep. I at 203:19-23, 204:15-24; Ex. 13: Cleared Open Report at City-JF-015250). Friend stated that on the day of the murder she saw Cooper at his truck and went over to talk to him. (*Id*. at City-JF-015251). She spoke to Cooper in his truck for approximately 20 minutes. (*Id*.). As she was exiting the truck, two male Blacks approached, both carrying handguns. (*Id*.). One offender grabbed her jacket and tried to push her back into the truck, but she was able to escape. (*Id*.). Friend ran to the corner of Madison and Central where she could see the offender pointing their guns at Cooper. (*Id*.). One offender patted down Cooper while the other offender pointed his gun at Cooper. (*Id*.). The offenders exited the truck and one offender had money in his hand. (*Id*.). Friend saw Cooper jump out of the truck with a gun in his hand. (*Id*.). The offenders then turned around and fired their guns at Cooper, who returned fire at the offenders. (*Id*.). Friend saw a group of people standing in front of the liquor store so she walked over and saw an older man lying on the sidewalk bleeding from the mouth. (*Id*.). Friend stated that the offenders had been firing their gun in the direction of where the victim was standing. (*Id*.).

40.     Friend was then shown the IDOC Photo Array and positively identified Fletcher as one of the offenders. (Ex. 13: Cleared Open Report at City-JF-015151; Ex. 8: Bogucki Dep. I at 38:8-18, 149:4-7; Ex. 7: Schalk Dep. I at 196:12-16).

41.     ASA Walker was then contacted to interview Friend. (Ex. 7: Schalk Dep. I at 204:25-205:2). ASA Walker interviewed Friend and subsequently recorded  a statement from Friend. (Ex. 13: Cleared Open Report, at City-JF-015221; *In re: John Doe Investigation*, Testimony of Sheenee Friend taken on May 1, 2002 ("Friend GJ Test.") GJ #April 1083, Fletcher

000486:22-487:19, attached hereto as Exhibit 23). In Friend's handwritten statement, Friend states that on the day of the murder she saw Cooper at his truck which was in front of Uncle Remus' restaurant. (Handwritten Statement of Sheenee Friend taken March 9, 2002 ("Friend Statement") at City-JF-000041, attached hereto as Exhibit 24). Friend walked over to Cooper's truck and talked to Cooper inside his truck for approximately 20 minutes. (*Id*. at City-JF-000041-42). As Friend opened the door to exit the truck, she saw two male Blacks approaching with guns. (*Id*. at City-JF-000042). One offender grabbed her jacket and attempted to push her back inside the truck, but she was able to pull away and flee from the truck. (*Id*. at City-JF-000042). Friend identified a photograph of Fletcher as the offender who grabbed her jacket and who had a gun in his hand. (*Id*. at City-JF-000042). Friend fled to a Church's Chicken where she was able to see Fletcher talking to Cooper and pointing his gun at him. (*Id*. at City-JF-000042). Friend stated that she saw Fletcher patting Cooper down while the other offender was pointing a gun at Cooper. (*Id*. at City-JF-000042-43). As both offenders left the truck, Friend saw Fletcher holding money. (*Id*. at City-JF-000043). Cooper then exited the truck with a gun in his hand. (*Id*. at City-JF-000043). The offenders turned around and fired their guns at Cooper, who returned fire. (*Id*. at City-JF-000043). Friend noticed a group of people gathering outside the liquor store so she went there and saw a man laying on the ground bleeding from his mouth. (*Id*. at City-JF-000043-44). Friend confirmed that she had been treated well by the police and ASA Walker and that nobody made any threats or promises to her for giving the handwritten statement. (*Id*. at City-JF-000044).

42.     A photograph of a smiling Friend was taken after she made her statement. (Ex. 24: Friend Statement at Fletcher Evidence Inspection 000096).

43.     Friend, Detectives Bogucki and Schalk, and ASA Walker signed each page of the statement, including the photograph of Fletcher she identified and the photograph of herself. (Ex.

23: Friend GJ Test. at Fletcher 0487:15-19; Ex. 24: Friend Statement). Friend also initialed corrections that were made in the handwritten statement. (*Id*. at City-JF-00041-44).

44.      The detectives did not decide whether ASA Walker took a statement from Friend. (Ex. 7: Schalk Dep. I at 205:3-6).

45.      On March 9, 2002, ASA Walker continued the investigation in order for Detectives Bogucki and Schalk to: (1) find Wade, interview him, and have him view a lineup; (2) have Cooper view a lineup; and (3) find the second offender. (Ex. 18: Felony Review Folder, CCSAO Conflicts 003022).

46.      On March 12, 2002, Detectives Bogucki and Schalk interviewed Wade at his home. (Ex. 13: Cleared Open Report, City-JF-015251; Ex. 7: Schalk Dep. I at 182:8-9). During the interview, Wade stated that he was in his vehicle parked behind the bread truck. (Ex. 13: Cleared Open Report, City-JF-015251; Ex. 14: Schalk Dep. II at 80:14-25, 81:10-15). Wade saw the offenders running towards him. (*Id*. at 80:14-25, 81:10-15). Cooper came out of his truck and shot at the offenders, but hit Wade's car. (Ex. 13: Cleared Open Report at City-JF-015252; Ex. 14: Schalk Dep. II at 80:14-25, 81:10-15). The offenders shot Sorrell. (Ex. 13: Cleared Open Report, City-JF-015252; Ex. 14: Schalk Dep. II at 80:14-25, 81:10-15). Wade informed the detectives that he did not see the faces of the offenders. (Ex. 7: Schalk Dep. I at 191:19-22; Ex. 8: Bogucki Dep. I at 44:23-45:2; Ex. 13: Cleared Open Report at City-JF-015252).

47.      On March 16, 1992, ASA Walker interviewed Wade at his home in the presence of Detectives Bogucki and Schalk. (Ex. 13: Cleared Open Report at City-JF-015252; Ex. 14: Schalk Dep. II, at 86:5-8). Wade stated that on the day of the shooting he had parked his van one or two spots behind Cooper's truck. (Deposition of Emmett Wade taken on November 11, 2023 ("Wade Dep.) at 89-15-90:11, attached hereto as Exhibit 25). Wade stated that Cooper came out of his truck

and began shooting at individuals and the offenders returned fire and hit Sorrell who was walking out of the store. (*Id.* at 91:19-92:8; Ex. 13: Cleared Open Report at City-JF-015252). Wade told ASA Walker that he did not see the faces of the offenders. (Ex. 7: Schalk Dep. I at 200:17-20; Ex. 25: Wade Dep. at 92:23-93:1). Wade stated he could not identify the offenders because he was looking in the direction of Cooper, which is how he saw Sorrell fall. (*Id.* at 41:17-42:3).

48. ASA Walker did not show Wade the IDOC Photo Array or any photos. (Ex. 7: Schalk Dep. I at 201:22-202:1). ASA Walker did not have the detectives conduct a photo array or live lineup with Wade. (*Id.* at 195:9-25).

49. On March 16, 2002, ASA Walker requested additional investigation to "conduct lineups with all witnesses," have Cooper be interviewed by ASA Walker, and present the witnesses to the grand jury. (Ex. 18: Felony Review Folder, CCSAO Conflicts 003028; Ex. 19: Walker Dep. at 97:16-99:8, 100:3-12).

50. The State's Attorney's Office tells the detectives what it feels needs to be done in the investigation before they decide to charge somebody. (Ex. 7: Schalk Dep. at 250:25-251:9).

**E.** **The CCSAO Charges Fletcher With Murder After Speaking With Cooper, Friend, and Rogers.**

51. On March 16, 2002, ASA Walker approved murder charges against Fletcher. (Ex. 18: Felony Review Folder, CCSAO Conflicts 003028). On March 21, 2002, an arrest warrant was signed by Judge Kevin Sheehan for the arrest of Fletcher for the murder of Sorrell. (Arrest Warrant, Fletcher 007040, attached hereto as Exhibit 26; Ex. 2: Crim. Tr., Bogucki Testimony at Fletcher 001068:19-23).

52. On April 18, 2002, Assistant State's Attorney Kathleen Lanahan ("ASA Lanahan") drafted, signed, and filed the criminal complaint against Fletcher for the murder of Sorrell. (Criminal Complaint, Fletcher 010433, attached hereto as Exhibit 27; Deposition of Kathleen

Lanahan taken on June 7, 2024 ("Lanahan Dep."), at 10:15-11:4, attached hereto as Exhibit 28). ASA Lanahan was assigned to Branch 66, which dealt mainly with cases being prepared for indictment. (*Id*. at 5:15-6:4). ASA Lanahan testified that as an ASA assigned to Branch 66, she would have the felony review folder for her to review in a particular case. (*Id*. at 7:21-8:3).

53.     That same day, Fletcher who was in IDOC custody on an unrelated armed robbery conviction, was writ into Branch 66 as the case was being prepared for indictment to stand in a lineup. (Ex. 28: Lanahan Dep. at 5:21-6:4; *People v. Fletcher*, 02-cr-16669, ROP ("Branch 66 Tr."), Fletcher 006877:4-19, attached hereto as Exhibit 29). Fletcher was remanded to Cook County Jail. (*Id*. at Fletcher 006876:4-5).

54.     On April 20, 2002, Friend identified Fletcher in a lineup as one of the offenders. (Ex. 8: Bogucki Dep. I at 38:22-39:5; Ex. 7: Schalk Dep. I at 161:21-162:3). That same day, Cooper identified Fletcher in a separate lineup, but using the same fillers, as one of the offenders. (Ex. 8: Bogucki Dep. I at 42:5-20; Ex. 7: Schalk Dep. I at 159:17-160:5). Below is a photograph taken of the appearance of Fletcher and the lineup fillers after the lineups:



(Lineup Photo, City-JF-004569, attached as Exhibit 30; Deposition of Edward Cooper taken on April 28, 2023 ("Cooper Dep. at 105:23-106:18, attached hereto as Exhibit 31; Ex. 7: Schalk Dep. I at 62:5-25).

55.     Rogers did not view a lineup on April 20, 2002, because the detectives could not locate him. (Ex. 7: Schalk Dep. I at 253:20-24).

56.     On May 7, 2002, Rogers was arrested and the next day he was transported to Area 5 for an interview by ASA Walker. (Ex. 7: Schalk Dep. I at 252:17-23; Ex. 13: Cleared Close Report at City-JF-015252).

57.     ASA Walker took a handwritten statement from Rogers in the presence of Detective Noradin. (Handwritten Statement of Terry Rogers taken on March 8, 2002 ("Rogers' Statement"), City-JF-000161-163, attached hereto as Exhibit 32; Deposition of Anthony Noradin taken on February 22, 2023 ("Noradin Dep."), 58:6-20, 61:3-7, attached hereto as Exhibit 33). ASA Walker

wrote out the handwritten statement while she spoke with Rogers. (*Id*. at 61:14-23). Rogers, ASA Walker, and Noradin signed each page of the statement. (*Id*. at 64:11-65:11).

58.     In his handwritten statement, Rogers identified the IDOC photograph of Fletcher/Arnold Dixon as a person he knows as Fletcher. (Ex. 33: Noradin Dep. at 202:24-203:1; Ex. 32: Rogers' Statement, City-JF-000161-62; City-JF-164). Rogers stated that on the day of the murder he saw Cooper and Cooper's truck near Uncle Remus' restaurant. (Ex. 33: Noradin Dep. at 203:1-5; Ex. 32: Rogers' Statement at City-JF-000162). Rogers saw Fletcher and another individual walk towards Cooper and Cooper's truck. (Ex. 33: Noradin Dep. at 203:7-10; Ex. 32: Rogers' Statement at City-JF-000162). When Fletcher approached Cooper, Fletcher had a gun in his hand. (Ex. 33: Noradin Dep. at 203:11-12; Ex. 32: Rogers' Statement at City-JF-000162). Cooper then went inside his truck. (Ex. 33: Noradin Dep. at 203:13-14). Rogers heard gunshots and then saw Fletcher and the other individual running towards Madison and Parkside, with Cooper running after them. (*Id*. at 203:14-18; Ex. 32: Rogers' Statement at City-JF-000162). Rogers stated that he has known Fletcher since they were kids and they used to go roller skating at the same place. (Ex. 33: Noradin Dep. at 203:18-20; Ex. 32: Rogers' Statement at City-JF-000162). Rogers stated that he had been treated okay by the police and ASA Walker. (Ex. 33: Noradin Dep. at 203:20-22; Ex. 32: Rogers' Statement at City-JF-000162-63). Rogers stated that no threats or promises were made and he made the statement freely and voluntarily. (Ex. 33: Noradin Dep. at 204:2-4; Ex. 32: Rogers' Statement at City-JF-000163).

59.     Rogers' handwritten statement reflected what he actually said to ASA Walker during the interview. (Ex. 33: Noradin Dep. at 70:3-11).

60.     Detectives Bogucki and Schalk did not coerce Rogers to sign his handwritten statement. (Ex. 8: Bogucki Dep. I at 19:22-20:24). No offers were made to Rogers to avoid criminal

charges in his cases if he assisted in the Sorrell homicide investigation. (Ex. 33: Noradin Dep. at 125:3-12).

61.     The State's Attorney did not have Rogers view a lineup. (Ex. 7: Schalk Dep. at 253:20-254:2).

62.     The only witness Noradin had contact with was Rogers. (Ex. 33: Noradin Dep. at 194:16-20).

63.     Fletcher's only contact with Noradin was that Noradin transported Fletcher from Cook County Jail to Area 5 for the lineup. (Ex. 20: Fletcher Dep. at 140:19; Ex. 33: Noradin Dep. at 52:15-53:2).

64.     Sergeant Wojcik did not interview any of the witnesses in the Sorrell murder investigation. (Ex. 7, Schalk Dep. I at 178:20-23; Deposition of Anthony Wojcik ("Wojcik Dep.") taken on June 20, 2024 at 188:11-189:2; 97:8-14, attached hereto as Exhibit 34).

65.     Sergeant Wojcik did not have any involvement in any of the photo arrays used in the Sorrell murder investigation. (Ex. 34: Wojcik Dep. at 191:2-6).

66.     Fletcher did not have any direct interactions with Sergeant Wojcik. (Ex. 20: Fletcher Dep. at 140:4-11).

67.     Sergeant Wojcik approved the Cleared Open Report on May 24, 2002, the Lineup Supplementary Report on May 24, 2002, and a Crime Scene Processing Report on April 20, 2002, submitted by the detectives. (Ex. 34: Wojcik Dep. at 135:24-136:17; Ex. 9: Hurtado Report at p. 16; Ex. 13: Cleared Open Report at City-JF-015245-15253; Lineup Supplementary Report, City-JF-000153-158, attached hereto as Exhibit 35; Crime Scene Processing Report, City-JF-000216, attached hereto as Exhibit 36). For this homicide investigation in which he had no direct involvement in the investigation, Sergeant Wojcik would review the reports to make sure the

classification codes for the Unified Crime Reporting were accurate, make sure that the reports document interviews with individuals the detectives said were interviewed, check for grammatical errors, and other administrative tasks. (Ex. 34: Wojcik Dep. at 136:23-138:25).

**F.     Fletcher Is Indicted By The Grand Jury.**

68.     On May 1, 2002, ASA Lanahan presented Friend to the Grand Jury. (Ex. 23: Friend GJ Test. at Fletcher 000474). Friend testified that on December 21, 1990, she was at Madison and Central between 1:00 and 2:00 in the afternoon. (*Id*. at Fletcher 000477:13-23). Friend testified that she met up with Cooper, who was delivering bread, in front of Uncle Remus' restaurant. (*Id*. at Fletcher 000478:13-22). Friend entered Cooper's truck and stayed there for approximately 20 minutes. (*Id*. at Fletcher 000479:11-14). As Friend opened the door to exit the truck, she saw two Black men approaching with guns. (*Id*. at Fletcher 000480:12-22). Friend was shown a photograph, and she identified Fletcher as one of the individuals who robbed Cooper and shot Sorrell. (*Id*. at Fletcher 000480:23-481:4, 481:19-23). As the two men got in the truck Fletcher grabbed Friend's jacket, but she was able to get away. (*Id*. at Fletcher 000481:9-482:3). Friend went to the Church's Chicken where she observed Fletcher patting down Cooper in his truck. (*Id*. at Fletcher 000482:4-23). Friend testified she saw the offenders jump off the truck and Fletcher had money in his hands. (*Id*. at Fletcher 000483:5-13). Friend testified that as the offenders fled Cooper jumped off the truck and began chasing them. (*Id*. at Fletcher 000483:14-23). The offenders both started shooting at Cooper, who shot back at the offenders while he chased them. (*Id*. at Fletcher 000483:24-484:11, 486:20-21). Friend testified that the offenders shot a man who was coming out of the liquor store. (*Id*. at Fletcher 000483:14-484:22).

69.     Friend testified before the Grand Jury that on March 9, 2002, she met with ASA Walker and had her statement written down. (Ex. 23: Friend GJ Test. at Fletcher 000486:22-487:7).

Friend confirmed that her handwritten statement contains the same facts as what she told the grand jurors. (*Id*. at Fletcher 000487:3-5). Friend testified that she was "treated real good" by the police and ASA Walker and that no one threatened her or promised her anything for her statement. (*Id*. at Fletcher 000487:20-488:1). Friend also confirmed that she was "treated well" by ASA Lanahan prior to her grand jury testimony and that no one threatened her or promised her anything in return for her grand jury testimony. (*Id*. at Fletcher 000488:5-19).

70.     On May 9, 2002, ASA Lanahan presented Rogers to the Grand Jury. (*In re: John Doe Investigation*, GJ #May 355, Testimony of Terry Rogers taken May 9, 2002 ("Rogers GJ Test."), attached hereto as Exhibit 37). Rogers identified a photograph of Fletcher as "Jimmy Fletcher" who he has known for "20 years." (*Id*. at Fletcher 007764:11-17). Rogers testified that on December 21, 1990, he was at Madison and Parkside in the early afternoon and saw Cooper, who was delivering bread. (*Id*. at Fletcher 007764:18-65:10). Rogers testified that Fletcher, who was with another individual, pulled out a gun and gunfire was exchanged between Fletcher and Cooper. (*Id*. at Fletcher 007765:17-66:3). Cooper started chasing Fletcher and the other individual. (*Id*. at Fletcher 007766:4-10). Rogers also testified that he had given a statement which he signed to ASA Walker the day before his grand jury testimony. (*Id*. at Fletcher 007767:5-16).

71.     On May 10, 2002, Detective Schalk testified before the grand jury. (*In re: People vs. James Fletcher*, GJ #355, ROP, Fletcher 007119 ("Schalk Grand Jury Testimony"), attached hereto as Exhibit 38). Schalk testified that based on the police reports and his "interviews with witnesses" that Fletcher and a co-offender were at 5615 West Madison on December 21, 1990, and that Fletcher was armed with a gun. (*Id*. at Fletcher 007121:14-23, 007123:5-8). Schalk testified that Fletcher and the co-offender took money from Cooper at gunpoint, then fled, with Cooper

chasing them. (*Id*. at Fletcher 007121:24-7122:5). Schalk testified that Fletcher fired his gun at Cooper, gunfire was exchanged, and Sorrell was shot in the head. (*Id*. at Fletcher 007122:6-14).

72.     In May 2002, Fletcher was indicted by the Grand Jury for the murder of Sorrell. (May 2002 Indictment, Fletcher 014015, Ind Def 001724-1739, attached hereto as Exhibit 39).

73.     In June 2002, the State sought to reindict Fletcher based on the murder statute in effect at the time of the murder. (*In re: People v. James Fletcher*, GJ #813, ROP, Fletcher 007913:4-15, Trans. of Jennifer Gonzalez ("Gonzalez GJ Test."), attached hereto as Exhibit 40; June 2002 Indictment, Ind Def 000430-449, attached hereto as Exhibit 41). On June 21, 2002, Assistant State's Attorney Jennifer Gonzalez testified before the grand jury and read into the record the transcript of Detective Schalk's May grand jury testimony. (Ex. 40: Gonzalez GJ Test. at Fletcher 007914:6-7919:15). In June 2002, the grand jury reindicted Fletcher on nineteen counts of first degree murder. (Ex. 41: June 2002 Indictment).

## PRETRIAL PROCEEDINGS

### A.     Fletcher's Pretrial Motions

74.     On January 10, 2003, Fletcher, through his criminal defense attorney, filed a "Motion to Suppress Identification Testimony." (*People v. Fletcher*, 02 CR 12937, Mtn. to Suppress ID, Fletcher 001157 (Cir. Ct. Cook Cty., Jan. 10, 2003), attached hereto as Exhibit 42). In the motion, Fletcher alleged, in part, that the composition of the lineup improperly suggested that Fletcher was the perpetrator. (*Id*. at Fletcher 001157).

75.     On November 10, 2003, Fletcher, through new criminal defense attorneys, filed a "Motion to Suppress All Pre-Trial Identifications and Bar Any In-Court Identification Testimony By The Witnesses That Participated In The Pre-Trial Identifications." (*People v. Fletcher*, 02 CR 16669, Mtn. to Suppress Pretrial Identifications (Cir. Ct. Cook Cty., Nov. 10, 2003), attached

hereto as Exhibit 43). In his November 10, 2003 motion, Fletcher alleged that the IDOC photo array was impermissibly suggestive because his IDOC photo showed him with "long hair (*i.e.* braids)" and the offender was initially described as having long hair. (*Id*. at Fletcher 000167). Fletcher alleged that the fillers were not chosen based on similarities to the eyewitness descriptions of the suspects or based on similarities to Fletcher, but were chosen because they all had the last name Dixon, which was the name Fletcher was under in the IDOC at the time. (*Id*. at Fletcher 000167-68). Fletcher further alleged that the IDOC photo array showed every person's name, date of birth, weight, height, and eye color. (*Id* at Fletcher 000168). Fletcher alleged that he appeared dissimilar to the other individuals in the photo array. (*Id*. at Fletcher 000168). Regarding the physical lineup, Fletcher alleged he appeared dissimilar to the fillers because he was the tallest, heaviest, and the only person who had long hair. (*Id*. at Fletcher 000169). Fletcher also alleged that the lineup was unnecessarily suggestive because Fletcher was the only person to appear in both the IDOC photo array and the lineup. (*Id*. at Fletcher 000174).

76.     That same day, Fletcher, through his criminal defense attorneys, filed a "Motion to Suppress Evidence of the Pre-Trial Lineup Identification and Bar Any In-Court Identification by the Witnesses That Participated in the Pre-Trial Line-Up Identification." (*People v. Fletcher*, 02 CR 16669, Mtn. to Bar In Court Identifications, Fletcher 000504 (Cir. Ct. Cook Cty, Nov. 10, 2003), attached hereto as Exhibit 44). This motion sought to bar evidence of the lineup identifications by Friend and Cooper and barring their in-court identification of Fletcher based on an alleged violation of Fletcher's right to counsel. (*Id*. at Fletcher 000504).

77.     Instead of litigating the motions regarding the identifications, Fletcher, through his criminal defense attorneys, withdrew them. (Ex. 2: Crim Tr. at Fletcher 001556:17-20).

**B.      Fletcher's Investigation into the Eyewitnesses**

78.      On September 23, 2004, Jim Zarnick, an investigator hired by Fletcher's criminal defense attorneys, interviewed Cooper. (Zarnick Report re: Cooper dated Sept. 28, 2004 ("Zarnick Report"), attached hereto as Exhibit 45; Deposition of James Zarnick taken on January 19, 2024 ("Zarnick Dep."), attached hereto as Ex. 46 at 20:21-21:7). Cooper told Zarnick that approximately 6-8 months ago, two detective came to his house and showed him approximately 12 pictures of various individuals. (Ex. 45: Zarnick Report, Fletcher 000407). Cooper stated that he could not positively identify the person who robbed him because it happened so long ago. (*Id*. at Fletcher 000407-08). When asked if any of the men looked familiar, he picked out one of the photos, but stated that he could not be 100% sure. (*Id*. at Fletcher 000408). Cooper told Zarnick that two or three days later he viewed a lineup and picked out one of the individuals from the lineup, but stated that he was not 100% sure because the robbery happened so long ago. (*Id*. at Fletcher 000408). The detectives then told him the person who he identified from the photos and lineup was James Fletcher. (*Id*. at Fletcher 000408). Zarnick asked Cooper if there were additional witnesses and Cooper responded that Rogers witnessed the incident and that he had heard that Rogers was the person who reported that Fletcher was one of the offenders. (*Id*. at Fletcher 000408).

79.      Prior to trial, Fletcher's father was a silent participant on a phone call with Friend and an acquaintance. (Email from Saltiel to Hill dated Sept. 14, 2004 ("Saltiel Email"), Fletcher 008785, attached hereto as Exhibit 47). During the call, Friend stated that she was not sure at first about any identification and the police told her they had a suspect and that he had done stuff like this before. (*Id*.). Fletcher's attorney planned on calling Fletcher Sr. or the acquaintance to impeach Friend if Friend identified Fletcher at trial. (Letter from Saltiel to Fletcher dated Sept. 14, 2004, Fletcher 008592, attached hereto as Exhibit 81).

80.     Prior to the trial, Saltiel interviewed Friend and took notes from that interview. (Saltiel's Notes, Fletcher 008576, attached hereto as Exhibit 48). During the interview, Friend confirmed that she knew Rogers because Rogers "stood out there all the time." (*Id*.). Friend stated that she had never met Fletcher. (*Id*.). Referring to the photo array, Friend stated that she recognized the offender's "eyes." (*Id*.).

81.     Prior to trial, Friend received money orders in exchange for her not to appear in court at Fletcher's criminal trial. (Ex. 2: Crim. Tr. at Fletcher 000883:12-19; Investigative Report of Daniel Brannigan on March 5, 2015 ("Brannigan Rpt."), CCSAO-CIU 000425, attached hereto as Exhibit 49; Deposition of Daniel Brannigan taken Aug. 16, 2024 ("Brannigan Dep."), 36:3-22, 37:3-8, attached hereto as Exhibit 50). Friend received phone calls from someone who identified themselves as Fletcher's uncle, who indicated that she would receive additional money if she did not show up to court. (Ex. 2: Crim. Tr. at Fletcher 000883:19-23).

82.     Fletcher's criminal defense attorney, Reginald Hill, had a conversation with Friend in court prior to trial where he asked her if she "thought Fletcher was the guy who had done this, and [Friend] expressed some doubt…" (Deposition of Reginald Hill taken on Jan. 17, 2024 ("Hill Dep.") at 76:4-22, attached hereto as Exhibit 51).

83.     On June 3, 2003, Fletcher's criminal defense attorney and an investigator went to Cook County Jail to interview Rogers. (Reply to Investigation Request dated June 5, 2003 at Fletcher 008700, attached hereto as Exhibit 52).

84.     In August 2003, Fletcher provided information regarding Rogers to his criminal defense attorneys. (Hoover Notes from Interview with Fletcher dated Aug. 12, 2003 ("Hoover Notes") at Fletcher 008811, attached hereto as Exhibit 53). Fletcher told his attorneys that he went to High School with Rogers, they were in rival gangs, and then saw him in prison in Stateville in

1986. (*Id.*). In another interview, Fletcher told his attorneys that he saw Rogers in Cook County Jail in 1992. (Jail Notes from Sept. 30, Fletcher 008822, attached hereto as Exhibit 54).

85.     Joe Saltiel, one of Fletcher's criminal defense attorneys, spoke to Wade and determined that Fletcher would call Wade as a witness in his case-in-chief at the criminal trial. (Letter from Saltiel to Wade dated Dec. 22, 2004, Fletcher 008551, attached hereto as Exhibit 55; Ex. 2: Crim. Tr. Wade Test. at 123:6-16; Trial Subpoena to Emmett Wade at Fletcher 009647-9648, attached hereto as Exhibit 56). Additionally, Fletcher's other criminal defense attorney, Reginald Hill, had a conversation with Wade prior to trial in which "Wade indicated that the police had brought some identification photos to him and that they had, in fact, told him which one of the perpetrators to pick as being the person who committed the underlying crime…" (Ex. 51: Hill Dep. at p. 52:6-53:18).

## FLETCHER 2005 CRIMINAL TRIAL

86.     Fletcher's criminal trial occurred from February 23, 2005 through February 25, 2005. (Ex. 2: Crim Tr. At Fletcher 000881; Fletcher 001400; Fletcher 001544-45). The State called Cooper, Wade, Friend, and Detective Bogucki in its case in chief. (*Id.* at Fletcher 000882). Prior to Friend being called by the State, Assistant State's Attorney Aidan O'Connor ("ASA O'Connor") made a record that Friend was in custody on contempt for failing to appear at trial; that she was arrested on that warrant and brought into court to testify. (*Id.* at Fletcher 00883:11-887:14). After the State rested, Fletcher called James Fletcher Sr. (his father), Deborah Sanders (his ex-wife), Detective Schalk, and Jacqueline C. Gordon (his sister) in his defense.  (*Id.* at Fletcher 001401). The State called George Murtaugh in rebuttal. (*Id.* at Fletcher 001545). Rogers did not testify at Fletcher's criminal trial. (*Id.* at Fletcher 000882, 001401, 001544-45).

87.     Cooper testified that on December 21, 1990, he was working driving a truck for Holsum bread. (Ex. 2: Crim Tr., Cooper Test. at Fletcher 935:8-16). Between 1:00 p.m. and 1:30 p.m. he was making a delivery to Uncle Remus' Restaurant. (*Id*. at Fletcher 935:21-936:5). As he was coming out of Uncle Remus' he saw Friend. (*Id*. at Fletcher 936:21-23). Friend asked Cooper if he had any change for the laundromat and Cooper asked her to wait until he put up his bread trays in the truck. (*Id*. at Fletcher 937:6-12).  Cooper testified that when he opened the door to the truck a guy came up behind him and stuck a pistol in his back. (*Id*.). Cooper testified that the man said "step on in the truck" and another man stepped in the truck and he pointed a gun at Cooper and asked him for money. (*Id*. at Fletcher 938:9-21). Cooper went into his left pocket and gave him the money out, to which the man responded, "this ain't all you got." (*Id*. at Fletcher 938:9-23). Cooper testified that the other guy then put his hand in Cooper's right pocket and took the rest of his money. (*Id*. at Fletcher 938:16-939:1). Cooper testified that both men had guns and when asked who the man was that had the gun in his side, Cooper identified Fletcher is open court. (*Id*. at Fletcher 939:6-940:12). Cooper further testified that the man who went through his pockets was "the gentleman sitting there" referring to Fletcher. (*Id*. at Fletcher 941:2-5).

88.     Cooper testified that the men took him to open up the safe in his truck, but he replied that he did not have the keys to the safe. (Ex. 2: Crim. Tr., Cooper Test. at Fletcher 941:13-23). One man who, Cooper indicated in court as Fletcher, "kept telling the other guy to go on and shoot me." (*Id*. at Fletcher 942:4-8). Cooper testified that after 30 more seconds of the men talking, they stepped off the truck and ran west on Madison. (*Id*. at Fletcher 942:12-15). Cooper testified that he pulled out his gun and they "started shooting at each other." (*Id*. at Fletcher 942:12-18). Cooper testified that both of the men were shooting and that he chased them, running westbound on Madison, but ultimately lost them near a vacant lot. (*Id*. at Fletcher 944:1-22). Cooper testified

26

that Rogers chased after the two men with him and that he knew who Rogers was at the time. (*Id*. at Fletcher 945:8-11). After he lost the two men he returned to his truck and the police were there and he saw a man lying on the ground. (*Id*. at Fletcher 946:3-17).

89.     Cooper testified that on December 21, 1990, Fletcher had "a Jheri curl, about collar length." (*Id*. at Fletcher 948:20-23). He further testified that Fletcher had a cap on, dark colored pants and a Starter jacket. (*Id*. at Fletcher 949:8-12). Cooper testified that he was interviewed by the police sometime in 1995 and again in 2002. (*Id*. at Fletcher 950:22-951:4). Cooper testified that Detectives Bogucki and Shalk showed him a photo array at his house in 2002. (*Id*. at Fletcher 951:5-15). Cooper testified that the detectives asked him if he saw the person who robbed him on December 21, 1990, in the photos. (*Id*. at Fletcher 951:20-952:3). Cooper testified that he was able to pick someone out of the photo array as being involved in the crime and that person was Fletcher, who he again identified in court. (*Id*. at Fletcher 952:4-11).

90.     Cooper testified that in April of 2002 he was asked to go to Area 5 Violent Crimes Headquarters where he met with Detectives Bogucki and Shalk. (*Id*. at Fletcher 952:12-20). While at Area 5, Cooper testified that he viewed a line-up and he recognized "the gentleman sitting there," identifying Fletcher, as one of the guys who robbed him. (*Id*. at Fletcher 952:21-954:4). When showed a photograph of the line-up, People's Exhibit Number 8, Cooper testified that he identified Number 2, the man in a purple jacket. (*Id*. at Fletcher 963:13-964:5). Further Cooper testified that the man he identified in the line-up was also who he identified in court. (*Id*. at Fletcher 965:5-8).

91.     On cross-examination, Cooper testified that when he was shown the photo array by the detectives he just looked at the pictures and not any of the other identifying information under the pictures. (*Id*. at Fletcher 975:18-976:1). Cooper admitted that when shown the photo array in

27

2002, he was not 100 percent sure of his identification so he informed the detectives that he would like "to see the person in person." (*Id*. at Fletcher 973:14-18).

92.     Further, on cross-examination Cooper testified that he recalled an investigator calling him on approximately September 23, 2004, and Cooper told the investigator that after "14 years I'm like about 75 percent sure" of who he identified was the offender. (*Id*. at Fletcher 978:1-979:2). On re-direct examination, Cooper testified that when he viewed the line-up he informed the detectives he was positive of his identification and that he never told the police he was not 100 percent sure of his identification at the line-up. (*Id*. at Fletcher 984:4-15).

93.     At no time during Cooper's testimony when he identified Fletcher in open court, in a photo array or when during the lineup did Fletcher's counsel lodge an objection to any of the identification testimony. (*Id*. at Fletcher 934:15-988:3).

94.     Wade was called to testify for the prosecution and he testified that on December 21, 1990, he was sitting in his van that was parked on the south side of Madison. (Ex. 2: Crim. Tr., Wade Test. at Fletcher 989:4-22). Wade testified that while he was sitting in his is van reading the newspaper, he heard screaming and then he saw Cooper coming towards him with a gun. (*Id*. at Fletcher 990:7-14). Wade further testified that Cooper fired his gun and that a bullet hit his windshield. (*Id*. at Fletcher 991:13-20). Wade testified he ducked and came back up to see people with hoodies on the side of him running west. (*Id*. at Fletcher 991:21-992:5). Wade testified that while he saw individuals in hoodies run past him, he never said he saw offenders nor did he said he saw any guns in their hands. (*Id*. at Fletcher 999:21-1000:4). Finally, Wade testified that he was never able to identify the offenders to the police. (*Id*. at Fletcher 1000:8-11).

95.     On cross-examination, Wade testified that detectives visited him in 2002 at his home and showed him a photo array. (*Id*. at 1003:17-1005:6).  Wade testified that he was unable

to identify a suspect from the photo array. (*Id*.) Wade testified that when the detectives came to his house, they indicated that they had a suspect. (*Id*. at Fletcher 1005:7-14). Defense counsel asked Wade if the detectives pointed out which one of the photos was the suspect, the prosecutor objected and the court sustained the objection. (*Id*. at Fletcher 1005:15-1006:7). The defense attempted to rephase the question by asking, if he knew which one of the photographs was the suspect the detectives had in their mind for the December 21, 1990, shooting. (*Id*.) Again the prosecution objected and the court sustained the objection. (*Id*.)

96.     Friend testified that she on December 21, 1990, at around 1:30 p.m., she was doing her laundry at the laundromat near 5615 West Madison. (Ex 2: Crim. Tr., Friend Test. at Fletcher 1012:10-19). Friend testified that she saw Cooper across the street delivering bread and that she went to go talk to him. (*Id*. at Fletcher 1013:9-1014:13). Friend testified that while she was talking with Cooper she noticed two men standing outside the bread truck. (*Id*. at Fletcher 1014:14-18). Friend testified that as she started to get off the truck, the two men approached, and one of them grabbed her arm and said, "What the fuck you think you're doing." (*Id*. at Fletcher 1014:24-1015:7). Friend testified that she said "[l]et me go" and she pulled away and he let her go. (*Id*. at Fletcher 1015:6-11). Friend testified that the men got onto the bread truck with Cooper and when asked if she saw either one of the men from that day present in court, she identified Fletcher. (*Id*. at Fletcher 1015:12-1016:4). Friend further testified that Fletcher was the man who grabbed her by the jacket. (*Id*. at Fletcher 1016:10-13).

97.     Friend testified that she was able to see what was happening on the bread truck and that she watched Fletcher go into Cooper's pockets. (*Id*. at Fletcher 1017:1-1018:8). Friend further testified that eventually the men "jumped out the front of the side door…ran around the truck" and Cooper jumped off behind them to go chase them. (*Id*. at Fletcher 1019:5-11). Friend also testified

29

that she saw Cooper pull his gun. (*Id*. at Fletcher 1019:5-13). Friend testified that Cooper shot first and both the men shot back at Cooper. (*Id*. at Fletcher 1021:14-21). Friend testified that she saw an old man coming out of a store get hit and fall to the ground by the men who were firing in his direction. (*Id*. at Fletcher 1022:3-18).

98.     Friend testified that in 2002 she was arrested on a parole violation and taken to Area 5 to be interviewed about the Sorrell murder. (*Id.* at Fletcher 1036:19-1037:14). Friend testified that in February 2002 she met with Detectives Schalk and Bogucki at Area 5 and viewed a photo array where the detectives asked her if she could "identify the guys that killed that old man." (*Id*. at 1024:7-21). Friend testified that she was able to identify one of the shooters and that it was the same man she identified in court, Fletcher. (*Id*. at Fletcher 1025:3-9). Friend further testified that she later viewed a physical line-up and again identified the man that she had previously identified as being in court, Fletcher. (*Id*. at Fletcher 1025:15-1026:3). When shown People's Exhibit No. 18, a photograph of the line-up, Friend identified "the one in…in the purple." (*Id*. at Fletcher 1026:11-1027:12). Friend also identified Fletcher in People's Exhibit Number 14, the IDOC photo array, as the man who was involved in the shooting and the same man she identified in open court. (*Id*. at Fletcher 1028:14-1029:15). On cross-examination, Friend testified that she did not see Fletcher's hair at the time of the robbery because he had on a skullcap. (*Id*. at Fletcher 1032:4-14). Friend testified that when she was shown the photo array in 2002, she did not look at "that background" information or identifiers under the photographs, but rather that she "looked at the face." (*Id*. at Fletcher 1042:10-21). Friend further testified that when the detectives showed her the photo array in 2002, that the police did not tell her they had a suspect or that one of the men in the photos was the suspect. (*Id*. at Fletcher 1042:22-1044:1).

99.    On re-direct examination, Friend testified that none of the detectives told her who to pick out of the photo array in 2002. (*Id*. at Fletcher 1052:19-22). Friend was asked the following questions at trial and gave the following answers:

> Q: When you looked at the photo array with the police, with the detectives in 2002, did any of them tell you who to pick out of that photo array?
>
> A: No, they didn't.
>
> Q: I'm asking did the police officer tell you who to identify out of that photo array.
>
> A: No, they didn't. (*Id*. at Fletcher 1052:19-1053:24).

Regarding the lineup, Friend testified that she viewed the lineup and identified Fletcher as one of the individuals from the shooting. (*Id*. at Fletcher 1025:10:1026:3). Friend was asked the following question and gave the following answer:

> Q: When you were at the line-up, did the detectives tell you who to identify?
>
> A: No, they didn't. (*Id*. at Fletcher 1054:4-7).

During questioning by Fletcher's counsel, Friend testified that she had "no doubt at all…" that Fletcher was the offender. (*Id*. at Fletcher 1055:14-17).

100.    At no time during Friend's testimony when she identified Fletcher in open court, in a photo array, or when viewing a photograph of the physical line-up, did Fletcher object to the identifications. (*Id*. at Fletcher 1010:9-1055:19).

101.    Detective Bogucki testified that he was assigned to investigate the Sorrell homicide in 1995. (Ex. 2: Crim. Tr., Bogucki Test. at Fletcher 1057:18-21). Detective Bogucki testified that after reading the reports generated in 1990 he and his partner wanted to talk to Terry Rogers. (*Id*. at Fletcher 1060:14-18). Detective Bogucki testified that he tried to locate Rogers at that time but was unsuccessful, so he submitted an investigative alert for Rogers. (*Id*. at Fletcher 1060:19-

1061:8). Detective Bogucki testified that on February 12, 2022, he came into contact with Terry Rogers at Area 5 and interviewed Rogers along with Detective Schalk. (*Id*. at Fletcher 1061:14-1062:3). Detective Bogucki testified that they also interviewed Cooper on February 12, 2002, at his home. (*Id*. at Fletcher 1066:6-13). Detective Bogucki testified that they showed Cooper a group of photographs, asked him if he recognized anyone in the photos and Cooper picked out one photo and said it looks like one of the offenders that shot at him but he could not be positive. (*Id*. at Fletcher 1066:19-1067:4).

102.    Detective Bogucki testified that on March 8, 2002, he and Detective Schalk spoke with Friend at Area 5. (*Id*. at Fletcher 1067:12-19). He further testified that they showed her the IDOC photo array. (*Id*. at Fletcher 1067:20-24). Detective Bogucki testified that Friend was asked if she recognized anyone in the photo array and "she indicated that James, the photo of James Fletcher was one of the two offenders that shot the victim and robbed Edward Cooper." (*Id*. at Fletcher 1068:1-18).

103.    Detective Bogucki testified that after Fletcher's arrest, a line-up was conducted on April 20, 2002, where Fletcher was placed in the line-up with four other participates and Friend and Cooper separately viewed the line-up. (*Id*. at 1068:24-1069:16). Detective Bogucki testified that Friend and Cooper both picked out James Fletcher. (*Id*. at Fletcher 1070:11-1071:18).

104.    On cross-examination, Detective Bogucki testified that at the time of the line-up Fletcher's hair was in braids and that none of the participates had collar-length curls or ponytails. (*Id*. at Fletcher 1081:9-11; 1082:23-1083:4). Detective Bogucki also confirmed that Fletcher was the only person who appeared in both the photo array and the line-up. (*Id*. at Fletcher 1089:8-12).

105.    On re-direct examination Detective Bogucki testified that when he first became involved in the investigation in 1995, "Fletcher" was the name given by an individual as being

involved in the Sorrell murder. (*Id*. at Fletcher 1085:19-1086:10). He further testified that at the time he did not know if that was a first or last name. (*Id*. at Fletcher 1085:11-19).

106.    The defense called, James Fletcher Sr., who testified about Fletcher's, physical appearance in 1990, that Fletcher had short hair, not collar-length curls. (Ex. 2: Crim. Tr., Fletcher, Sr. Test at Fletcher 1409:3-18). Additionally, Deborah Sanders, Fletcher's ex-wife, testified that in early December 1990 she moved to Mississippi because Fletcher was cheating on her. (Ex. 2: Crim. Tr., Sanders Test. at Fletcher 1432:15-24; 1443:1-11). She testified that Fletcher met her in Mississippi close to Christmas, but she was unable to specify the exact date. (*Id*. at Fletcher 1434:14-1436:19). Sanders testified that in the Fall of 1990 Fletcher had a "bald fade." (*Id*. at Fletcher 1430:22-1431:1). Jacqueline C. Gordon testified that she was Fletcher's attorney at the time he was placed in the line-up and that she was present in the same room as Fletcher when the line-up occurred. (Ex. 2: Crim. Tr., Gordon Test. at Fletcher 1466:23-1467:10; 1480:10-24). Finally, the defense called Detective Schalk, who testified that during the course of his interview with Friend, she indicated to him that she had seen one of the offenders who killed Sorrell, Fletcher, several times before in the neighborhood. (Ex. 2: Crim. Tr., Shalk Test. at Fletcher 1463:14-22).

107.    None of the police reports in the Sorrell homicide investigation were admitted into evidence at the 2005 criminal trial. (Ex. 2: Crim. Tr., Admitted Exhibits Fletcher 001640-001644 (Feb. 25, 2002)). The State admitted 23 exhibits consisting of 20 photographs, a diagram of the area of the crime, the IDOC Photo Array, and a testimonial stipulation of the medical examiner. (*Id*.; *People v. Fletcher*, 02 CR 16669, Impound Order at Fletcher 000164, attached hereto as Exhibit 57).

108.    On February 25, 2005, the jury found Fletcher guilty of first-degree murder. (Ex. 2: Crim. Tr., Verdict at Fletcher 001646:17-20 (Feb. 25, 2005)).

33

109.    On May 6, 2005, Fletcher, through his counsel, filed a Motion for New Trial, arguing that the Court erred in the following ways: (1) By allowing witnesses to testify about information obtained from out of court statements made by Terry Rogers; (2) By not allowing J. Cunyon Gordon to rebut Detective Bogucki's comments that attorney's for the accused are not allowed in the witness viewing room at the time of a line-up; (3) Numerous errors relating to the testimony of Friend's time in custody and the State's comments regarding the same in closing argument; (4) That the jury's verdict was against the manifest weight of the evidence, because the identifications by Cooper and Friend were suggestive and the evidence was insufficient to prove him guilty beyond a reasonable doubt; and (5) That the Court made various other reversable errors; (*People v. Fletcher*, 02-cr-016669, Motion for New Trial at Fletcher 010034-010053, attached hereto as Exhibit 58).

110.    In arguing his motion for a new trial, Fletcher's counsel stated "as far as the point with the lineups…we're not arguing…they were impermissibly suggestive as a violation of the due process rights." (*People v. Fletcher*, 02-cr-016669, ROP at Fletcher 001763:2-5 (June 16, 2005), attached hereto as Exhibit 59). The court denied Fletcher's motion for a new trial. (*Id*. at Fletcher 001781:7-8).

111.    Fletcher hired new counsel, Fred Cohen, who filed an amended motion for a new trial, which made the following additional arguments, that Fletcher's counsel was ineffective because he failed to proceed with a motion to suppress the identification, failed to provide a limiting instruction, failed to impeach witnesses presented by the State. (*People v. Fletcher*, 02-cr-01669, Amended Motion for New Trial, Ind Def 000331-345, attached hereto as Exhibit 60). The court denied the amended motion for a new trial. (*People v. Fletcher*, 02-cr-016669, ROP at

Fletcher 001976:10-12 (Sept. 27, 2005), attached hereto as Exhibit 61). Fletcher was sentenced to a mandatory term of natural life. (*Id*. at Fletcher 001991:1-4).

## APPELLATE AND POST-CONVICTION PROCEEDINGS

112.    On direct appeal, Fletcher argued (1) that the identification evidence was insufficient to prove him guilty beyond a reasonable doubt; (2) his confrontation rights were violated; and ineffective assistance of counsel when counsel failed to request a limiting instruction and failed to impeach a witness. (*People v. Fletcher*, No. 1-05-3477, Order ("Direct Appeal") at Fletcher 001824-31 (1st Dist. March 23, 2007), attached hereto as Exhibit 62). Fletcher did not raise any issue regarding the alleged suggestiveness of the photo array or lineups. (*Id*.). In discussing the identification evidence, the appellate court held, "any rational trier of fact could have found defendant guilty of murder beyond a reasonable doubt." (*Id*. at Fletcher 001829).

113.    On August 24, 2011, Fletcher, *pro se*, filed a writ of habeas corpus in federal court, but requested it be held in abeyance as he intended to file a successive petition for post-conviction relief in state court. (*People v. Fletcher*, 02-cr-016669, Petition for Writ of Habeas Corpus at Fletcher 000091-000110 (Aug. 24, 2011), attached hereto as Exhibit 65).

114.    In 2015, after Fletcher requested review of his case for innocence by the Cook County State's Attorney's Office, Conviction Integrity Unit ("CIU"), the CIU determined that his "claims are without merit." (June 12, 2015 CIU Letter at CCSAO_Conflicts_ CIU_000168, attached hereto as Exhibit 69).

115.    As a part of the CIU's review, CCSAO Investigator Brannigan was tasked with locating and speaking with Friend regarding two affidavits that she submitted on behalf of Fletcher on August 26, 2011 and April 5, 2012. (Ex. 49: Barnnigan Rpt. at CCSAO-CIU 000424-426)).

116.    In the 2011 affidavit, Friend indicated that in March of 2002, she "was on parole and was arrested for a parole violation…" and was taken to the police station where "two police detectives" showed her a group of photos and asked her who "did the shooting in December 1990." (Affidavit of Shenee Friend from Aug. 26, 2011 ("2011 Friend Aff." at Fletcher 000414-417, attached hereto as Exhibit 70). Friend "pointed at one picture" and "the police then pointed at a photo of a different man…and said something like 'that's right, this is the one.'" (*Id*. at Fletcher 414-415). Friend's explained in the affidavit that several weeks later "police picked me up while I was on house arrest…to view a line-up." (*Id*. at Fletcher 415). The affidavit states, "they told me to pick out who did the shooting, and I picked out the man policed pointed out to me weeks earlier in the group of photos." (*Id*.)

117.    In 2012, Friend signed a supplemental affidavit, because after talking to Jennifer Blagg, she "realized that I knew additional facts…." (Supplemental Affidavit of Shenee Friend from Apr. 5, 2012 ("Supp. Friend Aff.") at Fletcher 000418, attached hereto as Exhibit 71). This affidavit states that when "the police" showed her the photos, "they told me that Fletcher was the one that I should pick." (*Id*.). The affidavit states that the police told her that Fletcher was in jail for a robbery and had a violent background and she thought that Fletcher was "a bad guy." (*Id*.). Friend stated that at the line-up she knew who to pick out because it was the same person who "the police" pointed out to her before. (*Id*.). Friend stated that at the time of the crime she "couldn't see the face" of the offender. (*Id*.).

118.    During Investigator Brannigan's interview of Friend on March 5, 2015, Friend informed Brannigan that no detective or officer threatened her or "told her who to identify at any time." (Ex. 49: Brannigan Rpt. at CCSAO-CIU-00425; Ex. 50: Brannigan Dep. at 78:2-79:5)). Friend further relayed that she told the police "the truth about what happened initially and told

detectives the truth years later." (Ex. 49: Brannigan Rpt. at CCSAO-CIU-00425). She also stated

that she told "the truth at the Grand Jury and when she testified in court." (*Id*.) Investigator

Brannigan went through the two affidavits with Friend and she remarked "that the affidavits were

not accurate and truthful" and that she only signed them "so these people would leave me the fuck

alone." (*Id*.) Investigator Brannigan asked if Friend would review both affidavits and mark what

was true and what was false and she agreed. (*Id*. at CCSAO CIU-000426).

119.    Based on Friend's notations on the 2011 affidavit, when she was shown the photo

array, she pointed at Fletcher's picture. (2015 Mark-up of the 2011 Friend Affidavit at CCSAO-

CIU 000420, attached hereto as Exhibit 72). Friend marked as false the statement that the police

pointed out a photo to her and then she wrote the notation "Police didn't tell me who to pick out."

(*Id*.). With regard to the lineup, Friend crossed out the reference to the police pointing out an

individual, and she notated that she "picked out the man who I saw shooting." (*Id*.). She also wrote

the notation, "I only signed because Fletcher lawyer would not leave me alone." (*Id*. at CCSAO-

CIU 419).

120.    When going through the 2012 affidavit, Friend marked as false the paragraph

stating that the police told her to pick out Fletcher and that they told her about his background and

him being a bad guy. (Mark-Up of Supplemental Friend Affidavit at CCSAO-CIU 423, attached

hereto as Exhibit 73). Regarding the lineup, Friend notated that "the office[r] did not tell who to

pick out." (*Id*.). Friend identified as false the paragraph about her not remembering what the

offender looked like and notated, "I did remember." (*Id*.). Friend noted as false the paragraph that

stated that she always wondered if she put the wrong person away and wrote, "I never say it or

never thought it." (*Id*.). Additionally, Friend explained that she "only signed because Fletcher

Lawyer would not leave me alone." (*Id*.).

121.    Fletcher requested that the CIU review his case a second time based on innocence, and on April 12, 2019, the CIU sent a letter to Fletcher stating that "in the absence of new evidence since the determination" was first made in 2015 "CIU has determined additional review is unnecessary at this time." (CIU Letter from Apr. 12, 2019 at CCSAO_Conflicts_CIU_000167, attached hereto as Exhibit 74).

122.    On October 25, 2019, the federal court issued a ruling on Fletcher's habeas petition, holding that Detective Bogucki's testimony that he reviewed the file in 1995 and learned that "one of the witnesses had provided a name of Fletcher" was a Confrontation Clause violation (Habeas Court Order from October 25, 2019 at IND DEF 000125, attached hereto as Exhibit 75). The court further ordered that the "state either initiate proceedings to retry…within 120 days, or release" Fletcher from custody. (*Id*. at IND DEF 000136).

123.    On January 24, 2020, the Cook County State's Attorney's Office filed a Petition for Relief from Judgment requesting that the criminal court vacate Fletcher's murder conviction and sentence and reinstate the matter for further proceedings. (*People v. Fletcher*, 02-cr-016669, Petition for Relief from Judgment at Fletcher 000568-614, attached hereto as Exhibit 76).

124.    Toni Giancola was the Cook County Assistant State's Attorney ("ASA Giancola") who was tasked with reviewing Fletcher's criminal case and making a recommendation on whether or not to re-try Fletcher for the murder of Sorrell. (Deposition of Toni Giancola taken on September 19, 2024 ("Giancola Dep.") at 21:19-22:2, attached hereto as Exhibit 77). When asked if she followed any policies and procedures of the Cook County State's Attorney's Office when making her recommendation, ASA Giancola stated "[t]his is the one and only time that I've done this, so I'm unaware of the policies and procedures. I can't speak to that." (*Id*. at 18:23-19:11). ASA

Giancola further testified that when she reviewed Fletcher's case file she did not become aware of any evidence that exonerated Fletcher. (*Id*. at 57:12-18).

125.     On January 29, 2020, Judge Martin granted the People's request and vacate the conviction and the State *nolled* all pending charges against Fletcher. (*People v. Fletcher*, 02-cr-016669, *Nolle* Order at Fletcher 000643 (Jan. 29, 2020), attached hereto as Exhibit 78)

### DEPOSITION TESTIMONY

126.     When deposed, Cooper testified that in 2002 the police came to his house and showed him a photo array asking him if he could identify anyone, Cooper testified that he initially told the detectives that it had been "over, like, 11 or 12 years or more…" and that "features change." (Ex. 31: Cooper Dep. at 20:7-19). Cooper testified that he remembered one of the offenders having big lips and he told the detective that. (*Id*. at 23:2-6). Cooper claims that after he told the detectives that he could not recognize anyone in the pictures, one of the detectives pointed "to one of the guys….and he told [Cooper] that two people had already identified…him as the— as the shooter. (*Id*. at 20:7-25). Cooper testified that the detectives told him to look at the lips of the people in the photographs. (*Id*. at 23:7:11). In selecting the photograph, Cooper "went by his facial and this guy's lips" (*Id*. at 70:3-7). In picking out Fletcher, Cooper said, "it looked like him by his lips … that look just him – the—the lip – the lip like him." (*Id.* at 21:1-8). Cooper further testified that in 2002 when he was shown the photo array he was 50 percent sure Fletcher was the offender, and after the police told him that Rogers had given the police Fletcher's name. (*Id*. at 25:3-20). Cooper testified that the police asked him if he would view a lineup and Cooper responded "yes…because I have to see him in person." (*Id*. at 137:19-24). Cooper thought seeing him in person would make him more confident in the identification. (*Id*. at 137:25-138:2).

127.    Cooper testified that he went to the police station to view a line-up and before he was shown the line-up, the same detectives that came to his house told him to "remember the—the lips and stuff…" (*Id*. at 30:11-16). Cooper testified that when he viewed the line-up, he picked the same person who was in the photo and that he was only "about 50 percent sure...was that him or not." (*Id*. at 33:17-34:2). Cooper further testified that at Fletcher's criminal trial Cooper identified Fletcher as the offender and that he testified that way, in part, because he had talked to Rogers' brother and Rogers' brother told him that Fletcher was the guy. (*Id*. at p. 34:14-23).

128.    Cooper testified that in 2004 he told defense investigators that since so much time had passed since the robbery that "I can't even remember their faces after so many years." (*Id*. at 78:16-25, 87:10-16).

129.    Cooper testified at deposition that he met with the ASA O'Connor "at least three times" prior to testifying at trial and that during their first meeting he informed her that he was only 50 percent sure about his identification of Fletcher. (*Id*. at 110:2-4; 110:17-20). Cooper testified that he told ASA O'Connor that the police pointed out the photo of Fletcher in the photo array. (*Id*. at 114:12-15). Cooper further testified that he told ASA O'Connor that when the police were at his house in 2002, that they told him that Rogers had given them Fletcher's name. (*Id*. at 112:1-10).

130.    ASA O'Connor testified that she does not recall Cooper ever telling her anything exculpatory about the police investigation. (Deposition of Aiden O'Connor taken on Oct. 10, 2023 ("O'Connor Dep.") at p. 188:2-5, attached hereto as Exhibit 79).

131.    Cooper testified that he remembered a guy putting a gun in his side and that individual who put the gun in his side had big lips. (Ex. 31: Cooper Dep. at 123:9-124:2). When asked about his trial testimony where he was asked to identify the man who had the gun in his side

and he identified Fletcher in open court, Cooper admitted that his trial testimony was accurate and truthful. (*Id*. at 124:3-125:7). Cooper further testified that his trial testimony when he again identified Fletcher in open court as the offender who went through is pockets was accurate and truthful. (*Id*. at 125:16-126:2). Cooper testified that his criminal trial testimony that Fletcher was the individual who "kept telling the other guy to go on and shoot me" was accurate and truthful. (*Id*. at 127:2-23). Finally, when directed to the specific parts of his trial testimony in which he stated Fletcher was the offender with the Jheri curl, Cooper confirmed that his testimony was accurate. (*Id*. at 127:24-129:2).

132.    Cooper testified at deposition that he did not testify at Fletcher's criminal trial that the police told him who to pick out of the photo array because "they didn't ask me that question in trial." (*Id*. at 133:2-11). Cooper further testified that when he spoke to counsel for Fletcher the day prior to his deposition, Fletcher's counsel asked him, "did they show me any pictures and stuff…" which prompted his response that the police told him to pick Fletcher out of the photo array. (*Id*. at 205:7-17). Cooper testified that he did not testify at Fletcher's criminal trial that the police pointed out a photo because he "really thought it was him after the police told me about that—that two other witnesses had already identified, and that Terry Rogers had stated, so I just really believed—after that, I really believed it was him." (*Id*. at 214:13-19).

133.    Detectives Bogucki and Schalk testified that he never used any unlawful tactics to try and get Cooper to identify Fletcher. (Ex. 8: Bogucki Dep. I at 28:12-16; Ex. 7: Schalk Dep. I at 235:13-16).  Detectives Bogucki testified that he did NOT point out Fletcher as a suspect when he showed Cooper the photo array and Cooper is lying if he says they pointed out Fletcher as the suspect. (Ex. 17: Bogucki Dep. II at 128:24-129:2; 130:16-20; Ex. 7: Schalk Dep. I at 240:150-241:1). Detective Schalk further stated that neither he nor Detective Bogucki would have told

41

Cooper that they had two other witnesses who had already identified Fletcher or to look "at this person's lips…" (*Id*. at 235:17-25).

134.    Wade testified at his deposition that the police came to his home in 2002, showed him a photo array and asked him if he could identify anyone involved in the 1990 shooting of Sorrell. (Ex. 25: Wade Dep. at 10:3-11:1). Wade testified that the detectives pointed out one of the photographs as being the man they thought was their suspect. (*Id*. at 11:17-21). Wade further testified that he told the detectives, "I saw three people run past…with hoodies on…I'm still looking at the Holsum truck driver because he's shooting…and that's the only person that I can identify…" (*Id*. at 12:6-16). Wade also testified that the detectives told him that Fletcher is a "bad guy" and they showed him a photograph. (*Id*. at 12:21-24). However, Wade testified that he told the police, "I cannot identify the guy because I never saw him, per se, shoot." (*Id*. at 12:25-13:8). Finally, Wade testified that he was not manipulated by the police, but rather that he thought it was strange that the police would show him one photograph. (*Id*. at 118:10-18).

135.    Detective Bogucki denied that he pressured Wade to identify a photograph of Fletcher and further denied that during his interview of Wade that he showed him a single photograph. (Ex. 17: Bogucki Dep. II at 125:1-8; 124:15-17; Ex. 7: Bogucki Dep. I at 23:8-24:12). Detective Bogucki denied that he told Wade during his interview that Fletcher was a suspect or that  that Fletcher "was a bad guy." (*Id*. at 124:28-25). Detective Bogucki testified that if Wade said that one of the detectives showed him a single photograph and pressured him to identify that photograph, he would be lying. (*Id*. at 125:24-126:2). Detective Schalk denied showing Wade a single photograph of a suspect. (Ex. 14: Schalk Dep. II at 73:3-7).

136.    Detective Bogucki testified that when compiling the 2002 photo array he used fillers with the last name Dixon. (Ex. 8: Bogucki Dep. I at 203:7-204:4) Additionally, he testified

42

that he looked for similar looking individuals for the photo array but he did not attempt to match the hairstyle of the fillers because it did not matter since it had been 12 years since the crime. (*Id*. at 204:1-4; 204:22-205:2).

137.     During the course of fact discovery, the parties submitted a joint status report with this Court indicating which side would depose each witness. (Dkt. No. 90). Fletcher's counsel submitted to the court that they would be responsible for serving and deposing Terry Rogers and Shenee Friend. (*Id*. at p. 2). Fletcher filed a Motion to Compel Ms. Friend to sit for her deposition after she was served and indicated that she would not be appearing at her deposition. (Dkt. No. 77). This Court subsequently ordered Friend to appear at her deposition. (Dkt. No. 91). Fletcher never served Friend with the order or requested additional assistance from the court.  Fletcher never deposed Rogers in this matter and then objected to the Defendants' attempts to depose him. (Dkt. No. 150).

## FLETCHER'S CLAIMS

138.     Fletcher filed this instant lawsuit on August 13, 2020, suing Detectives Jerome Bogucki, Anthony Noradin, Raymond Schalk, Sergeant Anthony Wojcik and the City of Chicago. (Dkt. No. 1). After the Court's ruling on the Defendant Officers' motion to dismiss, the following claims remain: (1) A Fourteenth Amendment Due Process violation based on (a) fabricating police reports;  (b) fabricating witness statements implicating Fletcher; (c) utilizing unduly suggestive identification procedures; (d) destruction of the 1995 photo array shown to Cooper; and (e) failing to disclose the fabricated evidence;; (2) Failure to intervene; (3) Conspiracy under federal law; (4) Malicious Prosecution under Illinois state law; (5) Intentional infliction of emotional distress under Illinois law; and (6) Civil conspiracy under Illinois state law. (Dkt. No. 63 at ¶¶ 28, 29, 31, 33, 34,

38, 39, 40, 41, 43, 45, 46, 48, 50, 53, 54, 55, 59, 60, 98-110, 113-120, 134-144, 151-156, 157-163, 176-181, 182-184, 189-194).

139.    In response to Defendants interrogatory requesting Fletcher identify what specific evidence was fabricated and withheld, Plaintiff responded that "Plaintiff specifically alleges that … these Defendants … fabricated evidence in order to connect [Fletcher] to the crimes, including false police reports and witness statements regarding Plaintiff's purported connection to the crimes; manipulated and coerced eyewitnesses to make false identifications and manufactured false witness testimony that was used to implicate Plaintiff; and then suppressed that information during criminal proceedings; covered up their misconduct and destroyed or suppressed additional evidence that would have exculpated Plaintiff, including witness statements pointing to other suspects and pointing away from Plaintiff, hiding that information from Plaintiff, his attorneys, and state prosecutors; presented false evidence to state prosecutors and judicial authorities in order to secure and continue charges against Plaintiff; and provided false reports, statements and testimony in order to implicate Plaintiff in a crime he had not committed…." (Plaintiff's Supplement Response to Defendant Bogucki's Interrogatories No. 4 at pp. 5-6, attached hereto as Exhibit 80). "Answering further, [Fletcher] states that the Individual Defendants fabricated the photo identifications and live lineup identifications of Plaintiff by Terry Rogers, Edward Cooper, and Sheenee Friend. All of these witnesses had limited opportunity to view the offenders because of the circumstances in 1990, and could not be reasonably relied upon to make an identification almost 12 years later in 2002…" (*Id*. at pp. 7-8). "Defendants also attempted to fabricate an identification with a fourth witness, Emmet Wade, as his extensive testimony establishes. Wade refused Defendants' attempts to get him to falsely identify Plaintiff, so Defendants suppressed the photo array that they showed Wade…" (*Id*. at p. 9). "Answering further, Defendants falsified

reports claiming that Rogers, Cooper, and Friend had identified Plaintiff, when in fact that evidence was entirely fabricated…" (*Id*.).

Respectfully Submitted,
*/s/ Brian J. Stefanich*
Special Assistant Corporation Counsel
One of the attorneys for the Defendant Officers

Andrew M. Hale
Allyson L. West
Brian J. Stefanich
Jennifer Bitoy
Hale & Monico LLC
53 W. Jackson Blvd., Suite 337
Chicago, IL 60604

## <u>CERTIFICATE OF SERVICE</u>

I, Brian J. Stefanich, an attorney, hereby certify that on May 6, 2025 I caused the foregoing,

**DEFENDANT OFFICERS' STATEMENT OF MATERIAL UNDISPUTED FACTS,** to be

filed with the Clerk of the Court using the ECF system, which sent electronic notification of the

filing on the same day to all counsel of record via the Court's CM/ECF system.

*/s/ Brian J. Stefanich*