# EXHIBIT 7

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## — COURT REPORTERS —

## CASE NO. 20-CV-04768

## JAMES FLETCHER JR.

## V.

## JAMES BOGUCKI, ET AL.

## DEPONENT:

## RAYMOND SCHALK

## DATE:

## May 17, 2023



a courtroom
**powerhouse**



✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

1        IN THE UNITED STATES DISTRICT COURT

2       FOR THE NORTHERN DISTRICT OF ILLINOIS

3             EASTERN DIVISION

4           JUDGE ANDREA WOOD

5       MAGISTRATE JUDGE MARIA VALDEZ

6         CASE NO. 20-CV-04768

7

8

9          JAMES FLETCHER JR.,

10            Plaintiff

11

12              V.

13

14       JAMES BOGUCKI, ANTHONY

15      NORADIN, RAYMOND SCHALK,

16     ANTHONY WOJCIK, UNKNOWN CITY

17   OF CHICAGO POLICE OFFICERS, AND THE

18        CITY OF CHICAGO,

19         Defendants

20

21

22

23  DEPONENT: RAYMOND SCHALK

24  DATE:    MAY 17, 2023

25  REPORTER: KORTNEY CHASE



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                    APPEARANCES

 2

 3  ON BEHALF OF THE PLAINTIFF, JAMES FLETCHER JR.:

 4  Sean Starr, Esquire

 5  Loevy & Loevy

 6  311 North Aberdeen Street

 7  Third Floor

 8  Chicago, Illinois 60607

 9  Telephone No.: (312) 243-5900

10  E-mail: sean@loevy.com

11

12  ON BEHALF OF THE DEFENDANTS, JEROME BOGUCKI, ANTHONY

13  NORADIN, RAYMOND SCHALK, ANTHONY WOJCIK, UNKNOWN CITY

14  OF CHICAGO POLICE OFFICERS:

15  Brian Stefanich, Esquire

16  Hale & Monico

17  53 West Jackson Boulevard

18  Suite 337

19  Chicago, Illinois 60604

20  Telephone No.: (312) 564-4924

21  E-mail: bstefanich@halemonico.com

22

23

24

25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              APPEARANCES (CONTINUED)

 2

 3   ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:

 4   Paul Michalik, Esquire

 5   Reiter Burns LLP

 6   311 South Wacker Drive

 7   Suite 5200

 8   Chicago, Illinois 60606

 9   Telephone No.: (312) 982-0090

10   E-mail: pmichalik@reiterburns.com

11

12   Also Present: Brandon Rackowski, Videographer

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                              INDEX

 2                                            Page

 3   PROCEEDINGS                                6

 4   DIRECT EXAMINATION BY MR. STARR            7

 5

 6                            EXHIBITS

 7   Exhibit                                   Page

 8   1 - CPD Mugshot - Fletcher 000796         255

 9   2 - Criminal Record Search Summary -

10       CITY-JF-000086-000096                 257

11   3 - ICAM Report Generated on August 19, 1999

12       - CITY-JF-000062-000085               268

13   4 - Mug Shot of Fletcher Clinton -

14       CITY-JF-004561                        275

15   5 - General Progress Report Written on

16       March 19, 1995 - CITY-JF-000052       290

17

18

19

20

21

22

23

24

25
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                    STIPULATION

 2

 3  The VIDEO deposition of RAYMOND SCHALK was taken at

 4  LOEVY & LOEVY, 311 NORTH ABERDEEN STREET, THIRD FLOOR,

 5  CHICAGO, ILLINOIS 60607 on TUESDAY, the 16TH day of MAY

 6  2023 at 10:15 a.m. (CT); said VIDEO deposition was taken

 7  pursuant to the FEDERAL Rules of Civil Procedure.

 8

 9  It is agreed that KORTNEY CHASE, being a Notary Public

10  and Court Reporter for the State of ILLINOIS, may swear

11  the witness.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                        PROCEEDINGS

 2

 3        THE VIDEOGRAPHER:  My name is Brandon

 4   Rackowski.  I'm the videographer today and Kortney

 5   Chase is the court reporter.  Today is the 16th day

 6   of May 2023.  The time is 10:15 a.m.  We are at the

 7   offices of Loevy & Loevy to take the deposition of

 8   Raymond Schalk, in the matter of James Fletcher

 9   Junior.

10        v. Jerome Bogucki, et al.  Pending in the

11   United States District Court for the Northern

12   District of Illinois Eastern Division, case number

13   20-CV-04768.  Will counsel please identify

14   themselves for the record?

15        MR. STARR:  Sean Starr from Loevy & Loevy on

16   behalf of plaintiff, James Fletcher.

17        MR. STEFANICH:  Brian Stefanich for the

18   individual defendants.

19        MR. MICHALIK:  Paul Michalik for defendant,

20   City of Chicago.

21        THE VIDEOGRAPHER:  Raymond Schalk, will you

22   please raise your right hand for the reporter?

23        THE REPORTER:  Do you solemnly swear or affirm

24   that the testimony you're about to give will be the

25   truth, the whole truth, and nothing but the truth?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

7

```
 1              THE WITNESS:  I do.
 2              THE REPORTER:  Thank you.
 3                    DIRECT EXAMINATION
 4  BY MR. STARR:
 5      Q.    Good morning, sir.
 6      A.    Morning.
 7      Q.    As I mentioned, my name is Sean Starr and I
 8  represent the plaintiff, James Fletcher, in this matter.
 9  Could you just state and spell your name for the record?
10      A.    Yes, it's Raymond Schalk.  R-A-Y-M-O-N-D,
11  S-C-H-A-L-K.
12      Q.    All right.  Let the record reflect that this
13  is the deposition of Raymond Schalk taken pursuant to
14  Notice in the Federal Rules of Civil Procedure.  Sir,
15  you understand that this case that you're here for
16  concerns a shooting death of a man on December 21, 1990
17  named Willie Sorrell and the subsequent Chicago Police
18  investigation of that?
19      A.    Yes.
20      Q.    Okay.  And you understand that there was a
21  person who ultimately was charged and convicted of that
22  crime and his name was James Fletcher, correct?
23      A.    Yes.
24      Q.    And you understand that Fletcher's homicide
25  conviction was vacated, correct?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-7 Filed: 05/06/25 Page 10 of 336 PageID #:4783

```
 1        A.   Yes.

 2        Q.   And you understand that Mr. Fletcher has filed

 3   a civil lawsuit and that you are a defendant in that

 4   lawsuit, correct?

 5        A.   Yes.

 6        Q.   Sir, you worked on the Willie Sorrell shooting

 7   investigation, along with several other Chicago Police

 8   personnel, correct?

 9        A.   Correct.

10        Q.   And one of the other officers that you worked

11   with was an officer by the name of Jerome Bogucki,

12   correct?

13        A.   Yes.

14        Q.   And you and Detective Bogucki worked on

15   the Sorrell investigation, correct?

16        A.   Yes, we did.

17        Q.   And Detective Bogucki was your partner in

18   1995; is that correct?

19        A.   Yes.

20        Q.   Okay.  What is your opinion, sir, of Detective

21   Jerome Bogucki's work as a Chicago Police officer?

22             MR. STEFANICH:  Objection to form.  You can

23        answer.

24        A.   He was an excellent detective who I've worked

25   for many years, and one of the best detectives I've ever
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    seen.

2    BY MR. STARR:

3         Q.    Okay.  What do you base your opinion on, sir?

4         A.    My working with him for some 24 years.

5    24 years in detective and a couple years in patrol.

6         Q.    Okay.  Were you guys partners for 24 years as

7    detectives?

8         A.    Yes.

9         Q.    And you were also partners when you were on

10   patrol with Jerome Bogucki?

11        A.    For a couple years.

12        Q.    Okay.  And I assume the patrol part came

13   before the detective part?

14        A.    Yes.

15        Q.    All right.  When you say he's one of the best

16   detectives that you've ever seen, and I'm

17   characterizing, paraphrasing what you said, what do you

18   mean by that, sir?

19        A.    Well, his quality of his work, his demeanor,

20   trustworthiness, dependability.  I -- I could go on and

21   on of the -- of the -- of the high quality of his

22   professionalism.

23        Q.    Okay.  And what is it, in your opinion, you

24   were a detective -- strike that.  You were a detective

25   for 24 years or longer?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.   I was -- well, it would be 26 years.

 2   First two years I spent at Area 4 Property Crimes,

 3   and then I came to Area 5 Violent Crimes.

 4        Q.   Okay.  And I'm going to ask you at some point

 5   later on in the dep to kind of give me a history of your

 6   employment with the Chicago Police Department, but we're

 7   not there yet.  Given your -- the length of your time as

 8   a Chicago Police detective, in your opinion, what

 9   characteristics make a good detective?

10          MR. STEFANICH:  Objection.  Form.  You can

11       answer.

12        A.   Well, intelligence, the ability to read

13   people, understand what's going on, to be quick thinking

14   and be able to present that information in reports and

15   in court.  That's basically it.

16   BY MR. STARR:

17        Q.   Did you consider yourself a good detective

18   while you were employed by the Chicago Police

19   Department?

20        A.   I would like to think so.

21        Q.   Okay.  Did you ever see Detective Bogucki make

22   mistakes while he was acting as a Chicago Police

23   Department detective?

24        A.   I don't know what you mean by mistakes.

25        Q.   Do you know the general definitions of a
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    mistake?

2         A.    Doing something wrong?  Is that --

3         Q.    Yeah.

4         A.    No, never.

5         Q.    Okay.  So you never saw him do anything wrong

6    as a Chicago Police detective, correct?

7         A.    No.

8         Q.    So you -- is it correct to say that -- strike

9    that.  Did you ever see Detective Bogucki ever

10   manipulate any witnesses?

11        A.    What do you mean by manipulate?

12        Q.    I'm using the common definition of the term.

13          MR. STEFANICH:  Objection to form.

14   BY MR. STARR:

15        Q.    What do you understand manipulate to mean,

16   sir?

17        A.    Well, I -- I don't -- I don't understand what

18   you mean.  I mean, we speak with witnesses and we have

19   to question them.  If -- if, you know, if we don't

20   believe them, we have to present them with evidence and

21   why we don't believe them.  Is that manipulating?

22   I don't know what you mean by manipulating.

23        Q.    Okay.  Did you ever see Detective Bogucki

24   manipulate a witness to identify someone that he wanted

25   that witness to identify?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

12

1      A.   No.

2      Q.   Are you aware that Detective Bogucki, in his

3   career, has been accused of manipulating witnesses?

4      A.   Yes.

5      Q.   What is your knowledge of that?

6      A.   There was a Thaddeus Jimenez case, which I

7   wasn't involved with.  I -- I was involved with the

8   second offender being arrested, but I wasn't involved

9   with Thaddeus Jimenez, but I understand Detective

10  Bogucki was.

11     Q.   Okay.  And you -- are you aware of any other

12  instances, besides the Thaddeus Jimenez case, where

13  Detective Bogucki was accused of manipulating witnesses?

14     A.   No.

15     Q.   Are you aware that in this case, he's been

16  accused of manipulating witnesses?

17     A.   Yes.

18     Q.   Okay.  So those are the two instances that

19  you're aware of then.  The Thaddeus Jimenez case and

20  then the James Fletcher case, correct?

21     A.   Correct.

22     Q.   Okay.  Did you ever see Detective Bogucki

23  manipulate any identification procedures?

24          MR. STEFANICH:  Objection.  Form.  Sorry.

25     You can finish, but...

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1          MR. STARR:  No worries.  I -- let me just --
 2      let me just back up.  So I'll strike that question.
 3  BY MR. STARR:
 4      Q.   Let me just say, so we're on the same page
 5  here and I want to make this -- it's going to be
 6  here -- we're going to here a long time, long day.
 7  I want to make it go as smoothly as possible.
 8  So I'm going to use the term, identification procedures.
 9  What is your understanding of what that term means?
10          MR. STEFANICH:  So I just don't think we need a
11      definition of manipulate from before, but that was
12      my objection.
13  BY MR. STARR:
14      Q.   Okay.  Okay.  What do you understand
15  identification procedures to mean?
16      A.   Well, if -- if you're speaking of either
17  identification from a photo array or from a lineup,
18  if that's what you mean.
19      Q.   Yeah.  So when I say identification procedures
20  as a general term, I'm talking about any identification
21  procedures that the Chicago Police Department did while
22  you were a detective, any identification procedures you
23  worked on.  So lineups, photo arrays, anything where you
24  have a witness and you're trying to get them to identify
25  a suspect; is that fair?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.    Yes.

2      Q.    Okay.  Did you -- and I think I did define

3   manipulate earlier, but I'm going to ask it anyways.

4   Did you ever see Detective Bogucki manipulate any

5   identification procedures?

6      A.    No.

7      Q.    Did you ever know him to -- strike that.

8   Did you ever see him point out a suspect in a photo

9   array?

10     A.    No.

11     Q.    Okay.  Did you ever hear about Detective

12   Bogucki pointing to a suspect while showing a witness a

13   photo array?

14     A.    No.

15     Q.    In your entire career as a Chicago Police

16   officer, did you ever witness anyone point out a suspect

17   to a witness who was seeking to identify -- strike that.

18   Let me rephrase that.  In your entire career as a

19   Chicago Police officer, did you ever see any other

20   Chicago Police officer point out a suspect to a witness

21   during a photo array?

22     A.    No.

23     Q.    Did you ever, during your time as a Chicago

24   Police officer or detective, point out a suspect to a

25   witness during a photo array?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     A.   No.

2     Q.   Did you ever see Detective Bogucki indicate to

3 a witness who to pick in a lineup?

4     A.   No.

5     Q.   Did you ever see any Chicago Police officer do

6 that?

7     A.   No.

8     Q.   Did you ever do that, sir?

9     A.   No.

10    Q.   Okay.  Did you ever become aware of Chicago

11 Police officers pointing out suspects to witnesses

12 during lineups?

13    A.   No.

14    Q.   Did you ever become aware of Chicago Police

15 officers pointing out suspects to witnesses during photo

16 arrays?

17    A.   No.

18    Q.   Did you ever see Detective Bogucki fabricate

19 any evidence?

20    A.   No.

21    Q.   Did you ever become aware that Detective

22 Bogucki had fabricated evidence?

23    A.   No.

24    Q.   Did you ever fabricate any evidence in your

25 career as a Chicago Police detective?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

ANTHONY WOJCIK - CONFIDENTIAL - 04/01/2025 12:06

```
 1        A.    No.

 2        Q.    Did you ever see Detective Bogucki cause

 3   charges to be filed against the wrong person in an

 4   investigation?

 5        A.    No.

 6        Q.    Did you ever become aware that Detective

 7   Bogucki caused charges to be filed against the wrong

 8   person during a police investigation?

 9        A.    No.

10        Q.    Did you ever cause charges to be filed against

11   some -- strike that.  Did you ever charge -- strike

12   that.  Did you ever cause charges to be filed against

13   the wrong person during a police investigation?

14        A.    No.

15        Q.    Let me ask you about another Chicago Police

16   employee.  Are you familiar with Detective Anthony

17   Noradin?

18        A.    Yes.

19        Q.    How do you know Detective Anthony Noradin?

20        A.    He was detective at Area 5 who worked with

21   myself and Detective Bogucki for several years.

22        Q.    Okay.  And when you say he worked with you and

23   Detective Bogucki, was he your partner?

24        A.    Well, it was a -- for -- when he was working,

25   it'd be a three man team.  The three of us had worked
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    together.

2         Q.    And what time period was that during, sir?

3         A.    You know, I -- I don't remember the years.

4    I -- sometime in the '90s, I believe.

5         Q.    Do you have a --

6             THE VIDEOGRAPHER:  Would you mind moving your

7         water bottle?  You're blocking this.

8    BY MR. STARR:

9         Q.    Do you have an approximate -- can you tell me

10   an approximate number of years in which you and

11   Detective Noradin and Bogucki you were a three man team?

12        A.    I -- well, several years, 3, 4, 5 or something

13   like that.

14        Q.    And that was sometime in the 1990s?

15        A.    I believe so.

16        Q.    Okay.  Do you recall if it was more in the

17   early 90s or in the later 90s?

18        A.    You know, I really don't recall.

19        Q.    And do you have any -- thank you, Kortney.

20            THE REPORTER:  Uh-huh.

21   BY MR. STARR:

22        Q.    Do you have any opinion of Detective Anthony

23   Noradin's work as a Chicago Police officer?

24            MR. STEFANICH:  Objection to form.  You can

25        answer.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.    He's -- he's an excellent detective.

 2   BY MR. STARR:

 3        Q.    Okay.  And do you base that off of your time

 4   working with Anthony Noradin?

 5        A.    Yes.

 6        Q.    So is it correct that you worked on other

 7   investigations, other than the Willie Sorrell case,

 8   with Detective Noradin?

 9        A.    Yes.

10        Q.    And it's also correct that on other occasions,

11   you worked on investigations with Detective Bogucki and

12   Detective Noradin together?

13        A.    Yes.

14        Q.    Okay.  Did you ever see Detective Noradin

15   manipulate any witnesses?

16        A.    No.

17        Q.    Did you ever become aware that Detective

18   Noradin had manipulated any witnesses?

19        A.    No.

20        Q.    Did you ever see Detective Noradin manipulate

21   any identification procedures?

22        A.    No.

23        Q.    Did you ever become aware that Detective

24   Noradin had manipulated any identification procedures?

25        A.    No.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of RAYMOND SCHALK, taken 07/06/23

1    Q.   Did you ever see Detective Noradin fabricate

2  any evidence?

3    A.   No.

4    Q.   Did you ever become aware that he had

5  fabricated any evidence?

6    A.   No.

7    Q.   Did you ever see Detective Noradin cause

8  charges to be filed against the wrong person during a

9  Chicago Police investigation?

10   A.   No.

11   Q.   Did you ever become aware that Detective

12 Noradin had caused charges to be filed against the wrong

13 person during a Chicago Police investigation?

14   A.   No.

15   Q.   What about another Chicago Police employee,

16 Sergeant or Detective Anthony or Tony Wojcik.

17 Are you familiar with him?

18   A.   Yes.

19   Q.   And how are you familiar with Tony Wojcik?

20   A.   For a time period, he was a detective at Area

21 5.  He was promoted to sergeant and at some point,

22 returned as a detective sergeant at Area 5.

23   Q.   Okay.  While you were a detective at Area 5,

24 was Sergeant Wojcik your sergeant?

25   A.   Well, at -- at times, it depend -- whatever


502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of RAYMOND SCHULTE, taken 06/03/23

                                                                    20

```
 1   sergeant was working is my sergeant.  So at times he was

 2   my sergeant, but not -- not every time that I'm working,

 3   no.

 4        Q.   That's fair.  And I didn't mean to pin you

 5   down on that.  I just -- for clarity's sake.  So there

 6   was an overlap between when Tony Wojcik was a sergeant

 7   at Area 5 of detectives, and you were a detective at

 8   Area 5, correct?

 9        A.   Yes.

10        Q.   Okay.  And so there was periods where you

11   worked under his supervision, correct?

12        A.   He would've been my Sergeant at times, yes.

13        Q.   Okay.  And then do you also -- did you also

14   work with Tony Wojcik when he was just a detective at

15   Area 5?

16        A.   I don't know that we worked at any -- on any

17   case in particular together.  We may have.  I don't

18   recall.

19        Q.   And you and Tony Wojcik were never partners

20   then?

21        A.   No.

22        Q.   Okay.  Do you have an opinion about Tony

23   Wojcik's work as a Chicago Police officer?

24        A.   Highly intelligent, very dedicated,

25   hardworking detective.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q.   And you based that on experience working with
 2   him?
 3        A.   Of what I saw there at Area 5, yes.
 4        Q.   All right.  And did you ever see -- did you
 5   ever see or become aware of Detective Wojcik or Sergeant
 6   Wojcik manipulating any witnesses?
 7        A.   No.
 8        Q.   Did you ever see or become aware of Detective
 9   Wojcik or Sergeant Wojcik manipulating any
10   identification procedures?
11        A.   No.
12        Q.   And did you ever see or become aware of
13   Detective Wojcik fabricating, or Sergeant Wojcik
14   fabricating any evidence?
15        A.   No.
16        Q.   Did you ever see or become aware that Tony
17   Wojcik caused charges to be filed against the wrong
18   person during a Chicago Police investigation?
19        A.   No.
20        Q.   What about another detective?  What about a
21   detective by the name of Michael Fleming?  Are you
22   familiar with who he is?
23        A.   He -- he had been a detective at Area 5.
24        Q.   Was Michael Fleming a detective at Area 5
25   while you were a detective at Area 5?
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      A.    For a time period.  I believe he was there
 2 before I went to Area 5 also.  But he was there for a
 3 while, yes.
 4      Q.    All right.  And did you ever work on any
 5 investigations with Detective Fleming?
 6      A.    Not that I recall.
 7      Q.    So is it correct to say that you were never
 8 Detective Fleming's partner?
 9      A.    No.
10      Q.    And do you have any opinion of Detective
11 Fleming's work as a Chicago Police officer?
12      A.    Well -- well, from what I observed, he seemed
13 to be a -- a hardworking, dedicated detective.
14      Q.    Okay.  And are you aware of any
15 situation -- or strike that.  Did you ever see or become
16 aware that Detective Fleming manipulated any witnesses?
17      A.    No.
18      Q.    Did you ever see or become aware that
19 Detective Fleming manipulated any identification
20 procedures?
21      A.    No.
22      Q.    Did you ever see or become aware that
23 Detective Fleming fabricated any evidence?
24      A.    No.
25      Q.    Okay.  So I asked you just about a handful of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

ANESTEVEZ081620 - RAYMONE PIWNICKI - 05/16/23 - Page 2 of 3

23

```
1    people that were at Area 5 when you were there and you

2    seemed to have high opinions of all of them; is that

3    correct?

4         A.   Yes.

5         Q.   Were there any detectives at Area 5 that you

6    had low opinions of?

7         A.   The ones that I had knowledge of, no.

8    I can't say I had anybody, a low opinion.

9         Q.   Okay.  Did you ever -- did you have any

10   opinions -- strike that.  Were there any detectives at

11   Area 5 that you felt were bad detectives?

12        A.   No.  Not that I can -- not that I have

13   knowledge of that, no.

14        Q.   Okay.  And then I went through a list of

15   things that I asked you if you ever saw or were aware

16   of.  Do you remember those line of questions I asked

17   you --

18        A.   Uh-huh.

19        Q.   -- about each of those different people that I

20   identified?

21        A.   Uh-huh.

22        Q.   Okay.

23             THE REPORTER:  Is that a yes?  Sorry.

24             THE WITNESS:  Pardon me?

25             THE REPORTER:  Was that a yes?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1            THE WITNESS:  Yes.
 2   BY MR. STARR:
 3       Q.   Did you ever see or become aware of any
 4   Chicago Police detective, at Area 5 or otherwise,
 5   manipulating witnesses?
 6            MR. STEFANICH:  Objection to form --
 7       A.   No.
 8            MR. STEFANICH:  -- you can answer.
 9   BY MR. STARR:
10       Q.   Did you ever see or become aware of any
11   Chicago Police detective manipulating identification
12   procedures?
13            MR. STEFANICH:  Objection to form.  You can
14      answer.
15       A.   No.
16   BY MR. STARR:
17       Q.   Did you ever see or become aware of any
18   Chicago Police detective fabricating evidence?
19            MR. STEFANICH:  Objection to form.  You can
20      answer.
21       A.   No.
22   BY MR. STARR:
23       Q.   Did you ever see or become aware of any
24   Chicago Police detective causing the wrong person to
25   be charged for a crime?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

ANE DOE 5051 - UNDER SEAL - VOLUME 2 - 9/21/23

25

```
 1            MR. STEFANICH:  Objection to form.  You can
 2      answer.
 3      A.    No.
 4  BY MR. STARR:
 5      Q.    Do you think that those things happened at
 6  Area 5 during your tenure?
 7      A.    Not to my knowledge.
 8      Q.    Do you have any institutional knowledge that
 9  they did not happen?
10      A.    I'm not sure I understand that question.
11      Q.    Okay.  Let me rephrase it.  Actually, let me
12  ask you this way.  Do you have any -- let me do this.
13  Did you -- do you have any institutional knowledge that
14  any of those things did happen during your time as a
15  Chicago Police detective?
16            MR. MICHALIK:  Object to form, foundation.
17      A.    I don't have any knowledge of those happening
18  at Area 5.
19  BY MR. STARR:
20      Q.    Okay.  Have you -- have you -- as a citizen,
21  have you become aware through the media, or any other
22  source, that there's allegations, many allegations in
23  fact, that those things were in fact happening at
24  Area 5 during the 1990s and early 2000s?
25            MR. STEFANICH:  Objection.  Form, foundation.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        You can answer.
 2        A.   I mean, on the news, I've heard that there's
 3   other lawsuits, but I don't have any knowledge of them.
 4   BY MR. STARR:
 5        Q.   What have you -- what have you seen or heard
 6   on the news about Area 5 detectives?
 7        A.   Well just that there's been some lawsuits
 8   filed on -- on cases in -- in Area 5.
 9        Q.   Do you have any -- do you know which lawsuits
10   in particular have been filed against detectives at Area
11   5?
12        A.   I mean, obviously, Detective Guevara's name
13   comes up on the news quite a bit, but...
14        Q.   Yeah.  Did you ever work with Detective
15   Guevara?
16        A.   No.
17        Q.   Okay.  Do you have an opinion of Detective
18   Guevara's work as a Chicago Police officer?
19        A.   Well, I --
20          MR. STEFANICH:  I'm going to object to form.
21        You can answer.
22        A.   Seeing I've never worked with him, I never
23   really formed much of an opinion, but he seemed to be a
24   hardworking detective.
25   BY MR. STARR:
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.    When you were at Area 5, were there any rumors

2    about Detective Guevara committing misconduct?

3    A.    I've never heard any rumors like that, no.

4    Q.    Okay.  Did Detective Guevara have any kind of

5    reputation while you were an Area 5 detective, that you

6    were aware of?

7    A.    Not that I'm aware of, no.

8    Q.    Did you ever -- during your time at Area 5,

9    did you -- were you ever at Area 5, at the actual Area 5

10    location, and become aware of any detective using

11    physical force on any witness or suspect in custody?

12    A.    No.

13        MR. STEFANICH:  Objection to form.

14    A.    No.

15 BY MR. STARR:

16    Q.    Did you ever hear any rumors that Detective

17    Guevara used physical force against witnesses and

18    suspects?

19    A.    No, not to my knowledge.

20    Q.    Subsequent to your time -- tenure at Area 5,

21    did you hear that in the media?

22    A.    I don't know what the allegations were made in

23    the media against Detective Guevara.

24    Q.    Did you ever -- did I -- did I ask you, did

25    you ever work in any investigations with Detective

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  Guevara?

2      A.  I may have used him once or twice as a Spanish

3  interpreter, but that would be my extent of the

4  involvement with Detective Guevara.

5      Q.  Were there other detectives that spoke Spanish

6  during your tenure?

7      A.  Yes.

8      Q.  Okay.

9      A.  I've used all of them, yes.

10     Q.  But the extent of your interactions with

11  Detective Guevara, as far as you can recall on

12  investigations, were you'd bring them in to translate or

13  interpret?

14     A.  That's -- what -- whatever you call it, yes.

15     Q.  Okay.  Sir, have you been deposed before?

16     A.  Yes.

17     Q.  Okay.  So you're probably somewhat familiar

18  with this format, but I'm just going to go through a

19  couple of the rules and one of them, one of the more

20  important ones we've already kind of had come up.

21  All of -- all of our questions and all of your answers

22  need to be verbal.  Obviously, when you're talking to

23  your loved ones or people in public, you use other cues

24  to communicate, but because there's a court reporter

25  writing down everything we say, it's really important

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   that if I ask you a question, you give a verbal answer,
 2   okay?
 3        A.   Yes.
 4        Q.   All right.  And along those same lines, it's
 5   important that we don't talk over one another.  That's
 6   obviously going to happen, because that just happens in
 7   normal conversation, but I'm going to do my best to get
 8   my questions out.  The other attorneys may make
 9   objections.  You want to let them have a moment of time
10   to do that and then give your answer.  And I -- let's
11   all try not to interrupt each other, okay?
12        A.   Yes.
13        Q.   All right.  And you understand that you're
14   under oath today, sir, correct?
15        A.   I do, yes.
16        Q.   And you understand that telling a lie while
17   you're under oath at a deposition is a crime?
18        A.   Yes.
19        Q.   This is going to be a more informal kind of
20   exchange than you may have experienced testifying in
21   court, but let's just try to get through this.  And like
22   I said, it's going to be a long day.  If I ask you a
23   question that doesn't make sense to you, please let me
24   know and I will do my best to rephrase it, okay?
25        A.   Okay.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q.   And then if I ask you a question and you

2  answer it, I'm going to assume that you understood what

3  I was asking; is that fair?

4      A.   Yes.

5      Q.   Okay.  If you need a break, by all means, let

6  us know.  The only thing that I ask you is that if I

7  have a -- if there's a pending question, you answer that

8  question before we take a break, okay?

9      A.   Yes.

10     Q.   All right.  Do you have any conditions today

11  that might affect your ability to provide truthful and

12  accurate testimony?

13     A.   No.

14     Q.   Do you have any conditions that affect your

15  memory?

16     A.   Oh, well, other than I'm 70 years old and

17  I -- my memory isn't as good as when I was younger, but

18  I've also been recently diagnosed with leukemia, which

19  I'm taking medication for, which makes me more tired,

20  but that's about it.

21     Q.   Okay.  And I -- and I'm sorry to hear that.

22  And I'm sympathetic to that.  And if you need any

23  accommodations because of that, please let us know.

24  But do you understand that the medication you're taking,

25  does it have any effect on your memory?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1        A.    No.   No.

2        Q.    Okay.   And then are you taking any medications

3   that might affect your ability to be truthful and

4   accurate?

5        A.    No.

6        Q.    Is there anything else that you can think of

7   that might affect your ability to provide truthful and

8   accurate testimony today?

9        A.    No.   No.

10        Q.    Anything else that you can think of that may

11   affect your memory?

12

13

14        A.    No.

15        Q.    All right.   Excellent.   Sir, when did you

16   first learn that you were going to be deposed in this

17   case?

18             MR. STEFANICH:   Objection.

19        A.    I believe -- I believe --

20             MR. STEFANICH:   Hold on, hold on.

21             THE WITNESS:   I'm sorry.

22             MR. STEFANICH:   I'm going to object to the

23        extent it calls for attorney-client communications.

24        So I don't know if you want to rephrase, or if

25        there's something you're trying to get after.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

THE DEPOSITION OF THE HONORABLE LORI E. LIGHTFOOT, 9/2021

```
 1   BY MR. STARR:
 2       Q.   No.  I mean, I just asked when.  So I was --
 3            MR. STEFANICH:  Yeah.
 4   BY MR. STARR:
 5       Q.   -- asking for the, like, the dates or the
 6   approximate dates.  I'm not asking for any conversations
 7   you may have had with your attorney.  And I'm going to
 8   ask you about talking to your attorney, but I don't want
 9   you to reveal anything that you've discussed with your
10   attorney.  Does that make sense?
11       A.   Yes.
12            MR. STEFANICH:  Okay.  With that caveat,
13       you can answer the question.
14       A.   Okay.  Well, I believe I first learned I was
15   going to be deposed from my attorney.  I --
16            MR. STEFANICH:  So you can answer the date,
17       if you know the date.
18       A.   No, I really don't know the date.
19   BY MR. STARR:
20       Q.   Do you have an approximate --
21       A.   Months ago, but...
22       Q.   Several months ago?
23       A.   At least, yeah.
24       Q.   Okay.  Was it within the last calendar year?
25       A.   Probably.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q.   All right.  And then when you learned that you

2  were going to be deposed in this case, were you given

3  any documents that were -- that are relative to this

4  case?

5      A.   I was given a copy of the file, the police

6  file.

7      Q.   Okay.  And when you say a copy of the police

8  file, are you referring to the permanent retention file

9  or the investigative file?

10          MR. MICHALIK:  Object to form.

11     A.   Well, whatever the xerox copies came from,

12 that's what I was given.

13 BY MR. STARR:

14     Q.   Okay.  We'll get into -- we'll get into that

15 and we'll look at some documents and see if we can

16 identify the documents that you were given.  Do you know

17 the difference between the permanent retention file and

18 the investigative file as I used those terms?

19     A.   If I recall, I -- I believe there was an

20 investigative file at Area 5 and somewhere in

21 headquarters, there would be a permanent retention file.

22 I believe it's --

23     Q.   And --

24     A.   -- which included both -- the same documents.

25     Q.   Okay.  So it's your understanding that the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    permanent retention file and investigative file were
 2    housed in two different places, but contained the same
 3    documents?
 4            MR. MICHALIK:  Object --
 5        A.   Yes.  I'm sorry.
 6            MR. MICHALIK:  Object to form.
 7        A.   Yes.
 8    BY MR. STARR:
 9        Q.   Okay.  Did you receive a copy of the complaint
10    in this civil lawsuit when you were first notified that
11    you were going to be deposed?
12        A.   I -- someone came to my house and -- and gave
13    me the lawsuit, so I guess that's what it was, yes.
14        Q.   Okay.  So I think that may have been when you
15    were served with a subpoena and a notice of this
16    lawsuit?
17        A.   I believe so, yes.
18        Q.   Okay.  So at that point, you got a copy of the
19    civil complaint.  Did you read it?
20        A.   Yes.
21        Q.   Okay.  Did you read it in its entirety, or did
22    you just skim it?
23        A.   I believe I just basically skimmed it.
24        Q.   Did you read the fact section, do you know?
25        A.   I don't recall.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  Q. Okay.  Did you ever read the entire complaint?

2  A. I don't know that I did.

3  Q. Okay.  Did you receive -- so just to, like,

4 separate the time periods, like, at one point you were

5 served, and you got the complaint and then later on, you

6 were notified that you would be deposed, correct?

7  A. Yes.

8  Q. Okay.  So I'm talking about when you were

9 notified about the deposition.  At that juncture, did

10 you receive any additional documents besides the police

11 file, as you referred to it?

12  A. No.

13  Q. Okay.  At any point, since you were first

14 notified of the fact that you were being deposed in this

15 case until today, did you receive any additional

16 documents besides what you referred to as the police

17 file?

18  A. No.

19  Q. When you were first served with the lawsuit,

20 and again, taking you to two different junctures in

21 time, right?

22  A. Uh-huh.

23  Q. So when you were first served, when you were

24 first given the complaint and the subpoena, did you

25 remember anything about the underlying investigation in

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   the Sorrell murder?

2       A.  Well, I recall some of the unique facts of it

3   that it was a -- a bread truck driver was robbed, and

4   that he chased after the offenders with his own gun.

5   There was an exchange of gunfire and, you know, a person

6   just standing on the sidewalk was -- was shot by

7   one -- by one of the offender's bullets.  And I -- I

8   recall the name of Fletcher had come up, but I don't

9   really -- I don't recall the investigation itself.

10       Q.  Do you recall how the name Fletcher came up?

11       A.  Well, I -- I do, seeing that I read the

12   reports.  It came from Terry Rogers.

13       Q.  Okay.  So this can be difficult to do and I'm,

14   you know, going to ask you to try to do this.  I'm

15   trying to talk to you now about what you recalled, just

16   from your own memory, your own independent recollection,

17   when you were first served with the complaint.  And I

18   understand that subsequent to that, you reviewed

19   documents and it's maybe difficult to differentiate.

20   But to the best of your ability, I'm asking you, so that

21   when you were first served with the subpoena and the

22   complaint, you said that you recall there was a name

23   Fletcher associated.  Do you -- did you at that point,

24   did you recall why the name Fletcher was associated with

25   the case?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     A.   Well, I -- I believe I recalled it came from a

2   witness, but I didn't recall from who.

3     Q.   Okay.  And when I say -- when I use the term

4   independent recollection, is that a term that you're

5   familiar with?

6     A.   Yes.

7     Q.   And what do you understand that to mean,

8   generally?

9     A.   It's something that I -- I -- I recall without

10  having to review the reports.

11    Q.   Yeah.  So it's like a physical memory that you

12  have without the need to look at documents or talk to

13  any other person.  Does that make sense?

14    A.   Yes.

15    Q.   Okay, cool.  Any other independent

16  recollection that you had about this case when you were

17  first served with the complaint?

18    A.   No, I think that was it.

19    Q.   Okay.  And then later on, you received what

20  you referred to as the police file when you were

21  notified of your deposition.  Did you review the police

22  file when you got it?

23    A.   Yes.

24    Q.   Okay.  And then after reviewing the police

25  file, did it refresh your recollection at all?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-7 Filed: 05/06/25 Page 40 of 336 PageID #:4813

38

```
1        A.    Well, not really.  I mean, I -- I don't recall
2   any of the interviews or talking to anybody on the case,
3   but yeah, I -- no, not it -- it didn't give me any more
4   independent recollection.
5        Q.    Okay.  So the review -- you reviewed the
6   police file at some point within the last calendar year,
7   and the review of that did not engender any independent
8   recollection that you didn't have prior, correct?
9        A.    Correct.
10       Q.    Okay.  So is it safe to say -- is it correct
11  to say that your memory did not improve with your review
12  of the police file?  Strike that.  Let me re-ask it.  It
13  was kind of a poorly phrased question.  Is it correct to
14  say that your memory of the Sorrell murder investigation
15  did not improve upon review of the police file?
16       A.    Basically, that's correct, yes.
17       Q.    Okay.  And so in preparation for today's
18  deposition, did you review that police file on more than
19  one occasion?
20       A.    Yes.
21       Q.    Okay.  Did you review any other documents in
22  preparation for today's deposition?
23       A.    No.
24       Q.    So just the police file, that's the only
25  documents you looked at?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

TASTE DEPOSITION OF OFFICER DAVID BYRNE -- taken 1/30/25

```
 1        A.    Yes.

 2        Q.    Okay.  Do you know if you testified in the

 3   Willie Sorrell murder that led to the criminal

 4   proceedings against James Fletcher?

 5        A.    Now that I recall, there was a -- I was

 6   given -- I apparently testified briefly at -- at that

 7   trial and I -- I do recall seeing that --

 8        Q.    Okay.

 9        A.    -- in the file.

10        Q.    And that's fair.  I mean, I just --

11        A.    Yeah.

12        Q.    -- wanted to make sure that we're on the same

13   page and I'm not trying to trick you.  So in preparation

14   for today's deposition, the two different categories of

15   documents you reviewed were, one, the police file,

16   and two, the transcripts from your testimony at the

17   criminal proceedings of James Fletcher; is that correct?

18        A.    They were included -- in the -- in the group

19   with the police file, yes.

20        Q.    Okay.  Any other documents that you can recall

21   reviewing in preparation for today besides those two

22   documents?

23        A.    No, not that I recall.

24        Q.    Okay.  Did you meet with your counsel to

25   prepare for today's deposition?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.    Just over Zoom.

 2        Q.    Okay.  And when was your Zoom meeting with

 3   your -- with your lawyer?

 4        A.    We had a couple of -- there were several

 5   meetings and -- and phone conversations.  I -- I can't

 6   give you the -- the exact dates.

 7        Q.    Okay.  And I'm -- it's not -- I'm not trying

 8   to pin you down and give you a memory test, but I just

 9   generally want to have an idea of how much time you

10   spent talking to your attorney in preparation for today,

11   again, not asking you what you talked about.  So when

12   was the earliest meeting that you had, whether it was

13   over the telephone or over Zoom, with your attorney in

14   preparation for today's deposition?

15        A.    You know, I don't recall when it was actually,

16   with and I -- I forget her name, it was another female

17   attorney.  I think that was the first time I had a

18   conversation about it.

19        Q.    Was that --

20        A.    And --

21        Q.    Sorry, I didn't mean to interrupt you.

22        A.    And, I mean, it was months ago, whenever it

23   was.

24        Q.    All right, was that a phone conversation or a

25   Zoom meeting?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1          A.    That was a Zoom.

 2          Q.    All right.  Was that attorney's name Allyson?

 3          A.    That sounds familiar to me.

 4          Q.    Okay.  And how long, approximately, was that

 5   meeting?

 6          A.    Oh, half hour to an hour maybe.

 7          Q.    And were there any other people present on

 8   that Zoom, besides you and Allyson?

 9          A.    I believe Detective Bogucki was.

10          Q.    Okay.  So just three of you then, on that

11   Zoom, as far as you can recall?

12          A.    Yes.

13          Q.    All right.  And then when is the next time you

14   had any contact with your attorney about preparing for

15   this deposition?

16          A.    Again, I -- I can't give -- give you any

17   dates, but there were other Zoom meetings.

18          Q.    How many times do you think you met on Zoom

19   with your attorneys in preparation for today's

20   deposition?

21          A.    I can recall two.

22          Q.    Okay.  So you told me about the first one,

23   right?

24          A.    Uh-huh.

25          Q.    And the second one was --
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       A.   And two others.

2       Q.   **Two others?**

3       A.   Yes.

4       Q.   **Okay.  When was the most recent time you met**

5  **on Zoom with your attorneys?**

6       A.   Maybe several weeks ago.

7       Q.   **Okay.  And who was on that Zoom meeting?**

8       A.   I believe that was myself, Detective Bogucki

9  also.

10      Q.   **And what attorney?**

11      A.   And Mr. Stefanich.

12      Q.   **Okay.  And how long did that Zoom meeting**

13 **last?**

14      A.   Oh, maybe an hour.

15      Q.   **And then there was a third one in between**

16 **those two?**

17      A.   I believe so.

18      Q.   **And do you have any kind of ballpark estimate**

19 **of when that Zoom meeting, the second of your three Zoom**

20 **meetings, occurred?**

21      A.   Perhaps a month or so before that.

22      Q.   **And who was present on that Zoom?**

23      A.   Again, I believe it was myself and Detective

24 Bogucki, and Mr. Stefanich, if I'm pronouncing it right.

25           MR. STEFANICH:  Close enough.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              THE WITNESS:  Okay.
 2   BY MR. STARR:
 3       Q.   So you had three Zoom meetings, one was with
 4   Allyson and Detective Bogucki, and then you had two more
 5   with Brian and Detective Bogucki; is that correct?
 6       A.   That's what I recall, yes.
 7       Q.   Okay.  And then you said you had some phone
 8   calls too?
 9       A.   There were phone calls because obviously this
10   deposition was continued several times, so yeah.
11       Q.   Okay.  So other than, like, scheduling-related
12   phone calls, did you have any phone calls where
13   you -- (coughs) excuse me, discussed the substantive
14   matters that you would be testifying to today at the
15   deposition?
16       A.   I mean, there may -- there might have been
17   some things brought up, but the -- they weren't lengthy
18   conversations.
19       Q.   Okay.  And I don't think I asked you about the
20   length of that -- the last -- the middle meeting on
21   Zoom.  Do you know how long that lasted?
22       A.   Yeah, about -- in the range of an hour --
23       Q.   Okay.
24       A.   -- I guess.
25       Q.   And so on none of the phone calls did you have
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    any lengthy conversations about your deposition in
 2    preparing for your deposition?
 3         A.   No.
 4         Q.   Okay.  So other than potentially Allyson,
 5    Brian, and Detective Bogucki, did you meet with anybody
 6    else in preparation for your deposition?
 7         A.   No.
 8         Q.   Did you ever talk to anybody else in
 9    preparation for your deposition?
10         A.   No.
11         Q.   All right.  Are you aware that Detective
12    Bogucki gave a deposition, testified at a deposition in
13    this case already?
14         A.   Yes.
15         Q.   Okay.  Are you aware that that happened a
16    couple of weeks ago?
17         A.   I believe that's when it was.
18         Q.   Okay.  Do you know if any of these Zoom
19    meetings happened after your -- after Detective
20    Bogucki's deposition?
21         A.   No.  No, they didn't happen after.
22         Q.   Okay.  So they were all before --
23         A.   Yes.
24         Q.   -- Detective Bogucki's meeting --
25         A.   Yes.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1        Q.   -- or deposition.  Okay.  All right.

2   And during those Zoom meetings, were you shown documents

3   on the screen?

4        A.   I don't recall that.  I -- I had the documents

5   in front of me that were -- had been previously given to

6   me, so...

7        Q.   Okay.  And so you discussed the documents, but

8   you didn't see any on the screen; is that correct?

9        A.   That's what I remember, yes.

10       Q.   All right, that's fair.  And did -- you never

11  met with Mr. Michalik or any from -- any attorneys from

12  the city; is that correct?

13       A.   That's correct.

14       Q.   Okay.  And other than what you've testified

15  just now, did you do anything else to prepare for

16  today's deposition?

17       A.   No.

18       Q.   Okay.  Did -- you didn't meet with your

19  attorneys yesterday or today in preparation for today's

20  deposition?

21       A.   No.

22       Q.   Okay.  Mr. Schalk, did you graduate from high

23  school?

24       A.   Yes.

25       Q.   Where did you go to high school, sir?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.   Holy Cross High School.

2      Q.   All right.  That's Holy Cross High School here

3  in Chicago, correct?

4      A.   River Grove.

5      Q.   River Grove, okay.  Sorry.  And did you go to

6  college subsequent to that, sir?

7      A.   Yes, I did.

8      Q.   Where'd you go to college?

9      A.   University of Illinois in Chicago.

10     Q.   And did you earn a degree from University of

11 Illinois in Chicago?

12     A.   Yes, a BA in criminal justice.

13     Q.   What year was that, sir?

14     A.   I graduated in '75.

15     Q.   Okay.  And after your BA, did you seek out and

16 complete any additional higher education?

17     A.   No.

18     Q.   All right.  Are you from the City of Chicago

19 originally?

20     A.   Yes.

21     Q.   Okay.  North-sider or South-sider?

22     A.   North Side.

23     Q.   All right.  Are you currently employed, sir?

24     A.   No.

25     Q.   And did you retire from the Chicago Police

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    Department?

 2         A.   Yes.

 3         Q.   All right.  So let's -- well, I'd like to get

 4    an overview of your career as a Chicago Police officer,

 5    you know, where you were assigned or detailed to, what

 6    your position was in approximate dates, obviously.

 7         A.   Okay.

 8         Q.   You know, there may be some, you know, points

 9    you don't remember exactly the dates.  That's fine. When

10    did you retire, first of all?

11         A.   I retired on July 15th of 2006.

12         Q.   Okay.  And did you retire as a Chicago Police

13    detective, was that your rank?

14         A.   Yes.

15         Q.   Okay.  And then when did you -- when did

16    you -- did you go to the police academy?

17         A.   Yes.

18         Q.   When did you go to the police academy?

19         A.   I started in -- January 3, 1977.

20         Q.   Was that -- was the academy six months back

21    then, when you went?

22         A.   I believe it was, yeah.

23         Q.   Okay.

24         A.   Yes.

25         Q.   And then where was your first assignment and
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    rank after the academy?

2        A.   Oh, well, I was assigned as a patrolman

3    at -- in the 15th District.

4        Q.   Okay.  And that was also in 1977?

5        A.   Yes.

6        Q.   All right.  How long were you in the 15th

7    District?

8        A.   Until October of 1980, when I was promoted to

9    detective.

10       Q.   Was it a merit promotion, or did you take the

11   detective's test?

12       A.   I took the test.

13       Q.   Okay.  Was that your first time taking the

14   test and passing the test?

15       A.   Yes.

16       Q.   Okay.  And as a detective, where were you

17   detailed or assigned?

18       A.   I was initially assigned to area -- Area 4

19   Burglary, which they -- they reorganized the Detective

20   Division into Violent and Property Crimes, it became

21   Area 4 Property Crimes.

22       Q.   They reorganized it while you were already

23   there?

24       A.   Yes.

25       Q.   All right.  So would that be -- would

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    your -- was your assignment to Area 4 Burglary in 1980?

2        A.   Yes.

3        Q.   Okay.  And then do you know when the property

4    crimes designation came into effect?

5        A.   It was further thereafter, probably within six

6    months.

7        Q.   Okay.  So it could have been '80 or '81?

8        A.   Yeah, right.  Yes.

9        Q.   Okay.  And then how long were you there at

10   Area 4 Property Crimes?

11       A.   Until September of 1982, and I transferred to

12   Area 5 Violent Crimes.

13       Q.   Area 5 Violent Crimes, you said?

14       A.   Yes.

15       Q.   Okay.  Did you transfer by your own volition?

16   Was that something you wanted to do --

17       A.   Yes.

18       Q.   -- or did you just get moved?  Okay.  And how

19   long were you at Area 5, in Violent Crimes?

20       A.   Until I retired.

21       Q.   Okay.  That's pretty straightforward.  All

22   right.  Was Area 5, in September of 1982, was that

23   located in the same place it's located today?

24       A.   Yes.

25       Q.   Okay.  Isn't that Grand and Central?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.    Grand and Central, yes.

 2        Q.    On the second floor of the building?

 3        A.    Yes.

 4        Q.    Okay.  Did you have a -- now, I'm going to be

 5   a little specific here.  I know you started in 1982 and

 6   were there until 2006.  This case in -- the shooting

 7   happened in 1990, are you aware of that?

 8        A.    Yes.

 9        Q.    Okay.  Do you know when you were assigned to

10   this case initially?

11        A.    Well, the first report I see is in 1995,

12   so I -- I assume that was my first contact with this

13   case.

14        Q.    Okay.  And we will look at the reports and try

15   to dig in on them a little bit to figure out exactly

16   that point.  So I'm going to start asking you about

17   1995.  Are you also aware that James Fletcher was

18   arrested in 2002?

19        A.    Yes.

20        Q.    Okay.  So that's a seven-year gap, but I want

21   to talk to you about your time as a detective during

22   that period of time.  And this is just as a preface, if

23   you -- if I ask you a question that applies to '95 but

24   doesn't apply to 2002, and you're aware of that

25   difference, can you point that out for me?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        A.    Sure.

2        Q.    Okay.  And I'll try to ask both ways, but in

3    case -- just in general, if there's something that I

4    ask, that you're like, I know in 2002 that wasn't in

5    effect, you know, that regulation was gone, in '95 it

6    was in place, please point that out.

7        A.    Yes.

8        Q.    Okay, thank you.  In 1995, as a Area 5

9    detective, did you work a regular shift?

10       A.    Primarily -- primarily as my time as a

11   detective, I would -- I would work from 4:30 to

12   one -- 1:00 a.m.  There would be times where I'd have to

13   work a midnight shift or a day shift, but the -- the

14   vast majority of the time was 4:30 to 1:00 a.m.

15       Q.    Okay.  Did you choose to work that period of

16   time?

17       A.    Yes.

18       Q.    Okay.  Why did you want to -- let me ask you

19   this, actually.  You said that you transferred to

20   Area 5 Violent Crimes by your own volition.  Why did you

21   want to work at Area 5 Violent Crimes?

22       A.    I wanted -- well, I wanted to work in violent

23   crimes, and I wanted to get back to working with

24   Detective Bogucki, who was already there.

25       Q.    Okay.  And you would've been a parole

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    officer -- patrol officer in the 15th District with
2    Bogucki?
3         A.    For a couple of the years, yes.
4         Q.    Okay.  And then he, at some point, had made
5    Detective before you?
6         A.    No, we made detective together.
7         Q.    Okay.  But he went to Area 5 and you went to
8    Area 4?
9         A.    Correct.
10        Q.    Okay.  All right.  And then the 4:30 p.m. to
11   1:00 a.m. shift, is that the time you regularly worked,
12   you said?
13        A.    Yes.
14        Q.    And what watch was that?
15        A.    Police department calls it the third watch.
16        Q.    Third watch?
17        A.    Yes.
18        Q.    Okay.  And I know the times have changed a
19   little bit, and maybe they even changed during your
20   period of time there, but for the most part, was the
21   third watch approximately 4:30 p.m. to 1:00 a.m.?
22        A.    Yes.
23        Q.    All right.  And then what about the second
24   watch, what was the times during your general tenure
25   there?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.    That was -- that was the day shift.  They'd

2    start -- I assume they -- they started at, like, about

3    8:30, or 8:00.

4         Q.    And went till 4:30, or --

5         A.    4:30, time -- thereabouts.

6         Q.    Okay.  And you say it was the day shift, was

7    the third watch the night shift?

8         A.    Well, there's -- the first watch is -- the

9    police department calls it the first watch that works

10   the midnight shift.

11        Q.    Okay.

12        A.    Since they start at 1:00 a.m. and continue on

13   until the morning.

14        Q.    So the first watch was the midnight shift?

15        A.    Yes.

16        Q.    Because it started at midnight and went

17   until -- you said 8:00 in the morning?

18        A.    Probably about --

19        Q.    Okay.

20        A.    -- that time, yes.

21        Q.    Did the third watch have a moniker, or a...?

22        A.    Just the -- just the third watch.

23        Q.    Just the third watch?  Okay.

24        A.    Yeah.

25        Q.    Okay.  Just -- I wanted to be clear in case

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

54

1   you refer to something, I want to know what you're

2   talking about.  All right.  When you were a Area 5

3   detective in Violent Crimes, did you have an office?

4       A.   No.

5       Q.   Was it the case that the detectives had an

6   open area with desks, and they would work at the desks

7   that were in the open area?

8       A.   Whatever was available, yes.  It's all open

9   area, and you grabbed whatever desk and computer you

10  could get, yeah.

11      Q.   Okay.  So you didn't have a set computer that

12  you used every time?

13      A.   No.

14      Q.   All right.  But for the most part, you were

15  partners with Detective Bogucki during your time at Area

16  5, correct?

17      A.   Correct.

18      Q.   All right.  Outside of a professional context,

19  are you and Detective Bogucki friends?

20      A.   Yes.

21      Q.   Okay.  And you still in contact with him to

22  this day?

23      A.   Yes.

24      Q.   Okay.  Do you interact with him socially to

25  this day?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      A.   Well, we live some distance apart now,
 2  so I -- I don't see him in person that often, maybe once
 3  a year, but we spoke -- we speak over the phone
 4  regularly, maybe once or twice a month, maybe.
 5      Q.   Okay.  Do you have any continued interaction
 6  with Detective Noradin?
 7      A.   I see Detective -- Detective Noradin once a
 8  year.  There are nine of us that have season Cubs
 9  tickets together.  And once a year, we all get together,
10  either on Zoom or -- or in person to pick the -- the
11  Cubs games.  The nine of us get -- get nine -- each of
12  us get nine games.  So that's the one time a year
13  I -- I see Detective Noradin.
14      Q.   Okay.  Well, the Cubs are having a better year
15  this year, so I'm sure you're happy about that.
16      A.   A little bit.
17      Q.   Yeah, a little bit.  The nine -- the nine
18  people, are they all -- are they all former Chicago
19  police detectives?
20      A.   Except one, yes.
21      Q.   Okay.  And other than Detective Noradin, who
22  are the other people that are part of your Cubs group?
23      A.   Well, he -- he's the only one that's involved
24  in this case, so I don't know that I need to name the
25  other detectives, get other people involved.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   Yeah.  I mean, unless there's a -- you know,
2  unless your attorney instructs you that you don't have
3  to answer, this is a discovery deposition, so
4  we can -- I can pretty much ask you whatever.  I'm not
5  trying to, like, get into your personal business too
6  much, but unless there's a privileged reason where you
7  can't answer, you're obligated to answer, and I'm sure
8  your attorney will instruct you.
9           MR. STEFANICH:  You got to answer.
10          THE WITNESS:  I got to answer?
11          MR. STEFANICH:  Yeah.
12    A.   Okay.  There's myself, Detective Noradin,
13  Tom Boyce, Tommy Leva, Pete Best, his brother, George
14  Best, Hector -- what's Hector's last name?  Alvarez,
15  I believe, and it's John Boyle.  Did I -- did I give
16  nine people there?
17  BY MR. STARR:
18    Q.   1, 2, 3, 4, 5, 6, 7, 8.  One short.
19    A.   Who am I leaving off?
20          MR. STEFANICH:  Is he the ninth?
21  BY MR. STARR:
22    Q.   Is Bogucki part of the group?
23    A.   No.
24          MR. STARR:  Okay.  No, but he's two short.
25          MR. STEFANICH:  Okay.  With him?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1        A.    Who am I leaving off, who am I leaving off?
 2   It'll come to me, but --
 3   BY MR. STARR:
 4        Q.    Yeah, tell you what --
 5        A.    -- I can't right now.
 6        Q.    -- if you remember it at some point in the
 7   dep, let me know.  If not, okay.  All right.  So the
 8   only time you've see Noradin is in advance of that --
 9        A.    I can think of one more, Leo Schmitz.
10        Q.    Oh, okay.
11        MR. STEFANICH:  How did you forget Leo Schmitz?
12   BY MR. STARR:
13        Q.    All right, so the only time you see Detective
14   Noradin, currently, is that Zoom meeting where you
15   decide who gets what tickets, correct?
16        A.    Yes.
17        Q.    Okay.  What about Tony Wojcik, do you do you
18   see Tony Wojcik at all anymore?
19        A.    Not at all, no.
20        Q.    Okay.  Back to Area 5, can you give me a
21   general description of the physical layout of the second
22   floor, Area 5 Violent Crimes?
23        A.    It's one large open area, you know,
24   with -- with -- with desks and computers.  And along one
25   wall are interview rooms, and you know, the Violent

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Crimes office, the Property Crimes office.  There's a

2    front desk.  In the back, there's a lineup room and some

3    other offices with files.

4         Q.   Okay.  And I just -- you just went through

5    that pretty quickly, I just want to make sure I got

6    everything correctly.  So general open area.  And you

7    previously described there was places where detectives

8    use computers.  Are those at desks, I assume?

9         A.   Yes.

10        Q.   Okay.  And those are in the open area?

11        A.   Yes.

12        Q.   Okay.  And then you -- I think you went

13   through a list of different types of offices that are

14   actually part of that second floor?

15        A.   Yeah.

16        Q.   You said there was interview rooms, or those

17   individual rooms?

18        A.   Yes.

19        Q.   How many of those were there?

20        A.   I believe there was five.

21        Q.   Okay.

22        A.   Five or six.

23        Q.   Those rooms have doors on them?

24        A.   Yes.

25        Q.   Those rooms have windows on them?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.    There's glass in the doors.

2    Q.    Okay.  Like a window in the door?

3    A.    Yes.

4    Q.    Okay.  Do they have windows looking outside?

5    A.    No.

6    Q.    Okay.  And then you said there's a Violent
7  Crimes office?

8    A.    Yes.

9    Q.    Whose office was that?

10    A.    Well, there -- there's -- there's an inner
11  office for the Violent Crimes lieutenant, and then
12  there's an outer office where, generally, the --
13  whatever sergeant is working has a desk in there.

14    Q.    Got you.  And there's a property crimes
15  office, same kind of designation where there's
16  lieutenants and sergeants?

17    A.    Yes.

18    Q.    All right.  And then you said there's a front
19  desk.  Is that an actual desk that's sitting in the
20  open, or is that an office?

21    A.    It's -- it's -- it's open.  It's -- it's a
22  large desk area.  As you first walk in, it would be to
23  your right.

24    Q.    Okay.

25    A.    There's -- there's generally a couple of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

ANE DOE 09-01-04-CHARLIE LREMOVED Page 62 of 336

```
 1   detectives that answer phones behind there and -- and,

 2   you know, if someone comes in, ask them, you know, why

 3   they're there.

 4        Q.   Okay.  And there's a lineup room, you said --

 5        A.   Yes.

 6        Q.   -- what is -- what does that entail?

 7        A.   Well, there's two rooms and there's a one-way

 8   mirror in between them.  One side is -- is for witnesses

 9   to view the participants, and the other side is where

10   the suspect and the other fillers in the lineup stand.

11        Q.   In that room where the suspect and the fillers

12   stand, is there anything in that room?

13        A.   I mean, there might -- there might be a metal

14   bench in there like there is in all the other interview

15   rooms, but -- yeah, I believe there is, but nothing

16   else.

17        Q.   Okay.  There's not, like, a podium they stand

18   on --

19        A.   No.

20        Q.   -- or anything like that?

21        A.   No.

22        Q.   Okay.  And the glass is -- you can see from

23   the room where the witnesses are into the room where the

24   suspect and fillers are?

25        A.   Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q.    Can you see the other way?

2      A.    No.

3      Q.    Okay.  And then you said there was a file

4   room, just one file room?

5      A.    There's -- there was a file room in the back,

6   and then each -- well, each -- Property Crimes and

7   Violent Crimes, you know, had file cabinets.  And there

8   was another office up -- there was a commander's office

9   up front.  I believe there were some file cabinets in

10  there, but...

11     Q.    All right.  And then the -- just back to the

12  lineup room, real briefly.  On the back of the wall,

13  was there, like, a height scale?

14     A.    There -- there was a height scale along the

15  wall where the interview rooms were.

16     Q.    There's a height scale in the interview rooms,

17  but not in the lineup --

18     A.    Not in it, on the outside wall.

19     Q.    Okay.  So in the open area?

20     A.    Yes.

21     Q.    Okay.  But not in the lineup room, correct?

22     A.    Right.  Correct.

23     Q.    Okay.  And I'm going to ask you about this a

24  little more in detail, but just since we're on the topic

25  now, if you were going to -- as a Chicago Police

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

62

```
1    detective, you were going to have -- would you ever have
2    the occasion to take photographs of the participants in
3    the lineup?
4         A.   Yes.
5         Q.   Okay.  And if you were going to take
6    photographs of the participants in a lineup, would that
7    be done in that lineup room?
8         A.   No, it's really not big enough to get the
9    whole view of -- of all the participants in the lineups,
10   so they'd be brought out in the open area where I could
11   take the full picture.
12        Q.   Okay.  And would you take them out to the area
13   where that height scale is to take the photograph?
14        A.   No.  I mean, we -- we might, if we wanted an
15   individual photo of -- of someone in the lineup, we
16   might put that person in to stand against that, but not
17   everyone in there, no.
18        Q.   Was there a specific place where you took
19   photos of the lineups -- or strike that.  Was there a
20   specific place within Area 5 where you would take
21   photographs of the participants in a lineup, when you
22   were photographing a lineup?
23        A.   Well, just basically, you walked them out of
24   that room to the outer area and then line them up in the
25   same position, and then -- and then take the photos.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

63

```
 1        Q.   Okay.  So would that photograph happen right
 2   after you did the lineup, or would it happen at some
 3   other point in time?
 4        A.   Well, some other point, whenever I was ready
 5   to take the photo of -- of the lineup.
 6        Q.   Okay.  And those interview rooms -- are those
 7   the same -- were those holding rooms for suspects as
 8   well?
 9        A.   Well, they -- they could be held in there for
10   a while, yes.
11        Q.   Okay.  Was there any dedicated room to holding
12   a suspect?
13        A.   No.  I mean, if -- if someone was going to be
14   there for a length of time, they'd be put in the -- in
15   the lockup downstairs in the 25th District.
16        Q.   Okay.  And during your time as a Chicago
17   police detective, you interviewed witnesses and suspects
18   in those interview rooms at Area 5, correct?
19        A.   Yes.
20        Q.   All right.  At any point in time, were you
21   ever participating in a -- in an interview, or
22   conducting an interview, where you were -- had the
23   occasion to cover the window of the interview room with
24   paper, so that someone on the outside of the room could
25   not look into the room?
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   A. At times, they'd cover that -- that glass so

2 that if there were witnesses that were coming into the

3 outer area, wouldn't be able to see an individual

4 in -- in there until they stood in a lineup.

5   Q. Okay.  So there had -- there were occasions

6 where you covered up the window with paper so that the

7 outside people cannot look into the interview room,

8 correct?

9   A. Yes.

10   Q. And the only reason you did that was to

11 obscure the witnesses from whoever was in the

12 suspect -- in the interview room?

13   A. Well, you don't want to witness to see a

14 suspect before they do the lineup.

15   Q. So is that correct?

16   A. Yes.

17   Q. Okay.  Any other reason why you would ever

18 cover up a window to an interview room with paper,

19 other than that?

20   A. No, not that I can recall, unless we didn't

21 want one witness to see another witness for some reason,

22 but...

23   Q. Was it common during your tenure at Area 5 to

24 see those windows covered up with paper while interviews

25 being conducted?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.   I wouldn't say common, but it -- it --

 2   it's -- it occurs.

 3        Q.   Was it a frequent thing that you had seen?

 4        A.   Again, I --

 5             MR. MICHALIK:   Object to the form.

 6        A.   Again, I don't know what you mean by frequent.

 7   It happens, but it's not -- it's not like they're always

 8   covered.  They're all -- they're -- they're more open

 9   than ever covered.

10   BY MR. STARR:

11        Q.   Okay, that's fair.  During your tenure as an

12   Area 5 detective, in a given week, would you generally,

13   always see at least one occasion where there'd be a

14   interview room covered with paper?

15        A.   No, I wouldn't say every week that would

16   happen.  I don't know how often it would, but I

17   wouldn't -- that seemed to be an awful lack of -- of

18   times.  I -- I wouldn't think it happened that often.

19        Q.   Okay.  Would you say that it would happen once

20   every two weeks?

21        A.   Again, I couldn't put a time period on it.

22        Q.   Okay.  You couldn't -- you couldn't put a

23   frequency period on --

24        A.   That's --

25        Q.   -- how many times you would see that in a
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

ANTHONY COLTON - CONFIDENTIAL - 2/26/25 - PAGE 66

66

```
 1    given week or month, correct?

 2        A.   Correct.

 3        Q.   But it would -- but you'd see on a somewhat

 4    regular basis, and you were aware that it was a practice

 5    that was -- that was done in Area 5, correct?

 6             MR. MICHALIK:  Object to the form.

 7        A.   Yeah.  I don't know what you mean by practice,

 8    it just was the proper thing to do for detectives,

 9    if, you know, if they're conducting lineups.

10    BY MR. STARR:

11        Q.   Okay.  So again, let's see if we can define

12    some terms to make this a more efficient deposition.

13    I'm going to use the term policy.  And when I -- when I

14    say the word policy, unless I specify otherwise, I'm

15    talking about a written Chicago Police Department

16    policy; is that fair?

17        A.   Yes.

18        Q.   And then I'm also going to use the word

19    practice, which, what I mean by that is, the things that

20    you did as a Chicago Police officer are on a regular

21    basis.  Is that a fair definition?

22        A.   Yes.

23        Q.   Okay.  And if, you know, if at some point in

24    time, I'm using practice and it doesn't fit the question

25    or the answer, please let me know and we'll -- I'll try
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    to rephrase it, okay?

2         A.   Okay.

3         Q.   Okay, great.  Can you tell me what a witness

4    show-up is in Chicago Police parlance?

5         A.   A witness show-up?  I -- it's not a term I've

6    used.

7         Q.   Okay.  What about a photo show-up?

8         A.   Yes.

9         Q.   What's a -- what's a photo show-up?

10        A.   It's -- it's -- it's a group of photos,

11   generally containing at least one suspect or -- or more

12   suspects, that he would show to a witness.

13        Q.   Okay.  So when I asked you about a witness

14   show-up, has it ever been the -- an occasion, strike

15   that.  Regarding a witness show-up, was it ever

16   the -- an occasion in your career where you would take a

17   witness to see a suspect that was out in the field

18   somewhere?

19             MR. MICHALIK:  I just object to the form.

20        A.   Take a witness to see a suspect?

21   BY MR. STARR:

22        Q.   Yeah.  Let me -- let me rephrase it, so we're

23   clear.  Did you ever have an occasion where you, as a

24   Chicago Police officer, were aware that a suspect was

25   being held in police custody, but not at a police

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    station, somewhere out in public, and during that time,

2    brought a witness to see that person?

3        A.    I think there had been times when someone was

4    arrested, like a very short time after the crime has

5    happened, where the -- the beat officers, or whoever the

6    arresting officers were -- were, would take a witness to

7    see that person.

8        Q.    Okay.  And do you know if that was what is

9    referred to as that witness show-up?

10       A.    I -- I don't know that that would be the term

11   used.

12       Q.    Do you know if there was a term that applied

13   to that circumstance?

14       A.    No, not a particular term.

15       Q.    Did you use the term photo show-up during your

16   time at the Chicago Police Department?

17       A.    Yes.

18       Q.    And I believe you defined a photo show-up as

19   when you would bring a group of photos to show a

20   witness?

21       A.    Yes.

22       Q.    Okay.  What's a photo array?

23       A.    It's the same thing as a -- a photo show-up,

24   it's a group of photos.

25       Q.    Is there any difference between a photo

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  show-up and a photo array?

2      A.   Not to my opinion.  It -- it's the same thing,

3  as far as I'm concerned.

4      Q.   Do you know why there's two different terms

5  for the same thing?

6      A.   No.

7      Q.   Did you use both terms interchangeably?

8      A.   I believe I did.

9      Q.   Do you know if there's any Chicago Police

10 Department policy that refers to photo arrays?

11         MR. STEFANICH:  Objection.  Foundation.

12     You can answer.

13     A.   I don't know specifically.  There -- there

14 very well could be some directive as -- as to that.

15 BY MR. STARR:

16     Q.   All right.  Do you -- are you aware of any

17 Chicago Police Department policy that applies to photo

18 show-ups?

19     A.   Again, I don't know if there's anything

20 written down about it, there -- there very well could

21 be.

22     Q.   Did your involvement in this -- in the Willie

23 Sorrell police investigation end in 2002?

24     A.   Yes.

25     Q.   Okay.  And I understand that you testified,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    I believe it was in 2005, does that sound right?

2        A.    I believe so.

3        Q.    Okay.  Since 2002, other than your testimony,

4    when was the next time you had any involvement

5    whatsoever in the Willie Sorrell police investigation?

6        A.    After 2002?

7        Q.    Yes.

8        A.    Other than testifying in court, I had no

9    involvement in.

10       Q.    Okay.  After your testimony in approximately

11   2005, in the James Fletcher criminal proceedings, when

12   was the next time you thought about the Willie Sorrell

13   police investigation?

14       A.    I believe when somebody came to my house with

15   the -- the lawsuit.

16       Q.    Okay.  And then after 2005, when you testified

17   in the James Fletcher criminal proceedings, when was the

18   first time you thought about James Fletcher?

19       A.    Again, after I learned I was being sued.

20       Q.    So from 2005 -- approximately 2005, until you

21   were served in this lawsuit, you had no thoughts or

22   interactions on the -- regarding the Willie Sorrell

23   homicide investigation, correct?

24       A.    That's correct.

25       Q.    When you received that complaint, when you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    were served, and you said you generally looked at it
2    and read some of it, I believe, did you become aware
3    that this lawsuit stems from an arrest that happened in
4    2002?
5         A.   Well, I be -- became aware that James Fletcher
6    was arrested in that -- in that case.
7         Q.   Right.  But I'm specifically thinking -- I'm
8    asking about whether or not you were aware that that
9    arrest occurred in 2002?
10        A.   Well, I -- if -- if what I read in -- in what
11   I was served said that.  If not, I -- I learned about it
12   by seeing the police reports.
13        Q.   Okay.  That's fair.  Do you recall, when you
14   reviewed the complaint, whether or not you became aware
15   that the crime that occurred, that led to that 2002
16   arrest, occurred in 1990?
17        A.   Yes.
18        Q.   Okay.  And you had previously testified that
19   you believed you started working on the case in 1995,
20   right?
21        A.   I believe so.
22        Q.   This case in 1995, stemming from a shooting in
23   1990, would that case have been considered a cold case?
24        A.   You could call it that, yes.
25        Q.   Well, I don't want to call it that.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Did -- was that -- do you -- during you -- when you were

2    assigned to work on this case, did you -- were you told

3    by anyone that this is a cold case?

4         A.   Well, I don't know if I was specifically told

5    that.  There was a time period when I was working

6    on -- on cold cases and -- and old homicides.

7         Q.   And if I'm using the term cold cases because

8    it's something from popular culture, and that's not what

9    you -- the term you used as a police officer.

10        A.   Uh-huh.

11        Q.   Tell me, was there a different term that I

12   should be using?

13        A.   No, that's just -- we didn't really use cold

14   cases.  We just -- I mean, we did somewhat, that that

15   we were assigned to the cold cases.  But we wouldn't be

16   handed the case and say, here's a cold case.  That's

17   just not...

18        Q.   Okay.  That's fair.  But you did use the term

19   and you were familiar with the concept of a cold case,

20   correct?

21        A.   Yes.

22        Q.   And what was that general understanding?

23        A.   It's an older case.  It hasn't been solved

24   and -- and it may or may not have been worked on

25   in -- for years.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   Okay.  And you said there was a period of time

2  where you were working on cold cases?

3    A.   Yes.

4    Q.   And what period of time was that, sir?

5    A.   Well, that was probably also in the

6  late 90s -- or mid to late 90s.  I don't know how many

7  years. But it -- it -- it also got busy up in Area 5,

8  or if they didn't have anybody to go out a -- a recent

9  homicide.  Okay.  You're available.  Go, you know.

10  But primarily, for the time period there, we were

11  basically assigned to the old cases.

12    Q.   Okay.  So just -- I think I understand you.

13  I just want to make sure we're clear for the record.

14  There was a period in the 1990s where you were primarily

15  assigned to work on cold cases.  There were times where

16  you would work on current homicide investigations,

17  but your primary employment focus was on cold cases;

18  is that correct?

19    A.   Yes.

20    Q.   Okay.  And who assigned you to work on cold

21  cases during this period of time?

22    A.   Who assigned us?  I -- if it wasn't the

23  commander, it'd have been my lieutenant.  One of the two

24  probably.

25    Q.   And when you say us there, are you referring

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  to you and Detective Bogucki?

2      A.    Yes.

3      Q.    Okay.  Do you recall if there was a

4  conversation where a supervisor came to you and said,

5  hey, Detective Bogucki, Detective Schalk, I have X

6  number of cold cases, and I want to put you guys on it?

7      A.    Well, there had to have been some conversation

8  saying, we want you to do this, whether that was from

9  the commander or lieutenant, but you know, there

10  would've been some conversation with it.

11      Q.    But you don't have a specific independent

12  recollection of that conversation?

13      A.    No.

14      Q.    Okay.  Was there any Chicago Police Department

15  policies that you were aware of that applied to how a

16  detective should work a cold case?

17      A.    No, I -- I don't recall anything in

18  particular.  You worked a cold case the same you worked

19  another one.

20      Q.    Well, depending, you know, is there --

21  is -- let me ask you this.  Strike that.  Is there a

22  number of years or a duration of time that has to elapse

23  for something to be considered -- for a case to be

24  considered a cold case?

25          MR. MICHALIK:  Objection.  Foundation.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.   No, I don't think there's a specific time.

2 BY MR. STARR:

3      Q.   Okay.

4      A.   You know, just -- it's basically something

5 that's not regularly being worked on.

6      Q.   Okay.  And it's also something that had gone

7 unsolved, correct?

8      A.   Yes.

9      Q.   All right.  Was there any kind of Chicago

10 Police Department practice that you're aware of that

11 applied to how you should work a cold case?

12      A.   No, I don't know there's a -- that there's

13 any particular practice.  We work at homicides, whether

14 they're new or old, the -- the best we can.

15      Q.   Okay.  Is there any -- that you're aware of,

16 is there any period of time that can -- that can elapse

17 where a cold case is no longer worked on by Chicago

18 Police Department detectives?

19      A.   A time period when no -- when you can't work

20 on it?

21      Q.   Yeah.

22      A.   No.

23      Q.   Okay.  Do you have any recollection about what

24 the oldest cold case -- and when I say oldest, the most

25 amount of time elapsed from when the crime happened to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   when you started working on it, was?
 2        A.   No, I really don't remember that.
 3        Q.   Okay.  But this one was -- when you started
 4   working on it, it was five years old, correct?
 5        A.   Yes.
 6        Q.   Okay.  And then you didn't arrest anybody in
 7   this case until 2002, correct?
 8        A.   Correct.
 9        Q.   So it was 12 years after the crime that you
10   arrested somebody in this case, correct?
11        A.   Yes.
12        Q.   Okay.  Is there any other cold cases that you
13   worked where 12 years had elapsed between when the crime
14   occurred and when you arrested someone?
15        A.   There probably was.  I don't recall what the
16   cases would be, but there probably was.
17        Q.   Okay.  When you say there probably was, you're
18   just making an assumption, right?
19        A.   Yes.
20        Q.   You don't have any independent recollection of
21   any other cases that took 12 years of solve?
22        A.   I don't, but it -- it isn't outrageous to me
23   that it would take that time period.
24        Q.   Okay.  And that's fair.  I'm not asking
25   whether you think it's outrageous.  I'm just wondering
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  if you are specifically aware of any cases that took

2  that long to solve?

3       A.   I don't -- I couldn't name the specific cases,

4  no.

5       Q.   Okay.  Can you -- is there any other cold

6  cases that you worked on that took longer to solve?

7       A.   There may have been.  Again, I don't recall.

8       Q.   Okay.  So you don't have a specific

9  recollection of any other cold cases that you worked on

10 that took more than 12 years to solve, correct?

11      A.   Correct.

12      Q.   Okay.  Was there any kind of practice or

13 protocol about how long you should work on a cold case

14 before you abandon it?

15      A.   No.  You -- you work -- you work on it till

16 you feel that you were at a dead end, and then you have

17 to move on to something else.

18      Q.   Do you have any recollection of ever having

19 feelings like that in this case, that you have reached a

20 dead end?

21      A.   No.  No.

22      Q.   Is that because you don't have much of an

23 independent recollection of this case?  Or is that

24 because that didn't happen?

25           MR. MICHALIK:  Object to the form.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1     A.   Well, from looking at the reports, there were

2  witnesses that needed to be re-interviewed, so it was

3  something we always wanted to do.

4  BY MR. STARR:

5     Q.   Why do you say that?  Why was it something you

6  always wanted to do?

7     A.   Because that's -- that would be following up

8  on the investigation.

9     Q.   When did you -- were you work -- strike that.

10  You were working in Area 5 Violent Crimes in 1990,

11  correct?

12     A.   Yes.

13     Q.   Do you know -- were you familiar with this

14  case in 1990?

15     A.   No.

16     Q.   Okay.  So did you only become familiar with

17  this case in 1995?

18     A.   I believe so.  That's when the -- the first

19  report I have in there.

20     Q.   Okay.  So when you say that you always wanted

21  to interview the other suspect -- or other witnesses in

22  this case, are you talking about from 1995 until 2002

23  when you actually did interview them?

24     A.   Yes.

25     Q.   Okay.  Do you have any independent

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    recollection of any investigative steps you took in 1995
2    in this case?
3         A.   Independent, no.
4         Q.   Okay.  So you don't -- you don't have any
5    independent recollection of whether or not you
6    interviewed anybody in conjunction with the Willie
7    Sorrell shooting in 1995, correct?
8         A.   I just know who I interviewed from the report.
9         Q.   That's fair.  And I'm going to ask -- I'm
10   going to show you the report.  We'll talk about the
11   report, but I just -- again, just to try to bifurcate
12   two things.  Specifically, my question is, you have no
13   independent recollection of interviewing anybody in
14   relation to the Willie Sorrell shooting in 1995,
15   correct?
16        A.   Correct.
17        Q.   Okay.  And you have no independent
18   recollection of showing any witness any documents in
19   1995, correct?
20        A.   Correct.
21        Q.   And you have no independent recollection of
22   showing any witness any photographs in 1995, correct?
23        A.   Correct.
24        Q.   Okay.  I asked you earlier about being
25   deposed.  You said you had been.  How many other
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   occasions were you deposed on?
 2        A.   I believe there was five.
 3        Q.   Okay.  Were all five of the times that you
 4   were deposed -- strike that.  Were all the -- were each
 5   of the times you were deposed pursuant to work that you
 6   did as a Chicago Police officer?
 7        A.   Yes.
 8        Q.   Okay.  Can you, to the best of your
 9   recollection, tell me when those depositions occurred,
10   and what cases they were that you were deposed on?
11        A.   Okay.  Well, the -- let's see -- the -- the
12   last one would've been the -- the Thaddeus Jimenez case.
13   Then there was a -- a Warfield case.  And the other
14   three, I don't give you -- I can't -- couldn't give you
15   names.  It was one case where I just had part of the
16   original scene of the homicide scene, and it had nothing
17   to do with the -- any offender being arrested. There was
18   another case where, I believe, it was officers were
19   involved in a fatal traffic accident, where all I did
20   was do a canvas of the area.  And then back when I was
21   in patrol, I was involved in a squad car traffic
22   accident.
23        Q.   All right.  So the last three that you
24   referred to -- the deposition that you sat for in the
25   squad car accident had to do with being involved in a
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    squad car accident?
 2         A.    I was the driver of the squad car.
 3         Q.    Okay.  Now, were there any allegations of any
 4    other misconduct in that particular case?
 5         A.    No.
 6         Q.    Okay.  Were you a defendant in that case?
 7         A.    Yes.
 8         Q.    All right.  And then you referred to one, you
 9    said another officer was involved in a fatal --
10    car -- strike that.  You said another officer was
11    involved in a fatal traffic accident, correct?
12         A.    Yes.
13         Q.    Were you a defendant in that case?
14         A.    No.
15         Q.    Okay.  And was your deposition -- were you
16    deposed as a third-party witness in that case?
17         A.    Well, I was deposed as to what I did in the
18    investigation.
19         Q.    Okay.  Were you accused of any misconduct in
20    that investigation?
21         A.    No.
22         Q.    Okay.  And then the first one that -- or I
23    think, the third one you referred to in the -- it may be
24    the first one in chronological order or not, it's how I
25    wrote it down, the deposition involving a homicide scene
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    investigation.  Were you a party in that case, a
 2    defendant in that case?
 3        A.   No.
 4        Q.   Were you accused of any misconduct in that
 5    case?
 6        A.   No.
 7        Q.   Okay.  Then we'll move to the Warfield case.
 8        A.   Yes.
 9        Q.   Were you a defendant in that case?
10        A.   Yes.
11        Q.   Do you have an idea of when that that
12    deposition occurred, what year?
13        A.   It -- it might have been before I retired.
14    That didn't go to trial until after I retired, but it
15    was -- the deposition was probably in the
16    early 2000 -- 2000 something.
17        Q.   Okay --
18        A.   '4 or '5.
19        Q.   Sorry?
20        A.   Somewhere around 2004 or '5, or something like
21    that.
22        Q.   Okay.  I apologize for cutting you off.
23        A.   That's okay.
24        Q.   And were you the only defendant in that case?
25        A.   No.  There were several other detectives.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   Was Detective Bogucki a defendant in that

2  case?

3    A.   Yes.

4    Q.   Were any of the other detectives we've talked

5  about today defendants in that case?

6    A.   No.

7    Q.   And what were the -- were there allegations of

8  misconduct made against you in that case?

9    A.   Well, there were witnesses claimed they were

10  held at Area 5.

11    Q.   Okay.  So in that case, the witnesses who

12  claimed they were held in Area 5, was there allegations

13  that they were -- they shouldn't have been held, or what

14  was their allegation?

15    A.   I guess that was their allegation that -- that

16  they shouldn't have been held, yes.

17    Q.   All right.  Was there any allegations in that

18  case made against you regarding manipulating witnesses?

19    A.   No.

20    Q.   Was there any allegations in that case against

21  you regarding manipulating identification procedures?

22    A.   No.

23    Q.   Was there any allegations in that case

24  regard -- against you regarding fabricating evidence?

25    A.   No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q.    Was there any allegations against you in that
 2  case regarding causing the wrong person to be arrested
 3  and convicted of a crime?
 4        A.    No.
 5        Q.    Was there any allegations in that case against
 6  you of excessive force?
 7        A.    No.
 8        Q.    Have you ever had any allegations of excessive
 9  force in your career?
10        A.    No.
11        Q.    Anything else that you -- that you can recall
12  about what the allegations were against you in that
13  case?
14        A.    No, that was -- that's -- that's basically it,
15  yes.
16        Q.    Do you -- go ahead.
17        A.    Go ahead.  I'm good.
18        Q.    Do you know what the allegations against
19  Detective Bogucki were in that case?
20        A.    It was the same -- same against all the
21  detectives that were sued.
22        Q.    Okay.  Do you know in that case, the Warfield
23  case, was there any allegations of fabricating of
24  evidence?
25        A.    No.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q.   Was there any allegations in the Warfield case
 2   about manipulating witnesses?
 3        A.   No.
 4        Q.   Was there any allegations in that case
 5   regarding manipulating identification procedures?
 6        A.   No.
 7        Q.   Okay.  And then the Jimenez case, you were a
 8   defendant in that case I think you said?
 9        A.   No, I wasn't.
10        Q.   You weren't a defendant at any point?
11        A.   Initially, I was, but I was dropped as a
12   defendant before it went to trial.
13        Q.   Okay.  And I didn't work on that case, so my
14   familiarity with it is somewhat limited.  But at what
15   point after you were served with the lawsuit, how long
16   did it take before you were dropped as a defendant?
17        A.   Oh, it was -- it was a -- a length of time.
18   I don't know, a year -- year or more.
19        Q.   Was it -- do you know if it was already at
20   trial -- at trial -- the trial stage?
21        A.   It was before trial.
22        Q.   Okay.  Before you were dropped, when you were
23   still a defendant, do you know what the allegations
24   of -- strike that.  Before you were dropped, when you
25   were still a defendant, were there allegations of
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   misconduct against you?

2       A.   You know, I don't remember the specific

3   allegations because I -- I had nothing to do with

4   Thaddeus Jimenez.  I knew the -- the -- of a second

5   offender being arrested, but it was -- I was just

6   included in it for a while.

7       Q.   Okay.  And so in that Jimenez case, you

8   arrested one person, and then Detective Bogucki arrested

9   Thaddeus Jimenez; is that correct?

10      A.   He initially arrested Thaddeus Jimenez.

11  I wasn't -- I was off on vacation at that time.

12  And then I came back, and we were able to apprehend a

13  second offender in that case.

14      Q.   And that's when your involvement occurred?

15      A.   Yes.

16      Q.   All right.  Do you know what the allegations

17  of misconduct against Detective Bogucki were in the

18  Jimenez case?

19      A.   I -- I don't recall what all the allegations

20  were.

21      Q.   Do you recall Detective Bogucki being accused

22  of manipulating witnesses in that case?

23      A.   I -- I -- he may have been.  I'm not sure.

24      Q.   Okay.  Do you recall Detective Bogucki being

25  accused of manipulating identification procedures in

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    that case?

 2         A.   I don't know.

 3         Q.   Do you recall Detective Bogucki being accused

 4    of fabricating any evidence in that case?

 5         A.   I don't know.

 6         Q.   Do you recall Detective Bogucki being accused

 7    of causing the wrong person to be arrested for the crime

 8    in that case?

 9         A.   I don't know.

10         Q.   Okay.  Anything else you can recall about the

11    Jimenez case that you haven't testified to today?

12         A.   No.

13         Q.   Okay.  So I asked you about depositions.

14    You said you were deposed five times.  Have you been a

15    defendant in any other civil lawsuits, besides those

16    five occasions?

17         A.   No.

18         Q.   Okay.  Have you ever been a plaintiff in a

19    civil lawsuit where you sued someone else?

20         A.   No.

21         Q.   How many times have you testified at a civil

22    trial?

23         A.   How many times have I testified?  Well, the

24    Jimenez case, the Warfield case.  I seem to remember

25    another time I -- I testified in federal court regarding
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    a -- some robbery offenders that some other officers had

2    arrested and my -- my participation in -- in conducting

3    lineups for those offenders.  I don't remember -- I

4    mean, it's quite a while ago.  So I don't remember

5    names, but I did testify in federal court for that.

6        Q.   Okay.  And that -- and that testimony in

7    federal court on that other occasion, not Warfield,

8    not Jimenez, you were a witness in that case or a party

9    defendant?

10       A.   I wasn't a party defendant.  I didn't even

11   give a deposition in that case, but I was called to

12   testify as to what I did in the investigation.

13       Q.   Okay.  Any you don't recall the name of that

14   case?

15       A.   No, I don't.

16       Q.   Do you recall the approximate year when that

17   occurred?

18       A.   Well, I was still working obviously,

19   so I don't know.  Could be 20, 30 years ago.

20       Q.   Okay.  Some point prior to 2006?

21       A.   Yes.

22       Q.   Okay.  And then have you ever had any --

23   during your time as a Chicago Police officer, did you

24   ever have any disciplinary complaints filed against you?

25       A.   I can recall -- I -- I don't have any

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

ANTHONY WOJCIK - CONFIDENTIAL - 9/21/23

89

1    sustained complaints.  I recall one CR number or

2    a -- a landlord didn't like the fact that we entered his

3    building, when in fact, his building was a -- a homicide

4    crime scene.  So we were exonerated on that.

5        Q.   Other than that CR, can you recall the basis

6    of any allegations made against you in any other CRs?

7        A.   No.  Not that I recall, no.

8        Q.   Okay.  Did you get a CR related to your role

9    in the Warfield case?

10       A.   No.

11       Q.   Did you receive a CR related to your role in

12   the Jimenez case?

13       A.   No.

14       Q.   And you said you've never had any discipline

15   imposed as a result of a complainant made against you as

16   a Chicago Police officer?

17       A.   That's correct.

18       Q.   Have you ever been accused of falsifying

19   evidence?

20       A.   No.

21       Q.   Have you ever been accused of suppressing

22   evidence?

23       A.   No.

24       Q.   Have you ever been accused of coercing a false

25   confession?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     A.   No.

2     Q.   Have you ever been accused of coercing a false

3  statement?

4     A.   No.

5     Q.   Have you ever been accused of manipulating a

6  witness into giving a false statement?

7     A.   No.

8     Q.   Have you ever been accused of unduly

9  influencing any identification procedures?

10     A.   No.

11     Q.   Have you ever been accused of physical abuse

12  of someone in police custody?

13     A.   No.

14     Q.   Have you ever been accused of any other

15  misconduct that that you can think of that we haven't

16  discussed today?

17     A.   No.

18       MR. STARR:  Okay.  Everybody doing okay?

19       MR. STEFANICH:  I guess we might as well take a

20    bathroom break.

21       MR. STARR:  Take a break.  Okay.

22       MR. STEFANICH:  Five minutes.

23       THE VIDEOGRAPHER:  We are going off the record.

24    The time is 11:39 a.m.

25      (OFF THE RECORD)

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          THE VIDEOGRAPHER:  We are back on the record.

2      The time is 11:48 a.m.

3  BY MR. STARR:

4      Q.   All right.  Mr. Schalk, I want to ask you some

5  general questions about your practice as a Chicago

6  Police Department detective at Area 5.  Can you -- can

7  you describe for me, generally, what investigative steps

8  a detective would take in a given shooting homicide

9  investigation?

10      A.   You talking about someone who's initially

11  assigned to go out on a scene?

12      Q.   Yeah.

13      A.   Well, you go out on a scene, speak with any

14  witnesses.  You'll coordinate recovering any evidence

15  with the -- the crime lab personnel or evidence

16  technicians that would come out.  Might canvas the area,

17  looking for additional witnesses and then attempt to,

18  you know, find out what you can about the -- the victim

19  and, I guess, notify any family members if they don't

20  know already.  And continue from there, depending on

21  what the witnesses tell you.

22      Q.   Okay.  And what happens after that point may

23  involve further interviewing of witnesses, correct?

24      A.   Yes.

25      Q.   And it may involve interviewing member --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ana Meyers Deposition - CONFIDENTIAL - Taken 4/4/22

92

1  family members of the victim?

2      A.   Yes.

3      Q.   Okay.  Any other things that would

4  traditionally happen, routinely happen, after that

5  initial scene investigation when you were assigned to a

6  shooting in homicide?

7      A.   Well, if there's evidence recovered, you'd

8  submit the -- any requests that you have to the -- to

9  the crime lab to process whatever the evidence is

10  and -- and then continue it wherever it takes you.

11      Q.   All right.  And then if you had somebody -- if

12  you identified someone as a suspect, what kind of

13  investigative steps might you take?

14      A.   Well, it depends -- it depends on the

15  individual case.  You -- you -- you'd probably see if

16  witnesses identify that person as an offender.

17      Q.   Okay.  So let's talk about that type of case

18  where you have a -- it's a shooting homicide, and you

19  have eyewitnesses to the shooting, and then you identify

20  a suspect.  What is your next investigative step after

21  you identify that person?

22      A.   Well, again, it depends on how he's identified

23  as a suspect.  Frequently, you'd put a photo array

24  together and -- and take that to the witnesses to view,

25  unless this person's in custody, and then you'd want to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    do a physical lineup.

2        Q.    Okay.  If they're not in custody, you might do

3    a photo array where you take a photo array out to the

4    witness; is that correct?

5        A.    Yes.

6        Q.    Okay.  Would you also have the witness come to

7    the area to view a photo array?

8        A.    At times.  Whatever's convenient for the

9    witness.

10       Q.    All right.  And so how would you go about

11   assembling a photo array?

12       A.    Well, obviously you'd have a photo of --

13   however you'd have a photo of a suspect.

14       Q.    Okay.

15       A.    You'd -- generally, that would be a police

16   photo.

17       Q.    Okay.

18       A.    And you then -- I'd then look for other photos

19   with some similar characteristics.  Generally, four or

20   five other photos to put in a group.

21       Q.    Okay.  When you said that it would be a police

22   photo, what does that mean?

23       A.    Well, if -- if the suspect had been previously

24   arrested, they'd have a photo of him on file.

25       Q.    Okay.  Like a mugshot?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     A.   Yes.

2     Q.   Okay.  If the person -- if you had a suspect

3 in mind, but they had not been previously arrested, and

4 so you didn't have any police photos, where would you

5 get photos of that person?

6     A.   Well, you could -- possibly from other family

7 members, if they would give it to you.  Or you know, it

8 might even -- you could search his background.  If he's

9 never been in prison, never been arrested, then you'd

10 have to, you know, do what you can.  If you have

11 probable cause to arrest him, then you could pick him up

12 and do a physical lineup.

13     Q.   Okay.  And I'm, again, talking about that '95

14 to 2002 period, generally.  I imagine today, you might

15 look on the internet for a photo, correct?

16     A.   I -- I guess you possibly could.

17     Q.   Did you have any occasion during your career,

18 before you retired in 2006, where you couldn't -- you

19 didn't have a police photo of a suspect and you had to,

20 like, search the internet for the person's name, see if

21 there's any photos on the internet of that person?

22     A.   No, I don't recall doing that.

23     Q.   Okay.  Was it the default to use a police

24 photo, a mugshot of the suspect if there -- one existed?

25     A.   I don't know what you mean by default.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

ANG Deposition of Carmon Smith - 3/6/2024

1      Q.   Do you know what the word default means?

2      A.   Well, I don't know what you mean with regards

3 to a photo.  I mean...

4      Q.   Sure.  So I'm talking about doing a photo

5 array, conducting a photo array, and I'm asking about

6 your practice.  And you said that you would get a -- you

7 would look to see if there's a police photo of the

8 person, and then you would look to see for additional

9 filler photos, correct?

10     A.   And the easiest for us to obtain would be a

11 police photo, yes.

12     Q.   Okay.  Was it your practice to look first to

13 see if there was a mugshot on file of that person?

14     A.   Right.  You -- you'd -- you'd like to know if

15 this -- if your suspect has a criminal background.

16     Q.   Okay.

17     A.   And I -- go ahead.

18     Q.   I didn't mean to interrupt you.  Okay.

19 So you'd like to know if your suspect has a criminal

20 background.  Why is that?

21     A.   Well, to -- to know who you're dealing with,

22 you know.

23     Q.   Okay.  So you'd want to know if they had any

24 criminal history, if they've been arrested for anything

25 similar; is that correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.   Yes.

2      Q.   Okay.  And why would you want to know that?

3      A.   Well, it goes to showing what type of

4  individual this is.

5      Q.   Okay.  So if somebody had been previously

6  arrested for another shooting, it would indicate to you

7  that there was a likelihood that they were involved in

8  the shooting that you're looking at them as a suspect

9  for?

10     A.   Not necessarily, but it certainly indicates

11 the type of person he is.

12     Q.   Okay.  Would you -- would you pull their

13 criminal history, like, in a document form?

14     A.   Yes.

15     Q.   Okay.  And how would you go about doing that?

16     A.   Well -- it -- well, it depends what years.

17 In -- in going back, you had to send in a request and

18 have it sent to you, or go down to 11th and State and

19 pick it up.  And then when we got into the computer age,

20 where you could -- you could print them out from the

21 computer.

22     Q.   All right.  So do you know when that started,

23 when you were able to start printing them off the

24 computer directly?

25     A.   No, I'm not sure.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q.   All right.  So before you were able to print

2  them directly from the computer, you had to request them

3  from somewhere; is that correct?

4      A.   Yes.  From Headquarters at 11 and State, yes.

5      Q.   Okay.  And was there a form you had to fill

6  out to send to Headquarters?

7      A.   Yes.  Unless you wanted it immediately and

8  take a ride down there and fill the form out there.

9      Q.   Uh-huh.  Do you know what the form was called?

10     A.   No, I don't.

11     Q.   Was there a specific section at Headquarters

12  that you would get the criminal history from?

13     A.   It's -- well, it was either the identification

14  section or the records section.  I'm not sure which one

15  was.

16     Q.   Was it both, or one or the other?

17     A.   One or the other.

18     Q.   Okay.  All right.  That's the criminal history

19  we were just talking about.  Where would you get the

20  photos from?

21     A.   Again, that's -- that was from the graphic

22  arts section at 11th and State.

23     Q.   Okay.  So if you wanted to do a photo array

24  and -- you would request photos from the graphic arts

25  section at 11th and State; is that correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.    Yes.   Before we could pull them up on the

 2   computer, yes.

 3        Q.    Okay.   And was there a form that you filled

 4   out to request those photos?

 5        A.    Yes.

 6        Q.    Okay.   I'm not familiar with the graphic art.

 7   Was it -- was it a section of the headquarters?

 8        A.    Yes.

 9        Q.    Okay.   In the same way the identification

10   section is a section?

11        A.    Yes.

12        Q.    All right.   Okay.   How did you -- how would

13   you go about determining whether or not the suspect

14   already had a police photo on file?

15        A.    Well, obviously, when -- when we got into the

16   computer age, again, we could bring that right up.

17   Before that, I think we had to call down there and have

18   them run a -- a name check of the person.

19        Q.    Okay.

20        A.    And then they'd come back and tell us and say

21   here's his IR number.

22        Q.    Okay.   So in a circumstance like I previously

23   described, where you had a suspect in mind, and you had

24   an eyewitness that you wanted to show a photo array to,

25   your first step would be to call to determine if there's
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

99

1  a name check, that they have a photo on file?

2      A.   Well, yeah.  I mean, to -- to see what his

3  criminal record was.  And if they -- naturally,

4  if he -- he had a criminal record, there'd be a photo on

5  file.

6      Q.   Okay.  And where would you -- I'm sorry if I

7  missed that, but where would you call?

8      A.   I believe it was the identification section.

9      Q.   Okay.

10      A.   Again, identification section or records

11  section.

12      Q.   All right.  So you make a phone call to either

13  the identification section or the records section.

14  And you'd give them the name of the suspect?

15      A.   Yes.

16      Q.   And then you'd ask them to check and see if

17  there's a criminal history?

18      A.   I believe so.  Again, we're going back quite a

19  number of years, but you know, I believe that was the

20  way it was done.

21      Q.   Okay.  And then if there was a criminal

22  history involving the Chicago Police Department, there

23  wouldn't be -- necessarily be a file on photo, correct?

24      A.   Right.

25      Q.   I'm sorry.  There wouldn't necessarily be a

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  photo on file, correct?

2       A.   Right.  You'd have an IR number,

3  identification records number.

4       Q.   Okay.

5       A.   Once you have his record, and then there'd be

6  a -- a photo associated with that IR number.

7       Q.   Okay.  And you would then fill out that form

8  requesting the photo and the -- fill out the form

9  requesting the criminal history, correct?

10       A.   You could.  Yeah.  Again, if you wanted it

11  immediately, you -- you go down there and do it,

12  but --

13       Q.   But if you went down there, you had to fill

14  out the form anyways, right?

15       A.   Same forms.  Yeah.

16       Q.   Okay.  So sometimes there'd be a lag in time,

17  depending on how, you know, how urgent you were to get

18  the documents, correct?

19       A.   Correct.

20       Q.   Okay.  When you say a name check, is that just

21  literally, like, someone's just checking to see if the

22  name's in the system, or is there a -- is there a record

23  that's created when you ask for a name check?

24            MR. STEFANICH:  Objection.  Foundation.

25       A.   Yeah, I --



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1          MR. STEFANICH:  You can answer.  Sorry.

 2      A.   I don't know what you mean by that.

 3  BY MR. STARR:

 4      Q.   Fair.  That's fair.  So when you requested a

 5  photo, you had to fill out a form.  When you requested a

 6  criminal history, you fill out a form.  Was there

 7  anything that you needed to fill out in order to get a

 8  someone at the identification section or record section

 9  to look someone up to see if they were in the system?

10      A.   You know, I -- I don't believe so, as long as

11  you -- you called on the -- the police lines and

12  not -- not a public phone.

13      Q.   Okay.  That makes sense.  Okay.  So then in

14  that scenario where you have a suspect in mind and a

15  witness that you want to show a photo array to, after

16  you get the photo of the suspect, how do you go about

17  getting the photos of the fillers for the photo array?

18      A.   Well, a lot of times, they'd have a whole

19  collection of photos from other cases, and we'd search

20  through that and take out the photos we felt were

21  similar.

22      Q.   When you say you would have, who are you

23  referring to?

24      A.   At -- at Area 5.  Some of it might be my

25  personal file, some might -- might be in the Area 5

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  photos.

2    Q.   Okay.  So you would not request the

3  photo -- additional photos from the identification or

4  record section, right?

5    A.   Well, we could, but you'd have to know

6  the -- how the photos looked, if they were similar

7  enough to put them in -- in the photo, right?

8    Q.   So -- that's fair.  And so your practice

9  generally was, you would get the photo of the suspect

10  from the record section or identification section. Once

11  you had that photo, you would get other photos, either

12  from your personal collection, or from Area 5's

13  collection of photos?

14    A.   Generally, yeah.

15    Q.   Okay.  And what criteria would you personally

16  apply, what was your practice to picking out who to

17  choose as a filler photograph?

18    A.   Just similar physical characteristics.  You

19  know, a similar somewhat age -- age range, just, you

20  know, somewhat similar in the -- the height and weight

21  and other physical characteristics.  And of course race.

22    Q.   Okay.  Anything else that you would -- any

23  other criteria that you would apply, other than height,

24  weight, age range -- age range, and race?

25    A.   Well, if there was something that was, you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

RLC Deposit Confidential 01/04/2023

103

1  know, incredibly unique about a photo from someone's

2  facial features, and you know, if you had a big tattoo

3  on his face and your suspect didn't, obviously, you

4  wouldn't use that photo, but...

5      Q.   Okay.

6      A.   It -- it's similar characteristic.

7      Q.   Okay.  So you would never -- if the suspect

8  had a tattoo on his face, you would choose other people

9  who had tattoos on his face as well; is that correct?

10      A.   You try -- you certainly tried to, yes.

11      Q.   Okay.  Do you know if -- was there any Chicago

12  Police Department policy that dictated how you were

13  supposed to go about conducting a photo array?

14      A.   I don't recall if anything was specifically

15  written.  You know, when we were promoted to detective,

16  we spent a month at the academy training.  There could

17  have been something then.  And -- and of course, we

18  learned from working with our detectives also.

19      Q.   Okay.  So you may have learned stuff at

20  the -- at the detective academy about how to conduct a

21  photo array?

22      A.   It's possible.  I don't -- I don't recall.

23      Q.   Okay.  And you also learned on the job from

24  other detectives about how to conduct a photo array?

25      A.   Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.    Okay.  Do you have any specific detective that

2  you know that you learned how to conduct a photo array

3  from?

4    A.    Not that I recall, no.

5    Q.    All right.  And so I was asking about, like.

6         the initial investigative steps you would take

7  as a detective assigned to a homicide, and you kind of

8  gave me a little overview.  Is there any different

9  approach that you would take when you were assigned to a

10  cold case?

11    A.    Well, you -- you'd want to review all the

12  reports that -- and everything in the file you'd want to

13  review first, and then decide -- generally, you'd want

14  to -- you'd like to re-interview witnesses and -- and

15  see where you go from there.

16    Q.    Okay.  So it was your practice, the first step

17  you would take, first investigative step when you were

18  assigned a cold case was to read everything in the file,

19  correct?

20    A.    Yes.

21    Q.    And that was very important, right?

22    A.    Yes.

23    Q.    And why was that important?

24    A.    To know what has been done previously in the

25  case.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q.   Okay.  Because detectives had an obligation to

2  document their investigative work during the course of

3  investigation, right?

4      A.   They should, yes.

5      Q.   Okay.  And you would assume that the

6  detectives who worked the case originally would've done

7  their job correctly and documented all the relevant and

8  important information they learned during the course of

9  their investigation, right?

10     A.   I would hope so.

11     Q.   Okay.  Would you do that when you were a

12 detective?

13     A.   Yes.

14     Q.   Okay.  So you read everything in the file, and

15 then after you -- after you're done -- after you were

16 done reading everything that was in the file, what was

17 your next investigative step?

18     A.   Well, depends what -- what we saw on the file.

19 I mean, generally -- generally, it's re-interviewing the

20 witnesses, see what they -- what they say at that point.

21     Q.   Was it your practice to prioritize any

22 witnesses to re-interview?

23     A.   There might be witnesses that were more

24 important, or saw -- saw more than other witnesses --

25     Q.   Okay.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.    -- that you -- you'd rather talk to first.

2    Q.    So it was important what the witnesses had

3    previously told the other detectives, the original

4    detectives on the case -- strike that.  That was poorly

5    phrased.  Was it important to you, as a matter of

6    practice, to identify what the previous witnesses told

7    the first set of detectives who were working on the

8    case?

9    A.    Well, I -- I wanted to know what -- what was

10   in the file and what they had said previously, sure.

11   Q.    Okay.  So it's important to identify what

12   previous witnesses had said they saw, correct?

13   A.    It's important to -- to know what they had

14   said, yes.

15   Q.    Okay.  And then why would you go about -- to

16   re-interview them?

17   A.    Well, just to -- to see if, you know, if they

18   were -- if they were -- one, if they were able to still

19   find the witnesses, and to see what they were saying

20   now, as -- as -- as far as what they saw.

21   Q.    Okay.  So if you were able to find witnesses

22   on a cold case, you would want to re-interview them to

23   see if they had changed their stories; is that correct?

24   A.    Well, not necessarily change their stories,

25   just to -- to -- to understand what -- what happened at

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  the -- the time the homicide occurred.

2      Q.  Okay.  Were you cautious regarding a witness's

3  memory when you were re-interviewing a witness from a

4  cold case?

5          MR. STEFANICH:  Objection.  Form.

6      A.   I don't know about being cautious.

7  I just wanted to hear what they had to say.

8  BY MR. STARR:

9      Q.  Okay.  Did you take into consideration the

10 fact that time had elapsed when you were

11 re-interviewing witnesses on a cold case?

12     A.   I don't know that I took that into account.

13 I just wanted to hear what they had to say.

14     Q.  All right.  Were you concerned at all, as a

15 detective interviewing -- strike that.  Were you

16 concerned at all, as the detective investigating cold

17 cases, that the passage of time may have an effect on

18 the witness's memory that you were re-interviewing?

19     A.   Well, that's -- that comes down to the

20 individual witness.  Some will never forget what they

21 saw, so...

22     Q.  Okay.  Did you make a practice of doing

23 anything to test the witness's memory when you were

24 re-interviewing them?

25     A.   I don't know what you mean by testing their

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 memory.

2 Q. Did you do anything to evaluate whether a

3 witness had a -- the same memory that they had when they

4 were first interviewed?

5 A. Well, you talk to them and see what they had

6 to say at that point, and -- and you knew what they said

7 in previous reports, so...

8 Q. So you would compare what they were telling

9 you, versus what they had previously said in previous

10 reports; correct?

11 A. Yes.

12 Q. Okay. And why would we -- what would be the

13 point of that?

14 A. Well, just see if there's any discrepancies

15 and how reliable they are.

16 Q. All right. And if there were discrepancies,

17 would that indicate to you that they may be unreliable?

18 A. Depending on the witness and what -- what the

19 discrepancies were.

20 Q. If there were discrepancies, would that

21 indicate to you that the witness's memory may be

22 adversely affected?

23 A. It all depends on what they're saying.

24 Q. Okay. Would -- if there were discrepancies

25 between what they told the first set of detectives and

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  what they told you, would that indicate to you that the

2  passage of time may have had an impact on their memory?

3      A.   I don't know that it specifically -- that

4  would specifically occur to me, as far as the passage of

5  time, I will just want -- want to question them as to

6  why they said something different in the previous

7  interview.

8      Q.   Okay.  So did you not make it a priority to

9  be aware of the fact that the passage of time may have

10  affected a witness's memory from when they first were

11  interviewed to when you re-interviewed them on a cold

12  case?

13          MR. MICHALIK:  Object to form.

14      A.   I don't know that I thought about the time

15  period affecting their memory.  I'd just talk to them

16  and -- and see what they did remember.

17  BY MR. STARR:

18      Q.   Okay.  All right.  Do you know if there was

19  any Chicago Police Department policies that applied to

20  how you were supposed to work a cold case?

21      A.   I don't recall seeing anything in writing.

22      Q.   Okay.  Other than that, what you described as

23  your practice, were you aware of any other practice

24  expectations for detectives working cold cases?

25      A.   I don't know what you mean by expectations.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q.   Okay.  Were there -- were there any

2   expectations that you were aware of that applied to

3   detectives who were working on a cold case?

4          MR. MICHALIK:  Object to form, foundation.

5     A.   Again, I -- I don't know expectations.

6   I don't know what that means.  I -- no, I don't know

7   what that means.

8   BY MR. STARR:

9     Q.   Okay.  Did you ever have any conversations

10  with any supervisors other than -- strike that.

11  You previously testified that you, at some point,

12  had to talk to a supervisor who assigned you to work

13  cold cases, right?

14    A.   Yes.

15    Q.   Do you recall having any other conversations

16  with supervisors about how to go about working a cold

17  case?

18    A.   I mean, we would -- we'd be in touch with

19  supervisors, telling them what we were do -- what we

20  were doing.  They may have some input as -- as to what

21  to do on the case, or may not, but keeping them informed

22  that -- that we were working and what we were doing on

23  the case.

24    Q.   Were you ever given any directives from any

25  supervisors about how to work a cold case?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-7 Filed: 05/06/25 Page 113 of 336 PageID #:4886
The Deposition of DAVID O'CALLAGHAN, taken on 02/08/23
111

```
 1         A.   I don't remember any specific directives as to
 2    how to do it.
 3         Q.   Okay.
 4         A.   We were -- I mean, we're detectives for a
 5    number of years, we -- we knew how to work cases.
 6         Q.   Okay.  Did you -- were you ever trained
 7    specifically on how to work on a cold case?
 8         A.   No.
 9         Q.   Generally speaking, as a Chicago Police
10    Department detective, were you expected to conduct
11    identification procedures during homicide investigations
12    that involve witnesses and suspects?
13         A.   Yes.
14         Q.   We talked about a photo array and we talked
15    about a lineup.  Were there any other identification
16    procedures that you ever participated in or conducted
17    during your time as a Chicago Police Department
18    detective?
19         A.   I believe that's all the identification
20    procedures there could be.
21         Q.   All right.  Do you know if there -- if
22    the -- if any Chicago Police Department policies
23    regarding identification procedures changed from
24    1995 till 2002?
25         A.   Not that I remember.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q.    Did you change your practice about how you

2  went about conducting identification procedures between

3  1995 and 2002?

4      A.    No, I don't believe so.

5      Q.    All right.  I may have asked you this,

6  but I'm going to ask it again, and I apologize if I

7  have.  Were there any specific policies in place at the

8  Chicago Police Department in 1995 regarding how to

9  conduct photo arrays?

10      A.    If there was, I don't recall.  There could be

11  some directives, but I don't recall.

12      Q.    Would you have been familiar with the policy

13  as it was in 1995?

14      A.    Well, in 1995, I would've been familiar,

15  whatever policy there was.

16      Q.    Okay.  And would you have made -- would you

17  have ensured to act pursuant to whatever the policy was?

18      A.    Yes.

19      Q.    Okay.  And then the same question for 2002,

20  are -- were there any policies in 2002 that applied to

21  how to conduct photo arrays?

22      A.    I -- I don't recall any specific policies.

23      Q.    If there were policies in place in 2002 about

24  how to conduct photo arrays, would you have been aware

25  of them?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 1:20-cv-04768 Document #: 184-7 Filed: 05/06/25 Page 115 of 336

113

```
 1        A.    Yes.

 2        Q.    And would you have adhered to them in 2002?

 3        A.    Yes.

 4        Q.    Okay.  What about -- were there any policies

 5  in place in 2002 regarding how to conduct a lineup?

 6        A.    I'm sure there was some training as to how to

 7  do lineups.

 8        Q.    Besides training, I'm wondering if -- do you

 9  know if there were any Chicago Police Department written

10  policies that applied to how to conduct lineups?

11        A.    Again, there could have been, I don't -- I

12  don't recall.

13        Q.    All right.  If there were, in fact, policies

14  in place in 2002 regarding how police detectives were to

15  conduct lineups, would you have been familiar with them

16  in 2002?

17        A.    Yes.

18        Q.    And would you have adhered to them in 2002?

19        A.    Yes.

20        Q.    Were there any other practices that you used

21  when you conducted any identification procedures that

22  were not memorialized in a policy that you haven't

23  testified to today?

24              MR. MICHALIK:  Object to the form.

25        A.    Yeah.  I'm a little confused with that
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    question, but...

2    BY MR. STARR:

3        Q.    Have -- is there any other practices that you

4    generally employed when you conducted identification

5    procedures that you haven't told us about today?

6        A.    I don't believe so, no.

7        Q.    Okay.  Do you know if there's anything in

8    Chicago Police Department policy, or Chicago Police

9    Department practice, as you practiced it, designed to

10   avoid a situation where an officer conducting

11   identification procedure suggests to a witness who to

12   identify?

13       MR. MICHALIK:  Object to the form.

14       A.    I did -- what did you ask about?

15   Something -- what was the first part of that question?

16       MR. STARR:  Can you read it back?

17       (REPORTER PLAYS BACK REQUESTED QUESTION)

18       A.    The -- well, no one -- certainly, no one would

19   ever do that.  And I don't know if it was specifically

20   written down to say, no, don't do that, but it could

21   have been.  But I don't know.

22   BY MR. STARR:

23       Q.    Okay.  Why do you say that certainly no one

24   would ever do that?

25       A.    Well, you wouldn't want to influence an

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    identification.

2        Q.    You're talking generally, right?

3        A.    Yes.

4        Q.    Do you know for a fact that no Chicago Police

5    Department personnel ever unduly influenced an

6    identification procedure?

7        A.    Not to my knowledge.

8        Q.    And you're not sure if the policy had any

9    information in it about how to avoid doing that,

10   correct?

11       A.    There may have been.  I -- I don't recall.

12       Q.    Did any supervisor ever instruct you on things

13   to make sure you didn't do to influence an

14   identification procedure?

15       A.    I don't recall that.

16       Q.    Were you ever trained on things to avoid doing

17   to best put yourself in a position not to influence an

18   identification procedure?

19       A.    I mean, there -- there may have been some

20   training regarding lineups and that might have included

21   some of that.  I don't know.

22       Q.    Okay.  Did anyone ever say to you, hey, when

23   you're doing a photo array, don't point at the photo of

24   the suspect?

25       A.    I don't think they had to specifically tell us

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    that, no.

2        Q.    Okay.  Did anyone ever tell you, hey, when

3    you're doing a photo array, don't have one photo that's

4    in color, and all the rest be black and white?

5        A.    Well, it's probably pretty much common

6    knowledge not to do that.

7        Q.    But didn't anyone ever tell you that?

8        A.    I don't remember.  I don't think they had to

9    specifically tell me that.

10       Q.    So no one ever told you that, correct?

11       A.    I don't recall that.  No.

12       Q.    And no one ever told you not to point at a

13   photo when you're doing a photo array, correct?

14       A.    I don't recall anybody specifically telling me

15   that.

16       Q.    Okay.  And that applied to both 1995 and 2000,

17   correct?  2002?

18       A.    Yes.

19       Q.    Was there anything that you specifically did

20   as a matter of practice to avoid a situation where

21   there's an identification procedure that you're

22   conducting or participating in, and -- strike that, let

23   me rephrase it.  Was there anything that you ever did as

24   a matter of your practice to avoid a situation where the

25   identification procedure is unduly suggestive?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1            MR. MICHALIK:  I'm going to object.  I think
 2       that's been asked and answered to some extent.
 3       A.   Well, I -- one thing I can think of offhand is
 4  you -- you don't have witnesses together looking at a
 5  lineup or a photo array.  They do it separately.
 6  And -- and they don't speak to each other after one has
 7  viewed the lineup or the photo array.
 8  BY MR. STARR:
 9       Q.   Why would you not want to have more than one
10  witness viewing a photo array at the same time?
11       A.   We want -- I don't want one witness
12  influencing another witness.
13       Q.   All right.  And you would make sure that they
14  wouldn't speak to each other before after one
15  participated and another one was set to participate?
16       A.   Not -- yeah, not until they're all done with
17  the viewing the -- the array or lineup.
18       Q.   And why would you make that as a matter of
19  practice, why would you do that?
20       A.   Again, so one witness wouldn't influence the
21  other witness.
22       Q.   Anything else that you can recall specifically
23  doing to avoid situations where a witness might be
24  influenced about who to choose?
25       A.   Well, again, like we had spoke earlier, you
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    don't want the -- the witness to -- to view the person,

2    a single person, like as -- as to -- like in the -- in

3    the interview room without -- before a single lineup.

4        Q.   Okay.  Anything else you can think of besides

5    that?

6        A.   Not that I recall.

7        Q.   All right.  Did you ever have an occasion in

8    your entire career where you showed a witness a single

9    photograph of a suspect?

10       A.   I don't recall any specific case.  I would

11   think the only way that would be done is if the person

12   knew the suspect intimately, like a spouse, you know, a

13   sibling, a child.  It'd have to be something like that

14   before you would ever do just the one photo.

15       Q.   So in a situation where the witness intimately

16   knew the suspect, it was okay to show them a single

17   photograph; is that correct?

18       A.   Yes.

19       Q.   Okay.  Do you know if there was a Chicago

20   Police Department policy that made that an acceptable

21   practice?

22       A.   I don't know if -- if there was anything

23   written about that, or if it's just something I learned

24   from other detectives, talking to state's attorneys.

25       Q.   And as a matter of practice, did you show

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   single photographs to witnesses who said they were

2   intimately familiar with the suspect?

3        A.   You know, I don't recall a specific case.

4   It's -- it's possible, but I don't recall.

5        Q.   Okay.  And then you kind of gave me like a

6   list of people that might be intimately familiar with a

7   suspect.  You said a spouse or a child.  Is there

8   anybody else who may fall into that category of being

9   intimately familiar with the suspect, that you would

10  then possibly show a single photograph to?

11       A.   I -- I think that would be about the only

12  reasons that I would.

13       Q.   Okay.  What if a witness told you, I committed

14  a crime with this person -- or strike that.  What if the

15  witness told you, I committed the crime with this

16  person, would that qualify that person as being

17  intimately familiar with the suspect?

18            MR. MICHALIK:  Object to form, incomplete

19       hypothetical.

20       A.   Not to the point where I would just show one

21  photo, no.

22  BY MR. STARR:

23       Q.   Okay.  Could you ever imagine a situation

24  where one person told you, I was involved in the crime,

25  I was there when the crime occurred, I know the suspect,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   and you showed that person a single photo of the
 2   suspect?
 3          MR. MICHALIK:  Object to form.
 4      A.   No, I don't think so.  I think I'd still
 5   would -- would do a photo array.
 6   BY MR. STARR:
 7      Q.   How come?
 8      A.   I want to be sure about the identification.
 9      Q.   Okay.  Are you -- is your -- is your point in
10   showing a photo array to an individual like that, who
11   says that they know the suspect, they did the crime with
12   the suspect, to test the veracity of whether or not
13   they, in fact, know that person?
14      A.   Well, if -- if the person they're -- they're
15   talking about is, in fact, the person in this photo.
16      Q.   Okay.  So you would do a photo array with
17   somebody who is admitting to being involved in a crime
18   with the suspect in order to test whether or not they
19   could identify the suspect?
20      A.   Yes.
21      Q.   All right.  Any other people that may fit in
22   that category, besides the ones you've identified?
23      A.   I don't think so.  I, you know, I think
24   anybody else, I -- I'd want to do a photo array.
25   I think the state's attorneys would want me to do a
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  photo array.

2      Q.   And you were -- you were thinking about what

3  the state's attorney wanted you to do as a Chicago

4  Police officer when you were conducting identification

5  procedures?

6      A.   Well -- well, they're the ones that charge

7  somebody with murder.  We have to go to them, we have to

8  present the case to them, and they -- they'll tell us

9  what they feel needs to be done, if there's more needs

10  to be done.  So yeah, we want -- it's important to get

11  the state's attorneys involved.

12      Q.   Okay.  Can you say with any certainty that you

13  never showed an individual photo to a witness who said

14  they were intimately familiar with a suspect who wasn't

15  a child or a spouse?

16      A.   I don't believe I ever did that, no.

17      Q.   As a Chicago Police detective, were you

18  required to document all the identification procedures

19  that you conducted or participated in?

20          MR. MICHALIK:  Object to form.

21      A.   Yes.  You want to document everything you do

22  in an investigation.

23  BY MR. STARR:

24      Q.   Okay.  So how would you document a photo array

25  that you conducted in which the witness was unable to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  identify a suspect?

2      A.   I'd do a report as to showing that person a

3  photo array, of -- and of course, who the suspect was in

4  that photo array.

5      Q.   What, kind of like, a sub report?  What kind

6  of report would you do?

7      A.   Yes, generally.

8      Q.   All right.  Was a police report required in

9  all -- in all such circumstances where you'd conduct an

10  identification procedure?

11         MR. MICHALIK:  Object.  Foundation.

12     A.   It -- it's the proper thing to do in an

13  investigation.

14  BY MR. STARR:

15     Q.   Was it -- did you make it a practice to do

16  a -- some sort of police report in every circumstance

17  where you conducted any sort of identification

18  procedure?

19     A.   Well, I'd certainly want to do that, because I

20  wouldn't want anybody duplicating my work, and --

21     Q.   So -- I'm sorry, just for clarity's sake, so

22  is it correct to say that you made -- strike that.  Is

23  it correct that you created a police report documenting

24  every single photo identification procedure you ever

25  conducted?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.    I believe so.

2      Q.    Okay.  Would you -- if you conducted a photo

3  array and a witness was unable to identify a suspect,

4  you said that you would make a report that documented

5  who the suspect was and the fact that they were unable -

6  - the witness was unable to identify that suspect?

7      A.    Yes.

8      Q.    Would you do anything to document who the

9  other photographs were of, who the fillers were, during

10 that identification procedure?

11     A.    We weren't required to do anything when there

12 was no identification made of a photo array.  We weren't

13 required to do anything, as -- as far as inventorying

14 those photos or -- or documenting who else was in that

15 photo array.

16     Q.    How do you know that you were not required to

17 document those photos?

18     A.    I -- I believe there was policy on that,

19 or -- or what I had learned.

20     Q.    Okay.  So do you -- do you -- strike that.

21 Is your testimony that you think that there was a policy

22 that indicated that if you conducted an identification

23 procedure and used photos during a photo array that was

24 negative, that you did not need to document the filler

25 photos?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.   Yes.

2      Q.   Okay.  And as a matter of practice, did

3 you -- if you conducted a -- strike that.  As a matter

4 of practice, if you conducted a photo array

5 identification procedure that turned out to be negative,

6 would you never document the photos that you used as

7 fillers?

8      A.   Yes, I wouldn't document the fillers in a

9 negative photo array.

10     Q.   Okay.  So what you would document is who the

11 suspect photograph was, correct?

12     A.   Right.

13     Q.   And who the witness was, correct?

14     A.   Yes.

15     Q.   And the fact that there was a negative

16 identification?

17     A.   Yes.  And -- and -- and why this person was

18 put in the photo array to begin with.

19     Q.   Okay.  And that practice that you filed,

20 you filed in 1995?

21     A.   Yes.

22     Q.   And you also filed it in 2002?

23     A.   Yes.

24     Q.   And do you think the policy that indicated

25 that you did not need to document negative photo arrays,



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    did that apply in '95?
 2         A.    Yes.
 3              MR. MICHALIK:  Object to the form of that
 4        question.
 5              THE WITNESS:  I'm sorry.
 6    BY MR. STARR:
 7         Q.    Did it also apply in 2002?
 8              MR. STEFANICH:  Objection to form.
 9              MR. MICHALIK:  Same objection.
10         A.    Yes.
11    BY MR. STARR:
12         Q.    In a -- what about a circumstance where you
13    conducted a photo array, and a witness identified a
14    filler, what would you do?
15         A.    I would document that.
16         Q.    You would document the fact that the witness
17    identified the filler?
18         A.    Yes.
19         Q.    Would you document who the filler was?
20         A.    Yes.
21         Q.    Okay.  Were you required by any Chicago Police
22    Department policy to do that, as far as you understood
23    it?
24         A.    Again, I don't recall specific -- any specific
25    policy on that, but that's what I understood as what we
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   should do.

2       Q.   Okay.  And that was your practice, correct?

3       A.   Yes.

4       Q.   If there was a policy in 1995 that said that

5   if you conducted a photo array and a witness identified

6   a filler as being the perpetrator, you would've been

7   aware of that policy and followed it, correct?

8       A.   Yes.

9       Q.   Is this also true for 2002?

10      A.   Yes.

11      Q.   Okay.  Did you ever have a situation where you

12  showed a photo array to a witness and they identified a

13  filler, and not this person you thought was a suspect?

14      A.   You know, I don't recall that.  There were

15  certainly plenty of times where they identified no one,

16  but I don't recall them identifying somebody else in

17  the -- in the photo array.

18      Q.   It could have happened, you just don't

19  remember it, correct?

20      A.   I'm pretty sure it didn't happen or I'd

21  remember that.

22      Q.   Okay.  Do you know if there's any Chicago

23  Police Department policy about whether or not you were

24  allowed to show any witness a single photograph of a

25  suspect?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.   I don't know of that policy, no.

 2        Q.   Okay.  Would you agree that showing a witness

 3   a single photograph of a suspect would be something that

 4   would likely result in a bad identification?

 5             MR. STEFANICH:  Objection.  Foundation.

 6             MR. MICHALIK:  And form.  It's an incomplete

 7      hypothetical.

 8        A.   Well, possibly.  It's just something you

 9   wouldn't want to do.

10   BY MR. STARR:

11        Q.   Why not?

12        A.   You'd want a -- a fair identification.

13        Q.   Why would showing a single photograph to a

14   witness not result in a fair identification?

15             MR. STEFANICH:  Objection.  Form.  Objection,

16      foundation.  You can answer.

17        A.   Why would it be?  Because you want to make

18   sure this witness is identifying the right person.

19   BY MR. STARR:

20        Q.   But why would showing them a single photograph

21   preclude that?

22             MR. STEFANICH:  Objection.  Foundation.

23      You can answer.

24        A.   Well, whether they'd feel they'd want to

25   identify this single photograph, I don't know, but it's
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    just not something you should do.

2    BY MR. STARR:

3        Q.   Okay.  Do you think that showing a witness a

4    single photograph of a suspect, with no other

5    photographs of fillers, would unduly influence that

6    witness?

7            MR. STEFANICH:  Objection.  Form, foundation.

8        You can answer.

9        A.   Depends on the witness.  It's possible.

10   BY MR. STARR:

11       Q.   So not in every circumstance, it wouldn't

12   unduly influence a witness, correct?

13           MR. STEFANICH:  Objection.  Form, foundation.

14       You can answer.

15       A.   Again, it depends on the witness.

16   BY MR. STARR:

17       Q.   Did you conduct or participate in any witness

18   photo arrays during your investigation of Willie

19   Sorrell's homicide?

20       A.   Yes.

21       Q.   And you know that from reviewing the reports?

22       A.   Yes.

23       Q.   You don't have any independent recollection of

24   doing any photo arrays, correct?

25       A.   Correct.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1       Q.   Did you conduct any lineups during the
2   Willis -- Willie Sorrell homicide investigation?
3       A.   Yes.
4       Q.   And you know that from reviewing your reports,
5   correct?
6       A.   Correct.
7       Q.   You have no independent recollection of
8   conducting any lineups, correct?
9       A.   Correct.
10      Q.   Okay.  Do you know how many times you
11  conducted a photo array during the Sorrell homicide
12  investigation?
13      A.   It's -- yes.  Well, back in '95, we did
14  a -- a photo array with Ed -- with Edward Cooper, with a
15  suspect known as Fletcher Clinton, I believe.  Then in
16  '02, a photo array with Terry Rogers.  And then in March
17  of '02, a photo array with Sheenee Friend, oh, also
18  in -- in February of '02, a photo array with -- with
19  Edward Cooper.
20      Q.   The one that you conducted with Terry Rogers,
21  is it your understanding that that took place in
22  February, 2002?
23      A.   Yes.
24      Q.   Do you have any independent recollection of
25  conducting any of those four photo arrays that you just
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   testified to?
 2        A.   No --
 3             MR. STEFANICH:  Objection --
 4        A.   -- I don't.
 5             MR. STEFANICH:  -- asked and answered.
 6   BY MR. STARR:
 7        Q.   So the entire basis of your knowledge that
 8   those photo arrays occurred comes from reviewing reports
 9   today, correct?
10             MR. STEFANICH:  Objection.  Asked and answered.
11        You can answer.
12        A.   Yes.
13   BY MR. STARR:
14        Q.   Okay.  You said that -- the 1995 photo array
15   with Edward Cooper, correct?
16        A.   Yes.
17        Q.   Do you know what month that was in?
18        A.   I believe it was in March of '95.
19        Q.   Okay.  And I think you said that that photo
20   array involved a photograph of someone by the name of
21   Fletcher Clinton?
22        A.   Yes.
23        Q.   How do you know that, sir?
24        A.   From reading the report.
25        Q.   Which report, do you know?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.   It's a -- a typed report from March of '95.

2    Q.   Okay.  And we're going to look at the reports.

3  I'm not, like, trying to trick you or anything.  I just

4  want to make sure if you have it.  If you -- as you sit

5  here today, do you recall looking at a March of 1995

6  type report that indicates to you that you did a photo

7  array with Edward Cooper, in which you showed him a

8  photograph of someone named Fletcher Clinton; is that

9  correct?

10    A.   Did a photo array which included Fletcher

11  Clinton, yes.

12    Q.   Okay.  Do you know what other photos that you

13  allegedly showed Mr. Cooper during that photo array?

14    A.   No, I don't.

15        MR. MICHALIK:  Object to the form of the

16     question.

17    A.   No, I don't.

18  BY MR. STARR:

19    Q.   Okay.  And do you know who Fletcher Clinton

20  is?

21    A.   No.

22    Q.   Do you know how you came to show a photo array

23  to Edward Cooper that involved a man by the name of

24  Fletcher Clinton?

25    A.   Well, according to the report, Detectives

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  Rutherford and McDonald asked us to show that photo

2  array to Edward Cooper.

3       Q.   Okay.  Is it your understanding that

4  the -- Detectives McDonald and Rutherford provided you

5  with the photos for the photo array?

6       A.   I don't recall.  I assume that they -- they

7  had at least Fletcher Clinton's photo.  Whether they

8  gave us other photos, I don't know.

9       Q.   Okay.  Do you know, was Fletcher Clinton a

10  suspect when you showed the photo array to Edward Cooper

11  in 1995?

12      A.   He was a possible suspect.

13      Q.   Do you know where you conducted the photo

14  array with Edward Cooper in 1995?

15      A.   I believe the -- I believe the report

16  indicated at his home.

17      Q.   Do you have any independent recollection of

18  ever being at Edward Cooper's home?

19      A.   No.

20      Q.   Do you have -- do you have any independent

21  recollection of who Edward Cooper is?

22      A.   No.

23      Q.   And I'm not sure if I asked you this.

24  Did you -- the way you conducted photo arrays in 1995,

25  did you do anything different when you were conducting

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  photo arrays in 2002 that you can recall?

2      A.    No.

3      Q.    Okay.  So your process was the same, correct?

4      A.    Yes.

5      Q.    Other than Chicago Police Department photos,

6  which we talked about the mugshots in general parlance,

7  were there any other sources that you routinely would

8  acquire photos to conduct photo arrays in 1995 or 2000?

9      A.    Well obviously, as indicated on the report in

10  2002, we were able to obtain the -- the photograph of

11  James Fletcher, also known as Arnold Dixon (phonetic),

12  from the IDOC photographs.

13      Q.    Right.  So in this case, it appears that there

14  was photos that were acquired from IDOC, correct?

15      A.    Yes.

16      Q.    But my question was, other than Chicago Police

17  Department photos, was there any other sources that you

18  routinely acquired photos when conducting photo arrays

19  between the years 1995 and 2002?

20      A.    No.

21      Q.    Okay.  Do you -- can you tell me any other

22  cases in which you acquired photos from Illinois

23  Department of Corrections to conduct a photo array?

24      A.    I can't name specific cases.  I -- I believe

25  there were others, but I -- I don't know any specific

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DAVID MICHALIK, taken on 03/31/2023

```
 1   cases.

 2        Q.   Can you tell me why you would acquire photos

 3   from the IDOC -- actually, strike that.  Were you

 4   required to obtain photos from verifiable, authentic

 5   sources?

 6             MR. MICHALIK:  Object to the form.

 7        A.   Well you -- you'd want to know that that photo

 8   was the photo of the suspect.

 9   BY MR. STARR:

10        Q.   Right.  And so in an effort to accomplish

11   that, would you necessarily only acquire photographs

12   from places where you could verify that the person was,

13   in fact, who they -- who they purported to be?

14        A.   Well again, you -- you'd want to know that

15   that's the photo of your suspect, whether -- however

16   you can, you know, verify that, but that's -- you would

17   certainly want to know that.

18        Q.   Okay.  So other than the Chicago Police

19   Department photos, and at least the one time in this

20   case where you got the IDOC photos, can you tell me any

21   other sources in which you acquired photos to conduct a

22   photo array?

23        A.   I don't recall any.

24        Q.   When you conducted photo arrays, did you have

25   a practice whereby you showed witnesses color photos
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   versus black and white photos, or did it -- did it all

2   depend on the circumstance?

3        A.   It could be either one.

4        Q.   Okay.  If you had access to color photos,

5   would you want to use the color photos?

6        A.   I'd prefer color photos.

7        Q.   How come?

8        A.   They would generally show more details.

9        Q.   Okay.  So if you were conducting a photo array

10  and you had a choice between a black and white

11  photograph of a -- of an individual and a color photo,

12  you would opt for the color photo, correct?

13       A.   If I had the choice between the two, yes.

14       Q.   Okay.  And that was a matter of practice,

15  right?

16       A.   Matter of my practice, anyway.

17       Q.   Okay.  Do you know if there's any CPD policy

18  that dictated whether you should use color photos versus

19  black and white photos?

20       A.   I don't believe there is.

21       Q.   And then I think you testified that when you

22  did a photo array, you would -- you would generally want

23  to have -- I -- and correct me if I'm wrong, four or

24  five fillers; is that right?

25       A.   Oh, yes.  You -- at least three, but

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    preferably four or five.

2        Q.    Would you ever do a photo array where you had

3    more than that number?

4        A.    If you had more than one suspect in that photo

5    array, you'd have more fillers.

6        Q.    All right.  And in a circumstance where you

7    only had one suspect, would you ever use more than four

8    to five fillers?

9        A.    I don't recall ever -- any more than that.

10       Q.    Okay.  And we talked a little bit about the

11   different types of characteristics, physical

12   characteristics, that you'd look for in terms of

13   fillers.  Could you ever have a suspect who's one gender

14   and a -- fillers that are the other gender?

15       A.    No.

16       Q.    Okay.  Could you ever have a suspect who

17   has -- who is one skin color, and then fillers that are

18   other skin colors?

19       A.    Well, you -- you try to get them somewhat

20   similar.  And there's different complexions, but you try

21   to get them somewhat similar.

22       Q.    Okay.  Would you ever have a situation where

23   you're doing a photo array, and you had a suspect who

24   was Black, and you would use a filler who was white?

25       A.    No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   Okay.  Would you ever have a situation where

2    you were doing a photo array, and you had a suspect who

3    was Black, and use a filler who was Latino?

4    A.   No.

5    Q.   Okay.  Would you have a situation where you

6    would have a photo array -- where you were conducting a

7    photo array, and you had a suspect who was Black,

8    and you'd use an Asian or Pacific Islander filler?

9    A.   No.

10   Q.   Okay.

11   A.   No, there are -- there are Hispanics that have

12   a very dark complexion, that almost appear more Black

13   than Hispanic that you could possibly use, but that

14   would be the only case.

15   Q.   Okay.  And would you -- would you attempt

16   to -- or strike that.  Would you make sure to have a

17   filler -- strike that.  When you were conducting a photo

18   array, would you make sure that the fillers' skin

19   complexion was similar to the suspect's?

20   A.   Somewhat similar.

21   Q.   Okay.  So if the suspect was a -- was a -- had

22   a -- was a Black person with dark black skin, would you

23   ever have fillers that were Black people who had light

24   skin?

25   A.   It could be lighter shades, but not --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

138

1   generally, not a very light-skinned Black, and -- and a
2   very dark-skinned Black.
3        Q.   All right.  Did you ever have a -- did you
4   ever conduct a photo array with a suspect who had any
5   tattoos on their face or neck with fillers who didn't
6   have tattoos on their faces and necks?
7        A.   No.
8        Q.   What about facial hair?  If the suspect had
9   facial hair, would you make sure that all the fillers
10  had facial hair?
11       A.   Yes, we'd like to do that.
12       Q.   Would you do it on every occasion?
13       A.   I don't know if I did it every occasion but
14  depending on the amount of facial hair.
15       Q.   If the suspect was wearing glasses in the
16  photograph, would you make sure that all the fillers had
17  glasses on?
18       A.   I'd -- I'd prefer that, but...
19       Q.   Would you do that on every occasion?
20       A.   If I could come up with fillers with -- with
21  glasses, I would.
22       Q.   So it's possible that you would have a suspect
23  with glasses and fillers without glasses, if you had a
24  situation where you couldn't find fillers with glasses
25  that looked like the suspect, correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.   I don't know if I've ever done that,

2  but I think I would rather -- want to have glasses.

3    Q.   Okay.  Would you ever have an occasion where

4  you're conducting a photo array, and the suspect had a

5  full head of hair, and the fillers were bald?

6    A.   I'd prefer them to be more similar than that.

7    Q.   Okay.  Did you ever have a situation where you

8  had a photo array that you conducted where the suspect

9  had hair and the fillers didn't have hair?

10   A.   Well again, those -- the characteristics of

11 hair isn't the most important part of the photo array.

12 They're not identifying hair, but they're identifying

13 the face, so -- and hair can change -- change from day

14 to day, much -- much less year to year.  So it's --

15 wouldn't be that crucial as the -- the amount of hair.

16   Q.   What did you do to determine, in any given

17 photo array, that the witnesses were not looking at the

18 hair of the suspect and using that as a part of their

19 analysis in making an identification?

20   A.   Well you'd ask them, you know, if they can

21 identify anybody.  I mean, certainly if they said like,

22 oh, I can -- I'm identifying just by his hair, that

23 wouldn't be an identification.

24   Q.   Right.  So what if a -- what if a witness said

25 I saw the suspect, you know, he was a Black male and he

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    had long hair, would you ever show that witness a photo
 2    array with Black males without long hair?
 3              MR. STEFANICH:  Objection to form.
 4         You can answer.
 5         A.   It's possible.
 6    BY MR. STARR:
 7         Q.   Would you do everything in your power to find
 8    fillers and photographs of a suspect that had long hair,
 9    if that's what the witness had told you?
10              MR. STEFANICH:  Objection to form.  You can
11         answer.
12         A.   Again, the hair isn't a crucial factor in
13    identification.  It's the face.
14    BY MR. STARR:
15         Q.   Okay.  And that -- what do you base that upon?
16         A.   My knowledge as -- my many years as a
17    detective.
18         Q.   All right.  So if a witness told you that they
19    saw a Black male with long hair commit a crime, you
20    would not prioritize finding a photograph of a suspect
21    with long hair or fillers with long hair; is that
22    correct?
23              MR. STEFANICH:  Objection.  Form.  You can
24         answer.
25         A.   Well, not necessarily.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

BY MR. STARR:

    Q.   What about hair color?  If you were conducting a photo array, would you make sure that the hair color of the suspect was the same as what the witness said they saw the suspect having?

    A.   Again, it's the same as the -- the hair. It's -- the identification is the face, not the hair color.

    Q.   So let me ask you this because I was going to ask you about hairstyle as well, but I think you're probably going to testify the same way.  Did you -- did you take any consideration, when you were -- when you were putting together a photo array, of what a witness said about the suspect's hair?

    A.   Not necessarily.

    Q.   And I think you testified that you want to make sure that the fillers and the witness -- or sorry, strike that.  I think you testified earlier that you want to make sure that the fillers and the suspect were in the same age range; is that correct?

    A.   Yes.

    Q.   What does that -- what does that term age range mean to you?  What was your practice?

    A.   Well, you wouldn't want somebody very young in with somebody very old.  In between them, you know,



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    it's -- that would be impossible to use them in -- in

2    the fillers.

3        Q.   So if you had a suspect that was 30 years old,

4    would you have -- ever have fillers that were 50 years

5    old?

6        A.   If the 30-year-olds looked a little older than

7    30, it's possible.

8        Q.   Okay.

9        A.   Or if the 50-year-old looked younger.

10        Q.   Okay.  Would you ever conduct a photo array

11    where the fillers were more than 15 years age difference

12    than the suspect?

13        A.   It's possible.

14        Q.   Okay.  What circumstance can you think of

15    where that would be the case?

16        A.   Again, how -- how the photos look.

17        Q.   Okay.  So your primary determination when

18    you're putting together a photo array is if you

19    subjectively think that the suspect looks like the

20    fillers; is that correct?

21        A.   Yes.

22        Q.   Okay.  Any other criteria that you apply?

23    Would you ask any other detectives whether or not they

24    agreed that the fillers looked like the suspect?

25    Would you ask the supervisor?  Would you do anything

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   else to make sure that the suspect and the fillers

2   looked enough alike?

3       A.   No.  I would just put them together,

4   what I felt was right.

5       Q.   Okay.  So just like an eye test kind of thing,

6   correct?

7       A.   Well, what I -- what I thought was the -- a

8   proper photo array.

9       Q.   All right.  And that was your practice both in

10  1995 and 2002, right?

11      A.   Yes.

12      Q.   And you understood your practice to conform

13  with what the Chicago Police Department policy was in

14  '95 and 2002, correct?

15      A.   Yes.

16      Q.   When you were testifying earlier about your

17  own personal supply of photographs, were those

18  photographs all Chicago Police Department mugshots?

19      A.   Yes.

20      Q.   Okay.  And where did you keep those photos

21  when you were working back in '95 through 2002?

22      A.   Oh, I might have them in my locker.  There

23  might be a desk that have the -- a group -- a pile of

24  photos in.

25      Q.   And where did you acquire those photos from?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Vic Deposition Transcription Schriro 04/09/25 Page 146 of 336
144

```
 1        A.    From other investigations.
 2        Q.    All right.  And you also -- and what did you
 3   do with those photos when you were done with your
 4   career?
 5        A.    Whatever I had personally, I threw away.
 6   I didn't keep them, or -- didn't keep any files.
 7        Q.    Okay.  And then you also testified -- strike
 8   that.  So when you retired, you disposed of all the
 9   photographs that you had that were part of your personal
10   collection?
11        A.    Yes.
12        Q.    Did you just throw them in the trash, or what
13   do you remember -- what do you remember about how you
14   disposed of them?
15        A.    I don't remember.  I would say probably, yes.
16        Q.    And then you also testified that there was a
17   Area 5 collection of photographs that was separate from
18   the ones that you personally maintained, correct?
19        A.    I kind of recall there might have been a -- a
20   drawer that had extra photos in it.  I don't, you know,
21   recall why they were there, but I believe there were
22   some available.
23        Q.    And were those photos -- as far as you're able
24   to recall, were those photos all Chicago Police
25   Department mugshots?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.    Yes.

2      Q.    Were your -- was your personal collection of

3  photos, were they all color photos?

4      A.    A combination, black and white and color.

5      Q.    Okay.  Was the separate group collection of

6  photos at Area 5, were they color or black and white?

7      A.    I think it was all grouped together, both

8  color and black and white.

9      Q.    Regarding photo arrays still -- I'm still on

10  that subject.  If you had a witness who told you that

11  they didn't see the suspect, but they were there when

12  the crime occurred, or something to that effect, would

13  you still -- as a matter of practice, if you had a

14  suspect, would you still show that witness a photo array

15  to see if they could identify the suspect?

16      A.    No.  If they said they didn't see the suspect,

17  there'd be no reason to show them a photo array.

18      Q.    Okay.  So if they said that their view of the

19  suspect was obstructed and they weren't able to see the

20  person's face, you would never show them a photo array?

21      A.    No.  There would be no need to show them a

22  photo array if they didn't see the face.

23      Q.    Okay.  If a witness said that they saw the

24  suspect, and you were -- let's strike that.  If you were

25  working a cold case and on the initial investigation,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-3 Filed: 05/06/25 Page 148 of 336

146

1    the witness said they had seen the suspect, and you were

2    re-interviewing that suspect, like you testified you did

3    as a matter of practice, and that witness said, I don't

4    think I can -- I no longer can identify the suspect,

5    would you show that suspect a photo array if you had a

6    suspect in mind?

7            MR. STEFANICH:  Objection.  Form.  You can

8        answer.

9        A.   If they say no, they don't believe they can

10   identify him, if -- if there was any doubt whether

11   they -- they can, I would show the photo array to them.

12   BY MR. STARR:

13       Q.   Okay.  Would you show the photo array just to

14   see whether or not they, in fact -- it would refresh

15   their recollection?

16           MR. STEFANICH:  Objection.  Form.  You can

17       answer.

18       A.   I think it would be worth showing the photo

19   array in all circumstances.

20   BY MR. STARR:

21       Q.   Why would it be worth showing the photograph

22   in all circumstances?

23       A.   Well, in the circumstances you said, that they

24   did say they could identify originally, and now they're

25   saying that they don't, I think it would be worth



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  showing a photo array.

2      Q.    And -- but what would be the point of that?

3  Why would you -- why would you want to do that, as a

4  general matter of practice?

5      A.    Just -- just to see whether they could

6  identify them or not.

7      Q.    Would it be a good -- a good practice thing to

8  do to, you know, exhaust all of your investigative

9  leads?

10         MR. MICHALIK:  Object to the form.

11     A.    I think it's the proper thing to do.

12 BY MR. STARR:

13     Q.    Okay.  And just -- I'm just trying to get at

14 why you think that's the proper thing to do.  Why do you

15 think that's the thing you should have done as a

16 detective?

17     A.    Well, to see if this witness could make an

18 identification.

19     Q.    Okay.  So if a witness initially says they

20 can -- they can ID a suspect -- strike that.  If a

21 witness initially said, at some point in time, that they

22 saw the suspect, and then at some point in the future,

23 they said, I don't think I can -- I no longer can

24 identify the suspect, if you were investigating the

25 case, you would still show them a photo array to see

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   whether or not they could identify the suspect, correct?
 2              MR. STEFANICH:  Objection  to --
 3         A.   If --
 4              MR. STEFANICH:  Objection to form.  You can
 5       answer.
 6         A.   If they agreed to look at photo array.
 7   I mean, obviously if they said, I'm not -- I don't -- I
 8   don't want to look at any photos, then you don't show
 9   them.  But if -- if they were agreeable to look at
10   photos, I would show them photos.
11   BY MR. STARR:
12         Q.   Okay.  And just to exhaust this completely, in
13   a situation where -- like that, where you had a witness
14   who initially says they can -- they saw the suspect,
15   and then at some point later, they say they can no
16   longer recall what the suspect looked like, or they
17   can't identify the suspect, you would ask them, hey,
18   can I show you a photo array, correct?
19              MR. STEFANICH:  Objection.  Form.  You can
20       answer.
21         A.   I probably would, yes.
22   BY MR. STARR:
23         Q.   Okay.  And you would do that because you would
24   want to see whether or not they, in fact, can identify
25   the suspect, right?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DETECTIVE SCHRING, taken on 04/05/23

149

1      A.   Yes.

2      Q.   Because if they can identify the suspect,

3  that would certainly help your investigation, correct?

4      A.   Well, it would help to show whether this

5  suspect is the offender.

6      Q.   Okay.  So it would -- it would either rule

7  them in or rule them out, correct?

8      A.   Well, maybe not totally either way, depending

9  on other witnesses in the -- in the investigation.

10      Q.   But they would provide you with additional

11  information to make an educated evaluation of the case,

12  correct?

13      A.   It -- it would probably get us to continue

14  looking at that person as a suspect.

15      Q.   Okay.  So -- strike that.  If a witness told

16  you that they saw the suspect, but it was only for a

17  very short duration, would you attempt to show them a

18  photo array?

19          MR. STEFANICH:  Objection.  Form.  You can

20      answer.

21      A.   I probably would, yes.

22  BY MR. STARR:

23      Q.   And would you do it for the same reason you

24  just testified to, because you wanted to see whether or

25  not they could identify the person?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of ALAN WALCHONSKI, taken on 04/04/23

```
 1        A.    Yes.

 2        Q.    Because that would be a good matter of

 3   practice, right?

 4             MR. MICHALIK:  Object to the form.

 5        A.    Well, it's -- it's part of the investigation

 6   to see if witnesses can identify anybody.

 7   BY MR. STARR:

 8        Q.    But that would be a proper practice to do as a

 9   Chicago Police detective.  If you had a suspect -- or

10   strike that.  If you had a witness who said, yeah, I saw

11   the suspect for a fleeting instant, you would say, well,

12   I want you to take a look at the photo array, tell me

13   whether or not you can make an identification, correct?

14        A.    Well, again, they have to be --

15             MR. STEFANICH:  Objection to form.

16             THE WITNESS:  I'm sorry.

17             MR. STEFANICH:  Go ahead.  You can answer.

18        A.    They'd have to be able to say they -- they saw

19   the face.  They can't say, I saw them, you know, from

20   the back or, you know, I just -- I saw his hairstyle.

21   They have to be able to say they saw the face.

22   BY MR. STARR:

23        Q.    But in a circumstance where a witness tells

24   you, I did in fact see the suspect's face for a very

25   short duration of time, you, as a matter of good
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CAROL SCHMAL, taken on 04/08/25

1 practice, would ask them to look at a photo array if you

2 had a suspect, correct?

3          MR. STEFANICH:  Objection.  Form.  You can

4    answer.

5    A.   I believe I would ask them to -- if they would

6 be willing to look at some photos.

7 BY MR. STARR:

8    Q.   If you were working on a cold case where a

9 witness had previously indicated that they saw the

10 suspect, but during your re-interview of them, they

11 indicated to you that they had some sort of poor memory,

12 would you ask that witness to see a photo array if you

13 had a suspect in mind?

14          MR. STEFANICH:  Objection.  Form.

15    A.   I don't know what -- what you mean by them

16 saying they -- they would just say the words, I have a

17 poor memory?  I'd -- I'd ask them further, or whether

18 they -- if they think they could possibly identify

19 anybody, and if -- if they'd be willing to look at

20 photos.

21 BY MR. STARR:

22    Q.   Okay.  So in a circumstance where a witness

23 told you that they had poor -- a poor memory while you

24 were investigating a cold case, you would still want to

25 show them a photo array to see whether or not they could



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    identify the suspect, correct?

2          MR. STEFANICH:  Objection.  Form.

3      A.   Well, I -- I'd ask them if they'd be willing

4    to look at some photos.

5    BY MR. STARR:

6      Q.   Right.  So just so the record's clear, so in a

7    circumstance where you were interviewing a witness who

8    had previously indicated they could -- they saw the

9    suspect, but were now indicating that their memory was

10   poor, you would still ask them to review a photo array

11   to see whether or not they could identify the suspect,

12   correct?

13         MR. STEFANICH:  Objection.  Form.

14     A.   I probably would.

15   BY MR. STARR:

16     Q.   In a circumstance where you're investigating a

17   cold case and a witness tells you -- strike that.  In a

18   circumstance where you're investigating a cold case that

19   involved a witness who had previously indicated they

20   could see the suspect, they saw the suspect during the

21   crime, and you're interviewing them, you're re-

22   interviewing them, they tell you that they're -- that

23   they couldn't remember what the suspect looked like, in

24   those circumstances, would you ask that suspect -- that

25   witness see -- to review a photo array?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          MR. STEFANICH:  Objection.  Form.

2    BY MR. STARR:

3          Q.   Yeah, let me just rephrase that.  I butchered

4    it.  Give me one second.  In a circumstance where you're

5    investigating a cold case that involved a witness who

6    had previously indicated they saw the suspect, and

7    during your re-interview of that witness, they told you

8    they could no longer remember what the suspect looked

9    like, would you still show them, or attempt to show

10   them, a photo array to see whether or not they can

11   identify the suspect?

12         MR. STEFANICH:  Objection.  Form.

13         A.   If they say -- they were saying they no longer

14   can remember what the suspect looked like, I probably

15   wouldn't show photos, no.

16   BY MR. STARR:

17         Q.   Okay.  So you wouldn't show them a photo array

18   to see if that refreshes their recollection?

19         A.   Well if -- if they're insisting that they

20   can't remember it -- remember the suspect, I don't think

21   there'd be any need to show a photo array.

22         Q.   Would there be any reason not to show them a

23   photo array?

24         A.   It just doesn't seem like it would be

25   necessary.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q.   Why not?

2      A.   Because they're -- they're telling me that

3    they can't possibly identify anyone.

4      Q.   Well, they're not -- and that wasn't the

5    scenario I laid out.  I'm asking you about a witness who

6    you are interviewing, you're re-interviewing, and

7    they're saying to you, I saw the suspect back in 1990,

8    but it's 2002 and I don't remember what they looked

9    like.  Would you say, okay, well, look at this photo

10   array and tell me if you remember any of these people as

11   a suspect?

12             MR. STEFANICH:  Objection.  Form.

13     A.   I -- I'd certainly go into the -- what they

14   remember that they saw, you know, did they see a face?

15   Did -- do they remember anything about what the suspect

16   looked like?  And if they don't, well there's no reason

17   to show photos.

18   BY MR. STARR:

19     Q.   Well, so in a case like this, like if you were

20   re-interviewing a witness from a 1990 shooting, who in

21   1990, indicated they saw the suspect, and in 2002, they

22   tell you, I don't remember what the person looked like,

23   but I remember I saw the face, it was a Black male.  In

24   that circumstance, would you ask that witness to look at

25   a photo array to see whether or not they could identify

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1   a suspect?

 2        MR. STEFANICH:  Objection.  Form.

 3        A.   If they say they saw a face, I would show

 4   them -- ask them to look at a photo array.

 5   BY MR. STARR:

 6        Q.   Okay.  If you were interviewing a witness on a

 7   cold case, who had previously indicated that they had

 8   seen the suspect's face, and during your re-interview,

 9   they said to you that they were concerned that too much

10   time had elapsed since the crime, would you ask that

11   witness to view a photo array to see whether or not they

12   could identify the suspect?

13        MR. STEFANICH:  Objection.  Form.

14        A.   Well, it depends what they said besides

15   there's too much time passed, and whether they still

16   believe they could recall what the -- the offender

17   looked like.

18   BY MR. STARR:

19        Q.   So tell me everything that a witness could say

20   to you, in a situation like that, where they had

21   expressed they were concerned about how much time had

22   elapsed, that would allow for you to want to show them a

23   photo array?

24        MR. STEFANICH:  Objection.  Form.

25        A.   Again, it all depends on what the witness is
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1   saying.  They're not going to just say, I'm concerned

2   that there's a -- a time-lapse here, you know.

3   BY MR. STARR:

4       Q.   Well, in my situation, or the -- my question

5   was that, so let me just ask it again.  So in a

6   situation where you're interviewing -- re-interviewing

7   the witness who had previously indicated they saw the

8   suspect, and they told you during the re-interview, you

9   know, a lot of time has passed, I'm concerned that a lot

10  of time has passed since I saw that suspect.

11  My question is, would you still ask that witness to

12  review a photo array to see whether or not they could

13  make an identification?

14          MR. STEFANICH:  Objection.  Form.

15      A.   Well, I'd ask them, do you think it's possible

16  that you could -- you could still identify the suspect.

17  BY MR. STARR:

18      Q.   And what if they told you they didn't know?

19      A.   If they said they're not sure, I'd probably

20  show a photo array.

21      Q.   Okay.  I asked you early on in the dep about

22  whether or not you ever witnessed, or became aware, of

23  another detective unduly influencing identification

24  procedures.  Do you remember that question?

25      A.   Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q.    You said you had -- you'd never witnessed that

2  or became aware of that, correct?

3     A.   Correct.

4     Q.    If you had, during your time at Area 5, either

5  witnessed that or became aware of it, what would you

6  have done?

7     A.   I would have reported that to a supervisor.

8     Q.    Okay.  Why would you have reported that to

9  your supervisor?

10     A.   Because that's improper, illegal.

11  They -- they may have just committed a crime.

12     Q.    If a Chicago Police detective had unduly

13  influenced an identification procedure, could it also

14  compromise the integrity of the investigation?

15     A.   It's possible.

16     Q.    Okay.  Could it also undermine the ability to

17  prosecute the suspect?

18     A.   It's possible.

19     Q.    Could it also possibly lead to the prosecution

20  of someone who is innocent?

21     A.   I guess that's possible.

22     Q.    Was that a concern that you had at all?

23     A.   Well, I don't want any innocent person charged

24  with any crime.

25     Q.    So is that a concern that you had when you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   were a Chicago Police detective?

2       A.   A concern that someone innocent is charged?

3       Q.   Yeah.  Were you -- as a Chicago Police

4   detective, were you concerned that your work could lead

5   to the prosecution and conviction of an innocent person?

6       A.   I don't know that I -- I thought of that.

7   I -- I followed the investigation, and the investigation

8   made me believed that someone was the offender, and I'd

9   present that case to the State's Attorney's Office for

10  charging.

11      Q.   And in a circumstance where you did an

12  investigation and had a suspect, but you had doubts

13  about whether or not they were -- they were, in fact,

14  guilty of a crime, what would you do?

15          MR. STEFANICH:  Objection.  Form, sorry.

16      A.   I would continue the investigation.

17  BY MR. STARR:

18      Q.   Would you express those concerns with -- to

19  your -- to your partner?

20      A.   Well, certainly, we'd talk about the case.

21      Q.   Would you express those concerns to a

22  supervisor?

23      A.   I might.

24      Q.   Did you ever work on any cases, as a Chicago

25  Police Department detective, where someone was arrested

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   and then prosecuted, and you had doubts about their

2   innocence or guilt?

3        A.   No.

4        Q.   All right.  So I asked you about photo arrays,

5   I'm going to ask you about lineups now.  Did you conduct

6   any lineups in the Willie Sorrell criminal

7   investigation?

8        A.   Yes.

9        Q.   How many lineups did you either conduct or

10  participate in the Willie Sorrell investigation?

11       A.   Well, it was one lineup, but there were two

12  witnesses that viewed the lineup.

13       Q.   Okay.  And do you have independent

14  recollection of your participation in those lineups or

15  do you only know that because you read it in a report?

16       A.   Just from reading reports.

17       Q.   Okay.  Who -- what witness -- strike that.

18  Do you know what witnesses viewed lineups that you

19  participated in?

20       A.   Edward Cooper and Sheenee Friend.

21       Q.   And your testimony is that they did not view

22  the lineup at the same time; is that correct?

23       A.   No, they didn't.

24       Q.   Okay.  Which one viewed the lineup first?

25       A.   I don't recall which one went first.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q.    Okay.  Do you know if Edward Cooper identified

2  anyone in a lineup?

3     A.    Yes, he did.

4     Q.    Who did he identify?

5     A.    James Fletcher.

6     Q.    Did you speak to Mr. Cooper prior to his

7  viewing the lineup?

8     A.    Well, certainly, we would've contacted him

9  and -- and told him we -- we wanted -- we'd like to have

10  him come and look at the lineup.

11     Q.    Did you speak to him when he arrived at the

12  area?

13     A.    I'm sure we directed him where to sit while

14  the -- the lineup -- until we got the lineup going for

15  him to -- to view.

16     Q.    But you don't have any independent

17  recollection of anything you said to him or he said to

18  you, correct?

19     A.    Correct.

20     Q.    Do you know whether or not you showed Edward

21  Cooper any photos when he came to the area to view the

22  lineup?

23     A.    No, I don't -- I don't believe we did.  It's

24  not -- the report doesn't indicate that any photos were

25  shown.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   Q.   But you don't have any independent

2   recollection of whether or not you showed Edward Cooper

3   photos when came --

4   A.   There -- there would be no reason to show him

5   photos at that time.

6   Q.   Just let me get the question fully out so

7   it's a clean record.  You don't have any independent

8   recollection of whether or not you showed Edward Cooper

9   photos when he came to the Area 5 prior to viewing the

10  lineup, correct?

11  A.   I don't have any -- any recollection of that

12  occurring.  The whole thing occurring, so no, I -- I

13  don't, but it -- there would be no reason to show

14  photos.

15  Q.   Okay.  Do you recall selecting the fillers for

16  the lineup that Mr. Cooper viewed?

17  A.   I don't recall that.

18  Q.   Do you know if you selected the fillers or

19  not?

20  A.   I don't know who did.

21  Q.   And then you also had mentioned that Sheenee

22  Friend viewed a lineup at Area 5, correct?

23  A.   Yes.

24  Q.   And did she -- is it your -- do you

25  know -- strike that.  Do you know whether or not

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Ms. Friend identified anyone in the lineup during the
2    Willie Sorrell investigation?

3         A.   She also identified James Fletcher.

4         Q.   And did you speak to Ms. Friend when she
5    arrived at the area prior to her viewing the lineup?

6         A.   I'm sure we had some conversation with her.

7         Q.   Do you have any independent recollection of
8    anything you said to her, or she said to you?

9         A.   No.

10        Q.   And just -- I didn't ask you this.
11   Did you have -- do you have any independent recollection
12   of anything that any detective said to Edward Cooper,
13   or Edward Cooper said to any detective, when he came to
14   view a lineup?

15        A.   No.

16        Q.   Do you have any independent recollection of
17   anything that any police personnel said to Ms. Friend,
18   or what Ms. Friend said to any police personnel, when
19   she came to view a lineup?

20        A.   No.

21        Q.   Do you know whether or not you showed
22   Ms. Friend any photos prior to her viewing the lineup
23   when she came to the area to view the lineup?

24        A.   I don't -- I don't recall the lineups, but
25   again, there would be no reason to show her photos.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1      Q.    But you can't say one way or the other,

2  because you don't have independent recollection,

3  correct?

4      A.    But I -- I've never shown photos to anyone

5  before they're viewing a lineup.

6      Q.    Okay.  Your testimony is you've never shown

7  photos to anyone viewing a lineup at the same --

8      A.    Same --

9      Q.    -- occasion of them --

10      A.    At the same --

11      Q.    -- viewing a lineup?

12      A.    -- at the time of the lineup.  Uh-huh.

13      Q.    Okay.  Were the same fillers that were in the

14  lineup that Mr. Cooper viewed the fillers that were in

15  the lineup that Ms. Friend viewed?

16      A.    Yes.

17      Q.    And do you know that from looking at the

18  report?

19      A.    Yes.

20      Q.    But you don't have any independent

21  recollection of any of the fillers, correct?

22      A.    Correct.

23      Q.    What was your general practice when conducting

24  a lineup?

25      A.    Well, each witness would come in one at a

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    time, you know, separately.  Generally, they'd be behind

2    the one-way mirror, looking at the -- the participants

3    in the lineup.  We'd direct the participants would line

4    up to step forward one at a time, generally make a turn

5    left and right, and go back in line.  This could be done

6    through an intercom or -- or by another detective in the

7    room with the fillers. And then after each one did

8    this -- these motions, stepping forward and turning,

9    we'd ask the witness if she recognized anyone,

10   or he -- he recognized anyone.

11        **Q.   And as a general practice, did you have a**

12   **number of people that would be in a lineup at any given**

13   **time?**

14        A.   Well, again, you'd -- you'd want at least

15   three, but preferably four or five.

16        **Q.   Three to five plus the suspect?**

17        A.   Yes.

18        **Q.   And would the same criteria that you applied**

19   **to fillers for a photo array, apply to fillers that you**

20   **chose to sit in a lineup with the suspect?**

21        A.   Basically.

22        **Q.   Was there any differences in the criteria that**

23   **you applied to lineups that you -- that you applied to**

24   **photo arrays?**

25        A.   I mean, you might be looking closer at height



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   in a lineup, because they can -- they can easily tell a

2   height difference in a lineup as opposed to a photo,

3   but -- and weight, probably, also because -- because

4   you're seeing each participant in the lineup, but other

5   than that, it's basically the same.

6       Q.   So you would -- you would want to make sure

7   that the height and the weight of the fillers was

8   similar to the suspects, correct?

9       A.   Somewhat similar.

10      Q.   Like, what degree of difference in inches

11  would you think is acceptable to have a filler and a

12  suspect be different?

13      A.   Well, I -- I -- I don't know as far as inches.

14  You -- you just look at them, and if someone's very

15  short, you don't want to put someone very tall in it,

16  or vice versa.

17      Q.   So there's not a set number of inches that you

18  can tell me that you would --

19      A.   No.

20      Q.   -- you know, that would be too much --

21      A.   No.

22      Q.   -- to have a filler be shorter or taller than

23  a suspect, correct?

24      A.   Correct.

25      Q.   What about weight?  How much weight variance

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of LEO SCHMITZ, taken 04/06/2023

```
 1    is acceptable, in terms of --

 2         A.   I'd have to say --

 3         Q.   -- the fillers and the suspects?

 4         A.   Sorry.  I'd have to say the same thing.

 5    You'd -- you'd -- you'd look at them and -- and you

 6    wouldn't want someone very thin with someone obese, but

 7    the weight can vary a little bit.

 8         Q.   So you can't tell me a set number of pounds

 9    that would be an acceptable or unacceptable difference

10    between a filler and a suspect, correct?

11         A.   No, I can't.

12         Q.   If you were working a cold case that,

13    you know, 12 years had elapsed -- 11 to 12 years had

14    elapsed, would you do anything to make sure that the

15    suspect or the filler's weight was similar to what it

16    was when the crime occurred?

17         A.   No.

18         Q.   Okay.  Would you do anything in a situation

19    like that, where 12 years had -- 11 or 12 years had

20    elapsed, to make sure that the witnesses were viewing a

21    lineup, or a photo array, for that matter, where the

22    people in the lineup or the photo array had a similar

23    hairstyle that they had when the crime occurred?

24              MR. STEFANICH:  Objection.  Form.

25         A.   No.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    BY MR. STARR:

2        Q.    Would you do anything in a situation like that

3    to make sure that the witnesses were viewing a photo

4    array, or a lineup, that had people in it who had

5    similar facial hair that the suspect had in the

6    beginning?

7            MR. STEFANICH:  Objection.  Form.

8        A.    No.

9    BY MR. STARR:

10       Q.    Did you understand that last question?

11       A.    I believe so.

12       Q.    Okay.  It was kind of poorly phrased.

13   Were there any policies or regulations that you were

14   aware of in 2002 regarding how to conduct a lineup?

15       A.    I'm sure there were.  I don't recall them

16   specifically.  It must -- I'm sure we were trained at

17   the academy somewhat and, of course, you'd learn from

18   other detectives.

19       Q.    And then the -- if there were any policies

20   that governed how you could or could not conduct a

21   lineup in 2002 -- in 2002, would you have been aware of

22   them?

23       A.    Yes.

24       Q.    And would you have adhered to them?

25       A.    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q.   Do you have any recollection, during your time

2 as a Chicago Police detective, ever inquiring about what

3 the policies were regarding any kind of investigation or

4 investigative tax -- tasks?

5     A.   Inquiring, yes.

6     Q.   So I just -- let me rephrase the question.

7 As a detective, did you ever ask any supervisor or seek

8 out any source to find out what the policies were

9 regarding the work that you were doing?

10     A.   I mean, we'd -- we'd confer with supervisors

11 regarding the cases we did, but I'm not sure what you're

12 asking me.

13     Q.   So there were policies in place during your

14 tenure as a Chicago Police detective, correct?

15     A.   Yes.

16     Q.   And those policies dictated the things that

17 you were expected to do, correct?

18     A.   Some of them were, yes.

19     Q.   And those policies -- some of those policies

20 dictated the things you were not allowed to do, correct?

21     A.   Probably.

22     Q.   And some of those policies dictated how you

23 were supposed to do your job, correct?

24     A.   Well, that's -- that's what training is,

25 how to do your job.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.    Training is a separate, I think,

2    consideration.  I'm asking specifically about policies

3    governing the work you did as a detective.  You are

4    generally aware that there were policies in place that

5    governed how -- the work you did as a detective,

6    correct?

7    A.    I assume there were.  I don't know the --

8    the -- the specific directives or general orders

9    or -- that -- that would've applied to that.

10    Q.    Okay.  But you were aware that there were

11    general orders and there were directives during your

12    time as a detective that applied to you, right?

13    A.    It applied to the detective division, yes.

14    Q.    Okay.  Did you ever have an occasion where you

15    sought out, either through a supervisor or other means,

16    to find out what those specific policies were?

17    A.    Well, I -- I -- I can only think of one

18    that -- which applies to this case, as far as when

19    there's an attorney present for a lineup, what should be

20    done. And I know at some point, we were -- we were told

21    that the attorney should stand on the side with the

22    participants in the lineup and not in the room with

23    witnesses.

24    Q.    Do you have an independent recollection of

25    that?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Video Deposit Documentation Schiro: 04/06/23 Page 172 2023

170

```
 1        A.    Yes.
 2        Q.    Okay.  So you have an independent recollection
 3   of being told that an attorney should stand with the
 4   witnesses in this particular case?
 5        A.    Not in --
 6             MR. STEFANICH:  Objection.
 7        A.    Not in this particular -- sorry.
 8             MR. STEFANICH:  Yeah.  I think it misstates his
 9        prior testimony.  Okay.  You can answer.
10        A.    Not in this particular case, but in another
11   case.
12   BY MR. STARR:
13        Q.    Okay.  Because I thought -- I mean, I can have
14   him read it back, but I thought you said it was in this
15   case.  It wasn't in this case that you recall that?
16        A.    Well, I'm just saying it applies to this case
17   because there was an attorney present.
18        Q.    Okay.  So just -- I want it to just be clear.
19   So what is your independent recollection of what you're
20   testifying to regarding seeking out policies regarding
21   attorneys being present during lineups?
22        A.    That the attorney should stand with their
23   client and the participants in the lineup in that room
24   and not in the room where witnesses are viewing.
25        Q.    Okay.  And what is your independent
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    recollection of who you asked about that issue?

2       A.   We were told that by a sergeant, Sergeant

3    Keough.

4       Q.   How do you spell that name?

5       A.   K-E-O-U-G-H, I believe.  Thomas Keough.

6       Q.   And that was not in the Willie Sorrell

7    investigation?

8       A.   No, it was a different case.

9       Q.   What case was that in?

10      A.   I don't remember, but I remember being told

11   that.

12      Q.   And are you -- you're -- you have an

13   independent recollection that it was specifically a

14   different case and not this case, correct?

15      A.   Yes.

16      Q.   Was it before the Willie Sorrell case,

17   or after the Willie Sorrell case?

18      A.   Before.

19      Q.   And you have a specific independent

20   recollection of this case being before the Willie

21   Sorrell case?

22      A.   Yes, because I knew that when this

23   circumstances came up, that's what we were supposed to

24   do.  We were supposed to put this attorney in the lineup

25   with their client.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.    Okay.  And you asked the Sergeant Keough and

2    they just -- he just orally gave you the policy, or how

3    did the -- you -- how did it go about that you

4    understood what the policy was?

5    A.    Orally from him.

6    Q.    Okay.  Any other circumstances that you can

7    recall seeking out clarification on what the policy was

8    as it applied to the detectives, during your tenure as a

9    Chicago Police detective?

10    A.    You know, I don't -- that's a very general

11    question.  I don't -- I don't understand -- I don't

12    remember anything in particular.

13    Q.    Do you recall ever reading a policy, during

14    your time as a Chicago Police detective, that applied to

15    your work as a Chicago Police detective?

16    A.    Well, I mean, over many years, I've read

17    department -- department directives that come out. What

18    specifically is said, though, I don't remember.

19    Q.    Okay.  When you read department

20    detective -- directives that come out, what is

21    this -- what kind of context would you read those in?

22    A.    What kind of context would I read in?  I don't

23    understand that question.

24    Q.    Yeah.  So I think my understanding is that, if

25    a policy gets updated, they -- in the past, would give

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Fred Deposite Documentation Schedule 04/09/25 Page 175-2023

1   you a hard copy of that update; is that correct?

2       A.   Hard copies were available.  We might -- we

3   might also be instructed at roll calls by supervisors.

4       Q.   Okay.  So you might -- be orally instructed by

5   supervisors, or you may receive an actual physical copy

6   of the policy updates?

7       A.   Or both.

8       Q.   Okay.  Any other circumstances that you can

9   recall reading a policy as it applied to your work as a

10  Chicago Police detective, during your tenure as a

11  detective?

12      A.   I'm sure there are.  I -- I've read department

13  general orders and special orders and detective

14  directives and everything else they put out, but I don't

15  remember any -- what specifically I read.

16      Q.   Okay.  And the policy that governed lineups in

17  1995, do you have any recollection of it being different

18  in 2002?

19      A.   No.

20      Q.   And if there was a policy in place, you

21  would've conformed to that policy in '95 and 2002,

22  correct?

23      A.   Yes.

24      Q.   Regarding a lineup, specifically, if you

25  brought someone down to view a lineup, a witness to view

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  a lineup, and they told you at the station that they

2  didn't think they could identify anyone, would you still

3  show them the lineup?

4        MR. STEFANICH:  Objection.  Form.

5     A.   Well, it depends what they had said previously

6  and -- and whether they were willing to look at a

7  lineup.

8  BY MR. STARR:

9     Q.   If they were willing to look at a lineup but

10 they told you they couldn't identify anyone, would you

11 ask them to sit and view a lineup?

12       MR. STEFANICH:  Objection.  Form.

13    A.   If they said they previously could identify

14 someone and -- and now they don't think they can,

15 I'd probably ask them to look at the lineup.

16 BY MR. STARR:

17    Q.   Okay.  So in a circumstance where a witness

18 had previously indicated that they saw the suspect, and

19 they could potentially identify the suspect, but then in

20 the future, was indicating that they could no longer

21 identify the suspect, you'd still want them to look at

22 the lineup to see whether or not they could identify

23 them, correct?

24       MR. STEFANICH:  Objection.  Form.

25    A.   Again, it depends what they say, what the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   reason is now they felt that they can't identify.

2   BY MR. STARR:

3       Q.   Well, what if -- what if a witness had

4   previously indicated that they saw the suspect and

5   thought they could identify the witness, but then in the

6   future, were just indicating they didn't think they

7   could identify the suspect?  Would you still show them a

8   lineup?

9           MR. STEFANICH:  Objection.  Form.

10      A.   Again, it's -- it's an individual person,

11  individual case.  You'd have to make a -- a judgment

12  call at the time.  It's possible you would, if they're

13  willing to do it.

14          MR. STARR:  Anyone need a break?  Let's go off

15      the record.  What do you want to do for lunch?

16      I'll wait for the record to go off.

17          THE VIDEOGRAPHER:  We are going off the record.

18      The time is 1:23 p.m.

19              (OFF THE RECORD)

20          THE VIDEOGRAPHER:  We are going on the record.

21      The time is 2:17 p.m.

22  BY MR. STARR:

23      Q.   All right, Mr. Schalk.  I believe I

24  asked -- you had began your participation in the Sorrell

25  investigation in 1995.  Do you know what month it was?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.    I believe the report says March.

2    Q.    Okay.  But you don't have any independent

3  recollection of the beginning of that, correct?

4    A.    No.

5    Q.    All right.  Do you know how many witnesses

6  there were to the Willie Sorrell shooting?

7    A.    There were four.

8    Q.    Do you know what witnesses police interviewed

9  in 1990, in the Willie Sorrell shooting?

10    A.    I -- I believe they interviewed all four

11  witnesses.

12    Q.    Okay.  And did you and Detective Bogucki

13  interview those four witnesses as well?

14    A.    At different times, yes.

15    Q.    Okay.  When you say different times, do you

16  mean you and Detective Bogucki both interviewed them

17  separately, or do you mean you interviewed them not

18  altogether?  What do you mean by that exactly?

19    A.    Well, we -- we interviewed them on different

20  dates.

21    Q.    And those witnesses would be Edward Cooper,

22  Sheenee Friend, Emmitt Wade, and Terry Rogers, correct?

23    A.    Yes.

24    Q.    All right.  Did you and Detective Bogucki

25  interview all four of those people together?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       A.    No.

2       Q.    Did you ever interview any of those four

3   witnesses outside of Detective Bogucki's presence?

4       A.    I don't believe so.

5       Q.    Okay.  Did Detective Bogucki interview any of

6   those four witnesses outside of your presence?

7       A.    No.

8       Q.    So when I asked you if you and Detective

9   Bogucki interviewed all four witnesses together and you

10  said no, what did you mean?

11      A.    Did -- we didn't -- didn't interview the four

12  witnesses at the same time.  Myself and Detective

13  Bogucki interviewed each witness, but each witness

14  separately.

15      Q.    Okay.  Separate from one another --

16      A.    One another, right.

17      Q.    -- the two -- four witnesses, right?

18      A.    Yes.

19      Q.    But each of the interviews with the four

20  witnesses were conducted by both you and Detective

21  Bogucki --

22      A.    Yes.

23      Q.    -- together with the witness, correct?

24      A.    Yes.

25      Q.    All right.  And you said you don't -- you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   don't know whether Detective Bogucki interviewed anyone
 2   outside of your presence?
 3        A.   I don't believe he did.
 4        Q.   Okay.  Do you know what witnesses Detective
 5   Noradin interviewed during the Sorrell investigation?
 6        A.   You know, I don't.  He would've been working
 7   with us, but he was in a different day off group, so
 8   some days he'd be -- whenever he was working, he was
 9   with -- when we were working, we were together, but
10   there's the days off, we'd be off, and days when he'd be
11   off, so I'm not sure when he was present for any of the
12   -- the interviews.
13        Q.   How do you know that he was in a different day
14   off group than you?
15        A.   I remember that.
16        Q.   You have an independent recollection of the
17   fact that Detective Noradin had a different day off
18   group than you and Detective Bogucki?
19        A.   Yes.
20        Q.   Okay.  Do you know if Sergeant Wojcik
21   interviewed any of the witnesses to the Willie Sorrell
22   shooting?
23        A.   No, he didn't.
24        Q.   How do you know that?
25        A.   Because if he did, there'd be a -- a report on
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  it.

2      Q.   So since there's no report indicating that
3  Detective -- Sergeant Wojcik interviewed any of the
4  witnesses, there's no reason for you to believe that he
5  did?

6      A.   Correct.

7      Q.   You don't know one way or another though, if
8  he did?

9      A.   Well, as I said, a report would indicate if he
10 had anything to do with the case, other than approving
11 the -- the report once it's submitted.

12     Q.   Okay.  But other than -- other than your
13 review of the report, you have no other basis to say
14 that he, in fact, did not participate in any interviews,
15 correct?

16     A.   I don't recall the interviews themselves, so
17 no, but as I said, there would've -- if he was involved
18 at all, his involvement would've been documented.

19     Q.   Did any Black detectives work in Area 5 in
20 2002?

21     A.   I'm sure there were.  I don't recall exactly
22 who, though.

23     Q.   Can you recall any specific Black detective
24 working in Area 5 in 2002?

25     A.   Again, I don't know.  In 2002, I can't say



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
1  specifically.
2       Q.   Do you recall any Black detectives working in
3  Area 5 at all during your tenure?
4       A.   Yes.
5       Q.   Can you tell me any of their names?
6       A.   There was a Detective Crothers (phonetic) and
7  a Detective Perkins (phonetic), I believe.  I'm trying
8  to think who else.  There's more.  And there's property
9  -- property crimes had some -- had some Black detectives
10 too, but those are the two I can recall. They worked on
11 some homicides.  That's all I can remember right now.
12      Q.   Okay.  So during your entire tenure as an Area
13 5 detective, the only two detectives that you recall
14 working in Area 5 who were black, are Detective Crothers
15 and Detective Perkins, correct?
16      A.   Those are the only two I can name.  There were
17 others, but those are the only two I can name.
18      Q.   Do you know -- do you have an estimate of how
19 many others there were besides those two?
20      A.   I don't.
21      Q.   All right.  So I asked you about the four
22 witnesses.  Do you have any independent recollection of
23 the witness Emmitt Wade?
24      A.   No.
25      Q.   Do you know what Emmitt Wade looks like?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.   No.

2      Q.   Do you know how you came to meet Emmitt Wade?

3      A.   I -- we were looking to interview him and we

4 were able to obtain a -- a -- a new home address on him.

5      Q.   Where did you obtain a new home address from?

6      A.   I believe the report indicates that we

7 contacted a Sergeant Manos of the fugitive -- I believe

8 it was the fugitive apprehension unit, and he was able

9 to provide us with that address.

10     Q.   Was Emmitt Wade a fugitive when you were

11 looking for him?

12     A.   No.

13     Q.   And you know this information from reviewing

14 the reports, correct?

15     A.   Correct.

16     Q.   Do you know why Sergeant Manos was able to

17 obtain his address and you were not?

18     A.   I don't know how he did that.

19     Q.   Do you know how it came to be that you asked

20 the fugitive -- I'm sorry.  What did you say it was

21 called?

22     A.   Fugitive apprehension unit.

23     Q.   Do you know how it came to be that you asked

24 the fugitive apprehension unit for this man's address?

25     A.   Well, Sergeant Manos used to work at Area 5,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  so we were familiar with him. And I'm sure that's -- I

2  don't remember doing it, but that would be the reason we

3  contacted him.

4      Q.  **And you were unable to find his address, so**

5  **you went to an outside source, Sergeant Manos, correct?**

6      A.  Apparently, everything we had was old

7  addresses.

8      Q.  **When did you interview Emmitt Wade?**

9      A.  That was in March of '02.

10      Q.  **When did you start looking or seeking to find**

11  **Emmitt Wade?**

12      A.  We -- we first wanted to -- to find him after

13  speaking with Terry Rogers in February of '02. We

14  wanted to find all the other witnesses.

15      Q.  **So you began to look for Emmitt Wade in**

16  **February of '02?**

17      A.  Correct, and Sheenee Friend and -- and Edward

18  Cooper.

19      Q.  **Did you attempt to find Emmitt Wade in 1995?**

20      A.  I don't believe so.

21      Q.  **Why not?**

22      A.  Well, the report doesn't indicate that we

23  didn't put a -- a stop order on him. If I -- I believe

24  we first wanted to speak with Terry Rogers.

25      Q.  **Okay. Again, I understand the report doesn't**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    indicate it.  Do you know why you did not seek to locate
 2    Mr. Wade starting in 1995?
 3         A.    Well, I can assume why we didn't.
 4         Q.    What's your assumption?
 5         A.    That we first wanted to talk to Terry Rogers.
 6         Q.    Why do you have that -- and why do you make
 7    that assumption?
 8         A.    Because he's -- well, we put a stop order in
 9    on him.  He was -- he apparently hadn't been interviewed
10    since 1990, and he was the one who brought up the name
11    of Fletcher as one of the offenders.
12         Q.    Okay.  So how does the fact that Terry Rogers
13    had not been interviewed since 1990 and he came up with
14    the name Fletcher, indicate to you that you wanted to
15    interview him before you interviewed Emmitt Wade?
16         A.    Well, seeing he came up with that information,
17    he seemed like a -- a very important witness to -- to
18    re-interview.
19         Q.    Terry Rogers?
20         A.    Yes.
21         Q.    Okay.  But why would that inhibit you from
22    seeking to interview Emmitt Wade as well?
23              MR. STEFANICH:  Objection.  Form.
24         A.    Well, at that point, we just felt Terry Rogers
25    was the one to speak to.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1   BY MR. STARR:

 2        Q.   Okay.  So did you also just testify that you

 3   first began looking for Sheenee Friend in February of

 4   2002?

 5        A.   Yes.

 6        Q.   Okay.  Why did you wait till February of 2002

 7   to attempt to locate Sheenee Friend?

 8        A.   Well, again, we wanted to re-interview Terry

 9   Rogers and put the stop order on him.  Obviously, there

10   were other cases in all those years to work on and

11   continue with, but it seemed like Terry Rogers was the

12   key one to interview first.

13        Q.   So is it your testimony that one of the

14   reasons you waited until 2002 to interview, or seek to

15   interview Sheenee Friend, is because you had a lot of

16   other cases?

17             MR. MICHALIK:  Objection.

18        A.   Well -- well, we -- obviously, in those years

19   we moved on to other things, but the main reason we

20   didn't was we felt that Terry Rogers was the first one

21   that we needed to talk to.

22   BY MR. STARR:

23        Q.   But when you're investigating a cold case, is

24   time not of the essence?

25        A.   Well, I would say time is more of the essence

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   of a fresh case, but you prioritize the things you --
 2   you feel are the most important, and that's what we felt
 3   was most important.
 4        Q.   That's fair.  But my question is, in -- when
 5   you're investigating a cold case, is time not of the
 6   essence, meaning, isn't it important that you do
 7   whatever you're going to do in the investigation as soon
 8   as possible because the longer you wait, the older the
 9   cold case is?
10           MR. STEFANICH:  Objection.  Form.
11        A.   Again, I don't -- I don't consider the time
12   factor that important in cold cases, as much as -- as in
13   fresh cases.
14   BY MR. STARR:
15        Q.   Right.  And I just -- I'm not trying to
16   differentiate cold cases and fresh cases.  I understand
17   that you were, in your answer, doing that, but my
18   question is just about cold cases.  So when you're
19   investigating a cold case and the case is five years
20   old, and you start -- you get added to the case after
21   it's five years old, isn't it important to try to
22   investigate as much as possible, and to eliminate any
23   leads as early as possible, because the longer you wait,
24   the longer you'll be from the crime?
25           MR. STEFANICH:  Objection.  Form.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of DETECTIVE JOHN SCHLEPER, taken on May 28, 2023

```
 1        A.   You do what you can, you know?  You --
 2   you -- you follow up what -- what you feel is the most
 3   important things to do first and -- and you have other
 4   cases to -- to do also.  Terry Rogers was -- was on our
 5   list to do first.
 6   BY MR. STARR:
 7        Q.   When you get asked -- you get assigned to a
 8   cold case, your intention is to try to solve that case
 9   if possible, correct?
10        A.   Certainly.
11        Q.   Okay.  And so when you're assigned a cold
12   case, is it not important to, as you previously
13   testified, review the file as soon as you get assigned
14   the cold case?
15        A.   Well, that would be the first thing to do.
16        Q.   And you review it in its entirety, correct?
17        A.   Yes.
18        Q.   And then you testified previously the next
19   thing you do is re-interview the witnesses, correct?
20        A.   Well, every case is different, but that's
21   certainly a -- a possibility as the next thing to do.
22        Q.   Well, that's what you testified you would do?
23        A.   Probably.
24        Q.   Okay.  So my question is, if you got assigned
25   a cold case in 1995, why did you wait until 2002 to
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   interview two of the eyewitnesses?
 2            MR. STEFANICH:  Objection.  Asked and answered.
 3       You can answer again.
 4       A.   Well, again, we wanted to interview Terry
 5   Rogers first.
 6   BY MR. STARR:
 7       Q.   Why did you think it was important to
 8   interview Terry Rogers before you interviewed any of the
 9   other eyewitnesses?
10            MR. STEFANICH:  Objection.  Asked and answered.
11       You can answer again.
12       A.   Again, because -- because of his original
13   statement naming Fletcher as an offender.
14   BY MR. STARR:
15       Q.   Did you -- did you interview Terry Rogers
16   before you interviewed Edward Cooper?
17       A.   Yes.
18       Q.   You interviewed him --
19       A.   Well, no.  I'm sorry.  I spoke with first
20   Edward Cooper back in '92 --
21       Q.   Sure.  Sure.
22       A.   -- in '95.
23       Q.   Okay.  So you initially interviewed -- based
24   on the -- your review of the reports, you initially
25   interviewed Edward Cooper in 1995, correct?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-7 Filed: 05/06/25 Page 190 of 336 PageID #:4963
Vac Deposit Dube in various schedule dates 190-203
188

1      A.    Yes.

2      Q.    So you interviewed Edward Cooper before you

3  interviewed Terry Rogers, correct?

4      A.    Yes.

5      Q.    Okay.  So why did you choose to interview

6  Edward Cooper before you interviewed Terry Rogers?

7      A.    I believe we couldn't find Terry Rogers, so we

8  did find Edward Cooper.

9      Q.    Okay.  But you didn't seek to find either

10  Sheenee Friend or Emmitt Wade until 2002, correct?

11      A.    No.  In -- in '95, we had the Fletcher Clinton

12  photograph.  We showed Edward Cooper that photo array,

13  and -- and he made no identification from them.  So

14  there -- there was no need to show that photo array to

15  the other witnesses.

16      Q.    So you showed -- it's -- based on your review

17  of the reports, it's your understanding that in 1995,

18  you showed a photo array to Edward Cooper that included

19  a photograph of Fletcher Clinton, correct?

20      A.    Yes.

21      Q.    And he didn't identify anybody in that photo

22  array, correct?

23      A.    That's -- that's correct.

24      Q.    And because he didn't identify anyone in that

25  photo array, you chose not to show that photo array to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  the other witnesses?

2      A.   Yes.

3      Q.   Why was that a good investigative decision?

4          MR. MICHALIK:   Object to the form.

5      A.   Because we believed that he wasn't the

6  offender.

7  BY MR. STARR:

8      Q.   Based on one person's inability to identify

9  him?

10     A.   Yes.

11     Q.   Okay.  What did Edward Cooper tell you?

12     A.   This -- this is -- this is the witness who got

13 robbed, who saw them face to face, who chased after

14 them.  So yes, he was an important witness.

15     Q.   Right.  And Sheenee Friend was also part of

16 that robbery, wasn't she?

17     A.   Yes, she was.

18     Q.   So why didn't you seek to interview Sheenee

19 Friend until 2002?  Why did you wait that long?

20         MR. STEFANICH:   Objection.  Asked and answered.

21     A.   Just didn't feel that that -- we wanted to do

22 that at that point.

23 BY MR. STARR:

24     Q.   Okay.  Why didn't you show the photo array

25 that allegedly included Fletcher Clinton to Sheenee

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   Friend in 1995?
 2            MR. STEFANICH:  Objection.  Asked and answered.
 3       A.   We didn't feel he was a suspect any longer.
 4   BY MR. STARR:
 5       Q.   Based on Edward Cooper's negative
 6   identification?
 7       A.   Yes.
 8       Q.   Okay.  Did -- have you ever worked on any
 9   other cases where you did a photo array, and one person
10   made a negative identification, and then you didn't show
11   anyone else -- strike that.  It's -- strike that. Did
12   you ever -- have you ever worked on any other cases
13   where you showed one witness a photo array, they were
14   not able to make identification, and then you showed
15   that same photo array to another witness who was?
16       A.   I don't recall specifically.  That's very
17   possible.
18       Q.   Is it possible that Sheenee Friend could have
19   viewed the 1995 photo array and identified someone out
20   of that photo array?
21            MR. STEFANICH:  Objection.  Foundation.  You
22       can answer.
23       A.   Is it possible?  Anything's possible.
24   BY MR. STARR:
25       Q.   Well, the only way we'd know is if you showed
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   her the photo array, correct?

2       A.   Yes.

3       Q.   But you didn't do that?

4       A.   No.

5       Q.   Okay.  Is it possible that Emmitt Wade could

6   have identified somebody in the 1995 photo array?

7           MR. STEFANICH:  Objection.  Foundation.

8           MR. MICHALIK:  And form.

9       A.   Well, apparently not, because he said he

10  didn't see faces.

11  BY MR. STARR:

12      Q.   But you didn't show Emmitt Wade the 1995 photo

13  array, correct?

14      A.   No, I didn't.

15      Q.   So you don't know whether or not he would have

16  identified anyone, correct?

17      A.   I don't know.  I don't know what he would have

18  done.

19      Q.   So when you were interviewing Emmitt Wade in

20  2002, did he tell you that he could identify the

21  offender involved in the Sorrell shooting?

22      A.   No.  He said he didn't see faces.

23      Q.   And do you have an independent recollection of

24  that?

25      A.   No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.    And you know that how?

2    A.    From the report.

3    Q.    Did you ask Emmitt Wade why he previously said

4    he might be able to identify both defenders?

5    A.    I don't know that he did say that.

6    Q.    Well, you said you reviewed the reports when

7    you first were assigned the cold case in 1995, correct?

8    A.    Yes.

9    Q.    And you said you read them in their entirety,

10   correct?

11   A.    Yes.

12   Q.    And you said that was a very important part of

13   working on a cold case, is knowing what the other

14   investigators and the other detectives had done in their

15   investigation, correct?

16   A.    Yes.

17   Q.    And so if the other police had investigated

18   the case in 1990, and there was police reports that

19   reflected that Emmitt Wade had previously said that he

20   thought he could identify the offenders, you would have

21   known that, correct?

22   A.    I don't believe the reports say that.

23   Q.    If that was in fact the case, you would have

24   known that, correct?

25   A.    If -- if that was written --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MR. STEFANICH:  Objection.
 2         A.   -- on the report --
 3              MR. STEFANICH:  Objection.  Form.  Sorry --
 4         objection.  Form.  You can go ahead.
 5         A.   If that was written on the report, I would
 6    have known it.
 7    BY MR. STARR:
 8         Q.   Okay.  And so if the reports indicated that
 9    Terry Wade -- sorry, strike that.  If the reports
10    indicated that Emmitt Wade believed he could have
11    identified the offenders, would you have asked him why
12    he previously said that in 2002, when you were
13    interviewing him?
14              MR. STEFANICH:  Objection.  Form.
15         A.   I might have.
16    BY MR. STARR:
17         Q.   Would it be a good practice habit to confront
18    him and say, you previously said you could identify
19    them, why can you not identify them now?
20              MR. MICHALIK:  Object to form.
21         A.   I probably would have asked him that, yes.
22    BY MR. STARR:
23         Q.   Should you have asked him that?
24         A.   Maybe I did.  I don't recall.
25         Q.   Okay.  Should you have asked him that?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.    But I don't believe he said that initially.

2    Q.    Okay.  I understand you don't recall, but I'm

3  asking you, do you think you should have asked Emmitt

4  Wade that question?

5    A.    Well, again, I don't believe the initial

6  report says he said, I can identify somebody.  So there

7  would be no need for me to ask that question.

8    Q.    If the initial report said that Emmitt Wade

9  thought he could identify the two offenders, should you

10  have asked him in 2002, why he could no longer do so?

11    A.    Well, he didn't say that, so why should I?

12    Q.    I'm asking you, if they -- if the reports

13  indicated that Emmitt Wade in 1990 thought he could

14  identify the offenders, would it be important for you as

15  a detective investigating a cold case, when you

16  interviewed him in 2002, to ask him, why can you no

17  longer identify them?

18         MR. STEFANICH:  Objection.  Form.

19    A.    It would probably have been the part of the

20  interview with him.

21  BY MR. STARR:

22    Q.    Should you have asked that question?

23         MR. MICHALIK:  Form.

24         MR. STEFANICH:  Objection.  Form.

25    A.    Well, no, because he didn't say that



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    originally.

2    BY MR. STARR:

3        Q.    Okay.  What did Emmitt say -- what did -- what

4    did Emmitt say -- Emmitt Wade say in 1990, when he was

5    interviewed --

6        A.    I'd have to --

7        Q.    -- regarding what you view --

8        A.    I'd have to look at the report.

9        Q.    Okay.  And do you have any independent

10   recollection of whether or not you believe that what

11   Emmitt Wade was telling you in 2002 was truthful?

12       A.    I believe he was.

13       Q.    Do you have any independent recollection of

14   believing that?

15       A.    No.

16       Q.    Why do you believe that now?

17       A.    Well, because of what my report indicates, and

18   because we brought the state's attorney out to interview

19   him too, and she didn't -- she didn't have us do

20   anything further with Emmitt Wade, as -- as far as

21   showing photos or doing lineups.  So she believed him

22   too, obviously.

23       Q.    Did you show Emmitt Wade a photo array in

24   2002?

25       A.    No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   But you don't have any independent

2  recollection of that interview, correct?

3    A.   No.  But if -- if I had shown the photos, then

4  the report would have indicated that.

5    Q.   Right.  But you can't say -- other than the

6  report, you can't say one way or the other whether or

7  not you showed Emmitt Wade any photos in 2002?

8    A.   I don't remember anything about the interview.

9    Q.   Okay.  So you conducted a photo array in 1995

10  that was negative, correct?

11    A.   Yes.

12    Q.   And then you conducted one in 2002 that was a

13  positive identification of Mr. Fletcher; is that

14  correct?

15        MR. STEFANICH:  Objection.  Form.

16    A.   Yes, from Terry Rogers and Sheenee Friend.

17  BY MR. STARR:

18    Q.   And Terry Rogers was the first one to

19  positively identify --

20    A.   Yes.

21    Q.   -- Mr. Fletcher?  Okay.  And then the third

22  one that you -- the third person you interviewed

23  was -- strike that.  What is the sequence of interviews,

24  as you understand it, with -- in 2002?

25    A.   Terry Rogers, then Edward Cooper.  And I

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  believe that was the same day or the day after.  And

2  then sometime later, Sheenee Friend, and sometime after

3  that, Emmitt Wade.

4      Q.   Okay.  And you showed Terry Rogers the photo

5  array, correct?

6      A.   Yes.

7      Q.   And then you showed Edward Cooper the photo

8  array, correct?

9      A.   Yes.

10      Q.   And then you showed the photo array to Sheenee

11  Friend?

12      A.   Yes.

13      Q.   But you didn't take the photo array when you

14  went out to interview Emmitt Wade?

15      A.   We -- there's -- we probably had it with us,

16  but we didn't show anything to him.

17      Q.   Okay.  So you may have taken the photos with

18  you, but you don't -- you don't have any recollection of

19  whether you showed it to him or not, correct?

20          MR. STEFANICH:  Objection.  Misstates his

21      testimony.

22      A.   Yeah.  I don't have any recollection of the

23  interview at all.

24  BY MR. STARR:

25      Q.   Okay.  If Emmitt Wade -- if you had shown the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  photo array to Emmitt Wade, and he had told you that he

2  could not identify anyone in the photo array, would you

3  have documented that?

4      A.   Yes.

5      Q.   After you showed Edward Cooper the photo array

6  in 1995, was there any reason to show Terry Rogers the

7  same photo array?

8          MR. STEFANICH:  Objection.  Form.  You can

9      answer.

10     A.   I don't believe so, no.

11 BY MR. STARR:

12     Q.   So is it -- was it your practice when you had

13 multiple witnesses in a case, if you showed the first

14 witness a photo array and they were not able to make

15 identification, you wouldn't show any of the other

16 witnesses the photo array?

17     A.   Every case is different, but in this case,

18 that's the way we felt.

19     Q.   So did you have a practice regarding that

20 circumstance where you had multiple witnesses, and you

21 show the first witness a photo array, and they're unable

22 to make an identification?  Did you have a practice as

23 to what you would do in that certain situation?

24          MR. MICHALIK:  Object to form.

25     A.   Not a practice.  Every case is different.  We

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   made decisions on a case-by-case basis.
 2   BY MR. STARR:
 3        Q.   Okay.  Was there anything prohibiting you from
 4   showing any of the other witnesses the same 1995 photo
 5   array that you showed Edward Cooper?
 6        A.   No.
 7        Q.   Once you had the other witnesses, once you
 8   were in contact with the other witnesses in 2002, did
 9   you show them the photo array that you showed Edward
10   Cooper in 1995?
11        A.   No.
12        Q.   Why not?
13        A.   Well, number one, we ruled him, Fletcher
14   Clinton, out as a suspect, and the other people in the -
15   - that were in the photo array, we didn't even have
16   their photos anymore.
17        Q.   How did you rule Fletcher Clinton out as a
18   suspect?
19        A.   Well, as I said, because Edward Cooper didn't
20   identify him.
21        Q.   Do you have any -- strike that.  Did Edward
22   Cooper tell you that he wasn't sure if he could identify
23   someone in 1995?
24        A.   No, he didn't say that.
25        Q.   Okay.  So prior to showing him a photo array,
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    he did not indicate to you that he wasn't sure about
 2    whether or not he could make an ID, correct?
 3           MR. STEFANICH:  Objection.  Asked and answer.
 4       A.   He didn't say that.  No.
 5    BY MR. STARR:
 6       Q.   Would you have documented that if he had said
 7    that?
 8       A.   Yes.
 9       Q.   How would you have documented that?
10       A.   How?  I would put that in the report.
11       Q.   Okay.  When Emmitt Wade told you that he could
12    not identify any of the suspects, did you do anything to
13    confirm that?
14       A.   I don't know what you would mean by confirming
15    that.  Going by what he was telling me, that he didn't
16    see any faces.
17       Q.   So Emmitt Wade told you in 2002 that he didn't
18    see any faces?
19       A.   He told us, and he also told the state's
20    attorney that.
21       Q.   Isn't it possible that if you could -- strike
22    that.  Isn't it possible that showing Emmitt Wade the
23    photos would have refreshed his recollection?
24           MR. STEFANICH:  Objection.  Form.  Foundation.
25       A.   Not if he's saying he didn't see faces.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

BY MR. STARR:

Q.   So that's the cutoff for you, the fact that he says he didn't see faces in 2002, right?

MR. STEFANICH:  Objection.  Form.

A.   No.  I believed it wasn't necessary to show photos after he said that.

BY MR. STARR:

Q.   Okay.  Because earlier, I asked you about all these other scenarios where, you know, someone's memory might be compromised, or they might have -- they might have -- time might have elapsed, and you said that in those circumstances, you would -- generally, would try to show them photos to see if it could refresh their recollection.  Here you didn't do it because Emmitt Wade specifically said he never saw the faces, right?

A.   Right --

MR. STEFANICH:  Objection.  Form.  Sorry.  You can answer.

A.   Right.  He -- he -- he didn't say he has a memory loss.  He says he didn't see faces.

BY MR. STARR:

Q.   Okay.  Is there any other reason why you didn't show the photos to Emmitt Wade?

A.   That would be the reason.  He couldn't possibly identify anybody.  And obviously, the state's

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   attorney didn't show him photos either.

2       Q.   Why did you call the state's attorney up to

3   talk to Emmitt Wade if he told you he didn't -- he

4   didn't see the suspects' faces?

5       A.   Just --

6           MR. STEFANICH:  Objection.  Form.  You can

7       answer.

8       A.   The state's attorney wants -- before they

9   charge anybody, they want us to talk to all the

10  witnesses.  That was one that hadn't been talked to yet.

11  BY MR. STARR:

12      Q.   So when you were -- you called the state's

13  attorney when you were in -- at Emmitt Wade's residence?

14  Where were you?

15          MR. STEFANICH:  Objection.  Form.

16      A.   Well, the report indicates we went back with

17  the state's attorney about three or four days later, so

18  I must have had -- make arrangements with that

19  state -- state's attorney whenever she was available to

20  go out there with us.

21  BY MR. STARR:

22      Q.   Did you take the photo array with you the

23  second time you went to visit Emmitt Wade?

24      A.   I don't recall.

25      Q.   Did the state attorney take a statement from

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Emmitt Wade?

2        A.    No.

3        Q.    Do you know why not?

4        A.    That's their decision totally, of whether they

5    take a statement or don't.

6        Q.    As part of your practice as a homicide

7    detective interviewing case -- interviewing in

8    homicides, did you ever recommend a state's attorney

9    take a statement from a witness?

10       A.    No.  Again, that's their decision.

11       Q.    Do you have any independent recollection of

12   Sheenee Friend?

13       A.    No.

14       Q.    Do you know what she looks like?

15       A.    No.

16       Q.    Do you have any independent recollection of

17   anything she said to you or you said to her?

18       A.    No, I don't.

19       Q.    Did Sheenee Friend tell you that she could

20   identify any of the offenders involved in the Sorrell

21   shooting?

22       A.    Well, obviously, she did identify James

23   Fletcher.

24       Q.    Did she tell you that she could identify both

25   offenders, or just one offender?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.   I don't recall what she said specifically.

2    Q.   **Did you ask Sheenee Friend in 2002 why she had**

3 **previously told police that she had seen the suspect**

4 **around the area of the shooting?**

5    A.   Why she told police she said --

6    Q.   **Yeah.**

7    A.   I -- I don't know why.  I would have to ask

8 her why she said that.

9    Q.   **Did you ask her if she had previously said**

10 **this?**

11   A.   I don't remember what I've asked her.  I mean,

12 the -- the report indicates her whole statement or the

13 summary of the -- the account she gave us and the

14 state's attorney.

15   Q.   **Did you do anything to corroborate what**

16 **Sheenee Friend was telling you?**

17   A.   Interviewed all the witnesses.

18   Q.   **Anything else?**

19   A.   No.  I mean, showed her a photo array, showed

20 her a lineup, had her speak with the state's attorney,

21 gave a -- gave a handwritten statement to the state's

22 attorney.

23   Q.   **Where did you interview Sheenee Friend at?**

24   A.   I believe at Area 5.

25   Q.   **And after your interview with her, is that**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   when you called the state's attorney to interview her?

 2        A.   Yes.

 3        Q.   Okay.  Did you recommend to the state's

 4   attorney that the state's attorney should take a

 5   statement from Sheenee Friend?

 6        A.   No.  That's totally her decision.

 7        Q.   And you also testified that you know that one

 8   of the witnesses' name is Terry Rogers, correct?

 9        A.   Yes.

10        Q.   Do you have any independent recollection of

11   Terry Rogers?

12        A.   No.

13        Q.   Do you know what Terry Rogers looks like?

14        A.   No.

15        Q.   What efforts did you make, if any, in 1995 to

16   locate Terry Rogers?

17        A.   Well, we probably did a name check and found

18   out whatever previous addresses he gave.  And I assume

19   we went to those addresses looking for him.

20        Q.   But you don't know that for a fact, because

21   you can't recall?

22        A.   Well, it would just be the thing we would

23   naturally do to find somebody.

24        Q.   Okay.  So you think that you ran a name check

25   on Terry Rogers in 1995, and you think you probably got
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1   his criminal history, because he does have an extensive

2   criminal history, and you think you went out to his

3   previous addresses?

4          MR. MICHALIK:  Object to the form.

5      A.   That's basically what we would do in any

6   investigation.

7   BY MR. STARR:

8      Q.   Would you document that if you had done all

9   that?

10     A.   Well, we'd document whether we -- whether or

11   not we could find him.

12     Q.   Would you want to document --

13     A.   We might not document specifically, I went to

14   this address, I went to that address.  No, not

15   necessarily.

16     Q.   Okay.  Did you put an investigative alert in

17   on Terry Rogers?

18     A.   Yes.

19     Q.   In 1995?

20     A.   In 1995, they were called stop orders.  Same

21   name -- same thing, different name.  In '02, they were

22   referred to as investigative alerts.

23     Q.   Thanks for clarifying that for me.  I didn't

24   know that.  So did you put a stop order in on Terry

25   Rogers in 1995?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition Reverend Aaron Schilke taken 03/06/23 Page 207-2023

1      A.   Yes.

2      **Q.   What's the effect of a stop order, or what was**

3 **the effect of a stop order in 1995?**

4      A.   Well, it's paperwork we put in with the -- I

5 believe it was the records section, where if -- if this

6 person is arrested for some other charge, to notify us

7 because we want to interview them.

8      **Q.   Is it a pretty easy procedure to put that**

9 **information -- to put that stop order in?**

10      A.   Yeah.  In '95, it was a form you had to send

11 in.  When they became investigative alerts, you could do

12 it on the computer.

13      **Q.   Okay.  So you fill in the form, what kind of**

14 **information did you need to put into the form,**

15 **specifically, to affect the stop order?**

16      A.   Well, just information on the -- the person

17 you're looking for, or boxes to fill out, and a little

18 narrative as to why you wanted to talk to this person.

19      **Q.   Okay.  So like, in terms of information about**

20 **the witness, you would put in their name; is that**

21 **correct?**

22      A.   Right.  Name, if they have an IR number.

23 It's -- they -- well, they did.  That's why you could

24 put the stop order in.  And maybe previous addresses and

25 a birthday, maybe.  I'm not sure all the boxes that were

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    on there, but...

2        Q.    So there's a limited amount of information

3    that you would put into that form, correct?

4        A.    Yes.

5        Q.    All right.  And then you just would send that

6    form to where?

7        A.    I believe the records section.

8        Q.    Okay.  And you --

9        A.    Or identification section, one of those two.

10       Q.    And that's all you had to do?

11       A.    Right.  I had to sign it, I had to have a

12   supervisor sign it, and then send it in.

13       Q.    And then the effect of that stop order would

14   be that if that person was stopped by the police, it

15   would -- it would alert you?

16       A.    If he was arrested for something else,

17   and -- and they would let us know that he's in

18   custody --

19       Q.    Okay.

20       A.    -- so that we could interview him.

21       Q.    And why did you put a stop order in for Terry

22   Rogers in 1995?

23       A.    Because we wanted to re-interview him.

24       Q.    Okay.

25       A.    And we couldn't find him.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   Did you put a stop order in for Emmitt Wade in
2  1995?
3    A.   No.
4    Q.   Did you put a stop order in for --
5    A.   Well, with Emmitt Wade, we talked to in '95.
6  There was no need to put any stop order on him.
7    Q.   On Emmitt Wade?
8    A.   No, I'm sorry.
9    Q.   Are you thinking of --
10   A.   I'm thinking of Edward Cooper.
11   Q.   That's okay.  I don't want you --
12   A.   Emmitt Wade -- no, we didn't -- we didn't put
13  it on Emmitt Wade.
14   Q.   Okay.  Just so we get it clear on the record,
15  I don't want -- I don't want --
16   A.   Yeah.
17   Q.   -- it to be mistaken.  You didn't talk to
18  Emmitt Wade in 1995?
19   A.   No, I didn't.
20   Q.   Okay.  And you didn't put a stop order in on
21  him either?
22   A.   No.
23   Q.   Why didn't you put a stop order in on Emmitt
24  Wade?
25   A.   As I have said before, because Terry Rogers

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    was the next one I wanted to talk to.

2        Q.    Other than you wanted to talk to Terry Rogers,

3    was there any reason why you couldn't have put a stop

4    order also in on Emmitt Wade?

5        A.    As long as he had previously been arrested, we

6    could have.

7        Q.    Okay.  And you knew that Emmitt Wade was a

8    witness to the 1990 shooting of Willie Sorrell in 1995,

9    correct?

10        A.    Yes.

11        Q.    Okay.  So you could have put a stop order in

12    on him?

13        A.    I believe so.

14        Q.    And you chose not to?

15        A.    Correct.

16        Q.    Okay.  Did you put a stop order in on Sheenee

17    Friend in 1995?

18        A.    No.

19        Q.    And you -- in 1995, you were aware that

20    Sheenee friend was an eyewitness to the 1990 shooting of

21    Willie Sorrell, correct?

22        A.    Yes.

23        Q.    And you could have put a stop order in on

24    Sheenee Friend, right?

25        A.    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN EVANS, taken on 01/23/2023

```
 1        Q.    In 1995?

 2        A.    Yes.

 3        Q.    But you chose not to?

 4        A.    Correct.

 5        Q.    Okay.  Other than the fact that you wanted to

 6   talk to Terry Rogers, was there any other reason why you

 7   didn't put a stop order in on Sheenee Friend in

 8   1995?

 9        A.    No.  Just felt the next step was to talk to

10   Terry Rogers.

11        Q.    Do you have an independent recollection of

12   what James Fletcher looks like?

13        A.    No.

14        Q.    Okay.  Do you know how tall he is?

15        A.    No, I don't.

16        Q.    Do you know how much he weighs?

17        A.    No.

18        Q.    Do you know what his hair color is, or his eye

19   color?

20        A.    No.

21        Q.    Do you know what kind of hairstyle he had in

22   2002?

23        A.    No.

24        Q.    Do you know what kind of hairstyle he had in

25   1990?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.    No.
 2        Q.    When you spoke to Terry Rogers in 2002, that's
 3   the first time you spoke to him, correct?
 4        A.    Yes.
 5        Q.    Did Terry Rogers tell you that he could
 6   identify the offender or offenders involved in the
 7   Willie Sorrell shooting?
 8        A.    Well, he -- in '02, he named the offender as
 9   Jimmy Fletcher and told us he'd been in prison with him
10   and lived in a -- in a -- a neighborhood with him.
11        Q.    How long did it take to get him to identify
12   James Fletcher in 2002, after you first encountered
13   Terry Rogers in --
14              MR. STEFANICH:  Objection.  Form.
15        A.    When we initially when -- we -- when we
16   interviewed him in 2002, he told us the whole story.
17   BY MR. STARR:
18        Q.    So as soon as you had an opportunity to sit
19   down with him and interview him, he just proceeded to
20   tell you the entire story; is that correct?
21        A.    Yes.
22        Q.    So do you have an independent recollection of
23   how long it took for him to name James Fletcher
24   specifically?
25        A.    I don't, but it does -- it doesn't -- the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  report doesn't indicate that there were multiple

2  interviews.  It just indicates one interview and

3  whatever specific time that interview was done.

4      **Q.   Okay.  And did Terry Rogers indicate who**

5  **the other offender was besides James Fletcher?**

6      A.   I don't believe he did.  No.

7      **Q.   Did you ask him?**

8      A.   I'm sure we did.

9      **Q.   Did you document the fact that you asked him?**

10     A.   I don't believe report says -- well, reports

11 never say, I asked him this, I asked him that, I asked

12 him this.  It does somewhat, but it's all a summary.

13 It isn't -- every question asked isn't documented.

14     **Q.   But if he told you that he could not identify**

15 **the other offender, is that's something you should have**

16 **documented?**

17     A.   I would have documented that.  Yes.

18     **Q.   Okay.  Did you show him any photos of other**

19 **possible offenders when you had him in your interview?**

20     A.   We had no other suspects, other than James

21 Fletcher.

22     **Q.   Did you interview James Fletcher?**

23     A.   Yes.

24     **Q.   Did you ask James Fletcher who the other**

25 **offender was?**


Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.   Well, we asked -- we asked him if he had any

2    involvement in the homicide, which he denied.

3    **Q.   Right.  I understand that, but did you ask him**

4    **-- you believed he was involved in the homicide,**

5    **correct?**

6    A.   From the information I had, I did.  Yes.

7    **Q.   Did you ask him, when you had an opportunity**

8    **to interview him --**

9    A.   Well, I --

10    **Q.   -- who was the other offender?**

11    A.   I believed he -- he was a strong suspect.

12    After interviewing the other witnesses, then I -- I

13    absolutely believed he was the offender.

14    **Q.   Okay.  Did you interview James Fletcher before**

15    **you interviewed the other suspects?**

16    A.   Yes, with the state's attorney.

17    **Q.   When was it -- when did you interview James**

18    **Fletcher?**

19    A.   Well, that -- he was -- we spoke to him in

20    February -- I don't remember the exact date -- of '02,

21    and I believe it was still February of '02 we went to

22    the prison that he was in with the state's attorney to

23    interview him.

24    **Q.   Did you interview Terry Rogers before you**

25    **interviewed James Fletcher?**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        A.    Yes.

2        Q.    And Terry Rogers told you that James Fletcher

3    was one of the offenders, correct?

4        A.    He told us that, and he identified him from a

5    photo array.

6        Q.    And you interviewed Edward Cooper before you

7    interviewed James Fletcher, correct?

8        A.    Well, we interviewed Edward Cooper back in

9    '95.

10       Q.    But you also interviewed Edward Cooper in

11   2002, prior to interview James -- interviewing James

12   Fletcher, correct?

13       A.    Yes.  Yeah.

14       Q.    And based on your reports, Edward Cooper also

15   identified Mr. Fletcher in a photo array, correct?

16       A.    No.  He -- he picked his photo out and,

17   according to the report, said that it -- it looks

18   similar, but he's not sure.

19       Q.    Okay.  So back to my original question, you

20   interviewed two of the witnesses prior to interviewing

21   James Fletcher, correct?

22       A.    Yes.

23       Q.    And those witnesses were Terry Rogers and

24   Edward Cooper, correct?

25       A.    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.    And so when you interviewed James Fletcher,
2  you believed that he was a suspect, correct?

3    A.    Yes.

4    Q.    And you believed that he was one of the
5  offenders, correct?

6    A.    I believed he was a strong suspect from what
7  Terry Rogers had said.  Yes.

8    Q.    Okay.  Did you ask him who the other offender
9  was?

10   A.    Well, seeing he denied any knowledge of being
11 there or having any knowledge of the murder, there would
12 be no need for me to specifically to ask that question.

13   Q.    So you didn't ask him who the other offender
14 was, correct?

15   A.    Well, he said he wasn't there, so how would he
16 know?

17   Q.    But you believed that he was there?

18   A.    Well, at that point I did.  I wasn't -- I was
19 more convinced after he was identified by other
20 witnesses.

21   Q.    Okay.  So the answer to my question is no, you
22 did not ask Jimmy Fletcher who the other offender was in
23 the 1990 shooting, correct?

24   A.    Well, seeing he's not saying he's one of the
25 offenders or was even there or has any knowledge,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  I wouldn't specifically ask that question.

2      Q.   I understand you have an explanation for why

3  you wouldn't do it, but my question is, did you -- yes

4  or no, did you ask James Fletcher who the other offender

5  was in the 1990 shooting?

6      A.   I don't recall the interview at all, but it

7  isn't a question I would've asked.

8      Q.   Why is it not a question you would ask?

9          MR. MICHALIK:  Objection.

10          MR. STEFANICH:  Objection.

11          MR. MICHALIK:  Asked and answered.

12      A.   Because he is denying all knowledge of the

13  homicide.

14  BY MR. STARR:

15      Q.   Did you let -- did -- no, strike that.  And so

16  his denial of any knowledge of the 1990 homicide was a -

17  - was a -- enough of a reason for you to refrain from

18  asking him if he had any information about who the other

19  offender was?

20      A.   There would be no reason to ask him about

21  another offender if he's not admitting being one of the

22  offenders.

23      Q.   What did you do at any point in the Willie

24  Sorrell homicide investigation to investigate who the

25  other offender was?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.   Well, we had no information on who the second

 2   offender was.

 3        Q.   Sheenee Friend never gave you any information

 4   about who the other offender was?

 5        A.   Other than the description, there was no

 6   information of -- as who he possibly was.

 7        Q.   Emmitt Wade never gave you any indication that

 8   he could identify who the other offender was?

 9        A.   He told us he didn't see faces of either the

10   offenders.

11        Q.   Terry Rogers told you that he could

12   not -- strike that.  Terry Rogers never gave you any

13   indication he could identify who the other offender was?

14        A.   He didn't tell us anything about who the

15   second offender was, no.

16        Q.   Did you ask Terry Rogers who the other

17   offender was?

18        A.   I'm sure I did.

19        Q.   Did Edward Cooper give you any indication who

20   the other offender was?

21        A.   No.

22        Q.   Did you ask Edward Cooper if he had any idea

23   who the other offender was?

24        A.   Well, he never indicated that he knew either

25   of the offenders, so there would be no need for me to
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1  ask, specifically, that question.
 2       Q.   So you never asked him, correct?
 3       A.   No.  We certainly would have gone over what he
 4  saw had occurred.
 5       Q.   When you interviewed Terry Rogers, did you ask
 6  him why he initially told police only the name Fletcher,
 7  not the name James Fletcher?
 8       A.   Yes.
 9       Q.   What did he say?
10       A.   He said he didn't recall what he said back in
11  1990.
12       Q.   Did you believe him?
13       A.   I didn't know at that point what to believe.
14       Q.   Did you ask him if he was lying when he
15  previously spoke to police?
16       A.   I don't know if I asked him that question or
17  if I just asked him, why did you -- why didn't you just
18  tell us it was Jimmy Fletcher who you went to prison
19  with back in 1990?
20       Q.   What'd he say to that?
21       A.   Well, again, his answer was, I don't remember
22  what I said in 1990.
23       Q.   Do -- you don't have an independent
24  recollection of that question or that answer --
25       A.   No.  I'm --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       Q.    -- correct?

2       A.    -- just going off the report.

3       Q.    Okay.  So you would've asked Terry Rogers,

4  why didn't you tell police in 1990 that you knew who the

5  suspect was, correct?

6       A.    To words of that effect.

7       Q.    Okay.  And you believe you did ask him that,

8  correct?

9       A.    The report indicates that they asked him why

10  he didn't tell the officers back in 1990, the -- the

11  full name of Fletcher.

12      Q.    And what is your understanding of why he

13  didn't do that?

14      A.    Why he didn't say that?

15      Q.    Yeah.  What is your understanding of why Terry

16  Rogers refrained from telling police in 1990, that he

17  knew who the suspect was?

18      A.    All I know is what the report indicates.

19  He -- he responded that he doesn't remember what he said

20  in 1990.

21      Q.    Did you have any concerns in 2002 that Terry

22  Rogers might be trying to set James Fletcher up after

23  all these years?

24      A.    Edward Cooper, back in 1995, had mentioned

25  that -- that he thought that Terry Rogers might have set

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   him up.

2        Q.    Okay.  So Edward --

3        A.    Which was indicated on the report.

4        Q.    Okay.  So Edward Cooper told you in 1995, that

5   he was concerned that Terry Rogers might have set him up

6   in the 1990 shooting of Willie Sorrell, correct?

7        A.    Yes.

8        Q.    And so my question is, for you, when you were

9   interviewing Terry Rogers in 2002, and he all of a

10  sudden is telling you, I know who the suspect is, and he

11  tells you his name, did you have any concerns that Terry

12  Rogers was manufacturing that information?

13       A.    Well, obviously, we -- we had to corroborate

14  what he was saying.  We had to have other witnesses

15  identify James Fletcher, if -- if he was, in fact, the

16  offender.

17       Q.    Okay.  But did you have any concerns

18  that -- you know, given that one witness had previously

19  told you that this other witness was trying to set him

20  up, did you have any concerns that when you interviewed

21  Terry Rogers, that after 12 years of not identifying the

22  suspect, he all of a sudden identified the suspect, that

23  he was, in fact, setting up James Fletcher?  Did you

24  think about that at the time?

25            MR. STEFANICH:  Objection.  Form.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.   Well, he's -- it certainly hurt his
 2   credibility a little bit.  That's why we had to verify
 3   what he was saying with our witnesses.
 4   BY MR. STARR:
 5        Q.   Okay.  So when Edward Cooper told you in 1995
 6   that he had suspicion that Terry Rogers was setting him
 7   up, did that affect your opinion of Terry Rogers'
 8   credibility?
 9        A.   Possibly, yes.
10        Q.   Okay.  But yet you refrained from interviewing
11   Sheenee Friend and Emmitt Wade for seven more years,
12   because you wanted to talk to Terry Rogers, right?
13        A.   Yes.
14        Q.   Did you ever consider whether or not Terry
15   Rogers was actually involved in the robbery that led to
16   the Willie Sorrell shooting?
17        A.   Well, obviously, Edward Cooper knows Terry
18   Rogers.  He would've told us if Terry Rogers one of the
19   offenders.
20        Q.   Right.  He told you he thought that he was
21   involved in the set-up, correct?
22        A.   He thought he could have set them up, yes.
23        Q.   Right.  So there's two -- there's two people
24   who did the robbery, correct?
25        A.   Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of Edward W. Johnson-Scanlon, taken on 04/08/22

1     Q.   That doesn't mean that there was a

2 third -- there wasn't a third party involved in it,

3 right?

4     A.   Correct.

5     Q.   Okay.  And so Edward Cooper gave you reason to

6 suspect that Terry Rogers might have been involved in

7 the robbery, correct?

8     A.   Possibly.

9     Q.   What did you do to investigate whether or not

10 Terry Rogers was involved in the robbery?

11    A.   Well, firstly, we need to try to identify and

12 apprehend the -- the two offenders that did the robbery,

13 murder.

14    Q.   Okay.  But what did you do to investigate

15 whether or not Terry Rogers was also involved in the

16 crime that led to the shooting?

17    A.   Well, obviously, we interviewed him, we

18 interviewed James Fletcher, and we interviewed all the

19 witnesses.

20    Q.   Did you ever ask Terry Rogers if he was

21 involved in the crime that led to the shooting of Willie

22 Sorrell?

23    A.   I don't specifically know what we asked him,

24 but obviously, we asked him what he had said in 1990. We

25 confronted him with that.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q.   Did you ever rule Terry Rogers out as a

2  suspect of someone who was involved in the crime that

3  led to the shooting of Willie Sorrell?

4     A.   Well, we had nothing that would rule him in or

5  rule him out.

6     Q.   Well, you did have something that could rule

7  him in, right?  You had the victim telling you that he

8  thought he was involved?

9     A.   His opinion, because of his background, that

10  he -- that he might be, you know.

11     Q.   Is that what Edward Cooper told you, that the

12  reason he thought that Terry Rogers might be involved

13  was because of his background?

14     A.   Well, he -- he did tell us he had an extensive

15  background.

16     Q.   Edward Cooper told you that Terry Rogers had

17  an extensive background?

18     A.   I believe the report indicates that.

19     Q.   Okay.  Is there anything you can tell me that

20  you did to investigate whether or not Terry Rogers was,

21  in fact, involved in the crime that led to the shooting

22  of Willie Sorrell?

23     MR. STEFANICH:  Objection, asked and answered.

24     A.   There's nothing that it came forward, that

25  would indicate that he was involved in it.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    BY MR. STARR:
 2         Q.   Is there anything you can tell me that you did
 3    to rule him out?
 4         A.   I didn't have anything that could rule him in
 5    or rule him out.
 6         Q.   And you can't tell me whether or not you even
 7    asked him if he was involved in the crime, correct?
 8         A.   I don't recall exactly what I asked him.
 9         Q.   Did Edward Cooper telling you that he thought
10    that Terry Rogers was involving the crime, make you
11    think that maybe -- strike that.  Let me rephrase it.
12    Did learning -- strike that.  Did Edward Cooper telling
13    you that Terry Rogers may have been involved in the
14    crime that led to the Sorrell shooting, did that give
15    you any reason to think that Terry Rogers might have had
16    a motive to implicate James Fletcher?
17         A.   Well, if -- if -- if he was involved in the
18    whole crime, why would he name someone who did the
19    crime?
20         Q.   I can't answer your question.  I'm asking you,
21    do you think -- was there -- at any point in time, do
22    you think that it's possible that Terry Rogers had a
23    motive to implicate James Fletcher?
24         A.   No.
25         Q.   Okay.  Did Detective Bogucki ever say to you,
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  I wonder whether or not -- strike that.  Did Detective

2  Bogucki ever indicate to you that he thought that Terry

3  Rogers might have a motive to implicate James Fletcher

4  in this crime?

5      A.  I don't know what we -- what we talked about

6  back then.

7      Q.  Did you ever arrest Terry Rogers for his

8  involvement in the crime that led to the Willie Sorrell

9  shooting?

10     A.  No.

11     Q.  Did you ever ask James Fletcher if Terry

12 Rogers was involved in the crime that led to the Willie

13 Sorrell shooting?

14     A.  Well, obviously, he told us he had no

15 knowledge of the murder, so I don't know -- there

16 wouldn't be any reason to specifically ask him that

17 question.

18     Q.  So it's correct that you never asked James

19 Fletcher, was Terry Rogers involved in the crime?

20     A.  Again, I -- I don't remember the interview at

21 all, so I don't know what was asked him.  And the

22 state's attorney was there for the whole time.  I don't

23 know whether she asked him anything.

24     Q.  The state's attorney was present for your

25 entire interview with James Fletcher?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.    Yes.

2    Q.    You only interviewed James Fletcher once?

3    A.    We went and interviewed him once, and then

4  course, we brought him in for lineups, but there was no

5  interview done with him when we brought him in for

6  lineups.

7    Q.    And the state's attorney was present for the

8  lineups as well?

9    A.    No.

10    Q.    Why not?

11    A.    That's just not the procedure.

12    Q.    Did Terry Rogers ever ask you for anything in

13  exchange for giving you information about the suspect in

14  the Sorrell shooting?

15    A.    No.

16    Q.    Did you ever promise him anything in exchange

17  for giving you information about the suspect in the

18  Sorrell shooting?

19    A.    No.

20    Q.    So there's no quid pro quo between you and

21  Detective Bogucki and Terry Rogers at all in this case,

22  correct?

23    A.    No, there's nothing I -- I could do for Terry

24  Rogers.

25    Q.    After you first spoke to Terry Rogers, did you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    call the state's attorney in to interview him?

2        A.    Yes.

3        Q.    Okay.  Did the state's attorney take a

4    statement from him?

5        A.    Not until '02.

6        Q.    You didn't talk to Terry Rogers until '02,

7    I thought?

8        A.    I'm sorry.

9        Q.    Yeah, it's --

10       A.    Yeah.  We -- we talked to him in February of

11   '02, and the state's attorney talked to him then.  She

12   didn't take a statement till, I believe, it was May of

13   '02.

14       Q.    How long after you interviewed Terry Rogers

15   did the state's attorney arrive, in February of '02?

16       A.    Well, we went out to look for the other

17   witnesses, and showed an array to Edward Cooper, and

18   tried to find the other two, which we couldn't.  So then

19   -- then we would've called the state's attorney out.

20       Q.    Okay, so it was the next day?

21       A.    I -- I'd have to see her report, whether she

22   came out the next day or that same day.

23       Q.    Do you know why she didn't take a statement on

24   that first occasion?

25       A.    That's totally her decision.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.    Did she tell you why she wasn't taking his

2    statement?

3    A.    No.

4    Q.    Did you ask her?

5    A.    I don't -- I don't remember talking to her at

6    all, but that's totally their decision.

7    Q.    Okay.  What investigative effort did you make

8    in February of 2002 to find Emmitt Wade?

9    A.    I -- I don't recall, but I'm sure we went to

10   whatever previous addresses we had on him, and then

11   I -- I believe we put an investigative alert on him.

12   Q.    We -- when you say, we went to the addresses,

13   you and Detective Bogucki?

14   A.    Yes.  Possibly Detective Noradin.  I don't

15   know when he was working.

16   Q.    What investigative efforts did you make to

17   identify -- strike that.  What investigative efforts did

18   you make to find Sheenee Friend in February of

19   2002?

20   A.    Well, same thing, go to whatever addresses we

21   had on her.  And again, put an investigative alert on

22   her also.

23   Q.    Do you have any independent recollection of

24   the witness named Edward Cooper?

25   A.    No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q.    Do you know what Edward Cooper looks like?

 2        A.    No.

 3        Q.    During your first interview with Edward Cooper

 4   in 1995, did you show him a photograph of James

 5   Fletcher?

 6        A.    In '95, no.

 7        Q.    Do you know who the photographs of the fillers

 8   were, in that photo array you did in 1995?

 9        A.    No, I don't.

10        Q.    Is it possible that James Fletcher is one of

11   those photographs?

12        A.    I don't know why he would be.

13        Q.    But you can't say one or the other, correct?

14        A.    I just don't know who the other fellows were.

15        Q.    Okay.  And do you -- it's your understanding

16   that you had first interviewed him in 1995 at his

17   residence, correct?

18        A.    Yes.

19        Q.    And do you -- is it your testimony that

20   Detective Bogucki was with you during that photo array?

21        A.    Detective Bogucki and possibly Detective

22   Noradin.  No, I believe it was just our two names on

23   that report, so it would have just been myself and

24   Detective Bogucki.

25        Q.    So given your practice, in that particular
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  photo array, what you would've done is got the photo of

2  Fletcher Clinton, and then tried to find your own photos

3  that you have that were similar looking?  Is that --

4      A.   I mean --

5      Q.   -- is that what your practice would've been?

6      A.   I mean, it's -- it's possible that Detective

7  Rutherford and McDonald gave us a whole array also.

8  I don't remember, but -- whether they gave us one, and

9  we put together array, or whether they gave us a whole

10 array to use, I don't know.

11     Q.   Did you ask Detectives McDonald and Rutherford

12 how they came up with this Fletcher Clinton name?

13     A.   I -- I don't recall.  I -- I assume they did

14 some computer checking for someone named Fletcher.

15     Q.   So you don't know how they came up with the

16 name Fletcher Clinton, right?

17     A.   I don't recall, no.

18     Q.   Have you talked to Detective Rutherford about

19 this case at all in the last ten years?

20     A.   No.

21     Q.   Have you talked to Detective Rutherford at all

22 about this case since 2005 when you testified?

23     A.   No.

24     Q.   Okay.  There was a post-conviction proceedings

25 in this case.  Are you aware of that?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

232

```
1        A.   Well, I assume there was something that let
2   him out of jail, so...
3        Q.   Were you -- were you asked to testify at all
4   by anyone in that case?
5        A.   No.
6        Q.   Did anyone reach out to you regarding the
7   post-conviction proceedings at any point?
8        A.   No.
9        Q.   Prior to showing Edward Cooper the photo array
10  in 1985, did you ask him whether or not he could
11  identify the suspect?
12       A.   I don't know what we asked him back in '95.
13       Q.   As part of your regular practice, would you
14  ask the witness, do you think you can identify?
15       A.   We would -- I would -- practice would be
16  to -- to ask him, you know, what -- what he remembered,
17  what -- what happened.  I know the report indicates that
18  he was -- he was still very cooperative, so he must have
19  indicated that -- some ability to identify.
20       Q.   Yeah.  So I understand you don't have an
21  independent recollection of it, so just so my question's
22  clear.  As a matter of practice, when you're -- when you
23  would go out to do a photo array with somebody who was a
24  witness, who had indicated that they saw the suspect,
25  right, would you, before showing them photos, say to
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Video Deposition of Detective Schihl taken 02/09/23 2023

233

```
 1    them, did you see the suspect?
 2         A.   We probably would've gone over what occurred
 3    back when the crime happened.
 4         Q.   Okay.  And then would you ask them, do you
 5    think you can identify the suspect?
 6         A.   We might have, yes, asked him that.
 7         Q.   Okay.  And that's preliminary before you show
 8    the photo array, correct?
 9         A.   Yeah.  I wouldn't necessarily have to ask him
10    that specific question, but I could've.
11         Q.   Okay.  Do you know -- did you -- did you call
12    Edward Cooper on the phone before you went out to his
13    house, or did you just go to his residence?
14         A.   I don't remember.
15         Q.   Okay  And it's your understanding that Edward
16    Cooper, in 1995, could not identify any of the people
17    in the photo array that you showed him, correct?
18         A.   Correct.
19         Q.   And then you did another photo array with
20    Edward Cooper in 2002, right?
21         A.   Yes.
22         Q.   Okay.  Who conducted that photo array?
23    Was it -- was it you or was it Detective Bogucki?
24         A.   I assume it was both of us.  Detective Noradin
25    could have been present too, I don't know, but it
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
1    would've been at least me and Detective Bogucki.

2         Q.   Right.  You worked with Bogucki for a long

3    time.  Did you guys have an established practice when

4    you did a photo array, that one of you would hold the

5    photos and put them out, and one of you do the talking?

6         A.   Not necessarily.

7         Q.   Okay.  So different, each circumstance?

8         A.   Right.

9         Q.   All right.  So in the 1995 photo array, do you

10   know whether or not you showed the photos to Mr. Cooper,

11   or Detective Bogucki showed the photos?

12        A.   I don't know.  We both would've been there,

13   but I don't know who actually, physically held the

14   photos.

15        Q.   Okay.  Do you know, in the 2002 one, which one

16   of you would've had the physical photos in your hands?

17        A.   When was it?

18        Q.   In the 2002 photo array, do you know --

19        A.   Oh.

20        Q.   -- whether it was you or Bogucki that held --

21        A.   No, I don't.

22        Q.   -- the photo array?

23        A.   No, I don't.

24        Q.   Okay.  And during the 2002 photo array, did

25   Edward Cooper identify anyone?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.    Well, he picked out James Fletcher's photo,

2  but -- saying that he looked similar, he -- he couldn't

3  be sure.

4      Q.    Did Edward Cooper -- before you showed him the

5  photos, did Edward Cooper tell you, I don't think I can

6  identify anyone?

7      A.    I don't remember him ever saying that.

8      Q.    When -- once the photos were shown to Edward

9  Cooper, did Edward Cooper tell you, I can't identify

10 anyone?

11     A.    It's not indicated in the report, so

12 obviously, he didn't say that.

13     Q.    Okay.  And then did either you or Detective

14 Bogucki point at any of the photos and say, that's a

15 suspect?

16     A.    No, we never do that.

17     Q.    Did you or Detective Bogucki tell Edward

18 Cooper in 2002, that two other witnesses had already

19 identified James Fletcher as the suspect?

20     A.    No, we would never do that.

21     Q.    Did you or Detective Bogucki tell Edward

22 Cooper to look at the suspect's -- strike that.  Did you

23 or Detective Bogucki tell Edward Cooper, look at this

24 person's lips, those look like the lips of this suspect?

25     A.    No, we would never say that.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q.   Do you know that Edward Cooper has given a
 2   deposition in this case?
 3             MR. STEFANICH:  Objection.
 4             MR. STARR:  Yeah.  If you'll --
 5             MR. STEFANICH:  Attorney-client privilege.
 6             MR. STARR:  Let me rephrase it.
 7             MR. STEFANICH:  Don't answer the question.
 8   BY MR. STARR:
 9        Q.   Edward Cooper gave a deposition in this case.
10   If -- strike that.  Do you know if Edward Cooper gave a
11   deposition in this case?  And if you only know it
12   because your attorney told you, I don't want you to
13   reveal any attorney-client privilege.
14        A.   That's the only reason I know, is from my
15   attorney.
16   BY MR. STARR:
17        Q.   Okay.  If I told you that Edward Cooper,
18   during his deposition in this case, testified that he
19   told you and Detective Bogucki, in 2002, when you came
20   to his home to do a photo array, that he could not
21   identify the suspect before you showed him the photos,
22   would that surprise you?
23        A.   You --
24             MR. STEFANICH:  Objection.  Attorney-client
25        privilege.  I'm going to instruct you not to answer.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    I think you're going to need to rephrase this.
 2        MR. STARR:  I just said -- I don't think that's
 3    privileged.  I just asked him if he would surprise
 4    him.  I told him -- can you read the question back?
 5        THE REPORTER:  Uh-huh.
 6        MR. STEFANICH:  Sorry.
 7        THE REPORTER:  You're okay.
 8          (REPORTER PLAYS BACK REQUESTED QUESTION)
 9        MR. STEFANICH:  Yeah.  I think it gets at
10    conversations I've had with my client.  I don't know
11    how he can answer that as he sits here today.
12        MR. STARR:  Let me try to rephrase it --
13        MR. STEFANICH:  Okay.
14        MR. STARR:  -- because I don't -- like, him
15    being surprised is not -- that's a -- that's a
16    reaction that he may have, not a reaction that you
17    would tell him to have, but --
18        MR. STEFANICH:  Right.
19        MR. STARR:  Let me just ask -- let me brief --
20    let me rephrase it.
21        MR. STEFANICH:  The time, the timing I think is
22    the issue, right?
23        MR. STARR:  I don't -- I'm not sure if I
24    understand.  Maybe we can -- let me just try to
25    rephrase it --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    MR. STEFANICH:  Okay.

2    MR. STARR:  -- and if we can't get it,

3  we'll -- we can go over it --

4    MR. STEFANICH:  Okay.

5    MR. STARR:  -- and discuss it a little more.

6  BY MR. STARR:

7    Q.   I want to represent to you that Edward Cooper

8  was deposed in this case.  Okay, sir?

9    A.   Uh-huh.

10    Q.   And I'm going to represent to you that Edward

11  Cooper came in here, gave a deposition, and among other

12  things, stated that when you and Detective Bogucki came

13  to his home in 2002, he told you he couldn't identify

14  anyone, okay?

15    MR. STEFANICH:  You can -- that's just the

16    representation he's making to you.  So you can

17    answer that.

18    A.   Well, he -- he never told us that.

19  BY MR. STARR:

20    Q.   Okay.  I'm just -- I want to tell you that

21  that's what he testified to in this case.  Do you

22  understand that representation?

23    A.   If that's true, then I understand that.

24    Q.   Okay.  Does it surprise you to hear that

25  Mr. Cooper testified that he told you that he couldn't

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   identify anyone?

 2          MR. STEFANICH:  Yeah, I'm going to object.

 3      Maybe we can just go off the record.

 4          MR. STARR:  Okay.

 5          MR. STEFANICH:  Because I think maybe --

 6          MR. STARR:  Well, make your objection.

 7      Let's --

 8          MR. STEFANICH:  I'm going to object to

 9      attorney-client privilege, instruct him not to

10      answer. Let's go off the record.

11          MR. STARR:  Okay.

12          THE VIDEOGRAPHER:  We are going off the record.

13      The time is 3:25 p.m.

14              (OFF THE RECORD)

15          THE VIDEOGRAPHER:  We are back on the record.

16      The time is 3:26 p.m.

17   BY MR. STARR:

18      Q.   All right.  Mr. Schalk, I'm going to represent

19   to you that Edward Cooper testified in this civil

20   matter.  Recently, he gave a deposition.  And among

21   other things, he testified that, one, when you and

22   Detective Bogucki arrived at his residence in 2002,

23   he told you he wasn't going to be able to make an

24   identification, okay?  Do you understand that

25   representation?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     A.   Okay.

2     Q.   Was Edward Cooper lying when he testified to

3 that in this case?

4     A.   Yes.

5     Q.   Okay.  I'm going to also represent to you that

6 Edward Cooper also testified that you and Detective

7 Bogucki told him that two other witnesses had made an

8 identification prior to your arrival at his home in

9 2002, and that those two witnesses were Sheenee Friend

10 and Emmitt Wade, okay?

11     A.   Okay.

12     Q.   Was Mr. Cooper lying when he testified to that

13 in this case?

14     A.   Yes.

15     Q.   Okay.  I'm going to also indicate to you,

16 represent to you, that during his testimony, Mr. Cooper

17 testified that when you showed him the photos, you put

18 them down on his floor and you asked him to look at the

19 photos, and he said he couldn't make an identification.

20 And that one of the two of you, either you or Detective

21 Bogucki, pointed at a photo and said, that's the

22 suspect.  Do you understand that representation?

23     A.   Yes.

24     Q.   Was Mr. Cooper lying when he testified to that

25 in this case?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.   Yes.

 2        Q.   Okay.  Can you think of any reason why

 3   Mr. Cooper would be lying today about what he -- what

 4   happened in 2002 when you visited him to show him a

 5   photo array?

 6             MR. STEFANICH:  Objection.  Foundation.  You

 7        can answer.

 8        A.   Well, I -- I can only guess that he doesn't

 9   want to be any part of this.

10   BY MR. STARR:

11        Q.   Well, he willingly came to the deposition.

12   Can you -- can you think of any other reason why he

13   might be lying today?

14        A.   Does anybody willing come to these

15   depositions?

16             MR. STEFANICH:  Yeah.

17   BY MR. STARR:

18        Q.   I mean, you did, right?

19        A.   Yeah, kind of.

20        Q.   So other than -- other than he maybe didn't

21   want to be a part of this, he was a part of it, he came

22   to testify.  Can you think of any other reason why

23   Mr. Wade would lie -- or Mr. Cooper would lie?

24             MR. STEFANICH:  Objection.  Foundation.  You

25        can answer.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.   Well, like I say, all I can think of is he
2  wants no part of this lawsuit.
3  BY MR. STARR:
4    **Q.   Okay.  If I represented to you that before the**
5  **criminal trial, Mr. Cooper was contacted by a private**
6  **investigator who asked him about his identification, and**
7  **at that time, approximately in 2004, at that time, he**
8  **also indicated that he couldn't identify the suspect,**
9  **would that surprise you?**
10    MR. STEFANICH:  Objection.  Foundation.  I
11    think it misstates its testimony too, so form.  You
12    can answer.
13    A.   Yes, it would surprise me, and I -- I
14  certainly would've liked to have hear the -- heard the
15  conversation between the private investigator and
16  Mr. Cooper.
17  BY MR. STARR:
18    **Q.   Okay.  Was Mr. Cooper lying in 2004 when he**
19  **said he couldn't identify the suspect?**
20    MR. STEFANICH:  Objection --
21    A.   In 2000 --
22    MR. STEFANICH:  -- form.  Objection.  Form.
23    You can answer.
24    A.   In 2004, when...?
25  BY MR. STARR:

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-7 Filed: 05/06/25 Page 245 of 336 PageID #:5018
The Deposition of DETECTIVE SCHMITD, taken 04/06/23 2023
243

1     Q.    When he told the private investigator that he

2     couldn't identify Mr. Fletcher, was he lying?

3     A.    Well, yes, he -- he obviously told us, told

4     the state's attorney, told the jury that convinced

5     Mr. Fletcher, that he was the offender.

6     Q.    So he was lying, correct?

7     A.    Apparently.

8     Q.    After you interviewed Mr. Cooper in 2002 and

9     showed him the photo array, did you contact the state's

10    attorney?

11    A.    I believe we first tried to find Sheenee

12    Friend and Emmitt Wade, and then contacted the state's

13    attorney.

14    Q.    Okay.  So after you -- after you interviewed

15    Rogers, interviewed Cooper, and then tried to find the

16    other two witnesses, that's when you contacted the

17    state's attorney and told her everything you had learned

18    thus far?

19    A.    Yes.

20    Q.    Did you do anything -- strike that.  As you

21    sit here today, do you know whether or not James

22    Fletcher is guilty or innocent of the Willie Sorrell

23    murder?

24         MR. STEFANICH:  Objection.  Foundation.

25    A.    Well, from -- after interviewing the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  witnesses, I believed he was guilty.

2  BY MR. STARR:

3      Q.   Okay.  That was -- that's not what I'm asking,

4  though.  As you sit here today, do you know whether or

5  not he's guilty or innocent?

6          MR. STEFANICH:  Objection.  Foundation.

7      A.   I have heard nothing to change my opinion of

8  what -- that -- that he is guilty.

9  BY MR. STARR:

10     Q.   Okay.  So does the fact that Edward Cooper now

11  says that he never could identify the suspect change

12  your opinion at all about whether or not James Fletcher

13  is guilty or innocent?

14     A.   No.  Seeing he -- he told us, he told the

15  state's attorney, he told the jury that convicted him,

16  that he was the offender.  Whether he says it now under

17  duress of this lawsuit, you -- you know, that doesn't

18  change my opinion.

19     Q.   Okay.  There's a couple other things I forgot

20  to mention about Mr. Cooper.  I'm going to represent to

21  you that during his civil deposition in this case, he

22  also testified that when he was looking at the photos,

23  after he told you that he couldn't identify the suspect,

24  either you or Detective Bogucki told him, look at the

25  lips, and pointed at the lips of James Fletcher's

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   photograph.

 2        A.   We never would've done that.

 3        Q.   Okay.  So he's lying when he testified to that

 4   in this case --

 5        A.   Yes.

 6        Q.   -- correct?  Okay.  Mr. Cooper also testified

 7   that when he came to view a lineup in 2002, that he

 8   encountered a Black police detective at Area 5, who told

 9   him that James Fletcher was a bad guy, that he had done

10   this previously.  Do you know who that person was?

11        A.   There was no Black detective involved in this

12   case, at all.

13        Q.   But there -- you testified already, there were

14   Black detectives in Area 5 in 1995, correct?

15        A.   There were, yes.

16        Q.   Okay.  So you don't know whether or not a

17   Black detective talked to James Fletcher -- talked to

18   Edward Cooper in 1995, correct?

19        A.   I believe I would've known that if it had

20   happened.

21        Q.   But you didn't observe it, correct?

22        A.   I didn't observe it, no.

23        Q.   So you don't -- you can't say one way or

24   another if a Black detective approached Mr. Cooper in

25   1995, prior to him viewing a lineup and told him, the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

246

1    guy that you're -- the suspect you're here to identify,

2    James Fletcher, is a bad guy who's done this before?

3        A.    No, there -- there was nobody else involved

4    at -- at -- during that lineup, other than myself,

5    Detective Bogucki, Detective Noradin.  There was no

6    Black detective ever involved in this case.

7        Q.    He -- Mr. Cooper testified that it was before

8    he went in to view the lineup, that he'd spoke to this

9    Black detective.

10        A.    There would've been no detective talking to

11    him.

12        Q.    Okay.

13        A.    Black detective talking to him.

14        Q.    But you can't say one way or another because

15    you didn't -- you don't -- you didn't observe that,

16    correct?

17            MR. STEFANICH:  Objection, asked --

18        A.    I believe I would've --

19            MR. STEFANICH:  Objection, asked and answered.

20            THE WITNESS:  Oh, I'm sorry.

21            MR. STEFANICH:  Go ahead.

22        A.    I believe I would've observed it, if it had

23    happened.

24    BY MR. STARR:

25        Q.    But you have no independent recollection of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   any interaction with Mr. Cooper, or Mr. Cooper's

2   presence at Area 5 for the lineup, correct?

3       A.   Correct.

4       Q.   Okay.  I'm also going to represent to you that

5   Mr. Cooper also testified in this civil case that prior

6   to viewing the lineup, either you or Detective Bogucki

7   reminded him about who the suspect was.

8       A.   No, we never would do that.

9       Q.   So he's lying when he testified to that?

10      A.   Yes.

11      Q.   Okay.  As you sit here today, please tell me

12  all of the evidence that you're aware of, that

13  implicates James Fletcher in this Willie Sorrell

14  shooting?

15      A.   Okay.  Officially, Terry Rogers identified him

16  as one of the offenders.  And of course, his background

17  indicates he has a history of murder and armed

18  robberies.  We -- initially, Edward Cooper picked him

19  out of a photo as looking similar, and then positively

20  identified him in lineups.  Sheenee Friend positively

21  identified him in lineups.  Emmitt Wade, although he

22  didn't see the face of the offender, he corroborates

23  the account of what the witnesses said happened.

24      Q.   Anything else?

25      A.   I think that's it.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1        Q.    What in James Fletcher's background indicates
2   to you that he's guilty of this crime?
3             MR. STEFANICH:  Objection, asked and answered.
4        A.    Well, nothing would indicate that he's guilty
5   of this crime.  It certainly would make him a suspect
6   that -- that he has a history of doing murder and armed
7   robbery.
8   BY MR. STARR:
9        Q.    So what specifically in his background
10  indicates that to you?
11       A.    Previous arrests.
12       Q.    Which arrests?
13       A.    Murder and armed robbery.
14       Q.    Okay.  What year was that arrest?  Do you
15  know?
16       A.    I'd have to look at his sheet to know.
17       Q.    Okay.  And then you also said that Emmitt Wade
18  corroborates everything the witnesses said.  What do you
19  mean by that?
20       A.    Well, he corroborate --
21            MR. STEFANICH:  Object -- objection. Misstates
22       his former testimony.  You can answer.
23  BY MR. STARR:
24       Q.    Did I misstate that?
25       A.    Well, he was -- he was able to corroborate
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of DETECTIVE MICHAEL WHALEN, taken on 06/06/23

1   what he saw.  His part of what he saw corroborates what

2   the witnesses occurred, or said occurred.

3       Q.   What did Emmitt Wade tell you that

4   corroborates what the witnesses saw?

5       A.   That he saw -- I believe he says he saw two

6   offenders, you know, running from the bread truck, and

7   then the bread truck driver going after them and

8   shots -- shots were exchanged between the offenders.

9   And -- and the bread truck driver and that the victim

10  who was on the sidewalk was hit with the bullet from the

11  offenders.

12      Q.   Wade told you-all that?

13      A.   That's in the initial report.  And I'm sure we

14  would've also gone over that with him, too.

15  And, of course, he told the state's attorney this.

16      Q.   Did Emmitt Wade give a statement to the

17  state's attorney?

18      A.   No.

19      Q.   What information did you have that gave you

20  probable cause to arrest James Fletcher in 2002?

21      A.   Well, we -- we had the identification by three

22  eyewitnesses.

23      Q.   Anything else?

24      A.   The corroboration of a fourth witness.

25      Q.   Did Terry Rogers ever view a lineup?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.   No.

2    Q.   **Why not?**

3    A.   The -- apparently, the state's attorney didn't

4    feel it was necessary.  He had done a photo array when

5    he was brought in again back in, I believe, it was

6    May of '02.  The state's attorney took a statement from

7    them, but the lineup wasn't done, so apparently, they

8    didn't feel it was necessary.  Because state's attorney

9    would've told us that before charge or would've told us

10   to do a lineup, if they felt it was necessary.

11   Q.   **Did the state's attorney tell you to do a**

12   **lineup with the witnesses, Sheenee Friend and Edward**

13   **Cooper?**

14   A.   I don't know if she specifically said that or

15   we just knew that was what we should do.

16   Q.   **When I asked you earlier about whether or not**

17   **the state's attorney was present for the lineup,**

18   **I thought you said that the state's attorney has nothing**

19   **to do with the police conducting a lineup.  Is that not**

20   **correct?**

21   A.   They're never present for a lineup.

22   Q.   **Okay.  So you chose to do a lineup with**

23   **Everett Cooper as a witness, correct?**

24   A.   Yes.

25   Q.   **And you chose to do a lineup where you showed**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  Sheenee Friend in the lineup, correct?

2      A.   Yes.  I mean, the state's attorney may have

3  directed us to do that also, but it's -- we certainly

4  know we -- we have to do that.

5      Q.   But you have no recollection of the state's

6  attorney telling you that, correct?

7      A.   No, it's just -- that's the procedure.

8  They -- they tell us what they feel needs to be done

9  before they want to charge somebody.

10     Q.   So as a matter of practice, you don't -- you

11  don't put together lineups without the state's attorney

12  instructing you to do so?

13     A.   No, we do that, too.

14     Q.   Okay.  So you don't know, in this case,

15  whether or not you did the lineups with -- at the

16  direction of the state's attorney or not, correct?

17     A.   I don't recall specifically talking to her

18  about it.

19     Q.   And you don't know whether or not you did the

20  lineups in this case by your own volition, correct?

21     A.   By my own volition?  It's part of the

22  investigation.

23     Q.   Right.  And so if I didn't phrase it

24  correctly, I'll rephrase it.  You don't know whether or

25  not you and Detective Bogucki put together the lineup

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  for the witnesses Friend and Cooper to view on your own,

2  correct?

3      A.   I -- I don't know what you're saying here.

4      Q.   Yeah.  So let me ask it again.  So you -- can

5  you -- do you know whether or not -- strike that.  You

6  do not know whether or not -- strike that.  It's

7  possible that you and Detective Bogucki decided to show

8  Friend and Cooper the lineup without the instruction of

9  the state's attorney, correct?

10      A.   Well, seeing the state's attorney was involved

11  with some -- for a time period before that,

12  I assume -- I assume that we would've discussed with the

13  state's attorney what all needed to be done.

14      Q.   But you don't have a recollection of that one

15  way or the other, right?

16      A.   I don't remember our conversation.

17      Q.   Okay.  So you may have just chosen not to show

18  Terry Rogers a lineup, correct?

19      A.   It -- it's possible.  Well, we couldn't find

20  Terry Rogers, too.  He had to -- you know, he -- he had

21  to be arrested again back in May to be re-interviewed,

22  so we probably couldn't find him in April to look at the

23  lineup.

24      Q.   So let me make sure I got the timeline correct

25  here.  So February of 2002, you interviewed Terry Rogers

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Van Dyke Deposition Excerpts-8-14-18

253

```
1   and he, in a photo array, identifies my client, James
2   Fletcher, correct?
3         A.   Yes.
4         Q.   And then that same night, or the next day,
5   you go and interview Edward Cooper and show him a photo
6   array where he does a tentative identification, correct?
7         A.   Yes.
8         Q.   And then the next day is when you get in touch
9   with or you locate -- sorry, the next day is when you
10  locate James Fletcher?
11        A.   No.  Well, the state's attorney would've --
12  would've come out to talk to Terry Rogers either that
13  day or the next day.  And then we made arrangements
14  for -- I forget the exact dates, several days later to
15  interview him in the -- in the Graham Correctional
16  Center.
17        Q.   Okay.  And then you did a lineup in early
18  April, correct?
19        A.   April 20th.
20        Q.   Okay.  And you're telling me today, you're
21  testifying today, that you did not have Terry Rogers
22  view the lineup because you couldn't locate him?
23        A.   Well, I -- I believe that's why he didn't look
24  at the lineup in April 20.  After he was located,
25  obviously, we didn't do a lineup, so apparently the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

254

1    state's attorney felt it was unnecessary, seeing he
2    already did the photo array.
3        Q.   And that's just an assumption you're making,
4    because you don't have a recollection of that, correct?
5        A.   No.  I -- I just know that if the state's
6    attorney said we need to do a lineup with Terry Rogers,
7    we would've done that and it's not on -- in the reports
8    of doing it.
9        Q.   Right.  But my question was: When you did the
10   lineups in April 2002, you didn't have Terry Rogers view
11   the lineup because you couldn't find him.  Is that your
12   testimony?
13       A.   The report doesn't indicate that, but that
14   would -- I would guess that's the case.
15       Q.   Okay.  So you gave me -- when I asked you
16   about what was the probable cause you had to arrest
17   James Fletcher, you said that the identification by the
18   three witnesses and the corroboration by Emmitt Wade,
19   correct?
20       A.   Yes.
21       Q.   Any other probable cause that you had to
22   arrest James Fletcher when you did?
23       A.   I believe that -- that's quite a bit of
24   probable cause right there.
25       Q.   Okay.  At any later point in time, did you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  learn of additional information that gave you further

2  probable cause to suspect James Fletcher of the Willie

3  Sorrell shooting?

4          MR. STEFANICH:  Objection.  Form.  You can

5      answer.

6      A.   Anything additional?  I don't believe

7  any -- anything additional came in.

8          MR. STARR:  Okay.  Let's take a five-minute

9      break.

10         MR. STEFANICH:  okay.

11         THE VIDEOGRAPHER:  We are going off the record.

12     The time is 3:44 p.m.

13            (OFF THE RECORD)

14         THE VIDEOGRAPHER:  We are going on the record.

15     The time is 3:59 p.m.

16  BY MR. STARR:

17     Q.   All right.  Mr. Schalk, I want to show you

18  just a couple of documents here really briefly.  I want

19  to mark this first exhibit as Exhibit number 1 and for

20  the record, it's Bates stamp Fletcher 796.  You have it

21  preloaded?  Cool.  All right, Mr. Schalk, that's an

22  individual page photocopy of a photograph.  Take a look

23  at that and let me know when you're ready to answer a

24  couple questions about it.

25            (EXHIBIT 1 MARKED FOR IDENTIFICATION)

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.   Okay.

 2             BR MR. STARR:

 3        Q.   Do you -- did you have time to review this

 4   photograph?

 5        A.   Yes.

 6        Q.   Do you recognize this person?

 7        A.   No.

 8        Q.   Okay.  And this is a -- does this appear to

 9   you to be a Chicago Police Department mugshot?

10        A.   Yes.

11        Q.   Okay.  And when we were talking about

12   photographs that you had, and that the detectives in

13   Area 5 had that they used for fillers, and we were

14   talking about mugshots, is this what a mugshot looks

15   like?

16        A.   Yes.

17        Q.   Okay.  Is this the type of photograph that you

18   would have in your desk or your collection of potential

19   filler photographs?

20        A.   Yes.

21        Q.   Okay.  Is it -- is this photograph possibly

22   one of the photographs that you showed Edward Cooper

23   when you did the photo array in 1995?

24             MR. STEFANICH:  Objection.  Form and

25        foundation.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.    I don't know if it was this one or not.
 2   BY MR. STARR:
 3        Q.    Okay.  You can't say one way or the other,
 4   correct?
 5        A.    Correct.
 6        Q.    Okay.  But this is what the photographs, the
 7   mugshots that you showed Edward Cooper in 1995 would've
 8   looked like?
 9        A.    I believe so, yes.
10        Q.    Okay.  You can put that to the side for a
11   second, sir.  I'm going to show you what we'll mark as
12   Exhibit number 2 and for the record, the Bates is City
13   JF-86 through 96.  Take a look at that.  It's a couple
14   page document and we'll talk about it in just a minute,
15   sir.  I'm not sure.  It may be double-sided, sir, just
16   so -- just so you know.
17              (EXHIBIT 2 MARKED FOR IDENTIFICATION)
18        A.    Yeah.  Okay.
19   BY MR. STARR:
20        Q.    You have an opportunity to review it?
21        A.    Yes.
22        Q.    Okay.  Have you seen this document before,
23   sir?
24        A.    Yes, I have.
25        Q.    When have you seen this document?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.    In the -- when I was given a copy of
 2   the -- the whole file.
 3        Q.    Okay.  So did you review it in preparation for
 4   today's deposition?
 5        A.    I've seen it before.  I looked at it.
 6        Q.    Okay.  It was part of the file, the police
 7   file that you looked at and reviewed in preparation for
 8   today?
 9        A.    Yes.
10        Q.    Okay.  For the record, can you tell me what
11   this document is?
12        A.    Well, it's -- it's a -- a computer search.
13   I forgot -- I don't recall what they called it.
14   This -- this was a RAMIS search, or how the name was,
15   but it's a search the last name of Fletcher, a male,
16   Black, last name of Fletcher.  But apparently, the
17   computer also spit out names other than Fletcher on
18   here, all names beginning with F.  And it doesn't --
19   there's no indication as -- as to who printed this out
20   or when it was printed.
21        Q.    That was my next question.  You don't see your
22   name on this document anywhere, correct?
23        A.    Correct.
24        Q.    Do you have any independent recollection of
25   generating this request?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    A.   No, I don't.

2    Q.   Your -- Detective Bogucki testified that he

3    thought maybe this was the Fletcher name search that you

4    ran before going out to see Edward Cooper in 1995. Is

5    that possible?

6    A.   Again, I -- this doesn't indicate when this

7    was run or by who, so I don't know.

8    Q.   But is it possible, though, this is the name

9    search that you ran on Cooper's -- strike that.  Is it

10   possible that this is the name search that you ran prior

11   to going out to Edward Cooper's residence in

12   1995?

13            MR. STEFANICH:  Objection.  Asked and answered.

14            MR. MICHALIK:  Object to form.

15   A.   I don't know why it would've been '95.

16   We -- we were given a suspect's photo by Rutherford and

17   McDonald.  I don't know of -- if -- why we -- we

18   would've done this in '95.

19   BY MR. STARR:

20   Q.   I just want to make some clarification.  So is

21   it your testimony now that McDonald and Rutherford

22   actually gave you Clinton Fletcher's [sic] photograph in

23   1995?

24   A.   Well, I -- I -- I -- the report doesn't

25   indicate whether they physically handed us the photos,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    or allowed us to show his photo in an array.

2        Q.   Yeah.  I thought your previous estimate was

3    you weren't sure if he gave you the name or the

4    photographs?

5        A.   I believe the report doesn't indicate which

6    one it was, so I'm not sure.

7        Q.   If either Detective McDonald or Rutherford ran

8    a search for Fletcher's name prior to giving you that

9    information, is that something that they would've been

10   expected to include in the file?

11       A.   Well, obviously, this was included in the

12   files, but they wouldn't necessarily have to write a

13   report saying they did that.

14       Q.   Okay.  That's fair.  And I didn't ask about a

15   report, but just if they ran a search for Fletcher's

16   name prior to giving you that information, is that

17   something that they would've included in the file, the

18   search itself, like this?

19           MR. STEFANICH:  Objection.  Foundation.

20       You can answer.

21       A.   Well, whoever and whenever this was done, it

22   was obviously included in the file.

23   BY MR. STARR:

24       Q.   Right.  So if you're working on a homicide

25   investigation and you run a name search, and it

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   generates a bunch of names, are you -- is there an

2   expectation that you include that name search in the

3   investigative file?

4           MR. MICHALIK:  Object to form.

5       A.   I would.

6   BY MR. STARR:

7       Q.   Okay.  And do you have an opinion of Detective

8   McDonald and Rutherford's work as police officers?

9       A.   Yes.  They're -- they were competent

10  detectives.

11      Q.   So you would expect them if they ran a name

12  search, to include that name search in the investigative

13  file, correct?

14          MR. MICHALIK:  Object to form and foundation.

15      A.   I would -- I would expect them to, yes.

16  BY MR. STARR:

17      Q.   Okay.  And I think you said a minute ago that

18  this might be a RAMIS search.  Is that what you said?

19      A.   Yeah.  I -- I don't remember anymore what

20  the -- a RAMIS search looked like.  I mean, that name

21  isn't on this -- this report so maybe it's not,

22  but it's -- it's a criminal record search as indicated

23  on the top of the report.

24      Q.   Do you have any independent recollection of

25  reviewing this report when you first got assigned the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1   cold case?

2       A.   No, I don't.

3       Q.   Okay.  Do you see that there's a -- there's

4   like a list.  Each page is list of names and then on

5   some of the pages, the names have -- some of the names

6   have little what appear to be pen dots next to them.

7   Do you see that?

8       A.   Yes.

9       Q.   And the first one on the first page on 86 is

10  Maurice Fletcher?

11      A.   Yes.

12      Q.   You see that?  And then on the second page,

13  there's a Mose Fletcher that's got a little dot next to

14  his name, right?

15      A.   Right.

16      Q.   And then on the third page, on page 88,

17  there's two dots, one next to Devery, and one next to

18  Henry.  Do you see that?

19      A.   Yes.

20      Q.   And then if you go back to the second page

21  there's another dot next to the third one down, next to

22  James Fletcher's name.  Do you see that?

23      A.   I do.

24      Q.   Okay.  Do you do -- you know why those little

25  dots are on -- next to certain names, and not on -- next
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    to others?

2         A.    I have no idea.

3         Q.    Do you know what the little dots indicate?

4         A.    I do not have any idea of that.

5         Q.    Is it possible that those little dots indicate

6    people that were potential pieces -- people of inquiry

7    in this investigation?

8              MR. MICHALIK:  Object to form.

9         A.    Again, I don't -- I don't know why those dots

10   were put there.  It -- it's not something that I would

11   do.  I would -- if it was -- if it's indicating somebody

12   to look further into, I would underline them, or get a

13   yellow highlighter and highlight them.  So I -- I don't

14   believe that I could put those dots there, but I don't

15   know what purpose there -- there was.

16   BY MR. STARR:

17        Q.    Okay.  So if you had run a search like this,

18   and there was names on that list that you wanted to do

19   some further investigation on, your practice would be to

20   highlight them with a yellow highlighter or underline

21   them, correct?

22        A.    Yes.

23        Q.    Okay.  But does the fact that these

24   names -- certain names have a little black dot next to

25   them indicate to you that somebody was going to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    investigate these names further?

2        A.   Well, someone had a reason to put --

3            MR. MICHALIK:  Objection.  Form.  Calls for

4        speculation.

5        A.   Oh, sorry.  Someone had a reason to put the

6    dots there.  I don't know what the reason was.

7    BY MR. STARR:

8        Q.   Okay.  Is it possible that the people who have

9    dots next to their name are the people that were the

10   fillers in the Clinton Fletcher photo array?

11           MR. STEFANICH:  Objection.  Foundation, form.

12       A.   Well, seeing that there are quite a few dots,

13   I would -- I would doubt that.  I don't know that we

14   would've needed that many filler photos.

15   BY MR. STARR:

16       Q.   Okay.  What is a RAMIS report?

17       A.   Well, to the best of my recollection, there

18   was some computer search where you could put various

19   parameters into what you want to search for, names

20   so -- or other things that you'd want the computer

21   to -- to bring out for you.  But I don't -- I don't

22   remember what the RAMIS name stood for.

23       Q.   It's an --

24       A.   But it sounds familiar, yes.

25       Q.   Sorry.  It's an acronym?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.    Yes.

2    Q.    Okay.  And it's -- just to summarize your

3  testimony, it's a -- like, an electronic online computer

4  tool that you use in your investigations?

5    A.    Yes.

6    Q.    Okay.

7    A.    I mean, something that just law enforcement

8  can use.

9    Q.    And you could use it for -- to run a name

10 search?

11   A.    Yes.

12   Q.    And do you know what the database -- what

13 information the database contains?  Is it people that

14 have been previously arrested or do you have any idea?

15   A.    I would assume it would be previously

16 arrested.

17   Q.    Okay.  Do you know when the RAMIS system came

18 into existence within the CPD?

19   A.    No, I don't.

20   Q.    Do you know if it's a CPD specific system, or

21 is it a system that other police departments use?

22   A.    You know, I can't even recall that.

23 I -- I would guess the other law enforcement agencies

24 could probably use it.

25   Q.    Have you ever personally ran a RAMIS report?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.   Seeing that it sounds familiar, I'm sure I

2  have.

3      Q.   Okay.  Did I ask you, do you know when it came

4  into existence?

5      A.   I don't know.

6      Q.   Okay.  Do you know if it was in existence in

7  1995?

8      A.   I don't know.

9      Q.   Do you know if it was in existence in 2002?

10     A.   I really don't.

11     Q.   Do you know what information is necessary in

12  order to run a RAMIS report?

13     A.   I don't know.

14     Q.   Do you know what a RAMIS report looks like

15  when it's printed out?

16     A.   I -- I can't remember that, no.

17     Q.   Okay.  So it could be this -- it could be this

18  Exhibit number 2, right?

19     A.    It could be.  It doesn't indicate.  It just

20  indicates criminal record search, but I don't know.

21     Q.   Do you know when you learned how to use the

22  RAMIS system?

23     A.   No, I don't.

24     Q.   Did you ever receive any training on the RAMIS

25  system?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.    Somehow, I would've had to learn how -- how to

2  how to bring up the RAMIS system on the computer.

3  I don't know how I did that.

4      Q.    All right.  And then when I asked you about

5  another acronym, what is it -- what is an ICAM report?

6  Or what is ICAM, is a better way to ask that question.

7      A.    I'm trying to remember what that stands for,

8  too, but I -- I really can't remember exactly what that

9  is.  I mean, I believe there's photos related to ICAM,

10 but

11     Q.    If I represented to you that it stood for

12 Information Collection for Automated Mapping, does that

13 sound correct?

14     A.    Sounds good to me.

15     Q.    Okay.  Did you ever use the ICAM system?

16     A.    I'm sure I have.

17     Q.    And what information is necessary to run an

18 ICAM report?

19     A.    I don't remember.

20     Q.    Do you know what it does?

21     A.    I really couldn't go into it, no.

22     Q.    Is it another investigative tool that you use

23 to search for names?

24     A.    It might be.  I mean, obviously it gives us

25 some information.  I -- I don't recall what.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1       Q.   Okay.  Do you know what an ICAM report looks

2  like when it's printed out?

3       A.   No.

4       Q.   Do you know when you learned to use the ICAM

5  system?

6       A.   No, I don't.

7       Q.   Did you -- did you ever receive any training

8  on the ICAM system?

9       A.   I assume, as in the RAMIS, I had to be told by

10 somebody how to do it.

11      Q.   But you don't have any independent

12 recollection of any training, correct?

13      A.   No.

14      Q.   Okay.  You can put that number 2 aside.  I'm

15 going to show you another one here.  I'm going to mark

16 this as Exhibit number 3.  And for the record, this is

17 Fletcher -- I'm sorry.  No, this is City JF-62 through

18 85. Take a couple of moments to review that document and

19 let me know when you're ready to answer some questions

20 about it, sir.

21           (EXHIBIT 3 MARKED FOR IDENTIFICATION)

22      A.   Okay.

23 BY MR. STARR:

24      Q.   Did you have an opportunity to review this

25 document, sir?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

269

1    A.   Yes.

2    Q.   Okay.  Did you -- have you ever seen this

3 document before?

4    A.   In the -- the police file that I was given.

5    Q.   Okay.  So it was in the file that you reviewed

6 in preparation for today's deposition?

7    A.   Yes.  Well, I -- I've seen it in there, yes.

8    Q.   Okay.  And do you know -- for the record, can

9 you tell me what this document is?

10   A.   Well, this is what an ICAM document looks

11 like, apparently.

12   Q.   Okay.

13   A.   It -- this was run -- run for people with the

14 name of Fletcher.  It was run August 19th of 1999.  But

15 the -- there's no indication of who would've run this.

16   Q.   You don't see your name on this document

17 anywhere, do you, sir?

18   A.   No.

19   Q.   Okay.  And do you have any independent

20 recollection of creating this document?

21   A.   No, I don't.

22   Q.   Do you have any independent recollection of

23 reviewing this document when you began investigating

24 the Willie Sorrell shooting?

25   A.   Well, obviously, this wasn't done until '99,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  so it wouldn't have been in there in '95.

2      Q.   So it was created after you had started

3  working on the case, correct?

4      A.   Yes.

5      Q.   So in addition to you and Detective Bogucki

6  and Detective Noradin, what other Chicago Police

7  detectives worked on the Willie Sorrell case after

8  you joined the case in 1995?

9      A.   Well, apparently Detective Rutherford and

10  McDonald.  That's the only other two I know.

11      Q.   Okay.  So is it -- because this was in the

12  investigative file, is it safe to assume that either

13  yourself, Detective Bogucki, Detective Noradin,

14  Detective Rutherford, or Detective McDonald ran this

15  report and included it in the investigative file?

16          MR. MICHALIK:  Object to form.

17      A.   I believe one of us would've had to.  I don't

18  believe it was me or Bogucki, because we don't have any

19  reports in 1999 about it.  Actually, nobody has a report

20  in 1999 about it, but I don't believe it was ours.

21  BY MR. STARR:

22      Q.   Okay.  And you testified earlier that you

23  thought Rutherford and McDonald were good detectives,

24  correct?

25      A.   Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q.   And you would expect that if they ran this

2  report, they would include a police report explaining

3  what the purpose of running this report is?

4     A.   Not necessarily.  It's obviously evident that

5  they're looking for a Fletcher, and because of the

6  previous reports, a Fletcher was the suspect.  So it's

7  obvious that that's what they're looking into -- is what

8  we're looking into.

9     Q.   And because you were working on this case, you

10  would've been made aware of other investigative work

11  that was done by the detectives?

12     A.   Well, no, not necessarily.  We could have been

13  busy with other things.  They -- they could have done

14  things independent of us.

15     Q.   So you don't know -- you previously testified

16  you don't know who ran the report amongst the five

17  detectives that we previously listed, right?

18     A.   No, I don't.

19     Q.   But somebody did, correct?

20     A.   Well, it's in the file, obviously.

21     Q.   Okay.  You don't think that if another

22  detective had run this report, you would've been made

23  aware of it?

24     A.   Not necessarily.

25     Q.   And was that a common thing that when you were

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  working on an investigation with other detectives, they

2  were running reports and doing an investigation and not

3  keeping you abreast of what they're doing?

4      A.   Well, it depends on the case.  I mean, on,

5  you know, on an active case, you know, it's being passed

6  down from watch to watch.  Certainly, that information

7  we'd passed on cold cases, not necessarily.

8      Q.   Okay.  So in 1995, if Rutherford and McDonald

9  gave you this information that there was a suspect by

10 the name of Fletcher Clinton, and you investigated that

11 suspect, and your investigation led you to believe that

12 he was not a suspect, that's the kind of information

13 that you would've communicated to Rutherford and

14 McDonald, correct?

15     A.   I would guess we would, seeing that they were

16 the ones to ask us to show the photo array, yeah.

17     Q.   Because they gave you an investigative lead,

18 so to speak, right?

19     A.   You can call it that.

20     Q.   And you followed up on it and you determined

21 that it wasn't a good lead, correct?

22     A.   Yes.

23     Q.   And then you would've told them, we followed

24 up on your lead, and it wasn't a good investigative

25 lead.  Fletcher Clinton's not a suspect anymore,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    correct?

2        A.    Well, we would've told him what -- what

3    happened when we showed the photo array.

4        Q.    Okay.  What you would've told McDonald or

5    Rutherford, that you showed the photo array of Edward

6    Cooper, including Fletcher Clinton, and he wasn't able

7    to identify Fletcher Clinton, correct?

8        A.    Again, I don't remember any of the specific

9    conversations, but we probably would've told them,

10   seeing that they gave us that name to -- to try to show

11   to Edward Cooper.

12       Q.    Okay.  And you previously testified in this

13   deposition that Edward Cooper's negative identification

14   of Fletcher Clinton led you to believe that he was no

15   longer a suspect, correct?

16       A.    Yes.

17       Q.    And you went as far as you didn't show any of

18   the other witnesses the same photo array with Fletcher

19   Clinton because you ruled Fletcher Clinton out, because

20   Edward Cooper could not identify him, correct?

21       A.    We didn't do anything further at that point.

22   If -- if more information would've come in on him, I

23   certainly would've followed up on it, but that's all we

24   did on him.

25       Q.    Sure.  But my question is, because Edward

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  Cooper did a negative identification during your photo

2  array that included Fletcher Clinton, you ruled Fletcher

3  Clinton out as a suspect?

4      A.  Well, he's -- he's saying he's not one of the

5  offenders, yes.

6      Q.  Right.  And because he told you that he

7  couldn't identify Fletcher Clinton, you ruled him out as

8  a suspect?

9      A.  Him saying that neither of the offenders are

10  in this photo array makes me rule him out as a suspect,

11  yes.

12      Q.  Okay.  And yet in 1999, four years later,

13  somebody who was in -- working on the Willie Sorrell

14  shooting homicide investigation ran a name check of

15  Fletchers, correct?

16      A.  Yes.

17      Q.  And this name check includes Fletcher Clinton,

18  right?

19      A.  What page is that on?

20      Q.  That is on City JF-78.

21      A.  If that's the same Fletcher Clinton, I assume

22  it is, yes.

23      Q.  How could we tell if that's the same Fletcher

24  Clinton?

25      A.  IR number.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q.   Okay.  And his IR number is 823141?

2      A.   Yes.

3      Q.   Okay.  I'm going to show you what I'm going to

4 mark as Exhibit number 4.  And the Bates on this is City

5 JF-4561.  All right.  Take a look at that Exhibit number

6 4 there, sir.  It's a photograph, Bates 4561. Let me

7 know if you have a moment to review it.

8          (EXHIBIT 4 MARKED FOR IDENTIFICATION)

9      A.   Yes.

10 BY MR. STARR:

11      Q.   And that is a Chicago Police mugshot, correct?

12      A.   Yes.

13      Q.   And what is the IR number on that Chicago

14 Police mugshot?

15      A.   823141.

16      Q.   823141?

17      A.   Right.

18      Q.   And does that indicate to you that that's a

19 mugshot of Fletcher Clinton?

20      A.   That's the same IR number of a Fletcher

21 Clinton that's on this ICAM report.

22      Q.   Right.  And so the photograph of that

23 individual in that -- the photograph of that individual

24 has the IR number 823141, correct?

25      A.   Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.    And does that indicate to you that that's a

2  photograph of Fletcher Clinton?

3    A.    Of a Fletcher Clinton, yes.

4    Q.    Okay.  And the same Fletcher Clinton at the

5  1999 ICAM search ran the same exact IR number, right?

6    A.    Yes.

7    Q.    They're one in the same, correct?

8    A.    Correct.

9    Q.    Okay.  So the Fletcher Clinton that's listed

10  on City JF-78 and 79, because it's the bottom there,

11  is the same Fletcher Clinton that's listed in the

12  photograph that I just showed you as in Exhibit 4,

13  correct?

14    A.    Yes.

15    Q.    Okay.  So that -- does that tell you -- does

16  that indicate to you that in 1999, somebody was

17  still -- somebody who was working on the Willie Sorrell

18  investigation was still investigating Fletcher Clinton

19  as a suspect?

20       MR. STEFANICH:  Objection.  Foundation.

21    A.    No.  It just indicates that the ICAM, that

22  there was a search for people named Fletcher on the

23  ICAM, and the ICAM spit out a lot of Fletcher names.

24  BY MR. STARR:

25    Q.    But not all the Fletcher names, right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       A.   I don't know what parameters were used,

2  but there's a number of Fletchers on these pages.

3       Q.   Well, in 1999, do you know if my client,

4  James Fletcher, had already been arrested by the Chicago

5  Police and already had an I number -- IR number?

6       A.   Yes, he had.

7       Q.   Okay.  His name's not on this ICAM list,

8  is it?

9       A.   I -- I don't know.  I didn't look at --

10      Q.   I'll represent to you that it's not.  Do you

11  believe me?  If you want to take a look, go ahead.  But

12  I'll represent to you that James Fletcher is not on this

13  list.

14      A.   Okay.  I'll believe you.

15      Q.   Okay.  But Fletcher Clinton is.

16      A.   Okay.  Yes.

17      Q.   So what is this report, done in January of

18  1990 -- I'm sorry, August of 1990 -- what does this --

19  August 19th of 1999, someone ran an ICAM report that

20  generated Fletcher Clinton's name, what does that

21  indicate to you?

22          MR. STEFANICH:  Objection.  Form and

23      foundation.

24      A.   Well, it indicates to me that the -- that the

25  people with names Fletcher came up on here.  James

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 Fletcher used a number of aliases, which may be why this

2 ICAM report didn't print him out, as he -- he's in

3 prison under Arnold Dixon.  I believe he used several

4 other aliases for as many arrests, so...

5 BY MR. STARR:

6    Q.   Like Jimmy Fletcher instead of James Fletcher,

7 right?

8    A.   I believe that was one of his many, yes.

9    Q.   What other aliases, besides Arnold Dixon and

10 Jimmy Fletcher, did James Fletcher use?

11   A.   I'd have to see his --

12   Q.   Okay.

13   A.   -- rap sheet to know, but --

14   Q.   So --

15   A.   -- I believe there are others.

16   Q.   Do you think that James Fletcher's name didn't

17 come up in this ICAM report because he used an alias?

18   A.   I believe he was probably in ICAM as a -- as a

19 different name.  That's why it didn't print him out.

20   Q.   If he was arrested as James Fletcher, would he

21 not be in ICAM?

22   A.   I --

23       MR. STEFANICH:  Objection to foundation.

24   A.   I -- I would assume he would be.

25 BY MR. STARR:

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201
502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com
KENTUCKIANA
COURT REPORTERS

1    Q.   When you run an IR search, you're a

2   detective -- you were a detective for a long time,

3   so you -- I'm sure you did this.  When you run an IR

4   search, does it not give you-all the names and all the

5   aliases that are associated with that IR number?

6        MR. STEFANICH:  Objection to form and

7     foundation.

8    A.   It -- it will give the -- all the arrests of

9   that person with that IR number.

10  BY MR. STARR:

11   Q.   And so if they were arrested with an alias, it

12  would give you that name, right?

13   A.   Well, that's different than an ICAM search

14  though.

15   Q.   Okay.  I get that.  But I'm asking you, if you

16  run an IR search, it would give you-all the names that

17  are associated with the persons who's connected --

18   A    It would --

19   Q.   -- to that IR, correct?

20   A.   It would print out his rap sheet, all of his

21  arrests, all the names he used for all those arrests.

22   Q.   Okay.  So is it your testimony that you think

23  the reason that James Fletcher's name is not on this

24  ICAM list is because he used an alias?

25        MR. STEFANICH:  Objection.  Foundation.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.   Well, I -- I would have to guess.  And -- and

2  I also would assume there's more Fletchers than these

3  pages.  But anyway, I would have to guess he's not on

4  here because in ICAM, he's under a different name.

5  BY MR. STARR:

6      Q.   Okay.  I'm not withholding any of the

7  Fletchers that were on this list, just so we're on the

8  same page here.  You understand that, right?

9      A.   Okay.  Okay.

10     Q.   This is this is produced by the city in this

11 litigation.  I'm not withholding any of the

12 Fletchers -- list of Fletcher names from you.

13     A.   Okay.

14     Q.   Okay?  Can you think of any other reason,

15 besides the name Fletcher was ran through ICAM, that

16 there's a ICAM search with Fletcher Clinton's name on

17 the list?

18     A.   No.  I assume that that's what ICAM spit out.

19     Q.   Okay.

20     A.   You ask them for Fletcher's, that's what they

21 give you.

22     Q.   These Fletchers are all first name Fletchers,

23 correct?

24     A.   I didn't look that closely.

25     Q.   Well, go ahead and look closer.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      A.   Yeah.  If that's the case, I don't know why it
 2  was run like that.
 3      Q.   Well, in 1995 --
 4      A.   That should --
 5      Q.   -- you had reason to believe that Fletcher
 6  Clinton was involved in this case, correct?
 7      A.   He was a possible suspect.
 8      Q.   So it appears from this ICAM report that in
 9  1999, whoever ran the report had reason to believe that
10  someone with the first name Fletcher was involved in
11  this case.  Is that not correct?
12      A.   Not necessarily --
13           MR. MICHALIK:  Object to form.
14           THE WITNESS:  Excuse me.
15           MR. MICHALIK:  It calls for speculation.
16      A.   Yeah, not necessarily.
17  BY MR. STARR:
18      Q.   Okay.  So how do you interpret this search for
19  all Fletchers with the first name Fletcher?
20      A.   That for whatever reason, whether it wasn't
21  typed in here right, the ICAM report just printed out
22  people with first name of Fletcher.  There would be no
23  reason just to run the first name of Fletcher.
24      Q.   Well, what -- let me ask you this.  What
25  reason might there be to run a search of all people with
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    a first name Fletcher?

2        A.   You would run them both, first and last names.

3        Q.   Okay.  That's fair.  But what reason might a

4    detective run a search for only first name Fletchers?

5        A.   If the information they had was that an

6    offender had a first name of Fletcher.

7        Q.   Okay.  And is it your testimony that you think

8    that the reason that the search was run for first name

9    Fletchers is because someone typed it in wrong?

10       A.   I can't explain why -- why it's only printed

11   out first name of Fletchers.  It -- it doesn't make any

12   sense.

13       Q.   And you don't know whether or not you ran the

14   search, correct?

15       A.   I don't believe I did.

16       Q.   But you don't know --

17       A.   Because I don't believe I -- I did anything in

18   1999 with this case.

19       Q.   But you don't have an independent

20   recollection, so you can't say one way or the other

21   whether or not you, in fact, are the person who ran the

22   search for people with the first name Fletcher in August

23   of 1999, correct?

24            MR. STEFANICH:  Objection to form.

25       A.   There would be absolutely no reason for me to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

283

```
1    run just the first name of Fletcher in this case.
2    BY MR. STARR:
3         Q.   Well, that's not my question, but let's think
4    about that answer.  You just said there would be
5    absolutely no reason for you to run the first name of
6    Fletcher in this case.  When I asked you why someone
7    would run just the first name, you said it's because
8    there was information to indicate that the suspect had
9    the first name Fletcher.
10        A.   I said, there'd be no reason to run just the
11   first name of Fletcher.  You would run both first name
12   and last name.
13        Q.   So do you think that somebody ran the search
14   for last name of Fletcher and just didn't include it in
15   the investigative file?
16             MR. STEFANICH:  Objection.  Foundation.
17        A.   I -- I -- I don't know.  I can't explain why
18   there wasn't more run on that.
19   BY MR. STARR:
20        Q.   So it's possible somebody ran the last name
21   Fletcher, and then just didn't include that document in
22   the investigative file, correct?
23        A.   It's not --
24             MR. STEFANICH:  Objection.  Foundation.
25        A.   It's not likely, seeing this was included.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Video Deposition of Carl McHargue taken 04/06/23

1   There should have been the other two, but I -- I don't

2   know.  I have no explanation for it.

3   BY MR. STARR:

4        **Q.   But it's your testimony that somebody who ran**

5   **a first name Fletcher should have also ran a last name**

6   **Fletcher?**

7        A.   If you're going to search for Fletchers, then

8   you should do both.

9        **Q.   If you think that the suspect has the first**

10  **name Fletcher, should you also run the last name**

11  **Fletcher?**

12            MR. STEFANICH:  Objection.  Form.

13       A.   Well, again, it depends on the information.

14  If someone's telling you, I know his first name is

15  Fletcher, then I would run just the first name is

16  Fletcher.

17  BY MR. STARR:

18       **Q.   Well, in this case, you -- this is the**

19  **information you had, correct?  Terry Rogers tells the**

20  **police in 1990 that he hears one of the offenders yell**

21  **the name Fletcher.**

22       A.   Could be a first name or last name.

23       **Q.   Yeah.  He doesn't specify, correct?**

24       A.   Correct.

25       **Q.   Okay.  And then you get the name Fletcher**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of EDWARD SCHMIDT, taken on 03/08/2023

285

```
 1    Clinton from McDonald and Rutherford, correct?

 2        A.   Yes.

 3        Q.   In '95?

 4        A.   Yes.

 5        Q.   Okay.  So at that juncture, you have

 6    information that one of the witnesses heard the name

 7    Fletcher, and these two other detectives have a suspect

 8    with the first name Fletcher, correct?

 9        A.   We have a possible suspect with the first name

10    Fletcher.

11        Q.   Yeah.  Is that enough of a reason to run a

12    search for first name Fletchers?

13             MR. STEFANICH:  Objection.

14        A.   Well, the reason --

15             MR. STEFANICH:  Form and foundation.

16        A.   The reason you'd run a name for any Fletchers

17    is -- is because you have a witness saying they heard

18    the name Fletcher.  You wouldn't -- you don't know

19    whether that's a first or last name.

20    BY MR. STARR:

21        Q.   Right.  Which is probably why this Exhibit

22    number 2 that I showed you earlier and this printout of

23    the Fletcher names, this is probably why this is run,

24    correct?

25             MR. MICHALIK:  Objection to form and
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      foundation.

2          A.   That appears to be run with just the last name

3    of Fletcher.

4    BY MR. STARR:

5          Q.   **Right.  And the reason it was run --**

6          A.   But it even printed out other names

7    with -- that start with F on it.

8          Q.   **Yeah.  But the reason why someone -- the**

9    **detective would run this search is because they have**

10   **reason to believe that one of the offenders had the name**

11   **Fletcher?**

12         A.   Because --

13             MR. MICHALIK:  Objection.  Form.  Foundation.

14         A.   Because of what Terry Rogers had said.

15   BY MR. STARR:

16         Q.   **Okay.  Do you know -- can you say whether or**

17   **not Detective Bogucki ran this search that's in Exhibit**

18   **number --**

19             THE REPORTER:  4.

20         Q.   **-- 4?**

21             MR. STEFANICH:  Objection.  It's Exhibit number

22       3 --

23             MR. MICHALIK:  Yeah.

24             MR. STEFANICH:  -- but objection.  Asked and

25       answered.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Video Deposition of Detective Thomas Schiller taken on May 27, 2022

1  A.  No, I don't know.  I -- I don't think he did,

2  because I think -- think we would have done a report on

3  it, or done something with it, other than just put this

4  in the file.

5  BY MR. STARR:

6  Q.  But you do know one or the other, correct?

7  A.  No.

8  Q.  And you can't even tell me one way or the

9  other if you read this report, right?

10  A.  I can't say for sure.  I certainly don't

11  remember it.

12  Q.  Okay.  Is there any other information on this

13  report that you can identify for me to tell us who ran

14  the report, or what the search criteria they put in for

15  the report was?

16  A.  I don't see anything that would indicate who

17  ran the report.  It just says it's for Fletcher using,

18  whatever that means.  No, there's nothing else to

19  indicate on here.

20  Q.  And if you look at City JF-78, the one that

21  has Fletcher Clinton's name on there, did you ever go

22  interview this Fletcher Clinton?

23  A.  No.

24  Q.  Okay.  How come?

25  A.  Well, because we -- he wasn't identified as an

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   offender.
 2        Q.   And I'm not sure if I asked you this, but did
 3   Rutherford or McDonald ever explain to you how they came
 4   up with the name Fletcher Clinton?
 5        A.   I don't remember what -- what we talked about,
 6   so they may have.  I would assume they would have told
 7   us something of -- of why we wanted -- why we wanted to
 8   show the photo array to Edward Cooper.
 9        Q.   And if I represent you -- and we'll look at
10   this report at some point, but if I represent to you
11   there's a report that suggests that McDonald and
12   Rutherford came up with this Fletcher Clinton name
13   because he lived close to the victim, Edward Cooper,
14   does that refresh your recollection at all?
15        A.   It doesn't.  I don't remember our
16   conversation, no.
17        Q.   Okay.  You see this Fletcher Clinton has two
18   addresses, correct?
19        A.   Yes.
20        Q.   4238 West Washington?
21        A.   Yes.
22        Q.   And then the other one is 1538 North
23   Leaming --
24        A.   Leamington.
25        Q.   Leamington?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DETECTIVE DAVID SCHMELD, taken 04/09/25

289

```
 1        A.    Yes.
 2        Q.    Right.  And you never went to either of those
 3   locations, correct, to interview --
 4        A.    Correct.
 5        Q.    -- Mr. Fletcher -- or Mr. Clinton?
 6        A.    Correct.
 7        Q.    Do you know where Edward Cooper lives?
 8        A.    I'd have to look at the reports to indicate
 9   what his home address is.
10        Q.    Do you know if either of these two addresses
11   is anywhere near where Edward Cooper lives?
12        A.    I -- I'd have to see where Edward Cooper's
13   address is to tell you that.
14        Q.    Yeah.  Are you pretty familiar with Chicago
15   streets in hundreds?
16        A.    Yes.
17        Q.    Okay.  So Mr. Cooper, who -- I'll represent
18   you that Mr. Cooper lives on North Luna, does that sound
19   familiar?
20        A.    I know the street Luna.
21        Q.    Okay.
22              MR. STEFANICH:  If I can get that Bates
23        whenever you find the address.
24   BY MR. STARR:
25        Q.    Yeah, I'm looking for it.  Sorry.  I think
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    it's 1438.  No, it's 1435 North Luna.  I'm going to
2    represent to you that on City JF-52, it's a Chicago
3    Police report.  It's a general progress report.
4         A.   Uh-huh.
5         Q.   Oh, I have it right here.
6              MR. STEFANICH:  It's the one page I'm missing
7         actually, so...
8              MR. STARR:  Well, I got a copy for you.  I'm
9         going to mark this as Exhibit 5.  Sorry, Paul.
10        Take a look at that report there briefly, sir.
11        And then, say the Bates, City JF-52?
12             (EXHIBIT 5 MARKED FOR IDENTIFICATION)
13             MR. STEFANICH:  Yeah.
14   BY MR. STARR:
15        Q.   Okay.  Did you have an opportunity to review
16   that?
17        A.   Yes.
18        Q.   Okay.  Are you familiar with this document?
19        A.   Yes.
20        Q.   Did you review this document in preparation
21   for today's deposition?
22        A.   Yes.
23        Q.   And can you tell me what this document is?
24        A.   It's our -- our report from March of '95
25   regarding and interview of Edward Cooper.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q.   And does that report indicate what

2  Mr. Cooper's address is?

3      A.   Yes, it does.

4      Q.   And that is the top paragraph, it says his

5  address is 1435 North Luna?

6      A.   Yes.

7      Q.   Does that refresh your recollection of

8  Mr. Cooper's residence?

9      A.   If that's what the report says, then that's

10  what it is.

11      Q.   Do you -- but seeing that address, does that

12  refresh your recollection of going out to his residence

13  at any point in time?

14      A.   No.

15      Q.   Okay.  Do you know if that address, 1435, is

16  in the same neighborhood as Mr. Fletcher Clinton's

17  address on 4238 West Washington?

18      A.   It's not close to that address, no.

19      Q.   Okay.  And do you know if Mr. Cooper's address

20  at 1435 North Luna is close to the address of 1538 North

21  Leamington?

22      A.   It's closer than the other address, but it's

23  still a distance away.

24      Q.   Not the same neighborhood, correct?

25      A.   No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q.   Okay.  This document that's marked as Exhibit

2  5, what kind of Chicago Police report is this?

3     A.   Pardon me?

4     Q.   What kind of report is this?

5     A.   Well, it's -- it's a typewritten report put on

6  a -- a general progress report, which generally used as

7  just note paper.  There was a -- a time where for brief

8  reports, they would allow us just to -- to type a report

9  on a -- the general progress report form.

10     Q.   Yeah.  When was that period of time?

11     A.   Well, this was done in -- in '95, so sometime

12  around then.

13     Q.   Do you have a distinct independent

14  recollection of there being a period in time where you

15  were allowed to type general progress reports?  I don't

16  want to ask you anything that you --

17     A.   Yeah, well I don't know --

18     Q.   -- discussed with your attorney.

19     A.   -- how many years we did that, but -- or what

20  -- what commander allowed that, but there was a time

21  period that it was done.

22     Q.   Okay.  So I don't want to -- I don't want to

23  intrude upon the attorney-client for privilege.  I'm not

24  asking about any conversations you've had with your

25  attorney, but do you have an independent recollection of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    there being a time period where you were told, as a

2    Chicago Police detective, you should type your GPRs?

3          MR. MICHALIK:  Just object to the form of that

4       question.

5       A.    I -- I recall that there was a time period

6    where we were allowed to do that.

7    BY MR. STARR:

8       Q.    You were allowed to do it.

9       A.    Yes.

10      Q.    You weren't required to do it?

11      A.    No.

12      Q.    Okay.  And do you know why you typed this GPR?

13      A.    It was a brief report, so I assumed it was

14   just a -- a more quicker way of doing it.

15      Q.    Okay.  Does the fact that Detective Bogucki

16   signed it indicate to you who typed it?

17      A.    I believe he did.

18      Q.    Okay.  Is that how you guys would do your

19   general practices, whoever wrote the GPR would sign it?

20      A.    Yes.

21      Q.    Okay.  Did you ever write a GPR that Detective

22   Bogucki signed?

23      A.    I don't believe so.

24      Q.    Did Detective Bogucki ever write a GPR up and

25   then you signed it?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.    I don't believe so.

2    Q.    Okay.

3    A.    It's possible when -- and when they were just

4  used as notes.  It's possible, if someone was just

5  submitting the notes, that they might sign a name --

6  name.  I mean, there was a lot of times notes -- there

7  would be notes from different people written on the same

8  piece of paper, but...

9    Q.    Would you have taken the typewriter with you

10 out to Mr. Cooper's residence to type this --

11   A.    No.

12   Q.    -- or would you have typed this back at Area

13 5?

14   A.    Area 5.

15   Q.    Okay.  And so there is a fair amount of detail

16 in this general progress report, correct?

17   A.    It's brief.

18   Q.    It's brief, but there's a -- there's a decent

19 amount of details in it, correct?

20   A.    Well, there's -- there's some details.

21   Q.    Okay.

22   A.    It's like, only a couple paragraphs long.

23   Q.    It refers to a RAMIS check.  Do you see that?

24   A.    I do.

25   Q.    And is this -- is it Exhibit number 4 that was



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-7 Filed: 05/06/25 Page 297 of 336 PageID #:5070
Video Deposition of Mark Stevens - taken 10/17/2023
295

```
 1    the RAMIS check?  The one that had the --

 2         A.   That's -- that's --

 3         Q.   -- Fletcher Clinton?

 4         A.   That's ICAM.

 5         Q.   That's ICAM.  Okay.  Would this be a RAMIS

 6    check?

 7         A.   It might be.  I don't remember.

 8         Q.   Okay.  So it's possible that it -- what's been

 9    marked as Exhibit number 2, I have it number 3 written

10    on here, but Exhibit number 2, which is Bates stamp

11    8696, that this is the RAMIS search that was run before

12    you went out to Mr. Cooper's residence in 1995, right?

13         A.   I don't know what --

14              MR. MICHALIK:  Object to form.

15         A.   I don't know when that was run.

16    BY MR. STARR:

17         Q.   Right.  But --

18         A.   -- or by who.

19         Q.   This report indicates that a RAMIS search was

20    run of people with the last name Fletcher, or with the

21    name Fletcher, correct?

22         A.   It indicates that Clinton's name was obtained

23    through a RAMIS check of Fletchers.

24         Q.   Yeah.  It doesn't say Fletcher's first name or

25    Fletcher's last name, right?
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.   No, it doesn't.

2      Q.   It just says Fletcher?

3      A.   Yes.

4      Q.   Should that RAMIS check, that name search,

5  have been included in the investigative file?

6      A.   Possibly.

7      Q.   Based on your previous testimony about

8  detectives McDonald and Rutherford being diligent in

9  doing their job correctly, would you assume that they

10  would've included that RAMIS check in the investigative

11  file?

12          MR. MICHALIK:  Object to form.

13      A.   They could have, but seeing that we wrote this

14  report about it, maybe it wasn't necessary.  I don't

15  know.

16  BY MR. STARR:

17      Q.   Okay.  Did you see any other things in the

18  investigative file that could have been a RAMIS name

19  check, besides this document --

20      A.   not that I --

21      Q.   -- Exhibit number 2?

22      A.   Not that I recall, no.

23      Q.   Okay.  So is this document, Exhibit number 2,

24  the most likely candidate for the RAMIS check that was

25  run prior to your going out to Mr. Cooper's residence in

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   1995?
 2        A.   I don't know.
 3             MR. STEFANICH:  Objection.  Objection.  Form
 4        and foundation.  You can answer.
 5        A.   I -- I can't say that.  I don't know.
 6   BY MR. STARR:
 7        Q.   Tell me what else in the investigative file
 8   might be the RAMIS name check that was run, besides
 9   Exhibit number 2?
10        A.   I don't know.
11        Q.   Is it because you didn't get a chance to
12   review the investigative file?
13        A.   No, I -- I -- I don't know what that is.  And
14   I don't -- don't see anything else that says RAMIS in
15   the file.
16        Q.   Yeah, I understand that.  Was there anything
17   else that you saw in the investigative file, besides
18   this document that's Exhibit number 2, that could have
19   been the RAMIS name check?
20        A.   Not that I recall, no.
21        Q.   Okay.  I just want to make sure I asked you
22   this and maybe I did, you reviewed this in preparation
23   for today's deposition, right?
24        A.   Yes.
25        Q.   Okay.  And then what date is on this report?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.    March 19th of '95.

2      Q.    And this is your first interview with Mr.

3 Cooper, correct?

4      A.    Yes.

5      Q.    And based on your previous testimony, your own

6 terminology, this would be a re-interview of one of the

7 eyewitnesses, right?

8      A.    Yes.

9      Q.    Because Mr. Cooper was interviewed by the

10 detectives originally assigned to the case in 1990,

11 right?

12     A.    Yes.

13     Q.    Okay.  Do you have any independent

14 recollection of this interview at all?

15     A.    No.

16     Q.    And does seeing this GPR help refresh your

17 recollection at all?

18     A.    No.

19     Q.    Okay.  And this document indicates that at

20 some point in your investigation, you were focused on

21 someone with the first name of Fletcher, right?

22          MR. STEFANICH:  Objection to form.

23     A.    No, it doesn't say that.

24 BY MR. STARR:

25     Q.    Well, it says an IR check of Fletcher Clinton

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    showed that he had a UW robbery and drug arrest.  He's

2    currently serving time in DFC at Taylorville.  At some

3    point in time, you were focused on Fletcher Clinton,

4    right?

5              MR. STEFANICH:  Objection.  Form.

6        A.   Yes.  This -- this report indicates that we

7    wanted to show Edward Cooper a photo array with Fletcher

8    Clinton.  It doesn't indicate that they we were only

9    looking for persons with the first name of Fletcher.

10   BY MR. STARR:

11       Q.   Yeah.  That's not what I said.  I asked you at

12   some point, your investigation was focused on someone

13   with the first name of Fletcher, and that's right,

14   right?

15             MR. STEFANICH:  Objection.  That's not what you

16       asked, but I'll object to the form, again.

17       A.   Fletcher Clinton, that's the one person with

18   the first name of Fletcher that we showed the photo

19   array of.

20   BY MR. STARR:

21       Q.   Okay.  And you're referring to it as a photo

22   array, but if you look at the second paragraph, it says,

23   a photo of Clinton was obtained, and a photo show-up was

24   conducted at the home of Edward Cooper.  Do you see

25   that?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.    Yes.

 2        Q.    And is your testimony that the photo show-up

 3   was, in fact, the photo array where --

 4        A.    Same --

 5        Q.    -- you showed multiple photos, right?

 6        A.    Same thing.  Just a group of photos, yes.

 7        Q.    Okay.  And that photo array resulted a

 8   negative -- a negative identification, correct?

 9        A.    Correct.

10        Q.    And that was documented in this report by you

11   and Detective Bogucki, correct?

12        A.    Yes.

13        Q.    Did you document that photo array anywhere

14   else?

15        A.    No.

16        Q.    And you don't know what photos you showed

17   Mr. Cooper, other than the photo of Fletcher Clinton,

18   correct?

19        A.    Correct.

20        Q.    And you don't have any recollection of how you

21   chose the other photos that you used as fillers,

22   correct?

23        A.    Correct.

24        Q.    And you don't have any independent

25   recollection of the photo of Fletcher Clinton, right?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     A.   No, I don't.

2     Q.   I showed it to you.  It was Exhibit number 4.

3 It didn't refresh your recollection at all, right?

4     A.   Right.

5     Q.   Okay.  And then do you know if the photos that

6 you used in the photo array in 1995 with Edward Cooper,

7 did those photos become part of the investigative file?

8     A.   No, we don't -- we don't have to -- to hold

9 onto photos of a negative array.

10    Q.   And so you did not include the photos from

11 that photo array in the investigative file, correct?

12    A.   I don't believe there'd be any reason to do

13 that, no.  I mean, you know, I --

14    Q.   Should these photos --

15    A.   Is it possible that they were thrown into the

16 file too?  It's possible, but we weren't required to.

17    Q.   That was my next question.  Should the photos

18 that you used in the negative photo identification in

19 1995, should they have been included in the

20 investigative file?

21    A.   No, they didn't have to be.

22    Q.   What was your next investigative step, after

23 this interview resulted in a negative identification?

24    A.   Well, according to this report, we tried to

25 both find Terry Rogers and when we couldn't do that, we

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  put a stop order in on him.

2      Q.   What was your next investigative stop after

3  putting that stop order in?

4      A.   Well, the next report is in 2002, when Terry

5  Rogers is arrested, and we're notified that he's in

6  custody.

7      Q.   I think I asked you this, but just to be 100

8  percent sure, you never showed the photos that were part

9  of the 1995 photo array to any other witness besides

10 Edward Cooper, correct?

11         MR. STEFANICH:  Objection.  Asked and answered.

12     A.   Correct.

13 BY MR. STARR:

14     Q.   Did you do anything else after March 19, 1995

15 to investigate Fletcher Clinton?

16     A.   Well, there's nothing in the -- the file to

17 indicate that we did.  I don't remember doing anything

18 more, so apparently not.

19     Q.   Well, the exhibit that I showed you was from

20 1999, had Fletcher Clinton's name on there.  That

21 indicates that at some point, somebody ran a search that

22 generated a result that included Fletcher Clinton,

23 right?

24     A.   Yes.

25     Q.   But you don't have any independent

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of RAYMOND SCHALK, taken 03/09/2023

1   recollection of doing anything else to investigate

2   Fletcher Clinton after March 19, 1995, right?

3        A.   No, I don't.

4        MR. STARR:  Okay.  You want to stop, and we'll

5   resume this at another point in time?

6        MR. STEFANICH:  That's good with me.

7        MR. STARR:  How much time are we on the record?

8        THE REPORTER:  About 5 hours.

9        MR. STARR:  Okay.  That's fine.  Let's stop.

10  Stop and we'll resume.  We'll find another date that

11  works for the witness and for you guys, okay?

12       THE VIDEOGRAPHER:  We are going off the record

13  at 4:52 p.m., and this concluded today's testimony

14  given by Raymond Schalk.

15           (DEPOSITION SUSPENDED AT 4:52 P.M. (CT))

16

17

18

19

20

21

22

23

24

25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                    CERTIFICATE OF REPORTER

 2                      STATE OF ILLINOIS

 3

 4    I do hereby certify that the witness in the foregoing

 5    transcript was taken on the date, and at the

 6    time and place set out on the Title page hereof, by me

 7    after first being duly sworn to testify the

 8    truth, the whole truth, and nothing but the truth; and

 9    that the said matter was recorded by me digitally and

10    then reduced to typewritten form under my direction, and

11    constitutes a true record of the transcript as taken,

12    all to the best of my skill and ability. I certify that

13    I am not a relative or employee of either counsel and

14    that I am in no way interested financially, directly or

15    indirectly, in this action.

16

17

18                            KORTNEY J CHASE
                                Official Seal
19                     Notary Public - State of Illinois
                      My Commission Expires Sep 24, 2025
20

21

22    KORTNEY CHASE,

23    COURT REPORTER/NOTARY

24    MY COMMISSION EXPIRES: 09/24/2025

25    SUBMITTED ON: 05/25/2023
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-7 Filed: 05/06/25 Page 307 of 336 PageID #:5080
The Deposition of Raymond Schalk, taken on May 17, 2023
305

**Exhibits**

Exhibit 1_ Schalk 255:19, 25

Exhibit 2_ Schalk 257:12, 17 266:18 285:21,22 295:9,10 296:21,23 297:9,18

Exhibit 3_ Schalk 268:16, 21 286:21,22

Exhibit 4_ Schalk 275:4, 5,6,8 276:12 294:25 301:2

Exhibit 5_ Schalk 290:9, 12 292:1,2

_____

**0**

02 129:16,17,18 182:9,13,16 206:21 212:8 214:20,21 228:5,6,11,13, 15 250:6

_____

**1**

1 56:18 255:19, 25

100 302:7

10:15 6:6

11 97:4 166:13, 19

11:39 90:24

11:48 91:2

11th 96:18 97:22,25

12 76:9,13,21 77:10 166:13, 19 221:21

1435 290:1 291:5,15,20

1438 290:1

15 142:11

1538 288:22 291:20

15th 47:11 48:3,6 52:1

16th 6:5

19 302:14 303:2

1977 47:19 48:4

1980 48:8 49:1

1982 49:11,22 50:5

1985 232:10

1990 7:16 50:7 71:16,23 78:10, 14 154:7,20,21 176:9 183:10, 13 192:18 194:13 195:4 210:8,20 211:25 216:23 217:5,16 219:11,19,22 220:4,10,16,20 221:6 223:24 277:18 284:20 298:10

1990s 17:14 25:24 73:14

1995 8:18 50:11,17 51:8 71:19,22 78:17, 22 79:1,7,14, 19,22 111:24 112:3,8,13,14 116:16 124:20 126:4 130:14 131:5 132:11, 14,24 133:8,19 143:10 173:17 175:25 182:19 183:2 186:25 187:25 188:17 190:1,19 191:6, 12 192:7 196:9 198:6 199:4,10,

23 205:15,25 206:19,20,25 207:3 208:22 209:2,18 210:8, 17,19 211:1,8 220:24 221:4 222:5 230:4,8, 16 233:16 234:9 245:14, 18,25 256:23 257:7 259:4,12, 23 266:7 270:8 272:8 281:3 295:12 297:1 301:6,19 302:9, 14 303:2

1999 269:14 270:19,20 274:12 276:5, 16 277:3,19 281:9 282:18, 23 302:20

19th 269:14 277:19 298:1

1:00 51:12,14 52:11,21 53:12

1:23 175:18

_____

**2**

2 56:18 257:12, 17 266:18 268:14 285:22 295:9,10 296:21,23 297:9,18

20 88:19 253:24

20-CV-04768 6:13

2000 82:16 116:16 133:8 242:21

2000s 25:24

2002 50:18,24 51:4 69:23 70:3,6 71:4,9, 15 76:7 78:22 94:14 111:24 112:3,19,20,23 113:2,5,14,16,

18 116:17 124:22 125:7 126:9 129:22 133:1,10,19 143:10,14,21 154:8,21 167:14,21 173:18,21 179:20,24,25 184:4,6,14 186:25 188:10 189:19 191:20 193:12 194:10, 16 195:11,24 196:7,12,24 199:8 200:17 201:3 204:2 211:22 212:2, 12,16 215:11 220:21 221:9 229:8,19 233:20 234:15, 18,24 235:18 236:19 238:13 239:22 240:9 241:4 243:8 245:7 249:20 252:25 254:10 266:9 302:4

2004 82:20 242:7,18,24

2005 70:1,11, 16,20 231:22

2006 47:11 50:6 88:20 94:18

2023 6:6

20th 253:19

21 7:16

24 9:4,5,6,25

25th 63:15

26 10:1

2:17 175:21

_____

**3**

3 17:12 47:19 56:18 268:16, 21 286:22 295:9

30 88:19 142:3, 7

30-year-olds 142:6

3:25 239:13

3:26 239:16

3:44 255:12

3:59 255:15

_____

**4**

4 10:2 17:12 48:18,21 49:1, 10 52:8 56:18 82:18 275:4,6,8 276:12 286:19, 20 294:25 301:2

4238 288:20 291:17

4561 275:6

4:30 51:11,14 52:10,21 53:4,5

4:52 303:13,15

_____

**5**

5 10:3 16:20 17:12 19:21,22, 23 20:7,8,15 21:3,23,24,25 22:2 23:1,5,11 24:4 25:6,18,24 26:6,8,11 27:1, 5,8,9,20 33:20 49:12,13,19,22 51:8,20,21 52:7 54:2,16 56:18 57:20,22 62:20 63:18 64:23 65:12 66:5 73:7 78:10 82:18,20 83:10,12 91:6 101:24,25 144:17 145:6 157:4 161:9,22 179:19,24 180:3,13,14 181:25 204:24

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-7 Filed: 05/06/25 Page 308 of 336 PageID #:5081
The Deposition of RAYMOND SCHALK, taken on May 18, 2023
306

245:8,14 247:2
256:13 290:9,
12 292:2
294:13,14
303:8

5's 102:12

50 142:4

50-year-old
142:9

_____

6

6 56:18

_____

7

7 56:18

70 30:16

75 46:14

79 276:10

796 255:20

_____

8

8 56:18

80 49:7

81 49:7

823141 275:1,
15,16,24

85 268:18

86 262:9

8696 295:11

88 262:16

8:00 53:3,17

8:30 53:3

_____

9

90s 17:4,17
73:6

92 187:20

95 50:23 51:5
94:13 125:1

129:13 130:18
131:1 143:14,
21 173:21
187:22 188:11
207:10 209:5
215:9 230:6
232:12 259:15,
18 270:1 285:3
290:24 292:11
298:1

96 257:13

99 269:25

_____

A

a.m. 6:6 51:12,
14 52:11,21
53:12 90:24
91:2

abandon 77:14

ability 10:12
30:11 31:3,7
36:20 157:16
232:19

abreast 272:3

absolutely
214:13 282:25
283:5

abuse 90:11

academy
47:16,18,20
48:1 103:16,20
167:17

acceptable
118:20 165:11
166:1,9

access 135:4

accident
80:19,22,25
81:1,11

accommodati
ons 30:23

accomplish
134:10

account
107:12 204:13
247:23

accurate 30:12
31:4,8

accused 12:3,
13,16 81:19
82:4 86:21,25
87:3,6 89:18,
21,24 90:2,5,8,
11,14

acquire 133:8
134:2,11
143:25

acquired
133:14,18,22
134:21

acronym
264:25 267:5

act 112:17

acting 10:22

active 272:5

actual 27:9
59:19 173:5

added 185:20

addition 270:5

additional
35:10,15 46:16
91:17 95:8
102:3 149:10
255:1,6,7

address 181:4,
5,9,17,24 182:4
206:14 289:9,
13,23 291:2,5,
11,15,17,18,19,
20,22

addresses
182:7 205:18,
19 206:3
207:24 229:10,
12,20 288:18
289:10

adhered 113:2,
18 167:24

admitting
120:17 217:21

advance 57:8

adversely
108:22

affect 30:11,14
31:3,7,11
207:15 222:7

affected
108:22 109:10

affecting
109:15

affirm 6:23

age 96:19
98:16 102:19,
24 141:20,22
142:11

agencies
265:23

agree 127:2

agreeable
148:9

agreed 142:24
148:6

ahead 84:16,17
95:17 150:17
193:4 246:21
277:11 280:25

alert 206:16
208:15 229:11,
21

alerts 206:22
207:11

alias 278:17
279:11,24

aliases 278:1,
4,9 279:5

alike 143:2

allegation
83:14,15

allegations
25:22 27:22
81:3 83:7,12,
17,20,23 84:1,
5,8,12,18,23
85:1,4,23,25
86:3,16,19 89:6

allegedly
131:13 189:25

allowed
126:24 168:20

260:1 292:15,
20 293:6,8

Allyson 41:2,8
43:4 44:4

altogether
176:18

Alvarez 56:14

amount 75:25
138:14 139:15
208:2 294:15,
19

analysis
139:19

answers 28:21

Anthony
16:16,19 17:22
18:4 19:16

anymore
57:18 199:16
261:19 272:25

Anything's
190:23

apologize
82:22 112:6

apparently
39:6 182:6
183:9 191:9
243:7 250:3,7
253:25 258:16
269:11 270:9
302:18

appears
133:13 281:8
286:2

applied 68:12
74:15 75:11
109:19 110:2
112:20 113:10
116:16 164:18,
23 169:9,12,13
172:8,14 173:9

applies 50:23
69:17 169:18
170:16

apply 50:24
102:16,23
125:1,7 142:22
164:19



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-7 Filed: 05/06/25 Page 309 of 336 PageID #:5082
THE DEPOSITION OF RAYMOND SCHULZE taken on May 20, 2023
307

apprehend
86:12 223:12

apprehension
181:8,22,24

approach
104:9

approached
245:24

approving
179:10

approximate
17:9,10 32:6,20
47:6 88:16

approximately
41:4 52:21
70:10,20 242:7

April 252:22
253:18,19,24
254:10

area 10:2,3
16:20 19:20,22,
23 20:7,8,15
21:3,23,24,25
22:2 23:1,5,11
24:4 25:6,18,24
26:6,8,10 27:1,
5,8,9,20 33:20
48:18,21 49:1,
10,12,13,19,22
51:8,20,21
52:7,8 54:2,6,7,
9,15 57:20,22,
23 58:6,10
59:22 61:19
62:10,12,20,24
63:18 64:3,23
65:12 66:5 73:7
78:10 80:20
83:10,12 91:6,
16 93:7 101:24,
25 102:12
144:17 145:6
157:4 160:12,
21 161:9,22
162:5,23
179:19,24
180:3,12,14
181:25 204:4,
24 245:8,14
247:2 256:13
294:12,14

armed 247:17
248:6,13

Arnold 133:11
278:3,9

arrangements
202:18 253:13

array 13:17
14:9,13,21,25
68:22 69:1
92:23 93:3,7,11
95:5 97:23
98:24 101:15,
17 103:13,21,
24 104:2
111:14 115:23
116:3,13 117:5,
7,10,17 120:5,
10,16,24 121:1,
24 122:3,4
123:3,12,15,23
124:4,9,18
125:13 126:5,
12,17 129:11,
14,16,17,18
130:14,20
131:7,10,13,22
132:2,5,10,14
133:23 134:22
135:9,22 136:2,
5,23 137:2,6,7,
18 138:4 139:4,
8,11,17 140:2
141:3,13
142:10,18
143:8 145:14,
17,20,22 146:5,
11,13,19 147:1,
25 148:6,18
149:18 150:12
151:1,12,25
152:10,25
153:10,17,21,
23 154:10,25
155:4,11,23
156:12,20
164:19 166:21,
22 167:4
188:12,14,18,
22,25 189:24
190:9,13,15,19,
20 191:1,6,13
195:23 196:9
197:5,8,10,13
198:1,2,5,7,14,

16,21 199:5,9,
15,25 202:22
204:19 215:5,
15 228:17
230:8,20 231:1,
7,9,10 232:9,23
233:8,17,19,22
234:4,9,18,22,
24 236:20
241:5 243:9
250:4 253:1,6
254:2 256:23
260:1 264:10
272:16 273:3,5,
18 274:2,10
288:8 299:7,19,
22 300:3,7,13
301:6,9,11
302:9

arrays 13:23
15:16 69:10
112:9,21,24
124:25 128:18,
24 129:25
130:8 132:24
133:1,8,18
134:24 145:9
159:4 164:24

arrest 71:3,9,
16 76:6 94:11
226:7 248:14
249:20 254:16,
22 299:1

arrested 12:8
50:18 68:4 71:6
76:10,14 80:17
84:2 86:5,8,10
87:7 88:2 93:24
94:3,9 95:24
96:6 158:25
207:6 208:16
210:5 252:21
265:14,16
277:4 278:20
279:11 302:5

arresting 68:6

arrests 248:11,
12 278:4 279:8,
21

arrival 240:8

arrive 228:15

arrived 160:11
162:5 239:22

art 98:6

arts 97:22,24

Asian 137:8

assembling
93:11

assigned 47:5
48:2,17,18 50:9
72:2,15 73:11,
15,20,22 91:11
92:5 104:7,9,18
110:12 186:7,
11,13,24 192:7
261:25 298:10

assignment
47:25 49:1

assume 9:12
30:2 50:12 53:2
58:8 105:5
132:6 169:7
183:3 205:18
231:13 232:1
233:24 252:12
265:15 268:9
270:12 274:21
278:24 280:2,
18 288:6 296:9

assumed
293:13

assumption
76:18 183:4,7
254:3

attempt 91:17
137:15 149:17
153:9 182:19
184:7

attorney 32:7,
8,10,15 40:10,
13,17 41:14
42:10 56:2,8
121:3 169:19,
21 170:3,17,22
171:24 195:18
200:20 202:1,2,
8,13,17,19,25
203:8 204:14,
20,22 205:1,4
214:16,22
226:22,24

227:7 228:1,3,
11,15,19
236:12,15
243:4,10,13,17
244:15 249:15,
17 250:3,6,8,
11,17,18 251:2,
6,11,16 252:9,
10,13 253:11
254:1,6 292:18,
25

attorney's
41:2 158:9

attorney-client
31:23 236:5,13,
24 239:9
292:23

attorneys 29:8
41:19 42:5
45:11,19
118:24 120:25
121:11 170:21

August 269:14
277:18,19
282:22

authentic
134:4

Automated
267:12

avoid 114:10
115:9,16
116:20,24
117:23

aware 12:2,11,
15,19 15:10,14,
21 16:6 18:17,
23 19:4,11
21:5,8,12,16
22:14,16,18,22
23:15 24:3,10,
17,23 25:21
27:6,7,10
44:11,15 50:7,
17,24 66:4
67:24 69:16
71:2,5,8,14
74:15 75:10,15
77:1 109:9,23
110:2 112:24
126:7 156:22
157:2,5 167:14,
21 169:4,10

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-7 Filed: 05/06/25 Page 310 of 336 PageID #:5083
THE DEPOSITION OF RAYMOND SCHEUR, taken on May 21, 2021
308

210:19 231:25
247:12 271:10,
23

awful 65:17

_____

B

BA 46:12,15

back 13:2
47:20 51:23
57:20 58:2
61:5,11,12
80:20 86:12
91:1 96:17
98:20 99:18
114:16,17
129:13 143:21
150:20 154:7
164:5 170:14
187:20 202:16
215:8,19
219:10,19
220:10,24
226:6 232:12
233:3 237:4,8
239:15 250:5
252:21 262:20
294:12

background
94:8 95:15,20
224:9,13,15,17
247:16 248:1,9

bad 23:11
127:4 245:9
246:2

bald 139:5

ballpark 42:18

base 9:3 18:3
140:15

based 21:1
187:23 188:16
189:8 190:5
215:14 296:7
298:5

basically
10:15 34:23
38:16 62:23
73:11 75:4
84:14 164:21
165:5 206:5

basis 66:4,21
89:5 130:7
179:13 199:1

Bates 255:20
257:12 275:4,6
289:22 290:11
295:10

bathroom
90:20

beat 68:5

began 175:24
182:15 184:3
269:23

begin 124:18

beginning
167:6 176:3
258:18

behalf 6:16

believed 71:19
158:8 189:5
193:10 195:21
201:5 214:4,11,
13 216:2,4,6,17
244:1

believing
195:14

bench 60:14

bifurcate
79:11

big 62:8 103:2

birthday
207:25

bit 26:13 50:15
52:19 55:16,17
136:10 166:7
222:2 254:23

black 116:4
135:1,10,19
136:24 137:3,7,
12,22,23 138:1,
2 139:25 140:2,
19 145:4,6,8
154:23 179:19,
23 180:2,9,14
245:8,11,14,17,
24 246:6,9,13
258:16 263:24

blocking 17:7

Bogucki 6:10
8:11,14,17 9:10
10:21 11:9,23
12:2,10,13,22
14:4,12 15:2,
18,22 16:2,7,
21,23 17:11
18:11 41:9
42:8,24 43:4,5
44:5,12 51:24
52:2 54:15,19
56:22 74:1,5
83:1 84:19
86:8,17,21,24
87:3,6 176:12,
16,24 177:5,9,
13,21 178:1,18
225:25 226:2
227:21 229:13
230:20,21,24
233:23 234:1,2,
11,20 235:14,
17,21,23
236:19 238:12
239:22 240:7,
21 244:24
246:5 247:6
251:25 252:7
259:2 270:5,13,
18 286:17
293:15,22,24
300:11

Bogucki's
8:21 44:20,24
177:3

bottle 17:7

bottom 276:10

boxes 207:17,
25

Boyce 56:13

Boyle 56:15

BR 256:2

Brandon 6:3

bread 36:3
249:6,7,9

break 30:5,8
90:20,21
175:14 255:9

Brian 6:17 43:5
44:5

briefly 39:6
61:12 255:18
290:10

bring 28:12
68:19 98:16
264:21 267:2

brother 56:13

brought 43:17
62:10 68:2
173:25 183:10
195:18 227:4,5
250:5

building 50:2
89:3

bullet 249:10

bullets 36:7

bunch 261:1

Burglary 48:19
49:1

business 56:5

busy 73:7
271:13

butchered
153:3

_____

C

cabinets 61:7,
9

calendar 32:24
38:6

call 28:14
71:24,25 98:17,
25 99:7,12
175:12 202:2
228:1 233:11
272:19

called 88:11
97:9 101:11
181:21 202:12
205:1 206:20
228:19 258:13

calls 31:23
43:8,9,12,25
52:15 53:9

173:3 264:3
281:15

candidate
296:24

canvas 80:20
91:16

car 80:21,25
81:1,2,10

career 12:3
14:15,18 15:25
47:4 67:16 84:9
94:17 118:8
144:4

case 6:12 7:15
12:6,12,15,19,
20 18:7 20:17
31:17 33:2,4
35:15 36:25
37:16 38:2
44:13 50:6,10,
13 51:3 53:25
54:5 55:24
71:6,19,22,23
72:2,3,16,19,23
74:16,18,23,24
75:11,17,24
76:7,10 77:13,
19,23 78:14,17,
22 79:2 80:12,
13,15,18 81:4,
6,13,16 82:1,2,
5,7,9,24 83:2,5,
8,11,18,20,23
84:2,5,13,19,
22,23 85:1,4,7,
8,13 86:7,13,
18,22 87:1,4,8,
11,24 88:8,11,
14 89:9,12
92:15,17
104:10,18,25
105:6 106:4,8,
22 107:4,11
109:12,20
110:3,17,21,23,
25 111:7
118:10 119:3
121:8 133:13
134:20 137:14
142:15 145:25
147:25 149:11
151:8,24
152:17,18



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-7 Filed: 05/06/25 Page 311 of 336 PageID #:5084
THE DEPOSITION OF RAYMOND SCHLINGER taken on May 11, 2023
309

153:5 154:19
155:7 158:9,20
166:12 169:18
170:4,10,11,15,
16 171:8,9,14,
16,17,20,21
175:11 179:10
184:23 185:1,5,
9,19,20 186:8,
12,14,20,25
192:7,13,18,23
194:15 198:13,
17,25 203:7
227:21 231:19,
22,25 232:4
236:2,9,11,18
238:8,21 240:3,
13,25 244:21
245:4,12 246:6
247:5 251:14,
20 254:14
262:1 270:3,7,8
271:9 272:4,5
281:1,6,11
282:18 283:1,6
284:18 298:10

case-by-case
199:1

cases 26:8
72:6,7,14,15
73:2,11,15,17,
21 74:6 76:12,
16,21 77:1,3,6,
9 80:10 101:19
107:17 109:24
110:13 111:5
133:22,24
134:1 158:24
168:11 184:10,
16 185:12,13,
16,18 186:4
190:9,12 272:7

categories
39:14

category
119:8 120:22

caused 16:7
19:12 21:17

causing 24:24
84:2 87:7

cautious
107:2,6

caveat 32:12

Center 253:16

Central 49:25
50:1

certainty
121:12

chance 297:11

change 106:24
112:1 139:13
244:7,11,18

changed
52:18,19
106:23 111:23

characteristic
103:6

characteristic
s 10:9 93:19
102:18,21
136:11,12
139:10

characterizing
9:17

charge 16:11
121:6 202:9
207:6 250:9
251:9

charged 7:21
24:25 157:23
158:2

charges 16:3,
7,10,12 19:8,12
21:17

charging
158:10

Chase 6:5

chased 36:4
189:13

check 98:18
99:1,16 100:20,
23 205:17,24
274:14,17
294:23 295:1,6,
23 296:4,10,19,
24 297:8,19
298:25

checking
100:21 231:14

Chicago 6:20
7:17 8:7,21
10:6,8,18,22
11:6 13:21
14:15,19,20,23
15:5,10,14,25
16:15 17:23
19:9,13,15
20:23 21:18
22:11 24:4,11,
18,24 25:15
26:18 46:3,9,
11,18,25 47:4,
12 55:18 61:25
63:16 66:15,20
67:4,24 68:16
69:9,17 74:14
75:9,17 80:6
88:23 89:16
91:5 99:22
103:11 109:19
111:9,17,22
112:8 113:9
114:8 115:4
118:19 121:3,
17 125:21
126:22 133:5,
16 134:18
143:13,18
144:24 150:9
157:12 158:1,3,
24 168:2,14
172:9,14,15
173:10 256:9
270:6 275:11,
13 277:4
289:14 290:2
292:2 293:2

child 118:13
119:7 121:15

choice 135:10,
13

choose 51:15
102:17 103:8
117:24 188:5

chose 164:20
188:25 210:14
211:3 250:22,
25 300:21

chosen 252:17

chronological
81:24

circumstance
68:13 98:22
122:16 125:12
128:11 135:2
136:6 142:14
150:23 151:22
152:7,16,18
153:4 154:24
158:11 174:17
198:20 234:7

circumstance
s 122:9 146:19,
22,23 152:24
171:23 172:6
173:8 201:12

citizen 25:20

city 6:20 45:12
46:18 257:12
268:17 274:20
275:4 276:10
280:10 287:20
290:2,11

civil 7:14 8:3
34:10,19 87:15,
19,21 239:19
244:21 247:5

claimed 83:9,
12

clarification
172:7 259:20

clarifying
206:23

clarity's 20:5
122:21

clean 161:7

clear 53:25
67:23 73:13
152:6 170:18
209:14 232:22

client 170:23
171:25 237:10
253:1 277:3

Clinton 129:15
130:21 131:8,
11,19,24 132:9
188:11,19
189:25 199:14,
17 231:2,12,16
259:22 264:10

272:10 273:6,7,
14,19 274:2,3,
7,17,21,24
275:19,21
276:2,3,4,9,11,
18 277:15
281:6 285:1
287:22 288:4,
12,17 289:5
295:3 298:25
299:3,8,17,23
300:17,25
302:15,22
303:2

Clinton's
132:7 272:25
277:20 280:16
287:21 291:16
295:22 302:20

close 42:25
288:13 291:18,
20

closely 280:24

closer 164:25
280:25 291:22

coercing
89:24 90:2

cold 71:23
72:3,6,7,13,15,
16,19 73:2,15,
17,20 74:6,16,
18,24 75:11,17,
24 76:12 77:5,
9,13 104:10,18
106:22 107:4,
11,16 109:11,
20,24 110:3,13,
16,25 111:7
145:25 151:8,
24 152:17,18
153:5 155:7
166:12 184:23
185:5,9,12,16,
18,19 186:8,11,
14,25 192:7,13
194:15 262:1
272:7

collection
101:19 102:12,
13 144:10,17
145:2,5 256:18
267:12

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-7 Filed: 05/06/25 Page 312 of 336 PageID #:5085
The Deposition of RAYMOND SCHRICK, taken on May 12, 2023
310

college 46:6,8

color 116:4 134:25 135:4,5, 6,11,12,18 136:17 141:2,3, 8 145:3,4,6,8 211:18,19

colors 136:18

combination 145:4

commander 73:23 74:9 292:20

commander's 61:8

commit 140:19

committed 119:13,15 157:11

committing 27:2

common 11:12 64:23 65:1 116:5 271:25

communicate 28:24

communicated 272:13

communications 31:23

compare 108:8

competent 261:9

complainant 89:15

complaint 34:9,19 35:1,5, 24 36:17,22 37:17 70:25 71:14

complaints 88:24 89:1

complete 46:16

completely 148:12

complexion 137:12,19

complexions 136:20

compromise 157:14

compromised 201:10

computer 54:9,11 96:19, 21,24 97:2 98:2,16 207:12 231:14 258:12, 17 264:18,20 265:3 267:2

computers 57:24 58:8

concept 72:19

concern 157:22,25 158:2

concerned 69:3 107:14,16 155:9,21 156:1, 9 158:4 221:5

concerns 7:16 158:18,21 220:21 221:11, 17,20

concluded 303:13

conditions 30:10,14

conduct 103:20,24 104:2 111:10 112:9,21,24 113:5,10,15 122:9 128:17 129:1 133:8,23 134:21 138:4 142:10 159:5,9 167:14,20

conducted 64:25 111:16 113:21 114:4

121:19,25 122:17,25 123:2,22 124:3, 4 125:13 126:5 129:11,20 132:13,24 134:24 139:8 177:20 196:9, 12 233:22 299:24

conducting 63:22 66:9 88:2 95:5 103:13 112:2 114:10 116:22 121:4 129:8,25 132:25 133:18 135:9 137:6,17 139:4 141:2 163:23 250:19

confer 168:10

confession 89:25

confirm 200:13

confirming 200:14

conform 143:12

conformed 173:21

confront 193:17

confronted 223:25

confused 113:25

conjunction 79:6

connected 279:17

consideration 107:9 141:12 169:2

considered 71:23 74:23,24

contact 41:14 50:12 54:21 199:8 243:9

contacted 160:8 181:7 182:3 242:5 243:12,16

contained 34:2

context 54:18 172:21,22

continue 53:12 91:20 92:10 149:13 158:16 184:11

continued 43:10 55:5

convenient 93:8

conversation 29:7 40:18,24 74:4,7,10,12 162:6 242:15 252:16 288:16

conversations 32:6 40:5 43:18 44:1 110:9,15 237:10 273:9 292:24

convicted 7:21 84:3 244:15

conviction 7:25 158:5

convinced 216:19 243:4

cool 37:15 255:21

Cooper 129:14,19 130:15 131:7, 13,23 132:2,10, 14,21 159:20 160:1,6,21 161:2,8,16 162:12,13 163:14 176:21 182:18 187:16, 20,25 188:2,6, 8,12,18 189:11 196:25 197:7 198:5 199:5,10, 19,22 209:10

215:6,8,10,14, 24 218:19,22 220:24 221:4 222:5,17 223:5 224:11,16 225:9,12 228:17 229:24 230:1,3 232:9 233:12,16,20 234:10,25 235:4,5,9,18, 22,23 236:1,9, 10,17 238:7,11, 25 239:19 240:2,6,12,16, 24 241:3,23 242:5,16,18 243:8,15 244:10,20 245:6,18,24 246:7 247:1,5, 18 250:13,23 252:1,8 253:5 256:22 257:7 259:4 273:6,11, 20 274:1 288:8, 13 289:7,11,17, 18 290:25 298:3,9 299:7, 24 300:17 301:6 302:10

Cooper's 132:18 190:5 247:1 259:9,11 273:13 289:12 291:2,8,19 294:10 295:12 296:25

cooperative 232:18

coordinate 91:14

copies 33:11 173:2

copy 33:5,7 34:9,18 173:1,5 258:1 290:8

correct 7:22,25 8:4,8,9,12,15, 18 11:6,8 12:20,21 18:6, 10 20:8,11 22:7 23:3 29:14 35:6



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04768 Document #: 184-7 Filed: 05/06/25 Page 313 of 336 PageID #:5086
THE DEPOSITION OF RAYMOND SCHILLO taken on May 13, 2021
311

38:8,9,10,13,16
39:17 43:5
45:8,12,13 46:3
52:9 54:16,17
57:15 61:21,22
63:18 64:8,15
66:1,2,5 70:23,
24 72:20 73:18
75:7 76:4,7,8,
10 77:10,11
78:11 79:7,15,
16,19,20,22,23
81:11 86:9
89:17 91:23
93:4 94:15
95:9,25 97:3,25
99:23 100:1,9,
18,19 103:9
104:19 106:12,
23 108:10
115:10 116:10,
13,17 118:17
122:22,23
124:11,13
126:2,7,19
128:12,24,25
129:5,6,8,9
130:9,15 131:9
133:3,14
135:12,23
138:25 140:22
141:20 142:20
143:6,14
144:18 148:1,
18 149:3,7,12
150:13 151:2
152:1,12 157:2,
3 159:22
160:18,19
161:10,22
163:3,21,22
165:8,23,24
166:10 168:14,
17,20,23 169:6
171:14 173:1,
22 174:23
176:3,22
177:23 179:6,
15 180:15
181:14,15
182:5,17 186:9,
16,19 187:25
188:3,10,19,22,
23 191:1,13,16
192:7,10,15,21,
24 196:2,10,14

197:5,8,19
200:2 205:8
207:21 208:3
210:9,15,21
211:4 212:3,20
214:5 215:3,7,
12,15,21,24
216:2,5,14,23
219:2 220:1,5,8
221:6 222:21,
24 223:4,7
225:7 226:18
227:22 230:13,
17 233:8,17,18
243:6 245:6,14,
18,21 246:16
247:2,3 250:20,
23 251:1,6,16,
20 252:2,9,18,
24 253:2,6,18
254:4,19 257:4,
5 258:22,23
261:13 263:21
267:13 268:12
270:3,24
271:19 272:14,
21 273:1,7,15,
20 274:15
275:11,24
276:7,8,13
279:19 280:23
281:6,11
282:14,23
283:22 284:19,
23,24 285:1,8,
24 287:6
288:18 289:3,4,
6 291:24
294:16,19
295:21 298:3
300:8,9,11,18,
19,22,23
301:11 302:10,
12

**Correctional**
253:15

**Corrections**
133:23

correctly 58:6
105:7 251:24
296:9

corroborate
204:15 221:13
248:20,25

corroborates
247:22 248:18
249:1,4

corroboration
249:24 254:18

coughs 43:13

could've
233:10

counsel 6:13
39:24

couple 9:5,11
28:19 40:4
44:16 52:3
59:25 244:19
255:18,24
257:13 268:18
294:22

court 6:5,11
10:15 28:24
29:21 70:8
87:25 88:5,7

cover 63:23
64:1,18

covered 64:6,
24 65:8,9,14

CPD 135:17
265:18,20

CR 89:1,5,8,11

created 100:23
122:23 270:2

creating
269:20

credibility
222:2,8

crime 7:22
24:25 29:17
68:4 71:15
75:25 76:9,13
84:3 87:7 89:4
91:15 92:9
119:14,15,24,
25 120:11,17
140:19 145:12
152:21 155:10
157:11,24
158:14 166:16,
23 185:24
223:16,21

224:2,21 225:7,
10,14,18,19
226:4,8,12,19
233:3 248:2,5

crimes 10:2,3
48:20,21 49:4,
10,12,13,19
51:20,21,23
54:3 57:22 58:1
59:7,11,14
61:6,7 78:10
180:9

criminal 39:3,
17 46:12 70:11,
17 95:15,19,24
96:13 97:12,18
99:3,4,17,21
100:9 101:6
159:6 206:1,2
242:5 261:22
266:20

criteria 102:15,
23 142:22
164:18,22
287:14

Cross 46:1,2

Crothers
180:6,14

CRS 89:6

crucial 139:15
140:12

CT 303:15

Cubs 55:8,11,
14,22

cues 28:23

culture 72:8

current 73:16

custody 27:11
67:25 90:12
92:25 93:2
208:18 302:6

cutoff 201:2

cutting 82:22

———————

D

———————

dark 137:12,22

dark-skinned
138:2

database
265:12,13

date 32:16,17,
18 214:20
297:25 303:10

dates 32:5,6
40:6 41:17
47:6,9 176:20
253:14

day 6:5 13:6
29:22 51:13
53:1,6 54:22,25
139:13,14
178:7,13,17
197:1 228:20,
22 253:4,8,9,13

days 178:8,10
202:17 253:14

dead 77:16,20

dealing 95:21

death 7:16

December
7:16

decent 294:18

decide 57:15
104:13

decided 252:7

decision 189:3
203:4,10 205:6
228:25 229:6

decisions
199:1

dedicated
20:24 22:13
63:11

default 94:23,
25 95:1

defendant
6:19 8:3 81:6,
13 82:2,9,24
83:1 85:8,10,
12,16,23,25
87:15 88:9,10

defendants



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-7 Filed: 05/06/25 Page 314 of 336 PageID #:5087
The Deposition of RAYMOND SCHULTZ, taken on May 21, 2023

312

6:18 83:5

defenders 192:4

define 14:2 66:11

defined 68:18

definition 11:12 13:11 66:21

definitions 10:25

degree 46:10 165:10

demeanor 9:19

denial 217:16

denied 214:2 216:10

denying 217:12

dep 10:5 57:7 156:21

department 10:6,19,23 13:21 47:1 52:15 53:9 66:15 68:16 69:10,17 74:14 75:10,18 91:6 99:22 103:12 109:19 111:10, 17,22 112:8 113:9 114:8,9 115:5 118:20 125:22 126:23 133:5,17,23 134:19 143:13, 18 144:25 158:25 172:17, 19 173:12 256:9

departments 265:21

depend 19:25 135:2

dependability 9:20

depending 74:20 91:20 100:17 108:18 138:14 149:8

depends 92:14,22 96:16 105:18 108:23 128:9,15 155:14,25 174:5,25 272:4 284:13

deposed 28:15 31:16 32:15 33:2 34:11 35:6,14 79:25 80:1,4,5,10 81:16,17 87:14 238:8

deposition 6:7 7:13 29:17 35:9 37:21 38:18,22 39:14,25 40:14 41:15,20 43:10, 15 44:1,2,6,9, 12,20 45:1,16, 20 56:3 66:12 80:24 81:15,25 82:12,15 88:11 236:2,9,11,18 238:11 239:20 241:11 244:21 258:4 269:6 273:13 290:21 297:23 303:15

depositions 80:9 87:13 241:15

describe 91:7

description 57:21 218:5

designation 49:4 59:15

designed 114:9

desk 54:9 58:2 59:13,19,22 143:23 256:18

desks 54:6 57:24 58:8

detail 61:24 294:15

detailed 47:5 48:17

details 135:8 294:19,20

detective 8:14, 17,20,24 9:5, 13,24 10:8,9, 17,21,23 11:6, 9,23 12:2,9,13, 22 13:22 14:4, 11,24 15:2,18, 21,25 16:2,6, 16,19,20,21,23 17:11,22 18:1, 8,11,12,14,17, 20,23 19:1,7, 11,16,20,22,23 20:7,14,25 21:5,8,13,20, 21,23,24,25 22:5,8,10,13, 16,19,23 24:4, 11,18,24 25:15 26:12,14,17,24 27:2,4,5,10,16, 23,25 28:4,11 41:9 42:8,23 43:4,5 44:5,11, 19,24 47:13 48:9,16,19 50:21 51:9,11, 24 52:5,6 54:3, 15,19 55:6,7, 13,21 56:12 57:13 62:1 63:17 65:12 74:1,5,16 83:1 84:19 86:8,17, 21,24 87:3,6 91:6,8 103:15, 20 104:1,7 105:12 107:15, 16 111:10,18 121:17 140:17 147:16 150:9 156:23 157:12 158:1,4,25 162:12,13 164:6 168:2,7, 14 169:3,5,12, 13 172:9,14,15, 20 173:10,11,

13 176:12,16, 24 177:3,5,8, 12,20 178:1,4, 17,18 179:3,23 180:6,7,13,14, 15 194:15 203:7 225:25 226:1 227:21 229:13,14 230:20,21,24 231:6,18,21 233:23,24 234:1,11 235:13,17,21, 23 236:19 238:12 239:22 240:6,20 244:24 245:8, 11,17,24 246:5, 6,9,10,13 247:6 251:25 252:7 259:2 260:7 261:7 270:5,6, 9,13,14 271:22 279:2 282:4 286:9,17 293:2, 15,21,24 300:11

detective's 48:11

detectives 8:25 9:7,16 20:7 23:5,10,11 26:6,10 28:5 54:5 55:19,25 58:7 60:1 66:8 75:18 82:25 83:4 84:21 103:18,24 105:1,6 106:3, 4,7 108:25 109:24 110:3 111:4 113:14 118:24 131:25 132:4 142:23 167:18 172:8 179:19 180:2,9, 13 192:14 231:11 245:14 256:12 261:10 270:7,23 271:11,17 272:1 285:7 296:8 298:10

determination 142:17

determine 98:25 139:16

determined 272:20

determining 98:13

Devery 262:17

DFC 299:2

diagnosed 30:18

dictated 103:12 135:18 168:16,20,22

difference 33:17 50:25 68:25 142:11 165:2,10 166:9

differences 164:22

differentiate 36:19 185:16

difficult 36:13, 19

dig 50:15

diligent 296:8

direct 7:3 164:3

directed 160:13 251:3

direction 251:16

directive 69:14

directives 110:24 111:1 112:11 169:8, 11 172:17,20 173:14

directly 96:24 97:2

disciplinary 88:24

discipline 89:14



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-7 Filed: 05/06/25 Page 315 of 336 PageID #:5088
The Deposition of RAYMOND SCHAUB, taken on May 11, 2023
313

discovery 56:3

discrepancies 108:14,16,19, 20,24

discuss 238:5

discussed 32:9 43:13 45:7 90:16 252:12 292:18

disposed 144:8,14

distance 55:1 291:23

distinct 292:13

District 6:11, 12 48:3,7 52:1 63:15

division 6:12 48:20 169:13

Dixon 133:11 278:3,9

document 96:13 105:2 121:18,21,24 123:8,17,24 124:6,8,10,25 125:15,16,19 206:8,10,12,13 213:9 257:14, 22,25 258:11, 22 268:18,25 269:3,9,10,16, 20,23 283:21 290:18,20,23 292:1 296:19, 23 297:18 298:19 300:13

documented 105:7 123:4 179:18 198:3 200:6,9 213:13, 16,17 300:10

documenting 122:23 123:14

documents 33:3,15,16,24 34:3 35:10,16 36:19 37:12

38:21,25 39:15, 20,22 45:2,4,7 79:18 100:18 255:18

door 59:2

doors 58:23 59:1

dot 262:13,21 263:24

dots 262:6,17, 25 263:3,5,9,14 264:6,9,12

double-sided 257:15

doubt 146:10 264:13

doubts 158:12 159:1

downstairs 63:15

drawer 144:20

driver 36:3 81:2 249:7,9

dropped 85:11,16,22,24

drug 299:1

duplicating 122:20

duration 74:22 149:17 150:25

duress 244:17

—————
E
—————

earlier 14:3 79:24 117:25 141:18 143:16 201:8 250:16 270:22 285:22

earliest 40:12

early 17:17 25:24 82:16 156:21 185:23 253:17

earn 46:10

easiest 95:10

easily 165:1

Eastern 6:12

easy 207:8

Ed 129:14

educated 149:11

education 46:16

Edward 129:14,19 130:15 131:7, 23 132:2,10,14, 18,21 159:20 160:1,20 161:2, 8 162:12,13 176:21 182:17 187:16,20,25 188:2,6,8,12,18 189:11 190:5 196:25 197:7 198:5 199:5,9, 19,21 209:10 215:6,8,10,14, 24 218:19,22 220:24 221:2,4 222:5,17 223:5 224:11,16 225:9,12 228:17 229:24 230:1,3 232:9 233:12,15,20 234:25 235:4,5, 8,9,17,21,23 236:1,9,10,17 238:7,10 239:19 240:2,6 244:10 245:18 247:18 250:12 253:5 256:22 257:7 259:4,11 273:5,11,13,20, 25 288:8,13 289:7,11,12 290:25 299:7, 24 301:6 302:10

effect 30:25 49:4 51:5 107:17 145:12 207:2,3 208:13 220:6

efficient 66:12

effort 134:10 229:7

efforts 205:15 229:16,17

elapse 74:22 75:16

elapsed 75:25 76:13 107:10 155:10,22 166:13,14,20 201:11

electronic 265:3

eliminate 185:22

Emmitt 176:22 180:23,25 181:2,10 182:8, 11,15,19 183:15,22 188:10 191:5, 12,19 192:3,19 193:10 194:3,8, 13 195:3,4,11, 20,23 196:7 197:3,14,25 198:1 200:11, 17,22 201:14, 23 202:3,13,23 203:1 209:1,5, 7,12,13,18,23 210:4,7 218:7 222:11 229:8 240:10 243:12 247:21 248:17 249:3,16 254:18

employed 10:18 46:23 114:4

employee 16:16 19:15

employment 10:6 73:17

encountered 212:12 245:8

end 69:23 77:16,20

enforcement 265:7,23

engender 38:7

ensured 112:17

entail 60:6

entered 89:2

entire 14:15,18 35:1 118:8 130:7 180:12 212:20 226:25

entirety 34:21 186:16 192:9

essence 184:24,25 185:6

established 234:3

estimate 42:18 180:18 260:2

et al 6:10

evaluate 108:2

evaluation 149:11

Everett 250:23

evidence 11:20 15:19,22, 24 19:2,5 21:14 22:23 24:18 83:24 84:24 87:4 89:19,22 91:14,15 92:7,9 247:12

evident 271:4

exact 40:6 214:20 253:14 276:5

EXAMINATION 7:3

excellent 8:24 18:1 31:15

excessive 84:6,8

exchange 29:20 36:5

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-7 Filed: 05/06/25 Page 316 of 336 PageID #:5089
The Deposit of Curt Raymond Schilke taken on May 31, 2023

314

227:13,16

exchanged 249:8

excuse 43:13 281:14

exhaust 147:8 148:12

exhibit 255:19, 25 257:12,17 266:18 268:16, 21 275:4,5,8 276:12 285:21 286:17,21 290:9,12 292:1 294:25 295:9, 10 296:21,23 297:9,18 301:2 302:19

existed 94:24

existence 265:18 266:4,6, 9

exonerated 89:4

expect 261:11, 15 271:1

expectation 261:2

expectations 109:24,25 110:2,5

expected 111:10 168:17 260:10

experience 21:1

experienced 29:20

explain 282:10 283:17 288:3

explaining 271:2

explanation 217:2 284:2

express 158:18,21

expressed 155:21

extensive 206:1 224:14, 17

extent 28:3,10 31:23 117:2

extra 144:20

eye 143:5 211:18

eyewitness 98:24 210:20

eyewitnesses 92:19 187:1,9 249:22 298:7

———————

F

———————

fabricate 15:18,24 19:1

fabricated 15:22 19:5 22:23

fabricating 21:13,14 24:18 83:24 84:23 87:4

face 103:3,8,9 138:5 139:13 140:13 141:7 145:20,22 150:19,21,24 154:14,23 155:3,8 189:13 247:22

faces 138:6 191:10,22 200:16,18,25 201:3,15,20 202:4 218:9

facial 103:2 138:8,9,10,14 167:5

fact 25:23 34:24 35:14 89:2,3 107:10 109:9 113:13 115:4 120:13, 15 123:5

124:15 125:16 134:13 146:14 148:24 150:24 158:13 178:17 179:14 183:12 192:23 201:2 205:20 211:5 213:9 221:15, 23 224:21 244:10 263:23 282:21 293:15 300:3

factor 140:12 185:12

facts 36:2

fair 13:25 20:4 30:3 39:10 45:10 65:11 66:16,21 71:13 72:18 76:24 79:9 101:4 102:8 127:12, 14 185:4 260:14 282:3 294:15

fall 119:8

false 89:24 90:2,6

falsifying 89:18

familiar 16:16 19:17,19 21:22 28:17 37:5 41:3 72:19 78:13,16 98:6 112:12,14 113:15 119:2,6, 9,17 121:14 182:1 264:24 266:1 289:14, 19 290:18

familiarity 85:14

family 91:19 92:1 94:6

fatal 80:19 81:9,11

features 103:2

February 129:18,22

182:13,16 184:3,6 214:20, 21 228:10,15 229:8,18 252:25

federal 7:14 87:25 88:5,7

feel 77:16 121:9 127:24 185:2 186:2 189:21 190:3 250:4,8 251:8

feelings 77:19

fellows 230:14

felt 23:11 101:20 143:4 175:1 183:24 184:20 185:2 198:18 211:9 250:10 254:1

female 40:16

field 67:17

figure 50:15

file 33:5,6,8,9, 17,18,20,21 34:1 35:11,17 37:20,22,25 38:6,12,15,18, 24 39:9,15,19 61:3,4,5,7,9 93:24 95:13 98:14 99:1,5,23 100:1 101:25 104:12,18 105:14,16,18 106:10 186:13 258:2,6,7 260:10,17,22 261:3,13 269:4, 5 270:12,15 271:20 283:15, 22 287:4 296:5, 11,18 297:7,12, 15,17 301:7,11, 16,20 302:16

filed 8:2 16:3,7, 10,12 19:8,12 21:17 26:8,10 88:24 124:19, 20,22

files 58:3 144:6 260:12

fill 97:5,8 100:7,8,13 101:5,6,7 207:13,17

filled 98:3

filler 95:9 102:17 123:24 125:14,17,19 126:6,13 136:24 137:3,8, 17 165:11,22 166:10 256:19 264:14

filler's 166:15

fillers 60:10, 11,24 101:17 123:9 124:7,8 128:5 135:24 136:5,8,13,14, 17 137:23 138:5,9,16,20, 23,24 139:5,9 140:8,21 141:17,19 142:2,4,11,20, 24 143:1 161:15,18 163:13,14,21 164:7,19 165:7 166:3 230:7 256:13 264:10 300:21

fillers' 137:18

find 91:18 106:19,21 138:24 140:7 168:8 169:16 182:4,10,12,14, 19 188:7,8,9 205:23 206:11 208:25 228:18 229:8,18 231:2 243:11,15 252:19,22 254:11 289:23 301:25 303:10

finding 140:20

fine 47:9 303:9



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04768 Document #: 184-7 Filed: 05/06/25 Page 317 of 336 PageID #:5090
THE DEPOSITION OF RAYMOND SCHEUR, taken on May 11, 2023

315

finish 12:25

firstly 223:11

fit 66:24 120:21

five-minute 255:8

fleeting 150:11

Fleming 21:21, 24 22:5,16,19, 23

Fleming's 22:8,11

Fletcher 6:8,16 7:8,22 8:2 12:20 36:8,10, 23,24 39:4,17 50:17 70:11,17, 18 71:5 129:15 130:21 131:8, 10,19,24 132:7, 9 133:11 160:5 162:3 183:11, 14 187:13 188:11,19 189:25 196:13, 21 199:13,17 203:23 211:12 212:9,12,23 213:5,21,22,24 214:14,18,25 215:2,7,12,15, 21 216:1,22 217:4 219:6,7, 18 220:11,22 221:15,23 223:18 225:16, 23 226:3,11,19, 25 227:2 230:5, 10 231:2,12,14, 16 235:19 243:2,5,22 244:12 245:9, 17 246:2 247:13 249:20 253:2,10 254:17,22 255:2,20 258:15,16,17 259:3 262:10, 13 264:10 268:17 269:14 271:5,6 272:10, 25 273:6,7,14,

18,19 274:2,7, 17,21,23 275:19,20 276:2,3,4,9,11, 18,22,23,25 277:4,12,15,20, 25 278:1,6,10, 20 280:12,15, 16 281:5,10,19, 22,23 282:1,6, 22 283:1,6,9, 11,14,21 284:5, 6,10,11,15,16, 21,25 285:7,8, 10,18,23 286:3, 11 287:17,21, 22 288:4,12,17 289:5 291:16 295:3,20,21 296:2 298:21, 25 299:3,7,9, 13,17,18 300:17,25 302:15,20,22 303:2

Fletcher's 7:24 235:1 244:25 248:1 259:22 260:8, 15 262:22 278:16 279:23 280:20 295:24, 25

Fletchers 274:15 277:2 280:2,7,12,22 281:19 282:4,9, 11 284:7 285:12,16 295:23

floor 50:2 57:22 58:14 240:18

focus 73:17

focused 298:20 299:3, 12

follow 186:2

force 27:11,17 84:6,9

forget 40:16 57:11 107:20

253:14

forgot 244:19 258:13

form 8:22 10:10 11:13 12:24 17:24 24:6,13,19 25:1,16,25 26:20 27:13 33:10 34:6 65:5 66:6 67:19 77:25 96:13 97:5,8,9 98:3 100:7,8,14 101:5,6 107:5 109:13 110:4 113:24 114:13 119:18 120:3 121:20 125:3,8 127:6,15 128:7, 13 131:15 134:6 140:3,10, 23 146:7,16 147:10 148:4, 19 149:19 150:4,15 151:3, 14 152:2,13 153:1,12 154:12 155:2, 13,24 156:14 158:15 166:24 167:7 174:4,12, 24 175:9 183:23 185:10, 25 189:4 191:8 193:3,4,14,20 194:18,23,24 196:15 198:8, 24 200:24 201:4,17 202:6, 15 206:4 207:10,13,14 208:3,6 212:14 221:25 242:11, 22 255:4 256:24 259:14 261:4,14 263:8 264:3,11 270:16 277:22 279:6 281:13 282:24 284:12 285:15,25 286:13 292:9 293:3 295:14 296:12 297:3

298:22 299:5, 16

format 28:18

formed 26:23

forms 100:15

forward 164:4, 8 224:24

found 205:17

foundation 25:16,25 69:11 74:25 100:24 110:4 122:11 127:5,16,22 128:7,13 190:21 191:7 200:24 241:6, 24 242:10 243:24 244:6 256:25 260:19 261:14 264:11 276:20 277:23 278:23 279:7, 25 283:16,24 285:15 286:1, 13 297:4

fourth 249:24

frequency 65:23

frequent 65:3, 6

Frequently 92:23

fresh 185:1,13, 16

friend 129:17 159:20 161:22 162:1,4,17,18, 22 163:15 176:22 182:17 184:3,7,15 188:10 189:15, 19 190:1,18 196:16 197:2, 11 203:12,19 204:2,16,23 205:5 210:17, 20,24 211:7 218:3 222:11 229:18 240:9

243:12 247:20 250:12 251:1 252:1,8

friends 54:19

front 45:5 58:2 59:18 61:9

fugitive 181:7, 8,10,20,22,24

full 62:11 139:5 220:11

fully 161:6

future 147:22 174:20 175:6

————————

G

games 55:11, 12

gap 50:20

gave 34:12 44:12 104:8 119:5 132:8 172:2 204:13, 21 205:18 218:3,7,12 223:5 231:7,8,9 236:9,10 238:11 239:20 249:19 254:15 255:1 259:22 260:3 272:9,17 273:10

gender 136:13, 14

general 10:25 13:20 51:3 52:24 57:21 58:6 72:22 91:5 133:6 147:4 163:23 164:11 169:8,11 172:10 173:13 290:3 292:6,9, 15 293:19 294:16

generally 37:8 40:9 59:12,25 65:12 67:11 71:1 91:7



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-7 Filed: 05/06/25 Page 318 of 336 PageID #:5091
THE DEPOSITION OF RAYMOND SCHEURER, taken on MAY 31, 2023

316

93:15,19 94:14
102:9,14
104:13 105:19
111:9 114:4
115:2 122:7
135:8,22 138:1
164:1,4 169:4
201:12 292:6

generated
277:20 302:22

generates
261:1

generating
258:25

George 56:13

give 6:24 10:5
29:1,10 38:3
40:6,8 41:16
56:15 57:20
80:14 88:11
94:7 99:14
153:4 172:25
218:19 225:14
249:16 279:4,8,
12,16 280:21

giving 90:6
227:13,17
260:8,16

glass 59:1
60:22 64:1

glasses
138:15,17,21,
23,24 139:2

good 7:5 10:9,
17 30:17 84:17
147:7 150:2,25
189:3 193:17
267:14 270:23
272:21,24
303:6

governed
167:20 169:5
173:16

governing
169:3

GPR 293:12,
19,21,24
298:16

GPRS 293:2

grabbed 54:9

graduate
45:22

graduated
46:14

Graham
253:15

Grand 49:25
50:1

graphic 97:21,
24 98:6

great 67:3

group 39:18
55:22 56:22
67:10 68:19,24
93:20 143:23
145:5 178:7,14,
18 300:6

grouped 145:7

Grove 46:4,5

guess 34:13
43:24 83:15
90:19 91:19
94:16 157:21
241:8 254:14
265:23 272:15
280:1,3

Guevara 26:15
27:2,4,17,23
28:1,4,11

Guevara's
26:12,18

guilt 159:2

guilty 158:14
243:22 244:1,5,
8,13 248:2,4

gun 36:4

gunfire 36:5

guy 245:9
246:1,2

guys 9:6 74:6
234:3 293:18
303:11

---

**H**

habit 193:17

hair 138:8,9,10,
14 139:5,9,11,
12,13,15,18,22
140:1,2,8,12,
19,21 141:2,3,
6,7,14 167:5
211:18

hairstyle
141:10 150:20
166:23 211:21,
24

half 41:6

hand 6:22

handed 72:16
259:25

handful 22:25

hands 234:16

handwritten
204:21

happen 25:9,
14 29:6 44:21
63:1,2 65:16,19
77:24 92:4
126:20

happened
25:5 44:15,19
50:7 65:18 68:5
71:3 75:25
106:25 126:18
232:17 233:3
241:4 245:20
246:23 247:23
273:3

happening
25:17,23

happy 55:15

hard 173:1,2

hardworking
20:25 22:13
26:24

head 139:5

headquarters
33:21 97:4,6,11

98:7

hear 14:11
27:16,21 30:21
107:7,13
238:24 242:14

heard 26:2,5
27:3 242:14
244:7 285:6,17

hears 284:20

Hector 56:14

Hector's 56:14

height 61:13,
14,16 62:13
102:20,23
164:25 165:2,7

held 63:9 67:25
83:10,12,13,16
234:13,20

Henry 262:18

hey 74:5
115:22 116:2
148:17

high 9:21 23:2
45:22,25 46:1,2

higher 46:16

highlight
263:13,20

highlighter
263:13,20

Highly 20:24

Hispanic
137:13

Hispanics
137:11

history 10:5
95:24 96:13
97:12,18 99:17,
22 100:9 101:6
206:1,2 247:17
248:6

hit 249:10

hold 31:20
234:4 301:8

holding 63:7,
11

Holy 46:1,2

home 132:16,
18 181:4,5
236:20 238:13
240:8 289:9
299:24

homicide 7:24
70:23 73:9,16
80:16 81:25
89:3 91:8 92:6,
18 104:7 107:1
111:11 128:19
129:2,11 203:6
214:2,4 217:13,
16,24 260:24
274:14

homicides
72:6 75:13
180:11 203:8

hope 105:10

hour 41:6
42:14 43:22

hours 303:8

house 34:12
70:14 233:13

housed 34:2

hundreds
289:15

hurt 222:1

hypothetical
119:19 127:7

---

**I**

ICAM 267:5,6,
9,15,18 268:1,
4,8 269:10
275:21 276:5,
21,23 277:7,19
278:2,17,18,21
279:13,24
280:4,15,16,18
281:8,21 295:4,
5

ID 147:20 200:2

idea 40:9 82:11
218:22 263:2,4
265:14



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-7 Filed: 05/06/25 Page 319 of 336 PageID #:5092
The Deposition of RAYMOND SCHEULE, taken on May 14, 2023

317

identification
12:23 13:8,15,
17,19,20,22
14:5 18:21,24
21:10 22:19
24:11 83:21
85:5 86:25 90:9
97:13 98:9
99:8,10,13
100:3 101:8
102:3,10
111:11,15,19,
23 112:2
113:21 114:4,
11 115:1,6,14,
18 116:21,25
120:8 121:4,18
122:10,17,24
123:10,12,22
124:5,16 127:4,
12,14 139:19,
23 140:13
141:7 147:18
150:13 156:13,
23 157:13
188:13 190:6,
10,14 196:13
198:15,22
208:9 239:24
240:8,19 242:6
249:21 253:6
254:17 255:25
257:17 268:21
273:13 274:1
275:8 290:12
300:8 301:18,
23

identified
23:20 92:12,22
120:22 125:13,
17 126:5,12,15
160:1 162:1,3
190:19 191:6,
16 193:11
215:4,15
216:19 221:22
235:19 247:15,
20,21 287:25

identifies
253:1

identify 6:13
11:24,25 13:24
14:17 33:16
92:16,19,21

106:6,11
114:12 120:19
122:1 123:3,6
127:25 139:21
145:15 146:4,
10,24 147:6,24
148:1,17,24
149:2,25 150:6
151:18 152:1,
11 153:11
154:3,25
155:12 156:16
160:4 174:2,10,
13,19,21,22
175:1,5,7
188:21,24
189:8 191:20
192:4,20
193:18,19
194:6,9,14,17
196:19 198:2
199:20,22
200:12 201:25
203:20,22,24
212:6,11
213:14 218:8,
13 221:15
223:11 229:17
232:11,14,19
233:5,16
234:25 235:6,9
236:21 238:13
239:1 242:8,19
243:2 244:11,
23 246:1 273:7,
20 274:7
287:13

identifying
126:16 127:18
139:12,22
221:21

IDOC 133:12,
14 134:3,20

illegal 157:10

Illinois 6:12
46:9,11 133:22

imagine 94:14
119:23

immediately
97:7 100:11

impact 109:2

implicate
225:16,23
226:3

implicates
247:13

important
28:20,25 29:5
104:21,23
105:8,24 106:2,
5,11,13 121:10
139:11 183:17
185:2,3,6,12,21
186:3,12 187:7
189:14 192:12
194:14

imposed 89:15

impossible
142:1

improper
157:10

improve 38:11,
15

inability 189:8

inches 165:10,
13,17

include 260:10
261:2,12 271:2
283:14,21
301:10

included 33:24
39:18 86:6
115:20 131:10
188:18 189:25
260:11,17,22
270:15 274:2
283:25 296:5,
10 301:19
302:22

includes
274:17

including
273:6

incomplete
119:18 127:6

incredibly
103:1

independent
36:16 37:4,15

38:4,7 74:11
76:20 77:23
78:25 79:3,5,
13,17,21
128:23 129:7,
24 132:17,20
159:13 160:16
161:1,7 162:7,
11,16 163:2,20
169:24 170:2,
19,25 171:13,
19 176:2
178:16 180:22
191:23 195:9,
13 196:1
203:11,16
205:10 211:11
212:22 219:23
229:23 232:21
246:25 258:24
261:24 268:11
269:19,22
271:14 282:19
292:13,25
298:13 300:24
302:25

indicating
152:9 174:20
175:6 179:2
263:11

indication
218:7,13,19
258:19 269:15

individual 6:18
58:17 62:15
64:3 92:15 96:4
107:20 120:10
121:13 135:11
175:10,11
255:22 275:23

influence
114:25 115:13,
17 117:20
128:5,12

influenced
115:5 117:24
157:13

influencing
90:9 117:12
156:23

informal 29:19

information
10:14 105:8
115:9 149:11
181:13 183:16
207:9,14,16,19
208:2 214:6
217:18 218:1,3,
6 221:12
227:13,17
249:19 255:1
260:9,16
265:13 266:11
267:12,17,25
272:6,9,12
273:22 282:5
283:8 284:13,
19 285:6
287:12

informed
110:21

inhibit 183:21

initial 92:5
104:6 145:25
194:5,8 249:13

initially 48:18
50:10 85:11
86:10 91:10
147:19,21
148:14 187:23,
24 194:1
212:15 219:6
247:18

innocence
159:2

innocent
157:20,23
158:2,5 243:22
244:5,13

input 110:20

inquiring
168:2,5

inquiry 263:6

insisting
153:19

instances
12:12,18

instant 150:11

institutional
25:8,13

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-7 Filed: 05/06/25 Page 320 of 336 PageID #:5093
THE DEPOSITION OF RAYMOND SCHEURER, taken on May 26, 2023
318

instruct 56:8
115:12 236:25
239:9

instructed
173:3,4

instructing
251:12

instruction
252:8

instructs 56:2

integrity
157:14

intelligence
10:12

intelligent
20:24

intention
186:8

interact 54:24

interaction
55:5 247:1

interactions
28:10 70:22

interchangeab
ly 69:7

intercom
164:6

internet 94:15,
20,21

interpret 28:13
281:18

interpreter
28:3

interrupt 29:11
40:21 95:18

interview
57:25 58:16
60:14 61:15,16
63:6,18,21,22,
23 64:7,12,18
65:14 78:21,23
109:7 118:3
176:13,25
177:2,5,11
181:3 182:8
183:15,22

184:12,14,15
187:1,4,8,15
188:5 189:18
194:20 195:18
196:2,8 197:14,
23 204:23,25
205:1 207:7
208:20 212:19
213:2,3,19,22
214:8,14,17,23,
24 215:11
217:6 226:20,
25 227:5 228:1
230:3 253:5,15
287:22 289:3
290:25 298:2,
14 301:23

interviewed
63:17 79:6,8
108:4 109:11
176:8,10,16,17,
19 177:9,13
178:1,5,21
179:3 183:9,13,
15 187:8,16,18,
23,25 188:2,3,6
194:16 195:5
196:22 204:17
212:16 214:15,
25 215:6,7,8,
10,20 216:1
219:5 221:20
223:17,18
227:2,3 228:14
230:16 243:8,
14,15 252:25
298:9

interviewing
79:13 91:23,25
107:15 152:7,
21,22 154:6
155:6 156:6
191:19 193:13
203:7 214:12
215:11,20
221:9 222:10
243:25

interviews
38:2 64:24
177:19 178:12
179:14,16
196:23 213:2

intimately
118:12,15

119:2,6,9,17
121:14

intrude 292:23

inventorying
123:13

investigate
185:22 217:24
223:9,14
224:20 264:1
302:15 303:1

investigated
192:17 272:10

investigating
107:16 147:24
151:24 152:16,
18 153:5
184:23 185:5,
19 194:15
269:23 276:18

investigation
7:18 8:7,15
16:4,8,13 19:9,
13 21:18 35:25
36:9 38:14
69:23 70:5,13,
23 78:8 81:18,
20 82:1 88:12
91:9 92:5
105:3,9 121:22
122:13 128:18
129:2,12
145:25 149:3,9
150:5 157:14
158:7,12,16
159:7,10 162:2
168:3 171:7
175:25 178:5
185:7 192:15
206:6 217:24
251:22 260:25
263:7,19 272:1,
2,11 274:14
276:18 298:20
299:12

investigations
18:7,11 22:5
27:25 28:12
73:16 111:11
144:1 265:4

investigative
33:9,18,20 34:1
79:1 91:7

92:13,20 104:6,
17 105:2,17
147:8 168:4
189:3 206:16,
22 207:11
229:7,11,16,17,
21 261:3,12
267:22 270:12,
15 271:10
272:17,24
283:15,22
296:5,10,18
297:7,12,17
301:7,11,20,22
302:2

investigator
242:6,15 243:1

investigators
192:14

involve 91:23,
25 111:12

involved 12:7,
8 55:23,25
80:19,21,25
81:9,11 96:7
119:24 120:17
121:11 130:20
131:23 152:19
153:5 179:17
191:21 203:20
212:6 214:4
222:15,21
223:2,6,10,15,
21 224:2,8,12,
21,25 225:7,13,
17 226:12,19
245:11 246:3,6
252:10 281:6,
10

involvement
28:4 69:22
70:4,9 86:14
179:18 214:2
226:8

involving
81:25 99:22
225:10

IR 98:21 100:2,
6 207:22
274:25 275:1,
13,20,24 276:5
277:5 279:1,3,

5,9,16,19
298:25

Islander 137:8

issue 171:1
237:22

---

J

jail 232:2

James 6:8,16
7:8,22 12:20
39:4,17 50:17
70:11,17,18
71:5 133:11
160:5 162:3
203:22 211:12
212:12,23
213:5,20,22,24
214:14,17,25
215:2,7,11,21
216:1 217:4
219:7 220:22
221:15,23
223:18 225:16,
23 226:3,11,18,
25 227:2 230:4,
10 235:1,19
243:21 244:12,
25 245:9,17
246:2 247:13
248:1 249:20
253:1,10
254:17,22
255:2 262:22
277:4,12,25
278:6,10,16,20
279:23

January 47:19
277:17

Jerome 6:10
8:11,21 9:10

JF-4561 275:5

JF-52 290:2,11

JF-62 268:17

JF-78 274:20
276:10 287:20

JF-86 257:13

Jimenez 12:6,
9,12,19 80:12

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-7 Filed: 05/06/25 Page 321 of 336 PageID #:5094
The Deposition of RAYMOND SCHULTZ, taken on May 17, 2023

319

85:7 86:4,7,9,
10,18 87:11,24
88:8 89:12

Jimmy 212:9
216:22 219:18
278:6,10

job 103:23
105:7 168:23,
25 296:9

John 56:15

joined 270:8

judgment
175:11

July 47:11

juncture 35:9
285:5

junctures
35:20

Junior 6:9

jury 243:4
244:15

justice 46:12

K

K-E-O-U-G-H
171:5

keeping
110:21 272:3

Keough 171:3,
5 172:1

key 184:12

kind 10:5 27:4
28:20 29:19
38:13 42:18
59:15 75:9
77:12 92:12
104:7 119:5
122:5 143:5
144:19 167:12
168:3 172:21,
22 207:13
211:21,24
241:19 272:12
292:2,4

knew 86:4
108:6 111:5

118:12,16
171:22 210:7
218:24 220:4,
17 250:15

knowing
192:13

knowledge
12:5 23:7,13
25:7,8,13,17
26:3 27:19
115:7 116:6
130:7 140:16
216:10,11,25
217:12,16
226:15

Kortney 6:4
17:19

L

lab 91:15 92:9

lack 65:17

lag 100:16

laid 154:5

landlord 89:2

large 57:23
59:22

lasted 43:21

late 73:6

Latino 137:3

law 265:7,23

lawsuit 8:3,4
34:10,13,16
35:19 70:15,21
71:3 85:15
87:19 242:2
244:17

lawsuits 26:3,
7,9 87:15

lawyer 40:3

layout 57:21

lead 157:19
158:4 272:17,
21,24,25

leads 147:9
185:23

Leaming
288:23

Leamington
288:24,25
291:21

learn 31:16
167:17 255:1
267:1

learned 32:14
33:1 70:19
71:11 103:18,
19,23 104:2
105:8 118:23
123:19 243:17
266:21 268:4

learning
225:12

leaving 56:19
57:1

led 39:3 71:15
222:15 223:16,
21 224:3,21
225:14 226:8,
12 272:11
273:14

left 164:5

length 10:7
43:20 63:14
85:17

lengthy 43:17
44:1

Leo 57:9,11

leukemia
30:18

Leva 56:13

lie 29:16 241:23

lieutenant
59:11 73:23
74:9

lieutenants
59:16

light 137:23

light-skinned
138:1

lighter 137:25

likelihood 96:7

limited 85:14
208:2

lines 29:4
101:11

lineup 13:17
15:3 58:2 60:4,
10 61:12,17,21
62:3,6,7,15,21,
22 63:2,5 64:4,
14 93:1 94:12
111:15 113:5
117:5,7,17
118:3 159:11,
12,22,24 160:2,
7,10,14,22
161:10,16,22
162:1,5,14,19,
22,23 163:5,7,
11,12,14,15,24
164:3,12,20
165:1,2,4
166:21,22
167:4,14,21
169:19,22
170:23 171:24
173:24,25
174:1,3,7,9,11,
15,22 175:8
204:20 245:7,
25 246:4,8
247:2,6 249:25
250:7,10,12,17,
19,21,22,25
251:1,25 252:8,
18,23 253:17,
22,24,25 254:6,
11

lineups 13:23
15:12 62:9,19
66:9 88:3
113:7,10,15
115:20 129:1,8
159:5,6,9,14,18
162:24 164:23
170:21 173:16
195:21 227:4,6,
8 247:20,21
251:11,15,20
254:10

lips 235:24
244:25

list 23:14 58:13
119:6 186:5
262:4 263:18
277:7,13
279:24 280:7,
12,17

listed 271:17
276:9,11

literally 100:21

litigation
280:11

live 55:1

lived 212:10
288:13

lives 289:7,11,
18

locate 183:1
184:7 205:16
253:9,10,22

located 49:23
253:24

location 27:10

locations
289:3

locker 143:22

lockup 63:15

Loevy 6:7,15

long 13:6 29:22
41:4 42:12
43:21 48:6
49:9,19 77:2,13
85:15 101:10
140:1,2,8,19,21
189:19 210:5
212:11,23
228:14 234:2
279:2 294:22

longer 9:25
75:17 77:6
146:4 147:23
148:16 153:8,
13 174:20
185:8,23,24
190:3 194:10,
17 273:15

looked 38:25
71:1 102:6



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

138:25 142:6,9,
24 143:2
148:16 152:23
153:8,14 154:8,
16,22 155:17
235:2 257:8
258:5,7 261:20

loss 201:20

lot 101:18
156:9 184:15
276:23 294:6

loved 28:23

low 23:6,8

Luna 289:18,20
290:1 291:5,20

lunch 175:15

lying 219:14
240:2,12,24
241:3,13
242:18 243:2,6
245:3 247:9

_____

M

made 27:22
52:4,6 83:8,18
89:6,15 112:16
118:20 122:22
123:12 158:8
188:13 190:10
199:1 240:7
253:13 271:10,
22

main 184:19

maintained
144:18

majority 51:14

make 10:9,21
13:5,7 29:8,23
32:10 37:13
39:12 58:5
66:12 73:13
99:12 107:22
109:8 115:13
117:13,18
122:15 123:4
127:17 131:4
137:16,18
138:9,16 141:3,

17,19 143:1
147:17 149:11
150:13 156:13
164:4 165:6
166:14,20
167:3 175:11
183:6 190:14
198:14,22
200:2 202:18
205:15 225:10
229:7,16,18
239:6,23
240:19 248:5
252:24 259:20
282:11 297:21

makes 30:19
101:13 274:10

making 76:18
139:19 238:16
254:3

male 139:25
140:19 154:23
258:15

males 140:2

man 7:16 16:25
17:11 131:23

man's 181:24

manipulate
11:10,11,15,24
12:23 13:11
14:3,4 18:15,20

manipulated
18:18,24 22:16,
19

manipulating
11:21,22 12:3,
13,16 21:6,9
24:5,11 83:18,
21 85:2,5
86:22,25 90:5

Manos 181:7,
16,25 182:5

manufacturing
221:12

Mapping
267:12

March 129:16
130:18 131:1,5
176:1 182:9

290:24 298:1
302:14 303:2

mark 255:19
257:11 268:15
275:4 290:9

marked 255:25
257:17 268:21
275:8 290:12
292:1 295:9

matter 6:8 7:8
106:5 116:20,
24 117:18
118:25 124:2,3
135:14,16
145:13 146:3
147:4 150:2,25
166:21 232:22
239:20 251:10

matters 43:14

Maurice
262:10

Mcdonald
132:1,4 231:7,
11 259:17,21
260:7 261:8
270:10,14,23
272:8,14 273:4
285:1 288:3,11
296:8

meaning 185:6

means 13:9
30:5 95:1
110:6,7 169:15
287:18

media 25:21
27:21,23

medication
30:19,24

medications
31:2

meet 39:24
44:5 45:18
181:2

meeting 40:2,
12,25 41:5
42:7,12,19
43:20 44:24
57:14

meetings 40:5
41:17 42:20
43:3 44:19 45:2

member 91:25

members
91:19 92:1 94:7

memorialized
113:22

memory 30:15,
17,25 31:11
36:16 37:11
38:11,14 40:8
107:3,18,23
108:1,3,21
109:2,10,15
151:11,17,23
152:9 201:9,20

mention
244:20

mentioned 7:7
161:21 220:24

merit 48:10

met 41:18 42:4
45:11

metal 60:13

Michael 21:21,
24

Michalik 6:19
25:16 33:10
34:4,6 45:11
65:5 66:6 67:19
74:25 77:25
109:13 110:4
113:24 114:13
117:1 119:18
120:3 121:20
122:11 125:3,9
127:6 131:15
134:6 147:10
150:4 184:17
189:4 191:8
193:20 194:23
198:24 206:4
217:9,11
259:14 261:4,
14 263:8 264:3
270:16 281:13,
15 285:25
286:13,23
293:3 295:14

296:12

mid 73:6

middle 43:20

midnight
51:13 53:10,14,
16

mind 17:6 94:3
98:23 101:14
146:6 151:13

minute 257:14
261:17

minutes 90:22

mirror 60:8
164:2

misconduct
27:2 81:4,19
82:4 83:8 86:1,
17 90:15

missed 99:7

missing 290:6

misstate
248:24

misstates
170:8 197:20
242:11 248:21

mistake 11:1

mistaken
209:17

mistakes
10:22,24

moment 29:9
275:7

moments
268:18

moniker 53:21

month 42:21
55:4 66:1
103:16 130:17
175:25

months 32:21,
22 40:22 47:20
49:6

morning 7:5,6
53:13,17

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Mose 262:13

motions 164:8

motive 225:16, 23 226:3

move 77:17 82:7

moved 49:18 184:19

moving 17:6

mugshot 93:25 94:24 95:13 256:9,14 275:11,14,19

mugshots 133:6 143:18 144:25 256:14 257:7

multiple 198:13,20 213:1 300:5

murder 36:1 38:14 39:3 121:7 216:11 223:13 226:15 243:23 247:17 248:6,13

_____

N

name's 100:22 277:7

named 7:17 131:8 212:8 229:24 231:14 276:22

names 80:15 88:5 180:5 230:22 258:17, 18 261:1 262:4, 5,25 263:18,24 264:1,19 267:23 276:23, 25 277:25 279:4,16,21 280:12 282:2 285:23 286:6

naming 187:13

narrative

207:18

naturally 99:3 205:23

necessarily 96:10 99:23,25 106:24 134:11 140:25 141:15 206:15 233:9 234:6 260:12 271:4,12,24 272:7 281:12, 16

neck 138:5

necks 138:6

needed 78:2 101:7 184:21 252:13 264:14

negative 123:24 124:5,9, 15,25 190:5,10 196:10 273:13 274:1 300:8 301:9,18,23

neighborhood 212:10 291:16, 24

news 26:2,6,13

night 53:7 253:4

ninth 56:20

Noradin 16:17, 19 17:11 18:4, 8,12,14,18,20, 24 19:1,7,12 55:6,7,13,21 56:12 57:8,14 178:5,17 229:14 230:22 233:24 246:5 270:6,13

Noradin's 17:23

normal 29:7

North 46:22 288:22 289:18 290:1 291:5,20

North-sider 46:21

Northern 6:11

note 292:7

notes 294:4,5, 6,7

notice 7:14 34:15

notified 34:10 35:6,9,14 37:21 302:5

notify 91:19 207:6

number 6:12 17:10 74:6,22 89:1 98:21 99:19 100:2,3,6 111:5 136:3 164:12 165:17 166:8 199:13 207:22 255:19 257:12 266:18 268:14,16 274:25 275:1,4, 5,13,20,24 276:5 277:2,5 278:1 279:5,9 285:22 286:18, 21 294:25 295:9,10 296:21,23 297:9,18 301:2

_____

O

oath 29:14,17

obese 166:6

object 25:16 26:20 31:22 33:10 34:4,6 65:5 66:6 67:19 77:25 109:13 110:4 113:24 114:13 117:1 119:18 120:3 121:20 122:11 125:3 131:15 134:6 147:10 150:4 189:4 193:20 198:24 206:4 239:2,8 248:21 259:14 261:4,14 263:8

270:16 281:13 293:3 295:14 296:12 299:16

objection 8:22 10:10 11:13 12:24 13:12 17:24 24:6,13, 19 25:1,25 27:13 31:18 69:11 74:25 100:24 107:5 125:8,9 127:5, 15,22 128:7,13 130:3,10 140:3, 10,23 146:7,16 148:2,4,19 149:19 150:15 151:3,14 152:2, 13 153:1,12 154:12 155:2, 13,24 156:14 158:15 166:24 167:7 170:6 174:4,12,24 175:9 183:23 184:17 185:10, 25 187:2,10 189:20 190:2, 21 191:7 193:1, 3,4,14 194:18, 24 196:15 197:20 198:8 200:3,24 201:4, 17 202:6,15 212:14 217:9, 10 221:25 224:23 236:3, 24 239:6 241:6, 24 242:10,20, 22 243:24 244:6 246:17, 19 248:3,21 255:4 256:24 259:13 260:19 264:3,11 276:20 277:22 278:23 279:6, 25 282:24 283:16,24 284:12 285:13, 25 286:13,21, 24 297:3 298:22 299:5, 15 302:11

objections 29:9

obligated 56:7

obligation 105:1

obscure 64:11

observe 245:21,22 246:15

observed 22:12 246:22

obstructed 145:19

obtain 95:10 133:10 134:4 181:4,5,17

obtained 295:22 299:23

obvious 271:7

occasion 38:19 62:2 63:23 65:13 67:14,16,23 88:7 94:17 118:7 138:12, 13,19 139:3 163:9 169:14 228:24

occasions 18:10 64:5 80:1 87:16

occur 109:4

occurred 42:20 71:9,15, 16 76:14 80:9 82:12 86:14 88:17 107:1 119:25 130:8 145:12 166:16, 23 219:4 233:2 249:2

occurring 161:12

occurs 65:2

October 48:8

offender 12:8 80:17 86:5,13

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

92:16 149:5
155:16 158:8
187:13 189:6
191:21 203:25
212:6,8 213:5,
15,25 214:10,
13 216:8,13,22
217:4,19,21,25
218:2,4,8,13,
15,17,20,23
221:16 243:5
244:16 247:22
282:6 288:1

offender's
36:7

offenders 36:4
88:1,3 183:11
192:20 193:11
194:9,14
203:20,25
212:6 213:19
215:3 216:5,25
217:22 218:10,
25 222:19
223:12 247:16
249:6,8,11
274:5,9 284:20
286:10

offhand 117:3

office 54:3
58:1 59:7,9,11,
12,15,20 61:8
158:9

officer 8:11,21
14:16,19,20,24
15:5 17:23
20:23 22:11
26:18 47:4 52:1
66:20 67:24
72:9 80:6 81:9,
10 88:23 89:16
114:10 121:4

officers 8:10
15:11,15 68:5,6
80:18 88:1
220:10 261:8

offices 6:7
58:3,13

Officially
247:15

older 72:23

142:6 185:8

oldest 75:24

one-way 60:7
164:2

online 265:3

open 54:6,7,8
57:23 58:6,10
59:20,21 61:19
62:10 65:8

opinion 8:20
9:3,23 10:8
17:22 20:22
22:10 23:8
26:17,23 69:2
222:7 224:9
244:7,12,18
261:7

opinions 23:2,
6,10

opportunity
212:18 214:7
257:20 268:24
290:15

opposed 165:2

opt 135:12

orally 172:2,5
173:4

order 81:24
101:7 120:18
182:23 183:8
184:9 206:24
207:2,3,9,15,24
208:13,21
209:1,4,6,20,23
210:4,11,16,23
211:7 266:12
302:1,3

orders 169:8,
11 173:13
206:20

original 80:16
106:3 187:12
215:19

originally
46:19 105:6
146:24 195:1
298:10

outer 59:12
62:24 64:3

outrageous
76:22,25

overlap 20:6

overview 47:4
104:8

———————

P

p.m. 52:10,21
175:18,21
239:13,16
255:12,15
303:13,15

Pacific 137:8

pages 262:5
277:2 280:3

paper 63:24
64:6,18,24
65:14 292:7
294:8

paperwork
207:4

paragraph
291:4 299:22

paragraphs
294:22

parameters
264:19 277:1

paraphrasing
9:17

Pardon 23:24
292:3

parlance 67:4
133:6

parole 51:25

part 9:12,13
52:20 54:14
55:22 56:22
58:14 80:15
114:15 139:11,
18 144:9 150:5
189:15 192:12
194:19 203:6
232:13 241:9,
21 242:2 249:1

251:21 258:6
301:7 302:8

participant
165:4

participants
60:9 62:2,6,9,
21 164:2,3
169:22 170:23

participate
117:15 128:17
159:10 179:14

participated
111:16 117:15
121:19 159:19

participating
63:21 116:22

participation
88:2 159:14
175:24

partner 8:17
16:23 22:8
158:19

partners 9:6,9
20:19 54:15

party 82:1
88:8,10 223:2

passage
107:17 109:2,4,
9

passed 155:15
156:9,10 272:5,
7

passing 48:14

past 172:25

patrol 9:5,10,
12 52:1 80:21

patrolman
48:2

Paul 6:19 290:9

pen 262:6

pending 6:10
30:7

people 10:13
23:1,19 28:23
41:7 55:18,22,
25 56:16 64:7

103:8 119:6
120:21 137:23
154:10 164:12
166:22 167:4
176:25 199:14
222:23 233:16
263:6 264:8,9
265:13 269:13
276:22 277:25
281:22,25
282:22 294:7
295:20

percent 302:8

period 17:2
19:20 22:1
50:22 51:15
52:20 65:21,23
72:5 73:1,4,10,
14,21 75:16,19
76:23 94:14
109:15 252:11
292:10,14,21
293:1,5

periods 20:10
35:4

Perkins 180:7,
15

permanent
33:8,17,21 34:1

perpetrator
126:6

person 7:21
16:3,8,13 19:8,
13 21:18 24:24
36:5 37:13
55:2,10 62:16
68:2,7 84:2
86:8 87:7
92:16,21 94:2,
5,21 95:8,13
96:11 98:18
118:1,2,11
119:14,16,24
120:1,13,14,15
122:2 124:17
126:13 127:18
134:12 137:22
149:14,25
154:22 157:23
158:5 175:10
190:9 196:22
207:6,16,18



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-7 Filed: 05/06/25 Page 325 of 336 PageID #:5098
THE DEPOSITION OF RAYMOND SCHULTZ taken on May 17, 2023
323

208:14 245:10 256:6 279:9 282:21 299:17

person's 92:25 94:20 145:20 189:8 235:24

personal 56:5 101:25 102:12 143:17 144:9 145:2

personally 102:15 144:5, 18 265:25

personnel 8:8 91:15 115:5 162:17,18

persons 279:17 299:9

Pete 56:13

phone 40:5,24 43:7,9,12,25 55:3 99:12 101:12 233:12

phones 60:1

phonetic 133:11 180:6,7

photo 13:17,23 14:8,13,21,25 15:15 62:15 63:5 67:7,9 68:15,18,22,23, 25 69:1,10,17 92:23 93:3,7, 11,12,13,16,22, 24 94:15,19,24 95:3,4,5,7,11 97:23 98:14,24 99:1,4,23 100:1,6,8 101:5,15,16,17 102:3,7,9,11 103:1,4,13,21, 24 104:2 111:14 112:9, 21,24 115:23 116:3,13 117:5, 7,10 118:14 119:21 120:1,5, 10,15,16,24

121:1,13,24 122:3,4,24 123:2,12,15,23 124:4,9,18,25 125:13 126:5, 12,17 128:18, 24 129:11,14, 16,17,18,25 130:8,14,19 131:6,10,13,22 132:1,5,7,10, 13,24 133:1,8, 18,23 134:7,8, 15,22,24 135:9, 11,12,22 136:2, 4,23 137:2,6,7, 17 138:4 139:4, 8,11,17 140:1 141:3,13 142:10,18 143:8 145:9,14, 17,20,22 146:5, 11,13,18 147:1, 25 148:6,18 149:18 150:12 151:1,12,25 152:10,25 153:10,17,21, 23 154:9,25 155:4,11,23 156:12,20 159:4 164:19, 24 165:2 166:21,22 167:3 188:12, 14,18,21,25 189:24 190:9, 13,15,19,20 191:1,6,12 195:23 196:9 197:4,7,10,13 198:1,2,5,7,14, 16,21 199:4,9, 15,25 202:22 204:19 215:5, 15,16 230:8,20 231:1 232:9,23 233:8,17,19,22 234:4,9,18,22, 24 235:1 236:20 240:21 241:5 243:9 247:19 250:4 253:1,5 254:2 256:23 259:16 260:1 264:10

272:16 273:3,5, 18 274:1,10 288:8 299:7,18, 21,23 300:2,3, 7,13,17,25 301:6,11,18 302:9

photocopy 255:22

photograph 62:13 63:1 102:17 118:9, 17 119:10 124:11 126:24 127:3,13,20,25 128:4 130:20 131:8 133:10 135:11 138:16 140:20 146:21 188:12,19 230:4 245:1 255:22 256:4, 17,21 259:22 275:6,22,23 276:2,12

photographin g 62:22

photographs 62:2,6,21 79:22 119:1 123:9 128:5 133:12 134:11 140:8 143:17,18 144:9,17 230:7, 11 256:12,19, 22 257:6 260:4

photos 62:19, 25 67:10 68:19, 24 93:18,20 94:4,5,21 95:9 97:20,24 98:4 101:17,19,20 102:1,3,6,11,13 123:14,17,23, 25 124:6 131:12 132:5,8 133:5,8,14,17, 18,22 134:2,4, 19,20,21,25 135:1,4,5,6,18, 19 142:16 143:20,24,25 144:3,20,23,24

145:3,6 148:8, 10 151:6,20 152:4 153:15 154:17 160:21, 24 161:3,5,9,14 162:22,25 163:4,7 195:21 196:3,7 197:17 199:16 200:23 201:6,13,23 202:1 213:18 231:2 232:25 234:5,10,11,14, 16 235:5,8,14 236:21 240:17, 19 244:22 259:25 264:14 267:9 300:5,6, 16,21 301:5,7, 9,10,14,17 302:8

phrase 251:23

phrased 38:13 106:5 167:12

physical 27:11,17 37:11 57:21 90:11 93:1 94:12 102:18,21 136:11 173:5 234:16

physically 234:13 259:25

pick 15:3 55:10 94:11 96:19

picked 215:16 235:1 247:18

picking 102:16

picture 62:11

piece 294:8

pieces 263:6

pile 143:23

pin 20:4 40:8

place 49:23 51:6 62:18,20 112:7,23 113:5, 14 129:21 168:13 169:4 173:20

places 34:2 58:7 134:12

plaintiff 6:16 7:8 87:18

PLAYS 114:17 237:8

plenty 126:15

podium 60:17

point 10:4 14:8,16,20,24 19:21 34:18 35:4,13 36:23 38:6 50:16,25 51:6 52:4 57:6 63:3,4,20 66:23 85:10,15 88:20 91:22 105:20 108:6,13 110:11 115:23 116:12 119:20 120:9 147:2,21, 22 148:15 169:20 183:24 189:22 216:18 217:23 219:13 225:21 232:7 235:14 254:25 273:21 288:10 291:13 298:20 299:3,12 302:21 303:5

pointed 240:21 244:25

pointing 14:12 15:11,15

points 47:8

police 7:17 8:7, 21 10:6,8,18,22 11:6 13:21 14:15,19,20,24 15:5,11,14,25 16:8,13,15 17:23 19:9,13, 15 20:23 21:18 22:11 24:4,11, 18,24 25:15 26:18 33:5,7 35:10,16 37:20, 21,24 38:6,12, 15,18,24 39:15, 19 46:25 47:4,



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-7 Filed: 05/06/25 Page 326 of 336 PageID #:5099
THE DEPOSITION OF RAYMOND SCHULTZ taken on May 12, 2023
324

12,16,18 52:15
53:9 55:19
61:25 63:17
66:15,20 67:4,
24,25 68:16
69:9,17,23
70:5,13 71:12
72:9 74:14
75:10,18 80:6
88:23 89:16
90:12 91:6
93:15,21 94:4,
19,23 95:7,11
98:14 99:22
101:11 103:12
109:19 111:9,
17,22 112:8
113:9,14 114:8
115:4 118:20
121:4,17 122:8,
16,23 125:21
126:23 133:5,
16 134:18
143:13,18
144:24 150:9
157:12 158:1,3,
25 162:17,18
168:2,14 172:9,
14,15 173:10
176:8 192:17,
18 204:3,5
208:14 219:6,
15 220:4,16
245:8 250:19
256:9 258:6
261:8 265:21
269:4 270:6
271:2 275:11,
14 277:5
284:20 290:3
292:2 293:2

policies 74:15
109:19 111:22
112:7,20,22,23
113:4,10,13
167:13,19
168:3,8,13,16,
19,22 169:2,4,
16 170:20

policy 66:13,
14,16 69:10,17
103:12 112:12,
15,17 113:22
114:8 115:8
118:20 123:18,

21 124:24
125:22,25
126:4,7,23
127:1 135:17
143:13 172:2,4,
7,13,25 173:6,
9,16,20,21

poor 151:11,
17,23 152:10

poorly 38:13
106:4 167:12

popular 72:8

position 47:6
62:25 115:17

positive
196:13

positively
196:19 247:19,
20

possibility
186:21

possibly 94:6,
16 119:10
127:8 137:13
151:18 154:3
157:19 201:25
218:6 222:9
223:8 229:14
230:21 256:21
296:6

post-
conviction
231:24 232:7

potential
256:18 263:6

potentially
44:4 174:19

pounds 166:8

power 140:7

practice 66:4,
7,19,24 75:10,
13 77:12 91:5
95:6,12 102:8,
16 104:16
105:21 106:6
107:22 109:23
112:1 114:9
116:20,24

117:19 118:21,
25 122:15
124:2,4,19
126:2 134:25
135:14,16
141:23 143:9,
12 145:13
146:3 147:4,7
150:3,8 151:1
163:23 164:11
193:17 198:12,
19,22,25 203:6
230:25 231:5
232:13,15,22
234:3 251:10
263:19

practiced
114:9

practices
113:20 114:3
293:19

preclude
127:21

preface 50:22

prefer 135:6
138:18 139:6

preferably
136:1 164:15

preliminary
233:7

preloaded
255:21

preparation
38:17,22 39:13,
21 40:10,14
41:19 44:6,9
45:19 258:3,7
269:6 290:20
297:22

prepare 39:25
45:15

preparing
41:14 44:2

presence
177:3,6 178:2
247:2

present 10:14
11:20 41:7
42:22 121:8

158:9 169:19
170:17,21
178:11 226:24
227:7 233:25
250:17,21

pretty 49:21
56:4 58:5 116:5
126:20 207:8
289:14

previous
106:6,12 108:7,
9 109:6 205:18
206:3 207:24
229:10 248:11
260:2 271:6
296:7 298:5

previously
45:5 58:7 71:18
93:23 94:3 96:5
98:22 104:24
106:3,10 108:9
110:11 151:9
152:8,19 153:6
155:7 156:7
174:5,13,18
175:4 186:12,
18 192:3,19
193:12,18
204:3,9 210:5
219:15 221:18
245:10 265:14,
15 271:15,17
273:12

primarily
51:10 73:10,14

primary 73:17
142:17

print 96:20
97:1 278:2,19
279:20

printed 258:19,
20 266:15
268:2 281:21
282:10 286:6

printing 96:23

printout
285:22

prior 38:8
88:20 160:6
161:9 162:5,22

170:9 199:25
215:11,20
232:9 240:8
245:25 247:5
259:10 260:8,
16 296:25

prioritize
105:21 140:20
185:1

priority 109:8

prison 94:9
212:9 214:22
219:18 278:3

private 242:5,
15 243:1

privilege
236:5,13,25
239:9 292:23

privileged
56:6 237:3

pro 227:20

probable
94:11 249:20
254:16,21,24
255:2

procedure
7:14 114:11
115:6,14,18
116:21,25
122:10,18,24
123:10,23
124:5 157:13
207:8 227:11
251:7

procedures
12:23 13:8,15,
19,21,22 14:5
18:21,24 21:10
22:20 24:12
83:21 85:5
86:25 90:9
111:11,16,20,
23 112:2
113:21 114:5
121:5,18
156:24

proceeded
212:19

proceedings


Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

6:1 39:4,17
70:11,17
231:24 232:7

process 92:9
133:3

produced
280:10

professional
54:18

professionalis
m 9:22

progress
290:3 292:6,9,
15 294:16

prohibiting
199:3

promise
227:16

promoted
19:21 48:8
103:15

promotion
48:10

pronouncing
42:24

proper 66:8
122:12 143:8
147:11,14
150:8

property 10:2
48:20,21 49:3,
10 58:1 59:14
61:6 180:8,9

prosecute
157:17

prosecuted
159:1

prosecution
157:19 158:5

protocol 77:13

provide 30:11
31:7 149:10
181:9

provided
132:4

public 28:23
68:1 101:12

pull 96:12 98:1

purported
134:13

purpose
263:15 271:3

pursuant 7:13
80:5 112:17

put 62:16 63:14
65:21,22 74:6
92:23 93:20
102:7 115:17
124:18 143:3
165:15 171:24
173:14 182:23
183:8 184:9
200:10 206:16,
24 207:4,8,9,
14,20,24 208:3,
21 209:1,4,6,
12,20,23 210:3,
11,16,23 211:7
229:11,21
231:9 234:5
240:17 251:11,
25 257:10
263:10,14
264:2,5,18
268:14 287:3,
14 292:5 302:1

putting 141:13
142:18 302:3

—————

Q

—————

qualify 119:16

quality 9:19,21

question 11:19
13:2 25:10
29:1,23 30:1,7,
8 32:13 38:13
50:23 66:24
79:12 109:5
112:19 114:1,
15,17 125:4
131:16 133:16
156:4,11,24
161:6 167:10
168:6 172:11,
23 185:4,18

186:24 194:4,7,
22 213:13
215:19 216:12,
21 217:1,3,7,8
219:1,16,24
221:8 225:20
226:17 233:10
236:7 237:4,8
254:9 258:21
267:6 273:25
283:3 293:4
301:17

question's
232:21

questions
23:16 28:21
29:8 91:5
255:24 268:19

quick 10:13

quicker 293:14

quickly 58:5

quid 227:20

quo 227:20

—————

R

—————

R-A-Y-M-O-N-
D 7:10

race 102:21,24

Rackowski
6:4

raise 6:22

RAMIS 258:14
261:18,20
264:16,22
265:17,25
266:12,14,22,
24 267:2 268:9
294:23 295:1,5,
11,19,23 296:4,
10,18,24 297:8,
14,19

ran 205:24
259:4,9,10
260:7,15
261:11 265:25
270:14 271:1,
16 274:14
276:5 277:19

280:15 281:9
282:13,21
283:13,20
284:4,5 286:17
287:13,17
302:21

range 43:22
102:19,24
141:20,23

rank 47:13 48:1

rap 278:13
279:20

Raymond 6:8,
21 7:10,13
303:14

re- 152:21

re-ask 38:12

re-interview
104:14 105:22
106:16,22
151:10 153:7
155:8 156:8
183:18 184:8
186:19 208:23
298:6

re-interviewed
78:2 109:11
252:21

re-
interviewing
105:19 107:3,
11,18,24 146:2
154:6,20 156:6

reach 232:6

reached 77:19

reaction
237:16

read 10:12
34:19,21,24
35:1 36:11
71:2,10 104:18
105:14 114:16
159:15 170:14
172:16,19,21,
22 173:12,15
192:9 237:4
287:9

reading 105:16

130:24 159:16
172:13 173:9

ready 63:4
255:23 268:19

real 61:12

reason 56:6
64:10,17,21
145:17 149:23
153:22 154:16
161:4,13
162:25 175:1
179:4 182:2
184:19 198:6
201:22,24
210:3 211:6
217:17,20
223:5 224:12
225:15 226:16
236:14 241:2,
12,22 264:2,5,6
279:23 280:14
281:5,9,20,23,
25 282:3,8,25
283:5,10
285:11,14,16
286:5,8,10
301:12

reasons
119:12 184:14

recall 17:16,18
20:18 22:6
28:11 33:19
34:25 36:2,8,9,
10,22,24 37:2,9
38:1 39:5,7,20,
23 40:15 41:11,
21 43:6 45:4
64:20 71:13
74:3,17 76:15
77:7 84:11
86:19,21,24
87:3,6,10
88:13,16,25
89:1,5,7 94:22
103:14,22
104:4 109:21
110:15 112:10,
11,22 113:12
115:11,15
116:11,14
117:22 118:6,
10 119:3,4
125:24 126:14,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

16 131:5 132:6
133:1 134:23
136:9 144:19,
21,24 148:16
155:16 159:25
161:15,17
162:24 167:15
170:15 172:7,
13 173:9
179:16,21,23
180:2,10,13
190:16 193:24
194:2 202:24
204:1 205:21
217:6 219:10
225:8 229:9
231:13,17
251:17 258:13
265:22 267:25
293:5 296:22
297:20

recalled 36:15
37:1

receive 34:9
35:3,10,15
89:11 173:5
266:24 268:7

received 37:19
70:25

recent 42:4
73:8

recently 30:18
239:20

recognize
256:6

recognized
164:9,10

recollection
36:16 37:4,16,
25 38:4,8 74:12
75:23 76:20
77:9,18,23
79:1,5,13,18,21
80:9 128:23
129:7,24
132:17,21
146:15 153:18
159:14 160:17
161:2,8,11
162:7,11,16
163:2,21 168:1
169:24 170:2,

19 171:1,13,20
173:17 176:3
178:16 180:22
191:23 195:10,
13 196:2
197:18,22
200:23 201:14
203:11,16
205:10 211:11
212:22 219:24
229:23 232:21
246:25 251:5
252:14 254:4
258:24 261:24
264:17 268:12
269:20,22
282:20 288:14
291:7,12
292:14,25
298:14,17
300:20,25
301:3 303:1

recommend
203:8 205:3

record 6:14
7:9,12 73:13
90:23,25 91:1
99:3,4 100:5,22
101:8 102:4,10
161:7 175:15,
16,17,19,20
209:14 239:3,
10,12,14,15
255:11,13,14,
20 257:12
258:10 261:22
266:20 268:16
269:8 303:7,12

record's 152:6

records 97:14
99:10,13 100:3
207:5 208:7

recovered
92:7

recovering
91:14

refer 54:1

referred 35:11,
16 37:20 68:9
80:24 81:8,23
206:22

referring 33:8
73:25 101:23
299:21

refers 69:10
294:23

reflect 7:12

reflected
192:19

refrain 217:17

refrained
220:16 222:10

refresh 37:25
146:14 201:13
288:14 291:7,
12 298:16
301:3

refreshed
200:23

refreshes
153:18

regard 83:24

regular 51:9
66:4,20 232:13

regularly
52:11 55:4 75:5

regulation
51:5

regulations
167:13

related 89:8,11
267:9

relation 79:14

relative 33:3

relevant 105:7

reliable 108:15

remember
17:3 23:16
35:25 45:9 47:9
57:6 76:2 86:2
87:24 88:3,4
109:16 111:1,
25 116:8
126:19,21
144:13,15
152:23 153:8,
14,20 154:8,10,

14,15,22,23
156:24 171:10
172:12,18
173:15 178:15
180:11 182:2
196:8 204:11
214:20 219:21
220:19 226:20
229:5 231:8
233:14 235:7
252:16 261:19
264:22 266:16
267:7,8,19
273:8 287:11
288:5,15 295:7
302:17

remembered
232:16

reminded
247:7

reorganized
48:19,22

rephrase
14:18 25:11
29:24 31:24
67:1,22 116:23
153:3 168:6
225:11 236:6
237:1,12,20,25
251:24

report 50:11
78:19 79:8,10,
11 122:2,5,6,8,
16,23 123:4
130:24,25
131:1,6,25
132:15 133:9
159:15 160:24
163:18 176:1
178:25 179:2,9,
11,13 181:6
182:22,25
192:2 193:2,5
194:6,8 195:8,
17 196:4,6
200:10 202:16
204:12 213:1,
10 215:17
220:2,9,18
221:3 224:18
228:21 230:23
232:17 235:11
249:13 254:13

259:24 260:5,
13,15 261:21,
23,25 264:16
265:25 266:12,
14 267:5,18
268:1 270:15,
19 271:2,3,16,
22 275:21
277:17,19
278:2,17 281:8,
9,21 287:2,9,
13,14,15,17
288:10,11
290:3,10,24
291:1,9 292:2,
4,5,6,8,9
293:13 294:16
295:19 296:14
297:25 299:6
300:10 301:24
302:4

reported
157:7,8

reporter 6:5,
22,23 7:2 17:20
23:23,25 28:24
114:17 237:5,7,
8 286:19 303:8

reports 10:14
36:12 37:10
50:14 71:12
78:1 104:12
108:7,10
128:21 129:4
130:8 131:2
159:16 181:14
187:24 188:17
192:6,18,22
193:8,9 194:12
213:10 215:14
254:7 270:19
271:6 272:2
289:8 292:8,15

represent 7:8
238:7,10
239:18 240:5,
16 244:20
247:4 277:10,
12 288:9,10
289:17 290:2

representation
238:16,22
239:25 240:22



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04768 Document #: 184-7 Filed: 05/06/25 Page 329 of 336 PageID #:5102
The Deposition of RAYMOND SCHALK, taken on May 17, 2023
327

represented 242:4 267:11

reputation 27:5

request 96:17 97:2,24 98:4 102:2 258:25

requested 101:4,5 114:17 237:8

requesting 100:8,9

requests 92:8

required 121:18 122:8 123:11,13,16 125:21 134:4 293:10 301:16

residence 202:13 230:17 233:13 239:22 259:11 291:8, 12 294:10 295:12 296:25

responded 220:19

rest 116:4

result 89:15 127:4,14 302:22

resulted 300:7 301:23

resume 303:5, 10

retention 33:8, 17,21 34:1

retire 46:25 47:10,12

retired 47:11 49:20 82:13,14 94:18 144:8

returned 19:22

reveal 32:9 236:13

review 37:10, 21 38:5,7,11,

15,18,21 104:11,13 152:10,25 156:12 179:13 186:13,16 187:24 188:16 256:3 257:20 258:3 268:18, 24 275:7 290:15,20 297:12

reviewed 36:18 38:5 39:15 71:14 192:6 258:7 269:5 297:22

reviewing 37:24 39:21 128:21 129:4 130:8 181:13 261:25 269:23

ride 97:8

River 46:4,5

robbed 36:3 189:13

robberies 247:18

robbery 88:1 189:16 222:15, 24 223:7,10,12 248:7,13 299:1

Rogers 36:12 129:16,20 176:22 182:13, 24 183:5,12,19, 24 184:9,11,20 186:4 187:5,8, 15 188:3,6,7 196:16,18,25 197:4 198:6 205:8,11,13,16, 25 206:17,25 208:22 209:25 210:2 211:6,10 212:2,5,13 213:4 214:24 215:2,23 216:7 218:11,12,16 219:5 220:3,16, 22,25 221:5,9, 12,21 222:6,12, 15,18 223:6,10,

15,20 224:1,12, 16,20 225:10, 13,15,22 226:3, 7,12,19 227:12, 21,24,25 228:6, 14 243:15 247:15 249:25 252:18,20,25 253:12,21 254:6,10 284:19 286:14 301:25 302:5

Rogers' 222:7

role 89:8,11

roll 173:3

room 58:2 60:4,11,12,23 61:4,5,12,23 62:7,24 63:11, 23,24,25 64:7, 12,18 65:14 118:3 164:7 169:22 170:23, 24

rooms 57:25 58:16,17,23,25 60:7,15 61:15, 16 63:6,7,18

routinely 92:4 133:7,18

rule 149:6,7 199:17 224:1,4, 5,6 225:3,4,5 274:10

ruled 199:13 273:19 274:2,7

rules 7:14 28:19

rumors 27:1,3, 16

run 98:18 259:7 260:25 263:17 265:9 266:12 267:17 269:13, 14,15 271:22 279:1,3,16 281:2,23,25 282:2,4,8 283:1,5,7,10, 11,18 284:10,

15 285:11,16, 23 286:2,5,9 295:11,15,20 296:25 297:8

running 249:6 271:3 272:2

Rutherford 132:1,4 231:7, 11,18,21 259:16,21 260:7 270:9,14, 23 272:8,13 273:5 285:1 288:3,12 296:8

Rutherford's 261:8

_____

S

_____

S-C-H-A-L-K 7:11

safe 38:10 270:12

sake 20:5 122:21

sat 80:24

scale 61:13,14, 16 62:13

scenario 101:14 154:5

scenarios 201:9

scene 80:16 81:25 89:4 91:11,13 92:5

Schalk 6:8,21 7:10,13 45:22 74:5 91:4 175:23 239:18 255:17,21 303:14

scheduling-related 43:11

Schmitz 57:9, 11

school 45:23, 25 46:1,2

screen 45:3,8

Sean 6:15 7:7

search 94:8,20 101:19 258:12, 14,15 259:3,9, 10 260:8,15,18, 25 261:2,12,18, 20,22 263:17 264:18,19 265:10 266:20 267:23 276:5, 22 279:1,4,13, 16 280:16 281:18,25 282:4,8,14,22 283:13 284:7 285:12 286:9, 17 287:14 295:11,19 296:4 302:21

season 55:8

section 34:24 97:11,14,22,25 98:7,10 99:8, 10,11,13 101:8 102:4,10 207:5 208:7,9

seek 46:15 168:7 183:1 184:14 188:9 189:18

seeking 14:17 170:20 172:7 182:10 183:22

selected 161:18

selecting 161:15

send 96:17 97:6 207:10 208:5,12

sense 29:23 32:10 37:13 101:13 282:12

separate 35:4 144:17 145:5 169:1 177:15

separately 117:5 164:1



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-7 Filed: 05/06/25 Page 330 of 336 PageID #:5103
The Deposition of RAYMOND SCHULTZ, taken on March 23, 2023

328

176:17 177:14

September 49:11,22

sequence 196:23

sergeant 19:16,21,22,24 20:1,2,6,12 21:5,9,13 59:13 171:2 172:1 178:20 179:3 181:7,16,25 182:5

sergeants 59:16

served 34:15 35:5,19,23 36:17,21 37:17 70:21 71:1,11 85:15

serving 299:2

set 54:11 106:7 108:25 117:15 165:17 166:8 220:22,25 221:5,19 222:22

set-up 222:21

setting 221:23 222:6

seven-year 50:20

shades 137:25

Sheenee 129:17 159:20 161:21 176:22 182:17 184:3,7, 15 188:10 189:15,18,25 190:18 196:16 197:2,10 203:12,19 204:2,16,23 205:5 210:16, 20,24 211:7 218:3 222:11 229:18 240:9 243:11 247:20 250:12 251:1

sheet 248:16 278:13 279:20

shift 51:9,13 52:11 53:1,6,7, 10,14

shooting 7:16 8:6 50:6 71:22 79:7,14 91:8 92:6,18,19 96:6,8 154:20 176:6,9 178:22 191:21 203:21 204:4 210:8,20 212:7 216:23 217:5 221:6 222:16 223:16, 21 224:3,21 225:14 226:9, 13 227:14,18 247:14 255:3 269:24 274:14

short 56:18,24 68:4 149:17 150:25 165:15

shorter 165:22

shot 36:6

shots 249:8

show 67:12 68:19 79:10 98:24 101:15 118:16,25 119:10,20 126:24 131:22 132:1 135:8 140:1 145:14, 17,20,21 146:5, 11,13 147:25 148:8,10,18 149:4,17 151:25 153:9, 15,17,21,22 154:17 155:3, 22 156:20 161:4,13 162:25 174:3 175:7 188:14, 25 189:24 190:10 191:12 195:23 197:16 198:6,15,21 199:9 201:5,13, 23 202:1

213:18 230:4 233:7 241:4 252:7,17 253:5 255:17 257:11 260:1 268:15 272:16 273:10, 17 275:3 288:8 299:7

show-up 67:4, 5,7,9,14,15 68:9,15,18,23 69:1 299:23 300:2

show-ups 69:18

showed 118:8 120:1 121:13 126:12 131:7, 13 132:10 134:25 160:20 161:2,8 162:21 188:12,16,18 190:13,14,25 196:7 197:4,7, 10,19 198:5,13 199:5,9 204:19 228:17 233:17 234:10,11 235:4 236:21 240:17 243:9 250:25 256:22 257:7 273:3,5 276:12 285:22 299:1,18 300:5, 16 301:2 302:8, 19

showing 14:12 79:18,22 96:3 120:10 122:2 127:2,13,20 128:3 146:18, 21 147:1 195:21 199:4, 25 200:22 232:9,25

shown 45:2 160:25 163:4,6 196:3 197:25 235:8

sibling 118:13

sic 259:22

side 46:22 60:8,9 169:21 257:10

sidewalk 36:6 249:10

sign 208:11,12 293:19 294:5

signed 293:16, 22,25

similar 93:19 95:25 101:21 102:6,18,19,20 103:6 136:20, 21 137:19,20 139:6 165:8,9 166:15,22 167:5 215:18 231:3 235:2 247:19

single 118:2,3, 8,16 119:1,10 120:1 122:24 126:24 127:3, 13,20,25 128:4

sir 7:5,14 8:6, 20 9:3,18 11:16 15:8 17:2 28:15 29:14 31:15 45:25 46:6,13, 23 73:4 130:23 238:8 257:11, 15,23 268:20, 25 269:17 275:6 290:10

sit 131:4 160:13 164:20 174:11 212:18 243:21 244:4 247:11

sits 237:11

sitting 59:19

situation 22:15 114:10 116:20, 24 118:15 119:23 126:11 136:22 137:1,5 138:24 139:7 148:13 155:20 156:4,6 166:18 167:2 198:23

situations 117:23

skim 34:22

skimmed 34:23

skin 136:17,18 137:18,22,24

smoothly 13:7

socially 54:24

solemnly 6:23

solve 76:21 77:2,6,10 186:8

solved 72:23

someone's 100:21 103:1 165:14 201:9 284:14

Sorrell 7:17 8:6,15 18:7 36:1 38:14 39:3 69:23 70:5,12, 22 79:7,14 129:2,11 159:6, 10 162:2 171:6, 16,17,21 175:24 176:6,9 178:5,21 191:21 203:20 210:8,21 212:7 217:24 221:6 222:16 223:22 224:3,22 225:14 226:8, 13 227:14,18 243:22 247:13 255:3 269:24 270:7 274:13 276:17

Sorrell's 128:19

sort 122:16,17 151:11

sought 169:15

sound 70:1 267:13 289:18

sounds 41:3 264:24 266:1 267:14



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-7 Filed: 05/06/25 Page 331 of 336 PageID #:5104
THE DEPOSITION OF RAYMOND SCHULTZ taken on March 31, 2023

329

source 25:22
168:8 182:5

sources 133:7,
17 134:5,21

South-sider
46:21

Spanish 28:2,5

speak 11:18
55:3 91:13
117:6,14 160:6,
11 162:4
182:24 183:25
204:20 272:18

speaking
13:16 111:9
182:13

special 173:13

specific 50:5
62:18,20 74:11
75:1 77:3,8
86:2 97:11
104:1 111:1
112:7,22
118:10 119:3
125:24 133:24,
25 169:8,16
171:19 179:23
213:3 233:10
265:20 273:8

specifically
69:13 71:7 72:4
77:1 79:12
103:14 109:3,4
111:7 114:19
115:25 116:9,
14,19 117:22
167:16 169:2
171:13 172:18
173:15,24
180:1 190:16
201:15 204:1
206:13 207:15
212:24 216:12
217:1 219:1
223:23 226:16
248:9 250:14
251:17

speculation
264:4 281:15

spell 7:9 171:4

spent 10:2
40:10 103:16

spit 258:17
276:23 280:18

spoke 28:5
55:3 117:25
187:19 212:2,3
214:19 219:15
227:25 246:8

spouse 118:12
119:7 121:15

squad 80:21,
25 81:1,2

stage 85:20

stamp 255:20
295:10

stand 60:10,
12,17 62:16
169:21 170:3,
22

standing 36:6

stands 267:7

Starr 6:15 7:4,7
9:2 10:16 11:14
13:1,3,13 17:8,
21 18:2 24:2,9,
16,22 25:4,19
26:4,25 27:15
32:1,4,19 33:13
34:8 43:2
56:17,21,24
57:3,12 65:10
66:10 67:21
69:15 75:2 78:4
90:18,21 91:3
101:3 107:8
109:17 110:8
114:2,16,22
117:8 119:22
120:6 121:23
122:14 125:6,
11 127:10,19
128:2,10,16
130:6,13
131:18 134:9
140:6,14 141:1
146:12,20
147:12 148:11,
22 149:22
150:7,22 151:7,

21 152:5,15
153:2,16
154:18 155:5,
18 156:3,17
158:17 167:1,9
170:12 174:8,
16 175:2,14,22
184:1,22
185:14 186:6
187:6,14 189:7,
23 190:4,24
191:11 193:7,
16,22 194:21
195:2 196:17
197:24 198:11
199:2 200:5
201:1,7,21
202:11,21
206:7 212:17
217:14 222:4
225:1 236:4,6,
8,16 237:2,12,
14,19,23 238:2,
5,6,19 239:4,6,
11,17 241:10,
17 242:3,17,25
244:2,9 246:24
248:8,23 255:8,
16 256:2 257:2,
19 259:19
260:23 261:6,
16 263:16
264:7,15
268:23 270:21
275:10 276:24
278:5,25
279:10 280:5
281:17 283:2,
19 284:3,17
285:20 286:4,
15 287:5
289:24 290:8,
14 293:7
295:16 296:16
297:6 298:24
299:10,20
302:13 303:4,7,
9

start 50:16
53:2,12 96:23
182:10 185:20
286:7

started 47:19
50:5 53:2,16
71:19 76:1,3

96:22 270:2

starting 183:2

state 7:9 96:18
97:4,22,25
202:19,25

state's 118:24
120:25 121:3,
11 158:9
195:18 200:19
201:25 202:2,8,
12,17,19 203:8
204:14,20,21
205:1,3,4
214:16,22
226:22,24
227:7 228:1,3,
11,15,19 243:4,
9,12,17 244:15
249:15,17
250:3,6,8,11,
17,18 251:2,5,
11,16 252:9,10,
13 253:11
254:1,5

stated 238:12

statement
90:3,6 187:13
202:25 203:5,9
204:12,21
205:5 228:4,12,
23 229:2
249:16 250:6

States 6:11

station 68:1
174:1

Stefanich 6:17
8:22 10:10
11:13 12:24
13:10 17:24
24:6,8,13,19
25:1,25 26:20
27:13 31:18,20,
22 32:3,12,16
42:11,24,25
56:9,11,20,25
57:11 69:11
90:19,22
100:24 101:1
107:5 125:8
127:5,15,22
128:7,13 130:3,
5,10 140:3,10,

23 146:7,16
148:2,4,19
149:19 150:15,
17 151:3,14
152:2,13 153:1,
12 154:12
155:2,13,24
156:14 158:15
166:24 167:7
170:6,8 174:4,
12,24 175:9
183:23 185:10,
25 187:2,10
189:20 190:2,
21 191:7 193:1,
3,14 194:18,24
196:15 197:20
198:8 200:3,24
201:4,17 202:6,
15 212:14
217:10 221:25
224:23 236:3,5,
7,24 237:6,9,
13,18,21 238:1,
4,15 239:2,5,8
241:6,16,24
242:10,20,22
243:24 244:6
246:17,19,21
248:3,21 255:4,
10 256:24
259:13 260:19
264:11 276:20
277:22 278:23
279:6,25
282:24 283:16,
24 284:12
285:13,15
286:21,24
289:22 290:6,
13 297:3
298:22 299:5,
15 302:11
303:6

stemming
71:22

stems 71:3

step 92:20
98:25 104:16,
17 105:17
164:4 211:9
301:22

stepping 164:8



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-7 Filed: 05/06/25 Page 332 of 336 PageID #:5105
THE DEPOSITION OF RAYMOND SCHULTZ taken on May 17, 2023

330

steps 79:1 91:7
92:13 104:6

stood 64:4
264:22 267:11

stop 182:23
183:8 184:9
206:20,24
207:2,3,9,15,24
208:13,21
209:1,4,6,20,23
210:3,11,16,23
211:7 302:1,2,3
303:4,9,10

stopped
208:14

stories 106:23,
24

story 212:16,
20

straightforwar
d 49:21

street 289:20

streets 289:15

strike 9:24
11:8 13:2 14:7,
17 16:11 22:15
23:10 38:12
62:19 67:14
74:21 78:9 80:4
81:10 85:24
106:4 107:15
110:10 116:22
119:14 122:22
123:20 124:3
134:3 137:16,
17 141:18
144:7 145:24
147:20 149:15
150:10 152:17
159:17 161:25
190:11 193:9
196:23 199:21
200:21 217:15
218:12 225:11,
12 226:1
229:17 235:22
236:10 243:20
252:5,6 259:9

strong 214:11
216:6

stuff 103:19

subject 145:10

subjectively
142:19

submit 92:8

submitted
179:11

submitting
294:5

subpoena
34:15 35:24
36:21

subsequent
7:17 27:20
36:18 46:6

substantive
43:13

sudden
221:10,22

sued 70:19
84:21 87:19

suggestive
116:25

suggests
114:11 288:11

summarize
265:2

summary
204:13 213:12

supervision
20:11

supervisor
74:4 110:12
115:12 142:25
157:7,9 158:22
168:7 169:15
208:12

supervisors
110:10,16,19,
25 168:10
173:3,5

supply 143:17

supposed
103:13 109:20
168:23 171:23,
24

suppressing
89:21

surprise
236:22 237:3
238:24 242:9,
13

surprised
237:15

suspect 13:25
14:8,12,16,20,
24 27:11 60:10,
11,24 63:12
64:12,14 67:11,
17,20,24 78:21
92:12,20,23
93:13,23 94:2,
19,24 95:15,19
96:8 98:13,23
99:14 101:14,
16 102:9 103:3,
7 115:24 118:9,
12,16 119:2,7,
9,17,25 120:2,
11,12,18,19
121:14 122:1,3
123:3,5,6
124:11 126:13,
25 127:3 128:4
129:15 132:10,
12 134:8,15
136:4,7,13,16,
23 137:2,7,21
138:4,8,15,22,
25 139:4,8,18,
25 140:8,20
141:4,5,19
142:3,12,19,24
143:1 145:11,
14,15,16,19,24
146:1,2,4,5,6
147:20,22,24
148:1,14,16,17,
25 149:2,5,14,
16 150:9,11
151:2,10,13
152:1,9,11,20,
23,24 153:6,8,
11,14,20 154:7,
11,15,21 155:1,
12 156:8,10,16
157:17 158:12
164:16,20
165:12,23
166:10,15

167:5 174:18,
19,21 175:4,7
190:3 199:14,
18 204:3
214:11 216:2,6
220:5,17
221:10,22
223:6 224:2
227:13,17
232:11,24
233:1,5 235:15,
19,24 236:21
240:22 242:8,
19 244:11,23
246:1 247:7
248:5 255:2
271:6 272:9,11,
12,25 273:15
274:3,8,10
276:19 281:7
283:8 284:9
285:7,9

suspect's
137:19 141:14
150:24 155:8
235:22 259:16

suspects
15:11,15 27:18
63:7,17 67:12
111:12 165:8
166:3 200:12
213:20 214:15

suspects'
202:4

SUSPENDED
303:15

suspicion
222:6

sustained 89:1

swear 6:23

sympathetic
30:22

system 100:22
101:9 265:17,
20,21 266:22,
25 267:2,15
268:5,8

_____

T

takes 92:10

taking 30:19,
24 31:2 35:20
48:13 229:1

talk 29:5 36:15
37:12 44:8
50:21 79:10
92:17 106:1
108:5 109:15
110:12 158:20
183:5 184:21
202:3,9 207:18
209:17 210:1,2
211:6,9 222:12
228:6 253:12
257:14

talked 40:11
83:4 111:14
133:6 136:10
202:10 209:5
226:5 228:10,
11 231:18,21
245:17 288:5

talking 13:20
28:22 32:8 35:8
38:2 40:10 54:2
66:15 78:22
91:10 94:13
95:4 97:19
115:2 118:24
120:15 229:5
234:5 246:10,
13 251:17
256:11,14

tall 165:15
211:14

taller 165:22

tasks 168:4

tattoo 103:2,8

tattoos 103:9
138:5,6

tax 168:4

Taylorville
299:2

team 16:25
17:11

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-7 Filed: 05/06/25 Page 333 of 336 PageID #:5106
The Deposition of RAYMOND SCHEER, taken on May 31, 2023

331

technicians 91:16

telephone 40:13

telling 29:16 108:8 110:19 116:14 154:2 195:11 200:15 204:16 220:16 221:10 224:7 225:9,12 251:6 253:20 284:14

tells 150:23 152:17 221:11 284:19

ten 231:19

tentative 253:6

tenure 25:6 27:20 28:6 52:24 64:23 65:11 168:14 172:8 173:10 180:3,12

term 11:12 13:8,9,20 37:3, 4 66:13 67:5 68:10,12,14,15 72:7,9,11,18 141:22

terminology 298:6

terms 33:18 66:12 69:4,7 136:12 166:1 207:19

Terry 36:12 129:16,20 176:22 182:13, 24 183:5,12,19, 24 184:8,11,20 186:4 187:4,8, 15 188:3,6,7 193:9 196:16, 18,25 197:4 198:6 205:8,11, 13,16,25 206:17,24 208:21 209:25 210:2 211:6,10 212:2,5,13

213:4 214:24 215:2,23 216:7 218:11,12,16 219:5 220:3,15, 21,25 221:5,9, 11,21 222:6,7, 12,14,17,18 223:6,10,15,20 224:1,12,16,20 225:10,13,15, 22 226:2,7,11, 19 227:12,21, 23,25 228:6,14 247:15 249:25 252:18,20,25 253:12,21 254:6,10 284:19 286:14 301:25 302:4

test 40:8 48:11, 12,14 107:23 120:12,18 143:5

testified 39:2,6 44:12 45:14 69:25 70:16 71:18 87:11,21, 23,25 110:11 113:23 130:1 135:21 141:16, 18 144:7,16 146:2 149:24 186:13,18,22 205:7 231:22 236:18 238:21, 25 239:19,21 240:2,6,12,17, 24 244:22 245:3,6,13 246:7 247:5,9 259:2 270:22 271:15 273:12

testify 88:5,12 141:11 184:2 232:3 241:22

testifying 29:20 43:14 70:8 143:16 170:20 253:21

testimony 6:24 30:12 31:8 39:16 70:3,10 88:6 123:21

159:21 163:6 170:9 184:13 197:21 230:19 240:16 242:11 248:22 254:12 259:21 265:3 279:22 282:7 284:4 296:7 298:5 300:2 303:13

testing 107:25

Thaddeus 12:6,9,12,19 80:12 86:4,9,10

there'd 65:13 99:4 100:5,16 145:17 153:21 178:25 283:10 301:12

thereabouts 53:5

thin 166:6

thing 30:6 65:3 66:8 68:23 69:2,5 117:3 122:12 143:5 147:7,11,14,15 161:12 166:4 186:15,19,21 205:22 206:21 229:20 271:25 300:6

things 23:15 25:5,14,23 43:17 66:19 79:12 92:3 115:12,16 168:16,20 184:19 185:1 186:3 238:12 239:21 244:19 264:20 271:13, 14 296:17

thinking 10:13 71:7 121:2 209:9,10

third-party 81:16

Thomas 171:5

thought 70:12, 18 109:14 126:13 143:7 158:6 170:13, 14 175:5 192:20 194:9, 13 220:25 222:20,22 224:8,12 225:9 226:2 228:7 250:18 259:3 260:2 270:23

thoughts 70:21

threw 144:5

throw 144:12

thrown 301:15

tickets 55:9 57:15

till 53:4 77:15 111:24 184:6 228:12

time 6:6 10:7 13:6 14:23 17:2 18:3 19:20 20:2 22:1 25:14 27:8,20 29:9 35:4,21 40:9,17 41:13 42:4 48:13 50:21,22 51:10,14,16 52:11,20 53:5, 20 54:12,15 55:12 57:8,13 63:3,14,16,20 65:21 66:24 68:1,4,16 70:4, 12,18 72:5 73:1,4,10,21 74:22 75:1,16, 19,25 76:23 85:17 86:11 87:25 88:23 90:24 91:2 100:16 107:1, 10,17 109:2,5, 9,14 111:17 117:10 134:19 147:21 150:25 155:10,15,21 156:9,10 157:4 159:22 161:5

163:12 164:1,4, 13 168:1 169:12 172:14 175:12,18,21 177:12 184:24, 25 185:5,11 201:11 202:23 212:3 213:3 221:24 225:21 226:22 234:3 237:21 239:13, 16 242:7 252:11 254:25 255:12,15 256:3 279:2 291:13 292:7, 10,14,20 293:1, 5 299:2,3 303:5,7

time-lapse 156:2

timeline 252:24

times 19:25 20:1,12 41:18 43:10 51:12 52:18,24 64:1 65:18,25 68:3 73:15 80:3,5 87:14,21,23 93:8 101:18 126:15 129:10 176:14,15 294:6

timing 237:21

tired 30:19

today 6:4,5 29:14 30:10 31:8 35:15 39:21 40:10 43:14 45:19 49:23 83:5 87:11 90:16 94:14 113:23 114:5 130:9 131:5 237:11 241:3,13 243:21 244:4 247:11 253:20, 21 258:8

today's 38:17, 22 39:14,25



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-7 Filed: 05/06/25 Page 334 of 336 PageID #:5107
The Deposition of RAYMOND SCHROER, taken on May 3, 2023
332

40:14 41:19
45:16,19 258:4
269:6 290:21
297:23 303:13

told 41:22 72:2,
4 106:3,6
108:25 109:1
114:5 116:10,
12 119:13,15,
24 140:9,18
145:10 149:15
151:23 153:7
156:8,18 160:9
169:20 170:3
171:2,10 174:1,
10 198:1
200:11,17,19
202:3 204:3,5
212:9,16
213:14 215:2,4
218:9,11 219:6
221:4,19 222:5,
18,20 224:11,
16 226:14
236:12,17,19
237:4 238:13,
18,25 239:23
240:7 243:1,3,
4,17 244:14,15,
23,24 245:8,25
249:12,15
250:9 268:9
272:23 273:2,4,
9 274:6 288:6
293:1

Tom 56:13

Tommy 56:13

Tony 19:16,19
20:6,14,19,22
21:16 57:17,18

tool 265:4
267:22

top 261:23
291:4

topic 61:24

totally 149:8
203:4 205:6
228:25 229:6

touch 110:18
253:8

traditionally
92:4

traffic 80:19,21
81:11

trained 111:6
115:16 167:16

training 103:16
113:6,8 115:20
168:24 169:1
266:24 268:7,
12

transcripts
39:16

transfer 49:15

transferred
49:11 51:19

translate
28:12

trash 144:12

trial 39:7 82:14
85:12,20,21
87:22 242:5

trick 39:13
131:3

truck 36:3
249:6,7,9

true 126:9
238:23

trustworthines
s 9:20

truth 6:25

truthful 30:11
31:3,7 195:11

turn 164:4

turned 124:5

turning 164:8

type 92:17
96:3,11 131:6
256:17 292:8,
15 293:2
294:10

typed 131:1
281:21 282:9
293:12,16
294:12

types 58:13
136:11

typewriter
294:9

typewritten
292:5

———————
U
———————

Uh-huh 17:20
23:18,21 35:22
41:24 72:10
97:9 163:12
237:5 238:9
290:4

ultimately 7:21

unable 121:25
123:3,5,6 182:4
198:21

unacceptable
166:9

underline
263:12,20

underlying
35:25

undermine
157:16

understand
7:15,20,24 8:2
10:13 11:15,17
12:9 13:14
25:10 29:13,16
30:24 36:18
37:7 69:25
73:12 106:25
167:10 172:11,
23 182:25
185:16 194:2
196:24 214:3
217:2 232:20
237:24 238:22,
23 239:24
240:22 280:8
297:16

understanding
13:9 33:25
72:22 129:21
132:3 172:24
188:17 220:12,
15 230:15

233:15

understood
30:2 125:22,25
143:12 172:4

unduly 90:8
115:5 116:25
128:5,12
156:23 157:12

unique 36:2
103:1

unit 181:8,22,
24

United 6:11

University
46:9,10

unnecessary
254:1

unreliable
108:17

unsolved 75:7

update 173:1

updated
172:25

updates 173:6

urgent 100:17

UW 299:1

———————
V
———————

vacated 7:25

vacation 86:11

variance
165:25

vary 166:7

vast 51:14

veracity
120:12

verbal 28:22
29:1

verifiable
134:4

verify 134:12,
16 222:2

versa 165:16

versus 108:12
135:1,18

vice 165:16

victim 91:18
92:1 224:7
249:9 288:13

view 60:9 62:9
92:24 93:7
118:1 145:18
155:11 159:21
160:15,21
162:14,19,23
173:25 174:11
195:7 245:7
246:8 249:25
252:1 253:22
254:10

viewed 117:7
159:12,18,24
161:16,22
163:14,15
190:19

viewing
117:10,17
160:7 161:9
162:5,22 163:5,
7,11 166:20
167:3 170:24
245:25 247:6

violent 10:3
48:20 49:12,13,
19 51:20,21,22
54:3 57:22,25
59:6,11 61:7
78:10

visit 202:23

visited 241:4

volition 49:15
51:20 251:20,
21

———————
W
———————

Wade 176:22
180:23,25
181:2,10 182:8,
11,15,19 183:2,
15,22 188:10
191:5,12,19



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-7 Filed: 05/06/25 Page 335 of 336 PageID #:5108
THE DEPOSITION OF RAYMOND SCHEIDT, taken on May 11, 2023

333

192:3,19 193:9, 10 194:4,8,13 195:4,11,20,23 196:7 197:3,14, 25 198:1 200:11,17,22 201:14,23 202:3,23 203:1 209:1,5,7,12, 13,18,24 210:4, 7 218:7 222:11 229:8 240:10 241:23 243:12 247:21 248:17 249:3,12,16 254:18

Wade's 202:13

wait 175:16 184:6 185:8,23 186:25 189:19

waited 184:14

walk 59:22

walked 62:23

wall 57:25 61:12,15,18

wanted 11:24 39:12 49:16 51:22,23 53:25 62:14 78:3,6,20 97:7,23 98:24 100:10 106:9 107:7,13 121:3 149:24 160:9 182:12,14,24 183:5,14 184:8 187:4 189:21 207:18 208:23 210:1,2 211:5 222:12 263:18 288:7 299:7

Warfield 80:13 82:7 84:22 85:1 87:24 88:7 89:9

Washington 288:20 291:17

watch 52:14, 15,16,21,24 53:7,8,9,14,21, 22,23 272:6

water 17:7

ways 51:2

wearing 138:15

week 65:12,15 66:1

weeks 42:6 44:16 65:20

weighs 211:16

weight 102:20, 24 165:3,7,25 166:7,15

West 288:20 291:17

What'd 219:20

Whatever's 93:8

whatsoever 70:5

Where'd 46:8

white 116:4 135:1,10,19 136:24 145:4,6, 8

Willie 7:17 8:6 18:7 39:3 69:22 70:5,12,22 79:6,14 128:18 129:2 159:6,10 162:2 171:6,16, 17,20 176:6,9 178:21 210:8, 21 212:7 217:23 221:6 222:16 223:21 224:3,22 226:8, 12 243:22 247:13 255:2 269:24 270:7 274:13 276:17

willingly 241:11

Willis 129:2

window 59:2 63:23 64:6,18

windows 58:25 59:4

64:24

withholding 280:6,11

witness's 107:2,18,23 108:21 109:10

witnessed 156:22 157:1,5

witnesses 11:10,18 12:3, 13,16 15:11,15 18:15,18 21:6 22:16 24:5 27:17 60:8,23 63:17 64:2,11 78:2,21 83:9, 11,18 85:2 86:22 91:14,17, 21,23 92:16,24 104:14 105:20, 22,23,24 106:2, 6,12,19,21 107:11 111:12 117:4 119:1 134:25 139:17 149:9 150:6 159:12,18 166:20 167:3 169:23 170:4, 24 176:5,8,11, 13,21 177:3,6, 9,12,17,20 178:4,21 179:4 180:22 182:14 186:19 188:15 189:1 198:13, 16,20 199:4,7,8 202:10 204:17 214:12 215:20, 23 216:20 221:14 222:3 223:19 228:17 235:18 240:7,9 243:16 244:1 247:23 248:18 249:2,4 250:12 252:1 254:18 273:18 285:6

witnesses' 205:8

Wojcik 19:16, 19,24 20:6,14, 19 21:5,6,9,13,

17 57:17,18 178:20 179:3

Wojcik's 20:23

wondering 76:25 113:8

word 66:14,18 95:1

words 151:16 220:6

work 8:21 9:19 17:23 20:14,23 22:4,11 26:14, 18 27:25 51:9, 11,13,15,21,22 54:6 72:2 73:15,16,20 74:16 75:11,13, 19 77:13,15 78:9 80:5 85:13 105:2 109:20 110:12,25 111:5,7 122:20 158:4,24 168:9 169:3,5 172:15 173:9 179:19 181:25 184:10 261:8 271:10

worked 8:6,10, 14,24 13:23 16:20,22,25 18:6,11 20:11, 16 26:22 52:11 72:24 74:18 75:5,17 76:13 77:6,9 105:6 180:10 190:8, 12 234:2 270:7

working 9:4 16:24 18:4 20:1,2 21:1 51:23 59:13 71:19 72:5 73:2 76:1,4 78:10 88:18 103:18 106:7 109:24 110:3,16,22 143:21 145:25 151:8 166:12 178:6,8,9 179:24 180:2, 14 192:13 229:15 260:24

270:3 271:9 272:1 274:13 276:17

works 53:9 303:11

worries 13:1

worth 146:18, 21,25

would've 20:12 51:25 74:10 80:12 105:6 112:14 126:6 160:8 169:9 173:21 178:6 179:17, 18 217:7 220:3 222:18 228:19 231:1,5 233:2 234:1,12,16 242:14 245:2, 19 246:10,18, 22 249:14 250:9 252:12 253:11,12 254:7 257:7 259:15,18 260:9,17 264:14 267:1 269:15 270:17 271:10,22 272:13,23 273:2,4,9,22,23 296:10

write 260:12 293:21,24

writing 28:25 109:21

written 66:15 69:20 103:15 113:9 114:20 118:23 192:25 193:5 294:7 295:9

wrong 11:2,5 16:3,7,13 19:8, 12 21:17 24:24 84:2 87:7 135:23 282:9

wrote 81:25 293:19 296:13



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-7 Filed: 05/06/25 Page 336 of 336 PageID #:5109
The Deposit on of Raymond Schairer, taken on May 17, 2023

334

———————
X
———————

xerox 33:11

———————
Y
———————

year 32:24 38:6
46:13 55:3,8,9,
12,14,15 82:12
85:18 88:16
139:14 248:14

years 8:25 9:4,
5,6,11,25 10:1,
2 16:21 17:3,
10,12 30:16
52:3 72:25 73:7
74:22 76:4,9,
13,21 77:10
88:19 96:16
99:19 111:5
133:19 140:16
142:3,4,11
166:13,19
172:16 184:10,
18 185:19,21
220:23 221:21
222:11 231:19
274:12 292:19

yell 284:20

yellow 263:13,
20

yesterday
45:19

you-all 249:12
279:4,16

young 141:24

younger 30:17
142:9

———————
Z
———————

Zoom 40:1,2,
13,25 41:1,8,
11,17,18 42:5,
7,12,19,22
43:3,21 44:18
45:2 55:10
57:14

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com