# EXHIBIT 8

LOUISVILLE LEXINGTON LONDON FLORENCE CINCINNATI INDIANAPOLIS ORLANDO JACKSONVILLE TAMPA



# KENTUCKIANA
## — COURT REPORTERS —

CASE NO. 20-CV-04768

JAMES FLETCHER JUNIOR

V.

JEROME BOGUCKI, ET AL.

DEPONENT:

JEROME BOGUCKI

DATE:

April 20, 2023





✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

```
 1            IN THE UNITED STATES DISTRICT COURT

 2           FOR THE NORTHERN DISTICT OF ILLINOIS

 3                    EASTERN DIVISION

 4                   JUDGE ANDREA WOOD

 5             MAGISTRATE JUDGE MARIA VALDEZ

 6                  CASE NO. 20-CV-04768

 7

 8

 9              JAMES FLETCHER JUNIOR,

10                     Plaintiff

11

12                        V.

13

14          JEROME BOGUCKI, ANTHONY NORADIN,

15           RAYMOND SCHALK, ANTHONY WOJCIK,

16       UNKNOWN CITY OF CHICAGO POLICE OFFICERS,

17             AND THE CITY OF CHICAGO,

18                    Defendants

19

20

21

22

23   DEPONENT:  JEROME BOGUCKI

24   DATE:      APRIL 20, 2023

25   REPORTER:  KRYSTAL BARNES
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                            APPEARANCES

 2

 3   ON BEHALF OF THE PLAINTIFF, JAMES FLETCHER JUNIOR:

 4   Sean Starr, Esquire

 5   Anand Swaminathan, Esquire

 6   Loevy & Loevy

 7   311 North Aberdeen

 8   3rd Floor

 9   Chicago, Illinois 60607

10   Telephone No.: (312) 243-5900

11   E-mail: starr@loevy.com

12           anand@loevy.com

13

14   ON BEHALF OF THE DEFENDANTS, JEROME BOGUCKI, ANTHONY

15   NORADIN, RAYMOND SCHALK, AND ANTHONY WOJCIK:

16   Brian Stefanich, Esquire

17   Hale & Monico

18   53 West Jackson Boulevard

19   Suite 337

20   Chicago, Illinois 60604

21   Telephone No.: (312) 564-4924

22   E-mail: bstefanich@halemonico.com

23

24

25
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              APPEARANCES (CONTINUED)

 2

 3    ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:

 4    Terrence Burns, Esquire

 5    Reiter Burns

 6    311 South Wacker Drive

 7    Suite 5200

 8    Chicago, Illinois 60606

 9    Telephone No.: (312) 878-1294

10

11    Also Present: Kortney Chase, Videographer

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                          INDEX

 2                                              Page

 3   PROCEEDINGS                                   6

 4   DIRECT EXAMINATION BY MR. STARR               7

 5

 6                        EXHIBITS

 7   Exhibit                                     Page

 8   1 - Illinois Department of Corrections Photo

 9       - CITY-JF-164                           158

10   2 - Composite Exhibit of Photographs -

11       CITY-JF-4550-4565                       164

12   3 - Criminal Record Search - CITY-JF-86-96  176

13   4 - Arrest Report - CITY-JF-149             194

14   5 - Trial Transcript - FLETCHER 881-1092    213

15   6 - Initial Case Report - CITY-JF-64-65     219

16

17

18

19

20

21

22

23

24

25
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                        STIPULATION

 2

 3  The VIDEO deposition of JEROME BOGUCKI was taken at

 4  LOEVY & LOEVY 311 NORTH ABERDEEN, 3RD FLOOR CHICAGO,

 5  ILLINOIS 60607 on THURSDAY the 20TH day of APRIL 2023 at

 6  10:49 a.m. (CT); said deposition was taken pursuant to

 7  the FEDERAL Rules of Civil Procedure.

 8

 9  It is agreed that KRYSTAL BARNES, being a Notary Public

10  and Court Reporter for the State of ILLINOIS, may swear

11  the witness.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                      PROCEEDINGS

 2

 3        THE VIDEOGRAPHER:  We are now on the record.

 4   My name is Kortney Chase.  I'm the videographer

 5   today, and Krystal Barnes with the court reporter.

 6   Today's the 20th day of April 2023, and the time is

 7   10:49 a.m. Central Time.  We're at the offices of

 8   Loevy & Loevy to take the deposition of Jerome

 9   Bogucki in the matter of James Fletcher Junior

10   versus Jerome Bogucki et al.

11        pending in the United States District Court for

12   the Northern District of Illinois, Eastern Division,

13   case number 20-CV-04768.  Will the counsel please

14   identify themselves for the record?

15        MR. STARR:  Good morning.  My name is Sean

16   Starr.  I represent the plaintiff, James Fletcher,

17   in this matter.  And I'm from the law firm of Loevy

18   & Loevy.

19        MR. STEFANICH:  My name is Brian Stefanich. I'm

20   from Hale & Monico, and I represent the deponent,

21   Defendant Bogucki.

22        MR. BURNS:  Terrance Burns on behalf of the

23   City of Chicago.

24        THE VIDEOGRAPHER:  Okay.  And Mr. Bogucki, will

25   you please raise your right hand for the reporter to
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**KENTUCKIANA**
COURT REPORTERS

1  swear you in?

2       THE REPORTER:  Do you solemnly swear or affirm

3  that the testimony you're about to give will you the

4  truth, the whole truth, and nothing but the truth?

5       THE WITNESS:  Yes.

6       THE REPORTER:  Counsel may begin.

7            DIRECT EXAMINATION

8  BY MR. STARR:

9    Q.   All right.  Good morning, sir.  Thank you for

10  being here.  As I mentioned, my name is Sean Starr and I

11  represent the plaintiff in this matter.  Could you

12  please state and spell your name for the record?

13    A.   Jerome Bogucki.  That's J-E-R-O-M-E,

14  B-O-G-U-C-K-I.

15    Q.   Okay.  Thank you, sir.  I'll let the record

16  reflect that this is a deposition of Jerome Bogucki

17  taken pursuant to notice in the Federal Rules of Civil

18  Procedure, and that there's also a Zoom link for this

19  deposition.  Sir, you understand that this case that we

20  are here for today concerns a December 21, 1990 shooting

21  death of a man named Willie Sorrell Junior, and the

22  subsequent Chicago Police Department investigation?

23    A.   Yes.

24    Q.   Okay.  And you understand that the person who

25  was charged and convicted of that crime was a man by the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    name of James Fletcher, correct?

 2         A.   Yes.

 3         Q.   And you understand that Mr. Fletcher is my

 4    client, correct?

 5         A.   Yes.

 6         Q.   Okay.  And you understand that Mr. Fletcher's

 7    homicide conviction was vacated, correct?

 8         A.   I guess so, yes.

 9         Q.   Okay.  And you understand that Mr. Fletcher

10    has filed a lawsuit, and that you were a defendant in

11    that lawsuit, correct?

12         A.   Yes.

13         Q.   Okay.  Sir, what date were you specifically

14    assigned to the Sorrell shooting investigation?

15         A.   I don't know if I was assigned.  It was in

16    1995.  I believe it was in February, maybe.

17         Q.   Okay.  When you say you don't know if you were

18    assigned, what do you mean by that?

19         A.   Well, at the time, myself, my partner, and two

20    other detectives were assigned to look into older cases.

21    And I don't know if it was that case -- this case was

22    presented to me, or if we found it.

23         Q.   Okay.  When you say your partner, who are you

24    referring to?

25         A.   Raymond Schalk.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   Okay.  And then I think you said there was two

2    other detectives as well that were asked to look into

3    older cases.  Who were those detectives?

4    A.   Detective Robert Rutherford and Kevin

5    McDonald.

6    Q.   And so you're not sure if the supervisor asked

7    you to look at this case specifically, or if you decided

8    to look at on your own accord?

9    A.   I don't remember that, no.

10   Q.   Okay.  Was it the case that you did look at

11   some cases by your own hand, that you chose to look at

12   certain cases?

13   A.   I believe so, yes.

14   Q.   Okay.  And then was it also the case that some

15   cases were asked of you by a supervisor to review?

16   A.   Pretty much.  Yes.

17   Q.   Okay.  And these were these cold cases?  Or is

18   that an incorrect term that I'm using?

19   A.   Well, I mean, you can use that term.  But they

20   were cases that have been sitting for a while and needed

21   to be looked at again.

22   Q.   Okay.  Is it fair to say there were cases that

23   had not been solved?

24   A.   Yes.

25   Q.   Okay, so there was no convictions in the cases

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    that you were reviewing?
 2         A.   That's correct.
 3         Q.   Okay.  And how many cases -- strike that. What
 4    year did you start doing that type of work?
 5         A.   As far as cold cases?
 6         Q.   Yes.
 7         A.   It was probably sometime around then, but I
 8    don't remember any specific dates.
 9         Q.   Okay.  Had you been asked to review any cold
10    cases prior to February of 1995?
11         A.   I don't remember.  I don't know.
12         Q.   Okay.  Do you recall how many cold cases you
13    reviewed during your tenure as a Chicago police officer?
14         A.   No, I have no idea.
15         Q.   Was there a specific period of time during
16    your employment as a Chicago police officer where you
17    specifically were assigned to look at cold cases?
18         A.   Yes.
19         Q.   And what period, generally, was that?
20         A.   Again, I'm not sure when that started.  But it
21    was pretty much toward the end of my career, the last
22    years of my career.
23         Q.   Okay.  And we'll get into your employment
24    history in a few minutes.  So you don't know the exact
25    date you first began work on the Sorrell investigation;
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   is that correct?
 2        A.   I don't know the exact date, no.
 3        Q.   Okay.  But you believe it was sometime in
 4   February of 1995; is that correct?
 5        A.   Yes.
 6        Q.   Okay.  At any point in the Sorrell
 7   investigation, did you show any witness any photo array?
 8        A.   At any point?
 9        Q.   At any point.
10        A.   Yes.
11        Q.   Okay.  How many different times did you show
12   any given witness any photo array?
13        A.   Well, I can remember once in '95.  And I can
14   remember at least three more times in 2002.
15        Q.   And just so I'm correct.  You said you
16   remember one photo array that you conducted in 1995, and
17   three more in 2002?
18        A.   In regards to this case.  Yes.
19        Q.   Correct.  Okay.  Were those photo arrays --
20   did those photo -- strike that.  Did those photo arrays
21   constitute the same set of photos?
22        A.   The last -- the ones in 2002, yes.
23        Q.   Okay.  So is it your testimony that you did
24   two different types of photo arrays?
25             MR. STEFANICH:  Object to form.  You can
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      answer.
 2      A.   In '95, it was a different set of photos.
 3  BY MR. STARR:
 4      Q.   Okay.  So in '95 you did a photo array with
 5  one set of photos.  In 2002, you did three with the same
 6  set of photos; is that correct?
 7      A.   That is correct.
 8      Q.   Okay.  And at any point during the Sorrell
 9  investigation, were you present for any lineup that was
10  conducted in the Sorrell investigation?
11      A.   Yes.
12      Q.   How many line -- strike that.  How many times
13  were you present for a lineup that was conducted during
14  the Sorrell investigation?
15      A.   Let me make sure I'm thinking right here. Just
16  once.
17      Q.   In what year was the lineup that you were
18  present for conducted?
19      A.   2002.
20      Q.   At any point during the Sorrell investigation,
21  did you conduct a photo show up?
22          MR. STEFANICH:  Object to form.  You can
23      answer.
24      A.   Yes.
25  BY MR. STARR:
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q.    Okay.  And a photo show up is when you show a
 2   witness a single photo; is that correct?
 3        A.    That is not correct.
 4        Q.    Okay.  What is your definition of a photo show
 5   up, sir?
 6        A.    The same as you asked before, a photo lineup.
 7   It's the same -- same thing.
 8        Q.    Just for clarity's sake, I didn't ask you
 9   about a photo lineup.  I asked about a photo array, and
10   about a lineup.  So let's make sure we're clear here.
11   What is your definition of a photo array?
12        A.    A group of photos shown to a witness.
13        Q.    And then what is your definition of a lineup?
14        A.    A physical lineup.
15        Q.    Okay.  So when you say, "Physical lineup," you
16   mean there's physical people standing in a lineup
17   that --
18        A.    Yes.
19        Q.    -- a witness is viewing, correct?
20        A.    Yes.
21        Q.    Okay.  And then tell me again what your
22   definition of a photo show up is?
23        A.    I've never used that term --
24        Q.    Okay.
25        A.    -- but I -- I'm guessing that you're -- I can
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   only guess that you're referring to a single photo.
 2       Q.   I'm asking you for a definition.  So if you
 3   don't have a definition, you can --
 4       A.   I never use that term.
 5       Q.   Okay.  And are you familiar with the term,
 6   "A witness show up"?
 7       A.   No.
 8       Q.   Okay.  Did you ever conduct a witness show up
 9   in your career?
10       A.   I don't know what you're referring to.
11       Q.   Is there any term for an investigative --
12   strike that.  Is there any term for an identification
13   procedure in which a Chicago police officer shows a
14   witness a single photograph?
15       A.   Any term?
16       Q.   Yeah.
17       A.   No not that I know of.
18       Q.   Okay.  So when I asked you earlier whether or
19   not you ever conducted a photo show up during the
20   Sorrell investigation, I believe you said yes; is that
21   correct?
22           MR. STEFANICH:  Objection.  I think he said no,
23       and you he think he was referring to the photo
24       array.  But you can answer.
25       A.   That's exactly right.  I -- I thought you were
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  referring to a photo -- group of photos.

2  BY MR. STARR:

3      Q.    Okay.  So I want the record to be clear.

4  So I think I asked you and you said yes, but the reason

5  you said yes is you thought I was referring to a photo

6  array; is that correct, sir?

7      A.    Yes.

8      Q.    Okay.  During your photo array that you

9  conducted in 1995, how many photos were in that photo

10 array?

11     A.    I am not sure how many there were.

12 I would assume there was at least five, maybe more.

13     Q.    And why do you assume there was at least five

14 or maybe more?

15     A.    Just by regular -- my -- what we would

16 normally do.

17     Q.    Okay.  So was it your normal practice as a

18 Chicago police officer that, when you conducted a photo

19 array, you would typically use five or more photographs?

20     A.    Yes.

21     Q.    As a Chicago police officer, did you ever

22 conduct a photo array in which you used less than five

23 photographs?

24     A.    Not that I recall.

25     Q.    Okay.  And then during the 2002 photo arrays

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    that you conducted, you testified there was three of

2    them.  How many photographs did you use in those photo

3    arrays?

4         A.   According to my report, seven.

5         Q.   When you say, "According to my reports," do

6    you know -- do you have a -- strike that.  When you say,

7    "According to my reports," what specific report are you

8    referring to?

9         A.   Whatever -- what -- whatever was in the file.

10   Specifically, I think it's got to be in my closing supp.

11        Q.   Okay.  Is that something that you reviewed in

12   preparation for today's deposition?

13        A.   Yes.

14        Q.   Okay.  And is it your testimony that those

15   2002 photographs, you used the same seven photographs in

16   each of the three times?

17             MR. STEFANICH:  Objection.  Asked and answered.

18      You can answer.

19        A.   As I've said before, yes.

20   BY MR. STARR:

21        Q.   Okay.  Sir, did you violate Mr. Fletcher's

22   constitutional rights during the Willie Sorrell shooting

23   investigation?

24        A.   No.

25        Q.   And I believe you testified already that you
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   had a partner by the name of Raymond Schalk; is that
 2   correct?
 3        A.   Yes.
 4        Q.   So you're familiar with Detective Schalk,
 5   right?
 6        A.   Yes.
 7        Q.   Okay.  And Detective Schalk worked on the
 8   Sorrell investigation with you; is that correct?
 9        A.   That is correct.
10        Q.   Okay.  Do you know whether or not Detective
11   Schalk ever violated Mr. Fletcher's constitutional
12   rights during the Willie Sorrell shooting investigation?
13        A.   To my knowledge, no, he did not.
14        Q.   Okay.  And do you know who a Chicago police
15   detective by the name of Anthony Noradin is?
16        A.   I do.
17        Q.   Am I saying that last name correctly?
18        A.   It's pretty close, yes.
19        Q.   Okay.  And did Detective Noradin work with you
20   on the Willie Sorrell shooting investigation?
21        A.   He assisted us, yes.
22        Q.   Okay.  Do you know whether or not Detective
23   Noradin ever violated Mr. Fletcher's constitutional
24   rights during the Sorrell shooting investigation?
25        A.   I never saw anything like that, no.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q.   Okay.  And just for ease of this deposition,

2  and tell me if you don't agree with this, I'm going to

3  probably refer to the Sorrell investigation or the case,

4  you know what case I'm talking about, right?

5      A.   Yes.

6      Q.   Okay.  If I am talking about any different

7  case, I will tell you the name of that case.  But for

8  the purposes of this deposition, if I say, "During this

9  case," or, "During this investigation," I'm specifically

10  referring to the Sorrell shooting investigation, okay?

11      A.   I understand.

12      Q.   Excellent.  Do you know whether or not any

13  other Chicago police personnel violated Mr. Fletcher's

14  rights during the Sorrell investigation?

15      A.   I do not.

16      Q.   All right.  Sir, did you coerce a witness

17  by the name of Renee or Shanee Friend to sign a false

18  statement during the Willie Sorrell investigation?

19      A.   No, I did not.

20      Q.   Do you know who I'm referring to when I ask

21  about Renee or Shanee Friend?

22      A.   Shanee Friend.

23      Q.   Shanee Friend, okay.  So that's your

24  understanding of her name, Shanee?

25      A.   Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1       Q.   Okay.  So I will refer to her as Shanee
2   Friend.  Do you know whether or not Detective Schalk
3   coerced Ms. Friend to sign a false statement during the
4   Sorrell investigation?
5       A.   He did not.
6       Q.   You know that for a fact?
7       A.   Yes.
8       Q.   Okay.  Is that because you were present with
9   him at all times that he was present with this witness?
10      A.   All -- all times that -- I mean, I didn't
11  go -- I mean, every second?  No --
12      Q.   Okay.
13      A.   -- but yes.  All -- all pertinent times, yes.
14      Q.   So is it your testimony that you were with
15  Mr. Schalk at all the important -- sorry, strike that.
16  Was there any time that Detective Schalk was with
17  Ms. Friend when you weren't present that you know about?
18      A.   Not that I recall.
19      Q.   Okay.  Are you familiar with a witness in this
20  case by the name of Terry Rogers?
21      A.   Yes.
22      Q.   And did you coerce Mr. Rogers to sign a false
23  statement during the Sorrell investigation?
24      A.   No.
25           MR. STEFANICH:  Objection.  Foundation.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        You can answer again.
 2        A.   No.
 3   BY MR. STARR:
 4        Q.   Do you know whether or not Detective Schalk
 5   coerced Mr. Rogers to sign a false statement --
 6             MR. STEFANICH:  Objection.  Foundation.  You
 7        can answer.
 8             MR. STARR:  I wasn't fully done my question.
 9             MR. STEFANICH:  Oh, I'm sorry.
10             MR. STARR:  It's okay.  I believe I paused or
11        something.  Let me just re-ask it --
12             MR. STEFANICH:  Sure.
13             MR. STARR:  -- and then we can get your
14        objection on the record.
15        A.   He -- he did not.
16   BY MR. STARR:
17        Q.   Okay.  I'm just going to ask it again for the
18   sake of the record.  Do you know whether or not
19   Detective Schalk ever coerced Mr. Rogers to sign a false
20   confession during the Sorrell investigation?
21        A.   He did not.
22             MR. STEFANICH:  Objection.  Form, foundation.
23        You can answer.
24        A.   He did not.
25   BY MR. STARR:
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Fixx Deposition of TERONE JACKSON, taken on ...
21

```
 1        Q.   And how do you know that, sir?
 2        A.   How do I know that?  Because I -- I've never
 3   seen him do anything like that or hear anything like
 4   that.
 5        Q.   Okay.  And were you present for all the time
 6   that Detective Schalk was with Mr. Rogers during the
 7   investigation?
 8        A.   I can't say for sure.
 9        Q.   Okay.  So you can't say for sure whether or
10   not Detective Schalk coerced Mr. Rogers, correct?
11        A.   I can say that, yes.
12        Q.   Okay.  And, just again, what is your basis for
13   saying that, if you can't tell me whether or not you're
14   with him during all periods that he was with the
15   witness?
16             MR. STEFANICH:  Objection.  Asked and answered.
17        You can answer again.
18        A.   It's safe for me to assume that he had never
19   done that in his entire career that I had been with him.
20   So I would have to say he did not.
21   BY MR. STARR:
22        Q.   Okay.  Why is it safe for you to assume that
23   Detective Schalk never coerced a witness in his entire
24   career?
25        A.   Because he hasn't.
```



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

602.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      Q.   I understand.  But how do you know that, sir?

 2      A.   All the times I was with him, he's never done

 3  that.

 4      Q.   Okay.  So you're aware of certain times that

 5  you've been with Detective Schalk, you've never seen him

 6  coerce a witness, correct?

 7      A.   Correct.

 8      Q.   But there's other times in Detective Schalk's

 9  career where you're not present when he's doing an

10  investigation, correct?

11      A.   That's -- that should be correct.  Yes.

12      Q.   Okay.  And you don't know whether or not he

13  coerced witnesses during those periods of time, correct?

14      A.   Well, again, I know that he never has.  And I

15  can only assume that he has never done that.

16      Q.   Do you know whether or not Detective Noradin

17  coerced Mr. Rogers to sign a false statement during the

18  Sorrell investigation?

19          MR. STEFANICH:  Objection.  Form, foundation.

20      You can answer.

21      A.   I -- again, any time I've spent with that

22  particular detective, I've never seen him coerce anyone.

23  BY MR. STARR:

24      Q.   Okay, my question was a little bit different.

25  Do you know if, in this specific case, detective Noradin

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  ever coerced the witness, Terry Rogers, to give a false

2  statement?

3      A.   I have no knowledge of that.

4      Q.   Okay.  Did you ever attempt to coerce a

5  witness by the name of Emmett Wade -- actually, strike

6  that.  Do you know who the witness Emmett Wade is?

7      A.   I -- from reports, I do.  Yes.

8      Q.   Okay.  And then following back up on my last

9  question, did you ever attempt to coerce a witness by

10  the name of Emmett Wade to falsely implicate

11  Mr. Fletcher during the Sorrell investigation?

12      A.   No.

13      Q.   Did you use any unlawful tactics to try to get

14  Emmett Wade to identify Mr. Fletcher?

15          MR. STEFANICH:  Objection.  Form.  You can

16      answer.

17          MR. BURNS:  Hey, Sean, before you do that.

18      As far as objections, rather than be repetitive,

19      I'm not going to repeat objections.  If he makes an

20      objection, can we assume they apply to all of us?

21      Or do you want them individually?

22          MR. STARR:  If you want to have a standing join

23      of any of his objections, I'm fine with that.

24          MR. BURNS:  That's fine.  I may add from time

25      to time, but rather than delay it, I thought we'd

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        just say that right now.
 2             MR. STARR:  That's fine.
 3             MR. STEFANICH:  Okay.
 4             MR. BURNS:  Very good.
 5             MR. STARR:  Could I get the question read back?
 6             THE REPORTER:  Yes, absolutely.
 7        Mr. Swaminathan has dropped out of the zoom.
 8             MR. STARR:  Okay.
 9               (REPORTER PLAYS BACK REQUESTED QUESTION)
10   BY MR. STARR:
11        Q.   You can answer.
12        A.   No.
13        Q.   Do you know whether or not Detective Schalk
14   ever attempted to coerce Mr. Wade to falsely implicate
15   Mr. Fletcher during the Sorrell investigation?
16        A.   I have no knowledge of that.
17        Q.   Do you know whether or not Detective Schalk
18   ever used any unlawful tactics to try to get Mr. Wade to
19   identify Mr. Fletcher?
20             MR. STEFANICH:  Objection.  Form.  You can
21        answer.
22        A.   I have no knowledge of that.
23   BY MR. STARR:
24        Q.   Do you know whether or not Detective Noradin
25   ever attempted to get the witness, Emmett Wade, to
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1    falsely implicate Mr. Fletcher during the Sorrell
 2    investigation?
 3         A.   I have no knowledge of that.
 4         Q.   Do you know whether or not Detective Noradin
 5    used any unlawful tactics to try to get Mr. Wade to
 6    implicate Mr. Fletcher?
 7              MR. STEFANICH:  Objection.  Form.  You can
 8       answer.
 9         A.   I have no knowledge of that.
10    BY MR. STARR:
11         Q.   Did you deliberately conceal the fact that
12    Emmett Wade refused to identify James Fletcher?
13         A.   That he refused?
14              MR. STEFANICH:  I'm going to object.  Form.
15       You can answer.
16         A.   I have -- I have no memory of him refusing.
17    Or it's not in reports either, I don't believe.
18    BY MR. STARR:
19         Q.   Okay.  So you don't recall whether or not he
20    refused to identify Mr. Fletcher or not, correct?
21         A.   According to my reports, it doesn't say that.
22         Q.   We'll look at your reports in due course.
23    I'm asking about your recollection.  Do you recall
24    whether or not Mr. Wade refused to implicate or identify
25    Mr. Fletcher?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      A.   I don't know that.

 2      Q.   You don't know that, or you don't recall that?

 3      A.   I don't know that.

 4      Q.   Okay.  So you don't -- strike that.  So you do

 5 not recall whether or not Mr. Wade refused to identify

 6 Mr. Fletcher, correct?

 7      A.   I only recall what's in my report.

 8      Q.   Okay.  And that's not in your report, then?

 9      A.   I don't believe so --

10      Q.   Okay.  So it's fair to say that you do not

11 recall Mr. Wade refusing to identify Mr. Fletcher,

12 correct?

13           MR. STEFANICH:  Objection.  Form.  You can

14     answer.

15      A.   I -- I can only testify to what's in my report

16 as far as Wade.

17 BY MR. STARR:

18      Q.   Well, I mean, I'm going to ask you questions

19 that are outside the bounds of your report, sir.  And if

20 you want this deposition to move quickly, I'm expecting

21 you to answer the questions to the best of your ability.

22 So --

23           MR. STEFANICH:  He is.

24      A.   And --

25           MR. STEFANICH:  He is doing that.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MR. STARR:  Okay.

 2       A.    I am.

 3  BY MR. STARR:

 4       Q.    But he just said he can only answer questions

 5  that are in his report.  I'm asking if you recall

 6  something.  If you don't recall it, you can tell me

 7  that.  So --

 8       A.    I don't have independent recollection of that

 9  particular thing you're asking me.

10       Q.    Okay.  So let me ask it again so it's clean.

11  That's the question I am asking.  Do you independently

12  recall Mr. Wade refusing to implicate or identify

13  Mr. Fletcher during the investigation of the Willie

14  Sorrell shooting?

15              MR. STEFANICH:  Objection.  Form.  You can

16        answer.

17       A.    I don't recall him ever saying that.

18  I don't -- independently, I don't recall what he said.

19  BY MR. STARR:

20       Q.    Okay.  Do you know whether or not Detective

21  Schalk deliberately concealed the fact that Mr. Wade

22  refused to implicate or identify Mr. Fletcher?

23       A.    I have no knowledge of --

24              MR. STEFANICH:  Objection.  Form.

25       A.    -- no knowledge of that.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    BY MR. STARR:
2        Q.   Do you know whether or not Detective Noradin
3    deliberately concealed the fact that Mr. Wade refused to
4    identify Mr. Fletcher?
5            MR. STEFANICH:  Objection.  Form.  You can
6      answer.
7        A.   I have no knowledge of that.
8        Q.   Do you know the witness -- strike that.
9    Do you know who the witness Edward Cooper is?
10       A.   Yes.
11   BY MR. STARR:
12       Q.   Okay.  Did you use any unlawful tactics to try
13   to get Mr. Cooper to identify Mr. Fletcher?
14           MR. STEFANICH:  Objection.  Form.  You can
15     answer.
16       A.   No.
17   BY MR. STARR:
18       Q.   Did you ever attempt to coerce Mr. Cooper to
19   identify Mr. Fletcher?
20       A.   No.
21       Q.   Do you know whether or not Detective Schalk
22   ever attempted to coerce Mr. Cooper to falsely implicate
23   Mr. Fletcher in the Sorrell shooting investigation?
24       A.   I have no knowledge of that.
25       Q.   Do you know whether or not Detective Noradin
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   ever attempted to coerce Mr. Cooper to falsely implicate
 2   Mr. Fletcher during the Sorrell investigation?
 3        A.   I have no knowledge of that.
 4        Q.   Okay.  Sir, did you suppress any exculpatory
 5   evidence that could have exonerated Mr. Fletcher during
 6   the Sorrell investigation?
 7             MR. STEFANICH:  Objection.  Form.
 8        You can answer.
 9        A.   No.
10   BY MR. STARR:
11        Q.   And when I say, "Exculpatory evidence," are
12   you familiar with that term?
13        A.   Yes.
14        Q.   And what is your understanding of that term,
15   sir?
16        A.   Evidence that would help Mr. Fletcher.
17        Q.   Okay.  Evidence that would potentially help
18   prove his innocence, correct?
19        A.   I guess possibly.
20        Q.   Okay.  Evidence that could potentially impeach
21   state witnesses as well, is exculpatory, right?
22        A.   I don't -- I don't know --
23        Q.   Okay.
24        A.   -- I don't know what you -- what you're
25   getting at there.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q.   So I just want to make sure we're clear,

2  and I -- you understand my questions.  When I use the

3  term, "Exculpatory evidence," I'm referring to evidence

4  that would tend to exonerate Mr. Fletcher of the crime

5  or prove his innocence as one category, okay?

6     A.   I guess it's possible, yes.

7     Q.   Right.  I'm just trying to define the term for

8  you so we can be on the same page.

9          MR. STEFANICH:  He's just giving you the

10         definition of exculpatory evidence that he's using

11         in these questions.

12         THE WITNESS:  Okay.

13  BY MR. STARR:

14    Q.   So that we're on the same page, okay?

15    A.   Yes.

16    Q.   Okay.  So when I say "exculpatory evidence,"

17  I mean one of two things.  Either evidence that would

18  tend to exonerate Mr. Fletcher or prove his innocence,

19  or evidence that would impeach the testimony of the

20  prosecution's witnesses, okay?

21    A.   Yes.

22    Q.   That make sense to you?

23    A.   Yes.

24    Q.   Okay.  So when I asked you if you suppressed

25  any exculpatory evidence, given that definition, is your

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   answer still no?
 2        A.   It is --
 3        Q.   Okay.
 4        A.   -- still no.
 5        Q.   Okay.  Do you know whether or not Detective
 6   Schalk ever suppressed any exculpatory evidence that
 7   could have exonerated Mr. Fletcher?
 8        A.   No.
 9        Q.   Okay.  Do you know whether Detective Schalk
10   ever suppressed any exculpatory evidence in the Sorrell
11   investigation whatsoever?
12        A.   He has not, that -- to my knowledge.
13        Q.   Do you know whether or not Detective Noradin
14   ever suppressed any exculpatory evidence during the
15   Sorrell investigation?
16        A.   To my knowledge, no.
17        Q.   Okay.  Do you know who a Chicago police
18   officer by the name of Anthony or Tony Wojcik is?
19        A.   Yes.
20        Q.   Okay.  Did Mr. Wojcik work on the Sorrell
21   investigation with you?
22        A.   No.
23        Q.   No, okay.  Do you know whether or not
24   Mr. Wojcik coerced any of the witnesses in the Sorrell
25   investigation?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.    Yeah, he --
 2             MR. STEFANICH:  Objection.  Form.  Foundation.
 3        You can answer.
 4        A.    He -- he had nothing to do with this case.
 5   BY MR. STARR:
 6        Q.    Okay, do you know whether or not Mr. Wojcik
 7   ever suppressed any exculpatory evidence during this
 8   Sorrell investigation?
 9        A.    I have no knowledge of that.
10        Q.    Okay.  And just, again, for clarity's sake,
11   maybe I misheard you.  But when I asked you whether or
12   not Mr. Wojcik ever coerced any of the witnesses in this
13   case, you said he had nothing to do with this case.
14   Is your answer that Mr. Wojcik never coerced any
15   witnesses in this case, according to your recollection?
16        A.    Yes.
17        Q.    Okay.  Do you know if any Chicago police
18   personnel suppressed any exculpatory evidence during the
19   Sorrell investigation?
20        A.    No.
21        Q.    Did you personally fabricate any evidence
22   during the Sorrell investigation?
23        A.    No.
24        Q.    Do you know whether or not Detective Schalk
25   fabricated any evidence during the Sorrell
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   investigation?

 2        A.   I have no knowledge of that.

 3        Q.   Do you know whether Detective Noradin

 4   fabricated any evidence during the Sorrell

 5   investigation?

 6        A.   I have no knowledge of that.

 7        Q.   And do you know whether or not Tony Wojcik

 8   fabricated any evidence during the Sorrell

 9   investigation?

10        A.   I could say no on that.  Just no.

11        Q.   And do you know if any other Chicago police

12   personnels fabricated any evidence whatsoever during the

13   Sorrell investigation?

14        A.   I have no knowledge of any of that.

15        Q.   Okay.  Sir, do you know whether or not James

16   Fletcher is guilty or innocent of the Sorrell murder?

17        A.   I was -- did not witness the crime.

18   So I -- I wouldn't know for sure.

19        Q.   Okay.  Do you know of any evidence at all, as

20   you sit here today, showing that Mr. Fletcher is guilty

21   of that crime?

22        A.   Yes.

23        Q.   And tell me all the evidence that you're aware

24   of, as you sit here today, that Mr. Fletcher is guilty

25   of the shooting death of Mr. Sorrell.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     A.   We have a witness that actually knew him,

2   that -- and identified him as one of the offenders.

3   And you have two other witnesses that positively

4   identified him in a physical lineup.

5     Q.   **Any other evidence that you're aware of,**

6   **besides those two pieces of evidence that you just**

7   **testified to, that implicate Mr. Fletcher in the murder**

8   **of Mr. Sorrell?**

9         MR. STEFANICH:  Objection.  Form.  You can

10    answer.

11    A.   Those are the main things.  I guess you could

12  add in photo -- photo align -- photo lineups.

13  BY MR. STARR:

14    Q.   **Okay.  So any other evidence besides the three**

15  **things you testified to?  Which were, there was a**

16  **witness that actually knew Mr. Fletcher who identified**

17  **him.  There was two other witnesses who identified him,**

18  **I believe you said in lineups.  And then the third thing**

19  **being witnesses that identified him in photo lineups?**

20    A.   I'm sorry, I'll turn this off.

21    Q.   **No worries.**

22    A.   I forgot.

23    Q.   **No worries, I'll ask it again.**

24    A.   During -- during the parking brigade,

25  I forgot.  The only other thing I could add is that, one

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  of the witnesses, I wouldn't doubt -- I would not doubt

2  their identification because Shanee Friend said she had

3  seen him in the neighborhood several times.

4      Q.   Okay.

5      A.   So, that would add to my reasoning of his

6  guilt.

7      Q.   Okay.  So other than those four things that

8  you identified, one being a witness that actually knew

9  Mr. Fletcher, who identified him.  Two, being two

10 additional witnesses who identified him in a lineup.

11 Three, being a witness who identified him in a photo

12 array.  And four, being the fact that Ms. Friend knew

13 Mr. Fletcher or saw him around, and identified him.

14 Any other evidence that you are aware of that implicates

15 Mr. Fletcher in the murder of Mr. Sorrell?

16     A.   Not that I can think of right now.

17     Q.   Okay.  So let's unpack that evidence that you

18 just testified to a little bit.  The first thing you

19 told me is that there is a witness that actually knew

20 Mr. Fletcher and identified him.  What witness was that,

21 sir?

22     A.   Terry Rogers.

23     Q.   Okay.  And what evidence do you have that

24 Mr. Rogers knew Mr. Fletcher?

25     A.   His -- his own statement.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q.   What other evidence do you have that

2  Mr. Rogers knew Mr. Fletcher, other than Mr. Roger's own

3  statement?

4      A.   That's all I have.

5      Q.   Did you do anything to corroborate Mr. Roger's

6  statement, that him and Mr. Fletcher were familiar with

7  one another?

8      A.   I didn't, but I -- I've learned that there was

9  corroboration.

10      Q.   What corroboration did you learn about, that

11  in indicates that Mr. Fletcher and Mr. Rogers knew each

12  other?

13      A.   That at some time, that they were in prison

14  together.

15      Q.   Okay.  When did you learn that, sir?

16      MR. STEFANICH:  I'm going to object based on

17    attorney-client privilege, and instruct you that to

18    answer.

19  BY MR. STARR:

20      Q.   And that's fair.  And just to make this clear,

21  I'm not asking about anything that you learned from your

22  attorney at any point in time.  And you know, he'll let

23  you know if there's an issue as that arises. I'm not

24  asking you to testify to conversations you had with your

25  attorney.  So other than conversations you've had with

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   your attorney, at what point in time did you learn that
 2   Mr. Rogers and Mr. Fletcher spent time in prison
 3   together?
 4        A.   You know, I can't remember independently if we
 5   actually corroborated that.  I -- it's -- I -- I don't
 6   see it in the report.  So I'm not sure.
 7        Q.   Okay.  I asked you when.  So the other further
 8   question is, other than conversations you had with your
 9   attorney, how did you learn that Mr. Fletcher and
10   Mr. Rogers spent time in prison together?
11        A.   Just by his statement.
12        Q.   By Mr. Rogers statement?
13        A.   Yes.
14        Q.   Okay.  So is it correct to say that, other
15   than conversations you may or may not have had with your
16   attorney, the only evidence that you ever had, that
17   Mr. Rogers and Mr. Fletcher knew each other or were
18   familiar with each other, was that Mr. Rogers said in
19   his statement that they were?
20        A.   Correct.
21        Q.   Okay.  Then the second thing you told me was
22   that two other witnesses had identified Mr. Fletcher as
23   the shooter, correct?
24        A.   Yes.
25        Q.   And what are the -- strike that.  Who were
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   those two witnesses that identified Mr. Fletcher as the
 2   shooter?
 3        A.    Shanee Friend and Mr. Cooper --
 4        Q.    Okay.
 5        A.    -- forget his first name.
 6        Q.    Edward Cooper.
 7        A.    Edward Cooper, yes.
 8        Q.    Okay.  Okay, so let's start with Ms. Friend.
 9   When did Ms. Friend first identify Mr. Fletcher as being
10   the shooter of Mr. Sorrell?
11        A.    I believe it was in March 2002 with a photo
12   array.
13        Q.    Okay.  Do you believe, but you're not sure?
14   I just want to make sure.  So the first time that
15   Ms. Friend identified Mr. Fletcher as the shooter in
16   the Sorrell shooting was in March of 2002 during a photo
17   array, correct?
18        A.    Yes.
19        Q.    Okay.  And that was one of the three photo
20   arrays you conducted in 2002?
21        A.    Yes.
22        Q.    Okay.  And then did Ms. Friend ever identify
23   Mr. Fletcher at any other point after that initial photo
24   array in March of 2002?
25        A.    Yes.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q.    And when did that occur, sir?

 2        A.    It would be in April of 2002.

 3        Q.    And what was the circumstances in which Ms.

 4   Fran identified Mr. Fletcher in April of 2002?

 5        A.    During a physical lineup.

 6        Q.    Okay.  And was that the one physical lineup

 7   that you were present for, that you testified to

 8   earlier?

 9        A.    It was a physical lineup with two -- with two

10   witnesses.

11        Q.    Okay.  Well, I'll ask you what that means in a

12   second, but you didn't answer my question.  And I'm not

13   trying to offend you.  Was the physical lineup where

14   Ms. Friend identified Mr. Fletcher, the one physical

15   lineup that you previously testified that you were

16   present for?

17        A.    For Ms. Friend, yes.

18        Q.    Okay.  Now, you just said that the physical

19   lineup involved two witnesses.  What do you mean by

20   that, sir?

21        A.    Well, Shanee Friend viewed the lineup, and

22   Edward Cooper viewed the lineup.

23        Q.    And they viewed the lineup simultaneously;

24   is that correct?

25        A.    No.  One at -- independently.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.    Okay.  Which witness viewed the lineup first?

2    A.    I'm not sure.

3    Q.    Okay.  And then other than the March 2002

4    photo array and the April 2002 physical lineup, did

5    Ms. Friend, to your knowledge, ever identify

6    Mr. Fletcher at any other point in time in the Sorrell

7    shooting investigation?

8    A.    Not to my knowledge.

9    Q.    Okay.  And then you said Mr. Cooper was the

10   other witness who identified Mr. Fletcher as the shooter

11   in the Sorrell investigation, correct?

12   A.    That is correct.

13   Q.    And when did Mr. Cooper first identify

14   Mr. Fletcher as the shooter in the so investigation?

15   A.    Well, there was a photo array shown to him.

16   It would be, actually, the second time shown to him,

17   a different photo array, two separate photo arrays.

18   The second one -- the second one contained a -- a photo

19   of Mr. Fletcher.  And out of the seven photos, he picked

20   Mr. Fletcher as looking like the one of the offenders,

21   but he couldn't be sure.

22   Q.    Okay.  So I believe you just testified that

23   you showed Mr. Cooper two separate photo arrays,

24   correct?

25   A.    One in '95.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q.   Okay.  So that previous testimony about the
 2   first photo array being the one that you conducted in
 3   '95, that was a photo array you conducted with
 4   Mr. Cooper?
 5        A.   Yes.
 6        Q.   All right.  We'll talk about that later.
 7   The 2002 one is the one in which Mr. Cooper actually
 8   made an identification; is that your testimony?
 9        A.   He made a tentative identification.
10        Q.   Okay.  And what's the difference in your
11   understanding of a tentative identification and an
12   actual identification?
13        A.   He's not sure.
14        Q.   Okay.  What did Mr. Cooper tell you when he
15   tentatively identified Mr. Fletcher in 2002 and during
16   the photo array that you showed him?
17        A.   I -- I couldn't tell you his exact words, but
18   he said he -- he -- it looked like the offender, but he
19   wasn't sure.
20        Q.   Okay.  Do you remember him saying it looked
21   like him?
22        A.   Yes.
23        Q.   All right.  And you said that during that
24   2002 photo array, you showed him seven photographs; is
25   that correct?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

     1        A.    Yes.

     2        Q.    And one of those photographs was of

     3   Mr. Fletcher; is that correct?

     4        A.    Yes.

     5        Q.    Okay.  Other than that 2002 photo array in

     6   which Mr. Cooper allegedly made a tentative

     7   identification of Mr. Fletcher, do you know if

     8   Mr. Cooper ever identified Mr. Fletcher any other point

     9   in time?

    10        A.    Yes.

    11        Q.    And when was that, sir?

    12        A.    And that was the same physical lineup

    13   that -- that the same participants that were shown to

    14   Shanee Friend.

    15        Q.    So that was in April of 2002, correct?

    16        A.    Yes.

    17        Q.    Okay.  So during a, the April of 2002 physical

    18   lineup, it's your testimony that Mr. Cooper positively

    19   identified Mr. Fletcher?

    20        A.    He did.

    21        Q.    And was this positive identification different

    22   than the tentative identification?

    23        A.    Yes.

    24        Q.    Okay.  So therefore, this positive

    25   identification was an affirmative identification with

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   Mr. Cooper said, "That is the person I saw shoot
 2   Mr. Sorrell"?
 3        A.   He said it was one of the offenders, yes.
 4        Q.   Okay.  Because there was two offenders in the
 5   Sorrell shooting?
 6        A.   Yes.
 7        Q.   Okay.  All right.  Speaking of that, what
 8   investigation -- strike that.  What did your
 9   investigation reveal about the other suspect in the
10   Sorrell shooting investigation?
11        A.   Nothing.
12        Q.   Okay.  Nothing at all?
13        A.   Not to my knowledge, no.
14        Q.   You never learned any information about who
15   the other shooter -- or the other participant in the
16   shooting might have been?
17        A.   Did not.
18        Q.   Okay.  Did you ever ask Mr. Fletcher if he
19   knew who the other suspect was?
20        A.   Mr. Fletcher denied any knowledge of the
21   incident.
22        Q.   I understand that.  My question is though,
23   did you ever ask Mr. Fletcher who the other suspect was?
24        A.   No.
25        Q.   Did you ever ask Mr. Rogers if he knew who the
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1  other suspect was?

 2      A.   Yes.

 3      Q.   What did he say?

 4      A.   No.

 5      Q.   Did you ever ask Mr. Cooper if he knew who the

 6  other suspect was?

 7      A.   Mr. Cooper never said he knew either of the

 8  suspects.

 9      Q.   Okay.  Did you ever ask Mr. Cooper if he could

10  identify the other suspect?

11          MR. STEFANICH:  I'm sorry, I didn't hear you.

12  BY MR. STARR:

13      Q.   Did you ever ask Mr. Cooper if he could

14  identify the other suspect?

15      A.   I believe I did.

16      Q.   And what did Mr. Cooper tell you?

17      A.   He wasn't sure.

18      Q.   Okay.  What about Ms. Friend?  Did you ever

19  ask Ms. Friend who the other suspect was?

20      A.   I asked her if she -- yeah, right from the

21  beginning.  Of course, those were all normal questions.

22      Q.   And what did she tell you?

23      A.   She didn't know who it was.

24      Q.   Okay.  What about Mr. Wade?  Did you ever ask

25  Mr. Wade if you knew who the second suspect was?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.    Mr. Wade told us that he couldn't identify any

2  faces.

3    Q.    Mr. Wade told you that he couldn't identify

4  either of the two suspects; is that correct?

5    A.    Yes.

6    Q.    Okay.  All right.  So that's the second piece

7  of evidence you gave me that you said implicated Mr.

8  Fletcher in the murder of Mr. Sorrell.  The third had to

9  do with a photo lineup.  What is the photo lineup? I'm

10  sorry, strike that question.  I think I just wrote down

11  the wrong thing.  Let me ask it again.  You told me four

12  pieces of evidence, right?  First one being the witness

13  who actually knew him, identified him.  We talked about

14  that.  The second one being the two people who

15  identified him.  We talked about that.  And then you

16  told me the third one was a photo array, correct?

17        MR. STEFANICH:  I'm going to object to form. I

18     think you're misstating what he previously testified

19     to, but you can answer.

20    A.    Well, there was -- there were two -- two photo

21  arrays.  One of the photo arrays was positive, and the

22  other was tentative.  So yes.

23  BY MR. STARR:

24    Q.    Okay.  So the third piece of evidence was a, I

25  wrote down the words, "Photo lineup."  Is that not what

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1   your testimony was?
 2       A.   Yes.
 3       Q.   Okay.  So what photo lineup were you referring
 4   to, as a third piece of evidence that you know
 5   implicates Mr. Fletcher?
 6       A.   It would be the positive photo array that
 7   Shanee Friend looked at.
 8       Q.   Okay.  And when did that take place, sir?
 9            MR. STEFANICH:  Objection, asked and answered.
10       A.   I believe -- let's see, I believe that was in
11   March.
12   BY MR. STARR:
13       Q.   Okay.  March 2002?
14       A.   Of '02.
15       Q.   That's the one you already testified to,
16   correct?
17       A.   Yeah, I believe so --
18       Q.   Okay.  And then the last thing was that you
19   said one of the witnesses you wouldn't doubt because she
20   knew him from around.  You were referring to Ms. Friend,
21   correct?
22       A.   Correct.
23       Q.   When did Ms. Friend tell you that she knew
24   Mr. Fletcher from around?  And strike that.  Where did
25   Ms. Fletcher tell you -- strike that.  Where did
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  Ms. Friend tell you that she knew Mr. Fletcher from

2  around?

3      A.   She had seen him around in the -- not that she

4  knew him.  I think that's a bad word.

5      Q.   All right.

6      A.   That she had seen him around the area of the

7  shooting previously, several times.

8      Q.   And at what point in the investigation did

9  Ms. Friend tell you that she had seen Mr. Fletcher

10  around the area of the shooting?

11      A.   In March of '02.

12      Q.   And where did you document the fact that

13  Ms. Friend had told you that she had seen Mr. Fletcher

14  around the area of the shooting?

15      A.   I think in -- in our final supp.

16      Q.   Did you document it anywhere else that you can

17  remember?

18      A.   At this point, no, I can't remember.

19  Actually -- actually, I think the state's attorney

20  documented that in a handwritten statement in March.

21      Q.   Okay.  But I asked you about -- you were

22  document documenting it.  Do you, do you recall

23  documenting anywhere else besides your final supp?

24      A.   Not that I can recall.

25      Q.   Okay.  Other than the -- strike that.  Other

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  than the evidence that you testified to thus far, at the

2  time Mr. Fletcher was arrested, did you have any other

3  information that Mr. Fletcher was implicated into the

4  crime of shooting Mr. Sorrell?

5      A.   Just his background fit.

6      Q.   What do you mean by his background fit, sir?

7      A.   Well, he was in prison for robbery, and

8  obviously this was a robbery.

9      Q.   Okay.  What do you recall about Mr. Fletcher's

10  previous arrest and time in prison for a robbery?

11      A.   I -- I don't know anything about them.

12      Q.   Okay.  Were you aware that Mr. Fletcher had

13  been arrested and spent time in prison for a robbery

14  when you arrested Mr. Fletcher?

15      A.   I believe that's what he was in for.

16      Q.   Anything else about his background fit, as you

17  call it?

18      A.   I think he had drugs and gun arrests.

19      Q.   Okay.  What is it about a drug arrest that you

20  thinks provides you with evidence that Mr. Fletcher

21  would be implicated in the Sorrell shooting?

22      A.   Nothing in particular.

23      Q.   Okay.  What is it about a previous gun arrest

24  that made you think that Mr. Fletcher would be

25  implicated in the Sorrell shooting?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.    Because the offenders in this case had guns.
 2        Q.    Okay.  And then what is it about
 3   Mr. Fletcher's previous robbery arrest that you think
 4   would implicate him in the Sorrell investigation?
 5        A.    It's not that he would implicate them.
 6   It's just that he's a -- a good -- it -- it fits that
 7   he's -- that this murder was connected with a robbery.
 8        Q.    Okay.  And did you know that information about
 9   Mr. Fletcher's background before you arrested him, sir?
10        A.    Yes.
11        Q.    How did you become aware of that information
12   about Mr. Fletcher's background prior to arresting him?
13        A.    We were able to make computer checks.
14        Q.    Okay.  Did you know that information about
15   Mr. Fletcher's background before you ever spoke to
16   Mr. Fletcher?
17        A.    Yes.
18        Q.    And was it via computer checks as you referred
19   to it how you learned that?
20        A.    Yes.
21        Q.    At any point in time, did you learn any
22   additional information that gave you reason to suspect
23   Mr. Fletcher in the shooting of Mr. Sorrell?
24        A.    No, it's basically just witnesses.
25        Q.    And those are the witnesses you've testified
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   to today?
 2        A.   Yes.
 3        Q.   So no additional information beyond what
 4   you've already testified to; is that correct?  Let me
 5   rephrase that.  You did not learn any additional
 6   information that implicates Mr. Fletcher in the shooting
 7   of Mr. Sorrell, other than what you've already testified
 8   to today, correct?
 9        A.   Yes.
10        Q.   Okay.  Yes, that's correct?
11        A.   That is correct.
12        Q.   Okay.  Thank you.  What was the probable cause
13   that you had to arrest Mr. Fletcher?
14             MR. STEFANICH:  Objection.  Form.  You can
15        answer.
16        A.   Identification from witnesses.
17   BY MR. STARR:
18        Q.   Okay.  From which witnesses in particular?
19        A.   The three we talked about.
20        Q.   Okay, so the photo array that Ms. Friend
21   identified Mr. Fletcher, and then the lineup in which
22   Ms. Friend did and Mr. Cooper identified Mr. Fletcher?
23        A.   Yes, and the statement by Terry Rogers.
24        Q.   Okay.  And what was the statement by Terry
25   Rogers that gave you probable cause to arrest
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

EXH 8 - Depo of Bob McDaniel - 184-8 Filed: 05/06/25 Page 53 of 267

```
 1   Mr. Fletcher?

 2          MR. STEFANICH:  Objection.  Form.  You can

 3      answer.

 4      A.    That Terry Rogers was -- was one of the

 5   offenders.

 6   BY MR. STARR:

 7      Q.    Okay.  So I'm going to re-ask that because I

 8   don't think you answered that correctly.  You just said

 9   Mr. Rogers was one of the offenders?

10      A.    Oh, I'm sorry.  Mr. Fletcher was one of the

11   offenders.

12      Q.    Yeah.  We just want to get a clear record.

13   Okay.  So Mr. Rogers told you that Mr. Fletcher was one

14   of the offenders?

15      A.    Yes.

16      Q.    Okay.  At what point did Mr. Rogers tell you

17   that Mr. Fletcher was one of the offenders?

18      A.    In '02.

19      Q.    Okay.

20      A.    I -- I can revise that a little bit.

21      Q.    Go ahead.

22      A.    Originally, according to the reports,

23   he offered the name of Fletcher in 1990.

24      Q.    Okay.  Were you working on this case in 1990?

25      A.    No.
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q.   Okay.  So we'll get to that.  Sir, am I

2  correct to assume that you've been deposed before in

3  your career?

4     A.   I have.

5     Q.   Okay.  So you're probably generally familiar

6  with deposition rules and how these are conducted, but

7  I'm just going to go through a couple things to make

8  sure we're on the same page.  You understand that you're

9  under oath, correct?

10     A.   Yes.

11     Q.   And you understand that telling a lie under

12  oath is a crime?

13     A.   Yes.

14     Q.   Okay.  You understand that there's a court

15  reporter who's taking down everything we say so that

16  it's important that we don't talk over one another,

17  right?

18     A.   Sure.

19     Q.   Okay.  It's important to give verbal answers

20  in a deposition so that those get translated to the

21  written page, okay?

22     A.   Okay.

23     Q.   And this is, you know, a more informal setting

24  than a courtroom.  There's not a judge here to rule on

25  objections, but you understand that you're going to get

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1 | asked questions, and quite possibly attorneys going to

 2 | object to the questions.  That's a normal part of a

 3 | deposition, right?

 4 |     A.   Yes.

 5 |     Q.   Okay.  So it's important that after I ask a

 6 | question, you let your attorney or the other attorney

 7 | object on the record, and then we can make a clear

 8 | record before you give your answer, okay?

 9 |     A.   Okay.

10 |     Q.   If I ask you a question and you don't

11 | understand it, please tell me and I will rephrase it,

12 | okay?

13 |     A.   Okay.

14 |     Q.   And if I ask something and you give an answer

15 | to it, I'm going to assume that you understood what I

16 | asked you in the first place; is that fair?

17 |     A.   I guess so --

18 |     Q.   Okay.  This is a federal deposition, so we can

19 | go up to seven hours.  I don't know exactly how long

20 | it's going to take.  At some point in time if you need a

21 | break, please ask.  We can take a break at any time.

22 |     A.   Okay.

23 |         MR. STEFANICH:  I'm going to take a break when

24 |     you're done with your rules.

25 |         MR. STARR:  Sure.  I'm almost done.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    BY MR. STARR:
2        Q.  The only thing I ask is, if I ask you a
3    question and it's pending, that you take a break after
4    you answer that question; is that fair?
5        A.  Say that again, I'm sorry.
6        Q.  Sure thing.  So if I ask you a question, I
7    want you to answer it before you take a break,
8    so if there's a pending question, you have to answer it
9    before we take a break.
10       A.  Okay.
11           MR. STARR:  Okay.  We can take a break.
12           MR. STEFANICH:  Yeah.
13           THE VIDEOGRAPHER:  We are off the record.
14       The time is 11:40 a.m. Central Time.
15               (OFF THE RECORD)
16           THE VIDEOGRAPHER:  We are back on the record
17       for the deposition of Jerome Bogucki.  My name is
18       Kortney Chase.  The date is April 20, 2023, and the
19       time is 11:47 a.m. Central Time.
20   BY MR. STARR:
21       Q.  All right, Mr. Bogucki, do you have any
22   conditions that might affect your ability to give
23   truthful and accurate testimony today?
24       A.  Other than my age.
25       Q.  How old are you, sir?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.    I'm 71.
 2        Q.    Okay.  Are you taking any medications that
 3   might affect your ability to give truthful and accurate
 4   testimony?
 5        A.    No.
 6        Q.    Is there anything else that might affect your
 7   ability to give truthful and accurate test testimony
 8   today?
 9        A.    No.
10        Q.    All right, fair.  You said you'd been deposed
11   before.  How many times?
12        A.    Two or three.
13        Q.    What are all the times that you've been
14   deposed, situations that occurred as a result of your
15   employment at the Chicago Police Department?
16        A.    Yes.
17        Q.    All right.  And in the previous depositions
18   that you've given, were you a party or a witness?
19        A.    I actually have been both.
20        Q.    Okay.  So how many times have you been deposed
21   as a witness in a case?
22        A.    Just one I can remember, but there might be
23   more.
24        Q.    All right.  Do you remember the name of that
25   case there?
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.    No.

 2        Q.    Do you remember when that happened?

 3        A.    I think last year maybe.

 4        Q.    All right.  Do you remember what type of case

 5   it was?

 6        A.    I believe it was a murder.

 7        Q.    So it was a criminal investigation --

 8        A.    Yes.

 9        Q.    -- that you were deposed in?  Okay.

10        A.    Well, no, it was a civil.

11        Q.    Okay.  Was it a civil rights case like this?

12        A.    Yeah.  Yes.  I'm sorry.

13        Q.    And then how many cases have you been deposed

14   as a party?

15        A.    This is the third.

16        Q.    All right.  What was the first one you were

17   deposed as a party?

18        A.    It was a matter of a -- a police shooting

19   investigation.

20        Q.    And when was that, sir?

21        A.    Oh, I'm not sure of the year anymore.  It was

22   after I retired, though.

23        Q.    When did you retire?

24        A.    2006.

25        Q.    Okay, so was it --
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.    It might have been 2007.

2    Q.    Okay, so it was closer to your retirement date

3  than it was to today's date?

4    A.    Yes.

5    Q.    All right.  And do you remember the name of

6  that case?

7    A.    Warfield maybe, and et al.

8    Q.    And you were a defendant?

9    A.    Yes.

10    Q.    Okay.  What was the outcome of that case,

11  if you know?

12    A.    Judgment against -- against me.

13    Q.    Okay.  Against you and other defendants or

14  just you?

15    A.    And another.

16    Q.    Okay.  And who was the other defendant?

17    A.    Raymond Schalk.

18    Q.    Okay.  That's the same Detective Schalk we

19  were talking about earlier?

20    A.    Yes.

21    Q.    All right.  What were you found guilty of?

22       MR. STEFANICH:  Object to the form.

23  BY MR. STARR:

24    Q.    Let me rephrase it.

25    A.    I'm not -- I'm not really sure, to be honest

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    with you.
 2         Q.   Okay.  Let me just rephrase it so it's a clear
 3    question.  What was the judgment for, sir?
 4         A.   The -- the monetary figure?
 5         Q.   That, yes.
 6         A.   Against me, originally, it was $65,000
 7    punitive.
 8         Q.   Okay.  And what were you accused of doing in
 9    that case, sir?
10         A.   I guess violating rights.
11         Q.   Okay.  Were you accused of shooting somebody?
12         A.   Shooting someone?
13         Q.   I thought you said it was a police shooting?
14         A.   It was a police shooting investigation.
15         Q.   An investigation of a shooting by Chicago
16    Police?
17         A.   Yes.
18         Q.   Okay.  So the police didn't shoot anyone in
19    that case?
20         A.   They -- actually, someone did get hit, yes.
21         Q.   Okay.  So just for clarity's sake, was the
22    civil rights case about the police involved shooting, or
23    was it about something else?
24         A.   About the handling of the witnesses.
25         Q.   Okay.  And what were you accused of,
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   specifically, in that case, sir?
 2       A.    Holding witnesses.
 3       Q.    Were you accused of coercing witnesses?
 4       A.    No.
 5       Q.    Were you accused of fabricating any evidence?
 6       A.    No.
 7       Q.    Were you accused of suppressing any
 8   exculpatory evidence?
 9       A.    No.
10       Q.    Okay.  All right.  And then the second case
11   you were deposed in, which case is that, sir?
12       A.    Thaddeus Jimenez.
13       Q.    Okay.  And you were a defendant in the Jimenez
14   case; is that correct?
15       A.    Yes.
16       Q.    All right.  And do you remember what year that
17   was?
18       A.    I'm not sure anymore.
19       Q.    If I told you 2014, would that sound right?
20       A.    Probably.
21       Q.    Okay.  And what was the resolution in that
22   case, sir?
23       A.    Judgment.
24       Q.    Okay.  A judgment against you?
25       A.    No.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   Okay.  A Judgment against who?

2    A.   City.

3    Q.   Okay.  You were a defendant in that case?

4    A.   Yes.

5    Q.   What were you alleged to have done in that

6  case?

7    A.   I'm not even sure.

8    Q.   Were you alleged to have coerced any witnesses

9  in that case?

10    A.   I guess -- I guess so --

11    Q.   You guess so, or you know so --

12    A.   Well, I don't know what the alleged -- I can't

13  say if I didn't do it.

14    Q.   But you understand the allegations against you

15  were that you coerced the witness or witnesses in that

16  case; is that correct?

17         MR. STEFANICH:  Objection.  I think he said he

18     didn't know.  But you can answer.

19    A.   I don't know if that was part of it or not.

20  BY MR. STARR:

21    Q.   Okay.  Were you accused of fabricating any

22  evidence in the Jimenez case?

23    A.   No.

24    Q.   Were you accused of suppressing any

25  exculpatory evidence in the Jimenez case?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.    No.

 2        Q.    Okay.  Any other cases that you were deposed

 3   in besides the three that you just told me about?

 4        A.    Again, a -- as a witness, there may have been

 5   something else in the past, but I'm -- I can't -- I

 6   can't recall.

 7        Q.    No other cases where you're deposed as a party

 8   though; is that correct?

 9        A.    Right.

10        Q.    All right.  So this is your third case in

11   which you've been deposed as a party member?

12        A.    Yes.

13        Q.    Okay.  Do you know how many -- strike that.

14   Was during your tenure as a Chicago police officer, were

15   there any disciplinary complaints levied against you?

16        A.    Any ever?

17        Q.    Yeah.

18        A.    I think so --

19        Q.    Do you know how many?

20        A.    No.

21        Q.    Did you have any CRs during your time as a

22   Chicago police officer?

23        A.    A couple.

24        Q.    Do you have an idea of how many?

25        A.    Just a couple, I think.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q.   Okay.  Do you recall the factual allegations

2  of any of the disciplinary complaints that were filed

3  against you?

4      A.   No.

5      Q.   Do you recall the resolution of any of the

6  disciplinary complaints that were filed against you?

7      A.   None were sustained.

8      Q.   Okay.

9      A.   Nothing was just ever sustained on me.

10     Q.   Do you recall a disciplinary complaint filed

11 against you by a person by the name of Terry Corky?

12     A.   No.

13     Q.   Okay.  If I told you that case was -- it was

14 alleged that you coerced a false confession, would that

15 refresh your recollection?

16     A.   No.

17     Q.   All right.  Have I told you that Detective

18 Noradin was also accused on that particular disciplinary

19 complaint with that refresh your recollection?

20     A.   No.

21     Q.   Okay.  Do you recall being accused -- strike

22 that.  Do you recall having a disciplinary complaint

23 filed against you involving a civilian by the name of

24 Shalonda Davidson?

25     A.   No.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

63

```
 1        Q.    Okay.  If I told you that Detective Schalk,
 2   Detective Wojcik, and Detective Noradin were also
 3   co-accused on that case, would that refresh your
 4   recollection at all?
 5        A.    No.
 6        Q.    Okay.  Do you recall having a disciplinary
 7   complaint filed against you involving two civilians by
 8   the name of Maurice and Darnell Person?
 9        A.    The names sound familiar, but I don't -- I
10   don't know what it would be.
11        Q.    Okay.  If I told you that the allegations
12   involved an unlawful interrogation, would that refresh
13   your recollection at all?
14        A.    No.
15        Q.    If I told you the allegations involved
16   physical abuse, would that refresh your recollection at
17   all?
18        A.    No.
19        Q.    If it told you Detective Schalk was a
20   co-accused officer on that case, would that refresh your
21   recollection?
22        A.    No.
23        Q.    Do you know if you were ever accused, other
24   than that particular case, the Person disciplinary CR,
25   do you know if you were ever accused in any other
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    circumstance of physical abuse?

 2        A.    No.

 3        Q.    Okay.  You don't know or you weren't?

 4        A.    Not that I might have knowledge of.

 5            MR. STARR:  Okay.  I'm going to go off the

 6        record for a second.

 7            THE VIDEOGRAPHER:  We are off the record at

 8        11:56.

 9              (OFF THE RECORD)

10            THE VIDEOGRAPHER:  We are back on the record

11        for the deposition of Jerome Bogucki.  My name is

12        Kortney Chase.  Today is April 20, 2023, and the

13        time is 11:56 a.m. Central Time.

14    BY MR. STARR:

15        Q.    I think you answered this already indirectly,

16    so I apologize for asking again.  Did you ever receive

17    any discipline as a result of any complaint filed

18    against you during your tenure as a Chicago police

19    officer?

20        A.    I believe I didn't have a city sticker back

21    in -- on my windshield back in, well, probably be 1978

22    or so --

23        Q.    Other than that, do you recall any discipline

24    ever being imposed on you, as a result of your job as a

25    Chicago police officer?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.    No.

 2        Q.    Do you know if you've ever been accused of

 3   falsifying evidence in any case besides this one?

 4        A.    No.

 5        Q.    Do you know if you've ever been accused of

 6   suppressing any evidence in any case besides this one?

 7        A.    No.

 8        Q.    Have you ever been accused of coercing a

 9   false confession in any case besides this one?

10        A.    No.

11             MR. STEFANICH:  Objection.

12             MR. STARR:  Yeah.  Thank you.

13             MR. STEFANICH:  Form.  Foundation.

14   BY MR. STARR:

15        Q.    Let me strike that question.  Have you ever

16   been accused of coercing a false confession?

17        A.    No.

18        Q.    Have you ever been accused of coercing a false

19   statement in any other case besides this one?

20        A.    You know what?  Both of those questions,

21   I have no knowledge at this time.  I don't know if

22   anyone's accused me of that, to be honest with you.

23        Q.    All right.  And have you ever been accused of

24   any other misconduct besides what we've talked about

25   today?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1       A.    No.

 2       Q.    All right, sir, what did you do to prepare for

 3   today's deposition?

 4       A.    Looked over reports.

 5       Q.    Which reports did you look over?

 6       A.    Anything that was in the investigative file.

 7       Q.    Did you review the investigative file in its

 8   entirety?

 9       A.    Well, what was given to me, I don't know if

10   it's an entirety or not.

11       Q.    All right.  Well, if I represent to you that

12   there's over 200 pages in the investigative file, did

13   you review over 200 pages of an investigative file

14   documents?

15       A.    I don't know.

16       Q.    Okay.  So what specific reports can you recall

17   reviewing in preparation the today?

18       A.    Well, what the reports from 1990, and -- and

19   reports from 2002, and -- and the report from 1995.

20       Q.    What type of reports were they, sir?  And we

21   could break it down into the three different years that

22   you mentioned if you want.

23       A.    Oh, there's -- there's a lot of different

24   reports.  There's -- there's -- there's arrest reports,

25   there's supplementary reports, there's evidence reports,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    there's typewritten GPR, there's notes on -- on GPRs.

2        Q.   And those reports that you just testified, do

3    those are all types of reports you, you reviewed in

4    preparation for today?

5        A.   Yes.

6        Q.   Okay.  When you say notes on GPRs, do you mean

7    there's handwritten GPRs that you reviewed?

8        A.   Yes, sir.

9        Q.   Okay.

10       A.   Just notes.

11       Q.   Any other types of reports that you reviewed

12   in preparation for today?

13       A.   I -- I think I covered it, but --

14       Q.   Okay.  If you think of something along the way

15   or if I show you something that you reviewed and didn't

16   already testify to, please let me know, okay?

17       A.   I'll let you know.  Sure.

18       Q.   What else did you do to prepare for today's

19   deposition besides review reports?

20       A.   Talked with my attorney.

21       Q.   Okay.  And again, I'm not asking you for the

22   substance of the conversations you had with your

23   attorney, but you spoke with your attorney in

24   preparation for today?

25       A.   Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q.    How many occasions did you speak with your
 2   attorney?
 3        A.    Several.
 4        Q.    Do you know how many?
 5        A.    I don't know.  I could -- I could say three
 6   with the attorneys.  Four, maybe.
 7        Q.    When was the first conversation you had with
 8   your attorney?
 9        A.    I -- I don't know.  I'm -- I'm -- I don't know
10   what day it was or what time.
11        Q.    Was it within the last week?
12        A.    The first time?
13        Q.    Yes.
14        A.    No.  It was probably a month or two ago.
15        Q.    Okay.  So the first time that you spoke with
16   your attorney in preparation for today's dep was a month
17   or two ago, correct?
18        A.    I believe.
19        Q.    Okay.  And did you meet with your attorney in
20   person, or you talk to your attorney on the telephone?
21            MR. STEFANICH:  Objection.  Form.  You can
22      answer.
23            THE WITNESS:  I can answer?
24            MR. STEFANICH:  You can answer.  Yeah.
25        A.    Over Zoom and on the telephone.
```

**Kentuckiana Reporters**
**30 South Wacker Drive, 22nd Floor**
**Chicago, Illinois 60606**

KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
**schedule@kentuckianareporters.com**
**www.kentuckianareporters.com**

```
 1   BY MR. STARR:

 2        Q.   Okay.  And was Mr. Stefanich?

 3             MR. STEFANICH:  Stefanich.

 4   BY MR. STARR:

 5        Q.   Stefanich, my apologies.  Was Mr. Stefanich

 6   your attorney that you spoke to a month or two ago?

 7        A.   Also, one of his partners.

 8        Q.   Okay.  Who is that?

 9        A.   I don't recall her name.

10        Q.   Okay.  Female?

11        A.   Yes.

12        Q.   Okay.  Was her name Allyson?

13        A.   I think it was.

14        Q.   Okay.  And how long did you speak to Brian and

15   Allyson for a month or two ago?

16        A.   Briefly, less than a half an hour.

17        Q.   Okay.  And you said it was over Zoom and over

18   a telephone call?

19        A.   The Zoom -- the Zoom was longer.

20        Q.   Okay.  So how long was the Zoom?

21        A.   Maybe two, three hours.

22        Q.   All right.  And did they show you any

23   documents over the Zoom?

24        A.   Actually, there were two Zooms.  One with

25   Allyson and -- and one with Brian.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   Okay.  Two separate meetings or two meetings

2  in the same day?

3    A.   Two separate ones.

4    Q.   Okay.  Who was the first meeting you had with?

5    A.   Allyson.

6    Q.   Okay.  And how long was that?

7    A.   I believe that was about an hour.

8    Q.   Okay.  And did she show you any reports?

9    A.   I think she did.

10    Q.   Do you recall what reports she showed you?

11    A.   No.

12    Q.   Did she show you any non-Chicago Police

13  Department documents?

14    A.   I don't think so --

15    Q.   Did she show you the complaint in this civil

16  lawsuit?

17    A.   No.

18    Q.   Okay.  Have you ever seen the complaint in the

19  civil lawsuit?

20    A.   I think I was delivered that.

21    Q.   Okay.  When you were served, correct?

22    A.   Yes.

23    Q.   Did you read it?

24    A.   Back when I was served, I did.

25    Q.   Okay.  And that was in 2020; is that correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.    Yeah, I don't know.

 2        Q.    All right.  The second meeting you had with

 3   Brian over Zoom, when was that?

 4        A.    That was last week, I believe.

 5        Q.    Okay.  And between the meeting you had one or

 6   two months ago with Allyson and the meeting you had with

 7   Brian last week, did you have any other meetings or

 8   conversations with any attorneys in preparation for

 9   today's deposition?

10        A.    I've talked to Brian once or twice, and I

11   think I talked to Allyson another time.

12        Q.    On the telephone?

13        A.    I think it was via e-mail.

14        Q.    Okay.  Did you talk to them on the telephone

15   at all between the first meeting and the second meeting?

16        A.    Yes, to set up the second Zoom.

17        Q.    Okay.  Did you talk to them -- strike that.

18   When you spoke to them between the first meeting and the

19   second meeting, how long did you talk to them for?

20        A.    Minutes.

21        Q.    Okay.  And then the meeting with Brian over

22   Zoom, how long was that?

23        A.    About three hours.

24        Q.    Okay.  And did you say that the meeting with

25   Allyson was two to three hours?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.    No, about an hour.

 2        Q.    An hour, okay.  And then the meeting with

 3   Brian was about three hours, correct?

 4        A.    Yes.

 5        Q.    All right.  Other than those two meetings on

 6   Zoom, first one being with Allyson one or two months

 7   ago, on the second one being a week ago that was three

 8   hours, any other meetings that you had with your

 9   attorneys in preparation for today's dep?

10        A.    There were several short phone calls.

11        Q.    Okay.  Did you meet today in preparation for

12   the deposition with any attorney?

13        A.    Just outside.

14        Q.    Okay.  Outside this building?

15        A.    Yes.

16        Q.    Okay.  How long did you meet for in

17   preparation for today?

18        A.    Long enough to get into the door.

19        Q.    Okay.  All right.  Did you do anything else

20   besides the meetings that you described with your

21   attorneys to prepare for today's deposition and the

22   reports that we reviewed?

23        A.    No.

24        Q.    Did you speak to anybody else in preparation

25   for today's deposition?
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1       A.    In preparation?  No.

 2       Q.    Did you ever speak to Detective Schalk while

 3   you're preparing for today's deposition?

 4       A.    I speak to Detective Schalk quite often.

 5       Q.    Okay.  You guys are still in touch after your

 6   retirements, correct?

 7       A.    Yes.

 8       Q.    Okay.  When you say you speak to him quite

 9   often, what does that mean?

10       A.    He's a good friend.

11       Q.    Okay.  How many times a week do you speak to

12   Detective Schalk?

13       A.    How many?

14       Q.    How many times a week on average?

15       A.    It may not even be weekly, but it's at least a

16   couple times a month, I would say.

17       Q.    Okay.  How many times have you talked to

18   Detective Schalk about this deposition?

19       A.    Oh, you know, we talked about it.  Yeah.

20       Q.    What did you guys talk about?

21       A.    Tried to recall things about the case.

22            MR. STEFANICH:  I'm going to object based on

23        attorney-client, and make sure you understand.  You

24        cannot answer questions based on my conversations

25        with you and Detective Schalk at the same time.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   BY MR. STARR:
 2        Q.   Yeah.  So let me clarify that.  That's fair.
 3   In the meeting you had with Brian on Zoom, was there
 4   anybody else present besides you and Brian?
 5        A.   Detective Schalk.
 6        Q.   Okay.  Anybody else besides Detective Schalk?
 7        A.   Not to my knowledge, no.
 8        Q.   Okay.  And then the meeting you had with
 9   Allyson, was anybody else present besides you and
10   Allyson?
11        A.   Detective Schalk.
12        Q.   Okay.  And then did you and Detective Schalk
13   meet with your attorneys together any other time besides
14   those two times?
15        A.   No.
16        Q.   Okay.  So putting aside the conversations that
17   you had with Brian or Allyson while Detective Schalk was
18   present, what did you and Detective Schalk talk about in
19   reference to preparing for this deposition?
20        A.   Just going through reports a little bit,
21   you know, and understanding what they said.
22        Q.   Okay.  Did you actually physically meet with
23   them?
24        A.   No.
25        Q.   Okay.  So when you say going through reports,
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  he had a copy of the report, and you had a copy of the

2  report.  And you were talking on the telephone, or how

3  was that meeting conducted?

4       A.   Yeah, we talk on the telephone.

5       Q.   Okay.  Which specific reports did you guys

6  talk about?

7       A.   I -- just the case in general.

8       Q.   Okay.  Well, you said you weren't going

9  through reports, right?

10      A.   No, we just talked about the -- the case.

11 We didn't go through reports.

12      Q.   Okay.

13      A.   Just --

14      Q.   I thought you said you went through reports

15 when you talked to Detective Schalk in preparation, in

16 depth; is that incorrect?

17      A.   No, I talked to -- we talked about information

18 that was on the reports.

19      Q.   Okay.

20      A.   And -- and -- and tried to remember what was

21 going on at the time.

22      Q.   What information did you talk about that was

23 on the reports with Detective Schalk outside your --

24      A.   Any and all.

25      Q.   -- presence?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.   I -- I don't know for sure.  I --

 2        Q.   Okay.  Is there anything you recall

 3   specifically talking to Detective Schalk about in

 4   preparation for today's deposition related to the

 5   Sorrell investigation?

 6        A.   No.

 7        Q.   Okay.  Do you know whether or not you talked

 8   to Detective Schalk about any of the photo arrays that

 9   were conducted in this case?

10        A.   No.

11        Q.   Do you know whether you talked to Detective

12   Schalk about any of the lineups that were conducted in

13   this case?

14        A.   Again, we talked in general about the case

15   specifics.  I don't -- I don't know exactly what was

16   mentioned.

17        Q.   Do you recall what Detective Schalk told you

18   that he remembered about this case?

19        A.   No.  Other than what's on reports, that's what

20   we both looked at, and that's all -- that's all we know.

21        Q.   What did you tell Detective Schalk that you

22   remembered about this case?

23        A.   I don't know.

24        Q.   You don't remember anything you told him?

25        A.   No.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   Okay.  Did you talk to Detective Schalk about

2    Detective Noradin's role in this case whatsoever?

3    A.   I -- I asked him if he remembered what Noradin

4    did.  And he couldn't remember, and I can't remember.

5    Q.   Okay.  Did you talk to Detective Schalk about

6    Detective Wojcik's involvement in this case?

7         MR. STEFANICH:  Objection.  Form.  You can

8    answer.

9    A.   I -- I think I did, because we both agreed

10   that he had nothing to do with the case other than sign

11   it, and all -- all reports have to be signed by a

12   supervisor.

13   BY MR. STARR:

14   Q.   Okay.  And maybe I spoke earlier.  Was

15   Detective Wojcik, was he your sergeant during this case?

16   A.   He was a sergeant.

17   Q.   Okay.  He was a sergeant, so I should refer to

18   him as Sergeant Wojcik?

19   A.   Yeah.  At that time, anyway.

20   Q.   Okay, that's fair.  So you and Detective

21   Schalk talked about how you didn't think Sergeant Wojcik

22   was involved in this case; is that correct?

23   A.   Correct.

24   Q.   Did you talk anything else?  Sorry.

25   Did you and Detective Schalk talk about Sergeant Wojick,



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   about any other matters related to Sergeant Wojick?

 2        A.   No.

 3        Q.   Okay.  So you remember talking about Sergeant

 4   Wojcik with Detective Schalk, correct?

 5        A.   Only because he's -- he was named in this.

 6        Q.   Okay.  Did you and Detective Schalk talk about

 7   Shanee Friend in preparation for today's deposition?

 8        A.   I don't recall exactly what was talked about.

 9        Q.   Okay.

10        A.   Just things on the reports.

11        Q.   Right.  And Shanee Friend's listed on the

12   reports, that's why I'm asking you about if you have any

13   recollection of talking to --

14        A.   I very well may have, but I don't -- I don't

15   recall specifically, no.

16        Q.   Okay.  So you don't recall specifically

17   talking to Detective Schalk about Shanee Friend,

18   correct?

19        A.   Correct.

20        Q.   Did you talk to Detective Schalk about Edward

21   Cooper during your conversations in preparation for

22   today's deposition?

23        A.   I probably did.  I don't recall any specifics.

24        Q.   Okay.  Do you recall anything that Detective

25   Schalk told you about either Shanee Friend or Edward
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Cooper?

2        A.    No.

3        Q.    Did you talk to Detective Schalk about Emmett

4    Wade in any of the conversations you had in preparation

5    for today's deposition?

6        A.    I don't recall that.

7        Q.    Okay.  Did Detective Schalk tell you anything

8    about Emmett Wade during any of your conversations with

9    him in preparation of today's depo?

10       A.    Not that I recall.

11       Q.    Okay.  Did you talk to Detective Schalk about

12   Terry Rogers during any of the conversations you had in

13   preparation for today's deposition with Detective

14   Schalk?

15       A.    Probably.

16       Q.    What did you tell Detective Schalk about Terry

17   Rogers during any of those conversations?

18       A.    I don't recall.

19       Q.    What did Detective Schalk tell you about Terry

20   Rogers during any of those conversations?

21       A.    I don't recall.

22       Q.    Did you talk about Mr. Fletcher with Detective

23   Schalk in preparation for today's deposition?

24       A.    Probably.

25       Q.    What did you tell Detective Schalk about



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Mr. Fletcher during those conversations you had with him

2    in preparation for today's deposition?

3         A.   I can't recall.

4         Q.   What did Detective Schalk tell you about

5    Mr. Fletcher during those conversations you had with him

6    in preparation for today's deposition?

7         A.   I don't recall.

8         Q.   Okay.  When was the last time you spoke to

9    Detective Schalk?

10        A.   In the Zoom meeting that I had with my

11   attorney.

12        Q.   Okay.  And that was a week ago or so, correct?

13        A.   Yes.

14        Q.   Prior to that, when was the last time you had

15   one of those phone calls with just Detective Schalk?

16        A.   I can't say for sure.  I don't know.

17   I -- like I said, I talked to him often.

18        Q.   Okay.  Would it have been in the last two

19   weeks?

20        A.   Before that?

21        Q.   Yes.

22        A.   Yes, probably.

23        Q.   Do you recall what you talked about with

24   Detective Schalk during your last phone call you had

25   with him in preparation for today's deposition?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     A.   Can you say that again?

2     Q.   I can.  Do you recall what you and Detective

3   Schalk talked about during your last phone call with

4   Detective Schalk in preparation for today's deposition?

5     A.   In preparation for this?  No.

6     Q.   Okay.  How many times would you estimate that

7   you spoke to -- strike that.  How many times did you

8   speak to Detective Schalk in preparation for today's

9   deposition, with the exception of the times that your

10  attorneys were present?

11    A.   Okay.  I -- I don't -- I can't use the word

12  preparation.  We just talked about things about this

13  case, you know, just -- just general things and trying

14  to remember about it.

15    Q.   Okay.

16    A.   I -- I wouldn't call it preparation.

17    Q.   So let me ask you this way.  How many times

18  have you spoken to Detective Schalk about this case

19  since you knew you were going to be deposed in this

20  case, outside of the presence of your attorneys?

21    A.   A couple, two, maybe.

22    Q.   How many times have you talked to Detective

23  Schalk about this case outside of the presence of your

24  attorneys about this case since you were served with the

25  complaint?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.   I don't know.

2      Q.   Was it more than a couple?

3      A.   No.

4      Q.   Okay.  When you first got served with the

5 complaint, did you call Detective Schalk to talk to him

6 about it?

7      A.   Yes.

8      Q.   What was his --

9      A.   Or he may have called me, I'm not sure which.

10      Q.   What did you guys talk about that first

11 conversation after he was served?

12      A.   That we weren't happy.

13      Q.   Okay.  What did you tell Detective Schalk

14 about this case during that phone --

15      A.   I have no idea.

16      Q.   What did Detective Schalk tell you about this

17 case during that first phone call?

18      A.   We both agreed that it's -- this is highly

19 outrageous that this is happening.

20      Q.   Why is it highly outrageous that this is

21 happening, sir?

22      A.   Because none of the things that are alleged

23 have we done.

24      Q.   Okay.  We're going to get into the things that

25 are alleged against you, but you do understand that

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   Mr. Fletcher's conviction has been vacated, correct?
 2           MR. STEFANICH:  Objection.  Asked and answered.
 3       A.   Yes.
 4   BY MR. STARR:
 5       Q.   And take it you disagree with that?
 6       A.   I don't -- I -- you know, I'm not a -- I'm not
 7   an attorney and I'm not a judge.  All we do is present
 8   the evidence.
 9       Q.   Okay.  Do you think it's wrong that a judge
10   vacated the conviction of Mr. Fletcher in this case?
11       A.   It seems like it, but I don't know for sure.
12       Q.   Okay.  And you know that Mr. Fletcher received
13   a Certificate of Innocence in this case, correct?
14       A.   I think I've heard that.
15       Q.   Okay.  And do you think it's wrong that
16   Mr. Fletcher received a Certificate of Innocence in this
17   case?
18       A.   I have no opinion on that.
19       Q.   You don't agree or disagree either way?
20       A.   No.
21       Q.   Okay.  What do you understand a Certificate of
22   Innocence to be?
23       A.   Something that says Mr. Fletcher is --
24   Fletcher is innocent.
25       Q.   A court order that says Mr. Fletcher is
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    innocent?

 2        A.   I -- I would say so, yeah.

 3        Q.   Okay.  So you understand that Mr. Fletcher has

 4    a court order saying that he's innocent of the Sorrell

 5    shooting, correct?

 6        A.   Yes.

 7        Q.   Okay.  And what is your opinion of that court

 8    order?

 9            MR. STEFANICH:  Objection.  Form and

10        foundation.

11        A.   I have no opinion.

12    BY MR. STARR:

13        Q.   Okay.  I'm sorry, what did Detective Schalk

14    tell you his opinion was of the fact that Mr. Fletcher

15    was exonerated and he got a Certificate of Innocence?

16            MR. STEFANICH:  Objection.  Form.

17        A.   I don't recall.

18    BY MR. STARR:

19        Q.   Okay.  Any other conversations you had with

20    Detective Schalk about this case that you can recall

21    that you haven't told me about today?

22        A.   Not -- not that I know of, no.

23        Q.   Okay.  When you first were served with the

24    complaint in this case, how much could you recall about

25    this investigation?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.   Very little.  That the case did happen, and
 2    that we were involved, but the details I didn't know.
 3        Q.   Okay.  So you had some independent
 4    recollection of this was a case that you worked,
 5    correct?
 6        A.   Yes.
 7        Q.   All right.  And did you remember that this was
 8    a case that you and Detective Schalk were partners and
 9    worked together on?
10        A.   Yes.
11        Q.   Okay.  Did you recall that Detective Noradin
12    was also a detective that was assigned to this case?
13        A.   At that time, I didn't recall that.
14        Q.   All right.  Did you recall that Sergeant
15    Wojcik was the supervisor on this case?
16        A.   Had -- no.
17        Q.   All right.
18        A.   Not at all.
19        Q.   Did you recall anybody else -- any other
20    Chicago police personnel that worked on this case when
21    you first were served with the complaint?
22        A.   I don't recall anything like that, no.
23        Q.   Okay.  Tell me everything that you
24    independently recalled about this case when you were
25    first served with the complaint.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.    That it happened, that -- that we worked it

2 and that it happened, you know, that it happened.

3      Q.    Did you recall the names of any of the

4 witnesses independently?

5      A.    No.

6      Q.    All right.   Did you recall the name of

7 Mr. Fletcher independently?

8      A.    Yes.

9      Q.    Okay.   Did you recall the name of the victim

10 independently?

11      A.    No.

12      Q.    Okay.   And then after you read the complaint,

13 did that refresh your recollection at all?

14      A.    Not really.

15      Q.    Okay.   To what degree did it refresh your

16 recollection?

17      A.    I have no idea.

18      Q.    Okay.   And then subsequent to that, when you

19 were served the complaint, at some point you got your

20 hands on or you reviewed Chicago police reports that

21 were from the investigation, correct?

22      A.    Yes.

23      Q.    Did you ever have physical copies of the

24 reports?   Did you ever receive physical copies of the

25 reports after you were served with the complaint?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.    You mean paper?

 2        Q.    Yes.

 3        A.    Yes.

 4        Q.    Okay.  And where did you get those paper

 5   reports from?

 6        A.    From Hale's office.

 7        Q.    From your attorney?

 8        A.    From -- from Brian, I believe.

 9        Q.    Okay.  And then you reviewed those reports at

10   some point, correct?

11        A.    Yes.

12        Q.    And am I safe to assume you've looked at those

13   reports a couple of times, at least?

14        A.    Yes.

15        Q.    Okay.  So after reviewing those reports, how

16   much was your independent recollection refreshed about

17   this case?

18        A.    It's all still based on reports.

19        Q.    Okay.  So we're going to look at the reports

20   in a few minutes, but I just wanted to kind of just

21   establish your independent recollection of this case.

22   It improved after you reviewed the reports?

23        A.    I could say yes, somewhat.

24        Q.    Okay.  Did you have any other meetings in

25   preparation for the deposition with anybody besides the
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   meetings you've described where you met with Allyson and

 2   Detective Schalk on Zoom?  And then you met with Brian

 3   and Detective Schalk on Zoom, and then you had some

 4   phone calls with Brian, and some phone calls with

 5   Detective Schalk.  Any other meetings or conversations

 6   you had in preparation from today's depo?

 7        A.   Not that I recall.

 8        Q.   Okay.  Did you ever meet with any attorneys

 9   from the city?

10        A.   No.

11        Q.   Okay.  And you met with only Allyson and

12   Brian, no other attorneys, correct?

13        A.   Correct.

14        Q.   All right.  Mr. Bogucki, did you graduate from

15   high school?

16        A.   Yes.

17        Q.   Where'd you go to high school?

18        A.   St. Patrick's.

19        Q.   Here in the city of Chicago?

20        A.   Yes.

21        Q.   Okay.  What year did you graduate?

22

23

24        A.   '69.

25        Q.   All right.  And did you go to college?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     A.    Just what was offered in the police academy.

2     Q.    **What do you mean by that?  I'm not sure if I**

3  **understand.**

4     A.    That they had college classes in there.

5     Q.    Okay.  So the police academy offered college

6  courses and you took some of those?

7     A.    It was all part of the training.

8     Q.    Okay.  Any additional education after high

9  school besides what you got in the Chicago Police

10  Academy?

11     A.    No, just the police department.

12     Q.    Okay.  Are you currently employed today?

13     A.    No.

14     Q.    **Are you retired?**

15     A.    Yes.

16     Q.    Okay.  And I think you told me this already,

17  forgive me, but I forgot, what year did you retire?

18     A.    November of 2006.

19     Q.    And when you retired, that was from the

20  Chicago Police Department?

21     A.    Yes.

22     Q.    And what was your rank in the Chicago Police

23  Department of upon retirement?

24     A.    Detective.

25     Q.    Okay.  Can you give me a general overview of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    your tenure as an employee of the Chicago Police

2    Department, starting with where and what year you first

3    started; what your assignment was up until when you

4    retired in 2006 as a detective?

5         A.   I was -- after the police academy, I went to

6    the 15th District.  I worked patrol until 1980,

7    when I passed the detective's test and was -- and was

8    hired as a detective.  And I went to Area 5 as a robbery

9    detective.  That lasted at about three months, until

10   they changed that to Violent Crimes.  And stayed in

11   Violent Crimes after that until at some point, they

12   changed it to Homicide Unit, and that's where I finished

13   my career.

14        Q.   Okay.  That's pretty straightforward.

15   What years were you in the Chicago Police Academy?

16        A.   1976.

17        Q.   How long were you in the academy for?

18        A.   I -- I think it was a six-month program.

19        Q.   Okay.  And then you said you were first

20   assigned as a patrol officer to the 15th District,

21   correct?

22        A.   Yes.

23        Q.   What year was that?

24        A.   That was October -- in -- in -- well, I think

25   it would be '77 by that time.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q.    Okay.  First half of '77?

 2        A.    Yes.

 3        Q.    Okay.  And then you were in the patrol -- or

 4   I'm sorry.  You were in the 15th District as a patrol

 5   officer up until you passed the detective test in 1980;

 6   is that correct?

 7        A.    I was hired, I was promoted in '80.

 8        Q.    Promoted.

 9        A.    Yeah.

10        Q.    Okay.  Was it a meritorious promotion or --

11        A.    It was not.

12        Q.    Okay.  What kind of promotion was it?

13        A.    It's from the test.

14        Q.    Okay.  And then you said you were in the

15   robbery part of Area 5 Detective Unit for three months?

16        A.    That's -- yeah, that's how long it lasted.

17        Q.    Was that in 1980?

18        A.    Yes.

19        Q.    Okay.  And then how long were you a detective

20   in Violent Crimes in Area 5-4?

21        A.    I'm not sure.  I mean, I worked Violent Crimes

22   my whole career when they changed the names and the --

23        Q.    Okay.

24        A.    You know, I -- I'm not positive about that.

25        Q.    Do you remember how many years you were a
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    detective in the homicide unit in Area 5 before you

2    retired?

3        A.   Again, I don't know when they -- I worked

4    homicides while in Violent Crimes, and when -- when they

5    changed the name, I -- I don't know when that was.

6        Q.   Okay, that's fair.  And during your tenure,

7    where was Area 5 located?

8        A.   5555 West Grand.

9        Q.   Okay.  In 1995, you would've been in Violent

10   Crimes in Area 5; is that correct?

11       A.   I think by that time it was homicide.

12       Q.   It was homicide by then.  Okay.

13       A.   I think.

14       Q.   All right.  In 1995 as a homicide detective,

15   did you work a regular shift?

16       A.   Typically the -- the third watch.

17       Q.   And if you can recall in 1995 what the time

18   schedule was for the third watch?

19       A.   Barring any -- anything different we had to do

20   at different times, a normal -- normal day would be 4:30

21   until one in the morning.

22       Q.   4:30 p.m. until 1:00 a.m.?

23       A.   Yes.

24       Q.   Okay.  Barring special circumstances, then,

25   could you tell me, is there three watches?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1     A.    Yes.

 2     Q.    Barring special circumstances, what is the

 3  time for the second watch in 1995?

 4     A.    The second watch?  Well, again, that could be

 5  -- I think typically it was, like, eight in the morning

 6  until four -- until five.

 7     Q.    And then barring special circumstances, what

 8  was the time schedule for the first watch?

 9     A.    Again, typically midnight to eight in the

10  morning.

11     Q.    Okay.  In 2002, you were still a detective in

12  the homicide division at Area 5, correct?

13     A.    Yes.

14     Q.    Okay.  Were the times for the watches the same

15  as they were in 1995, or did they change that?

16     A.    The times can be changed at any time,

17  but I -- as far as I know, they were typically as I

18  described.

19     Q.    Okay.  So I'm not asking about, like -- I

20  understand that sometimes dark times change and move

21  back and forth, but the typical times for the watches

22  were the same in '95 as they were in 2002?

23     A.    Yes.  Okay.  As far as I know.

24     Q.    All right.  As a homicide detective, in 1995,

25  did you have an office that was specifically your own

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    office?

2         A.    No.

3         Q.    Okay.  Did you have an office that you shared?

4         A.    Yes.

5         Q.    And where was that located in Area 5?

6         A.    It could be either in the main -- the main

7    floor or their side office, also.

8         Q.    Okay.  Was the homicide division of Area 5 on

9    the second floor of the building in 1995?

10        A.    Yes.

11        Q.    And was it also the second floor in 2002?

12        A.    Yes.

13        Q.    Okay.  Could you just give me a brief

14   description of the layout of how the homicide department

15   division was in 1995?

16        A.    Well, the Area 5 detectives, it was a -- a

17   floor that was shared -- a main floor that was shared by

18   the property crimes detectives and the violent crimes

19   detectives or homicide.  There was a couple of offices

20   that were used by sergeants, and there was a -- there

21   was a separate office that they kept other files -- file

22   cabinets in, and there was a lineup room. There's -- I'm

23   trying to think of how many interview rooms there was.

24   There's four or five interview rooms. That's basically

25   it.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q.   Okay.  And it's my general understanding that

2  there's, like, an open area of desks that the detectives

3  use; is that correct?

4     A.   Yes.

5     Q.   Okay.  And then were the offices around the

6  perimeter of the floor?

7     A.   Yes.

8     Q.   Okay.  Do you remember how many supervisor

9  offices there were?

10     A.   Well, there was a commander's office, there

11  was a main sergeant's office.  And I'm not sure, there's

12  some daytime people that were mostly administrative that

13  might have had an office.

14     Q.   Okay.  So a handful of offices that were

15  dedicated to supervisors in 1995?

16     A.   Yes.

17     Q.   Is the layout as you described for 1995 the

18  same as the layout was in 2002?

19     A.   I think so.

20     Q.   Okay.  And then you said there was one office

21  that was a dedicated file room; is that correct?

22     A.   Yeah, there was -- I -- well, there were files

23  in the sergeant's office.  There were files in the -- in

24  another office that we had actually had access to.

25     Q.   So there was more than one office that was

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    dedicated to housing files; is that correct?

2        A.   Yes.

3        Q.   Two offices that were dedicated to housing

4    files or more than that?

5        A.   That's all I recall.

6        Q.   All right.  Was one of them -- did you say

7    that one of the two offices that house files, was this

8    also a supervisor's office?

9        A.   One of them was, yes.

10        Q.   Okay.  And then one of them was a dedicated

11    file office?

12        A.   There were homicide files, and I -- I'm not

13    sure things kept -- would -- would change over the

14    years.

15        Q.   Okay.

16        A.   So I'm -- I'm kind of leery -- blurry on that.

17        Q.   Okay.  I'm not going to hold you to the

18    specifics of the different file rooms.  I'm just trying

19    to get a general idea of what the layout was.  And then

20    you said there was four to five interview rooms?

21        A.   Yes.

22        Q.   Were those all the same size?

23        A.   Yes.

24        Q.   What part of the floor were they located on,

25    if you can recall?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.   Connected to the main floor.

 2        Q.   Okay.  Were they all next to each other?

 3        A.   Yes.

 4        Q.   Okay.  And do you remember if they were on the

 5   East or the West or the North or the South side of the

 6   building?

 7        A.   They were on the west side of the floor.

 8        Q.   Okay.

 9        A.   The east -- the east side was all glass.

10        Q.   Okay.  Windows?

11        A.   Uh-huh.

12        Q.   All right.  And then those interview rooms,

13   what was inside the interview rooms?  How were they

14   organized?

15        A.   There was a bench and a handcuff ring.

16   That's -- that's about it.  Some -- sometimes there were

17   tables in there.  That -- that changed at some points.

18        Q.   Okay.  Were there chairs in there for the

19   detectives to sit in when they were conducting the

20   interview?

21        A.   Sometimes there were chairs, sometimes there

22   weren't.

23        Q.   All right.  And then you said there was a

24   lineup room.  Where was that located?

25        A.   That would be the far south end of the floor
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  of the Area 5 main floor.

2      Q.   South, east, or west?

3      A.   I think just south.  The south -- the south

4  end, the south wall.

5      Q.   Okay.  So it wasn't in a corner, it was in the

6  middle of the wall between south and east to west?

7      A.   Yeah -- yeah.  It -- it encompassed the -- the

8  main floor.

9      Q.   Okay.  And what was the -- like, inside the

10  lineup room, how was that organized?

11      A.   There were two separate rooms, with the

12  one-way glass mirror in -- in between.

13      Q.   Okay.  And so two separate rooms.  Were they

14  identical on either side except for the -- you could see

15  through one of the mirrors, and you couldn't see through

16  on the other side?  Or how was it set up?

17      A.   No, one -- one was set up where it could be

18  used when lineups weren't being conducted.  So there

19  might be a table in there, or -- the other side

20  was -- was strictly for participants of the lineup.

21      Q.   Okay.  So the side that was strictly for

22  participants, was it just a flat ground that people

23  would stand on, or was there a stage they would get up

24  on?  How was it organized?

25      A.   I can't remember if there was a bench there or

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  not.  I think there might have been a bench in there.

2      Q.   And was there --

3      A.   And just -- yeah, just plain, nothing else.

4      Q.   Okay.  Nothing on the wall, but, like,

5  designate the height of the individuals in the lineups?

6      A.   I don't think so --

7      Q.   Okay.  And the other side was used for people

8  viewing the lineup or used for other purposes as you

9  described, correct?

10     A.   Correct.

11     Q.   And when it was used for people viewing the

12  lineup, how was it organized?  Were there chairs in

13  there?  Was there a table in there?  How was it set up?

14     A.   All people viewing the lineup would -- would

15  be standing.

16     Q.   Okay.  Anything else about either of those

17  rooms that you can recall?

18     A.   There was an intercom that you could speak

19  from the one side to the participant side.

20     Q.   Okay.  So if you were conducting, did you

21  conduct lineups as part of your time as a detective in

22  Area 5?

23     A.   Yes.

24     Q.   Okay.  Generally speaking, how would you go

25  about conducting a lineup?

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.   Generally, would have the participants of the

2    lineup stand against the back wall in their room, facing

3    -- actually, usually facing the wall.  And when we call,

4    they would be numbered from one through however how

5    many.  Usually five, one through five.  And you -- they

6    were instructed when you call their -- your number,

7    "Come up and stand in front of the mirror." And we'll

8    tell them to make several turning motions and then go

9    back in line.  After each of the participants did that,

10   we would have them all stand, turn around and face the

11   mirror.

12      Q.   Okay.  So initially, they were all lined up

13   facing the wall?

14      A.   That's how we did it, yes.

15      Q.   Okay.  And then you called them one by one?

16      A.   Yes.

17      Q.   They came forward, they rotated around.

18   So the person viewing the line could see their entire

19   body?

20      A.   Yes.

21      Q.   And then they went back to the line?

22      A.   Yes.

23      Q.   And then they all turned around at the same

24   time.  So they're all facing the mirror, correct?

25      A.   Yes.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1    Q.   Okay.  Was there a policy in place on how to

 2    govern lineups that you were familiar with in 1995?

 3         MR. STEFANICH:  Objection.  Foundation.  You

 4       can answer.

 5       A.   There may have been.  I mean, yes, obviously,

 6    there's was policy, but what's written, I don't know.

 7    BY MR. STARR:

 8       Q.   Okay.  Were you familiar with the policy that

 9    governed lineups in 2002?

10       A.   Yes.  The way we ran them was policy.

11       Q.   Okay.  What was your understanding of what you

12    were required to do when conducting a lineup in 2002?

13       A.   Show the participants of the lineup.  Have

14    them turn several ways, whether they were -- obviously,

15    it didn't -- not everybody did it exactly the same,

16    like, as far as the participants go.  Maybe -- maybe

17    some detectives didn't have them facing the wall, but

18    that's what we did.  You know, it would -- it would

19    still fit within policy.

20       Q.   Okay.  Was there any policy that governed how

21    many people needed to be in the lineup?

22         MR. STEFANICH:  Objection.  Foundation.

23       You can answer.

24       A.   Typically, four plus the -- the person of

25    interest.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  BY MR. STARR:

2       Q.   Okay.  Was it your understanding that you were

3  required to have four plus the person of interest, or

4  was there any set number that you were required to have

5  that you as you understood it in 2002?

6       A.   No, it -- it was the best you can do.

7  If you -- you should try and do four plus the -- the

8  person of interest.

9       Q.   Okay.

10      A.   There were times where there weren't fillers,

11 and it might have been four, I mean, total.

12      Q.   Okay.

13      A.   Instead of five.

14      Q.   So there was times that you did lineups where

15 there was three fillers plus the person of interest?

16      A.   I -- I believe it could have happened, yes.

17      Q.   Okay.  Was there ever times you did lineups

18 where there was less than four people total in the

19 lineup?

20      A.   No.

21      Q.   Okay.  Were there times that you did lineups

22 where there was more than five people total?

23      A.   When there was multiple persons of interest,

24 yes.

25      Q.   What was the most amount of people that you

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  could put in -- that you recall putting in a lineup at

2  one time?

3      A.   It was quite a few, but I -- I can't be

4  specific about it, because I really don't remember.

5      Q.   Okay.  Regarding the fillers, how did you get

6  people to be fillers in a lineup?

7      A.   Typically, we would check the lockup for

8  people that are locked up in the 25th District.

9  Sometimes have to go to another district, you know, to

10 get fillers.  If there were none in the lockup.

11 Other -- other than that it could be someone that was in

12 the Area 5 office at the time.

13     Q.   When you say the 25th District lockup, that

14 lockup is in the same building as where Area 5 is; is

15 that correct?

16     A.   Yeah, it's on the first floor, yes.

17     Q.   Okay.  And was there a Chicago Police

18 Department policy that applied to fillers of lineups

19 that you were familiar with in 2002?

20     A.   I don't know of an official policy, but

21 I -- I learned how to do lineups.

22     Q.   What did you learn how to do the -- do lineups

23 in terms of fillers?

24     A.   Get -- check the lockups first and go from

25 there.  Anybody -- I mean, you could -- you could

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    actually solicit someone off the street if you -- if you

2    could get them to come in.

3        Q.   Okay.  Was there a Chicago Police Department

4    policy that governed anything about the physical

5    characteristics of the fillers in lineups?

6        A.   Be -- try and be -- so do the best you can try

7    and be as similar.

8        Q.   Okay.  Did you make it a practice to find

9    fillers that looked like the suspect when you conducted

10   lineups in 2002?

11       A.   Well, yeah, we tried.

12       Q.   When you say, "We tried," what does that mean?

13       A.   That means we did the best we could.

14       Q.   Okay.  So were there times that you conducted

15   lineups with fillers that did not look like the suspect?

16       A.   Well --

17          MR. STEFANICH:  Objection.  Form and

18      foundation.  You can answer.

19       A.   I guess that's a matter of opinion.

20   BY MR. STARR:

21       Q.   Whose opinion?

22       A.   Anyone's.

23       Q.   Okay.  Did you conduct lineups as a Chicago

24   Police Department detective where the fillers were

25   different genders than the suspect?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1         A.   No.

2         Q.   Okay.  Did you conduct lineups as a Chicago

3    Police Department detective where the fillers were

4    different skin colors than the suspect?

5         A.   It -- they could be off a little bit.

6         Q.   Okay.  Did you as a Chicago Police Department

7    detective conduct lineups that involve fillers who had

8    different color hair than the suspects?

9         A.   I wouldn't if it didn't matter.

10        Q.   What do you mean by that, sir?

11        A.   Well, if hair had nothing -- no value, then it

12   might not have mattered, but I don't -- I can't recall a

13   time I did that.

14        Q.   What do you mean by if hair had no value?

15   I'm not sure if I understand that.

16        A.   Well, like in this case, 12 years later,

17   hairstyle doesn't -- doesn't matter much.  So if someone

18   had two different hairstyles, it wouldn't matter.

19        Q.   Okay.  So when you say "in this case 12 years

20   later, hairstyle didn't matter," what do you

21   specifically mean by that?

22        A.   That hairstyles change.  Could change daily.

23   I mean, it'd be totally different 12 -- 12 years later.

24        Q.   Right.  But if you have a witness who is

25   viewing a lineup, did you have an obligation to put
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1   people in the lineup that looked like the person they
2   saw when the crime was committed?
3       A.   No.
4       Q.   Okay.
5       A.   Not -- not as far as hair goes.
6       Q.   What obligation did you have to put people in
7   the lineup that looked like the person who allegedly
8   committed the crime -- strike that.  I poorly phrased
9   that.  You say "not as hair was considered."  What
10  obligations did you have regarding fillers in lineups in
11  2002 based on Chicago Police Department policy that
12  you were aware of?
13          MR. BURNS:  May I hear the question again,
14      please?  I'm sorry.
15          THE REPORTER:  Yeah.
16            (REPORTER PLAYS BACK REQUESTED QUESTION)
17          MR. BURNS:  Objection to the form of the
18      question.  Thank you.
19      A.   I'm not sure what you're asking.
20  BY MR. STARR:
21      Q.   Were you aware of any obligations -- strike
22  that.  Were you aware of any policy by the Chicago
23  Police Department that governed the type of fillers that
24  you put in lineups in 2002?
25      A.   Just as -- as best you can to get similar to
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-8 Filed: 05/06/25 Page 109 of 267 PageID #:5218
Video Deposition of Jerome Bogucki, taken on April 20, 2023
107

```
 1   the person of interest.
 2        Q.   Okay.  Let's take a five minute break, okay?
 3        A.   Okay.
 4             THE VIDEOGRAPHER:  We are off the record.  The
 5        time is 12:41 p.m. Central Time.
 6              (OFF THE RECORD)
 7             THE VIDEOGRAPHER:  We are back on record for
 8        the deposition of Jerome Bogucki.  My name is
 9        Kortney Chase.  Today's April 20, 2023 and the time
10        is 1:38 p.m. Central Time.
11   BY MR. STARR:
12        Q.   All right, Mr. Bogucki.  I think I was last
13   asking you before the break about some policy issues.
14   I'm going to come back to that.  I'm going to ask you
15   mentioned you were in the police academy.  You mentioned
16   about maybe it was a six month tenure in the police
17   academy, correct?
18        A.   I believe that's what it was, but I'm not
19   sure.
20        Q.   Okay.  And you were trained on various forms
21   of police work while you were in the academy; is that
22   correct?
23        A.   I -- yes.
24        Q.   All right.  Do you recall any topic areas that
25   you were specifically trained on during your time at the
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    police academy?

 2         A.    No.  Specifically, no.

 3         Q.    Okay.  Do you know whether or not you were

 4    trained on giving testimony in court?

 5         A.    I don't know.

 6         Q.    All right.  Do you know if you were trained on

 7    interviewing witnesses?

 8         A.    I'd say probably, but I have no recollection

 9    of it.

10         Q.    All right.  Do you have any recollection of

11    being trained on how to interview a suspect?

12         A.    I might have.  I don't know.

13         Q.    Okay.  What about any training that you

14    received during your time in the academy on report

15    writing?

16         A.    That's -- that I know, that was covered.

17         Q.    Okay.  So that's one thing you do remember

18    getting trained on is report writing, correct?

19         A.    From the original police academy?

20         Q.    Yeah.

21         A.    Yes.

22         Q.    Okay.  So in terms of report writing, other

23    than the training you received in the academy, did you

24    receive any additional training at any point in your

25    career on police report writing?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA REPORTERS | 502.589.2273 | schedule@kentuckianareporters.com

109

```
 1        A.    Possibly when I went to the Academy for
 2  Detective School.
 3        Q.    All right.
 4        A.    But I -- specifically, I can't recall.
 5        Q.    Okay.  Do you recall any other specialized
 6  training you received in the regular police academy
 7  besides report writing?
 8        A.    I don't know.
 9        Q.    All right.  And then you just alluded to
10  training that you received when you became a detective.
11  There's a separate academy for detectives; is that
12  correct?
13        A.    There's a -- I think it was six weeks.
14        Q.    Okay.  Do you recall when that was; was that
15  1980?
16        A.    Yes.
17        Q.    All right.  And where was that training
18  facility or was there a facility?
19        A.    The -- oh, what was the address of that?
20  The -- it's the police academy.
21        Q.    Okay.  Was that the same place you had
22  regular --
23        A.    Yes.
24        Q.    -- academy at?  Okay.  Did you receive any
25  additional training on report writing when you were at
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-8 Filed: 05/06/25 Page 112 of 267

110

```
 1    the detective's academy?

 2        A.   Possibly, but I don't have independent

 3    recollection.

 4        Q.   All right.  Do you have any independent

 5    recollection of any training you received at the

 6    detective's academy?

 7        A.   Not offhand.

 8        Q.   Okay.  Do you know whether or not you were

 9    trained on how to give testimony in court when you were

10    in the detective's academy?

11        A.   I believe they covered demeanor.

12    How you should act and --

13        Q.   Demeanor in court in particular?

14        A.   While I -- while in court, yes.

15        Q.   Okay.

16        A.   Yeah.

17        Q.   And then do you know whether or not you were

18    trained in the detectives academy on interviewing

19    witnesses?

20        A.   I would think so, but I haven't got

21    independent recollection of that.

22        Q.   All right.  Do you know whether or not you

23    were trained on interviewing suspects when you were in

24    the detective's academy?

25        A.   I probably was.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 153-8 Filed: 02/28/25 Page 113 of 267

```
 1        Q.    But you don't have an independent
 2   recollection?
 3        A.    No.
 4        Q.    Do you recall any of the specialized training
 5   that you received at the detective's academy?
 6        A.    No.
 7        Q.    Okay.  Well, let me just ask you generally
 8   then about your understanding of the policies and the
 9   practices in place while you were a homicide detective,
10   okay?
11        A.    Okay.
12        Q.    And I'm generally going to be talking about
13   the time period of '95 to 2002.  If there's a specific
14   difference between the two time periods that you recall,
15   please point that out for me, okay?
16        A.    Okay.
17        Q.    What was your understanding generally
18   regarding the policies governing report writing when it
19   came to the detectives?
20          MR. BURNS:  Objection.  Form.  Foundation.
21        A.    I don't know if there's a specific policy.
22   BY MR. STARR:
23        Q.    Okay.  Were you aware of any policies in place
24   that governed how you were supposed to write reports
25   when you were a homicide detective?
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.    No, it was kind of on the job training.

 2        Q.    Okay.  You became a detective in 1980,

 3   correct?

 4        A.    Yes.

 5        Q.    In 1995, did you consider yourself a seasoned

 6   detective?

 7        A.    I would say so, yes.

 8        Q.    You considered yourself an experienced

 9   detective as of 1995?

10        A.    Yes.

11        Q.    All right.  By 1995, you probably had a lot of

12   experience with the criminal process generally, correct?

13        A.    Yes.

14        Q.    All right.  In '95, did you consider yourself

15   to be good at your job?

16        A.    At least adequate.

17        Q.    Okay.  What about in 2002; did you consider

18   yourself to be good at your job in 2002?

19        A.    Sure.

20        Q.    And what's your definition of what a good

21   detective is?

22        A.    Someone that works hard.

23        Q.    Okay.  Anything else?

24        A.    Someone that does their job.

25        Q.    Okay.  Does a good detective collect all
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    relevant evidence that he or she can?

2        A.   Yes.

3        Q.   All right.  Does a good detective document all

4    information they learn that's relevant to an

5    investigation?

6        A.   Yes.

7        Q.   Okay.  Was it important to document facts that

8    you learned in the course of an investigation in a

9    formal way?

10            MR. STEFANICH:  Objection.  Form.

11       A.   I'm not sure I understand your question.

12   BY MR. STARR:

13       Q.   Okay.  Let me rephrase it.  How did you, in

14   your practice, document information you learned during

15   the course of an investigation?

16       A.   Anything important was put into a summary

17   on a -- well, either summary or fact in a -- a

18   case -- in a case reporter or a supplementary report.

19       Q.   Okay.  Was it important to document

20   information you learned during the course of an

21   investigation because you may need to recall that

22   information down the road?

23       A.   That's a good part of it, yes.

24       Q.   All right.  And did you make it a practice to

25   fully and accurately document the information you

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    learned during the course of a homicide investigation?

2        A.   Whatever I thought was important, yes.

3        Q.   All right.  You knew as a seasoned,

4    experienced detective that you may be called to testify

5    in a case that you investigated, correct?

6        A.   Yes.

7        Q.   And you knew as a seasoned and experienced

8    homicide detective that if you were called to testify

9    you may be cross-examined, correct?

10       A.   Yes.

11       Q.   And so as a seasoned, experienced detective,

12   it was important to you to have a document that you

13   could refer to that explained to you the information you

14   learned in the course of an investigation, correct?

15       A.   It'd be fair to say that, sure.

16       Q.   All right.  In addition to the possibility

17   that you may be called to testify and cross-examined,

18   were there other reasons that were important to document

19   information you learned in the course of a homicide

20   investigation?

21       A.   Well, it just -- that's my job and it makes it

22   important.

23       Q.   Okay.  Was it important to document

24   information you learned in the course of an

25   investigation in order to be thorough?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.    Yes.
 2        Q.    Okay.  Was it important to document
 3   information you learned in the course of an
 4   investigation in order to be accurate?
 5        A.    Yes.
 6        Q.    Okay.  Was it important to document
 7   information in -- that you learned in the course of an
 8   investigation in case you need to refresh your
 9   recollection?
10        A.    Yes.
11        Q.    All right.  Did you make it a practice to put
12   the information that you learned -- strike that.  Did
13   you make it a practice to put any information you
14   documented in a police report into the investigative
15   file?
16        A.    Yes.
17        Q.    Okay.  Was it also important to document
18   information you learned in the course of an
19   investigation because that information may be used
20   against a suspect at some point in time?
21        A.    Yes.
22        Q.    Okay.  Was it also conversely important to
23   document information you learned in the course of an
24   investigation because the information you learned
25   may be used to exonerate a suspect?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.    The facts are the facts, yes.

2    Q.    Okay.  So would you document all relevant

3 information you learned during the course of an

4 investigation, whether it was exculpatory or

5 inculpatory?

6    A.    Yes.

7    Q.    All right.  Did you make it part of your

8 practice to use GPRs when you were a homicide detective?

9    A.    When needed, yeah.

10    Q.    Okay.  When you would go out to investigate a

11 crime, would you have the GPR document with you?

12    A.    Most of the time.

13    Q.    Okay.  And how would you go about bringing a

14 GPR with you out into the field?

15    A.    We'd have a folder with blanks.

16    Q.    Okay.  And I think I asked you earlier about

17 writing GPRs.  You hand wrote GPRs and typed GPRs; is

18 that correct?

19    A.    Well, there was -- there was a period in Area

20 5 where some GPRs were type written.  It was kind of a

21 shortcut for a -- a supplementary report.

22    Q.    Okay.

23    A.    And it was just a -- a period of time that

24 people were doing that.

25    Q.    What period of time was that?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.    Well, '95.  I don't know any -- you know, not
 2   long.
 3        Q.    It was in 1995 though?
 4        A.    Well, apparently.
 5        Q.    Okay.  And why do you say that today?
 6        A.    Because I have one of those.
 7        Q.    For this case?
 8        A.    Yes.
 9        Q.    Okay.  And if you were investigating homicide
10   and you were interviewing a witness, would you document
11   all the information the witness told you?
12             MR. STEFANICH:  Objection to form.
13        A.    Anything pertinent.
14   BY MR. STARR:
15        Q.    Okay.  If you were in -- strike that.
16   As a practice, when you interviewed witnesses to
17   homicides, would you document the information in a GPR?
18        A.    Not necessarily.
19        Q.    Okay.  What circumstances would you document
20   that information in a GPR?
21        A.    You know what?  Sometimes -- sometimes you
22   can't write fast enough and it doesn't get on a GPR.
23   Sometimes you don't -- you don't want to bring out GPRs
24   because it might have someone stop talking.
25   So they're -- GPRs are just -- they were meant just for
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1   notes to help you write a supplementary report.

2       Q.   Okay.  In addition to GPRs, did you take notes

3   during the course of investigations in any other

4   fashion?

5       A.   Well, if there was no GPR paper around, it

6   could be on anything.  It could be on any piece of

7   paper.  If there's notes, they're notes.

8       Q.   And did you use regular pieces of paper to

9   take notes during your time as a homicide detective?

10      A.   I have.

11      Q.   Okay.  During the Sorrell investigation, did

12  you use any pieces of paper to take notes on?

13      A.   I don't know for sure.

14      Q.   Any other ways that you would personally

15  document information you learned during the course of an

16  investigation, other than GPRs and blank sheets of

17  paper?

18      A.   Just through my memory.

19      Q.   All right.  Did you keep any kind of journal

20  or anything like that?

21      A.   No.

22      Q.   As a Chicago police detective, you were

23  required to document any exculpatory information you

24  learned, correct?

25      A.   Right.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q.   And how did you understand that to be the

2  case?

3     A.   Just the right thing to do.

4     Q.   Did you understand that you had any kind of

5  legal obligation to document exculpatory information you

6  learned in the course of an investigation?

7     A.   Just through experience and what I've heard

8  and what people say.

9     Q.   Did you ever receive any training regarding

10  documenting exculpatory information?

11     A.   Not that I recall, but I may have.

12     Q.   Okay.  Do you know what Brady material is?

13     A.   Not really.  I've heard the term before, but

14  I'm not familiar with it.

15     Q.   Do you have any understanding of what that

16  term refers to?

17     A.   Not -- not offhand.

18     Q.   Okay.  So I represent it to you generally that

19  Brady's a Supreme Court case that made it a requirement

20  to document exculpatory information.  Would that be an

21  understanding that would be good share?

22     A.   Okay.  That'd be fair.

23     MR. STEFANICH:  I'll object.  I don't think

24    that's accurate, so I'm going to object to form.

25    You can answer.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.    You know what?  I don't -- I don't know for

2    sure.

3    BY MR. STARR:

4    Q.    Okay.  But you did have an understanding that

5    you had an obligation to document exculpatory

6    information that you learned in the course of an

7    investigation?

8    A.    Of course.

9    Q.    All right.  Did any supervisor ever tell you

10   that you had to document exculpatory information?

11   A.    They may have.  I don't know.  I don't

12   remember.

13   Q.    Did you ever receive any brochures or any

14   documents, training documents, on documenting

15   exculpatory information you learned in the course of the

16   investigation?

17   A.    I may have.  I don't know.  It's a long time

18   ago.

19   Q.    Did you ever go to any kind of professional

20   development course or anything along those lines where

21   you were instructed on documenting exculpatory evidence?

22   A.    I don't think so --

23   Q.    All right.  If you learned -- strike that. Did

24   you ever learn relevant information in the course of an

25   investigation that you communicated to another detective

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   and expected that detective to document the information?

2      A.   Yeah, probably my partner all the time.

3      Q.   Okay.  So was it a part of your practice that

4   if you learned stuff, sometimes you'd tell your partner

5   to document it and you'd expect him to document it?

6      A.   If -- if he was up for writing the report,

7   yeah.

8      Q.   Okay.  Did you have a practice where one of

9   you wrote the reports more frequently or what was the

10   exchange?

11      A.   Actually, we -- we'd kind of take turns with

12   all the -- say all the pertinent little evidence,

13   information and numbers and this and that, and then as

14   far as -- as far as writing summaries of what people

15   said and everything, we'd actually both contribute

16   to a -- oftentimes contribute to a report.  So we'd be

17   on two different computers and write our part and it

18   would make it into the same supp.

19      Q.   Okay.  Did you make it a practice to document

20   the investigative steps you took during the course of an

21   investigation in a police report?

22      A.   That was usually the case, yes.

23      Q.   Okay.  Would you document investigative steps

24   you took in a GPR ever?

25      A.   Not necessarily, no.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  Q. Okay. What would you use GPRs for?

2  A. Notes.

3  Q. Okay. Notes --

4  A. Except in that one time period where some

5 things got typed up.

6  Q. Yeah, I understand that. Okay. What kind of

7 notes would you put into a GPR?

8  A. Anything.

9  Q. Okay. So for instance, if you were

10 interviewing a witness, was it your practice to put

11 information you learned from the witness into a GPR?

12  A. Again, usually. But not always.

13  Q. If you were interviewing a witness and you

14 were taking a -- strike that. If you were interviewing

15 a witness and you happened to be using a GPR to document

16 the information you learned, what kind of information

17 would you put into the GPR?

18  A. Anything I thought I needed to remember.

19  Q. Okay. So if you were interviewing a witness

20 who told you that they saw the suspect and you were

21 using a GPR to document that interview, was that the

22 kind of thing you'd put into a GPR?

23  A. Well, that's something I could easily

24 remember, so not necessarily.

25  Q. Okay. If you were interviewing a witness

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  under the same circumstances and the witness told you
2  some sort of identifying characteristics about the
3  suspect, would you put that into a GPR?
4       A.   Usually yes.
5       Q.   Okay.  If you were interviewing a witness and
6  using a GPR to document the interview, and the witness
7  told you the color of the weapon that the suspect used,
8  was that something you would document into a GPR?
9       A.   Typically, but not necessarily.
10      Q.   Okay.  If you were interviewing a suspect or a
11 witness and they told you something about the number of
12 suspects, is that something that you would document into
13 a GPR?
14      A.   Again, it -- it all depends on the situation.
15      Q.   Okay.
16      A.   You know, if it -- if it's something simple
17 where I could remember it -- it may not go down on paper
18 at all.
19      Q.   So --
20      A.   Or if I -- or if I thought it was intimidating
21 to the person I'm talking to be writing in front of him,
22 I wouldn't write at all.
23      Q.   Okay.
24      A.   I might write something after I left the room.
25      Q.   If you learned relevant information and you

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

FRE 0747CH Document #: 165 Dockety Casino24 Apage 146 of 629

124

```
 1   didn't document it in a GPR, you would then document it
 2   in a different format; is that correct?
 3       A.   All the information is -- is -- things that
 4   are written on GPRs are -- helps to write a supp.
 5       Q.   Okay.  So what type of stuff would you
 6   typically include in a GPR?
 7       A.   Anything and everything.
 8       Q.   Were GPRs subject to approval?
 9       A.   You know what?  They had a -- an approval line
10   on there, but sometimes, you know, it depends what time
11   period it was, whether they'd actually get approved or
12   not.  There's -- there's a box for somebody to sign, but
13   I -- I believe, but it's not necessarily done.
14       Q.   All right.  After you wrote a GPR in any
15   circumstance, what would you do with it?
16       A.   Well, it would stay with the file.  So I mean,
17   the most important thing was that the GPR would make it
18   to the -- to -- to the formal file.
19       Q.   Okay.  Would you submit it to a supervisor or
20   would you just put it directly into the file?
21       A.   Again, that's something that's changed over
22   the years here and there.  Sometimes -- sometimes there
23   was a -- a -- a -- you did it yourself.  You put it in a
24   formal file.  Other times, you put it in a basket and
25   somebody else was assigned.  That was their job to put
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  files together.  I mean, it kept changing.  So.

2      Q.    What were you doing in 1995?

3      A.    Don't know.

4      Q.    What were you doing in 2002 as it pertains to

5  GPRs?

6      A.    I'm not sure.  But it would -- one way or

7  another, they would make it to the formal file.

8      Q.    Did you ever take notes on your own piece of

9  paper and then transfer that information to a GPR?

10     A.    I don't think so, but I may have.  I don't

11  know.

12     Q.    Do you know if that was an accepted practice?

13     A.    Any notes would go into the file.

14  That's -- that's --

15     Q.    So if you took notes on a non-GPR form, just

16  on a blank sheet of paper, you would put that blank

17  sheet of paper with the notes on it into the file?

18     A.    Yes.

19     Q.    Do you know if there was any Chicago Police

20  Department policy regarding how to write a GPR?

21     A.    Not that I know.

22     Q.    Do you know if there's any Chicago Police

23  Department policy regarding how to submit a GPR?

24     A.    No, not that I know of.

25     Q.    Were you trained on how to write a GPR?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.    No.    It -- it was -- we were told that it was
2    paper to write notes on.
3        Q.    Who told you that?
4        A.    Somebody.    I don't know who.
5        Q.    If you were interviewing a suspect and using a
6    GPR and they told you anything about the suspect
7    themself, would you document that in a GPR?
8        A.    I might.
9        Q.    If you're interviewing a witness to a homicide
10   who said they couldn't see the suspect, would you
11   document that?
12       A.    Sure.
13       Q.    Okay.
14       A.    I mean, if I was going to document it at all,
15   that would be documented.
16       Q.    Okay.
17       A.    I mean, it would -- if I needed to.    Let me
18   put it that way.
19       Q.    Did you make it a regular practice to take
20   notes?
21       A.    For the most part.
22       Q.    And why did you want to take notes as a
23   homicide detective?
24       A.    To help us write the supplementary report.
25       Q.    Okay.    So it was important to take notes in

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  some form, whether it was on a blank sheet of paper or a

2  GPR so that when you went to write the supplementary

3  report, you could be accurate, correct?

4      A.   Yes.

5      Q.   Did Detective Schalk in your experience take

6  notes?

7      A.   Yes.

8      Q.   Okay.  Did you guys ever compare notes when

9  you would interview a suspect or a witness?

10     A.   Well, if -- if one of us might have thought

11 they heard one thing and the other heard -- thought they

12 heard something else, so yeah.  We'd compare.  If

13 necessary.

14     Q.   And during your time as a homicide detective,

15 was Detective Schalk your regular partner?

16     A.   Yes.

17     Q.   Okay.  So did you have occasions to interview

18 witnesses together?

19     A.   Yes.

20     Q.   And did you have occasions to interview

21 suspects together?

22     A.   Yes.

23     Q.   When you were interviewing a witness with

24 Detective Schalk, would you both take notes or would you

25 choose one person to take notes?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

128

 1      A.   He was a better note taker than me.

 2  My fingers are kind of slow and clunky, but we

 3  could -- it -- it could be either.

 4      Q.   Okay.

 5      A.   Either we could both be writing down things

 6  or -- or just one of us.

 7      Q.   As a regular practice though, was Detective

 8  Schalk the primary detective who took the notes?

 9      A.   I -- I'd say if -- if you were to say who took

10  the most notes, I would say it was Detective Schalk

11  because he had a quicker hand.

12      Q.   Okay.  Were there ever any circumstances when

13  you were interviewing a witness or a suspect for that

14  matter, where you would specifically refrain from taking

15  notes?

16          MR. STEFANICH:  Objection.

17      A.   Well --

18          MR. STEFANICH:  Been asked and answered.

19      But --

20      A.   Yeah.  Not that -- not that I specifically

21  remember, but just in general practice, if it looked

22  into -- if -- if we thought it was intimidating to the

23  person that we're talking to, we may not take notes.

24  BY MR. STARR:

25      Q.   What basis would you have to think that taking

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1   notes would intimidate somebody?

2       A.   Just the way they act.  It's -- there's

3   nothing I can really describe.

4       Q.   Do you have any independent recollection of

5   interviewing a witness who you felt like it would be

6   intimidating if you took notes?

7       A.   I -- I can't recall.

8       Q.   Okay.  Do you know whether or not that ever

9   actually happened in your career?

10      A.   I know there's times we don't take notes,

11  didn't take notes.  But, you know, maybe -- maybe notes

12  were taken a little while longer when you left a person.

13  A little while after, I should say.

14      Q.   Okay.  So other than circumstances where you

15  were interviewing someone and you felt like you may

16  intimidate them, and because of that you refrain from

17  taking notes, what other circumstances can you think of

18  where you refrain from taking notes while you're

19  interviewing someone?

20      A.   I don't know.  I -- I -- I can't -- I can't

21  answer.  Every -- every interview is different.  Every

22  case is different.

23      Q.   How soon after taking notes would you submit

24  them to the file?

25      A.   I'm not sure.  It -- it should be right away,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  but I guess sometimes they could be held because --

2  until the reports are written.

3      Q.   So there was circumstances where you would

4  take notes during an interview that you conducted, and

5  then you would not submit those notes to the file until

6  after you actually wrote the supp report?

7      A.   Yeah, because that's -- those are the helps we

8  need to write the supp report.

9      Q.   Okay.  And then in terms of your time as a

10 homicide detective, were you familiar with any policy

11 that was in place governing how to conduct an interview?

12     A.   Policy?

13     Q.   Yeah.

14     A.   Not that I'm -- not that I remember.

15     Q.   Okay.  Was there any particular practice that

16 you would follow regarding interviewing?

17     A.   Any particular practice?  No.

18     Q.   Okay.  Do you know if there's any rules or

19 regulations that govern how a homicide detective

20 conducted an interview?

21     A.   If there is, I don't recall.

22     Q.   Was it a primary part of a homicide

23 detective's job to conduct interviews?

24     A.   Yes.

25     Q.   Okay.  How does a homicide detective determine

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   who to interview?

2       A.    Depending on what the case was.  Depending

3   where the case took you.

4       Q.    So would you always interview any witnesses to

5   a homicide?

6       A.    Yes.

7       Q.    Okay.  Would you always interview the suspect

8   in a homicide or attempt to interview a suspect in a

9   homicide?

10      A.    Yes.

11      Q.    Okay.  Where did you commonly conduct your

12  interviews as a homicide detective?

13      A.    Could be anywhere.  Could be on the street,

14  could be at their home.  Could be in the -- in the

15  office.

16      Q.    Okay.  If you interview a suspect or a witness

17  in the police station at Area 5, where would you conduct

18  the interview?

19      A.    In one of the interview rooms, typically.

20      Q.    Okay.  Would you ever record interviews that

21  you conducted with witnesses or suspects?

22      A.    Toward the end of my career, there were

23  suspect recordings.  Not yet witnesses, I believe.

24      Q.    Was that an audio recording?

25      A.    I think it was -- I think it was video.



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q.    When did that practice start?

2      A.    Again, toward the end of my career.

3   I -- I retired in '06 and I wasn't really -- some --

4   somebody else would have to help me on those because of

5   the technicality of it.

6      Q.    During your career, whether it was at the end

7   or not, did you conduct interviews of the suspects that

8   were recorded?

9      A.    I can't recall.

10      Q.    Is a homicide detective expected to share the

11   information they learn when they conduct an interview

12   with other police personnel that are part of the case?

13      A.    It wouldn't be uncommon.

14      Q.    Was there an expectation that you share that

15   information with the rest of the police personnel that

16   are assigned to that case?

17      A.    That are assigned to it?

18      Q.    Yeah.

19      A.    Oh, absolutely.

20      Q.    Okay.  Was it an expectation that you would

21   share the information you learned during interviews with

22   your supervisor?

23      A.    Yes.

24      Q.    Okay.  Was there an expectation you would

25   share the information you learned during interviews with

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   your partner?

2       A.   With your partner?

3       Q.   **Yeah.**

4       A.   Sure.

5       Q.   **Okay.  And did you make a practice of doing**

6   **that?  Sharing the information with your partner that**

7   **you learned?**

8       A.   Constantly.

9       Q.   **Okay.  Did you make it a practice to share the**

10  **information you learned during interviews with your**

11  **supervisors?**

12      A.   Not necessarily.

13      Q.   **Okay.  In what circumstances would you not**

14  **share the information you learned during an interview**

15  **with a supervisor?**

16      A.   If they didn't ask.

17      Q.   **So would you --**

18      A.   I mean, if -- if it was something -- I mean,

19  it was just general conversation basically, you know?

20  And it was --

21      Q.   **Would you only share information you learned**

22  **during the course of interviews with your supervisors if**

23  **your supervisors sought that information out?**

24      A.   Yes.  Unless we thought they should know

25  something.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-8 Filed: 05/06/25 Page 136 of 267

```
 1       Q.   Can you think of any circumstance where a

 2  detective does not have to formally document relevant

 3  information they learn during the course of an

 4  interview?

 5            MR. STEFANICH:  Objection.  Form.  You can

 6      answer.

 7       A.   Not that I can think of.

 8  BY MR. STARR:

 9       Q.   Okay.  Along the same lines of Chicago Police

10  Department policies and your practice, I want to ask you

11  some questions about identification procedures.

12  Do you know what I mean when I refer to identification

13  procedures?

14       A.   Well, I guess so.

15       Q.   What's your understanding of the term

16  identification procedures?

17       A.   What do you do when someone's identified.

18       Q.   Okay.  So commonly I'm talking about lineups

19  and photo arrays and any other procedure that the police

20  may engage in in order to see if a witness can identify

21  somebody.  Does that make sense?

22       A.   Yes.

23       Q.   Okay.  Were there any policies in place that

24  you were familiar with in the Chicago Police Department

25  in 1995 regarding how to conduct identification
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-8 Filed: 05/06/25 Page 137 of 267

135

```
 1   procedures?

 2        A.   Policies?  I -- I don't recall what the

 3   policies were.

 4        Q.   Do you know if there were any rules or

 5   regulations governing how you could or could not conduct

 6   an identification procedure in 1995?

 7        A.   Well, I would -- you would follow procedures

 8   that would be good for the -- the criminal trial.

 9        Q.   What do you mean by that, sir?

10        A.   Well, the -- the courts would -- we would -- I

11   would -- it was again, on the job training basically.

12   And the courts -- the courts would determine what we

13   would need to do.

14        Q.   What do you mean by that?

15        A.   Or not do.

16        Q.   I'm just not following.  What do you mean the

17   courts would determine what you could and couldn't do?

18        A.   Well, I -- I believe there's precedents

19   in -- in various cases where identifications are

20   questioned or approved.

21        Q.   Okay, let me ask you this: What precedents are

22   you referring to?

23        A.   Identification.

24        Q.   Yeah.  What precedents?

25        A.   Any.  Any -- anything.
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q.   Okay.  Are you --
 2        A.   Anything regarding identifications.
 3        Q.   Are you specifically familiar with any
 4   precedent that governs how the Chicago police can
 5   conduct an identification procedure?
 6        A.   No, but I just knew what -- what we had always
 7   done, and it was fine in court, and that was what I had
 8   learned.
 9        Q.   Okay.  And what was it that you always did
10   when you did identification procedures?
11        A.   You have to be more specific than that.
12        Q.   You just said that.  Let me ask you this:
13   What was your practice regarding how to conduct
14   identification procedures?
15        MR. BURNS:  Objection to form of the question.
16        A.   What was my practice?  To which form of
17   procedure are you -- which form of identification?
18        MR. BURNS:  Objection.  I think part of it's
19     been asked and answered earlier, but you can answer
20     again.
21        A.   Can you ask the question again, please?
22   BY MR. STARR:
23        Q.   Sure.  All right.  Let me break it down a
24   little bit for you.  When you conducted a photo array
25   with a witness to a homicide, what was your general
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   practice?

2       A.   To gather a number of photos that were similar

3   in looks of -- of your person of interest before

4   you -- and show it to witness.

5       Q.   And where would you gather those photos from?

6       A.   Could be from the internet -- I mean, from the

7   internet or from files, police files, anywhere you can

8   get them from.

9       Q.   Okay.  And what criteria would you have to

10  determine which photos to choose?

11      A.   Just similar looking photos.

12      Q.   Okay.  Where were the places that you said the

13  internet, where would you get photos from the internet

14  to use in a photo array?

15      A.   You know what?  Internet is probably not

16  the -- the right phrase.  Computer files that we had

17  access to.

18      Q.   What computer files did you have access to?

19      A.   You know what?  I don't -- I -- I don't recall

20  what they're called anymore.  The police -- you know,

21  this police could be IDOC, could be Cook County Jail,

22  could be Chicago Police Department photos.

23      Q.   Okay.  So as part of your practice when you

24  did photo arrays, you would get photos from IDOC; is

25  that correct?

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       A.    It is.  We have done that, but it's
2  typically -- typically, no.  It's typically -- typically
3  from the police department photos.
4       Q.    Okay.  We'll get to the police department
5  photos.  How would you get photos from IDOC?
6       A.    There's -- there was a computer link to that.
7       Q.    So you would go to the IDOC website,
8  and that -- just tell me what the practice was?
9       A.    Yeah, I don't think -- it wasn't -- we didn't
10 use it -- at -- as a regular basis, but we had used it.
11 I think there is a -- an IDOC website.
12      Q.    Okay.  In what circumstances would you go to
13 the IDOC website in order to get photos to use in a
14 photo array?
15      A.    I -- it could depend on the situation,
16 I guess.
17      Q.    What types of situations would it take for you
18 to decide to use the IDOC website to get photos for a
19 photo array?
20      A.    Well, I can't -- I can't say a particular
21 thing.  I know on this case we did.
22      Q.    Okay.
23      A.    And it is probably because we were already
24 looking at IDOC photos for our suspect.
25      Q.    And that was in 1995, correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     A.    No.

2     Q.    What time period are you referring to then

3  when you said you were already looking at IDOC photos

4  for your suspect?

5     A.    In 2002.

6     Q.    Okay.  What other circumstances -- strike

7  that.  In what other cases did you use the IDOC website

8  to retrieve photos to use in a photo array besides this

9  one?

10    A.    I don't recall any others.

11    Q.    Okay.

12    A.    There may have been, but I don't recall.

13    Q.    Why were you using the IDOC website to look

14 for photos to use in a photo array in this case?

15    A.    I'm not -- I'm not sure about that.  You know,

16 I can't remember exactly why they were chosen -- they

17 were picked out of there, but I can't recall.

18    Q.    All right.  You said that the other place that

19 you may look for photos to use, or the other place that

20 you did get photos from to use, in a photo array was the

21 Cook County Jail; is that correct?

22    A.    I think we had in the past, yes.

23    Q.    Okay.  How would you go about getting photos

24 from the Cook County Jail to use in a photo array?

25    A.    I think there was a -- a -- a website to go to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    there also, or a -- or there may have been a main way to

2    get in for police department.  I'm not sure anymore.

3         Q.    What cases did you use the Cook County Jail

4    website to retrieve photos to use in a photo array?

5         A.    I have no idea.

6         Q.    Okay.  Do you have any specific recollection

7    of using the Cook County Jail website to retrieve

8    photos?

9         A.    Not specific, no.

10        Q.    Let me just finish the question before you

11   answer it.

12        A.    Okay, I thought you were done.

13        Q.    Do you have any specific recollection of using

14   the Cook County Jail website to retrieve photos to use

15   in a photo array?

16        A.    No specific recollection, no.

17        Q.    And then you also said that you would get

18   photos from the Chicago Police Department to use in

19   photo arrays.  What was that process?  Describe that for

20   me.

21        A.    Well, those Chicago Police Department photos

22   are around a lot in -- in -- in the detective --

23   detective areas, or -- and you can order them.

24   You -- you can just put an IR number and order a photo.

25   So these photos are available all the time, quite often.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1     Q.   What type of photos are available via the

2  Chicago Police Department, in your experience?

3     A.   They're -- they're photos from arrests.

4     Q.   Okay.  So like booking photos?

5     A.   Uh-huh.

6     Q.   Okay.  Any other types of photos the Chicago

7  Police Department had that you would retrieve to use in

8  photo arrays?

9     A.   I think -- no.  I -- not -- not that I can

10  think of right now.

11     Q.   Okay.  In what circumstances would you choose

12  to use photos from the IDOC website over using photos

13  from the Chicago Police Department?

14     A.   Again, I don't -- I don't recall the -- the

15  reason that was done.

16     Q.   Can you think of a scenario where you would

17  want to use IDOC photos as opposed to Chicago Police

18  Department photos?

19     A.   I -- I know, at that time, there was -- I

20  think those photos were all named Dixon.  I don't know

21  what we were thinking at the time that there was a

22  better thing that our -- our suspect had an alias of

23  Dixon when he was in the penitentiary, and I think maybe

24  we thought it was a -- a good idea to keep all -- all

25  our photos saying Dixon.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   Okay.  So you --

2    A.   As long as we were going to use his photo.

3    Q.   So you're talking about, in this case, using

4  photos that you retrieved from the IDOC website, and all

5  of the people in the photographs had the last name of

6  Dixon; is that correct?

7    A.   Yes.

8    Q.   And so was it normal to do a photo array where

9  everybody in the array had the same name?

10   A.   It wasn't normal at all, no.

11   Q.   Well, in what circumstances could you do a

12  photo array where everyone had the same name?

13   A.   Well, you could do it anytime you want.

14   Q.   What other cases have you done a photo array

15  where all of the people in the photo array had the same

16  name?

17   A.   I can't recall of any -- any.

18   Q.   Was it a proper procedure to do a photo array

19  with people who had the same name?

20       MR. STEFANICH:  Objection.  Form and

21    foundation.  You can answer.

22   A.   I thought I just answered it.  No.

23  BY MR. STARR:

24   Q.   Okay.  So it was your intention in this case

25  to do a photo array with everyone who had the same name

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    of Dixon; is that correct?

2        A.   I don't remember -- recall specifically what

3    the intention was, but that's -- that's what was on

4    there, and there's a good chance that's -- that's what

5    it was, because we did use his picture from IDOC, so we

6    felt we needed all IDOC pictures.

7        Q.   How come?

8        A.   Just so one didn't stick out from the others.

9        Q.   Okay.  What other people from IDOC did you use

10   their photos in a photo array in this case?

11       A.   People that name -- were named Dixon.

12       Q.   Okay.  Do you know what their first or last

13   name other than Dixon was?

14       A.   I have no idea.

15       Q.   Okay.  How did you decide to use IDOC photos

16   of people named Dixon in this case?

17       A.   I -- again, I'm not positive of why we did it,

18   but I can only guess that because they're all named

19   Dixon and we wanted to use IDOC photo of our suspect,

20   so we should have all IDOC photos, so we -- that's what

21   we did.

22       Q.   What other criteria did you use besides the

23   name Dixon and being an IDOC photo to determine what

24   photos to use in that photo array that you're talking

25   about?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JEROME BOGUCKI, taken on April 14, 2023

 1      A.   Similar looking people.

 2      Q.   Okay.  What photo array are you talking about

 3 right now?

 4      A.   The one shown in -- to three different people

 5 in 2002.

 6      Q.   Okay.  So in the 2002 photo array, you used

 7 photos from IDOC; is that correct?

 8      A.   Yes.

 9      Q.   And you used six photos in that photo array?

10      A.   I think it was seven.

11      Q.   Seven photos?  Okay.  And they were all photos

12 that you got off the IDOC website?

13      A.   Yes, one of us did.

14      Q.   Do you know whether it was you or your partner

15 that retrieved the photos?

16      A.   I do not.  I don't know.

17      Q.   Okay.  What was the policy regarding how to

18 document a photo array?

19           MR. STEFANICH:  Objection.  Form.

20           MR. BURNS:  Foundation.

21 BY MR. STARR:

22      Q.   Let me re-ask it.  What was the Chicago Police

23 Department policy governing how to document a photo

24 array in 2002?

25      A.   If you get a positive identification or even a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  tentative identification, the photo should be

2  inventoried.

3       Q.    So was it a Chicago Police Department policy

4  requirement that you document positive photo arrays as

5  well as negative photo arrays in 2002?

6       A.    We were not required to -- at -- at least at

7  that time, we weren't required to inventory negative

8  photo arrays.

9       Q.    Did you make it a practice to inventory

10 negative photo arrays in 2002?

11      A.    We did not.  We did not.

12      Q.    Were you required to generate a police report

13 of some sort whenever you conducted a photo array,

14 whether it was positive or negative?

15      A.    Yes.

16      Q.    Were you required to document what fillers

17 were used in police reports?

18      A.    Not for negative.

19      Q.    Okay.  So in 2002, were you required to

20 document what fillers were used in photo arrays that you

21 conducted where there was a positive identification?

22      A.    The inventory would speak for itself,

23 and -- and as far as the names of the -- of the people

24 on the photos?

25      Q.    Yeah, and maybe you didn't understand my

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    question.  I'm going to rephrase it.  I'm not asking for
2    what the inventory would say.  I'm asking for what your
3    testimony is.  In 2002, were you required to document
4    the names of the fillers that you used when you did a
5    photo array and got a positive identification?
6         A.   Not to my --
7              MR. STEFANICH:  Just going to object to the
8         form.  I think there's a miscommunication on
9         documenting something.  I think that's where maybe
10        the issue is, but object to the form.  You can
11        answer.
12        A.   Document how?
13   BY MR. STARR:
14        Q.   In a police report.
15        A.   The names of the people on the photos?
16        Q.   Let me ask it again.  In 2002, were you
17   required to document the names of the fillers that you
18   used in a photo array when you got a positive
19   identification in a police report?
20        A.   No.
21        Q.   Okay.  In 2002, were you required to retain
22   the photos that you used of the fillers when you got a
23   positive identification?
24        A.   Yes.
25        Q.   What did you do with the photos when you did a
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  photo array in 2002 and got a positive identification?

2  What was your practice?

3      A.   Like I said before, inventory the photos into

4  evidence.

5      Q.   In this case, when you conducted a photo array

6  in 2002, did you get a positive identification?

7          MR. STEFANICH:  Objection.

8      A.   Yes.

9          MR. STEFANICH:  Asked and answered.  You may

10     answer.

11 BY MR. STARR:

12     Q.   In the three different photo arrays that you

13 conducted in 2002, you got a positive identification,

14 correct?

15     A.   Yes.

16     Q.   Okay.  Who did you do the first photo array

17 with?

18     A.   Terry Rogers.

19     Q.   Okay.  When did you do that photo array?

20         MR. STEFANICH:  Objection.  Asked and answered.

21     You can answer.

22     A.   It was February of 2002.

23 BY MR. STARR:

24     Q.   Okay.  And you used the IDOC photos for that

25 photo array, correct?

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1       A.    Yes.

 2       Q.    Okay.  And what did you do with those photos

 3  after you did that photo array?

 4       A.    They were kept until we were done using them.

 5       Q.    What do you mean until you were done using

 6  them?

 7       A.    Well, we had other people to show photos to.

 8       Q.    So after you did a --

 9       A.    Eventually.

10       Q.    -- you did a photo with Terry Rogers in

11  February of 2002, what did you do with the photos?

12       A.    They were kept in our possession.

13       Q.    Okay.  And in that photo array in 2002, who

14  did Terry Rogers identify?

15       A.    Mr. Fletcher.

16       Q.    Okay.  James Fletcher?

17       A.    He called him Jimmy Fletcher.

18       Q.    Okay.  Who was the second photo array that you

19  did?

20       A.    Shanee Friend.

21       Q.    Okay.  And when was that?

22          MR. STEFANICH:  Objection.  Asked and answered.

23       A.    That was in the following month.

24  BY MR. STARR:

25       Q.    Okay.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     A.   That was in March.

2     Q.   **March of 2002?**

3     A.   Yeah.

4     Q.   **And did you use the same photos that you used**

5 **in the February 2002 photo array with Terry Rogers in**

6 **the March 2002 photo array with Shanee Friend?**

7     A.   Yes.

8     Q.   **And what did you do with those and did Shanee**

9 **Friend make a positive identification?**

10    A.   Yes.

11    Q.   **Who did she identify?**

12    A.   Oh, I'm sorry.  Shanee -- I take -- she was

13 the third person that saw those photos.  Edward Cooper

14 had seen photos after speaking to Terry Rogers.

15    Q.   **Edward Cooper spoke to Terry Rogers?**

16    A.   No -- no -- no.  We showed photos to photo

17 group -- that same photo group.  We showed that to

18 Edward Cooper after speaking -- speaking with Terry

19 Rogers.

20    Q.   **Okay.  So you did three photo arrays.  The**

21 **first one you did with Terry Rogers, the second one you**

22 **do with Edward Cooper?**

23    A.   Yes.

24    Q.   **And where was that photo array conducted with**

25 **Edward Cooper?**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.    I believe that was at his home.

2    Q.    And what photo did you use in that photo

3  array?

4    A.    The same one that we were -- have been

5  speaking of.

6    Q.    Okay.  And did Mr. Cooper do a positive

7  identification in 2002?

8        MR. STEFANICH:  Objection.  Asked and answered.

9    A.    Again, he did a tentative identification,

10  saying he wasn't sure.

11  BY MR. STARR:

12    Q.    Okay.  And then you went and did a photo array

13  with Ms. Friend after that, correct?

14    A.    Sometime after that, not the next month.

15    Q.    And you used those same set of photos?

16    A.    Yes.

17    Q.    Okay.  So the actual physical photos that you

18  used in the first photo array are the same photos you

19  used for the second and third?

20    A.    Yes.

21    Q.    You didn't print new copies each time?

22    A.    No.

23    Q.    Okay.  After you did the third photo array,

24  what did you do with the photos that you used in the

25  three photo arrays?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

    1        A.   After the -- after the third one, they were
    2   inventoried.
    3        Q.   Okay.  Was a photo of Mr. Fletcher in that
    4   inventory?
    5        A.   Yes.
    6        Q.   Okay.  And do you recall the names of any of
    7   the other people that were in the photographs?
    8        A.   Dixon.
    9        Q.   Okay, but no first names?
   10        A.   No.
   11        Q.   Okay.  And why did you choose to -- strike
   12   that.  Let's take a water break.  Five minutes?
   13             MR. STEFANICH:  Yep.
   14             MR. BURNS:  Sure.
   15             THE VIDEOGRAPHER:  We are off the record.
   16              (OFF THE RECORD)
   17             THE VIDEOGRAPHER:  We are back on the record
   18        for the deposition of Jerome Bogucki.  My name is
   19        Kortney Chase.  Today is April 20, 2023.  The time
   20        is 1:38 p.m.  Central Time.
   21             MR. BURNS:  What time is it?
   22             THE VIDEOGRAPHER:  1:38 p.m.
   23             MR. STEFANICH:  It's got to be 2:38, right?
   24             THE VIDEOGRAPHER:  2:38 p.m.
   25   BY MR. STARR:

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q.   Okay.  Mr. Bogucki, as an area five detective,

2    did you ever suggest to a witness who they should pick

3    from a photo array?

4     A.   No.

5     Q.   Why not?

6     A.   Because it's not the right thing to do.

7     Q.   In addition to not being the right thing to

8    do, would it be improper under the Chicago Police

9    Department's policies and practices?

10     A.   I'm sure it is.

11     Q.   Okay.  Any other reason you can think of why

12    it would it be improper to do that?

13     A.   You'd lose the identification in court.

14     Q.   Okay.  Is it also possible that you could

15    implicate the wrong person?

16     A.   That I didn't -- what?

17     Q.   My question before was did you ever suggest to

18    a witness who they should pick out from a photo?

19     A.   No.

20     Q.   Right, and you said no.  And I'm wondering if

21    one of the reasons why you would never want to do that

22    is because you can potentially implicate the wrong

23    suspect?

24     A.   Oh, it sure could.

25     Q.   Okay.  Did you ever write any false report of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    an eyewitness identification procedure?

2        A.    No.

3        Q.    Did you ever fail to document -- strike that.

4    If a witness pointed out somebody who you thought was

5    not the suspect, what would you do?

6        A.    If a witness pointed out someone that was not

7    a suspect?

8        Q.    Yeah.

9        A.    It would -- it would be forgotten.

10       Q.    You wouldn't document it?

11       A.    You -- you would document that it was a -- it

12   was a negative lineup.

13       Q.    I thought you said you didn't document

14   negative lineups though?

15       A.    No -- no, I said I did an inventory.

16            MR. STEFANICH:  Objection.  Misstates his prior

17       testimony.  You can answer.

18       A.    I said I did an inventory negative lineups.

19   BY MR. STARR:

20       Q.    Okay.  So was it your practice if you did a

21   photo array and a witness identified somebody who you

22   didn't have as a suspect, you would document that fact?

23       A.    Not necessarily.  It would just be a negative

24   lineup.

25       Q.    Okay.  How would you document a negative

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   lineup?

2      A.   That it was a negative lineup.  That the --

3   the -- the witness failed to identify anyone.

4      Q.   Okay.  So you would include that information

5   in a report, but you wouldn't include who the witness

6   identified, correct?

7      A.   Correct.

8      Q.   Okay.  Were you ever trained that you should

9   not show up to a photo array with just a single photo

10  and ask a witness if they could identify that person?

11     A.   As far as trained, on-the-job training.  I

12  know that's -- that's -- that's an immediate loss

13  in -- in court.

14     Q.   So how did you learn that in on-the-job

15  training?

16     A.   Actually, you can do that under a

17  circumstance -- certain circumstance.

18     Q.   What circumstances can you do that?

19     A.   You can do that when the person knows the

20  other person.

21     Q.   Okay.

22     A.   You say, "Is this a person that you know?"

23  You can do that.

24     Q.   Have you done that in your career?

25     A.   I think so --

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

155

1     Q.  So if a witness told you they knew who the

2  suspect was, it was your understanding that you could

3  retrieve a photo of that suspect and show that

4  individual photo to that witness, correct?

5     A.  Just for purposes of saying -- asking him,

6  "Is this the person you're referring to?"

7     Q.  Okay.  Did you do that in this case?

8     A.  No.

9     Q.  Okay.  Why not?

10     A.  We wanted -- first of all, we want to make

11  sure that he's giving us the right information.

12     Q.  He being who?

13     A.  I'm sorry, that would be Rogers, Terry Rogers.

14     Q.  Okay.  So your previous testimony that Terry

15  Rogers told you that he knew Mr. Fletcher, correct?

16     A.  Right.

17     Q.  And so why did you not show Mr. Rogers an

18  individual photo of Mr. Fletcher to confirm that that

19  was the person he knew to be Mr. Fletcher?

20     A.  We probably could have.

21     MR. STEFANICH:  Objection.  Asked and answered.

22  You can answer.

23     A.  We could have, but did not.

24  BY MR. STARR:

25     Q.  Why did you choose not to do so?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.   Because we wanted to make sure he was telling

2   us the right story.

3    Q.   Okay.  And you knew, as a seasoned Chicago

4   Police Detective, that identification procedures were an

5   important part of a prosecution, correct?

6    A.   Yes.

7    Q.   Okay.  And you knew that it was important to

8   do them properly because if you did them improperly,

9   they could jeopardize the prosecution, correct?

10    A.   Correct.

11    Q.   Okay.  And you knew that pointing out

12   a photo -- strike that.  You knew that showing a witness

13   an individual photo would be an inherently unreliable

14   identification, correct?

15       MR. STEFANICH:  Objection.  Form.  Foundation.

16     Asked and answered.  You can answer.

17    A.   It would be a very -- yes, it would be

18   improper, totally improper.

19   BY MR. STARR:

20    Q.   And in this case, you didn't show Terry Rogers

21   an individual photo because you were concerned that it

22   would be an unreliable identification?

23    A.   We wanted to make sure of his reliability.

24    Q.   Okay.  So is that a yes?

25       MR. STEFANICH:  Objection.  Form.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      A.    That was my answer.

 2   BY MR. STARR:

 3      Q.    Did you -- strike that.  You said you could

 4   have shown Mr. Rogers an individual photo, in your

 5   opinion, in this case of Mr. Fletcher?  That would've

 6   been okay in your opinion, correct?

 7      A.    It could have been okay, let me put it that

 8   way.

 9      Q.    Okay.

10      A.    I -- I'd rather we -- we decided it was

11   a -- best to show a photo array.

12      Q.    And you didn't show him a single individual

13   photo of Mr. Fletcher because you thought that would be

14   unreliable in terms of identification, correct?

15          MR. STEFANICH:  Objection.  Asked and answered.

16      You can answer again.

17      A.    It's -- it was possible it could have been

18   unreliable, but we wanted to make sure.

19   BY MR. STARR:

20      Q.    Were you ever trained that you should not

21   improperly or unduly influence an identification

22   procedure that you were conducting?

23      A.    Yes.

24      Q.    When were you trained on that subject?

25      A.    I have no idea.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  Q. Did a supervisor ever instruct you to not

2 unduly influence an identification procedure?

3  A. It's -- it's some -- it's something that

4 doesn't need instruction.

5  Q. Why not?

6  A. Because it's -- you know what the right thing

7 to do is.

8  Q. And you never in your career improperly

9 influenced a witness in an identification procedure; is

10 that correct?

11  A. Never did.

12  Q. As the Chicago Police Department Area 5

13 detective, did you ever witness another police officer

14 suggest to witness who they should pick from a photo

15 array?

16  A. No.

17  Q. As an Area 5 Chicago Police Detective, did you

18 ever witness another police officer unduly influence any

19 kind of identification procedure involving a witness?

20  A. No.

21  MR. STEFANICH: Objection. Form.

22 BY MR. STARR:

23  Q. I'm going to show you what I'm going to mark

24 as Exhibit number 1.

25   (EXHIBIT 1 MARKED FOR IDENTIFICATION)

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1            THE REPORTER:  You've done this exhibit.
 2    BY MR. STARR:
 3         Q.    Oh, you're right.  I forgot I gave you those.
 4    Bear with me here.  My exhibits are a little out of
 5    order.  Sorry about that.  It's been a while since I've
 6    done an in-person depo, they're all on Zoom and it's a
 7    lot easier to just pull the document up.  Here you go,
 8    sir.  This is what I'm going to mark as Exhibit number
 9    1, and for the record, it's Bates City-JF-164.  Take a
10    moment to review that, please, sir.
11         A.    Okay.
12         Q.    Did you have enough time to look at that, sir?
13         A.    I see them.
14         Q.    Okay.  Have you seen this document before,
15    sir?
16         A.    Yes.
17         Q.    Did you review this document in preparation
18    for today's deposition?
19         A.    I believe I saw this picture, yeah.
20         Q.    Okay.  So this is not a police report,
21    correct?
22         A.    No, this is a photo.
23         Q.    Okay.
24         A.    A copy of a photo.
25         Q.    Right.  And so earlier, when I asked you what
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    you reviewed in preparation for today's deposition, you

2    talked about police reports.  You also reviewed this

3    particular photo, correct?

4        A.   Yes.

5        Q.   Okay.  Did you review any other photos in

6    preparation for today's deposition?

7        A.   I looked at whatever was in the file.

8        Q.   All right.  For the record, can you tell me

9    what this photograph is, sir?

10       A.   It's an Illinois Department of Corrections

11   photo of Arnold Dixon.

12       Q.   Okay.  And do you see -- is there any

13   identifying information on this photograph as to who

14   retrieved this photo?

15       A.   Not that I see.

16       Q.   Is this the IDOC photo that you retrieved of

17   James Fletcher, or in this case it says his name is

18   Arnold Dixon, in 2002 when you were doing the photo

19   array?

20       A.   One of us did, yeah.

21       Q.   Okay.  Do you don't know if you printed this

22   off the IDOC website or --

23       A.   I do not.

24       Q.   -- or if your partner did?  Okay.  And do you

25   know when this photo was retrieved from the IDOC

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    website?

2    A.   I believe it was right after talking to Terry

3    Rogers in 2002.

4    Q.   Okay.  And who did you show this photograph

5    to, sir?

6    A.   We showed this -- these -- this was part of a

7    group that was shown to the three people we were talking

8    about earlier.

9    Q.   The three witnesses that you talked about

10   earlier, is that what your testimony is?

11   A.   Yes.

12   Q.   Okay.  And this is the form of the photograph

13   that's shown to the individuals?

14   A.   I'd have to see the inventory to be sure what

15   form it was.

16   Q.   And did you show this to Terry Rogers on

17   February 12, 2002?

18   A.   I think so -- I think that was the date, yes.

19   Q.   So it's your testimony that this is the IDOC

20   photograph of Mr. Fletcher that you use in your photo

21   array, correct?

22   A.   I believe it is.

23   Q.   Okay.  Do you have an independent recollection

24   of that?

25   A.   If I saw the inventory, I could be sure.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   Okay.  Well, I'm asking if you have an

2  independent recollection of this photograph as being the

3  photograph that you showed the witness --

4    A.   Every -- everything's according to reports in

5  the file.

6    Q.   Okay.  We were just talking over each other a

7  little bit.  I just want to make sure that the record's

8  clear, okay?  You started answering before I was done

9  with my question.  I just want to make sure that we get

10  a clear record.  So do you have an independent

11  recollection of whether or not this is the photograph

12  that you retrieved from the IDOC website and showed to

13  the witnesses in this investigation?

14         MR. STEFANICH:  Objection.  Form.

15    Mischaracterizes prior testimony.  You can answer.

16    A.   If I saw the inventory, I'd be sure.

17  BY MR. STARR:

18    Q.   But as you sit here today, you're not sure?

19    A.   I can't -- I can't be sure, because I don't

20  see the inventory.

21    Q.   Okay.  And is it improper to show -- strike

22  that.  During a Chicago Police Department photo array,

23  would it be improper to show a witness a photograph with

24  any additional identifying information about the

25  individual in the photograph?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     A.   You know what?  It's -- it had never come up,

2  so I -- I can't say it's improper.

3     Q.   Okay.  But in this case, you did it, correct?

4     A.   In this case, it looks like we did.

5     Q.   Okay.  Did you ever do it in any other case

6  besides this one?

7     A.   I don't remember that, no, I don't recall ever

8  doing it.

9     Q.   Okay.  You can keep that to your side there

10  for a second.  We're going to look at it again, but I'm

11  going to show you some other documents here, sir, and as

12  I get these other documents together, just to make, make

13  sure the record is clear.  So in this case, you showed

14  the three witnesses, Mr. Rogers, Mr. Cooper,

15  and Ms. Friend, this photograph as it's constituted

16  today, correct?

17     A.   It -- it appears to be this photograph. Again,

18  if I saw the inventory, I'd be absolutely sure, but it

19  does appear that way.

20     Q.   Would you have printed it off in black and

21  white or did you have a color printer in 2002?

22     A.   You know what?  I don't know.

23     Q.   Okay.  You have no recollection of whether or

24  not you ever printed anything in color?

25     A.   I -- I -- I don't recall.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q.   Okay.  And the other photographs of the other

2   IDOC people that you allegedly showed these witnesses,

3   they also were similar to this one in the sense that

4   they said Illinois Department of Corrections and they

5   said the inmate number and the name; is that correct?

6      A.   Yes.

7      Q.   Do you think that there's anything improper

8   with showing a witness a photograph during a photo array

9   with the name of the suspect on the photograph?

10         MR. STEFANICH:  Objection.  Form.  You can

11      answer.

12      A.   Certainly not in this situation.

13   BY MR. STARR:

14      Q.   Not in this situation.  It wasn't improper?

15      A.   No, because they're all the same last name and

16   they're all an alias or it's an alias to Mr. Fletcher.

17      Q.   So the fact that this is an alias that Mr.

18   Fletcher used, made it okay for you to show the witness

19   a photograph with the name attached to it?

20      A.   I don't see a problem with it.

21      Q.   Okay.  This next exhibit, I'm going to mark as

22   Exhibit number 2.  And for the record, the Bates is

23   City-JF-4550.  And it's a group exhibit.  It's 4550

24   through 4565.  Here you are, sir.  Take a minute to look

25   through those.  It's a series of photographs.  Let me

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   know when you're done looking at it and we can talk

 2   through a little bit.  Have you had an opportunity to

 3   review them?

 4              (EXHIBIT 2 MARKED FOR IDENTIFICATION)

 5       A.   Okay.  Yeah, I looked at them.

 6   BY MR. STARR:

 7       Q.   Did you review these photographs in

 8   preparation for today's deposition, sir?

 9       A.   I -- I don't know.  They're -- they're not --

10       Q.   You don't recall?

11       A.   No.

12       Q.   If I represent to you, these are photographs

13   from the investigative file, does that refresh your

14   recollection of whether or not you reviewed them in

15   preparation for today?

16       A.   I don't know if I saw these or not.

17       Q.   Okay.  Do you know if you've ever seen these

18   photographs before, sir?

19       A.   I have no -- I -- I don't know.

20       Q.   All right.  Can you identify any of the people

21   in these photographs?

22       A.   It -- I -- I -- I don't know for sure.  No.

23       Q.   Okay.

24       A.   This top one looks like it could be a Polaroid

25   photo.  I -- I'm not sure, but I'm not sure who -- who
```



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  anybody is.

2      Q.   Okay.  Can you tell me, do you know what a

3  Bates stamp is sir?  The number at the bottom here?

4  All the individual --

5      A.   Okay.

6      Q.   -- Bates stamp individual number.  Can you

7  tell me by Bates stamp which of these photos you showed

8  to Mr. Rogers?

9      A.   No, I can't tell you.

10         MR. STEFANICH:  I'm going to object.  Form.

11      Objection.  Form.

12      A.   No, I can't tell you that.

13  BY MR. STARR:

14      Q.   Okay.  Can you tell me by Bates stamp which of

15  these photographs you showed to Mr. Cooper?

16         MR. STEFANICH:  Objection.  Form.  Foundation.

17      You can answer.

18      A.   No, I can't tell you that.

19  BY MR. STARR:

20      Q.   Can you tell me by Bates stamp which of these

21  photographs you showed to Ms. Friend?

22         MR. STEFANICH:  Objection.  Form.  Foundation.

23      You can answer.

24      A.   I don't know if I showed any of these photos

25  to any of these people.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   BY MR. STARR:

2        Q.   Okay.  Can you tell me by Bates stamp any of

3   these photos that you showed to Mr. Wade?

4        A.   I don't think we showed any photos to

5   Mr. Wade.

6        Q.   Okay.  You did not do a photo array with

7   Mr. Wade at any point in time?

8        A.   I'm not recalling that.

9        Q.   It's possible.  You just don't know.

10       A.   No, I don't think I did.

11       Q.   And does seeing these photos refresh your

12   recollection at all about anything you did during the

13   Sorrell investigation?

14       A.   No.

15       Q.   Are any of these photographs, the photographs

16   that you used in any of the photo arrays that you did in

17   2002?

18       A.   No, I believe they're all IDOC photos.

19       Q.   Okay.  So none of these are photographs that

20   you used in your photo array that you did in 2002,

21   correct?

22       A.   I don't believe so --

23       Q.   Okay.  Earlier you testified that Mr. Rogers

24   told you that he knew Mr. Fletcher, correct?

25       A.   Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   Okay.  How did you get the name Dixon?  Where

2  did you get the name Dixon from, sir?

3    A.   Looking through the arrest of James Fletcher,

4  we found that through IR number -- the IR number doesn't

5  change, it's -- it goes with fingerprints. Through the

6  IR number, we found out that he was under the name of

7  Arnold Dixon in the Illinois State Penitentiary.

8    Q.   He was under the name Dixon when he was in

9  prison with Mr. Rogers?

10    A.   No, I didn't say that.

11        MR. STEFANICH:  Objection.

12  BY MR. STARR:

13    Q.   Do you know that?

14        MR. STEFANICH:  Mischaracterizes his testimony.

15    A.   No, I don't.

16        MR. STEFANICH:  Objection.  Mischaracterizes

17    his testimony.  Can you just wait for me to object?

18        THE WITNESS:  I'm sorry.

19  BY MR. STARR:

20    Q.   Do you know whether or not he was under the

21  name Dixon when he was allegedly in prison with

22  Mr. Rogers?

23    A.   No, I don't.

24    Q.   Okay.  And you still thought it was proper to

25  show Mr. Rogers a photo array with his name on it,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  correct?

2       A.   I didn't see a problem, no.

3       Q.   So you don't know whether or not he went by

4  Arnold Dixon when he was in prison with Mr. Rogers,

5  correct?

6       A.   Yeah, if -- if I'm not mistaken, I only saw on

7  his rap sheet Arnold Dixon one time, which would mean

8  the answer would be it wouldn't have been.

9       Q.   Why would that be the answer based on seeing

10 his name Arnold Dixon on the rap sheet one time?

11      A.   Because that's the only time it looked like he

12 used Arnold Dixon.

13      Q.   So he was incarcerated at some point in IDOC

14 under the name Arnold Dixon because you have a

15 photograph in the investigative file with that name,

16 correct?

17      A.   Question is again?

18      Q.   Mr. Fletcher was incarcerated in IDOC with the

19 name Arnold Dixon at some point, because you have a

20 photograph that you testified you've seen and that you

21 used in the investigative file, correct?

22      A.   Yeah, it was current.  The current

23 incarceration.

24      Q.   Okay, so at some point in time Mr. Fletcher

25 was in IDOC with the name Arnold Dixon, correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1       A.    Yes.

 2       Q.    And can you tell me that you unequivocally

 3   know yes or no that during that time that he was

 4   incarcerated under the name Arnold Dixon, he was in

 5   prison with Mr. Rogers?

 6       A.    I -- I can't say that for sure.  No.

 7       Q.    Okay.  So you don't know if Mr. Dixon -- I'm

 8   going to strike that.  You don't know if Mr. Fletcher

 9   was incarcerated under the name Mr. Dixon at the same

10   time he was in prison with Mr. Rogers, right?

11       A.    I do know that Terry Rogers knew his real

12   name, so I don't know if he would be concerned of what

13   name he was under.

14       Q.    That wasn't my question, though.

15       A.    I know.

16       Q.    My question is: You don't know one way or the

17   other if Mr. Fletcher was in prison with Mr. Rogers and

18   was using the name Arnold Dixon, correct?

19       A.    I don't know that for sure, no.

20       Q.    Okay.  And yet you showed Mr. Rogers a photo

21   array with a photograph of Mr. Fletcher with the name

22   Arnold Dixon written on it, correct?

23            MR. STEFANICH:  Objection.  Asked and answered.

24       You can answer again.

25       A.    That's correct.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-8 Filed: 05/06/25 Page 173 of 267

171

```
 1   BY MR. STARR:
 2       Q.   You don't think there's anything improper
 3   about that particular identification procedure?
 4       A.   I don't
 5           MR. STEFANICH:  Objection.  Asked and answered.
 6       You can answer again.
 7       A.   I do not.
 8   BY MR. STARR:
 9       Q.   Did you ever ask Mr. Rogers if Mr. Fletcher
10   had any aliases?
11       A.   No, I did not.
12       Q.   Okay.
13       A.   Not that I recall.  Let me put it that way.
14       Q.   You previously testified that you also did a
15   photo array in 1995, correct?
16       A.   Yes.
17       Q.   What photos did you use for the photo array in
18   1995?
19       A.   Don't have any memory of that.
20       Q.   Who did you show a photo array in 1995?
21           MR. STEFANICH:  Objection.  Asked and answered.
22       You can answer again.
23       A.   Mr. Cooper.
24   BY MR. STARR:
25       Q.   Where was Mr. Cooper when you showed him a
```



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   photo array in 1995?

2       A.   I believe he was at his home.  I could be

3   wrong, but I believe so --

4       Q.   How did you go about retrieving the photos you

5   used for the photo array that you did with Mr. Cooper in

6   1995?

7       A.   I didn't have to retrieve them.  They were in

8   my possession.

9       Q.   How'd they come in your possession?

10      A.   I'm not sure which photos it was.  They were

11  Chicago Police Department photos, though.

12      Q.   So you believe that the photo array that you

13  did in 1995 and had Chicago Police Department photos?

14      A.   I believe so --

15      Q.   Strike that.  Let me ask that --

16      A.   Again, I'm not positive.

17      Q.   My question was poorly phrased.  Let me

18  rephrase it.  I apologize.  It's your testimony today

19  that the photos that you used for the 1995 photo array

20  that you allegedly showed Mr. Cooper were Chicago Police

21  Department photos, correct?

22      A.   I believe so --

23      Q.   How did it come to be that you had those

24  photos in your possession, sir?

25      A.   I have no idea.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.    When did you first interview Mr. Rogers?

2    A.    It would've been in February of 2002.

3    Q.    Did you show Mr. Rogers the same set of

4    photographs that you showed Mr. Cooper in 1995?

5         MR. STEFANICH:  Objection.  Asked and answer.

6    You can answer again.

7    A.    No.

8    BY MR. STARR:

9    Q.    Why not?

10   A.    It was a negative lineup.

11   Q.    Right, but a negative lineup suggests that the

12   witness can identify the person in the lineup, correct?

13   A.    That's correct.

14   Q.    Why would you choose to use different photos

15   to show another witness?  Why wouldn't you use the same

16   set of photos?

17   A.    Because the person that Terry Rogers said was

18   one of the -- the offenders was not in that photo group.

19   Q.    So you're saying that the photo array that you

20   did in 1995 did not include Mr. Fletcher?

21   A.    That's correct.

22   Q.    But you don't remember which photos you used?

23   A.    I remember one photo.

24   Q.    What photo was it?

25   A.    It was somebody named Clinton Fletcher.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   Okay.

2    A.   Or Fletcher Clinton.  I -- I take that back.

3  Fletcher Clinton.

4    Q.   So you used a photograph of somebody named

5  Fletcher Clinton that was a Chicago Police Department

6  photo?

7    A.   I believe it was.

8    Q.   Okay.  But you don't know who any of the other

9  people were in those photos, correct?

10    A.   No, I don't.

11    Q.   Do you know if there's a photograph of

12  Fletcher Clinton in the investigative file?

13    A.   I do not know.

14    Q.   What did you do with the photograph of

15  Fletcher Clinton after you showed Mr. Cooper?

16    A.   I don't know.  It was of no value.

17    Q.   Did you have any obligation to document that

18  photograph or retain that photograph after you showed

19  with Mr. Cooper and he was unable to identify --

20        MR. STEFANICH:  Objection.  Form.

21  BY MR. STARR:

22    Q.   -- Mr. Clinton as the suspect?

23        MR. STEFANICH:  Sorry, Sean.  Objection. Form.

24      You can answer.

25    A.   Are you talking about the 1995?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1    BY MR. STARR:

 2         Q.    Yeah.  The one you just were identifying.

 3         A.    Or Fletcher Clinton?

 4         Q.    Yeah.  Did you have any obligation to document

 5    or retain the photograph of Fletcher Clinton that you

 6    allegedly showed Mr. Cooper in 1995?

 7         A.    We documented that he did not identify him and

 8    did not inventory it.

 9         Q.    You knew that there was -- strike that.  How

10    did you know that someone with the name Fletcher was

11    associated with this case?

12              MR. STEFANICH:  Objection.  Asked and answered.

13         You can answer again.

14         A.    Okay.  In the 1990 investigation as we looked

15    at it, Terry Rogers made a statement that one of the

16    offenders called the other Fletcher.

17    BY MR. STARR:

18         Q.    So you learned that information by reviewing

19    the file when you first got assigned to the case?

20         A.    Yes.

21         Q.    Okay.  And what investigative steps did you

22    take to follow up on that piece of information?

23         A.    Looking for people with the name of Fletcher.

24         Q.    Okay.  How did you look for people with the

25    name of Fletcher?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.    Just through name check avenues that the

2    police department supplied.

3    Q.    Do you know the name of the system that you

4    would use to do a name check for --

5    A.    I can't --

6    Q.    -- for the name Fletcher?

7    A.    I can't remember.

8    Q.    But it was an online or electronic system that

9    you could search by name; is that correct?

10   A.    Yes.

11   Q.    Was it ICAM?

12   A.    I don't know.

13   Q.    Okay.

14   A.    I think in '95, I don't know if ICAM was even

15   around.

16   Q.    Okay.  Any other search engine that you

17   would've used as a Chicago police officer in 1995?

18   A.    Whatever searches were available to us, let me

19   put it that way.

20   Q.    Okay.  Let me show you another exhibit here.

21   This one's easier to find because it's more than one

22   single page.  I'm going to mark this as Exhibit number 3

23   for the record.  It's Bates stamp 86 through 96. Take an

24   opportunity to review that.  I'm going to ask you some

25   questions about it in a second here, sir. Yeah.  When

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  you get a certain age you start talking louder.  It's

2  happening to the best of us.  You have an opportunity to

3  review that, sir?

4          (EXHIBIT 3 MARKED FOR IDENTIFICATION)

5     A.  Yes.

6  BY MR. STARR:

7     Q.  Okay.  And is this one of the name searches

8  you ran on Mr. Fletcher?

9     A.  I -- I don't know who ran it.  Somebody ran

10  it.

11     Q.  Okay.  Have you seen this document before?

12     A.  I think I've saw it in the file.

13     Q.  Okay.  And did you review this in preparation

14  for today's deposition?

15     A.  I think I looked at it.

16     Q.  Is this a Chicago Police Department name

17  search document?

18     A.  It's some type of name search document, yeah.

19     Q.  And are you familiar with Chicago Police

20  Department search engine enough to know to say that this

21  is a document that looks like what a Chicago police

22  search engine --

23     A.  Yes, it is.  It's -- it's a search engine we

24  were ac -- had access to.

25     Q.  Okay.  So this is a name search of Fletcher

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   that was done in 1995 when you started on the case?

2      A.  I don't know when this is from, there's no

3   date on it.  It's a good bet, but I don't know.

4      Q.  It's a good bet that this is a name search

5   that was done.

6      A.  It -- it's -- it's -- it's got to be for

7   either.  I -- I don't know.

8      Q.  Let me just finish my question.

9      A.  I -- okay.

10      Q.  Sorry.  So it's a good bet that this was a

11  name search that was done when you first started working

12  on the case in 1995?

13      A.  I don't know if it's a good bet or not.

14  I -- I mean, I can't tell when this was done.

15      Q.  Did you run name searches on Mr. Fletcher in

16  2002?

17      A.  No, I would say we just did the search for

18  James Fletcher.

19      Q.  Okay.  And would that be a name search or

20  would it be a criminal history search?

21      A.  Criminal history.

22      Q.  Okay.  So if you didn't do a name search on

23  Fletcher in 2002, is it safe to assume that this is a

24  name search that was done when you first started working

25  on the case in 1995?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

179

1     A.   Most likely then, yes.

2     **Q.**   **Okay.**

3     A.   There were also some name searches I noticed

4 in the file that from '98.

5     **Q.**   **Well I'll you they're from '99, but we'll take**

6 **a look at those two.**

7     A.   Okay.

8     **Q.**   **Okay.  And so it's your testimony that you did**

9 **do a name search on Fletcher in 1995, correct?**

10     A.   Someone did.

11     **Q.**   **Okay.**

12     A.   There was four of us looking at this and --

13 and we actually got the name of Fletcher Clinton from

14 Detectives McDonald and Rutherford.  So I'm guessing

15 they found that name.

16     **Q.**   **Okay.**

17     A.   Otherwise I wouldn't have wrote it that way.

18     **Q.**   **When you say there were four of us looking at**

19 **this, was it was you and Detective Schalk and then**

20 **Detectives Rutherford and McDonald?**

21     A.   Yes, we're working with them also at that

22 time.

23     **Q.**   **Okay.  So my original question was: Somebody**

24 **working on the Sorrell investigation ran a name search**

25 **in 1995, correct?**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.    Yes.
 2        Q.    And you would've been aware of this name
 3   search that was ran in 1995 as the detective on the
 4   case, correct?
 5        A.    I've at least been aware of it, yes.
 6        Q.    Okay.  I don't think I asked this earlier.
 7   Were you the lead detective on this investigation in
 8   1995?
 9        A.    There's no lead detective.
10        Q.    Okay.  Was that not a term that was used in
11   Area 5?
12        A.    No.
13        Q.    During your tenure?
14        A.    No.
15        Q.    Okay.  Were you the primary detective on this
16   case in 1995?
17        A.    Again, there was four of us looking at old
18   cases.  So there's -- there's no assigning.  This is an
19   old case.  It's -- it's like it wasn't assigned.  It was
20   something we picked up.
21        Q.    Right.  But I think I saw Detective
22   Rutherford's name mentioned on one report.  I don't
23   think I saw Detective McDonald's name mentioned.  You
24   were the detective.  You and Detective Schalk and
25   Detective Noradin were the primary detectives on the
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    reports on this case; is that not correct?

2          MR. STEFANICH:  I'm going to object to the

3      form.  You can answer.

4      A.   In 2002.

5    BY MR. STARR:

6      Q.   In 2002.  What about in 1995, who were the

7    primary detectives investigating this case in 1995?

8      A.   I don't think Noradin was working with us at

9    that time.

10     Q.   That's fair.  So it was you and Detective

11   Schalk primarily working on this case in 1995, correct?

12     A.   And Rutherford and McDonald.

13     Q.   And one of the four of you did a name search

14   on Fletcher and came up with this document, correct?

15     A.   That would be -- that would most likely be

16   correct.

17     Q.   Okay.  Taking you back to the previous

18   questions, that line of questions I had about the IDOC

19   photo; what did you do to confirm that Mr. Fletcher and

20   Mr. Rogers were in prison contemporaneously with one

21   another?

22          MR. STEFANICH:  Objection.  Asked and answered.

23      You can answer again.

24     A.   What did -- what would -- what did we do?

25   We -- I don't know.  I don't know if we confirmed it or

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  not.

2  BY MR. STARR:

3      Q    Okay.  And if I asked that previously, I

4  apologize.

5          MR. STEFANICH:  Yeah, you did.

6  BY MR. STARR:

7      Q.   I don't remember asking it.  It's at the

8  beginning.  Okay.  So you, you don't have any

9  recollection of doing anything to confirmed that

10  Mr. Fletcher and Mr. Rogers were in IDOC at the same

11  facility at the same time, correct?

12      A.   Correct.  We had no reason to believe

13  otherwise.

14      Q.   Okay.  All right.  So taking a look at this

15  document, if you look at this document, you said there's

16  no information on about when this document was produced,

17  correct?

18      A.   I don't see it.

19      Q.   Okay.  But it's your understanding it was

20  produced in 1995, right?

21      A.   It would be my guess.  It's not my

22  understanding.

23      Q.   Okay.  If you look at this document, there

24  appears to be a number of names that have.  This is a

25  computer printout, but there appears to be a number of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    names on the computer printout that also have a little

2    pen or maybe pencil -- I'm not sure -- circle next to

3    him.  Do you see that, sir?  The first one on the first

4    page is Maurice Fletcher, the first name.  Do you see

5    that little squiggle next to his name?

6        A.   I see a mark.

7        Q.   Okay.

8        A.   I don't know what that is.

9        Q.   You see a little mark next to Maurice Fletcher

10   on Bates Stamp 86, correct?

11       A.   Yeah.

12       Q.   Okay, let's turn the page to Bates stamp 87.

13   Do you see a little circle or a little mark next to the

14   name Mose Fletcher on Bates stamp 87?

15       A.   I do.

16       Q.   Okay.  And if you turn the page to Bates stamp

17   88, do you see a little circle or squiggle next to the

18   name Devery Fletcher at the top there?

19       A.   Yes.

20       Q.   And do you see also a little marker squiggle

21   next to the name Henry Fletcher?

22       A.   I do.

23       Q.   Okay.  And then if you turn to 89, there's two

24   more little squiggles or little marks.  One is next to

25   Curtis Fletcher.  Do you see that, sir?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1        A.    I do.

 2        Q.    And then there's one next to Terry Fletcher.

 3   Do you see that, sir?

 4        A.    I do.

 5        Q.    Okay.  And then if you turn the page to page

 6   90, there's two more and one is next to Anthony

 7   Fletcher.  Do you see that, sir?

 8        A.    Yes.

 9        Q.    And then one is next to Ronald Fletcher.

10   Do you see that, sir?

11        A.    Yes.

12        Q.    All right.  And then if you turn the page to

13   page 91, Bates stamp 91.  There's one, it's the first

14   one at the top.  It's under next to Robert Fletcher's

15   name.  Do you see that, sir?

16        A.    I do.

17        Q.    Okay.  And then if you turn to Bates stamp 92,

18   there's another one, it's the second from the bottom,

19   it's Darnell Fletcher.  Do you see that little squiggle

20   next to Darnell Fletcher's name?

21        A.    I do.  Yes, I do.

22        Q.    Okay.  And then if you turn to Bates stamp 93,

23   there is two.  There's one next to Charles Fletcher. Do

24   you see that, sir?

25        A.    Yeah.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       Q.   And there's one next to Antonio Fletcher.  Do
2  you see that?
3       A.   I do.
4       Q.   Okay.  And then if you turn to Bates stamp 94,
5  there's no squiggles.  Do you see there's no squiggles
6  on that page, sir?
7       A.   Uh-huh.  I do.
8       Q.   Excellent.  And if you turn to Bates stamp 95,
9  there's no squiggles.  Do you see no squiggles on that
10  page, sir?
11      A.   Yes.
12      Q.   Okay.  And then if you turn to the last page,
13  96, do you see there's a squiggle next to Derell
14  Fletcher?  The very last one on the list, sir?
15      A.   Yes.
16      Q.   Okay.  Do you know what those little marks
17  indicate, sir?
18      A.   I don't know for sure.  It doesn't look like
19  something that -- a marking that I've ever done, but I
20  could guess.
21      Q.   What do you think it means, sir?
22           MR. STEFANICH:  You can answer.
23      A.   Maybe those were the photos that were shown to
24  Mr. Cooper in '95.
25  BY MR. STARR:

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   Okay.  So you think that possibly these are

2  the other Fletcher that were shown to Mr. Cooper?

3    A.   It could be.

4    Q.   In 1995.

5    A.   It could be.

6    Q.   Is that your best guess?

7    A.   Pardon?

8    Q.   Is that your best guess?

9    A.   It's just a guess.

10    Q.   Okay.

11    A.   Yeah.

12    Q.   Well, do you have any other interpretations of

13  what those squiggles could necessarily mean?

14    A.   No.  If I had to guess, that's what I would

15  say.

16    Q.   Okay.  And I honestly didn't do this on

17  purpose, but I did miss one, and it's on page 87; if you

18  look back on page 87.

19    A.   Okay.  All right.

20    Q.   I literally didn't do this intentionally, but

21  I did overlook one.  It's on 87.  It's a squiggle next

22  to James Fletcher.  Do you see that, sir?

23    A.   Let's see.

24        MR. STEFANICH:  It's an incomplete squiggle.

25        THE WITNESS:  A what?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

140 Deposition of Jerome Bogucki, taken on April 12, 2023
187

```
 1   BY MR. STARR:

 2       Q.   Yeah, it's a little circle next to Mr. James

 3   Fletcher is the third from the top.  Do you see that,

 4   sir?

 5       A.   Which page is this?

 6       Q.   Bates stamp 87.

 7            MR. STEFANICH:  Second page.

 8       A.   I see that.

 9   BY MR. STARR:

10       Q.   Okay.  And do you see the left-hand column has

11   at the top, it's listed as a column that's described as

12   "IRNBR"; do you see that?

13       A.   Yes.  The IR number?

14       Q.   Yeah.  What does that indicate, sir?

15       A.   That would indicate that that's the -- no

16   matter what name that person uses, that's --

17   fingerprints would come up to that number.

18       Q.   Okay, so that's a Chicago Police Department

19   number, that internal documentation number?

20       A.   Yes.

21       Q.   Okay.  And so no matter how many times you're

22   arrested, your fingerprints are linked to the same IR

23   every single time; is that correct?

24       A.   Yes.

25       Q.   Okay.  And so the IR for James Fletcher here
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    is 0966425.  Do you see that, sir?

2        A.    Yes.

3        Q.    Okay.  And if you compare that to Exhibit

4    number 1, which I have misplaced.  Thanks, Terry.

5    Is there an IR number on this page, sir?

6        A.    I don't see one.

7        Q.    Okay.  And then the next column, there's a

8    letter and it looks like it's either "Y" or "N"; do you

9    see that, sir?

10       A.    On the next page after --

11       Q.    No, same page.  We're staying on page 87.

12       A.    Okay.

13       Q.    And do you see that the next column after the

14   IR number is a column that has an "Y" or "N", which I

15   assume means yes or no, but I don't know for a fact.

16   Do you see that column, sir?

17       A.    I see that column.  I'm not sure what it

18   means.

19       Q.    It's under the heading of "AFIS".

20       A.    Oh, is he in -- that probably -- I -- I guess

21   that means is he in AFIS or is he not?

22       Q.    Okay.  And can you tell me for the record what

23   AFIS is, sir?

24       A.    It's a -- it is a fingerprint -- I think it's

25   a national fingerprint file.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Jane Doe vs Jerome E. Stocklery, taken 04/11/2023

189

```
 1        Q.   Okay.  And this one seems to indicate that

 2   Mr. James Fletcher, with IR number 966425, is in AFIS,

 3   correct?  Based on the "Y"?

 4        A.   If that's what we understand that means, yes.

 5        Q.   Okay.  And then if you follow, there's the

 6   last name and then the first name, and then there's a

 7   race and there's a number "1".  Do you know what that

 8   race stands for?

 9        A.   Male black.

10        Q.   Okay.

11        A.   Or it means black.

12        Q.   And then there's a date of birth in the next

13   column there.  Do you see that, sir?

14        A.   Yes, I do.

15        Q.   And that date of birth for this Mr. James

16   Fletcher, is March 30, 1963, correct?

17        A.   Yes.

18        Q.   Okay.  And then next column is, "Stop".

19   Do you know what -- do you see that final column?

20        A.   Yes.

21        Q.   What does that indicate?

22        A.   I'm not sure if that's for stop order or --

23   I -- I don't know for sure.

24        Q.   Okay.  So if these are the photographs that

25   were shown to Mr. Cooper in 1995, that means that a
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  photograph of someone named James Fletcher was shown to

2  Mr. Cooper, correct?

3      MR. STEFANICH:  Objection.  Form.  Foundation.

4    You can answer.

5    A.   If indeed that's what it means.  I really

6  don't know.

7  BY MR. STARR:

8    Q.   Well, what else could this name search in

9  these squiggles indicate, other than these were the

10 photos that were used in a photo array in 1995, sir?

11      MR. STEFANICH:  Objection.  Form.  Foundation.

12    You can answer.

13    A.   I -- I really don't know.  I -- I -- I -- I

14 know that I don't ever remember making those kind of

15 marks myself, so if I don't -- I don't know that Schalk

16 does either, but maybe McDonald and Rutherford did.

17 I don't know.

18 BY MR. STARR:

19    Q.   Well, would making a little circle next to a

20 name be something you would remember 20 plus years

21 later?

22    A.   I don't remember doing something like that.

23    Q.   Okay.  Do you think that's something that you

24 would likely remember, writing a little circle next to a

25 name?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.   Well, usually you do things as a habit.
 2   I would -- something like this, I would put check marks.
 3        Q.   Well, I asked you a whole bunch of practice
 4   questions and you didn't remember what your practice was
 5   exactly, correct?
 6             MR. STEFANICH:  Objection.
 7        A.   Say that again?
 8   BY MR. STARR:
 9        Q.   I asked you a number --
10             MR. STEFANICH:  Objection.  Form,
11        mischaracterizes his former testimony. You can
12        answer.
13   BY MR. STARR:
14        Q.   I've asked you -- go ahead.  You can answer.
15   Go ahead.  Sorry.
16             MR. BURNS:  What's the question here?
17             THE WITNESS:  I don't know.
18   BY MR. STARR:
19        Q.   I'll rephrase it.  Yeah.  I've asked you a
20   number of questions about your practice that I believe
21   you indicated you couldn't remember exactly what your
22   practice was.  Isn't that right?
23             MR. STEFANICH:  Objection.
24        A.   As far as marks?
25             MR. STEFANICH:  Objection.  Hold on.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1          THE WITNESS:  Okay.

 2          MR. STEFANICH:  Objection.  Form.

 3      Mischaracterizes his former testimony.  You can

 4      answer.

 5      A.   As far as marks on paper, you asked me?

 6 BY MR. STARR:

 7      Q.   **No, just as far as your practice as a Chicago**

 8 **Police Department homicide detective.**

 9      A.   Oh, I can -- I can tell you some things. Yeah.

10      Q.   **Sure.  But there's other things you don't**

11 **remember what your practice was, correct?**

12      A.   I don't remember a practice like this.

13      Q.   **Okay.  That's fair.  So you don't remember if**

14 **you made squiggles next to names in 1995, correct?**

15      A.   These are -- these are little circles.

16      Q.   **Okay.  You don't remember if you made little**

17 **circles next to names on --**

18      A.   I -- no, I don't remember ever doing it, is

19 the proper answer.

20      Q.   **Okay.  You can't say whether or not you did in**

21 **fact do this, correct?**

22          MR. BURNS:  I'm going to object to the form of

23      that question.  That's a double negative in there,

24      so I'm lost on that.  Excuse me.  You want to hear

25      it again, or do you want to ask it again?

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

 1          MR. STARR:  No.

 2          MR. BURNS:  Do you remember the question?

 3     I'm sorry.

 4     A.   I don't remember ever making marks like that

 5  next to names.

 6  BY MR. STARR:

 7     Q.   So you don't remember making it, I understand

 8  that, but you can't say unequivocally that you did not

 9  make those marks next to those names, correct?

10     A.   I can't even remember who brought this paper

11  up.

12     Q.   And that's fair.  And I don't want you to try

13  to remember something you don't remember.  And my

14  question though is: You cannot tell me as you sit here

15  today, that you in fact did not make those marks?

16          MR. BURNS:  Objection.  Form.

17  BY MR. STARR:

18     Q.   Correct?

19     A.   I can't tell you one way or another.  Yes.

20     Q.   The date of birth on there, do you know if

21  that's the same date of birth as Mr. Fletcher?

22     A.   I -- I don't know.

23     Q.   You could refer to the IDOC Exhibit number 1,

24  appears to be the same date of birth, correct?

25     A.   It does appear that way.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q.   Okay.  And the way we can cross check it to
 2   make sure that it's Mr. Fletcher --
 3        A.   By the IR number.
 4        Q.   It's by the IR number, correct?  Okay.
 5   We'll do that right now.
 6             MR. STARR:  All right.  And four?
 7             THE REPORTER:  Yes.
 8             MR. STARR:  Okay.  For the record, been marked
 9        as Exhibit number 4, and it's Bates City-JF-149.
10        Take a look at that one page document, sir, and let
11        me know when you're ready to answer some questions
12        about it.
13             (EXHIBIT 4 MARKED FOR IDENTIFICATION)
14   BY MR. STARR:
15        Q.   Did you have an opportunity to review that
16   document, sir?
17        A.   I did.
18        Q.   Okay.  Thank you.  And have you seen this
19   document before?
20        A.   This one?
21        Q.   Yes.
22        A.   Number four?  Yes.
23        Q.   Yes.  And did you review this document in
24   preparation for today?
25        A.   I did.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   Okay.  For the record, can you just tell me
2  what this document is?

3    A.   What it is?

4    Q.   Yeah.

5    A.   It's in an arrest report from myself, Schalk
6  and Noradin.  It's an arrest report for James Fletcher.

7    Q.   Okay.  So this is an arrest report of
8  Mr. James Fletcher.  And what's the date on this, sir?

9    A.   The date is 18th of April of '02.

10    Q.   Okay.  And 8:30, is that 8:30 a.m. or 8:30
11  p.m.?

12    A.   That's 8:30 a.m.

13    Q.   Okay.  And Mr. Fletcher is listed as his first
14  and last name, and he has an alias as Arnold Dixon.
15  Do you see that, sir?

16    A.   Yes, That is correct.

17    Q.   And the detectives listed on here are, you
18  said was yourself, Mr. Schalk, and Mr. Noradin; is that
19  correct?

20    A.   Yes.

21    Q.   You see your signature on here?

22    A.   Yes.

23    Q.   Is that your signature right above your name
24  that's printed?

25    A.   Yes.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1    Q.   Okay.  And then is Mr. Fletcher's IR number on
 2  here, sir?
 3    A.   It is.
 4    Q.   And could you tell me for the record what his
 5  IR number is?
 6    A.   966425.
 7    Q.   And then for the record, if you look back at
 8  Exhibit number 3, the printout with the names, is it the
 9  same IR number?
10    A.   It is.
11    Q.   Okay.
12    A.   The --
13    Q.   And that's 966425, correct?
14    A.   Yes.
15    Q.   Okay.  So based on the date of birth that we
16  confirm on the IDOC photo, and the IR number that we've
17  confirmed with this Chicago Police Department arrest
18  report, is it your understanding that the James Fletcher
19  listed on this name printout is the same James Fletcher
20  that was arrested for this Sorrell shooting?
21    A.   Yes.
22    Q.   Okay.  And so that seems to indicate that in
23  1995, when this name printout was done, that
24  Mr. Fletcher was listed as a suspect and was -- strike
25  that.  That seems to indicate to me, correct me if you

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    think I'm wrong, that in 1995 when this name search was

2    done, that Mr. Fletcher, Mr. James Fletcher, was one of

3    the suspects in 1995, correct?

4         MR. STEFANICH:  Objection.  Form.  Foundation.

5         Mischaracterizes the former testimony about when

6         this was printed out.  You can answer.

7         A.   Right.  I'm -- I'm not sure, first of all,

8    that -- when this was printed out, and -- and these are

9    not necessarily -- I mean -- I mean, they --

10   they're -- people with the name of Fletcher, they're not

11   necessarily suspects.

12   BY MR. STARR:

13        Q.   Okay.  That's fair.  You did testify that you

14   didn't run a name search in 2002 like this, correct?

15        A.   I don't think so, but I'm not sure.

16        Q.   And it was your understanding that you or one

17   of the three other detectives working with you ran a

18   name search of Fletcher back in 1995, correct?

19        A.   For some reason -- for some reason,

20   the -- the -- the name of Clinton, or Fletcher Clinton

21   was an issue, and this was given to us by our other pair

22   of detectives.

23        Q.   Right.  I understand that.  But you previously

24   testified that one of the four detectives, and you

25   including yourself in that list, you, Detective Schalk,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1   Detective McDonald, and Detective Rutherford, one of the

2   four of you ran a name search on Fletcher in 1995?

3       A.   Apparently.

4       Q.   Okay.  And this is the only document we have

5   with the name search of Fletcher that was from the

6   investigative file, other than the one you also referred

7   to, which was from 1999?

8       A.   '98.

9       Q.   We'll look at it in just a minute, and we'll

10  confirm whether it's '98.

11      A.   I thought -- I thought it was '98.

12      Q.   Okay.  But other than the name search that was

13  run in '98 or '99, this is the only name search that's

14  in the investigative file, correct?

15      A.   I -- I guess it is.  I --

16      Q.   Did you --

17      A.   I -- I didn't look closely at this.

18      Q.   Fair enough.

19      A.   Before this.

20      Q.   Did you see any other name searches in the

21  investigative file besides this one or the one that's

22  from '98 or '99?

23      A.   I don't think so --

24      Q.   Okay.  And if I represent to you that this is

25  the only other name search besides that one that's

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  either '98 or '99, which we'll look at in a little bit,

2  will you believe me that this is the only other name

3  search in the investigative file?

4      A.   As far as I know.

5      Q.   Do you have any reason to dispute that this is

6  the only other name search besides the '98, '99 --

7      A.   No, I have no reason to dispute that.

8      Q.   Okay.

9      A.   No.

10     Q.   Okay.  And so based on the fact that Mr. James

11 Fletcher's on this list, what does that tell you about

12 Mr. Fletcher, James Fletcher, in 1995?

13     A.   It tells me we missed it.

14     Q.   Okay.  Did you see a Clinton Fletcher on this

15 list anywhere?

16     A.   I didn't notice that, no.  So that --

17     Q.   Take a second to review.

18     A.   That's -- that's what I don't understand,

19 actually.  Or Fletcher, it's because these are the last

20 names of Fletcher.  That's why.  Clinton Fletcher was a

21 -- I mean, Fletcher Clinton was the opposite.

22     Q.   Right.  And you testified you had his Chicago

23 Police Department photo, correct?

24     A.   We did at one time, yeah.

25     Q.   And in order to do a photo array, you would

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  need other photos other than Fletcher Clinton's,

2  correct?

3         A.    Yes.

4         Q.    So when you did a photo array with Mr. Cooper

5  in 1995, that was a negative identification, correct?

6         A.    Yes.

7         Q.    Okay.  So in 1995, your testimony is that you

8  showed Mr. Cooper a photo of Fletcher Clinton that was

9  in a Chicago Police Department photo, and then other

10  photos that you had run a name search for, correct?

11         A.    Yes.

12         Q.    Okay.  And it could have been the names that

13  are indicated on this list, correct?

14         A.    It could have been some of them, you know,

15  I -- I -- I really don't know.

16         Q.    Okay.  So it could have been any of the names

17  that are on this list that have the little squiggles

18  next to them, based on your testimony, correct?

19         A.    It could have been any -- anybody.

20  I don't -- I really don't know if any of them were on

21  there.

22         Q.    Right.  But you previously testified that you

23  believed that the squiggles likely indicated that those

24  were the photographs that you used, correct?

25         A.    I could guess so --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          MR. STEFANICH:  Objection.  Mischaracterizes
2      his former testimony.  You can answer.
3      A.   I -- I -- it was only a guess.  I don't know.
4          MR. STARR:  Okay.  All right.  Let's take a
5      five minute break.
6          MR. STEFANICH:  Sure.
7          THE VIDEOGRAPHER:  We are off record.  The time
8      is 3:46.
9           (OFF THE RECORD)
10         THE VIDEOGRAPHER:  We're back on the record for
11     the deposition of Jerome Bogucki.  My name is
12     Kortney Chase.  The date is April 20, 2023, and the
13     time is 4:10 p.m. Central time.
14  BY MR. STARR:
15     Q.   All right Mr. Bogucki, I was asking you
16  earlier in the deposition about your use of the IDOC
17  photos, correct?
18     A.   Yes.
19     Q.   Okay.  And correct me if I'm wrong, but I
20  believe your testimony was that you used IDOC photos in
21  the 2002 photo arrays, and that the one that I showed
22  you of Mr. Fletcher, whose named Mr. Dixon on that
23  actual particular photo, that's one of the photos you
24  used, correct?
25     A.   Yes, I believe so --



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    Q.   Okay.  And that you put that photo into the
2  investigative file after you used it, I assume?
3    A.   If it was --
4      MR. STEFANICH:  Objection.  Mischaracterizes
5    his testimony.  You can answer.
6    A.   If it's there, then it was in the -- that's
7  a -- that's where it was.
8  BY MR. STARR:
9    Q.   Okay.  And so did you put the IDOC photo of
10  Mr. Fletcher that's listed as Arnold Dixon into the
11  investigative file after you used it?
12    A.   Yes.
13    Q.   Okay.  The other IDOC file photographs, I
14  believe you testified you think you inventoried them; is
15  that correct?
16    A.   Inventoried the entire group of seven.
17    Q.   Okay.  So do you know what happened to the
18  other IDOC photos that are not of Mr. Fletcher that you
19  used during the photo arrays?
20    A.   I don't know that there are any others.
21    Q.   Okay.  But you did a photo array with multiple
22  IDOC photos, correct?
23    A.   The ones that were inventoried.
24    Q.   Okay.  And one of them was of James Fletcher,
25  AKA Arnold Dixon?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.    Yes.

 2        Q.    And the other ones were of other people that

 3   you don't know the names of, correct?

 4           MR. STEFANICH:   Objection.

 5        A.    Except Dixon.

 6   BY MR. STARR:

 7        Q.    Okay.  So let's talk about that.  So you used

 8   all the other IDOC photos you used had the last name of

 9   Dixon; is that correct?

10        A.    Yes.

11        Q.    Okay.  And you showed the three witnesses,

12   Rogers, Cooper, and Friend those photos as they appeared

13   like Mr. James Fletcher's photo with the information

14   about the IDOC and the name on the photograph, correct?

15        A.    Yes.

16        Q.    Okay.  You didn't do anything to cover any of

17   the IDOC information at all when you showed the

18   photographs to the witnesses, correct?

19        A.    I don't remember doing that.

20        Q.    Okay.  And you don't dispute that you had IDOC

21   photos to use for a photo array in 2002?

22        A.    They were on the computer, I believe.

23        Q.    And you printed them off the computer,

24   correct?

25        A.    One of us did, yes.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-8 Filed: 05/06/25 Page 206 of 267

1    Q.   Okay.  Did you use any other criteria in

2  selecting the other fillers in that photo array other

3  than the fact that they had the last name Dixon?

4    A.   Similar looking.

5    Q.   Okay.  So did you make sure that the other

6  individuals -- strike that.  Did you make certain that

7  the other photographs -- strike that.  Did you make

8  certain that the other IDOC photographs that you used as

9  fillers in the 2002 photo array were all men?

10    A.   Were all men?

11    Q.   Yes.

12    A.   Yes.

13    Q.   Okay.  Did you make certain that the

14  photographs, the IDOC photographs you used as fillers in

15  the 2002 photo array, were all African American or black

16  men?

17    A.   Yes.

18    Q.   Okay.  Did you make certain that they, the

19  filler photographs, that the complexion of their skin

20  was similar to Mr. Fletcher's or Mr. Dixon's?

21    A.   I believe so --

22    Q.   Okay.  Did you make certain that the hairstyle

23  of the other filler IDOC photographs was similar to the

24  hairstyle of Mr. Dixon slash Mr. Fletcher's?

25    A.   No.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   Q.   Why not?

2   A.   Because it wouldn't matter 12 years later.

3   Q.   But you were asking a witness to identify what

4   they saw previously, correct?

5   A.   Asking to identify a face.

6   Q.   Okay.  So you didn't care about the hairstyle

7   whatsoever?

8   A.   I -- I didn't have a choice to care.

9   Q.   Okay.  When you pulled the photos of the

10  alternative filler Dixons, did you find more than the

11  photos that you used, or did you find only a finite

12  amount of Dixons?  That's a bad question.  Let me

13  re-ask it.

14  A.   I agree.

15  Q.   When you retrieved filler photos of other men

16  with the last name Dixon, did you have a multitude of

17  Dixons to choose from, or was there only six other

18  Dixons?

19  A.   You know, I -- I don't -- I don't remember,

20  and I don't even know who pulled those up.

21  Q.   Did you make sure that the six other Dixon

22  filler photographs that you used looked similar to

23  Mr. Fletcher?

24  A.   We believe so, yes.

25  Q.   Okay.  And were you certain to make sure that

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  the height of the fillers was similar to the height of

2  Mr. Dixon or Mr. Fletcher?

3      A.  That had no bearing.

4      Q.  Okay.  Did you make certain that the weight of

5  the fillers was similar to the weight of Mr. Fletcher?

6      A.  No, we were just looking at faces.

7      Q.  Okay.  Did you make sure that none of the

8  other filler photographs had facial hair that was

9  different than what Mr. Dixon or Mr. Fletcher had?

10      A.  Again, that's something 12 years later,

11  it wouldn't come into play.

12      Q.  Okay.

13      A.  Either they can identify a face or they

14  cannot.

15      Q.  So this photograph of Mr. Fletcher, Mr. Dixon

16  that I showed you that's Exhibit 1, does he have any

17  facial hair in this photograph?

18      A.  I'm not sure.

19      Q.  Okay.

20      A.  He might have a little.

21      Q.  Okay.  But you didn't take facial hair into

22  account when you were choosing to fill her photographs

23  whatsoever, correct?

24      A.  No, not in -- not in just -- I mean, if

25  someone had a -- a full beard or something, obviously

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 we wouldn't put that in with this photo.

2   Q. Okay. In this photograph of Mr. Fletcher,

3 he appears to have braids; is that correct?

4   A. Yes.

5   Q. Okay. Did you do anything to make sure that

6 the other filler photographs had braids?

7   A. No.

8   Q. Okay. Did you take the hairstyle of the other

9 filler photographs into account whatsoever?

10   A. No.

11   Q. Okay. Underneath this photograph, there's

12 some identifying information; do you see that?

13   A. Yes.

14   Q. And it says that the eye color of Mr. Fletcher

15 is brown; do you see that?

16   A. Yes.

17   Q. Did you make sure that the filler photographs

18 you used all had brown eyes?

19   A. Did I make sure of that? No.

20   Q. And then you see that the date of birth,

21 we talked about that earlier, about Mr. Fletcher's is

22 March 30, 1963, correct?

23   A. Yes.

24   Q. Did you make sure that the filler IDOC

25 photographs that you used during your photo array had a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-8 Filed: 05/06/25 Page 210 of 267

208

```
 1   similar birthdate to Mr. Fletcher?

 2       A.    No.

 3       Q.    Why not?

 4       A.    Just similar faces.  That's all we're trying

 5   to put together.

 6       Q.    Okay.  All right.  I think that's the only

 7   questions I have about this.  Let me ask you: Did you

 8   use any other criteria to determine which filler

 9   photographs to use other than what you've already

10   testified to today?

11       A.    Not that I'm recalling, no.

12       Q.    Okay.  And I think I asked you earlier about,

13   like, your practice in terms of documenting information

14   you learned in the course of an investigation.  Do you

15   remember that line of questions?

16       A.    Yes.

17       Q.    I don't remember if I asked you, was it

18   important to include everything that you document and

19   that you learn into the investigative file?

20       A.    If it's important, yes.

21       Q.    Okay.  So anything important that you

22   documented during the course of the investigative file

23   or any investigative steps you took, you would make sure

24   to include in the investigative file, correct?

25       A.    I would hope to, yes.
```



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q.   Okay.  In the name search exhibit, which is

2  Exhibit number 4, I believe -- three, I'm sorry, Exhibit

3  number 3?

4     A.   Yes.

5     Q.   If you had run this name search, I know you

6  said you can't remember exactly if you ran it or one of

7  your partners ran it, but if you had ran this name

8  search, you had made certain to include this in the

9  investigative file, correct?

10    A.   Not necessarily.

11    Q.   Why not?

12    A.   Well, first of all, it -- it dawned on me

13  after we -- our last session that in '98 and '99 we were

14  doing name checks, and it makes a lot more sense to me

15  that this was from '98 or '99 and we just -- those were

16  not -- I mean, we didn't do anything with those.  It was

17  just, we're looking at the case again and still waiting

18  for Terry Rogers to show up, and that would be our next

19  step.

20    Q.   Okay.  Well, you already testified that you

21  ran a name search in 1995.  So if you did in fact run a

22  name search in 1995, would you have put that name search

23  in the investigative file?

24       MR. STEFANICH:  Objection.  Form.  You can

25    answer.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.    Somebody ran a name search in '95.
 2   BY MR. STARR:
 3        Q.    Yeah.  And --
 4        A.    And the detectives we were working with,
 5   whether they were going on vacation or days off or
 6   whatever, they gave us a name of Fletcher Clinton.  I
 7   keep -- and the -- and then -- those -- that -- if -- if
 8   we were going to show any number of Fletchers with the
 9   last name, it would've been documented, but because we
10   were just showing in '95 Fletcher Clinton, that's why
11   that is documented.
12        Q.    So did you just show --
13        A.    So -- which is what makes me think this is
14   from '98.
15        Q.    Right, I understand what you're saying, but
16   you did testify that somebody ran a name search in '95.
17   So my question is, if you were aware of a name search
18   that was ran in 1995, whether you ran it or one of your
19   partners ran it, would you make certain that that name
20   search was included in the investigative file?
21             MR. STEFANICH:  Objection.  Asked and answered.
22        You can answer again.
23        A.    Included how?
24   BY MR. STARR:
25        Q.    Physically put into the investigative file.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.    If was negative, not necessarily.

2    Q.    Right.  So this is a name search that was run

3    at some point in the investigation, and was in the

4    investigative file, right?

5    A.    Right.

6    Q.    Were there other name searches that you ran

7    that you didn't include in the investigative file?

8    A.    Well, this seemed to be -- again, it took me a

9    while to figure this -- figure this out maybe, but it

10   seems to be information that was staying in the file

11   until Terry Rogers was talked to.

12   Q.    Were there other name searches that you ran

13   during the Sorrell investigation that you did not

14   include in the investigative file?

15   A.    Not that I know of.

16   Q.    Okay.  So any name searches that you were

17   aware of that were run during the Sorrell investigation,

18   you would've made certain were included in the

19   investigative file, correct?

20   A.    Well, the ones I know about are.  That's all I

21   can tell you.

22   Q.    Okay.  So it's possible that another detective

23   ran a name search you're not familiar with and they

24   didn't include it, but you don't know that, correct?

25   A.    Their actual search?  I know somehow --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    somehow this name from the other detectives came up.

2    So what they did with that, with their information,

3    you know, they came up with the name Clinton Fletcher.

4        **Q.   Right.**

5        A.   I don't know what they did, how many names

6    they looked at, or negative names or -- those aren't

7    things that would necessarily go on the file.

8        **Q.   But all the name searches that you were**

9    **familiar with were included in the investigative file?**

10       A.   I can't say for sure.

11       **Q.   I thought you just said that.  Am I wrong?**

12       A.   Maybe -- maybe you're confusing me.

13       **Q.   I'm not trying to confuse you, sir.**

14       A.   Well, I think you are.  But I really don't

15   know, okay?  I know that this one was done, and I'm

16   guessing it was '98 or '99 where -- when the other ones

17   were being done, where the other system was being done.

18       **Q.   Right.  I understand that's your testimony**

19   **now, but my question was -- and I just want to try and**

20   **get it clear here, any name search that you were aware**

21   **of being run during the Sorrell investigation, you**

22   **would've, as a matter of good practice, made sure it**

23   **was included in the investigative file, correct?**

24       A.   Well, it could -- it -- it could go either

25   way.  It's not necessary.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q.   So it's possible there were name searches run
 2   during the Sorrell investigation that you're aware of
 3   that were not included in the investigative file; is
 4   that what your testimony is?
 5        A.   Sure.  It's possible.
 6            MR. STARR:  Okay.  Let's look at what I'm going
 7        to mark as Exhibit number 5.
 8                 (EXHIBIT 5 MARKED FOR IDENTIFICATION)
 9            MR. BURNS:  Thank you.
10   BY MR. STARR:
11        Q.   All right.  Take a look at this document, sir.
12   I'm not expecting you to read it's entirety right this
13   minute.  Have you reviewed that document?
14        A.   I have previously.
15        Q.   Okay.  So when I asked you earlier in the
16   deposition about documents you reviewed, you told me
17   police reports.  Did you also review testimony in this
18   case?
19        A.   Yes.
20        Q.   Okay.  And did you review your testimony in
21   this case?
22        A.   I did.
23        Q.   Did you review anybody else's testimony in
24   this case?
25        A.   No.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 185 Filed: 05/06/25 Page 216 of 267

214

```
 1        Q.   Okay.  And so this document, which is Bates
 2   stamped -- give me one second here.  I'll get to the
 3   Bates.  Just Fletcher 881 through Fletcher 1092, I
 4   believe.  This document is a transcript of testimony
 5   that you gave in the Fletcher criminal trial, is that
 6   correct, sir?
 7        A.   Yes.
 8        Q.   And you reviewed this in its entirety for
 9   preparation today?
10        A.   I've read it.
11        Q.   Okay.  Do you recall giving this testimony,
12   sir?
13        A.   Yes.
14        Q.   Okay.  I'm going to direct your attention to
15   Bates 1059, line 7.  And there's a question that's asked
16   at the time, March of '95, "What was the purpose of
17   reviewing that file?"  And then the answer starting at
18   line 9 is, "At that time I was assigned to peruse older
19   homicides that had been put aside and see if there was
20   anything more that could have been done with them."
21   Do you see that question and answer?
22        A.   Yes.
23        Q.   Were you asked that question and gave that
24   answer, sir?
25        A.   Apparently I did.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q.   Okay.  And is that what you were talking about

2  earlier when you said that you were asked to look at

3  cold cases?

4     A.   Yes.

5     Q.   Okay.  And then the next question there on

6  line 13 is, "As of March of '95, was there anyone wanted

7  in connection with the murder of Willie Sorrell?"  Do

8  you see that question?

9     A.   I see it.

10     Q.   And then there's a series of objections in

11  communications with the court, but on the next page,

12  Bates 1060, your answer on line 1 is, "There were two

13  male black offenders wanted.  One of the witnesses had

14  provided a name of Fletcher."  Do you see that?

15     A.   I do.

16     Q.   Okay.  So in 1995, you were aware as of

17  March of 1995 that there was an allegation that one of

18  the suspects had the name Fletcher, correct?

19     A.   For -- yeah.  Either the first or last name,

20  yes.

21     Q.   Unclear, correct?

22     A.   Correct.

23     Q.   Okay.  So is it possible that this search that

24  we looked at previously in Exhibit 3 was run because you

25  had learned that there was information that one of the

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  witnesses said that the suspect said the name Fletcher?

2      A.   Yeah.  The only question is when.

3      Q.   Okay.  And I understand that you previously

4  testified that it was '95, and then now you're saying

5  maybe it was '98, but your answer to that first question

6  is, is it possible that the name check was run on

7  Fletcher because you knew that the one of the witnesses

8  had said the name Fletcher?

9      A.   Okay.  Just to clear it up.  I -- I wasn't

10 ever sure it was '95.  I'm more -- more going toward 98,

11 but I don't know.

12     Q.   The record speaks for itself.

13     A.   Okay.

14     Q.   Okay.  Okay.  Do you remember being asked that

15 question and giving that answer?

16     A.   Yes.

17     Q.   Okay.  Do you recall anything else about any

18 suspects in March of '95?  Any other information you had

19 about suspects in March 1995?

20     A.   I -- the only -- the only thing I can say for

21 sure is the name of provided to us by our -- our fellow

22 detectives of Fletcher Clinton.

23     Q.   Right.  And when did you get that name, sir?

24     A.   In '95.

25     Q.   Do you know exactly when you received that

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   name?

 2       A.   Only if my report says so.

 3       Q.   Okay.  We'll get to your report.  Maybe not

 4   today, but we'll definitely get to it.  Let me take you

 5   back to the IDOC photos.  I do remember I had one other

 6   question.  The IDOC photos that you used in the photo

 7   array in 2002, you remember?

 8       A.   Okay, sure.

 9       Q.   Okay.  At that time in 2002, did you have

10   access to Chicago Police Department photos of

11   Mr. Fletcher?

12       A.   We probably would've, yes.

13       Q.   Okay.  And can you explain to me why you chose

14   to use IDOC photographs of Mr. Fletcher as opposed to

15   using the Chicago Police Department photographs that you

16   had at your disposal?

17       A.   Well, there were certainly more -- it -- it

18   was -- I guess it was convenient.  But I can't say for

19   sure why we went that way.

20       Q.   Okay.  And regarding those IDOC photographs,

21   you testified that you chose people with similar faces,

22   right?

23       A.   Yes.

24       Q.   What specific criteria about their faces did

25   you use to choose the filler photographs?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

218

 1      A.   I can't -- I can't explain that.  Just look

 2  similar.

 3      Q.   In 2002 when you did that photo array,

 4  was it important that you chose photographs of people

 5  that looked like Mr. Fletcher so that the array could be

 6  fair?

 7      A.   Fair enough.  I mean, we -- obviously you

 8  can't look for twins, but -- but you can do the best you

 9  can.

10      Q.   Okay.  Barring twins, you chose people that

11  you thought looked like Mr. Fletcher, correct?

12      A.   Yes.

13      Q.   Except for the hair and the facial hair,

14  correct?

15      A.   Possibly.  I mean, I'd have to look at the

16  photos again, but the hair wouldn't matter.

17      Q.   Would, would you have chosen people that had

18  similar sized noses?

19      A.   Not necessarily.

20      Q.   Would you have chosen people who had similar

21  sized lips?

22      A.   Not necessarily.

23      Q.   Would you have chosen people that had similar

24  sized ears?

25      A.   Not necessarily.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       Q.   Would you have chosen people who have thin

2   faces versus people who have like larger, fatter faces?

3       A.   Not necessarily.

4       Q.   Okay.  Is there any other criteria that you

5   can tell me that you would've used to make a fair photo

6   array in 2002?

7       A.   Just look similar.

8       Q.   Okay.  And that's just a subjective --

9       A.   It is subjective, always.

10       Q.   -- analysis that you did.  Okay.  Do you have

11   any independent recollection of ever interacting or

12   speaking to a police officer by the name of James Gilger

13   concerning the Sorrell case?

14       A.   I know James Gilger, or I knew him, I should

15   say.  I don't remember talking about this case with him.

16   He actually was a detective in Area 5.

17       Q.   But you don't know if you spoke to him about

18   the circumstances --

19       A.   I don't know.

20       Q.   -- of the Sorrell case, correct?

21       A.   No.

22       Q.   I'm going to show you another document here,

23   sir.  I believe we're on six, correct?

24       THE REPORTER:  Yep.

25       MR. STARR:  Okay.  This is Exhibit 6.  And for

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    the record, this is Bates stamp City-JF-64 and 65.

2              (EXHIBIT 6 MARKED FOR IDENTIFICATION)

3  BY MR. STARR:

4      Q.    Take a moment to take a look at that document,

5  sir.  I'm going to ask you a few questions about it.

6      A.    Okay.

7      Q.    You have the opportunity to review it?

8      A.    Yes.

9      Q.    Okay.  And have you seen this document before,

10 sir?

11     A.    Yes, I have.

12     Q.    And did you review it in preparation for

13 today's deposition?

14     A.    I read it.

15     Q.    Okay.  And what is this document?

16     A.    It's the original case report.

17     Q.    Yeah, And the top left corner, is cut off,

18 but this is what this form is, correct?

19     A.    Yes.

20     Q.    It's called the original case incident report?

21     A.    Yes.

22     Q.    Okay.  And so this is the original case

23 incident report from the December 21, 1990 shooting of

24 Willie Sorrell Junior, correct?

25     A.    Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 155-5 Filed: 12/20/24 Page 223 of 267

221

```
 1        Q.   Okay.  And based on this document, can you
 2   tell me who created it?
 3        A.   James Gilger.
 4        Q.   Okay.  And this is the same James Gilger I
 5   asked you about earlier, correct?
 6        A.   Yes.
 7        Q.   You would've reviewed this document when you
 8   first started working on the Sorrell investigation; is
 9   that correct?
10        A.   Yes -- yes.
11        Q.   Okay.  It would've been in the investigative
12   file?
13        A.   Yes.
14        Q.   Okay.  And did you in fact review this
15   document when you first started working on the case?
16        A.   I have -- I have no specific memory of it,
17   but I'm sure I did.
18        Q.   As a matter of practice, you would've done so?
19        A.   Yes.
20        Q.   Okay.  And what is your understanding of like
21   the purpose of a general offense case report?
22        A.   It's the original.  It's a report of the
23   officers that originally go to the scene of the crime.
24        Q.   Okay.  And did it list the witnesses here as
25   well, sir; is that correct?
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-8 Filed: 05/06/25 Page 224 of 267

222

```
 1        A.    Yes.

 2        Q.    And you see Mr. Edward Cooper's name listed as

 3   one of the witnesses?

 4        A.    Yes.

 5        Q.    He's listed as victim, actually, correct?

 6        A.    Yeah, he's a victim and a witness.

 7        Q.    Okay.  And then the other witnesses that are

 8   listed are Sheree Friend and Emmett Wade, correct?

 9        A.    Yes.

10        Q.    Those are people we've talked about

11   extensively today, right?

12        A.    Yep.

13        Q.    Okay.  And Mr. Rogers' name is not listed on

14   here, is he?

15        A.    I don't see him listed.

16        Q.    Okay.

17        A.    Unless he's in the narrative somewhere.

18        Q.    I don't see him the narrative.  If you do let

19   me know.

20        A.    No, I'm not seeing him.  Apparently Gilger did

21   not talk to him.

22        Q.    Okay.  But he did talk to Ms. Friend, correct?

23        A.    Yes.

24        Q.    You previously testified that Ms. Friend told

25   you that she had seen Mr. Fletcher around the
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   neighborhood before the shooting; is that correct?

2      A.   Yes, she did.

3      Q.   Okay.  Is there anything in this original case

4   incident report to indicate that Ms. Friend had seen

5   Mr. Fletcher around the neighborhood prior to the

6   shooting?

7      A.   I don't know the --

8         MR. STEFANICH:  Objection.  Form and

9      foundation.  You can answer.

10      A.   I don't know.

11  BY MR. STARR:

12      Q.   Go take a minute to review it and tell me if

13  you see it.

14      A.   No.

15      Q.   There's nothing in this general offense case

16  report to indicate that Ms. Friend knew one of the

17  suspects in this shooting, correct?

18      A.   There's nothing there, no.

19      Q.   Okay.  And in fact, if you look at the top

20  line of the narrative on page 2, it says, "Witness

21  number 1, Friend, observed male black, M/B, standing in

22  the doorway with Offender 1 loading a blue steel

23  revolver with bullets.  Witness number 1, Friend, told

24  the victim what she saw, and that was when she attempted

25  to run, but she stopped when both offenders approached

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    the truck and told the Victim Cooper to "Give me your

2    money."  Nothing in that sentence indicates that she

3    knew or was familiar with any of the offenders in this

4    case, correct?

5        A.   Well, it's not on here or no.

6        Q.   And it would be a good police practice to

7    include that information.  If Mr. Gilger had learned

8    from Ms. Friend that she knew or was familiar with one

9    of the suspects, he would've included that, correct?

10        MR. STEFANICH:  Objection.  Form and

11     foundation.  You can answer.

12        A.   Yeah --

13   BY MR. STARR:

14        Q.   Let me withdraw the question.  It was a badly

15   phrased question.  It would be a good police practice

16   for whoever created a general offense case report to

17   include information like one of the victims or witnesses

18   knew one of the suspects, correct?

19        MR. BURNS:  Objection to the form of the

20     question.

21        A.   Something like -- there's two different things

22   going on here.  That somebody that knows somebody is a

23   little different than somebody that's been seen in the

24   neighborhood several times.

25   BY MR. STARR:

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

225

1      Q.    Okay.  So it doesn't say that she knew him,
2  correct?
3      A.    It doesn't say that, no.
4      Q.    Does it say that she had seen him in the
5  neighborhood several times?
6      A.    No.
7      Q.    Okay.  If you were writing a general of
8  offense case report and a witness told you I saw the
9  suspect and it was someone who I've seen around the
10 neighborhood several times before the shooting, is that
11 information that you think would be a good practice to
12 include in a police report?
13          MR. STEFANICH:  Objection.  Form.  You can
14     answer.
15     A.    These reports are highly summarized, and I'm
16 sure Gilger didn't have a whole lot of time to talk to
17 everyone.  You get more information once the detectives
18 talk to everybody.
19 BY MR. STARR:
20     Q.    Okay.  So that's fine.  But --
21     A.    Actually this -- this report is more detailed
22 than normal.
23     Q.    Okay.  That's fine.  But my question is,
24 if you were writing a general offense case report and
25 you interviewed a witness who said I'd seen the one of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   the suspects in the neighborhood several times before
 2   the shooting, is that information that you think should
 3   have been included in the police report?
 4        A.   If they said that at that time, yes.
 5        Q.   Okay.  So if Mr. Gilger had learned that from
 6   Ms. Friend, he should have included that in here,
 7   correct?
 8        A.   I would think he would've, yes.
 9        Q.   Okay.  All right.  Just real briefly, there's
10   some other police officers listed at the very end of the
11   narrative.  Can you take a quick look at that?
12   Maniscalco, Gates, Povolo, and Fleming.  Do you see
13   those names?
14        A.   Yeah, Fleming's a detective and he's --
15   Gilger's required to whoever comes on the scene that he
16   just includes them in the report if he can.
17        Q.   Okay.  Are you familiar with Detective
18   Fleming?
19        A.   Yes.
20        Q.   Okay.  Did you work with Detective Fleming at
21   any point?
22        A.   Very -- very slightly.
23        Q.   Did you have any opinion about Detective
24   Fleming's work as a Chicago police officer?
25        A.   Yeah.  He -- he seems a good detective.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q.    Okay.  What about these other officers;
 2   do you know them?
 3        A.    Let me see.  No.
 4        Q.    Does seeing their names listed on this report
 5   refresh your recollection at all?
 6        A.    No.
 7        Q.    Okay.  All right.  Sir, you previously -- I
 8   believe I asked you this, and I think I believe you
 9   testified this, but I'm going to make sure.  I asked you
10   if you ever, in your career as a Chicago police
11   detective, did you ever manipulate any eyewitness -- or
12   sorry.  In your career as a Chicago police officer, did
13   you ever manipulate or coerce any witness to identify a
14   suspect?
15        A.    No.
16            MR. STEFANICH:  Objection.  Form.
17   BY MR. STARR:
18        Q.    Were you ever accused of doing that as far as
19   you know?
20        A.    Yes.
21        Q.    Okay.  When were you accused of doing that,
22   sir?
23        A.    In -- in the Thaddeus Jimenez case.
24        Q.    Okay.  We talked about that case a little bit
25   briefly, correct?  Earlier today?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.    Yeah.

2    **Q.    Okay.**

3    A.    A little bit.

4    **Q.    What were you accused of doing in that case,**

5    **sir?**

6    A.    You know I'm not even sure.

7    **Q.    Okay.  Well, you just testified that you were**

8    **accused of manipulating or coercing a witness to**

9    **identify a suspect; is that correct?**

10    A.    Well --

11        MR. STEFANICH:  Objection.  Form.  You can

12    answer.

13    A.    I -- I believe I was accused of showing a

14    single photo before the lineup.  And they felt it was

15    coercion.

16    BY MR. STARR:

17    **Q.    Okay.  You were accused of showing a single**

18    **photo before a lineup.  Is that what your testimony is?**

19    A.    That's -- that's what I said, yes.

20    **Q.    Did you in fact manipulate a witness in the**

21    **Jimenez case?**

22    A.    No.

23        MR. STEFANICH:  Objection.  Form.  You can

24    answer.

25    A.    No.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JEROME BOGUCKI, taken on April 9, 2021

229

```
1    BY MR. STARR:
2        Q.    Did you show a witness a single photograph in
3    the Jimenez case?
4        A.    No.
5        Q.    Did you violate Thaddeus Jimenez's
6    constitutional rights?
7            MR. STEFANICH:  Objection.  Form.  And I think
8        it violates the agreement that was reached in the
9        Thaddeus Jimenez case.  That your office wasn't
10       going to use anything that was said if he was asked
11       that question in any other proceedings, except for a
12       potential Thaddeus Jimenez retrial.  So I think
13       you're violating that agreement by asking that
14       question.  I'm going to instruct him not to answer
15       that question.
16           MR. STARR:  Okay.  And for the record, I don't
17       think I am.  I think that the agreement was absent
18       if there was no appeal that was the agreement, but I
19       think the agreement was if there was an appeal that
20       that agreement was off.  Why don't we take a
21       five-minute break and I can talk to my colleagues
22       who were involved in that case and see if I'm
23       correct?
24           MR. STEFANICH:  Sure.  Okay.  I mean, you have
25       the transcript.  I have the transcript, so --
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JEROME BOGUCKI, taken on April 20, 2023

```
 1          MR. STARR:  Yeah.

 2          MR. STEFANICH:  I mean, I think it's pretty

 3    clear from the transcript and I think it's pretty

 4    clear from the briefs in the 7th Circuit too,

 5    so -- you can take five minutes.

 6          MR. STARR:  Yeah.  So let me just before we go

 7    off the record.

 8          MR. STEFANICH:  Yeah.

 9          MR. STARR:  So any questions I asked about

10    this, you're going to instruct him not to answer?

11          MR. STEFANICH:  Based on the agreement, yes.

12          MR. STARR:  Okay.  Could I have the last

13    question I asked Mr. Bogucki read back just so I

14    know what it is?

15          THE REPORTER:  Yeah.

16           (REPORTER PLAYS BACK REQUESTED QUESTION)

17          THE VIDEOGRAPHER:  We are off the record. Time

18    is 4:46 p.m.

19           (OFF THE RECORD)

20          THE VIDEOGRAPHER:  We are back on the record

21    for the deposition of Jerome Bogucki.  My name is

22    Kortney Chase.  The date is April 20, 2023, and the

23    time is 4:54 p.m. Central time.

24          MR. STARR:  Okay.  So I believe that I just

25    asked the witness whether or not he violated
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  Thaddeus Jimenez's constitutional rights.

2      MR. STEFANICH:  That's correct.  I objected and

3  instructed the witness not to answer.

4      MR. STARR:  Okay.  And I have not entered any

5  document from the Thaddeus Jimenez trial or case

6  into evidence today, during today's deposition,

7  right?

8      MR. STEFANICH:  I agree with that.

9      MR. STARR:  Okay.  So is it your position that

10 I'm not allowed to ask him any questions about

11 Thaddeus Jimenez?

12     MR. STEFANICH:  It's not.  My position is, the

13 question you asked was a question that was asked to

14 Mr. Bogucki at a part of the Thaddeus Jimenez

15 proceeding that your office agreed not to use and

16 never use in any other proceeding except for a

17 retrial of Mr. Jimenez's civil case.  And by asking

18 him that same question, that's what you're doing.

19 And that's what I think you're violating

20 that -- that agreement that was reached between your

21 office and Mr. Bogucki.

22     MR. SWAMINATHAN:  But that agreement does not

23 say that we did not agree that -- we would agree

24 that we would never ask this witness in any other

25 proceeding about his actions, but in context of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    404(b) or any other case.  You can take whatever
2    position you want about whether or not we're allowed
3    to impeach him with his testimony from the Thaddeus
4    Jimenez case and whether we're allowed to use that
5    transcript.  And that's a very different question
6    than whether we get to simply ask him the typical
7    404(b) questions we'd asked of any witness.
8         MR. STEFANICH:  It's the same exact question
9    that was asked in the Thaddeus Jimenez case.
10   It's --
11        MR. SWAMINATHAN:  All we're asking is whether
12   he violated his -- you're saying we cannot ask him
13   any form of a question of whether he violated the
14   constitutional rights or you want us to rephrase it.
15        MR. STEFANICH:  I'm saying the former, correct.
16        MR. SWAMINATHAN:  You cannot ask any questions
17   whatsoever about whether he violated Thaddeus
18   Jimenez constitutional rights in any form?
19        MR. STEFANICH:  Yes -- yes.
20        MR. SWAMINATHAN:  And regardless of whether --
21   so that has nothing to do with whether or not we're
22   impeaching him with the transcript, has nothing to
23   do with the transcript.  We cannot ask on that topic
24   whatsoever.
25        MR. STEFANICH:  I might not be following you.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1    But yeah.  That is our position.

 2        MR. SWAMINATHAN:  Does that transcript that

 3    you're referring to, say that we would not ask any

 4    question of this witness ever again, of whether he

 5    violated constitutional rights, or does it say that

 6    we would not use that transcript?

 7        MR. STEFANICH:  It says, "We're never going to

 8    use this again unless there's an appeal in a

 9    successful retrial.  In which case then we would be

10    able to use this?  That's the only conceivable way

11    this testimony," it says, "would be under seal."

12    And then if you go further, Mr. Loevy states --

13        MR. SWAMINATHAN:  Specifically referring to the

14    transcript, right?

15        MR. STEFANICH:  Yep.  Mr. Loevy states, "Let's

16    say they win a Batson challenge and the court says,

17    do this again.  We intend to use this at the

18    retrial."

19        MR. SWAMINATHAN:  When you say "use this,"

20    you're referring to the transcript of his testimony

21    in the Jimenez case, correct?

22        MR. STEFANICH:  I'm referring to the questions

23    and answers that were asked of Mr. Bogucki at that

24    proceeding.

25        MR. SWAMINATHAN:  Yes.  The questions and

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

234

1   answers that we're asking.  We're not asking him of

2   his questions and answers in the Jimenez case.

3       MR. STEFANICH:  You asked the exact same

4   question.

5       MR. SWAMINATHAN:  You said --

6       MR. STEFANICH:  Word for word.

7       MR. SWAMINATHAN:  Okay.  Sean ask him whether

8   he's fabricated evidence, ask him whether he

9   violated due process, ask him whether he's

10  suppressed evidence, and ask him whether he violated

11  the constitutional rights of Thaddeus Jimenez.

12      MR. STEFANICH:  And I'm instructing him not to

13  answer that.

14      MR. SWAMINATHAN:  On any of those questions.

15  Even the questions that are not in the transcript.

16      MR. STEFANICH:  Yeah.  The way you just phrased

17  it now.  Yes.

18      MR. SWAMINATHAN:  And where in the transcript

19  did we ask whether he ever fabricated evidence?

20      MR. STEFANICH:  I'm sorry.  I couldn't hear

21  you.

22      MR. SWAMINATHAN:  Where in the transcript do we

23  ask him if he fabricated evidence?

24      MR. STEFANICH:  I think there's an inference

25  based on the questions that were asked.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1      MR. SWAMINATHAN:  Where did we agree that we'll

2  never ask him if he's ever fabricated evidence ever

3  again in the history of times?

4      MR. STEFANICH:  So you're misconstruing what

5  I'm saying.

6      MR. SWAMINATHAN:  Where do we agree that we'll

7  bind future clients --

8      MR. STEFANICH:  So I --

9      MR. SWAMINATHAN:  -- the types of questions

10  that we can ask of this witness.

11      MR. STEFANICH:  Okay.  So I'm not going to

12  allow you to yell at me, which is what you're doing.

13  I'm not going to let you interrupt me.

14      MR. SWAMINATHAN:  No I'm trying to be very

15  clear.  You are telling us that -- that transcript

16  binds all future clients in terms of the questioning

17  that we can ask this witness.  There's a difference

18  between that and saying that whether or not we can

19  use that transcript, that can be a separate debate.

20  But we're not talking about using that transcript.

21  We're talking about asking him questions.  Yes or no

22  questions, just like you asked about the Kourtney

23  Terry case or any other case.

24      MR. STEFANICH:  Okay.  So I think what's

25  happening now is inappropriate for this deposition.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1   I'm not the deponent, you're interrogating me,

 2   you're interrupting me.  You're not listening to me.

 3   You're misconstruing what I'm saying.  I don't mind

 4   continuing this discussion at a meet and confer, but

 5   I don't think it's appropriate to do this in the

 6   middle of a deposition right now.

 7        MR. SWAMINATHAN:  No, what the problem is,

 8   we're in the middle of a deposition.  You have never

 9   once taken the position in advance of this

10   deposition or sought a protective order stating that

11   you would not permit this witness to answer basic

12   questions about his conduct in the case.

13        MR. STEFANICH:  I was relying on the

14   representation that Mr. Loevy made to a federal

15   court judge that he would never use this in any

16   other proceeding except for a retrial of

17   Mr. Jimenez.  So I didn't think that this would --

18        MR. SWAMINATHAN:  Okay.  Go ahead.

19        MR. STEFANICH:  -- be an issue.  And I think

20   I'm justified in relying on that representation.

21        MR. SWAMINATHAN:  With regard to questions that

22   are not in any way relying on that transcript

23   testimony?

24        MR. STEFANICH:  He asked the same exact

25   question.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          MR. SWAMINATHAN:  It doesn't matter.  You're

2     saying something that's an irrelevant point.

3     Because now I've asked you about five other

4     questions that are not the exact question, and you

5     said you're instructed not to answer those either.

6     That's correct?  I'm understanding correctly, right?

7          MR. STEFANICH:  Correct.

8          MR. SWAMINATHAN:  Is that correct?

9          MR. STEFANICH:  I just said "correct".

10          MR. SWAMINATHAN:  Okay.  So Sean, I think our

11     record is clear and we'll address it with briefing.

12          MR. STARR:  Okay.  I think I'm going to

13     complete the circuit by asking the witness if he's

14     going to take his attorney's advice and not testify

15     and then --

16          MR. SWAMINATHAN:  Okay.

17          MR. STARR:  Okay.  So I'm going to re-ask the

18     question.  You can make your objection.

19          MR. STEFANICH:  Sure.

20 BY MR. STARR:

21     **Q.   Okay.  Mr. Bogucki, did you violate Thaddeus**

22 **Jimenez's constitutional rights?**

23          MR. STEFANICH:  Objection.  I'm going to object

24     based on the agreement that Mr. Loevy reached with

25     Mr. Bogucki in the Jimenez trial.  And I'm

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        instructing the witness not to answer.
 2   BY MR. STARR:
 3        Q.    Mr. Bogucki --
 4        A.    I will follow my lawyer's advice.
 5        Q.    Okay.
 6             MR. SWAMINATHAN:  Sean, ask him about whether
 7        he had fabricated evidence or suppressed evidence in
 8        that case.
 9   BY MR. STARR:
10        Q.    Mr. Bogucki --
11             MR. STEFANICH:  I'm going to object to this
12        format too, where Anand is telling you what to ask
13        on the record.  I think that's inappropriate.
14        I don't think that's how it's supposed to be done
15        under the federal rules.
16             MR. STARR:  That's fair.  I'll ask the
17        questions.
18   BY MR. STARR:
19        Q.    Mr. Bogucki, did you ever fabricate evidence
20   in the Thaddeus Jimenez's case?
21        A.    No.
22             MR. STEFANICH:  Objection.  The answer can
23        stand, but listen, wait for me to object.
24             THE WITNESS:  Okay.
25   BY MR. STARR:
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   Mr. Bogucki, did you ever manipulate an

2    eyewitness identification procedure in the Thaddeus

3    Jimenez case?

4         MR. STEFANICH:  Objection.  I'm instructing the

5    client not to answer.

6    BY MR. STARR:

7    Q.   Are you're going to take your attorney's

8    advice and refuse to answer my question?

9    A.   I will accept my attorney's advice.

10   Q.   Mr. Bogucki, did you ever unduly influence any

11   witness identification procedures in the Thaddeus

12   Jimenez case?

13        MR. STEFANICH:  Objection.  Based on the same

14   agreement.  Instruct the client not to answer.

15   BY MR. STARR:

16   Q.   Mr. Bogucki are you going to --

17   A.   I follow my lawyer's advice.

18   Q.   Okay.  Mr. Bogucki, did you ever coerce any

19   witnesses in the Thaddeus Jimenez case to identify

20   Thaddeus Jimenez?

21        MR. STEFANICH:  Objection.  Same basis.

22   Instruct the client and that's answer.

23   BY MR. STARR:

24   Q.   Are you going to take your attorney's advice?

25   A.   I do.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q.   Okay.  Let's take a two-minute break and see

2  where we're at.

3           MR. BURNS:  What time is it now?  How long have

4      we been on the record, I'm sorry.

5           THE REPORTER:  Four hours, 26 minutes.

6           MR. BURNS:  Okay.

7           THE REPORTER:  Okay, we going off record.

8           THE VIDEOGRAPHER:  We are off the record and

9      the time is 5:03.

10          (OFF THE RECORD)

11          THE VIDEOGRAPHER:  We are back on the record

12     for the deposition of Jerome Bogucki.  My name is

13     Kortney Chase. Today is April 20, 2023 and the time

14     is 5:05 p.m. Central time.

15          MR. STARR:  Can we get a time of the record

16     check?

17          THE REPORTER:  Four hours, 26 minutes.

18          MR. STARR:  Okay.  And I think the parties have

19     agreed off the record that we will suspend this

20     deposition, address the issues related to the

21     Jimenez line of questions and also resume for the

22     remainder of the time at another date; is that

23     correct?

24          MR. STEFANICH:  Agreed.

25          MR. BURNS:  I have no objection.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    MR. STARR:  Okay.  Thank you very much.

2    THE REPORTER:  All right.

3    THE VIDEOGRAPHER:  We are -- go ahead.

4    THE REPORTER:  Sorry.  Do we want orders for

5  this portion of the transcript starting with Mr.

6  Starr?

7    MR. STARR:  I'm going to hold off.

8    THE REPORTER:  Absolutely.

9    MR. STEFANICH:  I don't want it

10   MR. BURNS:  Not at this time.

11   THE REPORTER:  Okay.  Are we reading or waiving

12  today?

13   MR. BURNS:  Well just hold till we --

14   MR. STEFANICH:  Suspended, yeah.

15   THE REPORTER:  Absolutely.

16   THE VIDEOGRAPHER:  We are off the record. Time

17  is 5:05 p.m. Central time.

18       (DEPOSITION CONCLUDED AT 5:05 P.M.)

19

20

21

22

23

24

25

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

242

```
 1                    CERTIFICATE OF REPORTER

 2                       STATE OF ILLINOIS

 3

 4    I do hereby certify that the witness in the foregoing

 5    transcript was taken on the date, and at the time and

 6    place set out on the Title page hereof by me after first

 7    being duly sworn to testify the truth, the whole truth,

 8    and nothing but the truth; and that the said matter was

 9    recorded digitally by me and then reduced to typewritten

10    form under my direction, and constitutes a true record

11    of the transcript as taken, all to the best of my skill

12    and ability.  I certify that I am not a relative or

13    employee of either counsel, and that I am in no way

14    interested financially, directly or indirectly, in this

15    action.

16                          KRYSTAL M BARNES
                              Official Seal
17                    Notary Public - State of Illinois
                     My Commission Expires Feb 18, 2026
18

19

20

21

22    KRYSTAL M. BARNES,

23    COURT REPORTER/NOTARY

24    MY COMMISSION EXPIRES ON: 02/18/2026

25    SUBMITTED ON: 05/04/2023
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04768 Document #: 184-8 Filed: 05/06/25 Page 245 of 267 PageID #:5354
THE DEPOSITION OF JEROME BOGUCKI, taken on April 26, 2023
243

## Exhibits

Exhibit 1_
Bogucki
158:24,25
159:8,9 188:3,4
193:23 206:16

Exhibit 2_
Bogucki
164:22 165:4

Exhibit 3_
Bogucki
176:22 177:4
196:8 209:2,3
215:24

Exhibit 4_
Bogucki
194:9,13 209:2

Exhibit 5_
Bogucki
213:7,8

Exhibit 6_
Bogucki
219:25 220:2

___

$

$65,000 58:6

___

0

02 46:14 47:11
51:18 195:9

06 132:3

0966425 188:1

___

1

1 158:24,25
159:9 188:4
189:7 193:23
206:16 215:12
223:21,22,23

1059 214:15

1060 215:12

1092 214:3

10:49 6:7

11:40 54:14

11:47 54:19

11:56 64:8,13

12 105:16,19,23
161:17 205:2
206:10

12:41 107:5

13 215:6

15th 90:6,20
91:4

18th 195:9

1963 189:16
207:22

1976 90:16

1978 64:21

1980 90:6 91:5,
17 109:15
112:2

1990 7:20
51:23,24 66:18
175:14 220:23

1995 8:16
10:10 11:4,16
15:9 66:19
92:9,14,17
93:3,15,24
94:9,15 95:15,
17 101:2 112:5,
9,11 117:3
125:2 134:25
135:6 138:25
171:15,18,20
172:1,6,13,19
173:4,20
174:25 175:6
176:17 178:1,
12,25 179:9,25
180:3,8,16
181:6,7,11
182:20 186:4
189:25 190:10
192:14 196:23
197:1,3,18
198:2 199:12
200:5,7 209:21,
22 210:18
215:16,17

216:19

1999 198:7

1:00 92:22

1:38 107:10
151:20,22

___

2

2 164:22 165:4
223:20

20 54:18 64:12
107:9 151:19
190:20 201:12
230:22 240:13

20-CV-04768
6:13

200 66:12,13

2002 11:14,17,
22 12:5,19
15:25 16:15
38:11,16,20,24
39:2,4 40:3,4
41:7,15,24
42:5,15,17
46:13 66:19
93:11,22 94:11
95:18 101:9,12
102:5 103:19
104:10 106:11,
24 111:13
112:17,18
125:4 139:5
144:5,6,24
145:5,10,19
146:3,16,21
147:1,6,13,22
148:11,13
149:2,5,6 150:7
160:18 161:3,
17 163:21
167:17,20
173:2 178:16,
23 181:4,6
197:14 201:21
203:21 204:9,
15 217:7,9
218:3 219:6

2006 56:24
89:18 90:4

2007 57:1

2014 59:19

2020 70:25

2023 6:6 54:18
64:12 107:9
151:19 201:12
230:22 240:13

20th 6:6

21 7:20 220:23

25th 103:8,13

26 240:5,17

2:38 151:23,24

___

3

3 176:22 177:4
196:8 209:3
215:24

30 189:16
207:22

3:46 201:8

___

4

4 194:9,13
209:2

404(b) 232:1,7

4550 164:23

4565 164:24

4:10 201:13

4:30 92:20,22

4:46 230:18

4:54 230:23

___

5

5 90:8 91:15
92:1,7,10 93:12
94:5,8,16 98:1
99:22 103:12,
14 116:20
131:17 158:12,
17 180:11
213:7,8 219:16

5-4 91:20

5555 92:8

5:03 240:9

5:05 240:14
241:17,18

___

6

6 219:25 220:2

65 220:1

69 88:24

___

7

7 214:15

71 55:1

77 90:25 91:1

7th 230:4

___

8

80 91:7

86 176:23
183:10

87 183:12,14
186:17,18,21
187:6 188:11

88 183:17

881 214:3

89 183:23

8:30 195:10,12

___

9

9 214:18

90 184:6

91 184:13

92 184:17

93 184:22

94 185:4

95 11:13 12:2,4
40:25 41:3
93:22 111:13
112:14 117:1



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04768 Document #: 184-8 Filed: 05/06/25 Page 246 of 267 PageID #:5355
THE DEPOSITION OF JEROME BOGUCKI, taken on April 26, 2023

244

176:14 185:8,
24 210:1,10,16
214:16 215:6
216:4,10,18,24

96 176:23
185:13

966425 189:2
196:6,13

98 179:4 198:8,
10,11,13,22
199:1,6 209:13,
15 210:14
212:16 216:5,
10

99 179:5
198:13,22
199:1,6 209:13,
15 212:16

—————

A

a.m. 6:7 54:14,
19 64:13 92:22
195:10,12

ability 26:21
54:22 55:3,7

absent 229:17

absolutely
24:6 132:19
163:18 241:8,
15

abuse 63:16
64:1

ac 177:24

academy 89:1,
5,10 90:5,15,17
107:15,17,21
108:1,14,19,23
109:1,6,11,20,
24 110:1,6,10,
18,24 111:5

accept 239:9

accepted
125:12

access 95:24
137:17,18
177:24 217:10

accord 9:8

account
206:22 207:9

accurate 54:23
55:3,7 115:4
119:24 127:3

accurately
113:25

accused 58:8,
11,25 59:3,5,7
60:21,24 62:18,
21 63:23,25
65:2,5,8,16,18,
22,23 227:18,
21 228:4,8,13,
17

act 110:12
129:2

actions 231:25

actual 41:12
150:17 201:23
211:25

add 23:24
34:12,25 35:5

addition
114:16 118:2
152:7

additional
35:10 49:22
50:3,5 89:8
108:24 109:25
162:24

address
109:19 237:11
240:20

adequate
112:16

administrative
95:12

advance 236:9

advice 237:14
238:4 239:8,9,
17,24

affect 54:22
55:3,6

affirm 7:2

affirmative
42:25

AFIS 188:19,
21,23 189:2

African 204:15

age 54:24
177:1

agree 18:2
83:19 205:14
231:8,23 235:1,
6

agreed 77:9
82:18 231:15
240:19,24

agreement
229:8,13,17,18,
19,20 230:11
231:20,22
237:24 239:14

ahead 51:21
191:14,15
236:18 241:3

AKA 202:25

alias 141:22
164:16,17
195:14

aliases 171:10

align 34:12

allegation
215:17

allegations
60:14 62:1
63:11,15

alleged 60:5,8,
12 62:14 82:22,
25

allegedly 42:6
106:7 164:2
168:21 172:20
175:6

allowed
231:10 232:2,4

alluded 109:9

Allyson 69:12,
15,25 70:5
71:6,11,25 72:6

74:9,10,17
88:1,11

alternative
205:10

American
204:15

amount 102:25
205:12

analysis
219:10

Anand 238:12

answering
162:8

answers 52:19
233:23 234:1,2

Anthony 17:15
31:18 184:6

Antonio 185:1

anymore
56:21 59:18
137:20 140:2

anyone's
65:22 104:22

anytime
142:13

apologies 69:5

apologize
64:16 172:18
182:4

apparently
117:4 198:3
214:25 222:20

appeal 229:18,
19 233:8

appeared
203:12

appears
163:17 182:24,
25 193:24
207:3

applied 103:18

apply 23:20

approached
223:25

approval
124:8,9

approved
124:11 135:20

April 6:6 39:2,4
40:4 42:15,17
54:18 64:12
107:9 151:19
195:9 201:12
230:22 240:13

area 47:6,10,14
90:8 91:15,20
92:1,7,10 93:12
94:5,8,16 95:2
98:1 99:22
103:12,14
116:19 131:17
152:1 158:12,
17 180:11
219:16

areas 107:24
140:23

arises 36:23

Arnold 160:11,
18 168:7 169:4,
7,10,12,14,19,
25 170:4,18,22
195:14 202:10,
25

array 11:7,12,
16 12:4 13:9,11
14:24 15:6,8,
10,19,22 35:12
38:12,17,24
40:4,15,17
41:2,3,16,24
42:5 45:16 46:6
50:20 136:24
137:14 138:14,
19 139:8,14,20,
24 140:4,15
142:8,9,12,14,
15,18,25
143:10,24
144:2,6,9,18,24
145:13 146:5,
18 147:1,5,16,
19,25 148:3,13,
18 149:5,6,24
150:3,12,18,23
152:3 153:21
154:9 157:11



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

158:15 160:19
161:21 162:22
164:8 167:6,20
168:25 170:21
171:15,17,20
172:1,5,12,19
173:19 190:10
199:25 200:4
202:21 203:21
204:2,9,15
207:25 217:7
218:3,5 219:6

arrays 11:19,
20,24 15:25
16:3 38:20
40:17,23 45:21
76:8 134:19
137:24 140:19
141:8 145:4,5,
8,10,20 147:12
149:20 150:25
167:16 201:21
202:19

arrest 48:10,
19,23 49:3
50:13,25 66:24
168:3 195:5,6,7
196:17

arrested 48:2,
13,14 49:9
187:22 196:20

arresting
49:12

arrests 48:18
141:3

assigned 8:14,
15,18,20 10:17
85:12 90:20
124:25 132:16,
17 175:19
180:19 214:18

assigning
180:18

assignment
90:3

assisted 17:21

assume 15:12,
13 21:18,22
22:15 23:20
52:2 53:15

87:12 178:23
188:15 202:2

attached
164:19

attempt 23:4,9
28:18 131:8

attempted
24:14,25 28:22
29:1 223:24

attention
214:14

attorney
36:22,25 37:1,
9,16 47:19 53:6
67:20,23 68:2,
8,16,19,20 69:6
72:12 80:11
83:7 87:7

attorney's
237:14 239:7,9,
24

attorney-client
36:17 73:23

attorneys 53:1
68:6 71:8 72:9,
21 74:13 81:10,
20,24 88:8,12

audio 131:24

avenues 176:1

average 73:14

aware 22:4
33:23 34:5
35:14 48:12
49:11 106:12,
21,22 111:23
180:2,5 210:17
211:17 212:20
213:2 215:16

——————

B

——————

B-O-G-U-C-K-I
7:14

back 23:8 24:5,
9 54:16 64:10,
20,21 70:24
93:21 100:2,9,
21 106:16

107:7,14
151:17 174:2
181:17 186:18
196:7 197:18
201:10 217:5
230:13,16,20
240:11

background
48:5,6,16 49:9,
12,15

bad 47:4
205:12

badly 224:14

Barnes 6:5

barring 92:19,
24 93:2,7
218:10

based 36:16
73:22,24 87:18
106:11 169:9
189:3 196:15
199:10 200:18
221:1 230:11
234:25 237:24
239:13

basic 236:11

basically
49:24 94:24
133:19 135:11

basis 21:12
128:25 138:10
239:21

basket 124:24

Bates 159:9
164:22 166:3,6,
7,14,20 167:2
176:23 183:10,
12,14,16
184:13,17,22
185:4,8 187:6
194:9 214:1,3,
15 215:12
220:1

Batson 233:16

Bear 159:4

beard 206:25

bearing 206:3

began 10:25

begin 7:6

beginning
44:21 182:8

behalf 6:22

believed
200:23

bench 97:15
98:25 99:1

bet 178:3,4,10,
13

bind 235:7

binds 235:16

birth 189:12,15
193:20,21,24
196:15 207:20

birthdate
208:1

bit 22:24 35:18
51:20 74:20
105:5 136:24
162:7 165:2
199:1 227:24
228:3

black 163:20
189:9,11
204:15 215:13
223:21

blank 118:16
125:16 127:1

blanks 116:15

blue 223:22

blurry 96:16

body 100:19

Bogucki 6:9,
10,21,24 7:13,
16 54:17,21
64:11 88:14
107:8,12
151:18 152:1
201:11,15
230:13,21
231:14,21
233:23 237:21,
25 238:3,10,19
239:1,10,16,18

240:12

booking 141:4

bottom 166:3
184:18

bounds 26:19

box 124:12

Brady 119:12

Brady's
119:19

braids 207:3,6

break 53:21,23
54:3,7,9,11
66:21 107:2,13
136:23 151:12
201:5 229:21
240:1

Brian 6:19
69:14,25 71:3,
7,10,21 72:3
74:3,4,17 87:8
88:2,4,12

briefing 237:11

briefly 69:16
226:9 227:25

briefs 230:4

brigade 34:24

bring 117:23

bringing
116:13

brochures
120:13

brought
193:10

brown 207:15,
18

building 72:14
94:9 97:6
103:14

bullets 223:23

bunch 191:3

Burns 6:22
23:17,24 24:4
106:13,17
111:20 136:15,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

18 144:20
151:14,21
191:16 192:22
193:2,16 213:9
224:19 240:3,6,
25 241:10,13

---

C

cabinets 94:22

call 48:17
69:18 80:24
81:3,16 82:5,17
100:3,6

called 82:9
100:15 114:4,8,
17 137:20
148:17 175:16
220:20

calls 72:10
80:15 88:4

care 205:6,8

career 10:21,
22 14:9 21:19,
24 22:9 52:3
90:13 91:22
108:25 129:9
131:22 132:2,6
154:24 158:8
227:10,12

case 6:13 7:19
8:21 9:7,10,14
11:18 18:3,4,7,
9 19:20 22:25
32:4,13,15 49:1
51:24 55:21,25
56:4,11 57:6,10
58:9,19,22
59:1,10,11,14,
22 60:3,6,9,16,
22,25 61:10
62:13 63:3,20,
24 65:3,6,9,19
73:21 75:7,10
76:9,13,14,18,
22 77:2,6,10,
15,22 81:13,18,
20,23,24 82:14,
17 83:10,13,17
84:20,24 85:1,
4,8,12,15,20,24
87:17,21

105:16,19
113:18 114:5
115:8 117:7
119:2,19
121:22 129:22
131:2,3 132:12,
16 138:21
139:14 142:3,
24 143:10,16
147:5 155:7
156:20 157:5
160:17 163:3,4,
5,13 175:11,19
178:1,12,25
180:4,16,19
181:1,7,11
209:17 213:18,
21,24 219:13,
15,20 220:16,
20,22 221:15,
21 223:3,15
224:4,16 225:8,
24 227:23,24
228:4,21 229:3,
9,22 231:5,17
232:1,4,9
233:9,21 234:2
235:23 236:12
238:8,20 239:3,
12,19

cases 8:20 9:3,
11,12,15,17,20,
22,25 10:3,5,
10,12,17 56:13
61:2,7 135:19
139:7 140:3
142:14 180:18
215:3

category 30:5

Central 6:7
54:14,19 64:13
107:5,10
151:20 201:13
230:23 240:14
241:17

Certificate
83:13,16,21
84:15

chairs 97:18,
21 99:12

challenge
233:16

chance 143:4

change 93:15,
20 96:13
105:22 168:5

changed
90:10,12 91:22
92:5 93:16
97:17 124:21

changing
125:1

characteristic
s 104:5 123:2

charged 7:25

Charles
184:23

Chase 6:4
54:18 64:12
107:9 151:19
201:12 230:22
240:13

check 103:7,24
176:1,4 191:2
194:1 216:6
240:16

checks 49:13,
18 209:14

Chicago 6:23
7:22 10:13,16
14:13 15:18,21
17:14 18:13
31:17 32:17
33:11 55:15
58:15 61:14,22
64:18,25 85:20
86:20 88:19
89:9,20,22
90:1,15 103:17
104:3,23 105:2,
6 106:11,22
118:22 125:19,
22 134:9,24
136:4 137:22
140:18,21
141:2,6,13,17
144:22 145:3
152:8 156:3
158:12,17
162:22 172:11,
13,20 174:5
176:17 177:16,

19,21 187:18
192:7 196:17
199:22 200:9
217:10,15
226:24 227:10,
12

choice 205:8

choose 127:25
137:10 141:11
151:11 155:25
173:14 205:17
217:25

choosing
206:22

chose 9:11
217:13,21
218:4,10

chosen 139:16
218:17,20,23
219:1

circle 183:2,13,
17 187:2
190:19,24

circles 192:15,
17

circuit 230:4
237:13

circumstance
64:1 124:15
134:1 154:17

circumstance
s 39:3 92:24
93:2,7 117:19
123:1 128:12
129:14,17
130:3 133:13
138:12 139:6
141:11 142:11
154:18 219:18

city 6:23 60:2
64:20 88:9,19

City-jf-149
194:9

City-jf-164
159:9

City-jf-4550
164:23

City-jf-64
220:1

civil 7:17
56:10,11 58:22
70:15,19
231:17

civilian 62:23

civilians 63:7

clarify 74:2

clarity's 13:8
32:10 58:21

classes 89:4

clean 27:10

clear 13:10
15:3 30:1 36:20
51:12 53:7 58:2
162:8,10
163:13 212:20
216:9 230:3,4
235:15 237:11

client 8:4
239:5,14,22

clients 235:7,
16

Clinton 173:25
174:2,3,5,12,
15,22 175:3,5
179:13 197:20
199:14,20,21
200:8 210:6,10
212:3 216:22

Clinton's
200:1

close 17:18

closely 198:17

closer 57:2

closing 16:10

clunky 128:2

co-accused
63:3,20

coerce 18:16
19:22 22:6,22
23:4,9 24:14
28:18,22 29:1
227:13 239:18

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

coerced 19:3
20:5,19 21:10,
23 22:13,17
23:1 31:24
32:12,14 60:8,
15 62:14

coercing 59:3
65:8,16,18
228:8

coercion
228:15

cold 9:17 10:5,
9,12,17 215:3

colleagues
229:21

collect 112:25

college 88:25
89:4,5

color 105:8
123:7 163:21,
24 207:14

colors 105:4

column
187:10,11
188:7,13,14,16,
17 189:13,18,
19

commander's
95:10

committed
106:2,8

commonly
131:11 134:18

communicate
d 120:25

communicatio
ns 215:11

compare
127:8,12 188:3

complaint
62:10,19,22
63:7 64:17
70:15,18 81:25
82:5 84:24
85:21,25 86:12,
19,25

complaints
61:15 62:2,6

complete
237:13

complexion
204:19

computer
49:13,18
137:16,18
138:6 182:25
183:1 203:22,
23

computers
121:17

conceal 25:11

concealed
27:21 28:3

conceivable
233:10

concerned
156:21 170:12

concerns 7:20

CONCLUDED
241:18

conditions
54:22

conduct 12:21
14:8 15:22
99:21 104:23
105:2,7 130:11,
23 131:11,17
132:7,11
134:25 135:5
136:5,13
236:12

conducted
11:16 12:10,13,
18 14:19 15:9,
18 16:1 38:20
41:2,3 52:6
75:3 76:9,12
98:18 104:9,14
130:4,20
131:21 136:24
145:13,21
147:5,13
149:24

conducting

97:19 99:20,25
101:12 157:22

confer 236:4

confession
20:20 62:14
65:9,16

confirm 155:18
181:19 196:16
198:10

confirmed
181:25 182:9
196:17

confuse
212:13

confusing
212:12

connected
49:7 97:1

connection
215:7

considered
106:9 112:8

Constantly
133:8

constitute
11:21

constituted
163:15

constitutional
16:22 17:11,23
229:6 231:1
232:14,18
233:5 234:11
237:22

contained
40:18

contemporane
ously 181:20

context 231:25

continuing
236:4

contribute
121:15,16

convenient
217:18

conversation
68:7 82:11
133:19

conversations
36:24,25 37:8,
15 67:22 71:8
73:24 74:16
78:21 79:4,8,
12,17,20 80:1,5
84:19 88:5

conversely
115:22

convicted 7:25

conviction 8:7
83:1,10

convictions
9:25

Cook 137:21
139:21,24
140:3,7,14

Cooper 28:9,
13,18,22 29:1
38:3,6,7 39:22
40:9,13,23
41:4,7,14 42:6,
8,18 43:1 44:5,
7,9,13,16 50:22
78:21 79:1
149:13,15,18,
22,25 150:6
163:14 166:15
171:23,25
172:5,20 173:4
174:15,19
175:6 185:24
186:2 189:25
190:2 200:4,8
203:12 224:1

Cooper's
222:2

copies 86:23,
24 150:21

copy 75:1
159:24

Corky 62:11

corner 98:5
220:17

correct 8:1,4,7,
11 10:2 11:1,4,

15,19 12:6,7
13:2,3,19 14:21
15:6 17:2,8,9
21:10 22:6,7,
10,11,13 25:20
26:6,12 29:18
37:14,20,23
38:17 39:24
40:11,12,24
41:25 42:3,15
45:4,16 46:16,
21,22 50:4,8,
10,11 52:2,9
59:14 60:16
61:8 68:17
70:21,25 72:3
73:6 77:22,23
78:4,18,19
80:12 83:1,13
84:5 85:5 86:21
87:10 88:12,13
90:21 91:6
92:10 93:12
95:3,21 96:1
99:9,10 100:24
103:15 107:17,
22 108:18
109:12 112:3,
12 114:5,9,14
116:18 118:24
124:2 127:3
137:25 138:25
139:21 142:6
143:1 144:7
147:14,25
150:13 154:6,7
155:4,15 156:5,
9,10,14 157:6,
14 158:10
159:21 160:3
161:21 163:3,
16 164:5
167:21,24
169:1,5,16,21,
25 170:18,22,
25 171:15
172:21 173:12,
13,21 174:9
176:9 179:9,25
180:4 181:1,11,
14,16 182:11,
12,17 183:10
187:23 189:3,
16 190:2 191:5
192:11,14,21
193:9,18,24

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

194:4 195:16, 19 196:13,25 197:3,14,18 198:14 199:23 200:2,5,10,13, 18,24 201:17, 19,24 202:15, 22 203:3,9,14, 18,24 205:4 206:23 207:3, 22 208:24 209:9 211:19, 24 212:23 214:6 215:18, 21,22 218:11, 14 219:20,23 220:18,24 221:5,9,25 222:5,8,22 223:1,17 224:4, 9,18 225:2 226:7 227:25 228:9 229:23 231:2 232:15 233:21 237:6,7, 8,9 240:23

Corrections 160:10 164:4

correctly 17:17 51:8 237:6

corroborate 36:5

corroborated 37:5

corroboration 36:9,10

counsel 6:13 7:6

County 137:21 139:21,24 140:3,7,14

couple 52:7 61:23,25 73:16 81:21 82:2 87:13 94:19

courses 89:6

court 6:5,11 52:14 83:25 84:4,7 108:4

110:9,13,14 119:19 136:7 152:13 154:13 215:11 233:16 236:15

courtroom 52:24

courts 135:10, 12,17

cover 203:16

covered 67:13 108:16 110:11

CR 63:24

created 221:2 224:16

crime 7:25 30:4 33:17,21 48:4 52:12 106:2,8 116:11 221:23

crimes 90:10, 11 91:20,21 92:4,10 94:18

criminal 56:7 112:12 135:8 178:20,21 214:5

criteria 137:9 143:22 204:1 208:8 217:24 219:4

cross 194:1

cross-examined 114:9,17

CRS 61:21

current 169:22

Curtis 183:25

cut 220:17

——————

D

daily 105:22

dark 93:20

Darnell 63:8

184:19,20

date 8:13 10:25 11:2 54:18 57:2,3 161:18 178:3 189:12, 15 193:20,21, 24 195:8,9 196:15 201:12 207:20 230:22 240:22

dates 10:8

Davidson 62:24

dawned 209:12

day 6:6 68:10 70:2 92:20

days 210:5

daytime 95:12

death 7:21 33:25

debate 235:19

December 7:20 220:23

decide 138:18 143:15

decided 9:7 157:10

dedicated 95:15,21 96:1, 3,10

defendant 6:21 8:10 57:8, 16 59:13 60:3

defendants 57:13

define 30:7

definition 13:4,11,13,22 14:2,3 30:10,25 112:20

degree 86:15

delay 23:25

deliberately 25:11 27:21

28:3

delivered 70:20

demeanor 110:11,13

denied 43:20

dep 68:16 72:9

department 7:22 55:15 70:13 89:11,20, 23 90:2 94:14 103:18 104:3, 24 105:3,6 106:11,23 125:20,23 134:10,24 137:22 138:3,4 140:2,18,21 141:2,7,13,18 144:23 145:3 158:12 160:10 162:22 164:4 172:11,13,21 174:5 176:2 177:16,20 187:18 192:8 196:17 199:23 200:9 217:10, 15

Department's 152:9

depend 138:15

Depending 131:2

depends 123:14 124:10

depo 79:9 88:6 159:6

deponent 6:20 236:1

deposed 52:2 55:10,14,20 56:9,13,17 59:11 61:2,7,11 81:19

deposition 6:8 7:16,19 16:12 18:1,8 26:20 52:6,20 53:3,18

28:3

54:17 64:11 66:3 67:19 71:9 72:12,21,25 73:3,18 74:19 76:4 78:7,22 79:5,13,23 80:2,6,25 81:4, 9 87:25 107:8 151:18 159:18 160:1,6 165:8 177:14 201:11, 16 213:16 220:13 230:21 231:6 235:25 236:6,8,10 240:12,20 241:18

depositions 55:17

depth 75:16

Derell 185:13

describe 129:3 140:19

description 94:14

designate 99:5

desks 95:2

detailed 225:21

details 85:2

detective 9:4 17:4,7,10,15, 19,22 19:2,16 20:4,19 21:6, 10,23 22:5,8, 16,22,25 24:13, 17,24 25:4 27:20 28:2,21, 25 31:5,9,13 32:24 33:3 57:18 62:17 63:1,2,19 73:2, 4,12,18,25 74:5,6,11,12, 17,18 75:15,23 76:3,8,11,17,21 77:1,2,5,6,15, 20,25 78:4,6, 17,20,24 79:3, 7,11,13,16,19,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

22,25 80:4,9,
15,24 81:2,4,8,
18,22 82:5,13,
16 84:13,20
85:8,11,12
88:2,3,5 89:24
90:4,8,9 91:5,
15,19 92:1,14
93:11,24 99:21
104:24 105:3,7
109:2,10 111:9,
25 112:2,6,9,
21,25 113:3
114:4,8,11
116:8 118:9,22
120:25 121:1
126:23 127:5,
14,15,24 128:7,
8,10 130:10,19,
25 131:12
132:10 134:2
140:22,23
152:1 156:4
158:13,17
179:19 180:3,7,
9,15,21,23,24,
25 181:10
192:8 197:25
198:1 211:22
219:16 226:14,
17,20,23,25
227:11

detective's
90:7 110:1,6,
10,24 111:5
130:23

detectives
8:20 9:2,3
94:16,18,19
95:2 97:19
101:17 109:11
110:18 111:19
179:14,20
180:25 181:7
195:17 197:17,
22,24 210:4
212:1 216:22
225:17

determine
130:25 135:12,
17 137:10
143:23 208:8

development
120:20

Devery 183:18

difference
41:10 111:14
235:17

direct 7:7
214:14

directly 124:20

disagree 83:5,
19

disciplinary
61:15 62:2,6,
10,18,22 63:6,
24

discipline
64:17,23

discussion
236:4

disposal
217:16

dispute 199:5,
7 203:20

district 6:11,12
90:6,20 91:4
103:8,9,13

division 6:12
93:12 94:8,15

Dixon 141:20,
23,25 142:6
143:1,11,13,16,
19,23 151:8
160:11,18
168:1,2,7,8,21
169:4,7,10,12,
14,19,25 170:4,
7,9,18,22
195:14 201:22
202:10,25
203:5,9 204:3,
24 205:16,21
206:2,9,15

Dixon's 204:20

Dixons 205:10,
12,17,18

document
47:12,16,22
113:3,7,14,19,
25 114:12,18,
23 115:2,6,17,

23 116:2,11
117:10,17,19
118:15,23
119:5,20 120:5,
10 121:1,5,19,
23 122:15,21
123:6,8,12
124:1 126:7,11,
14 134:2
144:18,23
145:4,16,20
146:3,12,17
153:3,10,11,13,
22,25 159:7,14,
17 174:17
175:4 177:11,
17,18,21
181:14 182:15,
16,23 194:10,
16,19,23 195:2
198:4 208:18
213:11,13
214:1,4 219:22
220:4,9,15
221:1,7,15
231:5

documentatio
n 187:19

documented
47:20 115:14
126:15 175:7
208:22 210:9,
11

documenting
47:22,23
119:10 120:14,
21 146:9
208:13

documents
66:14 69:23
70:13 120:14
163:11,12
213:16

door 72:18

doorway
223:22

double 192:23

doubt 35:1
46:19

dropped 24:7

drug 48:19

drugs 48:18

due 25:22
234:9

_____

E

_____

e-mail 71:13

earlier 14:18
39:8 57:19
77:14 116:16
136:19 159:25
161:8,10
167:23 180:6
201:16 207:21
208:12 213:15
215:2 221:5
227:25

ears 218:24

ease 18:1

easier 159:7
176:21

easily 122:23

east 97:5,9
98:2,6

Eastern 6:12

education
89:8

Edward 28:9
38:6,7 39:22
78:20,25
149:13,15,18,
22,25 222:2

electronic
176:8

else's 213:23

Emmett 23:5,6,
10,14 24:25
25:12 79:3,8
222:8

employed
89:12

employee 90:1

employment
10:16,23 55:15

encompassed
98:7

end 10:21
97:25 98:4
131:22 132:2,6
226:10

engage 134:20

engine 176:16
177:20,22,23

entered 231:4

entire 21:19,23
100:18 202:16

entirety 66:8,
10 213:12
214:8

establish
87:21

estimate 81:6

et al 6:10 57:7

Eventually
148:9

everything's
162:4

evidence 29:5,
11,16,17,20
30:3,10,16,17,
19,25 31:6,10,
14 32:7,18,21,
25 33:4,8,12,
19,23 34:5,6,14
35:14,17,23
36:1 37:16
45:7,12,24 46:4
48:1,20 59:5,8
60:22,25 65:3,6
66:25 83:8
113:1 120:21
121:12 147:4
231:6 234:8,10,
19,23 235:2
238:7,19

exact 10:24
11:2 41:17
232:8 234:3
236:24 237:4

EXAMINATIO
N 7:7



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Excellent 18:12 185:8

exception 81:9

exchange 121:10

exculpatory 29:4,11,21 30:3,10,16,25 31:6,10,14 32:7,18 59:8 60:25 116:4 118:23 119:5, 10,20 120:5,10, 15,21

Excuse 192:24

exhibit 158:24, 25 159:1,8 164:21,22,23 165:4 176:20, 22 177:4 188:3 193:23 194:9, 13 196:8 206:16 209:1,2 213:7,8 215:24 219:25 220:2

exhibits 159:4

exonerate 30:4,18 115:25

exonerated 29:5 31:7 84:15

expect 121:5

expectation 132:14,20,24

expected 121:1 132:10

expecting 26:20 213:12

experience 112:12 119:7 127:5 141:2

experienced 112:8 114:4,7, 11

explain 217:13 218:1

explained 114:13

extensively 222:11

eye 207:14

eyes 207:18

eyewitness 153:1 227:11 239:2

———————

——— F

fabricate 32:21 238:19

fabricated 32:25 33:4,8,12 234:8,19,23 235:2 238:7

fabricating 59:5 60:21

face 100:10 205:5 206:13

faces 45:2 206:6 208:4 217:21,24 219:2

facial 206:8,17, 21 218:13

facility 109:18 182:11

facing 100:2,3, 13,24 101:17

fact 19:6 25:11 27:21 28:3 35:12 47:12 84:14 113:17 153:22 164:17 188:15 192:21 193:15 199:10 204:3 209:21 221:14 223:19 228:20

facts 113:7 116:1

factual 62:1

fail 153:3

failed 154:3

fair 9:22 26:10 36:20 53:16

54:4 55:10 74:2 77:20 92:6 114:15 119:22 181:10 192:13 193:12 197:13 198:18 218:6,7 219:5 238:16

false 18:17 19:3,22 20:5,19 22:17 23:1 62:14 65:9,16, 18 152:25

falsely 23:10 24:14 25:1 28:22 29:1

falsifying 65:3

familiar 14:5 17:4 19:19 29:12 36:6 37:18 52:5 63:9 101:2,8 103:19 119:14 130:10 134:24 136:3 177:19 211:23 212:9 224:3,8 226:17

fashion 118:4

fast 117:22

fatter 219:2

February 8:16 10:10 11:4 147:22 148:11 149:5 161:17 173:2

federal 7:17 53:18 236:14 238:15

fellow 216:21

felt 129:5,15 143:6 228:14

Female 69:10

field 116:14

figure 58:4 211:9

file 16:9 66:6,7, 12,13 94:21 95:21 96:11,18 115:15 124:16,

18,20,24 125:7, 13,17 129:24 130:5 160:7 162:5 165:13 169:15,21 174:12 175:19 177:12 179:4 188:25 198:6, 14,21 199:3 202:2,11,13 208:19,22,24 209:9,23 210:20,25 211:4,7,10,14, 19 212:7,9,23 213:3 214:17 221:12

filed 8:10 62:2, 6,10,23 63:7 64:17

files 94:21 95:22,23 96:1, 4,7,12 125:1 137:7,16,18

fill 206:22

filler 204:19,23 205:10,15,22 206:8 207:6,9, 17,24 208:8 217:25

fillers 102:10, 15 103:5,6,10, 18,23 104:5,9, 15,24 105:3,7 106:10,23 145:16,20 146:4,17,22 204:2,9,14 206:1,5

final 47:15,23 189:19

find 104:8 176:21 205:10, 11

fine 23:23,24 24:2 136:7 225:20,23

fingerprint 188:24,25

fingerprints

168:5 187:17, 22

fingers 128:2

finish 140:10 178:8

finished 90:12

finite 205:11

firm 6:17

fit 48:5,6,16 101:19

fits 49:6

five-minute 229:21

flat 98:22

Fleming 226:12,18,20

Fleming's 226:14,24

Fletcher 6:9,16 8:1,3,9 23:11, 14 24:15,19 25:1,6,12,20,25 26:6,11 27:13, 22 28:4,13,19, 23 29:2,5,16 30:4,18 31:7 33:16,20,24 34:7,16 35:9, 13,15,20,24 36:2,6,11 37:2, 9,17,22 38:1,9, 15,23 39:4,14 40:6,10,14,19, 20 41:15 42:3, 7,8,19 43:18, 20,23 45:8 46:5,24,25 47:1,9,13 48:2, 3,12,14,20,24 49:16,23 50:6, 13,21,22 51:1, 10,13,17,23 79:22 80:1,5 83:10,12,16,23, 24,25 84:3,14 86:7 148:15,16, 17 151:3 155:15,18,19 157:5,13

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

160:17 161:20
164:16,18
167:24 168:3
169:18,24
170:8,17,21
171:9 173:20,
25 174:2,3,5,
12,15 175:3,5,
10,16,23,25
176:6 177:8,25
178:15,18,23
179:9,13
181:14,19
182:10 183:4,9,
14,18,21,25
184:2,7,9,19,23
185:1,14 186:2,
22 187:3,25
189:2,16 190:1
193:21 194:2
195:6,8,13
196:18,19,24
197:2,10,18,20
198:2,5 199:12,
14,19,20,21
200:1,8 201:22
202:10,18,24
205:23 206:2,5,
9,15 207:2,14
208:1 210:6,10
212:3 214:3,5
215:14,18
216:1,7,8,22
217:11,14
218:5,11
222:25 223:5

Fletcher's 8:6
16:21 17:11,23
18:13 48:9
49:3,9,12,15
83:1 184:14,20
196:1 199:11
203:13 204:20,
24 207:21

Fletchers
210:8

floor 94:7,9,11,
17 95:6 96:24
97:1,7,25 98:1,
8 103:16

folder 116:15

follow 130:16
135:7 175:22

189:5 238:4
239:17

forget 38:5

forgive 89:17

forgot 34:22,25
89:17 159:3

forgotten
153:9

form 11:25
12:22 20:22
22:19 23:15
24:20 25:7,14
26:13 27:15,24
28:5,14 29:7
32:2 34:9 45:17
50:14 51:2
57:22 65:13
68:21 77:7
84:9,16 104:17
106:17 111:20
113:10 117:12
119:24 125:15
127:1 134:5
136:15,16,17
142:20 144:19
146:8,10
156:15,25
158:21 161:12,
15 162:14
164:10 166:10,
11,16,22
174:20,23
181:3 190:3,11
191:10 192:2,
22 193:16
197:4 209:24
220:18 223:8
224:10,19
225:13 227:16
228:11,23
229:7 232:13,
18

formal 113:9
124:18,24
125:7

formally 134:2

format 124:2
238:12

forms 107:20

forward 100:17

found 8:22
57:21 168:4,6
179:15

foundation
19:25 20:6,22
22:19 32:2
65:13 84:10
101:3,22
104:18 111:20
142:21 144:20
156:15 166:16,
22 190:3,11
197:4 223:9
224:11

Fran 39:4

frequently
121:9

friend 18:17,
21,22,23 19:2,
3,17 35:2,12
38:3,8,9,15,22
39:14,17,21
40:5 42:14
44:18,19 46:7,
20,23 47:1,9,13
50:20,22 73:10
78:7,17,25
148:20 149:6,9
150:13 163:15
166:21 203:12
222:8,22,24
223:4,16,21,23
224:8 226:6

Friend's 78:11

front 100:7
123:21

full 206:25

fully 20:8
113:25

future 235:7,16

_____

G

Gates 226:12

gather 137:2,5

gave 45:7
49:22 50:25
159:3 210:6
214:5,23

genders
104:25

general 75:7
76:14 81:13
89:25 95:1
96:19 128:21
133:19 136:25
221:21 223:15
224:16 225:7,
24

generally
10:19 52:5
99:24 100:1
111:7,12,17
112:12 119:18

generate
145:12

Gilger 219:12,
14 221:3,4
222:20 224:7
225:16 226:5

Gilger's
226:15

give 7:3 23:1
52:19 53:8,14
54:22 55:3,7
89:25 94:13
110:9 214:2
224:1

giving 30:9
108:4 155:11
214:11 216:15

glass 97:9
98:12

good 6:15 7:9
24:4 49:6 73:10
112:15,18,20,
25 113:3,23
119:21 135:8
141:24 143:4
178:3,4,10,13
212:22 224:6,
15 225:11
226:25

govern 101:2
130:19

governed
101:9,20 104:4
106:23 111:24

governing
111:18 130:11
135:5 144:23

governs 136:4

GPR 67:1
116:11,14
117:17,20,22
118:5 121:24
122:7,11,15,17,
21,22 123:3,6,
8,13 124:1,6,
14,17 125:9,20,
23,25 126:6,7
127:2

GPRS 67:1,6,7
116:8,17,20
117:23,25
118:2,16 122:1
124:4,8 125:5

graduate
88:14,21

Grand 92:8

ground 98:22

group 13:12
15:1 149:17
161:7 164:23
173:18 202:16

guess 8:8 14:1
29:19 30:6
34:11 53:17
58:10 60:10,11
104:19 130:1
134:14 138:16
143:18 182:21
185:20 186:6,8,
9,14 188:20
198:15 200:25
201:3 217:18

guessing
13:25 179:14
212:16

guilt 35:6

guilty 33:16,
20,24 57:21

gun 48:18,23

guns 49:1

guys 73:5,20
75:5 82:10



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04768 Document #: 184-8 Filed: 05/06/25 Page 254 of 267 PageID #:5363
THE DEPOSITION OF JEROME BOGUCKI, taken on April 24, 2023
252

127:8

---

**H**

habit 191:1

hair 105:8,11, 14 106:5,9 206:8,17,21 218:13,16

hairstyle 105:17,20 204:22,24 205:6 207:8

hairstyles 105:18,22

Hale 6:20

Hale's 87:6

half 69:16 91:1

hand 6:25 9:11 116:17 128:11

handcuff 97:15

handful 95:14

handling 58:24

hands 86:20

handwritten 47:20 67:7

happen 85:1

happened 56:2 86:1,2 102:16 122:15 129:9 202:17

happening 82:19,21 177:2 235:25

happy 82:12

hard 112:22

he'll 36:22

heading 188:19

hear 21:3 44:11 106:13 192:24 234:20

heard 83:14 119:7,13 127:11,12

height 99:5 206:1

held 130:1

helps 124:4 130:7

Henry 183:21

Hey 23:17

high 88:15,17 89:8

highly 82:18, 20 225:15

hired 90:8 91:7

history 10:24 178:20,21 235:3

hit 58:20

hold 96:17 191:25 241:7, 13

Holding 59:2

home 131:14 150:1 172:2

homicide 8:7 90:12 92:1,11, 12,14 93:12,24 94:8,14,19 96:12 111:9,25 114:1,8,19 116:8 117:9 118:9 126:9,23 127:14 130:10, 19,22,25 131:5, 8,9,12 132:10 136:25 192:8

homicides 92:4 117:17 214:19

honest 57:25 65:22

honestly 186:16

hope 208:25

hour 69:16 70:7 72:1,2

hours 53:19 69:21 71:23,25 72:3,8 240:5,17

house 96:7

housing 96:1,3

How'd 172:9

---

**I**

ICAM 176:11, 14

idea 10:14 61:24 82:15 86:17 96:19 140:5 141:24 143:14 157:25 172:25

identical 98:14

identification 14:12 35:2 41:8,9,11,12 42:7,21,22,25 50:16 134:11, 12,16,25 135:6, 23 136:5,10,14, 17 144:25 145:1,21 146:5, 19,23 147:1,6, 13 149:9 150:7, 9 152:13 153:1 156:4,14,22 157:14,21 158:2,9,19,25 165:4 171:3 177:4 194:13 200:5 213:8 220:2 239:2,11

identifications 135:19 136:2

identified 34:2,4,16,17,19 35:8,9,10,11, 13,20 37:22 38:1,15 39:4,14 40:10 41:15 42:8,19 45:13, 15 50:21,22 134:17 153:21

154:6

identify 6:14 23:14 24:19 25:12,20,24 26:5,11 27:12, 22 28:4,13,19 38:9,22 40:5,13 44:10,14 45:1,3 134:20 148:14 149:11 154:3, 10 165:20 173:12 174:19 175:7 205:3,5 206:13 227:13 228:9 239:19

identifying 123:2 160:13 162:24 175:2 207:12

IDOC 137:21, 24 138:5,7,11, 13,18,24 139:3, 7,13 141:12,17 142:4 143:5,6, 9,15,19,20,23 144:7,12 147:24 160:16, 22,25 161:19 162:12 164:2 167:18 169:13, 18,25 181:18 182:10 193:23 196:16 201:16, 20 202:9,13,18, 22 203:8,14,17, 20 204:8,14,23 207:24 217:5,6, 14,20

Illinois 6:12 160:10 164:4 168:7

impeach 29:20 30:19 232:3

impeaching 232:22

implicate 23:10 24:14 25:1,6,24 27:12,22 28:22 29:1 34:7 49:4, 5 152:15,22

implicated 45:7 48:3,21,25

implicates 35:14 46:5 50:6

important 19:15 52:16,19 53:5 113:7,16, 19 114:2,12,18, 22,23 115:2,6, 17,22 124:17 126:25 156:5,7 208:18,20,21 218:4

imposed 64:24

improper 152:8,12 156:18 162:21, 23 163:2 164:7, 14 171:2

improperly 156:8 157:21 158:8

improved 87:22

in-person 159:6

inappropriate 235:25 238:13

incarcerated 169:13,18 170:4,9

incarceration 169:23

incident 43:21 220:20,23 223:4

include 124:6 154:4,5 173:20 208:18,24 209:8 211:7,14, 24 224:7,17 225:12

included 210:20,23 211:18 212:9, 23 213:3 224:9 226:3,6

includes

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-8 Filed: 05/06/25 Page 255 of 267 PageID #:5364
THE DEPOSITION OF JEROME BOGUCKI, taken on April 9, 2025

253

226:16

including
197:25

incomplete
186:24

incorrect 9:18
75:16

inculpatory
116:5

independent
27:8 85:3
87:16,21 110:2,
4,21 111:1
129:4 161:23
162:2,10
219:11

independently
27:11,18 37:4
39:25 85:24
86:4,7,10

indirectly
64:15

individual
155:4,18
156:13,21
157:4,12
162:25 166:4,6

individually
23:21

individuals
99:5 161:13
204:6

inference
234:24

influence
157:21 158:2,
18 239:10

influenced
158:9

informal 52:23

information
43:14 48:3
49:8,11,14,22
50:3,6 75:17,22
113:4,14,20,22,
25 114:13,19,
24 115:3,7,12,
13,18,19,23,24

116:3 117:11,
17,20 118:15,
23 119:5,10,20
120:6,10,15,24
121:1,13
122:11,16
123:25 124:3
125:9 132:11,
15,21,25 133:6,
10,14,21,23
134:3 154:4
155:11 160:13
162:24 175:18,
22 182:16
203:13,17
207:12 208:13
211:10 212:2
215:25 216:18
224:7,17
225:11,17
226:2

inherently
156:13

initial 38:23

initially 100:12

inmate 164:5

innocence
29:18 30:5,18
83:13,16,22
84:15

innocent 33:16
83:24 84:1,4

inside 97:13
98:9

instance 122:9

instruct 36:17
158:1 229:14
230:10 239:14,
22

instructed
100:6 120:21
231:3 237:5

instructing
234:12 238:1
239:4

instruction
158:4

intend 233:17

intention
142:24 143:3

intentionally
186:20

interacting
219:11

intercom
99:18

interest 101:25
102:3,8,15,23
107:1 137:3

internal 187:19

internet 137:6,
7,13,15

interpretation
s 186:12

interrogating
236:1

interrogation
63:12

interrupt
235:13

interrupting
236:2

interview
94:23,24 96:20
97:12,13,20
108:11 122:21
123:6 127:9,17,
20 129:21
130:4,11,20
131:1,4,7,8,16,
18,19 132:11
133:14 134:4
173:1

interviewed
117:16 225:25

interviewing
108:7 110:18,
23 117:10
122:10,13,14,
19,25 123:5,10
126:5,9 127:23
128:13 129:5,
15,19 130:16

interviews
130:23 131:12,
20 132:7,21,25

133:10,22

intimidate
129:1,16

intimidating
123:20 128:22
129:6

inventoried
145:2 151:2
202:14,16,23

inventory
145:7,9,22
146:2 147:3
151:4 153:15,
18 161:14,25
162:16,20
163:18 175:8

investigate
116:10

investigated
114:5

investigating
117:9 181:7

investigation
7:22 8:14 10:25
11:7 12:9,10,
14,20 14:20
16:23 17:8,12,
20,24 18:3,9,
10,14,18 19:4,
23 20:20 21:7
22:10,18 23:11
24:15 25:2
27:13 28:23
29:2,6 31:11,
15,21,25 32:8,
19,22 33:1,5,9,
13 40:7,11,14
43:8,9,10 47:8
49:4 56:7,19
58:14,15 76:5
84:25 86:21
113:5,8,15,21
114:1,14,20,25
115:4,8,19,24
116:4 118:11,
16 119:6 120:7,
16,25 121:21
162:13 167:13
175:14 179:24
180:7 208:14
211:3,13,17
212:21 213:2

221:8

investigations
118:3

investigative
14:11 66:6,7,
12,13 115:14
121:20,23
165:13 169:15,
21 174:12
175:21 198:6,
14,21 199:3
202:2,11
208:19,22,23,
24 209:9,23
210:20,25
211:4,7,14,19
212:9,23 213:3
221:11

involve 105:7

involved 39:19
58:22 63:12,15
77:22 85:2
229:22

involvement
77:6

involving
62:23 63:7
158:19

IR 140:24
168:4,6 187:13,
22,25 188:5,14
189:2 194:3,4
196:1,5,9,16

IRNBR 187:12

irrelevant
237:2

issue 36:23
146:10 197:21
236:19

issues 107:13
240:20

---

J

J-E-R-O-M-E
7:13

Jail 137:21
139:21,24
140:3,7,14



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

James 6:9,16
8:1 25:12 33:15
148:16 160:17
168:3 178:18
186:22 187:2,
25 189:2,15
190:1 195:6,8
196:18,19
197:2 199:10,
12 202:24
203:13 219:12,
14 221:3,4

jeopardize
156:9

Jerome 6:8,10
7:13,16 54:17
64:11 107:8
151:18 201:11
230:21 240:12

Jimenez
59:12,13 60:22,
25 227:23
228:21 229:3,9,
12 231:5,11,14
232:4,9,18
233:21 234:2,
11 236:17
237:25 239:3,
12,19,20
240:21

Jimenez's
229:5 231:1,17
237:22 238:20

Jimmy 148:17

job 64:24
112:1,15,18,24
114:21 124:25
130:23 135:11

join 23:22

journal 118:19

judge 52:24
83:7,9 236:15

judgment
57:12 58:3
59:23,24 60:1

Junior 6:9 7:21
220:24

justified
236:20

---

**K**

Kevin 9:4

kind 87:20
91:12 96:16
112:1 116:20
118:19 119:4
120:19 121:11
122:6,16,22
128:2 158:19
190:14

knew 34:1,16
35:8,12,19,24
36:2,11 37:17
43:19,25 44:5,
7,25 45:13
46:20,23 47:1,4
81:19 114:3,7
136:6 155:1,15,
19 156:3,7,11,
12 167:24
170:11 175:9
216:7 219:14
223:16 224:3,8,
18 225:1

knowledge
17:13 23:3
24:16,22 25:3,9
27:23,25 28:7,
24 29:3 31:12,
16 32:9 33:2,6,
14 40:5,8
43:13,20 64:4
65:21 74:7

Kortney 6:4
54:18 64:12
107:9 151:19
201:12 230:22
240:13

Kourtney
235:22

Krystal 6:5

---

**L**

larger 219:2

lasted 90:9
91:16

law 6:17

---

lawsuit 8:10,11
70:16,19

lawyer's 238:4
239:17

layout 94:14
95:17,18 96:19

lead 180:7,9

learn 36:10,15
37:1,9 49:21
50:5 103:22
113:4 120:24
132:11 134:3
154:14 208:19

learned 36:8,
21 43:14 49:19
103:21 113:8,
14,20 114:1,14,
19,24 115:3,7,
12,18,23,24
116:3 118:15,
24 119:6 120:6,
15,23 121:4
122:11,16
123:25 132:21,
25 133:7,10,14,
21 136:8
175:18 208:14
215:25 224:7
226:5

leery 96:16

left 123:24
129:12 220:17

left-hand
187:10

legal 119:5

letter 188:8

levied 61:15

lie 52:11

lined 100:12

lines 120:20
134:9

lineup 12:9,13,
17 13:6,9,10,
13,14,15,16
34:4 35:10
39:5,6,9,13,15,
19,21,22,23
40:1,4 42:12,18

---

45:9,25 46:3
50:21 94:22
97:24 98:10,20
99:8,12,14,25
100:2 101:12,
13,21 102:19
103:1,6 105:25
106:1,7 153:12,
24 154:1,2
173:10,11,12
228:14,18

lineups 34:12,
18,19 76:12
98:18 99:5,21
101:2,9 102:14,
17,21 103:18,
21,22 104:5,10,
15,23 105:2,7
106:10,24
134:18 153:14,
18

link 7:18 138:6

linked 187:22

lips 218:21

list 185:14
197:25 199:11,
15 200:13,17
221:24

listed 78:11
187:11 195:13,
17 196:19,24
202:10 222:2,5,
8,13,15 226:10
227:4

listen 238:23

listening 236:2

literally 186:20

loading 223:22

located 92:7
94:5 96:24
97:24

locked 103:8

lockup 103:7,
10,13,14

lockups
103:24

Loevy 6:8,17,
18 233:12,15

---

236:14 237:24

long 53:19
69:14,20 70:6
71:19,22 72:16,
18 90:17 91:16,
19 117:2
120:17 142:2
240:3

longer 69:19
129:12

looked 9:21
41:18,20 46:7
66:4 76:20
87:12 104:9
106:1,7 128:21
160:7 165:5
169:11 175:14
177:15 205:22
212:6 215:24
218:5,11

lose 152:13

loss 154:12

lost 192:24

lot 66:23
112:11 140:22
159:7 209:14
225:16

louder 177:1

---

**M**

M/b 223:21

made 41:8,9
42:6 48:24
119:19 164:18
175:15 192:14,
16 209:8
211:18 212:22
236:14

main 34:11
94:6,17 95:11
97:1 98:1,8
140:1

make 12:15
13:10 30:1,22
36:20 38:14
49:13 52:7 53:7
73:23 100:8
104:8 113:24

---



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-8 Filed: 05/06/25 Page 257 of 267 PageID #:5366
THE DEPOSITION OF JEROME BOGUCKI, taken on April 9, 2020

255

115:11,13
116:7 121:18,
19 124:17
125:7 126:19
133:5,9 134:21
145:9 149:9
155:10 156:1,
23 157:18
162:7,9 163:12
193:9,15 194:2
204:5,6,7,13,
18,22 205:21,
25 206:4,7
207:5,17,19,24
208:23 210:19
219:5 227:9
237:18

makes 23:19
114:21 209:14
210:13

making
190:14,19
193:4,7

male 189:9
215:13 223:21

man 7:21,25

manipulate
227:11,13
228:20 239:1

manipulating
228:8

Maniscalco
226:12

March 38:11,
16,24 40:3
46:11,13 47:11,
20 149:1,2,6
189:16 207:22
214:16 215:6,
17 216:18,19

mark 158:23
159:8 164:21
176:22 183:6,9,
13 213:7

marked 158:25
165:4 177:4
194:8,13 213:8
220:2

marker 183:20

marking
185:19

marks 183:24
185:16 190:15
191:2,24 192:5
193:4,9,15

material
119:12

matter 6:9,17
7:11 56:18
104:19 105:9,
17,18,20
128:14 187:16,
21 205:2
212:22 218:16
221:18 237:1

mattered
105:12

matters 78:1

Maurice 63:8
183:4,9

Mcdonald 9:5
179:14,20
181:12 190:16
198:1

Mcdonald's
180:23

means 39:11
104:13 185:21
188:15,18,21
189:4,11,25
190:5

meant 117:25

medications
55:2

meet 68:19
72:11,16 74:13,
22 88:8 236:4

meeting 70:4
71:2,5,6,15,18,
19,21,24 72:2
74:3,8 75:3
80:10

meetings 70:1
71:7 72:5,8,20
87:24 88:1,5

member 61:11

memory 25:16
118:18 171:19
221:16

men 204:9,10,
16 205:15

mentioned
7:10 66:22
76:16 107:15
180:22,23

meritorious
91:10

met 88:1,2,11

middle 98:6
236:6,8

midnight 93:9

mind 236:3

minute 107:2
164:24 198:9
201:5 213:13
223:12

minutes 10:24
71:20 87:20
151:12 230:5
240:5,17

mirror 98:12
100:7,11,24

mirrors 98:15

mischaracteri
zes 162:15
168:14,16
191:11 192:3
197:5 201:1
202:4

miscommunic
ation 146:8

misconduct
65:24

misconstruing
235:4 236:3

misheard
32:11

misplaced
188:4

missed 199:13

Misstates
153:16

misstating
45:18

mistaken
169:6

moment
159:10 220:4

monetary 58:4

money 224:2

Monico 6:20

month 68:14,
16 69:6,15
73:16 107:16
148:23 150:14

months 71:6
72:6 90:9 91:15

morning 6:15
7:9 92:21 93:5,
10

Mose 183:14

motions 100:8

move 26:20
93:20

multiple
102:23 202:21

multitude
205:16

murder 33:16
34:7 35:15 45:8
49:7 56:6 215:7

—————

N

named 7:21
78:5 141:20
143:11,16,18
173:25 174:4
190:1 201:22

names 63:9
86:3 91:22
145:23 146:4,
15,17 151:6,9
182:24 183:1
192:14,17
193:5,9 196:8
199:20 200:12,
16 203:3 212:5,
6 226:13 227:4

narrative
222:17,18
223:20 226:11

national
188:25

necessarily
117:18 121:25
122:24 123:9
124:13 133:12
153:23 186:13
197:9,11
209:10 211:1
212:7 218:19,
22,25 219:3

needed 9:20
101:21 116:9
122:18 126:17
143:6

negative
145:5,7,10,14,
18 153:12,14,
18,23,25 154:2
173:10,11
192:23 200:5
211:1 212:6

neighborhood
35:3 223:1,5
224:24 225:5,
10 226:1

non-chicago
70:12

non-gpr
125:15

Noradin 17:15,
19,23 22:16,25
24:24 25:4
28:2,25 31:13
33:3 62:18 63:2
77:3 85:11
180:25 181:8
195:6,18

Noradin's 77:2

normal 15:17
44:21 53:2
92:20 142:8,10
225:22

North 97:5

Northern 6:12



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

noses 218:18

note 128:1

notes 67:1,6, 10 118:1,2,7,9, 12 122:2,3,7 125:8,13,15,17 126:2,20,22,25 127:6,8,24,25 128:8,10,15,23 129:1,6,10,11, 17,18,23 130:4, 5

notice 7:17 199:16

noticed 179:3

November 89:18

number 6:13 100:6 102:4 123:11 137:2 140:24 158:24 159:8 164:5,22 166:3,6 168:4,6 176:22 182:24, 25 187:13,17, 19 188:4,5,14 189:2,7 191:9, 20 193:23 194:3,4,9,22 196:1,5,8,9,16 209:2,3 210:8 213:7 223:21, 23

numbered 100:4

numbers 121:13

───────────

O

───────────

oath 52:9,12

object 11:25 12:22 25:14 36:16 45:17 53:2,7 57:22 73:22 119:23, 24 146:7,10 166:10 168:17 181:2 192:22 237:23 238:11,

23

objected 231:2

objection 14:22 16:17 19:25 20:6,14, 22 21:16 22:19 23:15,20 24:20 25:7 26:13 27:15,24 28:5, 14 29:7 32:2 34:9 46:9 50:14 51:2 60:17 65:11 68:21 77:7 83:2 84:9, 16 101:3,22 104:17 106:17 111:20 113:10 117:12 128:16 134:5 136:15, 18 142:20 144:19 147:7, 20 148:22 150:8 153:16 155:21 156:15, 25 157:15 158:21 162:14 164:10 166:11, 16,22 168:11, 16 170:23 171:5,21 173:5 174:20,23 175:12 181:22 190:3,11 191:6, 10,23,25 192:2 193:16 197:4 201:1 202:4 203:4 209:24 210:21 223:8 224:10,19 225:13 227:16 228:11,23 229:7 237:18, 23 238:22 239:4,13,21 240:25

objections 23:18,19,23 52:25 215:10

obligation 105:25 106:6 119:5 120:5 174:17 175:4

obligations

106:10,21

observed 223:21

occasions 68:1 127:17,20

occur 39:1

occurred 55:14

October 90:24

offend 39:13

offender 41:18 223:22

offenders 34:2 40:20 43:3,4 49:1 51:5,9,11, 14,17 173:18 175:16 215:13 223:25 224:3

offense 221:21 223:15 224:16 225:8,24

offered 51:23 89:1,5

offhand 110:7 119:17

office 87:6 93:25 94:1,3,7, 21 95:10,11,13, 20,23,24,25 96:8,11 103:12 131:15 229:9 231:15,21

officer 10:13, 16 14:13 15:18, 21 31:18 61:14, 22 63:20 64:19, 25 90:20 91:5 158:13,18 176:17 219:12 226:24 227:12

officers 221:23 226:10 227:1

offices 6:7 94:19 95:5,9,14 96:3,7

official 103:20

oftentimes 121:16

older 8:20 9:3 214:18

on-the-job 154:11,14

one's 176:21

one-way 98:12

online 176:8

open 95:2

opinion 83:18 84:7,11,14 104:19,21 157:5,6 226:23

opportunity 165:2 176:24 177:2 194:15 220:7

opposed 141:17 217:14

opposite 199:21

order 83:25 84:4,8 114:25 115:4 134:20 138:13 140:23, 24 159:5 189:22 199:25 236:10

orders 241:4

organized 97:14 98:10,24 99:12

original 108:19 179:23 220:16, 20,22 221:22 223:3

originally 51:22 58:6 221:23

outcome 57:10

outrageous 82:19,20

overlook 186:21

overview 89:25

───────────

P

───────────

p.m. 92:22 107:5,10 151:20,22,24 195:11 201:13 230:18,23 240:14 241:17, 18

pages 66:12,13

pair 197:21

paper 87:1,4 118:5,7,8,12,17 123:17 125:9, 16,17 126:2 127:1 192:5 193:10

Pardon 186:7

parking 34:24

part 53:2 60:19 89:7 91:15 96:24 99:21 113:23 116:7 121:3,17 126:21 130:22 132:12 136:18 137:23 156:5 161:6 231:14

participant 43:15 99:19

participants 42:13 98:20,22 100:1,9 101:13, 16

parties 240:18

partner 8:19, 23 17:1 121:2,4 127:15 133:1,2, 6 144:14 160:24

partners 69:7 85:8 209:7 210:19

party 55:18 56:14,17 61:7, 11



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

passed 90:7
91:5

past 61:5
139:22

Patrick's
88:18

patrol 90:6,20
91:3,4

paused 20:10

pen 183:2

pencil 183:2

pending 6:11
54:3,8

penitentiary
141:23 168:7

people 13:16
45:14 95:12
98:22 99:7,11,
14 101:21
102:18,22,25
103:6,8 106:1,6
116:24 119:8
121:14 142:5,
15,19 143:9,11,
16 144:1,4
145:23 146:15
148:7 151:7
161:7 164:2
165:20 166:25
174:9 175:23,
24 197:10
203:2 217:21
218:4,10,17,20,
23 219:1,2
222:10

perimeter 95:6

period 10:15,
19 111:13
116:19,23,25
122:4 124:11
139:2

periods 21:14
22:13 111:14

permit 236:11

person 7:24
43:1 62:11
63:8,24 68:20
100:18 101:24

102:3,8,15
106:1,7 107:1
123:21 127:25
128:23 129:12
137:3 149:13
152:15 154:10,
19,20,22 155:6,
19 173:12,17
187:16

personally
32:21 118:14

personnel
18:13 32:18
85:20 132:12,
15

personnels
33:12

persons
102:23

pertains 125:4

pertinent
19:13 117:13
121:12

peruse 214:18

phone 72:10
80:15,24 81:3
82:14,17 88:4

photo 11:7,12,
16,19,20,24
12:4,21 13:1,2,
4,6,9,11,22
14:1,19,23
15:1,5,8,9,18,
22,25 16:2
34:12,19 35:11
38:11,16,19,23
40:4,15,17,18,
23 41:2,3,16,24
42:5 45:9,16,
20,21,25 46:3,6
50:20 76:8
134:19 136:24
137:14,24
138:14,19
139:8,14,20,24
140:4,15,19,24
141:8 142:2,8,
12,14,15,18,25
143:10,19,23,
24 144:2,6,9,
18,23 145:1,4,

5,8,10,13,20
146:5,18 147:1,
5,12,16,19,25
148:3,10,13,18
149:5,6,16,17,
20,24 150:2,12,
18,23,25 151:3
152:3,18
153:21 154:9
155:3,4,18
156:12,13,21
157:4,11,13
158:14 159:22,
24 160:3,11,14,
16,18,25
161:20 162:22
164:8 165:25
167:6,16,20
168:25 170:20
171:15,17,20
172:1,5,12,19
173:18,19,23,
24 174:6
181:19 190:10
196:16 199:23,
25 200:4,8,9
201:21,23
202:1,9,19,21
203:13,21
204:2,9,15
207:1,25 217:6
218:3 219:5
228:14,18

photograph
14:14 160:9,13
161:4,12,20
162:2,3,11,23,
25 163:15,17
164:8,9,19
169:15,20
170:21 174:4,
11,14,18 175:5
190:1 203:14
206:15,17
207:2,11 229:2

photographs
15:19,23 16:2,
15 41:24 42:2
142:5 151:7
164:1,25 165:7,
12,18,21
166:15,21
167:15,19
173:4 189:24
200:24 202:13

203:18 204:7,8,
14,19,23
205:22 206:8,
22 207:6,9,17,
25 208:9
217:14,15,20,
25 218:4

photos 11:21
12:2,5,6 13:12
15:1,9 40:19
137:2,5,10,11,
13,22,24 138:3,
5,13,18,24
139:3,8,14,19,
20,23 140:4,8,
14,18,21,25
141:1,3,4,6,12,
17,18,20,25
142:4 143:10,
15,20,24 144:7,
9,11,15 145:24
146:15,22,25
147:3,24 148:2,
7,11 149:4,13,
14,16 150:15,
17,18,24 160:5
166:7,24 167:3,
4,11,18 171:17
172:4,10,11,13,
19,21,24
173:14,16,22
174:9 185:23
190:10 200:1,
10 201:17,20,
23 202:18,22
203:8,12,21
205:9,11,15
217:5,6,10
218:16

phrase 137:16

phrased 106:8
172:17 224:15
234:16

physical
13:14,15,16
34:4 39:5,6,9,
13,14,18 40:4
42:12,17 63:16
64:1 86:23,24
104:4 150:17

physically
74:22 210:25

pick 152:2,18
158:14

picked 40:19
139:17 180:20

picture 143:5
159:19

pictures 143:6

piece 45:6,24
46:4 118:6
125:8 175:22

pieces 34:6
45:12 118:8,12

place 46:8
53:16 101:1
109:21 111:9,
23 130:11
134:23 139:18,
19

places 137:12

plain 99:3

plaintiff 6:16
7:11

play 206:11

PLAYS 24:9
106:16 230:16

point 11:6,8,9
12:8,20 36:22
37:1 38:23 40:6
42:8 47:8,18
49:21 51:16
53:20 86:19
87:10 90:11
108:24 111:15
115:20 167:7
169:13,19,24
211:3 226:21
237:2

pointed 153:4,
6

pointing
156:11

points 97:17

Polaroid
165:24

police 7:22
10:13,16 14:13
15:18,21 17:14



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-8 Filed: 05/06/25 Page 260 of 267 PageID #:5369
THE DEPOSITION OF JEROME BOGUCKI, taken on April 04, 2023

258

18:13 31:17
32:17 33:11
55:15 56:18
58:13,14,16,18,
22 61:14,22
64:18,25 70:12
85:20 86:20
89:1,5,9,11,20,
22 90:1,5,15
103:17 104:3,
24 105:3,6
106:11,23
107:15,16,21
108:1,19,25
109:6,20
115:14 118:22
121:21 125:19,
22 131:17
132:12,15
134:9,19,24
136:4 137:7,20,
21,22 138:3,4
140:2,18,21
141:2,7,13,17
144:22 145:3,
12,17 146:14,
19 152:8 156:4
158:12,13,17,
18 159:20
160:2 162:22
172:11,13,20
174:5 176:2,17
177:16,19,21
187:18 192:8
196:17 199:23
200:9 213:17
217:10,15
219:12 224:6,
15 225:12
226:3,10,24
227:10,12

policies 111:8,
18,23 134:10,
23 135:2,3
152:9

policy 101:1,6,
8,10,19,20
103:18,20
104:4 106:11,
22 107:13
111:21 125:20,
23 130:10,12
144:17,23
145:3

poorly 106:8
172:17

portion 241:5

position 231:9,
12 232:2 233:1
236:9

positive 42:21,
24 45:21 46:6
91:24 143:17
144:25 145:4,
14,21 146:5,18,
23 147:1,6,13
149:9 150:6
172:16

positively 34:3
42:18

possession
148:12 172:8,9,
24

possibility
114:16

possibly 29:19
53:1 109:1
110:2 186:1
218:15

potential
229:12

potentially
29:17,20
152:22

Povolo 226:12

practice 15:17
104:8 113:14,
24 115:11,13
116:8 117:16
121:3,8,19
122:10 125:12
126:19 128:7,
21 130:15,17
132:1 133:5,9
134:10 136:13,
16 137:1,23
138:8 145:9
147:2 153:20
191:3,4,20,22
192:7,11,12
208:13 212:22
221:18 224:6,
15 225:11

practices
111:9 152:9

precedent
136:4

precedents
135:18,21,24

preparation
16:12 66:17
67:4,12,24
68:16 71:8
72:9,11,17,24
73:1 75:15 76:4
78:7,21 79:4,9,
13,23 80:2,6,25
81:4,5,8,12,16
87:25 88:6
159:17 160:1,6
165:8,15
177:13 194:24
214:9 220:12

prepare 66:2
67:18 72:21

preparing 73:3
74:19

presence
75:25 81:20,23

present 12:9,
13,18 19:8,9,17
21:5 22:9 39:7,
16 74:4,9,18
81:10 83:7

presented
8:22

pretty 9:16
10:21 17:18
90:14 230:2,3

previous 41:1
48:10,23 49:3
55:17 155:14
181:17

previously
39:15 45:18
47:7 171:14
182:3 197:23
200:22 205:4
213:14 215:24
216:3 222:24
227:7

primarily

181:11

primary 128:8
130:22 180:15,
25 181:7

print 150:21

printed 160:21
163:20,24
195:24 197:6,8
203:23

printer 163:21

printout
182:25 183:1
196:8,19,23

prior 10:10
49:12 80:14
153:16 162:15
223:5

prison 36:13
37:2,10 48:7,
10,13 168:9,21
169:4 170:5,10,
17 181:20

privilege 36:17

probable
50:12,25

problem
164:20 169:2
236:7

procedure
7:18 14:13
134:19 135:6
136:5,17
142:18 153:1
157:22 158:2,9,
19 171:3 239:2

procedures
134:11,13,16
135:1,7 136:10,
14 156:4
239:11

proceeding
231:15,16,25
233:24 236:16

proceedings
6:1 229:11

process
112:12 140:19
234:9

produced
182:16,20

professional
120:19

program 90:18

promoted
91:7,8

promotion
91:10,12

proper 142:18
168:24 192:19

properly 156:8

property 94:18

prosecution
156:5,9

prosecution's
30:20

protective
236:10

prove 29:18
30:5,18

provided
215:14 216:21

pull 159:7

pulled 205:9,
20

punitive 58:7

purpose
186:17 214:16
221:21

purposes 18:8
99:8 155:5

pursuant 7:17

put 103:1
105:25 106:6,
24 113:16
115:11,13
122:7,10,17,22
123:3 124:20,
23,24,25
125:16 126:18
140:24 157:7
171:13 176:19
191:2 202:1,9
207:1 208:5
209:22 210:25



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04768 Document #: 184-8 Filed: 05/06/25 Page 261 of 267 PageID #:5370
The Deposition of JEROME BOGUCKI, taken on April 16, 2025

259

214:19

putting 74:16
103:1

―――――――

Q

―――――――

question 20:8
22:24 23:9
24:5,9 27:11
37:8 39:12
43:22 45:10
53:6,10 54:3,4,
6,8 58:3 65:15
106:13,16,18
113:11 136:15,
21 140:10
146:1 152:17
162:9 169:17
170:14,16
172:17 178:8
179:23 191:16
192:23 193:2,
14 205:12
210:17 212:19
214:15,21,23
215:5,8 216:2,
5,15 217:6
224:14,15,20
225:23 229:11,
14,15 230:13,
16 231:13,18
232:5,8,13
233:4 234:4
236:25 237:4,
18 239:8

questioned
135:20

questioning
235:16

questions
26:18,21 27:4
30:2,11 44:21
53:1,2 65:20
73:24 134:11
176:25 181:18
191:4,20
194:11 208:7,
15 220:5 230:9
231:10 232:7,
16 233:22,25
234:2,14,15,25
235:9,21,22
236:12,21

237:4 238:17
240:21

quick 226:11

quicker 128:11

quickly 26:20

―――――――

R

―――――――

race 189:7,8

raise 6:25

ran 101:10
177:8,9 179:24
180:3 197:17
198:2 209:6,7,
21 210:1,16,18,
19 211:6,12,23

rank 89:22

rap 169:7,10

Raymond 8:25
17:1 57:17

re-ask 20:11
51:7 144:22
205:13 237:17

reached 229:8
231:20 237:24

read 24:5 70:23
86:12 213:12
214:10 220:14
230:13

reading 241:11

ready 194:11

real 170:11
226:9

reason 15:4
49:22 141:15
152:11 182:12
197:19 199:5,7

reasoning
35:5

reasons
114:18 152:21

recall 10:12
15:24 19:18
25:19,23 26:2,
5,7,11 27:5,6,
12,17,18 47:22,

24 48:9 61:6
62:1,5,10,21,22
63:6 64:23
66:16 69:9
70:10 73:21
76:2,17 78:8,
15,16,23,24
79:6,10,18,21
80:3,7,23 81:2
84:17,20,24
85:11,13,14,19,
22 86:3,6,9
88:7 92:17
96:5,25 99:17
103:1 105:12
107:24 109:4,5,
14 111:4,14
113:21 119:11
129:7 130:21
132:9 135:2
137:19 139:10,
12,17 141:14
142:17 143:2
151:6 163:7,25
165:10 171:13
214:11 216:17

recalled 85:24

recalling 167:8
208:11

receive 64:16
86:24 108:24
109:24 119:9
120:13

received
83:12,16
108:14,23
109:6,10 110:5
111:5 216:25

recollection
25:23 27:8
32:15 62:15,19
63:4,13,16,21
78:13 85:4
86:13,16 87:16,
21 108:8,10
110:3,5,21
111:2 115:9
129:4 140:6,13,
16 161:23
162:2,11
163:23 165:14
167:12 182:9
219:11 227:5

record 6:3,14
7:12,15 15:3
20:14,18 51:12
53:7,8 54:13,
15,16 64:6,7,9,
10 107:4,6,7
131:20 151:15,
16,17 159:9
160:8 162:10
163:13 164:22
176:23 188:22
194:8 195:1
196:4,7 201:7,
9,10 216:12
220:1 229:16
230:7,17,19,20
237:11 238:13
240:4,7,8,10,
11,15,19
241:16

record's 162:7

recorded
132:8

recording
131:24

recordings
131:23

refer 18:3 19:1
77:17 114:13
134:12 193:23

reference
74:19

referred 49:18
198:6

referring 8:24
14:1,10,23
15:1,5 16:8
18:10,20 30:3
46:3,20 135:22
139:2 155:6
233:3,13,20,22

refers 119:16

reflect 7:16

refrain 128:14
129:16,18

refresh 62:15,
19 63:3,12,16,
20 86:13,15
115:8 165:13

167:11 227:5

refreshed
87:16

refuse 239:8

refused 25:12,
13,20,24 26:5
27:22 28:3

refusing 25:16
26:11 27:12

regard 236:21

regular 15:15
92:15 109:6,22
118:8 126:19
127:15 128:7
138:10

regulations
130:19 135:5

related 76:4
78:1 240:20

relevant 113:1,
4 116:2 120:24
123:25 134:2

reliability
156:23

relying 236:13,
20,22

remainder
240:22

remember 9:9
10:8,11 11:13,
14,16 37:4
41:20 47:17,18
55:22,24 56:2,4
57:5 59:16
75:20 76:24
77:4 78:3 81:14
85:7 91:25 95:8
97:4 98:25
103:4 108:17
120:12 122:18,
24 123:17
128:21 130:14
139:16 143:2
163:7 173:22,
23 176:7 182:7
190:14,20,22,
24 191:4,21
192:11,12,13,
16,18 193:2,4,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-8 Filed: 05/06/25 Page 262 of 267 PageID #:5371
THE DEPOSITION OF JEROME BOGUCKI, taken on April 26, 2023

260

7,10,13 203:19
205:19 208:15,
17 209:6
216:14 217:5,7
219:15

remembered
76:18,22 77:3

Renee 18:17,
21

repeat 23:19

repetitive
23:18

rephrase 50:5
53:11 57:24
58:2 113:13
146:1 172:18
191:19 232:14

report 16:4,7
26:7,8,15,19
27:5 37:6 66:19
75:1,2 108:14,
18,22,25 109:7,
25 111:18
113:18 115:14
116:21 118:1
121:6,16,21
126:24 127:3
130:6,8 145:12
146:14,19
152:25 154:5
159:20 180:22
195:5,6,7
196:18 217:2,3
220:16,20,23
221:21,22
223:4,16
224:16 225:8,
12,21,24 226:3,
16 227:4

reporter 6:5,25
7:2,6 24:6,9
52:15 106:15,
16 113:18
159:1 194:7
219:24 230:15,
16 240:5,7,17
241:2,4,8,11,15

reports 16:5,7
23:7 25:17,21,
22 51:22 66:4,
5,16,18,19,20,
24,25 67:2,3,

11,19 70:8,10
72:22 74:20,25
75:5,9,11,14,
18,23 76:19
77:11 78:10,12
86:20,24,25
87:5,9,13,15,
18,19,22
111:24 121:9
130:2 145:17
160:2 162:4
181:1 213:17
225:15

represent
6:16,20 7:11
66:11 119:18
165:12 198:24

representation
236:14,20

REQUESTED
24:9 106:16
230:16

required
101:12 102:3,4
118:23 145:6,7,
12,16,19 146:3,
17,21 226:15

requirement
119:19 145:4

resolution
59:21 62:5

rest 132:15

result 55:14
64:17,24

resume 240:21

retain 146:21
174:18 175:5

retire 56:23
89:17

retired 56:22
89:14,19 90:4
92:2 132:3

retirement
57:2 89:23

retirements
73:6

retrial 229:12
231:17 233:9,

18 236:16

retrieve 139:8
140:4,7,14
141:7 155:3
172:7

retrieved
142:4 144:15
160:14,16,25
162:12 205:15

retrieving
172:4

reveal 43:9

review 9:15
10:9 66:7,13
67:19 159:10,
17 160:5 165:3,
7 176:24 177:3,
13 194:15,23
199:17 213:17,
20,23 220:7,12
221:14 223:12

reviewed
10:13 16:11
67:3,7,11,15
72:22 86:20
87:9,22 160:1,2
165:14 213:13,
16 214:8 221:7

reviewing 10:1
66:17 87:15
175:18 214:17

revise 51:20

revolver
223:23

rights 16:22
17:12,24 18:14
56:11 58:10,22
229:6 231:1
232:14,18
233:5 234:11
237:22

ring 97:15

road 113:22

robbery 48:7,
8,10,13 49:3,7
90:8 91:15

Robert 9:4
184:14

Roger's 36:2,5

Rogers 19:20,
22 20:5,19
21:6,10 22:17
23:1 35:22,24
36:2,11 37:2,
10,12,17,18
43:25 50:23,25
51:4,9,13,16
79:12,17,20
147:18 148:10,
14 149:5,14,15,
19,21 155:13,
15,17 156:20
157:4 161:3,16
163:14 166:8
167:23 168:9,
22,25 169:4
170:5,10,11,17,
20 171:9 173:1,
3,17 175:15
181:20 182:10
203:12 209:18
211:11

Rogers'
222:13

role 77:2

Ronald 184:9

room 94:22
95:21 97:24
98:10 100:2
123:24

rooms 94:23,
24 96:18,20
97:12,13 98:11,
13 99:17
131:19

rotated 100:17

rule 52:24

rules 7:17 52:6
53:24 130:18
135:4 238:15

run 178:15
197:14 198:13
200:10 209:5,
21 211:2,17
212:21 213:1
215:24 216:6
223:25

Rutherford 9:4
179:14,20
181:12 190:16
198:1

Rutherford's
180:22

_____

S

safe 21:18,22
87:12 178:23

sake 13:8
20:18 32:10
58:21

scenario
141:16

scene 221:23
226:15

Schalk 8:25
17:1,4,7,11
19:2,15,16
20:4,19 21:6,
10,23 22:5
24:13,17 27:21
28:21 31:6,9
32:24 57:17,18
63:1,19 73:2,4,
12,18,25 74:5,
6,11,12,17,18
75:15,23 76:3,
8,12,17,21
77:1,5,21,25
78:4,6,17,20,25
79:3,7,11,14,
16,19,23,25
80:4,9,15,24
81:3,4,8,18,23
82:5,13,16
84:13,20 85:8
88:2,3,5 127:5,
15,24 128:8,10
179:19 180:24
181:11 190:15
195:5,18
197:25

Schalk's 22:8

schedule
92:18 93:8

school 88:15,
17 89:9 109:2



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

seal 233:11

Sean 6:15 7:10 23:17 174:23 234:7 237:10 238:6

search 176:9, 16 177:17,18, 20,22,23,25 178:4,11,17,19, 24 180:3 181:13 190:8 197:1,14,18 198:2,5,12,13, 25 199:3,6 200:10 209:1,5, 8,21,22 210:1, 16,17,20 211:2, 23,25 212:20 215:23

searches 176:18 177:7 178:15 179:3 198:20 211:6, 12,16 212:8 213:1

seasoned 112:5 114:3,7, 11 156:3

selecting 204:2

sense 30:22 134:21 164:3 209:14

sentence 224:2

separate 40:17,23 70:1,3 94:21 98:11,13 109:11 235:19

sergeant 77:15,16,17,18, 21,25 78:1,3 85:14

sergeant's 95:11,23

sergeants 94:20

series 164:25

215:10

served 70:21, 24 81:24 82:4, 11 84:23 85:21, 25 86:19,25

session 209:13

set 11:21 12:2, 5,6 71:16 98:16,17 99:13 102:4 150:15 173:3,16

setting 52:23

Shalonda 62:24

Shanee 18:17, 21,22,23,24 19:1 35:2 38:3 39:21 42:14 46:7 78:7,11, 17,25 148:20 149:6,8,12

share 119:21 132:10,14,21, 25 133:9,14,21

shared 94:3,17

Sharing 133:6

sheet 125:16, 17 127:1 169:7, 10

sheets 118:16

Sheree 222:8

shift 92:15

shoot 43:1 58:18

shooter 37:23 38:2,10,15 40:10,14 43:15

shooting 7:20 8:14 16:22 17:12,20,24 18:10 27:14 28:23 33:25 38:16 40:7 43:5,10,16 47:7,10,14 48:4,21,25

49:23 50:6 56:18 58:11,12, 13,14,15,22 84:5 196:20 220:23 223:1,6, 17 225:10 226:2

short 72:10

shortcut 116:21

show 11:7,11 12:21 13:1,4,22 14:6,8,19 67:15 69:22 70:8,12, 15 101:13 137:4 148:7 154:9 155:3,17 156:20 157:11, 12 158:23 161:4,16 162:21,23 163:11 164:18 168:25 171:20 173:3,15 176:20 209:18 210:8,12 219:22 229:2

showed 40:23 41:16,24 70:10 149:16,17 161:6 162:3,12 163:13 164:2 166:7,15,21,24 167:3,4 170:20 171:25 172:20 173:4 174:15, 18 175:6 200:8 201:21 203:11, 17 206:16

showing 33:20 156:12 164:8 210:10 228:13, 17

shown 13:12 40:15,16 42:13 144:4 157:4 161:7,13 185:23 186:2 189:25 190:1

shows 14:13

side 94:7 97:5, 7,9 98:14,16,

19,21 99:7,19 163:9

sign 18:17 19:3,22 20:5,19 22:17 77:10 124:12

signature 195:21,23

signed 77:11

similar 104:7 106:25 137:2, 11 144:1 164:3 204:4,20,23 205:22 206:1,5 208:1,4 217:21 218:2,18,20,23 219:7

simple 123:16

simply 232:6

simultaneously 39:23

single 13:2 14:1,14 154:9 157:12 176:22 187:23 228:14, 17 229:2

sir 7:9,15,19 8:13 13:5 15:6 16:21 18:16 21:1 22:1 26:19 29:4,15 33:15 35:21 36:15 39:1,20 42:11 46:8 48:6 49:9 52:1 54:25 56:20 58:3,9 59:1,11,22 66:2,20 67:8 82:21 105:10 135:9 159:8,10, 12,15 160:9 161:5 163:11 164:24 165:8, 18 166:3 168:2 172:24 176:25 177:3 183:3,25 184:3,7,10,15, 24 185:6,10,14, 17,21 186:22 187:4,14 188:1, 5,9,16,23

189:13 190:10 194:10,16 195:8,15 196:2 212:13 213:11 214:6,12,24 216:23 219:23 220:5,10 221:25 227:7, 22 228:5

sit 33:20,24 97:19 162:18 193:14

sitting 9:20

situation 123:14 138:15 164:12,14

situations 55:14 138:17

six-month 90:18

size 96:22

sized 218:18, 21,24

skin 105:4 204:19

slash 204:24

slightly 226:22

slow 128:2

solemnly 7:2

solicit 104:1

solved 9:23

someone's 134:17

Sorrell 7:21 8:14 10:25 11:6 12:8,10,14,20 14:20 16:22 17:8,12,20,24 18:3,10,14,18 19:4,23 20:20 22:18 23:11 24:15 25:1 27:14 28:23 29:2,6 31:10, 15,20,24 32:8, 19,22,25 33:4, 8,13,16,25 34:8

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

35:15 38:10,16
40:6,11 43:2,5,
10 45:8 48:4,
21,25 49:4,23
50:7 76:5 84:4
118:11 167:13
179:24 196:20
211:13,17
212:21 213:2
215:7 219:13,
20 220:24
221:8

sort 123:2
145:13

sought 133:23
236:10

sound 59:19
63:9

south 97:5,25
98:2,3,4,6

speak 68:1
69:14 72:24
73:2,4,8,11
81:8 99:18
145:22

speaking 43:7
99:24 149:14,
18 150:5
219:12

speaks 216:12

special 92:24
93:2,7

specialized
109:5 111:4

specific 10:8,
15 16:7 22:25
66:16 75:5
103:4 111:13,
21 136:11
140:6,9,13,16
217:24 221:16

specifically
8:13 9:7 10:17
16:10 18:9 59:1
76:3 78:15,16
93:25 105:21
107:25 108:2
109:4 128:14,
20 136:3 143:2
233:13

specifics
76:15 78:23
96:18

spell 7:12

spent 22:21
37:2,10 48:13

spoke 49:15
67:23 68:15
69:6 71:18
77:14 80:8 81:7
149:15 219:17

spoken 81:18

squiggle
183:5,17,20
184:19 185:13
186:21,24

squiggles
183:24 185:5,9
186:13 190:9
192:14 200:17,
23

St 88:18

stage 98:23

stamp 166:3,6,
7,14,20 167:2
176:23 183:10,
12,14,16
184:13,17,22
185:4,8 187:6
220:1

stamped 214:2

stand 98:23
100:2,7,10
238:23

standing 13:16
23:22 99:15
223:21

stands 189:8

Starr 6:15,16
7:8,10 12:3,25
15:2 16:20
20:3,8,10,13,
16,25 21:21
22:23 23:22
24:2,5,8,10,23
25:10,18 26:17
27:1,3,19 28:1,
11,17 29:10

30:13 32:5
34:13 36:19
44:12 45:23
46:12 50:17
51:6 53:25
54:1,11,20
57:23 60:20
64:5,14 65:12,
14 69:1,4 74:1
77:13 83:4
84:12,18 101:7
102:1 104:20
106:20 107:11
111:22 113:12
117:14 120:3
128:24 134:8
136:22 142:23
144:21 146:13
147:11,23
148:24 150:11
151:25 153:19
155:24 156:19
157:2,19
158:22 159:2
162:17 164:13
165:6 166:13,
19 167:1
168:12,19
171:1,8,24
173:8 174:21
175:1,17 177:6
181:5 182:2,6
185:25 187:1,9
190:7,18 191:8,
13,18 192:6
193:1,6,17
194:6,8,14
197:12 201:4,
14 202:8 203:6
210:2,24 213:6,
10 219:25
220:3 223:11
224:13,25
225:19 227:17
228:16 229:1,
16 230:1,6,9,
12,24 231:4,9
237:12,17,20
238:2,9,16,18,
25 239:6,15,23
240:15,18
241:1,6,7

start 10:4 38:8
132:1 177:1

started 10:20
90:3 162:8
178:1,11,24
221:8,15

starting 90:2
214:17 241:5

state 7:12
29:21 168:7

state's 47:19

statement
18:18 19:3,23
20:5 22:17 23:2
35:25 36:3,6
37:11,12,19
47:20 50:23,24
65:19 175:15

states 6:11
233:12,15

stating 236:10

station 131:17

stay 124:16

stayed 90:10

staying 188:11
211:10

steel 223:22

Stefanich 6:19
11:25 12:22
14:22 16:17
19:25 20:6,9,
12,22 21:16
22:19 23:15
24:3,20 25:7,14
26:13,23,25
27:15,24 28:5,
14 29:7 30:9
32:2 34:9 36:16
44:11 45:17
46:9 50:14 51:2
53:23 54:12
57:22 60:17
65:11,13 68:21,
24 69:2,3,5
73:22 77:7 83:2
84:9,16 101:3,
22 104:17
113:10 117:12
119:23 128:16,
18 134:5
142:20 144:19

146:7 147:7,9,
20 148:22
150:8 151:13,
23 153:16
155:21 156:15,
25 157:15
158:21 162:14
164:10 166:10,
16,22 168:11,
14,16 170:23
171:5,21 173:5
174:20,23
175:12 181:2,
22 182:5
185:22 186:24
187:7 190:3,11
191:6,10,23,25
192:2 197:4
201:1,6 202:4
203:4 209:24
210:21 223:8
224:10 225:13
227:16 228:11,
23 229:7,24
230:2,8,11
231:2,8,12
232:8,15,19,25
233:7,15,22
234:3,6,12,16,
20,24 235:4,8,
11,24 236:13,
19,24 237:7,9,
19,23 238:11,
22 239:4,13,21
240:24 241:9,
14

step 209:19

steps 121:20,
23 175:21
208:23

stick 143:8

sticker 64:20

stop 117:24
189:18,22

stopped
223:25

story 156:2

straightforwar
d 90:14

street 104:1
131:13

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

strictly 98:20, 21

strike 10:3 11:20 12:12 14:12 16:6 19:15 23:5 26:4 28:8 37:25 43:8 45:10 46:24,25 47:25 61:13 62:21 65:15 71:17 81:7 106:8,21 115:12 117:15 120:23 122:14 139:6 151:11 153:3 156:12 157:3 162:21 170:8 172:15 175:9 196:24 204:6,7

stuff 121:4 124:5

subject 124:8 157:24

subjective 219:8,9

submit 124:19 125:23 129:23 130:5

subsequent 7:22 86:18

substance 67:22

successful 233:9

suggest 152:2, 17 158:14

suggests 173:11

summaries 121:14

summarized 225:15

summary 113:16,17

supervisor 9:6,15 77:12 85:15 95:8

120:9 124:19 132:22 133:15 158:1

supervisor's 96:8

supervisors 95:15 133:11, 22,23

supp 16:10 47:15,23 121:18 124:4 130:6,8

supplementary 66:25 113:18 116:21 118:1 126:24 127:2

supplied 176:2

supposed 111:24 238:14

suppress 29:4

suppressed 30:24 31:6,10, 14 32:7,18 234:10 238:7

suppressing 59:7 60:24 65:6

Supreme 119:19

suspect 43:9, 19,23 44:1,6, 10,14,19,25 49:22 104:9,15, 25 105:4 108:11 115:20, 25 122:20 123:3,7,10 126:5,6,10 127:9 128:13 131:7,8,16,23 138:24 139:4 141:22 143:19 152:23 153:5,7, 22 155:2,3 164:9 174:22 196:24 216:1 225:9 227:14 228:9

suspects 44:8 45:4 105:8

110:23 123:12 127:21 131:21 132:7 197:3,11 215:18 216:18, 19 223:17 224:9,18 226:1

suspend 240:19

Suspended 241:14

sustained 62:7,9

Swaminathan 24:7 231:22 232:11,16,20 233:2,13,19,25 234:5,7,14,18, 22 235:1,6,9,14 236:7,18,21 237:1,8,10,16 238:6

swear 7:1,2

system 176:3, 8 212:17

—————————

T

—————————

table 98:19 99:13

tables 97:17

tactics 23:13 24:18 25:5 28:12

taker 128:1

taking 52:15 55:2 122:14 128:14,25 129:17,18,23 181:17 182:14

talk 41:6 52:16 68:20 71:14,17, 19 73:20 74:18 75:4,6,22 77:1, 5,24,25 78:6,20 79:3,11,22 82:5,10 165:1 203:7 222:21, 22 225:16,18 229:21

talked 45:13,15 50:19 65:24 67:20 71:10,11 73:17,19 75:10, 15,17 76:7,11, 14 77:21 78:8 80:17,23 81:3, 12,22 160:2 161:9 207:21 211:11 222:10 227:24

talking 18:4,6 57:19 75:2 76:3 78:3,13,17 111:12 117:24 123:21 128:23 134:18 142:3 143:24 144:2 161:2,7 162:6 174:25 177:1 215:1 219:15 235:20,21

technicality 132:5

telephone 68:20,25 69:18 71:12,14 75:2,4

telling 52:11 156:1 235:15 238:12

tells 199:13

tend 30:4,18

tentative 41:9, 11 42:6,22 45:22 145:1 150:9

tentatively 41:15

tenure 10:13 61:14 64:18 90:1 92:6 107:16 180:13

term 9:18,19 13:23 14:4,5, 11,12,15 29:12, 14 30:3,7 119:13,16 134:15 180:10

terms 103:23 108:22 130:9

157:14 208:13 235:16

Terrance 6:22

Terry 19:20 23:1 35:22 50:23,24 51:4 62:11 79:12,16, 19 147:18 148:10,14 149:5,14,15,18, 21 155:13,14 156:20 161:2, 16 170:11 173:17 175:15 184:2 188:4 209:18 211:11 235:23

test 55:7 90:7 91:5,13

testified 16:1, 25 34:7,15 35:18 39:7,15 40:22 45:18 46:15 48:1 49:25 50:4,7 67:2 167:23 169:20 171:14 197:24 199:22 200:22 202:14 208:10 209:20 216:4 217:21 222:24 227:9 228:7

testify 26:15 36:24 67:16 114:4,8,17 197:13 210:16 237:14

testimony 7:3 11:23 16:14 19:14 30:19 41:1,8 42:18 46:1 54:23 55:4,7 108:4 110:9 146:3 153:17 155:14 161:10,19 162:15 168:14, 17 172:18 179:8 191:11 192:3 197:5 200:7,18 201:2, 20 202:5



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

212:18 213:4,
17,20,23 214:4,
11 228:18
232:3 233:11,
20 236:23

Thaddeus
59:12 227:23
229:5,9,12
231:1,5,11,14
232:3,9,17
234:11 237:21
238:20 239:2,
11,19,20

That'd 119:22

themself 126:7

thin 219:1

thing 13:7 27:9
34:18,25 35:18
37:21 45:11
46:18 54:2,6
108:17 119:3
122:22 124:17
127:11 138:21
141:22 152:6,7
158:6 216:20

things 30:17
34:11,15 35:7
52:7 73:21
78:10 81:12,13
82:22,24 96:13
122:5 124:3
128:5 191:1
192:9,10 212:7
224:21

thinking 12:15
141:21

thinks 48:20

thought 14:25
15:5 23:25
58:13 75:14
114:2 122:18
123:20 127:10,
11 128:22
133:24 140:12
141:24 142:22
153:4,13
157:13 168:24
198:11 212:11
218:11

till 241:13

time 6:6,7 8:19
10:15 19:16
21:5 22:13,21
23:24,25 36:13,
22 37:1,2,10
38:14 40:6,16
42:9 48:2,10,13
49:21 53:20,21
54:14,19 61:21
64:13 65:21
68:10,12,15
71:11 73:25
74:13 75:21
77:19 80:8,14
85:13 90:25
92:11,17 93:3,
8,16 99:21
100:24 103:2,
12 105:13
107:5,9,10,25
108:14 111:13,
14 115:20
116:12,23,25
118:9 120:17
121:2 122:4
124:10 127:14
130:9 139:2
140:25 141:19,
21 145:7
150:21 151:19,
20,21 159:12
167:7 169:7,10,
11,24 170:3,10
179:22 181:9
182:11 187:23
199:24 201:7,
13 214:16,18
217:9 225:16
226:4 230:17,
23 240:3,9,13,
14,15,22
241:10,16,17

times 11:11,14
12:12 16:16
19:9,10,13
22:2,4,8 35:3
47:7 55:11,13,
20 73:11,14,16,
17 74:14 81:6,
7,9,17,22 87:13
92:20 93:14,16,
20,21 102:10,
14,17,21
104:14 124:24
129:10 187:21

224:24 225:5,
10 226:1 235:3

today 6:5 7:20
33:20,24 50:1,8
54:23 55:8
64:12 65:25
66:17 67:4,12,
24 72:11,17
84:21 89:12
117:5 151:19
162:18 163:16
165:15 172:18
193:15 194:24
208:10 214:9
217:4 222:11
227:25 231:6
240:13 241:12

today's 6:6
16:12 57:3 66:3
67:18 68:16
71:9 72:9,21,25
73:3 76:4 78:7,
22 79:5,9,13,23
80:2,6,25 81:4,
8 88:6 107:9
159:18 160:1,6
165:8 177:14
220:13 231:6

told 35:19
37:21 45:1,3,
11,16 47:13
51:13 59:19
61:3 62:13,17
63:1,11,15,19
76:17,24 78:25
84:21 89:16
117:11 122:20
123:1,7,11
126:1,3,6
155:1,15
167:24 213:16
222:24 223:23
224:1 225:8

Tony 31:18
33:7

top 165:24
183:18 184:14
187:3,11
220:17 223:19

topic 107:24
232:23

total 102:11,18,

22

totally 105:23
156:18

touch 73:5

trained 107:20,
25 108:4,6,11,
18 110:9,18,23
125:25 154:8,
11 157:20,24

training 89:7
108:13,23,24
109:6,10,17,25
110:5 111:4
112:1 119:9
120:14 135:11
154:11,15

transcript
214:4 229:25
230:3 232:5,22,
23 233:2,6,14,
20 234:15,18,
22 235:15,19,
20 236:22
241:5

transfer 125:9

translated
52:20

trial 135:8
214:5 231:5
237:25

truck 224:1

truth 7:4

truthful 54:23
55:3,7

turn 34:20
100:10 101:14
183:12,16,23
184:5,12,17,22
185:4,8,12

turned 100:23

turning 100:8

turns 121:11

twins 218:8,10

two-minute
240:1

type 10:4 56:4

66:20 106:23
116:20 124:5
141:1 177:18

typed 116:17
122:5

types 11:24
67:3,11 138:17
141:6 235:9

typewritten
67:1

typical 93:21
232:6

typically 15:19
92:16 93:5,9,17
101:24 103:7
123:9 124:6
131:19 138:2

_____

U

Uh-huh 97:11
141:5 185:7

unable 174:19

Unclear
215:21

uncommon
132:13

Underneath
207:11

understand
7:19,24 8:3,6,9
18:11 22:1 30:2
43:22 52:8,11,
14,25 53:11
60:14 73:23
82:25 83:21
84:3 89:3 93:20
105:15 113:11
119:1,4 122:6
145:25 189:4
193:7 197:23
199:18 210:15
212:18 216:3

understanding
18:24 29:14
41:11 74:21
95:1 101:11
102:2 111:8,17
119:15,21



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

120:4 134:15 155:2 182:19, 22 196:18 197:16 221:20 237:6

understood 53:15 102:5

unduly 157:21 158:2,18 239:10

unequivocally 170:2 193:8

unit 90:12 91:15 92:1

United 6:11

unlawful 23:13 24:18 25:5 28:12 63:12

unpack 35:17

unreliable 156:13,22 157:14,18

**V**

vacated 8:7 83:1,10

vacation 210:5

verbal 52:19

versus 6:10 219:2

victim 86:9 222:5,6 223:24 224:1

victims 224:17

video 131:25

viewed 39:21, 22,23 40:1

viewing 13:19 99:8,11,14 100:18 105:25

violate 16:21 229:5 237:21

violated 17:11, 23 18:13 230:25 232:12,

13,17 233:5 234:9,10

violates 229:8

violating 58:10 229:13 231:19

violent 90:10, 11 91:20,21 92:4,9 94:18

**W**

Wade 23:5,6, 10,14 24:14,18, 25 25:5,12,24 26:5,11,16 27:12,21 28:3 44:24,25 45:1,3 79:4,8 167:3,5, 7 222:8

wait 168:17 238:23

waiting 209:17

waiving 241:11

wall 98:4,6 99:4 100:2,3,13 101:17

wanted 87:20 143:19 155:10 156:1,23 157:18 215:6, 13

Warfield 57:7

watch 92:16,18 93:3,4,8

watches 92:25 93:14,21

water 151:12

ways 101:14 118:14

weapon 123:7

website 138:7, 11,13,18 139:7, 13,25 140:4,7, 14 141:12 142:4 144:12 160:22 161:1

162:12

week 68:11 71:4,7 72:7 73:11,14 80:12

weekly 73:15

weeks 80:19 109:13

weight 206:4,5

west 92:8 97:5, 7 98:2,6

whatsoever 31:11 33:12 77:2 205:7 206:23 207:9 232:17,24

Where'd 88:17

white 163:21

Willie 7:21 16:22 17:12,20 18:18 27:13 215:7 220:24

win 233:16

Windows 97:10

windshield 64:21

withdraw 224:14

witnesses 22:13 29:21 30:20 31:24 32:12,15 34:3, 17,19 35:1,10 37:22 38:1 39:10,19 46:19 49:24,25 50:16, 18 58:24 59:2,3 60:8,15 86:4 108:7 110:19 117:16 127:18 131:4,21,23 161:9 162:13 163:14 164:2 203:11,18 215:13 216:1,7 221:24 222:3,7 224:17 239:19

Wojcik 31:18, 20,24 32:6,12, 14 33:7 63:2 77:15,18,21 78:4 85:15

Wojcik's 77:6

Wojick 77:25 78:1

wondering 152:20

word 47:4 81:11 234:6

words 41:17 45:25

work 10:4,25 17:19 31:20 92:15 107:21 226:20,24

worked 17:7 85:4,9,20 86:1 90:6 91:21 92:3

working 51:24 178:11,24 179:21,24 181:8,11 197:17 210:4 221:8,15

works 112:22

worries 34:21, 23

would've 92:9 157:5 173:2 176:17 180:2 210:9 211:18 212:22 217:12 219:5 221:7,11, 18 224:9 226:8

write 111:24 117:22 118:1 121:17 123:22, 24 124:4 125:20,25 126:2,24 127:2 130:8 152:25

writing 108:15, 18,22,25 109:7, 25 111:18 116:17 121:6, 14 123:21

128:5 190:24 225:7,24

written 52:21 101:6 116:20 124:4 130:2 170:22

wrong 45:11 83:9,15 152:15, 22 172:3 197:1 201:19 212:11

wrote 45:10,25 116:17 121:9 124:14 130:6 179:17

**Y**

year 10:4 12:17 56:3,21 59:16 88:21 89:17 90:2,23

years 10:22 66:21 90:15 91:25 96:14 105:16,19,23 124:22 190:20 205:2 206:10

yell 235:12

**Z**

zoom 7:18 24:7 68:25 69:17,19, 20,23 71:3,16, 22 72:6 74:3 80:10 88:2,3 159:6

Zooms 69:24

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**KENTUCKIANA**
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com