# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAMES FLETCHER JR.,   )
          )
          )  Case No. 20 CV 4768
  Plaintiff,    )
          )  Honorable Andrea R. Wood
  v.       )
          )
JEROME BOGUCKI, ANTHONY  )
NORADIN, RAYMOND SCHALK  )
ANTHONY WOJCIK, UNKNOWN CITY )
OF CHICAGO POLICE OFFICERS, and )
The CITY OF CHICAGO   )
          )
          )
  Defendants.   )
          )

**Report of Expert Witness Victoria Hurtado**

I.      Education and Qualifications

        a.  Prior Involvement as an Expert

II.     Introduction

III.    Methodology

IV.     Factual Background of Willie Sorrell Homicide Investigation

V.      The Defendants Followed Basic Investigative Steps in the Homicide Investigation

        a.  Report Writing

VI.     The Defendants Conducted Identification Procedures According to Policy

        a.  1995 Photo Array

        b.  2002 Photo Array of James Fletcher

                i.  IDOC Photos

        c.  In Person Lineup

VII.    The Defendants Corroborated Facts During the Investigation

VIII.   Fletcher Clinton Investigation

IX.     Sergeant Anthony Wojcik had Minimal Involvement

X.      Detective Anthony Noradin had Minimal Involvement

XI.     Evidence Based Investigation Inconsistent with Fabrication

XII.    Conclusion

## I.  Education and Qualifications

My name is Victoria Hurtado and I have been employed by law enforcement agencies since 1992.  In December, 2018, I retired from the Irvine Police Department (California) where I was working as a Crimes Against Persons Detective. From January, 2019 to March, 2024 I worked at the Orange County District Attorney's Office as an Investigator.

I began my career in April, 1992 with the Irvine Police Department as an Intern in the Narcotics/Vice Unit. Shortly after, I was hired as an Administrative Assistant. As a non-sworn employee, I also worked in General Investigations and as Court Liaison Officer. In January, 1996 I attended the Orange County Sheriff's Academy, graduated as a Police Officer in July, 1996, and was assigned to the Patrol Division. During my last year in patrol, I became a charter member of the newly created Domestic Violence Response Team.  In April, 2002 I tested and was selected to become a Detective, I initially worked property crimes (fraud, burglary and automobile theft).

In approximately 2004, I was assigned to work Crimes Against Persons. As a Crimes Against Persons Detective, my caseload included homicide, domestic violence, sexual assault, child abuse, stalking, elder abuse, robbery and assault.  At this time, Detectives were assigned to work their specialty assignment on a rotational basis of 5-years then return to Patrol. As my rotation date neared, I was selected to be the only "at will" (no rotation) Crimes Against Persons Detective and spent over 16 years in the Detective Bureau.  I was routinely called out for all homicides and significant crimes of violence that occurred in the city. I was regularly tasked to train and mentor new Detectives.  I was often consulted by the Irvine Police Department Training Division to vet Training Bulletins and in-service training outlines to ensure the lawfulness and best practices as it involved Crimes Against Persons.  The Department's Professional Standards (Internal Affairs) would also consult with me regarding the manner in which investigations were conducted to assess the best practices employed by the affected employee.  I provided department-wide instruction on domestic violence, stalking, child abuse, and general investigations to meet state mandates for department personnel to be in compliance with California's Peace Officer Standards and Training (POST). In addition, I conducted department-wide homicide case de-briefs, as well as case de-briefs for the Field Training Officers.  These de-briefs were conducted to impart lessons learned and share best practices.

During my 32-year career in law enforcement, I have handled and assisted in the investigation of numerous types of cases, including all manner of violent crime, sexual assault and property crimes. During those investigations I have liaised with Deputy District Attorneys, District Attorney Investigators, Crime Lab, Probation, Parole, Victim Witness advocates, child protective services, Elder Abuse Services, Social Services, Coroner's office, allied police agencies, FBI, Homeland Security, Medical Board, and other local, County, State and Federal investigative agencies. I often worked beside prosecutors and was the designated Investigating Officer through motions, preliminary hearings, jury voir dire and trials. Besides regularly testifying in various state courts, I have also testified in front of the grand jury, juvenile court, medical board, chiropractic board and parole board. I have attended thousands of hours of training in all aspects of investigations, but mainly focused on crimes of violence in an effort to glean and adopt industry best practices.  To build upon those best practices, I have attended homicide case de-briefings throughout the United States offered by State and Federal Agencies.  I am a member of several

3

professional associations and I regularly attend trainings and de-briefs held by the California Homicide Investigators Association and Orange County Homicide Investigators Association.

Additionally, I have conducted case briefings, regarding high-profile homicide and serial sexual assault cases I investigated, to the Federal Bureau of Investigation (Orange County, Los Angeles and Maryland), Women Leaders in Law Enforcement, Orange County Family Violence Council, Los Angeles Police Department, California Homicide Investigators Association, Washington State Investigators Association and Southeastern Homicide Investigators Association.

During my time with the Irvine Police Department, I received recognition for the work I performed in the area of criminal investigations.

- 2002 I received the Unit Award for the Economics Crime Unit
- 2005 I received the Meritorious Service Award
- 2007 I was named the Police Officer of the Year
- 2008 I received the Law and Order Award from the American Legion
- 2009 I received the City of Irvine's Above and Beyond Award
- 2013 I received the Unit Award for the Investigations Bureau
- 2013 I was named the Employee of the Quarter
- 2017 I was nominated for the Valiant Award by the Community Service Program (victim advocate program)
- 2018 I was recognized by the Federal Bureau of Investigation's Bank Robbery Task Force

I retired from my position at the Orange County District Attorney's Office as a District Attorney Investigator in March, 2024. I spent over two years working Insurance Fraud Unit, and spent over 2 ½ years working in the Sexual Assault Unit. I routinely interacted with District Attorneys, Detectives, Defense Attorneys, Police Departments, Orange County Crime Lab and Federal Agencies. From November, 2019 until I retired, I was assigned to the Officer Involved Shooting/In Custody Death Team, and attended a 40-hour Institute of Criminal Investigation training in the area of Officer Involved Shooting Investigations. As such, I assisted in the investigation of officer involved shootings and in-custody deaths that occurred within the County of Orange, California.

I hold a Bachelor of Arts Degree from the University of California at Irvine in Social Ecology with an emphasis in Criminology and a minor in Psychology. I also hold graduate units in Criminal Justice from California State University Long Beach.

### a. Prior Involvement as an Expert

To date, I have been retained in the following cases involving police/investigative practices:

*Does vs. County of Santa Barbara, et al.*
Superior Court of California, County of Los Angeles, Central District
Case No.: 22STCV09312
Retained by Plaintiffs – Anthony DeMarco, Esq.

4

*Demetrius Blackwell and Tyrese Jackson v. City of Detroit*
Case 2:21-cv-11586-PDB-EAS
*Lavelle Williams v. City of Detroit*
Case 2:21-cv-11578-BAF-EAS
United States District Court, Eastern District of Michigan
Retained by Plaintiffs – David A. Robinson, Esq.

*Michael Liggins vs. City of Chicago, et al.*
United States District Court, Northern District of Illinois
Case No.: 20 C 4085
Retained by Defense – City of Chicago Department of Law

*Kiontae Mack vs. City of Chicago, et al.*
United States District Court, Northern District of Illinois
Case No.: 19 CV 4001
Retained by Defense – Kulwin, Masciopinto & Kulwin

*Teresa Rogerson vs. City of Seattle*
Superior Court, State of Washington, King County
Case No.: 21-2-00661-9 SEA
Retained by Defense – Seattle City Attorney's Office

*Bernard Mims v. City of Chicago, et al.*
United States District Court, Northern District of Illinois
Case No.: 18 CV 7192
Retained by Defense – Rock, Fusco and Connelly

*Tyrone Hood, et al. v. City of Chicago, et al.*
United States District Court, Northern District of Illinois
Case No.: 16 CV 1893
Retained by Defense – Rock, Fusco and Connelly

*Cihak v. City of Chicago, et al.*
Circuit Court of Cook County, Illinois
Case No.: 13 L 11845
Retained by Defense – Rock, Fusco and Connelly

## II.  Introduction

I was retained by Defense counsel at a fee of $375 an hour to review testimony, reports, and investigative material to provide an opinion as to the Defendants' conduct during the criminal investigation and prosecution of the homicide investigation of Willie Sorrell.

A list of materials provided to me by Defense counsel, and reviewed in order to base my opinion is attached.

5

Based on my review of the provided materials, coupled with my years of hands-on experience, education, and training in law enforcement, and specifically conducting criminal investigations, I have formed an opinion that the Chicago Police Department Officers and Detectives' investigation was reasonable and followed Chicago Police Department general orders and policies, and was consistent with generally accepted police practices at the time. Specific areas will be individually evaluated and discussed in the following pages.

I understand that additional documentation may be provided, and if that in any manner changes my opinion(s), a supplemental report will be provided.

### III. Methodology

I have formulated my opinions after having reviewed the documentation provided to me by Defense counsel and set forth on Attachment "A", which may be used as an exhibit to illustrate, support, or summarize my opinions or bases. My opinions are also based on over 27 years as a police officer, and specifically 22 years as a Detective/Investigator working a wide range of crimes, which includes 5 years as a District Attorney Investigator working closely with Prosecuting attorneys. My opinions are also based on being involved in, and attending trainings and homicide case de-briefs conducted by California Homicide Investigators Association, Orange County Homicide Investigators Association, Federal Bureau of Investigation, Washington Homicide Investigators Association and South East Homicide Investigators Association. Such case de-briefs are conducted by involved and experienced investigators whose goal is to educate attendees in lessons learned. I have additionally worked with District Attorneys on numerous vertical prosecutions, sat through preliminary hearings, motions and trials, and been the designated case investigator working hand in hand with the prosecutor during the course of numerous types of cases. This has afforded me the opportunity to learn from experienced prosecutors about cases presented and prosecuted.

### IV. Factual Background of Willie Sorrell Homicide Investigation

On 12-21-90 Edward Cooper returned to his truck after delivering bread for the Holsum Bread Company when he was contacted by his friend, Sheenee Friend, who joined him on the truck. While speaking to Friend, he was approached by two males with guns who demanded his money. Cooper handed the offenders $30 from a pants pocket. One of the offenders searched Cooper and removed $300 from another pocket. Friend escaped the truck to safety. The offenders fled the truck and Cooper removed a gun from his waistband and gave chase.

While giving chase, Cooper's cousin, Terry Rogers joined him, stating he knew the suspects and they would shoot him. Cooper and the suspects exchanged gun fire and one of the suspects' bullets struck victim Willie Sorrell as he was exiting a nearby store. Sorrell was pronounced dead a short time later. One of Cooper's bullets struck the windshield of the vehicle Emmett Wade was seated in.

Cooper saw the offenders enter a building at which time he discontinued his chase. Cooper initially denied having a gun, but eventually told the police the truth and directed them to the location he had secreted it.

Officer James Gilger and Detective Michael Fleming of the Chicago Police Department responded to the shooting scene. Detective Fleming interviewed witnesses Friend, Wade and Rogers, as well as victim/witness Cooper. Friend believed she could identify the suspects if she saw them again. Wade also stated he may be able to identify the suspects if he saw them again. Rogers said he got a good look at one of the suspects and had seen him around over the last month. He added that he heard one of the suspects call the other suspect "Fletcher," and that he could identify at least one of the suspects if he saw him again.

The same day as the homicide, Detective Fleming had Rogers respond to the police station where he viewed a book of photos, in an attempt to identify the suspects, with negative results.

In 1995, Detectives Jerome Bogucki and Raymond Schalk were assigned to look into cold cases and began to reinvestigate the case. Detectives Kevin McDonald and Robert Rutherford informed them of a person by the name of Fletcher Clinton who lived in the area near Cooper, had a criminal history and was currently in custody. Detectives conducted a photo array containing Fletcher Clinton with Cooper, but Cooper was unable to identify anyone. Detectives were unable to locate Rogers, so a stop order was placed for him.

On 02-12-02 Detectives Schalk and Bogucki interviewed Rogers after he was arrested for an unrelated crime. At that time Rogers disclosed that he knew one of the homicide suspects as "Jimmie Fletcher." He stated he knew Fletcher from where he used to live, as well as having spent time with him in custody. Fletcher was identified as James Fletcher, who was then incarcerated under the alias of Arnold Dixon. Rogers was shown a photo array containing Fletcher's photo, as well as six other subjects, and positively identified Fletcher as one of the offenders.

That same day, Detectives went to Cooper's residence and re-interviewed him. Cooper was shown the same photo array containing Fletcher's photo, and pointed out Fletcher's photograph, stating that he looked similar to one of the suspects. Cooper requested to view Fletcher in person to substantiate his identification.

Since Detectives were unable to locate Friend and Wade, they placed investigative alerts for both of them.

ASA Jennifer Walker interviewed Rogers on 02-13-02 and joined Bogucki and Schalk's interview of Fletcher on 02-21-02. Fletcher denied any involvement in the homicide. Fletcher admitted to knowing Rogers.

Friend was interviewed by Detectives on 03-08-02 after having been arrested on a parole violation warrant. Friend stated she had previously seen one of the suspects in the neighborhood. Friend was shown the same photo array, and positively identified Fletcher. ASA Jennifer Walker interviewed Friend on 03-09-02 and took a written statement from her.

On 03-12-02 Detectives interviewed Wade, at which time he stated he had not seen the suspects' faces. On 03-16-02 ASA Walker interviewed Wade.

On 03-21-02 ASA Walker approved a 1st Degree Murder warrant for James Fletcher. At a later date ASA Lanahan filed a Criminal Complaint against Fletcher.

On 04-20-02 an in person line-up was conducted with Fletcher at Area 5. Witnesses Friend and Cooper individually viewed the lineup and each positively identified Fletcher. Friend testified in front of the Grand Jury on 05-01-02. Detectives were unable to locate witness Rogers at this time. Rogers was later arrested, allowing ASA Jennifer Walker to interview and obtain a written statement from him on 05-08-02. Rogers testified in front of the Grand Jury on 05-09-02.

On 02-25-05 a jury found James Fletcher guilty of first degree murder. On 10-25-19 the court granted James Fletcher's habeas corpus petition and his conviction was set aside.

## V.      The Defendants Followed Basic Investigative Steps in the Homicide Investigation

Plaintiff's expert, Ms. Susan Peters states that "any reasonable officers would have understood the inherent problems with relying on eyewitness identifications in a case such as this one."[1] While I concur that there have been studies regarding eyewitness identifications, one must acknowledge that "felonious injuries and criminal homicides are viewed as among the most serious offenses committed in our society"[2] and as such must be investigated thoroughly. Ms. Peters did not offer any alternative investigative options available to Detectives Bogucki and Schalk who were attempting to gain justice for Willie Sorrell. Any experienced Detective knows when the perpetrator is a stranger to the witness and there is an unknown suspect, the most common method of identification involves the use of a "photo array," whereby a law enforcement officer displays a photograph of the suspect along with images of similar looking individuals for comparison.[3]

Detectives conducted a reasonable investigation utilizing the information they obtained and following logical investigative steps as follows:

1.  Canine officers conducted a search of the location Cooper last saw the suspects;
2.  Witnesses were interviewed;
    a.  GSR test conducted of Cooper;
    b.  Cooper's gun was located;
3.  Rogers responded to Area 5 and viewed photographs;
4.   Upon receiving Fletcher Clinton's information in 1995, Detectives showed a photo array to Edward Cooper;
    a.  Cooper's negative identification was documented in a GPR as required by CPD policy at the time.
    b.  Attempted to locate Terry Rogers;
        i.  Placed Investigative alert for him;

---

[1] Susan Peters Expert Report at Page 12.
[2] Criminal Investigation Seventh Edition, Charles Swanson at Page 225.
[3] U.S. Department of Justice, "Eyewitness Identification: Procedures for Conducting Photo Arrays at Page 1.

5. Rogers was re-interviewed in 2002 when located, and identified Jimmie Fletcher as one of the suspects;
   a. Photo array with Fletcher (as Arnold Dixon) shown to Rogers resulting in a positive identification;
      i. ASA Walker interviewed Rogers;
   b. Investigative alerts placed for Friend and Wade;
   c. Detectives interviewed Fletcher with ASA Walker;
   d. Friend positively identified Fletcher from the same photo array;
      i. ASA Walker interviewed and obtained a written statement from Friend;
   e. Detectives re-interviewed Wade who stated he had not seen the suspects' faces;
      i. ASA Walker interviewed Wade
6. In-person Line up was conducted with Fletcher
   a. Friend positively identified Fletcher
   b. Cooper positively identified Fletcher
7. Friend testified in front of Grand Jury
8. Rogers testified in front of Grand Jury
9. ASA Walker approved a 1st Degree Murder warrant for James Fletcher.

Knowledgeable detectives know that regardless of any difficulties with photo arrays they are still accepted as an integral part of police investigations.

### a. Report Writing

Ms. Peters is critical of detectives not documenting all investigative steps in their police reports. But, according to Fundamentals of Criminal Investigation, "discretion should be exercised also, in the inclusion of negative material which merely states that certain investigative measures were fruitless and does not prove a point, clarify an issue, or aid an inquiry even by misdirection.[4]

During deposition testimony, Ms. Peters discussed her concern over the 02-12-02 interview of Rogers not being documented until May. In reviewing the May report, I do not find it contrary from standard police practices or Chicago Police Department policy based on it being a continuing investigative report. The report begins with documenting an incident on 02-11-02, continues by documenting the Rogers' interview and ultimately ends with details on 05-07-02. During my years as a Detective, it was common to detail numerous days of investigation in one report. Based on my experience, it was not unusual to have a delay in such a report.

### VI. The Defendants Conducted Identification Procedures According to Policy

Ms. Peters incorrectly opines that Detectives violated Chicago Police Department policy regarding photo array procedures. During the course of the investigation, Detectives Bogucki and Schalk showed two different photo arrays to witnesses. In 1995 they showed Edward Cooper a photo array containing a photo of Fletcher Clinton. In 2002 they separately showed Rogers, Cooper and Friend a photo array containing a photo of James Fletcher.

---

[4] Fundamentals of Criminal Investigation, Seventh Edition, by Charles O'Hara at Page 42.

Chicago Police Department General Order 88-18 (Lineup Procedures) was amended 11-19-03. This amendment incorporated **changes** to include:

1. A form for witnesses to sign (Lineup/Photospread Advisory Form);
2. Lineups with one suspect should include at least four non-suspects;
3. All lineups shall be photographed;
4. Photographs used in a photo spread shall be inventoried whether or not a positive identification is made;
5. A supplementary report will be completed to document a lineup or photo spread;
6. The supplementary report will include information of fillers.[5]

Since both photo arrays were prior to the Lineup Procedure amendment in 2003, the Detectives were within policy. Prior to November, 2003, there did not exist a formal Advisory form for Detectives to utilize when showing photo arrays. Regardless of Ms. Peters opining that best practice would have been for the detectives to instruct witnesses prior to viewing the photo array, if there was no policy requirement, and the form did not exist at the Chicago Police Department, then the detectives did not have to make such an advisement. I am aware that this was a changing area in law enforcement, and as such it was not uncommon for law enforcement agencies to modify their practices and procedures over time with regard to investigative steps such as photo arrays and lineups.

### a. 1995 Photo Array

Detectives Bogucki and Schalk showed Cooper a photo array containing Fletcher Clinton on 03-19-95, but he was unable to make an identification. In accordance with CPD policy, Detective Bogucki prepared a General Progress Report documenting the negative identification. Detectives were not required to document the fillers in the photo array, inventory the photo array, or read photo array instructions at that time. During her deposition testimony Ms. Peters concurred that she did not see any policy that specifically required Bogucki and Schalk to record the names and dates of births of the participants in a negative photo array.[6]

As set forth in more detail below, it does not appear Fletcher Clinton was truly a suspect, so when Cooper did not identify him, there was no reason to show the array to the other witnesses. Additionally, there was no point to show the Fletcher Clinton array to additional witnesses once Terry Rogers provided the added information regarding James Fletcher being one of the suspects.

### b. 2002 Photo Array of James Fletcher

The guidelines used by law enforcement for picking out photographs to use in a photo array are simply to "select fillers who generally fit the witness' description of the perpetrator" and to "compose the lineup in such a manner that the suspect does not unduly stand out."[7] Ms. Peters takes fault in the photo array utilizing the Illinois Department of Corrections (IDOC) database

---

[5] CPD Facsimile Message to All Department Members, City-JF-015725-015727
[6] Deposition of Susan Peters at Pages 12-13.
[7] U.S Department of Justice, Eyewitness Evidence, A Guide for Law Enforcement, 1999 at Page 29.

photographs, which depicted James Fletcher (under his alias of Arnold Dixon), in the photo array. Seasoned detectives know that police work frequently consists of making quick decisions and adapting to changing circumstances. This issue is discussed further in the next paragraph.

Detectives attempted to interview Rogers in 1995, but were unable to track him down. They placed an investigative alert for Rogers, which took until 02-11-02 to locate him. When Detectives interviewed Rogers on 02-12-02 he provided the name "Jimmie Fletcher" as the suspect. At the time of the homicide, in 1990, it was Rogers that stated one of the suspects referred to the other suspect as "Fletcher".

During the follow up interview, Rogers provided information which was the first true lead in the case in years. The fact that Rogers was now providing additional information regarding Fletcher's identity is not uncommon. As Detective Schalk stated during his deposition, "people always don't come forward with all the information right away. It's not that unusual." The seasoned investigator is aware that "whenever there are witnesses to a crime, even the most conscientious investigator may fail to elicit all information available."[8] This fact is also documented in O'Hara's Fundamentals of Criminal Investigation, "Depending on the technique he employs while interviewing these people, he may come away with all the desired data available or he may obtain only a few scattered facts of doubtful value."[9] During her deposition testimony, Ms. Peters stated "but true follow-up investigation of witnesses, you can re-interview people on a case such as this and find out specifics what they saw."[10] The information Rogers revealed was not a "change of story" as alleged in Ms. Peters report. Rogers provided additional information which was consistent with what he had previously stated.

Once Rogers told the Detectives the identity of Fletcher, there was no longer any reason to show him the Fletcher Clinton photo array. During his deposition, Detective Bogucki stated the reason they did not show the Fletcher Clinton array to Rogers was "because the first time we talked to Mr. Rogers, he told us who – who James Fletcher was and that he was one of the offenders" and "so Fletcher Clinton did not have any bearing on this case anymore."[11] That is a reasonable investigative step and well within Chicago Police Department policy.

i.    **Illinois Department of Corrections (IDOC) Photographs**

There is much dispute over the suitableness of using IDOC photographs for the James Fletcher, aka Arnold Dixon, photo array. State's Attorney Investigator Daniel Brannigan was asked during his deposition about utilizing IDOC photos and he too disagreed with using IDOC for a photo array but stated "sometimes there may be a reason for it."[12] I believe Detective Schalk explained the reason IDOC was utilized when he stated ".. it would take a while to send for photos. This was a time before everything was computerized. It would take a while to send for photos to our – our graphic art section downtown for then to send photos back where I could pull up the ICD

---

[8] Criminal Investigation, 7th Edition by Charles Swanson at Page 149.
[9] Fundamentals of Criminal Investigation at Page 108.
[10] Deposition of Susan Peters at Page 70.
[11] Deposition of Jerome Bogucki 04-20-23 at Page 86.
[12] Deposition of Daniel Brannigan 08-16-24 at Page 329.

– IDOC photos right away."[13]   Detective Bogucki believed "because we did use his [Fletcher's] picture from IDOC, so we felt we needed all IDOC pictures." Detective Bogucki said when putting the photo array together he was looking for "just similar faces. That's all we're trying to put together" and that he chose people that he thought looked like Mr. Fletcher. Ultimately in showing a photo array "either they can identify a face or they cannot."[14] At this time it had taken seven years to locate Rogers. It is reasonable that Detectives wanted to pursue and verify the information Rogers provided by showing him a photo array with no further delay and the IDOC website was an appropriate photo database to gather pictures.

If witnesses were to look at the names on the photo array, everyone had the last name of Dixon. Even though Rogers knew Fletcher as Jimmy Fletcher, he still identified him, despite the photo depicting an entirely different name (Arnold Dixon). As Sergeant Wojcik stated, "so that would indicate to me maybe a little stronger identification because even though he would have saw – seen all people with the last name of Dixon, he still picked out Jimmy Fletcher."[15]

Despite the fact that every photograph contained descriptors of the person, witnesses stated they did not look at the information. During the criminal trial, Cooper testified that he "just looked at the photos, not the information."[16] During deposition, Cooper was asked about the information on the photos in the photo array. He stated that he saw the names on the photos, but "I was looking at the pictures."[17] During Friend's testimony she stated "I didn't study all this. I looked at the face" and she had "no doubt at all" that Fletcher was the man from the robbery.[18]

The height of a person in a photo array is not relevant because the viewer is unable to determine height by looking at a photograph. Ms. Peters also spends some time describing the hair of each of the persons in the photo array. In regards to hair style in photo arrays Sergeant Wojcik stated you had to look at the circumstances if time had passed. Since hair and hair style can easily be changed the hair can be varied. Detective Bogucki did not make sure the hair style was the same "because it wouldn't matter 12 years later."[19] During deposition testimony Ms. Peters even agreed that hairstyle changes over time.[20]

Further, the standard photo array consists of a total of six photos; a possible suspect and a "minimum of five fillers.[21] The 2002 photo array of Fletcher using IDOC photos consisted of seven photographs. If anything, seven photographs would provide witnesses with an additional option, which would prove to be a more challenging line-up.

Regardless, none of the involved ASAs had issues with the photo array or the any of the witness identifications. ASA Michael Clarke, who was involved in preparing the case and the trial

---

[13] Deposition of Raymond Schalk (10-17-23) at Page 58.

[14] Deposition of Jerome Bogucki at Page 206.

[15] Deposition of Anthony Wojcik at Page 165.

[16] People v. Fletcher ROP Jury Trial 02-23-05 at Pages 95-96.

[17] Deposition of Edward Cooper at Pages 135-136.

[18] People v. Fletcher ROP Jury Trial 02-23-05 at Pages 162 and 175.

[19] Deposition of Jerome Bogucki at Page 205.

[20] Deposition of Susan Peters at Page 180.

[21] U.S. Department of Justice, Eyewitness Evidence, A Guide for Law Enforcement, 1999 at page 29.

stated he did not recall having any concerns that Rogers' identification of Fletcher was not credible and when he was asked if he trusted that Detectives Bogucki and Schalk conducted the photo array with Cooper correctly he stated "there was nothing to suggest otherwise." He also offered that "we talked to Mr. Cooper, so there was nothing brought up to cause us additional concerns. But we interviewed him prior to him testifying as well."[22] When asked about Friend, Clark stated during his deposition that he "had no reason to think she was not being forthcoming and truthful in her testimony." Asa O'Connor also testified during her deposition that she Asa Aiden O'Connor believed the photo array to be fair. [23] She also stated she did not have any concerns that Rogers' identification of Fletcher was not credible. When she was asked about the witnesses she did not have any concerns about Friend's or Rogers' credibility or that Cooper's identification of Fletcher being credible. She stated "he appeared to be a very truthful witness at time of trial."[24]

In reviewing the IDOC photographs, it is my opinion that the six filler photographs are similar enough to Fletcher so that Fletcher did not stand out. This fact was corroborated by the trial judge, as well as the opinions of the ASAs.

Realistically, Detectives could have merely shown Rogers a confirmation photo of James Fletcher based on his statements of knowing him for years, as well as having served time with him. But, according to Detective Bogucki they did not show Rogers a single photo because "we wanted to make sure of his information" and "they wanted to make sure he was telling the truth."[25] Detective Shalk also stated during his deposition that he would not show a single photo because "I want to be sure about the identification."[26] This is an example of Detectives Bogucki and Schalk going above and beyond what they needed to do in the investigation.

### c. In-Person Lineup

In my opinion, the in-person line up was not necessary after witnesses had already identified Fletcher in the photo array.

During defense's motion for a new trial in the criminal case on 09-27-05 the court stated "Now the defense has argued that the lineup, that the defendant was grossly dissimilar because he is taller and heavier. That is not the case that I see."[27] It is reasonable that Detectives did conduct the in person line up since "I believe even again going back to their opening statement Mr. Cooper was brought out that he had told the officer at one time the individual looked similar during the photo array but he wanted to see him in person."[28] During his deposition Cooper agreed that he thought seeing Fletcher in person would make him more certain of his identification

Although the in person was not necessarily needed after witnesses viewed the photo arrays, it was an investigative step requested by the State's Attorney on two occasions. On 02-13-02 there

---

[22] Deposition of Michael Clarke at Pages 97, 106-107.
[23] Deposition of Aiden O'Connor at Page 227.
[24] Deposition of Aiden O'Connor at Pages 176-177, 184-186 and 194.
[25] Deposition of Jerome Bogucki at Pages 127-128.
[26] Deposition of Raymond Schalk (05-16-23) at Page 120.
[27] Transcript 09-27-05 Motion for New Trial at Page 37.
[28] Transcript 09-27-05 Motion for New Trial at Page 41.

is a note to "run live line up with Edward Cooper". There is a second note on 03-09-02 to "live line up w/Edward Cooper." Based on the fact that this was a requested step by the ASA, it was necessary for the Detectives to conduct an in-person line up.

In reviewing the documents reviewed by Ms. Peters I noticed she did not review the felony review folder. During her deposition testimony Ms. Peters was told about the note on the folder requesting the in-person lineup and she opined that the detectives should not have done the in-person lineup regardless of Walker's request. I disagree with Ms. Peters' opinion. Based on my experience, not only as a detective, but as a District Attorney Investigator, I am aware that attorneys file cases they are confident they can prevail on and they are not going to request investigative steps that could cause issues in a case. It is not against Chicago Police Department policy or best practice to confirm a witness' selection by showing a line-up, particularly when the investigative step is also requested by an ASA who is familiar with and involved in the case.

Based on my experience, Detectives and Prosecutors, such as ASAs, typically work very closely together on cases such as homicides. Detectives know that Prosecutors may request certain investigative steps to further prove up aspects of a case. Detectives are aware that if a Prosecutor does not believe they can meet their burden of proof in court and potentially before a jury, they are not going to file the case and/or sign off on the criminal complaint. There is no Chicago Police Department policy preventing Detectives from having witnesses view an in-person lineup, and it was in the best interest of the case to follow the request of ASA Walker in order to have the case filed.

Regardless, attorney Jacqueline Cunyon-Gordon, who is Fletcher's half-sister and represented him during the line-up, did not tell Fletcher's criminal attorney that she thought the line-up was suggestive.[29] Moreover, it is my opinion that Ms. Gordon not being present in the witness room did not violate Chicago Police Department policy because Fletcher had not yet been charged with the murder and according to Detective Schalk it was the policy in Area 5 for the attorney to stand with their client and not with the witnesses.[30]

Based on my review of the photographs of the fillers utilized during the in-person show up, I believe the fillers are sufficiently similar per Chicago Police Department policy.

### VII. The Defendants Corroborated Facts During the Investigation

In her report, Ms. Peters writes that "Defendants did nothing to corroborate T. Rogers' statement regarding his knowledge of Fletcher."[31] This is not accurate in that the following was corroborated:

1. Rogers told Detectives he knew Fletcher from when they lived in the area of Fulton and Latrobe.

---

[29] Deposition of Jacqueline Cunyon-Gordon at Page 44.
[30] Deposition of Raymond Schalk (05-16-23) at Pages 169-170.
[31] Susan Peters Expert report at Page 8.

      a. According to Rogers' criminal history he has a prior address at 100 N. Latrobe. According to Fletcher's criminal history he has a prior address at 301 N. Latrobe.

2.   They showed Rogers' a photo array containing Fletcher under the name Arnold Dixon, and Rogers correctly identified Fletcher.

3.   During his interview Fletcher admitted to knowing Rogers;

      a. Fletcher's admission to knowing Rogers is also noted on the Felony review folder dated 05-0802;

Experienced Detectives know the importance of corroborating facts in an investigation. It is obvious that Detectives Bogucki and Schalk realized the importance of corroborating Rogers' statement naming Fletcher as one of the suspects. In his deposition, Detective Schalk stated "we had to corroborate what he was saying. We had to have other witnesses identify James Fletcher, if - if he was in fact the offender."[32] This is also documented in Fundamentals of Criminal Investigation that "information obtained from one witness should be correlated with that obtained from another. Corroboration of important facts is desirable."[33]

## VIII.   Fletcher Clinton Investigation

In 1995 Detectives Bogucki and Schalk investigated Fletcher Clinton's involvement, if any, in the Sorrell homicide by showing a photo array to Edward Cooper. Ms. Peters faults Detectives Bogucki and Schalk for not showing a photo array containing Fletcher Clinton until March, 1995. It is clear from documentation that Detective McDonald requested a photo of Fletcher Clinton in June, 1994. It is unknown who requested Fletcher Clinton's criminal history. It is a matter of dispute when Detectives Bogucki and Schalk actually became aware of Fletcher Clinton and came into possession of his photograph.

According to Detective Rutherford, he, Bogucki, Schalk and McDonald were all assigned to an Area 5 subunit when an in-house cold case unit was established.[34] Further, during the time that Detective Rutherford was partners with Detective McDonald from approximately 1994-1999 they did work on cold cases.[35]

Edward Cooper was unable to identify anyone in the photo array containing Fletcher Clinton. Detective Bogucki documented the negative identification in a General Progress Report. During both Detective Bogucki and Schalk's depositions they explained they were not required to document the names of the fillers used in a photo array or inventory the photo array when they received a negative identification.[36] A note to this effect was also documented in the Felony Review Folder that "dept policy in 1990s not to keep/inventory photos not identified."[37]

---

[32] Deposition of Raymond Schalk (05-16-23) at Page 221.
[33] Fundamentals of Criminal Investigation, 7th Edition by Charles O'Hara at Page 115.
[34] Deposition of Robert Rutherford at pages 36-37.
[35] Deposition of Robert Rutherford at page 35.
[36] Deposition of Jerome Bogucki at Page 145 and Deposition of Raymond Schalk (05-16-23) at Pages 123-125
[37] Felony Review Folder at 003040.

It is reasonable that Detectives only showed the photo array to Cooper and not any other witnesses. There was little to believe that Fletcher Clinton was an actual suspect, as opposed to someone that Detectives Rutherford and McDonald knew had the name Fletcher. As Detective Rutherford said in his deposition, "I don't know if Fletcher Clinton was a suspect. [38]There's no reason to believe, except for the name, that this guy might have had something involved, that he has some involvement, but I wouldn't classify that as a suspect."

## IX.    Sergeant Anthony Wojcik's Involvement

Plaintiff alleges that Sergeant Wojcik was Detective Bogucki, Schalk and Noradin's supervisor, and as such "participated in these actions, including by monitoring, directing, approving and ratifying them." Sergeant Anthony Wojcik had minimal involvement in the investigation. During my review of the documents, I found he approved:

- Detective Bogucki's Crime Scene Processing Report (a one page report) on 04-20-02 regarding the line up;
- Detective Schalk's case supplementary report/ field investigation on 05-24-02;
- Detective Schalk's Case Supplementary Report / Field Investigation Progress Line Up report on 05-24-02.

If this is in fact accurate, then Sergeant Wojcik did not have any involvement in the investigation until after both photo arrays had been shown to witnesses and ASA Walker had approved the murder warrant for Fletcher. Sergeant Wojcik stated he became involved in the Sorrell homicide investigation in 2002 when he signed off a report.[39] This was well after Bogucki's 1995 report which was not approved by a supervisor.

During his deposition, Sergeant Wojcik stated he did sign off on the line up report on 05-24-02. He stated it was not normal practice to look at the photos before approving. Sergeant Wojcik explained "I don't know that I ever have reviewed the photos of a lineup prior to proving a lineup report."[40] When asked about approving reports, Sergeant Wojcik stated "our main function there is to try, again, we – we err at times, but just to make sure that the headings are that that that RD" and "our big function in that time on approving these is to make sure that the UCR are properly filled in."[41] Sergeant Wojcik clarified "so to review every case and every file and – and try to get it – a handle on the entire investigation, that was a rarity, you know" and that with good detectives like Schalk, Bogucki and Noradin he just perused it and approved it.[42]

There were numerous Sergeants who approved other reports, including, but not limited to Sergeant Bosky, Sergeant Epplen, Sergeant S. Kuhn, Sergeant Biebel, Sergeant Jarvis, and Sergeant Michael Flynn #1903. There were also illegible approvals by Sergeants indicating additional Supervisors.

---

[38] Deposition of Robert Rutherford at Page 120.
[39] Deposition of Anthony Wojcik at Pages 19-20.
[40] Deposition of Anthony Wojcik at Page 190.
[41] Deposition of Anthony Wojcik at Pages 134 and 137.
[42] Deposition of Anthony Wojcik at Page 138.

Both Detectives Bogucki and Schalk stated in their depositions that Sergeant Wojcik had nothing to do with the case. Detective Bogucki in speaking to Detective Schalk "we both agreed that he had nothing to do with the case other than sign it, and all – all reports have to be signed by a supervisor."[43] When Detective Schalk was asked about Sergeant Wojcik's involvement he said "seeing that he – he had nothing to do with this case, I don't believe he did."[44]

Based on my experience in law enforcement as a Detective, I am aware that reports are to be approved by a supervisor. It is not uncommon for supervisors to approve reports for Detectives and not be aware of the totality of the circumstances related to the case at hand. There are often times a Sergeant who may not have direct knowledge of a case approves a report due to availability. Additionally, I am aware that supervisors do not have to have investigative experience in order to promote, and as such frequently rely on a detective's expertise when approving a report.

## X.    Detective Anthony Noradin's Involvement

Detective Anthony Noradin had minimal involvement in the Willie Sorrell homicide investigation. Although Plaintiff alleges that Detective Noradin interviewed Terry Rogers along with Detectives Bogucki and Schalk in 2002, this is incorrect. Detective Noradin's involvement was as follows:

- Accompanied Detectives Bogucki and Schalk in transporting Fletcher from prison to Area 5;
- Sat in with ASA Jennifer Walker while she interviewed Terry Rogers in 2002;
- Transported Fletcher to the hospital in order to get checked out.

Detective Noradin sat in with ASA Jennifer Walker while she was interviewing Terry Rogers in 2002. Detective Noradin did not conduct the interview, but merely sat in while the ASA interviewed Rogers and took a handwritten statement.

Detective Schalk explained that Noradin had a different day off group then he and Bogucki. He did not recall Noradin interviewing any witnesses during the investigation.[45] Detective Bogucki did not recall Noradin being assigned to the Sorrell homicide investigation. Detective Bogucki further stated that when he spoke with Detective Schalk, neither of them could remember what Noradin did in the case.[46]

Detective Noradin only became a detective in 2002, the year this case was concluding. Based on my experience as a detective, I know there are often times that lead detectives will request detectives to conduct minor, non-investigative type tasks. In these situations, the detective need not have any firsthand knowledge of the investigation. Such assignment is no different than what could be assigned to a line-level patrol officer, in this case sitting in on an interview and providing transportation to the hospital.

---

[43] Deposition of Jerome Bogucki at Page 77.
[44] Deposition of Raymond Schalk (10-17-23) at Pages 99-100.
[45] Deposition of Raymond Schalk (05-17-23) at Page 178.
[46] Deposition of Jerome Bogucki at Page 77.

### XI.     Evidence Based Investigation Inconsistent with Fabrication

Nowhere in Ms. Peters' report does she mention the safeguard of the Assistant States Attorneys' involvement in the investigation and prosecution of the case. In reviewing Ms. Peters' list of documents, as well as her deposition testimony, it does not appear that she was provided ASA Jennifer Walker's deposition testimony or felony review folder. ASA Walker, as felony review, was involved in the investigation once Rogers provided Fletcher's name and subsequently identified him in a photo array. ASA Walker:

- Interviewed and obtained written statement from Rogers;
- Approved a murder warrant for Fletcher
- Was present for Fletcher's interview;
- Interviewed and obtained written statement from Friend;
- Interviewed Wade

During her deposition, ASA Walker explained that "under the laws of the state of Illinois, probable cause needs to be obtained before an arrest warrant can be issued."[47] Any experienced Officer or Detective knows that it is the attorney that makes the ultimate decision on the filing of charges. According to the Chicago Police Department Operational Manual, in homicide cases the State's Attorneys' Office alone has the authority to approve charges.[48] Both ASA Walker and ASA Lanahan explained their involvement in the investigation. ASA Lanahan filed the criminal complaint against Fletcher and presented both Rogers and Friend before the Grand Jury. ASA Lanahan stated she would always talk to witnesses alone. ASA O'Connor tried the criminal case and also testified that there would be a period that she would talk to witnesses without police present to find out how they had been treated. Witnesses had an opportunity at those times to reveal any inappropriate actions detectives may have taken. According to the ASAs, none of the witnesses ever disclosed any acts of coercion, threats or improper behavior.

ASA Walker took a written statement from Friend on 03-09-02. Friend identified a photograph of Fletcher and said she saw him pointing a gun at Cooper and patting him down. She said she saw Fletcher holding a bund of money before both offenders jumped off the truck and ran.

Friend testified in front of the Grand Jury on 05-01-02. She testified that while she was on Cooper's truck she observed two male blacks carrying guns approach the truck. She was shown a photograph of Fletcher and identified him as "the one that grabbed her jacket" and "stuck up Edward Cooper". She further stated that Fletcher was the suspect who was going through Cooper's pockets before they ran away with money in their hands.

ASA Walker took a written statement from Rogers on 05-08-02. Rogers identified a photograph of Fletcher and said he saw him approach Cooper with a gun in his hand and then run away while shooting the gun. He said he had known Fletcher since they were kids and they used to go roller skating at the same place.

---

[47] Deposition of Jennifer Walker at Page 91.
[48] CPD Operational Manual at Page 812.

Rogers testified in front of the Grand Jury on 05-09-02. Rogers identified a photograph of Fletcher and stated he knew him for 20 years. He testified that he saw Fletcher with a gun and that there was an exchange of gunfire between Cooper and Fletcher. He was also shown a copy of the statement taken by ASA Walker and confirmed that it he had signed it.

On 02-23-05 Friend testified during the criminal trial. Friend identified Fletcher in court as one of the suspects. She stated she saw Fletcher going through Cooper's pockets while he was on the truck. She observed the two offenders, one of which was Fletcher, get off the truck and exchange gunfire with Cooper as they fled. Friend testified that both offenders were carrying guns. She further testified to viewing a photo array and picking Fletcher out, as well as picking Fletcher out of an in person line-up.

If Detectives were conspiring to frame Fletcher as alleged by Plaintiff, they would not have documented details that pointed to subjects other than Fletcher. Detective Bogucki documented in his March, 1995 report that Cooper believed Rogers may have set him up. It does not make sense that Defendants would have drawn attention to Rogers as a possible suspect, or to tarnish him as a witness in that he divulged the name "Fletcher" as a suspect.

Further, if Rogers was involved in the crime as Plaintiff claims, then it is not logical that he identified Fletcher who was also involved. If this was the case, Rogers would risk Fletcher being able to supply testimony or some type of evidence which would point towards Rogers as being involved in the crime. Detectives could have merely omitted Cooper's belief that Rogers may have been involved in order to frame Fletcher. Also, two other witnesses positively identified Fletcher as being a suspect. The witnesses were consistent in their identifications of Fletcher in the photo array, in person line up, during Grand Jury testimony, during trial testimony, in interviews with Detectives, and in conversations with Assistant State Attorneys.

Additionally, If Detectives were conspiring to frame Fletcher, it would have made more sense for them to document that Cooper positively identified Fletcher, rather than stating it was a tentative identification. Both Cooper and Detectives Bogucki and Schalk maintained throughout their testimony and documentation that Cooper made a tentative identification.

If Detectives were merely attempting to close out this case without truly locating the suspects, they could have framed Fletcher Clinton who also had a criminal history including robbery and, like Fletcher, was in custody at the time.

It was not until Fletcher had been convicted and began having family, attorneys and investigators reach out to the witnesses that their stories changed. Both State's Attorney Investigator Brannigan and ASA Clarke testified to Friend complaining about Fletcher's daughter and uncle telling her not to come to court, and receiving money not to go to court. ASA Clarke stated "I remember her making complaints about being either threatened or influenced and not wanting to come to the trial."[49] According to Fletcher's deposition testimony, his father may have met with Cooper prior to the trial, his father communicated with Wade and talked to him the day of trial, multiple private investigators contacted the witnesses, and a family member talked to a witness for him. Although there are witness declarations that recant testimony, there is deposition

---

[49] Deposition of Michael Clarke at Page 8.

testimony from some of the witnesses regarding the declarations. Wade stated that the handwriting on the declaration was not his, that he had never reviewed the document in full and that he did not go over what was being put into his declaration prior to it being drafted.[50] During Jennifer Blagg's deposition, Friend's affidavit and her recantations of it were discussed. Friend signed two affidavits, in 2011 and 2012. States' Attorney Investigator Daniel Brannigan testified during his deposition that Friend said she was presented with affidavits from Fletcher's attorneys that were already prepared.[51] Brannigan further stated that Friend said she told the truth when she went to court and the grand jury.[52] Brannigan had Friend review the 2012 affidavit in 2015 at which time she made the notations that "I only signed because Fletcher lawyer would not leave me alone" and "Police didn't tell me who to pick out SF."

## XII.    Conclusion

After reviewing and evaluating the documents provided, it is my opinion, based upon a reasonable degree of certainty, the Officers and Detectives conducted a reasonable investigation into the homicide of Willie Sorrell. The investigation was consistent with generally accepted police practices and Chicago Police Department policy at the time. They did not violate the basic rules of police procedure or generally accepted police practices that were in effect at the time of the investigation. I base this on my over 32 years of law enforcement experience, education, training and knowledge. My firsthand working knowledge and experience as a Detective/Investigator for over 22 years has provided me the expertise to evaluate such an investigation.

I declare that the foregoing is true and correct and based upon the information I have been provided to date. I reserve the right to modify my opinions should I receive new or additional information.


December 23, 2024

_____
                        Victoria Hurtado


---

[50] Deposition of Emmett Wade at Pages 105-107, 122.
[51] Deposition of Daniel Brannigan at Pages 56-57.
[52] Deposition of Daniel Brannigan at Page 41.