# EXHIBIT 17

LOUISVILLE  LEXINGTON  LONDON  FLORENCE  CINCINNATI  INDIANAPOLIS  ORLANDO  JACKSONVILLE  TAMPA



# CASE NO. 20-CV-04768

# JAMES FLETCHER, JR.

# V.

# JAMES BOGUCKI, ET AL.

## DEPONENT:

## JEROME BOGUCKI

## DATE:

## October 12, 2023



a courtroom
**powerhouse**

schedule@kentuckianareporters.com

877.808.5856 | 502.589.2273

1    IN THE UNITED STATES DISTRICT COURT

2   FOR THE NORTHERN DISTRICT OF ILLINOIS

3      EASTERN DIVISION

4     JUDGE ANDREA R. WOOD

5    MAGISTRATE JUDGE MARIA VALDEZ

6     CASE NO. 20-CV-04768

7

8

9     JAMES FLETCHER, JR.,

10      Plaintiff

11

12       V.

13

14   JEROME BOGUCKI, ANTHONY NORADIN,

15  RAYMOND SCHALK, ANTHONY WOJCIK, UNKNOWN CITY

16 OF CHICAGO POLICE OFFICERS, AND THE CITY OF CHICAGO,

17      Defendants

18

19

20

21

22

23 DEPONENT: JEROME BOGUCKI

24 DATE:   OCTOBER 12, 2023

25 REPORTER: LINDSAY LARSON-TODD



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                      APPEARANCES

 2

 3   ON BEHALF OF THE PLAINTIFF, JAMES FLETCHER, JR.:

 4   Sean Starr, Esquire

 5   Loevy & Loevy

 6   311 North Aberdeen

 7   3rd Floor

 8   Chicago, Illinois 60607

 9   Telephone No.: (312) 243-5900

10   E-mail: sean@loevy.com

11    (Appeared via videoconference)

12

13   ON BEHALF OF THE DEFENDANTS, JEROME BOGUCKI, ANTHONY

14   NORADIN, RAYMOND SCHALK, ANTHONY WOJCIK, UNKNOWN CITY

15   OF CHICAGO POLICE OFFICERS:

16   Brian Stefanich, Esquire

17   Hale & Monico

18   53 West Jackson Boulevard

19   Suite 334

20   Chicago, Illinois 60604

21   Telephone No.: (312) 870-6908

22   E-mail: bstefanich@halemonico.com

23    (Appeared via videoconference)

24

25
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JEROME BEACH, Taken 05/06/25 Page 2 of 222

3

```
 1              APPEARANCES (CONTINUED)

 2

 3   ON BEHALF OF THE DEFENDANT, THE CITY OF CHICAGO:

 4   Paul Michalik, Esquire

 5   Terrence Burns, Esquire

 6   Reiter Burns

 7   311 South Wacker Drive

 8   Suite 5200

 9   Chicago, Illinois 60606

10   Telephone No.: (312) 982-0090

11   E-mail: pmichalik@reiterburns.com

12   E-mail: tburns@reiterburns.com

13    (Appeared via videoconference)

14

15   Also Present: Lohith Ramanujam, Paralegal for Hale &

16   Monico

17

18

19

20

21

22

23

24

25
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                          INDEX

 2                                              Page

 3   PROCEEDINGS                                  7

 4   DIRECT EXAMINATION BY MR. STARR              8

 5

 6                         EXHIBITS

 7   Exhibit                                    Page

 8   7 - Supplementary Report -

 9       December 21st, 1990                     41

10   8 - Investigative Report File               61

11   9 - Stop Order or Cancellation Request -

12       March 19th, 1995                        66

13   10 - Investigative Alert - March 19th, 1995  71

14   11 - General Progress Report -

15       March 19th, 1995                        74

16   12 - Chicago Police Department - Arrest

17       Records - August 19th, 1999             94

18   13 - City of Chicago Arrest Record for

19       Clinton, Fletcher                      101

20   14 - City of Chicago Arrest Report for

21       Rogers, Terry                          106

22   15 - City of Chicago - Criminal History for

23       Rogers, Terry                          111

24   16 - City of Chicago - Criminal History for

25       Fletcher, James                        115
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                    EXHIBITS (CONTINUED)

 2   Exhibit                                       Page

 3   17 - General Progress Report -

 4        March 12th, 2002                         120

 5   18 - Illinois Department of Corrections'

 6        Photographs                              132

 7   19 - Case Supplementary Report - Cleared

 8        Open Report                              135

 9   20 - Supplementary Report - April 28th, 1989 140

10   21 - Supplementary Report - April 28th, 1988 142

11   22 - Handwritten Note by Joseph Sparks -

12        May 23rd, 2022                           147

13   23 - Blueback - State's Attorney's Notes      152

14

15                   CERTIFIED QUESTIONS

16                                                 Page

17   Q. - Did you commit any misconduct during

18        the investigation to the shooting death

19        of Eric Morrow, sir?                      17

20

21

22

23

24

25
```



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1                              STIPULATION

2

3    The REAL VIDEO deposition of JEROME BOGUCKI was taken at

4    KENTUCKIANA COURT REPORTERS, 110 NORTH WACKER DRIVE,

5    CHICAGO, ILLINOIS, 60606, via videoconference in which

6    all participants attended remotely, on THURSDAY the 12TH

7    day of OCTOBER 2023 at 10:12 a.m. (CT); said deposition

8    was taken pursuant to the FEDERAL Rules of Civil

9    Procedure. The oath in the matter was administered

10   remotely as permitted by Illinois Supreme Court Order

11   No. 30370 which amended Civil Rule 206(h).

12

13   It is agreed that LINDSAY LARSON-TODD, being a Notary

14   Public and Digital Reporter for the State of ILLINOIS,

15   may swear the witness and that the reading and signing

16   of the completed transcript by the witness is not

17   waived.

18

19

20

21

22

23

24

25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JEROME BOGUCKI, taken 10/12/2023 Page 12 of 182

7

```
 1                    PROCEEDINGS

 2

 3      THE REPORTER:  All right.  We are now on the

 4   record.  My name is Lindsay Todd.  I'm the online

 5   video technician and digital court reporter today,

 6   representing Kentuckiana Court Reporters located at

 7   110 North Wacker Drive, Chicago, Illinois, 60606.

 8   Today is the 12th day of October 2023.  The current

 9   time is 10:12 a.m. Central.  We are convened by

10   video conference to take the deposition of Jerome

11   Bogucki in the matter of James Fletcher Jr., v.

12   Jerome Bogucki, Anthony Noradin, Raymond Schalk,

13   Anthony Wojcik, unknown City of Chicago police

14   officers, and the City Of Chicago, pending in the

15   United States District Court for the Northern

16   District of Illinois Eastern Division, Case number

17   20-cv-04768.  Will everyone but the witness please

18   state your appearance, how you're attending, and the

19   location you're attending from, starting with

20   Plaintiff's counsel?

21      MR. STARR:  My name is Sean Starr from the law

22   firm of Loevy & Loevy.  I represent the plaintiff,

23   James Fletcher, in this matter, and I'm attending

24   remotely from the city of Chicago.

25      MR. STEFANICH:  Brian Stefanich.  I represent
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:20-cv-04768 Deposition of Jerome Bogucki taken 06/25/20 page 8 of 182

8

```
 1    Mr. Bogucki in this matter, and we are attending
 2    remotely from Park Ridge.
 3         MR. MICHALIK:  Paul Michalik on behalf of
 4    Defendant City of Chicago.  I am attending remotely
 5    from Chicago.
 6         THE REPORTER:  All righty.  And off the record,
 7    all parties agreed to stipulate that the witness is,
 8    in fact, Mr. Jerome Bogucki.  Do all parties still
 9    agree to the stipulation?
10         MR. STARR:  Plaintiff still stipulates --
11         MR. MICHALIK:  Yes.
12         MR. STEFANICH:  Agreed.
13         THE REPORTER:  All righty.  And Mr. Bogucki,
14    will you please raise your right hand for me?  Do
15    you solemnly swear or affirm that the testimony
16    you're about to give will be the truth, the whole
17    truth, and nothing but the truth?
18         THE WITNESS:  Yes.
19         THE REPORTER:  All righty.  You may begin.
20              DIRECT EXAMINATION
21  BY MR. STARR:
22    Q.   Good morning, sir.  Nice to see you again.  As
23  I stated, my name is Sean Starr, and I represent the
24  plaintiff in this matter.  This is the continuation of
25  your deposition from April of this year.  Sir, you
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


**KENTUCKIANA**
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-17 Filed: 05/06/25 Page 11 of 182 PageID #:5606

1  understand you're still under oath, correct?

2      A.   Yes.

3      Q.   Since last time, did you have an opportunity

4  to review the transcript from your previous deposition

5  in this case?

6      A.   I did look at it, yes.

7      Q.   Okay.  Did you review anything in addition to

8  your transcript that you didn't -- that you didn't tell

9  us about last time?

10     A.   I don't know how to answer that question.

11     Q.   Okay.  What documents did you review in

12  preparation for today, sir?

13     A.   I looked at the police reports, and I looked

14  at my last -- my last part of deposition.

15     Q.   Okay.  Did you look at any other documents

16  besides that?

17     A.   No.

18     Q.   All right.  Did you meet with your attorney in

19  preparation for today, sir?

20     A.   By telephone.

21     Q.   How long did you speak with your attorney by

22  telephone in preparation for today?

23     A.   Ten minutes, 15 minutes.

24     Q.   Okay.  Excellent.  I have a little bit of a

25  cold, so if you can't hear me or if you need me to ask

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   the question again, please let me know.  If you answer
 2   my question, I'll assume you understood what I was
 3   asking, okay?
 4        A.   Okay.
 5        Q.   All right.  When we left off last time, I was
 6   asking you about the Thaddius Jimenez case.  Do you
 7   recall that, sir?
 8        A.   Yes.
 9        Q.   Okay.  And your counsel and I have discussed
10   that off record, and I'm going to ask you a few
11   questions about that today.  Did you interrogate Larry
12   Tueffel and force him to identify Thaddius Jimenez as
13   the shooter in the Eric Morrow homicide?
14             MR. STEFANICH:  Objection.  Form.  You can
15        answer.
16             THE WITNESS:  No.
17   BY MR. STARR:
18        Q.   Did you pressure Mr. Tueffel to ID Thaddius
19   Jimenez, even though Mr. Tueffel made it very clear that
20   the shooter was not, in fact, Thaddius Jimenez?
21             MR. STEFANICH:  Objection.  Form.  You can
22        answer.
23             THE WITNESS:  Absolutely not.
24   BY MR. STARR:
25        Q.   When Mr. Tueffel refused to implicate
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:20-Deposition Document #: 1684-17 Filed: 05/06/25 Page 13 of 182

```
 1    Mr. Jimenez, did you threaten to arrest Mr. Tueffel?
 2              MR. STEFANICH:  Objection.  Form.  Foundation.
 3         You can answer.
 4              THE WITNESS:  I don't know that he did refuse.
 5         He did not refuse to identify anyone.
 6    BY MR. STARR:
 7         Q.   Did you ever threaten to send Mr. Tueffel to
 8    jail?
 9         A.   No.
10         Q.   Did you badger and tell Mr. Tueffel that he
11    was a liar when you were interrogating him?
12              MR. STEFANICH:  Objection.  Form.  You can
13         answer.
14              THE WITNESS:  No.
15    BY MR. STARR:
16         Q.   Did you show a woman by the name of Tina Elder
17    two photographs at the police station, one of the dead
18    victim, Eric Morrow, and one of Thaddius Jimenez?
19              MR. STEFANICH:  Objection.  Form.  You can
20         answer.
21              THE WITNESS:  At what point?
22    BY MR. STARR:
23         Q.   At any point while she was in the station,
24    sir?
25         A.   Not that I recall.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-17 Filed: 05/06/25 Page 14 of 182 PageID #:5609

12

```
 1        Q.   Okay.  Did you show Tina Elder two
 2   photographs, one of the dead victim, Eric Morrow, and
 3   one of Thaddius Jimenez, at any point at all?
 4            MR. STEFANICH:  Objection.  Form.  You can
 5      answer.
 6            THE WITNESS:  Not that I recall.
 7   BY MR. STARR:
 8        Q.   Okay.  Did you tell Tina Elder that Mr.
 9   Jimenez was your primary suspect before she viewed a
10   lineup?
11        A.   No.
12        Q.   Did you receive a tape-recorded confession of
13   a man named Juan Carlos Torres confessing to the murder
14   of Eric Morrow?
15        A.   I assumed that's what it was.  It was in -- I
16   -- I received some type of recording that was in
17   Spanish, which was given to the State's Attorney's
18   Office.
19        Q.   Prior to giving that to the State's Attorney's
20   Office, did you conceal the tape-recorded confession of
21   Juan Carlos Torres confessing to the murder?
22        A.   Did I conceal it?
23        Q.   Yes.
24        A.   I don't know what you mean by that.
25        Q.   Did you attempt to suppress it as evidence in
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    the Jimenez case?

2        A.    No.

3        Q.    Did you disclose the tape-recorded confession

4    to Juan Carlos Torres confessing to the murder?

5        A.    Yes.

6        Q.    Did a boy named Victor Romo, who was with Juan

7    Carlos when the shooting occurred, tell you that Juan

8    Carlos Torres was the man that pulled the trigger?

9        A.    I don't recall.

10        Q.    Did a boy named Victor Romo tell you anything

11    about the murder prior to the conviction of Thaddius

12    Jimenez?

13        A.    Repeat the question, please.

14        Q.    Yeah.  Did a boy named Victor Romo tell you

15    anything about the murder of Eric Morrow prior to the

16    conviction of Thaddius Jimenez?

17        A.    Yes.

18        Q.    And what did he tell you, sir?

19        A.    I have to look at the reports again to be

20    sure.

21        Q.    Based on your recollection, what do you recall

22    him telling you?

23        A.    I recall him saying that he ran away from the

24    scene of the murder and heard a shot.

25        Q.    Did Mr. Romo ever tell you what he saw -- that

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:20-cv-04768 Document #: 184-17 Filed: 05/06/25 Page 16 of 182

14

1  he saw the shooter?

2      A.   He said he was with another subject --

3  subject.

4      Q.   And who was that?

5      A.   I -- I'm not sure what he said.  He -- he

6  might have said Juan Carlos, but I have to look at

7  reports again.  It's been a long time.

8      Q.   Did he ever -- okay.  I didn't mean to

9  interrupt you.  Did he ever tell you that Juan Carlos

10  was the shooter in the Eric Morrow murder?

11      A.   I'm not sure at this point.

12      Q.   Okay.  And despite evidence from Victor Romo

13  and Juan Carlos Torres about Torres's guilt, you managed

14  to get multiple identifications of Thaddius Jimenez from

15  various witnesses, didn't you?

16          MR. STEFANICH:  Objection.  Form.  Foundation.

17      You can answer.

18          THE WITNESS:  There were witnesses that did

19      identify Thaddius Jimenez.

20  BY MR. STARR:

21      Q.   They -- and those witnesses identifications

22  were witness identifications that you were involved in,

23  correct?

24      A.   Yes.

25      Q.   Okay.  And as you sit there -- sit here today,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    do you agree that Mr. Jimenez was innocent of the
 2    shooting of Eric Morrow?
 3            MR. STEFANICH:  Objection.  Form.  Foundation.
 4       Legal conclusion.  You can answer.
 5            THE WITNESS:  No.
 6    BY MR. STARR:
 7       Q.   Do you still maintain that Thaddius Jimenez
 8    was guilty of it -- the -- of committing the crime of
 9    shooting Eric Morrow?
10       A.   The evidence pointed toward that, yes.
11       Q.   So do you maintain that his -- that
12    Mr. Jimenez is guilty?
13            MR. STEFANICH:  Objection.  Asked and answered.
14            THE WITNESS:  It's --
15            MR. STEFANICH:  You can answer again.
16            THE WITNESS:  It's not up to me to determine
17       that.
18    BY MR. STARR:
19       Q.   I'm asking you for your personal opinion.
20    Do you believe that Mr. Jimenez was guilty of the
21    shooting of Eric Morrow?
22            MR. STEFANICH:  Asked and answered.  You can
23       answer again.
24            THE WITNESS:  I believe he was, yes.
25    BY MR. STARR:
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q.    Okay.  And do -- so I guess my next question
 2   is probably moot, but do you have any explanation for
 3   how you were able to get multiple witnesses to identify
 4   the wrong man?
 5            MR. STEFANICH:  Objection.  Form.  Foundation.
 6            THE WITNESS:  That's not the case.
 7   BY MR. STARR:
 8        Q.    Well, you understand that Mr. Jimenez was
 9   found innocent by a court of law, correct?
10            MR. STEFANICH:  Objection.  Form.  Objection.
11        Foundation.  You can answer if you know.
12            THE WITNESS:  I am aware that Thaddius Jimenez
13        was convicted two separate times in criminal court.
14   BY MR. STARR:
15        Q.    But are you aware that Thaddius Jimenez's
16   conviction for the shooting death of Eric Morrow has
17   been overturned, correct?
18            MR. STEFANICH:  Objection.  Foundation.
19        You can answer if you know.
20            THE WITNESS:  I believe so.
21   BY MR. STARR:
22        Q.    Okay.  And did you do anything wrong during
23   the homicide investigation -- the Eric Morrow homicide
24   investigation, sir?
25            MR. STEFANICH:  Objection.  Form.
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:20-Deposition Document: 184-17 Filed 05/06/25 Page 19 of 182

```
 1            THE WITNESS:  No.
 2    BY MR. STARR:
 3                (CERTIFIED QUESTION)
 4       Q.    Did you commit any misconduct during the
 5    investigation to the shooting death of Eric Morrow, sir?
 6            MR. STEFANICH:  Objection.  Form.  Foundation.
 7       I think that violates our agreement, Sean.  I'm
 8       instructing him not to answer that question.
 9            MR. STARR:  It's a fact question.
10            MR. STEFANICH:  No, it's a legal conclusion
11       question that we agreed that wouldn't be asked.
12       I'm instructing him not to answer.
13    BY MR. STARR:
14       Q.    Are you going to take your attorney's advice
15    and refuse to answer my question, sir?
16       A.    That's correct.
17       Q.    Okay.  I'm going to certify that question.
18    Did your partner, Detective Schalk, do anything --
19            THE REPORTER:  Sorry.  I'm sorry to interrupt.
20       My audio just cut out.  I cannot hear you-all --
21            MR. STARR:  Just go off the record --
22            THE REPORTER:  Can I take us off the record --
23            MR. STARR:  Yeah --
24            THE REPORTER:  -- really quick?
25            MR. STARR:  -- please.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1          MR. STEFANICH:  Sure.

 2          THE REPORTER:  Okay.  Let me get us off the

 3      record.  I apologize.

 4             (OFF THE RECORD)

 5          THE REPORTER:  All right.  We are back on the

 6      record for the deposition at 10:23 a.m.  Central.

 7          MR. STEFANICH:  Objection to the last question.

 8      I believe it violates the agreement that the defense

 9      had with Plaintiff's counsel.  I'm instructing the

10      witness not to answer the question.

11          MR. STARR:  And Plaintiff's position is that it

12      is a fact question about Mr. Bogucki's misconduct.

13   BY MR. STARR:

14      Q.   Mr. Bogucki, are you going to take your

15   attorney's advice and refuse to answer my question?

16      A.   That is correct.

17          MR. STARR:  Okay.  I'm going to -- I'm going to

18      ask that that question to be certified.

19   BY MR. STARR:

20      Q.   Mr. Bogucki, during the homicide investigation

21   in the Eric Morrow shooting, did you ever become aware

22   of or observe your partner, Detective Schalk, do

23   anything wrong during that investigation?

24      A.   No, I did not.

25      Q.   Okay.  And -- sir, you testified at Mr.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:20-cv-04768 Document: 184-17 Filed: 05/06/25 Page 21 of 182

19

```
 1    Jimenez's criminal trial, correct?

 2         A.   Yes.

 3         Q.   And would you agree with me that some of the

 4    testimony that you gave at the criminal trial was not

 5    true?

 6         A.   I do not agree with you.

 7         Q.   Would you at least agree with me that some of

 8    the testimony you gave in that criminal trial was

 9    misleading?

10              MR. STEFANICH:  Objection.  Form.

11              THE WITNESS:  No.

12    BY MR. STARR:

13         Q.   Do you stand by your criminal trial testimony

14    in the Thaddius Jimenez case?

15         A.   Yes.

16         Q.   Sir, you did not disclose all the information

17    that you knew at trial, like the information about Juan

18    Carlos Torres's confession, correct?

19              MR. STEFANICH:  Objection.  Form.  Foundation.

20         You can answer if you can --

21              THE WITNESS:  That was not up to me.  It was up

22         to the State's attorneys.

23    BY MR. STARR:

24         Q.   Did you disclose everything to the State's

25    attorneys prior to the trial, sir?
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        A.    Yes.

2        Q.    Including the confession of Juan Carlos

3   Torres, correct?

4        A.    I don't know about the confession.  I know

5   there was a -- a recording.  That's all I know --

6        Q.    Okay.

7        A.    -- I don't know -- I don't know exactly what

8   was on there because I don't speak Spanish.

9        Q.    You also testified at the federal civil rights

10  trial in Thaddius -- for Thaddius Jimenez, correct?

11       A.    Yes.

12       Q.    You were a defendant in that case, correct?

13       A.    Yes.

14       Q.    Would you agree that some of the testimony

15  that you gave in that trial was not true?

16       A.    No, I would not agree.

17       Q.    Would you at least agree that some of the

18  testimony you gave in Thaddius Jimenez's civil rights

19  case was misleading?

20           MR. STEFANICH:  Objection.  Form.  You can

21      answer.

22           THE WITNESS:  No.

23  BY MR. STARR:

24       Q.    Do you stand by your testimony that you gave

25  in Thaddius Jimenez civil trial?

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MR. STEFANICH:  Objection.  Form.  You can
 2       answer.
 3              THE WITNESS:  Yes.
 4   BY MR. STARR:
 5       Q.   And you're aware that Thaddius Jimenez
 6   conviction was thrown out and that he was exonerated,
 7   correct?
 8              MR. STEFANICH:  Objection.  Foundation.
 9       Asked and answered.
10              THE WITNESS:  Yes.
11   BY MR. STARR:
12       Q.   How many total men have been exonerated in
13   cases in which you were actively involved in the
14   investigation?
15       A.   I don't --
16              MR. STEFANICH:  I'm sorry.  Can you -- I didn't
17       -- you're talking pretty fast.  Can you repeat that,
18       Sean?
19              MR. STARR:  Sure.
20   BY MR. STARR:
21       Q.   How many total men have been exonerated in
22   cases in which you were the primary detective or one of
23   the primary detectives investigating the case?
24              MR. STEFANICH:  Objection.  Form.  Foundation.
25       You can answer if you know.
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1:20-Deposition Document: 184-17 Filed: 05/06/25 Page 24 of 182

```
 1              THE WITNESS:  I don't know.
 2   BY MR. STARR:
 3        Q.   There's been at least three, correct?
 4        A.   I don't know.
 5        Q.   Including Mr. Fletcher, correct?
 6        A.   I know about Mr. Fletcher.
 7        Q.   Okay.  Do you have any explanation for how
 8   your investigations have resulted in multiple
 9   convictions being thrown out, sir?
10             MR. STEFANICH:  Objection.  Form.  Foundation.
11             THE WITNESS:  I can only -- I can only assume
12        that people were swayed and -- and coerced into
13        changing their minds.
14   BY MR. STARR:
15        Q.   And you think that the witnesses in these
16   cases were swayed after the fact to change their
17   statements?
18        A.   I think that's very possible, yes.
19        Q.   And who do you think did this -- the swaying,
20   as you call it?
21        A.   Oh, I would think people connected with your -
22   - your law firm.
23        Q.   Okay.  And do you have any idea who you're
24   referring to or who you're making this accusation about?
25        A.   No.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:20-cv-04768 Deposition of JAMES CASSIDY taken on 06/28/2022

```
 1        Q.    Okay.  Is it possible that any of the cases in
 2   which individuals were exonerated where you were the
 3   lead detective or one of the lead detectives -- is it
 4   possible that you got the wrong guy?
 5        A.    Not that I know of.
 6        Q.    Because that's not possible then, correct?
 7             MR. STEFANICH:  Objection.  Asked and answered.
 8             THE WITNESS:  Not that I know of.
 9   BY MR. STARR:
10        Q.    Okay.  Unrelated to Thaddius Jimenez, when you
11   last testified in this case, I asked you some questions
12   about a negative ID.  Do you remember that?
13             MR. STEFANICH:  Objection.  Form.  Are you
14        talking about the Fletcher case now, Sean?
15             MR. STARR:  Yeah.  Yeah.  Yes.
16             MR. STEFANICH:  Yeah.  Objection.  Form.
17             MR. STARR:  Well, let me then rephrase it.
18   BY MR. STARR:
19        Q.    Sir, unrelated to Thaddius Jimenez, last time
20   we sat for a deposition, I asked you questions about
21   identification procedures, and you generally talked
22   about how sometimes you -- there's negative IDs that
23   occur when you do identification procedures, correct?
24        A.    Yes.
25        Q.    Okay.  And then I also asked you about the
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:20-Deposition of Jerome Bowen - Taken 05/06/25 Page 26 of 182

24

```
 1   Fletcher case, and you told me there was a negative ID
 2   in the Fletcher case, correct?
 3        A.    You have to be more specific, sir.
 4        Q.    Well, I asked you about the 1995
 5   identification procedure, and you said that there was a
 6   negative ID in that particular identification procedure,
 7   correct?
 8        A.    If you're talking about the photo array in
 9   1995, that would be correct.
10        Q.    Well, did you do more than one photo array in
11   the Fletcher case in 1995 or more than one
12   identification procedure?
13             MR. STEFANICH:  Objection.  Form.
14             THE WITNESS:  No.
15   BY MR. STARR:
16        Q.    Okay.  So that's what I'm talking about.  I'm
17   talking about negative IDs that you've had as -- in your
18   career.  And then also, specifically, I asked you about
19   the Fletcher case, and you gave me an example that it
20   happened in the Fletcher case, correct?
21             MR. STEFANICH:  Objection.  Form.  You can
22        answer.
23             THE WITNESS:  I -- I assume I said that,
24        but --
25   BY MR. STARR:
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.    Okay.  And when I asked you what you would do

2    if a witness identified a filler in a -- in a -- in a

3    photo identification procedure, you testified you had to

4    document it as a negative ID, correct?

5    A.    Yes.

6    Q.    Okay.  Can you explain to me what it is --

7    what's the term negative ID or negative identification?

8    What does that refer to exactly?

9    A.    That the subject of the -- the photo spread or

10   the photo lineup, or the subject in a physical lineup,

11   was not picked out.

12   Q.    Okay.  That's what I thought you meant.

13   I just wanted to make sure that was clear.  So I'm

14   talking more generally now, not specifically about the

15   Fletcher case, but just more generally about police

16   practices.  I will let you know if I'm asking you a

17   question about the Fletcher case.  I'm not trying to

18   confuse you, okay?  If I understand you correct, if a

19   photo array -- if -- as a -- as a detective, you

20   conducted a photo array with a witness, and there was a

21   filler identification, meaning that the suspect wasn't

22   identified but a filler was instead identified, you

23   would still document that that photo array occurred,

24   correct?

25        MR. MICHALIK:  I'm going to object to form and

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      foundation on that question.

2           MR. STEFANICH:  Going to object to ask and

3      answered, as well.  You can answer again.

4           THE WITNESS:  Would you say it again, please?

5 BY MR. STARR:

6      Q.  Sure.  If you conducted a photo array with a

7 witness and there was a filler identification, you would

8 still document that that photo array occurred, correct?

9      A.  Yes --

10           MR. MICHALIK:  Same objection.

11 BY MR. STARR:

12      Q.  Okay.  And is that true of a lineup as well,

13 sir?  If a witness identified a filler in a lineup,

14 would you still document that that lineup occurred?

15      A.  Yes.

16      Q.  Okay.  And when you documented that a photo

17 array, or a lineup identification, or -- strike that.

18 If you -- when you documented that a photo array or a

19 lineup occurred where a negative ID occurred, would you

20 put in your police report that it was a negative ID?

21      A.  I would put in my police report that the

22 subject of the lineup or the subject of the -- of the

23 photo array was not identified.

24      Q.  Okay.  And you would not document that they

25 actually made a selection, but that the selection was

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-17 Filed: 05/06/25 Page 29 of 182 PageID #:5624

```
 1  not of the -- strike that.  You would document that the
 2  witness could not identify the suspect, correct?
 3       A.   Yes.
 4       Q.   Would you put in your police report who the
 5  witness identified if they identified a filler?
 6       A.   Probably not.
 7       Q.   Okay.  How come?
 8       A.   Because it wouldn't have any bearing on the
 9  case.
10       Q.   Okay.
11       A.   It would -- it would -- what it would mean was
12  that our witness was unable to identify.
13       Q.   Okay.  So if a witness identifies a filler,
14  that means they select the wrong person, correct?
15            MR. STEFANICH:  Objection.  Form.
16            THE WITNESS:  Yes.
17  BY MR. STARR:
18       Q.   And if a -- and if a witness identified a
19  filler in a photo array or a live lineup instead of a
20  suspect that you had, that would not immediately make
21  the filler the suspect, correct?
22       A.   Not unless there was other circumstances that
23  pointed toward that.
24       Q.   Okay.  So if a -- if a witness identifies a
25  filler, you would not immediately treat the filler as
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   the suspect, correct?

 2        A.   That is correct.

 3        Q.   And that would be improper to do, right?

 4        A.   It would just be wrong.

 5        Q.   Why would it -- why would it be wrong?

 6        A.   Because you don't pull someone off the street

 7   or out of a lockup that has no bearing on the case and -

 8   - and -- you know, there have to be other circumstances.

 9        Q.   Okay.  And so in circumstances where a witness

10   selects a filler in a lineup, you would document that as

11   a negative ID rather than documenting it as a filler was

12   identified, correct?

13        A.   Most likely, yes.

14        Q.   Okay.  Was that your practice or was it

15   your -- was it consistent with the practice that you

16   learned on the job?

17           MR. MICHALIK:  Object to form.  Foundation.

18           THE WITNESS:  Well, I don't think I -- right

19        now, I can't recall any time that's ever happened

20        where someone said that it's definitely someone,

21        picked the wrong person, and said that was the

22        person.  I've had -- I've had instances where people

23        say it looked -- kind of looks like this guy or it

24        kind of looks like Number 4, Number 5, but I can't

25        recall one that said, "That's definitely him."
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    BY MR. STARR:
2        Q.    But based on your experience in your -- in
3    your general practice, if a witness selected a filler,
4    your general practice would be not to treat that filler
5    as the suspect, correct?
6        A.    That is correct.
7        Q.    Okay.  And that was consistent with the policy
8    of the Chicago Police Department, as far as you
9    understood it, when you were on the job --
10           MR. STEFANICH:  Objection.  Objection.
11       Foundation.  You can answer.
12           THE WITNESS:  I -- as far as I know, it's
13       consistent.
14   BY MR. STARR:
15       Q.    Okay.  And as a detective conducting
16   identification procedures, was there any policy that you
17   were aware of that dictated that detectives should be
18   the ones conducting the identification procedures?
19       A.    It's just standard operation.
20       Q.    Okay.  Did you ever -- as a detective,
21   did you ever rely on gang crimes officers?
22       A.    Rely on how --
23           MR. STEFANICH:  Same objection.  Form --
24   BY MR. STARR:
25       Q.    In any capacity in doing your investigations?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.   Oh, sure.

 2        Q.   All right.  And doing any investigation as a

 3   detective, if you were -- if you needed a lineup done,

 4   would you ever ask gang crimes officers to conduct a

 5   lineup for you?

 6        A.   It's --

 7             MR. STEFANICH:  Objection.  Form.  Foundation.

 8        It's also irrelevant, but you can answer.

 9             THE WITNESS:  No.

10   BY MR. STARR:

11        Q.   All right.  Well, do -- sir, do you recall if

12   you had any evidence that Mr. Fletcher was involved in

13   any gang?

14        A.   Not that I recall.

15        Q.   When you were a detective generally speaking,

16   and you were looking to conduct a photo identification,

17   a photo array, would you ask the gang crimes officers

18   for photos?

19        A.   That has happened.

20        Q.   Was it your understanding that gang crimes

21   officers kept photos of known gang members?

22        A.   Yes.

23        Q.   And would gang crime officers conduct gang

24   book ID procedures with witnesses where they would ask

25   them to make IDs from gang books?
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    MR. STEFANICH:  Objection.  Form.  Foundation.

2    Irrelevant.  You can answer if you know.

3    THE WITNESS:  I know they -- at one time, at

4    least, they had photo albums that they would show

5    witnesses or victims.

6    BY MR. STARR:

7    Q.   Was that true in 2002?

8    A.   I'm not sure.

9    Q.   Do you recall that being true as far back as

10   1995?

11   A.   I'm guessing it was, but I can't be sure.

12   Q.   All right.  Was it true for the entirety of

13   your -- early part of your career?

14   A.   No.  I believe that there were some --

15   something that said that they didn't -- couldn't keep

16   those kind of files.  I'm not sure, though.

17   It wasn't -- it wasn't in my -- it wasn't in -- it

18   didn't concern me.

19   Q.   Well, that reference that you're making to

20   something that disallowed them from keeping those kind

21   of gang books, was that later in your career or earlier

22   in your career?

23   A.   Well, it -- it would have been later,

24   I think.

25   Q.   All right.  So like, in the 1980s, did -- as

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:20-cv-04768 Document #: 184-17 Filed: 05/06/25 Page 34 of 182

32

```
 1    far as your experience, did gang crime officers keep

 2    gang books?

 3             MR. STEFANICH:  Objection.  Form.  Foundation.

 4        Irrelevant.  You can answer.

 5             THE WITNESS:  As far as I know, they did, yes.

 6    BY MR. STARR:

 7        Q.    All right.  Well, in addition to gang book

 8    identification procedures, would gang crime officers

 9    also sometimes help detectives conduct photo array

10    procedures with witnesses?

11        A.    I'm not sure exactly what you mean by that.

12        Q.    Well, if you needed a photo array done, would

13    you -- did you ever have an occasion to ask a gang

14    crimes officer to assemble the photo array for you and

15    conduct it?

16        A.    That could have happened, but I don't have any

17    independent recollection right now.

18        Q.    Do you know if the gang crimes officers would

19    create photo arrays from the -- from photographs that

20    they had in their own possession?

21             MR. STEFANICH:  Objection.  Foundation.

22        Irrelevant.  You can answer.

23             THE WITNESS:  Can you ask that again, please?

24    BY MR. STARR:

25        Q.    Yeah, sure.  Do you know if the gang crime
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Deposition of [REDACTED] - Taken 05/06/25 Page 33 of 182

```
 1    officers would create photo arrays using photographs
 2    that they had in their own possession -- in their own
 3    personal possession?
 4           MR. STEFANICH:  Objection.  Foundation.
 5       Irrelevant.  You can answer.
 6           THE WITNESS:  I don't have independent
 7       recollection of that.
 8    BY MR. STARR:
 9       Q.   Would you, as a detective, sometimes rely on
10    photo array procedures conducted by gang crimes officers
11    in your homicide investigations?
12           MR. STEFANICH:  Objection.  Irrelevant.
13       You can answer.
14           THE WITNESS:  I don't know if I would rely on
15       it, but they certainly would be able to do that.
16    BY MR. STARR:
17       Q.   Well, as a homicide detective, did you ever
18    ask a gang crimes officer to create and conduct photo
19    arrays to assist you in any homicide investigation you
20    were conducting?
21           MR. STEFANICH:  Objection.  Form.  Relevance.
22       You can answer.
23           THE WITNESS:  We would always conduct our own.
24       If they -- if the gang crimes officers got
25       information and they did it on their own, it --
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1:20-cv-04768 Deposition of John Heerdt Page 36 of 182

 1      it -- we wouldn't stop them.

 2   BY MR. STARR:

 3      Q.   During your time at Area Five, did you ever

 4   have occasion to work on cases with Detective Reynaldo

 5   Guevara?

 6      A.   Did I ever have a --

 7      Q.   Occasions to work on investigations with

 8   Reynaldo Guevara?

 9      A.   Very, very slightly.  We had used him for

10   interpreter on a number of occasions, and for the most

11   part, that was probably it.  He -- he would do -- any of

12   -- any of the detectives there would help each other as

13   far as, like, what -- what I could call a busy work,

14   like picking up someone to bring them in when they

15   needed a ride or that type of thing.  We'd all do it for

16   each other, so that type of -- that type of instance

17   probably had happened, yes.

18      Q.   What about -- when did -- when Ronaldo Guevara

19   was a gang crimes officer and you were a detective, did

20   you ever work on any cases together in that capacity?

21      A.   I'm sure that it had come up.

22      Q.   Do you have -- did you ever hear anything

23   about Detective Guevara's reputation as a Chicago Police

24   Officer?

25      A.   I've seen it all on the news.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-17 Filed: 05/06/25 Page 37 of 182 PageID #:5632

```
 1        Q.    But what about during the time in which you
 2   were working with him, did you hear anything about his
 3   reputation then?
 4        A.    Not --
 5             MR. MICHALIK:  So I'm just going to object to
 6        this line of questioning as being irrelevant to this
 7        lawsuit.  Obviously, there are a number of cases
 8        pending against Officer Guevara, but this isn't one
 9        of them.
10   BY MR. STARR:
11        Q.    Go ahead, sir.
12             MR. STEFANICH:  I think you might need to
13        repeat --
14             THE WITNESS:  Yeah.  You're going to have to
15        repeat the question.
16   BY MR. STARR:
17        Q.    When you were -- when you were working at Area
18   Five in conjunction with Detective -- or -- strike that.
19   When you were working at Area Five simultaneous to the
20   time in which Rey Guevara was working at Area Five, did
21   you hear any rumors about his reputation?
22        A.    I just knew that he was specifically adept at
23   gang homicides and -- and investigations.
24        Q.    How did you know that he was specifically
25   adept at those?
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.    Just by my own observation, for one thing.

2    Q.    Did you have any opinion of Detective --

3  or -- strike that.  Do you have any opinion of Rey

4  Guevara's work as a Chicago Police Officer?

5    A.    I thought he always -- thought he worked hard.

6    Q.    What about an officer by the name of Ernest

7  Halvorsen?  Were you familiar with him at Area Five?

8    A.    Yes.

9    Q.    And did you work with Ernest Halvorsen when he

10 was in gang crimes and you were a detective at Area

11 Five?

12   A.    He was in gang crimes?

13   Q.    I believe so.

14   A.    If he was, I don't remember working with him.

15   Q.    Did you work with him when he was a detective?

16   A.    At some occasions, yes.

17   Q.    Did he have any reputation when you guys were

18 both at Area Five?

19   A.    No.  He -- obviously he worked hard, also.

20   Q.    Do you have any opinion about Ernest Halvorsen

21 as a Chicago Police Officer?

22   A.    I don't know what opinion you're looking for.

23   Q.    I'm asking if you had an opinion.

24   A.    That he was a coworker.

25   Q.    You had no opinion about his work as a Chicago

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   Police Officer?
 2       A.   No.
 3       Q.   What about a gang crimes officer by the name
 4   of Joe Sparks?  Are you familiar with him?
 5       A.   Yes.
 6       Q.   And did you work with Joe Sparks at Area Five?
 7           MR. STEFANICH:  I'm going to object to this
 8       line of questioning.  I -- so -- a standing
 9       objection based on the relevance.  You can answer.
10           THE WITNESS:  I knew him, and there was --
11       there had been cases that I worked with him.
12   BY MR. STARR:
13       Q.   Did Joe Sparks have any reputation when you
14   were at Area Five?
15       A.   As far as what?
16       Q.   As a Chicago Police Officer.
17       A.   He was a good police officer.
18       Q.   Did you have any opinion about his work as a
19   Chicago Police officer?
20       A.   I had no problem with it.
21       Q.   Did you ever know Joe Sparks to be untruthful?
22       A.   No.
23       Q.   Did you think he was a good police officer?
24       A.   Yes.
25       Q.   Right.  Sir, can you -- do you understand the
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    concept of independent recollection?
2         A.    Yes.
3         Q.    So last deposition, you talked about how you
4    remembered certain things because of documents that you
5    were relying on, reports that you were relying on.  Do
6    you remember generally that testimony?
7         A.    Generally.
8         Q.    So when I say the term independent
9    recollection, what I mean is your memory -- your actual
10   physical memory of something without relying on
11   documents or relying on something that someone else told
12   you in -- recently, okay?
13        A.    Okay.
14        Q.    So can you tell me what your independent
15   recollection of the investigation into the Willie
16   Sorrell homicide is?
17             MR. STEFANICH:  So I'm going to object to form.
18        And maybe, Sean, I'll ask clarifying questions --
19             MR. STARR:  Sure.
20             MR. STEFANICH:  -- because he's obviously
21        reviewed things.
22             MR. STARR:  Sure.
23             THE WITNESS:  And documents, which I think may
24        have refreshed part of his recollection, so is
25        things that may have refreshed part of his
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1        recollection part of your definition of independent
2        recollection or no?
3    BY MR. STARR:
4        Q.    I'm just going to ask you, sir.  What do you
5    independently, without the aid of documents, recall
6    about the Willie Sorrell homicide investigation?
7            MR. STEFANICH:  Objection.  Form.  Objection.
8        Form.  You can answer if you can.
9            THE WITNESS:  Without reports, I have little
10        independent recollection.
11   BY MR. STARR:
12       Q.    Okay.  That's fair.  So when you say "little
13   independent recollection," what specifically independent
14   recollection do you have without the aid of reports?
15           MR. STEFANICH:  Objection.  Form.  You can
16        answer.
17           THE WITNESS:  I can't tell you because I don't
18        know what refreshed my memory or -- until I read
19        reports, I -- I had little -- little memory of this
20        case before reading reports.
21   BY MR. STARR:
22       Q.    Prior to looking at the report, did you have
23   any independent recollection of this case?
24       A.    I remember the case happened.
25       Q.    What does that mean?  Do you --
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:20-cv-04768 Document #: 184-17 Filed: 05/06/25 Page 42 of 182

                                                                    40

```
 1        A.    And I -- I remember going to -- to talk to
 2   Mr. Fletcher at -- in prison.
 3        Q.    What do you remember about that?
 4        A.    What do I remember?
 5        Q.    About --
 6        A.    I remember that -- it -- it's -- it's kind of
 7   funny because he said he was -- he told us -- what I
 8   remember independently is that he told us that he was
 9   selling drugs, and his drug business was so good that he
10   didn't need to right up -- rob anyone.
11        Q.    Okay.  And that was in the year 1990 when this
12   crime occurred, that he was talking about, correct?
13   Do you recall that?
14        A.    I'm sorry?
15        Q.    The reference you just made to -- what you
16   recall Mr. Fletcher telling you, he said that in 1990,
17   he was making enough money that he didn't need to rob
18   anyone; is that correct?
19        A.    I -- I believe that's what he meant.
20        Q.    Okay.  I want to show you --
21        MR. MICHALIK:  Excuse me, Sean.  I think Terry
22    is going to step in now.
23        MR. STARR:  Okay.
24        MR. MICHALIK:  Let me make --
25        MR. STARR:  It's --
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     MR. MICHALIK:  -- just make sure he's on.

2     MR. BURNS:  I'm with you.  Thank you.

3     MR. MICHALIK:  All right.  I'm going to step

4  out.  Thank you.

5     MR. BURNS:  Thank you.

6  BY MR. STARR:

7     Q.   All right.  Mr. Bogucki, any other independent

8  recollection, besides that, that you had prior to

9  reviewing documents?

10    A.   Not that I recall.  I -- I -- I don't recall

11  any independent recollection without looking at reports.

12       MR. STARR:  All right.  I'm going to show you a

13       document, which I'm going to mark as Exhibit 7,

14       because I think we got through six exhibits last

15       time. And for the record the Bates is CITY-JF-47 to

16       51.  I'm going to share the screen with you, sir.

17       All right. Can you see this document on your screen?

18          (EXHIBIT 7 MARKED FOR IDENTIFICATION)

19    A.   Yes.

20  BY MR. STARR:

21    Q.   All right.  This is a supplementary report.

22  If you see in the right-hand corner, it has the date of

23  December 21st, 1990.  Do you see that?

24    A.   I do.

25    Q.   Okay.  And this is a supplementary Chicago

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   Police Department report from the homicide of Willie

 2   Sorrell.  Do you see that, sir?

 3       A.   Yes.

 4       Q.   And if you look at the bottom of this page,

 5   the reporting officer is the officer by name of Michael

 6   Fleming.  Do you see that?

 7       A.   Yes.

 8       Q.   Okay.  Have you seen this December 21st, 1990,

 9   sup report before?

10       A.   Yes.

11       Q.   Did you review this supplemental report in

12   preparation for the deposition?

13       A.   Not -- not to this half of the deposition, no.

14       Q.   You reviewed it before for your first half of

15   the deposition?

16       A.   Yes.

17       Q.   And I believe, based on what you testified to

18   last time, it was your practice when working on a cold

19   case to review the entire file, correct?

20       A.   Yes.

21       Q.   And so based on your practice, you would have

22   reviewed this particular supplemental report before you

23   began work on the investigation of a cold -- of this

24   cold case, correct?

25       A.   Yes.
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.    Do you have any independent recollection of
2  reviewing this report back when you started working on
3  the cold case of the Sorrell homicide?
4    A.    No.
5    Q.    All right.  I'm going to direct your attention
6  to Bates CITY-JF-48.  Do you see here the category on
7  the left, it says, "Wanted"?
8    A.    I do.
9    Q.    And there's two -- there's a description of
10 two offenders, right -- correct?
11   A.    That's correct.
12   Q.    And they're both unknown offenders, and
13 there's some physical characteristics that are listed
14 here; is that correct?
15   A.    That is correct.
16   Q.    Do you recall learning that there was two
17 offenders wanted in this homicide?
18   A.    Yes.
19   Q.    And do you recall learning that there was some
20 physical characteristics that witness had -- witnesses
21 had given police?
22   A.    Yes.
23   Q.    Okay.  And then further down here, there's
24 some different -- additional information about the
25 robbery and the motive.  And then if we take you to Page

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    50, there is a -- actually starting on 49, there's a
 2    history of investigation.  Do you see that?
 3         A.   Yes.
 4         Q.   And you would have read this when you started
 5    working on the cold case and be -- familiarized yourself
 6    with what prior police investigation had been done,
 7    correct?
 8         A.   Yes.
 9         Q.   All right.  And then have you -- direct you to
10    Page 50 on Page 4 of this document, I highlighted a
11    section here of the narrative.  It says, "While chasing
12    the offenders, he met a cousin, Terry" -- "Rogers Terry,
13    who told him to be careful as he knows them, and he" --
14    "and they will shoot him.  He goes on to say that Rogers
15    told him that he will help Cooper find the offenders
16    later."  You see that?
17         A.   Yes.
18         Q.   And this is part of a narrative description of
19    what Edward Cooper told police in 1990, correct?
20         A.   That's what it says there, yes.
21         Q.   And you would have familiarized yourself with
22    this information when you started working on this case,
23    correct?
24         A.   Yes.
25         Q.   Do you recall ever finding out whether or not
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  Terry Rogers and Edward Cooper were, in fact, cousins?

2      A.   I don't recall that.

3      Q.   Do you -- is there any indication in this

4  narrative that Mr. Cooper could identify the offenders

5  in this part that we just looked at -- this section,

6  this paragraph?

7          MR. STEFANICH:  Objection.  Form.  Foundation.

8      You can answer.

9          THE WITNESS:  Can you ask that once more,

10     please?

11  BY MR. STARR:

12     Q.   Yeah.  So you said you reviewed this in

13  preparation for your first deposition.  You said you

14  also reviewed it when you started working on the cold

15  case.  I'm wondering if there's any indication in this

16  that Mr. Cooper could identify the offenders.  Did he

17  gave any indication to the police in 1990 that he could

18  identify the offenders?

19         MR. STEFANICH:  Objection.  Form.  Foundation.

20     I think it also misstates what the document says,

21     but you can answer it if you know.

22         THE WITNESS:  Well, I wasn't there.

23     I didn't -- I didn't talk to Mr. Cooper, so I -- I

24     have no opinion on that.

25  BY MR. STARR:

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1       Q.   You didn't talk to Mr. Cooper in 1990.  That's
 2  what you mean, right?
 3       A.   Right.
 4       Q.   You talked to him subsequent to 1990, correct?
 5       A.   Yes.
 6       Q.   All right.  Do you see the bottom of
 7  the next paragraph -- is labeled Sheene Friend?  Do you
 8  see -- do you see that paragraph, sir?
 9       A.   I do.
10       Q.   And at the bottom, I highlighted a section
11  where it says, "She states that she can identify the
12  offenders if she sees them again and agreed to view
13  photos in Area 5."  Do you see that?
14       A.   Yes.
15       Q.   Do you know what photos Ms. Friend viewed in
16  Area Five in 1990?
17       A.   No clue --
18            MR. STEFANICH:  Objection.  Form.  Foundation.
19       You can answer.
20            THE WITNESS:  No clue.
21  BY MR. STARR:
22       Q.   I'm sorry.  I didn't hear your answer, sir.
23       A.   I have no clue, sir.
24       Q.   Okay.  So do you have any independent
25  recollection of seeing any photos that were part of a
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    photo array in 1990 in this case?

 2         A.   No.

 3         Q.   Should those photos have been made part of the

 4    file as far as you understand it?

 5              MR. STEFANICH:  Objection.  Foundation.

 6         You can answer if you know.

 7              THE WITNESS:  If what photos, sir?

 8    BY MR. STARR:

 9         Q.   Whatever photos were used in the 1990 photo

10    array, should those photos have been included in the

11    file?

12              MR. STEFANICH:  Objection.  Foundation.

13         It misstates the evidence.  You can answer if you

14         know.

15              THE WITNESS:  I have no idea if there was any

16         photo array.

17    BY MR. STARR:

18         Q.   Well, if there -- this says that she agreed to

19    view photos at the area, right?

20         A.   That's what it says.

21         Q.   Okay.  So if she did, in fact, view photos at

22    Area Five, or if any of the witnesses viewed photos at

23              Area Five in 1990, my question is: Should

24    those photos have been included in this file?

25              MR. STEFANICH:  Objection.  Foundation.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        You can answer if you know.

 2             THE WITNESS:  I -- I have no idea if anyone

 3        ever did view any photos.

 4   BY MR. STARR:

 5        Q.   I -- I'm asking you if, in fact, that

 6   happened, should they have been included in the file,

 7   sir?

 8             MR. STEFANICH:  Objection.  Foundation.

 9        You can answer.

10             THE WITNESS:  Again, we go back to the negative

11        photo lineups, and if there were

12        negative -- it was negative photo lineups.  If that

13        was indeed conducted, then no.  The answer is no.

14   BY MR. STARR:

15        Q.   Okay.  Did you ever remove any photos from the

16   file that were used in a 1990 photo array?

17             MR. STEFANICH:  Objection.  Foundation.

18        It misstates the evidence.  You can answer.

19             THE WITNESS:  No clue.

20             THE REPORTER:  I'm sorry --

21             MR. STARR:  I'm sorry.

22             THE REPORTER:  -- could you repeat that?

23             MR. STEFANICH:  Repeat your answer.

24             THE WITNESS:  The answer is no.

25   BY MR. STARR:
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q.   Okay.  And then I'm moving us down to 51 --
 2   Bates stamp 51.  There's another paragraph where it's
 3   attributed to a man by the name of Emmett Wade.
 4   Do you see that, sir?
 5        A.   I do.
 6        Q.   All right.  Do you see the part that I
 7   highlighted?  It says, "He stated that approximately six
 8   or seven shots were fired, and he may be able to
 9   identify the two unknown male Blacks if seen again." Do
10   you see that?
11        A.   I do see it.
12        Q.   Do you know if Mr. Wade was showed a photo
13   array in 1990?
14        A.   I do not know.  If it's not on our report,
15   I would not know about it.
16        Q.   Based on your practice, if you had been
17   working on this case in 1990, and you had a witness
18   who said they may be able to identify the two known
19   male -- unknown Blacks, would you have shown this
20   witness a photo array?
21             MR. STEFANICH:  Objection.  Form.  Incomplete
22        hypothetical.  You can answer.
23             THE WITNESS:  Not unless I had a -- a suspect
24        to -- for them to look at.
25   BY MR. STARR:
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  Q. Okay.  And then on the same page, there's

2 another paragraph attributed to a witness by the name of

3 Terry Rogers.  Do you see that?

4  A. Yes, I see it.

5  Q. And you're familiar with the witness Terry

6 Rogers in this case, correct?

7  A. Yes.

8  Q. Okay.  Do you see the part that I highlighted,

9 sir?

10  A. I do.

11  Q. It reads, "He stated that he got a look at one

12 of the men and remembers seeing him in the area of

13 Parkside and Madison off and on for the past month."

14 Do you see that?

15  A. Yes.

16  Q. "He stated that the man is a narcotic user."

17 Do you see that?

18  A. Yes.

19  Q. "While they were running, he heard one of the

20 men call the other to hurry up, and he called them by

21 the name Fletcher."  Do you see that?

22  A. I do.

23  Q. And then it says, "Rogers viewed photos in

24 Area Five with negative results."  Do you see that?

25  A. I do.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:20-cv-04768 Document #: 168-14 Filed: 04/25/25 Page 53 of 182

51

1     Q.   So does that indicate to you that there was a

2   photo array conducted in 1990?

3     A.   That -- to me, at that point in time, probably

4   meant that he looked at robbery -- known robbery

5   offenders' albums in Area Five.

6     Q.   And what do you base that on, sir?

7     A.   Just the way things used to be.

8     Q.   Okay.  So -- and you see at the end of this

9   paragraph, it says, "He can identify at least one of the

10  offenders if seen again," correct?

11    A.   Yes.

12    Q.   So you think that this sentence here that says

13  that he viewed photos means that he most likely viewed

14  known robbery suspects in the area?

15     MR. STEFANICH:  Objection.  Form.  Misstates

16    the prior testimony.  You can answer.

17     THE WITNESS:  There were -- there were

18    books -- robbery offender books that weren't really

19    kept up to date, and it was kind of like you show

20    these if -- and I did work robbery for three months,

21    and it was kind like if you didn't know where to go

22    with it, at least you did that -- that you showed

23    these photo albums, not -- not knowing that -- if

24    there was any one in particular that was in those

25    albums.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   BY MR. STARR:

 2        Q.   So does -- is there anything in this police

 3   report that indicates that Mr. Rogers was shown books of

 4   robbery suspects?

 5        A.   The word books is not in there, no.

 6        Q.   Okay.  It just says that he was -- he viewed

 7   photos, correct?

 8        A.   Yes.

 9        Q.   Okay.  So now we know that there was some

10   photos viewed by the witnesses in 1990, correct?

11            MR. STEFANICH:  Objection to form.  Misstates

12        the evidence.  You can answer.

13            THE WITNESS:  Again, that line in this

14        report -- it's a typical thing at that time to bring

15        a witness in to look at known robbery offender

16        albums --

17   BY MR. STARR:

18        Q.   So you have a --

19        A.   -- to see if anyone was in there might have

20   been one of the offenders in this case.

21        Q.   You don't have any independent knowledge that

22   Mr. Rogers was shown albums of known robbery offenders,

23   correct?

24        A.   I don't have any independent recollection of

25   anything in 1990.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   Okay.  Because Mr. Rogers was shown photos,

2  should Mr. Wade have also been shown photos?

3         MR. STEFANICH:  Objection.  Foundation.  You

4     can answer.

5         THE WITNESS:  I guess that's a possibility.

6  BY MR. STARR:

7    Q.   Well, given your experience -- wealth of

8  experience as a detective, if you have multiple

9  witnesses saying that they might be able to identify the

10  suspect, and you show one of those witnesses photos,

11  will you also show the other witnesses photos?

12    A.   If the witnesses actually came in and followed

13  through.

14    Q.   Okay.  So if Mr. Wade was available and you

15  had been working on this case in 1990, and you had

16  showed Terry Rogers photos, you would have also showed

17  Mr. Wade those same photos, correct?

18         MR. STEFANICH:  Objection.  Form.  Incomplete

19     hypothetical.  You can answer.

20         THE WITNESS:  If there was cooperation between

21     the witnesses, yeah, we could have done that.

22  BY MR. STARR:

23    Q.   Okay.  And you would have shown Ms. Friend

24  those same photos, correct?

25         MR. STEFANICH:  Objection.  Form.  Incomplete

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        hypothetical.  You can answer.

 2            THE WITNESS:  I don't -- you know what?  Every

 3        case is different, so -- I -- I -- I wasn't there in

 4        1990.

 5   BY MR. STARR:

 6        Q.   I understand every case --

 7        A.   I can't -- I can't -- I can't tell you what

 8   I would have done unless I was actually working on the

 9   case.

10        Q.   I'm asking, as a matter of good practice,

11   being a competent homicide detective, if you have

12   several witnesses who viewed a homicide and you have

13   photos that you're showing one of them, shouldn't you

14   show all the witnesses the same set of photos?

15            MR. STEFANICH:  Objection.  Form.  Incomplete

16        hypothetical.  You can answer.

17            THE WITNESS:  No.  The answer is not

18        necessarily.

19   BY MR. STARR:

20        Q.   Why would you not show Mr. Wade the same

21   photos that you showed Mr. Rogers if Mr. Wade had

22   indicated he could also potentially identify the

23   offenders?

24        A.   Well, it -- it depends.  It depends on how

25   much of a -- a waste of time it might be.  The -- again,
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 168-1 Filed: 05/06/25 Page 57 of 182

55

1  you have to have a feel for the witnesses, and I have no

2  feel for it at that time -- is how they were acting or

3  if they could identify or might not identify -- if the

4  photo books were up to date.  If they were not,

5  sometimes -- sometimes people just came in, so maybe the

6  detective said, "Well, we tried something."

7      Q.   So if your photo books -- if you deemed the

8  photo books not up to date, you wouldn't show them to

9  all the witnesses, you would just show them the one

10  witness?  Is that what your testimony is?

11          MR. STEFANICH:  Objection.  Form.

12      Mischaracterizes his testimony.  You can answer.

13          THE WITNESS:  Again, every case is different.

14      I don't know what the circumstances were then.

15      I can't really tell you.

16  BY MR. STARR:

17      Q.   So I'm asking you, though.  If you were

18  working on this investigation in 1990 and Mr. Rogers,

19  Mr. Wade, and Ms. Friend were all at the station, and

20  all willing to look at the photos, and you showed

21  Mr. Rogers these photos, given what we know from this

22  report, would you show the other two witnesses the same

23  photos?

24          MR. STEFANICH:  Objection.  Incomplete

25      hypothetical.  Form.  You can answer.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1            THE WITNESS:  If they were all in the station
 2      at the same time?
 3 BY MR. STARR:
 4      Q.   If they were all in the station at any point
 5 in time.
 6      A.   If it was convenient, you know.  If -- if it
 7 looked like it could be something that would have a good
 8 turnout, I guess I would.
 9      Q.   Okay.  Well, if you thought you had a suspect
10 in the photos -- if you thought there was one of the
11 people in the photos that were being shown to Mr. Rogers
12 was a good suspect, would you have made sure to show
13 those photos to Mr. Wade?
14      A.   Oh, absolutely. It --
15      Q.   Okay.
16      A.   It would be -- it -- it wouldn't be in photo
17 albums, though.  It would be a photo array.
18      Q.   So if you had a photo array with a suspect,
19 you would certainly have showed Mr. Wade that photo
20 array, correct?
21      A.   Yes.
22      Q.   Okay.  Do you see in the Rogers' paragraph
23 that we just looked at, it states that the man that he
24 recognized was a narcotics user?
25      A.   I see that, yep.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1        Q.   Did you ever do anything -- did you -- strike
2   that.  Did you ever do any investigation into whether or
3   not Mr. Fletcher used narcotics?
4        A.   I believe -- I believe that his criminal
5   history indicated that.
6        Q.   Well, does a criminal history indicate whether
7   or not someone uses or someone sells narcotics?
8        A.   I'd have to look at it.  I -- I can't tell you
9   right now.
10       Q.   So do you have any independent recollection of
11  doing any investigation whatsoever into whether or not
12  Mr. Fletcher was a narcotic user?
13       A.   No, I can't recall that.
14       Q.   Do you see that it says that Terry Rogers told
15  police that one of the men called the other man
16  Fletcher?
17       A.   Yes.
18       Q.   Did you ever do anything with -- strike that.
19  Did you ever ask Terry Rogers which man called the other
20  man Fletcher?
21           MR. STEFANICH:  Objection.  Form.  You can
22       answer.
23           THE WITNESS:  It was obvious that it would have
24       been the second unknown offender calling
25       the -- the person that was arrested and charged
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Fletcher because his name was Fletcher.
 2   BY MR. STARR:
 3        Q.   So it was obvious that the other offender
 4   called James Fletcher based on what?
 5        A.   Based on that he is -- that the one offender
 6   is Fletcher.  His name is Fletcher.
 7        Q.   Right.  But there was a lot of people in
 8   Chicago in 1990 with the name -- first name or last name
 9   of Fletcher, correct?
10        A.   I -- yes, there was.
11        Q.   And you did an investigation into people with
12   the last name Fletcher and an investigation into people
13   with the first name Fletcher, correct?
14        A.   Yes.
15        Q.   Okay.  So my question is: Did you ever ask
16             Terry Rogers whether or not the man that he
17   heard call the other man Fletcher -- strike that.
18   My question is: Did you ever ask Terry Rogers which man
19   called the other man Fletcher?
20             MR. STEFANICH:  Objection.  Form.  You can
21        answer if you know.
22             THE WITNESS:  Did I ever -- no, I would not ask
23        him that because it was obvious that if he's saying
24        the person is James Fletcher, then obviously I
25        didn't believe the other offender was also Fletcher.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

BY MR. STARR:

Q.   Well, you knew that in 1990, Terry Rogers told police that he heard one man call the other man Fletcher, but there's no evidence in that police report that Terry Rogers knew that James Fletcher was involved in this crime, is there?

A.   Well, it's not what he said, anyway.  Terry Rogers did not say that at that time.

Q.   Right.  So Terry Rogers in 1990 did not tell police that he knew that one of the offenders was named James Fletcher, correct?

A.   That is correct.

Q.   And Terry Rogers only told the police in 1990 that he had recognized one of the offenders from the area and that that offender was a drug or narcotics user, correct?

A.   Yes.

Q.   And Terry Rogers also only said to the police that he heard one of the men -- he didn't specify which one, but that he heard one of the men call the other man Fletcher, correct?

A.   Yes.

Q.   Okay.  Do you know why Terry Rogers did not tell police in 1990 that he knew who one of the offenders was and that his name was James Fletcher?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.   I can give you an opinion on that.
 2        Q.   Sure.  Go ahead.
 3        A.   People -- I think he was trying to say who the
 4   offender was without getting involved.
 5        Q.   Who trained him to do that?
 6        A.   Pardon?
 7        Q.   You said he was trained to say that.
 8   Who trained him to say that --
 9             THE WITNESS:  No, no --
10             MR. STEFANICH:  Yeah.
11             THE WITNESS:  -- I didn't say that.
12             MR. STEFANICH:  Objection.  Mischaracterizes
13        his testimony.
14   BY MR. STARR:
15        Q.   If I misheard you, I apologize.  What did you
16   say then?
17        A.   I said that I believe that he was
18   trying -- probably trying to tell us, meaning the
19   police, who the offender was without getting himself too
20   involved.
21        Q.   Why is that your opinion?
22        A.   Because I've seen witnesses do things like
23   that.
24        Q.   Did you ever ask Terry Rogers if that's what
25   he was doing in 1990?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.   He said he couldn't remember what he said in

2   1990.

3           MR. STARR:  Okay.  All right.  I'm going to

4       show you another exhibit.  I'm going to mark

5       this as Exhibit 8.  And for the record, this is

6       JF -- CITY-JF-113.  All right, sir, do you see this

7       document on your screen?

8               (EXHIBIT 8 MARKED FOR IDENTIFICATION)

9       A.   Yes.

10  BY MR. STARR:

11      Q.   It's a single-page document.  Are you familiar

12  with what this document is?

13      A.   It's an investigative file inventory.

14      Q.   Have you seen this particular document before?

15      A.   I may have.

16      Q.   Did you review it in preparation for today's

17  deposition?

18      A.   No.

19      Q.   Okay.  Do you have any independent

20  recollection of writing any of this information on this

21  document?

22      A.   Independent, no.

23      Q.   Is -- do you recognize your handwriting on

24  this document?

25      A.   I do.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1       Q.   And where -- can you tell me -- do you see the
 2  numbers in the left-hand column?  What columns are
 3  your -- is your handwriting located in?
 4            MR. STEFANICH:  Objection.  You mean what rows,
 5      but...
 6  BY MR. STARR:
 7       Q.   Okay.  So there's numbers in the left-hand,
 8  whether they're rows or columns.  Do you see -- can you
 9  tell me by number which rows or columns your handwriting
10  is in?
11       A.   I can't be totally sure.  It looks like
12  there's some on -- on both the -- all three columns.
13       Q.   Okay.  So start -- Line number 4, is that your
14  handwriting going across?
15       A.   I'm not sure.  It does.  The IR -- part of it
16  might be.  I'm not sure on that one.
17       Q.   Anything in Lines 1 through 3 that are your
18  handwriting?
19       A.   It looks like my handwriting where it says,
20  "Bogucki, Schalk" --
21       Q.   Okay.
22       A.   -- for sure.
23       Q.   So starting in Line 4 that -- you think that
24  that's your handwriting.  The first three are not your
25  handwriting, correct?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.    That would definitely be correct.

2    Q.    Okay.  So you think that you wrote Line number

3  4; is that correct?

4    A.    It looks like it.

5    Q.    What about Lines 5 through 8?  Do you think

6  you wrote those lines?

7    A.    It looks like it.  I'm not sure, though.

8    Q.    What, if anything, does this document tell

9  you, sir, about your role in the investigation?

10    A.    That some things were put in the file by

11  myself and my partner.

12    Q.    Does the date of March 19th, 1995 indicate

13  anything to you?

14    A.    It indicates the date.

15    Q.    Do you know what date you were first assigned

16  to work on the Sorrell investigation?

17    A.    In 1995.  I don't know the exact date, no.

18    Q.    Okay.  Is it possible that March 19th, 1995 is

19  the first date -- the earliest date that you worked on

20  the investigation?

21    A.    I don't know.

22    Q.    Okay.  Did you work on the investigation at

23  any -- in any year prior to 1995?

24    A.    Not that I know of.

25    Q.    Okay.  So your recollection is you started

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    working on this cold case, this Willie Sorrell homicide,

 2    in 1995, correct?

 3         A.    Yes.

 4         Q.    And it may or may not have been in March of

 5    1995, correct?

 6         A.    Correct.

 7         Q.    Could it have been earlier than -- it could

 8    have been in February of 1995 or January of 1995?

 9         A.    I guess it could be because the date that

10    these things are put in the file isn't necessarily

11    timely.

12         Q.    Okay.  So this does not indicate the date that

13    you started working on the case necessarily, correct?

14         A.    I don't think it indicates anything more than

15    what -- that we put these documents in the file.

16         Q.    Okay.  And this -- based on your testimony, it

17    seems that you at least created one, two, three, four,

18    five documents, and put them in the file, correct?

19         A.    That I created them --

20         Q.    Yeah.

21         A.    I don't know if I created them, no.

22         Q.    Okay.  How would you characterize it?

23         A.    I put these sheets of paper in the file.

24         Q.    Okay.  Did you put any more than five sheets

25    of paper in the file?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.    I -- I imagine I did --

 2        Q.    Why is there --

 3        A.    --  I don't know.

 4        Q.    Why is there no other entries other than these

 5   five entries then?

 6        A.    I don't know.

 7        Q.    Was it a -- did you have an obligation to list

 8   the documents you put in the file on this inventory

 9   sheet?

10        A.    You know, those things kind of changed through

11   the years, also -- the procedures.  Sometimes they had

12   office people putting things in the files.

13   I -- I really can't tell you what was exactly going on

14   at that time.

15        Q.    Okay.  Do you know that -- as if -- for a fact

16   that you generated more than five documents for the

17   Willie Sorrell homicide investigation?

18             MR. STEFANICH:  Objection.  Form.  Are you

19        talking just on March 1995, Sean, or --

20             MR. STARR:  During the investigation.

21             MR. STEFANICH:  Okay.  Objection to form.

22        You can answer.

23             THE WITNESS:  I -- I would -- I would assume

24        there was more than that, yes.

25   BY MR. STARR:
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   And I -- forgive me if I already asked this.

2    I'm a little bit not sure if I asked it.  Why would

3    there not be more entries then?

4       A.   I don't know.

5           MR. STARR:  Okay.  I'm going to show you

6       another document.  Mark it as Exhibit number 9.

7               (EXHIBIT 9 MARKED FOR IDENTIFICATION)

8    BY MR. STARR:

9       Q.   And for the record, this is CITY-JF-97.  All

10   right, sir.  Do you see this document on your screen?

11      A.   Yes.

12      Q.   And this is a one-page document, correct?

13      A.   Yes.

14      Q.   Have you seen this document before today, sir?

15      A.   I believe I have.

16      Q.   Did you review this document in preparation

17   for the deposition?

18      A.   I believe I've looked at it.

19      Q.   For the record, can you tell me what this

20   document is?

21      A.   It's a -- what we called at the time a stop

22   order request.

23      Q.   What is -- what was your understanding of the

24   purpose of a stop order or cancellation request?

25      A.   These were used for people we could not find,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  and it would -- what it would do is if they ever had an

2  occasion to be arrested or stopped or run -- their name

3  run by the police, this stop order or record stop, you

4  could call it, would pop up, and we would be notified

5  that this person is wherever.  If he's in the district

6  station, or -- or they talked to someone on the street,

7  we -- we would be notified that he is indeed with some

8  police, and we would want to talk to him at that point.

9      **Q.    So when you put a stop order in, is it -- does**

10 **it run indefinitely until you would have -- put a**

11 **cancellation request in?**

12     A.    Again, this is another thing that changed over

13 the years, and I can't tell you, about this one, how

14 long it would last, but I do -- I do know in later years

15 -- well, they -- they changed the name to investigative

16 alert, but it's essentially the same thing.  And -- and

17 I -- I remember those, in the later years, would expire,

18 and you would have to put them in again.

19     **Q.    Do you have any basis reviewing this document**

20 **to see that this document or -- I'm sorry, that this**

21 **stop order had a shelf life, so to speak, or a time**

22 **limit when it were to expire?**

23     A.    I -- I do not know.

24     **Q.    Okay.  And do you see your name listed here at**

25 **the bottom, under "requesting officer"?**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.    Yes.
 2        Q.    Okay.  Do you have an independent recollection
 3   of putting this request in?
 4        A.    There should be a date on there.
 5        Q.    Yeah.  No.  My question is: Do you have -- I
 6              -- my question is: Do you have an independent
 7   recollection of putting this request in?
 8        A.    Independent, no.  I --
 9        Q.    Okay.
10        A.    I see that I did.
11        Q.    Yeah.  And what date did you put this request
12   in?
13        A.    19 March of '95.
14        Q.    Okay.  And then how does this request, so to
15   speak, go into the police system?  How -- once you fill
16   this out, what do you do with it?
17        A.    It's submitted, and I can't -- I can't tell
18   you exactly how anymore.  I don't remember.
19        Q.    Do you know whether or not this was -- this
20   stop order or this request was the first action you took
21   on this investigation?
22        A.    No.  The first action we took was listening to
23   detectives McDonald and Rutherford when they asked us to
24   talk to Mr. Cooper and show him a photo
25   array -- array of Fletcher Clinton.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q.   Okay.  So Mr. -- I'm sorry.  Detectives

2  Rutherford and McDonald asked you to show a photo array

3  involving a photo of Fletcher Clinton to Mr. Cooper?

4     A.   Yes, it was --

5     Q.   And you --

6     A.   Let me put it this way.  I don't know if they

7  asked us to do it, but it was discussed, and --

8  and -- and that was the outcome of the discussion.

9     Q.   And that was in 1995?

10    A.   Yes.

11    Q.   And that was before you put this stop order in

12  for Terry Rogers?

13    A.   Probably.  Probably.  Because, again, we would

14  have looked at all the old reports, and -- and the

15  reports -- I believe -- actually, I believe it was

16  Rutherford and McDonald that first looked at this whole

17  case, so I don't know whether they were unable to find

18  Mr. Cooper or any of the other witnesses.  I don't know

19  how it occurred that they asked us to do it, but we did

20  work with them.

21    Q.   And did McDonald or Rutherford ever tell you

22  where they got the name Fletcher Clinton from?

23    A.   Somehow they did research.  I don't know how.

24    Q.   And they would have had to have done that

25  research before they asked you, correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    A.    Yes.

2    Q.    So it's your testimony that at some point in

3  1995, McDonald and Rutherford asked you to show a photo

4  array to Edward Cooper, correct?

5        MR. STEFANICH:  Objection.  Misstates his prior

6    testimony, but you can answer.

7        THE WITNESS:  It was determined that's what we

8    should do.

9  BY MR. STARR:

10   Q.    And that would have occurred before March

11  19th, 1995, when you put the stop order in for Terry

12  Rogers, correct?

13   A.    I don't know what the date is -- would be.

14   Q.    Right.  But you previously testified that your

15  first investigative action in this case was to be told

16  or asked by McDonald, Rutherford -- McDonald and

17  Rutherford to go out and do a photo array with Cooper

18  involving a photo of Fletcher Clinton?

19   A.    No, I -- I told you it was discussed with

20  them, and it was determined that we would do that.

21   Q.    Okay.  So you don't know whether or not you

22  did the photo array before you put the stop order in for

23  Terry Rogers or not?

24   A.    I -- I don't know for sure, no.

25   Q.    Okay.  All right.  Do you know why the stop

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   order was put in for Terry Rogers?

 2        A.    Because he needed to be talked to.  He was the

 3   one -- he was the one that first said the name of

 4   Fletcher.

 5        Q.    In 1990, correct?

 6        A.    That's correct.

 7        Q.    And at some point between 1990 and when you

 8   started working on this case, it's your testimony that

 9   McDonald and Rutherford had zeroed in on the name

10   Fletcher Clinton, correct?

11        A.    Yeah, for some reason.

12        Q.    But you don't know why?

13        A.    Not exactly at this point.

14        Q.    Okay.  I'm going to show you another document.

15   I'm going to mark this as Exhibit number 10.

16              (EXHIBIT 10 MARKED FOR IDENTIFICATION)

17   BY MR. STARR:

18        Q.    And for the record, this is CITY-JF-136.

19   You see this document on your screen, sir?

20        A.    Yes.

21        Q.    It's a one-page document.  Do you see that?

22        A.    Yes.

23        Q.    Okay.  Do you recognize what this document is?

24        A.    It -- it would be the -- another record stop

25   that in the -- in that year, whenever that was, was now
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  called an investigative alert.

2      Q.   Okay.  Do you see the part that I'm

3  highlighting on the screen?

4      A.   Yes.

5      Q.   Okay.  Do you see that?  I know it's, like,

6  the -- not the greatest copy, but you can -- if I can

7  zoom in, do you see that it says "request date" there,

8  and there's a date of March 19th, 1995?

9      A.   Yeah.  And again, I don't know if that was

10  something that had to be changed over to that format.

11  I don't -- I don't know why that would be.

12      Q.   Do you see -- above that there's a column, and

13  I can't make out what it says.  Do you know what it says

14  to the left of the word renewed?

15          MR. STEFANICH:  Sean, we got hard copies.  If I

16      can find it, it might be helpful, so if you give me

17      a second, I might be able to get a hard copy for

18      him.

19          MR. STARR:  Yeah, that's fine.  But while

20      you're doing that, I just want to know if he recalls

21      what it says there, based on his --

22          MR. STEFANICH:  Okay.

23          MR. STARR:  -- experience, you know?

24          THE WITNESS:  You know what?  I -- I do not.

25  BY MR. STARR:

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:20-cv-04768 Document #: 184-17 Filed: 05/06/25 Page 75 of 182

```
 1        Q.    Okay.  But do you see that it says "renewed"
 2   there, correct?
 3        A.    Yes.
 4        Q.    Does that indicate to you that there was
 5   previously a stop order put on Terry Rogers before March
 6   19th, 1995?
 7        A.    Before '95?  No.
 8        Q.    Okay.  That word renewed does not indicate to
 9   you that this is a renewal of a previous stop order for
10   Mr. Rogers?
11        A.    No, I -- I -- I've -- I've got a -- again,
12   it's a long time ago, but I've got a feeling it means
13   that's when it was originally put in.
14        Q.    All right.  And you see that this is a stop
15   order for Terry Rogers?  You see the name in the middle
16   there, correct?
17        A.    Yes.
18        Q.    All right.  And then there's a handwritten
19   note here at the bottom.  Is this your handwriting?
20        A.    Yeah, it is.
21        Q.    And there's your signature, correct?
22        A.    Yes.
23        Q.    And it says, "Please cancel.  Subject has been
24   interviewed."  Is that -- do you see that?
25        A.    Yes.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1     Q.    What does that indicate to you?

2     A.    That the subject has been interviewed, and we

3   no longer need the record stop.

4     Q.    Do you -- does this indicate to you when the

5   subject was interviewed?

6     A.    That does not.  I don't -- I don't -- I don't

7   see that it does, no --

8     Q.    So the fact that there's a March 19th, '95,

9   date here doesn't tell you that you had interviewed

10   Mr. Rogers by March 19th, 1995?

11     A.    Oh, absolutely not.

12     Q.    Okay.  Do you have a -- an independent

13   recollection of printing this document and writing this

14   on here?

15     A.    Independently, no.

16     Q.    Okay.  But you know you did because it's your

17   signature, correct?

18     A.    Yes.

19     Q.    Okay.  I'm going to show you another exhibit,

20   and this is going to be marked as Exhibit number 11. And

21   for the record, this is CITY-JF-52.  Again, a single-

22   page document.  Give me a second to pull it up. All

23   right, sir.  Just -- you can take a look.  The Bates is

24   CITY-JF-52.  It's a single page, correct?

25              (EXHIBIT 11 MARKED FOR IDENTIFICATION)

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.    That's what I see.

 2   BY MR. STARR:

 3        Q.    And you see this document on your screen?

 4        A.    Yes.

 5        Q.    And do you know what this document is, sir?

 6        A.    Yeah.  It was a typewritten GPR.

 7        Q.    Okay.  Have you seen this particular document

 8   before today?

 9        A.    I did.

10        Q.    Did you review it in preparation for the

11   deposition?

12        A.    Yes.

13        Q.    Okay.  Do you see your name as well as

14   Detective Raymond Schalk's name at the bottom there?

15        A.    Yes.

16        Q.    Is this a general progress report that you and

17   Detective Schalk created during the Willie Sorrell

18   investigation?

19        A.    Yes.

20        Q.    Okay.  And the date of this report is March

21   19th, 1995.  Do you see that?

22        A.    Yes.

23        Q.    Does that indicate to you that that's the date

24   that you wrote this report?

25        A.    Yes, that would indicate that.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   Okay.  Does it indicate to you about when you

2    conducted the information that's found in the report?

3    A.   Not necessarily.

4    Q.   Okay.  The report, just in summary form,

5    indicates that you interviewed a subject by the name of

6    Edward Cooper at his home.  Do you see that?

7    A.   I'm sure it's in here, but I -- yes.

8    Q.   Okay.  And right here -- and I should have

9    highlighted this for you, but right here it says that

10   "The detectives learned from Detectives Rutherford and

11   McDonald that a subject named Fletcher Clinton lived in

12   the area of the intended victim, Edward Cooper."

13   Do you see that?

14   A.   Yes.

15   Q.   Do you recall learning from Rutherford and

16   McDonald that this Fletcher Clinton individual lived

17   close to Mr. Cooper?

18   A.   No, I don't remember that.

19   Q.   Okay.  And then it goes on to say that

20   "Clinton's name was obtained through an RAMIS check of

21   Fletcher's."  Do you see that?

22   A.   Yes.

23   Q.   And it further says that "An IR check of

24   Fletcher Clinton showed that he had a UUW, robbery,

25   and drug arrest."  Do you see that?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.   Yes.

 2        Q.   "He is currently serving time in DOC at

 3   Taylorville,"  Do you see that?

 4        A.   Yes.

 5        Q.   So that's all information that you would have

 6   known as of March 19th, 1995, correct?

 7        A.   That would have been, yes --

 8        Q.   Okay.  Do you have any independent

 9   recollection of creating this report?

10        A.   Independently, no.

11        Q.   Do you have any independent recollection of

12   interviewing Mr. Cooper?

13        A.   No.

14        Q.   But it's your understanding based on this

15   report that at this point in time in March 19th, 1995,

16   you were focused on someone by the name of Fletcher

17   Clinton, correct?

18            MR. STEFANICH:  Objection.  Form.  You can

19       answer.

20            THE WITNESS:  Yes.

21   BY MR. STARR:

22        Q.   Okay.  Would -- as a matter of practice, would

23   you have pulled Mr. Fletcher Clinton's IR history at

24   this point?

25        A.   I don't know if I would have, but I would
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  think that it had already been done by McDonald and

2  Rutherford.

3      Q.   Does the sentence at the end of that paragraph

4  that says, "An IR check of Fletcher Clinton show that he

5  had a UUW, robbery, and drug arrest" -- does that

6  indicate to you that an IR history was pulled of

7  Fletcher Clinton?

8      A.   Yes.

9      Q.   Okay.  Does that also indicate to you that a

10  photo would have been received from Chicago Police

11  Department during the IR check?

12      A.   Well, the photo was gotten by someone

13  somewhere.

14      Q.   Okay.  And according to this document,

15  you conducted a photo array with Mr. Cooper, right?

16      A.   Yes.

17      Q.   Okay.  It says, "A photo of Clinton was

18  obtained, and a photo show up was conducted at the home

19  of Edward Cooper."  you see that?

20      A.   Yes.

21      Q.   And then it says that "Cooper did not pick the

22  photo of Clinton."  Do you see that?

23      A.   Yes.

24      Q.   Okay.  You also apparently learned at this

25  point in time that Mr. Cooper believed that Terry Rogers

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-17 Filed: 05/06/25 Page 81 of 182 PageID #:5676

```
 1   had set him up, correct?

 2        A.   Well, that's what -- that was his thought.

 3   It's -- that's what it says here, yeah.

 4        Q.   I mean, you wrote it in your report, right?

 5        A.   Yes.

 6        Q.   Okay.  And he -- and Mr. Cooper went on to

 7   state that Mr. Rogers -- he was familiar with

 8   Mr. Rogers' family and that "he had heard that

 9   Mr. Rogers had a bad drug habit and would do almost

10   anything for money."

11        A.   Okay.

12        Q.   That's what you wrote in your report, right?

13        A.   Right.

14        Q.   Okay.  And you even went as far as to say

15   "he has a five-page sheet."  What does that indicate,

16   sir?

17        A.   It means his criminal history was five pages

18   long.

19        Q.   And that means that you would have -- you

20   would have previously taken a look at Mr. Rogers'

21   criminal history, correct?

22        A.   Yes.

23        Q.   Because you wouldn't have known that without

24   looking that up, correct?

25        A.   Without seeing it, yes.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   Yes.  And then it says, finally, "It should be

2  noted that Rogers is the one who claimed to

3  have" -- "that one of the offenders called the other

4  Fletcher." Do you see that?

5    A.   Yes.

6    Q.   Okay.  At this point in your investigation,

7  did you -- do you have -- strike that.  At this

8  point -- of your investigation, did you have any

9  concerns that maybe Mr. Rogers was giving you any false

10 information?

11   A.   Well, I -- I -- I didn't know at that time.

12   Q.   Well, given the information that Mr. Cooper

13 presented you with, did you have any reason to doubt

14 Terry Rogers' statements to you?

15   A.   Oh, there's always room for doubt, sure.

16   Q.   Okay.  Did the fact that Mr. Cooper told you

17 that he thought Terry Rogers was involved in the crime

18 give you any reason to think that maybe Terry Rogers was

19 giving you false information?

20   A.   Well, not unless Mr. Cooper could -- you know,

21 could tell us exactly why he thought that other than him

22 being a drug user.

23   Q.   Did you ever do anything to investigate

24 whether or not Terry Rogers was a drug user?

25   A.   No, but it was obvious.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   It was obvious to you that Terry Rogers was a

2    drug user?

3    A.   Well, I had -- I had no reason not to believe

4    Mr. Cooper.

5    Q.   Okay.  And so because you had no reason to

6    believe -- not to believe Mr. Cooper, did you do

7    anything to investigate whether or not Terry Rogers was

8    involved in the crime?

9    A.   I don't recall that.

10    Q.   Did you ever ask Terry Rogers if he was

11    involved in the crime?

12    A.   Not that I know of.

13    Q.   Okay.  Did your partner, Detective Schalk,

14    ever ask Terry Rogers if he was involved in the crime?

15    A.   I don't know.

16    Q.   Did the photos that you used in the photo

17    array during this 1995 meeting with Mr. Cooper make

18    their way into the investigative file?

19         MR. STEFANICH:  Objection.  Foundation.  Form.

20      Objection --

21         MR. STARR:  Yeah, let me --

22         MR. STEFANICH:  Objection.

23         MR. STARR:  -- rephrase it.  I'm going to

24      rephrase it.  I'm going to withdraw and --

25         MR. STEFANICH:  So --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1              MR. STARR: rephrase it.
2    BY MR. STARR:
3         Q.   Did the photos that you used during the photo
4    array with Mr. Cooper in 1995 -- did you put those
5    photos into the investigative file?
6         A.   I don't know.
7         Q.   Should the photos that you used for the photo
8    array with Mr. Cooper in 1995 have been placed in the
9    investigative file?
10             MR. STEFANICH:  Objection.  Asked and answered.
11        You can answer again.
12             THE WITNESS:  They -- they didn't necessarily
13        have to be in there, no.
14   BY MR. STARR:
15        Q.   Because it was a negative ID, correct?
16        A.   Right.
17        Q.   Okay.  And general progress report your way of
18   documenting the fact that a negative ID occurred?
19        A.   Yes.
20        Q.   And if Mr. Cooper had identified any of the
21   fillers in your photo array, you would not have
22   documented that, correct?
23        A.   I doubt that.
24        Q.   You would have just -- you would have just
25   done what you did in this report and make note that it
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Deposition of DEBORAH LOSADA / Faras Dolbow

83

1   was a negative identification, correct?

2       A.   Correct.

3       Q.   Okay.  What was your next investigative step

4   after interviewing Mr. Cooper?

5       A.   I believe it was the record stop for Terry

6   Rogers.

7       Q.   So you think you put that record stop in after

8   you went to Mr. Cooper's house on March 19th, 1995?

9       A.   I don't know if it was before or after,

10  but that would have been -- the next step would have

11  been to find Terry Rogers and talk to him.

12      Q.   Okay.  Why was the next step to find Terry

13  Rogers and talk to him after you met with Mr. Cooper?

14      A.   Well, because of what Cooper had told us and

15  because of the name Fletcher that he gave.  It was

16  obvious that he knew something.

17      Q.   Are general progress reports something that

18  you submit to a supervisor after you fill them out, sir?

19      A.   Again, this is -- this is -- this is something

20  that's changed over time.

21      Q.   Do you see --

22      A.   Sometimes -- sometimes it was.  Sometimes it

23  wasn't, but it -- it's not -- it wasn't a must-do at the

24  time.

25      Q.   Okay --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     A.   I don't know.

2     Q.   -- do you see your name at the bottom of this

3  report, the signature?

4     A.   I do.

5     Q.   Do you know if you ever submitted this

6  document to any supervisor?

7     A.   I don't know.

8     Q.   Do you know why this document was never

9  approved by any supervisor?

10    A.   Again, I don't know what the thought was at

11  the time.

12    Q.   Okay --

13    A.   GPRs were usually just note paper, and at that

14  time some were being used for short reports.

15    Q.   So you -- at this point in time, you attempted

16  to find Terry Rogers, correct?

17    A.   Yes.

18    Q.   Did you attempt to find the witness by the

19  name of Emmett Wade at this point in time?

20    A.   I don't recall that.

21    Q.   Why not?

22    A.   Because I think the next -- the next thing we

23  wanted to do was to talk to Terry Rogers.

24    Q.   Why would you not put a stop order in on

25  March 19th, 1995, for the witness Emmett Wade?

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.    I don't remember.

2    Q.    Did you attempt to find Sheene Friend at this

3 point on March 19th, 1995?

4    A.    No.  At some point, we put a record stop for

5 her, too, so I don't know if we tried to find her then

6 or not.  But I would guess we did.

7    Q.    You think you put a stop order in for Sheene

8 Friend in March of 1995?

9    A.    I don't know exactly the date on that.

10    Q.    Any explanation for why you chose to look for

11 Terry Rogers first and not look for all the witnesses at

12 the same time?

13    A.    I don't know that we didn't look for all the

14 witnesses at the same time.  I don't remember.

15    Q.    I thought you just testified that you didn't

16 look for Mr. Wade at this point in time?

17    A.    Not that I recall --

18    Q.    Okay.

19    A.    Let me put it that way.

20    Q.    But you recall from the 1990 police report,

21 the sup that was done by Detective Fleming, that

22 Mr. Wade had indicated that he might be able to identify

23 the suspects, correct?

24    A.    It says that, yes.

25    Q.    And you recall from the 1990 report that was

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:20-cv-04768 Document #: 184-17 Filed: 05/06/25 Page 88 of 182

86

```
 1   done by Detective Fleming that Ms. Friend had indicated
 2   she might be able to identify the suspects, correct?
 3        A.   I believe so, yes.
 4        Q.   Okay.  Wouldn't it have been proper to seek to
 5   find those two witnesses at this point in time, as well?
 6             MR. STEFANICH:  Objection.  Form.  You can
 7        answer.
 8             THE WITNESS:  Again, I don't recall exactly
 9        what we did back in 1995.
10   BY MR. STARR:
11        Q.   Did you ever show the photo array that you
12   showed to Mr. Cooper to Mr. Rogers?
13        A.   No.
14        Q.   Why not?
15        A.   Because the first time we talked to
16   Mr. Rogers, he told us who -- who James Fletcher was and
17   that he was one of the offenders.
18        Q.   But --
19        A.   So Fletcher Clinton did not have any bearing
20   on this case anymore.
21        Q.   Well, Detective Rutherford and Detective
22   McDonald thought that Fletcher Clinton had some bearing
23   on this case, correct?
24        A.   No, they didn't.  They said he -- he had the
25   right type of his -- criminal history, and he lived in
```





Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1   the area.  And his name was Fletcher.  That was all.

2       **Q.   And you remember that?**

3       A.   I -- I've got that from the reports.

4       **Q.   Okay.  So you never showed Terry Rogers the**

5   **photo array that you showed Edward Cooper, even though**

6   **Terry Rogers had said that he thought he could identify**

7   **one of the individuals, correct?**

8         MR. STEFANICH:  Objection.  Form.  You can

9      answer.

10         THE WITNESS:  I just said he told us exactly

11      who one of the offenders was.

12  BY MR. STARR:

13       **Q.   So when you met with Mr. Rogers, the first**

14   **thing he told you was who one of the offenders was?**

15         MR. STEFANICH:  Objection.  Misstates his prior

16      testimony --

17         THE WITNESS:  He might have said hello, the

18      first thing.  I -- I -- what do you -- yeah.

19      I don't know what you're getting at.

20  BY MR. STARR:

21       **Q.   I -- I'm just trying to figure out what you**

22   **did and what investigative steps you took, sir.**

23   **So did you intend to show the photo array that included**

24   **Mr. Clinton to Terry Rogers?**

25       A.   Not at that -- not that I know of, no.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q.   Why not?

2     A.   We intended to talk to Terry Rogers.  And when

3 we talked to Terry Rogers, he told us exactly who one of

4 the offenders was.

5     Q.   Right.  But you knew from the 1990 --

6     A.   Why would -- why -- I -- I don't understand

7 your question.  I don't know -- know why we would show a

8 negative -- someone we -- we disregarded already.

9     Q.   Okay.  The 1990 sup report indicates that

10 Mr. Rogers could potentially identify the

11 suspect -- one of the suspects, correct?

12     A.   Potentially, yes.

13     Q.   And the 1990 sup report indicates that

14 Mr. Wade could potentially identify both of the

15 suspects, correct?

16     A.   It's what it said.

17     Q.   And the 1990 sup report indicates that

18 Ms. Friend could potentially identify both of the

19 suspects, correct?

20     A.   She -- I believe she said one of the offenders

21 that she had --

22     Q.   Okay.

23     A.   -- seen -- she had seen in the neighborhood

24 before.

25     Q.   Okay.  And you showed her a photo array to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1 | Mr. Cooper, correct?

 2 |     A.    When?

 3 |     Q.    In 1995.

 4 |     A.    Yes.

 5 |     Q.    But you did not show that same photo array to

 6 | any of the other -- any of the other witnesses, correct?

 7 |     A.    That is correct.

 8 |     Q.    And why did you choose not to show the other

 9 | witnesses the same photo array that you showed

10 | Mr. Cooper?

11 |         MR. STEFANICH:  Objection.  Asked and answered.

12 |     You can answer again.

13 |         THE WITNESS:  Because we had no reason to

14 |     believe that Fletcher Clinton had anything to do

15 |     with this case.

16 | BY MR. STARR:

17 |     Q.    Because Mr. Cooper could not identify him?

18 |         MR. STEFANICH:  Objection.  Misstates his prior

19 |     testimony.  You can answer.

20 |         THE WITNESS:  No, that's not --

21 |         THE REPORTER:  I'm sorry.  Could you repeat

22 |     that?

23 |         MR. STEFANICH:  Can you repeat that answer --

24 |         THE WITNESS:  No, that's not the case.

25 | BY MR. STARR:

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   Then why did you believe that Mr. Clinton had

2 nothing to do with the -- had no bearing on the

3 investigation anymore at this point in time?

4         MR. STEFANICH:  Objection.  Form.  Misstates

5    prior -- or mischaracterizes his prior testimony.

6    You can answer again.

7         THE WITNESS:  Fletcher Clinton -- the only

8    reason we showed a photo is because of his -- he had

9    a name of Fletcher, as did many others, and that he

10   lived in the area, and he had a criminal history.

11   That's the only reason at that time.  It was a shot

12   in the dark at that time in '95.  When we talked to

13   Terry Rogers, Terry Rogers told us exactly who one

14   of the offenders was, and it just happened that his

15   name was Fletcher.

16 BY MR. STARR:

17   Q.   And you learned this --

18   A.   So there was no -- there was absolutely no

19 reason to show the photo array of Fletcher Clinton ever

20 again.

21   Q.   And you learned this information from Terry

22 Rogers right after he was arrested, correct?

23   A.   In 2002.

24   Q.   You learned from Terry Rogers in 2002 that

25 the -- one of the suspects was named James Fletcher,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1  right after he was arrested, correct?

 2      A.   Correct.

 3      Q.   And you learned this information from Terry

 4  Rogers in 2002 that one of the suspects was named James

 5  Fletcher following learning from Mr. Cooper that he

 6  thought Mr. Rogers was involved in the crime, correct?

 7          MR. STEFANICH:  Form.  You can answer.

 8          THE WITNESS:  Following a statement by Cooper

 9     in '95?

10  BY MR. STARR:

11      Q.   Yeah.  So let me re-ask the question.

12  In 1995, you learned from Mr. Cooper that he thought

13  that Terry Rogers was involved in the crime, correct?

14      A.   That's what he said.  That's what he thought.

15      Q.   And then the first time you got an opportunity

16  to speak to Terry Rogers, Terry Rogers told you that the

17  suspect was named James Fletcher, correct?

18      A.   Yes.

19      Q.   Did you have any concerns that Terry Rogers

20  was giving you the name James Fletcher because of what

21  Mr. Cooper had told you -- that he thought Mr. Rogers

22  was involved in the crime?

23      A.   I -- we took it as -- as -- as it was -- came

24  out --

25      Q.   Okay.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:20-cv-04768 Document #: 184-17 Filed: 05/06/25 Page 94 of 182

92

1        A.   We can't -- you know, it doesn't -- whatever

2    thoughts we could have had, we -- we'd have to prove.

3        Q.   So between 1995, when you showed Mr. Cooper

4    the photo array with Fletcher Clinton in it, and 2002,

5    seven years, what did you do to investigate whether or

6    not Fletcher Clinton was involved in the crime in any

7    way or -- in any way?

8        A.   Nothing.

9        Q.   Okay.  Between 1995, when Mr. Cooper was

10   unable to identify the photo array containing Fletcher

11   Clinton, and 2002, why did you not go out and find

12   Emmett Wade and show Emmett Wade the photo array that

13   involved Fletcher Clinton?

14       A.   Well, because if -- if Mr. Cooper said -- if

15   Fletcher Clinton wasn't the person, he was the one that

16   was the main person in this.  He had the best look, and

17   there was no sense in -- in burning out witnesses with

18   frivolous photo shows.

19       Q.   Is that the same reason why you didn't take

20   the photo array to Sheene Friend between 1995 and 2002?

21       A.   I don't know if we even -- were even able to

22   find Sheene Friend at that time.

23       Q.   So in 1995, when you got Fletcher Clinton's

24   criminal history, you pulled this photo, and you showed

25   it to Cooper, that's the last thing you did to



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    investigate whether or not Fletcher Clinton was involved
2    in the shooting of Willie Sorrell, correct?
3        A.    Yes.
4        Q.    Did you do anything else to investigate any
5    other suspects between 1995 and 2002?
6        A.    No.  Our key was to talk to Rogers again.
7        Q.    Okay.  So you waited seven years to talk to
8    Rogers, correct?
9        A.    We had to.
10       Q.    Okay.  And you did nothing on the
11   investigation between 1995 and 2002; is that correct?
12       A.    Not that I recall.
13       Q.    Okay.  Did you investigate whether or not
14   there were any other Fletchers that live close to
15   Mr. Cooper who also had a criminal history similar to
16   Fletcher Clinton's?
17       A.    I'm sure -- I'm sure there could have been.
18       Q.    Did you ever take any photos of those
19   Fletchers and show them to Mr. Cooper?
20       A.    No.
21       Q.    Why not?
22       A.    Again, you -- you -- you can't just keep
23   flooding witnesses with photo arrays with no --
24   with -- with -- with no basis.
25       Q.    Well, what was your basis in showing a photo

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   array with Fletcher Clinton in it to Mr. Cooper in

2   1995?

3      A.   Because detectives McDonald and Rutherford

4   requested that.

5      **Q.   Yes.  And when you say that --**

6      A.   They thought -- they thought it -- it was

7   worth the shot to just show that photo.

8      **Q.   And you would have an independent recollection**

9   **of them telling you they thought it was worth a shot to**

10   **just show that photo, correct?**

11      A.   I don't know exactly what was said, no.

12      **Q.   But you have a -- you have an independent**

13   **recollection that's what happened?**

14      A.   I have no independent recollection.

15   I can only go by the reports.

16      **Q.   Okay.  I'm going to show you another document**

17   **here.  This is Exhibit 12.  CITY-JF --**

18         (EXHIBIT 12 MARKED FOR IDENTIFICATION)

19        MR. STEFANICH:  Can we take a five-minute

20     break?

21        MR. STARR:  I'm sorry.  I didn't hear you.

22        MR. STEFANICH:  Can we take a five-minute

23     break?

24        MR. STARR:  Five-minute break?  Sure.

25        MR. STEFANICH:  Yep.  Thanks.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1            THE REPORTER:  All right.  Let me get us off
 2       the record.  The current time is 11:42 a.m. Central.
 3       We are off the record.
 4            (OFF THE RECORD)
 5            THE REPORTER:  All right.  We are back on the
 6       record for the deposition of Jerome Bogucki on
 7       October 12th, 2023.  The current time is 12:03 p.m.
 8       Central.  You may continue.
 9  BY MR. STARR:
10       Q.   All right.  Mr. Bogucki, I want to show you
11  what I'm going to mark as Exhibit number 12.  And this
12  is City-JF--66 through 85.  Do you see the document on
13  your screen, sir?
14            THE WITNESS:  Yes.
15  BY MR. STARR:
16       Q.   And I'll show you that the first Bates stamp
17  on this is 60 -- I'm sorry.  It's 66.  See that bottom
18  there?
19       A.   Yeah.
20       Q.   Okay.  And then the last Bates stamp is 85.
21  You see that, sir?
22       A.   Yes.
23       Q.   Do you know what this document is, sir?
24       A.   It's -- it's some type of arrest record --
25  records, I should say.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-17 Filed: 05/06/25 Page 98 of 182 PageID #:5693

96

```
 1        Q.   Okay.  And have you seen this document before
 2   today, sir?
 3        A.   It looks like I have, but I don't have
 4   independent recollection.
 5        Q.   Okay.  Do you know if you reviewed this
 6   document in preparation for today's deposition, sir?
 7        A.   If it was in the file, I did.
 8        Q.   Okay.  And I -- I'll represent to you that
 9   this document was produced in discovery as part of the
10   investigative file in the Willie Sorrell homicide
11   investigation, okay?
12        A.   Okay.
13        Q.   And we -- I believe previously at your first
14   deposition or first part of your deposition, we talked
15   about this document, and I refer to it as a CAPS
16   document.  Do you see how the top left-hand, that signed
17   -- the insignia of CAPS there?
18        A.   Yeah, I see the insignia, but I'm not sure
19   that's what it's called, but --
20        Q.   Okay.  Do you know what it's called?
21        A.   I'm not sure.
22        Q.   And I think --
23        A.   Anymore -- I -- I did at one time, but I don't
24   know.
25        Q.   Did you run this report, sir?
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.   I don't know.

2    Q.   Okay.  So it's possible that you ran this

3 report during the Willie Sorrell homicide investigation,

4 correct?

5    A.   I have no idea.

6    Q.   Okay.  And there's no place in this document

7 that reveals the name of the person who ran this

8 document, correct?

9    A.   Not that I see.

10   Q.   Okay.  Do -- I think you previously referred

11 to this as a document that was created in 1998.  Do you

12 remember talking about that at the last deposition?

13   A.   If that's -- I'd say I can see a date of 1999

14 on it.

15   Q.   Yeah.  So I'll zoom in a little bit.  You can

16 see here, it says, "Today is 19 August 1999.  Time is

17 00:40." do you see that, sir?

18   A.   I do see it.

19   Q.   So does that tell you that this document was

20 generated in -- on August 19th of 1999?

21   A.   Apparently.

22   Q.   And the time was 12:40 a.m.; is that correct?

23   A.   That's what it says there.

24   Q.   Was that a watch -- during the time on the

25 watch that you would work in 1999?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.   Yeah.  Yes, it is.

 2        Q.   Okay --

 3        A.   It was.

 4        Q.   And then I'll direct you to -- towards

 5   the end of this document, there's on page Bates stamp

 6   70 -- 78, you see that there's Fletcher Clinton's name,

 7   correct?

 8        A.   I see that.

 9        Q.   And that is IR number of 823141, you see that?

10        A.   I see that.

11        Q.   And it says he has an address of 4238 West

12   Washington.  Do you see that?

13        A.   I do.

14        Q.   All right.  That's his home address, it says,

15   right?

16        A.   I don't see it anymore --

17        Q.   I'll go back.

18        A.   That's what it says, yes.

19        Q.   Okay.  And then it also says Fletcher Clinton

20   again -- his name again, a second time at the bottom of

21   the page.  You see that?

22        A.   Yes.

23        Q.   And it says -- for this, it says his home

24   address is 1538 North Leamington.  Do you see that?

25        A.   Yes.
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**KENTUCKIANA**
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.    Do you know what the purpose of this report
2  is?
3    A.    I do not.
4    Q.    Does this report indicate to you -- indicate
5  to you that in 1999, somebody working on the Willie
6  Sorrell investigation was still investigating other
7  Fletchers -- other people by the name -- by the first
8  name of Fletcher?
9    A.    Apparently.
10    Q.    Yeah, because all the names -- all the
11  Fletcher -- there's a number of Fletcher names on here,
12  correct?
13    A.    Yes, I see some.
14    Q.    And they're all Fletcher as a first name.
15  Do you agree with me?
16    A.    I see that.
17    Q.    Okay.  Including Fletcher Clinton, correct?
18    A.    Correct.
19    Q.    So does this document indicate to you that
20  somebody working on the Willie Sorrell investigation
21  was still investigating Fletcher Clinton as a possible
22  suspect in 1999?
23        MR. STEFANICH:  Objection.  Foundation.
24    You can answer.
25        THE WITNESS:  Not necessarily, no.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

BY MR. STARR:

Q.   What else might this document indicate other than that fact?

A.   Well, depending on -- depending on how this was brought up, I'm -- I'm guessing there was some way to bring up anybody with the name of Fletcher, and he just came up again.

Q.   All right.  Do you know what investigation into the Willie Sorrell homicide you were conducting in August of 1999?

A.   I have no idea.

Q.   Is it possible that you were investigating other individuals by the name of -- with the first name of Fletcher?

A.   I don't know.

Q.   Is it possible that you were investigating Fletcher Clinton as a suspect in 1999?

A.   Not that I recall.

Q.   Is it possible that Detective Schalk was investigating Fletcher Clinton in 1999?

A.   Not that I know of.

Q.   Is it possible that Detective -- Defendant Noradin was investigating Fletcher Clinton in 1999?

A.   Not that I know of.

Q.   Is it possible that Detective Wojcik or


Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   Sergeant Wojcik was investigating Fletcher Clinton in

2   1999?

3       A.    I highly doubt that.

4       Q.    Why do you highly doubt that, sir?

5       A.    Because as far as to my knowledge he had

6   nothing to do with this case.

7       Q.    Okay.  What was your next investigative step

8   after August of 1999 in the Willie Sorrell homicide?

9       A.    I don't know that I did anything in 1999.

10      Q.    So your next investigative step that you do

11  recall doing was in 2002; is that correct?

12      A.    That's according to reports, yes.

13      Q.    Okay.  Let's look at another document.  I'm

14  going to mark this as Exhibit number 13, and for the

15  record, this is CITY-JF-15274.  All right.  Sir, do you

16  see this document on your screen?  It's a one-page

17  document.

18              (EXHIBIT 13 MARKED FOR IDENTIFICATION)

19      A.    Yep --

20          MR. STEFANICH:  Oh, sorry.  Never mind.

21  BY MR. STARR:

22      Q.    Do you see the Bates there at the bottom,

23  CITY-JF-1574 -- 7 -- 15274?

24      A.    I see that.

25      Q.    Okay.  And what is this document, sir?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1     A.    It is an arrest record of Fletcher Clinton.

2     Q.    Okay.  So is this his criminal history or IR

3   report?  Is that -- are those terms that this document

4   has used?

5     A.    Yes.

6     Q.    Okay.  And I'll represent to you that this is

7   part of the investigative file in the Willie Sorrell

8   homicide investigation.  Do you have any reason to doubt

9   that?

10    A.    I have no reason to doubt it, no.

11    Q.    Is this the IR history that you believe you

12  ran when you pulled the photo to take out to show Edward

13  Cooper in 1995?

14        MR. STEFANICH:  Objection.  Misstates his

15    testimony.  You can answer.

16        THE WITNESS:  I don't believe I ran anything as

17    far as Fletcher Clinton.

18  BY MR. STARR:

19    Q.    Well, you did write in GPR that their -- an IR

20  history was pulled for Fletcher Clinton, correct?

21    A.    Yeah, I believe I said -- what -- it --

22  it -- I believe I said it was Rutherford and McDonald.

23    Q.    And do you know that for a fact, or are you

24  just --

25    A.    That's what it appeared to be.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of Jerome Roeder, taken on 05/09/23, Page 105 of 182

103

1     Q.   Based on what?

2     A.   Based on my GPR that was written.

3     Q.   And do you see at the bottom of this -- or

4 this criminal history of Fletcher Clinton, there's some

5 handwriting.  Do you see that, sir?

6     A.   I do.

7     Q.   Is that your handwriting?

8     A.   It is not.

9     Q.   Do you recognize whose handwriting this is?

10    A.   Nope.

11    Q.   Do you see what it says?

12    A.   I see what it says.

13    Q.   Can you tell us for the record what you can

14 read that it would say?

15    A.   It says, "In custody -- Taylorville --

16 Admitted 7-8-94.  Parole 6-13-96."

17    Q.   And that, in part, tracks some of the

18 information that was found in your general progress

19 report about your visit to Mr. Cooper, correct?

20    A.   I'm sorry.  I didn't get that question.

21    Q.   Yeah.  That information that's handwritten on

22 this document tracks some of the information that's

23 found in your general progress report, correct?

24    A.   I have -- I don't know.  I don't know what

25 that's --

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Fred Reyes - Book of Jerome Booker - taken 05/06/25 Page 106 of 182

104

```
 1        Q.   Your general progress report indicated that
 2   Mr. Clinton was in Taylorville penitentiary, did it not?
 3        A.   I guess it did.
 4        Q.   Okay.  It also indicated that he had certain
 5   arrests for -- one for a UUW and another for a drug
 6   offense, correct?
 7             MR. STEFANICH:  Objection.  Form.
 8             THE WITNESS:  I don't know.  I'd have to see it
 9        once again to be sure.
10   BY MR. STARR:
11        Q.   Sure.  Well, in the interest of time, I'm
12   going to just represent you that it does.  Do you see
13   that it says Mr. Fletcher Clinton, at the top here,
14   had a UUW charge?
15             MR. STEFANICH:  I'm going to object to the
16        form.  You can answer.
17             THE WITNESS:  I see it's there, yes.
18   BY MR. STARR:
19        Q.   All right.  And do you see that there's also
20   some indication that there was some drug offenses
21   charged to Mr. Clinton -- Fletcher Clinton?
22        A.   Yeah, I can see -- yes, I can see that.
23        Q.   Okay.  And so that --
24        A.   I see -- yeah.  Oh, go ahead.
25        Q.   That would track -- and a robbery conviction
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  or a charge as well, right?

2      A.   I see that, yes.

3      Q.   So that would track some of the information

4  found in your general progress report as well, correct?

5      A.   It seems to be, yes.

6      Q.   Okay.  I'm going to rotate this document.

7  Do you see at the bottom -- there's a stamp when this

8  document was pulled?  Do you see that, sir?  Here.  It's

9  at the top now -- the top left-hand side?

10     A.   Yeah.

11     Q.   All right.  And do you see that stamp?

12 Can you read that stamp?  When I zoom in on -- what the

13 date is on that stamp?

14     A.   Not really.  It looks like October

15 20-something 1994, maybe.

16     Q.   Okay.  That's how I read it as well, sir --

17     A.   I'm not sure.

18     Q.   Do you know if the criminal history of

19 Fletcher Clinton was pulled in October of 1994?

20     A.   I have no idea.

21     Q.   Do you know who would have pulled the criminal

22 history of Fletcher Clinton in 1994 during the Sorrell

23 investigation?

24     A.   No.

25     Q.   Okay.  I'm going to show you another document

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   here, sir.  For the record, this is going to be marked

2   as Exhibit number 14, and this is CITY-JF-18 --

3   CITY-JF-18.  All right.  Do you see that document on

4   your screen, sir?

5       (EXHIBIT 14 MARKED FOR IDENTIFICATION).

6       A.   Yes.

7   BY MR. STARR:

8       Q.   What is this document, sir?

9       A.   Looks like it's an arrest record -- arrest

10   report for Terry Rogers.

11       Q.   All right.  And you see the Bates stamp at the

12   bottom there, City-JF-18?

13       A.   I do.

14       Q.   Did you review this document in preparation

15   for today's deposition?

16       A.   I probably saw it.  I don't know how much

17   I reviewed it.

18       Q.   Okay.  And do you see at the top here -- this

19   document appears to be created or printed on February

20   12th, 2002.  Do you see that?

21       A.   That's what it looks like.  Yes.

22       Q.   Okay.  And it says from District 16?

23       A.   I'm sorry?

24       Q.   And then next to it, it says from District 16.

25   Do you see that -- Chicago PD?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.   That's what it says there.

2    Q.   All right.  Do you see there's some

3 handwriting on this document here at the top -- at the

4 very top underneath District Chicago PD?

5    A.   I do see handwriting there.

6    Q.   And do you see -- it appears to say sister,

7 and there's a phone number and then the words Angela,

8 or something, Rogers.  Do you see that?

9    A.   I do see it.

10    Q.   All right.  Do you have any recollection of

11 ever contacting Mr. Rogers' sister?

12    A.   I do not have a recollection, no.

13    Q.   Did you -- do you know if you ever spoke to

14 Mr. Rogers' sister during the Sorrell investigation for

15 any reason?

16    A.   I don't know that.

17    Q.   Okay.  And do you recall having this document

18 in your possession at any point during the Sorrell

19 investigation?

20    A.   I don't recall.

21    Q.   Okay.  Do you see that -- in the narrative

22 section here, it reads, "Above arrested unsigned

23 complaints after being positively identified by

24 Complainant as the individual who entered the above

25 listed building without lawful entry and remained within

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    that residence.  Subject taken into custody, read rights

2    per Miranda, and transferred to an illegible district

3    for processing."  And then it says, "Subsequent name

4    check revealed investigative alerts for homicide under

5    number 95376.  Area Five Sergeant Dolan contacted."

6    Do you see that?

7         A.   I see that.

8         Q.   And then it says, "Hold papers secured"?

9         A.   Yes.

10        Q.   Okay.  Was this the scenario that you were

11   talking about earlier when you testified that a stop

12   order -- if someone was arrested, a stop order would be

13   alerted, and investigative alert would go out?

14        A.   Apparently, this was probably the -- the

15   arrest, yes.

16

17

18        Q.   All right.  This is the arrest that put you in

19   contact with Terry Rogers; is that correct?

20        A.   That's what it looks like.

21        Q.   And I know it's handwritten, and it's not the

22   best copy, but do you see here in this box -- I can't

23   make the number out, but it says date of arrest.  Do you

24   see I'm highlighting it right here?

25        A.   I do.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q.   Can you tell me what the date and the time of

2 the arrest is?

3     A.   It says 11 -- oh, wait.  There it is. "11

4 February '02, 23:30."

5     Q.   And in layman's terms, what time is 23:30 sir?

6     A.   11:30 p.m.

7     Q.   Okay.  So this indicates that Mr. Rogers was

8 arrested on 11:30 p.m. on February 11th of 2002,

9 correct?

10     A.   That's what it says, yes.

11     Q.   Okay.  And were you notified when this

12 investigative alert had -- was tripped with Terry

13 Rogers?

14     A.   Apparently.

15     Q.   Do you know who notified you?

16     A.   I have no idea.

17     Q.   Do you know what you did in response to

18 finding out that an investigative alert on Terry Rogers

19 had been called in?

20     A.   We arranged to talk to Terry Rogers.

21     Q.   That was your next investigative step in the

22 Sorrell homicide -- was to make arrangements to speak to

23 Terry Rogers?

24     A.   I believe so, yes.

25     Q.   Do you know when Mr. Rogers -- after this

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  arrest, do you know when Mr. Rogers was transported to

2  Area Five?

3      A.   When?  No --

4      Q.   Yeah.  Okay.

5      A.   No, I do not.

6      Q.   Do you know how long after Mr. Rogers was

7  arrested, that you actually got to sit down and speak to

8  Terry Rogers?

9      A.   It might have been the next day.

10     Q.   Do you have a recollection of that?

11     A.   Not --

12     A.   Meeting?

13     A.   -- independently, no.

14     Q.   All right.  You have no independent

15 recollection of meeting with Terry Rogers; is that

16 correct?

17     A.   I didn't say that.

18     Q.   That --

19     A.   I said I don't remember when and how.

20     Q.   Okay.  What independent recollection do you

21 have of meeting with Mr. Rogers?

22     A.   That it did actually happen.

23     Q.   Beyond the fact that it did actually happen,

24 what other independent recollection do you have of

25 meeting with Mr. Rogers?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.   Only what it says on the reports.

2      Q.   Prior to your meeting with Mr. Rogers, would

3 you have -- when you put out an investigative alert, is

4 there any steps that you normally take in the process of

5 doing that?

6      A.   I don't understand the question.

7      Q.   Well, if you're trying to find somebody, you

8 put out an investigative alert, correct?

9      A.   Right.  We put out an investigative alert in

10 order to try and find someone, yes.

11     Q.   Would you have pulled Terry Rogers IR history

12 prior to putting an investigative alert on him?

13     A.   Yes.

14     Q.   Would you have pulled this photograph prior to

15 putting an investigative alert on him?

16     A.   Most likely, yes.

17     Q.   Okay.  I'm going to show you another document

18 I'm going to mark as Exhibit number 15, and this is two

19 different pages.  This is CITY-JF-98 and 104.  Let's

20 take a look at those.

21          (EXHIBIT 15 MARKED FOR IDENTIFICATION)

22 BY MR. STARR:

23     Q.   All right.  So the first one you see at the

24 bottom here, it says, CITY-JF-98?

25     A.   Yes.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q.   And then the next one you see at the bottom

2 says, City-JF-104?

3     A.   Yes.

4     Q.   Okay. And the first one is the criminal

5 history or the IR history of Terry Rogers, correct?

6     A.   It looks like it, yes.

7     Q.   Okay. And does it indicate to you what --

8 when this criminal history was pulled?

9     A.   It appears in '95. February 22nd of '95.

10     Q.   And would it been you and Detective Schalk

11 that would have pulled this IR history; is that correct?

12     A.   I have no idea.

13     Q.   Well, who else might have pulled this IR

14 history in this case?

15     A.   Well, it could have been anyone, but if I was

16 to guess it would be McDonald and Rutherford, either one

17 of them.

18     Q.   Okay. Were they -- they were still working on

19 the case in February of 1995, correct?

20     A.   I believe they started it.

21     Q.   And then --

22     A.   According to reports.

23     Q.   Okay. And the second document here is

24 CITY-JF-104. Do you see that, sir?

25     A.   Yes.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   And this is in a -- this is another arrest

2  report of Terry Rogers, correct?

3    A.   Yes, it is.

4    Q.   And his arrest date here -- do you see that as

5  September 20th, 1994.  Do you see that?

6    A.   Yes.

7    Q.   Okay.  Do you recall reviewing this document

8  in preparation for today's deposition, sir?

9    A.   I probably saw it.  I don't know how much I

10  reviewed it.

11    Q.   All right.  And this was also pulled as --

12  based on this timestamp down here on February 22nd,

13  1995, correct?

14    A.   That's what the timestamp says, yes.

15    Q.   Do you have any reason to doubt that that's

16  the correct date and time that this -- or the date that

17  this document was pulled?

18    A.   No.  I have no reason to doubt that.

19    Q.   And do you know whether or not you requested

20  this arrest report or not?

21    A.   I have no recollection of that.

22    Q.   Do you know whether there were any

23  investigative alerts out for Terry Rogers prior to the

24  one that you issued?

25    A.   I do not know that.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.    Okay.  Was that something that you would have

2    been aware of when you put in an investigative alert?

3    Somebody did -- does it tell you?  Did the -- does the

4    system tell you whether there's an outstanding

5    investigative alert for that person?

6    A.    I'm not sure at that time.

7    Q.    All right.  Where were you when you first

8    encountered Terry Rogers during the investigation of the

9    Sorrell homicide?

10   A.    I think, according to reports, we were in the

11   Area Five office.

12   Q.    And you interviewed him at Area Five; is that

13   correct?

14   A.    I believe so, yes.

15   Q.    Who else was present for that interview, sir?

16   A.    Detective Schalk.

17   Q.    How long did that interview last?

18   A.    Don't know.

19   Q.    At what point in the interview did Mr. Rogers

20   tell you that he knew that Jimmy Fletcher or James

21   Fletcher was one of the offenders in the Sorrell

22   shooting?

23   A.    I -- I don't recall it ever being a problem.

24   I believe he said it pretty much right away.

25   Q.    And do you have any independent recollection

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   of what he specifically said?

2      A.   No.

3      Q.   Do you have any independent recollection of

4   what you asked him?

5      A.   No.

6      MR. STARR:  Okay.  I'm going to show you

7     another document.  This is Exhibit 16.  I'm going to

8     mark it as Exhibit 16.  And this is CITY-JF-4544.

9   Do you see this document on your screen, sir?

10       (EXHIBIT 16 MARKED FOR IDENTIFICATION)

11      A.   Yes.

12  BY MR. STARR:

13      Q.   And this is a -- an IR history or name check

14   for James Fletcher, correct?

15      A.   I -- that's what it looks like.  Yes.

16      Q.   All right.  And do you see the time in which

17   this was pulled according to this timestamp here?

18      A.   I -- it gives a date, not the time.

19      Q.   Yeah, you're correct.  I apologize.

20  Do you see the date?

21      A.   February 12th of 2002 --

22      Q.   Okay.

23      A.   -- on the timestamp.

24      Q.   And then if you look at the bottom -- I don't

25  know if you can see this upside down, but it appears to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
1    indicate February 12th, 2002 at 20:48.  Do you see that?

2        A.   I do.

3        Q.   Okay.  So that's when this document would have

4    been generated, correct?

5        A.   Apparently.

6        Q.   Okay.  Do you have -- did you pull this IR

7    history for James Fletcher?

8        A.   Well, probably either myself or my partner.

9        Q.   And you would have pulled this after

10   Mr. Rogers had told you that James Fletcher was one of

11   the suspects, correct?

12       A.   Yeah.  I -- I don't have independent

13   recollection of the timing on this, but I would assume

14   so, yes.

15       Q.   Do you recall whether or not there were any

16   other James Fletchers that were in the Chicago Police

17   Department system when you searched James Fletcher's

18   name?

19       A.   I don't recall.

20       Q.   Do you recall whether or not -- strike that.

21   Did Mr. Rogers give you any other identifying

22   information about James Fletcher that allowed you to

23   narrow down to this particular James Fletcher?

24           MR. STEFANICH:  Objection.  Form.  You can

25       answer.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    THE WITNESS:  The -- it was -- it's a pretty

2  simple -- simple way to do it.  We would get -- we

3  got James Fletcher's photo, and we pretty

4  much -- we put in the photo group and say,

5  "Do you see the James Fletcher we're talking about?"

6  And he picked it out.  And --

7 BY MR. STARR:

8   **Q.** **Right.  But -- go ahead.**

9   A. I mean, there -- so there was -- there

10 was -- there was no reason to go anywhere else with it.

11   **Q.** **Well, my question is: Do you know whether or**

12 **not there were more than one James Fletcher that had an**

13 **IR history of the Chicago Police Department when you**

14 **pulled this particular James Fletcher's IR history?**

15   A. I --

16   MR. STEFANICH:  Objection.  Form.  You can

17  answer.

18   THE WITNESS:  I -- I don't know.

19 BY MR. STARR:

20   **Q.** **Do you -- did Mr. Rogers give you any**

21 **additional information other than the name James**

22 **Fletcher or Jimmy Fletcher that allowed you to narrow**

23 **down to this particular James Fletcher at that**

24 **particular time?**

25   MR. STEFANICH:  Objection.  Form.  You can

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1        answer.
 2              THE WITNESS:  I don't know exactly how he
 3        narrowed it down, but it was from computer searches.
 4        I'm sure.
 5   BY MR. STARR:
 6        Q.   If you had pulled the IR history of any other
 7   James Fletchers that are not the James Fletcher that are
 8   the plaintiff in this case, but just another person with
 9   the name James Fletcher, would you have necessarily
10   included those IR histories or those name checks in the
11   investigative file?
12        A.   It's possible.
13        Q.   Is it possible that you pulled other James
14   Fletchers' names and just destroyed the document?
15        A.   Not that I know of.
16        Q.   So as a general matter of practice, if you
17   pulled a number of different name checks for a name
18   that's a common name like James Fletcher, you would have
19   included all those IR histories in the investigative
20   file, correct?
21              MR. STEFANICH:  Objection.  Form.  Misstate --
22              THE WITNESS:  I don't know what --
23              MR. STEFANICH:  -- misstates his prior
24        testimony.  You can answer.
25              THE WITNESS:  I don't know exactly what I did
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      at that time.
 2  BY MR. STARR:
 3      Q.   Well, would it have been a good practice to
 4  include all documents that you pulled in in an
 5  investigation in the investigative file?
 6      A.   If -- if they were of use.
 7      Q.   So if you pulled other investigative -- strike
 8  that.  If you pulled other IR histories for other
 9  people, and they -- you later deemed them be not of use,
10  you may have not included them in investigative file; is
11  that correct?
12      A.   I can't tell you unless -- I can't -- I -- I
13  don't have any recollection.
14      Q.   Well, is it possible that you printed other IR
15  histories for other individuals during the Sorrell
16  investigation and did not include those IR histories in
17  your investigative file?
18      A.   I don't -- I don't know.  I don't -- I -- I
19  don't -- you -- you -- you're asking a couple different
20  questions there at once.  I -- which -- which part
21  of it --
22      Q.   I'm asking you one question.
23      A.   -- do you want answered?
24      Q.   Is it possible that you printed additional IR
25  histories for additional individuals that you later
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    deemed to be not significant, and you did not include

 2    those documents in the investigative file?

 3            MR. STEFANICH:  Objection.  Form.  You can

 4        answer.

 5            THE WITNESS:  I guess it's possible.  Sure.

 6    BY MR. STARR:

 7        Q.   And those could have been other James

 8    Fletchers as well, correct?

 9        A.   I don't know if there is or was.

10        Q.   I'm going to show you what I'm going to

11    mark as Exhibit number 16, I believe --

12            THE REPORTER:  17.

13            MR. STARR:  And -- 17, thank you.

14    BY MR. STARR:

15        Q.   And this is three pages.  So the Bates stamp

16    is CITY-JF-179 through 181.  Do you see these on your

17    screen, sir?  I'm just going to scroll through them and

18    look -- we'll look at in more detail, but do you just

19    see there's three pages and that it's 179, 180 and 181?

20            (EXHIBIT 17 MARKED FOR IDENTIFICATION)

21        A.   Yes.

22    BY MR. STARR:

23        Q.   And do you recognize what these documents are

24    offhand?

25        A.   Those are notes written on a -- what we call a
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Tim Deposition of Lieutenant Lloyd Graff taken on 01/26/2022 Page 123 of 182

```
 1   GPR.

 2        Q.   All right.  So the first one, which is Bates

 3   179, do you see the reporting officer's signature?

 4        A.   Yes.

 5        Q.   And is that -- from your recollection,

 6   is that Detective Schalk's signature?

 7        A.   It is.

 8        Q.   And the second one, the reporting officer's

 9   signature appears also to be Detective Schalk; is that

10   correct?

11        A.   Yes.

12        Q.   And then the last one appears to be Detective

13   Schalk, as well.  Do you see that?

14        A.   Yes.

15        Q.   Okay.  I'm going to ask you some questions

16   about this first one.  This is 179.  Do you see that

17   there's the name Emmett Wade up there and a phone number

18   next to his name?

19        A.   I see that.  Yes.

20        Q.   And then the date of this report is -- can you

21   read me the date into the record?

22        A.   Looks like 12 March '02.

23        Q.   Okay.  Did you review this document in

24   preparation for today's deposition?

25        A.   I probably saw it, yes.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       Q.   All right.  And the -- it's third watch.
2  Do you see that?
3       A.   Yes.
4       Q.   All right.  And that's the watch you were
5  working in March of 2002?
6       A.   Yeah, it was my normal watch.  Yes.
7       Q.   Okay.  And this is a GPR that at least has
8  some information about Mr. Wade on it, correct?
9       A.   It's got a phone number.
10       Q.   Okay.  Can you read the rest of this?
11  Can you read what it says here, sir -- where did I
12  highlight it on the left-hand side?
13       A.   Well, I can't read -- which -- which line are
14  we talking about?
15       Q.   There's three entries here on the left-hand
16  side of, you know, a third --
17       A.   Okay.
18       Q.   -- part of the way down.  Do you see that?
19       A.   Yeah.  The first line I cannot read.  The
20  second line I can't read.
21       Q.   Okay.
22       A.   Third line I could read, "taken."
23       Q.   What about the line -- two lines below that?
24       A.   Where it says -- I -- I can make out a word
25  "driver."

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   I'm talking about right here on the left-hand

2    column.  It -- I read it as, "Saw O-F-F period running

3    towards him three?"  Do you see that?

4    A.   Yes.

5    Q.   Okay.  And do you recognize that writing as

6    being Detective Schalk's writing?

7    A.   I do.

8    Q.   Okay.  Can you read anything else that's in

9    this little paragraph here?

10   A.   Oh, it was always hard to read his writing.

11   You know what?  Not without misdirection,

12   I couldn't -- I don't think I can read most of it.

13   Q.   Do you see on the right-hand column -- there's

14   some additional information?  There's a phone number and

15   a date and maybe a Social Security number.  And it says,

16   "Sister Leticia" or something Wade.

17   Do you see that?

18   A.   I see -- yes, something Wade there --

19   Q.   Okay.

20   A.   Yeah.

21   Q.   Do you believe that this is a GPR that was

22   created during an interview that you and Detective

23   Schalk conducted with Emmett Wade?

24   A.   It could be.  I'm not sure.

25   Q.   What do you recall about your interview with

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Video Deposition of Detective Robert Fries taken on 04/22/22 Page 126 of 182

124

1   Detective -- with -- strike that.  What do you recall

2   about your interview with Emmett Wade in 2002?

3        A.   I have no recollection.

4        Q.   Did you show Emmett Wade any photographs

5   during your interview with him in 2002?

6        A.   Not that I recall.

7        Q.   Do you recall going to Emmett Wade's home at

8   all?

9        A.   I don't recall.

10       Q.   Do you recall whether or not you interviewed

11  Emmett Wade with assistant state attorney, Jennifer

12  Walker?

13       A.   That's in reports.  I don't have independent

14  recollection, but it is in the -- in the reports.

15       Q.   Okay.  During your interview of Emmett Wade,

16  did you show him a single photograph of James Fletcher?

17       A.   Absolutely not.

18       Q.   During your interview of Emmett Wade, did you

19  indicate to Mr. Wade that James Fletcher was the

20  suspect?

21       A.   No.

22       Q.   During your interview of Mr. Wade, did you

23  tell him that James Fletcher was a bad guy that you

24  needed to get off the street?

25       A.   No.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1     Q.    During your interview with Mr. Wade, did you
 2  pressure him to identify a photograph of James Fletcher?
 3     A.    No.
 4     Q.    During your interview of Emmett Wade, did you
 5  pressure him to identify James Fletcher as one of the
 6  offenders that he saw during the shooting of Willie
 7  Sorrell in 1990?
 8     A.    No.
 9     Q.    Would he -- would it have been your normal
10  practice to show Mr. Wade a photo array?
11     A.    Depending on the situation.
12     Q.    Under what circumstances would you refrain
13  from showing Mr. Wade a photo array?
14     A.    If he says he could not identify anyone.
15     Q.    If Mr. Wade says he could not identify anyone,
16  you'd show him a photo array?
17     A.    I would not show him a photo array.
18     Q.    But Mr. Wade had previously told the police
19  that he potentially could identify the offenders,
20  correct?  It's in a police report we looked at already,
21  right?
22     A.    Well, he told us he do -- he couldn't, so what
23  he said before didn't apply to the present.
24     Q.    If Mr. Wade says that you showed him a single
25  photograph and pressured him to identify that photograph

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    as one of the suspects, is he lying?

2        A.   Yes.

3        Q.   If Mr. Wade says that you told him that James

4    Walker or Jimmy Walk -- strike that.  If Emmett Wade

5    says that you and Detectives Schalk told him that James

6    Fletcher or Jimmy Fletcher was a bad guy and that you

7    needed to get him off the streets, is he lying?

8        A.   Yes.

9        Q.   If Emmett Wade says that you and Detective

10   Schalk pressured him to identify Mr. Fletcher as the

11   suspect that he saw in the 1990 shooting, is he lying?

12       A.   He certainly is.

13       Q.   Is there anything that you can recall about

14   your interview with Emmett Wade in 2002?

15           MR. STEFANICH:  Objection.  Form.  You can

16       answer.

17           THE WITNESS:  Specifically, no.

18   BY MR. STARR:

19       Q.   Since you have no independent recollection,

20   is it possible that you showed Mr. Wade a photo array in

21   March of 2002?

22       A.   According to reports, no.

23       Q.   Since you have no independent recollection, is

24   it possible that you showed Mr. Wade a single photograph

25   of Mr. Fletcher in 2002?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.   No, that is not possible.

2    **Q.   Have you ever shown any witness a single**

3 **photograph of someone you thought was a suspect in any**

4 **case you worked on?**

5    A.   In only -- only if the case -- they knew the

6 person personally.  In other words -- in other words,

7 if they said, "Well, it was" -- "it was my neighbor,

8 Tom Jones."  I would show them a picture.  "Is this the

9 Tom Jones you're talking about?"  That was the

10 only -- absolutely only time in my entire career that

11 something like that would happen.

12    **Q.   So when Terry Rogers told you that he knew**

13 **James Fletcher and he knew that James Fletcher was one**

14 **of the shooters or one of the suspects in the Willie**

15 **Sorrell shooting, did you show Mr. Rogers a single**

16 **photograph?**

17    A.   No, I did not.

18    **Q.   Why not?**

19       MR. STEFANICH:  Objection.  This is asked and

20    answered at the last step, too.  You can answer

21    again.

22       THE WITNESS:  We wanted to make sure of his

23    information.

24 BY MR. STARR:

25    **Q.   You wanted to make sure of his information.**

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    What do you mean by that, sir?

2              MR. STEFANICH:  Objection.  Asked and answered.

3        You can answer again.

4              THE WITNESS:  I want to make sure that he

5        wasn't -- he was telling the truth.

6    BY MR. STARR:

7        Q.   And so you showed him a photo array of the

8    IDOC photos; is that correct?

9        A.   Yes.

10       Q.   And those photos included a photograph of

11   someone by the name of Arnold Dixon, who we know is also

12   James Fletcher, correct?

13       A.   Yes.

14       Q.   And did you go and -- after you met with

15   Emmett Wade in 2002, did you go interview Mr. Cooper

16   again at his home?

17       A.   I don't recall the timing on that.

18       Q.   Did you interview Mr. Cooper at his home in

19   2002 at any point in time?

20       A.   Yes.

21       Q.   And did you show Mr. Cooper a photo array

22   during that interview at his home?

23       A.   Yes.

24       Q.   And did you point out James Fletcher as a

25   suspect during that photo array after Mr. Cooper

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    indicated he could not identify anyone?

 2        A.   No.

 3        Q.   So if Mr. Cooper says that, is he lying --

 4        A.   First -- first -- first of all, you misspoke

 5    there.  He did -- he did point out the picture of James

 6    Fletcher as looking like one of the -- one of the

 7    offenders.  He could not be sure.

 8        Q.   Could I have the question read back into the

 9    record?  My last question?

10           THE REPORTER:  Yes.  Give me just one moment.

11        Well, it'd help if my sound was on.  I need to start

12        that for you.  Can you-all hear anything?

13           MR. STARR:  No.  But maybe we'll just move on

14        because we're wasting time.

15    BY MR. STARR:

16        Q.   Let me ask you again, sir.  When you showed

17    Mr. Cooper a photo array, did you -- strike that.

18    I already asked that.  When you showed Mr. Cooper a

19    photo array and he was unable to identify anyone, did

20    you point to a photograph of James Fletcher and tell him

21    that he was the suspect?

22           MR. STEFANICH:  Objection.  Form.  You can

23        answer.

24           THE WITNESS:  Okay.  Again, I'm going

25        to -- I'm going to say you misspoke again.
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      He did --

 2  BY MR. STARR:

 3      Q.   And that -- no --

 4      A.   He did -- he did --

 5      Q.   Because not -- I'm not being deposed.

 6  I'm asking you -- it's a yes or no question.

 7  Did --

 8      A.   I can't answer the question because

 9  you -- you were -- you misspoke --

10      Q.   Let me ask it again.  If Mr. Cooper has

11  testified that you pointed out James Fletcher, when he

12  told you that he could not identify anyone in the photo

13  array, if he has testified to that, is he lying?

14      A.   He tentatively picked a photo of James

15  Fletcher.

16      Q.   If Mr. Cooper has testified that he was unable

17  to identify anyone in the photo array, and he told you

18  and Detective Schalk that, and you pointed out the

19  photograph of James Fletcher, is he lying?

20      A.   Yes, he is lying.

21      MR. STARR:  Okay.  Let's take a five-minute

22      break.

23      THE REPORTER:  All right.  We are going off the

24      record at 12:40 p.m. Central.

25          (OFF THE RECORD)
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          THE REPORTER:  All right.  We are back on the

2      record for the deposition of Jerome Bogucki on

3      October 12th, 2023.  The current time is 12:57 p.m.

4      Central.  You may continue.

5  BY MR. STARR:

6      Q.   Mr. Bogucki, during the first deposition,

7  you testified that yourself and Detective Schalk would

8  regularly take notes during investigations that you

9  worked on, correct?

10     A.   We -- we took notes when we needed to or

11  wanted to.

12     Q.   Did you take any additional notes other than

13  what's found in the investigative file in this case

14  regarding this oral investigation?

15     A.   If we did, it would be in the file.

16     Q.   Okay.  So any notes you took would be included

17  in the investigative file, correct?

18     A.   Yes.

19     Q.   And that includes -- there -- you know there

20  was handwritten statements from some of the witnesses in

21  this case, correct?

22     A.   Yes.

23     Q.   If you participated or sat in during one of

24  the handwritten statements of a witness in this case,

25  would you have taken separate notes during that

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    interview?

 2         A.   No.

 3         Q.   Okay.  So any notes you took would be

 4    necessarily included in investigative file, correct?

 5         A.   Correct.

 6         MR. STARR:  All right.  I'm going to show

 7    you what I'm going to mark as Exhibit number 18.

 8    That's correct, right?

 9              (EXHIBIT 18 MARKED FOR IDENTIFICATION)

10    BY MR. STARR:

11         Q.   And this, for the record, is CCSAO Conflicts,

12    Fletcher, Dixon, Bogucki, 2047681761 through 1767, which

13    last time I don't believe you looked at.      Sir, do

14    you see the document on your screen?

15         A.   Yes.

16         Q.   Okay.  I'm going to scroll down just to show

17    you that this is a series of IDOC photographs, correct?

18         A.   Yes.

19         Q.   Do you recall -- strike that.  Is this the

20    photo array that you put together that you showed Edward

21    Cooper in 2002?

22         A.   It appears to be, but to be sure, I would have

23    to see the inventory.

24         Q.   Well, I represent to you the inventory just

25    says seven IDOC photographs.  I -- I'm not sure how that
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   would necessarily illuminate that more for you.

2   Do you -- can you tell me why that would help you

3   understand whether or not this is it?

4        A.   Well, the actual photo should be in the

5   inventory itself.

6        Q.   So the inventory report, which

7   I didn't -- have not shown you, does indicate that seven

8   IDOC photos were pulled, and then these are seven IDOC

9   photos.  So you can't say one way or the other if this

10  is the photo array that you showed Mr. Cooper, correct?

11       A.   I -- it -- it appears to be, but I can't say

12  for sure unless the actual inventory came forward.

13       Q.   Right.  And do you have any independent

14  recollection of actually pulling these photos and

15  showing them to Mr. Cooper?

16       A.   I don't know who exactly pulled the photos.

17  And --

18       Q.   Did you ever -- go ahead --

19       A.   Go ahead.

20       Q.   Did you ever show this photo array to

21  Emmett Wade?

22       A.   The photo array that is inventoried was the

23  one that was shown to Edward Cooper.

24       Q.   Did you ever show this photo array to

25  Emmett Wade, is my question?

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1        A.   I believe, no.

 2        Q.   Did you ever show this --

 3        A.   According -- according to reports, no.

 4        Q.   Did you show this individual photo of

 5   Mr. -- listed as Arnold Dixon, which we know is James

 6   Fletcher, do you show this individual photo to

 7   Emmett Wade?

 8        A.   Absolutely not.

 9        Q.   Okay.  Did you show this photo right to Sheene

10   Friend?

11        A.   I believe so, according to reports.

12        Q.   Do these individuals to you look like a fair

13   photo array?

14        A.   Yes.

15        Q.   Okay.  Is there anything about the photo of

16   Mr. Fletcher that is different, in your opinion, than

17   the photos of these other individuals?

18             MR. STEFANICH:  Objection.  Form.  You can

19        answer.

20             THE WITNESS:  I -- I really -- I have no idea.

21        They're -- I have no idea.

22   BY MR. STARR:

23        Q.   Did you ever tell anyone that Mr. Fletcher had

24   big lips?

25        A.   Did I ever tell anyone?  No.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q.   Did you ever instruct any of the witnesses to

2 remember the fact that Mr. Fletcher had big lips?

3      A.   Absolutely not.

4      Q.   Looking at this photograph, do you think that

5 Mr. Fletcher's lips are big?

6      A.   I -- I -- I would --

7      MR. STEFANICH:  Objection.  Form.  You can

8    answer.

9      THE WITNESS:  I would -- I would guess you

10    could say that, yes.

11 BY MR. STARR:

12      Q.   Do they appear to be bigger than any of the

13 other people in the photo array?

14      A.   That's -- it could be.  They might be.

15 I don't know.

16      Q.   Did you ever hear Detective Schalk or any

17 other police personnel indicating to a witness that they

18 need to remember the fact that Mr. Fletcher or

19 Mr. Dixon has big lips?

20      A.   No.

21      Q.   I'm going to show you what I'm going to mark

22 as Exhibit number 19.  And for the record, this is CITY-

23 JF-15245 through 15252. Sir, this is a Chicago Police

24 case supplementary report.  Do you see this?

25        (EXHIBIT 19 MARKED FOR IDENTIFICATION)

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.   Yes.
 2   BY MR. STARR:
 3        Q.   And it's -- at the top left-hand side,
 4   it says it's a cleared open arrest and prosecution
 5   report.  Do you see that?
 6        A.   Yes.
 7        Q.   All right.  Do -- did you review this document
 8   in preparation for today's deposition?
 9        A.   I have seen it, yes.
10        Q.   What is a cleared open report, sir?
11        A.   The case is cleared, so in other words,
12   it's solved, I guess you could say.  And the reason
13   being open is that there's a -- another offender that
14   can be sought.
15        Q.   And when you reviewed this document in
16   preparation today -- for today, did you see anything in
17   this document that you thought to be incorrect?
18        A.   Yeah, not that I know of.
19        Q.   And do you see on this final page here,
20   CITY-JF-15252, it says it's a report of Detective
21   Schalk, Bogucki and Noradin.  Do you see that?
22        A.   Yes.
23        Q.   And did you review this document before it was
24   submitted back in 2002?
25        A.   I believe so.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q.    And if you had seen anything in this document
 2   in 2002 that you thought was incorrect, what would you
 3   have done?
 4        A.    Corrected it.
 5        Q.    So the fact that this document was submitted,
 6   and it says it was a report of you and Detective Schalk
 7   and Detective Noradin, does that tell you that you
 8   approved this document before it was submitted?
 9        A.    Yes.
10        Q.    And you reviewed it today, and there's nothing
11   about it that you would change today, correct?
12        A.    I did not review it today.
13            MR. STEFANISH:  Objection --
14   BY MR. STARR:
15        Q.    I'm sorry.  But you reviewed it for -- in
16   preparation for the deposition, correct?
17            MR. STEFANICH:  Sean, let me get my objection
18       in.  Objection.  Mischaracterizes his testimony.
19       You can -- he probably needs you to ask the question
20       again.
21   BY MR. STARR:
22        Q.    You reviewed this document in preparation for
23   the deposition, correct, sir?
24        A.    I looked at it, yes.
25        Q.    Is there anything in the document that -- in
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    Exhibit 19 that you would change today that you think is

 2    wrong?

 3         A.   Not that I know of.

 4         Q.   All right, sir.  Do you have any independent

 5    recollection of participating in any of the handwritten

 6    statements in this case?

 7         A.   Independent, no.

 8         Q.   Did you participate in any of the handwritten

 9    statements in this case?

10         A.   According to the file, yes.

11         Q.   And you have no recollection of that

12    participation at all, correct?

13         A.   I didn't get that question --

14         Q.   You have no recollection of any participation

15    in those handwritten statements, correct?

16         A.   Not independent, no.

17         Q.   Did you review those handwritten statements in

18    preparation for today's deposition?

19         A.   I looked at them.

20         Q.   Did you see anything in those handwritten

21    statements that you thought was incorrect?

22         A.   I did not.

23         Q.   Did you see your hand -- your signature on

24    some of those handwritten statements?

25         A.   I don't know if it's one or two or -- I'm not
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  sure how many there are I might have set in on.

2      **Q.  If you signed that document back in 2002 -- if**

3  **you -- strike that.  I'm going to ask you, are you aware**

4  **that there's a man by the name of Frankie Benitez who**

5  **was recently exonerated in a case in which you were the**

6  **lead detective?**

7        MR. STEFANICH:  Objection.  Relevance.

8     You can answer.  And form.  You can answer.

9        THE WITNESS:  I have come to realize that, yes.

10  BY MR. STARR:

11     **Q.  Is that name, Frankie Benitez or Francisco**

12  **Benitez -- is that name a familiar name to you?**

13        MR. STEFANICH:  Objection.  Relevance.

14     You can answer.

15        THE WITNESS:  Not really, no.

16  BY MR. STARR:

17     **Q.  What do you recall about that case?**

18        MR. STEFANICH:  Objection.  Relevance.

19     You can answer.

20        THE WITNESS:  I only recall doing the scene on

21     that case at this point.

22  BY MR. STARR:

23     **Q.  It was a 1989 homicide investigation into the**

24  **death of two young kids near the intersection of Potomac**

25  **and Harding.  Does that refresh your recollection at**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    all?

2        A.   I remember that it -- I -- I -- I don't have

3    any independent recollection of where it was or when it

4    was.  I remember that there was such an investigation.

5        Q.   And the victims were named Prudencio Cruz and

6    William Sanchez.  Do either of those names refresh your

7    recollection at all?

8        A.   No.

9        Q.   Have you reviewed any documents related to

10   that investigation in preparation for the deposition?

11       A.   What deposition?

12       Q.   Today --

13       A.   This one?

14       Q.   Yeah.

15       A.   No.

16       Q.   Okay.  I'm going to show you a document,

17   which I'm going to mark as Exhibit number 20.  And for

18   the record, this is Fletcher 15897 through 15902.

19   Do you see this supplemental report on your screen, sir?

20           (EXHIBIT 20 MARKED FOR IDENTIFICATION)

21           MR. STEFANICH:  Hold on.  Object to

22       that -- like, a standing objection based on the fact

23       that we don't have the whole file on this case,

24       based on relevance that -- it wasn't these

25       allegations, and the Cruz case aren't contained in

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        the complaint.  And I think you're using this step

 2        for -- to get evidence in a potential -- another

 3        lawsuit.  So those are my objections, like a

 4        standing objection for those reasons.

 5   BY MR. STARR:

 6        Q.   Do you see those document, sir?

 7   The supplemental report?

 8        A.   I see it.  Yes.

 9        Q.   It's dated April 28th, 1989.  Do you see that,

10   sir?

11        A.   I do see that.

12        Q.   Okay.  And at the bottom here, do you see that

13   you and Detective Schalk are the detectives that signed

14   off on this report?

15        A.   I do see that.

16        Q.   And this is a multiple page report.  It says

17   that the location of the incident was 1253 North

18   Harding.  Do you see that, sir?

19        A.   I see it printed there, yes.

20        Q.   Okay.  And this is an initial report that you

21   submitted on this case?

22        A.   I don't know.

23        Q.   Okay.  Does any of the information that we

24   looked at in this report, the address, the date,

25   the name of the victims, the fact that you and Detective
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  Schalk are listed on the report -- does any of that

2  refresh your recollection?

3      A.   No, not at this time.

4      Q.   Okay.  I'm going to show you another report

5  from this case, sir.  I'm going to work this as Exhibit

6  number 21.  And for the record, this is going to be

7  Fletcher 15905 through 15909.  All right, sir.  This is

8  another supplemental report.  Do you see that?

9              (EXHIBIT 21 MARKED FOR IDENTIFICATION)

10     A.   I see that there is one, yes.

11  BY MR. STARR:

12     Q.   Okay.  And the date on this says April 28th of

13  '88.  Do you see that, sir?

14     A.   I see that.

15     Q.   And the address is the same as previous

16  address of 1253 North Harding, right?

17     A.   I do see that.

18     Q.   And the bottom here, you see that it -- your

19  name and Detective Schalk's name are both listed, and

20  that's your signature, correct?

21     A.   I see that.

22     Q.   Okay.  And you see that the arresting officers

23  include Officer Sparks, Officer Galligan, Officer

24  Vukonich, Officer Zacharias, and then you and Detective

25  Schalk?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.    Yes.

 2        Q.    Okay.  I'm going to direct your attention to a

 3   paragraph here on the third page, which the Bates is

 4   15907.  This -- just read this.  If you could read this

 5   first paragraph to yourself, and let me know when you're

 6   done?

 7        A.    Okay.  A part of is blocked off by our

 8   pictures here.

 9        Q.    Okay.  Well, let me know when you can see the

10   whole thing.

11        A.    All right.  I'll let you know

12            THE REPORTER:  If you look on there,

13        there's -- above where your photos are on the video,

14        there's four little icons.  If you press the second

15        one, it should shorten those icons for you.

16   BY MR. STARR:

17        Q.    You know, I'll just read it to you, sir.

18   "On April 29th, 1989, gang crimes north Officers Sparks,

19   Galligan, Vukonich, and Zacharias were assigned to

20   continue the investigation of the homicide occurring at

21   1253 North Harding.  At that time, those officers were

22   aware of a subject who fit the description of the

23   offender, and he was known to have frequent the area of

24   division in Keeler.  That was the area where witness

25   Mildred Cotto had previously observed the offender.  That
```



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   subject, Francisco Benitez, had previously been arrested
 2   by the gang crimes officers and had obtained a Polaroid
 3   photo of him.  That photo, along with five other photos
 4   of male white Hispanics, were shown to Mildred Cotto and
 5   Hipolito Rosado.  At the time, both witnesses identified
 6   the photo of Francisco Benitez as the person who they
 7   observed running from the scene at the time of the
 8   shooting.  That photo array was subsequently inventory
 9   at Area Five.  Francisco Benitez was located out in
10   front of his residence at 447" -- "4447 West Iowa.  He
11   was placed under arrest and transported at Area Five."
12   Did you hear that paragraph, sir?
13       A.   I did hear you.
14       Q.   Does that refresh your recollection at all of
15   this case?
16           MR. STEFANICH:  I'm going to object based on
17       not giving him a chance to read the entirety of this
18       report or the entirety of the other report.  That
19       objection.  You can answer.
20           THE WITNESS:  Well, it -- it -- it shows me
21       what happened there.
22   BY MR. STARR:
23       Q.   Okay.  Does it refresh your recollection at
24   all of this case is what my question was, sir?
25       A.   Not really.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.    All right.  And according to this report,

2    Mr. Benitez had been a suspect in a photo array,

3    correct?

4    A.    According to this report, yes.

5    Q.    And that's what it says here in that -- this

6    paragraph that I just read to you, correct?

7    A.    Yes.

8    Q.    And after reading this or hearing me read

9    this, it appears this photo array was conducted by gang

10   crimes officers, correct?

11   A.    That's what it says.  Yes.

12   Q.    And this report seems to indicate that the

13   photo array was -- the photos in the photo array were

14   chosen by the gang crimes officers, correct?

15   A.    Apparently.

16   Q.    And sitting here today, do you know which gang

17   crime officers chose the photos?

18   A.    I have no idea.

19   Q.    The part that I read to you does not indicate

20   that, does it?

21   A.    It does not indicate that, no.

22   Q.    And if gang crimes Officer Joseph Sparks has

23   previously testified about the photo array, do you have

24   any reason to dispute that -- I'm sorry.  If gang crimes

25   Officer Joseph Sparks had previously testified that he

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    was the one who arranged the photo array, do you have

2    any reason to dispute that he was the one who created

3    and conducted the photo array?

4           MR. STEFANICH:  Objection.  Form.  Foundation.

5       You can answer.

6           THE WITNESS:  I -- I have no reason because I

7       don't know.

8    BY MR. STARR:

9       Q.   And do you have any memory of any conversation

10   that you had with gang crimes Officer Joe Sparks about

11   this photo array?

12      A.   No.

13      Q.   If witnesses that viewed this photo array

14   selected fillers, would you have documented that they

15   had selected a filler?

16          MR. STEFANICH:  Objection.  Form.  Foundation.

17      Incomplete hypothetical.  You can answer.

18          THE WITNESS:  I don't know what you're asking

19      here.

20   BY MR. STARR:

21      Q.   So if any of the witnesses had reviewed

22   or -- strike that.  If any of the witnesses had viewed

23   this photo array, and they had identified a filler in

24   the photo array, would you identify in your report what

25   filler that was?
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1            MR. STEFANICH:  Objection.  Form.  Foundation.
 2       Incomplete hypothetical.  You can answer.
 3            THE WITNESS:  If that happened and we were told
 4       about it, it would be in there.
 5  BY MR. STARR:
 6       Q.   Well, you would -- I think -- I thought your
 7  testimony earlier is that you wouldn't identify what
 8  filler was identified.  Instead you would just -- you
 9  would write it up as a negative ID?
10       A.   Well, the whole thing is, I don't know what
11  type of photo array they showed -- they showed.
12  If they -- if they had more than one person in mind in
13  this photograph -- in this -- in these photos, it -- it
14  might be relevant, but I don't know that.
15       Q.   Okay.  I'm going to show you one more document
16  today, sir.  And this is going to be Exhibit 22, and
17  it's Fletcher 15923 through 15925.  Let me pull it up
18  here.  All right, sir.  Do you see this document on your
19  screen?
20            (EXHIBIT 22 MARKED FOR IDENTIFICATION)
21       A.   I see it.
22  BY MR. STARR:
23       Q.   And you can -- so I'll show you.  The Bates
24  stamp is 15923 through 15925.  Do you see that?
25       A.   Yes.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q.    And I'll represent you this is an affidavit

 2   that was signed by Joseph Sparks.  You see his signature

 3   right there?

 4        A.    I see it.

 5        Q.    And he signed it on 5-13-22.  Do you see that,

 6   sir?

 7        A.    That's what I see.

 8        Q.    It's a very short affidavit.  I'm going to ask

 9   that you read it to yourself and let me know when you're

10   done.  I'll scroll down.  When you need me to scroll

11   down, please let me know.

12        A.    Okay.  You can scroll down.  You can scroll

13   down some more.  You can scroll down some more.  Okay.

14   Some more.  You can scroll down some more.  Okay.

15   I got it.

16        Q.    Were you able to read that document in full,

17   sir?

18        A.    I did.

19        Q.    Okay.  I previously asked you if you knew who

20   gang crimes Officer Joseph Sparks was, and you testified

21   you did, correct?

22        A.    Yes.

23        Q.    You testified you worked with Joseph Sparks in

24   the past, correct?

25        A.    Yes.
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q.   And you testified that you thought Joseph

2  Sparks was a good police officer, and you never found

3  him to be untruthful, correct?

4     A.   I don't know if I said that, but I --

5  I -- I -- I would say that.

6     Q.   Okay.  And this is an affidavit of Joseph

7  Sparks about the Benitez case, correct?

8     A.   It's what it looks like --

9     Q.   Do you dispute --

10    A.   Something I've never seen before.

11    Q.   Do you dispute any of the information stated

12  by Joseph Sparks in this affidavit?

13    A.   That he has an opinion that he doesn't think

14  that Benitez is the offender?  I --

15    Q.   Do you dispute anything that's in the

16  affidavit?

17    A.   I don't -- I don't know what he is getting to

18  on that.

19    A.   Well, the affidavit states that Joe Sparks put

20  Mr. Benitez into the photo array as a filler, correct?

21    A.   That's what it says.

22    Q.   And yet your report lists Mr. Benitez as being

23  a suspect that was identified, correct?

24    A.   Apparently.

25    Q.   And earlier you testified that if you had a

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   filler who was identified by a witness, that would not
 2   make them a suspect, correct?
 3        A.   Not in my investigation, no.
 4        Q.   So why did Mr. Benitez become a suspect in
 5   this case?
 6        A.   I don't --
 7             MR. STEFANICH:  Objection.  Form.  Foundation.
 8        You can answer.
 9             THE WITNESS:  I have no clue at this point.
10   BY MR. STARR:
11        Q.   Okay.  I just have a couple final questions to
12   ask you here, sir.  Did you conspire with any police
13   officer in this case to deprive James Fletcher of his
14   constitutional rights?
15        A.   No.
16        Q.   Did you withhold any exculpatory evidence from
17   James Fletcher?
18        A.   No.
19        Q.   Did anyone present any exculpatory evidence to
20   you, which you then withheld, during the course of the
21   investigation?
22        A.   No.
23        Q.   Did you present any evidence to which -- did
24   you present any evidence -- strike that.
25   Did Mr. Fletcher present any evidence to you -- any
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    evidence to you that you then withheld?

2         A.    No.

3         Q.    Did any of the witnesses present any evidence

4    to you which you then withheld?

5         A.    No.

6         Q.    Did you hear of anyone receiving evidence from

7    Detective Schalk that was withheld?

8         A.    No.

9         Q.    Did you hear of any evidence of

10   anyone -- strike that.  Did you hear of anyone giving

11   any evidence to Detective Noradin that was withheld?

12        A.    No.

13        Q.    Did you hear of anyone receiving any evidence

14   from Tony Wojcik that was withheld?

15        A.    No.

16        Q.    Did you hear of any other police personnel

17   withholding any evidence in the James Fletcher case?

18        A.    No.

19        Q.    Has any of our discussion today refreshed your

20   recollection about the James Fletcher case any further

21   than what you've testified to?

22        A.    No.

23        Q.    Can you think of any documents that I could

24   show you that might refresh your recollection any

25   further than what you've already testified to today?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1    A.    Not that I can think of.

 2         MR. STARR:  Okay.  Brian, I think I'm done.

 3    I just need five minutes to double check my notes,

 4    okay?

 5         MR. STEFANICH:  All right.

 6         THE REPORTER:  All right.  Let me get us off

 7    the record really quick.  The current time is

 8    1:12 p.m. Central.  We are off the record.

 9         (OFF THE RECORD)

10         THE REPORTER:  All right.  We are back on the

11    record for the deposition of Jerome Bogucki on

12    October 12th, 2023.  The current time is 1:28 p.m.

13    Central.  You may continue.

14         MR. STARR:  Okay.  Mr. Bogucki, I think your

15    Counsel just said we have eight minutes.  I'll try

16    to get done in less than eight minutes.  I'm going

17    to show you one more Exhibit today.  It -- I'm going

18    to mark it as, I believe, Exhibit number 23, and

19    this is Bates individual Defendant's 1904 through

20    1938.  Can you bear with me?  I will share my screen

21    here.  Okay.  It's a document which is commonly

22    referred to and was testified to in this case by the

23    assistant state's attorney who prosecuted the case

24    by the last name of O'Connor as a blueback.  I don't

25    want to spend any time looking at it because it's

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        state's attorney notes, other than we need to -- and
 2        I want direct your attention to what's marked as
 3        individual defendant 1910.
 4              (EXHIBIT 23 MARKED FOR IDENTIFICATION)
 5   BY MR. STARR:
 6        Q.   Do you see the Bates stamp at the bottom
 7   there, sir?
 8        A.   Yes.
 9        Q.   Okay.  And then I'm just going to Zoom in here
10   at the top.  You see on the left-hand side there, it
11   says, "Detective Schalk, Detective Bogucki, Detective
12   Noradin"?
13        A.   I do see that.
14        Q.   And then below that, it says, "Received a
15   letter on 9-16 from Jenner and Block re" -- I'm not sure
16   what that is.  But then the next entry says,
17   "9-19" something.  Maybe "S-W.  Detective Bogucki,
18   re 1995 photo array.  He will check file." Do you see
19   that?
20        A.   I see it.
21        Q.   Do you have any independent recollection of
22   speaking with any of the state's attorneys who are
23   prosecuting this case?
24        A.   Did I speak to any of the state's attorneys
25   prosecuting this case --
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:20-cv-04768 Document #: 184-17 Filed: 05/06/25 Page 156 of 182

154

1     Q.    No.  Do you have any independent recollection

2  of any conversation you had with any of the state's

3  attorneys who were prosecuting James Fletcher?

4     A.    I don't at this point, no --

5     Q.    Okay.  Does the name Aidan O'Connor refresh

6  your recollection at all?

7     A.    I don't know if it refreshes my recollection,

8  but I do know who she is and that she did this case.

9     Q.    Okay.  Do you remember Aidan O'Connor or any

10  of the other state's attorneys asking you about the 1995

11  photo array?

12     A.    I do not.

13     Q.    Do you remember going back and checking your

14  file to see if you could locate the 1995 photo array?

15     A.    I do not.

16     Q.    Do you know whether or not you were able to

17  locate the 1995 photo array?

18     A.    I have no idea.

19     Q.    Okay.  I showed you that Sparks affidavit,

20  and you seemed a little surprised by that.  Were you

21  surprised by that affidavit, sir?

22          MR. STEFANICH:  Objection.  Form.  Relevance.

23     You can answer.

24          THE WITNESS:  Yes, I didn't know anything about

25     it.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JEROME BOGUCKI, taken on 05/06/25 Page 157 of 182

155

```
 1   BY MR. STARR:
 2       Q.   Why were you surprised?
 3            MR. STEFANICH:  Objection. He just said -- he
 4       just answered that question.  You can answer
 5       again --
 6            THE REPORTER:  I'm sorry.  We're missing that
 7       reason for objection there.
 8            MR. STEFANICH:  Sure.  Objection.  He just
 9       answered that question.  You can answer again.
10            THE WITNESS:  Why was I surprised?
11   BY MR. STARR:
12       Q.   Yeah.
13       A.   Because I had never seen it, and I didn't know
14   it existed.
15       Q.   Did you find any information in that affidavit
16   to be incorrect?
17       A.   I --
18            MR. STEFANICH:  Objection.  Form.  Foundation.
19       You can answer.
20            THE WITNESS:  I have no idea at this point.
21   BY MR. STARR:
22       Q.   Regarding the Fletcher case, have you ever
23   considered that perhaps you and your colleagues,
24   Detective Schalk, Detective Noradin, Sergeant Wojcik,
25   got this case wrong and that someone other than James
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Fletcher committed the crime?

2          MR. STEFANICH:  Objection.  Form.  You can

3       answer.

4          THE WITNESS:  If I thought I got the case

5       wrong, it wouldn't have been gone forward.

6    BY MR. STARR:

7       Q.    What do you --

8       A.    Right at this -- at this point in time,

9    I can't give you many opinions on this case because I

10   haven't seen the file, and I don't remember it.

11      Q.    Well, you know that Mr. Fletcher was

12   exonerated, correct?

13         MR. STEFANICH:  Objection.  Form.  You can

14      answer.

15         THE WITNESS:  I saw that on the news.

16   BY MR. STARR:

17      Q.    And you know that Mr. Fletcher received a

18   certificate of innocence?

19      A.    You told me that.

20      Q.    Yeah.  And does -- did -- does -- do those two

21   facts have any effect on your opinion of this case?

22         MR. STEFANICH:  Objection.  Form.  You can

23      answer.

24         THE WITNESS:  No.

25   BY MR. STARR:

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1       Q.   Is there anything that would change your

 2   opinion about whether or not James Fletcher is guilty of

 3   this crime?

 4       A.   Not that I -- not --

 5            MR. STEFANICH:  Objection.  Objection.  Form.

 6       You can answer.

 7            THE WITNESS:  Not that I'm aware of.

 8   BY MR. STARR:

 9       Q.   If Edward Cooper testified that he was not

10   able to identify anyone in 2002 or anyone today, would

11   that have any effect on whether or not you believe

12   Mr. Fletcher is guilty?

13            MR. STEFANICH:  Objection.  Form.  You can

14       answer.

15            THE WITNESS:  No.

16   BY MR. STARR:

17       Q.   If Emmett Wade testified that he was not able

18   to identify anyone, would that have any effect on

19   whether or not you believe Mr. Fletcher is guilty?

20            MR. STEFANICH:  Objection.  Form.  Miss --

21       objection.  Form.  You can answer.

22            THE WITNESS:  We knew that Emmett Wade -- he

23       said that he could not identify anyone.  So that

24       wouldn't change anything either.

25   BY MR. STARR:
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

FAX Deposition of Jerome Bowman taken on 09/06/22 Page 160 of 182

158

```
1        Q.   Well, in 1990, he said he could, correct?

2        A.   Apparently.  I wasn't there.

3        Q.   If Ms. Friend testifies that she was never

4   able to identify James Fletcher as the shooter, would

5   that have any bearing on whether or not you believe he's

6   guilty or not?

7             MR. STEFANICH:  Objection.  Form.  Misstates

8        the testimony.  Incomplete hypothetical.  You can

9        answer.

10            THE WITNESS:  No.

11  BY MR. STARR:

12       Q.   Is there anything that you -- that could

13  change your belief that Mr. Fletcher is guilty?

14            MR. STEFANICH:  Objection.  Asked and answered.

15            MR. STARR:  Yeah.  Strike that.  I'll

16       withdraw the question out.  You're right.

17       I did ask that.

18  BY MR. STARR:

19       Q.   Is there any evidence that you know of

20  suggesting that James Fletcher is guilty of the Willie

21  Sorrell shooting that we've not already discussed today?

22       A.   No.

23       Q.   Do you believe that James Fletcher is guilty

24  of the Willie Sorrell shooting?

25            MR. STEFANICH:  Objection.  You asked that
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1        first part of the dep.  You can answer again.
2            THE WITNESS:  I wasn't there.  I can only go by
3        what the witnesses told me.
4   BY MR. STARR:
5        Q.   Okay.  Is there anything you haven't told us
6   today about your role in the investigation of the
7   Willie Sorrell shooting?
8            MR. STEFANICH:  Objection to the phrase today.
9        Maybe you can rephrase it --
10           MR. STARR:  Yeah.  Yeah.  Thank you, Brian.
11  BY MR. STARR:
12       Q.   Is there anything else that you know about the
13  role you played in the investigation of the shooting of
14  Willie Sorrell that you haven't testified to at either
15  of the two depositions?
16       A.   No.
17           MR. STARR:  Okay.  I have no further questions.
18           MR. STEFANICH:  I have no questions.
19           MR. BURNS:  Neither do I.
20           THE REPORTER:  All right.  Perfect.  While we
21       are still on the record, I'm going to go ahead and
22       get everybody's orders really quick.  Mr. Starr,
23       did you want a copy of this deposition?
24           MR. STARR:  Yeah, I'll take a copy.
25           THE REPORTER:  Okay.  Electronic okay?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:20-cv-04768 Document #: 184-17 Filed: 05/06/25 Page 162 of 182

160

```
 1        MR. STARR:  Yeah, absolutely.

 2        THE REPORTER:  Okay, perfect.  And Mr. -- well,

 3   not Mr. Stefanich.  Mr. Burns, did you want a copy

 4   of the deposition?

 5        MR. BURNS:  No, I do not at this time.

 6        THE REPORTER:  Okay.  And then I do have to ask

 7   Mr. Starr, did you want the video since we're

 8   recording it?

 9        MR. STARR:  I don't need the video right now.

10        THE REPORTER:  Okay, perfect.  Mr. Burns, did

11   you need the video?

12        MR. BURNS:  No, not at this time.

13        THE REPORTER:  Okay.  Perfect.  And then

14   Mr. Michalik, did you want the video?

15        MR. STEFANICH:  He is not on anymore.

16        MR. BURNS:  Alex is no longer there.  Yeah --

17        THE REPORTER:  Oh.  All right.  All righty.

18   Oh, I put the wrong person.  Mr. Stefanich, did you

19   want a copy of the video?

20        MR. STEFANICH:  I don't need the video.

21   I'll take a copy of the transcript --

22        THE REPORTER:  Transcript?  Well --

23        MR. STEFANICH:  We'll reserve signature.

24        THE REPORTER:  Perfect.  And are we sending

25   that to you, or do you want us to send it directly
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   to Mr. Bogucki?

2        MR. STEFANICH:  Send it to me.

3        THE REPORTER:  Okay, perfect.  Let me go ahead

4   and get us off the record.

5            (DEPOSITION CONCLUDED AT 1:36 P.M. (CT))

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1                CERTIFICATE OF DIGITAL REPORTER

2                     STATE OF ILLINOIS

3

4    I do hereby certify that the witness in the foregoing

5    transcript was taken on the date, and at the time and

6    place set out on the Title page hereof, by me after

7    first being duly sworn to testify the truth, the whole

8    truth, and nothing but the truth; and that the said

9    matter was recorded digitally by me and then reduced to

10   typewritten form under my direction, and constitutes a

11   true record of the transcript as taken, all to the best

12   of my skill and ability. I certify that I am not a

13   relative or employee of either counsel and that I am in

14   no way interested financially, directly or indirectly,

15   in this action.

16

17

18

19

20

21

22   LINDSAY KATHRYN LOUISE LARSON-TODD,

23   DIGITAL REPORTER/NOTARY

24   MY COMMISSION EXPIRES ON: 11/01/2023

25   SUBMITTED ON: 10/23/2023
```

LINDSAY LARSON TODD
Official Seal
Notary Public - State of Illinois
My Commission Expires Nov 1, 2023

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibits**

Exhibit 7_
Bogucki
41:13,18

Exhibit 8_
Bogucki  61:5,
8

Exhibit 9_
Bogucki  66:6,
7

Exhibit 10_
Bogucki
71:15,16

Exhibit 11_
Bogucki
74:20,25

Exhibit 12_
Bogucki
94:17,18 95:11

Exhibit 13_
Bogucki
101:14,18

Exhibit 14_
Bogucki
106:2,5

Exhibit 15_
Bogucki
111:18,21

Exhibit 16_
Bogucki
115:7,8,10
120:11

Exhibit 17_
Bogucki
120:20

Exhibit 18_
Bogucki
132:7,9

Exhibit 19_
Bogucki
135:22,25
138:1

Exhibit 20_
Bogucki
140:17,20

Exhibit 21_
Bogucki
142:5,6,9

Exhibit 22_
Bogucki
147:16,20

Exhibit 23_
Bogucki
152:18 153:4

_____

0

00:40  97:17

02  109:4 121:22

_____

1

1  62:17

10  71:15,16

104  111:19

10:12  7:9

10:23  18:6

11  74:20,25
109:3

110  7:7

11:30  109:6,8

11:42  95:2

11th  109:8

12  94:17,18
95:11 121:22

1253  141:17
142:16 143:21

12:03  95:7

12:40  97:22
130:24

12:57  131:3

12th  7:8 95:7
106:20 115:21
116:1 131:3
152:12

13  101:14,18

14  106:2,5

15  9:23 111:18,
21

15252  135:23

15274  101:23

1538  98:24

15897  140:18

15902  140:18

15905  142:7

15907  143:4

15909  142:7

15923  147:17,
24

15925  147:17,
24

16  106:22,24
115:7,8,10
120:11

17  120:12,13,20

1767  132:12

179  120:19
121:3,16

18  132:7,9

180  120:19

181  120:16,19

19  68:13 97:16
135:22,25
138:1

1904  152:19

1910  153:3

1938  152:20

1980s  31:25

1989  139:23
141:9 143:18

1990  40:11,16
41:23 42:8
44:19 45:17
46:1,4,16 47:1,
9,23 48:16
49:13,17 51:2
52:10,25 53:15
54:4 55:18 58:8
59:2,9,14,24
60:25 61:2

71:5,7 85:20,25
88:5,9,13,17
125:7 126:11
158:1

1994  105:15,
19,22 113:5

1995  24:4,9,11
31:10 63:12,17,
18,23 64:2,5,8
65:19 69:9
70:3,11 72:8
73:6 74:10
75:21 77:6,15
81:17 82:4,8
83:8 84:25
85:3,8 86:9
89:3 91:12
92:3,9,20,23
93:5,11 94:2
102:13 112:19
113:13 153:18
154:10,14,17

1998  97:11

1999  97:13,16,
20,25 99:5,22
100:10,17,20,
23 101:2,8,9

19th  63:12,18
70:11 72:8 73:6
74:8,10 75:21
77:6,15 83:8
84:25 85:3
97:20

1:12  152:8

1:28  152:12

1:36  161:5

_____

2

20  140:17,20

20-cv-04768
7:17

20-something
105:15

2002  31:7
90:23,24 91:4
92:4,11,20
93:5,11 101:11
106:20 109:8

115:21 116:1
122:5 124:2,5
126:14,21,25
128:15,19
132:21 136:24
137:2 139:2
157:10

2023  7:8 95:7
131:3 152:12

2047681761
132:12

20:48  116:1

20th  113:5

21  142:6,9

21st  41:23 42:8

22  147:16,20

22nd  112:9
113:12

23  152:18 153:4

23:30  109:4,5

28th  141:9
142:12

29th  143:18

_____

3

3  62:17

_____

4

4  28:24 44:10
62:13,23 63:3

4238  98:11

4447  144:10

447  144:10

49  44:1

_____

5

5  28:24 46:13
63:5

5-13-22  148:5

50  44:1,10



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

51 41:16 49:1,2

**6**

6-13-96 103:16

60 95:17

60606 7:7

66 95:17

**7**

7 41:13,18
101:23

7-8-94 103:16

70 98:6

78 98:6

**8**

8 61:5,8 63:5

823141 98:9

85 95:12,20

88 142:13

**9**

9 66:6,7

9-16 153:15

9-19 153:17

95 68:13 73:7
74:8 90:12 91:9
112:9

95376 108:5

**A**

a.m. 7:9 18:6
95:2 97:22

absolutely
10:23 56:14
74:11 90:18
124:17 127:10
134:8 135:3
160:1

accusation
22:24

acting 55:2

action 68:20,
22 70:15

actively 21:13

actual 38:9
133:4,12

addition 9:7
32:7

additional
43:24 117:21
119:24,25
123:14 131:12

address 98:11,
14,24 141:24
142:15,16

adept 35:22,25

Admitted
103:16

advice 17:14
18:15

affidavit 148:1,
8 149:6,12,16,
19 154:19,21
155:15

affirm 8:15

agree 8:9 15:1
19:3,6,7 20:14,
16,17 99:15

agreed 8:7,12
17:11 46:12
47:18

agreement
17:7 18:8

ahead 35:11
60:2 104:24
117:8 133:18,
19 159:21
161:3

aid 39:5,14

Aidan 154:5,9

albums 31:4
51:5,23,25
52:16,22 56:17

alert 67:16 72:1
108:13 109:12,
18 111:3,8,9,
12,15 114:2,5

alerted 108:13

alerts 108:4
113:23

Alex 160:16

allegations
140:25

allowed
116:22 117:22

Angela 107:7

Anthony 7:12,
13

anymore
68:18 86:20
90:3 96:23
98:16 160:15

apologize 18:3
60:15 115:19

apparently
78:24 97:21
99:9 108:14
109:14 116:5
145:15 149:24
158:2

appearance
7:18

appeared
102:25

appears
106:19 107:6
112:9 115:25
121:9,12
132:22 133:11
145:9

apply 125:23

approved 84:9
137:8

approximately
49:7

April 8:25
141:9 142:12
143:18

area 34:3

35:17,19,20
36:7,10,18
37:6,14 46:13,
16 47:19,22,23
50:12,24 51:5,
14 59:15 76:12
87:1 90:10
108:5 110:2
114:11,12
143:23,24
144:9,11

Arnold 128:11
134:5

arranged
109:20 146:1

arrangements
109:22

array 24:8,10
25:19,20,23
26:6,8,17,18,23
27:19 30:17
32:9,12,14
33:10 47:1,10,
16 48:16 49:13,
20 51:2 56:17,
18,20 68:25
69:2 70:4,17,22
78:15 81:17
82:4,8,21 86:11
87:5,23 88:25
89:5,9 90:19
92:4,10,12,20
94:1 125:10,13,
16,17 126:20
128:7,21,25
129:17,19
130:13,17
132:20 133:10,
20,22,24
134:13 135:13
144:8 145:2,9,
13,23 146:1,3,
11,13,23,24
147:11 149:20
153:18 154:11,
14,17

arrays 32:19
33:1,19 93:23

arrest 11:1
76:25 78:5
95:24 102:1
106:9 108:15,
18,23 109:2

110:1 113:1,4,
20 136:4
144:11

arrested 57:25
67:2 90:22 91:1
107:22 108:12
109:8 110:7
144:1

arresting
142:22

arrests 104:5

assemble
32:14

assigned
63:15 143:19

assist 33:19

assistant
124:11 152:23

assume 10:2
22:11 24:23
65:23 116:13

assumed
12:15

attempt 12:25
84:18 85:2

attempted
84:15

attending
7:18,19,23 8:1,
4

attention 43:5
143:2 153:2

attorney 9:18,
21 124:11
152:23 153:1

attorney's
12:17,19 17:14
18:15

attorneys
19:22,25
153:22,24
154:3,10

attributed 49:3
50:2

audio 17:20



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-17 Filed: 05/06/25 Page 167 of 182 PageID #:5762
The Deposition of JEROME BOGUCKI, taken on 09/22/2022

165

August 97:16,
20 100:10
101:8

aware 16:12,15
18:21 21:5
29:17 114:2
139:3 143:22
157:7

_____

B

back 18:5 31:9
43:2 48:10 86:9
95:5 98:17
129:8 131:1
136:24 139:2
152:10 154:13

bad 79:9
124:23 126:6

badger 11:10

base 51:6

based 13:21
29:2 37:9
42:17,21 49:16
58:4,5 64:16
72:21 77:14
103:1,2 113:12
140:22,24
144:16

basis 67:19
93:24,25

Bates 41:15
43:6 49:2 74:23
95:16,20 98:5
101:22 106:11
120:15 121:2
143:3 147:23
152:19 153:6

bear 152:20

bearing 27:8
28:7 86:19,22
90:2 158:5

began 42:23

begin 8:19

behalf 8:3

belief 158:13

believed 78:25

Benitez 139:4,
11,12 144:1,6,9
145:2 149:7,14,
20,22 150:4

big 134:24
135:2,5,19

bigger 135:12

bit 9:24 66:2
97:15

Blacks 49:9,19

Block 153:15

blocked 143:7

blueback
152:24

Bogucki 7:11,
12 8:1,8,13
18:14,20 41:7
62:20 95:6,10
131:2,6 132:12
136:21 152:11,
14 153:11,17
161:1

Bogucki's
18:12

book 30:24
32:7

books 30:25
31:21 32:2
51:18 52:3,5
55:4,7,8

bottom 42:4
46:6,10 67:25
73:19 75:14
84:2 95:17
98:20 101:22
103:3 105:7
106:12 111:24
112:1 115:24
141:12 142:18
153:6

box 108:22

boy 13:6,10,14

break 94:20,
23,24 130:22

Brian 7:25
152:2 159:10

bring 34:14
52:14 100:6

brought 100:5

building
107:25

burning 92:17

Burns 41:2,5
159:19 160:3,5,
10,12,16

business 40:9

busy 34:13

_____

C

call 22:20
34:13 50:20
58:17 59:3,20
67:4 120:25

called 50:20
57:15,19 58:4,
19 66:21 72:1
80:3 96:19,20
109:19

calling 57:24

cancel 73:23

cancellation
66:24 67:11

capacity 29:25
34:20

CAPS 96:15,17

career 24:18
31:13,21,22
127:10

careful 44:13

Carlos 12:13,
21 13:4,7,8
14:6,9,13 19:18
20:2

case 7:16 9:5
10:6 13:1 16:6
19:14 20:12,19
21:23 23:11,14
24:1,2,11,19,20
25:15,17 27:9
28:7 39:20,23,
24 42:19,24
43:3 44:5,22

45:15 47:1
49:17 50:6
52:20 53:15
54:3,6,9 55:13
64:1,13 69:17
70:15 71:8
86:20,23 89:15,
24 101:6
112:14,19
118:8 127:4,5
131:13,21,24
135:24 136:11
138:6,9 139:5,
17,21 140:23,
25 141:21
142:5 144:15,
24 149:7 150:5,
13 151:17,20
152:22,23
153:23,25
154:8 155:22,
25 156:4,9,21

cases 21:13,22
22:16 23:1
34:4,20 35:7
37:11

category 43:6

CCSAO 132:11

Central 7:9
18:6 95:2,8
130:24 131:4
152:8,13

certificate
156:18

certified 17:3
18:18

certify 17:17

chance 144:17

change 22:16
137:11 138:1
157:1,24
158:13

changed 65:10
67:12,15 72:10
83:20

changing
22:13

characteristic
s 43:13,20

characterize
64:22

charge 104:14
105:1

charged 57:25
104:21

chasing 44:11

check 76:20,23
78:4,11 108:4
115:13 152:3
153:18

checking
154:13

checks 118:10,
17

Chicago 7:7,
13,14,24 8:4,5
29:8 34:23
36:4,21,25
37:16,19 41:25
58:8 78:10
106:25 107:4
116:16 117:13
135:23

choose 89:8

chose 85:10
145:17

chosen 145:14

circumstance
s 27:22 28:8,9
55:14 125:12

city 7:13,14,24
8:4

CITY- 135:22

CITY-JF 94:17

City-jf--66
95:12

City-jf-104
112:2,24

CITY-JF-113
61:6

CITY-JF-136
71:18

CITY-JF-15252
136:20



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

CITY-JF-15274 101:15

CITY-JF-1574 101:23

CITY-JF-179 120:16

City-jf-18 106:2,3,12

CITY-JF-4544 115:8

CITY-JF-47 41:15

CITY-JF-48 43:6

CITY-JF-52 74:21,24

CITY-JF-97 66:9

CITY-JF-98 111:19,24

civil 20:9,18,25

claimed 80:2

clarifying 38:18

clear 10:19 25:13

cleared 136:4, 10,11

Clinton 68:25 69:3,22 70:18 71:10 76:11,16, 24 77:17 78:4, 7,17,22 86:19, 22 87:24 89:14 90:1,7,19 92:4, 6,11,13,15 93:1 94:1 98:19 99:17,21 100:17,20,23 101:1 102:1,17, 20 103:4 104:2, 13,21 105:19, 22

Clinton's 76:20 77:23 92:23 93:16 98:6

close 76:17 93:14

clue 46:17,20, 23 48:19 150:9

coerced 22:12

cold 9:25 42:18,23,24 43:3 44:5 45:14 64:1

colleagues 155:23

column 62:2 72:12 123:2,13

columns 62:2, 8,9,12

commit 17:4

committed 156:1

committing 15:8

common 118:18

commonly 152:21

competent 54:11

Complainant 107:24

complaint 141:1

complaints 107:23

computer 118:3

conceal 12:20, 22

concept 38:1

concern 31:18

concerns 80:9 91:19

CONCLUDED 161:5

conclusion 15:4 17:10

conduct 30:4, 16,23 32:9,15 33:18,23

conducted 25:20 26:6 33:10 48:13 51:2 76:2 78:15,18 123:23 145:9 146:3

conducting 29:15,18 33:20 100:9

conference 7:10

confessing 12:13,21 13:4

confession 12:12,20 13:3 19:18 20:2,4

Conflicts 132:11

confuse 25:18

conjunction 35:18

connected 22:21

considered 155:23

consistent 28:15 29:7,13

conspire 150:12

constitutional 150:14

contact 108:19

contacted 108:5

contacting 107:11

contained 140:25

continuation 8:24

continue 95:8 131:4 143:20

152:13

convened 7:9

convenient 56:6

conversation 146:9 154:2

convicted 16:13

conviction 13:11,16 16:16 21:6 104:25

convictions 22:9

Cooper 44:15, 19 45:1,4,16,23 46:1 68:24 69:3,18 70:4,17 76:6,12,17 77:12 78:15,19, 21,25 79:6 80:12,16,20 81:4,6,17 82:4, 8,20 83:4,13,14 86:12 87:5 89:1,10,17 91:5,8,12,21 92:3,9,14,25 93:15,19 94:1 102:13 103:19 128:15,18,21, 25 129:3,17,18 130:10,16 132:21 133:10, 15,23 157:9

Cooper's 83:8

cooperation 53:20

copies 72:15

copy 72:6,17 108:22 159:23, 24 160:3,19,21

corner 41:22

correct 9:1 14:23 16:9,17 17:16 18:16 19:1,18 20:3, 10,12 21:7 22:3,5 23:6,23 24:2,7,9,20

25:4,18,24 26:8 27:2,14,21 28:1,2,12 29:5, 6 40:12,18 42:19,24 43:10, 11,14,15 44:7, 19,23 46:4 50:6 51:10 52:7,10, 23 53:17,24 56:20 58:9,13 59:11,12,16,21 62:25 63:1,3 64:2,5,6,13,18 66:12 69:25 70:4,12 71:5,6, 10 73:2,16,21 74:17,24 77:6, 17 79:1,21,24 82:15,22 83:1,2 84:16 85:23 86:2,23 87:7 88:11,15,19 89:1,6,7 90:22 91:1,2,6,13,17 93:2,8,11 94:10 97:4,8,22 98:7 99:12,17,18 101:11 102:20 103:19,23 104:6 105:4 108:19 109:9 110:16 111:8 112:5,11,19 113:2,13,16 114:13 115:14, 19 116:4,11 118:20 119:11 120:8 121:10 122:8 125:20 128:8,12 131:9, 17,21 132:4,5, 8,17 133:10 137:11,16,23 138:12,15 142:20 145:3,6, 10,14 148:21, 24 149:3,7,20, 23 150:2 156:12 158:1

Corrected 137:4

Cotto 143:25 144:4

counsel 7:20

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

10:9 18:9
152:15

couple 119:19
150:11

court 7:5,6,15
16:9,13

cousin 44:12

cousins 45:1

coworker
36:24

create 32:19
33:1,18

created 64:17,
19,21 75:17
97:11 106:19
123:22 146:2

creating 77:9

crime 15:8
30:23 32:1,8,25
40:12 59:6
80:17 81:8,11,
14 91:6,13,22
92:6 145:17
156:1 157:3

crimes 29:21
30:4,17,20
32:14,18 33:10,
18,24 34:19
36:10,12 37:3
143:18 144:2
145:10,14,22,
24 146:10
148:20

criminal 16:13
19:1,4,8,13
57:4,6 79:17,21
86:25 90:10
92:24 93:15
102:2 103:4
105:18,21
112:4,8

Cruz 140:5,25

CT 161:5

current 7:8
95:2,7 131:3
152:7,12

custody
103:15 108:1

cut 17:20

D

dark 90:12

date 41:22
51:19 55:4,8
63:12,14,15,17,
19 64:9,12
68:4,11 70:13
72:7,8 74:9
75:20,23 85:9
97:13 105:13
108:23 109:1
113:4,16
115:18,20
121:20,21
123:15 141:24
142:12

dated 141:9

day 7:8 110:9

dead 11:17
12:2

death 16:16
17:5 139:24

December
41:23 42:8

deemed 55:7
119:9 120:1

defendant 8:4
20:12 100:22
153:3

Defendant's
152:19

defense 18:8

definition 39:1

dep 159:1

Department
29:8 42:1 78:11
116:17 117:13

depending
100:4 125:11

depends 54:24

deposed 130:5

deposition
7:10 8:25 9:4,

14 18:6 23:20
38:3 42:12,13,
15 45:13 61:17
66:17 75:11
95:6 96:6,14
97:12 106:15
113:8 121:24
131:2,6 136:8
137:16,23
138:18 140:10,
11 152:11
159:23 160:4
161:5

depositions
159:15

deprive 150:13

description
43:9 44:18
143:22

destroyed
118:14

detail 120:18

detective
17:18 18:22
21:22 23:3
25:19 29:15,20
30:3,15 33:9,17
34:4,19,23
35:18 36:2,10,
15 53:8 54:11
55:6 75:14,17
81:13 85:21
86:1,21 100:19,
22,25 112:10
114:16 121:6,9,
12 123:6,22
124:1 126:9
130:18 131:7
135:16 136:20
137:6,7 139:6
141:13,25
142:19,24
151:7,11
153:11,17
155:24

detectives
21:23 23:3
29:17 32:9
34:12 68:23
69:1 76:10 94:3
126:5 141:13

determine
15:16

determined
70:7,20

dictated 29:17

digital 7:5

direct 8:20
43:5 44:9 98:4
143:2 153:2

directly 160:25

disallowed
31:20

disclose 13:3
19:16,24

discovery
96:9

discussed
10:9 69:7 70:19
158:21

discussion
69:8 151:19

dispute 145:24
146:2 149:9,11,
15

disregarded
88:8

district 7:15,16
67:5 106:22,24
107:4 108:2

division 7:16
143:24

Dixon 128:11
132:12 134:5
135:19

DOC 77:2

document
25:4,23 26:8,
14,24 27:1
28:10 41:13,17
44:10 45:20
61:7,11,12,14,
21,24 63:8
66:6,10,12,14,
16,20 67:19,20
71:14,19,21,23
74:13,22 75:3,
5,7 78:14 84:6,

8 94:16 95:12,
23 96:1,6,9,15,
16 97:6,8,11,19
98:5 99:19
100:2 101:13,
16,17,25 102:3
103:22 105:6,8,
25 106:3,8,14,
19 107:3,17
111:17 112:23
113:7,17 115:7,
9 116:3 118:14
121:23 132:14
136:7,15,17,23
137:1,5,8,22,25
139:2 140:16
141:6 147:15,
18 148:16
152:21

documented
26:16,18 82:22
146:14

documenting
28:11 82:18

documents
9:11,15 38:4,
11,23 39:5 41:9
64:15,18 65:8,
16 119:4 120:2,
23 140:9
151:23

Dolan 108:5

double 152:3

doubt 80:13,15
82:23 101:3,4
102:8,10
113:15,18

Drive 7:7

driver 122:25

drug 40:9
59:15 76:25
78:5 79:9
80:22,24 81:2
104:5,20

drugs 40:9

E

earlier 31:21
64:7 108:11



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

147:7 149:25

earliest 63:19

early 31:13

Eastern 7:16

Edward 44:19
45:1 70:4 76:6,
12 78:19 87:5
102:12 132:20
133:23 157:9

effect 156:21
157:11,18

Elder 11:16
12:1,8

Electronic
159:25

Emmett 49:3
84:19,25 92:12
121:17 123:23
124:2,4,7,11,
15,18 125:4
126:4,9,14
128:15 133:21,
25 134:7
157:17,22

encountered
114:8

end 51:8 78:3
98:5

entered 107:24

entire 42:19
127:10

entirety 31:12
144:17,18

entries 65:4,5
66:3 122:15

entry 107:25
153:16

Eric 10:13
11:18 12:2,14
13:15 14:10
15:2,9,21
16:16,23 17:5
18:21

Ernest 36:6,9,
20

essentially

67:16

everybody's
159:22

evidence
12:25 14:12
15:10 30:12
47:13 48:18
52:12 59:4
141:2 150:16,
19,23,24,25
151:1,3,6,9,11,
13,17 158:19

exact 63:17

EXAMINATIO
N 8:20

Excellent 9:24

exculpatory
150:16,19

Excuse 40:21

exhibit 41:13,
18 61:4,5,8
66:6,7 71:15,16
74:19,20,25
94:17,18 95:11
101:14,18
106:2,5 111:18,
21 115:7,8,10
120:11,20
132:7,9 135:22,
25 138:1
140:17,20
142:5,9 147:16,
20 152:17,18
153:4

exhibits 41:14

existed 155:14

exonerated
21:6,12,21 23:2
139:5 156:12

experience
29:2 32:1 53:7,
8 72:23

expire 67:17,
22

explain 25:6

explanation
16:2 22:7 85:10

F

fact 8:8 10:20
17:9 18:12
22:16 45:1
47:21 48:5
65:15 74:8
80:16 82:18
100:3 102:23
110:23 135:2,
18 137:5
140:22 141:25

facts 156:21

fair 39:12
134:12

false 80:9,19

familiar 36:7
37:4 50:5 61:11
79:7 139:12

familiarized
44:5,21

family 79:8

fast 21:17

February 64:8
106:19 109:4,8
112:9,19
113:12 115:21
116:1

federal 20:9

feel 55:1,2

feeling 73:12

figure 87:21

file 42:19 47:4,
11,24 48:6,16
61:13 63:10
64:10,15,18,23,
25 65:8 81:18
82:5,9 96:7,10
102:7 118:11,
20 119:5,10,17
120:2 131:13,
15,17 132:4
138:10 140:23
153:18 154:14
156:10

files 31:16
65:12

fill 68:15 83:18

filler 25:2,21,22
26:7,13 27:5,
13,19,21,25
28:10,11 29:3,4
146:15,23,25
147:8 149:20
150:1

fillers 82:21
146:14

final 136:19
150:11

finally 80:1

find 44:15
66:25 69:17
72:16 83:11,12
84:16,18 85:2,5
86:5 92:11,22
111:7,10
155:15

finding 44:25
109:18

fine 72:19

fired 49:8

firm 7:22 22:22

fit 143:22

five-minute
94:19,22,24
130:21

five-page
79:15

Fleming 42:6
85:21 86:1

Fletcher 7:11,
23 22:5,6 23:14
24:1,2,11,19,20
25:15,17 30:12
40:2,16 50:21
57:3,12,16,20
58:1,4,6,9,12,
13,17,19,24,25
59:4,5,11,21,25
68:25 69:3,22
70:18 71:4,10
76:11,16,24
77:16,23 78:4,7
80:4 83:15
86:16,19,22

87:1 89:14
90:7,9,15,19,25
91:5,17,20
92:4,6,10,13,
15,23 93:1,16
94:1 98:6,19
99:8,11,14,17,
21 100:6,14,17,
20,23 101:1
102:1,17,20
103:4 104:13,
21 105:19,22
114:20,21
115:14 116:7,
10,22,23 117:5,
12,22,23 118:7,
9,18 124:16,19,
23 125:2,5
126:6,10,25
127:13 128:12,
24 129:6,20
130:11,15,19
132:12 134:6,
16,23 135:2,18
140:18 142:7
147:17 150:13,
17,25 151:17,
20 154:3
155:22 156:1,
11,17 157:2,12,
19 158:4,13,20,
23

Fletcher's
76:21 116:17
117:3,14 135:5

Fletchers
93:14,19 99:7
116:16 118:7
120:8

Fletchers'
118:14

flooding 93:23

focused 77:16

force 10:12

forgive 66:1

form 10:14,21
11:2,12,19 12:4
14:16 15:3
16:5,10,25 17:6
19:10,19 20:20
21:1,24 22:10
23:13,16 24:13,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

21 25:25 27:15 28:17 29:23 30:7 31:1 32:3 33:21 38:17 39:7,8,15 45:7, 19 46:18 49:21 51:15 52:11 53:18,25 54:15 55:11,25 57:21 58:20 65:18,21 76:4 77:18 81:19 86:6 87:8 90:4 91:7 104:7,16 116:24 117:16, 25 118:21 120:3 126:15 129:22 134:18 135:7 139:8 146:4,16 147:1 150:7 154:22 155:18 156:2, 13,22 157:5,13, 20,21 158:7

format 72:10

forward 133:12 156:5

found 16:9 76:2 103:18,23 105:4 131:13 149:2

foundation 11:2 14:16 15:3 16:5,11,18 17:6 19:19 21:8,24 22:10 26:1 28:17 29:11 30:7 31:1 32:3, 21 33:4 45:7,19 46:18 47:5,12, 25 48:8,17 53:3 81:19 99:23 146:4,16 147:1 150:7 155:18

Francisco 139:11 144:1,6, 9

Frankie 139:4, 11

frequent 143:23

Friend 46:7,15 53:23 55:19 85:2,8 86:1 88:18 92:20,22 134:10 158:3

frivolous 92:18

front 144:10

full 148:16

funny 40:7

———————
G
———————

Galligan 142:23 143:19

gang 29:21 30:4,13,17,20, 21,23,25 31:21 32:1,2,7,8,13, 18,25 33:10,18, 24 34:19 35:23 36:10,12 37:3 143:18 144:2 145:9,14,16,22, 24 146:10 148:20

gave 19:4,8 20:15,18,24 24:19 45:17 83:15

general 29:3,4 75:16 82:17 83:17 103:18, 23 104:1 105:4 118:16

generally 23:21 25:14,15 30:15 38:6,7

generated 65:16 97:20 116:4

give 8:16 60:1 72:16 74:22 80:18 116:21 117:20 129:10 156:9

giving 12:19 80:9,19 91:20 144:17 151:10

good 8:22 37:17,23 40:9 54:10 56:7,12 119:3 149:2

GPR 75:6 102:19 103:2 121:1 122:7 123:21

GPRS 84:13

greatest 72:6

group 117:4

guess 16:1 53:5 56:8 64:9 85:6 104:3 112:16 120:5 135:9 136:12

guessing 31:11 100:5

Guevara 34:5, 8,18 35:8,20

Guevara's 34:23 36:4

guilt 14:13

guilty 15:8,12, 20 157:2,12,19 158:6,13,20,23

guy 23:4 28:23 124:23 126:6

guys 36:17

———————
H
———————

habit 79:9

half 42:13,14

Halvorsen 36:7,9,20

hand 8:14 138:23

handwriting 61:23 62:3,9, 14,18,19,24,25 73:19 103:5,7,9 107:3,5

handwritten 73:18 103:21 108:21 131:20,

24 138:5,8,15, 17,20,24

happen 110:22,23 127:11

happened 24:20 28:19 30:19 32:16 34:17 39:24 48:6 90:14 94:13 144:21 147:3

hard 36:5,19 72:15,17 123:10

Harding 139:25 141:18 142:16 143:21

hear 9:25 17:20 34:22 35:2,21 46:22 94:21 129:12 135:16 144:12,13 151:6,9,10,13, 16

heard 13:24 50:19 58:17 59:3,19,20 79:8

hearing 145:8

helpful 72:16

highlight 122:12

highlighted 44:10 46:10 49:7 50:8 76:9

highlighting 72:3 108:24

highly 101:3,4

Hipolito 144:5

Hispanics 144:4

histories 118:10,19 119:8,15,16,25

history 44:2 57:5,6 77:23 78:6 79:17,21

24 138:5,8,15, 17,20,24

86:25 90:10 92:24 93:15 102:2,11,20 103:4 105:18, 22 111:11 112:5,8,11,14 115:13 116:7 117:13,14 118:6

Hold 108:8 140:21

home 76:6 78:18 98:14,23 124:7 128:16, 18,22

homicide 10:13 16:23 18:20 33:11,17, 19 38:16 39:6 42:1 43:3,17 54:11,12 64:1 65:17 96:10 97:3 100:9 101:8 102:8 108:4 109:22 114:9 139:23 143:20

homicides 35:23

house 83:8

hurry 50:20

hypothetical 49:22 53:19 54:1,16 55:25 146:17 147:2 158:8

———————
I
———————

icons 143:14, 15

ID 10:18 23:12 24:1,6 25:4,7 26:19,20 28:11 30:24 82:15,18 147:9

idea 22:23 47:15 48:2 97:5 100:11 105:20 109:16 112:12

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

134:20,21
145:18 154:18
155:20

identification
23:21,23 24:5,
6,12 25:3,7,21
26:7,17 29:16,
18 30:16 32:8
41:18 61:8 66:7
71:16 74:25
83:1 94:18
101:18 106:5
111:21 115:10
120:20 132:9
135:25 140:20
142:9 147:20
153:4

identifications
14:14,21,22

identified
25:2,22 26:13,
23 27:5,18
28:12 82:20
107:23 144:5
146:23 147:8
149:23 150:1

identifies
27:13,24

identify 10:12
11:5 14:19 16:3
27:2,12 45:4,
16,18 46:11
49:9,18 51:9
53:9 54:22 55:3
85:22 86:2 87:6
88:10,14,18
89:17 92:10
125:2,5,14,15,
19,25 126:10
129:1,19
130:12,17
146:24 147:7
157:10,18,23
158:4

identifying
116:21

IDOC 128:8
132:17,25
133:8

IDS 23:22
24:17 30:25

illegible 108:2

Illinois 7:7,16

illuminate
133:1

imagine 65:1

immediately
27:20,25

implicate
10:25

improper 28:3

incident
141:17

include 119:4,
16 120:1
142:23

included
47:10,24 48:6
87:23 118:10,
19 119:10
128:10 131:16
132:4

includes
131:19

Including 20:2
22:5 99:17

Incomplete
49:21 53:18,25
54:15 55:24
146:17 147:2
158:8

incorrect
136:17 137:2
138:21 155:16

indefinitely
67:10

independent
32:17 33:6
38:1,8,14 39:1,
10,13,23 41:7,
11 43:1 46:24
52:21,24 57:10
61:19,22 68:2,
6,8 74:12 77:8,
11 94:8,12,14
96:4 110:14,20,
24 114:25
115:3 116:12
124:13 126:19,

23 133:13
138:4,7,16
140:3 153:21
154:1

independently
39:5 40:8 74:15
77:10 110:13

indicating
135:17

indication
45:3,15,17
104:20

individual
76:16 107:24
134:4,6 152:19
153:3

individuals
23:2 87:7
100:13 119:15,
25 134:12,17

information
19:16,17 33:25
43:24 44:22
61:20 76:2 77:5
80:10,12,19
90:21 91:3
103:18,21,22
105:3 116:22
117:21 122:8
123:14 127:23,
25 141:23
149:11 155:15

initial 141:20

innocence
156:18

innocent 15:1
16:9

insignia 96:17,
18

instance 34:16

instances
28:22

instruct 135:1

instructing
17:8,12 18:9

intend 87:23

intended 76:12

88:2

interest 104:11

interpreter
34:10

interrogate
10:11

interrogating
11:11

interrupt 14:9
17:19

intersection
139:24

interview
114:15,17,19
123:22,25
124:2,5,15,18,
22 125:1,4
126:14 128:15,
18,22 132:1

interviewed
73:24 74:2,5,9
76:5 114:12
124:10

interviewing
77:12 83:4

inventoried
133:22

inventory
61:13 65:8
132:23,24
133:5,6,12
144:8

investigate
80:23 81:7 92:5
93:1,4,13

investigating
21:23 99:6,21
100:12,16,20,
23 101:1

investigation
16:23,24 17:5
18:20,23 21:14
30:2 33:19
38:15 39:6
42:23 44:2,6
55:18 57:2,11
58:11,12 63:9,
16,20,22 65:17,

20 68:21 75:18
80:6,8 90:3
93:11 96:11
97:3 99:6,20
100:8 102:8
105:23 107:14,
19 114:8 119:5,
16 131:14
139:23 140:4,
10 143:20
150:3,21 159:6,
13

investigations
22:8 29:25
33:11 34:7
35:23 131:8

investigative
61:13 67:15
70:15 72:1
81:18 82:5,9
83:8 87:22
96:10 101:7,10
102:7 108:4,13
109:12,18,21
111:3,8,9,12,15
113:23 114:2,5
118:11,19
119:5,7,10,17
120:2 131:13,
17 132:4

involved 14:22
21:13 30:12
59:5 60:4,20
80:17 81:8,11,
14 91:6,13,22
92:6,13 93:1

involving 69:3
70:18

Iowa 144:10

IR 62:15 76:23
77:23 78:4,6,11
98:9 102:2,11,
19 111:11
112:5,11,13
115:13 116:6
117:13,14
118:6,10,19
119:8,14,16,24

irrelevant 30:8
31:2 32:4,22
33:5,12 35:6



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

issued 113:24

**J**

jail 11:8

James 7:11,23
58:4,24 59:5,
11,25 86:16
90:25 91:4,17,
20 114:20
115:14 116:7,
10,16,17,22,23
117:3,5,12,14,
21,23 118:7,9,
13,18 120:7
124:16,19,23
125:2,5 126:3,5
127:13 128:12,
24 129:5,20
130:11,14,19
134:5 150:13,
17 151:17,20
154:3 155:25
157:2 158:4,20,
23

January 64:8

Jenner 153:15

Jennifer
124:11

Jerome 7:10,
12 8:8 95:6
131:2 152:11

JF 61:6

JF-15245
135:23

Jimenez 10:6,
12,19,20 11:1,
18 12:3,9 13:1,
12,16 14:14,19
15:1,7,12,20
16:8,12 19:14
20:10,25 21:5
23:10,19

Jimenez's
16:15 19:1
20:18

Jimmy 114:20
117:22 126:4,6

job 28:16 29:9

Joe 37:4,6,13,
21 146:10
149:19

Jones 127:8,9

Joseph
145:22,25
148:2,20,23
149:1,6,12

Jr 7:11

Juan 12:13,21
13:4,6,7 14:6,9,
13 19:17 20:2

**K**

Keeler 143:24

keeping 31:20

Kentuckiana
7:6

key 93:6

kids 139:24

kind 28:23,24
31:16,20 40:6
51:19,21 65:10

knew 19:17
35:22 37:10
59:2,5,10,24
83:16 88:5
114:20 127:5,
12,13 148:19
157:22

knowing 51:23

knowledge
52:21 101:5

**L**

labeled 46:7

Larry 10:11

law 7:21 16:9
22:22

lawful 107:25

lawsuit 35:7
141:3

layman's

109:5

lead 23:3 139:6

Leamington
98:24

learned 28:16
76:10 78:24
90:17,21,24
91:3,12

learning 43:16,
19 76:15 91:5

left 10:5 43:7
72:14

left-hand 62:2,
7 96:16 105:9
122:12,15
123:1 136:3
153:10

legal 15:4
17:10

Leticia 123:16

letter 153:15

liar 11:11

life 67:21

limit 67:22

Lindsay 7:4

lines 62:17
63:5,6 122:23

lineup 12:10
25:10 26:12,13,
14,17,19,22
27:19 28:10
30:3,5

lineups 48:11,
12

lips 134:24
135:2,5,19

list 65:7

listed 43:13
67:24 107:25
134:5 142:1,19

listening 68:22

lists 149:22

live 27:19
93:14

lived 76:11,16
86:25 90:10

locate 154:14,
17

located 7:6
62:3 144:9

location 7:19
141:17

lockup 28:7

Loevy 7:22

long 9:21 14:7
67:14 73:12
79:18 110:6
114:17

longer 74:3
160:16

looked 9:13
28:23 45:5 51:4
56:7,23 66:18
69:14,16
125:20 132:13
137:24 138:19
141:24

lot 58:7

lying 126:1,7,
11 129:3
130:13,19,20

**M**

made 10:19
26:25 40:15
47:3 56:12

Madison 50:13

main 92:16

maintain 15:7,
11

make 25:13
27:20 30:25
40:24 41:1
72:13 81:17
82:25 108:23
109:22 122:24
127:22,25
128:4 150:2

making 22:24
31:19 40:17

lived 76:11,16

male 49:9,19
144:4

man 12:13 13:8
16:4 49:3 50:16
56:23 57:15,19,
20 58:16,17,18,
19 59:3,20
139:4

managed
14:13

March 63:12,
18 64:4 65:19
68:13 70:10
72:8 73:5 74:8,
10 75:20 77:6,
15 83:8 84:25
85:3,8 121:22
122:5 126:21

mark 41:13
61:4 66:6 71:15
95:11 101:14
111:18 115:8
120:11 132:7
135:21 140:17
152:18

marked 41:18
61:8 66:7 71:16
74:20,25 94:18
101:18 106:1,5
111:21 115:10
120:20 132:9
135:25 140:20
142:9 147:20
153:2,4

matter 7:11,23
8:1,24 54:10
77:22 118:16

Mcdonald
68:23 69:2,16,
21 70:3,16 71:9
76:11,16 78:1
86:22 94:3
102:22 112:16

meaning 25:21
60:18

means 27:14
51:13 73:12
79:17,19

meant 25:12
40:19 51:4



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

meet 9:18

meeting 81:17 110:12,15,21, 25 111:2

members 30:21

memory 38:9, 10 39:18,19 146:9

men 21:12,21 50:12,20 57:15 59:19,20

met 44:12 83:13 87:13 128:14

Michael 42:5

Michalik 8:3, 11 25:25 26:10 28:17 35:5 40:21,24 41:1,3 160:14

middle 73:15

Mildred 143:25 144:4

mind 101:20 147:12

minds 22:13

minutes 9:23 152:3,15,16

Miranda 108:2

mischaracterizes 55:12 60:12 90:5 137:18

misconduct 17:4 18:12

misdirection 123:11

misheard 60:15

misleading 19:9 20:19

missing 155:6

misspoke 129:4,25 130:9

Misstate 118:21

misstates 45:20 47:13 48:18 51:15 52:11 70:5 87:15 89:18 90:4 102:14 118:23 158:7

moment 129:10

money 40:17 79:10

month 50:13

months 51:20

moot 16:2

morning 8:22

Morrow 10:13 11:18 12:2,14 13:15 14:10 15:2,9,21 16:16,23 17:5 18:21

motive 43:25

move 129:13

moving 49:1

multiple 14:14 16:3 22:8 53:8 141:16

murder 12:13, 21 13:4,11,15, 24 14:10

must-do 83:23

─────────
N
─────────

named 12:13 13:6,10,14 59:10 76:11 90:25 91:4,17 140:5

names 99:10, 11 118:14 140:6

narcotic 50:16 57:12

narcotics 56:24 57:3,7 59:15

narrative 44:11,18 45:4 107:21

narrow 116:23 117:22

narrowed 118:3

necessarily 54:18 64:10,13 76:3 82:12 99:25 118:9 132:4 133:1

needed 30:3 32:12 34:15 71:2 124:24 126:7 131:10

negative 23:12,22 24:1, 6,17 25:4,7 26:19,20 28:11 48:10,12 50:24 82:15,18 83:1 88:8 147:9

neighbor 127:7

neighborhood 88:23

news 34:25 156:15

Nice 8:22

Noradin 7:12 100:23 136:21 137:7 151:11 153:12 155:24

normal 122:6 125:9

north 7:7 98:24 141:17 142:16 143:18,21

Northern 7:15

note 73:19 82:25 84:13

noted 80:2

notes 120:25 131:8,10,12,16, 25 132:3 152:3 153:1

notified 67:4,7 109:11,15

number 7:16 28:24 34:10 35:7 62:9,13 63:2 66:6 71:15 74:20 95:11 98:9 99:11 101:14 106:2 107:7 108:5,23 111:18 118:17 120:11 121:17 122:9 123:14, 15 132:7 135:22 140:17 142:6 152:18

numbers 62:2, 7

─────────
O
─────────

O'CONNOR 152:24 154:5,9

O-F-F 123:2

oath 9:1

object 25:25 26:2 28:17 35:5 37:7 38:17 104:15 140:21 144:16

objection 10:14,21 11:2, 12,19 12:4 14:16 15:3,13 16:5,10,18,25 17:6 18:7 19:10,19 20:20 21:1,8,24 22:10 23:7,13,16 24:13,21 26:10 27:15 29:10,23 30:7 31:1 32:3, 21 33:4,12,21 37:9 39:7,15 45:7,19 46:18 47:5,12,25 48:8,17 49:21

51:15 52:11 53:3,18,25 54:15 55:11,24 57:21 58:20 60:12 62:4 65:18,21 70:5 77:18 81:19,20, 22 82:10 86:6 87:8,15 89:11, 18 90:4 99:23 102:14 104:7 116:24 117:16, 25 118:21 120:3 126:15 127:19 128:2 129:22 134:18 135:7 137:13, 17,18 139:7,13, 18 140:22 141:4 144:19 146:4,16 147:1 150:7 154:22 155:3,7,8,18 156:2,13,22 157:5,13,20,21 158:7,14,25 159:8

objections 141:3

obligation 65:7

observation 36:1

observe 18:22

observed 143:25 144:7

obtained 76:20 78:18 144:2

obvious 57:23 58:3,23 80:25 81:1 83:16

occasion 32:13 34:4 67:2

occasions 34:7,10 36:16

occur 23:23

occurred 13:7 25:23 26:8,14, 19 40:12 69:19 70:10 82:18



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

occurring 143:20

October 7:8 95:7 105:14,19 131:3 152:12

offender 51:18 52:15 57:24 58:3,5,25 59:15 60:4,19 136:13 143:23,25 149:14

offenders 43:10,12,17 44:12,15 45:4, 16,18 46:12 51:10 52:20,22 54:23 59:10,14, 25 80:3 86:17 87:11,14 88:4, 20 90:14 114:21 125:6, 19 129:7

offenders' 51:5

offense 104:6

offenses 104:20

offhand 120:24

office 12:18,20 65:12 114:11

officer 32:14 33:18 34:19,24 35:8 36:4,6,21 37:1,3,16,17, 19,23 42:5 67:25 142:23, 24 145:22,25 146:10 148:20 149:2 150:13

officer's 121:3, 8

officers 7:14 29:21 30:4,17, 21,23 32:1,8,18 33:1,10,24 142:22 143:18, 21 144:2 145:10,14,17

one-page

66:12 71:21 101:16

online 7:4

open 136:4,10, 13

operation 29:19

opinion 15:19 36:2,3,20,22, 23,25 37:18 45:24 60:1,21 134:16 149:13 156:21 157:2

opinions 156:9

opportunity 9:3 91:15

oral 131:14

order 66:22,24 67:3,9,21 68:20 69:11 70:11,22 71:1 73:5,9,15 84:24 85:7 108:12 111:10

orders 159:22

originally 73:13

outcome 69:8

outstanding 114:4

overturned 16:17

_____

P
_____

p.m. 95:7 109:6,8 130:24 131:3 152:8,12 161:5

pages 79:17 111:19 120:15, 19

paper 64:23,25 84:13

papers 108:8

paragraph 45:6 46:7,8

49:2 50:2 51:9 56:22 78:3 123:9 143:3,5 144:12 145:6

Pardon 60:6

Park 8:2

Parkside 50:13

Parole 103:16

part 9:14 31:13 34:11 38:24,25 39:1 44:18 45:5 46:25 47:3 49:6 50:8 62:15 72:2 96:9,14 102:7 103:17 119:20 122:18 143:7 145:19 159:1

participate 138:8

participated 131:23

participating 138:5

participation 138:12,14

parties 8:7,8

partner 17:18 18:22 63:11 81:13 116:8

past 50:13 148:24

Paul 8:3

PD 106:25 107:4

pending 7:14 35:8

penitentiary 104:2

people 22:12, 21 28:22 55:5 56:11 58:7,11, 12 60:3 65:12 66:25 99:7 119:9 135:13

perfect 159:20

160:2,10,13,24 161:3

period 123:2

person 27:14 28:21,22 57:25 58:24 67:5 92:15,16 97:7 114:5 118:8 127:6 144:6 147:12 160:18

personal 15:19 33:3

personally 127:6

personnel 135:17 151:16

phone 107:7 121:17 122:9 123:14

photo 24:8,10 25:3,9,10,19, 20,23 26:6,8, 16,18,23 27:19 30:16,17 31:4 32:9,12,14,19 33:1,10,18 47:1,9,16 48:11,12,16 49:12,20 51:2, 23 55:4,7,8 56:16,17,18,19 68:24 69:2,3 70:3,17,18,22 78:10,12,15,17, 18,22 81:16 82:3,7,21 86:11 87:5,23 88:25 89:5,9 90:8,19 92:4,10,12,18, 20,24 93:23,25 94:7,10 102:12 117:3,4 125:10, 13,16,17 126:20 128:7, 21,25 129:17, 19 130:12,14, 17 132:20 133:4,10,20,22, 24 134:4,6,9, 13,15 135:13 144:3,6,8 145:2,9,13,23

146:1,3,11,13, 23,24 147:11 149:20 153:18 154:11,14,17

photograph 111:14 124:16 125:2,25 126:24 127:3, 16 128:10 129:20 130:19 135:4 147:13

photographs 11:17 12:2 32:19 33:1 124:4 132:17, 25

photos 30:18, 21 46:13,15,25 47:3,7,9,10,19, 21,22,24 48:3, 15 50:23 51:13 52:7,10 53:1,2, 10,11,16,17,24 54:13,14,21 55:20,21,23 56:10,11,13 81:16 82:3,5,7 93:18 128:8,10 133:8,9,14,16 134:17 143:13 144:3 145:13, 17 147:13

phrase 159:8

physical 25:10 38:10 43:13,20

pick 78:21

picked 25:11 28:21 117:6 130:14

picking 34:14

picture 127:8 129:5

pictures 143:8

place 97:6

plaintiff 7:22 8:10,24 118:8

Plaintiff's 7:20 18:9,11



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

played 159:13

point 11:21,23 12:3 14:11 51:3 56:4 67:8 70:2 71:7,13 77:15, 24 78:25 80:6,8 84:15,19 85:3, 4,16 86:5 90:3 107:18 114:19 128:19,24 129:5,20 139:21 150:9 154:4 155:20 156:8

pointed 15:10 27:23 130:11, 18

Polaroid 144:2

police 7:13 9:13 11:17 25:15 26:20,21 27:4 29:8 34:23 36:4,21 37:1, 16,17,19,23 42:1 43:21 44:6,19 45:17 52:2 57:15 59:3,4,10,13, 18,24 60:19 67:3,8 68:15 78:10 85:20 116:16 117:13 125:18,20 135:17,23 149:2 150:12 151:16

policy 29:7,16

pop 67:4

position 18:11

positively 107:23

possession 32:20 33:2,3 107:18

possibility 53:5

potential 141:2

potentially 54:22 88:10,12,

14,18 125:19

Potomac 139:24

practice 28:14, 15 29:3,4 42:18,21 49:16 54:10 77:22 118:16 119:3 125:10

practices 25:16

preparation 9:12,19,22 42:12 45:13 61:16 66:16 75:10 96:6 106:14 113:8 121:24 136:8, 16 137:16,22 138:18 140:10

present 114:15 125:23 150:19, 23,24,25 151:3

presented 80:13

press 143:14

pressure 10:18 125:2,5

pressured 125:25 126:10

pretty 21:17 114:24 117:1,3

previous 9:4 73:9 142:15

previously 70:14 73:5 79:20 96:13 97:10 125:18 143:25 144:1 145:23,25 148:19

primary 12:9 21:22,23

printed 106:19 119:14,24 141:19

printing 74:13

prior 12:19 13:11,15 19:25 39:22 41:8 44:6 51:16 63:23 70:5 87:15 89:18 90:5 111:2,12,14 113:23 118:23

prison 40:2

problem 37:20 114:23

procedure 24:5,6,12 25:3

procedures 23:21,23 29:16, 18 30:24 32:8, 10 33:10 65:11

PROCEEDING S 7:1

process 111:4

processing 108:3

produced 96:9

progress 75:16 82:17 83:17 103:18, 23 104:1 105:4

proper 86:4

prosecuted 152:23

prosecuting 153:23,25 154:3

prosecution 136:4

prove 92:2

Prudencio 140:5

pull 28:6 74:22 116:6 147:17

pulled 13:8 77:23 78:6 92:24 102:12, 20 105:8,19,21 111:11,14 112:8,11,13 113:11,17

115:17 116:9 117:14 118:6, 13,17 119:4,7,8 133:8,16

pulling 133:14

purpose 66:24 99:1

put 26:20,21 27:4 63:10 64:10,15,18,23, 24 65:8 67:9, 10,18 68:11 69:6,11 70:11, 22 71:1 73:5,13 82:4 83:7 84:24 85:4,7,19 108:18 111:3,8, 9 114:2 117:4 132:20 149:19 160:18

putting 65:12 68:3,7 111:12, 15

Q

question 9:10 10:1,2 13:13 16:1 17:3,8,9, 11,15,17 18:7, 10,12,15,18 25:17 26:1 35:15 47:23 58:15,18 68:5,6 88:7 91:11 103:20 111:6 117:11 119:22 129:8,9 130:6,8 133:25 137:19 138:13 144:24 155:4,9 158:16

questioning 35:6 37:8

questions 10:11 23:11,20 38:18 119:20 121:15 150:11 159:17,18

quick 17:24 152:7 159:22

R

raise 8:14

RAMIS 76:20

ran 13:23 97:2, 7 102:12,16

Raymond 7:12 75:14

re-ask 91:11

read 39:18 44:4 103:14 105:12, 16 108:1 121:21 122:10, 11,13,19,20,22 123:2,8,10,12 129:8 143:4,17 144:17 145:6,8, 19 148:9,16

reading 39:20 145:8

reads 50:11 107:22

realize 139:9

reason 71:11 80:13,18 81:3,5 89:13 90:8,11, 19 92:19 102:8, 10 107:15 113:15,18 117:10 136:12 145:24 146:2,6 155:7

reasons 141:4

recall 10:7 11:25 12:6 13:9,21,23 28:19,25 30:11, 14 31:9 39:5 40:13,16 41:10 43:16,19 44:25 45:2 57:13 76:15 81:9 84:20 85:17,20, 25 86:8 93:12 100:18 101:11 107:17,20 113:7 114:23 116:15,19,20 123:25 124:1,6,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

7,9,10 126:13
128:17 132:19
139:17,20

recalls 72:20

receive 12:12

received 12:16
78:10 153:14
156:17

receiving
151:6,13

recently 38:12
139:5

recognize
61:23 71:23
103:9 120:23
123:5

recognized
56:24 59:14

recollection
13:21 32:17
33:7 38:1,9,15,
24 39:1,2,10,
13,14,23 41:8,
11 43:1 46:25
52:24 57:10
61:20 63:25
68:2,7 74:13
77:9,11 94:8,
13,14 96:4
107:10,12
110:10,15,20,
24 113:21
114:25 115:3
116:13 119:13
121:5 124:3,14
126:19,23
133:14 138:5,
11,14 139:25
140:3,7 142:2
144:14,23
151:20,24
153:21 154:1,6,
7

record 7:4 8:6
10:10 17:21,22
18:3,4,6 41:15
61:5 66:9,19
67:3 71:18,24
74:3,21 83:5,7
85:4 95:2,3,4,6,
24 101:15

102:1 103:13
106:1,9 121:21
129:9 130:24,
25 131:2
132:11 135:22
140:18 142:6
152:7,8,9,11
159:21 161:4

recording
12:16 20:5
160:8

records 95:25

refer 25:8
96:15

reference
31:19 40:15

referred 97:10
152:22

referring 22:24

refrain 125:12

refresh 139:25
140:6 142:2
144:14,23
151:24 154:5

refreshed
38:24,25 39:18
151:19

refreshes
154:7

refuse 11:4,5
17:15 18:15

refused 10:25

regularly
131:8

related 140:9

relevance
33:21 37:9
139:7,13,18
140:24 154:22

relevant
147:14

rely 29:21,22
33:9,14

relying 38:5,
10,11

remained
107:25

remember
23:12 36:14
38:6 39:24
40:1,3,4,6,8
61:1 67:17
68:18 76:18
85:1,14 87:2
97:12 110:19
135:2,18 140:2,
4 154:9,13
156:10

remembered
38:4

remembers
50:12

remotely 7:24
8:2,4

remove 48:15

renewal 73:9

renewed 72:14
73:1,8

repeat 13:13
21:17 35:13,15
48:22,23 89:21,
23

rephrase
23:17 81:23,24
82:1 159:9

report 26:20,21
27:4 39:22
41:21 42:1,9,
11,22 43:2
49:14 52:3,14
55:22 59:4
75:16,20,24
76:2,4 77:9,15
79:4,12 82:17,
25 84:3 85:20,
25 88:9,13,17
96:25 97:3
99:1,4 102:3
103:19,23
104:1 105:4
106:10 113:2,
20 121:20
125:20 133:6
135:24 136:5,
10,20 137:6

140:19 141:7,
14,16,20,24
142:1,4,8
144:18 145:1,4,
12 146:24
149:22

reporter 7:3,5
8:6,13,19
17:19,22,24
18:2,5 48:20,22
89:21 95:1,5
120:12 129:10
130:23 131:1
143:12 152:6,
10 155:6
159:20,25
160:2,6,10,13,
17,22,24 161:3

Reporters 7:6

reporting 42:5
121:3,8

reports 9:13
13:19 14:7 38:5
39:9,14,19,20
41:11 69:14,15
83:17 84:14
87:3 94:15
101:12 111:1
112:22 114:10
124:13,14
126:22 134:3,
11

represent
7:22,25 8:23
96:8 102:6
104:12 132:24
148:1

representing
7:6

reputation
34:23 35:3,21
36:17 37:13

request 66:22,
24 67:11 68:3,
7,11,14,20 72:7

requested
94:4 113:19

requesting
67:25

research
69:23,25

reserve 160:23

residence
108:1 144:10

response
109:17

rest 122:10

resulted 22:8

results 50:24

revealed 108:4

reveals 97:7

review 9:4,7,11
42:11,19 61:16
66:16 75:10
106:14 121:23
136:7,23
137:12 138:17

reviewed
38:21 42:14,22
45:12,14 96:5
106:17 113:10
136:15 137:10,
15,22 140:9
146:21

reviewing 41:9
43:2 67:19
113:7

Rey 35:20 36:3

Reynaldo
34:4,8

ride 34:15

Ridge 8:2

right-hand
41:22 123:13

rights 20:9,18
108:1 150:14

righty 8:6,13,
19 160:17

rob 40:10,17

robbery 43:25
51:4,14,18,20
52:4,15,22
76:24 78:5
104:25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Rogers 44:12, 14 45:1 50:3,6, 23 52:3,22 53:1,16 54:21 55:18,21 56:11 57:14,19 58:16, 18 59:2,5,8,9, 13,18,23 60:24 69:12 70:12,23 71:1 73:5,10,15 74:10 78:25 79:7,9 80:2,9, 17,18,24 81:1, 7,10,14 83:6, 11,13 84:16,23 85:11 86:12,16 87:4,6,13,24 88:2,3,10 90:13,22,24 91:4,6,13,16, 19,21 93:6,8 106:10 107:8 108:19 109:7, 13,18,20,23,25 110:1,6,8,15, 21,25 111:2,11 112:5 113:2,23 114:8,19 116:10,21 117:20 127:12, 15

Rogers' 56:22 79:8,20 80:14 107:11,14

role 63:9 159:6, 13

Romo 13:6,10, 14,25 14:12

Ronaldo 34:18

room 80:15

Rosado 144:5

rotate 105:6

rows 62:4,8,9

rumors 35:21

run 67:2,3,10 96:25

running 50:19 123:2 144:7

Rutherford

68:23 69:2,16, 21 70:3,16,17 71:9 76:10,15 78:2 86:21 94:3 102:22 112:16

_____

S

S-W 153:17

Sanchez 140:6

sat 23:20 131:23

scenario 108:10

scene 13:24 139:20 144:7

Schalk 7:12 17:18 18:22 62:20 75:17 81:13 100:19 112:10 114:16 121:9,13 123:23 126:5, 10 130:18 131:7 135:16 136:21 137:6 141:13 142:1, 25 151:7 153:11 155:24

Schalk's 75:14 121:6 123:6 142:19

screen 41:16, 17 61:7 66:10 71:19 72:3 75:3 95:13 101:16 106:4 115:9 120:17 132:14 140:19 147:19 152:20

scroll 120:17 132:16 148:10, 12,13,14

Sean 7:21 8:23 17:7 21:18 23:14 38:18 40:21 65:19 72:15 137:17

searched 116:17

searches 118:3

section 44:11 45:5 46:10 107:22

secured 108:8

Security 123:15

seek 86:4

sees 46:12

select 27:14

selected 29:3 146:14,15

selection 26:25

selects 28:10

selling 40:9

sells 57:7

send 11:7 160:25 161:2

sending 160:24

sense 92:17

sentence 51:12 78:3

separate 16:13 131:25

September 113:5

Sergeant 101:1 108:5 155:24

series 132:17

serving 77:2

set 54:14 79:1 139:1

share 41:16 152:20

Sheene 46:7 85:2,7 92:20,22 134:9

sheet 65:9 79:15

sheets 64:23, 24

shelf 67:21

shoot 44:14

shooter 10:13, 20 14:1,10 158:4

shooters 127:14

shooting 13:7 15:2,9,21 16:16 17:5 18:21 93:2 114:22 125:6 126:11 127:15 144:8 158:21, 24 159:7,13

short 84:14 148:8

shorten 143:15

shot 13:24 90:11 94:7,9

shots 49:8

show 11:16 12:1 31:4 40:20 41:12 51:19 53:10,11 54:14, 20 55:8,9,22 56:12 61:4 66:5 68:24 69:2 70:3 71:14 74:19 78:4,18 86:11 87:23 88:7 89:5,8 90:19 92:12 93:19 94:7,10,16 95:10,16 102:12 105:25 111:17 115:6 120:10 124:4, 16 125:10,16, 17 127:8,15 128:21 132:6, 16 133:20,24 134:2,4,6,9 135:21 140:16 142:4 147:15, 23 151:24 152:17

showed 49:12 51:22 53:16

54:21 55:20 56:19 76:24 86:12 87:4,5 88:25 89:9 90:8 92:3,24 125:24 126:20,24 128:7 129:16, 18 132:20 133:10 147:11 154:19

showing 54:13 93:25 125:13 133:15

shown 49:19 52:3,22 53:1,2, 23 56:11 127:2 133:7,23 144:4

shows 92:18 144:20

side 105:9 122:12,16 136:3 153:10

signature 73:21 74:17 84:3 121:3,6,9 138:23 142:20 148:2 160:23

signed 96:16 139:2 141:13 148:2,5

significant 120:1

similar 93:15

simple 117:2

simultaneous 35:19

single 74:24 124:16 125:24 126:24 127:2, 15

single- 74:21

single-page 61:11

sir 8:22,25 9:12,19 10:7 11:24 13:18 16:24 17:5,15 18:25 19:16,25



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

22:9 23:19 24:3
26:13 30:11
35:11 37:25
39:4 41:16 42:2
46:8,22,23 47:7
48:7 49:4 50:9
51:6 61:6 63:9
66:10,14 71:19
74:23 75:5
79:16 83:18
87:22 95:13,21,
23 96:2,6,25
97:17 101:4,15,
25 103:5 105:8,
16 106:1,4,8
109:5 112:24
113:8 114:15
115:9 120:17
122:11 128:1
129:16 132:13
135:23 136:10
137:23 138:4
140:19 141:6,
10,18 142:5,7,
13 143:17
144:12,24
147:16,18
148:6,17
150:12 153:7
154:21

sister 107:6,
11,14 123:16

sit 14:25 110:7

sitting 145:16

situation
125:11

slightly 34:9

Social 123:15

solemnly 8:15

solved 136:12

Sorrell 38:16
39:6 42:2 43:3
63:16 64:1
65:17 75:17
93:2 96:10 97:3
99:6,20 100:9
101:8 102:7
105:22 107:14,
18 109:22
114:9,21
119:15 125:7

127:15 158:21,
24 159:7,14

sought 136:14

sound 129:11

Spanish 12:17
20:8

Sparks 37:4,6,
13,21 142:23
143:18 145:22,
25 146:10
148:2,20,23
149:2,7,12,19
154:19

speak 9:21
20:8 67:21
68:15 91:16
109:22 110:7
153:24

speaking
30:15 153:22

specific 24:3

specifically
24:18 25:14
35:22,24 39:13
115:1 126:17

spend 152:25

spoke 107:13

spread 25:9

stamp 49:2
95:16,20 98:5
105:7,11,12,13
106:11 120:15
147:24 153:6

stand 19:13
20:24

standard
29:19

standing 37:8
140:22 141:4

Starr 7:21 8:10,
21,23 10:17,24
11:6,15,22 12:7
14:20 15:6,18,
25 16:7,14,21
17:2,9,13,21,
23,25 18:11,13,
17,19 19:12,23

20:23 21:4,11,
19,20 22:2,14
23:9,15,17,18
24:15,25 26:5,
11 27:17 29:1,
14,24 30:10
31:6 32:6,24
33:8,16 34:2
35:10,16 37:12
38:19,22 39:3,
11,21 40:23,25
41:6,12,20
45:11,25 46:21
47:8,17 48:4,
14,21,25 49:25
52:1,17 53:6,22
54:5,19 55:16
56:3 58:2 59:1
60:14 61:3,10
62:6 65:20,25
66:5,8 70:9
71:17 72:19,23,
25 75:2 77:21
81:21,23 82:1,
2,14 86:10
87:12,20 89:16,
25 90:16 91:10
94:21,24 95:9,
15 100:1
101:21 102:18
104:10,18
106:7 111:22
115:6,12 117:7,
19 118:5 119:2
120:6,13,14,22
126:18 127:24
128:6 129:13,
15 130:2,21
131:5 132:6,10
134:22 135:11
136:2 137:14,
21 139:10,16,
22 141:5
142:11 143:16
144:22 146:8,
20 147:5,22
150:10 152:2,
14 153:5 155:1,
11,21 156:6,16,
25 157:8,16,25
158:11,15,18
159:4,10,11,17,
22,24 160:1,7,9

start 62:13
129:11

started 43:2
44:4,22 45:14
63:25 64:13
71:8 112:20

starting 7:19
44:1 62:23

state 7:18 79:7
124:11

state's 12:17,
19 19:22,24
152:23 153:1,
22,24 154:2,10

stated 8:23
49:7 50:11,16
149:11

statement
91:8

statements
22:17 80:14
131:20,24
138:6,9,15,17,
21,24

states 7:15
46:11 56:23
149:19

station 11:17,
23 55:19 56:1,4
67:6

Stefanich 7:25
8:12 10:14,21
11:2,12,19 12:4
14:16 15:3,13,
15,22 16:5,10,
18,25 17:6,10
18:1,7 19:10,19
20:20 21:1,8,
16,24 22:10
23:7,13,16
24:13,21 26:2
27:15 29:10,23
30:7 31:1 32:3,
21 33:4,12,21
35:12 37:7
38:17,20 39:7,
15 45:7,19
46:18 47:5,12,
25 48:8,17,23
49:21 51:15
52:11 53:3,18,
25 54:15 55:11,
24 57:21 58:20

60:10,12 62:4
65:18,21 70:5
72:15,22 77:18
81:19,22,25
82:10 86:6
87:8,15 89:11,
18,23 90:4 91:7
94:19,22,25
99:23 101:20
102:14 104:7,
15 116:24
117:16,25
118:21,23
120:3 126:15
127:19 128:2
129:22 134:18
135:7 137:17
139:7,13,18
140:21 144:16
146:4,16 147:1
150:7 152:5
154:22 155:3,8,
18 156:2,13,22
157:5,13,20
158:7,14,25
159:8,18 160:3,
15,18,20,23
161:2

STEFANISH
137:13

step 40:22 41:3
83:3,10,12
101:7,10
109:21 127:20
141:1

steps 87:22
111:4

stipulate 8:7

stipulates 8:10

stipulation 8:9

stop 34:1
66:21,24 67:3,
9,21 68:20
69:11 70:11,22,
25 71:24 73:5,
9,14 74:3 83:5,
7 84:24 85:4,7
108:11,12

stopped 67:2

street 28:6
67:6 124:24



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

streets 126:7

strike 26:17
27:1 35:18 36:3
57:1,18 58:17
80:7 116:20
119:7 124:1
126:4 129:17
132:19 139:3
146:22 150:24
151:10 158:15

subject 14:2,3
25:9,10 26:22
73:23 74:2,5
76:5,11 108:1
143:22 144:1

submit 83:18

submitted
68:17 84:5
136:24 137:5,8
141:21

subsequent
46:4 108:3

subsequently
144:8

suggesting
158:20

summary 76:4

supervisor
83:18 84:6,9

supplemental
42:11,22
140:19 141:7
142:8

supplementar
y 41:21,25
135:24

suppress
12:25

surprised
154:20,21
155:2,10

suspect 12:9
25:21 27:2,20,
21 28:1 29:5
49:23 53:10
56:9,12,18
88:11 91:17
99:22 100:17

124:20 126:11
127:3 128:25
129:21 145:2
149:23 150:2,4

suspects
51:14 52:4
85:23 86:2
88:11,15,19
90:25 91:4 93:5
116:11 126:1
127:14

swayed 22:12,
16

swaying 22:19

swear 8:15

system 68:15
114:4 116:17

——————

T

talk 40:1 45:23
46:1 67:8 68:24
83:11,13 84:23
88:2 93:6,7
109:20

talked 23:21
38:3 46:4 67:6
71:2 86:15 88:3
90:12 96:14

talking 21:17
23:14 24:8,16,
17 25:14 40:12
65:19 97:12
108:11 117:5
122:14 123:1
127:9

tape-recorded
12:12,20 13:3

Taylorville
77:3 103:15
104:2

technician 7:5

telephone
9:20,22

telling 13:22
40:16 94:9
128:5

Ten 9:23

tentatively
130:14

term 25:7 38:8

terms 102:3
109:5

Terry 40:21
44:12 45:1
50:3,5 53:16
57:14,19 58:16,
18 59:2,5,7,9,
13,18,23 60:24
69:12 70:11,23
71:1 73:5,15
78:25 80:14,17,
18,24 81:1,7,
10,14 83:5,11,
12 84:16,23
85:11 87:4,6,24
88:2,3 90:13,
21,24 91:3,13,
16,19 106:10
108:19 109:12,
18,20,23 110:8,
15 111:11
112:5 113:2,23
114:8 127:12

testified 18:25
20:9 23:11 25:3
42:17 70:14
85:15 108:11
130:11,13,16
131:7 145:23,
25 148:20,23
149:1,25
151:21,25
152:22 157:9,
17 159:14

testifies 158:3

testimony
8:15 19:4,8,13
20:14,18,24
38:6 51:16
55:10,12 60:13
64:16 70:2,6
71:8 87:16
89:19 90:5
102:15 118:24
137:18 147:7
158:8

Thaddius
10:6,12,18,20
11:18 12:3

13:11,16 14:14,
19 15:7 16:12,
15 19:14 20:10,
18,25 21:5
23:10,19

thing 34:15
36:1 52:14
67:12,16 84:22
87:14,18 92:25
143:10 147:10

things 38:4,21,
25 51:7 60:22
63:10 64:10
65:10,12

thought 25:12
36:5 56:9,10
79:2 80:17,21
84:10 85:15
86:22 87:6
91:6,12,14,21
94:6,9 127:3
136:17 137:2
138:21 147:6
149:1 156:4

thoughts 92:2

threaten 11:1,
7

thrown 21:6
22:9

time 7:9 9:3,9
10:5 14:7 23:19
28:19 31:3 34:3
35:1,20 41:15
42:18 51:3
52:14 54:25
55:2 56:2,5
59:8 65:14
66:21 67:21
73:12 77:2,15
78:25 80:11
83:20,24 84:11,
14,15,19 85:12,
14,16 86:5,15
90:3,11,12
91:15 92:22
95:2,7 96:23
97:16,22,24
98:20 104:11
109:1,5 113:16
114:6 115:16,
18 117:24
119:1 127:10

128:19 129:14
131:3 132:13
142:3 143:21
144:5,7 152:7,
12,25 156:8
160:5,12

timely 64:11

times 16:13

timestamp
113:12,14
115:17,23

timing 116:13
128:17

Tina 11:16
12:1,8

today 7:5,8
9:12,19,22
10:11 14:25
66:14 75:8 96:2
97:16 136:16
137:10,11,12
138:1 140:12
145:16 147:16
151:19,25
152:17 157:10
158:21 159:6,8

today's 61:16
96:6 106:15
113:8 121:24
136:8 138:18

Todd 7:4

told 24:1 38:11
40:7,8 44:13,
15,19 57:14
59:2,13 70:15,
19 80:16 83:14
86:16 87:10,14
88:3 90:13
91:16,21
116:10 125:18,
22 126:3,5
127:12 130:12,
17 147:3
156:19 159:3,5

Tom 127:8,9

Tony 151:14

top 96:16
104:13 105:9
106:18 107:3,4



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

136:3 153:10

Torres 12:13,
 21 13:4,8 14:13
 20:3

Torres's 14:13
 19:18

total 21:12,21

totally 62:11

track 104:25
 105:3

tracks 103:17,
 22

trained 60:5,7,
 8

transcript 9:4,
 8 160:21,22

transferred
 108:2

transported
 110:1 144:11

treat 27:25
 29:4

trial 19:1,4,8,
 13,17,25 20:10,
 15,25

trigger 13:8

tripped 109:12

true 19:5 20:15
 26:12 31:7,9,12

truth 8:16,17
 128:5

Tueffel 10:12,
 18,19,25 11:1,
 7,10

turnout 56:8

type 12:16
 34:15,16 86:25
 95:24 147:11

typewritten
 75:6

typical 52:14

—————

U

unable 27:12
 69:17 92:10
 129:19 130:16

underneath
 107:4

understand
 9:1 16:8 25:18
 37:25 47:4 54:6
 88:6 111:6
 133:3

understanding
 30:20 66:23
 77:14

understood
 10:2 29:9

United 7:15

unknown 7:13
 43:12 49:9,19
 57:24

unrelated
 23:10,19

unsigned
 107:22

untruthful
 37:21 149:3

upside 115:25

user 50:16
 56:24 57:12
 59:16 80:22,24
 81:2

UUW 76:24
 78:5 104:5,14

—————

V

victim 11:18
 12:2 76:12

victims 31:5
 140:5 141:25

Victor 13:6,10,
 14 14:12

video 7:5,10
 143:13 160:7,9,
 11,14,19,20

view 46:12
 47:19,21 48:3

viewed 12:9
 46:15 47:22
 50:23 51:13
 52:6,10 54:12
 146:13,22

violates 17:7
 18:8

visit 103:19

Vukonich
 142:24 143:19

—————

W

Wacker 7:7

Wade 49:3,12
 53:2,14,17
 54:20,21 55:19
 56:13,19 84:19,
 25 85:16,22
 88:14 92:12
 121:17 122:8
 123:16,18,23
 124:2,4,11,15,
 18,19,22 125:1,
 4,10,13,15,18,
 24 126:3,4,9,
 14,20,24
 128:15 133:21,
 25 134:7
 157:17,22

Wade's 124:7

wait 109:3

waited 93:7

Walk 126:4

Walker 124:12
 126:4

wanted 25:13
 43:7,17 84:23
 127:22,25
 131:11

Washington
 98:12

waste 54:25

wasting
 129:14

watch 97:24,25
 122:1,4,6

wealth 53:7

West 98:11
 144:10

whatsoever
 57:11

white 144:4

William 140:6

Willie 38:15
 39:6 42:1 64:1
 65:17 75:17
 93:2 96:10 97:3
 99:5,20 100:9
 101:8 102:7
 125:6 127:14
 158:20,24
 159:7,14

withdraw
 81:24 158:16

withheld
 150:20 151:1,4,
 7,11,14

withhold
 150:16

withholding
 151:17

witnesses
 14:15,18,21
 16:3 22:15
 30:24 31:5
 32:10 43:20
 47:22 52:10
 53:9,10,11,12,
 21 54:12,14
 55:1,9,22 60:22
 69:18 85:11,14
 86:5 89:6,9
 92:17 93:23
 131:20 135:1
 144:5 146:13,
 21,22 151:3
 159:3

Wojcik 7:13
 100:25 101:1
 151:14 155:24

woman 11:16

wondering

45:15

word 52:5
 72:14 73:8
 122:24

words 107:7
 127:6 136:11

work 34:4,7,13,
 20 36:4,9,15,25
 37:6,18 42:23
 51:20 63:16,22
 69:20 97:25
 142:5

worked 36:5,
 19 37:11 63:19
 127:4 131:9
 148:23

working 35:2,
 17,19,20 36:14
 42:18 43:2
 44:5,22 45:14
 49:17 53:15
 54:8 55:18
 64:1,13 71:8
 99:5,20 112:18
 122:5

worth 94:7,9

write 102:19
 147:9

writing 61:20
 74:13 123:5,6,
 10

written 103:2
 120:25

wrong 16:4,22
 18:23 23:4
 27:14 28:4,5,21
 138:2 155:25
 156:5 160:18

wrote 63:2,6
 75:24 79:4,12

—————

Y

year 8:25 40:11
 63:23 71:25

years 65:11
 67:13,14,17
 92:5 93:7

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

you-all  17:20
129:12

young  139:24

——————

Z

——————

Zacharias
142:24 143:19

zeroed  71:9

zoom  72:7
97:15 105:12
153:9



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com