# EXHIBIT 33

LOUISVILLE    LEXINGTON    LONDON    FLORENCE    CINCINNATI    INDIANAPOLIS    ORLANDO    JACKSONVILLE    TAMPA



# KENTUCKIANA
## — COURT REPORTERS —

## CASE NO. 20-CV-04768

## JAMES FLETCHER JR.

## V.

## JEROME BOGUCKI, ET AL.

## DEPONENT:

## ANTHONY NORADIN

## DATE:

## February 22, 2023



a courtroom
**powerhouse**



schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF ILLINOIS

3                       EASTERN DIVISION

4                      JUDGE ANDREA WOOD

5               MAGISTRATE JUDGE MARIA VALDEZ

6                  CASE NO. 20-CV-04768

7

8

9

10                  JAMES FLETCHER JR.,

11                      Plaintiff

12

13                          V.

14

15      JEROME BOGUCKI, ANTHONY NORADIN, RAYMOND SCHALK,

16       ANTHONY WOJCIK, UNKNOWN CITY OF CHICAGO POLICE

17          OFFICERS, AND THE CITY OF CHICAGO,

18                      Defendants

19

20

21

22

23   DEPONENT:  ANTHONY NORADIN

24   DATE:      FEBRUARY 22, 2023

25   REPORTER:  SYDNEY LITTLE

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-33 Filed: 05/06/25 Page 4 of 236 PageID #:6738
The Deposition of ANTHONY NERADA, taken 05/06/2024

2

```
 1                        APPEARANCES

 2

 3    ON BEHALF OF THE PLAINTIFF, JAMES FLETCHER JR.:

 4    Anand Swaminathan, Esquire

 5    Mariah Garcia, Esquire

 6    Sean Starr, Esquire

 7    Loevy & Loevy

 8    311 North Aberdeen Street

 9    Third Floor

10    Chicago, Illinois 60607

11    Telephone No.: (312) 243-5900

12    E-mail: anand@loevy.com: mariahgarcia@loevy.com

13              sean@loevy.com

14    (Appeared via Videoconference)

15

16    AND

17

18    Jennifer Blagg, Esquire

19    Law Office of Jennifer Blagg

20    1509 West Berwyn Avenue

21    Suite 201E

22    Chicago, Illinois 60640

23    Phone: (773) 859-0081

24    E-mail: jennifer@blagglaw.net

25    (Appeared via Videoconference)
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                    APPEARANCES (CONTINUED)

 2

 3    ON BEHALF OF THE DEFENDANTS, JEROME BOGUCKI, ANTHONY

 4    NORADIN, RAYMOND SCHALK, ANTHONY WOJCIK:

 5    Jennifer Bitoy, Esquire

 6    Hale & Monico

 7    Monadnock Building

 8    53 West Jackson Boulevard

 9    Suite 337

10    Chicago, Illinois 60604

11    Telephone No.: (312) 815-1948

12    E-mail: jbitoy@HaleMonico.com

13     (Appeared via Videoconference)

14

15    ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:

16    Daniel Burns, Esquire

17    Reiter Burns

18    311 South Wacker Drive

19    Suite 5200

20    Chicago, Illinois 60606

21    Telephone No.: (312) 878-1291

22    E-mail: dburns@reiterburns.com

23     (Appeared via Videoconference)

24

25
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of ANTHONY NORADIN, taken 05/06/25 Page 2 of 232

4

```
 1                        INDEX

 2                                                Page

 3   PROCEEDINGS                                    8

 4   DIRECT EXAMINATION BY MR. SWAMINATHAN         10

 5   CROSS EXAMINATION BY MS. BITOY               201

 6

 7                       EXHIBITS

 8   Exhibit                                      Page
```

```
 9    1 - Defendant Anthony Noradin's Answers to

10        Plaintiff's First Set of Interrogatories  33

11    2 - Chicago Police Department Case

12        Supplementary Report May 21, 2002 -

13        CITY-JF-000153-000158                     50

14    3 - Statement of Terry Rogers May 8, 2002 -

15        CITY-JF-000161-000163                     63

16    4 - Chicago Police Department Cleared Open

17        Arrest and Prosecution Supplementary

18        Report - Fletch 000864-000872             84

19    5 - Chicago Police Department General

20        Offense Case Report Date of Occurrence

21        February 11, 2002 - Fletcher

22        000432-000433                            122
```

```
23

24

25
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                  EXHIBITS (CONTINUED)

 2    Exhibit                                    Page

 3     6 - Chicago Police Department Crime History

 4           Report for Terry Rogers -

 5           CCSAO_Conflicts_FletcherDixonBogucki_

 6           20cv4768_000093-000112               122

 7     7 - Handwritten Note - CITY-JF-000019      138

 8     8 - Handwritten Note - CITY-JF-000022      138

 9     9 - Handwritten Note - CITY-JF-000168      138

10    10 - Handwritten Note - CITY-JF-000170      139

11    11 - Handwritten Notes -

12           CITY-JF-000187-000189                139

13    12 - Handwritten Note - CITY-JF-000185      139

14    13 - Handwritten Note - CITY-JF-000184      140

15    14 - Handwritten Note - CITY-JF-000183      140

16    15 - Chicago Police Department Original

17           Case Incident Report December 21, 1990 -

18           CCSAO_Conflicts_FletcherDixonBogucki_

19           20cv4768_001434-001435               154

20    16 - Chicago Police Department Case

21           Supplementary METHOD/CAU Report -

22           CITY-JF-000126-000128                159

23    17 - Chicago Police Department General

24           Progress Report - TIRC-FLETCHER 000039   170

25
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                    EXHIBITS (CONTINUED)

 2   Exhibit                                          Page

 3   18 - Arrest Report of James Fletcher -

 4         CITY-JF-000225-000226                      172

 5   19 - Investigative File CITY-JF-000001-000226 184
```



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                       STIPULATION

 2

 3   The VIDEO deposition of ANTHONY NORADIN was taken at

 4   KENTUCKIANA COURT REPORTERS, 110 NORTH WACKER DRIVE,

 5   CHICAGO, ILLINOIS 60606, via videoconference in which

 6   all participants attended remotely, on WEDNESDAY the

 7   22nd day of FEBRUARY 2023 at 10:12 a.m. (CT); said VIDEO

 8   deposition was taken pursuant to the FEDERAL Rules of

 9   Civil Procedure.  The oath in this matter was sworn

10   remotely pursuant to FRCP 30.

11

12   It is agreed that SYDNEY LITTLE, being a Notary Public

13   and Court Reporter for the State of ILLINOIS, may swear

14   the witness and that the reading and signing of the

15   completed transcript by the witness is not waived.

16

17

18

19

20

21

22

23

24

25
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1                  PROCEEDINGS

2

3      COURT REPORTER:  We're on the record.

4  My name is Sydney Little.  I'm the online video

5  technician and court reporter today representing

6  Kentuckiana Court Reporters located at 110 North

7  Wacker Drive, Chicago, Illinois 60606.  Today is the

8  22nd day of February 2023.  The time is 10:12 a.m.

9  Central.  We're convened by videoconference to take

10  the deposition of Anthony Noradin in the James

11  Fletcher Jr. versus City of Chicago et al pending in

12  the United States District Court for the Northern

13  District of Illinois Eastern Division, Case number

14  20-CV-04768.  Will everyone, but the witness, please

15  state your appearance, how you're attending, and the

16  location you are attending from, starting with

17  Plaintiff's counsel.

18      MR. SWAMINATHAN:  This is Anand Swaminathan for

19  Plaintiff Mr. Fletcher, appearing by Zoom from

20  Chicago.

21      MS. BITOY:  Jennifer Bitoy on behalf of the

22  deponent, Anthony Noradin, appearing remotely in

23  Chicago.

24      MR. BURNS:  Dan Burns on behalf of the City of

25  Chicago, appearing remotely from Chicago.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1          MS. BLAGG:  Jennifer Blagg on behalf of the
 2     plaintiff, appearing remotely from Chicago.
 3          MS. GARCIA:  Mariah Garcia, also appearing on
 4     behalf of the plaintiff for -- and I'm remotely from
 5     Chicago as well.
 6          MR. STARR:  John Starr appearing remotely from
 7     Chicago on behalf of the plaintiff as well.
 8          COURT REPORTER:  All right, great.  Thank you.
 9     Mr. Noradin, will you please state your name for the
10     record.
11          THE WITNESS:  Anthony Noradin.  N-O-R-A-D-I-N.
12          COURT REPORTER:  Thank you.  And do all parties
13     stipulate that the witness is, in fact, Anthony
14     Noradin?
15          MR. SWAMINATHAN:  So stipulated on behalf of
16     the plaintiff.
17          MR. BURNS:  So stipulated.
18          COURT REPORTER:  Okay.  Thank you.  And sir,
19     will you please raise your right hand?  Do you
20     solemnly swear or affirm that the testimony you're
21     about to give will be the truth, the whole truth,
22     and nothing but the truth?
23          THE WITNESS:  I do.
24          COURT REPORTER:  Thank you.  Counsel may begin.
25          MR. SWAMINATHAN:  All right.  And just before

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1          we get going, let me note for the record my prior
2          memorialized communications with Mr. Stefanich on
3          behalf of defendants.  We are agreeing to continue
4          this deposition and its -- at its conclusion for
5          today's purposes without questioning regarding the
6          subject of complaint registers against Mr. Noradin,
7          or anything related to his involvement in the Villa
8          case, and the law -- and the lawsuits that are
9          identified in his interrogatory responses, as those
10         are subjects related to 404(b) topics that we have
11         agreed to put off to a future date.  So let me just
12         note that for the record. Ms. Bitoy, does that
13         fairly characterize our agreement?
14              MS. BITOY:  It does.
15              MR. SWAMINATHAN:  Okay.  Thank you.
16         Am I pronouncing your name properly?  Bitoy?
17         Is that correct?
18              MS. BITOY: Yes.  Yes.
19              MR. SWAMINATHAN:  Okay.
20              MS. BITOY:  It is, yeah.
21                   DIRECT EXAMINATION
22    BY MR. SWAMINATHAN:
23         Q    Thank you.  Thank you.  Mr. Noradin, are you
24    currently employed by the Chicago Police Department?
25         A    Yes, I am.
```



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

```
 1        Q    Okay.  And how long have you been at the
 2   Chicago Police Department?
 3        A    29 years.
 4        Q    What is your current title, sir?
 5        A    Detective.
 6        Q    Okay.  I'm going to refer to you as
 7   Mr. Noradin or Detective Noradin, with your permission.
 8   Is that a respectful way to refer to you, sir?
 9        A    That's fine.
10        Q    Okay.  Have you given a deposition before?
11        A    Yes, I have.
12        Q    How many times?
13        A    Two or three, four?  I'm not -- I'm not 100
14   percent sure.
15        Q    Is -- has every deposition you've
16   been -- you've given, been in the context of your work
17   as a Chicago police officer?
18        A    Yes.
19        Q    Have you ever given a deposition in your
20   personal life related to personal matters unrelated to
21   your police work?
22        A    No.
23        Q    In each of the instances in which you were
24   previously deposed, were you a defendant in the lawsuit?
25        A    Defendant as well as witness.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Okay.  So in some cases, you've been deposed

2 as a witness, and in some cases, you've been deposed as

3 a witness; is that correct?

4    A    Correct.

5    Q    Okay.  In how many cases have you been deposed

6 as a defendant?

7    A    I believe two.

8    Q    And how many cases have you been deposed as a

9 witness?

10    A    One or two.

11    Q    Okay.  And in either of the cases in which you

12 in -- strike that.  In any of the cases in which you've

13 been deposed as a witness, has it resulted in a verdict

14 against you?

15    A    No.

16    Q    In any of the cases in which you've been

17 deposed as a witness -- strike that.  In any of the

18 cases in which you've been deposed as a defendant, has

19 it resulted in a judgment against you?

20    A    No.

21    Q    In any of the cases in which you've been

22 deposed as a defendant, has it resulted in a settlement

23 or monetary payment of any kind?

24    A    Yes, I believe so.

25    Q    Okay.  In which case is that?

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     I don't recall the name of the case.
 2        Q     Okay.  Have you ever testified in court in a
 3   civil lawsuit against yourself?
 4        A     Yes, I have.
 5        Q     Okay.  In which case is that?
 6        A     Nicole Harris.
 7        Q     Okay.  I'm not going to go into more detail on
 8   those cases now in light of our prior agreement, but I
 9   just wanted to get some basic understanding of the
10   contours of your prior testimony.  Suffice to say you
11   have given several depositions in the past.  You
12   understand how this process works.  Is that fair, sir?
13        A     Yes, I understand.
14        Q     Okay.  And you've given -- you've testified
15   under oath many, many times in your career; is that
16   fair?
17        A     Yes.
18        Q     Fair to say you've testified under oath
19   hundreds of times in your career?
20        A     At least.
21        Q     Okay.  I'll just walk through the deposition
22   process very quickly, although I know you understand it,
23   but let me walk through it one more time.  Sir, this is
24   a question-and-answer session.  I'll ask you questions,
25   you'll answer them to the best of your ability.  To the
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   extent I ask you a question that you do not understand,
 2   please let me know and I will happily rephrase it.
 3   Is that under -- is that fair?
 4       A    Understood.
 5       Q    Okay.  If you answer my question then I will
 6   assume you understood my question.  Is that also fair?
 7       A    Understood.
 8       Q    Okay.  If at any time you need to take a
 9   break, please let me know and we'll take a break; is
10   that fair?
11       A    Understood.
12       Q    The only rule is that if I have a pending
13   question, you must complete answering that question
14   before we take a break, understood?
15       A    Understood.
16       Q    Okay.  During the course of the deposition,
17   there's a court reporter who will be writing down all
18   the answers.  So please make sure that you let me
19   complete my question before you answer the question,
20   understood?
21       A    Understood.
22       Q    And likewise, if you're answering my question,
23   and I've cut you off, you had more to say, please let me
24   know and I will let you finish your answer.  It's not my
25   intention to cut you off, but sometimes you pause and I
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

602.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   think that you're done with your answer. Understood?

2        A    Understood.

3        Q    Okay.  No verbal answers, no uh-huhs -- oh

4   sorry -- no non-verbal answers, no uh-huhs or nods of

5   the head, because the court reporter can't take that

6   down, understood?

7        A    Understood.

8        Q    Okay.  Let me ask you a simple yes/no

9   question.  I'm not asking to go into your medical

10  history, so listen carefully to my question.  Do you

11  have any medical conditions that would prevent you from

12  being able to understand my questions and answer them

13  today?

14       A    No.

15       Q    Are you taking any medications that would

16  prevent you from being able to understand my questions

17  and answer them today?

18       A    No.

19       Q    Okay.  All right.  Let's -- tell me what year

20  you started in the Chicago Police Department.

21       A    Can you repeat that, sir?

22       Q    Yeah.  Can you please tell me what year you

23  started in the Chicago Police Department?

24       A    1994.

25       Q    Okay.  And where did you get assigned when you

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    first joined the police department?

 2         A    I was assigned to the 15th District.

 3         Q    And which area is that in?

 4         A    Detective area?

 5         Q    Yes.

 6         A    That would be Area 5 Detective Division.

 7         Q    Okay.  And then what was your next position in

 8    the police department?

 9         A    I was promoted to detective in year 2000.

10         Q    And where were you assigned?

11         A    Area 5 Detective Division.

12         Q    And what type of detective were you?  Were you

13    a violent crimes detective, property detective?

14    What was it?

15         A    I started out as general assignment, which

16    would handle all kinds of cases, and then I was doing

17    violent crimes.

18         Q    Okay.  So when did you become a violent crimes

19    detective?

20         A    Six months after I -- I was promoted to

21    detective.

22         Q    Okay.  So sometime around the second half of

23    2000 or 2001, you became a violent crimes detective,

24    correct?

25         A    Correct.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Okay.  And have you held any other positions

2  in the Chicago Police Department?

3    A    I have not.

4    Q    Okay.  So you've been a violent crimes

5  detective at Area 5 from approximately 2001 until the

6  present; is that fair?

7    A    No.

8    Q    Okay.  Tell me why I've got that wrong.

9    A    I was an Area 5 detective from September of

10  2000 through March of 2012.

11    Q    And what happened in March of 2012?

12    A    March of 2012, they shut down Area 5.  Then I

13  was a detective at Area 3, which was known at that time

14  Area North, Belmont and Western.

15    Q    Yep.

16    A    And then in 2000 -- I'm sorry, 2020 to

17  current, I am now assigned to the Area 4 Detective

18  Division.

19    Q    Sorry.  So you got assigned to Area 4 for what

20  period?

21    A    March of 2020 to now, current.

22    Q    Okay.  So you were at Area 5 until March of

23  2012, correct?

24    A    Correct.

25    Q    And then from March 2012 until March of 2020,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    you were at Area 3; is that right?

2        A    Correct.

3        Q    Okay.  And Area 3 is Belmont and Western,

4    correct?

5        A    Correct.  It was considered Area North at that

6    time.

7        Q    When you say it was Area 3, it was also known

8    as Area North?

9        A    Correct.

10       Q    Okay.  Okay.  And where was your -- where were

11   you based out of Area -- where was Area 4 based when you

12   went there in March 2020?

13       A    Harrison and Kedzie.

14       Q    Okay.  And have you been a vi -- when you were

15   in Area 5 until March of 2012, you were a violent crimes

16   detective throughout that period, after your initial six

17   months, correct?

18       A    Correct.

19       Q    And in Area 3, were you a violent crimes

20   detective?

21       A    Correct.

22       Q    And in Area 4, were you a violent crimes

23   detective?

24       A    Correct.

25       Q    Okay.  And what kind of crimes do violent

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    crimes detectives investigate?

2        A    Mainly homicides and crimes against persons.

3        Q    Have you ever sought promotion from detective

4    to a sergeant or other role?

5        A    No.

6        Q    Why not?

7        A    I don't have the schooling.

8        Q    And what do you mean by that, sir?

9        A    You need two years of college credit, and I

10   don't have two years of college credit.

11       Q    Okay.  Do you have any other sources of income

12   other than your work as a Chicago police officer?

13       A    No.

14       Q    Are you working any other jobs part-time or

15   full-time?

16       A    No.

17       Q    When you became an Area 5 detective, did you

18   go through a detective training program?

19       A    I did.

20       Q    Okay.  And have you had any subsequent

21   training programs that you went through after you went

22   through the detective training at Area 5?

23       A    Yes.

24       Q    And what training is that?

25       A    It's called lead homicide training.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    You said lead homicide training?

2    A    Lead.  Yes.  L-E-A-D.

3    Q    Okay.  And when did you go through lead

4  homicide training?

5    A    I went through it a couple times.  I don't

6  remember to years or the dates.

7    Q    And can you explain for us what lead homicide

8  training is?

9    A    Basically, it -- it -- it teaches you how to

10  be a homicide investigator.

11    Q    And was that part of your initial detective

12  division training or something different?

13    A    That was in addition to the training,

14  initially.

15    Q    And you said you did it several times?

16    A    At least a couple times that I'm aware -- that

17  I recall.

18    Q    Okay.  And what did you learn in the lead

19  homicide training that was not part of the regular

20  detective division training?

21    A    It's just basically like a refresher course.

22    Q    So it's something you don't do -- something

23  you do not at the same time as detective division

24  training or immediately afterward, but something you do

25  later on; is that right?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     That's correct.

 2        Q     Okay.  And it's essentially intended as a

 3  refresher?

 4        A     That's correct.

 5        Q     Okay.  Understood.  And are there -- and as a

 6  general matter -- strike that.  So if I understand

 7  correctly, the lead homicide training is something that

 8  essentially refreshes you on the same topics you've

 9  learned about in the original detective division

10  training, correct?

11        A     Correct.

12        Q     Are there any newer different topics that you

13  recall as part of the lead homicide training course?

14        A     Not that I recall, no.

15        Q     And how long was the lead train -- the lead

16  homicide training course?

17        A     It's a 40-hour course.  It's a week course.

18        Q     You do it over the course of one week while

19  you're also performing your other duties as a police

20  officer?

21        A     Rephrase.  I -- I don't understand.

22        Q     Okay.  You said you do it for -- it's 40

23  hours, but it takes one week?

24        A     Correct.

25        Q     Can you explain how it takes one week to do
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    the 40 hours of training?

2        A    Monday through Friday, 7:00 to 3:00, 7:00 to

3    4:00, whatever the hours are.

4        Q    Okay.  All right.  Are there any topics that

5    have been taught in your lead homicide training that

6    were different than what you learned in the original

7    detective division training that you did?

8        A    Not -- not that I recall.

9        Q    Did you receive training as -- strike that.

10   Did you receive training during the course of the lead

11   homicide training with regard to interrogations?

12       A    Yes, we did.

13       Q    Okay.  And you also received training on that

14   subject in your original detective division training,

15   correct?

16       A    Correct.

17       Q    Okay.  Did you receive any training on the

18   conduct in -- on the conduct of identification

19   procedures in your original detective division training?

20       A    In reference to --

21       Q    Photo arrays, live line-ups, those types of

22   things?

23       A    That would've been part of the -- that

24   would've been part of the training.  Yes.

25       Q    Okay.  And so when I refer to identification



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    procedures, you understand that to mean things like

2    photo arrays and live line-ups?

3         A    Yes.

4         Q    Okay.  And what terminology do you use

5    generally to describe those concepts?

6         A    Photo array and line -- physical line-up.

7         Q    Okay.  All right.  So let me just -- let me

8    just go through and make sure I'm using the same

9    vocabulary as you.  So live line-up, can you just

10   explain what that is?

11        A    A live line-up is individuals in --

12   in -- physical line-up, is a person at -- physically, at

13   the -- at the area standing in a line-up with other

14   individuals.

15        Q    Okay.  And then what's a photo array?

16        A    Photo array is basically six photos of

17   individuals on a piece of paper.

18        Q    Okay.  And then what's a show-up?

19        A    Show-up is when if a crime occurs on the

20   street, and the -- the -- the offender is captured

21   subsequently close to the time that the -- the incident

22   occurred, the officer will do a show-up with the victim

23   on scene.

24        Q    In other words, the victim will view that

25   single person who is the suspect?

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     A    Correct.

2     Q    And it'll be out in the field on, you know,

3 out in the street somewhere?

4     A    Correct.

5     Q    Okay.  So a show-up occurs -- is a show-up is

6 basically a single person identification under unique

7 circumstances, correct?

8     A    Correct.

9     Q    Okay.  And what are the unique circumstances?

10    A    I'm -- I'm sorry?

11    Q    And what are those unique circumstances when

12 you conduct showups?

13    A    If the crime happened -- if -- if the show-up

14 is done immediately following the crime.

15    Q    Okay.  And then what does a photo show-up?

16    A    What is a photo show-up?

17    Q    Yes.

18    A    It's photo array.

19    Q    That's what I'm asking you.  What -- is there

20 ever a term, a concept, called a photo show-up?

21    A    No.

22    Q    Okay.  You're not -- you'd never used a

23 terminology known as a photo show-up?

24    A    I've never used a terminology photo show-up.

25    Q    Okay.  And do you know what a photo show-up

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    is?

2        A    If you're --

3            MS. BITOY:  I'm just going to object to the

4        foundation.  You can go ahead and answer.

5        A    When you say photo show-up, what are you

6    refer -- what -- what are you -- what are you referring

7    to?

8        Q    I -- I'm just referring to -- I -- I've seen

9    the term photos show-up in various police documents. I'm

10   wondering if you have an understanding of what that

11   terms mean in police parlance?

12       A    Well, a photo show-up could be interpreted as

13   a photo array.

14       Q    Okay.  And could a photo show-up be

15   referred -- be interpreted as a show-up?

16           MS. BITOY:  Object, again, to foundation, and

17       if you have an answer, you can answer that.

18       A    My -- my only understanding is photo array.

19   I don't know anything about a photo show-up.

20       Q    Okay.  In the lead homicide training, did you

21   get training on the conduct -- strike that.  On the

22   documentation practices of detectives?

23       A    Yes.

24       Q    And what training did you -- strike that.

25   And did you receive any training in the lead homicide

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1   training course that was on the subject of documentation
2   that was different than what you had learned in your
3   detective division training?
4        A    Not that I recall, no.
5        Q    Did you ever receive any training during the
6   course of your -- strike that.  In your detective
7   division training, did you receive any training about
8   the Jones Palmer litigation from the early 1980s?
9            MS. BITOY:  I object to foundation.  You can
10       answer.
11       A    I don't recall that.
12       Q    In your detective division -- strike that.
13  In the lead homicide training, did you receive any
14  training about the Jones Palmer litigation from the
15  early 1980s?
16           MR. BURNS:  Objection to foundation.
17       A    I don't recall that.
18       Q    In the detective division training you
19  received back in around 2000, did you receive any
20  training about street files?
21           MR. BURNS:  Objection.  Foundation.
22       Q    Go ahead.
23       A    In the -- in the -- as far as training goes?
24       Q    Yes.
25       A    No.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 Q Okay.  In your --

2 A Not that I recall.

3 Q In your lead homicide training, did you

4 receive any training about street files?

5 A Not that I recall, no.

6 Q Okay.  During the course of your detective

7 division training, whether initially or in the lead

8 homicide training, did you receive training that

9 documentation is a requirement of detectives?

10 A Yes.

11 Q Were you trained that documentation was an

12 important step in the role of detectives?

13 A Yes.

14 Q Were you trained that detectives should

15 document their investigative steps?

16 A Yes.

17 Q Were you trained that detectives should

18 document both information that is incriminating and

19 information that is exculpatory towards the det- --

20 towards suspects?

21 A Yes.

22 Q Were you trained to document when you

23 conducted interviews?

24 A Yes.

25 Q Were you trained to document -- strike that.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   Were you trained that it was important to have thorough

 2   and accurate documentation?

 3        A    Yes.

 4        Q    And what steps did you take to try to have

 5   thorough and accurate documentation?

 6             MS. BITOY:  Object to form.  You can answer.

 7        A    I have referred to my -- my general progress

 8   reports when I write my reports.

 9        Q    In other words, you use your notes to help you

10   write thorough and accurate reports; is that correct?

11        A    That's correct.

12        Q    And so were you trained that notetaking was an

13   important step in conducting homicide investigations?

14        A    Yes, it was.

15        Q    And were you trained that notes were an

16   important tool to help you write your reports?

17        A    Yes.

18        Q    And were you trained that you should take

19   notes to help you aid your memory in writing your

20   reports?

21        A    Yes.

22        Q    And did you follow those practices?

23        A    Yes, I do.

24        Q    Is it your practice -- is it your regular

25   practice to take notes during the course of your
```



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  homicide investigations?

2      A    Yes, I do.

3      Q    And then you do you do that as a matter of

4  routine?

5      A    Yes.

6      Q    And what are the types of things you take

7  notes about during the course of your involvement in

8  homicide investigations?

9      A    People I've talked to, crime scene, evidence,

10 canvas, video location.

11     Q    Excuse me.  During the course of your

12 involvement in homicide investigations -- well, strike

13 that.  What information from your notes do you include

14 in your report?

15     A    The information -- what -- my notes dictate

16 what my report says.

17     Q    In other words, the information in your notes

18 helps you prepare the report; is that right?

19     A    That's correct.

20     Q    And sometimes the notes may be cryptic or

21 incomplete, but then you'll flesh that out in your

22 report; is that correct?

23         MS. BITOY:  Objection.  Misstates his

24     testimony.  You can answer that question.

25     A    My notes reflect my re -- my report reflects

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   what my notes say.
 2        Q    Okay.  And would you -- did you try to
 3   take -- when you took notes, would you take notes on the
 4   important things that witnesses were telling you?
 5        A    Yes.
 6        Q    Okay.  And you obviously weren't taking a
 7   transcript of every single thing a witness was saying.
 8   That's fair when you take notes, right?
 9        A    My notes are just -- my notes that'll refresh
10   my recollection of what they said.
11        Q    Okay.  And so any -- anything a witness was
12   telling you that you thought was important or pertinent,
13   you'd take a note on those portions to assist you in
14   writing your future reports, correct?
15        A    My notes reflect what the witnesses told me.
16        Q    Okay.  And when you took notes, would you try
17   to make sure that the information that you believe the
18   witness was telling you that was pertinent to the
19   investigation was included in your notes?
20        A    You're trying to -- you're trying to say I'm
21   putting pertinent stuff in and leaving other stuff out.
22   That's not the truth.  What my note -- my notes reflect
23   what -- my report reflects my notes.
24        Q    Okay.  And in your notes -- what I'm asking
25   you is what do your notes reflect?  Your notes are
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   obviously not a transcription of every word the witness
 2   said, correct?
 3       A    Generally, no.
 4       Q    So what type of information were you
 5   taking -- of all the things the witness told you, what
 6   was the type of information you were putting into your
 7   notes?
 8           MS. BITOY:  Object to the form and foundation,
 9       incomplete hypothetical.  You can answer the
10       question.
11       A    My notes help me write my report.  Based on
12   what's on my notes, my report reflects what's in my
13   notes.
14       Q    I'm not asking you about your report with this
15   question.  I'm asking you a different question, which is
16   just about your notes.  Putting aside the reports for a
17   moment, what type of information that a witness provided
18   you would you include in your notes?
19           MS. BITOY:  Object to asked and answered.
20       You can answer the question.
21       A    I write down basically what the -- what the
22   witness and/or victim had told me.
23       Q    And if there was information a witness told
24   you that you thought was relevant or important to the
25   investigation, would you take notes on it?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      A    Whether it was important or not important,

 2  it would be in my notes.

 3      Q    Okay.  Would you -- did you take notes

 4  contemporaneously?

 5      A    Yes.

 6      Q    In other words, as you were talking to the

 7  witness, you'd take notes as you were talking to them;

 8  is that fair?

 9      A    That's fair.

10      Q    Similarly, if you were at a crime scene and

11  taking notes about what you observed, you'd do that as

12  you were at the crime scene, correct?

13      A    That's correct.

14      Q    It was not your practice to wait until you got

15  back to the police station before you wrote notes,

16  correct?

17      A    That's correct.

18      Q    Okay.  Are there any homicide investigations

19  that you've been involved with in which you simply took

20  no notes?

21      A    Yes.

22      Q    And what are the circumstances in which you'd

23  be involved in a homicide investigation and taking no

24  notes?

25      A    I didn't have -- well, for example, this case,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  I did not take any notes in this case.

2      Q    Why would that be the case?

3      A    I'm sorry?

4      Q    Why would that be the case?

5      A    Because my -- my involvement in this case was

6  very little.

7      Q    Okay.  Let's talk about that.  So let me see

8  here.  I'm showing you a document I've marked as Exhibit

9  1.  These are your interrogatory responses in this

10 matter.  The caption is Fletcher v. Bogucki et al,

11 and it says, "Defendant Anthony Noradin's answers to

12 Plaintiff's first set of interrogatories."  You see

13 that, sir?

14              (EXHIBIT 1 MARKED FOR IDENTIFICATION)

15     A    Yes.

16     Q    Okay.  And so these are a set of responses

17 that you provided to questions from Plaintiff's counsel,

18 correct?

19     A    Yes.

20     Q    And looking at page 11 of this document, is

21 that your signature, sir?

22     A    Yes, it is.

23     Q    Okay.  And so you re -- did you review these

24 interrogatory responses before you signed this?

25     A    I did.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q    Okay.  And so the information in this -- in

2  these interrogatory responses is truthful and accurate;

3  is that fair?

4      A    Yes.

5      Q    Okay.  Let's take a look at question number

6  five.  Question number five says, "Do you contend that

7  Plaintiff James Fletcher murdered Willie Sorrell?  If

8  so, please provide the complete factual basis for your

9  contention."  Do you see that, sir?

10      A    Yes.

11      Q    Okay.  And your answer is, "Defendant Noradin

12  objects to Interrogatory number 5 as it is a contention

13  interrogatory and premature at this stage in litigation.

14  Subject to and without waiving said objection, Plaintiff

15  murdered and/or participated in the murder of Willie

16  Sorrell based on the entirety of the police

17  investigation and the criminal trial testimony."  Do you

18  see that, sir?

19      A    Yes, sir.

20      Q    Okay.  So it's your opinion that Plaintiff did

21  commit the murder of Willie Sorrell; is that correct?

22      A    Yes.

23      Q    Okay.  And you believe you had a sufficient

24  involvement in this homicide invest -- investigation to

25  be able to offer such an opinion, correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    Based on the information that I knew at the

2    time, yes.

3    Q    Okay.  And so you were involved with this

4    investigation in -- strike that.  You were sufficiently

5    involved in the investigation to be able to offer an

6    opinion about Plaintiff being guilty of the murder,

7    fair?

8    A    Fair.

9    Q    Okay.  And you had sufficient involvement in

10   the investigation that you learned the information that

11   caused you to believe Plaintiff was involved in the

12   murder, correct?

13   A    Yes.

14   Q    And what information did you learn during the

15   course of your involvement in the investigation that

16   caused you to believe Plaintiff was guilty of the

17   murder?

18   A    He was identified by two individuals as the

19   person who shot and killed Willie Sorrell.

20   Q    Okay.  And when did you learn that

21   information?

22   A    During the course of the investigation.

23   Q    So you knew that information while you

24   were -- during the course of your involvement, correct?

25   A    At some point, yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  Q   Okay.  And let me ask you this.
2  After Mr. Fletcher was charged with this crime, did you
3  have any other involvement in this investigation?
4  A   I did not.
5  Q   Okay.  So from the time that charges were
6  approved against Mr. Fletcher, did you have any
7  involvement in any work in the pretrial period leading
8  up to the criminal trial?
9  A   I did not.
10  Q   Did you testify at the criminal trial?
11  A   I did not.
12  Q   Did you testify in any post-conviction
13  proceedings?
14  A   I did not.
15  Q   Okay.  And so your entire basis for knowledge
16  regarding the Sorrell murder investigation was your
17  involvement up to the point that charges were approved
18  against Mr. Fletcher; is that correct?
19  A   That's correct.
20  Q   Okay.  And so at the point that charges were
21  approved against Mr. Fletcher, you were aware that he'd
22  been identified by two witnesses, correct?
23  A   Correct.
24  Q   And did you have -- were you involved in those
25  identification procedures?

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    No, I was not.

2    Q    And so how did you learn -- how did you know

3  about them?

4    A    Detective Bogucki and Detective Schalk.

5    Q    Okay.  They told you about it?

6    A    Yes.

7    Q    Okay.  And what did they tell you about the

8  positive identifications of Mr. -- strike that.  What

9  did they tell you about the identifications of Mr.

10  Fletcher?

11    A    Sheenee Friend and Edward Cooper identified

12  him as the person who shot Willie Sorrell.

13    Q    Did they tell you anything else about those

14  identifications?

15    A    That's what I recall.

16    Q    Did they tell you whether there were any other

17  identifications?

18    A    Not that I re -- not that I recall, no.

19    Q    Did they tell you if there were any failed

20  identifications or negative identifications?

21    A    Based on my review of the reports, I --

22  I'm -- I saw there was negative -- negative photo

23  arrays.

24    Q    Were there any negative photo arrays of Jimmy

25  Fletcher?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     Not that I'm aware of.
 2        Q     Okay.  Did anyone ever inform you about
 3   whether there were any negative identification
 4   procedures involving Jim -- Jimmy Fletcher?
 5        A     No.
 6        Q     Did you review any documentation indicating to
 7   you that there were any negative identification
 8   procedures involving Jimmy Fletcher?
 9        A     No.
10        Q     And if there had been negative identification
11   procedures in which Jimmy Fletcher had not been
12   identified from photos, should that have been
13   documented?
14        A     Yes, it should have.
15        Q     Okay.  Should all line-up -- strike that.
16   Should all photo identification procedures, whether
17   line-ups or photo arrays, should those be documented?
18        A     Yes.
19        Q     If the photo array or line-up results in a
20   negative identification or a failure to make an
21   identification, should it still be documented?
22        A     Yes.
23        Q     And what information needs to be documented
24   for even a negative photo array or a line-up?
25        A     Information would be the witness that viewed
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1  the line-up, the participants in that photo line-up, and

 2  whatever documentation that the witness provided at that

 3  time.

 4      Q    When you say whatever documentation that the

 5  witness provided at that time, what do you mean?

 6      A    Reference -- I'm referencing whatever the

 7  witness said at that time.  He -- a person could look at

 8  the photo array and say, "I don't recognize anybody in

 9  these photos."

10      Q    Okay.  In other words, you should -- the

11  report should accurately document what the witness said

12  when they were shown the photos or the line-up, correct?

13      A    That's correct.

14      Q    Okay.  And that's true even if it's a negative

15  line-up, correct?

16      A    Correct.

17      Q    And is the photo line-up, or photo array,

18  supposed to be inventoried in the case of a negative

19  procedure?

20      A    Yes.

21      Q    Okay.  Was that your practice?

22      A    Yes.

23      Q    Did you inventory photo arrays in which it did

24  not result in an identification?

25      A    Is that a general question or are you

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    referring to this -- to this case?

2        Q    Thank you.  And let me clarify.  That --

3    that's a good question.  Was it your practice to

4    inventory photo arrays in which there was a negative

5    identification?

6        A    Yes.

7        Q    And was it your practice to have photographs

8    taken of line-up procedures that resulted in negative

9    identifications?

10        A    Yes.

11        Q    Okay.  And were you -- was your practice, with

12    regard to inventorying negative photo arrays, consistent

13    with the policies of the Chicago Police Department?

14        A    Can we go back one question?

15        Q    Please.

16        A    You asked the question if the -- if there's a

17    photo array we're taking pictures of.  Are you referring

18    to the pho -- a -- a photo array of six individuals, or

19    are you talking about a physical photo array -- of

20    physical line-up?

21        Q    Yeah, sorry.  So let me just clarify again to

22    make sure we're not -- there's no misunderstanding. I'm

23    going to refer to the photo arrays which you've -- which

24    you previously told me as sort of a set of six photos,

25    correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        A    That's correct.

2        Q    Okay.  And then I'm going to separately refer

3    to line-ups as being physical line-ups, correct?

4        A    Correct.

5        Q    Okay.  All right.  So let's just clear it up,

6    and make sure I'm not misunderstanding.  So your

7    practice was -- strike that.  With regard to photo

8    arrays, your practice was to inventory the photo arrays

9    even if they resulted in a negative identification,

10   correct?

11       A    That is correct.

12       Q    And your -- and that practice was consistent

13   with Chicago Police Department policy, correct?

14            MR. BURNS:  Objection.  Foundation.

15            MS. BITOY:  And foundation.  Sorry.  Sorry,

16       Dan.

17       A    Yes, correct.  Correct.

18   BY MR. SWAMINATHAN:

19       Q    And that practice was consistent with Chicago

20   Police Department training for detectives, correct?

21            MR. BURNS:  Objection.  Foundation.

22            MS. BITOY:  Foundation.  Object.  Join.

23       You can answer.

24       A    Correct.

25       Q    And with regard to live line-up procedures,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    your practice was to document with photos those -- the
 2    participants in the line-up, even in the case of
 3    negative identifications, correct?
 4         A    Correct.
 5         Q    Okay.  And your practice with regard to live
 6    line-ups was consistent with CPD policy, correct?
 7              MS. BITOY:  Objection.  Foundation.
 8              MR. BURNS:  Objection.  Foundation.
 9         A    Correct.
10         Q    And your practice was consistent with CPD
11    training, correct?
12              MS. BITOY:  Same objection.
13         A    Correct.
14         Q    Did you participate in -- strike that.  Let's
15    take a look at your -- oh, sorry.  Looking again at
16    interrogatory number 5 and your answer to interrogatory
17    number 5.  Other than the two positive identification
18    procedures that you learned about from Mr. Bogucki and
19    Schalk, what other basis do you have for asserting that
20    Plaintiff was guilty of the Willie Sorrell murder?
21         A    Based on interviews of Sheenee Friend and
22    Edward Cooper.
23         Q    Did you participate in either of those
24    interviews?
25         A    I did not.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     And how did you learn about those interviews?

 2        A     Based on what I've read in the reports.

 3        Q     Okay.  And when did you read that information

 4   in the reports?  Was it recent in preparation for this

 5   deposition, or was this back at the time that you were

 6   involved in the homicide investigation?

 7        A     Back when I was involved in homicide

 8   investigation.  I made my --

 9        Q     Okay.

10        A     I -- I reviewed the reports in -- in reference

11   to the investigation.  Familiar -- to familiarize myself

12   with the investigation.

13        Q     Okay.  So when you were in -- your involvement

14   -- during the course of your involvement in the

15   investigation, you familiarized yourself with the

16   reports that had been prepared in that investigation up

17   to that point, correct?

18        A     That's correct.

19        Q     And so at that time, you had learned of the

20   information contained in the various reports that had

21   been prepared by your colleagues, correct?

22        A     Correct.

23        Q     Did you have any oral conversations with

24   Mr. Bogucki or Mr. Schalk about the interviews of

25   Mr. -- of Ms. Friend or Mr. Cooper?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       A    I reviewed their -- their progress note,

2   general -- general progress notes as well as the

3   handwritten statements.

4       Q    Okay.  And this was, again, back during the

5   time of your involvement in the investigation, correct?

6       A    Correct.

7       Q    Okay.  Did you -- what other information were

8   you aware of during your involvement in the homicide

9   investigation that you rely on for purposes of asserting

10  that Plaintiff was involved in the murder of Willie

11  Sorrell?

12      A    Just -- just -- just those facts alone, and

13  that he was identified by the two witnesses.  And the

14  interviews conducted by -- conducted with Edward Cooper

15  and Sheenee Friend.

16      Q    Have you ever had any -- you said you didn't

17  have any involvement in the criminal trial, correct?

18      A    I did not.

19      Q    Did you meet with any prosecutors in

20  preparation for the criminal trial?

21      A    I did.  Yes, I did.

22      Q    And then ultimately, you did not testify; is

23  that correct?

24      A    That's correct.

25      Q    Do you know why the decision was made for you

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    not to testify?

2          MS. BITOY:  Objection.

3      A    I do not.

4          MS. BITOY:  Objection.  Calls for speculation.

5    You can answer.

6      A    I do not.

7      Q    Did you review reports in the course of your

8    meeting with the prosecutors in preparation for trial?

9      A    I did not.

10     Q    Did you review any reports independently

11   before you met with prosecutors for possible testimony

12   at the criminal trial?

13     A    I did not.

14     Q    Have you learned any -- strike that.  Have you

15   reviewed any documents related to the post-conviction

16   proceedings involving Mr. Fletcher?

17     A    I have not.

18     Q    Are you aware of what evidence was used to

19   obtain Mr. Fletcher's exoneration?

20         MS. BITOY:  I'm going to object for calls for a

21    legal conclusion and foundation.  You can answer.

22     A    I do not.

23     Q    Did you review the federal judge's decision

24   related to Mr. Fletcher's case?

25     A    I did not.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     As you sit here today, do you have any
 2   knowledge about why Mr. Fletcher's conviction was
 3   vacated?
 4        A     I do not.
 5        Q     Do you have any opinion about whether the
 6   vacating of his conviction was appropriate?
 7             MS. BITOY:  Object to form.  You can answer.
 8        A     I -- I can't give an opinion on something I
 9   don't know the background on.
10        Q     Okay.  And so given that you have not reviewed
11   the evidence that resulted in his conviction being
12   vacated, do you still stand by an opinion that Plaintiff
13   murdered Mr. Sorrell?
14             MS. BITOY:  Just object to form, foundation.
15        You can answer.
16        A     Based on the information I knew back at the
17   time with the identification of Ms. -- Mr. Fletcher
18   being the person who shot Willie Sorrell, yes.
19        Q     Okay.  And is it your opinion -- strike that.
20   Is it your testimony that regardless of what information
21   was developed during the course of the post-conviction
22   investigation, it would not and could not change your
23   opinion about Plaintiff's involvement in the Sorrell
24   murder?
25             MS. BITOY:  Object to form, foundation, calls
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
1        for legal conclusions.  You can answer.
2        A    I don't -- I can't compare the two to make a
3   final, I can't compare the two to give you a decision
4   why -- I don't know why his -- why there was a legal
5   process after he was convicted.  I just know up until
6   that point he was identified by two witnesses and based
7   on the witnesses identification and the witnesses
8   interview, that's why he was -- he was charged
9   with -- with what he was charged with.
10       Q    Okay.  And so you -- certainly, it was your
11  belief at the time that Plaintiff was charged with the
12  murder based on your involvement in the investigation
13  that he was guilty of that crime, correct?
14       A    Based on that information, yes.
15       Q    Okay.  And you acknowledge that since that
16  time, other evidence has been developed that you're not
17  aware of that resulted in his conviction being vacated,
18  correct?
19            MS. BITOY:  Object to the foundation.
20       You can answer.
21       A    Based on what you're telling me, the --
22  that's -- that's how I know.
23       Q    Okay.  And you've seen the complaint in this
24  case, correct?
25       A    Pardon me?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       Q    You've seen the complaint, the lawsuit that

2 was filed against you, correct?

3       A    I believe I read it once, but it was a long

4 time ago.

5       Q    Okay.  And so you understand that the only

6 reason there's a lawsuit now is because Mr. Fletcher's

7 conviction was vacated, correct?

8           MS. BITOY:  Object to foundation, calls for a

9     legal conclusion.  You can answer.

10       A    I believe.  Yeah, that's what I believe, yes.

11       Q    Okay.  And do you have any knowledge about

12 what -- strike that.  Do you have any understanding

13 today about what the claims are about the misconduct

14 that occurred in this case that resulted in

15 Mr. Fletcher's conviction?

16       A    I do not.

17           MS. BITOY:  Object.  Objection, foundation,

18     calls for legal confusion.  You can answer.  Sorry.

19       A    I do not.

20       Q    All right.  Let's look at your -- let's look

21 at number 6.  Interrogatory number 6.  Do you see that,

22 sir?

23       A    Yes.

24       Q    Okay.  Just take a moment to read

25 interrogatory number 6 and your response and let me know

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    when you've done so.

 2         A    Okay.

 3         Q    All right.  Basically, interrogatory number 6

 4    asks whether you participated in any identification

 5    procedures including photo arrays and live line-ups,

 6    correct?

 7         A    Correct.

 8         Q    And your answer is, "Well, look at the police

 9    reports contained in the investigative file," which is

10    at Bates stamps 1 through 226, correct?

11         A    Yes.

12         Q    Is there any information that is contained in

13    the investigative file that you believe is false or

14    inaccurate?

15              MS. BITOY:  Object to form, foundation.

16         You can answer.

17         A    No.

18         Q    You reviewed the investigative file in

19    preparation for this deposition, correct?

20         A    I did.

21         Q    And when you reviewed the investigative file

22    in preparation for this deposition, did you find any

23    information in it that was false or inaccurate?

24              MS. BITOY:  I'm just going to object to the

25         foundation.  You can answer.
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     A    No.

2     Q    When you -- did you review the investigative

3    file before you answered these interrogatories?

4     A    No.

5     Q    Okay.  When you reviewed the investigative

6    file -- strike that.  Your interrogatory response

7    indicates that the answer to the question, "Did you

8    participate in any identification procedures including

9    photo arrays and live line-ups," is contained in the

10   investigative file at City-JF 1 through 226, correct?

11    A    Correct.

12    Q    Okay.  All right.  Let's take a look at a

13   document that I've marked as Exhibit 2.  Let's not use

14   this version.  Sorry.  Sorry about that.  Let's see.

15   Okay.  Let's see if this works here.  All right.

16   Are you able to see a document on my screen now?

17         (EXHIBIT 2 MARKED FOR IDENTIFICATION)

18    A    I do.

19    Q    Okay.  All right.  I'm showing you a document

20   I've marked as Exhibit 2.  This is City-JF 153 through

21   158.  Do you see that, sir?

22    A    I do.

23    Q    Okay.  And so this is that investigative file

24   that you referred to in your interrogatory, correct?

25    A    It's one of them, yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Okay.  Strike that.  Good point.  This is a

2    document that is part of the investigative file that

3    you referred to in your interrogatory response, correct?

4    A    Correct.

5    Q    And this is one of the documents that you

6    reviewed in preparation for this deposition, correct?

7    A    Correct.

8    Q    Okay.  And this document is a Chicago Police

9    Department supplementary report, documenting in

10   particular a line-up report, correct?

11   A    Correct.

12   Q    Okay.  And this is a line-up report obviously

13   conducted in this as part of the Sorrell investigation,

14   correct?

15   A    Correct.

16   Q    Okay.  And what's the date that this report

17   was submitted?

18   A    21 May 2002.

19   Q    Okay.  And this is ultimately documenting a

20   line-up that occurred on what date?

21   A    20 April 2002.

22   Q    Okay.  Do you know why it took so long to

23   create documentation of a line-up?

24        MS. BITOY:  Objection form, foundation.  You

25   can answer.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      A     I do not.

 2      Q     And if you look on page 6 of this document,

 3  it identifies the report as being the report of

 4  Mr. Schalk, Mr. Bogucki, and yourself, correct?

 5      A     That's correct.

 6      Q     Okay.  And so you did have -- you were

 7  involved in this line-up procedure; is that correct?

 8      A     To certain -- to some certain extent I was.

 9      Q     In what way were you involved in the line-up

10  procedure?

11      A     You know, my only participation in this

12  line-up procedure was the transfer of James Fletcher

13  from 26th and California to the Area 5 Detective

14  Division.

15      Q     Did you have any other involvement in the

16  line-up procedure?

17      A     I had no contact with the witnesses.  I had no

18  contact with anybody else in reference to the line-up

19  procedure, other than transport procedure from 26th and

20  Cal to Area 5 Detective Division.

21      Q     So in other words, you're saying you went to

22  26th and California and brought Mr. Fletcher to Area 5;

23  is that right?

24      A     That's correct.

25      Q     Did you stand with the line-up participants in

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    the viewing room?

2        A    I did not.

3        Q    Okay.  Did you -- were you in the room with

4    the witnesses who viewed the line-up?

5        A    I did not.

6        Q    So your testimony is that you actually had no

7    involvement in the actual line-up itself; is that

8    correct?

9        A    That is correct.

10       Q    Do you know why you were included as being

11   individuals who participated in this line-up on this

12   report Exhibit 2?

13       A    Why I was included in this report?

14       Q    Yeah.

15       A    For the transfer of James Fletcher from 26th

16   and California to Area 5 Detective Division.  And if you

17   scroll up a little bit, under persons conducting

18   line-up, there's the two -- there's Detective Bogucki

19   and Detective Schalk.

20       Q    And so that indicates that you did not

21   participate -- you did not actually conduct the

22   line-up, correct?

23       A    Correct.

24       Q    Who was in the room with the witnesses when

25   the line-up was conducted?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1         MS. BITOY:  Objection form, foundation.

2     You can answer.

3     A    I don't know.

4     Q    And did you have -- you see a list of persons

5  present at the line-up as Attorney J. Cunyon Gordon?

6     A    I see that, yes.

7     Q    Did you have any communications with

8  Mr. Gordon?

9     A    I did not.

10    Q    And did you have any -- strike that.  Do you

11  have any knowledge about any interactions with Gordon?

12    A    I did not.

13    Q    Did you have -- and do you have any

14  information about -- strike that.  But was Attorney

15  Gordon in -- did Attorney Gordon participate in the

16  line-up as far as you know?

17        MS. BITOY:  Objection, foundation.  You can

18    answer.

19    A    I don't know.

20    Q    Did -- was Attorney Gordon allowed to be in

21  the room while the witnesses view the line-up?

22        MS. BITOY:  Objection.  Foundation.  You can

23    answer.

24    A    I don't know.

25    Q    Okay.  Did you have any knowledge of whether

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  an attorney appeared on behalf of Mr. Fletcher at the

2  police station that day?

3          MS. BITOY:  Objection.  Foundation.  You can

4      answer.

5      A    I don't recall any knowledge of that, no.

6      Q    Okay.  So what were you doing -- strike that.

7  You were involved in the investigation on April 20,

8  2002, correct?

9      A    I was.

10     Q    And what did you do on that day?

11     A    I don't recall.

12     Q    Do you recall doing anything other than

13 transferring Mr. Fletcher to the police station?

14     A    No, I don't recall anything other than that.

15     Q    Okay.  If you had done anything else other

16 than that, would you have written some notes or

17 documentation about it?

18     A    Yes.

19     Q    And by the way, do you know -- are you able to

20 say with certainty that you didn't take any notes during

21 the course of your involvement in this homicide

22 investigation?

23     A    If I took notes in this homicide

24 investigation, they would be part of the file.

25     Q    Well, certainly under policy they should be in



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    the file.  Any notes you took, you would preserve them

2    and keep them in the file, correct?

3          A    Any notes that I would've -- would've drafted

4    would've been part of the file.

5          Q    Okay.  And when you -- when you take notes, do

6    you immediately put them into the investigative file or

7    do you first you keep them with yourself for some period

8    of time?

9          A    They go in the investigative file with a

10   report.

11         Q    And so when you type up a report and complete

12   the report and submit it, you submit it with the notes;

13   is that correct?

14         A    That's correct.

15         Q    And sometimes there's a little bit of delay

16   before you write a report, correct?

17         A    Depending on the circumstances, yes.

18         Q    Sometimes it -- sometimes it'll take you as

19   long as a month to write a line-up report?

20             MS. BITOY:  Objection to form, foundation. You

21       can answer.

22         A    It could take a day, it could take two days,

23   it could take a month, yes.

24         Q    Okay.  And during that period of time, if you

25   had notes, you would hold on to those notes until you

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   submitted the line-up report, correct?

2       A    Correct.

3       Q    And same thing is true for a cleared open or

4   cleared closed report, correct?

5       A    Correct.

6       Q    It could sometimes take as much as a month for

7   you to write a cleared -- to submit a cleared open or

8   cleared closed report, correct?

9           MS. BITOY:  Object as to the foundation.

10      You can answer.

11      A    If there -- depending on how in-depth the

12  investigation is, it may take time.

13      Q    Okay.  And in those circumstances, you would

14  hold onto your notes until you submitted the report,

15  correct?

16      A    Yes.

17      Q    Okay.  And in this investigation, do you have

18  any memory -- strike that.  Do you have any personal

19  memory about whether you created any notes or not during

20  the course of this investigation?

21      A    I did not create any notes in the part of this

22  investigation.

23      Q    And your knowledge of that is based on the

24  fact that you don't see any notes in the investigative

25  file from you, correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A     No.  My -- my knowledge is based on what I

2   recall.  I did not -- I did not take any notes in this

3   case.

4      Q     Did you interview any witnesses in this case?

5      A     I did not.

6      Q     Did you have -- strike that.  Did you have any

7   interactions with any of the witnesses related to this

8   trial investigation?

9      A     I did.

10     Q     Which witnesses?

11     A     Terry Rogers.

12     Q     Okay.  And you were -- you participated in an

13  interview of Terry Rogers, correct?

14     A     An interview with the state's attorney.

15     Q     Okay.  And did you take any notes on that

16  interview?

17     A     I did not.

18     Q     How many interviews did you participate in

19  which Terry Rogers was questioned?

20     A     Just the one with the state's attorney.

21     Q     Well, tell me about how that conversation went

22  down.

23     A     What do you mean, how the conversation went

24  down?

25     Q     Yeah.  So did you meet with the -- did the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   state's attorney meet with Mr. Rogers just once?

2        MS. BITOY:  Just going to object to foundation.

3     You can answer.

4     A    My recollection is she met with him at least

5   once or twice.

6     Q    Okay.  You met with Mr. Rogers in May of 2002,

7   correct?

8     A    Correct.

9     Q    Okay.  And when you met with Rogers in May of

10  2002, how many times did you meet with him?

11    A    Are you asking how many times did I meet with

12  him prior to May?

13    Q    No, I'm asking when you met with him in May of

14  2002, how many times?

15    A    Well, when you say how many times, he was

16  picked up at 26th and California, brought to Area 5, and

17  he was interviewed by the state's attorney in my

18  presence.

19    Q    Okay.  And so when he was brought to Area 5,

20  who brought him?

21    A    I believe myself, Detective Schalk, and

22  Detective Bogucki.

23    Q    And what did you-all say to Mr. Rogers during

24  the course of that transport?

25    A    I don't recall.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    And what did Mr. Rogers say to you-all during

2    the course of that transport?

3    A    I don't recall.

4    Q    And then once he got to Area -- once he'd been

5    brought to Area 5, how many interviews were conducted

6    with Mr. Rogers before he met with the state's attorney?

7         MS. BITOY:  Object to foundation.  You can

8       answer.

9    A    My -- far as I know, I don't recall if there

10   were any interviews conducted prior to the state's

11   attorney arriving at Area 5.

12   Q    Okay.  So sitting here today, do you have any

13   ability to say whether or not any interviews were

14   conducted of Mr. Rogers before the state's attorney

15   arrived?

16   A    I -- I can't.  I don't recall.

17   Q    Okay.  Did you participate in any interviews

18   of Mr. Rogers before the state's attorney arrived?

19   A    Not -- not that I recall, no.

20   Q    Okay.  And you can't say whether or not

21   Mr. Bogucki and Mr. Schalk participated in any

22   interviews of Mr. Rogers before the state's attorney

23   arrived, correct?

24        MS. BITOY:  Object the foundation.  You can

25      answer.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    No, I can't answer that.  I -- I don't recall

2    that.

3        Q    Okay.  And so once the state's attorney

4    arrived, what happened?

5        A    The interview with myself and Terry Rogers and

6    the state's attorney, did -- conducted an interview as

7    with her doing a handwritten statement.

8        Q    Okay.  And how long did that interview last?

9        A    I don't recall.

10       Q    Was it ten minutes, was it an hour, was it

11   three hours?  Can you give me a general ballpark?

12       A    Based on handwritten statement, I would -- I

13   would venture to say about an hour.

14       Q    Okay.  And when that handwritten statement was

15   taken -- well, strike that.  The handwritten statement,

16   was that written out while Mr. Rogers was in the room

17   with the state's attorney, or did the state's attorney

18   write that out in another room before coming back in to

19   show it to Mr. Rogers?

20       A    No.  The -- the handwritten statement was

21   taken in my presence, Terry Rogers' presence, and the

22   state's attorney's presence.  She wrote -- she was

23   writing down as Terry Rogers was -- was speaking.

24       Q    So she was actually -- so whatever he was

25   saying to her, she was just writing it out dutifully as

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    he was saying it; is that correct?

2           MS. BITOY:   Object to form.   But you can

3       answer.

4       A    As the interview was -- as the interview was

5    taking place, she was taking -- she was written -- doing

6    the handwritten statement.

7       Q    And so she was initially interviewing him to

8    learn what information he could provide in writing down

9    his answers; is that correct?

10          MS. BITOY:   Objection, foundation, calls for

11      speculation.   You can answer.

12      A    Based on what I've read, she interviewed him a

13   couple times.   I'm sure she -- I don't -- I can't speak

14   for what she knew and what she didn't know,

15   but I -- under my assumption, she already had an idea of

16   what he was going to say.   But she did interview him one

17   more time prior to taking the handwritten statement.

18      Q    So when you say she interviewed him

19   previously, you're talking about it at points prior to

20   you picking him up that day in May of 2002, correct?

21      A    Based on the reports, yes.

22      Q    Okay.   But on that day when she came in to

23   interview him with you, that was the first time she was

24   interviewing him that day, correct?

25      A    Yes.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1          MS. BITOY:  Object to foundation.  Sir, you can

 2     answer.

 3      A    Yes, that day.

 4      Q    And that's the first time you were

 5     interviewing him that day, correct?

 6      A    Yes.

 7      Q    Okay.  In fact, let's pull up that handwritten

 8     statement.  So we're -- we've got it in front of us.

 9     All right.  I'm showing you the document I've marked as

10     Exhibit 3.  It's Bates stamp City-JF 161 to 163, and it

11     says it's a statement of Terry Rogers.  Do you see that,

12     sir?

13          (EXHIBIT 3 MARKED FOR IDENTIFICATION)

14      A    I do.

15      Q    You're familiar with this document, correct?

16      A    I am.

17      Q    This is the document that was created based on

18     your participation in an interview of Mr. Rogers at Area

19     5, correct?

20      A    Correct.

21      Q    And on the right-hand near the top of the

22     page, on the right-hand side it says Detective Noradin.

23     Do you see that?

24      A    I do.

25      Q    That's you, correct?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-33 Filed: 05/06/25 Page 66 of 236 PageID #:6800
The Deposition of JACKSON NORADIN, taken 05/06/25, Page 66 of 236

64

1     A    Yes, it is.

2     Q    **That's your star number, correct?**

3     A    It is.

4     Q    And is that you -- is that Detective Noradin

5 is written there, is that written by you or by somebody

6 else?

7     A    That's written by the state's attorney.

8     Q    Okay.  And the handwriting on this page, whose

9 handwriting is it?

10    A    The state's attorney.

11    Q    And at the bottom of the page, there's some

12 signatures, correct?

13    A    Bottom of page is my signature, Terry Rogers'

14 signature, and Jennifer Walker's signature.

15    Q    Okay.  And on the second page, the text of the

16 document is whose handwriting?

17    A    Jennifer Walker.

18    Q    And at the bottom of the page, are there some

19 signatures?

20    A    Correct.  Terry Rogers' signature, my

21 signature, and Jennifer Walker's signature.

22    Q    Okay.  And on page 3, the body of the document

23 contains the handwriting of who?

24    A    State's Attorney Jennifer Walker.

25    Q    Okay.  And then there's some signatures on

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   this page, correct?

2        A     Correct.

3        Q     Okay.  And whose signatures are there?

4        A     Terry Rogers, myself, and Jennifer Walker.

5        Q     And right at the end of the text before sort

6   of the X at the bottom of the page, one of those

7   signatures is yours, correct?

8        A     I can't tell for sure.

9        Q     Well, there's three signatures there, right

10  above the X, correct?

11       A     Above the X, yes.  Mine is number two.

12       Q     Okay.  So the -- so there's three signatures

13  there, and one of those is yours above the X, correct?

14       A     Correct.

15       Q     Okay.  And then at the bottom of the page,

16  there's some additional signatures you see that?

17       A     I can only see part of it.  I can't see all of

18  it.

19       Q     Okay.  It appears to be partially cut off,

20  right?

21       A     Correct.

22       Q     Okay.  Was it your practice to sign the pages

23  more than once or at the bottom of the page on the last

24  page?

25       A     I believe it -- it was signed more than once

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  because there was a -- because of the X was placed in

2  there and we signed below the X.  But I -- based on what

3  I see here, I can't definitively say.

4      Q    Okay.  This -- so obviously this document --

5  strike that.  The information contained in this document

6  about what happened in relation to the Sorrell

7  investigation was written by Assistant State's Attorney

8  Walker, correct?

9      A    Correct.

10     Q    Okay.  And Assistant State's Attorney

11 Walker -- strike that.  Why wasn't this written out by

12 Mr. Rogers?

13         MS. BITOY:  Object to foundation.  You can

14     answer.

15     A    It was the practice of the state attorney's

16 office that they wrote the handwritten -- they

17 wrote -- they did the handwritten statement.

18     Q    Was Mr. Rogers asked to write out a

19 handwritten statement himself?

20     A    I don't recall.  I don't recall.

21     Q    Was it your practice to ask individuals who

22 were giving incriminating statements to write out those

23 statements themselves in their own words?

24         MS. BITOY:  Object to incomplete hypothetical.

25     You can answer.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A      No.

 2        Q      Okay.  Looking at this document, the

 3   information contained in the document, this was written

 4   out by Assistant State's Attorney Walker.  Is that your

 5   testimony?

 6        A      Yes, it is.

 7        Q      And was it written out -- and your testimony,

 8   it was written out in front of Mr. Rogers, correct?

 9        A      Correct.

10        Q      And so is -- as Mr. Rogers was being asked

11   questions and giving answers, this statement was being

12   written; is that right?

13        A      Correct.

14        Q      And so was this being written out

15   contemporaneously as Mr. Rogers was being interviewed?

16        A      Yes.

17        Q      Okay.  And so these are based -- are these his

18   words or somebody else's words that are written on

19   Exhibit 3?

20        A      Those are his words.  Based on what

21   I can -- based on what I see, yeah, those are his words.

22        Q      Okay.  And is that consistent with your

23   memory, that basically as you sat with Mr. Rogers, he

24   gave you a description of what happened, and you-all

25   just dutifully wrote it out?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          MS. BITOY:  Object to form.  You can answer.

2     A    Correct.

3     Q    Okay.  And did you ask any questions of

4 Mr. Rogers during the course of that interview?

5     A    Not that I recall, no.

6     Q    And so all the questions were being asked by

7 the state's attorney?

8     A    Yes.

9     Q    And how were the questions asked?  Were they

10 just open-ended questions, tell me what happened, or was

11 it something else?

12    A    It was open-ended questions.

13    Q    Okay.  And so what do you mean by open, it was

14 open-ended questions?

15    A    Basically, what you just said.  She asked

16 him -- she asked him what happened and he explained

17 what -- what he saw.

18    Q    Okay.  So basically what happened -- when you

19 went in for that interview of Mr. Rogers, the state's

20 attorney came in and obviously read -- strike that. Did

21 the state's attorney read him his rights?

22    A    No.

23    Q    Why not?

24    A    He wasn't under arrest.

25    Q    Okay.  When the state's attorney provided

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    some -- did the state's attorney provide any preliminary

2    remarks to him when she first came in?

3        A    I don't recall.

4        Q    Did you provide any preliminary remarks to

5    Mr. Rogers?

6        A    No, I don't recall that.

7        Q    Okay.  And then essentially Mr. Rogers was

8    asked what happened with regard to the trial

9    investigation and he told you what happened, correct?

10       A    Correct.

11       Q    And then she basically wrote that all out as

12   he was talking, correct?

13       A    Correct.

14       Q    Okay.  And did she -- and then after that was

15   done, was Mr. Rogers given an opportunity to review the

16   statement?

17       A    He was.

18       Q    And was that -- was it given to him to read,

19   or was it read to him?

20       A    Yeah, I believe it was read to him based on

21   what the -- based on what the handwritten says.

22       Q    Okay.  And so basically what was written in

23   the handwritten statement was read to Mr. Rogers,

24   correct?

25       A    Correct.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  Q    And you were present for that, correct?

2  A    Correct.

3  Q    And what was written on the handwritten

4  statement as it was read to him, did it sound to you

5  like the exact same thing that Mr. Rogers had just said

6  to you while he was being interviewed?

7  A    Yes.

8  Q    Okay.  And so as you -- as the handwritten

9  statement was being read to Mr. Rogers, it reflected

10  Mr. Rogers's words; is that right?

11  A    It reflected what he said.

12  Q    Okay.  And was it paraphrased or rephrased as

13  the state's attorney wanted or was it actually the

14  things that he was saying?

15      MS. BITOY:  Just going to object to foundation.

16  You can answer.

17  A    It was what he was saying.

18  Q    And were the things that he said during the

19  course of that interview that was left out of the

20  handwritten statement when you heard it being read?

21  A    No.

22  Q    All right.  And why did you participate in

23  this interview of Mr. Rogers?

24  A    I was asked by Detective Schalk and Bogucki to

25  sit in on the handwritten statement.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1       Q     You hadn't previously participated in any

 2  interviews of Mr. Rogers?

 3       A     I had not.

 4       Q     But Mr. Bogucki and Mr. Schalk had, correct?

 5       A     Correct.

 6       Q     You had reviewed you had familiarized yourself

 7  with the investigation up to that point, correct?

 8       A     Correct.

 9       Q     So you knew that they had interviewed

10  Mr. Schalk -- strike that.  You knew that they had

11  interviewed Mr. Rogers on several occasions, correct?

12       A     Correct.

13       Q     Okay.  And so in the typical course, would

14  they have been the ones to sit in for the handwritten

15  statement?

16            MS. BITOY:  Object to foundation.  You can

17       answer.

18       A     They could have, yes.

19       Q     Okay.  And do you have any understanding of

20  why they asked you to do it instead of them?

21       A     I don't.

22       Q     Okay.  Was Mr. -- what was Mr. Rogers's

23  demeanor during the course of this interview with him

24  resulting in the handwritten statement on May 8, 2002?

25       A     I don't recall.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  Q    Well, was he acting erratically or bizarre in
2  any way?
3       MS. BITOY:  Objection foundation.
4  A    Not that I recall, no.
5  Q    Was there anything unusual about his behavior?
6       MS. BITOY:  Objection.  Foundation.
7  A    Not that I recall.
8  Q    Was he hostile in any way?
9  A    Not that I recall.
10  Q    Was he cooperative?
11  A    I believe he was cooperative.  I don't have
12  independent recollection as I sit here right now
13  if -- but based on him -- the handwritten statement,
14  I believe he was cooperative.
15  Q    Okay.  And if he had been hostile, is that
16  something you would've noted?
17  A    Yes.
18  Q    Okay.  And why would you have noted if a
19  witness was being hostile in the course of an interview
20  like this to prepare a handwritten statement?
21  A    Because it would've been included.  The
22  state's attorney would've included his -- him being
23  hostile and/or his attitude if he had an attitude in the
24  handwritten statement.
25  Q    Okay.  And why didn't you take -- you said

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    your practice was to take notes during the course of

2    interviews.  Why didn't you take any notes during the

3    course of this interview?

4        A    What -- what -- I reviewed Detective Schalk's

5    GPR, general progress report, prior to going into the

6    handwritten statement, and I remembered what it said.

7    There was no need for me to take notes.

8        Q    And so is it your testimony that Mr. Rogers

9    was saying the exact same things he'd said to Mr. Schalk

10   in his general progress report?

11       A    Yes.

12       Q    Okay.  By the way, had Detective Schalk

13   created any supplementary report related to his earlier

14   interview of Mr. Rogers?

15       MS. BITOY:  Object to foundation.  You can

16       answer.

17       A    I believe it's part of the -- the actual last

18   report that was generated.

19       Q    Okay.  But that -- but at the point that you

20   were review -- before you went in to talk to Mr. Rogers

21   on May 8, 2002, that report hadn't been created.  That

22   cleared open report referencing Mr. Rogers's interview

23   had not been created yet, correct?

24       A    Correct.

25       Q    Okay.  So you didn't -- did you have any

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   supplementary report that documented Mr. Schalk's

2   earlier interview of Mr. Rogers?

3       A    Other than his general progress report, no.

4       Q    Okay.  And did you have an -- do you have an

5   understanding about whether Mr. Bogucki or Mr. Schalk or

6   both of them conducted the interviews of Rogers before

7   May 2002?

8           MS. BITOY:  Object to foundation.  You can

9       answer.

10      A    I know Rogers was interviewed by other

11  detectives prior to that, early on in the investigation.

12  And I believe it wasn't Detective Schalk or Bogucki at

13  that time, I believe it was somebody else.

14      Q    Okay.  In other words, on the original date of

15  the shooting, there was a Detective Fleming who was

16  involved in the investigation, correct?

17      A    Correct.

18      Q    And do you know Detective Fleming?

19      A    I do not.

20      Q    Did you ever work with him?

21      A    I don't know him.

22      Q    Okay.  And so what you're noting is that when

23  you reviewed the file, you saw that Detective Fleming

24  had previously interviewed Mr. Rogers, correct?

25      A    That's correct.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    And by the way, when you familiarized yourself

2    with this investigation before going into the room with

3    Mr. Rogers on May 8, 2002, you review -- had reviewed

4    those earlier reports in the investigation going all the

5    way back to 1990, correct?

6    A    Yes.

7    Q    Okay.  So you knew that there had been these

8    earlier interviews of Mr. Rogers on the day of the crime

9    itself, correct?

10    A    Correct.

11    Q    And you knew, excuse me, and then you said you

12    subsequently knew about the follow-up investigation that

13    had been conducted with Mr. Rogers leading up to

14    the -- to May 8, 2002, correct?

15    A    Yes.

16    Q    Okay.  And so do you know, other than

17    Mr. Fleming -- strike that.  Other than Mr. Fleming, you

18    were aware that Detectives Bogucki and Schalk had

19    continued this investigation in the period from 1995

20    through May of 2002, correct?

21    A    Yes.

22    Q    And you knew that they had interviewed

23    Mr. Rogers during the course of this period from 1995 to

24    2002, correct?

25    A    Correct.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1         Q    Okay.  And do you know which of them
2    interviewed Mr. Rogers?
3         A    I do not.  You know what, let me -- let me
4    rephrase that.  I know at least Detective Schalk did
5    because he has a general progress report in there.
6         Q    And you don't know one way or the other
7    whether Mr. Bogucki also participated in that interview?
8         A    I don't know that.
9         Q    Okay.  Was it their practice, in your
10   experience working with them, to interview witnesses
11   together or separately?
12            MS. BITOY:  Object to foundation.  You can
13       answer.
14        A    I believe they did everything together.
15        Q    Okay.  And they were partners for a long time,
16   correct?
17        A    Yes, they were.
18        Q    How long did you work with Detective Bogucki
19   and Schalk?
20        A    Maybe two years.
21        Q    What was your opinion of Detective Bogucki?
22        A    He's very knowledgeable and very
23   straightforward.
24        Q    Did you ever see him engage in any type of
25   misconduct?
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1      A    No.

 2      Q    Did you ever see him cut corners?

 3      A    No.

 4      Q    What was your opinion of Detective Schalk?

 5      A    The same.

 6      Q    The same meaning what?

 7      A    The same as Detective Bogucki.

 8      Q    And what is that?

 9      A    Straightforward, knowledgeable.

10      Q    What -- did you ever seen Detective Schalk

11 commit any kind of misconduct?

12      A    No.

13      Q    Have you ever seen Detective Schalk cut

14 corners?

15      A    No.

16      Q    Have you ever seen any Chicago Police

17 Department detective engage in any type of misconduct?

18      A    No, not in my presence.

19      Q    Have you ever reported any Chicago police

20 officer for engaging in any type of misconduct?

21      A    I have not.

22      Q    Are you aware of any Chicago police detective

23 ever accusing another Chicago police detective engaging

24 in misconduct?

25           MS. BITOY:  Object to foundation.  You can
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        answer.

 2        A     Not, not to my knowledge.

 3        Q     Are you aware of any Chicago police detective

 4   ever reporting another detective for engaging in

 5   misconduct?

 6             MS. BITOY:  Same objection.  Answer.

 7        A     Not that I'm aware of.

 8        Q     Are you aware of any Chicago Police Department

 9   detective sergeant -- when I say detective sergeant,

10   sorry, I mean a sergeant overseeing detectives.  Let me

11   rephrase.  Have you ever -- strike that.  During the

12   course of your time, more than what two decades as a

13   homicide detective, have you ever seen an instance in

14   which a sergeant supervising detectives reported a

15   homicide -- strike that.  In your two decades working as

16   a detective, have you ever seen a sergeant supervising

17   detective report a detective for engaging in misconduct?

18             MS. BITOY:  Object to foundation.  You can

19        answer.

20        A     No, not my presence.

21        Q     Are you aware of any instance in which a

22   sergeant supervising detectives reported a detective for

23   misconduct?

24             MS. BITOY:  Objection.  Foundation.

25        A     No, not my presence.
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1        Q    Okay.  Okay.  When you went in for this
2   interview with Mr. Rogers on May 8, 2002, you were aware
3   that he was -- you had indicated that you had brought
4   him over from -- you say from Cook County Jail?
5        A    That's correct.
6        Q    Okay.  And so he had been recently arrested;
7   is that correct?
8        A    I believe so, yes.
9        Q    Okay.  And what was -- what he -- what had he
10  been arrested for; do you recall?
11       A    I don't recall.
12       Q    Okay.  But in any event, when you went to pick
13  him up, you knew what he had been arrested for at that
14  time, correct?
15       A    At that time, yes.
16       Q    Okay.  And at that time, was Mr. Rogers facing
17  criminal charges?
18            MS. BITOY:  Object to foundation.  You can
19       answer.
20       A    If he was in custody at 26th and California,
21  yes, he was facing some type of criminal charges.
22  I just don't recall what they are right now.
23       Q    Okay.  But back at that time, you agree that
24  you were aware that he was facing criminal charges back
25  at -- before you went into interview him, correct?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Yes.

 2        Q    Okay.  And you were aware that Mr. -- and at

 3   that time, fair to say, you had an understanding of

 4   Mr. Rogers's criminal history as well, correct?

 5        A    Yes.

 6        Q    Okay.  You understood that he's somebody who'd

 7   been arrested and convicted many times, correct?

 8        A    Correct.

 9        Q    And he was someone who had significant

10   troubles with the law; fair to say?

11        A    Fair to say.

12        Q    Did he -- and he had multiple pending criminal

13   cases going on at that time; is that fair?

14        A    That, I don't know.

15             MR. SWAMINATHAN:  Okay.  Why don't we take a

16        quick -- we've been going here almost an hour and a

17        half here.  Why don't we take a quick break?

18        Is that -- does that make sense to everybody that

19        need to use the bathroom?

20             THE WITNESS:  Sure.

21             MR. SWAMINATHAN:  Okay.  We'll take five

22        minutes.

23             COURT REPORTER:  We are off the record.

24        The time is 11:24.

25                  (OFF THE RECORD)
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      COURT REPORTER:  We are back on the record for

2    the deposition of Anthony Noradin being conducted by

3    videoconference.  My name is Sydney Little.  Today

4    is February 22, 2023, and the time is 11:46 a.m.

5  BY MR. SWAMINATHAN:

6      Q    All right.  Mr. Noradin, you have, fair to

7  say, sat in on many instances in which a state's

8  attorney takes a handwritten statement from a witness or

9  suspect, correct?

10     A    That's correct.

11     Q    Okay.  And is it fair to say that sometimes

12  when the state's attorneys prepare handwritten

13  statements, they prepare them outside of the room, away

14  from the witness, and then bring it back in to show the

15  witness?  Does that happen from time to time, fair?

16     A    That's --

17         MS. BITOY:  Objection.  Foundation and calls

18    for speculation.  You can answer.

19     A    Not true.

20     Q    Why is that not true?

21     A    The handwritten is -- is -- has always been

22  prepared in front of the witness as well as the lead

23  detective, whoever is assigned, working the case.

24     Q    Okay.  And so you said the handwritten is

25  always prepared with the state's attorney in the room,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    as they're interviewing the witness?

2       A    With the witness, yes.

3       Q    Okay.  And have you ever seen a handwritten

4    statement prepared outside the presence of the witness?

5       A    I have not.

6       Q    Okay.  And is that -- strike that.  Do you

7    have any -- strike that.  You also said the handwritten

8    statement is prepared in the presence of the lead

9    detective, is that what you said?

10      A    I see -- in -- in the presence of a witness,

11   which would be the -- the witness as well as a detective

12   working on the case.

13      Q    Okay.  And in this case, the handwritten

14   statement -- strike that.  In this case, you

15   specifically remember that the handwritten statement

16   that was prepared by ASA Walker was prepared as she was

17   sitting with Mr. Rogers and you in the room, correct?

18      A    Yes.

19      Q    Okay.  And looking again at Exhibit 3, the

20   Rogers statement, do you see on page 1 where it lists

21   Detective Bogucki and Detective Raymond Schalk, and

22   they're crossed out?

23      A    Yes.

24      Q    Do you know why their names were written here

25   and crossed out?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        MS. BITOY:  Object to foundation, calls for

2     speculation.  You can answer.

3     A    I don't.

4     Q    Had they been in the room at some point during

5     the course of the Rogers statement being taken?

6     A    This statement you're referring to, we're

7     talking about on the handwritten?

8     Q    Yes.

9     A    No, not that I'm aware of.

10    Q    Okay.  Do you have any -- had Detective

11    Bogucki and Detective Schalk participated in any way,

12    in the interview you and ASA Walker did of Mr. Rogers?

13    A    During this handwritten?

14    Q    Yes.

15    A    No.

16    Q    Okay.  And so do you have any understanding of

17    why their names were written here by ASA Walker?

18        MS. BITOY:  Same objection.  Foundation and

19     calls for speculation.  You can go ahead.

20    A    I don't know why.

21    Q    Was a portion of this statement of Mr. Rogers

22    filled out before you and ASA Walker began your

23    interview?

24    A    Not that I recall.

25    Q    Okay.  So all of the information contained in

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    Exhibit 3 was filled out while you were in the room with

2    Mr. Walker [sic]; is that correct?

3        A    Yes.

4        Q    I mean with Mr. Rogers, correct?

5        A    Yes.

6        Q    Let's take a look at a document I've marked as

7    Exhibit 4.  All right.

8            (EXHIBIT 4 MARKED FOR IDENTIFICATION)

9        A    I see it.

10           MS. BITOY:  Yeah.

11       Q    Are you able to see it on your screen here?

12       A    Yes.

13       Q    All right.  I've shown -- I'm showing you a

14   document I've marked as Exhibit 4.  It is a CPD

15   Supplementary Report, referred to as a Field

16   Investigation Cleared Open Report.  It's Bates stamped

17   Fletcher 864 through 872.

18       A    Yes.

19       Q    This is a document you're familiar with,

20   correct, sir?

21       A    Yes.

22       Q    This is the Cleared Open Report from this

23   Sorrell homicide investigation, correct?

24       A    Correct.

25       Q    Okay.  And you reviewed this in preparation

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    for today's deposition, correct?

2        A    Correct.

3        Q    Okay.  I want to ask you just a little bit

4    about this report, and this type of report and how it's

5    created.  So first of all, this is a typed report.

6    You agree with me?

7        A    A portion of it is a typed report, yes.

8        Q    Okay.  And this is a report that you could

9    create in Chicago Police Department's computer systems,

10   correct?

11       A    Yes.

12       Q    Okay.  And so was this a report that you

13   prepared in the CLEAR System?

14       A    I didn't -- I did not generate this report.

15       Q    Okay.  Thank you for that clarification.  Let

16   me put aside the question of whether you create -- about

17   whether you created this particular report.  This is a

18   type of report that you have seen many times in your

19   career, correct?

20       A    That is correct.

21       Q    And this is a type of report that you filled

22   out regularly during the course of your career, correct?

23       A    Correct.

24       Q    Okay.  And when you filled out reports like

25   these, you could fill them out in something called the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    CLEAR System; is that right?

2        A    Well, this is considered the CRIS system.

3        Q    I'm -- thank you.  Okay.  So this report was

4    in the -- what was created in the CRIS system; is that

5    correct?

6        A    Correct.

7        Q    Okay.  And so the CRIS system allowed you to

8    essentially create reports and then submit them; is that

9    right?

10       A    Correct.

11       Q    And you'd do all of that electronically,

12   correct?

13       A    Correct.

14       Q    Okay.  And so CLEAR -- obviously as of May of

15   2002, the Chicago police detectives were using the CRIS

16   system to generate their reports, correct?

17       A    Correct.

18       Q    Okay.  And so instead of sort of typing up

19   your reports and then signing them at the end, you would

20   just prepare them within the CRIS system, correct?

21       A    Correct.

22       Q    Okay.  And so on the report itself, I take

23   it -- see where it lists, "Cleared Open Arrest and

24   Prosecution."  Do you see that near the top?

25       A    Yes.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    Q    Okay.  And so did -- was the Cleared Open a

2    type of report that you could select within the CRIS

3    system?

4    A    Yes.

5    Q    Okay.  So when you -- within the CRIS system,

6    you could create a report and then you could choose

7    which type of report you wanted to create, correct?

8    A    Correct.

9    Q    And what were different types of reports you

10   could choose within the CRIS system?

11   A    There's a list of them.  There's -- could be

12   suspended, it could be closed not criminal, it could be

13   arrest and -- clear closed arrest and prosecution,

14   suspended.  There's -- there -- there's probably at

15   least ten of them, ten different choices.

16   Q    Okay.  Was there an initial, like, scene

17   report that you could create?

18   A    Correct.  There's a scene report.  There's a

19   line-up report.  There's a lab report.

20   Q    Got it.  Okay.  And then some of the

21   information in these reports would be automatically

22   filled in when you chose to create a report within the

23   context of a single investigation, correct?

24   A    Correct.

25   Q    So for example, if you were creating a report

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 in the Sorrell investigation, the -- a lot of the

2 information on the top of page 1 of Exhibit 4 would

3 already be filled in for you, like related to the date

4 of the occurrence, and the address of the occurrence,

5 and so on, correct?

6     A    That's correct.

7     Q    Okay. So once the original report had been

8 created in the Sorrell investigation in the CRIS system,

9 the subsequent reports would have that same information

10 related to the investigation, correct?

11     A    Correct.

12     Q    Okay. All right. And then in this -- let's

13 see if I can do this. Working together. All right.

14 And then here in this second set of boxes on the report,

15 it identifies the reporting officers and approving

16 supervisors, correct?

17     A    Correct.

18     Q    Okay. And so here, it allows you to

19 identify -- it -- the report identifies who is

20 submitting the report, correct?

21     A    Correct.

22     Q    Okay. And in this case, who's listed for this

23 particular report in Exhibit 4?

24     A    Raymond Schalk.

25     Q    Okay. And then it also lists a primary

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    detective assigned as Jerome Bogucki.  Do you see that?

2        A    I do.

3        Q    So what was the -- how were those fields used

4    in the CRIS system for reporting officer versus primary

5    detective assigned?

6            MR. BURNS:  Objection.  Foundation.

7        Q    Go ahead.

8        A    This -- this is -- Detective Bogucki --

9    basically what we -- what's called an inbox.  Each one

10   of us as a detective have an inbox.  So at some point or

11   another, Detective Bogucki was assigned this

12   investigation.  And subsequent to that, Detective Schalk

13   is allowed to create reports that -- that is assigned to

14   Jerome Bogucki and vice versa.  So if Raymond Schalk was

15   assigned this case, Jerome Bogucki would be able to

16   draft a report under -- under that RD number.

17       Q    Okay.  Got it.  And so any detective could

18   essentially write a report as the reporting officer in

19   an investigation assigned to another detective, correct?

20       A    That is correct.

21       Q    Okay.  So for example, if you could have

22   written a report in the Sorrell investigation as the

23   reporting officer, even though Bogucki had been assigned

24   the investigation, correct?

25       A    That's correct.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-33 Filed: 05/06/25 Page 92 of 236 PageID #:6826
1:20-cv-04768 Document #: 184-33 Filed: 05/06/25 Page 92 of 236

90

1    Q    Okay.  And one of the things this report is

2  telling us is that the detective who was primarily

3  assigned to this investigation -- strike that.  The

4  detective who was responsible as the primary detective

5  on the investigation was Jerome Bogucki, correct?

6    A    Correct.

7    Q    And in the CRIS system, every -- in every

8  homicide investigation had a primary detective who was

9  assigned, correct?

10    A    Correct.

11    Q    Okay.  And what was the job of the primary

12  detective assigned to a homicide investigation?

13    A    To maintain the -- control the investigation,

14  what reports were generated, and the progress --

15  and -- and the progress in which the investigation was

16  going.

17    Q    When you say control the investigation, what

18  do you mean by that?

19    A    I mean, if another detective had drafted a

20  report, the -- the -- the primary detective's going to

21  review that report to see what progress was made on it.

22    Q    Okay.  And so the -- was the primary detective

23  was responsible for ensuring that the investigation

24  proceeded, correct?

25    A    Correct.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    And the primary detective was responsible for

2   ensuring that any investigative leads were followed,

3   correct?

4    A    Correct.

5    Q    And those leads could be followed by other

6   detectives, but the primary detective was responsible

7   for making sure that those leads actually were followed

8   up on, correct?

9    A    Correct.

10   Q    And the primary detective was responsible for

11  ensuring that there was documentation of the steps that

12  were taken during the course of the investigation,

13  correct?

14   A    Correct.

15   Q    And the primary detective responsible for

16  maintaining the investigative file for that homicide

17  investigation?

18   A    Correct.

19   Q    And the primary detective responsible for

20  ensuring the disclosure of the information learned

21  during the course of the homicide investigation to

22  prosecutors and criminal defendants?

23   A    Correct.

24   Q    And in this particular investigation, it's

25  indicating that Mr. -- I'll strike that.  It lists

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    approving supervisor.  Do you see that?

2        A    I do.

3        Q    And in this case, obviously it's listed as

4    Anthony Wojcik.  Do you see that?

5        A    I do.

6        Q    And what is the -- who is the approving

7    supervisor when the -- when listed on these CRIS

8    reports?

9        A    That's the supervisor who reviewed the report.

10       Q    And is that the supervisor who was the

11   day-to-day supervisor of the primary detective assigned,

12   or the reporting officer, or just which supervisor just

13   happened to be the one to approve the report?

14       A    It could be a combination of all -- of all the

15   above.

16       Q    Okay.  So in this particular case, do you have

17   an understanding of why Mr. Wojcik was the approving

18   supervisor?

19            MS. BITOY:  Object to foundation, calls for

20       speculation.  You can answer.

21       A    I believe he was the supervising sergeant at

22   the time.

23       Q    Supervising sergeant over this investigation

24   or over Mr. Bogucki and Schalk?

25       A    Over -- overall.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q    Overall for all homicide detectives?

2     A    Yes.

3     Q    Okay.  And was Mr. Wojcik a hands-on sergeant,

4 would you say?

5       MS. BITOY:  Just object to form.  You can

6   answer.

7     A    No, I wouldn't say that.

8     Q    Okay.  Was Mr. Wojcik -- well, strike that.

9 He -- what shift did Mr. Wojcik work?

10    A    We worked the afternoon shift, third watch.

11    Q    That's third watch, correct?

12    A    Yes.

13    Q    Okay.  And Mr. Wojcik worked third watch with

14 you, correct?

15    A    Yes.

16    Q    And so he -- oh, he supervised all of the

17 third watch violent crime detectives, correct?

18    A    Correct.

19    Q    Was he -- you know, was he a detective --

20 strike that.  Was he a sergeant who would go out in the

21 field, to crime scenes?

22       MS. BITOY:  Just object to foundation.  You can

23   answer.

24    A    Yes, he would.

25    Q    Would he stay actively abreast of what was

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  happening in the various homicide investigations that

2  were ongoing?

3         MS. BITOY:  Object to foundation and calls for

4     speculation.  You can answer.

5     A    I believe he would, yes.

6     Q    When you had -- when you made progress in

7  investigations, were you expected to inform Sergeant

8  Wojcik about what had happened and what you -- what

9  had -- what developments had taken place?

10    A    Well, Sergeant -- I mean, Sergeant Wojcik was

11  one of the -- just one sergeant there, but there

12  was -- there was multiple sergeants that we had to

13  report to. So it wasn't all on Sergeant Wojcik to follow

14  all the homicide investigations.  So if he was to

15  follow-up on an -- if he was out on an investigation,

16  he would follow-up on it.

17    Q    And did Sergeant Wojcik have an -- have any

18  involvement in the Sorrell investigation?

19    A    Other than approving the reports?  Not that

20  I'm aware of, no.

21    Q    And you obviously -- there was a number of

22  things that happened as part of the Sorrell homicide

23  investigation before you got involved, correct?

24    A    Correct.

25    Q    Okay.  Did you have any involvement in the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   Sorrell homicide investigation before April 20, 2002,

2   when there were line-ups conducted?

3        A    No.

4        Q    Okay.  Did you do anything as -- strike that.

5   Did you interview any witnesses as part of the Sorrell

6   homicide investigation prior to April 20, 2002?

7        A    No.

8        Q    Did you interview any witnesses related to the

9   Sorrell homicide investigation prior to participating in

10  the interview of Terry Rogers on May 8, 2002?

11       A    No.

12       Q    Now, this report lists the date submitted.

13  Do you see that?

14       A    I do.

15       Q    And in this case, it's May 21, 2002, 1651,

16  correct?

17       A    Correct.

18       Q    And so is that time is auto generated,

19  correct?

20       A    Correct.

21       Q    And so how does that time get auto generated?

22       A    By the computer.

23       Q    So when you -- and so what do you have to do

24  that causes that time to get listed in the report?

25       A    Well, it says date submitted, so as soon as



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1   you hit the submit button, it timestamps the date and
2   time.
3       Q    Okay.  So basically you have to hit -- there's
4   a button that you hit in the system that's called
5   Submit, and then that submits the report officially?
6       A    That's correct.
7       Q    Okay.  And prior to that, there's some point
8   at which you first click a button to sort of create a
9   template report for you to fill in with information,
10  correct?
11      A    Correct.
12      Q    Okay.  And in between those two points
13  is -- are there -- other than submitting the report, are
14  there -- is there anything else you can do after you've
15  generated a -- or sort of created a report?
16      A    As -- as -- as to what?  Adding information to
17  it?
18      Q    Yeah, sorry, that's a poor question.  So after
19  you've hit the button to create a report in the system,
20  then you basically have a mostly blank report into which
21  you're going to fill in information, correct?
22      A    Correct.
23      Q    And you fill that information in directly in
24  the system itself, right?
25      A    Correct.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1       Q    And can you then save that report without
 2  submitting it?
 3       A    Correct.
 4       Q    And so you can -- you could -- you can save
 5  the report and come back to it a day later, a week
 6  later, whatever it is?
 7       A    Correct.
 8       Q    And can you edit and change the information
 9  that you've already filled in?
10       A    Correct.
11       Q    Okay.  And when you make those edits or
12  changes, are the prior versions stored in the system?
13            MS. BITOY:  Object to foundation.  You can
14       answer.
15       A    Not that I'm aware of.
16       Q    And then as you're -- if you're -- so
17  basically, you can -- there's a button that allows you
18  to essentially save the report, correct?
19       A    Correct.
20       Q    Okay.  And after you save the report, you can
21  separately hit a button that submits the report to your
22  supervisor; is that right?
23       A    Correct.
24       Q    Okay.  And when you submit the report -- and
25  up to the point that you submit the report, you can make
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1   any changes you want to the report, correct?

 2       A    Correct.

 3       Q    And there's no record that keeps track of any

 4   changes that are made, correct?

 5           MS. BITOY:  I'm going to object to

 6       foundation --

 7           MR. BURNS:  Objection.  Foundation.

 8           MS. BITOY:  Sorry.

 9       A    Not that I'm aware.

10   BY MR. SWAMINATHAN:

11       Q    Okay.  And then once the report is submitted,

12   can you make changes to the report?

13       A    If -- if -- after it's submitted?  The

14   sergeant would have to reject it for it to be -- to make

15   any changes.

16       Q    Okay.  So once it's submitted, it cannot be

17   edited unless something additional happens, correct?

18       A    Correct.

19       Q    Okay.  And then for -- if -- so if there's

20   going to be some additional changes made to the report,

21   the sergeant would have to reject the report so that it

22   would then be open for you to make edits again, correct?

23       A    Correct.

24       Q    And then if the -- if -- at that point,

25   if it's -- you can resubmit the report after making

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of UNKNOWN, taken 03/09/25, Page 101 of 236

1  changes, correct?

2      A     Correct.

3      Q     Okay.  And is there -- and then once the

4  report is resubmitted, it's again available to the

5  sergeant for approval; is that right?

6      A     Correct.

7      Q     Okay.  And then after it goes to the sergeant

8  for approval, what happens?

9      A     After the sergeant's approved it?

10     Q     Yes.

11     A     Then it goes into the -- it goes into the main

12  file.

13     Q     When you say the main file, what are you

14  referring to?

15     A     The -- the homicide file for that

16  investigation.

17     Q     And is the homicide filed the investigative

18  file we've been talking about, or is it some other file?

19     A     A homicide file -- investigative file.

20     Q     It goes to the -- okay.  So -- okay.

21  So once the report is approved by the sergeant, it can

22  then -- it -- it's then put into the investigative file;

23  is that right?

24     A     That is correct.

25     Q     And a copy is also then placed in the RD file,



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   correct?

 2       A     Define RD file.

 3       Q     Records division file or permanent retention

 4   file, are those terms familiar to you?

 5       A     Yes, they are.

 6       Q     Okay.  And --

 7       A     So what the file -- that file -- RD file

 8   you're referring to and the investigative file are one

 9   and the same.

10       Q     The RD file and the investigative file are one

11   and the same.  What do you mean by that?

12       A     The same thing.  I mean, whatever reports go

13   into the investigative file is the RD file.

14       Q     Okay.  So the RD file is the file that sits in

15   the detective division that the detective puts all his

16   notes and everything into, correct?

17       A     That's also the investigative file.

18       Q     Okay.  So those are essentially two names for

19   the same thing, correct?

20       A     Correct.

21       Q     Okay.  And then what is the permanent

22   retention file?

23       A     Same thing.

24       Q     Okay.  Are you aware of there being any file

25   that's maintained at the Records' Division warehouse?
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          MS. BITOY:  Object to foundation.  Go ahead.

2     A     Repeat the question, please.

3     **Q     Are you aware of there being any other file**

4  **that's maintained for a homicide investigation at the**

5  **Records' Division warehouse?**

6     A     There is homicide files maintained at

7  the -- the warehouse, yes.

8     **Q     Okay.  And what files are maintained there,**

9  **different from the investigative file?**

10          MR. BURNS:  Objection.  Foundation.

11          MS. BITOY:  Join in that objection.  You can

12     answer.

13     A     The files that are at -- that are at -- in

14  storage at the warehouse are files at aren't actual

15  homicide files.

16  BY MR. SWAMINATHAN:

17     **Q     Okay.**

18     A     So there's not two separate locations.

19  It's -- the homicide file is maintained at the

20  warehouse.

21     **Q     The same homicide file that's in detective**

22  **division area?**

23     A     At some point -- for example, in this

24  investigation, since it is clear closed, once all the

25  reports are -- are compiled and put into the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   investigative file, that whole file leaves the area and

2   goes to the warehouse.

3       **Q    And are you aware of there being any file that**

4   **was maintained, that contained the typed supplementary**

5   **reports of an investigation, separate and apart from the**

6   **investigative file, kept in the detective division area?**

7        MS. BITOY:  Object to foundation.  You can

8    answer.

9    A    No.

10    **Q    Okay.  Okay.  And so once a report was**

11   **approved by the sergeant, I take it, it could not be**

12   **edited at that point either, correct?**

13    A    That is correct.

14    **Q    Okay.  When you submitted reports to the**

15   **sergeant through the CLEAR system by hitting the submit**

16   **button, would you also provide hard copies of those**

17   **reports?**

18    A    Yes.

19    **Q    Okay.  And how would you go about doing that?**

20    A    After you hit the submit button, you would

21   print out a copy of the report and present it to the

22   sergeant for review.

23    **Q    Okay.  So you had the ability to also print**

24   **the reports out of the CRIS system; is that right?**

25    A    Correct.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    And when you printed them out of this CRIS

2  system, they basically looked like what's on our screen

3  now, Exhibit 4, correct?

4    A    Correct.

5    Q    Okay.  And in fact, when you printed reports

6  out of the CRIS system, it made a notation of who

7  printed them at what time they printed them at the

8  bottom of the page, like we see on Exhibit 4, correct?

9    A    That is correct.

10   Q    Okay.  And could you print out the reports

11 before they were submitted to the sergeant?

12   A    Yes.

13   Q    You could print out drafts of the reports too,

14 correct?

15   A    Correct.

16   Q    Would you ever print out drafts to show the

17 supervisor before officially submitting them to the

18 system?

19   A    No.

20   Q    Why not?

21   A    I would -- I would submit a -- I would submit

22 the sergeant a submitted report for his review.

23   Q    Through the system?

24   A    Yes.

25   Q    Would you ever submit drafts of those reports

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    in hard copy form?

2         A    A draft?  If it's a submitted report, I hand

3    him the submitted report.

4         Q    So when you say submitted report, you mean

5    something that you've clicked submit in the CRIS system,

6    correct?

7         A    Correct.

8         Q    Okay.

9         A    Where it would say -- it would say in the

10   upper left-hand corner, where it says, "Detective's supp

11   approval complete."  It would say, "Detective supp

12   submitted."

13        Q    Yes.  Okay.  And would you ever submit the

14   report -- and what would it say in that top corner

15   before you hit the submit button?

16        A    "Preliminary."

17        Q    I see.  And could you -- and you could print

18   out the preliminary reports if you wanted to, correct?

19        A    If I wanted to, yes.

20        Q    Okay.  And what were circumstances in which

21   you would print out the preliminary report before it was

22   submitted?

23        A    There -- I -- I wouldn't have a circumstance

24   to print out a preliminary report.

25        Q    Well, what about when you were working with
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1   other detectives?  Would you ever print out preliminary
2   reports to show them, to make sure all the information
3   is accurate?
4         MS. BITOY:  I'm just going to object to
5      foundation.  You can answer.
6      A    No.
7      Q    When you worked on homicide investigations,
8   would it sometimes be the case that you'd work on those
9   investigations with other detectives?
10     A    I would confer with them if I learned -- if
11  there was an investigative lead in their investigation,
12  I would confer with them before I would draft anything.
13     Q    Okay.  What do you mean you would confer with
14  them before you drafted anything?
15     A    That I -- that I conduct an interview with an
16  individual, or whatever the case may be, and this is
17  where I'm at with it, and this is what I'm going to
18  write in my report.
19     Q    And so you would tell them what it is you were
20  going to write in your report before you wrote it;
21  is that right?
22     A    Correct.
23     Q    And why would you do that?
24     A    Make them aware of what -- where -- where the
25  investigation stood.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Okay.  And would there be times when they
 2   would ask you not to write a report on information you
 3   were sharing with them?
 4        A    No, I'd draft a report on everything.
 5        Q    Okay.  And when you would inform them of
 6   that -- strike that.  Strike that.  Were there times
 7   when you would write a report based on information that
 8   was not just investigation that you did, but an
 9   investigation that was conducted by other detectives?
10        A    Yes, I've done -- I've -- I've written reports
11   on other detectives' investigations.
12        Q    Okay.  And so if, in other words, they conduct
13   some investigative steps that you did not participate in
14   and then you'll write the report about it?
15        A    If it was something associated with their
16   investigation that I conducted some type of
17   investigation on their report, I would draft a report.
18        Q    Okay.  I -- I'm not asking about whether it
19   was their investigation.  I'm asking about whether it
20   was their investigative step.  So in other words, would
21   you ever write a supplementary report for another
22   detective when the other detective interviewed a witness
23   rather than you?
24        A    No.
25        Q    Would you ever write an investigative --
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    strike that.  Would you ever write a supplementary

2    report using another detective's notes of their

3    interview of a witness?

4         A    Would I?

5         Q    Yes.

6         A    I would, yes.

7         Q    Okay.  So in other words, you may not have

8    participated in the interview, but you would still write

9    a report about what happened, using their notes?

10        A    Yes.

11        Q    Okay.  And so it was appropriate within the

12   Chicago Police Department for a detective to write notes

13   -- to write a supplementary report of an interview they

14   didn't conduct, using another detective's notes,

15   correct?

16             MR. BURNS:  Objection.  Foundation.

17             MS. BITOY:  Objection to foundation.

18        A    That's a generality.  Some people -- you know,

19   some people choose to write their own notes and

20   some -- I would -- I would write them off the -- the

21   detective's notes himself.  And if I had any questions

22   in reference to his notes, I would talk to him

23   personally.

24        Q    Okay.  So you could write -- you would

25   sometimes write reports based on a different detective's
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**KENTUCKIANA**
COURT REPORTERS

```
 1   notes of an interview you didn't participate in, but

 2   you'd confer with that detective before writing the

 3   report, correct?

 4        MS. BITOY:  I'm just going to object to

 5      foundation and incomplete hypothetical, but you can

 6      go ahead and answer.

 7      A    Yes.

 8 BY MR. SWAMINATHAN:

 9      Q    And would you give them an opportunity to

10   review what you'd written to make sure it was thorough

11   and accurate?

12      A    Yes.

13      Q    And how would you go about giving them an

14   opportunity to review it?

15      A    Take a look at the -- look -- once I finished

16   the -- the -- the report, I could show it to them on the

17   computer.

18      Q    Okay.  And so they could look at it on

19   the -- they could look at the version you created on the

20   computer before you submitted it, correct?

21      A    Correct.

22      Q    And they could -- you could also print out a

23   copy and give it to them to look at, correct?

24      A    Oh, I could, sure.

25      Q    Would you do that from time to time?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    No.

 2        Q    So you'd never print out preliminary versions

 3   of your reports?

 4        A    No.

 5        Q    Did other detectives ever print preliminary

 6   versions of the reports to show you, to make sure they

 7   were accurate?

 8             MS. BITOY:  Just objection to foundation.

 9        You can answer.

10        A    I don't -- I -- I think I've looked at a

11   couple that were preliminary, yes.

12        Q    And when you listed other detectives as -- on

13   your reports, would you give them an opportunity to

14   review those reports before submitting those reports?

15        A    Well, generally if I'm working on an

16   investigation, they're usually with me when I put their

17   name on the bottom of the report.

18        Q    Okay.  So instances when you put a detective's

19   name on a report that you're submitting is because that

20   detective participated in what you were doing, that's

21   documented in the report?

22        A    That is correct.

23        Q    Okay.  And that was your practice, correct?

24        A    Correct.

25        Q    And if you wrote up the report based on what
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    had occurred or what -- strike that.  If you wrote up

2    the report, would you give that other detective an

3    opportunity to review it before submitting it?

4         A    Yes.

5         Q    Okay.  And how would you do that?

6         A    Look at the computer.

7         Q    Okay.  And when other detectives put your name

8    on their reports, as participating in that

9    investigation, would they give you an opportunity to

10   review it before they submitted it?

11        MS. BITOY:  Objection.  Foundation.  You can

12     answer.

13        A    Yes.

14        Q    Okay.  And so looking for example at Exhibit

15   4, Exhibit 4 was -- says it was submitted by Raymond

16   Schalk, correct?

17        A    Correct.

18        Q    And it lists on the last -- on page 8, it

19   lists that it's the report of Schalk, Bogucki, and

20   yourself, correct?

21        A    Correct.

22        Q    Okay.  And so were you given an opportunity to

23   review this report before it was submitted?

24        A    I don't recall reviewing it before it was

25   submitted.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    And so are you saying that did not happen or

2  you're saying you just don't remember it?

3    A    I just don't remember it.

4    Q    Okay.  And the common practice would've been

5  that if your name was being included on a report, you

6  would've reviewed it first, correct?

7    A    I would've reviewed -- my -- that's my

8  practice.  I don't know what other -- what other

9  detective practices were.  However, if I had something

10  to do with part of the investigation and a detective

11  added my name to it, then that -- my name would be on

12  the bottom of the report.

13    Q    And if your name was added to the bottom of

14  the report, would you typically have had a chance to

15  review that report before it was submitted?

16    A    No, I would not -- it -- it doesn't happen in

17  every case.

18    Q    Okay.  In this case, do -- can you say one way

19  or the other, whether you reviewed this report before it

20  was submitted, Exhibit 4?

21    A    I don't recall reviewing this report before it

22  was submitted.

23    Q    Okay.  And do you know why you were included

24  on this report?

25    A    Do I know why it was included in this report?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Yes.

2    A    Because I did participate a little bit in this

3  report.

4    Q    Okay.  And so what portions of the

5  investigation did you -- did you participate in, that

6  are documented in this report?

7    A    The handwritten statement of Terry -- Terry

8  Rogers.

9    Q    Okay.  And on this report, it refers

10  repeatedly to the R/DETs, which stands for reporting

11  detectives, correct?

12    A    Correct.

13    Q    Okay.  And who are the reporting detectives

14  listed on this report?

15    A    Detective Schalk, Detective -- Detective

16  Bogucki, and myself.

17    Q    Okay.  And back in 2002, were you-all using

18  e-mail in the Chicago Police Department?

19    A    Not that I recall.

20    Q    There was a point when you began using e-mail

21  in the Chicago Police Department, correct?

22    A    Yes.

23    Q    Okay.  And around when did you start using

24  e-mail?

25    A    I don't recall.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q    Did you -- was it in -- was it before 2010 at

2 some point that you started using e-mail?

3         MS. BITOY:  I'm going to object to foundation.

4     A    I don't recall.

5     Q    And would you ever submit reports through

6 e-mail?

7     A    No.

8     Q    Did you ever use e-mail to track investigative

9 progress in any of your cases?

10        MS. BITOY:  Just object to form, vague and

11    ambiguous, but you can answer.

12    A    Not that I recall.

13    Q    And to this day, you continue to work on

14 homicide investigations, correct?

15    A    I do.

16    Q    And when you work on homicide investigations,

17 do you document them in supplementary reports?

18    A    I do.

19    Q    And you're no longer using the CRIS system,

20 correct?

21    A    I do use the CRIS system.

22    Q    Okay.  CRIS system is still used to this day

23 to document homicide investigations, correct?

24    A    Yes.

25    Q    Okay.  And do you ever communicate information

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  about the progress in homicide investigations through

2  e-mail?

3       A    No.

4            MS. BITOY:  Object to the foundation.

5       A    No.

6       Q    Okay.  So other than oral communications, what

7  written mechanisms would you use -- do you use to

8  communicate information about a homicide investigation

9  at present?

10      A    Communicate with who?

11      Q    With other detectives.

12      A    Well, if I'm working on another detective's

13 investigation, I'm speaking with him face-to-face.

14      Q    Okay.  And so you don't -- you wouldn't -- you

15 don't ever use notes or to/from memos or other means of

16 communicating with other detectives?

17      A    No.

18      Q    Have you ever written a to/from memo?

19      A    Not that I recall.

20      Q    Okay.  Did you ever use cell phones or

21 Blackberry devices back in 2002?

22      A    I mean, I had a cell phone, but I don't -- I

23 don't -- what's -- what do you mean by devices?

24      Q    I mean, did you use a cell phone back in 2002?

25      A    Yeah.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Did you have a Blackberry in 2002?

2    A    I don't recall about having a Blackberry.

3    Q    Would you use your cell phone ever to

4  communicate about investigations back in and around the

5  time of 2002?

6    A    I don't recall.

7    Q    Would you text other detectives about

8  something you'd learned while you were out on

9  investigation?

10        MS. BITOY:  I'm going to object to foundation.

11    You can answer.

12    A    Not that I recall, no.

13    Q    You could communicate with other detectives

14  back in 2000, through your computer terminals in your

15  cars, correct?

16    A    Well, in the detective division, we don't have

17  computers in the cars.

18    Q    Okay.  Hang one second.  Sorry.  Okay.  Once a

19  report is submitted and approved, obviously you could

20  still print reports at any point throughout the process,

21  correct?

22    A    Rephrase that question because I -- kind of

23  confusing.

24    Q    You could print reports out of the CRIS system

25  at any point, correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1       A     You can only print out a CRIS system report if

 2  it's either in submitted status or approved status.

 3       Q     **Well, you were -- I thought you said you were**

 4  **able to print out preliminary versions of the reports as**

 5  **well.**

 6       A     Well, if it's somebody else's investigation

 7  and I -- and they draft the report and it's in

 8  preliminary, I can't look at it.

 9       Q     **I see.**

10       A     That's why I asked you to be specific.

11       Q     **Okay.  So you can't see the -- a report that's**

12  **in a preliminary status from another detective unless**

13  **they show it to you on their screen, correct?**

14       A     Correct.

15       Q     **Or they print it out themselves and show it to**

16  **you?**

17       A     Correct.

18       Q     **Though once a report is submitted, then you**

19  **can see all the reports for a case, even if it's not a**

20  **report you created, correct?**

21       A     Correct.

22       Q     **Okay.  So once a report is submitted, any**

23  **detective in the homicide division can see any of the**

24  **other reports from that investigation, right?**

25       A     Correct.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    Q    And you could print them -- you could print

2   any other reports that have been submitted by other

3   detectives, correct?

4    A    They can be printed but cannot be edited.

5    Q    Okay.  And if you're a lead detective on

6   the -- strike that.  If you're the primary detective

7   assigned, could you see the preliminary reports being

8   created by other detectives?

9    A    I can see that there was a report generated by

10  another detective, but I cannot view it.

11   Q    In other words, you'll see that someone opened

12  up a new type of report, but you can't see the actual

13  content of the report, am I understanding correctly?

14   A    That is correct, unless it's submitted or

15  approved.

16   Q    Okay.  One second.  Sorry.  Okay.  And then

17  would you ever send, you know, portions -- sorry.  Would

18  you ever use e-mail to send portions of what you were

19  going to include in a report or the contents of what you

20  include a report before you actually put it into the

21  report and submitted it?

22       MS. BITOY:  Object to form and foundation.

23  You can answer.

24   A    No.

25   Q    Okay.  Would you ever send e-mails to say,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    "Hey, here's what I'm planning to include in the report.

2    Is this accurate?  Should I include this?" Before that

3    included in your report?

4         MS. BITOY:  I'm going to object again to

5      foundation.  You can answer.

6      A    No.

7      Q    Okay.  Why not?

8      A    Because I don't -- I don't send anything like

9    that through e-mail.  I have the detective look at it.

10     Q    Okay.  All right.  Let me go back.  You said

11   you had participated, of course, in the interview of

12   Terry Rogers, correct?  In May 2002?

13     A    Correct.

14     Q    Okay.  I'm showing you a General Offense Case

15   Report.  It's dated February 11th.  It says date

16   and -- date of occurrence, February 11, 2002.  Do you

17   see that?

18     A    I do.

19     Q    Okay.  And it lists the offender as Terry

20   Rogers.  Do you see that?

21     A    I do.

22     Q    Okay.  So back around February 11, 2002,

23   Mr. Rogers was arrested in relation to an event that

24   occurred at 227 South Central Street.  Do you see that?

25     A    I do.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

In the Deposition of Unknown (Unknown) taken 09/09/25, page 121 of 236

119

```
1        Q    Okay.  And he was charged with criminal

2   trespass, correct?

3        A    I mean, that's the heading on the -- on

4   the -- on the general offense case report.  If that's

5   what he was arrested for, that's what he could

6   have -- he could have been arrested for.

7        Q    Okay.  Did you -- when you spoke to him in May

8   of 2002, you indicated that, of course, you were aware

9   that he'd had -- he had various pending criminal issues,

10  correct?

11       A    I was aware he was in custody at 26th and

12  California when I brought him out to do the handwritten

13  statement in May.

14       Q    Okay.  Were you aware of this February 2002

15  arrest?

16       A    I don't recall this, no.

17       Q    Okay.  And if you look on page 2 of this

18  report, it indicates that his name check revealed there

19  was an Investigative Alert Number 95376 in reference to

20  a homicide which occurred at 15 West Madison.

21  That's -- in other words, he was -- there was an

22  investigative alert for him to be interviewed on the

23  Sorrell investigation, correct?

24       A    That's correct.

25       Q    Okay.  And then it indicates, "Additionally,
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   name check further revealed subject to have an

2   outstanding warrant under" -- it's hard to read that.

3   "W00H5728 for dangerous drugs."  Do you see that?

4        A    Yes, I do.

5        Q    Okay.  And so he was wanted on a separate

6   issue different from the homicide investigation,

7   correct?

8        A    Yes.

9        Q    Okay.  And did you know anything -- do you

10  have any knowledge about the dangerous drugs warrant

11  that he had outstanding?

12       A    I do not.

13       Q    Okay.  And then it also lists here that,

14  "Reporting officers contacted Donald and Lee, who

15  confirmed the hit and gave the reporting officers a hold

16  number of H05144 for Cook County Sheriff's Department."

17  Do you see that?

18       A    I do.

19       Q    What does that refer to?  Is that referring to

20  one of those two earlier, the investigative alert for

21  the Sorrell investigation or for the outstanding

22  warrant, or is that something else?

23       A    That's in reference to the outstanding

24  warrant.

25       Q    Okay.  I see.  Okay.  And so did you have

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    knowledge of these various allegations, these -- the

2    dangerous drugs warrant for Mr. Rogers at the time you

3    interviewed him in May of 2002, or do you not know what

4    information you had about this?

5         A    I don't know anything about this.

6         Q    So are you able to say that you know from

7    memory that you did not know about this at the time you

8    met with him in May of 2002?

9         A    I know he -- I knew he was arrested based on

10   the investigative alert, based on the reports that I've

11   read.

12        Q    Okay.  And you didn't know that he had been

13   arrested in February of 2002 in relation to an -- to a

14   possible charge of criminal trespass; is that correct?

15        A    That I don't know.  I -- I just -- like I

16   said, I knew he was arrested.  I didn't know what he was

17   arrested for.  The investigative alert basically popped

18   when he was arrested, and he was interviewed at that

19   time.  That's based on the -- what I read on the

20   reports.

21        Q    And did you know that at the time in February,

22   2002 when he was arrested, that Bomb and Arson had been

23   involved in the investigation?

24        A    No, I did not.

25        Q    And were you aware that when he was arrested

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   at that time, he'd been found in possession of rags,
 2   paper towels, and six packs of matches?
 3           MS. BITOY:  Object to foundation.  You can
 4       answer.
 5       A    I did not.
 6       Q    Okay.
 7           COURT REPORTER:  Did you want to mark that or
 8       were you just referring to it?
 9           MR. SWAMINATHAN:  Oh, let's mark that as
10       Exhibit 5.  I must have forgotten to do that.  Let's
11       mark that Exhibit 5, please.  And I'll just -- I'll
12       put on the record what we're looking at here.
13               (EXHIBIT 5 MARKED FOR IDENTIFICATION)
14   BY MR. SWAMINATHAN:
15       Q    All right.  The document we've been referring
16   to is marked as Exhibit 5.  It is a little hard
17   to -- it's a General Offense Case Report related to
18   February 11, 2002, date of occurrence, RD Number
19   HH181 -- 1H181765.  The Bates number appears to be
20   Fletcher 432. Yeah, through 433.  Thank you.  Okay.  One
21   second. Showing now a document we'll mark as Exhibit 6.
22   This is CCSAO, Conflicts, et cetera, et cetera.  CIU 93
23   through 112.  And the top page -- the first page
24   indicates that it is a Chicago Police Department
25   Criminal History Report.  You're familiar with this type
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    of document, correct, sir?

2              (EXHIBIT 6 MARKED FOR IDENTIFICATION)

3        A    I am.

4        Q    Did you review it in preparation for this

5    deposition?

6        A    I did.

7        Q    Okay.  And so you reviewed this criminal

8    history report for Mr. Rogers, correct?

9        A    I did.

10       Q    Okay.  And when you reviewed this criminal

11   history report, did it refresh your recollection about

12   information you knew back at the time of your

13   involvement in the Sorrell homicide investigation?

14       A    I just -- I just skimmed through it.  I didn't

15   look that closely at it.

16       Q    Okay.  But this report is -- criminal history

17   report is consistent with your -- with your

18   understanding back at the time of the Sorrell homicide

19   investigation, that Mr. Rogers was somebody who had a

20   lot of interactions with the police, correct?

21       A    That's correct.

22       Q    And he was somebody who you knew who had a

23   long criminal history, correct?

24       A    Correct.

25       Q    Okay.  And in your experience working as a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   homicide detective, did you have different tactics or

 2   techniques that you used with individuals who had a

 3   significant experience with law enforcement?

 4            MS. BITOY:  Objection to form and foundation.

 5       You can answer.

 6       A    No.

 7       Q    Did you have witnesses who you would interview

 8   who would try to get you to do them some favors or help

 9   them with their own criminal issues if they cooperated

10   in your investigations?

11            MS. BITOY:  Object to form and foundation.

12       A    No.

13       Q    Had you ever had an instance in which somebody

14   offered to cooperate or say what you wanted them to say

15   if you could assist them in their own criminal risks?

16            MS. BITOY:  Objection.  Foundation.

17       A    No.

18       Q    Have you ever had any instance in which you

19   have made any offer to a witness or suspect that you

20   would assist them in their -- on their criminal issues

21   if they cooperated in your investigation?

22       A    No.

23       Q    Have you ever offered any kind of promise or

24   deal to a witness or suspect to obtain their cooperation

25   in a criminal -- in a homicide investigation?
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1              MS. BITOY:  Object to form.

 2       A    No.

 3       Q    Did you ever offer Mr. Rogers an opportunity

 4  to avoid criminal charges on any of his cases if he

 5  assisted in your homicide investigation?

 6       A    No.

 7       Q    Do you know if anyone did?

 8       A    Not that I know of, no.

 9       Q    Okay.  Do you know whether Mr. Bogucki and

10  Schalk did during the course of their conversations with

11  him?

12       A    Not that I know of, no.

13       Q    And are you saying that because you have

14  personal knowledge of what occurred during the course of

15  those interviews between Mr. Bogucki and Schalk and

16  Mr. Rogers?

17       A    I don't have personal knowledge of their

18  interaction other than what I've reviewed on -- on their

19  GPR.

20       Q    Okay.  In other words, they don't say anything

21  in their GPR about admitting that they made any kind of

22  deal with Mr. Rogers; is that correct?

23       A    Correct.

24       Q    And if any kind of offer or promise was made

25  to Mr. Rogers related to his own criminal charges, that
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    should have been documented, correct?

2         MS. BITOY:  Object to foundation.  You can

3      answer.

4      A    I would think yes.

5      Q    Okay.  And according to this criminal history

6    report in Exhibit 6, it identifies that Mr. Rogers was

7    arrested on February 11, 2002, for criminal

8    trespass -- criminal trespass to residence.  Do you see

9    that?

10     A    I do.

11     Q    Okay.  And that was the arrest we just looked

12   at a moment ago, correct?

13     A    Correct.

14     Q    And you didn't have -- it sounds like you

15   didn't have any involvement with that February 11, 2002,

16   arrest, correct?

17     A    No.

18     Q    And you're aware that in your review of the

19   materials, as you have indicated that he was then

20   transferred over to Area 5 to be interviewed by

21   Detective Bogucki and Schalk after that arrest, correct?

22     A    I believe, yes.

23     Q    Okay.  And did you have any involvement in

24   those interviews of Mr. Rogers immediately after his

25   arrest for criminal trespass?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1       A    No, not that I recall.
 2       Q    Do you have any knowledge about what the
 3  disposition was of Mr. Rogers's arrest for criminal
 4  trespass in February of 2002?
 5       A    I do not.
 6       Q    Okay.  Do you know how he was able to obtain
 7  his release after that arrest for criminal trespass?
 8            MS. BITOY:  Object to foundation.
 9       A    I do not.
10       Q    And then it indicates that subsequently on
11  May 6, 2002, he was again arrested, this time on charges
12  of possession of less than 15 grams of heroin and says,
13  "Soliciting unlawful business."  Do you see that?
14       A    I do.
15       Q    Okay.  And so when he was arrested again in
16  May of 2002, did you have knowledge of those particular
17  charges against him?
18       A    I did not.
19       Q    Okay.  So you -- so other than the fact that
20  he had been arrested and was being held at Cook County
21  Jail, you did not know any details of what those arrest
22  charges were?
23       A    No, I don't -- I don't know the circumstances
24  of why he was being held.
25       Q    Okay.  Can you do anything to find out what
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    the circumstances were of why he was being held?

2        A    Not that I recall, no.

3        Q    Did you -- so they -- as it stood as of

4    May the 8th of 2002, when you were interviewing

5    Mr. Rogers, you understood that he was facing some

6    criminal charges, correct?

7        A    Yes.

8        Q    And did you take any steps to ensure that

9    Mr. Rogers wasn't going to just simply feed you

10   information you wanted to hear in hopes that you'd go

11   easy on him?

12          MS. BITOY:  Object to form.

13       A    After reviewing the reports and the GPRs,

14   what he had provided to AS -- assistant state's attorney

15   Jennifer Walker was consistent with what he had said in

16   the past.

17       Q    Did you have any -- and when you say it was

18   consistent what he'd said in the past, is that the kind

19   of thing that you would assess as a homicide detective

20   to assess whether or not you found what a witness was

21   telling you was believable?

22       A    Yes.

23       Q    And in fact, as a homicide detective, fair to

24   say that witnesses and suspects sometimes lie to you?

25       A    Absolutely.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    And so as a homicide detective, you have to be

2  constantly assessing whether the information that's

3  being provided to you by a witness is accurate, correct?

4    A    Correct.

5    Q    And what are some of the things you do to

6  assess whether or not the information being provided to

7  you by a witness is accurate?

8    A    Based on what that witness says, based on

9  other witnesses we're also interviewed in an

10  investigation.

11    Q    And if the -- what the information the witness

12  is providing you is consistent with, you know, physical

13  evidence, for example, you might take that -- you might

14  find that to be an indication that the information is

15  truthful, correct?

16    A    Correct.

17    Q    And if the witness is providing you with

18  information that's contrary to what you know of the

19  physical evidence in the crime scene, that would be an

20  indication that they're not being truthful, correct?

21    A    Correct.

22    Q    And a -- if a witness was giving you changing

23  stories about what happened, then you'd have an

24  indication that this is a witness who may not be

25  truthful, correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      A    Changing versions, you mean?

 2      Q    Yes.  Changing versions of the story.

 3      A    Depends what the change is.

 4      Q    Yeah.  Tell me.  Tell me what you mean by

 5   that.

 6      A    I mean, you can say the sky was, you know,

 7   pink that day, but it really was blue.

 8      Q    Okay.  If a witness is changing their story

 9   about what they saw and -- strike that.  A witness is

10   changing their story about what they saw during the

11   course of a crime, that could be indication that the

12   person's not being truthful, correct?

13           MS. BITOY:  Object to foundation, incomplete

14      hypothetical.  You can answer.

15      A    If a witness is giving information that he

16   provided, you know, 20 years, you know, in excess of 20

17   years ago, and coupled with the other witness of --

18   interviews of other witnesses, and it maintained the

19   same observations at that time, people's memories do

20   diminish over time.  He may not -- that person may not

21   remember everything that they saw, but they remembered

22   certain things that they saw.

23      Q    Okay.  So if a witness memory wasn't as

24   detailed as it was previously, that may not be an

25   indication that they're being untruthful.  Just may be
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    an indication they don't remember as well, fair?

2        A    That's fair.

3        Q    And if a witness is providing you with

4    information that is contradictory to information they

5    provided previously, that would be the kind of thing

6    that would cause you to have at least some pause,

7    correct?

8        A    Correct.

9        Q    And if a witness was giving you information

10   that was contrary to information they'd given you

11   previously, what kind of things would you do to

12   follow-up on that?

13       MS. BITOY:  Object to incomplete hypothetical,

14   and foundation.

15       A    Confront him with the inconsistencies.

16       Q    Okay.  And in this case, were there any

17   inconsistencies that you confronted Mr. Rogers with?

18       A    Not that I recall, no.

19       Q    Are you -- well, there were some -- were

20   there -- strike that.  Were there any inconsistencies in

21   what Mr. Rogers was telling you compared to what he'd

22   said in the past?

23       A    No.

24       Q    Okay.  And if there had been inconsistencies,

25   that would've been something that causes you pause,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    correct?

2        A    Yes.

3        Q    Okay.  And if there had been inconsistencies

4    that caused you to have pause, you might've taken some

5    steps to try to follow-up and understand why this person

6    was telling you different things, correct?

7        A    Correct.

8        Q    And ultimately in this case, you didn't find

9    there to be any inconsistencies involving Mr. Rogers's

10   prior statements, correct?

11       A    No.

12       Q    And you found him to -- and as a result,

13   you found him to be believable, correct?

14       A    Yes.

15       Q    And in fact, that there had been

16   inconsistencies in what he had said previously compared

17   to what he was saying when you interviewed him in May of

18   2002, that might have had some impact on whether you

19   thought he was believable, correct?

20           MS. BITOY:  Object to the form.  Misstates his

21       prior testimony.  You can answer.

22       A    Can you repeat that question, please?

23   You broke up a little bit.

24       Q    If you had noticed any inconsistencies in what

25   Mr. Rogers was telling you in May of 2002 compared to

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1   what he had said previously, that could have had some

2   impact on whether you found him believable, correct?

3        A    I would've questioned it -- if there was some

4   type of inconsistency, I would've questioned him about

5   it.

6        Q    Okay.  And in this case, you didn't question

7   him about any inconsistencies, correct?

8        A    Correct.

9        Q    And in this case, did you take any steps to

10  ensure that Mr. Rogers wasn't just telling you what you

11  wanted to hear given his other pending criminal charges?

12            MS. BITOY:  Object to form.  You can answer.

13       A    Based on the information that I've read from

14  the other witnesses, and based on the information that

15  he provided, it was consistent.

16       Q    Okay.  And if Mr. Rogers was providing you

17  with inconsistent information and was behaving in a

18  hostile manner, is that information that you might have

19  taken into consideration about whether he was

20  believable?

21            MS. BITOY:  Object to incomplete hypothetical.

22       You can answer.

23       A    Define hostile.  I don't -- I don't -- I'm

24  not -- I don't understand.

25       Q    Yeah.  I mean, you've sometimes used the term

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   hostile witness, correct?

 2        A    I personally haven't, no.

 3        Q    Okay.  And so if a witness is being hostile,

 4   in other words, a witness is being extremely angry,

 5   extremely upset, a witness is telling you they don't

 6   want to talk to you, is that information that you take

 7   into consideration as you're deciding whether this

 8   person is believable or not?

 9        A    The person doesn't want to talk to me, I'm not

10   going to force the issue.

11        Q    Okay.  And so the witness is being hostile,

12   that's a situation in which you would essentially

13   terminate the interview?

14        A    Correct.

15        Q    Okay.  And why is it that if a witness is

16   being hostile, you would -- why is it that you would

17   terminate the interview rather than continue it?

18        A    Because they may not give you the proper

19   information that you're looking for.

20        Q    Okay.  In other words, they may not give you

21   truthful information.

22        A    Correct.

23        Q    Because as a homicide detective, you weren't

24   interested in just getting whatever information somebody

25   told you.  You wanted truthful information, correct?
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Correct.

 2        Q    As a homicide detective, your goal was not to

 3   close cases, it was to actually solve the cases by

 4   finding the person who had actually committed the crime,

 5   correct?

 6        A    Yes, that's correct.

 7        Q    And so if a witness was being hostile,

 8   you'd have some concern that they may just be saying

 9   untruthful things rather than things that are actually

10   truthful and are going to help you find the person who

11   really committed the crime, correct?

12            MS. BITOY:  Again, object to foundation.

13      Incomplete hypothetical.  You can answer.

14        A    Correct.

15        Q    I going to ask you about some aspects of the

16   investigative file here.  We mark these one by one.

17   So did you have any partners that you worked with during

18   the time you were working as a homicide detective in

19   Area 5?

20        A    Yes.

21        Q    Who were your partners?

22        A    Detective Jim Kelly.

23        Q    Who else?

24        A    Detective -- pardon me?

25        Q    Yeah, sorry, who else?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    Detective Falk.

2    Q    **Who else?**

3    A    At Area 5?

4    Q    **At Area 5.  Yes.**

5    A    Those -- just those two.

6    Q    **And then did you have -- during the -- in**

7    **2002, during the course of your involvement in this**

8    **homicide investigation, did you have any partners?**

9    A    I was, like, the third person with Detective

10   Bogucki and Detective Schalk.

11   Q    **Okay.  So you -- so it was sort of a**

12   **three-person team?**

13   A    Yes.

14   Q    **Okay.  Explain how that worked.**

15   A    There was three -- there was a three-man team

16   versus two-man teams.

17   Q    **And would you guys be out in the cars together**

18   **typically then?**

19   A    Typically, yes.

20   Q    **Okay.  And were you junior to them?**

21   A    Yes.

22   Q    **Okay.  Did you -- did they train you?**

23   A    Yes.

24   Q    **Okay.  And so was it considered part**

25   of -- strike that.  So part of why you rode with them

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   was because they were more senior homicide detectives;

 2   is that right?

 3        A    Correct.

 4        Q    And I take it there's a lot of on-the-job

 5   training, correct?

 6        A    Correct.

 7        Q    And would they -- and you -- you'd learned

 8   from them about how to go about conducting homicide

 9   investigations, correct?

10        A    Correct.

11        Q    And the various techniques and tools that they

12   use in conducting homicide investigations were things

13   that they would pass on to you, correct?

14        A    Correct.

15        Q    Okay.  Their techniques for conducting

16   interrogations, would you learn from them in terms of

17   how they went about conducting interrogations?

18        A    Yes.

19        Q    And would you learn from them in how they went

20   about conducting interviews of witnesses?

21        A    Yes.

22        Q    And did you learn from them in terms of how

23   you went about conducting identification procedures?

24        A    Yes.

25        Q    Did you learn from them in terms of how you
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1  went about taking notes?
 2       A    Yes.
 3       Q    Did you learn from them in terms of how you
 4  went about documenting in supplementary reports,
 5  your investigation?
 6       A    Yes.
 7       Q    Okay.  Showing you a document I've marked as
 8  Exhibit 7, it's Bates stamped City-JF 19.  Do you
 9  recognize any of the handwriting on this page?
10            (EXHIBIT 7 MARKED FOR IDENTIFICATION)
11       A    I do not.
12       Q    Okay.  Is any of that handwriting yours?
13       A    No.
14       Q    Okay.  Showing you a document I've marked as
15  Exhibit 8, City-JF 22.  Do you recognize that
16  handwriting?
17            (EXHIBIT 8 MARKED FOR IDENTIFICATION)
18       A    I don't see it.
19       Q    Oh, I got to share my screen here.  You see
20  the screen now?
21       A    I do.  And I do not recognize it.
22       Q    Okay.  And so that's not your handwriting?
23       A    It is not.
24       Q    Okay.  Showing your document I've marked as
25  Exhibit 9.  Do you recognize that handwriting?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              (EXHIBIT 9 MARKED FOR IDENTIFICATION)

 2      A     I do not.

 3      Q     And do you know whose handwriting that is?

 4      A     I do not.

 5      Q     Okay.  And this is Bates stamped City-JF 168

 6  for the record.  Showing you a document I've marked as

 7  Exhibit 10.  Let's get this up on the screen.  This is

 8  Bates stamped City-JF -- let's see, 17.  Do you

 9  recognize -- is any of this your handwriting?

10              (EXHIBIT 10 MARKED FOR IDENTIFICATION)

11      A     It is not.

12      Q     Okay.  And do you recognize any of this

13  handwriting?

14      A     I do not.

15      Q     Okay.  Showing your document I've marked as

16  Exhibit 11, Bates stamped City-JF 187 through 189.

17  And there's some handwriting on these pages.  Is any of

18  this handwriting yours?

19              (EXHIBIT 11 MARKED FOR IDENTIFICATION)

20      A     It is not.

21      Q     Okay.  And do you recognize any of this

22  handwriting?

23      A     I do not.

24      Q     Showing you document I've marked as Exhibit

25  12, Bates stamp is City-JF 185.  Is any of that
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    handwriting yours?
2              (EXHIBIT 12 MARKED FOR IDENTIFICATION)
3        A     It is not.
4        Q     You recognize any of that handwriting?
5        A     I do not.
6        Q     From your document I've marked as Exhibit 13,
7    it is City-JF 184.  Is that your handwriting?
8              (EXHIBIT 13 MARKED FOR IDENTIFICATION)
9        A     It is not.
10       Q     Do you recognize that handwriting?
11       A     I do not.
12       Q     And I'm showing you a document I'm marking as
13   Exhibit 14.  It is City-JF 183 and on the bottom right
14   there's some handwriting there.  Is that your
15   handwriting?
16             (EXHIBIT 14 MARKED FOR IDENTIFICATION)
17       A     It is not.
18       Q     Okay.  And do you recognize whose handwriting
19   that is?
20       A     I do not.
21           MR. SWAMINATHAN:  Okay.  All right.  It's
22       12:45.  I'm going about another -- little over
23       another hour.  I suggest we take a break here
24       and I think maybe we should talk about whether we
25       take a -- I think it probably makes sense to take
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    sort of a quick lunch break.  Does that make sense?

2         MS. BITOY:  Sure.  Do you have any guess in

3    terms of how much longer you have with this?  Just

4    so we can try and get --

5         MR. SWAMINATHAN:  And yeah.  Yeah.  Jennifer,

6    with -- as I say to all defense counsel, you and I

7    have not worked together.  I'm willing to give you

8    an estimate if you promise not to hold me to it and

9    understand --

10        COURT REPORTER:  All right, we're off the

11   record.  The time is 12:48.

12          (OFF THE RECORD)

13        COURT REPORTER:  We are back on the record for

14   the deposition of Anthony Noradin being conducted by

15   videoconference.  My name is Sydney Little.  Today

16   is February 22, 2023.  And the time is 1:28 p.m.

17 BY MR. SWAMINATHAN:

18   **Q    All right.  Mr. Noradin, did you get a chance**

19 **to get some lunch?**

20   A    I did.

21   **Q    Are you ready to continue?**

22   A    Yes.

23   **Q    Okay.  Were you trained on the Brady**

24 **disclosure obligations of police officers?**

25   A    I believe so, yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    And were you trained on the idea that police

2    officers had an obligation to turn over exculpatory

3    information or evidence of innocence regarding criminal

4    suspects?

5    A    Yes.

6    Q    Okay.  And what was your understanding about

7    what your Brady obligations were based on your training?

8    A    To turn all the over -- turn over the

9    information that was part of the discovery.

10   Q    Okay.  And so was the -- what was the training

11   with regard to what portions of a police investigative

12   file to share with the prosecution in criminal defense?

13   A    You shared a complete file.

14   Q    When you say a complete file, you're referring

15   to the complete investigative file.

16   A    I'm -- you're -- you're -- it's a

17   broad -- it's a broad question you're asking me.  You're

18   asking me in relation to a homicide investigation?

19   Q    Yes.

20   A    All the reports associated with that homicide

21   investigation or any paperwork associated to that

22   homicide investigation gets turned over.

23   Q    Okay.  And that would include -- would that

24   include everything contained in the investigative file?

25   A    That's correct.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q    And as a primary detective assigned to a

2  homicide investigation, was it your practice to turn

3  over the entire investigative file to the prosecution?

4      A    Either I would turn over to file to the

5  prosecution, or they would go through the normal

6  channels and be subpoenaed.

7      Q    Would you ever pick and choose what portions

8  of the investigative files to share with the prosecution

9  or criminal defense?

10     A    No.

11     Q    Could you ever exclude any particular notes or

12  supplementary reports from the file in terms of what to

13  include?

14     A    No.

15     Q    And would you agree that that picking and

16  choosing which portions of the investigation to document

17  or disclose would be in violation of your Brady

18  obligations, as you were trained?

19     A    Repeat that question, please.

20     Q    Yeah.  Choosing not to document or disclose

21  portions of a homicide investigation as you saw fit

22  would be improper under your Brady obligations as you

23  were trained on them, correct?

24     A    That's correct.

25     Q    Okay.  As part of your Brady obligations, did

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    you have an obligation to turn over the results of photo

2    identification procedures?

3         A    Yes.

4         Q    Did you have an obligation to turn over the

5    results of photo identification procedures that they

6    result in a negative identification?

7         A    Yes.

8         Q    Okay.  And would you agree that if there was a

9    negative identification of a suspect in a photo array,

10   that should be documented and disclosed?

11        A    Yes.

12        Q    And if there was a negative identification or

13   a failure to identify your suspect in a live line-up

14   procedure, that should be documented and disclosed,

15   correct?

16        A    Yes.

17        Q    And if there was a failure to identify your

18   suspect in a show-up, that should be documented and

19   disclosed, correct?

20        A    Yes.

21        Q    Okay.  Were all -- information about alternate

22   suspects, was that something that should have been

23   documented and disclosed?

24        A    Yes.

25        Q    And so any time you had alternate suspects in

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   a homicide investigation, who those alternate suspects

 2   were was information that you would document and

 3   disclose to the prosecution, correct?

 4        A    Correct.

 5        Q    And it was your understanding that you were

 6   required to disclose that information as part of your

 7   Brady obligations, correct?

 8        A    Correct.

 9        Q    And whatever leads led you to develop evidence

10   -- strike that.  Whatever information you learned that

11   caused you to believe somebody was an alternate suspect,

12   that was information that also had to be documented and

13   disclosed, correct?

14        A    Correct.

15        Q    And in terms of generating photo arrays, back

16   around the time of 2002, what were the available methods

17   for you to develop a photo array to use with witnesses

18   in a homicide investigation?

19        A    How was a photo array generated at that time?

20        Q    Exactly, sir.

21        A    I'm trying to remember back in 2002, that's 20

22   years ago.  Because now the things have changed.

23   We were able to do it on the computer.  I believe, back

24   then, we were able to pull up photos on the computer and

25   generate a photo array.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Did you guys have something called an ICAM
2    database?

3    A    Back then, I believe it was called ICAM, yes.

4    Q    Okay.  Thank you very much.  So around 2002,
5    you could have used the ICAM database to generate photo
6    arrays, correct?

7    A    I believe -- I'm -- I -- I -- I know that it's
8    -- technology has changed.  I just don't know what year
9    it changed from ICAM to the data warehouse, so to speak.

10   Q    Okay.  And I can represent that I know because
11   of a 1998 homicide investigation that the ICAM database
12   was in use in 1998 for sure.  Was there a point in time
13   when it switched from the ICAM database to some other
14   system?

15   A    It's now called Data Warehouse, but I don't
16   know what year that changed.  There again, I don't know
17   if ICAM was in -- in place in 2002 or was Data Warehouse
18   in place in 2002.  I just don't know what technology was
19   in place in 2002 at that time.

20   Q    Okay.  So in 2002, it would've been either the
21   ICAM database or the Data Warehouse that was in place,
22   correct?

23   A    Correct.

24   Q    Okay.  Thank you.  And in the -- if I -- if it
25   was the ICAM database that was in place, can you explain

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   how that process worked?

2       A    Meaning as far as what?

3       Q    If you wanted to generate a photo array, how

4   could you do that using this ICAM database?

5       A    Basically, you would've to go -- you would've

6   to go a series -- through a series of photos to match

7   demographics of your -- of your person that you want to

8   put in the photo array.

9       Q    Okay.  The ICAM database gave you access to

10  thousands of photos of people who'd been arrested by the

11  Chicago Police Department, correct?

12      A    That's correct.

13      Q    Okay.  And you could essentially filter in

14  that system, people who met certain criteria, you know,

15  people of a particular race, people of a particular

16  height or weight, those kinds of things, correct?

17      A    If I remember correctly, yes.

18      Q    Okay.  So you could create filters based on

19  certain physical characteristics of your suspect, and

20  then it would generate a whole bunch of photos for you

21  to look through, correct?

22      A    Correct.

23      Q    And then you would choose which set of six

24  photos you actually wanted to use for your photo array,

25  correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Correct.

 2        Q    Okay.  So basically, the system gave you

 3   access to thousands and thousands of photos, and then

 4   you could filter that down to a smaller number from

 5   which you selected the exact photos you wanted, correct?

 6        A    Correct.

 7        Q    Okay.  And so in -- and is that ultimately,

 8   essentially -- strike that.  Is that basically the same

 9   process in the Data Warehouse system?

10        A    Yes.

11        Q    In other words, in the Data Warehouse system,

12   you also had access to thousands of CPD arrest photos,

13   and then you could filter that down to a smaller set

14   from which you chose exactly which photos you wanted to

15   include, correct?

16        A    Well, right now it's -- it's -- it's -- with

17   the Data Warehouse, there is a -- a program in there for

18   mug shots, and you can generate a mugshot photo array

19   from that system, but you're only allowed, I believe,

20   200 photos to choose from.

21        Q    Okay.  And how does it decide what the 200

22   photos are that are available to you?

23        A    Those are populated by --

24             MR. BURNS:  Foundation.  Foundation.

25             THE WITNESS:  I'm sorry, go ahead.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1            MR. BURNS:  I had an objection to foundation.

 2       You can answer.

 3            THE WITNESS:  Yeah.

 4  BY MR. SWAMINATHAN:

 5       Q    Go ahead.

 6       A    Okay.  Sorry.  Basically, we would -- whoever

 7  our offender is in the case, we would pull this photo

 8  up, and then the computer would generate photos based

 9  off of that CV number.

10       Q    I see.  So you would upload the photo that you

11  were going to use of your suspect?

12       A    I'm not basically uploading it.  If I have

13  a person's IR number or CV number from a prior arrest,

14  I can enter that into the system, and then the system

15  itself would match the geographics of that person and

16  that CV number or IR number.

17       Q    And when you say the geographics, you mean

18  sort of the physical characteristics?

19       A    Correct.

20       Q    And is it matching just like sort of their age

21  and that type of information, or is it also matching

22  their actual physical characteristics?

23       A    Actual physical character --

24            MR. BURNS:  Foundation.

25       A    Actual physical characteristics.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   Q    I see.  So the Data Warehouse system will look

2   at the arrest photo of the person that you've identified

3   as your suspect, and if that person is bald, for

4   example, the system will recognize that they're bald and

5   it'll give you other bald individuals?

6   A    Correct.

7        MR. BURNS:  Objection.  Foundation.

8   Q    And previous to that, in the CRIS -- strike

9   that.  Previous to that, in the ICAM system, you could

10  input a filter that the person was bald, correct?

11  A    I don't recall.  I just -- it's just been so

12  long, I just don't -- I haven't -- I can't really

13  expound on the ICAM system.  I can expound more on the

14  Data Warehouse system.  Sorry.

15  Q    Okay.  Fair enough.  Fair enough.  Let me do

16  it without putting the system in play and just sort of

17  do it in more generally, which is, regardless of whether

18  you're using the ICAM system or the Data Warehouse

19  system, your goal was to create a photo array that was

20  fair, correct?

21  A    That's correct.

22  Q    Okay.  And what were you trained in terms of

23  how -- what you needed to do to make a photo array be a

24  fair photo array?

25       MS. BITOY:  Object to form.  You can answer.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:20-cv-04768 Document #: 184-33 Filed: 05/06/25 Page 153 of 236

1        A     Height, weight, physical characteristics,

2    tattoos, the way the hair was worn, facial hair.  You

3    try to get it as close as you can so it is -- so it is

4    as fair as possible.

5        Q     Okay.  And in other words, you want people who

6    have physical characteristics that don't -- that match

7    your suspect, correct?

8        A     Correct.

9        Q     Okay.  And in both of those systems, you had

10   the ability to essentially select a set of photos that

11   allowed you to create a photo array where the other

12   individuals had similar characteristics to your suspect,

13   correct?

14       A     Correct.

15       Q     Okay.  And so for example, if your suspect had

16   a unique hairstyle, you could get -- you could put

17   together a photo array with other individuals who had a

18   similar hairstyle, correct?

19       A     That's correct.

20       Q     And if you had a person who had -- again, all

21   similar concepts, if you had an individual who had sort

22   of a, you know, dark complexion, you could get other

23   individuals who all had dark complexion, correct?

24       A     Correct.

25       Q     Okay.  And those were -- those were the types

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    of things you would do as you generated photo arrays as

2    a homicide detective, correct?  You tried to get people

3    who had similar height and weight and complexion and

4    hairstyle, so on, correct?

5        A    Correct.

6        Q    Okay.  And would you account for the original

7    witness statement?  So for example, if the witness who's

8    going to be shown a photo array, says that the person

9    had long hair, would you make it a point to in -- make

10   sure the photo array included all individuals who had

11   long hair?

12       A    Yes.

13       Q    Okay.  And so similarly, if the original

14   eyewitnesses indicated that the witness was, you know,

15   the suspect was -- had dark complexion, you would put

16   together a photo array where the witnesses all had dark

17   complexion, correct?  The suspect and the fillers had

18   dark complexion, correct?

19       A    Correct.

20       Q    Okay.  And those were the kind of steps you

21   would take to ensure that a photo array that you were

22   creating and using in your homicide investigations was

23   fair, correct?

24       A    Correct.

25       Q    And when we say fair part of what we mean

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   is a step to ensure that the photo array is actually

2   identifying the person who committed the crime, rather

3   than just simply identifying one person out of a group

4   who stands out, correct?

5       A    Rephrase that question or ask it again.

6       Q    Let me -- yeah, let me strike that and ask a

7   better question.  Another question.  When you were

8   conducting photo arrays, would you try to conduct photo

9   arrays using pictures that were close in time to the

10  time of the crime?

11      A    Yes.

12      Q    Okay.  So in other words, sometimes a homicide

13  investigation might take six months or a year to solve

14  or even longer in some instances, fair?

15      A    Fair.

16      Q    And so when you were creating photo arrays,

17  would you try to use pictures of suspects and fillers

18  that were close in time to the time of the crime?

19      A    Yes.

20      Q    Okay.  And what was the reason that you tried

21  to do that?

22      A    Because that's based on what the

23  witness -- that's what the witness saw at that time so

24  they're going to be able to identify the offender or

25  subject at that -- what that person looked like at

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of ANTHONY NOBLE, taken on February 20, 2024

```
 1   that time because if time has passed, it's not -- it's

 2   not a -- a good way to show a photo array of somebody is

 3   older with long hair versus somebody who was younger

 4   with short hair.

 5        Q    Got it.  Okay.  Let show you a document I have

 6   marked as -- I'm just going to going to go through some

 7   documents.  I suspect we can go through these pretty

 8   quickly, but I'm just going to -- I need to put them in

 9   front of you here.  Let's see.  Okay.  This is a

10   document I've marked as Exhibit 15.  This is CCSAO

11   Conflicts Bates stamp 1434 through 1435.  And the topic

12   says Chicago Police Department --

13        A    Can you share -- can you share because I can't

14   see it?

15        Q    Sorry.  Sorry.  You see it on your screen now,

16   sir?

17             (EXHIBIT 15 MARKED FOR IDENTIFICATION)

18        A    I do.

19        Q    Okay.  It's a two page report, and it's

20   entitled Chicago Police Department Original Case

21   Incident Report.  Do you see that, sir?

22        A    I do.

23        Q    Okay.  And this particular report relates to

24   the same RD number of the Sorrell investigation,

25   correct?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    Yes.

2    Q    Okay.  And this report is -- this report lists

3 on page 2 -- see where it says personnel?

4    A    Yes.

5    Q    And then the personnel lists assisting

6 detective/youth investigator Raymond Schalk.  Do you see

7 that?

8    A    Yes.

9    Q    Okay.  And then it lists assisting

10 detective/youth investigator Anthony Noradin.  Do you

11 see that?

12    A    Yes.

13    Q    Okay.  And why are you listed there?

14    A    Because when -- this report -- this just

15 general offense case report was generated subsequent to

16 the handwritten report, and being generated subsequent

17 to the handwritten report, the bottom one, Jerry Bogucki

18 is the assigned detective, so to speak, detective

19 investigator.  And then myself and Ray Schalk were

20 under -- we were working on the same three-man car,

21 so to speak.

22    Q    Okay.  And then here, on page 1, it indicates

23 that this was printed by you on January 30, 2013.

24 Do you see that?

25    A    I do.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    So what -- so what is the purpose of this

2    report?

3    A    I -- I -- I -- I don't know.

4    Q    There's a narrative section that says,

5    "The facts of this preliminary investigation were

6    recorded on the original case report on 21 December

7    1990."  Do you see that?

8    A    I do.

9    Q    So what information are you trying to

10   communicate here?

11        MS. BITOY:  Object to foundation.  You can

12      answer.

13   A    I don't know.  Can you scroll up -- can you

14   scroll up back down a minute?

15   Q    Up this way?

16   A    Right there.  Yeah.

17   Q    I'll make it a little bigger if that's

18   helpful.

19   A    I -- I -- I don't know.

20   Q    Okay.  Is this a report that you created?

21   A    It would not be something I created.

22   Q    So this is a -- you know who created this

23   report?

24   A    I do not.

25   Q    And -- but you printed it on January 30, 2013,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    correct?

2         A    That's what it says at the bottom, yes.

3         Q    Do you know why you printed it in January

4    2013?

5         A    I -- I do not -- I don't recall.

6         Q    And do you know what purpose this type of

7    original case incident report is intended to serve in a

8    case that's already been cleared open?

9              MS. BITOY:  Object to foundation.  You can

10        answer.

11        A    Because the case originally happened in 1990.

12   Since the case happened in 1990, the CRIS system was not

13   enrolled into the police department until after 2000.

14   So if you look at the RD number in the upper right hand

15   corner, it says 90N603937, which indicates the incident

16   occurred in 1990, and that's the way we were able

17   to -- that -- that's the way it was able to be input

18   into the system was with the year of 1990 and then the

19   RD number to follow.

20        Q    So was this intended to essentially input this

21   case into the CRIS system even though it was a 1990

22   case?

23             MS. BITOY:  I'm going to object to foundation.

24        Go ahead.

25        A    Yes.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-33 Filed: 05/06/25 Page 160 of 236 PageID #:6894

158

1        Q     Okay.

2        A     Because if you look at the previous reports

3   from the 1990s, those were all typed -- typed like on a

4   typewriter.

5        Q     Yes.

6        A     That's not converted over into the CRIS

7   system.  So that handwritten report done on the day of -

8   - the general offense case report done on the day of is

9   now generated in the CRIS system under this particular

10  way the RD is written.

11       Q     I see.  And would there -- so in this case,

12  where the general offense case report is essentially now

13  being replaced with this incident report, would there

14  have been an attachment to this incident report that

15  contained the old handwritten general offense case

16  report?

17       A     Well, the --

18             MS. BITOY:  Objection to foundation.  You can

19       answer.

20       A     The handwritten portion of general offense

21  case report is also included in the master file.

22       Q     When you say the master file, you mean within

23  the CRIS system?

24       A     Within the investigative file.

25       Q     Okay.  Within the investigative file.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    But would the CRIS system, would a copy of that

2    handwritten general offense case report have been input

3    or uploaded into the CRIS system?

4         MS. BITOY:  Objection.  Foundation.  You can

5      answer.

6      A    This is in lieu of that handwritten case

7    report.

8      Q    Got it.  Could you upload photos or any other

9    type of information into the CRIS system to associated

10   with reports, or would it only be the reports

11   themselves?

12     A    Only the reports themselves.

13     Q    Got it.  Showing you a document I've marked as

14   Exhibit 16.  Do you see that on your screen now, sir?

15         (EXHIBIT 16 MARKED FOR IDENTIFICATION)

16     A    I do now.

17     Q    Okay.  And it's Bates stamp City-JF 126

18   through 128.

19     A    Yep.

20     Q    And this one is a CPD case supplementary

21   report, and it indicates that this is a field

22   investigation method/CAU code report.  Do you see that,

23   sir?

24     A    I do.

25     Q    What does that mean?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    This report is generated -- this report is

2 generally generated after the general offense report has

3 been inputted into the CRIS system.

4    **Q    And what is the purpose of this report?**

5    A    This report, basically if you scroll up a

6 little bit --

7    **Q    Yeah.**

8    A    I'm sorry, the other way, down.  My bad.

9 A little further.  A little further.  Stop.  In the

10 middle of the page where it says, "Method codes and CAU

11 codes," this report is generated specifically for that.

12 So once the investigation is complete, or during the

13 process of the investigation, those two fields would be

14 filled in with -- with information.  For example, method

15 code, the person -- it would be, "Person shot," because

16 Willie Sorrell was shot, so it would say, "Person shot."

17    **Q    And what about the CAU codes?**

18    A    The CAU code would be a firearm or shot or

19 however -- there's -- there's many -- there's

20 many -- there's a dropdown box grab, and there's many

21 categories you can be -- it can be placed in.

22    **Q    Okay.  And so it's basically the method by**

23 **which the crime occurred?**

24    A    Correct.

25    **Q    And then the CAU code is -- I guess what I'm**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   asking, what's the difference between the method code

2   and the CAU code?

3        A    If you -- if you pull up the -- I can better

4   explain it if you pull up the -- the clear close report,

5   I can explain it to you better that way.

6        Q    All right.  Let's do it that way.  All right.

7   I'm showing you a document I've marked as Exhibit 4.

8   This is the cleared open report we looked at previously,

9   and here we have the --

10       A    All right, stop.

11       Q    Yeah.  There we go.

12       A    See, person shot.  CAU code, delivery truck

13  driver.

14       Q    Okay.  And so what is intended to be captured

15  in the CAU codes?

16       A    Just part of the invest -- what -- what

17  occurred during the part of the investigation.  So

18  method code was the person was shot, and during it, was

19  -- there was an armed robbery of a delivery truck

20  driver.

21       Q    Okay.  All right.  And in this case, by the

22  way, it's a cleared open report.  In other -- and the

23  reason it's open is what?

24       A    There is a second offender that has not been

25  identified.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q    Okay.  And in terms of what implication that

2  has for how the case is treated by the Chicago Police

3  Department -- strike that.  Let me ask a better

4  question.  What is -- how does that impact how the

5  investigation proceeds if it's cleared open as opposed

6  to cleared closed?

7     A    It means that there's still an

8  outstanding -- an offender out there in -- in relation

9  to this case.

10     Q    And does that mean that the investigation will

11  then be treated as still open within the police

12  department?

13     A    The case is cleared, but it's still open. It's

14  not officially closed -- completely closed because there

15  is an outstanding individual in reference into this

16  investigation.

17     Q    Okay.  And if the case was cleared closed,

18  would the investigative file then be transferred to the

19  records division warehouse?

20     A    It's -- it's transferred whether it's cleared

21  open or cleared closed.

22     Q    Okay.  So both cleared open and cleared closed

23  cases get transferred to the Records Division warehouse?

24     A    That is correct.

25     Q    I see.  Is there any difference in terms of

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   what files are kept between cleared open and cleared
 2   closed cases?
 3           MR. BURNS:  Objection.  Foundation.
 4           MS. BITOY:  Foundation.
 5       A   Can you rephrase the question or expound a
 6   little more because I'm -- I don't understand the
 7   question.
 8       Q   Yeah.  So basically when you have an
 9   investigative file and a cleared close case, which is
10   what I typically see, then the file, you know, is
11   basically complete and it gets sent on to the records
12   division either by the, you know, by the clerk in the
13   area or whoever it is.  Is that the same process that
14   occurs with open files?
15       A   Yes.
16           MS. BITOY:  I'm going to object to the
17       foundation.  You can answer.
18       A   Yes.
19       Q   Okay.  And in cleared -- before a -- whether
20   it's cleared open or cleared closed, is there any
21   process of going through the investigative file to make
22   sure it's organized and stuff before it's sent on to the
23   records division warehouse?
24           MS. BITOY:  Just object again to foundation.
25       A   It -- it wouldn't not be done by me unless
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    there was -- I shouldn't say by myself.  If it was -- if

2    the -- there's furtherance of the investigation, then it

3    would be reviewed.  If there's something further to go

4    into the file as far as a detective is concerned, the

5    file would go as is.

6        Q    Okay.  From a detective's perspective, is

7    there any difference in terms of what happens with

8    cleared open cases versus cleared closed cases?

9             MS. BITOY:  Objection.  Foundation.

10       A    I mean, the case is still an ongoing

11   investigation at that point because there's still a

12   wanted offender out there.  And if new developments in

13   the investigation do occur, then you follow that lead in

14   reference to that, whatever that lead is, for that

15   investigation.

16       Q    Okay.  But the file -- but you don't even have

17   the file anymore at that point; is that right?

18       A    That is correct.

19       Q    So how do you continue to conduct the

20   investigation if you don't have the file?

21       A    You would -- you would submit a request to the

22   warehouse requesting a copy of the file.

23       Q    Okay.  For purposes of tracking your own

24   cases, is it considered a case that you have essentially

25   closed among your set of assigned cases?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MS. BITOY:  Object to form, ambiguity.

 2        Q    Strike that.  Yeah, strike that.  That's a

 3   poor question.  Within the Chicago Police Department,

 4   having been a homicide detective for a long time,

 5   they would track your clearance rate, right, as a

 6   homicide detective?

 7              MS. BITOY:  I'm just going to object again to

 8        foundation.  You can answer.

 9        A    Individuals?

10        Q    Yes.

11        A    I'm not aware of individual.

12        Q    Okay.  Have you ever had anybody follow-up

13   with you about the rate in which you were clearing your

14   homicide cases that you were assigned?

15        A    No.

16        Q    Is that something that you were aware of ever

17   occurring within your department?

18        A    No.

19        Q    Okay.  And overall clearance rates within the

20   Chicago Police Department, you're aware of there being

21   some tracking of that information, correct?

22              MS. BITOY:  Object to foundation.

23        A    Overall, yes.

24        Q    Okay.  And were clear open versus -- were

25   clear open cases treated differently than cleared closed
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   cases for tracking purposes?

 2           MS. BITOY:  Objection to foundation.

 3           MR. BURNS:  Objection.  Foundation.

 4       A    My understanding, if it's cleared,

 5   it's -- it's -- it's covered under both.

 6       Q    Okay.  In this case, you indicated that there

 7   was a second defender and that's why it was listed as

 8   cleared open, correct?

 9       A    Correct.

10       Q    During the course of your involvement in this

11   investigation, did you learn any information about who

12   the second offender was?

13       A    No, not that I'm aware of, no.

14       Q    Did you ask any of the witnesses that you

15   spoke to about who the second offender was?

16       A    Well, the only witness I spoke with was

17   Terry Rogers.

18       Q    Did you ask Mr. Rogers for any more

19   information on who the second offender was?

20       A    I did not.

21       Q    Are you aware of any of the detectives

22   developing any additional information to identify who

23   the second defender was?

24       A    I do not.

25       Q    Okay.  Just quickly go through this clear open
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    report while we have it in front of us.  It lists here

2    in interview on -- this is on Page 5 of the report,

3    Fletcher 868.  It lists here interview of Terry Rogers

4    from February 12, 2002.  Did you have any involvement in

5    that interview whatsoever?

6        A    Not that I recall, no.

7        Q    Okay.  And it says here that there are -- at

8    the bottom of the page it says, "Reporting detectives

9    checked ICAM arrest records."  Do you see that?

10       A    Yes, I do.  At the bottom.

11       Q    Okay.  So does that refresh your recollection

12   that in -- around -- in 2002 the system that they were

13   using at that time was ICAM?

14       A    Yes.

15       Q    Okay.  And so you would've -- back in 2002,

16   you would've been using the ICAM system to generate any

17   photo arrays, correct?

18       A    There again, I know that ICMA -- ICAM system

19   existed, but as far as doing photo arrays like we do at

20   the Data Warehouse, I don't know if it had that feature.

21       Q    Okay.

22       A    I don't recall if it -- I don't recall it

23   having that feature.  I just don't remember.

24       Q    Okay.  And then it lists that there was,

25   "The reporting detectives then located the bread truck

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    driver, Edward Cooper."  Did you participate in any

2    interviews of Edward Cooper?

3         A    Not that I recall, no.

4         Q    It next lists, "Efforts to locate other

5    witnesses to the shooting, Sheenee Friend and Emmett

6    Wade."  Did you participate in any interviews of

7    Sheenee Friend?

8         A    I did not.

9         Q    Did you participate in any interviews of

10   Emmett Wade?

11        A    Not that I recall, no.

12        Q    Okay.  It indicates here that on February 13,

13   2002, Terry Rogers was interviewed by ASA Jennifer

14   Walker.  Do you see that?

15        A    I see that.

16        Q    Did you participate in the February 13th

17   interview of Terry Rogers?

18        A    Not that I recall, no.

19        Q    Have you seen any handwritten note -- strike

20   that.  Have you seen any handwritten statement prepared

21   regarding the February 13, 2000, interview of Terry

22   Rogers?

23        A    When you say statement, you mean a statement

24   drafted by the state's attorney, or you mean notes taken

25   by a detective?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q    Thank you.  Have you seen any handwritten

2  statement prepared by an assistant state's attorney

3  regarding the February 13, 2002, interview of Terry

4  Rogers?

5      A    No.

6      Q    Do you have any knowledge about why a

7  handwritten statement was not taken on February 13,

8  2002?

9        MS. BITOY:  Objection.  Foundation and calls

10   for speculation.  You can answer.

11     A   I don't -- I -- I don't know why his

12  handwritten was not taken at that time.  I -- I --

13  I -- I don't know.

14      Q    Okay.  And then it lists here James Fletcher

15  and appears he was interviewed on February 21, 2002.

16  Did you participate in any way in that interview of

17  James Fletcher?

18      A    I did not.

19      Q    Okay.  And then it lists a March 7, 2002,

20  interview of Sheenee Friend.  Did you have any

21  participation in that interview?

22      A    No, I did not.  Not that I recall.

23      Q    Okay.  And this lists that a March 12, 2002

24  interview of Emmett Wade that begins on page 7 into page

25  8 of this report, did you participate in that interview

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    of Emmett Wade at all?

2        A    Not that I recall.

3        Q    Okay.  Okay.  Mark this.  All right.  I'm

4    showing your document I've marked as Exhibit 17.

5    It is -- all right.  This one is marked TIRC, T-I-R-C,

6    Fletcher 39.  And this is a general progress report.

7    You reviewed this document in preparation for this

8    deposition?

9                (EXHIBIT 17 MARKED FOR IDENTIFICATION)

10       A    I did.

11       Q    Okay.  And this documents a report -- an

12   interview that appears to have occurred on March 19,

13   1995, correct?

14       A    Yes.

15       Q    Were you a participant in that interview at

16   all?

17       A    No, sir.

18       Q    Okay.  This indicates that a subject named

19   Fletcher Clinton lived in the area of the intended

20   victim, Edward Cooper.  Do you see that?

21       A    I do.

22       Q    Did you have any -- did you know anybody by

23   the name of Fletcher Clinton?

24       A    No, I did not.

25       Q    Did you participate in any efforts to locate

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   an individual by the name of Fletcher Clinton?

 2        A    No, I did not.

 3        Q    It says, "Clinton's name was obtained through

 4   a RAMIS," R-A-M-I-S, "check of Fletcher."  Do you see

 5   that?  Let me make it a little bigger.  You see this

 6   RAMIS?

 7        A    I do, yes.

 8        Q    What is RAMIS?

 9        A    I'm not familiar with it because it was prior

10   to me being a detective.  I -- I can't explain what

11   it -- what it is.

12        Q    Okay.  So you didn't ever use that system,

13   whatever it is?

14        A    Not that I'm aware of, no.

15        Q    Okay.  And you said you didn't participate in

16   any interviews of Mr. Fletcher.  Did you have any other

17   conversations with Mr. Fletcher that you can recall?

18        A    Not that I recall, no.

19        Q    Did you have any involvement in transporting

20   Mr. Fletcher to the hospital?

21        A    I did.

22        Q    And what do you remember about that?

23        A    I remember he -- I think he said he had high

24   blood pressure or something like that, and we had to

25   take him to the hospital to get checked out.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q    And who took him?

2     A    Myself and another detective.  I don't know

3 who it was.

4     Q    Was it Detective Bogucki or Detective Schalk?

5     A    I don't recall.

6     Q    Showing you a document I've marked as Exhibit

7 18.  This is the arrest report of Jimmy Fletcher --

8 James Fletcher, City-JF 225 to 226.  And on the second

9 page of this document, you'll see it lists that you,

10 Noradin, took Mr. Fletcher to the hospital on April 20,

11 2005.  Do you see that?

12          (EXHIBIT 18 MARKED FOR IDENTIFICATION)

13     A    I do.

14     Q    Okay.  So this basically indicates that you

15 transported him to the hospital and back on April 20th,

16 correct?

17     A    That's correct.

18     Q    And you agree that you did, in fact, transport

19 Mr. Fletcher, correct?

20     A    Correct.

21     Q    At any point when you were transporting

22 Mr. Fletcher to or from the hospital on April 20th, did

23 he say anything to indicate to you that he had any

24 involvement in the Sorrell crime?

25     A    Not that I recall.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     Did he anything incriminating to you during

 2   the course of that conversation?

 3        A     Not that I -- not that I recall.

 4        Q     If he had said something incriminating to you

 5   during the course of that conversation, you would've

 6   written that down, correct?

 7        A     I would've written it down, yes.

 8        Q     Okay.  Oh, I was asking you before about photo

 9   arrays.  Did you review any photo arrays in preparation

10   for this deposition?

11        A     I did not.

12        Q     Okay.  Did -- and you didn't generate any

13   photo arrays in this case, correct?

14        A     No, I did not.

15        Q     When creating photo arrays, did you ever

16   create photo arrays just using Polaroid photos like

17   photo, you know, Polaroid photos that you could hold in

18   your hand?

19        A     In reference to this case?

20        Q     No.  I apologize.  In -- as a matter of your

21   practice, did you have access to Polaroid photos that

22   you could use to generate photo arrays?

23        A     I wouldn't use -- I would not use a

24   generate -- I would not use a Polaroid.

25        Q     Okay.  Did you ever -- were you -- were there
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    other detectives in the time that you were a detective

2    who used Polaroid photos to generate photo arrays?

3          MS. BITOY:  Object to foundation and calls for

4       speculation.

5       A    No, not that I'm aware of.

6       Q    Okay.  And so by the time you were working in

7    the detective division in 2000, were there boxes of

8    Polaroid photos that were kept at Area 5 at that point?

9       A    Not Polaroid photos.  There would've been if

10   maybe IR photos.

11      Q    Okay.  And so there would be sort of physical

12   IR photos that were kept at the -- at Area 5, correct?

13      A    At some -- yes.  I believe there were at some

14   point.

15      Q    Okay.  And would you ever use those to

16   generate photo arrays?

17      A    I personally did not.

18      Q    Okay.  And when you generated photo arrays,

19   would you ever include the name of the individuals who

20   were the suspect and the fillers in -- as part of the

21   photo array?

22      A    No.

23      Q    And so when witnesses viewed photo arrays,

24   would you ever have their names visible for the

25   witnesses to see?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      A    No.

 2      Q    And I think I asked that question poorly,

 3  so let me ask it again.  When you conducted photo

 4  arrays, would you ever allow the witness to be able to

 5  see the suspect and fillers' actual names?

 6      A    No.

 7      Q    Okay.  And that was not something that

 8  you -- did you ever -- had you ever have a case where

 9  the witness could see the suspect and fillers' actual

10  names?

11      A    No.

12      Q    Is that something that you would ever do?

13      A    No.

14      Q    And in terms of photo array procedures, for

15  them to be fair, the goal was to focus on an

16  individual's appearance, not on names, correct?

17      A    Correct.

18          MS. BITOY:  I'm just going to object to form.

19      You can answer.

20      Q    Did you ever use Illinois Department of

21  Correction photos to generate photo arrays?

22      A    I have not.

23      Q    In investigative files, they typically have

24  an inventory sheet, correct?

25      A    They do.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q    Okay.  And when you -- when I refer to

2  investigative inventory, we're talking about basically

3  an index that allows you to identify all the documents

4  that are contained in an investigative file, correct?

5      A    Correct.

6      Q    Okay.  And what was the purpose of the

7  investigative file?  I'm sorry.  What was the purpose of

8  the inventory in the investigative file?

9      A    It's -- it's an inventory of everything that's

10  listed inside the -- the homicide file.

11      Q    Okay.  And as documents were added to the

12  investigative file, they were supposed to be added to

13  the inventory, correct?

14      A    That is correct.

15      Q    Okay.  And you were you trained that one of

16  the reasons for the inventory sheet was to ensure that

17  when prosecutors and criminal defendants received the

18  file, they could confirm whether they got everything

19  used in the inventory?

20      A    Yes.

21      Q    Okay.  And so would you -- when you disclosed

22  files to the prosecution and the defense, you would also

23  turn over the inventory sheet that was in the

24  investigative file, correct?

25      A    Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Okay.  And so as a homicide detective,
 2   would you -- would you actually put in or enter in the
 3   documents that were being added to the investigative
 4   file, or was that somebody else's responsibility?
 5        A    That's somebody else's responsibility.
 6        Q    And who's responsibility was it?
 7        A    There was a person that keeps track of the
 8   files, the homicide files.
 9        Q    Okay.  So the homicide file basically sat in
10   some other office, correct?
11        A    Expound on that a little bit so I understand
12   what you're asking.
13        Q    Yeah.  So when you have a homicide file during
14   an active investigation, does the homicide file live
15   with the assigned detective or some other detective or
16   with -- or does it live in a file cabinet in a
17   sergeant's office, for example?
18        A    It's in the file cabinet.
19        Q    Okay.  And the file cabinet is where?
20        A    Sergeant's office.
21        Q    Okay, got it.  So the investigative file is in
22   the sergeant's office in a file cabinet, and then
23   detectives add documents to that investigative file,
24   correct?
25        A    Correct.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     And there's somebody who works in the

 2   sergeant's office who's responsible for filling out the

 3   inventory sheet as documents are added; is that right?

 4        A     Correct.

 5        Q     Okay.  And detectives have access to those

 6   investigative files in the sergeant's office during the

 7   course of an investigation, correct?

 8        A     Up -- up to a certain point, yes.

 9        Q     What do you mean by up to a certain point?

10        A     At some point the -- the file gets broken down

11   into the main file and then it's -- it's put into a

12   locked -- locked room.

13        Q     And when do the files end up in a locked room?

14        A     It -- it varies.

15        Q     Is it -- would that be that -- I assume that's

16   after the investigation is no longer active.

17        A     That would be safe -- that would be safe to

18   say.

19        Q     And would it be -- typically would it be after

20   the investigation is closed or cleared?

21        A     It's -- it's a matter of both.

22        Q     But an investigation that's still ongoing or

23   active is not locked down, correct?

24        A     It's sometimes it is.

25        Q     And what are the circumstances in which an
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  active investigation is locked down?

2         MS. BITOY:  I'm going to object to foundation.

3     You can answer.

4     A    I mean, at some point the lead, a lead, the

5  investigation needs -- requires more leads.  And if

6  there's no more leads to be followed up on that, that

7  file is now placed in the main file and it -- and it's

8  locked up into a -- and it's locked in a room in a

9  cabinet.

10    Q    And when you say that file is added to the

11 main file, what does that mean?

12    A    You -- you're -- you keep calling it two

13 different files.  I'm calling whatever -- whatever

14 you're calling two different files.  I'm calling one

15 file.  So if you're calling the file that's in the

16 homicide office, that's one file.  That same file gets

17 put into the main file, which I'm pulling the main file.

18 It's not put into -- it's now the main file.

19    Q    Okay.  And I guess, maybe what I'm getting

20 confused about is, as far as I understand what you've

21 been telling me in this deposition, there's really just

22 one file and it is sometimes referred to as the

23 investigative file, sometimes referred to as the RD

24 file, but it's the one file that contains all of the

25 notes and reports and everything else for that homicide

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    investigation.  Are we on the same page?

2        A    Yes, we are on the same page.

3        Q    Okay.  And you're not aware of there being any

4    other files that are kept regarding a particular

5    homicide investigation, correct?

6        A    Correct.

7        Q    And that one file, whether we call it the main

8    file or investigative file or RD file, lives in the

9    sergeant's office, in the detective division area,

10   correct.

11       A    In a locked room, yes.

12       Q    Okay.  And the detective division area

13   investigative files are not locked away initially while

14   the case is being investigated, correct?

15       A    Not on day one, no.  Because there's

16   still -- it's still an ongoing investigation.

17       Q    Okay.  So the -- and so while it's still an

18   ongoing investigation, does the file live, the file

19   still lives in the sergeant's office and is accessible

20   in the file cabinet to all of the detectives, correct?

21       A    Correct.

22       Q    Okay.  So the file can be in the sergeant's

23   office, in the file cabinet accessible to all of the

24   various violent crimes homicide detectives, while the

25   case is active and ongoing, correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      A    Correct.

 2      Q    And any homicide detective can access the

 3  files while it's active and ongoing in the sergeant's

 4  office, correct?

 5      A    Correct.

 6      Q    And somebody in the sergeant's office will be

 7  adding -- will be adding entries into the inventory as

 8  documents are added to the investigative file, correct?

 9      A    Well, to clarify that the -- the -- my

10  understanding is the inventory sheet is not completed

11  until that file is made complete, locked into the locked

12  room where the files go.

13      Q    Got it.  So in other words, the inventory's

14  not being filled out day in and day out.  It gets

15  prepared once the case is being locked up and closed up?

16      A    Correct.

17      Q    Okay.  And that occurs either because the case

18  has gone cold and there's no longer any active leads or

19  because the case is cleared or closed, correct?

20      A    That's correct.

21      Q    Okay.  All right.  So while the investigation

22  is ongoing and detectives are accessing the

23  investigative file, the inventory is not being filled up

24  contemporaneously, are we in agreement?

25          MS. BITOY:  Object to foundation.  You can

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     answer.

2         A     Agreed.

3         Q     Okay.  And while the investigation is ongoing,

4     detectives can access specific reports and notes within

5     the file if they want to review those, correct?

6         A     Correct.

7         Q     So for example, when you wanted to -- you

8     indicated that you reviewed the earlier reports in the

9     case before you went in and participated in the

10    interview of Mr. Rogers in May of 2002, correct?

11        A     Correct.

12        Q     And so for you to be able to review the

13    earlier GPRs and reports, you could -- you simply went

14    over to the investigative file and accessed those

15    documents within the investigative file, correct?

16        A     At some point somebody had to request that

17    investigative file be sent to the area, I believe.

18    I don't recall specifically because it was so -- it was

19    just such an old case.

20        Q     But as of -- that would've happened well

21    before May of 2002, when Mr. Bogucki and Schalk were

22    doing their work in February and March of 2002, they

23    had clearly already requested that file back to Area 5,

24    correct?

25             MS. BITOY:  Objection foundation.  You can



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

 1        answer.

 2        A     Well, that specific file could have remained

 3   at Area 5 up until 1995 and then eventually got sent to

 4   the warehouse.

 5        Q     Okay.  But in any event you knew that that

 6   case was being actively worked in February, March, and

 7   April of 2002 before you participated in the Rogers

 8   interview in May, correct?

 9        A     Correct.  I read -- I read the reports.

10        Q     Okay.  And so you knew that as of May of 2002

11   you didn't -- you weren't requesting that file from the

12   Records Division, that file was back at Area 5, correct?

13        A     Correct.

14        Q     Okay.  All right.  That's what I want.

15   I just want to make sure we're getting confused there.

16   Okay. So as of May of 2002, you certainly had access to

17   that investigative file back at the area, regardless of

18   whether it at some point had gone to the RD, to the

19   Records Division, and come back.  It had come back at

20   some point because Bogucki and Schalk had brought it

21   back before you accessed it in May of 2002, correct?

22              MS. BITOY:  I'm going to object to form and

23         foundation.  You can answer.

24        A     I believe they brought it back.  I don't know

25   specifically who brought it back.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q     Okay.  And you don't have any -- you don't

2    believe that you made a request for that file to be

3    brought back from the Records Division for you to be

4    able to familiarize yourself with reports, correct?

5      A     No, I don't recall making a request for that,

6    no.

7      Q     Okay.  It was your understanding that the file

8    had already been requested and brought back to the area

9    before you looked at it in May of 2002?

10      A     Correct.

11      Q     Okay.  And so then when you looked at it in

12    May 2002, you could just simply access it in the

13    sergeant's office, correct?

14      A     Correct.

15      Q     Okay.

16      A     Well, let me rephrase that.  It could either

17    have been in the sergeant's office or it could have been

18    in the locker room because it's a cold case.

19      Q     I see.  Okay.  But it would've been accessible

20    to you in either location?

21      A     Correct.

22      Q     Okay.  And now if we look at Exhibit 19, this

23    is the entire investigative file, Bates stamped City-JF

24    1 through CJF 226.  And obviously, as I'm indicating

25    just from the Bates numbers, it's a 226-page

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04768 Document #: 184-33 Filed: 05/06/25 Page 187 of 236 PageID #:6921
1:20-cv-04768 Document #: 184-33 Filed: 05/06/25 Page 187 of 236

185

```
 1   investigative file, correct?
 2              (EXHIBIT 19 MARKED FOR IDENTIFICATION)
 3        A    Yes.
 4        Q    Okay.  And you, this is the -- you reviewed
 5   this entire file in preparation for this deposition,
 6   correct?
 7        A    I did.
 8        Q    Okay.  And this investigative file contains
 9   all the types of things you typically expect to see in
10   an investigative file, including supplementary reports,
11   general progress reports, or arrest reports, and lots of
12   other records, correct?
13        A    Yes.
14        Q    Was there anything unusual about the contents
15   of this investigative file from your perspective?
16             MS. BITOY:  Object to form.  You can answer.
17        A    No, not that I see.  No.
18        Q    Was there anything in this file that you
19   expected to see there that you did not see there?
20        A    No.
21        Q    Anything that you saw in this file that you
22   did not expect to see there?
23        A    No.
24        Q    Okay.  And if you look at page 113 of this
25   investigative file, that is an investigative file
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    inventory that we've been discussing, correct?

2        A    That is correct.

3        Q    Okay.  And this investigative file inventory

4    indicates that various documents were added to the

5    investigative file in 1990 and then in 1995, correct?

6        A    Correct.

7        Q    Okay.  And would you agree with me this

8    investigative file inventory is incomplete?

9            MS. BITOY:  Object to form and foundation.

10       You can answer.

11       A    I would say yes.

12       Q    Okay.  In other words, there's a bunch of

13   other investigation that was done and contained within

14   this investigative file that's not documented on this

15   inventory, correct?

16       A    Well, there are things that are not documented

17   that should be on there.  I don't -- I see that the one

18   in particular, the closing, the line-ups supplementary

19   report and the closing supplementary report.

20       Q    Okay.  And some additional GPRs, correct?

21       A    Correct.

22       Q    Okay.  And do you have any understanding or

23   explanation for why this inventory was not -- is

24   incomplete?

25            MS. BITOY:  Objection.  Foundation and calls
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    for speculation.

2    A   I do not.

3    Q   And do you have any personal knowledge about

4  when this inventory was created?

5    A   I do not.

6    Q   Okay.  I'm looking at page 190 of this

7  investigative file that says City-JF.  This is a request

8  for identification photos.  Do you see that?

9    A   I do.

10    Q   It's hard to tell what date this is exactly.

11  And Jennifer, I'm going to follow up with you and Brian,

12  and actually I think Paul more likely, but I think

13  there's some documents here that are -- that are cut off

14  on the edges and we should -- we'd like to try to get

15  those cleaned up, but I'll follow with you guys after

16  the deposition about that.  Meanwhile, it -- it's a June

17  24, 1990 something document.  Sitting here today, do you

18  have an idea what that date actually is?

19    A   I don't.

20    Q   Okay.  And what is a request for

21  identification photos?

22    A   I believe he's requesting a color photo of

23  Clinton Fletcher.

24    Q   I see.  Okay.  So this allows you to request

25  color photos of a particular individual, correct?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    Correct.

2    Q    And those are photos that are obtained from

3  what division within the Chicago Police Department?

4    A    I would say identification.

5    Q    Okay.  And with the photos that will come back

6  are color photos of arrest photos?

7    A    Yes.

8    Q    Got it.  Okay.  And so in this, the way to

9  interpret this document is that it's basically a request

10  by Sergeant Biebel for a color arrest photo of somebody

11  named Fletcher Clinton, correct?

12    A    Well, it's requested by Detective McDonald

13  approved by Sergeant Biebel.

14    Q    Thank you, thank you.  Okay.  And when

15  creating -- well, this was in 19 -- it looks like it was

16  in 1990 sometime.  Did you ever use these requests for

17  identification photos as a tool to generate photo arrays

18  yourself?

19    A    I have not.

20    Q    Okay.  Okay.  And looking at page 6 of this

21  Exhibit 19, City-JF 6, it's an investigative file

22  control.  Do you see that?

23    A    I do.

24    Q    What is an investigative file control?

25    A    That is when the file is taken out of the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:20-cv-04768 Document #: 184-33 Filed: 05/06/25 Page 191 of 236

189

```
1    office, out of the locked office.
2         Q    Okay.  And it appears here that on January 31,
3    2013, your name is listed there, correct?
4         A    It is.
5         Q    Why did you request access to this file on
6    January 31, 2013?
7         A    I did -- that's not my writing, so I don't
8    know.  I don't know.
9         Q    Do you have any memory of requesting that
10   file in January of 2013?
11        A    I do not.
12        Q    You know what you did with the file when you
13   requested it in January 2013?
14             MS. BITOY:  I object to foundation.  You can
15        answer.
16        A    I do not.
17        Q    Okay.  In terms of your preparation for this
18   deposition, sir, I know you've indicated that you
19   reviewed the investigative file, correct?
20        A    Correct.
21        Q    What other documents did you review in
22   preparation for the deposition?
23        A    Just the documents -- documents of the file
24   that was provided.
25        Q    Were you provided with any files other than
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    the investigative file?

 2         A     No.

 3         Q     Did you review any photographs or pictures

 4    that were not contained in the investigative file?

 5         A     No.

 6         Q     Did you review any criminal trial testimony?

 7         A     No.

 8         Q     Did you review any deposition transcripts?

 9         A     No.

10         Q     Have you spoken, other than conversations with

11    Counsel, have you spoken with any other witnesses or

12    suspects related to this case?

13         A     No.

14         Q     Have you spoken with Mr. Bogucki or Schalk

15    about this investigation?

16         A     I spoke with Detective Bogucki last week.

17         Q     Okay.  And when you spoke with Detective

18    Bogucki, was that on the phone or in-person?

19         A     On the phone.

20         Q     Is he still employed by the Chicago Police

21    Department?

22         A     He is not.

23         Q     Okay.  And why'd you speak with Mr. Bogucki?

24         A     We -- we've been long-time friends.

25         Q     And so did you talk to -- what did you talk to
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:20-cv-04768 Document #: 184-33 Filed: 05/06/25 Page 193 of 236

1    him about with regard to your deposition in this case?

2        A    The only thing he asked me if I -- if I had

3    provided one, I told him no.

4        Q    And did you talk at all about any of the

5    evidence in the case?

6        A    No.

7        Q    Did you talk about your memories of this

8    underlying investigation?

9        A    No.

10        Q    Did you tell him what you remembered about

11    this homicide investigation?

12        A    We didn't talk about this investigation at

13    all, other than the question he asked me.

14        Q    At any point since this homicide investigation

15    ended in 2002, did you and Mr. Bogucki ever talk about

16    this investigation?

17        A    No.

18        Q    You said -- how often do you stay in touch

19    with Mr. Bogucki?

20        A    Not often.

21        Q    And what about Mr. Schalk, you stay in touch

22    with him?

23        A    I do.

24        Q    And how often do you stay in touch with

25    Mr. Schalk?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      A    At least once a year.

 2      Q    Okay.  Have you spoken with Sergeant,

 3 then-Sergeant, Wojcik?  I'll strike that.  Have you ever

 4 spoken with Mr. Wojcik about this lawsuit?

 5      A    I have not.

 6      Q    Have you ever spoken with Mr. Wojcik about the

 7 Sorrell homicide investigation at any point since it

 8 concluded in May of 2002?

 9      A    I have not.

10      Q    What is your opinion of Mr. Wojcik?

11           MS. BITOY:  Object to form.  You can answer.

12      A    Repeat the question.

13      Q    Yeah.  What is your opinion of Mr. Wojcik?

14      A    He is a straightforward guy.

15      Q    Did you have -- did he have a reputation in

16 the department when you worked with him?

17           MS. BITOY:  Objection.  Form, foundation.  You

18    can answer.

19      A    What type of reputation you're referring to?

20      Q    I -- I'm not.  I'm asking you, do -- did he

21 have any kind of reputation?

22           MS. BITOY:  Same objection.  You can answer.

23      A    My understanding, Tony, Sergeant Wojcik, was a

24 smart -- a smart straight direct guy who was very good

25 at what he did.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Are you aware of there ever being any

2  allegations of misconduct against Tony Wojcik?

3         MS. BITOY:  Objection.  Foundation.  You can

4    answer.

5    A    Not that I'm aware of.

6    Q    Are you aware of any allegations from multiple

7  individuals that Mr. Wojcik ever subjected them to any -

8  - to physical abuse during the course of interrogations?

9         MS. BITOY:  Objection.  Foundation.  You can

10   answer.

11   A    Not that I'm aware of, no.

12   Q    And are you aware of any misconduct associated

13  with Mr. Wojcik's involvement in the Laquan McDonald

14  case?

15        MS. BITOY:  Objection Foundation.

16   A    Not that I'm aware of.

17   Q    Okay.  When you reviewed the investigative

18  file in this case, did it cause you to -- did it trigger

19  any specific memories in your brain about this

20  particular homicide investigation?

21   A    No.

22   Q    And in fact, when you first learned about this

23  lawsuit against you, did you remember anything about the

24  Sorrell homicide investigation?

25   A    No, I did not.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Okay.  Does this investigation stick out to
 2   you in any way as compared to the many, many other
 3   homicide investigations you've conducted in your career?
 4        A    No.
 5        Q    Would you say you have any personal
 6   independent memory of this homicide investigation?
 7        A    No, I don't.
 8        Q    Okay.  And so in other words, you can't
 9   picture some specific event from this particular
10   investigation that you can see in your mind, correct?
11        A    Correct.
12        Q    Okay.  You can't think -- you can't remember
13   any specific conversation that you had with anybody
14   related to this investigation, correct?
15        A    Correct.
16        Q    Okay.  And so you cannot remember what you,
17   any specific thing you said to a witness or what a
18   witness said to you, correct?
19        A    The only witness I engaged with was Terry
20   Rogers.
21        Q    Okay.  And you don't remember anything
22   specific about that conversation, correct?
23        A    No, nothing specific other than what -- other
24   than what I've read on the report.
25        Q    Okay.  In other words, you're entirely
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  dependent on your report to testify about that

2  interaction with Mr. Rogers, correct?

3      A    I know I was with Mr. Rogers and I was with

4  Jennifer Walker.

5      Q    Okay.  And other than -- and you know that

6  from the reports, correct?

7      A    Yes.

8      Q    And you don't -- and do you have any specific

9  memory of being in a room with Mr. Rogers and Ms.

10 Walker?

11     A    I have a distinct little bit of a memory of

12 what room we were in, but it just -- it just doesn't

13 stand out.

14     Q    Okay.  And so anything you can say about what

15 was actually said during the course of that conversation

16 is based on your review of documents, correct?

17     A    Yes.

18     Q    And similarly, anything else related to your

19 interactions in any way during the course of the Sorrell

20 homicide investigation is entirely dependent on review

21 of documents, correct?

22         MS. BITOY:  Object to the investigative

23     testimony.  You can answer.

24     A    Like I -- like I stated before, the only thing

25 that I really have knowledge of is Terry Rogers's

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   interview.
 2       Q    Okay.  And then in terms of anything else you
 3   did or didn't do on the investigation, you're basically
 4   relying on the documents to tell you what you did or
 5   didn't do, correct?
 6       A    If I would've recalled I did something, I'd
 7   tell you I did.  I do remember, like I told you,
 8   transporting from 26th Street to Area 5 that I do
 9   remember.  Was there any conversations at that point? I
10   don't remember if there was or was not.
11           MR. SWAMINATHAN:  Why don't we take a
12       five-minute break?  I'm pretty close to done here,
13       so why don't we just take a quick break and then let
14       me see if I've got anything else.
15           COURT REPORTER:  All right.  We are off the
16       record.  The time is 2:27.
17               (OFF THE RECORD)
18           COURT REPORTER:  We are back on the record for
19       the deposition of Anthony Noradin being conducted
20       via videoconference.  My name is Sydney Little,
21       today is February 22, 2023, and the time is 2:36.
22   BY MR. SWAMINATHAN:
23       Q    Mr. Noradin, we talked earlier about the
24   primary detective assigned on a homicide investigation,
25   and I want to ask you just about the responsibility of
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   the primary detective assigned with regard to the

2   investigative file.  And so again, investigative file

3   as we're using it refers to that one file that's kept

4   within the detective division area, correct?

5        A    Correct.

6        Q    Okay.  And so what responsibility did the

7   primary assigned detective have with regard to the

8   investigative files kept in the detective division area?

9        A    Ensure that all the reports and GPRs and

10  paperwork that belongs with the investigation is

11  enclosed in that file.

12       Q    Okay.  And did they have any -- were they

13  expected to organize the file so that it was, you know,

14  readable and the same types of reports were in the same

15  place, those kinds of things?

16       A    Correct.  It's done by the -- that's done by

17  the, I'm going to call the file clerk, but there's

18  somebody that actually inputs all the files into the

19  file folder or book, whatever you want to call it.

20  The investigative file.  Let me -- let me just use that

21  word.

22       Q    So there's a file clerk whose job is actually

23  to physically put the documents into the file; is that

24  what you're saying?

25       A    That is correct.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Okay.  And that -- and because those things go

2    into the file like in a -- with little sort of -- with

3    little holes and they get punched into the file,

4    correct?

5    A    Correct.  And each file or each subsection is

6    tagged by a file separator.

7    Q    Okay.  And that's all done by the file clerk

8    you're saying?

9    A    Correct.

10    Q    Okay.  But the primary detective assigned is

11    the one who will pass all of the documents on or ensure

12    that all the documents that need to be passed on are

13    given to that file clerk?

14    A    Yeah.  I mean, the lead detective as well.

15    The assisting detectives also have the same procedures

16    of giving the file clerk the information to be put into

17    that specific file.

18    Q    Okay.  And I guess my understanding was that

19    the investigative file was essentially more of a loose

20    file that you could take documents in and out of while

21    the investigation's ongoing.

22        MS. BITOY:  Object to form and foundation.

23    Q    Is that wrong?  In other words, the document,

24    it's all going in with two whole punches into that

25    investigative file, even as the investigation is

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1   ongoing?

2       A    Yes.

3       Q    Okay.  So the primary detective assigned is

4   responsible for just ensuring that everybody is handing

5   their documents into that file clerk to get them

6   included into the investigative file, correct?

7       A    The best that they can, yes.

8       Q    Okay.  And during the course of an

9   investigation until a report is written on a particular

10  aspect of an investigation, the GPRs for that will stay

11  with the particular detectives who conducted those

12  investigative steps, correct?

13      A    Correct.

14      Q    Okay.  And then only once the report and the

15  GPRs have being turned in do they end up going into the

16  investigative file, correct?

17      A    Correct.

18      Q    Okay.  And at the end, and when investigation

19  was closed, the primary detective assigned, I assume,

20  had the responsibility for going through that file to

21  make sure everything that was supposed to be there was

22  there?

23      A    That's fair to say.

24      Q    Because that's the person who has -- who is

25  knowledgeable about what all happened during the course
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  of that investigation to ensure that it's all documented

2  and contained in the file, correct?

3      A    Correct.

4      Q    And the file clerk is not in a position to be

5  able to review the investigative file to be able to say

6  whether all of the investigation steps have been

7  properly documented included in that file, correct?

8          MS. BITOY:  Object to foundation.

9      A    The -- the -- the person who does the filings

10  job is to list the inventory, put the information on the

11  inventory sheet, and then put that in the documents into

12  the investigative file.

13      Q    Okay.  So the file clerk is not knowledgeable

14  about the day-to-day progress of each homicide

15  investigation, correct?

16      A    That's correct.

17          MS. BITOY:  Object to foundation.  You can

18      answer.

19      A    Correct.

20      Q    Okay.  The person who has that knowledge is

21  the primary detective assigned, correct?

22      A    That's the sergeant.

23          MR. SWAMINATHAN:  Okay.  I have no further

24      questions.

25                  CROSS EXAMINATION

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    BY MS. BITOY:

2        Q    All right, Mr. Noradin, I do have a couple

3    follow-up questions for you.  You previously testified

4    that you were present for Terry Rogers's statement to

5    ASA Walker on May 8, 2002; is that correct?

6        A    That's correct.

7        Q    I want to direct you to that statement.

8    I believe it was Plaintiff's Exhibit number 3, Bates

9    stamped City-JF 161 to 163.  And do you have the

10   statement in front of you to appear?  I know, so just

11   for the record, we have the exact same statement, but a

12   different Bates numbers.  We have the IND DPF1587 to

13   INDPF1589, but it corresponds to Terry Rogers's

14   statement as Plaintiff -- Plaintiff's Exhibit 3?

15       A    Yes.

16       Q    Okay.  So I'm going to go through that with

17   you right now quickly.  It says the statement of Terry

18   Rogers taken May 8, 2002 at 4:35 p.m. at Area 5.

19   Do you see that?

20       A    I do.

21       Q    And then it says that the statement taken

22   regarding the shooting and robbery of Willie Sorrell

23   and Edward Cooper on December 21, 1990, I think you said

24   15 West Madison Street at 1:25 p.m.  Do you see that?

25       A    Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q    And then there's a cross out in terms of

2  Miranda rights given; is that accurate?

3     A    That's accurate.

4     Q    And I believe that your explanation for that

5  was that Mr. Rogers is not under arrest; is that

6  correct?

7     A    Correct.

8     Q    Okay.  So can you just please read the

9  statement into the record, please?

10     A    Sure.

11     MR. SWAMINATHAN:  Objection to form and

12     foundation.  There's no basis in a deposition to

13     read the document into the record but go ahead.

14  BY MS. BITOY:

15     Q    Go ahead.

16     A    "After being advised of the fact that

17  Assistant State's Attorney Jennifer Walker is a lawyer

18  and a prosecutor, but not his lawyer, Terry Rogers

19  agreed to give the following statement, which is a

20  summary but not word for word.  Terry states he is 40

21  years old.  Terry states he was born on September 12,

22  1962.  Terry states he currently does not have a

23  permanent address, but states he lived in Chicago all

24  his life.  Terry states he went to school up into fifth

25  grade at Emmett Grade School.  Terry states that Exhibit

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   A is a picture of a guy he knows as Fletcher. Terry
 2   states that on December 21, 1990, he was hanging out on
 3   Madison in Chicago, in the -- in the early afternoon.
 4   Terry states he saw Edward Cooper and Cooper's bread
 5   truck near Uncle Remus' restaurant, also, on Madison.
 6   Terry states he has known Edward Cooper since he was
 7   eight or nine years old.  Terry states he watched
 8   Fletcher and another guy Terry doesn't know walk down
 9   Madison towards where Edward Cooper had parked the bread
10   truck.  Terry states he saw Fletcher and the other guy
11   approach Edward Cooper. When Fletcher approached Cooper,
12   Terry saw that Fletcher had a gun in his hand.
13   Terry states he then saw Cooper get inside the bread
14   truck.  Terry states he then heard some shots, and then
15   saw Fletcher and the other guy with Fletcher running
16   towards Madison and Parkside, and Edward Cooper was
17   running after them. Later on that afternoon, Terry heard
18   that someone had been shot.  Terry states he was -- he
19   has known Fletcher since they were kids and they used to
20   go roller skating at the same place.  Terry states he
21   has been treated okay by the police and by Assistant
22   State's Attorney Jennifer Walker.  Terry states he was
23   given McDonald's to eat and coffee and soda to drink.
24   Terry states he has been given cigarettes to smoke and
25   has been allowed to sleep -- and has been allowed to
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   sleep.  Terry states he was allowed to go to the

2   bathroom.  Terry states he was not made any threats or

3   promises and given this statement freely and

4   voluntarily.  Terry states that Assistant State's

5   Attorney Jennifer Walker read the entire statement out

6   loud to Terry and allowed him to follow along if he

7   needed -- if he wished.  Terry was allowed to make any

8   corrections -- any changes or corrections to the

9   statement that he wished."

10   **Q   Were you present when the assistant state's**

11   **attorney Walker was writing out this statement in the**

12   **presence of Terry Walker, Terry Rogers.  Is that**

13   **accurate?**

14   A   Yes.

15   **Q   And your signature is affixed to the bottom of**

16   **all three --**

17   MR. SWAMINATHAN:  Jennifer, I can't really hear

18   you very well.  Sorry.

19   MS. BITOY:  I'm sorry.  I'll speak louder.

20   BY MS. BITOY:

21   **Q   Your signature is affixed to the bottom of all**

22   **three pages of this handwritten statement; is that**

23   **accurate?**

24   A   That's true.

25   MR. SWAMINATHAN:  Form.  Go ahead.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

205

```
 1        Q    And do you also previously testified that you
 2   reviewed the GPR related to Mr. Rogers's interview prior
 3   to this handwritten statement being taken with ASA
 4   Walker; is that accurate?
 5        A    That's correct.
 6             MR. SWAMINATHAN:  Objection.  I'm going to have
 7        an objection to these leading questions.  Just give
 8        me a chance to get that in, Mr. Noradin. Objection
 9        to form.  Go ahead.
10   BY MS. BITOY:
11        Q    And in your review of the GPR related to
12   Mr. Rogers's interview, and this handwritten statement
13   that we have just reviewed, did Mr. Rogers essentially
14   relay the same information to you as he had documented
15   in the GPR of his interview?
16             MR. SWAMINATHAN:  Objection to form.  Go ahead.
17        A    Yes.
18        Q    And you testified that you were familiar with
19   what had occurred within the investigation prior to your
20   involvement in 2002; is that correct?
21        A    Yes.
22        Q    Were you aware that Mr. Rogers had been
23   previously interviewed back in 1990?
24        A    Yes.
25             MR. SWAMINATHAN:  Objection to form.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        Q      And do you recall what Mr. Rogers stated back

2 in 1990?

3          MR. SWAMINATHAN: Objection to form. Go ahead.

4        A     I do.

5        Q      And what was that?

6        A     He stated that he recalled one of the

7 individuals being by the name of Fletcher.

8        Q      And so -- and you came across -- you

9 were -- and were you privy to this information prior or

10 when you were conducting your investigation in 2002 that

11 Mr. Rogers had previously identified someone by the name

12 of Fletcher back in 1990?

13        A     Yes.

14          MR. SWAMINATHAN: Objection. Form. Go ahead.

15        Q      No problem. So Plaintiff's counsel had

16 previously asked you questions regarding your personal

17 practice with regards to communicating with other

18 detectives regarding the status and progress of an

19 investigation that you were working on. Do you recall

20 that line of questioning?

21        A     I do.

22        Q      And I think you testified that it was your

23 personal practice or preference to discuss matters

24 related to investigations either face-to-face or over

25 the phone with other detectives working on the case; is

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1   that correct?

2       A    That's correct.

3       Q    Okay.  Did that preclude you from answering or

4   utilizing e-mail in response to other detectives

5   inquiring regarding certain aspects of an investigation?

6       A    No, it did not.

7       Q    At any point during your investigation into

8   the Willie Sorrell murder, did you provide Mr. Rogers

9   with an incentive in the way of declining to investigate

10  charges against him on an unrelated case in exchange

11  for him providing testimony against Mr. Fletcher?

12      A    No.

13      Q    And did having an extensive criminal history

14  in and of itself diminish Mr. Rogers' credibility and

15  the information that he was providing to you regarding

16  his knowledge of the Sorrell murder?

17           MR. SWAMINATHAN:  Objection.  Form.  Go ahead.

18      A    No.

19      Q    Other than the transportation of Mr. Fletcher

20  to Area 5, based on your review of the area file, you

21  were not present for the line-up conducted on April 20,

22  2002, that Mr. Fletcher participated in; is that

23  correct?

24      A    Correct

25           MR. SWAMINATHAN:  Objection to form.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q   And based on your review of the area file, you

2  weren't present for Edward Cooper's interview in 2002,

3  at which time he viewed a photo array and picked out

4  Mr. Fletcher as looking to similar as one of the

5  offenders; is that accurate?

6        MR. SWAMINATHAN:  Objection to form.

7    A   Correct.

8    Q   And similarly, based on your review of the

9  area file, you weren't present for Sheenee Friend's

10  interview in 2002, which she was shown a photo array and

11  positively identified Mr. Fletcher as one of the

12  offenders who robbed Edward Cooper; is that correct?

13        MR. SWAMINATHAN:  Objection to form.

14    A   Correct.

15        MS. BITOY:  Those are all of the questions that

16  I have for you.  Thank you.

17        MR. BURNS:  I have no questions.

18        COURT REPORTER:  Okay.  Any follow-up?

19        MR. SWAMINATHAN:  No, no follow-up.

20        MS. BITOY:  Right.  And we'll reserve

21  signature.

22        COURT REPORTER:  Reserve, sounds good.

23  And then Anand, how would you like your copy?

24        MR. SWAMINATHAN:  I don't need a copy now.

25  Thank you.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       COURT REPORTER:  Okay.  And same with the

2  video?

3       MR. SWAMINATHAN:  Yeah, same with the video,

4  but could you just -- before you move on, before I

5  forget, can you tell us a total time on the record

6  today?

7       COURT REPORTER:  Yes, we are at 3:26 and I'll

8  just get their orders and get off of it for you.

9  Ms. Blagg, would you like a copy?

10       MR. SWAMINATHAN:  She -- nobody is Blagg here.

11       COURT REPORTER:  Oh, excuse me, sorry.

12  Yeah, Ms. Bitoy, would you like a copy?

13       MS. BITOY:  Great, we'll take a copy.  Just PDF

14  is fine.

15       COURT REPORTER:  PDF, would you like a copy of

16  the video?

17       MS. BITOY:  No, no video.  That's fine.

18       COURT REPORTER:  Okay.  And then Mr. Burns,

19  would you like a copy?

20       MR. BURNS:  No, thanks.

21       COURT REPORTER:  And same with the video?

22       MR. BURNS:  No, thanks.

23       COURT REPORTER:  Okay.  I'll get us off the

24  record.  We're off the record.

25          (DEPOSITION CONCLUDED AT 2:49 P.M. (CT))

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                    CERTIFICATE OF REPORTER

 2                      STATE OF ILLINOIS

 3

 4    I do hereby certify that the witness in the foregoing

 5   transcript was taken on the date, and at the time and

 6   place set out on the Stipulation page hereof by me after

 7   first being duly sworn to testify the truth, the whole

 8   truth, and nothing but the truth; and that the said

 9   matter was recorded by me digitally and then reduced to

10   typewritten form under my direction, and constitutes a

11   true record of the transcript as taken, all to the best

12   of my skills and ability. I certify that I am not a

13   relative or employee of either counsel, and that I am in

14   no way interested financially, directly or indirectly,

15   in this action.

16

17

18

19

20

21

22   SYDNEY LITTLE,

23   COURT REPORTER/NOTARY

24   COMMISSION EXPIRES ON: 03/18/2026

25   SUBMITTED ON: 03/03/2023
```

OFFICIAL SEAL
SYDNEY LITTLE
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES MARCH 18, 2026

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04768 Document #: 184-33 Filed: 05/06/25 Page 213 of 236 PageID #:6947
The Deposition of ANTHONY NORADIN, taken on February 13, 2020

211

**Exhibits**

Exhibit 1_ Noradin 33:8, 9,14

Exhibit 2_ Noradin 50:13, 17,20 53:12

Exhibit 3_ Noradin 63:10, 13 67:19 82:19 84:1 201:8,14

Exhibit 4_ Noradin 84:7, 8,14 88:2,23 103:3,8 110:14, 15 111:20 161:7

Exhibit 5_ Noradin 122:10,11,13, 16

Exhibit 6_ Noradin 122:21 123:2 126:6

Exhibit 7_ Noradin 138:8, 10

Exhibit 8_ Noradin 138:15,17

Exhibit 9_ Noradin 138:25 139:1

Exhibit 10_ Noradin 139:7, 10

Exhibit 11_ Noradin 139:16,19

Exhibit 12_ Noradin 139:24,25 140:2

Exhibit 13_ Noradin 140:6,

8

Exhibit 14_ Noradin 140:13,16

Exhibit 15_ Noradin 154:10,17

Exhibit 16_ Noradin 159:14,15

Exhibit 17_ Noradin 170:4, 9

Exhibit 18_ Noradin 172:6, 7,12

Exhibit 19_ Noradin 184:22 185:2 188:21

**1**

1 33:9,14 49:10 50:10 82:20 88:2 155:22 184:24

10 139:7,10

100 11:13

10:12 8:8

11 33:20 118:16,22 122:18 126:7, 15 139:16,19

110 8:6

112 122:23

113 185:24

11:24 80:24

11:46 81:4

11th 118:15

12 139:25 140:2 167:4 169:23 202:21

126 159:17

128 159:18

12:45 140:22

12:48 141:11

13 140:6,8 168:12,21 169:3,7

13th 168:16

14 140:13,16

1434 154:11

1435 154:11

15 119:20 127:12 154:10, 17 201:24

153 50:20

158 50:21

15th 16:2

16 159:14,15

161 63:10 201:9

163 63:10 201:9

1651 95:15

168 139:5

17 139:8 170:4, 9

18 172:7,12

183 140:13

184 140:7

185 139:25

187 139:16

189 139:16

19 138:8 170:12 184:22 185:2 188:15,21

190 187:6

1962 202:22

1980s 26:8,15

1990 75:5 156:7 157:11, 12,16,18,21 186:5 187:17

188:16 201:23 203:2 205:23 206:2,12

1990s 158:3

1994 15:24

1995 75:19,23 170:13 183:3 186:5

1998 146:11,12

1:25 201:24

1:28 141:16

1H181765 122:19

**2**

2 50:13,17,20 53:12 119:17 155:3

20 51:21 55:7 95:1,6 130:16 145:21 172:10 207:21

20-CV-04768 8:14

200 148:20,21

2000 16:9,23 17:10,16 26:19 115:14 157:13 168:21 174:7

2001 16:23 17:5

2002 51:18,21 55:8 59:6,10,14 62:20 71:24 73:21 74:7 75:3,14,20,24 79:2 86:15 95:1,6,10,15 112:17 114:21, 24 115:1,5 118:12,16,22 119:8,14 121:3, 8,13,22 122:18 126:7,15 127:4, 11,16 128:4 132:18,25 136:7 145:16,

21 146:4,17,18, 19,20 167:4,12, 15 168:13 169:3,8,15,19, 23 182:10,21, 22 183:7,10,16, 21 184:9,12 191:15 192:8 201:5,18 205:20 206:10 207:22 208:2, 10

2005 172:11

2010 113:1

2012 17:10,11, 12,23,25 18:15

2013 155:23 156:25 157:4 189:3,6,10,13

2020 17:16,21, 25 18:12

2023 8:8 81:4 141:16 196:21

20th 172:15,22

21 51:18 95:15 156:6 169:15 201:23 203:2

22 81:4 138:15 141:16 196:21

225 172:8

226 49:10 50:10 172:8 184:24

226-page 184:25

227 118:24

22nd 8:8

24 187:17

26th 52:13,19, 22 53:15 59:16 79:20 119:11 196:8

29 11:3

2:27 196:16

2:36 196:21



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-33 Filed: 05/06/25 Page 214 of 236 PageID #:6948
In the Deposition of: ANTHONY NOTARDINO taken on February 24, 2020
212

2:49  209:25

201:18 207:20

Absolutely 128:25

abuse  193:8

access  147:9 148:3,12 173:21 178:5 181:2 182:4 183:16 184:12 189:5

accessed 182:14 183:21

accessible 180:19,23 184:19

accessing 181:22

account  152:6

accurate  28:2, 5,10 34:2 105:3 108:11 109:7 118:2 129:3,7 202:2,3 204:13, 23 205:4 208:5

accurately 39:11

accusing 77:23

acknowledge 47:15

acting  72:1

active  177:14 178:16,23 179:1 180:25 181:3,18

actively  93:25 183:6

actual  53:7 73:17 101:14 117:12 149:22, 23,25 175:5,9

add  177:23

added  111:11, 13 176:11,12 177:3 178:3 179:10 181:8 186:4

**3**

3  17:13 18:1,3, 7,19 63:10,13 64:22 67:19 82:19 84:1 201:8,14

30  155:23 156:25

31  189:2,6

39  170:6

3:00  22:2

3:26  209:7

**4**

4  17:17,19 18:11,22 84:7, 8,14 88:2,23 103:3,8 110:15 111:20 161:7

40  21:22 22:1 202:20

40-hour  21:17

404(b)  10:10

432  122:20

433  122:20

4:00  22:3

4:35  201:18

**5**

5  16:6,11 17:5, 9,12,22 18:15 19:17,22 34:12 42:16,17 52:13, 20,22 53:16 59:16,19 60:5, 11 63:19 122:10,11,13, 16 126:20 135:19 136:3,4 167:2 174:8,12 182:23 183:3, 12 196:8

**6**

6  48:21,25 49:3 52:2 122:21 123:2 126:6 127:11 188:20, 21

60606  8:7

**7**

7  138:8,10 169:19,24

7:00  22:2

**8**

8  71:24 73:21 75:3,14 79:2 95:10 110:18 138:15,17 169:25 201:5, 18

864  84:17

868  167:3

872  84:17

8th  128:4

**9**

9  138:25 139:1

90N603937 157:15

93  122:22

95376  119:19

**A**

a.m.  8:8 81:4

ability  13:25 60:13 102:23 151:10

abreast  93:25

adding  96:16 181:7

addition  20:13

additional 65:16 98:17,20 166:22 186:20

Additionally 119:25

address  88:4 202:23

admitting 125:21

advised 202:16

affirm  9:20

affixed  204:15, 21

afternoon 93:10 203:3,17

afterward 20:24

age  149:20

agree  79:23 85:6 143:15 144:8 172:18 186:7

agreed  10:11 182:2 202:19

agreeing  10:3

agreement 10:13 13:8 181:24

ahead  25:4 26:22 83:19 89:7 101:1 108:6 148:25 149:5 157:24 202:13,15 204:25 205:9, 16 206:3,14 207:17

aid  28:19

alert  119:19,22 120:20 121:10, 17

allegations 121:1 193:2,6

allowed  54:20 86:7 89:13 148:19 151:11 203:25 204:1,6, 7

alternate 144:21,25 145:1,11

ambiguity 165:1

ambiguous 113:11

Anand  8:18 208:23

and/or  31:22 34:15 72:23

angry  134:4

answering 14:13,22 207:3

answers  14:18 15:3,4 33:11 62:9 67:11

Anthony  8:10, 22 9:11,13 33:11 81:2 92:4 141:14 155:10 196:19

anymore 164:17

apologize 173:20

appearance 8:15 175:16

appeared  55:1

appearing 8:19,22,25 9:2, 3,6

appears  65:19 122:19 169:15 170:12 189:2

approach 203:11

approached 203:11



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-33 Filed: 05/06/25 Page 215 of 236 PageID #:6949
The Deposition of ANTHONY NOTARIAN, taken 02/25/2020

213

approval 99:5, 8 104:11

approve 92:13

approved 36:6,17,21 99:9,21 102:11 115:19 116:2 117:15 188:13

approving 88:15 92:1,6,17 94:19

approximately 17:5

April 51:21 55:7 95:1,6 172:10,15,22 183:7 207:21

area 16:3,4,6, 11 17:5,9,12, 13,14,17,19,22 18:1,3,5,7,8,11, 15,19,22 19:17, 22 23:13 52:13, 20,22 53:16 59:16,19 60:4, 5,11 63:18 101:22 102:1,6 126:20 135:19 136:3,4 163:13 170:19 174:8, 12 180:9,12 182:17,23 183:3,12,17 184:8 196:8 197:4,8 201:18 207:20 208:1,9

armed 161:19

array 23:6,15, 16 24:18 25:13, 18 38:19,24 39:8,17 40:17, 18,19 144:9 145:17,19,25 147:3,8,24 148:18 150:19, 23,24 151:11, 17 152:8,10,16, 21 153:1 154:2 174:21 175:14 208:3,10

arrays 22:21

23:2 37:23,24 38:17 39:23 40:4,12,23 41:8 49:5 50:9 145:15 146:6 152:1 153:8,9, 16 167:17,19 173:9,13,15,16, 22 174:2,16,18, 23 175:4,21 188:17

arrest 68:24 86:23 87:13 119:15 126:11, 16,21,25 127:3, 7,21 148:12 149:13 150:2 167:9 172:7 185:11 188:6, 10 202:5

arrested 79:6, 10,13 80:7 118:23 119:5,6 121:9,13,16,17, 18,22,25 126:7 127:11,15,20 147:10

arrived 60:15, 18,23 61:4

arriving 60:11

Arson 121:22

ASA 82:16 83:12,17,22 168:13 201:5 205:3

asks 49:4

aspect 199:10

aspects 135:15 207:5

asserting 42:19 44:9

assess 128:19, 20 129:6

assessing 129:2

assigned 15:25 16:2,10 17:17,19 81:23 89:1,5,11,13,

15,19,23 90:3, 9,12 92:11 117:7 143:1 155:18 164:25 165:14 177:15 196:24 197:1,7 198:10 199:3, 19 200:21

assignment 16:15

assist 30:13 124:15,20

assistant 66:7, 10 67:4 128:14 169:2 202:17 203:21 204:4, 10

assisted 125:5

assisting 155:5,9 198:15

assume 14:6 178:15 199:19

assumption 62:15

attachment 158:14

attending 8:15,16

attitude 72:23

attorney 54:5, 14,15,20 55:1 58:14,20 59:1, 17 60:6,11,14, 18,22 61:3,6,17 64:7,10,24 66:7,10 67:4 68:7,20,21,25 69:1 70:13 72:22 81:8,25 128:14 168:24 169:2 202:17 203:22 204:5, 11

attorney's 61:22 66:15

attorneys 81:12

auto 95:18,21

automatically 87:21

avoid 125:4

aware 20:16 36:21 38:1 44:8 45:18 47:17 75:18 77:22 78:3,7,8,21 79:2,24 80:2 83:9 94:20 97:15 98:9 100:24 101:3 102:3 105:24 119:8,11,14 121:25 126:18 165:11,16,20 166:13,21 171:14 174:5 180:3 193:1,5, 6,11,12,16 205:22

_____

B
_____

back 26:19 32:15 40:14 43:5,7 44:4 46:16 61:18 75:5 79:23,24 81:1,14 97:5 112:17 114:21, 24 115:4,14 118:10,22 123:12,18 141:13 145:15, 21,23 146:3 156:14 167:15 172:15 182:23 183:12,17,19, 21,24,25 184:3, 8 188:5 196:18 205:23 206:1, 12

background 46:9

bad 160:8

bald 150:3,4,5, 10

ballpark 61:11

based 18:11 31:11 34:16

35:1 37:21 42:21 43:2 46:16 47:6,12, 14,21 57:23 58:1 61:12 62:12,21 63:17 66:2 67:17,20, 21 69:20,21 72:13 106:7 107:25 109:25 121:9,10,19 129:8 133:13, 14 142:7 147:18 149:8 153:22 195:16 207:20 208:1,8

basic 13:9

basically 20:9, 21 23:16 24:6 31:21 49:3 67:23 68:15,18 69:11,22 89:9 96:3,20 97:17 103:2 121:17 147:5 148:2,8 149:6,12 160:5, 22 163:8,11 172:14 176:2 177:9 188:9 196:3

basis 34:8 36:15 42:19 202:12

Bates 49:10 63:10 84:16 122:19 138:8 139:5,8,16,25 154:11 159:17 184:23,25 201:8,12

bathroom 80:19 204:2

began 83:22 112:20

begin 9:24

begins 169:24

behalf 8:21,24 9:1,4,7,15 10:3 55:1

behaving



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

133:17

behavior 72:5

belief 47:11

believable 128:21 132:13, 19 133:2,20 134:8

Belmont 17:14 18:3

belongs 197:10

Biebel 188:10, 13

bigger 156:17 171:5

bit 53:17 56:15 85:3 112:2 132:23 160:6 177:11 195:11

Bitoy 8:21 10:12,14,16,18, 20 25:3,16 26:9 28:6 29:23 31:8,19 41:15, 22 42:7,12 45:2,4,20 46:7, 14,25 47:19 48:8,17 49:15, 24 51:24 54:1, 17,22 55:3 56:20 57:9 59:2 60:7,24 62:2,10 63:1 66:13,24 68:1 70:15 71:16 72:3,6 73:15 74:8 76:12 77:25 78:6,18,24 79:18 81:17 83:1,18 84:10 92:19 93:5,22 94:3 97:13 98:5,8 101:1,11 102:7 105:4 107:17 108:4 109:8 110:11 113:3,10 114:4 115:10 117:22 118:4 122:3 124:4,11,16 125:1 126:2

127:8 128:12 130:13 131:13 132:20 133:12, 21 135:12 141:2 150:25 156:11 157:9, 23 158:18 159:4 163:4,16, 24 164:9 165:1, 7,22 166:2 169:9 174:3 175:18 179:2 181:25 182:25 183:22 185:16 186:9,25 189:14 192:11, 17,22 193:3,9, 15 195:22 198:22 200:8, 17 201:1 202:14 204:19, 20 205:10 208:15,20 209:12,13,17

bizarre 72:1

Blackberry 114:21 115:1,2

Blagg 9:1 209:9,10

blank 96:20

blood 171:24

blue 130:7

body 64:22

Bogucki 33:10 37:4 42:18 43:24 52:4 53:18 59:22 60:21 70:24 71:4 74:5,12 75:18 76:7,18, 21 77:7 82:21 83:11 89:1,8, 11,14,15,23 90:5 92:24 110:19 112:16 125:9,15 126:21 136:10 155:17 172:4 182:21 183:20 190:14,16,18, 23 191:15,19

Bomb 121:22

book 197:19

born 202:21

bottom 64:11, 13,18 65:6,15, 23 103:8 109:17 111:12, 13 140:13 155:17 157:2 167:8,10 204:15,21

box 160:20

boxes 88:14 174:7

Brady 141:23 142:7 143:17, 22,25 145:7

brain 193:19

bread 167:25 203:4,9,13

break 14:9,14 80:17 140:23 141:1 196:12, 13

Brian 187:11

bring 81:14

broad 142:17

broke 132:23

broken 178:10

brought 52:22 59:16,19,20 60:5 79:3 119:12 183:20, 24,25 184:3,8

bunch 147:20 186:12

Burns 8:24 9:17 26:16,21 41:14,21 42:8 89:6 98:7 101:10 107:16 148:24 149:1, 24 150:7 163:3 166:3 208:17 209:18,20,22

business

127:13

button 96:1,4, 8,19 97:17,21 102:16,20 104:15

———————

C

cabinet 177:16,18,19, 22 179:9 180:20,23

Cal 52:20

California 52:13,22 53:16 59:16 79:20 119:12

call 180:7 197:17,19

called 19:25 24:20 85:25 89:9 96:4 146:1,3,15

calling 179:12, 13,14,15

calls 45:4,20 46:25 48:8,18 62:10 81:17 83:1,19 92:19 94:3 169:9 174:3 186:25

canvas 29:10

caption 33:10

captured 23:20 161:14

car 155:20

career 13:15, 19 85:19,22 194:3

carefully 15:10

cars 115:15,17 136:17

case 8:13 10:8 12:25 13:1,5 32:25 33:1,2,4, 5 39:18 40:1 42:2 45:24

47:24 48:14 58:3,4 81:23 82:12,13,14 88:22 89:15 92:3,16 95:15 105:8,16 111:17,18 116:19 118:14 119:4 122:17 131:16 132:8 133:6,9 149:7 154:20 155:15 156:6 157:7,8, 11,12,21,22 158:8,11,12,15, 21 159:2,6,20 161:21 162:2,9, 13,17 163:9 164:10,24 166:6 173:13, 19 175:8 180:14,25 181:15,17,19 182:9,19 183:6 184:18 190:12 191:1,5 193:14, 18 206:25 207:10

cases 12:1,2,5, 8,11,12,16,18, 21 13:8 16:16 80:13 113:9 125:4 135:3 162:23 163:2 164:8,24,25 165:14,25 166:1

categories 160:21

CAU 160:10,17, 18,25 161:2,12, 15

caused 35:11, 16 132:4 145:11

CCSAO 122:22 154:10

cell 114:20,22, 24 115:3

Central 8:9 118:24

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-33 Filed: 05/06/25 Page 217 of 236 PageID #:6951
The Deposition of ANTHONY NORABIN, taken on February 22, 2023
215

certainty 55:20

CERTIFICATE 210:1

cetera 122:22

chance 111:14 141:18 205:8

change 46:22 97:8 130:3

changed 145:22 146:8,9, 16

changing 129:22 130:1,2, 8,10

channels 143:6

character 149:23

characteristics 147:19 149:18,22,25 151:1,6,12

characterize 10:13

charge 121:14

charged 36:2 47:8,9,11 119:1

charges 36:5, 17,20 79:17,21, 24 125:4,25 127:11,17,22 128:6 133:11 207:10

check 119:18 120:1 171:4

checked 167:9 171:25

Chicago 8:7, 11,20,23,25 9:2,5,7 10:24 11:2,17 15:20, 23 17:2 19:12 40:13 41:13,19 51:8 77:16,19, 22,23 78:3,8 85:9 86:15

107:12 112:18, 21 122:24 147:11 154:12, 20 162:2 165:3, 20 188:3 190:20 202:23 203:3

choices 87:15

choose 87:6, 10 107:19 143:7 147:23 148:20

choosing 143:16,20

chose 87:22 148:14

cigarettes 203:24

circumstance 104:23

circumstances 24:7,9,11 32:22 56:17 57:13 104:20 127:23 128:1 178:25

City 8:11,24

City-jf 50:10,20 63:10 138:8,15 139:5,8,16,25 140:7,13 159:17 172:8 184:23 187:7 188:21 201:9

CIU 122:22

civil 13:3

CJF 184:24

claims 48:13

clarification 85:15

clarify 40:2,21 181:9

cleaned 187:15

clear 41:5 85:13 86:1,14 87:13 101:24

102:15 161:4 165:24,25 166:25

clearance 165:5,19

cleared 57:3,4, 7,8 73:22 84:16,22 86:23 87:1 157:8 161:8,22 162:5, 6,13,17,20,21, 22 163:1,9,19, 20 164:8 165:25 166:4,8 178:20 181:19

clearing 165:13

clerk 163:12 197:17,22 198:7,13,16 199:5 200:4,13

click 96:8

clicked 104:5

Clinton 170:19,23 171:1 187:23 188:11

Clinton's 171:3

close 23:21 135:3 151:3 153:9,18 161:4 163:9 196:12

closed 57:4,8 87:12,13 101:24 162:6, 14,17,21,22 163:2,20 164:8, 25 165:25 178:20 181:15, 19 199:19

closely 123:15

closing 186:18,19

code 159:22 160:15,18,25 161:1,2,12,18

codes 160:10,

11,17 161:15

coffee 203:23

cold 181:18 184:18

colleagues 43:21

college 19:9, 10

color 187:22, 25 188:6,10

combination 92:14

commit 34:21 77:11

committed 135:4,11 153:2

common 111:4

communicate 113:25 114:8, 10 115:4,13 156:10

communicating 114:16 206:17

communications 10:2 54:7 114:6

compare 47:2, 3

compared 131:21 132:16, 25 194:2

compiled 101:25

complaint 10:6 47:23 48:1

complete 14:13,19 34:8 56:11 104:11 142:13,14,15 160:12 163:11 181:11

completed 181:10

completely 162:14

complexion 151:22,23 152:3,15,17,18

computer 85:9 95:22 108:17, 20 110:6 115:14 145:23, 24 149:8

computers 115:17

concept 24:20

concepts 23:5 151:21

concern 135:8

concerned 164:4

concluded 192:8 209:25

conclusion 10:4 45:21 48:9

conclusions 47:1

conditions 15:11

conduct 22:18 24:12 25:21 53:21 105:15 106:12 107:14 153:8 164:19

conducted 27:23 44:14 51:13 53:25 60:5,10,14 61:6 74:6 75:13 81:2 95:2 106:9,16 141:14 175:3 194:3 196:19 199:11 207:21

conducting 28:13 53:17 137:8,12,15,17, 20,23 153:8 206:10

confer 105:10, 12,13 108:2

confirm 176:18

confirmed



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-33 Filed: 05/06/25 Page 218 of 236 PageID #:6952
The Deposition of ANTHONY MCTAGGART, taken on February 13, 2020

216

120:15

Conflicts
122:22 154:11

Confront
131:15

confronted
131:17

confused
179:20 183:15

confusing
115:23

confusion
48:18

consideration
133:19 134:7

considered
18:5 86:2
136:24 164:24

consistent
40:12 41:12,19
42:6,10 67:22
123:17 128:15,
18 129:12
133:15

constantly
129:2

contact 52:17,
18

contacted
120:14

contained
43:20 49:9,12
50:9 66:5 67:3
83:25 102:4
142:24 158:15
176:4 186:13
190:4 200:2

contemporane
ously 32:4
67:15 181:24

contend 34:6

content 117:13

contention
34:9,12

contents
117:19 185:14

context 11:16
87:23

continue 10:3
113:13 134:17
141:21 164:19

continued
75:19

contours
13:10

contradictory
131:4

contrary
129:18 131:10

control 90:13,
17 188:22,24

convened 8:9

conversation
58:21,23 173:2,
5 194:13,22
195:15

conversations
43:23 125:10
171:17 190:10
196:9

converted
158:6

convicted 47:5
80:7

conviction
46:2,6,11 47:17
48:7,15

Cook 79:4
120:16 127:20

Cooper 37:11
42:22 43:25
44:14 168:1,2
170:20 201:23
203:4,6,9,11,
13,16 208:12

Cooper's
203:4 208:2

cooperate
124:14

cooperated
124:9,21

cooperation

124:24

cooperative
72:10,11,14

copies 102:16

copy 99:25
102:21 104:1
108:23 159:1
164:22 208:23,
24 209:9,12,13,
15,19

corner 104:10,
14 157:15

corners 77:2,
14

correct 10:17
12:3,4 16:24,25
17:23,24 18:2,
4,5,9,17,18,21,
24 21:1,4,10,
11,24 22:15,16
24:1,4,7,8
28:10,11 29:19,
22 30:14 31:2
32:12,13,16,17
33:18 34:21,25
35:12,24 36:18,
19,22,23 39:12,
13,15,16 40:25
41:1,3,4,10,11,
13,17,20,24
42:3,4,6,9,11,
13 43:17,18,21,
22 44:5,6,17,
23,24 47:13,18,
24 48:2,7 49:6,
7,10,19 50:10,
11,24 51:3,4,6,
7,10,11,14,15
52:4,5,7,24
53:8,9,22,23
55:8 56:2,13,
14,16 57:1,2,4,
5,8,15,25 58:13
59:7,8 60:23
62:1,9,20,24
63:5,15,19,20,
25 64:2,12,20
65:1,2,7,10,13,
14,21 66:8,9
67:8,9,13 68:2
69:9,10,12,13,
24,25 70:1,2
71:4,5,7,8,11,

12 73:23,24
74:16,17,24,25
75:5,9,10,14,
20,24,25 76:16
79:5,7,14,25
80:4,7,8 81:9,
10 82:17 84:2,
4,20,23,24
85:1,2,10,19,
20,22,23 86:5,
6,10,12,13,16,
17,20,21 87:7,
8,18,23,24
88:5,6,10,11,
16,17,20,21
89:19,20,24,25
90:5,6,9,10,24,
25 91:3,4,8,9,
13,14,18,23
93:11,14,17,18
94:23,24 95:16,
17,19,20 96:6,
10,11,21,22,25
97:3,7,10,18,
19,23 98:1,2,4,
17,18,22,23
99:1,2,6,24
100:1,16,19,20
102:12,13,25
103:3,4,8,9,14,
15 104:6,7,18
105:22 107:15
108:3,20,21,23
109:22,23,24
110:16,17,20,
21 111:6
112:11,12,21
113:14,20,23
115:15,21,25
116:13,14,17,
20,21,25 117:3,
14 118:12,13
119:2,10,23,24
120:7 121:14
123:1,8,20,21,
23,24 125:22,
23 126:1,12,13,
16,21 128:6
129:3,4,15,16,
20,21,25
130:12 131:7,8
132:1,6,7,10,
13,19 133:2,7,8
134:1,14,22,25
135:1,5,6,11,14
137:3,5,6,9,10,

13,14 142:25
143:23,24
144:15,19
145:3,4,7,8,13,
14 146:6,22,23
147:11,12,16,
21,22,25 148:1,
5,6,15 149:19
150:6,10,20,21
151:7,8,13,14,
18,19,23,24
152:2,4,5,17,
18,19,23,24
153:4 154:25
157:1 160:24
162:24 164:18
165:21 166:8,9
167:17 170:13
172:16,17,19,
20 173:6,13
174:12 175:16,
17,24 176:4,5,
13,14,24
177:10,24,25
178:4,7,23
180:5,6,10,14,
20,21,25 181:1,
4,5,8,16,19,20
182:5,6,10,11,
15,24 183:8,9,
12,13,21 184:4,
10,13,14,21
185:1,6,12
186:1,2,5,6,15,
20,21 187:25
188:1,11 189:3,
19,20 194:10,
11,14,15,18,22
195:2,6,16,21
196:5 197:4,5,
16,25 198:4,5,9
199:6,12,13,16,
17 200:2,3,7,
15,16,19,21
201:5,6 202:6,7
205:5,20 207:1,
2,23,24 208:7,
12,14

Correction
175:21

corrections
204:8

correctly 21:7
117:13 147:17



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

corresponds
201:13

counsel 8:17
9:24 33:17
141:6 190:11
206:15

County 79:4
120:16 127:20

couple 20:5,16
62:13 109:11
201:2

coupled
130:17

court 8:3,5,6,
12 9:8,12,18,24
13:2 14:17 15:5
80:23 81:1
122:7 141:10,
13 196:15,18
208:18,22
209:1,7,11,15,
18,21,23

covered 166:5

CPD 42:6,10
84:14 148:12
159:20

create 51:23
57:21 85:9,16
86:8 87:6,7,17,
22 89:13 96:8,
19 147:18
150:19 151:11
173:16

created 57:19
63:17 73:13,21,
23 85:5,17 86:4
88:8 96:15
108:19 116:20
117:8 156:20,
21,22 187:4

creating 87:25
152:22 153:16
173:15 188:15

credibility
207:14

credit 19:9,10

crime 23:19
24:13,14 29:9
32:10,12 36:2

47:13 75:8
93:17,21
129:19 130:11
135:4,11 153:2,
10,18 160:23
172:24

crimes 16:13,
17,18,23 17:4
18:15,19,22,25
19:1,2 180:24

criminal 34:17
36:8,10 44:17,
20 45:12 79:17,
21,24 80:4,12
87:12 91:22
119:1,9 121:14
122:25 123:7,
10,16,23 124:9,
15,20,25 125:4,
25 126:5,7,8,25
127:3,7 128:6
133:11 142:3,
12 143:9
176:17 190:6
207:13

CRIS 86:2,4,7,
15,20 87:2,5,10
88:8 89:4 90:7
92:7 102:24
103:1,6 104:5
113:19,21,22
115:24 116:1
150:8 157:12,
21 158:6,9,23
159:1,3,9 160:3

criteria 147:14

cross 200:25
202:1

crossed 82:22,
25

cryptic 29:20

CT 209:25

Cunyon 54:5

current 11:4
17:17,21

custody 79:20
119:11

cut 14:23,25
65:19 77:2,13

187:13

CV 149:9,13,16

————— D —————

Dan 8:24 41:16

dangerous
120:3,10 121:2

dark 151:22,23
152:15,16,18

data 146:9,15,
17,21 148:9,11,
17 150:1,14,18
167:20

database
146:2,5,11,13,
21,25 147:4,9

date 10:11
51:16,20 74:14
88:3 95:12,25
96:1 118:15,16
122:18 187:10,
18

dated 118:15

dates 20:6

day 8:8 55:2,10
56:22 62:20,22,
24 63:3,5 75:8
97:5 113:13,22
130:7 158:7,8
180:15 181:14

day-to-day
92:11 200:14

days 56:22

deal 124:24
125:22

decades
78:12,15

December
156:6 201:23
203:2

decide 148:21

deciding 134:7

decision 44:25
45:23 47:3

declining
207:9

defendant
11:24,25 12:6,
18,22 33:11
34:11

defendants
10:3 91:22
176:17

defender
166:7,23

defense 141:6
142:12 143:9
176:22

Define 100:2
133:23

definitively
66:3

delay 56:15

delivery
161:12,19

demeanor
71:23

demographics
147:7

department
10:24 11:2
15:20,23 16:1,8
17:2 40:13
41:13,20 51:9
77:17 78:8
107:12 112:18,
21 120:16
122:24 147:11
154:12,20
157:13 162:3,
12 165:3,17,20
175:20 188:3
190:21 192:16

Department's
85:9

dependent
195:1,20

depending
56:17 57:11

Depends
130:3

deponent 8:22

deposed 11:24
12:1,2,5,8,13,
17,18,22

deposition
8:10 10:4
11:10,15,19
13:21 14:16
43:5 49:19,22
51:6 81:2 85:1
123:5 141:14
170:8 173:10
179:21 185:5
187:16 189:18,
22 190:8 191:1
196:19 202:12
209:25

depositions
13:11

describe 23:5

description
67:24

det- 27:19

detail 13:7

detailed
130:24

details 127:21

detective 11:5,
7 16:4,6,9,11,
12,13,19,21,23
17:5,9,13,17
18:16,20,23
19:3,17,18,22
20:11,20,23
21:9 22:7,14,19
26:3,6,12,18
27:6 37:4
52:13,20 53:16,
18,19 59:21,22
63:22 64:4
70:24 73:4,12
74:12,15,18,23
76:4,18,21
77:4,7,10,13,
17,22,23 78:3,
4,9,13,16,17,22
81:23 82:9,11,
21 83:10,11
89:1,5,8,10,11,
12,17,19 90:2,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-33 Filed: 05/06/25 Page 220 of 236 PageID #:6954
The Deposition of ANTHONY NOTARIS, Taken on February 22, 2023
218

4,8,12,19,22
91:1,6,10,15,19
92:11 93:19
100:15 101:21
102:6 104:11
106:22 107:12
108:2 109:20
110:2 111:9,10
112:15 115:16
116:12,23
117:5,6,10
118:9 124:1
126:21 128:19,
23 129:1
134:23 135:2,
18,22,24 136:1,
9,10 143:1
152:2 155:18
164:4 165:4,6
168:25 171:10
172:2,4 174:1,7
177:1,15 180:9,
12 181:2
188:12 190:16,
17 196:24
197:1,4,7,8
198:10,14
199:3,19
200:21

detective's
90:20 104:10
107:2,14,21,25
109:18 114:12
164:6

detective/
youth 155:6,10

detectives
19:1 25:22
27:9,12,14,17
41:20 74:11
75:18 78:10,14,
22 86:15 91:6
93:1,17 105:1,9
106:9 109:5,12
110:7 112:11,
13 114:11,16
115:7,13 117:3,
8 137:1 166:21
167:8,25 174:1
177:23 178:5
180:20,24
181:22 182:4
198:15 199:11
206:18,25

207:4

detectives'
106:11

develop 145:9,
17

developed
46:21 47:16

developing
166:22

developments
94:9 164:12

devices
114:21,23

dictate 29:15

difference
161:1 162:25
164:7

differently
165:25

diminish
130:20 207:14

direct 10:21
192:24 201:7

directly 96:23

disclose
143:17,20
145:3,6

disclosed
144:10,14,19,
23 145:13
176:21

disclosure
91:20 141:24

discovery
142:9

discuss
206:23

discussing
186:1

disposition
127:3

distinct 195:11

District 8:12,
13 16:2

division 8:13
16:6,11 17:18
20:12,20,23
21:9 22:7,14,19
26:3,7,12,18
27:7 52:14,20
53:16 100:3,15,
25 101:5,22
102:6 115:16
116:23 162:19,
23 163:12,23
174:7 180:9,12
183:12,19
184:3 188:3
197:4,8

document
27:15,18,22,25
33:8,20 39:11
42:1 50:13,16,
19 51:2,8 52:2
63:9,15,17
64:16,22 66:4,5
67:2,3 84:6,14,
19 113:17,23
122:15,21
123:1 138:7,14,
24 139:6,15,24
140:6,12
143:16,20
145:2 154:5,10
159:13 161:7
170:4,7 172:6,9
187:17 188:9
198:23 202:13

documentatio
n 25:22 26:1
27:9,11 28:2,5
38:6 39:2,4
51:23 55:17
91:11

documented
38:13,17,21,23
74:1 109:21
112:6 126:1
144:10,14,18,
23 145:12
186:14,16
200:1,7 205:14

documenting
51:9,19 138:4

documents
25:9 45:15 51:5
154:7 170:11

176:3,11 177:3,
23 178:3 181:8
182:15 186:4
187:13 189:21,
23 195:16,21
196:4 197:23
198:11,12,20
199:5 200:11

Donald 120:14

DPF1587
201:12

draft 89:16
104:2 105:12
106:4,17 116:7

drafted 56:3
90:19 105:14
168:24

drafts 103:13,
16,25

drink 203:23

Drive 8:7

driver 161:13,
20 168:1

dropdown
160:20

drugs 120:3,10
121:2

duties 21:19

dutifully 61:25
67:25

_____

E

e-mail 112:18,
20,24 113:2,6,8
114:2 117:18
118:9 207:4

e-mails 117:25

earlier 73:13
74:2 75:4,8
120:20 182:8,
13 196:23

early 26:8,15
74:11 203:3

Eastern 8:13

easy 128:11

eat 203:23

edges 187:14

edit 97:8

edited 98:17
102:12 117:4

edits 97:11
98:22

Edward 37:11
42:22 44:14
168:1,2 170:20
201:23 203:4,6,
9,11,16 208:2,
12

efforts 168:4
170:25

electronically
86:11

else's 67:18
116:6 177:4,5

Emmett 168:5,
10 169:24
170:1 202:25

employed
10:24 190:20

enclosed
197:11

end 65:5 86:19
178:13 199:15,
18

ended 191:15

enforcement
124:3

engage 76:24
77:17

engaged
194:19

engaging
77:20,23 78:4,
17

enrolled
157:13

ensure 128:8
133:10 152:21
153:1 176:16
197:9 198:11
200:1



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04768 Document #: 184-33 Filed: 05/06/25 Page 221 of 236 PageID #:6955
The Deposition of ANTHONY MCRABBIN, taken on February 22, 2023
219

ensuring 90:23 91:2,11, 20 199:4

enter 149:14 177:2

entire 36:15 143:3 184:23 185:5 204:5

entirety 34:16

entitled 154:20

entries 181:7

erratically 72:1

essentially 21:2,8 69:7 86:8 89:18 97:18 100:18 134:12 147:13 148:8 151:10 157:20 158:12 164:24 198:19 205:13

estimate 141:8

et al 8:11 33:10

event 79:12 118:23 183:5 194:9

eventually 183:3

evidence 29:9 45:18 46:11 47:16 129:13, 19 142:3 145:9 191:5

exact 70:5 73:9 148:5 201:11

EXAMINATIO N 10:21 200:25

excess 130:16

exchange 207:10

exclude 143:11

exculpatory 27:19 142:2

excuse 29:11 75:11 209:11

exhibit 33:8,14 50:13,17,20 53:12 63:10,13 67:19 82:19 84:1,7,8,14 88:2,23 103:3,8 110:14,15 111:20 122:10, 11,13,16,21 123:2 126:6 138:8,10,15,17, 25 139:1,7,10, 16,19,24 140:2, 6,8,13,16 154:10,17 159:14,15 161:7 170:4,9 172:6,12 184:22 185:2 188:21 201:8, 14 202:25

existed 167:19

exoneration 45:19

expect 185:9, 22

expected 94:7 185:19 197:13

experience 76:10 123:25 124:3

explain 20:7 21:25 23:10 136:14 146:25 161:4,5 171:10

explained 68:16

explanation 186:23 202:4

expound 150:13 163:5 177:11

extensive 207:13

extent 14:1 52:8

extremely 134:4,5

eyewitnesses 152:14

———————

F

face-to-face 114:13 206:24

facial 151:2

facing 79:16, 21,24 128:5

fact 9:13 57:24 63:7 103:5 127:19 128:23 132:15 172:18 193:22 202:16

facts 44:12 156:5

factual 34:8

failed 37:19

failure 38:20 144:13,17

fair 13:12,16,18 14:3,6,10 17:6 30:8 32:8,9 34:3 35:7,8 80:3,10,11,13 81:6,11,15 128:23 131:1,2 150:15,20,24 151:4 152:23, 25 153:14,15 175:15 199:23

fairly 10:13

Falk 136:1

false 49:13,23

familiar 43:11 63:15 84:19 100:4 122:25 171:9 205:18

familiarize 43:11 184:4

familiarized 43:15 71:6 75:1

favors 124:8

feature 167:20, 23

February 8:8 81:4 118:15,16, 22 119:14 121:13,21 122:18 126:7, 15 127:4 141:16 167:4 168:12,16,21 169:3,7,15 182:22 183:6 196:21

federal 45:23

feed 128:9

field 24:2 84:15 93:21 159:21

fields 89:3 160:13

file 49:9,13,18, 21 50:3,6,10,23 51:2 55:24 56:1,2,4,6,9 57:25 74:23 91:16 99:12,13, 15,18,19,22,25 100:2,3,4,7,8, 10,13,14,17,22, 24 101:3,9,19, 21 102:1,3,6 135:16 142:12, 13,14,15,24 143:3,4,12 158:21,22,24, 25 162:18 163:9,10,21 164:4,5,16,17, 20,22 176:4,7, 8,10,12,18,24 177:4,9,13,14, 16,18,19,21,22, 23 178:10,11 179:7,10,11,15, 16,17,18,22,23, 24 180:7,8,18, 20,22,23 181:8, 11,23 182:5,14, 15,17,23 183:2, 11,12,17 184:2, 7,23 185:1,5,8, 10,15,18,21,25 186:3,5,8,14 187:7 188:21,

24,25 189:5,10, 12,19,23 190:1, 4 193:18 197:2, 3,11,13,17,19, 20,22,23 198:2, 3,5,6,7,13,16, 17,19,20,25 199:5,6,16,20 200:2,4,5,7,12, 13 207:20 208:1,9

filed 48:2 99:17

files 26:20 27:4 101:6,8,13,14, 15 143:8 163:1, 14 175:23 176:22 177:8 178:6,13 179:13,14 180:4,13 181:3, 12 189:25 197:8,18

filings 200:9

fill 85:25 96:9, 21,23

filled 83:22 84:1 85:21,24 87:22 88:3 97:9 160:14 181:14, 23

fillers 152:17 153:17 174:20

fillers' 175:5,9

filling 178:2

filter 147:13 148:4,13 150:10

filters 147:18

final 47:3

find 49:22 127:25 129:14 132:8 135:10

finding 135:4

fine 11:9 209:14,17

finish 14:24

finished



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

108:15

firearm 160:18

fit 143:21

five-minute 196:12

Fleming 74:15, 18,23 75:17

flesh 29:21

Fletcher 8:11, 19 33:10 34:7 36:2,6,18,21 37:10,25 38:4, 8,11 45:16 46:17 52:12,22 53:15 55:1,13 84:17 122:20 167:3 169:14, 17 170:6,19,23 171:1,4,16,17, 20 172:7,8,10, 19,22 187:23 188:11 203:1,8, 10,11,12,15,19 206:7,12 207:11,19,22 208:4,11

Fletcher's 45:19,24 46:2 48:6,15

focus 175:15

folder 197:19

follow 28:22 94:13 157:19 164:13 187:11, 15 204:6

follow-up 75:12 94:15,16 131:12 132:5 165:12 201:3 208:18,19

force 134:10

forget 209:5

forgotten 122:10

form 28:6 31:8 46:7,14,25 49:15 51:24 54:1 56:20 62:2

68:1 93:5 104:1 113:10 117:22 124:4,11 125:1 128:12 132:20 133:12 150:25 165:1 175:18 183:22 185:16 186:9 192:11, 17 198:22 202:11 204:25 205:9,16,25 206:3,14 207:17,25 208:6,13

found 122:1 128:20 132:12, 13 133:2

foundation 25:4,16 26:9, 16,21 31:8 41:14,15,21,22 42:7,8 45:21 46:14,25 47:19 48:8,17 49:15, 25 51:24 54:1, 17,22 55:3 56:20 57:9 59:2 60:7,24 62:10 63:1 66:13 70:15 71:16 72:3,6 73:15 74:8 76:12 77:25 78:18,24 79:18 81:17 83:1,18 89:6 92:19 93:22 94:3 97:13 98:6,7 101:1,10 102:7 105:5 107:16,17 108:5 109:8 110:11 113:3 114:4 115:10 117:22 118:5 122:3 124:4,11, 16 126:2 127:8 130:13 131:14 135:12 148:24 149:1,24 150:7 156:11 157:9, 23 158:18 159:4 163:3,4, 17,24 164:9 165:8,22 166:2, 3 169:9 174:3

179:2 181:25 182:25 183:23 186:9,25 189:14 192:17 193:3,9,15 198:22 200:8, 17 202:12

freely 204:3

Friday 22:2

Friend 37:11 42:21 43:25 44:15 168:5,7 169:20

Friend's 208:9

friends 190:24

front 63:8 67:8 81:22 154:9 167:1 201:10

full-time 19:15

furtherance 164:2

future 10:11 30:14

_____

G

Garcia 9:3

gave 67:24 120:15 147:9 148:2

general 16:15 21:6 28:7 39:25 44:2 61:11 73:5,10 74:3 76:5 118:14 119:4 122:17 155:15 158:8, 12,15,20 159:2 160:2 170:6 185:11

generality 107:18

generally 23:5 31:3 109:15 150:17 160:2

generate 85:14 86:16 145:25 146:5

147:3,20 148:18 149:8 167:16 173:12, 22,24 174:2,16 175:21 188:17

generated 73:18 90:14 95:18,21 96:15 117:9 145:19 152:1 155:15, 16 158:9 160:1, 2,11 174:18

generating 145:15

geographics 149:15,17

give 9:21 46:8 47:3 61:11 108:9,23 109:13 110:2,9 134:18,20 141:7 150:5 202:19 205:7

giving 66:22 67:11 108:13 129:22 130:15 131:9 198:16

goal 135:2 150:19 175:15

good 40:3 51:1 154:2 192:24 208:22

Gordon 54:5,8, 11,15,20

GPR 73:5 125:19,21 205:2,11,15

GPRS 128:13 182:13 186:20 197:9 199:10, 15

grab 160:20

grade 202:25

grams 127:12

great 9:8 209:13

group 153:3

guess 141:2 160:25 179:19 198:18

guilty 35:6,16 42:20 47:13

gun 203:12

guy 192:14,24 203:1,8,10,15

guys 136:17 146:1 187:15

_____

H

H05144 120:16

hair 151:2 152:9,11 154:3, 4

hairstyle 151:16,18 152:4

half 16:22 80:17

hand 9:19 104:2 157:14 173:18 203:12

handing 199:4

handle 16:16

hands-on 93:3

handwriting 64:8,9,16,23 138:9,12,16,22, 25 139:3,9,13, 17,18,22 140:1, 4,7,10,14,15,18

handwritten 44:3 61:7,12, 14,15,20 62:6, 17 63:7 66:16, 17,19 69:21,23 70:3,8,20,25 71:14,24 72:13, 20,24 73:6 81:8,12,21,24 82:3,7,13,15 83:7,13 112:7 119:12 155:16, 17 158:7,15,20 159:2,6 168:19,



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04768 Document #: 184-33 Filed: 05/06/25 Page 223 of 236 PageID #:6957
In the Deposition of ANTHONY NOTABIN, taken on February 23, 2023

221

20 169:1,7,12
204:22 205:3,
12

Hang 115:18

hanging 203:2

happen 81:15
111:1,16

happened
17:11 24:13
61:4 66:6 67:24
68:10,16,18
69:8,9 92:13
94:8,22 107:9
129:23 157:11,
12 182:20
199:25

happening
94:1

happily 14:2

hard 102:16
104:1 120:2
122:16 187:10

Harris 13:6

Harrison 18:13

head 15:5

heading 119:3

hear 128:10
133:11 204:17

heard 70:20
203:14,17

height 147:16
151:1 152:3

held 17:1
127:20,24
128:1

helpful 156:18

helps 29:18

heroin 127:12

Hey 118:1

HH181 122:19

high 171:23

history 15:10
80:4 122:25
123:8,11,16,23

126:5 207:13

hit 96:1,3,4,19
97:21 102:20
104:15 120:15

hitting 102:15

hold 56:25
57:14 120:15
141:8 173:17

holes 198:3

homicide
19:25 20:1,4,7,
10,19 21:7,13,
16 22:5,11
25:20,25 26:13
27:3,8 28:13
29:1,8,12
32:18,23 34:24
43:6,7 44:8
55:21,23 78:13,
15 84:23 90:8,
12 91:16,21
93:1 94:1,14,22
95:1,6,9 99:15,
17,19 101:4,6,
15,19,21 105:7
113:14,16,23
114:1,8 116:23
119:20 120:6
123:13,18
124:1,25 125:5
128:19,23
129:1 134:23
135:2,18 136:8
137:1,8,12
142:18,20,22
143:2,21 145:1,
18 146:11
152:2,22
153:12 165:4,6,
14 176:10
177:1,8,9,13,14
179:16,25
180:5,24 181:2
191:11,14
192:7 193:20,
24 194:3,6
195:20 196:24
200:14

homicides
19:2

hopes 128:10

hospital
171:20,25
172:10,15,22

hostile 72:8,
15,19,23
133:18,23
134:1,3,11,16
135:7

hour 61:10,13
80:16 140:23

hours 21:23
22:1,3 61:11

hundreds
13:19

hypothetical
31:9 66:24
108:5 130:14
131:13 133:21
135:13

─────────

I

─────────

ICAM 146:1,3,
5,9,11,13,17,
21,25 147:4,9
150:9,13,18
167:9,13,16,18

ICMA 167:18

idea 62:15
142:1 187:18

identification
22:18,25 24:6
33:14 36:25
38:3,7,10,16,
20,21 39:24
40:5 41:9 42:17
46:17 47:7 49:4
50:8,17 63:13
84:8 122:13
123:2 137:23
138:10,17
139:1,10,19
140:2,8,16
144:2,5,6,9,12
154:17 159:15
170:9 172:12
185:2 187:8,21
188:4,17

identifications
37:8,9,14,17,20

40:9 42:3

identified 10:9
35:18 36:22
37:11 38:12
44:13 47:6
150:2 161:25
206:11 208:11

identifies 52:3
88:15,19 126:6

identify 88:19
144:13,17
153:24 166:22
176:3

identifying
153:2,3

Illinois 8:7,13
175:20

immediately
20:24 24:14
56:6 126:24

impact 132:18
133:2 162:4

implication
162:1

important
27:12 28:1,13,
16 30:4,12
31:24 32:1

improper
143:22

in-depth 57:11

in-person
190:18

inaccurate
49:14,23

inbox 89:9,10

incentive
207:9

incident 23:21
154:21 157:7,
15 158:13,14

include 29:13
31:18 117:19,
20 118:1,2
142:23,24
143:13 148:15
174:19

included 30:19
53:10,13 72:21,
22 111:5,23,25
118:3 152:10
158:21 199:6
200:7

including 49:5
50:8 185:10

income 19:11

incomplete
29:21 31:9
66:24 108:5
130:13 131:13
133:21 135:13
186:8,24

inconsistencie
s 131:15,17,20,
24 132:3,9,16,
24 133:7

inconsistency
133:4

inconsistent
133:17

incriminating
27:18 66:22
173:1,4

IND 201:12

independent
72:12 194:6

independently
45:10

index 176:3

indicating
38:6 91:25
184:24

indication
129:14,20,24
130:11,25
131:1

individual
105:16 151:21
162:15 165:11
171:1 187:25

individual's
175:16

individuals
23:11,14,17

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-33 Filed: 05/06/25 Page 224 of 236 PageID #:6958
In Deposition of ANTHONY NOTARIN Videotaped on February 24, 2020
222

35:18 40:18
53:11 66:21
124:2 150:5
151:12,17,23
152:10 165:9
174:19 193:7
206:7

INDPF1589
201:13

inform 38:2
94:7 106:5

information
27:18,19 29:13,
15,17 30:17
31:4,6,17,23
34:1 35:1,10,
14,21,23 38:23,
25 43:3,20 44:7
46:16,20 47:14
49:12,23 54:14
62:8 66:5 67:3
83:25 87:21
88:2,9 91:20
96:9,16,21,23
97:8 105:2
106:2,7 113:25
114:8 121:4
123:12 128:10
129:2,6,11,14,
18 130:15
131:4,9,10
133:13,14,17,
18 134:6,19,21,
24,25 142:3,9
144:21 145:2,6,
10,12 149:21
156:9 159:9
160:14 165:21
166:11,19,22
198:16 200:10
205:14 206:9
207:15

initial 18:16
20:11 87:16

initially 20:14
27:7 62:7
180:13

innocence
142:3

input 150:10
157:17,20
159:2

inputs 197:18

inputted 160:3

inquiring
207:5

inside 176:10
203:13

instance
78:13,21
124:13,18

instances
11:23 81:7
109:18 153:14

intended 21:2
157:7,20
161:14 170:19

intention
14:25

interaction
125:18 195:2

interactions
54:11 58:7
123:20 195:19

interested
134:24

interpret 188:9

interpreted
25:12,15

interrogations
22:11 137:16,
17 193:8

interrogatorie
s 33:12 50:3

interrogatory
10:9 33:9,24
34:2,12,13
42:16 48:21,25
49:3 50:6,24
51:3

interview 47:8
58:4,13,14,16
61:5,6,8 62:4,
16,23 63:18
68:4,19 70:19,
23 71:23 72:19
73:3,14,22 74:2
76:7,10 79:2,25
83:12,23 95:5,

8,10 105:15
107:3,8,13
108:1 118:11
124:7 134:13,
17 167:2,3,5
168:17,21
169:3,16,20,21,
24,25 170:12,
15 182:10
183:8 196:1
205:2,12,15
208:2,10

interviewed
59:17 62:12,18
67:15 70:6
71:9,11 74:10,
24 75:22 76:2
106:22 119:22
121:3,18
126:20 129:9
132:17 168:13
169:15 205:23

interviewing
62:7,24 63:5
82:1 128:4

interviews
27:23 42:21,24
43:1,24 44:14
58:18 60:5,10,
13,17,22 71:2
73:2 74:6 75:8
125:15 126:24
130:18 137:20
168:2,6,9
171:16

inventoried
39:18

inventory
39:23 40:4 41:8
175:24 176:2,8,
9,13,16,19,23
178:3 181:7,10,
23 186:1,3,8,
15,23 187:4
200:10,11

inventory's
181:13

inventorying
40:12

invest 34:24
161:16

investigate
19:1 207:9

investigated
180:14

investigation
30:19 31:25
32:23 34:17,24
35:4,5,10,15,22
36:3,16 43:6,8,
11,12,15,16
44:5,9 46:22
47:12 51:13
55:7,22,24
57:12,17,20,22
58:8 66:7 69:9
71:7 74:11,16
75:2,4,12,19
84:16,23 87:23
88:1,8,10
89:12,19,22,24
90:3,5,8,12,13,
15,17,23 91:12,
17,21,24 92:23
94:15,18,23
95:1,6,9 99:16
101:4,24 102:5
105:11,25
106:8,9,16,17,
19 109:16
110:9 111:10
112:5 114:8,13
115:9 116:6,24
119:23 120:6,
21 121:23
123:13,19
124:21,25
125:5 129:10
136:8 138:5
142:18,21,22
143:2,16,21
145:1,18
146:11 153:13
154:24 156:5
159:22 160:12,
13 161:17
162:5,10,16
164:2,11,13,15,
20 166:11
177:14 178:7,
16,20,22 179:1,
5 180:1,5,16,18
181:21 182:3
186:13 190:15
191:8,11,12,14,
16 192:7

193:20,24
194:1,6,10,14
195:20 196:3,
24 197:10
198:25 199:9,
10,18 200:1,6,
15 205:19
206:10,19
207:5,7

investigation'
s 198:21

investigations
28:13 29:1,8,12
32:18 94:1,7,14
105:7,9 106:11
113:14,16,23
114:1 115:4
124:10 137:9,
12 152:22
194:3 206:24

investigative
27:15 49:9,13,
18,21 50:2,5,
10,23 51:2
56:6,9 57:24
91:2,16 99:17,
19,22 100:8,10,
13,17 101:9
102:1,6 105:11
106:13,20,25
113:8 119:19,
22 120:20
121:10,17
135:16 142:11,
15,24 143:3,8
158:24,25
162:18 163:9,
21 175:23
176:2,4,7,8,12,
24 177:3,21,23
178:6 179:23
180:8,13 181:8,
23 182:14,15,
17 183:17
184:23 185:1,8,
10,15,25 186:3,
5,8,14 187:7
188:21,24
189:19 190:1,4
193:17 195:22
197:2,8,20
198:19,25
199:6,12,16
200:5,12

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273** Phone
**502.584.0119** Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-33 Filed: 05/06/25 Page 225 of 236 PageID #:6959
The Deposition of ANTHONY NORABIN, taken on February 23, 2023
223

investigator
20:10 155:6,10,
19

involved
32:19,23 35:3,
5,11 36:24
43:6,7 44:10
52:7,9 55:7
74:16 94:23
121:23

involvement
10:7 29:7,12
33:5 34:24
35:9,15,24
36:3,7,17
43:13,14 44:5,
8,17 46:23
47:12 52:15
53:7 55:21
94:18,25
123:13 126:15,
23 136:7
166:10 167:4
171:19 172:24
193:13 205:20

involving 38:4,
8 45:16 132:9

IR 149:13,16
174:10,12

issue 120:6
134:10

issues 119:9
124:9,20

——————
J
——————

Jail 79:4
127:21

James 8:10
34:7 52:12
53:15 169:14,
17 172:8

January
155:23 156:25
157:3 189:2,6,
10,13

Jennifer 8:21
9:1 64:14,17,
21,24 65:4
128:15 141:5

168:13 187:11
195:4 202:17
203:22 204:5,
17

Jerome 89:1,
14,15 90:5

Jerry 155:17

Jim 38:4
135:22

Jimmy 37:24
38:4,8,11 172:7

job 90:11
197:22 200:10

jobs 19:14

John 9:6

Join 41:22
101:11

joined 16:1

Jones 26:8,14

Jr 8:11

judge's 45:23

judgment
12:19

June 187:16

junior 136:20

——————
K
——————

Kedzie 18:13

Kelly 135:22

Kentuckiana
8:6

kids 203:19

killed 35:19

kind 12:23
18:25 77:11
115:22 124:23
125:21,24
128:18 131:5,
11 152:20
192:21

kinds 16:16
147:16 197:15

knew 35:1,23
46:16 62:14
71:9,10 75:7,
11,12,22 79:13
121:9,16
123:12,22
183:5,10

knowledge
36:15 46:2
48:11 54:11,25
55:5 57:23 58:1
78:2 120:10
121:1 125:14,
17 127:2,16
169:6 187:3
195:25 200:20
207:16

knowledgeabl
e 76:22 77:9
199:25 200:13

——————
L
——————

L-E-A-D 20:2

lab 87:19

Laquan 193:13

law 10:8 80:10
124:3

lawsuit 11:24
13:3 48:1,6
192:4 193:23

lawsuits 10:8

lawyer 202:17,
18

lead 19:25
20:1,2,3,7,18
21:7,13,15
22:5,10 25:20,
25 26:13 27:3,7
81:22 82:8
105:11 117:5
164:13,14
179:4 198:14

leading 36:7
75:13 205:7

leads 91:2,5,7
145:9 179:5,6
181:18

learn 20:18
35:14,20 37:2
43:1 62:8
137:16,19,22,
25 138:3
166:11

learned 21:9
22:6 26:2 35:10
42:18 43:19
45:14 91:20
105:10 115:8
137:7 145:10
193:22

leaves 102:1

leaving 30:21

led 145:9

Lee 120:14

left 70:19

left-hand
104:10

legal 45:21
47:1,4 48:9,18

lie 128:24

lieu 159:6

life 11:20
202:24

light 13:8

likewise 14:22

line-up 23:6,9,
11,12,13 38:15,
19,24 39:1,12,
15,17 40:8,20
41:25 42:2
51:10,12,20,23
52:7,9,12,16,
18,25 53:4,7,
11,18,22,25
54:5,16,21
56:19 57:1
87:19 144:13
207:21

line-ups 22:21
23:2 38:17 41:3
42:6 49:5 50:9
95:2 186:18

list 54:4 87:11
200:10

listed 88:22
92:3,7 95:24
109:12 112:14
155:13 166:7
176:10 189:3

listen 15:10

lists 82:20
86:23 88:25
91:25 95:12
110:18,19
118:19 120:13
155:2,5,9
167:1,3,24
168:4 169:14,
19,23 172:9

litigation 26:8,
14 34:13

live 22:21 23:2,
9,11 41:25 42:5
49:5 50:9
144:13 177:14,
16 180:18

lived 170:19
202:23

lives 180:8,19

locate 168:4
170:25

located 8:6
167:25

location 8:16
29:10 184:20

locations
101:18

locked 178:12,
13,23 179:1,8
180:11,13
181:11,15
189:1

locker 184:18

long 11:1 21:15
48:3 51:22
56:19 61:8
76:15,18
123:23 150:12
152:9,11 154:3
165:4

long-time
190:24



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

longer 113:19 141:3 153:14 178:16 181:18

looked 103:2 109:10 126:11 153:25 161:8 184:9,11

loose 198:19

lot 88:1 123:20 137:4

lots 185:11

loud 204:6

louder 204:19

lunch 141:1,19

_____

M

_____

made 43:8 44:25 90:21 94:6 98:4,20 103:6 124:19 125:21,24 181:11 184:2 204:2

Madison 119:20 201:24 203:3,5,9,16

main 99:11,13 178:11 179:7, 11,17,18 180:7

maintain 90:13

maintained 100:25 101:4,6, 8,19 102:4 130:18

maintaining 91:16

make 14:18 23:8 30:17 38:20 40:22 41:6 47:2 80:18 97:11,25 98:12, 14,22 105:2,24 108:10 109:6 141:1 150:23 152:9 156:17 163:21 171:5 183:15 199:21

204:7

makes 140:25

making 91:7 98:25 184:5

manner 133:18

March 17:10, 11,12,21,22,25 18:12,15 169:19,23 170:12 182:22 183:6

Mariah 9:3

mark 122:7,9, 11,21 135:16 170:3

marked 33:8, 14 50:13,17,20 63:9,13 84:6,8, 14 122:13,16 123:2 138:7,10, 14,17,24 139:1, 6,10,15,19,24 140:2,6,8,16 154:6,10,17 159:13,15 161:7 170:4,5,9 172:6,12 185:2

marking 140:12

master 158:21, 22

match 147:6 149:15 151:6

matches 122:2

matching 149:20,21

materials 126:19

matter 21:6 29:3 33:10 173:20 178:21

matters 11:20 206:23

Mcdonald 188:12 193:13

Mcdonald's 203:23

meaning 77:6 147:2

means 114:15 162:7

mechanisms 114:7

medical 15:9, 11

medications 15:15

meet 44:19 58:25 59:1,10, 11

meeting 45:8

memo 114:18

memorialized 10:2

memories 130:19 191:7 193:19

memory 28:19 57:18,19 67:23 121:7 130:23 189:9 194:6 195:9,11

memos 114:15

met 45:11 59:4, 6,9,13 60:6 121:8 147:14

method 160:10,14,22 161:1,18

method/cau 159:22

methods 145:16

middle 160:10

might've 132:4

mind 194:10

Mine 65:11

minute 156:14

minutes 61:10 80:22

Miranda 202:2

misconduct 48:13 76:25 77:11,17,20,24 78:5,17,23 193:2,12

Misstates 29:23 132:20

misunderstan ding 40:22 41:6

moment 31:17 48:24 126:12

Monday 22:2

monetary 12:23

month 56:19, 23 57:6

months 16:20 18:17 153:13

move 209:4

mug 148:18

mugshot 148:18

multiple 80:12 94:12 193:6

murder 34:15, 21 35:6,12,17 36:16 42:20 44:10 46:24 47:12 207:8,16

murdered 34:7,15 46:13

_____

N

_____

N-O-R-A-D-I-N 9:11

named 170:18 188:11

names 82:24 83:17 100:18 174:24 175:5, 10,16

narrative 156:4

needed 150:23 204:7

negative 37:20,22,24 38:3,7,10,20,24 39:14,18 40:4, 8,12 41:9 42:3 144:6,9,12

newer 21:12

Nicole 13:6

nods 15:4

non-verbal 15:4

Noradin 8:10, 22 9:9,11,14 10:6,23 11:7 34:11 63:22 64:4 81:2,6 141:14,18 155:10 172:10 196:19,23 201:2 205:8

Noradin's 33:11

normal 143:5

North 8:6 17:14 18:5,8

Northern 8:12

notation 103:6

note 10:1,12 30:13,22 44:1 168:19

noted 72:16,18

notes 28:9,15, 19,25 29:7,13, 15,17,20,25 30:1,3,8,9,15, 16,19,22,23,24, 25 31:7,11,12, 13,16,18,25 32:2,3,7,11,15, 20,24 33:1 44:2 55:16,20,23 56:1,3,5,12,25 57:14,19,21,24 58:2,15 73:1,2, 7 100:16 107:2, 9,12,14,19,21, 22 108:1 114:15 138:1 143:11 168:24

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-33 Filed: 05/06/25 Page 227 of 236 PageID #:6961
The Deposition of ANTHONY NOTABIN, taken on February 22, 2020
225

179:25 182:4

notetaking
28:12

noticed 132:24

noting 74:22

number 8:13
34:5,6,12
42:16,17 48:21,
25 49:3 64:2
65:11 89:16
94:21 119:19
120:16 122:18,
19 148:4 149:9,
13,16 154:24
157:14,19
201:8

numbers
184:25 201:12

—————
O
—————

oath 13:15,18

object 25:3,16
26:9 28:6 31:8,
19 41:22 45:20
46:7,14,25
47:19 48:8,17
49:15,24 57:9
59:2 60:7,24
62:2 63:1
66:13,24 68:1
70:15 71:16
73:15 74:8
76:12 77:25
78:18 79:18
83:1 92:19
93:5,22 94:3
97:13 98:5
101:1 102:7
105:4 108:4
113:3,10 114:4
115:10 117:22
118:4 122:3
124:11 125:1
126:2 127:8
128:12 130:13
131:13 132:20
133:12,21
135:12 150:25
156:11 157:9,
23 163:16,24
165:1,7,22

174:3 175:18
179:2 181:25
183:22 185:16
186:9 189:14
192:11 195:22
198:22 200:8,
17

objection
26:16,21 29:23
34:14 41:14,21
42:7,8,12 45:2,
4 48:17 51:24
54:1,17,22 55:3
56:20 62:10
72:3,6 78:6,24
81:17 83:18
89:6 98:7
101:10,11
107:16,17
109:8 110:11
124:4,16 149:1
150:7 158:18
159:4 163:3
164:9 166:2,3
169:9 182:25
186:25 192:17,
22 193:3,9,15
202:11 205:6,7,
8,16,25 206:3,
14 207:17,25
208:6,13

objects 34:12

obligation
142:2 144:1,4

obligations
141:24 142:7
143:18,22,25
145:7

observations
130:19

observed
32:11

obtain 45:19
124:24 127:6

obtained 171:3
188:2

occasions
71:11

occur 164:13

occurred
23:22 48:14
51:20 110:1
118:24 119:20
125:14 157:16
160:23 161:17
170:12 205:19

occurrence
88:4 118:16
122:18

occurring
165:17

occurs 23:19
24:5 163:14
181:17

offender 23:20
118:19 149:7
153:24 161:24
162:8 164:12
166:12,15,19

offenders
208:5,12

offense 118:14
119:4 122:17
155:15 158:8,
12,15,20 159:2
160:2

offer 34:25
35:5 124:19
125:3,24

offered 124:14,
23

office 66:16
177:10,17,20,
22 178:2,6
179:16 180:9,
19,23 181:4,6
184:13,17
189:1

officer 11:17
19:12 21:20
23:22 77:20
89:4,18,23
92:12

officers 88:15
120:14,15
141:24 142:2

officially 96:5
103:17 162:14

older 154:3

on-the-job
137:4

ongoing 94:2
164:10 178:22
180:16,18,25
181:3,22 182:3
198:21 199:1

online 8:4

open 57:3,7
68:13 73:22
84:16,22 86:23
87:1 98:22
157:8 161:8,22,
23 162:5,11,13,
21,22 163:1,14,
20 164:8
165:24,25
166:8,25

open-ended
68:10,12,14

opened 117:11

opinion 34:20,
25 35:6 46:5,8,
12,19,23 76:21
77:4 192:10,13

opportunity
69:15 108:9,14
109:13 110:3,9,
22 125:3

opposed 162:5

oral 43:23
114:6

orders 209:8

organize
197:13

organized
163:22

original 21:9
22:6,14,19
74:14 88:7
152:6,13
154:20 156:6
157:7

originally
157:11

outstanding

120:2,11,21,23
162:8,15

overseeing
78:10

—————
P
—————

p.m. 141:16
201:18,24
209:25

packs 122:2

pages 65:22
139:17 204:22

Palmer 26:8,14

paper 23:17
122:2

paperwork
142:21 197:10

paraphrased
70:12

pardon 47:25
135:24

parked 203:9

Parkside
203:16

parlance 25:11

part 20:11,19
21:13 22:23,24
51:2,13 55:24
56:4 57:21
65:17 73:17
94:22 95:5
111:10 136:24,
25 142:9
143:25 145:6
152:25 161:16,
17 174:20

part-time
19:14

partially 65:19

participant
170:15

participants
39:1 42:2 52:25

participate
42:14,23 50:8



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

53:21 54:15
58:18 60:17
70:22 106:13
108:1 112:2,5
168:1,6,9,16
169:16,25
170:25 171:15

participated
34:15 49:4
53:11 58:12
60:21 71:1 76:7
83:11 107:8
109:20 118:11
182:9 183:7
207:22

participating
95:9 110:8

participation
52:11 63:18
169:21

parties 9:12

partners 76:15
135:17,21
136:8

pass 137:13
198:11

passed 154:1
198:12

past 13:11
128:16,18
131:22

Paul 187:12

pause 14:25
131:6,25 132:4

payment 12:23

PDF 209:13,15

pending 8:11
14:12 80:12
119:9 133:11

people 29:9
107:18,19
147:10,14,15
151:5 152:2

people's
130:19

percent 11:14

performing
21:19

period 17:20
18:16 36:7
56:7,24 75:19,
23

permanent
100:3,21
202:23

permission
11:7

person 23:12,
25 24:6 35:19
37:12 39:7
46:18 130:20
132:5 134:8,9
135:4,10 136:9
147:7 149:15
150:2,3,10
151:20 152:8
153:2,3,25
160:15,16
161:12,18
177:7 199:24
200:9,20

person's
130:12 149:13

personal
11:20 57:18
125:14,17
187:3 194:5
206:16,23

personally
107:23 134:2
174:17

personnel
155:3,5

persons 19:2
53:17 54:4

perspective
164:6 185:15

pertinent
30:12,18,21

pho 40:18

phone 114:22,
24 115:3
190:18,19
206:25

phones 114:20

photo 22:21
23:2,6,15,16
24:15,16,18,20,
23,24,25 25:5,
12,13,14,18,19
37:22,24 38:16,
17,19,24 39:1,
8,17,23 40:4,
12,17,18,19,23
41:7,8 49:5
50:9 144:1,5,9
145:15,17,19,
25 146:5 147:3,
8,24 148:18
149:7,10 150:2,
19,23,24
151:11,17
152:1,8,10,16,
21 153:1,8,16
154:2 167:17,
19 173:8,9,13,
15,16,17,22
174:2,16,18,21,
23 175:3,14,21
187:22 188:10,
17 208:3,10

photographs
40:7 190:3

photos 23:16
25:9 38:12
39:9,12 40:24
42:1 145:24
147:6,10,20,24
148:3,5,12,14,
20,22 149:8
151:10 159:8
173:16,17,21
174:2,8,9,10,12
175:21 187:8,
21,25 188:2,5,
6,17

physical 23:6,
12 40:19,20
41:3 129:12,19
147:19 149:18,
22,23,25 151:1,
6 174:11 193:8

physically
23:12 197:23

pick 79:12
143:7

picked 59:16
208:3

picking 62:20
143:15

picture 194:9
203:1

pictures 40:17
153:9,17 190:3

piece 23:17

pink 130:7

place 62:5 94:9
146:17,18,19,
21,25 197:15
203:20

plaintiff 8:19
9:2,4,7,16 34:7,
14,20 35:6,11,
16 42:20 44:10
46:12 47:11
201:14

Plaintiff's 8:17
33:12,17 46:23
201:8,14
206:15

planning 118:1

play 150:16

point 35:25
36:17,20 43:17
47:6 51:1 71:7
73:19 83:4
89:10 96:7
97:25 98:24
101:23 102:12
112:20 113:2
115:20,25
146:12 152:9
164:11,17
172:21 174:8,
14 178:8,9,10
179:4 182:16
183:18,20
191:14 192:7
196:9 207:7

points 62:19
96:12

Polaroid
173:16,17,21,
24 174:2,8,9

police 10:24
11:2,17,21
15:20,23 16:1,8
17:2 19:12
21:19 25:9,11
32:15 34:16
40:13 41:13,20
49:8 51:8 55:2,
13 77:16,19,22,
23 78:3,8 85:9
86:15 107:12
112:18,21
122:24 123:20
141:24 142:1,
11 147:11
154:12,20
157:13 162:2,
11 165:3,20
188:3 190:20
203:21

policies 40:13

policy 41:13
42:6 55:25

poor 96:18
165:3

poorly 175:2

popped 121:17

populated
148:23

portion 83:21
85:7 158:20

portions 30:13
112:4 117:17,
18 142:11
143:7,16,21

position 16:7
200:4

positions 17:1

positive 37:8
42:17

positively
208:11

possession
122:1 127:12

post-
conviction
36:12 45:15
46:21



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-33 Filed: 05/06/25 Page 229 of 236 PageID #:6963
The Deposition of ANTHONY NOTABIN, taken on February 23, 2023
227

practice 28:24,
25 32:14 39:21
40:3,7,11 41:7,
8,12,19 42:1,5,
10 65:22 66:15,
21 73:1 76:9
109:23 111:4,8
143:2 173:21
206:17,23

practices
25:22 28:22
111:9

preclude
207:3

preference
206:23

preliminary
69:1,4 104:16,
18,21,24 105:1
109:2,5,11
116:4,8,12
117:7 156:5

premature
34:13

preparation
43:4 44:20 45:8
49:19,22 51:6
84:25 123:4
170:7 173:9
185:5 189:17,
22

prepare 29:18
72:20 81:12,13
86:20

prepared
43:16,21 81:22,
25 82:4,8,16
85:13 168:20
169:2 181:15

presence
59:18 61:21,22
77:18 78:20,25
82:4,8,10
204:12

present 17:6
54:5 70:1
102:21 114:9
201:4 204:10
207:21 208:2,9

preserve 56:1

pressure
171:24

pretrial 36:7

pretty 154:7
196:12

prevent 15:11,
16

previous
150:8,9 158:2

previously
11:24 40:24
62:19 71:1
74:24 130:24
131:5,11
132:16 133:1
161:8 201:3
205:1,23
206:11,16

primarily 90:2

primary 88:25
89:4 90:4,8,11,
20,22 91:1,6,
10,15,19 92:11
117:6 143:1
196:24 197:1,7
198:10 199:3,
19 200:21

print 102:21,23
103:10,13,16
104:17,21,24
105:1 108:22
109:2,5 115:20,
24 116:1,4,15
117:1

printed 103:1,
5,7 117:4
155:23 156:25
157:3

prior 10:1 13:8,
10 59:12 60:10
62:17,19 73:5
74:11 95:6,9
96:7 97:12
132:10,21
149:13 171:9
205:2,19 206:9

privy 206:9

problem
206:15

procedure
39:19 52:7,10,
12,16,19
144:14

procedures
22:19 23:1
36:25 38:4,8,
11,16 40:8
41:25 42:18
49:5 50:8
137:23 144:2,5
175:14 198:15

proceeded
90:24

proceedings
8:1 36:13 45:16

proceeds
162:5

process 13:12,
22 47:5 115:20
147:1 148:9
160:13 163:13,
21

program 19:18
148:17

programs
19:21

progress 28:7
44:1,2 73:5,10
74:3 76:5
90:14,15,21
94:6 113:9
114:1 170:6
185:11 200:14
206:18

promise
124:23 125:24
141:8

promises
204:3

promoted
16:9,20

promotion
19:3

pronouncing
10:16

proper 134:18

properly 10:16
200:7

property 16:13

prosecution
86:24 87:13
142:12 143:3,5,
8 145:3 176:22

prosecutor
202:18

prosecutors
44:19 45:8,11
91:22 176:17

provide 34:8
62:8 69:1,4
102:16 207:8

provided
31:17 33:17
39:2,5 68:25
128:14 129:3,6
130:16 131:5
133:15 189:24,
25 191:3

providing
129:12,17
131:3 133:16
207:11,15

pull 63:7
145:24 149:7
161:3,4

pulling 179:17

punched 198:3

punches
198:24

purpose 156:1
157:6 160:4
176:6,7

purposes 10:5
44:9 164:23
166:1

put 10:11 56:6
85:16 99:22
101:25 109:16,
18 110:7
117:20 122:12
147:8 151:16
152:15 154:8
177:2 178:11

179:17,18
197:23 198:16
200:10,11

puts 100:15

putting 30:21
31:6,16 150:16

————————

Q

question 14:1,
5,6,13,19,22
15:9,10 29:24
31:10,15,20
34:5,6 39:25
40:3,14,16 50:7
85:16 96:18
101:2 115:22
132:22 133:6
142:17 143:19
153:5,7 162:4
163:5,7 165:3
175:2 191:13
192:12

question-and-
answer 13:24

questioned
58:19 133:3,4

questioning
10:5 206:20

questions
13:24 15:12,16
33:17 67:11
68:3,6,9,10,12,
14 107:21
200:24 201:3
205:7 206:16
208:15,17

quick 80:16,17
141:1 196:13

quickly 13:22
154:8 166:25
201:17

————————

R

R-A-M-I-S
171:4

R/dets 112:10

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

race 147:15

rags 122:1

raise 9:19

RAMIS 171:4, 6,8

rate 165:5,13

rates 165:19

Ray 155:19

Raymond 82:21 88:24 89:14 110:15 155:6

read 43:2,3 48:3,24 62:12 68:20,21 69:18, 19,20,23 70:4, 9,20 120:2 121:11,19 133:13 183:9 194:24 202:8, 13 204:5

readable 197:14

ready 141:21

reason 48:6 153:20 161:23

reasons 176:16

recall 13:1 20:17 21:13,14 22:8 26:4,11,17 27:2,5 37:15,18 55:5,11,12,14 58:2 59:25 60:3,9,16,19 61:1,9 66:20 68:5 69:3,6 71:25 72:4,7,9 79:10,11,22 83:24 110:24 111:21 112:19, 25 113:4,12 114:19 115:2,6, 12 119:16 127:1 128:2 131:18 150:11 157:5 167:6,22 168:3,11,18 169:22 170:2

171:17,18 172:5,25 173:3 182:18 184:5 206:1,19

recalled 196:6 206:6

receive 22:9, 10,17 25:25 26:5,7,13,19 27:4,8

received 22:13 26:19 176:17

recent 43:4

recently 79:6

recognize 39:8 138:9,15,21,25 139:9,12,21 140:4,10,18 150:4

recollection 30:10 59:4 72:12 123:11 167:11

record 8:3 9:10 10:1,12 80:23, 25 81:1 98:3 122:12 139:6 141:11,12,13 196:16,17,18 201:11 202:9, 13 209:5,24

recorded 156:6

records 100:3 162:19,23 163:11,23 167:9 183:12, 19 184:3 185:12

Records' 100:25 101:5

refer 11:6,8 22:25 25:6 40:23 41:2 120:19 176:1

reference 22:20 39:6 43:10 52:18 107:22 119:19

120:23 162:15 164:14 173:19

referencing 39:6 73:22

referred 25:15 28:7 50:24 51:3 84:15 179:22, 23

referring 25:6, 8 40:1,17 83:6 99:14 100:8 120:19 122:8, 15 142:14 192:19

refers 112:9 197:3

reflect 29:25 30:15,22,25

reflected 70:9, 11

reflects 29:25 30:23 31:12

refresh 30:9 123:11 167:11

refresher 20:21 21:3

refreshes 21:8

regard 22:11 40:12 41:7,25 42:5 69:8 142:11 191:1 197:1,7

registers 10:6

regular 20:19 28:24

regularly 85:22

reject 98:14,21

related 10:7,10 11:20 45:15,24 58:7 73:13 88:3,10 95:8 122:17 125:25 190:12 194:14 195:18 205:2, 11 206:24

relates 154:23

relation 66:6 118:23 121:13 142:18 162:8

relay 205:14

release 127:7

relevant 31:24

rely 44:9

relying 196:4

remained 183:2

remarks 69:2,4

remember 20:6 82:15 111:2,3 130:21 131:1 145:21 147:17 167:23 171:22,23 193:23 194:12, 16,21 196:7,9, 10

remembered 73:6 130:21 191:10

remotely 8:22, 25 9:2,4,6

Remus' 203:5

repeat 15:21 101:2 132:22 143:19 192:12

repeatedly 112:10

rephrase 14:2 21:21 76:4 78:11 115:22 153:5 163:5 184:16

rephrased 70:12

replaced 158:13

report 29:14, 16,18,22,25 30:23 31:11,12, 14 39:11 51:9, 10,12,16 52:3

53:12,13 56:10, 11,12,16,19 57:1,4,8,14 73:5,10,13,18, 21,22 74:1,3 76:5 78:17 84:15,16,22 85:4,5,7,8,12, 14,17,18,21 86:3,22 87:2,6, 7,17,18,19,22, 25 88:7,14,19, 20,23 89:16,18, 22 90:1,20,21 92:9,13 94:13 95:12,24 96:5, 9,13,15,19,20 97:1,5,18,20, 21,24,25 98:1, 11,12,20,21,25 99:4,21 102:10, 21 103:22 104:2,3,4,14, 21,24 105:18, 20 106:2,4,7, 14,17,21 107:2, 9,13 108:3,16 109:17,19,21, 25 110:2,19,23 111:5,12,14,15, 19,21,24,25 112:3,6,9,14 115:19 116:1,7, 11,18,20,22 117:9,12,13,19, 20,21 118:1,3, 15 119:4,18 122:17,25 123:8,11,16,17 126:6 154:19, 21,23 155:2,14, 15,16,17 156:2, 6,20,23 157:7 158:7,8,12,13, 14,16,21 159:2, 7,21,22 160:1, 2,4,5,11 161:4, 8,22 167:1,2 169:25 170:6, 11 172:7 186:19 194:24 195:1 199:9,14

reported 77:19 78:14,22



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

reporter 8:3,5
9:8,12,18,24
14:17 15:5
80:23 81:1
122:7 141:10,
13 196:15,18
208:18,22
209:1,7,11,15,
18,21,23 210:1

Reporters 8:6

reporting 78:4
88:15 89:4,18,
23 92:12
112:10,13
120:14,15
167:8,25

reports 28:8,
10,16,20 30:14
31:16 37:21
43:2,4,10,16,20
45:7,10 49:9
62:21 75:4
85:24 86:8,16,
19 87:9,21 88:9
89:13 90:14
92:8 94:19
100:12 101:25
102:5,14,17,24
103:5,10,13,25
104:18 105:2
106:10 107:25
109:3,6,13,14
110:8 113:5,17
115:20,24
116:4,19,24
117:2,7 121:10,
20 128:13
138:4 142:20
143:12 158:2
159:10,12
179:25 182:4,8,
13 183:9 184:4
185:10,11
195:6 197:9,14

represent
146:10

representing
8:5

reputation
192:15,19,21

request 164:21
182:16 184:2,5

187:7,20,24
188:9 189:5

requested
182:23 184:8
188:12 189:13

requesting
164:22 183:11
187:22 189:9

requests
188:16

required 145:6

requirement
27:9

requires 179:5

reserve
208:20,22

residence
126:8

respectful
11:8

response
48:25 50:6 51:3
207:4

responses
10:9 33:9,16,24
34:2

responsibility
177:4,5,6
196:25 197:6
199:20

responsible
90:4,23 91:1,6,
10,15,19 178:2
199:4

restaurant
203:5

resubmit
98:25

resubmitted
99:4

result 39:24
132:12 144:6

resulted 12:13,
19,22 40:8 41:9
46:11 47:17
48:14

resulting
71:24

results 38:19
144:1,5

retention
100:3,22

revealed
119:18 120:1

review 33:23
37:21 38:6
45:7,10,23 50:2
69:15 73:20
75:3 90:21
102:22 103:22
108:10,14
109:14 110:3,
10,23 111:15
123:4 126:18
173:9 182:5,12
189:21 190:3,6,
8 195:16,20
200:5 205:11
207:20 208:1,8

reviewed
43:10 44:1
45:15 46:10
49:18,21 50:5
51:6 71:6 73:4
74:23 75:3
84:25 92:9
111:6,7,19
123:7,10
125:18 164:3
170:7 182:8
185:4 189:19
193:17 205:2,
13

reviewing
110:24 111:21
128:13

right-hand
63:21,22

rights 68:21
202:2

risks 124:15

robbed 208:12

robbery
161:19 201:22

rode 136:25

Rogers 58:11,
13,19 59:1,6,9,
23 60:1,6,14,
18,22 61:5,16,
19,23 63:11,18
65:4 66:12,18
67:8,10,15,23
68:4,19 69:5,7,
15,23 70:5,9,23
71:2,11 73:8,
14,20 74:2,6,
10,24 75:3,8,
13,23 76:2
79:2,16 82:17,
20 83:5,12,21
84:4 95:10
112:8 118:12,
20,23 121:2
123:8,19 125:3,
16,22,25 126:6,
24 128:5,9
131:17,21
132:25 133:10,
16 166:17,18
167:3 168:13,
17,22 169:4
182:10 183:7
194:20 195:2,3,
9 201:18 202:5,
18 204:12
205:13,22
206:1,11 207:8

Rogers' 61:21
64:13,20
207:14

Rogers's
70:10 71:22
73:22 80:4
127:3 132:9
195:25 201:4,
13 205:2,12

role 19:4 27:12

roller 203:20

room 53:1,3,24
54:21 61:16,18
75:2 81:13,25
82:17 83:4 84:1
178:12,13
179:8 180:11
181:12 184:18
195:9,12

routine 29:4

rule 14:12

running
203:15,17

────────

S

────────

safe 178:17

sat 67:23 81:7
177:9

save 97:1,4,18,
20

scene 23:23
29:9 32:10,12
87:16,18
129:19

scenes 93:21

Schalk 37:4
42:19 43:24
52:4 53:19
59:21 60:21
70:24 71:4,10
73:9,12 74:5,12
75:18 76:4,19
77:4,10,13
82:21 83:11
88:24 89:12,14
92:24 110:16,
19 112:15
125:10,15
126:21 136:10
155:6,19 172:4
182:21 183:20
190:14 191:21,
25

Schalk's 73:4
74:1

school 202:24,
25

schooling
19:7

screen 50:16
84:11 103:2
116:13 138:19,
20 139:7
154:15 159:14

scroll 53:17
156:13,14
160:5



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

section 156:4

select 87:2
151:10

selected 148:5

send 117:17,
18,25 118:8

senior 137:1

sense 80:18
140:25 141:1

separate
101:18 102:5
120:5

separately
41:2 76:11
97:21

separator
198:6

September
17:9 202:21

sergeant 19:4
78:9,10,14,16,
22 92:21,23
93:3,20 94:7,
10,11,13,17
98:14,21 99:5,
7,21 102:11,15,
22 103:11,22
188:10,13
192:2,23
200:22

sergeant's
99:9 177:17,20,
22 178:2,6
180:9,19,22
181:3,6 184:13,
17

sergeants
94:12

series 147:6

serve 157:7

session 13:24

set 33:12,16
40:24 88:14
147:23 148:13
151:10 164:25

settlement
12:22

share 138:19
142:12 143:8
154:13

shared 142:13

sharing 106:3

Sheenee 37:11
42:21 44:15
168:5,7 169:20
208:9

sheet 175:24
176:16,23
178:3 181:10
200:11

Sheriff's
120:16

shift 93:9,10

shooting
74:15 168:5
201:22

short 154:4

shot 35:19
37:12 46:18
160:15,16,18
161:12,18
203:18

shots 148:18
203:14

show 61:19
81:14 103:16
105:2 108:16
109:6 116:13,
15 154:2,5

show-up
23:18,19,22
24:5,13,15,16,
20,23,24,25
25:5,9,12,14,
15,19 144:18

showing 33:8
50:19 63:9
84:13 118:14
122:21 138:7,
14,24 139:6,15,
24 140:12
159:13 161:7
170:4 172:6

shown 39:12
84:13 152:8

208:10

showups
24:12

shut 17:12

sic 84:2

side 63:22

sign 65:22

signature
33:21 64:13,14,
20,21 204:15,
21 208:21

signatures
64:12,19,25
65:3,7,9,12,16

signed 33:24
65:25 66:2

significant
80:9 124:3

signing 86:19

similar 151:12,
18,21 152:3
208:4

similarly 32:10
152:13 195:18
208:8

simple 15:8

simply 32:19
128:9 153:3
182:13 184:12

single 23:25
24:6 30:7 87:23

sir 9:18 11:4,8
13:12,23 15:21
19:8 33:13,21
34:9,18,19
48:22 50:21
63:1,12 84:20
123:1 145:20
154:16,21
159:14,23
170:17 189:18

sit 46:1 70:25
71:14 72:12

sits 100:14

sitting 60:12
82:17 187:17

situation
134:12

skating 203:20

skimmed
123:14

sky 130:6

sleep 203:25
204:1

smaller 148:4,
13

smart 192:24

smoke 203:24

soda 203:23

solemnly 9:20

Soliciting
127:13

solve 135:3
153:13

Sorrell 34:7,
16,21 35:19
36:16 37:12
42:20 44:11
46:13,18,23
51:13 66:6
84:23 88:1,8
89:22 94:18,22
95:1,5,9 119:23
120:21 123:13,
18 154:24
160:16 172:24
192:7 193:24
195:19 201:22
207:8,16

sort 40:24 65:5
86:18 96:8,15
136:11 141:1
149:18,20
150:16 151:21
174:11 198:2

sought 19:3

sound 70:4

sounds 126:14
208:22

sources 19:11

South 118:24

speak 62:13
146:9 155:18,
21 190:23
204:19

speaking
61:23 114:13

specific
116:10 182:4
183:2 193:19
194:9,13,17,22,
23 195:8
198:17

specifically
82:15 160:11
182:18 183:25

speculation
45:4 62:11
81:18 83:2,19
92:20 94:4
169:10 174:4
187:1

spoke 119:7
166:15,16
190:16,17

spoken
190:10,11,14
192:2,4,6

stage 34:13

stamp 63:10
139:25 154:11
159:17

stamped 84:16
138:8 139:5,8,
16 184:23
201:9

stamps 49:10

stand 46:12
52:25 195:13

standing 23:13

stands 112:10
153:4

star 64:2

Starr 9:6

start 112:23

started 15:20,
23 16:15 113:2



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

starting 8:16

state 8:15 9:9
66:15

state's 58:14,
20 59:1,17
60:6,10,14,18,
22 61:3,6,17,22
64:7,10,24
66:7,10 67:4
68:7,19,21,25
69:1 70:13
72:22 81:7,12,
25 128:14
168:24 169:2
202:17 203:22
204:4,10

stated 195:24
206:1,6

statement
61:7,12,14,15,
20 62:6,17
63:8,11 66:17,
19 67:11 69:16,
23 70:4,9,20,25
71:15,24 72:13,
20,24 73:6 81:8
82:4,8,14,15,20
83:5,6,21 112:7
119:13 152:7
168:20,23
169:2,7 201:4,
7,10,11,14,17,
21 202:9,19
204:3,5,9,11,22
205:3,12

statements
44:3 66:22,23
81:13 132:10

states 8:12
202:20,21,22,
23,24,25 203:2,
4,6,7,10,13,14,
18,20,22,24
204:1,2,4

station 32:15
55:2,13

status 116:2,
12 206:18

stay 93:25
191:18,21,24
199:10

Stefanich 10:2

step 27:12
28:13 106:20
153:1

steps 27:15
28:4 91:11
106:13 128:8
132:5 133:9
152:20 199:12
200:6

stick 194:1

stipulate 9:13

stipulated
9:15,17

stood 105:25
128:3

stop 160:9
161:10

storage 101:14

stored 97:12

stories 129:23

story 130:2,8,
10

straight 192:24

straightforwar
d 76:23 77:9
192:14

street 23:20
24:3 26:20 27:4
118:24 196:8
201:24

strike 12:12,17
21:6 22:9
25:21,24 26:6,
12 27:25 29:12
35:4 37:8 38:15
41:7 42:14
45:14 46:19
48:12 50:6 51:1
54:10,14 55:6
57:18 58:6
61:15 66:5,11
68:20 71:10
75:17 78:11,15
82:6,7,14 90:3
91:25 93:8,20
95:4 106:6
107:1 110:1

117:6 130:9
131:20 136:25
145:10 148:8
150:8 153:6
162:3 165:2
168:19 192:3

stuff 30:21
163:22

subject 10:6
22:14 26:1
34:14 120:1
153:25 170:18

subjected
193:7

subjects 10:10

submit 56:12
57:7 86:8 96:1,
5 97:24,25
102:15,20
103:21,25
104:5,13,15
113:5 164:21

submits 96:5
97:21

submitted
51:17 57:1,14
95:12,25 98:11,
13,16 102:14
103:11,22
104:2,3,4,12,22
108:20 110:10,
15,23,25
111:15,20,22
115:19 116:2,
18,22 117:2,14,
21

submitting
88:20 96:13
97:2 103:17
109:14,19
110:3

subpoenaed
143:6

subsection
198:5

subsequent
19:20 88:9
89:12 155:15,
16

subsequently
23:21 75:12
127:10

Suffice 13:10

sufficient
34:23 35:9

sufficiently
35:4

suggest
140:23

summary
202:20

supervised
93:16

supervising
78:14,16,22
92:21,23

supervisor
92:1,7,9,10,11,
12,18 97:22
103:17

supervisors
88:16

supp 104:10,11

supplementar
y 51:9 73:13
74:1 84:15
102:4 106:21
107:1,13
113:17 138:4
143:12 159:20
185:10 186:18,
19

supposed
39:18 176:12
199:21

suspect 23:25
81:9 124:19,24
144:9,13,18
145:11 147:19
149:11 150:3
151:7,12,15
152:15,17
154:7 174:20
175:5,9

suspects
27:20 128:24
142:4 144:22,

25 145:1
153:17 190:12

suspended
87:12,14

Swaminathan
8:18 9:15,25
10:15,19,22
41:18 80:15,21
81:5 98:10
101:16 108:8
122:9,14
140:21 141:5,
17 149:4
196:11,22
200:23 202:11
204:17,25
205:6,16,25
206:3,14
207:17,25
208:6,13,19,24
209:3,10

swear 9:20

switched
146:13

Sydney 8:4
81:3 141:15
196:20

system 85:13
86:1,2,4,7,16,
20 87:3,5,10
88:8 89:4 90:7
96:4,19,24
97:12 102:15,
24 103:2,6,18,
23 104:5
113:19,21,22
115:24 116:1
146:14 147:14
148:2,9,11,19
149:14 150:1,4,
9,13,14,16,18,
19 157:12,18,
21 158:7,9,23
159:1,3,9 160:3
167:12,16,18
171:12

systems 85:9
151:9



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

## T

T-I-R-C 170:5

tactics 124:1

tagged 198:6

takes 21:23,25
81:8

taking 15:15
30:6 31:5
32:11,23 40:17
62:5,17 138:1

talk 33:7 73:20
107:22 134:6,9
140:24 190:25
191:4,7,12,15

talked 29:9
196:23

talking 32:6,7
40:19 62:19
69:12 83:7
99:18 176:2

tattoos 151:2

taught 22:5

teaches 20:9

team 136:12,15

teams 136:16

technician 8:5

techniques
124:2 137:11,
15

technology
146:8,18

telling 30:4,12,
18 47:21 90:2
128:21 131:21
132:6,25
133:10 134:5
179:21

template 96:9

ten 61:10 87:15

term 24:20
25:9 133:25

terminals
115:14

terminate
134:13,17

terminology
23:4 24:23,24

terms 25:11
100:4 137:16,
22,25 138:3
141:3 143:12
145:15 150:22
162:1,25 164:7
175:14 189:17
196:2 202:1

Terry 58:11,13,
19 61:5,21,23
63:11 64:13,20
65:4 95:10
112:7 118:12,
19 166:17
167:3 168:13,
17,21 169:3
194:19 195:25
201:4,13,17
202:18,20,21,
22,24,25 203:1,
4,6,7,8,10,12,
13,14,17,18,20,
22,24 204:1,2,
4,6,7,12

testified 13:2,
14,18 201:3
205:1,18
206:22

testify 36:10,
12 44:22 45:1
195:1

testimony
9:20 13:10
29:24 34:17
45:11 46:20
53:6 67:5,7
73:8 132:21
190:6 195:23
207:11

text 64:15 65:5
115:7

that'll 30:9

then-sergeant
192:3

thing 30:7 57:3
70:5 100:12,19,

23 128:19
131:5 191:2
194:17 195:24

things 22:22
23:1 29:6 30:4
31:5 70:14,18
73:9 90:1 94:22
129:5 130:22
131:11 132:6
135:9 137:12
145:22 147:16
152:1 185:9
186:16 197:15
198:1

thought 30:12
31:24 116:3
132:19

thousands
147:10 148:3,
12

threats 204:2

three-man
136:15 155:20

three-person
136:12

time 8:8 13:23
14:8 17:13 18:6
20:23 23:21
35:2 36:5 39:3,
5,7 43:5,19
44:5 46:17
47:11,16 48:4
56:8,24 57:12
62:17,23 63:4
74:13 76:15
78:12 79:14,15,
16,23 80:3,13,
24 81:4,15
92:22 95:18,21,
24 96:2 103:7
108:25 115:5
121:2,7,19,21
122:1 123:12,
18 127:11
130:19,20
135:18 141:11,
16 144:25
145:16,19
146:12,19
153:9,10,18,23
154:1 165:4
167:13 169:12

174:1,6 196:16,
21 208:3 209:5

times 11:12
13:15,19 20:5,
15,16 59:10,11,
14,15 62:13
80:7 85:18
106:1,6

timestamps
96:1

TIRC 170:5

title 11:4

to/from
114:15,18

today 8:5,7
15:13,17 46:1
48:13 60:12
81:3 141:15
187:17 196:21
209:6

today's 10:5
85:1

told 30:15 31:5,
22,23 37:5
40:24 69:9
134:25 191:3
196:7

Tony 192:23
193:2

tool 28:16
188:17

tools 137:11

top 63:21 86:24
88:2 104:14
122:23

topic 154:11

topics 10:10
21:8,12 22:4

total 209:5

touch 191:18,
21,24

towels 122:2

track 98:3
113:8 165:5
177:7

tracking
164:23 165:21
166:1

train 21:15
136:22

trained 27:11,
14,17,22,25
28:1,12,15,18
141:23 142:1
143:18,23
150:22 176:15

training 19:18,
21,22,24,25
20:1,4,8,12,13,
19,20,24 21:7,
10,13,16 22:1,
5,7,9,10,11,13,
14,17,19,24
25:20,21,24,25
26:1,3,5,7,13,
14,18,20,23
27:3,4,7,8
41:20 42:11
137:5 142:7,10

transcript 30:7

transcription
31:1

transcripts
190:8

transfer 52:12
53:15

transferred
126:20 162:18,
20,23

transferring
55:13

transport
52:19 59:24
60:2 172:18

transportation
207:19

transported
172:15

transporting
171:19 172:21
196:8

treated 162:2,
11 165:25



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-33 Filed: 05/06/25 Page 235 of 236 PageID #:6969
The Deposition of ANTHONY NOTABIN, taken on February 15, 2020

233

203:21

trespass 119:2
121:14 126:8,
25 127:4,7

trial 34:17 36:8,
10 44:17,20
45:8,12 58:8
69:8 190:6

trigger 193:18

troubles 80:10

truck 161:12,
19 167:25
203:5,10,14

true 39:14 57:3
81:19,20
204:24

truth 9:21,22
30:22

truthful 34:2
129:15,20,25
130:12 134:21,
25 135:10

turn 142:2,8
143:2,4 144:1,4
176:23

turned 142:22
199:15

two-man
136:16

type 16:12
31:4,6,17 56:11
76:24 77:17,20
79:21 85:4,18,
21 87:2,7
106:16 117:12
122:25 133:4
149:21 157:6
159:9 192:19

typed 85:5,7
102:4 158:3

types 22:21
29:6 87:9
151:25 185:9
197:14

typewriter
158:4

typical 71:13

typically
111:14 136:18,
19 163:10
175:23 178:19
185:9

typing 86:18

—————

U

uh-huhs 15:3,
4

ultimately
44:22 51:19
132:8 148:7

Uncle 203:5

underlying
191:8

understand
13:12,13,22
14:1 15:12,16
21:6,21 23:1
48:5 132:5
133:24 141:9
163:6 177:11
179:20

understanding
13:9 25:10,18
48:12 71:19
74:5 80:3 83:16
92:17 117:13
123:18 142:6
145:5 166:4
181:10 184:7
186:22 192:23
198:18

understood
14:4,6,7,11,14,
15,20,21 15:1,
2,6,7 21:5 80:6
128:5

unique 24:6,9,
11 151:16

United 8:12

unlawful
127:13

unrelated
11:20 207:10

untruthful
130:25 135:9

unusual 72:5
185:14

upload 149:10
159:8

uploaded
159:3

uploading
149:12

upper 104:10
157:14

upset 134:5

utilizing 207:4

—————

V

vacated 46:3,
12 47:17 48:7

vacating 46:6

vague 113:10

varies 178:14

venture 61:13

verbal 15:3

verdict 12:13

versa 89:14

version 50:14
108:19

versions 97:12
109:2,6 116:4
130:1,2

versus 8:11
89:4 136:16
154:3 164:8
165:24

vi 18:14

vice 89:14

victim 23:22,24
31:22 170:20

video 8:4 29:10
209:2,3,16,17,
21

videoconferen
ce 8:9 81:3
141:15 196:20

view 23:24
54:21 117:10

viewed 38:25
53:4 174:23
208:3

viewing 53:1

Villa 10:7

violation
143:17

violent 16:13,
17,18,23 17:4
18:15,19,22,25
93:17 180:24

visible 174:24

vocabulary
23:9

voluntarily
204:4

—————

W

W00h5728
120:3

Wacker 8:7

Wade 168:6,10
169:24 170:1

wait 32:14

waiving 34:14

walk 13:21,23
203:8

Walker 64:17,
24 65:4 66:8,11
67:4 82:16
83:12,17,22
84:2 128:15
168:14 195:4,
10 201:5
202:17 203:22
204:5,11,12
205:4

Walker's
64:14,21

wanted 13:9
70:13 87:7
104:18,19
120:5 124:14
128:10 133:11

134:25 147:3,
24 148:5,14
164:12 182:7

warehouse
100:25 101:5,7,
14,20 102:2
146:9,15,17,21
148:9,11,17
150:1,14,18
162:19,23
163:23 164:22
167:20 183:4

warrant 120:2,
10,22,24 121:2

watch 93:10,
11,13,17

watched 203:7

week 21:17,18,
23,25 97:5
190:16

weight 147:16
151:1 152:3

West 119:20
201:24

Western 17:14
18:3

whatsoever
167:5

who'd 80:6
147:10

why'd 190:23

Willie 34:7,15,
21 35:19 37:12
42:20 44:10
46:18 160:16
201:22 207:8

wished 204:7,9

witnesses
30:4,15 36:22
44:13 47:6,7
52:17 53:4,24
54:21 58:4,7,10
76:10 95:5,8
124:7 128:24
129:9 130:18
133:14 137:20
145:17 152:16
166:14 168:5



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

174:23,25 190:11

Wojcik 92:4,17 93:3,8,9,13 94:8,10,13,17 192:3,4,6,10, 13,23 193:2,7

Wojcik's 193:13

wondering 25:10

word 31:1 197:21 202:20

words 23:24 28:9 29:17 32:6 39:10 52:21 66:23 67:18,20, 21 70:10 74:14 106:12,20 107:7 117:11 119:21 125:20 134:4,20 148:11 151:5 153:12 181:13 186:12 194:8, 25 198:23

work 11:16,21 19:12 36:7 74:20 76:18 93:9 105:8 113:13,16 182:22

worked 93:10, 13 105:7 135:17 136:14 141:7 147:1 183:6 192:16

working 19:14 76:10 78:15 81:23 82:12 88:13 104:25 109:15 114:12 123:25 135:18 155:20 174:6 206:19,25

works 13:12 50:15 178:1

worn 151:2

would've 22:23,24 56:3,4

72:16,21,22 111:4,6,7 131:25 133:3,4 146:20 147:5 167:15,16 173:5,7 174:9 182:20 184:19 196:6

write 28:8,10, 16 31:11,21 56:16,19 57:7 61:18 66:18,22 89:18 105:18, 20 106:2,7,14, 21,25 107:1,8, 12,13,19,20,24, 25

writing 14:17 28:19 30:14 61:23,25 62:8 108:2 189:7 204:11

written 55:16 61:16 62:5 64:5,7 66:7,11 67:3,7,8,12,14, 18 69:22 70:3 82:24 83:17 89:22 106:10 108:10 114:7, 18 158:10 173:6,7 199:9

wrong 17:8 198:23

wrote 32:15 61:22 66:16,17 67:25 69:11 105:20 109:25 110:1

_____

Y

_____

year 15:19,22 16:9 146:8,16 153:13 157:18 192:1

years 11:3 19:9,10 20:6 76:20 130:16, 17 145:22 202:21 203:7

yes/no 15:8

you-all 59:23 60:1 67:24 112:17

younger 154:3

_____

Z

_____

Zoom 8:19



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com