# EXHIBIT 34

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## — COURT REPORTERS —

# CASE NO. 20-CV-04768

# JAMES FLETCHER JR.

# V.

# JEROME BOGUCKI, ET AL.

## DEPONENT:

## ANTHONY  WOJCIK

## DATE:

## June 20, 2024



✉ schedule@kentuckianareporters.com

☎ 877.808.5856  |  502.589.2273



```
 1            IN THE UNITED STATES DISTRICT COURT

 2           FOR THE NORTHERN DISTRICT OF ILLINOIS

 3                     EASTERN DIVISION

 4                    JUDGE ANDREA WOOD

 5            MAGISTRATE JUDGE MARIA VALDEZ

 6                  CASE NO. 20-CV-04768

 7

 8                 JAMES FLETCHER JR.,

 9                       Plaintiff

10

11                          V.

12

13              JEROME BOGUCKI, ANTHONY

14               NORADIN, RAYMOND SCHALK,

15             ANTHONY WOJCIK, UNKNOWN CITY

16         OF CHICAGO POLICE OFFICERS, AND THE

17                   CITY OF CHICAGO,

18                     Defendants

19

20

21

22

23   DEPONENT:   ANTHONY WOJCIK

24   DATE:       JUNE 20, 2024

25   REPORTER:   CARLI GROSSMAN
```



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Fletcher v. City of Chicago, et al. - 30(b)(6) Anthony Wojcik taken 6/21 of Chicago, et al.

2

```
 1                         APPEARANCES

 2

 3   ON BEHALF OF THE PLAINTIFF, JAMES FLETCHER JR.:

 4   Anand Swaminathan, Esquire

 5   Loevy & Loevy

 6   311 North Aberdeen Street

 7   Third Floor

 8   Chicago, Illinois 60607

 9   Telephone No.: (312) 243-5900

10   E-mail: anand@loevy.com

11    (Appeared via videoconference)

12

13   ON BEHALF OF THE DEFENDANTS, JEROME BOGUCKI, ANTHONY

14   NORADIN, RAYMOND SCHALK, AND ANTHONY WOJCIK:

15   Brian Stefanich, Esquire

16   Hale & Monico

17   53 West Jackson Boulevard

18   Suite 334

19   Chicago, Illinois 60604

20   Telephone No.: (312) 870-6908

21   E-mail: bstefanich@halemonico.com

22    (Appeared via videoconference)

23

24

25
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Fike Deposition of Anthony Woods Taken 6/23/2022

```
 1                   APPEARANCES (CONTINUED)

 2

 3   ON BEHALF OF THE DEFENDANT, THE CITY OF CHICAGO:

 4   Dhaviella Harris, Esquire

 5   Burns Noland

 6   311 South Wacker Drive

 7   Suite 5200

 8   Chicago, Illinois 60606

 9   Telephone No.: (312) 872-8930

10   E-mail: dharris@burnsnoland.com

11    (Appeared via videoconference)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                          INDEX

 2                                            Page

 3   PROCEEDINGS                                7

 4   DIRECT EXAMINATION BY MR. SWAMINATHAN      9

 5

 6                        EXHIBITS

 7   Exhibit                                  Page
```

```
 8   1 - City JF 190 - Request for Identification Photos  63

 9   2 - City JF 98, 99 - Arrest Report             67

10   3 - City JF 62, 66-85 - Juvenile Arrest Report  76

11   4 - City JF 86, 96 - Criminal Record Search Summary 84

12   5 - City JF 97 - Stop Order/Cancellation Request  91

13   6 - City JF 52 - General Progress Report by Jerome

14        Bogucki                                   95

15   7 - City JF 134, 135 - Investigative Alert      113

16   8 - City JF 129, 130 - Active Investigative Alert

17        for Emmett Wade                           127

18   9 - City JF 179-182 - General Progress Report by

19        Raymond Schalk and Jerome Bogucki         131

20   10 - City JF 140-147 - Cleared Open Report from

21        Sorrell Murder Investigation              135

22   11 - City JF 4544 - Record of Arrest and Prosecution

23        (Identification Section)                  156

24   12 - Illinois Department of Corrections Photo

25        Array - B1563-1569                        166
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Fire Deposition of Anthony Holt - taken 6/2 of 6/24

```
 1                  EXHIBITS (CONTINUED)

 2   Exhibit                                       Page

 3   13 - Second Version of Illinois Department of

 4        Correction Photo Array - B1563-1569       167

 5   14 - City JF 47-51 - Original Supplementary Report

 6        by Detective Michael Fleming             169

 7   15 - City JF 153-159 - Line Up Report/Case

 8        Supplementary Report                     189

 9   16 - City JF 4566-4569 - Line Up Photographs  193

10   17 - City JF 191-198 - Series of Arrest Photographs 195

11   18 - Complaint Register 211634                207

12   19 - City JF 6600-6640 - Summary Report from

13        December 2017                            234

14

15

16

17

18

19

20

21

22

23

24

25
```



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                              STIPULATION

 2

 3     The deposition of ANTHONY WOJCIK was taken at

 4     KENTUCKIANA COURT REPORTERS, 730 WEST MAIN STREET, SUITE

 5     101, LOUISVILLE, KENTUCKY 40202, via videoconference in

 6     which all participants attended remotely, on THURSDAY

 7     the 20th day of JUNE 2024 at 10:55 a.m. (CT); said

 8     deposition was taken pursuant to the FEDERAL Rules of

 9     Civil Procedure. The oath in this matter was sworn

10     remotely pursuant to FRCP 30.

11

12     It is agreed that CARLI GROSSMAN, being a Notary Public

13     and Digital Reporter, may swear the witness and that the

14     reading and signing of the completed transcript by the

15     witness is not waived.

16

17

18

19

20

21

22

23

24

25
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Fletcher Deposition of Anthony Wojcik taken 06/20/2024

7

```
 1           PROCEEDINGS
 2   THE REPORTER:  All right.  We are on record. My
 3   name is Carli Grossman.  I'm the online video
 4   technician and court reporter today, representing
 5   Kentuckiana Court Reporters located at 710 [sic]
 6   West Main Street, Louisville, Kentucky 40202.
 7   Today is the 20th day of June 2024.  The time is
 8   11:55 a.m.  We are convened by videoconference
 9   today to take the deposition of Anthony Wojcik in
10   the matter of James Fletcher, Jr., versus Jerome
11   Bogucki, Anthony Noradin, Raymond Schalk, Anthony
12   Wojcik, Unknown City of Chicago Police Officers,
13   and the City of Chicago, pending in the District
14   Court for the Northern District of Illinois, case
15   number 20-CV-04-768.  Will everyone but the
16   witness please state your appearance, how you are
17   attending, and the location you are attending
18   from, starting with Plaintiff's counsel?
19   MR. SWAMINATHAN:  Good morning.  This is Anand
20   Swaminathan for Plaintiff James Fletcher,
21   appearing via Zoom from Chicago.
22   MR. STEFANICH:  Brian Stefanich, appearing via
23   Zoom in Chicago.  I represent the individual
24   defendants in this case.  And I believe there is
25   an agreement not to have this deposition
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
1  recorded, so -- it looks like it is being
2  recorded, so we object to that if it is.
3  MR. SWAMINATHAN:  Yeah.  You can -- we can --
4  Carli, we can take off the recording.  I agreed
5  to that.
6  THE REPORTER:  Okay.
7  MR. STEFANICH:  Thanks.
8  THE REPORTER:  I do like to have the audio -- the
9  Zoom audio recorded, just because it's a better
10 audio, but we won't have it noticed as a
11 recording if that's all right.
12 MR. SWAMINATHAN:  That's fine with me.
13 THE REPORTER:  Mr. Stefanich, is that okay?
14 MR. STEFANICH:  Yes, ma'am.  Yes.
15 THE REPORTER:  Okay.
16 MS. HARRIS:  And Dhaviella Harris on behalf of
17 the City of Chicago, appearing remotely from
18 Chicago.
19 THE REPORTER:  All right.  This is where I
20 typically check the witness's ID, but the
21 attorneys stipulated it off the record that they
22 would like to skip this.  Counsel, is that
23 correct?
24 MR. STEFANICH:  Yeah.  We would stipulate that
25 this is the defendant, Anthony Wojcik.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1          MR. SWAMINATHAN:  So stipulated by Plaintiff.
 2          THE REPORTER:  Do all parties agree that the
 3          witness is, in fact, Anthony Wojcik?
 4          MR. STEFANICH:  Agreed.
 5          MR. SWAMINATHAN:  Yes, so stipulated.
 6          THE REPORTER:  Okay.  Mr. Wojcik, will you please
 7          raise your right hand?
 8          Do you solemnly swear or affirm that the
 9          testimony you're about to give will be the truth,
10          the whole truth, and nothing but the truth?
11          THE WITNESS:  Yes, I do.
12          THE REPORTER:  Counsel, you may begin.
13                    DIRECT EXAMINATION
14   BY MR. SWAMINATHAN:
15        Q.   All right.  Mr. Wojcik, can you please state
16   and spell your name for the record?
17        A.   It's Anthony Wojcik, A-N-T-H-O-N-Y
18   W-O-J-C-I-K.
19          MR. STEFANICH:  Sorry.  Sorry.  I mean, just to
20          clarify it, I think the court reporter -- I don't
21          know if -- where she is, actually, but I think
22          she said the start time was 11:55, but it was
23          10:55 Chicago time, so just to clarify that.
24          Thank you.
25          THE REPORTER:  I apologize.  11:55 Eastern Time.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1         MR. STEFANICH:  Yes.
 2   BY MR. SWAMINATHAN:
 3         Q.    Okay.  Good morning, Mr. Wojcik.  I know we
 4   had -- we had spent a little time together just a couple
 5   days ago, --
 6         A.    That's right.
 7         Q.    -- so we have gone through the ground rules
 8   for a deposition, but I just want to do that again very
 9   briefly just so we have it on the record here today.
10   Have you given a deposition before?
11         A.    Yes.
12         Q.    You said something in the order of ten to 20
13   times, potentially?
14         A.    Correct.
15         Q.    Okay.  Got it.  Similar to those prior
16   depositions you've given, this is the same thing.  This
17   is a question-and-answer session.  You'll be asked
18   questions, and you'll answer them to the best of your
19   ability.  And Madam Court Reporter will be taking down
20   the questions and answers faithfully, so for that
21   purpose, there are a couple of things you have to have
22   in mind.  One is, we can't talk at the same time because
23   she can't write that down, understood?
24         A.    Yes.
25         Q.    Okay.  So many times in the deposition, you'll
```



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    know where I'm going.  Please let me finish my question
2    before you answer.  I think -- I don't think we had many
3    issues with that on Tuesday, but again, continue to make
4    sure you let me finish my question, even if you know
5    where I'm going before you answer, understood?
6         A.   Yes.
7         Q.   Similarly, if I mistakenly believe you
8    finished your answer and I'm cutting you off, please let
9    me know, and I will let you finish your answer,
10   understood?
11        A.   Yes.
12        Q.   Okay.  No nods or uh-huhs.  We need verbal
13   answers for the court reporter, okay?
14        A.   Yes.
15        Q.   If you don't understand my question, please
16   tell me and I will rephrase my question, fair?
17        A.   That's fair.
18        Q.   And similarly, if you answer my question, I'll
19   assume you understood my question; is that fair?
20        A.   That's fair.
21        Q.   Okay.  If you need to take a break at any
22   point, we can do that.  Just answer any pending
23   question, and then we'll take a break, okay?
24        A.   Yes.
25        Q.   Okay.  Last set of questions I want to just
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    ask you preliminarily.  Are you -- this is a yes-no

2    question because I don't want to get into your medical

3    history: Do you have any medical conditions that would

4    prevent you from being able to understand my questions

5    and answer them truthfully today?

6        A.   No, not that I'm aware.

7        Q.   And do you -- are you taking any medications

8    currently that would prevent you from being able to

9    understand my questions and answer them truthfully?

10       A.   I'm taking several medications.  I'm not sure

11   of all the effects of them, but I don't believe they

12   will interfere with my ability to answer your questions.

13       Q.   Okay.  And have -- has any doctor told you

14   that the medications you're taking would prevent you

15   from being able to understand questions and answer them

16   truthfully?

17       A.   Not that I recall.

18       Q.   All right.  What did you do to prepare for

19   today's deposition?

20       A.   I reviewed a closing supplementary report and

21   a lineup report that I was the approving supervisor on.

22       Q.   Were you the approving supervisor on both the

23   closing supp and the lineup report?

24       A.   That's correct.

25       Q.   Did you review any other documents in

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    preparation for today's deposition?

2         A.    No.

3         Q.    Did you review any GPRs?

4         A.    No.

5         Q.    Did you review any transcripts of trial

6    testimony or deposition testimony?

7         A.    No, I have not.

8         Q.    And did you review any photos or pictures?

9         A.    No.

10        Q.    Did you review any information from the

11   criminal trial of Mr. James Fletcher?

12        A.    No, I have not.

13        Q.    And did you review any of the evidence or

14   testimony from the post-conviction proceedings of

15   Mr. Fletcher that resulted in his exoneration?

16        A.    No, I have not.

17        Q.    Okay.  Did you have meetings with Counsel in

18   preparation for today's deposition?

19        A.    I only spoke to him on the phone, briefly, and

20   probably in total, less than one hour, maybe in three

21   conversations over the years.  And today was the first

22   time that I actually met Brian.

23        Q.    So you said you had three conversations over

24   the last year or more; is that right?

25        A.    Over the last years, there was probably three
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  conversations where we spoke anything in regards to the

2  case, and those were very brief.  It was never anything

3  --

4  **Q.   Okay.  And the -- oh, I'm sorry, go ahead.**

5  A.   It was very short, each one.  And I don't know

6  how many times -- I might have spoke to him on the phone

7  where he was calling me to set up a -- you know, the

8  deposition or whatever.  I -- I couldn't tell you how

9  many times because I --

10  **Q.   Okay.  And I don't want you to go into the**

11  **details of those.**

12  A.   -- never met him in-person.  Never went to his

13  office or anything like that.

14  **Q.   Okay.  And I don't want you to go into the**

15  **details of those conversations.  So you had -- separate**

16  **and apart from those sort of short conversations,**

17  **scheduling, other kinds of things, you're saying you had**

18  **one conversation with Counsel, which was specifically**

19  **for purposes of preparing for today's deposition; is**

20  **that right?**

21  MR. STEFANICH:  Objection.  Form.  Misstates the

22  testimony.  You can answer.

23  THE WITNESS:  It was -- we didn't -- the call

24  wasn't for that, but during the call, we might

25  have spoke about the -- the -- I had some

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1          questions about the --
 2          MR. STEFANICH:  I'm going to object --
 3          THE WITNESS:  I'm sorry to -- I'm sorry.
 4          MR. STEFANICH:  -- and instruct him not to answer
 5          --
 6          THE WITNESS:  Okay.
 7          MR. STEFANICH:  -- just the way you're --
 8   BY MR. SWAMINATHAN:
 9       Q.    Let me ask you a different question.  You
10   indicated that you -- that your meetings with Counsel in
11   preparation for today's deposition were exclusively by
12   phone, correct?
13       A.    Yes.
14          MR. STEFANICH:  Objection.  Form.  Misstates his
15          testimony.
16          THE WITNESS:  Okay.
17          MR. STEFANICH:  You can answer.
18          THE WITNESS:  The calls themselves weren't for a
19          meeting to prepare.  The -- the times I talked
20          about the case in general with him over the years
21          was very short and maybe more than one
22          conversation or whatever, one or two
23          conversations over the phone, so I never really
24          went over the case with him or he never did with
25          me.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      MR. STEFANICH:  Objection.

2      THE WITNESS:  I'm sorry.

3  BY MR. SWAMINATHAN:

4      Q.    Okay.  Let me ask you a different -- let me

5  ask a different question.  In preparation for today's

6  deposition, did you have any in-person meetings with

7  Counsel today or in the last few months?

8      A.    No.  Today was the first day I met Counsel.

9      Q.    Okay.  And did you meet today in preparation

10 for today's deposition?

11     A.    No.  I got here, and it was a few minutes

12 after 10:00, and just sat down waiting to start.

13     Q.    Okay.  And then did you have any phone or Zoom

14 meetings with Counsel in preparation for today's

15 deposition?

16     MR. STEFANICH:  Objection.  Asked and answered.

17     Can answer again.

18     THE WITNESS:  No.

19 BY MR. SWAMINATHAN:

20     Q.    Okay.  Did you -- so you indicated that you

21 had reviewed several documents, the closing supp and the

22 lineup report; how did you get those documents?

23     A.    I had received those from Counsel.

24     Q.    And then did you receive a copy of the

25 investigative file in this case?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1     A.   Yes.

2     Q.   So you had a copy of the complete

3 investigative file?

4     A.   I don't know because I didn't review that.  I

5 believe that's what was sent, but I never reviewed the

6 whole file, so I couldn't say with certainty.  All I

7 reviewed was the closing supp and the lineup supp that I

8 approved as a sergeant, so...

9     Q.   But you went through the investigative file to

10 find those documents; is that right?

11    A.   Correct.

12    Q.   So you went through the entire file, but you

13 were looking -- it sounds like you focused on just a

14 couple of documents; is that right?

15    A.   That's correct.

16    Q.   Okay.  And did you -- so you had an

17 opportunity to see what else was in the investigative

18 file; is that fair?

19    A.   I wouldn't say that, no.  I was just searching

20 out the closing supp and the lineup supp.

21    Q.   In your recent deposition in the Jackson case,

22 you indicated that you had reviewed the entire

23 investigative file in preparation for the deposition; is

24 that fair?

25    A.   I don't recall if I said the entire file or

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1  not, but I --

 2      Q.   But you had indicated you had gone through the

 3  entire file and focused on some number of documents; is

 4  that fair?

 5      A.   I don't know what I said in that regards, --

 6      Q.   So --

 7      A.   -- but I did focus on certain documents

 8  though, meaning, just like in this case, it was the

 9  closing supplementary report on that one that -- that I

10  had approved on that one also.

11      Q.   Any reasons you took a different approach in

12  this case, in terms of focusing on just a few documents?

13          MR. STEFANICH:  Objection.  Calls for

14          attorney-client privilege.  Instruct him not to

15          answer.

16  BY MR. SWAMINATHAN:

17      Q.   Okay.  You'll follow Counsel's advice and not

18  answer that question, sir?

19      A.   Yes.

20      Q.   Okay.  Other than the investigative file, did

21  you receive any other documents from -- or files from

22  Counsel?

23      A.   Not that I recall at this time, no.

24      Q.   Okay.  We don't need to go back through your

25  background.  I have kept my notes on your history
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of RENATO BROWN, taken on June 21, 2024

```
 1   through the Chicago Police Department, so we can skip
 2   that step.  The only thing I wanted to just be reminded
 3   of is when do you say you started in the police
 4   department?  Did you say 1986?
 5        A.   13 October 1986, correct.
 6        Q.   Okay.  October 13th, '86?
 7        A.   Correct.
 8        Q.   Okay.  At -- what was the first point in time
 9   at which you got involved in the Sorrell homicide
10   investigation?
11        A.   I have no recollection.
12        Q.   Can you say what year it was?
13        A.   No.  I have no recollection.
14        Q.   Were you -- what -- yeah, what position were
15   you working in, in the Chicago Police Department, when
16   you joined the Sorrell homicide investigation?
17           MR. STEFANICH:  Objection.  Form.  Foundation.
18           You can answer.
19           THE WITNESS:  I have no recollection other than
20           what I saw in the documents, which was -- I don't
21           remember the exact date, but it would've been the
22           date that I approved those reports.
23   BY MR. SWAMINATHAN:
24        Q.   Okay.  And so on the date that you approved
25   the reports, that would've been in and around 2002,
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    correct?

2        A.    If that's the date on the reports, correct.

3        Q.    Okay.  And at that time, you were a sergeant

4    at Area 5; is that right?

5        A.    That's correct.

6        Q.    Okay.  And at that time, were you working in

7    the Cold Case Unit?

8        A.    Not that I recall.  I was a sergeant at Area

9    5.

10       Q.    Okay.  And so is it your -- had you -- at the

11   -- as of -- at the time of 2002, had you worked in the

12   Cold Case Unit yet as a supervisor, or was that

13   something you were -- that would happen later on?

14       A.    That would've happened later.

15       Q.    Okay.  And when you worked on -- when you

16   approved reports in this case, some of those reports

17   that were being submitted to you were reports being

18   submitted by Detective Bogucki and Schalk, fair?

19       A.    That's correct.

20       Q.    Were Mr. Bogucki and Schalk, when you were

21   approving these reports in 2002, were they members of

22   the Cold Case Unit?

23            MR. STEFANICH:  Objection.  Foundation.  You can

24            answer.

25            THE WITNESS:  No.  They were detectives at Area



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        5.
 2  BY MR. SWAMINATHAN:
 3        Q.   Okay.  And so what was your understanding of
 4  why, in 2002, as detectives, they were reinvestigating -
 5  - or participating in an investigation of a 1990 case?
 6        A.   That was part of their function as detectives
 7  at Area 5, to investigate homicides or whatever other
 8  handouts they may have received of crimes that occurred
 9  in Area 5.
10        Q.   And is there any practice or policy that once
11  a case becomes so old, it's sort of closed
12  administratively within the detective division area, or
13  the -- can the case just stay open, sort of, into
14  perpetuity?
15             MR. STEFANICH:  Objection.  Form.  Foundation.
16             You can answer.
17             THE WITNESS:  Well, homicides cannot be closed.
18             They remain open in perpetuity because they're
19             homicides, and there is no statute of limitations
20             on the -- the offense, charging anybody for that
21             offense. So other crimes, like misdemeanors or
22             others, if they sat for that long of a period of
23             time and went beyond the statute, they could be
24             closed administratively, but not homicides.
25  BY MR. SWAMINATHAN:
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q.   And is there a point in time when homicide

2  cases will be transferred to a cold case unit?

3      A.   No, it's not a -- what -- no, it's not by

4  time.  What occurs -- and there is no reason that any

5  detective at Area 5 can't pick a case going back to the

6  1920s, if they wanted, and work on it.  I was a sergeant

7  later at the Cold Case Unit, like you had asked earlier.

8  The cases came there either -- mostly at our initiation.

9  Sometimes we would get a call from the public, you know,

10  my -- my father, my uncle, my -- my, you know, wife was

11  killed X number of years ago, I -- case remains open.

12  We would check it out if it was open.  We would contact

13  the area, speak to them.  And if nobody was working on

14  it at that time or wasn't active, then we would initiate

15  a cold case investigation for that.  That was one way

16  they would come in.  Other ways, like, for example, we

17  had received a grant on DNA -- using DNA in solving

18  cases. And based on that, we did an analysis of all the

19  open murders in the city in all the areas.  And of the

20  5,500 that were open, we tried to research and narrow it

21  down to ones that -- where there was a potential of DNA

22  evidence.  And -- and we went through our filters to

23  narrow it down.  We then requested copies of files from

24  the area.  We never got the -- or the investigative

25  files and removed the files from the area.  We would

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1   just get copies to initiate a cold case investigation.

2   But for the area, God bless anybody that wanted to work

3   on those old cases.  You know, those were murders, and

4   they deserved to be worked on, so if anybody wanted to

5   go back and pick up on them, God bless them.

6        Q.   In the Cold Case Unit when you were

7   supervising that group, that was at some point later in

8   the 2000s; is that right?

9        A.   Approximately.  Yes, it would've been because

10  -- yeah, it would've been later in the 2000s, correct.

11       Q.   Okay.  Because you ended up becoming a

12  sergeant by 2008, so it would've been before 2008 that

13  you were working in the Cold Case Unit?

14       A.   Right.  That's correct.  Right.

15       Q.   Okay.  In the Cold Case Unit, obviously, you

16  mentioned that there was some -- there was a lot of

17  DNA-based work in that unit, especially after you got

18  the grant, correct?

19       A.    Well, that wasn't the only thing we did.

20  Because of the grant, we did approach cases with DNA and

21  that, but that wasn't the only case, nor I -- would I

22  say was it the greater percentage of cases that we

23  worked on.  Not all of them had DNA.  But yes, we did

24  try to -- based on the grant, we did try to -- try to --

25  try to find those cases to work on.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1        Q.   What were the other emphases in the Cold Case
2    Unit?  Obviously, DNA was one.  What were other, you
3    know, areas of focus for the Cold Case Unit in terms of
4    how to go back and solve cases?
5        A.   Well, our mission was to work old, unresolved
6    homicides that were not being currently worked by the
7    areas, you know?  So again, a detective working in Cold
8    Case can find a case on his own, or he might remember a
9    case.  And back when I was Area 2, I started working on
10   a case, and it never got resolved.  And he'd just start
11   working on that, you know, because he had some knowledge
12   of it.  Sometimes retired detectives would contact us
13   and -- because once the -- you never -- Cold Case Unit
14   wasn't always there, and I don't know exactly when it
15   got formed.  There was a lieutenant in there prior to
16   the lieutenant that asked me to go there, and I don't
17   know how many years they were there.  But we -- we would
18   get calls sometimes from retired detectives that had
19   worked a case, and it still bothered them that that case
20   was unresolved.  Or maybe they had an idea of who the
21   suspect was back then, but there was no charges, and
22   they thought maybe via, you know, speaking to witnesses
23   now, years later, we might get more information.  Or, in
24   the case of DNA, we might be reexamining some of the
25   evidence and may be able to find some evidence that
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  would lead to -- to the suspect.  So there's many ways

2  to get them and many ways to initiate a -- a cold case

3  investigation.

4      Q.  And the cold case -- so when detectives were

5  initiating cold case investigations, other than it being

6  an old case they had worked on or that a detective or

7  colleague said, hey, I want to follow-up on, was there

8  also a process of, like, going through old files, old,

9  unsolved cases and saying, "All right. This is a good

10  candidate for cold case investigation versus others"?

11     A.  Well, that -- I don't remember specific cases,

12  but that was part of it.  And some of it was where, once

13  the unit was formed, we would periodically go to areas

14  and sometimes talk to the detectives.  On occasion, I

15  went to roll calls and reminded them, hey, look, we're

16  out there.  If you guys got any cases that are old and

17  because of the -- like, for example, Area 2 was busy.

18  For them to look back at old cases was near impossible

19  just by the volume of what they had coming in.  So if

20  there are any old cases that you think you'd like some -

21  - some fresh eyes on or somebody to actually take a look

22  on because you can't get back to them.  And same thing

23  with the lieutenants and the commanders there, we let

24  them be aware.  So many ways that we got cases.  And

25  sometimes a detective would call and say, hey, man, take

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    a look at this case, or the commander would forward a --

2    a -- not -- not the file itself, but forward information

3    on cases.  Then we would go to the areas, have that file

4    copied, reexamine evidence that might inventoried to

5    find out where it was.  You know, is it in bulk storage?

6    Is it still at ERPS?  Is there potential for reexamining

7    it now with current technology and stuff?  So it was a

8    lot involved, but basically, again, we were looking at

9    old murders.  And then on occasion, depending on the

10    volume of work, there were times where we were asked to

11    go out to the - - a scene.  Rare, but we were asked to

12    go out to the scenes of a fresh homicide because there

13    was just nobody available.

14    **Q.    Manpower.**

15    A.   We -- we would run out and take care of that.

16    And then on occasion, also, other cases, like old --

17    there was times we investigated old police-related

18    shooting incidents and -- and -- and such, so it may be

19    --

20    **Q.    So when you were supervising -- oh, go ahead.**

21    A.    -- cold case homicides, but again, if the

22    chief of detectives wanted us to look at another case or

23    some other case, or there was some issue that they

24    wanted it reinvestigated, we had some of those too where

25    we had re-looked at cases that were already -- where

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  there already was some conclusion to.

2      Q.   In -- as a sergeant in that unit -- well,

3  strike that.  The -- one of the things it sounds like -

4  - if I'm understanding you correctly, one of the

5  emphases was, when you're going back to the units or the

6  areas and looking at some of the older cases that could

7  be potential candidates, one area of emphasis, it sounds

8  like, was cases where there might be physical evidence

9  that could be subjected to, you know, more advanced

10  scientific testing, whether it's DNA or other forensic

11  types of testing; is that fair?

12      A.   One of them, yeah.  It didn't just -- that

13  wasn't conclusive, though, the only -- I mean, there was

14  times where sometimes you revisited a case because, like

15  I said, maybe a family member called into the area,

16  maybe another detective remembered it.  And sometimes

17  people that were not cooperative at the time of the

18  incident, would -- would be entirely cooperative now.

19  Like, for example, a -- a husband and -- and wife, and

20  they had a -- a -- some kind of an incident, and the

21  wife was shielding the husband, you know, giving him an

22  alibi.  Maybe now they're divorced. Maybe now there's

23  other things.  Maybe now -- sometimes the offender has

24  passed away, and then the -- the person is not fearful

25  anymore and they will tell you. So no -- you -- you can

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  come up with all kind of reasons why, so we weren't just

2  looking for ones that had evidence.  You know, again, if

3  a family member called and -- or a detective called and,

4  yeah, we'll take a look at it.  By taking a look at it,

5  we would see that, okay, this was X number of years ago.

6  This witness was never found back then.  Maybe we can

7  find them now, or let's go re-interview, you know?  Or

8  sometimes you would just find out that the main suspect

9  back then was now deceased, and maybe going back and

10  talking to people, you would -- would find out, okay,

11  yeah, I didn't say my -- I knew my husband, and I --

12  yeah, I said he was at home that night, but he wasn't.

13  He came back, was frantic, threw his clothes into the

14  wash, had me wash his clothes, you know?  So it's not

15  just, you know, looking for DNA or -- or other evidence.

16  It's -- there's a myriad of things you're looking for,

17  and if -- if you could find one that you can do

18  something with, or you believe you can, or you're going

19  to give a shot at, then we -- we would do so.

20      **Q.    Anything that was done differently in that**

21  **unit, given that you're -- these are cases where a lot**

22  **of time has passed since the underlying crime, you know,**

23  **witness memories may be affected, those kinds of things?**

24  **Anything that was done differently?**

25      A.    What do you mean by --



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1         MR. STEFANICH:  Objection to form.  Go ahead.
2         THE WITNESS:  I'm sorry.  I'm kind of confused
3         what you mean by differently.  Differently from -
4         -
5   BY MR. SWAMINATHAN:
6    Q.   Yeah.  In terms of how you interview
7   witnesses, how you interview suspects, you know, those
8   kinds of things.  Anything different about how those
9   cases were approached in the Cold Case Unit rather than
10  if it was just a regular active investigation?
11   A.   No.  You would still follow -- you'd formulate
12  a plan of -- of how you're going to proceed, but it was
13  the same way.  Interviewing was done the same.
14  Submitting evidence was the same.  We had a more direct
15  way of getting evidence worked up due to the grant
16  because now it was set up with the state lab, you know,
17  based -- we had a federal grant where the state lab was
18  going to be getting paid off the federal grant, so it
19  was some differences, but the -- working the case was
20  all the same.  It was, you know -- it was --
21   Q.   And what was done to -- was there anything
22  that was done to account for the, you know, concerns
23  about, you know, witness memory being, you know --
24  fading over time?
25        MR. STEFANICH:  Objection.  Form.  You can answer
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1          the question.
 2          THE WITNESS:  Nothing different than working an
 3          old case from, you know, if you -- if I was in
 4          the area or detectives were in the area, there
 5          was no -- nothing different with that.  You know,
 6          again, that's - - every circumstance is
 7          different.  Every person is different and -- you
 8          know, as far as whether or not their -- their
 9          memory fades over time.
10  BY MR. SWAMINATHAN:
11      Q.    But was there an understanding of within that
12  unit about what you do if you have, you know, you have -
13  - and a lot of times -- I mean, let's start with the
14  basics.  Was there some general understanding that, you
15  know, when -- with the passage of time, memory fades and
16  can change?
17          MR. STEFANICH:  Objection.  Form.  You can
18          answer.
19          THE WITNESS:  Well, there was no discussion of
20          that.  There was no looking at it that way.  And
21          the reality is that, with the passage of time,
22          sometimes memories come into it.  And I believe I
23          mentioned these Tuesday when I talked to you.
24          You have cases where, like, for example, a young
25          man was abused as -- as -- in his younger ages,
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 and he might be in his 30s or 40s, based on

2 having suppressed that or whatever, he may then

3 remember it and tell you about it, and this has

4 happened, you know, numerous times, and

5 corroborated then by -- because he now remembers

6 that, then you find out who the offender was

7 suspect, and then the -- the individual admits to

8 it. So now the fact that all those years he

9 didn't remember or recall, talk about that

10 incident, doesn't necessarily mean that over time

11 your memory fades. So if you could take that

12 extreme, where you have almost no memory of an

13 incident occurring, then years later you have,

14 let's just go to the extreme and say, a full

15 memory of what occurred, anything in between can

16 happen. Some people may have a photographic

17 memory. They may remember an offender. Some

18 people, based on having had a relationship or

19 having seen that person before, you know, like a

20 -- like a neighbor may say, yeah, it's the guy

21 who used to live for -- he lived next door for

22 six months. Well, if they see him on a -- on a

23 basis, you know, for six months, then yeah, 15,

24 20 years, they have a better chance of

25 identifying or whatever. Same thing with a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   crime.  If the person is in a -- involved with
 2   that, like sexual assault, where a woman, though
 3   traumatized, that face may be ingrained in her
 4   forever, and her memory would occur.  It could be
 5   the opposite, you know, where because of the
 6   trauma, they can't remember. But you can't say as
 7   a given or as a -- a -- a -- a factual, that all
 8   memory fades over time.  Some memory will get
 9   better.  Some memory, people will lose.  You have
10   people that five minutes after the crime, they
11   couldn't identify anybody.  You have people that
12   are traumatized five minutes after the crime,
13   they're in somewhat of a shock, but doesn't mean
14   a week later when they settle down and are asked
15   that they can't make an identification either.
16   So it's a myriad of things. And like I had said
17   the other day, our job would then to be present
18   it and, as is, if somebody makes an
19   identification years later, we present that, that
20   an identification was made.  Whether or not the
21   judge or a jury or some trier of fact might, you
22   know, accept that or -- or proceed with that,
23   that's their decision, and everybody's different.
24   You know, somebody can explain why they didn't --
25   you know, didn't remember. Sometimes it's not
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1          memory.  Sometimes it's fear, so sometimes
 2          somebody will tell you, no, I didn't see
 3          anything.  Years later, they're moved out of the
 4          neighborhood.  They're no longer have to walk by
 5          these people every day or these gang bangers
 6          every day, or they don't have kids that have to
 7          go to school by these gang bangers every day.
 8          And now that they feel safe, they will then tell
 9          you.  It doesn't mean that they're -- what
10          they're saying then is false.  It just means that
11          they have a reason, which they can explain, why
12          they are now making that identification.  So you
13          have to look at every situation differently and -
14          - and proceed with -- with that and present it
15          going forward.
16  BY MR. SWAMINATHAN:
17      Q.    Did you, as a detective -- at the time that
18  you were a detective or as a sergeant supervising
19  detectives, did you ever operate with a general
20  understanding, subject to exceptions, that witness
21  memories fade over time?
22      A.    Well, I can only base that on -- I -- I mean,
23  that would be a general way of looking at things.  But
24  again, it's all individual, you know?  You -- you can't
25  say, oh -- you know, approach everything and say, well,
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    it's ten years from now, there's, you know -- we're not

2    going to even bother with this case because that witness

3    is not going to be able to identify.  Again --

4        Q.   Do you -- putting aside identifications, just

5    in terms of witness's memory of events, are you saying

6    you generally agree with the idea that memory fades over

7    time, subject to exceptions, or are you saying you

8    disagree with that?

9        A.   It depends on the person, again.  So I guess

10   if you want to say that in the greater percentage of

11   time, does memory fade over time?  I'm not a scientist.

12   I'm not a -- a biologist or whatever, whoever would

13   make, you know, that.  But that would be a -- probably

14   be just a general belief.  But again, there are so many

15   times, just like the -- the young man that was sexually

16   assaulted by a priest, you know?  He -- he -- he went

17   from maybe what was zero memory to full memory, so --

18   again, that's an extreme, and you can have anything in

19   between there, regarding not just identification, but

20   memories of the offense itself.  You know, it's -- it's

21   like human nature.  Like, sometimes you get together

22   with your friends and you'll be talking about an

23   incident that happened back in high school, and I'll

24   remember, oh yeah, remember when you, whatever, you

25   pulled that fire alarm?  No, no, no.  That wasn't me.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Remember -- I was there, but that was -- oh yeah, that's

2    right, it was Frankie.  So everybody has that. And now

3    in conversing about it or maybe looking about it, it

4    might spur your memory.  It can happen to people also

5    about an offense.  They may be driving, you know, down

6    the street and see something or hear something that, you

7    know, refreshes their memory about something that

8    occurred.  It could be a million -- you know, a bunch of

9    things.  So human nature is a funny thing and -- and,

10   you know, it happens.  It does happen.

11        Q.   Did you get any training at the time you were

12   a detective or a supervisor of detectives on the

13   reliability of memory over time?

14        A.   Not that I recall.  Not specific training in

15   that regards, no.

16        Q.   And do you recall getting -- strike that.  Did

17   you get any training from the police department on the

18   reliability of identification procedures over the

19   passage of time?

20        A.   Not that I can specifically recall.

21        Q.   Did you get any training from the police

22   department on issues with the reliability of

23   identification procedures as a general matter?  In other

24   words -- strike that.  So putting aside the passage of

25   time, just as a general matter, were you ever trained or

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1  taught about the issues with the reliability of
 2  eyewitnesses' abilities to conduct -- to make
 3  identifications of witnesses or suspects?
 4          MR. STEFANICH:  Objection.  Form.  You can
 5          answer.
 6          THE WITNESS:  I can't recall specifically as I'm
 7          sitting here right now.
 8  BY MR. SWAMINATHAN:
 9      Q.   Do you recall generally getting any training
10  about, hey, you know, you have to be careful, witnesses
11  are often unreliable in their ability to make
12  identifications?
13          MR. STEFANICH:  Objection.  Form.  You can
14          answer.
15          THE WITNESS:  I don't recall specifically getting
16          training about that.  I know that was a big buzz
17          out in your profession, where that was being
18          stated, and witness identification were being
19          attacked on various grounds.  But whether or not
20          I got specific training, I couldn't state as I'm
21          sitting here right now whether I did or not.
22  BY MR. SWAMINATHAN:
23      Q.   And just to clarify, when you said you got --
24  you had an understanding it -- from my world, are you
25  saying that was -- you did get training about what was
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  going on in the world of civil rights lawyering and

2  criminal justice lawyering about identifications?  Or

3  are you saying -- you're just -- you're saying that's

4  separate apart from training?

5      A.   No, I'm -- just from hearing -- you know, it's

6  my profession also.  You know, we're -- we're involved

7  in those things, but it wasn't, like, a formal training,

8  but just in hearing, you know, challenges, TV news, you

9  know, trying to change the system of photo arrays, how

10 it's done.  And it did occur because at some point we

11 went with this blind administrator and all that, as

12 opposed to somebody involved in the case showing photos

13 or running a lineup.  We were charged with then having

14 somebody not involved in the case, who didn't even know

15 who the suspect was or was not in that lineup run that

16 or -- or run the photo arrays.  So I -- I'm aware of it,

17 and -- and if you're talking about the training leading

18 to the blind administrator, yes, I'm aware of that.  But

19 I never -- you know, I -- I don't recall specifically

20 anybody talking about, you know, you can't trust that --

21 I -- I think the department was -- or the city or

22 department or whoever decided to go with the blind

23 administrator was acting as a result of -- of things

24 that were happening out in the -- the legal world.

25      Q.   And those -- that change to blind

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    administrators happened well after 2002, correct?

2         A.    To the best of my recollection, correct.

3         Q.    Okay.  And prior to the change to going to

4    blind administrators, are you aware of any training

5    about any scientific or other indications about

6    unreliability of eyewitness identifications?

7         A.    Not that I'm aware of, no.

8         Q.    Within the police department, as a detective

9    conducting and -- conducting investigations, or as a

10   supervisor of those investigations, did you ever have

11   any concerns about the reliability of eyewitness

12   identifications?

13        A.    That's a hard question to answer.  You -- on

14   specific -- yeah, again, on certain circumstances.  I --

15   I think I explained to you yesterday cases where, like,

16   one gang would come in, and they had shot their own gang

17   member in the back of the head during a drive- by, but

18   were coming in trying to say it was another one, it was

19   the Latin Kings.  Well, in that individual thing, after

20   a while when you start hearing that, well, it was close

21   range fire or closer range fire in the back of the head,

22   indicating that -- and he was in the front seat, that

23   probably somebody in the back seat might have done it,

24   well, yeah, if they came in and identified somebody,

25   well, yeah, then I'd be suspicious of their

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    identifications.  So in -- every -- every instance is

2    different.  Every circumstance is different.  You have

3    to weigh it, you know?  If I -- if a person who I find

4    out is 95 percent blind is identifying somebody from a

5    block away, well, yeah, you may -- you may question that

6    or have a concern about that identification.  But again,

7    that would all have to be presented and looked at by

8    people beyond us, being prosecutors, defense attorneys,

9    judges, and juries, et cetera.  You know, it -- it's --

10   you know, the veracity of that identification.  So an

11   individual -- so every circumstance is different.  You

12   have to weigh it.  So just to state that I had concern -

13   - yeah, sometimes I'm sure I probably did, but other

14   times --

15        **Q.   If you felt --**

16        A.   But other times, no.

17        **Q.   If you felt that a witness had a very limited**

18   **opportunity, just a matter of a few seconds to witness a**

19   **shooter, were those the type of circumstances that would**

20   **raise concerns about the witness's ability to make an**

21   **identification?**

22        A.   No, not necessarily.  Again, because --

23        **Q.   What about the past -- I'm sorry, go ahead.**

24        A.   That person came in and was very sharp on

25   their identification and explained that, no, this is the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

40

1   guy, 100 percent, they're not waffling, they're not

2   guessing, they're not -- you know, some people -- again,

3   you know, not a scientist, not a doctor, but -- you

4   know, you hear about people that have near photographic

5   memories, you know, where they can remember things that

6   they get -- and again, it's the -- if -- if I saw you in

7   an instant shooting somebody, even though it was an

8   instant, well, I've met you before, I know you, so the -

9   - the -- the momentary time is not as -- as crucial.

10      Q.   So were you trained as -- when you were a

11  detective, or as a sergeant overseeing detectives, about

12  the difference -- about differences in the reliability

13  of identifications of familiar suspects versus

14  strangers?

15      A.   I -- I'm sorry, can you repeat that?  I missed

16  the first part there.

17      Q.   Yeah.  Were you trained at all when you were a

18  detective or a supervisor of detectives about

19  differences in the reliability of identifications of

20  familiar individuals versus strangers?

21      A.   Not that I can specifically recall.

22      Q.   And if you had a stranger -- a situation in

23  which a witness was being asked to identify a stranger,

24  if they had only a few seconds to view that stranger,

25  would that raise concerns about their ability to make an

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   identification?

2       A.   No.  I mean, again, it's -- it's -- it's case

3   by case, person by person.  Everybody's different.

4       Q.   And in a stranger identification -- oh, I'm

5   sorry.  Go ahead.

6       A.   So you have to take the circumstances.  It

7   could have been dark out, no lights, and he saw him in

8   an instant.  Okay.  It could have been bright lights,

9   you know, sunny day, and the suspect had very particular

10  features or whatever.  So you have to look at each case

11  differently and individually.  And again, if the person

12  came in and made an identification, that -- that is not

13  for me to -- my -- my report, my documentation, and it

14  confirms that, is that an identification was made, and -

15  - and then somebody else who would then either review

16  the case or charges or present the case in court or a

17  defendant can, you know, look at it and then try to

18  determine further the weight that they're going to put

19  on that identification.

20      Q.   And then would the -- in the case of a

21  stranger identification procedure, would you have -- did

22  you have any concerns about the ability to make reliable

23  identifications with the passage of time?

24      A.   Again, you'd have to look at it case by case.

25  You know, it could be a total stranger, but he looks

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1    just like my father.  The guy just looked like my

 2    father.  Well, I'll remember that face because I have a

 3    reference for that person.  You know, if -- so, again,

 4    case by case, individual by individual.

 5         Q.   When you were -- when -- were you trained that

 6    when -- well, strike that.  In 2002, when you were a

 7    sergeant supervising detectives, what was your

 8    expectation of what detectives would say to the

 9    witnesses when they viewed photo arrays before they

10    showed them the photos?

11         A.   Well, I would expect them not to be suggestive

12    in any way and say anything that may be suggestive or

13    may lead to the identification of an individual, and

14    also just to let the person know that a suspect or an

15    offender may or may not be in that photo spread shown to

16    them.  So you don't want somebody thinking, hey, the

17    guy's in there, you know, because then they're looking

18    hard, looking hard, looking hard, thinking the guy's in

19    there.  You got to let them know he may or may not be in

20    there.  And you don't want any -- them to suggest

21    anything.  You know, you want to say maybe the guy had

22    an afro at the time, before you show the photos, and

23    then you're showing one guy with an afro in there.  You

24    know -- you know what I'm getting at?  So you -- you

25    would want them, and I've never seen anybody do other

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    than that, where it was -- you -- you just want to leave
2    it an unbiased, unprejudiced photo spread or lineup, you
3    know?
4        Q.   And so obviously you couldn't indicate who the
5    suspect was in the lineup or photo array, correct?
6        A.   Obviously.  Correct.
7        Q.   And you -- and if I'm understanding you
8    correctly, you were -- the detectives were not to
9    indicate that there even was a person who was the
10   suspect in the lineup; is that correct?
11       A.   Correct.  They should just be showing the
12   witness or the victim photos and -- and letting them
13   know that the -- a -- a suspect or offender may or may
14   not be in there.
15       Q.   I see.  And that's true for both lineups and
16   photo arrays, correct?
17       A.   Correct.
18       Q.   And so what they'd be saying to them is
19   something along the lines of, do you recognize anybody,
20   or does anybody in these photos look like the person you
21   may have seen?  They may or may not -- person may or may
22   not be in this photo, do any of these people look
23   familiar?  Something like that.
24       A.   Along their lines, something like that.  Yeah.
25       Q.   And then if an individual makes an
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   identification, was there any expectations of what the

2   detectives were to say to those witnesses after they

3   view the lineup or photo array?

4       A.   As far as --

5       Q.   Yeah.  Like, were detectives expected to ask

6   them, you know, are you confident?  Are you sure?  Are

7   you certain?  How certain are you?  Those kinds of

8   questions.

9       A.   You can, sure.  If somebody runs up to the

10  glass and pounds on it and yells out, "That's the guy,

11  that's the guy" and falls to the floor and passes out, I

12  don't think you need to ask those questions.  If

13  somebody says number one, then you may ask, look, how

14  certain are you?  I'm certain it's number one.

15      Q.   Well, were detectives expected to essentially

16  try to get some indication from the witness, either it's

17  obvious from their behavior, or ask them verbally how

18  confident they are in their identifications?

19      A.   Again, they could ask or they could leave that

20  for the state's attorney to ask, you know, who -- who

21  may be reviewing the case, given if it's a felony or

22  not, you know, how confident are you, you know?  But

23  yeah, I mean, you -- at some point that would be

24  clarified either by the detectives or by the state's

25  attorney or -- or -- you know.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.    I think yesterday you indicated that anything
that's done during the course of the identification
procedure, for example, the lineup, if you have the
individuals repeat a certain phrase, or if you have
them, you know, turn a certain direction, you know,
whatever it is, that might be relevant, you know, to
help the witness in the identification procedure, that's
to be documented, correct?

A.    Correct.  Anything that's -- yes.  You know,
like, there's times we had tall guy and you couldn't
find tall fillers, so you had everybody seated.  So you
would state that.  You know, all participants were
seated.  If you had like -- again, like if you had like
a sexual assault, and during the sexual assault, the --
the -- the male or whatever was talking to the female,
or said certain words, you may have them speak those
words and -- and see if -- maybe even in addition to a
physical, or they -- they might have, you know,
identified -- you may also have them speak, the words,
so they could say they identified physically and then
they also identified by voice.

Q.    Okay.  And similarly --

A.    Or here's a voice, you know, the guy's got a
mask on, but he's talking to him the whole time, and it
may be just you having them speak, you know, because

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Tre Roberson 30(b)(6) Deposition - Volume II, taken on June 20, 2024

```
 1   there was no view of his face, and identifications can
 2   be made that way.  Again, you would document that, and
 3   the weight on that identification would be determined
 4   later.
 5        Q.   And so basically, those kinds of
 6   identifications, voice identifications, other procedures
 7   like that, as long as you're documenting that that is
 8   what you did, you can do that?
 9        A.   Correct.  Correct.  Depending on the case.
10   Like I said, all circumstances, cases are all different,
11   and you do the best you can based on the circumstances
12   in the case.
13        Q.   If witnesses indicated that they were
14   uncertain or not sure in an identification, did that
15   need to be documented?
16        A.   Correct.  I mean, there's times where people
17   say, you know, it looks like that guy, looks like that
18   guy.  Well, how sure?  Well, I'm not -- you know, I'm
19   not sure, I'm not 100 percent, but I think it's that
20   guy.  And that's exactly how you would document it, as
21   --
22        Q.   That wouldn't be documented as they made a
23   positive identification, that would be documented as
24   person indicated that this person looks similar, it
25   could be this person.  Something that indicates that
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

 1   it's not a certain identification, but a tentative

 2   identification, fair?

 3        A.   Yeah.  Looks similar, could be, possibly from

 4   the people in the lineup, it -- he looks the most, the

 5   closest, whatever the words are.  And some guys use the

 6   word, it was a tentative ID, and then they would let the

 7   witness explain that, either to state's attorney or, you

 8   know, anybody else that would ask later on --

 9        Q.   But in that kind of a situation, you got to

10   document either that it was a tentative ID, or that the

11   person said it looks like the guy, could be the guy, but

12   not say they positively identified this person, fair?

13        A.   That's fair.

14        Q.   Okay.  And just like tentative IDs -- well,

15   strike that.  And if the witness indicated that they

16   were certain in an identification, that should be

17   documented too, correct?

18        A.   Well, I don't know if you'd have to write down

19   that he said he was certain, but that would be a

20   positive identification.  And then he can fill in the

21   words if asked later by state's attorney or anybody else

22   where he says, "I was certain, I was positive, I'm --

23   I'm -- I'm -- without doubt it's him," et cetera, et

24   cetera.  I don't know you have to -- sometimes guys

25   would document exactly what the -- the witness stated,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  you know, quoting them and -- but it's not necessary
2  that you do that.
3      Q.   And if you indicated, you know, if a witness
4  falls over and passes out, because they're so certain,
5  you know, this is the guy who did this to me, or, you
6  know, did this to my friend, that's the kind of thing
7  you'd document?  Something that indicates --
8      A.   I -- I would, because that would indicate, you
9  know, the -- the -- the certain belief for that person
10 that that is the guy.  I mean, if there was the -- those
11 extra, you know, pounding on the glass, passing out, I
12 would have documented.  But again --
13     Q.   And I have --
14     A.   -- they come out, they -- it was a positive,
15 and when asked later, he'll remember or something that,
16 yeah, the guy passed -- or woman screamed and passed
17 out.  So you -- it's not required that you write it that
18 way because that one there would be considered positive.
19     Q.   And you mentioned the idea of not having
20 suggestive photo arrays or lineups.  And what do you
21 mean by suggestive?
22     A.   It could be a thousand things.  I mean,
23 there's many ways where -- I mean, let's take the
24 extreme --
25     Q.   I don't mean to go through all the myriad

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    **ways, and I --**

2        A.    But -- but where you -- you're -- the photo or

3    the physical lineup, just by the way it's set up with

4    the type of individuals, points towards the one -- one

5    individual.  So, for example, you have a 7' tall

6    offender, and all your fillers are 5', and the witness

7    stated he was seven foot tall.  It's not like she saw

8    him in a car, okay?  Or, you know, let's take the

9    extreme where you have a male White offender and you put

10    him in there with four African Americans.  Well, again,

11    that's an extreme that would never happen, but that's

12    what -- you're suggesting it.  Or say at the time of the

13    crime, a witness had described the individual and stated

14    what he was wearing a -- a -- a yellow guayabera, you

15    know, a Hispanic type shirt.  And now you get your

16    suspect in there and he's wearing the yellow guayabera,

17    and he's the only guy in there wearing it.  Well, no.

18    Either you get him a different shirt, or have the other

19    guys wear the same shirt he's wearing.  So there's many

20    things you have to look for. You know, they used to say

21    age, race, gender.  You can't say that.  I can get four

22    guys that are exactly 50 years old, they're male Whites,

23    doesn't mean anything.  You know, one of them could be

24    way overweight, one of them -- so it's the physical

25    thing. You can have a -- an individual that looks like -

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    - like he's female.  Well, you can't put four distinctly
 2    male- looking guys.  So your gender's not right.
 3    However, you know, you -- you -- you know, you have to
 4    get maybe females in there because, when you look at it,
 5    it -- it would be more -- it would be a better lineup
 6    that is not leading somebody's eyes to one person in
 7    particular.  You know, you're -- you're now giving them
 8    an even -- you know, on -- on an even field when they do
 9    that lineup, as best as is possible.  You know,
10    sometimes -- like, again, you can have -- we had a -- a
11    short person as an offender.  Well, it's going to be
12    hard for you to find four, you know, very short people
13    for lineups, so you may have to accommodate that by
14    trying to have them seated or whatever -- the best you
15    can do.  So again, it gets back to as best as it's
16    possible, you know.  But yeah, not suggestive, and it's
17    by looking at it, determining, again, maybe the offender
18    had glasses, but you don't want one guy in a lineup
19    wearing glasses.  You should put glasses on everybody
20    else.  Or a prison jumpsuit.  You get the guy out of the
21    joint, he's wearing an orange suit -- jumpsuit?  Well,
22    because that's the way he came, you can't just throw in
23    a lineup that way.  He's going to stand out, you know?
24    So you have your jail jumpsuits, or you give him
25    civilian clothes.  I'm sorry --
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

51

Q.   I think the example -- I think the language
you just used was -- so -- what -- part of the idea is,
you don't want one person to stand out.  That's the kind
of thing that makes a lineup suggestive, fair?

A.   That's possible.  Correct.  You can have
different --

Q.   And --

A.   -- people, but there's no thing that's just
one guy jumping at you for -- out at you for one reason
or the other.

Q.   And if I think you cut out for a second for
me, but you used an example of, you know, witnesses say
the suspect had a distinct style of yellow shirt.  In
that example, if you have your suspect, you arrest him
and he's in a yellow shirt, he should either not wear
the yellow shirt, or you should put everybody in yellow
shirts.  Did I understand that correctly?

A.   Well, it doesn't necessarily have to be
everybody, but you can have, you know, a few other guys,
so it doesn't jump out at you.  You know what I mean?  I
mean, that would be the ultimate, if you could.  And
it's all -- all of this is when possible, to the best
you can.

Q.   And then similarly things -- I mean, that
could -- this is -- let's use the height as another

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   example.  You got a tall suspect, you don't want to have

2   a bunch of short fillers, or if you do, you need to have

3   them all sit down.  Fair example?

4       A.   Sure.  To try to level the playing field as

5   much as is possible.

6       Q.   Same thing with hairstyles.  If the witness --

7   if there's eyewitnesses say that the person had an afro,

8   you can't have a suspect who's wearing an afro, and a

9   bunch of fillers who aren't -- who don't have afros

10   there.

11       A.   Well, on that one there, you'd have to look at

12   the amount of time that has progressed, too.  You know,

13   if -- if it's two days after the crime, and they said

14   the individual had an afro, and again, you -- you get

15   your suspect and he has an afro, and he's the only one

16   in there, then no.  And vice versa, you know, if he --

17   could have shaved his head.  So -- you know, but there -

18   - my point being is, you may have short -- short hair

19   today.  If we find you years later, your hair may be

20   longer than what they described at the time.  So you

21   know, it's -- you have to look at the totality of it

22   all.

23       Q.   I guess in that example, maybe I'm confused.

24   In that example where the witnesses described somebody

25   with an afro, and then you pick up your suspect, you

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 know, two weeks later, and he's -- and he's bald, in

2 that example, do the fillers need to have afros, or

3 should the fillers have -- be bald like the suspect?

4     A.    They can all be bald, because now everybody in

5 there is -- is level -- is similar.

6     Q.    Okay.

7     A.    Or if you have two with afros and she still

8 picks out the short hair guy, that makes it even

9 stronger in my mind because it wasn't just going for a

10 person with an afro.  But then, if it's a shaved head,

11 then everybody would -- you know, can have everybody

12 with shaved head, or not.  You know --

13    Q.    I think -- so putting aside the change of, you

14 know, hairstyle or necklace or whatever, the idea is, if

15 your suspect has an afro, you should have fillers who

16 have afros, or if your suspect is bald, you should have

17 fillers who are bald, fair?

18    A.    As best as possible, and again, depending on

19 the case, depending the amount of time that has gone by,

20 et cetera, et cetera.  So if -- again, he could have --

21 if he had an afro, you know, and has shaven and time has

22 changed, it changed.  If the guy had short hair and she

23 says he had short hair, but months have gone by and he

24 could now have long hair, well, you know, you don't have

25 to have short-haired people in there, you can -- you

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    know what I'm saying?  You can have -- as long as they

2    look all similar in that lineup.  So you can have

3    long-haired people in lineup, even though, at the time

4    of the offense, she said short hair because that's what

5    he's got.  It's best to have --

6        Q.    I think that's what I'm getting confused --

7        A.    -- similar hair as best as possible.  And if

8    you say that he has long hair, but you put short hair in

9    there, then that's like the opposite.  That's like

10   you're even pulling away from him, and if they still ID

11   him, then it's -- it's -- it would make it even a little

12   bit of a stronger identification, because they avoided

13   the long hair and went to the shorter hair.  So they

14   identified it by other features.

15       Q.    So are you saying, with the passage of time,

16   that if the suspect has an afro, that everyone else

17   should have an afro as well, or you should try to have

18   other fillers with afros, but if the time passes, then

19   you could have your suspect stand out as being the only

20   person with an afro?  I think I'm misunderstanding you.

21       A.    I'm not saying that at all.

22       Q.    Okay.  So -- okay.  So putting aside the

23   examples where somebody -- all I'm saying is, am I -- am

24   I -- am I understanding you correctly that, if your

25   suspect has an afro, you should try to have fillers who

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1 also have afros; is that fair?

2     A.   He has an afro while he's standing in the

3 lineup.

4     Q.   Yes.

5     A.   -- you should have similar characteristics as

6 best as possible.  Correct.

7     Q.   Okay.  And similarly, if that suspect, even

8 though the witnesses originally described somebody with

9 an afro, if your suspect, when you pick them up, is

10 bald, you should have fillers -- you should try to have

11 fillers who are also bald, fair?

12     A.   Well, wouldn't a lineup with two guys that are

13 bald and three with afros be even a better lineup?

14 Because it's not -- it's -- it's the opposite of being

15 suggestive.  You're actually pulling away from your

16 offender then, and you would have their eyes go -- if

17 they were uncertain, their eyes go more towards the

18 persons with afros.  So that would kind of be the other

19 way around.

20     Q.   So you're saying you could actually -- I guess

21 what I -- that's what I'm trying to understand.  You're

22 saying in my example, if your suspect comes in -- if

23 your witnesses describe somebody with an afro, but when

24 you pick up your suspect, he's bald, you're saying it's

25 okay to have a lineup in which the suspect is bald and

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

56

1    all the fillers have afros?

2         A.   No, that's not what I'm saying.  I'm saying --

3    I'm just saying, hypothetically, you can argue that that

4    would be -- but I would never do one different than the

5    rest.  And again, it's as best possible.  What -- what -

6    - what is available, what is available in the lockups,

7    who will you get on the street to volunteer? There's

8    times we couldn't get a good filler in the lineup -- or

9    in the lockup, or volunteers, and we had to ask police

10   officers to don civilian clothing or whatever to -- to

11   do that.  So you do the best possible to make -- to

12   match that everybody in the lineup looks similar and is

13   not unduly suggestive in any -- you know -- as best as -

14   -

15        Q.   I think you described -- so you -- if you have

16   somebody who has, like, a distinct tattoo on their face

17   or a distinct feature on their face like that, for --

18   that's a tough one, but what you'd have to do in that

19   situation is you'd have to have fillers -- you'd have to

20   have everybody sort of wear a Band-Aid or a tape

21   covering one part of their face, something like that,

22   right?  How do you handle that kind of situation?

23        A.   Well, if you had -- you know, common thing is

24   the teardrops under their eye.  So if you have an -- you

25   know, a witness says, yeah, the guy -- so-and-so, this

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  height, this weight, Hispanic, teardrop under his left

2  eye, you don't want to put your suspect who, if in fact

3  he has a teardrop under his left eye, be the only guy

4  with a teardrop under his left eye.  So either you can

5  pen in teardrops on the other guys, or you put a

6  Band-Aid over -- under everybody's left eye, so that is

7  not an -- you know, they're all then wearing a Band-Aid

8  and there's -- you can't tell anybody with a tattoo or

9  not.

10      Q.   In other words, that's how you'd make sure

11  that one guy doesn't stand out?

12      A.   Correct.

13      Q.   Okay.  If you had somebody who was handcuffed,

14  then either everybody should be handcuffed, or nobody

15  should be handcuffed?

16      A.   That's correct.

17      Q.   If you had -- well, I -- that -- I think that

18  explains it.  And then I think you -- I don't want to go

19  into details.  I think this one we did talk about at

20  your prior deposition.  But regardless of the result of

21  a photo array or a lineup procedure, whether it's a

22  positive ID or a negative ID, it should be documented,

23  correct?

24      A.   And a photo array was shown, that is correct.

25  And --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       Q.   And if a lineup was shown also -- you're
2   cutting out, so let me try it again.  Sorry.  And let me
3   do it separately, just so that it's clear.  If a photo
4   array is conducted --
5           THE WITNESS:  Just lost him.  Think he might have
6           hit his --
7           THE REPORTER:  Should I take us off the record?
8           MR. STEFANICH:  Yeah.  We're going to take a
9           bathroom break anyways, so --
10          THE REPORTER:  Okay.  We're off the record.
11             (OFF THE RECORD)
12          THE REPORTER:  We're back on record.
13  BY MR. SWAMINATHAN:
14      Q.   Okay.  Mr. Wojcik, the -- for photo arrays in
15  particular, as of 2002 at the time of the Sorrell
16  investigation, you had the ability to get photos from
17  the ICAM system, correct?
18      A.   I believe so, yes.
19      Q.   In fact, I think on Tuesday, we talked about -
20  - we were talking about the Jackson case involving an
21  investigation in 2000 and 2001, and in that case, there
22  was the use of ICAM photos, fair?
23      A.   Right.  Yes.
24      Q.   Okay.  So in 2002 -- so can you just explain
25  for -- just so I understand, in and around the time of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    the Sorrell investigation in 2002, what were the tools

2    that were available to homicide detectives for purposes

3    of gathering photos for a photo array?

4         A.   Well, you had -- at that time, I believe you

5    could still get photos from Ident, you know, either a

6    black or white on an emergency basis, or a color that

7    you can order ahead of time, which would be CB photos.

8    The ICAM I believe was still -- obviously, that was

9    still going.  I don't know about the CRIS system, if you

10   were able to pull the photos on that yet or not, I'm not

11   sure.  You had -- if need be, and you had no photos, no

12   arrest record on somebody, you could try for a driver's

13   license photo.  And then other photos if -- that you ran

14   around there, you can -- if, say, a witness had personal

15   photos of somebody, then you'd have to, you know, resort

16   to using those.

17        Q.   And then was there also photos that were kept

18   in the detective divisions, or in the tact or the gang

19   teams of --

20        A.   Mostly.  Yeah.  Not most of them, but some of

21   them had, you know, gang photo books.  And obviously you

22   can try other jurisdictions, other law enforcement,

23   county, IDOC, stuff like that, if needed.

24        Q.   But you mentioned the gang photo books, so you

25   could pull photos out of those books to use in a photo

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   array; is that right?
 2        A.    No.  I mean, I -- I -- technically the way we
 3   did it was we would just show that book.  So most of the
 4   books that were utilized in that fashion were -- had
 5   multiple pictures per page, and multiple pages in the
 6   book.  So there could be, you know, 600, 700 photos in
 7   that particular book.  So if you were, say, at a loss
 8   for anything, and you were showing a gang book because
 9   somebody said they might be Cobras, you might show a
10   Cobra book, say, and let them page through it, you know?
11   So you wouldn't have to, excuse me, take the photos out
12   of there necessarily.  But now if they said Pookie, a
13   Cobra from, you know, Potomac and Lemoyne, and you had
14   Pookie from Potomac and Lemoyne in there, and you wanted
15   to temporarily pull it out, use it in a spread, I don't
16   see -- you know, there was no rules or -- saying you
17   can't do it.  However, you'd have to maintain that book
18   by putting that photo back in there at some point.  So
19   to say you can't pull it out or you could, you know, you
20   would try not to.  I would try not to personally because
21   I want to maintain the integrity of that book as it had
22   been.  It might have been used prior by somebody else,
23   and -- for purposes of that. So you could, you know, but
24   it wasn't a -- a lot of times there wasn't a need to
25   pull it out.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q.    Okay.  And you just referenced Ident.  You

2  could ask Ident for photos.  Ident means the

3  identification section, correct?

4     A.    Correct.  I mean, if you were able to get -- I

5  mean, you usually go to the easiest -- whatever your

6  quickest source is, or fastest way for either was with

7  Ident.  You normally -- I believe so at that time, you'd

8  have to put a request, in a written request, put it in

9  the mail, wait for them to receive it, wait for them to

10 fill it, and then send it back to you.  In extreme or

11 emergency circumstances where you had no options, say

12 you did everything, I couldn't find it on ICAM here, but

13 I think Ident has one, but we need it tonight, you know,

14 our witnesses are here, this guy might kill somebody

15 else or shoot somebody else or flee to Mexico or

16 whatever, where we can't get our hands on them, then,

17 you know, there was times where we can then have our

18 commander contact Ident commander or whatever, and have

19 somebody come in, and it would be a black and white.

20 They'd have to print out a black and white one from the

21 old film system.  So you normally would go with, you

22 know, if you find one, no matter what it is, you know,

23 if you find one in a gang book, if you find one, you

24 know, else -- usually the first one you find or the

25 easiest one for you to -- to work with is what you

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    probably go with, you know, even though you may be able

2    to wait a few days or find it on another system, if you

3    found it somewhere, you can use that.

4        Q.    And then you mentioned -- and obviously you

5    talked about ICAM.  ICAM basically was a database that

6    had arrest photos for individuals.  It was full of the

7    arrest photos for everybody who'd been input into the

8    ICAM system, fair?

9        A.    For people put into the system.  Correct.

10       Q.    So by 2002, there would've been, I mean,

11   definitely hundreds, but more likely thousands of photos

12   in the ICAM system, fair?

13       A.    I'd have to -- I -- I couldn't say.  I don't

14   know when they started putting them in there.  But I --

15   I imagine they tried to go backwards and put people that

16   were arrested prior, but I couldn't say how many were in

17   there.  But yeah, I would probably assume there would be

18   thousands in there.

19       Q.    And in the ICAM system, could you select, you

20   know, I'm looking for some -- I want photos of

21   individuals who are Black or Latino or White, you could

22   pick filters that you wanted about the individuals,

23   correct?

24       A.    At -- at a certain time, I'm not sure, you

25   know, if initially you could do that or you were just

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    pulling people up and say you had an -- an IR name or

2    whatever, and you pull the photo up where, if you'd have

3    to just try to pull more up or if you -- if they had

4    those filters.  But they did at some point where you can

5    then assemble one based on whatever filters you would

6    use.  And I don't know exactly when that evolved or not,

7    you know, I -- I couldn't say with specificity.

8         **Q.   Can you say as of 2002 whether that existed or**

9    **not?**

10        A.   I can't say for certain.

11        **Q.   What's your recollection of whether you had**

12   **that capability as of 2002 in the ICAM system?**

13        A.   Well, I -- I'm not certain.  I -- I believe we

14   -- we may have, but as I sit here right now, I -- I -- I

15   can't be certain.

16             MR. SWAMINATHAN:  Okay.  I'm going to show you a

17             document on my screen.  We'll mark it as Exhibit

18             1. Just pull this up.

19                  (EXHIBIT 1 MARKED FOR IDENTIFICATION)

20             MR. STEFANICH:  Is this one of the exhibits that

21             was sent to us?

22             MR. SWAMINATHAN:  Yes.  Let me find it.

23             MR. STEFANICH:  We have them printed out, so --

24             MR. SWAMINATHAN:  It is -- trying to get it moved

25             so I can see it.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              THE REPORTER:  Should I take us off while we wait
 2              for him to hop back on?
 3              MR. STEFANICH:  Sure.
 4              THE REPORTER:  All right.
 5                  (OFF THE RECORD)
 6              MR. SWAMINATHAN:  I apparently really like
 7              kicking myself out of this system.  Sorry.
 8              THE WITNESS:  It's all right.
 9              MR. SWAMINATHAN:  All right.  What did I do?
10              Okay.  This is the -- this is City JF 190, Brian,
11              and I'll show it on my screen, but if it's easier
12              for him to look at it on paper, that's fine, too.
13              MR. STEFANICH:  Excuse me a second.
14    BY MR. SWAMINATHAN:
15         Q.   Okay.  Do you have it in front of you,
16    Mr. Wojcik?
17         A.   Yes.
18         Q.   Okay.  I'm showing you a document I've marked
19    as Exhibit 1.  It's City JF 190.  At the top, it says,
20    "Request for Identification Photos, Chicago Police
21    Department."
22         A.   Correct.  This --
23         Q.   Is this a form that's -- or a document that's
24    familiar to you?
25         A.   Yes.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   Okay.  And what is this, what is a request for

2  identification photos?

3    A.   It would be a request that we would send down

4  to Ident for their arrest photos, you know, CB photos,

5  central booking photos.

6    Q.   And so this was a -- the form you basically

7  fill out as a detective and you could send it -- you'd

8  send it into the identification section and then they

9  would send back photos for whoever you'd requested,

10  right?

11    A.   Well, like I stated earlier, you'd use this

12  form and like here it says, request for color.  So then

13  you would send that one in the mail because those would

14  not be done on an emergency basis.  You'd send it in,

15  wait for them to send you the photos back in the mail.

16  So McDonald would send this to Ident.  Ident would get

17  it, they print out the color photos for the IR number

18  given, and send it back to McDonald.  Now, if you see

19  the other boxes, what I was talking about, where it's

20  kind of an emergency and you're waiting for them, you

21  could -- you could also hand carry this down.  Again, if

22  your lieutenant, sergeant, commander, whatever had made

23  contact with Ident and said, hey, look, we need the

24  pictures right away, have somebody come in.  I'm going

25  to send, you know, the -- the detectives or whatever who

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   was requesting it would go down with this form with that

 2   emergency box checked and hand carry this down to Ident

 3   to get those photos immediately if they could.  There

 4   was not -- I mean, they frowned on us doing that unless

 5   it was a -- a real emergency.  I'm sorry.

 6        Q.   And then in this example, they're going to

 7   pull the arrest photos for, in this case, an individual

 8   named Fletcher Clinton based on that IR number 08231415,

 9   it looks like, correct?

10        A.   That's what it looks like.  Correct.

11        Q.   And so they, in that instance, they would --

12   they pull just one arrest photo or all of the arrest

13   photos associated with that IR number?

14        A.   Normally you'd get -- I -- I -- I remember

15   they never sent them all and I don't know if they, you

16   know, again, human nature, you would think that they

17   would probably send you the most recent.  The other

18   thing you can do is, if you wanted a certain photo, you

19   know, you'd have to then go down and ask them for a

20   certain CB.  But I don't remember them, you know, if a

21   guy was arrested 30 times sending you 30 different

22   photos.  They would send you the, you know, you'd

23   probably get maybe like two -- two or three color

24   photos, usually the same CB.  Like here, he has

25   specified he wants four copies.  If you look at request
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**KENTUCKIANA**
COURT REPORTERS

```
 1   for color and then it says four copies.  So he is asking
 2   to send him four copies of -- of the Fletcher Clinton.
 3       Q.   Okay.  Let me show you another -- you can put
 4   that one to the side.  Showing you another document I've
 5   marked as Exhibit 2.  This is City JF 98 and 99.
 6              (EXHIBIT 2 MARKED FOR IDENTIFICATION)
 7   BY MR. SWAMINATHAN:
 8       Q.   Page 99 appears to be a arrest report; is that
 9   right?
10       MR. STEFANICH:  If you want to just give me a
11       second, I can get that --
12       MR. SWAMINATHAN:  Yeah.  You got it, Brian?
13       MR. STEFANICH:  Yeah.
14       MR. SWAMINATHAN:  Is that a yes?
15       MR. STEFANICH:  No, it's a no.
16       MR. SWAMINATHAN:  Okay.  It's a rap sheet for
17       Rogers if you're looking through mail to find it.
18       MR. STEFANICH:  All right.  He's got it.
19   BY MR. SWAMINATHAN:
20       Q.   Okay.  Looking at Exhibit 2, this appears to
21   be two pages.  Are these two types of documents familiar
22   to you on Pages 1 and 2?
23       A.   Yes.
24       Q.   What are they?  Are you looking at the
25   documents right now?
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.    Yes.

2    Q.    Page 1, what is that?  That's a -- is that a

3  criminal history or rap sheet?

4    A.    That's correct.

5    Q.    And then Page 2 is an arrest report, correct?

6    A.    That's correct.

7    Q.    Okay.  This particular case, these are for an

8  individual named Terry Rogers or aliases associated with

9  Terry Rogers, correct?

10    A.    Correct.  Yeah.  Terry Rogers, Fred Rogers,

11  Jimmy Rogers.

12    Q.    Okay.  And also it's all names or nicknames

13  for the same individual with a single IR number,

14  correct?

15    A.    Yes.  It's all by fingerprint.  It would be

16  under that IR 553789.

17    Q.    And these are documents that also come from

18  the identification section, correct?

19    A.    Correct.

20    Q.    Okay.  So when you make a request for --

21    A.    The arrest report doesn't come from the

22  identification section.  I mean, that would be filled

23  out by the arresting officer then sent to the

24  identification section.  So yes, you can later, you

25  know, request a copy of it.  Yes.  So --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q.   And in this particular case --

2      A.   I'm sorry, go ahead.

3      Q.   In this case, if you look at Pages 1 -- on

4  Page 1, near the top of the page, you can actually see

5  on my screen.  I can highlight it here just so you can

6  see what I'm pointing at.  There's this stamp on it. Do

7  you see where it says, "Issued on inquiry February

8  22, 1995"?

9      A.   Correct.

10     Q.   Okay.  What does that mean?

11     A.   My understanding of that is somebody called or

12  sent the form in, requesting it -- this individual's

13  arrest record as opposed to he was arrested,

14  fingerprinted, and they're sending this to the district

15  or whatever to attach to his court papers based on his

16  fingerprint, you know, having hit.  So this is --

17  appears to be somebody requesting the arrest record.

18     Q.   The detectives could call over to the

19  identification section or make another -- or make a

20  written request to the identification section to get a

21  copy of the arrest record for somebody, correct?

22     A.   Correct.

23     Q.   So this would be somebody in the

24  identification section sending it back to the detectives

25  in response to their request, correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.    Correct.  Like -- and this was like pre-CRIS

2  or pre-automated.  This is what we would have to do to

3  get that record.  You know, it wasn't available.  Ident

4  had them down there, paper copies, master copies. You'd

5  request it and then they'd send you four, you know,

6  daytime, their normal -- their normal business hours.

7  You'd run down there and fill out the form to request

8  the arrest record.  And then you may ask for a specific

9  CB or a specific arrest report based on the

10  CB.

11    **Q.    And then -- and similar, and so if you look at**

12  **Page 2 of the document, there's that same, February 22,**

13  **1995 issued on inquiry stamp, correct?**

14    A.    Correct.

15    **Q.    This would indicate that a request was made**

16  **for Mr. Rogers's criminal history, arrest history, along**

17  **with at least this particular arrest report, correct?**

18    A.    That's my understanding, correct.

19    **Q.    Okay.  And this -- the February 22, 1995**

20  **issued on inquiry, so that would be -- is your**

21  **understanding that's the date that the request was**

22  **fulfilled?  So the person who's stamping it is the**

23  **person in the identification section saying, "This is**

24  **the date I essentially fulfilled the request from the**

25  **detective"?**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 73 of 326 PageID #:7043
The Deposition of MARTIN WOOTEN, taken on June 29, 2024

71

1    A.   Well, I can't say that, you know, somebody
2    there stamped it, but my assumption and my belief is
3    that, yes, they would say that the request or the
4    issuance of that request was on that date and they stamp
5    it and then forward it or hand it to the detective if he
6    was there or forward it by mail.
7        Q.   So the -- so -- but just -- I guess maybe let
8    me break it down.  The stamp that's put on this issued
9    on inquiry that -- the detective division doesn't stamp
10   these, correct?
11
12
13   A.   That's correct.  Not -- I've never -- not to
14   my knowledge, they -- we never did.  No.
15       Q.   Okay.  So the stamp is being put on there by
16   the identification section?
17       A.   That's my belief.  Correct.
18       Q.   And then the identification section -- how
19   long did it usually take the identification section to
20   fill these kinds of requests?
21       A.   Well, again, you know, if it's their normal
22   business hours, it was for the most part civilians
23   working there and there were some officers that were
24   assigned there.  It -- it would be normal hours.  So
25   like maybe on second watch, you know, if you wanted to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  jump in a car, take your request form, go down there and
2  request it, then you might be able to get it right away.
3  If you do it by mail, there's no -- you know, it could
4  be, you know, human nature, maybe the -- the -- the mail
5  guy didn't come to the area and pick up the mail pouch
6  that day.  So it might be a delay there. You know, it
7  was mostly done by interdepartmental mail. So then when
8  they get it, depends on how they, you know, did they
9  fill it right away?  Did they get to it right away?  Did
10 they send it out back right away?  So you can get it
11 quickly or it may be a -- days before you get your --
12 your thing back.  So like I said, if you want -- if it's
13 something you wanted and you felt you needed the
14 information faster, you are working on a case and you'd
15 run down there or have another detective, you know, if
16 you were busy with something else and you needed some
17 assistance, ask somebody else to run down there and get
18 it for you.
19      Q.   And I guess that was my question.  I had --
20 I've had a lot of detectives testify, you know, it would
21 take often months for us to get firearms testing results
22 back, right?  You get --
23      A.   Oh, that's different than this.
24      Q.   Yeah.  That -- that's why I was asking.  So is
25 this one where -- so identification section was --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    A.   As you know, at state lab, there was rape kits

2  that weren't being done for years.

3    **Q.   Yeah.**

4    A.   So this is totally different.  This is the

5  identification section, so they -- it's different. It's

6  just paper, you know?

7    **Q.   Okay.**

8    A.   Back then they had the master arrest reports.

9  There's nothing on a computer.  It was all paper, you

10  know.  So basically when somebody would get arrested,

11  they'd sit down with a typewriter and type this

12  information in, you know, who arrested him or what

13  district, et cetera, et cetera.  And it -- and then they

14  put that back in the file and sometimes it would get

15  updated with the results of the cases, et cetera, as

16  they became aware.  But if that paper copy got lost,

17  well, good luck.  But anyway, so then you go there,

18  they'd go into wherever their filing system was, the

19  boxes, whatever they had, they pull that one out and

20  they'd make you a copy of it.  That's the way, you know,

21  before computerized system, that's the way it was done.

22    **Q.   So this wasn't a -- this was a type of**

23  **document from identification section where you could get**

24  **it -- you could get a response back to them pretty**

25  **quickly?**

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.    Again, depending on the watch and depending on

2  if they're there, you know, and the manpower, but you

3  could if it's like a photo, it would be an emergency

4  basis.  But in the -- in after hours, you -- you'd

5  probably have to wait until they show back up for work,

6  close to second watch, right?

7    **Q.    So typically you'd be able to get it back the**

8  **same day or the next day depending on what the time of**

9  **day was?**

10   A.    No, not typically, no.  I mean, if, again, if

11 you went down there and it was at a time when they were

12 working and you -- you take the -- hand carry the

13 request down, then you should be able to get a copy

14 because they are there.  They weren't a 24-hour

15 operation.  You know, it was mostly civilians in there.

16 There were some officers in there, but, you know, it

17 wasn't 24 hours.  So - and if you sent it by mail, then

18 it -- it, you know, there is no set -- it could -- you

19 could get it back in a day or two.  It could be a week.

20 It could be two weeks.

21   **Q.    Okay.**

22   A.    You know, again, depends on who fills it out,

23 you know, how fast they fill it out, when they throw it

24 in the mail, is the mail pouch picked up, is it --

25 sometimes they -- you're supposed to come, you know,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  once or twice or three times a day to each unit to pick

2  up the mail pouch and it -- it's supposed to, but it

3  never really worked out that way, so --

4     Q.  So this one has if you see at the very top,

5  there's an indication that it was -- there was a -- it

6  was faxed.  It's cut off a little bit on this copy, but

7  it looks like the -- this was actually faxed back over

8  to the detective division.  Do you see that?

9     A.  I can't state -- I see something that says

10 Ident number, but other than that, I can't tell.

11     Q.  Okay.  But in the -- but could the

12 identification section also fax these back to the

13 detective division?

14     A.  I'm sure.  I probably could have.  Yes.  I --

15 I -- I believe so.

16     Q.  So in those instances, the document would've

17 been a written request would've been made through the

18 interdepartmental mail and then eventually --

19     A.  Or -- or possibly the written request faxed

20 there.

21     Q.  Okay.

22     A.  And then they received the fax and -- and send

23 it over.

24     Q.  Okay.  So you think that was another way to do

25 it is you could fax the request over and get it back?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.    Yeah, I'm not sure.  I know that I can state

2   that that was done.  I don't know if that became --

3   evolved into that, where we were able to do that, or,

4   you know -- I remember most of the time we were hand

5   carrying things down, if we needed it quickly, putting

6   it in the mail.  But now that you mentioned the

7   potential fax, I mean, I don't know if initially they

8   were doing it that way or if they wanted people to come

9   in with the original form, but eventually I think it

10   evolved, you know, where we were able to fax also.

11          MR. SWAMINATHAN:  Okay.  Okay.  We can put that

12          one to the side.  Brian, the next document I'm

13          going to show is the -- it's City JF 66 through

14          85.  I have it up on my screen here while Brian's

15          pulling that up.  This is City JF 62 and then 66

16          through 85.  And those are all the CAPS pages.  I

17          think there was a couple in the investigative

18          file, there was a couple documents that were

19          stuck in between there.

20          (EXHIBIT 3 MARKED FOR IDENTIFICATION)

21      THE REPORTER:  I'm sorry, did you say 62 before

22          66?

23      MR. SWAMINATHAN:  Yes.  62 and then 66 through

24          85, yes.

25      THE REPORTER:  Thank you.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    BY MR. SWAMINATHAN:
2         Q.   Okay.  You have that in front of you,
3    Mr. Wojcik?
4         A.   Yes.
5         Q.   Okay.  What is this document?  This is
6    obviously some computerized printout.  Can you tell me
7    what this is?
8         A.   Well, it looks to me like it's a juvenile
9    arrest records, copies of juvenile arrest.
10        Q.   Okay.  And how can you -- and what tells you
11   that it's juvenile arrest records?
12        A.   Well, pretty much in the top, it'll tell you
13   that.  It says these are -- there are five juvenile
14   records listed in this report.  And it reminds officers
15   about, you know, the restrictions regarding juvenile
16   records, et cetera, et cetera.
17        Q.   And this is a -- this appears to be some
18   juvenile arrest records that are being pulled out of an
19   ICAM system.  It says ICAM version 2.0.  Do you see
20   that?
21        A.   Yes.
22        Q.   Okay.  So this was something that could be run
23   in that ICAM system?
24        A.   Correct.
25        Q.   And then at the top, it says, near the very
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  top, it says, "LTS for Fletcher using."  Do you see

2  that?

3        A.    Yeah.  I don't know if that's ITS, LTS.

4        Q.    What's your understanding of what the --

5  what's being searched for here in this document, Exhibit

6  3?

7        A.    It appears like juvenile arrest records for

8  individuals with the last name of Fletcher.

9        Q.    Okay.  Oh, LTS could be last name or something

10 like that?

11       A.    That or name of Fletcher rather, whatever, but

12 Fletcher.

13       Q.    Okay.  And they're being specifically

14 searching for juvenile records, it looks like; is that

15 fair?

16       A.    That's what it appears, yes.

17       Q.    Okay.  So in that ICAM system, not only could

18 you -- could you pull photos, but you can also

19 essentially search the arrest history for, you know, for

20 people with certain names or those kinds of things,

21 correct?

22       A.    It appears that way, correct, at that time.

23       Q.    In the top left, it makes a reference to CAPS.

24 Do you see that?

25       A.    Yes, I can see.  Yeah.  It's kind of dim on



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    there, but I can see CAPS.  Yes.

2         Q.   And would it -- does that indicate anything to

3    you about this report?

4         A.   Just one of the police departments.  That's

5    the neighborhood -- neighborhood policing logo, and then

6    to the right, they do have Chicago Police also.

7         Q.   Okay.  And then this report, it looks like was

8    pulled on August 19, 1999 at 12:40 a.m., correct?

9         A.   That's correct.

10        Q.   Okay.  And then when a search like this was

11   done by detectives in ICAM to pull, you know, names like

12   this, what were the types of reasons detectives were

13   using this ICAM system to pull this type of information?

14   Like, what was it being -- what would it be used for?

15        A.   Well --

16        MR. STEFANICH:  Objection.  Form and foundation.

17        You can answer.

18        THE WITNESS:  I would say multiple reasons.

19        Probably one of them could be to identify an -- a

20        suspect.  Like here, if you're looking for

21        somebody, you know, with the first or last name

22        of Fletcher, you run Fletcher.  And then you

23        could come up with various Fletchers.  With

24        juveniles at the time, sometimes there was not a

25        fingerprint association between the many names

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          they were using.  So you may try to make

2          associations that way or -- and I'm not sure what

3          was searchable, you know, if, back then, if every

4          box here was searchable or not, I don't know, you

5          know.  So you know, could you go with an address

6          and search that out and see, you know, what

7          juveniles may pop up or it doesn't necessarily

8          have to be a juvenile.  It could be just the

9          record of an individual who now can be an adult.

10         But this is what they had when they were a

11         juvenile.  This was a record of when they were,

12         you know, that was recorded when they were --

13         when they -- when they were a juvenile.  So I

14         would say the number one reason is to try to

15         identify somebody where you're -- if you're

16         running a name, this particular name.

17    BY MR. SWAMINATHAN:

18         Q.   And then if you look at the bottom right-hand

19    corner of the document, there's basically just a page

20    number there.  The first one's cut off.  And then it

21    says 25, 27, 30, 18, 19.  Do you see that?

22         A.   I'm sorry.  Where are you at?

23         Q.   On the bottom right of each of these pages.

24         A.   Oh, yeah.

25         Q.   So it looks like a little page number there?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of MENTION WOUCFKY, taken on June 29, 2022

1    A.    Yeah.  I can't make it out on that first one,

2  but I do see on the, like 66, they have 25, 67 is 27, et

3  cetera, et cetera.

4    **Q.    Okay.  So basically, it looks like it's just -**

5  **- these are the pages of the printout, basically, right?**

6    A.    I don't know because you're jumping, you know,

7  you're -- you're going from 25 to 27 on 67 and you're

8  going to 30 on 68.  So I don't know that that's what

9  that is referencing, unless it's -- unless it is by --

10 okay.  What it may be is by the entry.  So for example,

11 on that first page, you know, you have two entries and

12 then the start of a third entry, or -- wait, you have

13 two entries -- or no, you have two entries.  So I don't

14 know if they're counting it that way by entry.  I don't

15 know if it's pages because it -- it kind of doesn't make

16 sense then.

17   **Q.    Okay.**

18   A.    Jumping, you know, you're having big jumps.  So

19 it might be by -- if you look at the separations

20 between, it -- it -- they may be counting it that way.

21 I'm not sure.

22   **Q.    Okay.**

23   A.    You know, like in 69 now we're back at 18.  So

24 you know, it --

25   **Q.    So you're just not sure what that -- what**

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**KENTUCKIANA**
COURT REPORTERS

1    that's indicating; is that fair?

2         A.    That's correct.  Unless, you know, these

3    things may be out of order or out of sequence and you

4    may have continuous numbers, but they're not in the pack

5    that way, in the packet I have, or starting out at

6    least.  Well, going further than they -- they do seem to

7    start going in order because they go on 69 to 18 and 70

8    is 19, 71 is -- can't tell, but it's probably 20.  72 is

9    21.  73 is 22.  So it may just be that these are out of

10   sequence and that is a page number.  I'm not sure.

11        Q.    And then in this case, so it looks like at

12   least one -- so the various names that came up in the

13   course of this search included Fletcher Clinton,

14   Fletcher Cobbs, and so on, correct?

15        A.    Well, I'm a -- I'm at 62, I have Fletcher

16   Williams.  67, I have F. -- Fletcher McClain.  And that

17   may be -- and then you have Fletcher McNeil.  You have

18   Fletcher Pugh.  You have Fletcher Gatewood, Fletcher

19   George.  So this -- this run may have been just with the

20   first name of Fletcher for individuals first name of

21   Fletcher, because that's what appears, not having gone

22   through all the documents, that you are now receiving --

23   everybody's receiving everybody in here has a first name

24   of Fletcher.

25        Q.    Okay.  And then the list that you would -- put

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   aside going through all the names, but it looks like

2   there's a lot more names than just five names in here,

3   correct?

4       A.   There's more than that.  And they appear at

5   this point to all be first name Fletcher.  So that was

6   probably, I would surmise again, just me, that the

7   search was for first name of Fletcher.

8       Q.   Okay.  And then it indicates at the top that

9   there are five juvenile records listed in the report.

10  You see that?

11      A.   That's what it says.  Correct.

12      Q.   Okay.  So this is -- so given that there's

13  many more than five entries in here, does that give you

14  an indication about, I think you said earlier that this

15  was a report that was run for on a juvenile search?

16      A.   Yeah, maybe it's just Fletcher first name,

17  juvenile and maybe they combined them.

18      Q.   Okay.  Okay.  So there could -- it could be

19  more than just a search of juveniles?

20      A.   It's possible.  If it says five juvenile

21  records, although usually they would not combine

22  juvenile records with adult, but maybe back then they

23  still were.  I -- I know there were separation at some

24  point made trying to keep juvenile records and stuff,

25  adult records separate.  So maybe at that time you were

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  able to go into ICAM and just run Fletcher period.  And

2  that might be why it does say five.  So maybe only five

3  of these are juveniles and five are -- unless that means

4  current adults.  Not sure.  So I don't know. Appeared to

5  be Fletcher and it gave them both or they could have run

6  Fletcher and -- and it gave juvenile records but for

7  people that are now adults, I don't know.  I'd have to

8  really go through this to determine that, but --

9       Q.   Okay.

10      A.   Here, the commonality here is running the

11 first name of Fletcher.

12           MR. SWAMINATHAN:  And then let me show you a

13           document I've marked as Exhibit 4.  Brian, this

14           is the printout, the criminal record search

15           printout.  It's City JF 86 to 96.

16               (EXHIBIT 4 MARKED FOR IDENTIFICATION)

17           MR. STEFANICH:  You got it.

18 BY MR. SWAMINATHAN:

19      Q.   All right.  Looking at Exhibit 4, what is this

20 document?

21      A.   This is a search off of a different database.

22 I believe it's the older database.  The same one that we

23 would use as Soundex or Secretary of State inquiries or

24 LEADS in NCIC.  I forgot the name of the particular

25 database.  On there, they were, where you see IR 65, it

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   looks like they were searching, I don't know, by name or
 2   whatever.  Again, probably a Fletcher, but this was on -
 3   - I'm trying to remember the name of the database. It
 4   was an older system prior to ICAM or CRIS.  And I think
 5   it was still somewhat active at the time or -- or still
 6   available to be searched.
 7        Q.   So that was going to be my next question.  So
 8   this is a similar type of search to what was in Exhibit
 9   3, correct?
10        A.   Right.  But it was a older, from my
11   recollection, would be the older database and I forgot
12   what we call that, but it was a -- I think the original
13   thing was, like, HD00.  And then from 00, you went to
14   other numbers, and then you can also search arrest
15   records on it.  I'm trying to remember what the -- the
16   name of that database or what we called it anyway.  I
17   don't know if it was the RAMIS database or -- well, it
18   couldn't have been just RAMIS.  RAMIS was the old case
19   reporting system.  So it might have been -- it was the
20   same database so that we can go in and run people for
21   driver's licenses or LEADS, stops, screening.
22        Q.   Okay.
23        A.   And also run, I believe, names and arrest
24   records and stuff.  I -- I'm not positive.  It's been a
25   long time.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   Okay.  And this was an older system than the

2    ICAM version of --

3    A.   I -- I believe, yes.

4    Q.   Okay.  And then -- so this would -- this

5    printout, do you know when -- does this thing, does it

6    indicate on here when this was print -- this was search

7    was done, or when this was printed out?

8    A.   Not that I can immediately ascertain.

9    Q.   And so is it your understanding that given

10   that this was the older system that this printout

11   would've been done at some point earlier than 1999 when

12   they were using the ICAM system at Exhibit 3?

13   A.   By an older and earlier system, I mean, it was

14   a system that predated ICAM and CRIS and all that, but

15   they -- they -- they could have -- it still up and

16   running when --

17   Q.   I see.  Okay.  It was still up and you can --

18   so they both were available.

19   A.   They could have used this, and then on the

20   same day, run something in CRIS.

21   Q.   I see.

22   A.   Because I -- I mean, you're going -- and --

23   and again, I -- like with CRIS and ICAM, once those were

24   established, I -- I don't know how far back they went in

25   inputting information from prior and previous arrests,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  and then if they went all the way back in perpetuity as

2  far as they could, and then the time it takes to do

3  that.  So, you know, they may have started CRIS, and new

4  arrests were going directly into there, and information

5  from new arrests.  But in the meantime, they were still

6  inputting past information as best they could into that

7  system.  So it looks -- it appears that this was a

8  system that predated that, which was probably still able

9  to be searched at -- at this time, and maybe still

10  actively being updated.  You know, I -- I can't say with

11  certainty.  But I'm trying to remember the name of the -

12  - it was -- it was -- I still picture the old computers,

13  the big green-screen ones.  You know, with this system,

14  there'd be, like, one in -- one in the unit that, you

15  know, you go and sit down at.  It wasn't like a -- a

16  database where all computers were hooked up to it.  You

17  would go to that one specific console to -- to do the

18  runs on there.  Or, if you were in patrol over the air,

19  you can ask when they would name check people and stuff

20  like that.  You know, for a does this guy have a

21  driver's license, et cetera, et cetera.  Are there any

22  warrants -- warrants on this guy, or stops in effect,

23  stuff like that.

24      Q.    Okay.  And you see on some of these pages,

25  there's a little dot next to some of the names.  Like,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 90 of 326 PageID #:7060
The Deposition of MARIANNE WALKER, taken on June 30, 2022

88

1    on the first page, it has a dot next to Maurice

2    Fletcher.  Second page has a dot next to Mose or Mose

3    Fletcher.  Do you see that?

4         A.   Yes.  I see that.

5         Q.   Yeah.  And obviously that's handwritten,

6    that's not on the printout, but somebody put those

7    little markings on there, correct?

8         A.   Well, all I'm looking at is a copy, but it

9    appears that, yeah, somebody put dots next to some of

10   these names.

11        Q.   Okay.

12        A.   Or that they highlighted them or whatever, for

13   lack of a better word.

14        Q.   Do you have any understanding of why those

15   dots would've been placed next to some names?

16        A.   No.  I mean, other than Fletcher and -- you

17   know, they all have the name Fletcher, because some of

18   these have Fields, the name of Fields.  They're not all

19   the Fletchers, but the -- there's some of the Fletchers.

20   All Fletchers, not every Fletcher that's on here, but

21   they are all Fletchers.

22        Q.   Okay.  And then could this -- from this

23   system, if you had identified, could you identify

24   specific individuals out of this list, and then click on

25   these particular individuals to get arrest photos or

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1   arrest information?

2       A.   No.  On this database, from what I recall,

3   like, say, for example, let me just go to one of the

4   first pages, like that very first one, like Maurice

5   Fletcher.

6       Q.   Yeah.

7       A.   You know, this is probably, like, when you're

8   tradition -- transitioning just from paper to

9   computerized.  So what you would have to do to get

10  information on Maurice Fletcher is, you know, now you

11  write down the IR, 581033.  You want to get photos, you

12  go and request those photos, or if it was at a stage

13  where the ICAM was now up and running also, and you can

14  run that in there, fine.  Or the arrest record.  It's

15  not like in this particular database, now you -- you

16  highlight Maurice Fletcher, and it gives you more

17  information on him.  Now, it's -- it -- the information

18  availability was pretty much what was there, and then

19  you would -- you would have to take it further by either

20  going to another database, going to Ident, you know, to

21  further identify or get arrest records or more

22  information on that person.

23      Q.   Okay.  So this system would really just

24  connect the name --

25      A.   And I -- I mean, you could -- you could click

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

90

1   over to another screen now that you have a date of

2   birth, and run them for a driver's license.  See what

3   address he has on the driver's license if he has one.

4        Q.   Okay.

5        A.   That would be on this same database, but a

6   totally different screen.  So you'd have to scribble

7   down, okay, Maurice Fletcher, 2 January '62, put that

8   into the other -- that -- you know, the other, for lack

9   of a better word, section of this database to pull that

10  information up.  But this was not that advanced by any

11  means where you could just click on it and -- and pull

12  up more information.  Not a hot desk.  I was trying to

13  remember what we called it.  So we would call this the

14  hot desk.  So I'd go to the hot desk.  I could run,

15  like, this.  On the hot desk, I could run Secretary of

16  State.  On the hot desk, I could run LEADS.  And there

17  was other stuff, I was not as well versed.  We had some

18  sergeants that were really, really good with that

19  system.  But the main things on that, we did.  That's I

20  was trying to remember yesterday what we called it, we

21  called it the hot desk.

22       Q.   Okay.

23       A.   Even in patrol, you would say, can you run one

24  on a hot desk for me?  And this is the database that

25  they would utilize.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1          MR. SWAMINATHAN:  Let me put that one for the
 2          side.  Let me ask you about this one.  Right.
 3          Let me do this first.  Okay.  I'm going to -- I -
 4          - I'm going to -- this is going to be the City JF
 5          97.
 6              (EXHIBIT 5 MARKED FOR IDENTIFICATION)
 7          MR. STEFANICH:  All right.  We got it.
 8   BY MR. SWAMINATHAN:
 9       Q.   Okay.  Exhibit 5, I -- I'm showing you
10   document marked Exhibit 5.  It's City JF 97.
11       A.   Yes.
12       Q.   In the top it says, "It's a stop order or
13   cancellation request."  So can you explain to me what is
14   a stop order or cancellation request?
15       A.   Yeah.  Stop order was a -- a way -- a -- a
16   vehicle that we would use in if there's somebody we
17   wanted to talk to, be it a victim, witness, suspect, or
18   identified offender, and even persons with warrants. We
19   would put it -- fill out the stop order request form.
20   That would go down to Ident.  And if the individual that
21   we're looking for, wanted to speak to, or whatever,
22   would be arrested, be it a fingerprint, a -- a clearing,
23   and then they would see the IR would match, then they
24   would contact the area to let the specific detective
25   know that, hey, this person that you wanted to speak to
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of ANTHONY WOJCIK, taken on June 29, 2021

```
1    or that you have a warrant for is now under arrest.  So
2    it wasn't done by -- by name, it was done by fingerprint
3    classification.  So in other words, if -- for -- here
4    they put it in for Terry Rogers.  If Terry Rogers was
5    stopped for traffic on the street, and they ran his
6    name, stop order would not show -- would, you know,
7    wouldn't indicate because it was only on the fingerprint
8    classification.  So if he was -- it would have to be
9    somebody being taken into custody for an offense, then
10   the stop order would -- we call it stop order would hit,
11   and the detectives who put it in, or the area where the
12   detectives were, would be notified that that person is
13   in custody.  So if you look at the top, you have record
14   stop, computer stop, which is -- which is LEADS,
15   computer stop, NCIC.  And you'd also use this form to
16   cancel a stop order.  So now if Terry Jones got arrested
17   for a narcotics violation, in this case, they would
18   contact Area 5. Ident would say, look, this guy is in
19   custody at whatever, 11th -- in the 11th District for
20   narcotics, and Bogucki and Schalk have a stop order for
21   him.  So they would either -- Bogucki and Schalk were
22   working, they'd let them know, or contact them on the
23   phone and let them know, or assign somebody else to
24   determine why they wanted -- why they had the stop order
25   in there, and then to -- to, you know, further the
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  investigation.  So a record stop would be just for that.

2  So to notify that the person is in custody.  You can --

3  the computer stops the two of them, LEADS and NCIC, you

4  can only check off if there was active warrants.  But

5  now if, in addition to -- we -- we -- we had a warrant,

6  then, you know, that stop would be put into that

7  database.  So if he is fingerprinted in, say, Florida,

8  you know, it would then -- their system would hit on

9  that LEADS in NCIC, I say -- or the City of Chicago is

10  looking for this guy, they have an active warrant for

11  him for whatever, murder or whatever, then he would be

12  held there and we would be contacted, let him know, hey,

13  he's in custody in Florida.

14      **Q.   So basically the record stop means that this**

15  **is really just a request within the Chicago Police**

16  **Department system rather than a national system.**

17      A.   Correct.  Yeah.

18      **Q.   Okay.  And then -- and what this means -- so**

19  **this is really an indication -- okay.  This tells other**

20  **people in the police department, hey, if you happen --**

21  **if you arrest this guy, I want you to know that I need**

22  **to talk to this guy.**

23      A.   Well, this form would go and would only -- it

24  would go to Ident.  Now, unless a detective told a tact,

25  hey, we got a stop order on Terry Rogers, if you see

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    him, you know, we want to talk to him.  You know what I
2    mean?  But this was meant only to be attached and
3    notifications to be made if the person was in custody.
4    Because the only way the stop order would -- would --
5    would come to an alert or come to -- would be by
6    fingerprints.
7         Q.    I see.
8         A.    So it's not a stop order under the name Terry
9    Rogers.  The stop order would be under his fingerprint
10   classification.
11        Q.    Related to his IR number?
12        A.    Correct.
13        Q.    Correct.  Okay.  And so this particular stop
14   order was for Terry Rogers and it was issued by Bogucki
15   and Schalk on March 19, 1995, correct?
16        A.    Correct.
17        Q.    Okay.
18        A.    And it was wanted for questioning.  They
19   needed to speak to him regard -- regarding homicide.
20        Q.    And what is the -- what is -- so I noticed
21   that it says "questioning only" in all caps.  What did -
22   - what does that mean as a -- what was the other
23   possibility, that what else could be written there other
24   than "wanted for questioning only"?
25        A.    Well, I -- well, again, there was no -- there

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1   was no, like, specific verbiage delineated in any order
 2   or anything.  So in this case, I -- I think they were
 3   being very -- you know, just to let everybody know or
 4   Ident know that, hey, this guy is not a suspect in the
 5   murder, he's not -- you know, he's not identified.  Now
 6   sometimes you can put it in for a suspect, you won't
 7   check computer stop, LEADS, computer stop NCIC, because
 8   we may have them identified, we may have probable cause
 9   to hold them, but we don't have a warrant yet.  So the
10   record stop can be checked, again, it could be checked
11   just for witnesses, for a victim.  If you have a victim
12   that, say, two years ago, we got a warrant on a sexual
13   assault, well, that guy is in custody, we're trying to
14   find this victim, you know.  You know, well, we may put
15   a stop order in just by that, and it may say it is
16   victim only.  So I think they were being just very
17   cautious as they knew those guys to be there, and very -
18   - you know, by even -- they even capitalized questioning
19   only, so that it wouldn't appear that, you know, he was
20   a -- a -- a suspect in the case, or, you know, any other
21   reason.
22       Q.   Okay.  Let me show you a document I'm marking
23   as Exhibit 6.
24            (EXHIBIT 6 MARKED FOR IDENTIFICATION)
25       MR. SWAMINATHAN:  Brian, this will be JF as -- be

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       the number 52.

2       MR. STEFANICH:  Got it.

3  BY MR. SWAMINATHAN:

4     Q.  Okay.  This is -- I'm showing you a document

5  I've marked Exhibit 6.  It's City JF 52.  This appears

6  to be a general progress report, correct?

7     A.  Correct.

8     Q.  And this particular one was -- appears to have

9  been written by Detective Bogucki, correct?

10     A.  Correct.

11     Q.  Okay.  And this -- and we often see GPRs that

12  are handwritten, but in this particular case, it was

13  typed, correct?

14     A.  Correct.

15     Q.  Anything unusual about that?

16     A.  Not at all, no.

17     Q.  Okay.  All right.

18     A.  As I said -- and I -- like, I explained you on

19  Tuesday that sometimes, you know, they will type out a -

20  - a GPR.  They may have typed it in there, so they're

21  putting it in the -- in here, and -- and maybe because

22  they haven't formalized their supp yet, but they'd

23  wanted to get it into -- into the record or into the

24  file just in case.  But the -- it's not unusual for this

25  to -- to be used for, you know, a typewritten

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   information.  And you might even find -- and I don't

2   know in this case, but it might be the exact verbiage

3   that's in the supp, it might have been later, or, like I

4   told you on Tuesday, it -- sometimes they would say - -

5   in the supp they might say, "We re-interviewed Edward

6   Cooper.  See GPR for details."  That could be the case

7   here, too.  I don't know.

**8   Q.  Okay.  In this -- first of all, was -- this is**

**9   an interview of Mr. Edward Cooper.  Did you participate**

**10   in any interviews of Edward Cooper?**

11   A.  Not that I ascertained from my review of what

12   I did review, and I did not review this prior to now,

13   and I don't think I had anything at all doing any of the

14   interviews on this case.

**15   Q.  Okay.  And so you don't have any memory of**

**16   ever interviewing somebody named Edward Cooper, correct?**

17   A.  As I sit here now, that's correct.

**18   Q.  Okay.  And you haven't reviewed -- and there's**

**19   nothing that you reviewed from the investigative file**

**20   that indicated to you that you participated in any**

**21   interviews with Edward Cooper, correct?**

22   A.  Well, I didn't go through every document in

23   the file.  I -- I scanned through them, and I picked

24   out, and then I reviewed the closing supp and the lineup

25   supp, but I did not see anything else.  I -- I believe

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 100 of 326 PageID #:7070
The Deposition of ANTHONY WOJCIK, taken on 11/08/2022

98

1   maybe I did -- I don't know if there was a -- one

2   inventory that I signed the inventory slip on.  But

3   other than that, I did not see anything.  I don't recall

4   any involvement in this case, and nothing is reflected

5   in the documents other than that I -- they had to review

6   the closing clear -- cleared open report, and the lineup

7   report, and possibly one inventory that I saw.

8       Q.   Okay.  This document -- this e-mail -- oh,

9   sorry, this GPR, in the beginning it lists that

10  Detectives Rutherford and McDonald learned about a

11  subject named Fletcher Clinton who lived in the area of

12  the intended victim, Edward Cooper.  Do you see that?

13      A.   Correct.

14      Q.   Rutherford and McDonald, were they working in

15  Violent Crimes at that time, or were they working in the

16  cold case unit?

17      A.   No, they were in Area 5 Violent Crimes.  That

18  they were never, as far as I know, at cold -- at the

19  cold case unit.

20      Q.   And then it indicates Clinton's name was

21  obtained through a RAMIS check of Fletcher's.  Do you

22  see that?

23      A.   Correct.

24      Q.   Okay.  So the RAMIS check, is that -- does

25  that match up with either of those two printouts that we

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    looked at earlier?

2         A.   That may be the -- one of the -- what I was

3    calling the hot desk database.  RAMIS was information

4    that you can pull from old handwritten case reports that

5    was put into that hot desk.

6         Q.   I see.  So that --

7         A.   I'm trying --

8         Q.   -- would be the --

9         A.   I'm trying to remember the -- like -- like,

10   for some of it would be -- HD80 would be the main one,

11   like, for SOS, NCIC, and I don't remember the RAMIS.  I

12   -- I was never good at RAMIS.  Sergeant Biebel was the

13   one that we would normally go to, because he was able to

14   -- he -- he was -- on his own, he learned how to access,

15   what was really an administrative -- RAMIS was really

16   administrative.  I meant -- I think to help with the UCR

17   reporting, or the uniform -- Uniform Crime Reporting

18   with the FBI.  But at some point, somebody realized,

19   hey, there -- there's information in there that we can -

20   - can help us in our investigations, and Biebel was very

21   sharp in that way, and I think he was one of them that

22   realized, hey, even though it's just an administrative

23   thing where the civilians are putting -- punching in

24   information from our paper case reports, and used for

25   UCR, that I can -- and being Biebel, we can access some

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    stuff that may help us.  So when they say RAMIS, that's

2    what they're talking about, and it's obviously ran

3    Fletcher's, and that might be what is -- are on that

4    report that you're showing me earlier off, the -- the

5    hot desk printout.

6         Q.   Okay.  So the RAMIS check might be this

7    document that's on the screen here, Exhibit 4, that --

8    that's your recollection?

9         A.   That could be the RAMIS report.

10        Q.   Okay.

11        A.   I'm not positive what the -- I don't remember

12   exactly, you know, how they looked when you printed them

13   out, you know.  I think with that one, you would - - it

14   would just be like a screen print.  It was showing up on

15   that screen, that old green-type screen would maybe

16   print that screen, and then the next screen, and the

17   next screen, but I'm not positive.  Well, RAMIS was a

18   database that was an administrative tolling and

19   function, it wasn't designed for investigative purposes,

20   --

21        Q.   Okay.

22        A.   -- but there was things that could be utilized

23   in there to help.

24        Q.   Okay.  And then it looks like what this is

25   saying is they did an IR check for Fletcher on Fletcher

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 103 of 326 PageID #:7073
The Deposition of ANTHONY WOJCIK, taken on June 23, 2022
101

1    Clinton, and learned -- and were able to get some

2    information about his arrest history, correct?

3          A.   Yeah.  Looks like they ran RAMIS, probably

4    checked into those Fletcher, anybody named Fletcher,

5    from that they saw Fletcher Clinton, then got an IR

6    check, and yes, determined that he had UEW, robbery, and

7    drug arrests, and that he was currently in custody in

8    Taylorville in IDOC.

9          Q.   So an IR check means -- is that what we looked

10   at before, where you -- you're basically pulling the --

11   an arrest history for somebody from, I think, an -- in a

12   request from the identification section?

13         A.   First, you run them, determine that that

14   individual has an IR, then request his arrest record

15   based on that IR.

16         Q.   Okay.  And then it says that Fletcher Clinton

17   was shown a photo show-up.  What is a photo show-up?

18            MR. STEFANICH:  Objection.  Form.  Foundation.

19            THE WITNESS:  Okay.  Let me just read this here.

20            That's what it says.  It says, "A photo of

21            Clinton was obtained, and a photo show-up was

22            conducted at the home of Edward Cooper."  Cooper

23            did not pick the photo of Clinton.

24   BY MR. SWAMINATHAN:

25         Q.   So -- and what is a photo show-up?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MR. STEFANICH:  Objection.  Form.  Foundation.
 2              THE WITNESS:  Well, I don't know the terminology.
 3         I know when you do a show-up on the street, like,
 4         a crime happens, and two blocks down officers see
 5         a person matching the description that was put
 6         over the air, they bring them, and because of the
 7         short duration of time, you can bring that
 8         individual back to your victim or your witness,
 9         and just do a show-up, which is pretty much like
10         a one-on-one, hey, is this the guy?  And, you
11         know, that would hold up in court.  Now, when
12         they say photo show-up here, I don't know mean --
13         if they meant array, I don't -- don't know if
14         they meant just showing the one photo, which I
15         don't think -- I think they would've shown more
16         than one. I'm not sure.  It looked to me like
17         this really meant array because they did not pick
18         the photo of Clinton. So by saying it, it would
19         be like he had options to pick from, being
20         Cooper, and he did not identify Clinton.  So it
21         appears that --
22    BY MR. SWAMINATHAN:
23         Q.   So did you -- okay.
24         A.   It appears that -- again, I -- I wasn't there,
25    I wasn't part of this.  And based on the reading here, I
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  would read it to be that they just used the terminology

2  photo show-up, and may have -- may have showed them an

3  array that was negative.

4      Q.   And if it had been a -- if -- so if they were

5  going to show a photo of Fletcher Clinton to Mr. Cooper,

6  it should have been done as part of a photo array,

7  correct?

8      A.   Well, I'd have to go through the file. Unless,

9  you know, they had reason to believe that Cooper may

10  have had an association with, or may have seen him

11  several times prior, or know him further than beyond

12  just some guy that he had never seen before, I don't

13  think they would've done a one-on-one.  So I can't state

14  that with certainly because I don't know the

15  relationship between Cooper and Clinton, and -- but I --

16  I believe it would've been a negative photo spread.

17      Q.   Okay.  And so if -- yeah, typically, and --

18  strike that.  When officers were conducting an

19  identification procedure with the witness, who didn't

20  have, you know, personal familiarity with the suspect,

21  that should be done in a photo array, not as a single

22  photo, correct?

23      A.   That's your best evidence.

24      Q.   Okay.

25      A.   So can't say it -- it can't, if they did that.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 106 of 326 PageID #:7076
The Deposition of ANTHONY WOJCIK, taken 03/02/23

104

1  And then it would -- again, it -- it would be up -- a --

2  a -- be determined by anybody beyond us, the -- the --

3  you know, the validity of that identification, or the

4  weight to put on it.  However, in general, and best

5  practice would be, if there was no relationship, or you

6  have a doubt, or you're not certain, best to do the

7  photo array, and that's what it sounds like was probably

8  done here, it was just that it was a negative photo

9  array.

10      Q.   And any --

11      A.   You know, all the photo show-up, just

12  terminology.  I don't know that they meant show-up, per

13  se.  I never heard the photo show-up being done.

14  Show-up, again, I guess, that technically used in legal

15  way would be, you know, a live show-up immediately or

16  shortly thereafter a crime was committed.

17      Q.   And you say you've never heard -- you --

18  you've heard that there's a very unique circumstance in

19  which live show-ups can be conducted, correct?

20      A.   Well, it's not -- well, in -- in that, yes. If

21  -- okay.  So if, like I said, a shooting happens,

22  witnesses -- responding officers respond to the shots

23  fired, they get there, the witnesses say, yeah, it was a

24  guy wearing a black and yellow, a male Hispanic, red gym

25  shoes, and he ran that way.  They put it over the air,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 107 of 326 PageID #:7077
The Deposition of ANTHONY WOJCIK, taken on 3/23/21
105

1    officers up in the direction where the guy ran, see a

2    guy matching that description, running, same clothing,

3    you know, whatever, they stop him, and it's two minutes

4    after the shooting.  I mean, there is no time -- exact

5    time.  Again, that's to be determined later.  But -- and

6    -- and they bring them back, and the witness say, yeah,

7    that's the guy.  That identification, again, it'd be

8    subject to challenge maybe by his attorney, but that

9    would hold up as -- and what -- what you call as

10   show-up, and would hold up in court.  Now, if it's the

11   next day and officers find a guy wearing exact clothes

12   matching the description and they think, well, Maniac

13   Latin Disciple was shot, this guy is Latin King based on

14   the colors.  Let's throw him in a car.  They go back to

15   the neighborhood where the shooting was, and, oh,

16   there's Pookie.  Pookie saw the shooting.  Hey, man, is

17   this the guy?  No.  Then you would want to do a physical

18   lineup with other fillers in there.

19        Q.   Okay.

20        A.   So there -- there's no exact time.  The law

21   doesn't state five minutes after the incident, ten

22   minutes after the incident.  It's case by case, you

23   know, is how that determination is made.  You know what

24   I mean?

25        Q.   Okay.  And that example for live show-ups.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 108 of 326 PageID #:7078
The Deposition of CAPTION, taken on REVIEW, Page 108 of 326
106

1   There's no example for photo show-ups where you'd

2   show-up and just show a single photo of the guy?

3       A.   Not that I'm aware of.  I'm not saying that,

4   you know -- and I -- I think that would be -- no, not

5   that I'm aware of.

6       Q.   Okay.  And then, in this case, the -- oh,

7   sorry.  I think we had -- and may -- I think I asked you

8   this before, I'm not sure.  So let me just ask it. When

9   any time they -- any time photos are shown to the

10  witness, that should be documented, correct?

11      A.   Correct.

12      Q.   Okay.  And that's what happened here, they

13  documented that they showed photos to Mr. Cooper,

14  correct?

15      A.   Yeah, like I said, it appears that their

16  documentation, a lot are using the word show-up, I -- I

17  -- it -- it appears that they showed a -- a compilation

18  or an array, whatever you'd like to call it.  Including

19  --

20      Q.   And even if the photo array result -- I'm

21  sorry, go ahead.

22      A.   Including Clinton to Cooper.

23      Q.   And even though the identification procedure

24  resulted in a negative identification in this case, or a

25  lack of an identification, that's still to be



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    documented, correct?

2        A.    Yeah.  And they -- they did document it here,

3    correct.

4        Q.    And then the photos of this photo array, those

5    should also be kept in inventory, correct?

6            MR. STEFANICH:  Objection.  Form.  Foundation.

7            THE WITNESS:  Okay.  I'd have to look at -- going

8            back in time, I don't know what it is today.  I -

9            - well, obviously today is different because

10           they're -- when I left, they were veering towards

11           not even doing physical lineups, but at -- it was

12           a time when you only had to document the

13           negative.  So like if you had a negative physical

14           lineup, there was no need to photograph it.  You

15           would just document the negative physical lineup.

16           So, you know, same as with photos, if you had a

17           negative, you would document the negative lineup.

18           And I -- I don't recall when it evolved that, you

19           know, you should inventory, they wanted to do an

20           inventory negative photo spreads, it was just

21           documentation that a negative spread was shown.

22           And here they're saying that, yeah, we showed

23           them Clinton, with obviously fillers, what

24           would've been fillers, or some other photos.  And

25           Clinton, being Edward Clinton, male, Black, 38, 6

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 110 of 326 PageID #:7080
The Deposition of ANTHONY WHO was TAKEN on Date of 2025

108

```
 1              April '52, at 1435 North Luna.  I'm sorry.
 2              That's Cooper.  I'm sorry.  So whatever Clinton's
 3              identifiers were, that -- that Clinton was not
 4              identified.  I was going to say --
 5   BY MR. SWAMINATHAN:
 6         Q.   And so is it --
 7         A.    -- Fletcher Clinton was not -- Fletcher
 8   Clinton, referred to by Rutherford and McDonald, was not
 9   identified.
10         Q.   And so is it your testimony that, in 1995,
11   detectives could create a photo array, show it to a
12   witness, and if there was a negative identification,
13   they could destroy the photos rather than preserve them
14   in the investigative file?
15              MR. STEFANICH:  Objection.  Form.  Foundation.
16              Misstates his testimony.
17              THE WITNESS:  Okay.  I -- I don't know exactly
18              when I -- I said that, at certain time, it --
19              things changed where, you know, it was requested
20              and whatever, that we inventoried the photos,
21              negative or positive. But times until that change
22              was made, anything negative was only stated that
23              it'd be documented, that the negative was shown
24              via the negative lineup, physical lineup, or
25              negative photo spread.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

BY MR. SWAMINATHAN:

     Q.   So I know there was a point in time when, for
lineups -- well, there was a point in -- there was a
period of time when, if the lineup resulted in no
identification, you didn't have to have the evidence
technician come out and photograph the negative
identification.  Does that sound right to you?

     A.   Yes, that's correct.

     Q.   Okay.  And then that eventually changed,
right?

     A.   I'm not sure where they're at now.  I don't
recall what exactly -- if -- if we had to photograph the
negatives, and when that evolved into -- I've been away
for a while, I'm trying to remember how things evolved,
--

     Q.   Yeah.

     A.   -- but I know, early on, negative lineups, no
need to photograph.  So if you look at it that way, if
you're not preserving a photo of individuals standing a
lineup, then would you have to preserve the photo of
individuals in a negative photo array?  I mean, I --
like I -- like you said, things evolved.  I don't know
the exact duration in time, or when they -- things
evolved, but I do know that, for negative things, it was
document, not necessarily inventory or portal.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1       Q.  If, for example, Jimmy Fletcher had been -- or

2  James Fletcher had been included as a filler in this

3  photo array, in which Clinton didn't identify anybody,

4  that would be important information for James Fletcher,

5  correct?

6          MR. STEFANICH:  Object.  Form.  Foundation.

7          Incomplete hypothetical.  You may answer.

8          THE WITNESS:  If he was, I -- and if -- oh,

9          although I -- I don't think it was because they

10          here had received information of a particular

11          Fletcher that lived in the area, and check in

12          with his history with the UEW, being a gun, just

13          like a gun used in a homicide, the robbery, the

14          drug arrests, then they specifically showed that

15          photo with -- and I -- I'd -- it doesn't state in

16          here that they put him with four other Fletchers,

17          or one other Fletcher, and I believe they would

18          have, had they done that.  I -- I just think they

19          just went, based on the information from

20          Rutherford and McDonald, identified that person,

21          got his picture, put it with fillers, showed it,

22          it was negative, and they -- they did document

23          that the photo of that particular individual was

24          negative.  If they had --

25  BY MR. SWAMINATHAN:

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   Did they --

2    A.   If they -- if they had -- say, they had just

3    gone in, and let's get -- let's just try everybody named

4    a Fletcher, and show it to them, and they documented all

5    the Fletchers, you know, and it was negative, say, five

6    or six Fletchers, and it was negative, but there -- it

7    was -- it was a -- a Hail Mary, for lack of a better

8    word, you know, just to try something because nothing

9    else was going on it.  I think they would've -- you

10   know, they may have documented all of them, but it was

11   negative, regardless.  So -- so my understanding reading

12   this, or my assumption, is that it was one, for lack of

13   a better word, suspect or potential offender with

14   fillers, that they called it a show-up, although it was

15   a spread, and that he did not pick -- pick that specific

16   individual who they named, and said he did not pick

17   them, that it was negative.

18   Q.   Do you know who the fillers were in this photo

19   array that resulted in a negative identification?

20   A.   Were what?

21   Q.   Do you know who the fillers were that were

22   used in this identification procedure?

23   A.   No, I don't.  It doesn't state.

24   Q.   Okay.  Okay.  And then the next thing that's

25   in here is that Mr. Cooper indicated that he believed

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 114 of 326 PageID #:7084
The Deposition of MELANIE MATTSON, taken 05/16/23

112

```
1   Terry Rogers had set them up.  You see that?
2       A.   It says -- well, that's not the next thing.
3   There is another line after that.  It says --
4       Q.   Yeah.
5       A.   -- "Cooper appeared to still be cooperative
6   and stated he believed he still could identify the
7   offenders.  Cooper went on to say that he believed that
8   Terry Rogers had set him up.  He stated that he was
9   friends of Rogers' family.  He had heard that Rogers had
10  a bad drug habit and would do almost anything for
11  money."  In parentheses they have, "he has a five-page
12  sheet."
13      Q.   And this is the -- and this is a GPR that was
14  written on March 19, 1990 -- March 19, 1995, correct?
15      A.   Correct.
16      Q.   Okay.  So then we looked earlier at Exhibit 6,
17  which was the -- Exhibit 5, which was the stop order. So
18  on the same day, after Cooper had said this to them, it
19  looks like they got -- put out a stop order on Rogers,
20  correct?
21      A.   Well, actually it would be the same day
22  because it's showing the stop order date of -- if you're
23  looking at 97, I don't have a stamp --
24      Q.   Yeah, I think that's what I said, right?  Same
25  -- maybe I misspoke.  The -- so it looks like they spoke
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of ANTHONY WOJCIK, taken 05/05/25

113

```
1    with Cooper on March --
2         A.   I think they -- yeah, then they put in a
3    alert, or not -- a stop order, record stop order, wanted
4    for questioning only for Terry Rogers.
5              MR. SWAMINATHAN:  Okay.  You can put this to the
6              side.  And then I'm showing you a document marked
7              Exhibit 7.  This is 134 -- City JF 134 to 135.
8                   (EXHIBIT 7 MARKED FOR IDENTIFICATION)
9    BY MR. SWAMINATHAN:
10        Q.   And this is the -- what -- at the top of the
11   page it says, "Investigative alert."  You see that?
12             MR. STEFANICH:  Yeah, give us a second.
13             MR. SWAMINATHAN:  Are you grabbing it, Brian?
14             MR. STEFANICH:  Okay.  He's got it.
15             THE WITNESS:  Okay.  Is that the 134?
16   BY MR. SWAMINATHAN:
17        Q.   Yeah.
18        A.   134 to 135?  Yes.
19        Q.   Yeah.  This is a -- an investigative alert.
20   Can you tell me what that is?
21        A.   Investigative alerts evolved -- they were
22   predated and probably overflowed, or whatever, with stop
23   orders.  So initially the stop orders, like I said,
24   would only hit, for lack of a better word, or you'd be
25   notified if the person was taken in custody. Because the
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

114

1   stop order, the record stop, would only attach when

2   somebody was fingerprinted.  So it would attach to his

3   IR number.  So it came to a point where it -- to assist

4   in investigations and otherwise, they evolved into the

5   start of what they called investigative alerts.  So now,

6   for example, if you take Rogers, instead of -- and --

7   and say Rogers had been stopped on the street, name

8   checked.  He gave his real name.  He was name checked

9   over the air through the hot desk, and it would come

10  back no wants, no warrants, you know, et cetera, et

11  cetera.  And he would go on his way.  If -- with the

12  investigative alert, it would attach now both to the IR

13  and the name.  So if Rogers was walking down the street

14  and an alert was in, and a patrolman ran his name and he

15  gave his proper name, as -- as you have in the alert

16  itself, you know, then they would say, yeah, they would

17  notify the patrolman, it appears that Bogucki and Schalk

18  at Area 5 would like to speak to this guy.  You know,

19  every -- the officer asks, whatever, they maybe say,

20  regarding a homicide or whatever.  So -- but it would be

21  probable cause or no probable cause.  So on the

22  investigative alert, you have to say, is there a

23  probable cause to arrest or not?  Well, on the case of

24  one where they -- where they had put in bold,

25  "questioning only," obviously that would be a no



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   probable cause alert, so they would let the -- the --
2   the -- dispatch would let the officer know that, yeah, a
3   detective 5 -- a detective in Area 5 would like to speak
4   to them.  However, there's no probable cause to arrest
5   them.  So if they have nothing, you know, they don't
6   have him with a bag of weed, they don't have him
7   dropping anything, he's not in custody, he -- or if it's
8   traffic and he does have driver's license, there's
9   nothing that they're going to -- they can then request
10  of him, hey, we have -- you know, your name reveals that
11  detectives would like to talk to you about a case.  Are
12  you willing to come in or not?  And if he says yes, then
13  they can bring him in or follow him in or whatever.  If
14  he says no, then they have no cause to hold him.  You
15  know, they can't come back later and say, hey -- or call
16  Area 5 and say, hey, look, that guy that they were
17  looking to talk to, we had just stopped him.  Just so
18  you're aware, he was in town.  He was driving a car like
19  this.  He's around.
20      Q.   Okay.
21      A.   Now, if there's probable cause to arrest, then
22  you can check that.  And again, so it -- it gave us the
23  greater tool now of being able to locate and possibly
24  speak to people or have people arrested based on, you
25  know, names.  You know?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q.    Yeah.

2     A.    Names or --

3     Q.    So the investigative alert and stop order

4  served similar purposes, but they were slightly

5  different in terms of how they could trigger, you know,

6  a flag that this person wanted to be spoken to by a

7  detective?

8     A.    Correctly.  Correct, yeah.

9     Q.    Okay.  And in this -- so it looks like this

10 was on -- so this particular investigative alert in

11 Exhibit 7 is for the same individual, Terry Rogers,

12 correct?

13    A.    Correct.

14    Q.    And it was requested on March 19, 1995?

15    A.    Double check -- let me just double check the

16 IR to make sure it is the same.

17    Q.    Yeah.

18    A.    I don't know where they -- so -- yes, it is

19 the same individual.

20    Q.    Okay.  And this was also issued -- this was a

21 -- this investigative alert was entered on March 19,

22 1995, correct?

23    A.    Correct.

24    Q.    Okay.  So basically, it looks like on March

25 19, 1995, after speaking with Cooper, who said that he

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  believed Terry Rogers was involved, then Bogucki and

2  Schalk basically entered a stop order and an

3  investigative alert for Terry Rogers on the same day,

4  correct?

5      A.   I -- I can't say that because -- here's the

6  problem we have with that is, this was during a time

7  when we were transitioning or we still had stop orders

8  in effect.  You're talking about the 19th, the 19th, and

9  the 19th -- on -- on the stop order 19th on this. I do

10 know that -- I do recall that when we were transitioning

11 from stop orders to alerts, at some point,

12 administratively, civilians, I believe, were then going

13 back to the stop orders that were in effect and

14 inputting those into the alert system.  So in other

15 words, to capture all predating wanted for questionings

16 or wanted on a warrant or -- or arrest, looking to

17 arrest, they -- so Bogucki and Schalk may not have

18 necessarily -- because I -- I find it -- if you look at

19 the top two where it says 19 March, '95, I -- I think

20 that -- and when you say 00:00 hours, you know, that

21 would have to be right at the stroke of midnight on the

22 19th of March.  I believe this was one where civilians

23 or maybe officers that were, you know, in a civilian

24 capacity at the time, were now catching up and loading

25 up the investigative alerts system by going back to stop

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    orders.  So their request date would be the request date

2    of the stop order, a particular stop order they're

3    looking at.  And Bogucki and Schalk may or may not have

4    input it on a date.  I don't know.  Because I do know

5    that they were going back in time to try to load up the

6    investigative alerts system with active stop orders.

7         Q.   Okay.

8         A.   So I can't say with certainty that Bogucki and

9    Schalk put this in on that date.  It may been input into

10   the investigative alerts system a month later, two

11   months later, but to reflect that, the civilian or

12   whoever may have put that 19 March 00:00 time, which is

13   kind of odd to me, you know?  But I do remember there

14   was a time where, when that transition was being made,

15   they were loading up, you know, loading stop orders into

16   the investigative alerts system because that was going

17   to be -- stop orders were no longer going to be used.

18        Q.   So the -- so your understanding is that either

19   Bogucki and Schalk created this investigative alert on

20   the 19th, or a civilian person or somebody else entered

21   it later on based on the existing stop order from the

22   19th, correct?

23        A.   Well, more so that it was entered later.  But

24   it's possible they, at the stroke of midnight, they --

25   but I -- I believe -- my belief as I sit here now is

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of ANTHONY WOODS, taken 02/09/23

1    that this was one of those that was where they went back

2    in time to get the stop orders into the alert system

3    because of how --

4         **Q.   And this one -- this investigative alert**

5    **indicates that it's -- that there was probable cause for**

6    **arrest, correct?**

7         A.   Yes.  And it also --

8         **Q.   And they --**

9         A.   -- says it's expired on here, which doesn't

10   make sense to me either.  Why would Bogucki and Schalk

11   enter -- expire an investigative alert and put a stop

12   order where the investigative alerts were the new way?

13   See, that's why I'm telling you, I think that this was

14   just civilians going back in time and punching it in,

15   just to get the bare bones information in there.

16   Because, number one, in the stop order submitted on the

17   19th, with a signature from Bogucki, it says

18   "Questioning only."  And like I said, they highlighted

19   it in bold.  No probable cause existed.  And I don't

20   think they -- they would have put that in there, you

21   know?  So I believe this is just somebody loading up the

22   investigative alert system with stop orders that

23   predated, you know, the system.  Because why would they

24   expire an alert that they just put in on the same day?

25        **Q.   Yeah, that's what I was going to ask you.  I**



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    mean, if you printed -- if the -- if you put it in on

2    the 19th and then three months later it expired and you

3    printed it out some time after that, it's going to

4    indicate that it was requested on the 19th and it's

5    going to indicate that it's expired, correct?

6         A.   Well, yeah.  Well, what is the date of -- you

7    know, I don't know what date -- yeah.  Well, no, that

8    would happen.  You -- you are correct.  They would fall

9    to --

10        Q.   So if this was just printed some time later,

11   but --

12        A.   Then you should have a -- so the report you're

13   giving me here is the expired.  Then there should be one

14   where it was input and then there was -- should be a --

15   a sergeant would have to expire it.  So there should be

16   other ones prior to the status of expired. There should

17   be a status of active, which I don't know if you have

18   that there or not.  But I'm telling you that I remember

19   that when we were transitioning, and obviously we were

20   still using stop orders on the 19th of March, so --

21        Q.   And so this one, I think you indicated there

22   was a period of time --

23        A.   -- if they weren't using stop orders, that

24   wouldn't exist.  That has his signature on there.  I

25   believe that this was probably input into the system

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 123 of 326 PageID #:7093
The Deposition of ANTHONY was taken on ..... Page 123 of 326
121

1  some time after.  And maybe when he -- anyway, it could
2  have been either way, but this is the expired one.  So I
3  don't know if a detective or -- and the sergeant would
4  have had to expire it based on a request from Bogucki
5  and Schalk.
6      **Q.  So there would be a separate form, you're**
7  **saying, that it gets filled out to expire it?**
8      A.  Well, this one is expired.  So --
9      **Q.  Yes.**
10     A.  -- the sergeant would expire it.  So a
11 detective would request an alert.  The sergeant would
12 have to approve the request, you know.  Because
13 normally, our function then is, again, we're human, but
14 to review it and, you know -- so if Bogucki and Schalk
15 had accidentally -- I think the default was probably no
16 probable cause.  I think you would have to hit probable
17 cause if I remember correctly.  But the sergeant would
18 normally ask, okay, probable cause.  Do you have
19 probable cause on this guy?  Yes.  And then the sergeant
20 could -- would make it an active alert.  Then if the
21 person got picked up, you know, stopped on the street
22 and he willingly came in, he was interviewed, then
23 Bogucki and Schalk would put in that the alert be
24 expired and the sergeant would have to expire it.  So
25 you had -- you know, you had to submit it for an

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  approval. The sergeant would review it and approve it,

2  which would make it active. You know what I mean? And

3  then you would have to let them know if you're going to

4  -- and over time eventually what did happen too, this

5  system got updated where every so often you would have

6  to renew an alert. So if alerts were active, the

7  sergeant would have to go back to the detective and say,

8  "Hey, do you want still want this alert in the system?"

9  And then it would -- they would have to -- if it expired

10  on its own, they would have to renew it. Or if you

11  interviewed them today and they expired it, but now

12  something comes up where somebody tells you, hey, you

13  know, gives you more information that you want to

14  re-interview that person, then they can renew it. So

15  anyway, this was at a time when there was a transition

16  being made. So I cannot state that they put it in --

17  they submitted an alert. Although this could be down

18  the road when -- I mean, I don't know. You'd have to

19  look at when was it -- the request first put in and when

20  was it approved by a sergeant.

21      Q.   Okay. So if I'm understanding you correctly,

22  you're not sure when this was input into the system,

23  correct?

24      A.   Correct.

25      Q.   Okay. And eventually if this stop order

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

123

1    expired, if this was -- if this investigative alert was
2    printed out some time after it expired, this is exactly
3    what you'd expect it to look like, correct?
4        A.    Yes.
5        Q.    Okay.
6        A.    So if it was expired and -- and it's in the
7    system and six months later you go to print it out,
8    it'll show that it is expired, correct.
9        Q.    Exactly.  Okay.  And this lists -- so for
10   these investigative alerts, there -- you had to indicate
11   when you were seeking approval of the investigative
12   alert for it to be either listed as -- well, you had to
13   get approval for the investigative alert from a
14   sergeant, correct?
15       A.    Well, yeah.  You -- it would be just similar
16   to the CRIS system where you would submit it, and then
17   it would be in the system.  So now a sergeant can go in
18   there.  You could let them either know by paper or say,
19   hey, sergeant I got an alert in there.  Can you take a
20   look at it?  Or they would just sit down as course of
21   their administrative functions and go in and check for
22   alerts, and read them and approve them or reject.
23   Because maybe you were missing particular information,
24   or maybe it says probable cause, which -- but in your
25   narrative, it says questioning only.  So in this one

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    here it again says, "the above subject is wanted for

2    questioning only in regards to the homicide which

3    occurred."  But yet as -- as a sergeant, if I would have

4    caught it, I would say, well, what is it?  Is it

5    probable cause or no probable cause?  Because it says

6    questioning only.  I would go talk to them.  So I'd

7    probably have to reject it because either the, you know,

8    box was checked in error or whatever, if they did in

9    fact submit it.  And, hey guys, you -- you have to

10   change it to no probable cause and then resubmit it, so

11   --

12        Q.   So in this case, it's your -- you agree there

13   really was not probable cause to arrest?

14        A.   I would agree based on my review of the

15   documents, correct.

16        Q.   And this -- so this investigative alert

17   appears to be incorrect, correct, to list probable cause

18   for arrest?

19        A.   In that box, I would say that's incorrect.

20        Q.   Okay.  And then putting aside the question of

21   probable cause or not is, at this point in -- on March

22   19, 1995, based on the stop order and the GPR and so on,

23   it looks like there's some indication that Bogucki and

24   Schalk are now investigating Terry Rogers as a potential

25   perpetrator of this crime; is that fair?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MR. STEFANICH:  Objection.  Form.  Foundation.
 2              Misstates the evidence.  You can answer.
 3              THE WITNESS:  No.  The only thing I'm -- I'm
 4              seeing is that they want to interview him
 5              regarding it. I don't see where there's any
 6              concrete information that he had any involvement
 7              in it.  You know what I mean?  I mean, there's
 8              one guy stating that he believes they may have
 9              set him up, but other than that, there's no
10              indication that they were -- I don't think they
11              had probable cause at that point.  I think they
12              were just looking to talk to him.
13    BY MR. SWAMINATHAN:
14         Q.   Yeah.  And I'm not saying probable cause, but
15    was he --
16         A.   Well, questioning --
17         Q.   -- was he someone who should be treated as a
18    suspect for a -- wanted for questioning?
19         A.   Well --
20              MR. STEFANICH:  Objection.  Form.  Misstates he
21              testimony.
22              THE WITNESS:  Well, those are two different
23              things.  Is, you know, a suspect wanted?  You
24              know, either you have probable cause or you
25              don't.  And in this one, I think when they're
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              saying questioning only and on the stop order
 2              that they -- there is a signature on there.  They
 3              put on their record stop only, you know, so I
 4              don't believe they're looking for -- they were
 5              looking for him at that point as a suspect in
 6              this.
 7              MR. SWAMINATHAN:  Okay.
 8              THE WITNESS:  That's, again, my interpretation.
 9              MR. SWAMINATHAN:  Okay.  Ouch.  Why don't we take
10              a quick break?  We've been going a while.  Oh,
11              well, why don't -- instead of saying quick break,
12              we could take a quick break, which I'm happy to
13              do and then -- and then go back on, or a full
14              full-on break for lunch, for a quick lunch.  We
15              could do that, too. You tell me.
16              MR. STEFANICH:  We're off, right?
17              THE WITNESS:  Well, how much --
18              MR. SWAMINATHAN:  Let's go off the record then.
19              Yeah.
20              THE WITNESS:  Okay.
21              THE REPORTER:  Off the record.
22                   (OFF THE RECORD)
23              THE REPORTER:  Back on record.
24      BY MR. SWAMINATHAN:
25          Q.   All right.  Mr. Wojcik, did you get a chance
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  to grab some lunch?

2      A.   Yes, I did.

3      Q.   Are you ready to keep going?

4      A.   Yes.

5      Q.   Okay.  I'm going to show you a document I've

6  marked as Exhibit 8.

7           (EXHIBIT 8 MARKED FOR IDENTIFICATION)

8  BY MR. SWAMINATHAN:

9      Q.   You see that on your screen there.  It is C JF

10  129 to 130.

11      A.   Okay.  Got it.

12      Q.   Okay.  You got it in front of you?

13      A.   Yes.

14      Q.   Okay.  So this appears to be an investigative

15  alert similar to the one we looked at earlier in Exhibit

16  7, correct?

17      A.   That's correct.

18      Q.   Okay.  And this is actually listed as an

19  active investigative alert, correct?

20      A.   That's correct.

21      Q.   And this is an investigative alert for a man

22  named Emmett Wade, correct?

23      A.   That's correct.

24      Q.   And it indicates that the request for it --

25  the investigative alert was entered on March 17, 2002 at

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 130 of 326 PageID #:7100
The Deposition of EDWARD WODNICKI, taken on 11/08/2019

128

1    17:26 p.m., correct?

2        A.    That's correct.

3        Q.    Okay.  So -- and the person who requested this

4    investigative alert for Emmett Wade on March 17th was

5    Detective Schalk, correct?

6        A.    That's correct.

7        Q.    Okay.  And there's a justification provided

8    for why they wanted to -- why they were putting out an

9    investigative alert for Emmett Wade, correct?

10       A.    That's correct.

11       Q.    Okay.  And what was the justification that was

12   given for why they were doing the investigative alert?

13       A.    It says, "The RDET," recording detective,

14   "wishes to interview Emmett Wade, who was a witness to

15   the 1990 homicide of Willie Sorrell, RD number N," like

16   Nora, "603937."

17       Q.    Okay.  And this indicates that it is -- there

18   was no probable cause for arrest then, correct?

19       A.    That's correct.

20       Q.    All right.  And in this case, you would agree

21   it -- there was not probable cause to arrest?  He was

22   just a witness, correct?

23       A.    That's what it says in the document.  That's

24   correct.

25       Q.    Okay.  So as of March 17, 2002, the detectives

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  were looking to speak with Emmett Wade based on this

2  investigative alert, correct?

3     A.   Correct.

4     Q.   Okay.  And then how long does an investigative

5  alert like this last?  So if this was entered on March

6  17, 2002, how long would it last for?

7     A.   Well, it would last until it's either canceled

8  by the detective, so in other words, if they did

9  interview Mr. Wade, they would cancel the alert.  And I

10  believe after -- I don't know if it was initially when

11  investigative alerts started or later where they put a

12  time -- some kind of time parameter on there where then

13  the sergeant would have to review them to make sure that

14  they still wanted them to be active so they didn't go,

15  like, into perpetuity.

16     Q.   When you retired in 2016, did this

17  investigative alert system still exist?

18     A.   Yes.

19     Q.   And so if you wanted to go back and look at

20  old investigative alerts, you could just put in an RD

21  number on a case and pull all of the old investigative

22  alerts, correct?

23     A.   I'm not sure if it is searchable that way,

24  although it would make sense that it should be.

25     Q.   Okay.  Okay.  Oh, and then this one indicates

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  at the bottom -- you see where it says in handwriting at

2  the bottom of the first page, it says "Haas copy"?

3      A.   Correct.

4      Q.   What does it -- what do you understand that to

5  mean?

6      A.   Well, that would be a copy for Kevin Haas to

7  include into the investigative file.

8      Q.   Okay.  And you and I talked about this on

9  Tuesday, but Kevin Haas was the one who would put

10  documents into the formal investigative file as they

11  were approved, correct?

12      A.   Yeah, he was one of the -- again, it could be

13  done by anybody really.  He was assigned to, for the

14  most part, oversee the homicide investigative files.  So

15  that was his function.  And then, like I said, there was

16  times people filled in for him, or there's no limit that

17  the sergeant or detectives involved couldn't put

18  documents into the file.

19      Q.   Okay.  And as documents went into the file,

20  they were to be added to the inventory, correct?

21      A.   Correct.

22      Q.   So this, in that indication where it says

23  "Haas copy," is an indication that a copy of this

24  investigative alert was provided to Haas, would have

25  been included in the inventory and in the investigative

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    file, correct?

2        A.   Well, it -- it indicates that this was a copy

3    for Kevin Haas.  Whether or not he received it or not, I

4    can't say.  But that would be the idea behind it, yes.

5           MR. SWAMINATHAN:  Okay.  One second.  Okay. We

6           can put that document to the side.  All right.

7           Brian, I'm going to show him City JF 179 to 182.

8              (EXHIBIT 9 MARKED FOR IDENTIFICATION)

9    BY MR. SWAMINATHAN:

10       Q.   All right.  Mr. Wojcik, I'm showing you a

11   document I've marked Exhibit 9, City JF 179 to 182. Let

12   me know when you have that.  Okay.  And this is

13   basically four pages of GPRs, or general progress

14   reports, correct?

15       A.   Correct.

16       Q.   And there's handwriting on each of these

17   pages.  Is any of the -- well, let me start with this.

18   Are any of the signatures on the bottom of these four

19   pages yours?

20       A.   No, not that I -- no, not at all.

21       Q.   Okay.  And do you know who the sergeant is

22   that approved these GPRs?  Can you tell?

23       A.   Yeah.  It looks like star maybe 1320 or 1322.

24       Q.   Okay.  And off the top of your head, you don't

25   know who that is?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      A.   I don't know.  I don't know.  I can't tell
 2  immediately the sergeant.
 3      Q.   Okay.  And then looking at the body of these
 4  or the narrative, you know, middle section of each of
 5  these GPRs, is any of the handwriting yours?
 6      A.   It does not appear to be at all, no.
 7      Q.   Okay.  And then the headers on each of these
 8  pages -- well, strike that.  For the body of each of
 9  these pages, do you recognize any of the handwriting to
10  be a particular person's handwriting?
11      A.   I would say 179 appears to be Schalk's, just
12  from recollection and memory.  180 appears to be some
13  Schalk and possibly some Bogucki.  181 appears to be
14  mostly Schalk's, maybe all.  I can't tell on that one
15  thing where it says "ASA Jennifer," whose that is, to be
16  honest with you.  And on 182 appears to be mostly
17  Bogucki's.  However, in the upper right of the
18  narrative, the body section at 2373805, 10:30 hours, and
19  then "Debra Asary, friend," that may be Schalk's.
20      Q.   Okay.
21      A.   And then also possibly the 21 December '90 on
22  the top and possibly to 5511.  I -- I can't say for
23  certainty there.  But most of it appears by far to be
24  Bogucki's, is what I believe.
25      Q.   On that one.  Okay.  And so it sounds like on

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    some of these pages, like on that last page, it sounds

2    like a lot of the narrative section is -- it appears to

3    be Bogucki's handwriting, but the top in the header

4    maybe have actually been written by Schalk, correct?

5         A.    Yeah.  Well, that word homicide in the top

6    header on that 182 looks like Bogucki's.

7         Q.    Okay.

8         A.    Also, possibly that 21 December '90 and

9    possibly the 5511 beat unit sign looks like it may be

10   Schalk's.  It's hard to tell with the "Sorrell" though.

11        Q.    Okay.  And I think we talked about this last

12   week or a couple days ago, but the information in the

13   headers, that's often filled in later before it's

14   submitted for approval, correct?

15        A.    Well, or before it -- well, submitted for

16   receipt -- receipt by the sergeant.  Sergeant receives

17   it, usually signs off and then makes -- makes sure that

18   it gets to the file.  We try to make sure on all of them

19   that the headings and the -- most important thing is the

20   RD number.  But we try to make sure the headings are

21   done.  But like I said, at -- human nature, and at times

22   you'll find missing signatures.  Sometimes they're in

23   the file, you know, without a sergeant's signature on

24   there.  So -- but for the most part, yes, you would get

25   it, receive it, sign it, and -- and get it to, you know,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    the bin for Kevin Haas or hand it to him or whatever,

2    just to make sure or to attempt to make sure it gets to

3    the file.

4         Q.   So what you just did, what you were just

5    describing, is the process of what happens when these

6    detectives, they turn it into the sergeant.  The

7    sergeant reviews it, signs off on it, and then passes it

8    on to Kevin Haas or whoever's maintaining the formal

9    inventory, correct?

10        A.   Correct.  Our main function there is to try,

11   again, we -- we err at times, but just to make sure that

12   the headings are there and that RD.  For me, the most

13   important thing is the RD, to make sure it gets in

14   there, into the file.

15        Q.   Okay.  And then you -- and then I think the

16   part that I had asked about, maybe you had skipped past

17   where I was, but I was trying to understand if Bogucki

18   had written this GPR for the most part, but that the

19   dates on the top might have been written by Schalk, that

20   reflects the fact that often, you know, before it gets

21   submitted to the sergeant, detectives might add that --

22   the date and classification kind of information at the

23   top, correct?

24        A.   Correct.

25        Q.   So that often gets added -- like the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  detectives, as they're writing their GPRs, they may
2  write it out and the top may be blank, but they'll fill
3  that in before they turn it in into the sergeant,
4  correct?

5      A.  Well, that's the idea, yeah, to get it there.
6  And then like I said, sometimes we'll either see that
7  it's blank and fill it in ourselves, you know, if you
8  know what the RD is, or have -- send it back to them and
9  have them fill it out or somebody else working on the
10 case.  So the big thing is the -- make sure it gets to
11 the proper file.  That's the -- the whole thing.

12     Q.  Okay.

13     A.  That's the attempt.

14         MR. SWAMINATHAN:  We can take that one down. All
15         right.  I'm going to show you a document marked
16         Exhibit 10, and that's City JF 140 to 147.
17         Brian, it's the closing report.

18             (EXHIBIT 10 MARKED FOR IDENTIFICATION)

19 BY MR. SWAMINATHAN:

20     Q.  All right.  Mr. Wojcik, this is one of the
21 documents you reviewed in preparation for today's
22 deposition, correct?

23     A.  Correct.

24     Q.  Okay.  And this is the closing report from the
25 Sorrell homicide investigation, correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of ANTHONY NORADIN, taken on March 26, 2025

136

```
 1        A.    Well, it's the cleared open report, correct.

 2        Q.    Cleared open.  Thank you.  Who were the

 3   reporting detectives on this?

 4        A.    Well, Ray Schalk submitted the report.  The

 5   reporting detectives were Ray Schalk, Jerry/Jerome

 6   Bogucki, and Tony, or Anthony, Noradin.

 7        Q.    And as one reads one of these reports, there's

 8   references in the report throughout to R/DET.  That

 9   refers to reporting detectives, correct?

10        A.    Correct.

11        Q.    Okay.  And then if we -- who -- did you -- you

12   approved this report, correct?

13        A.    Correct.

14        Q.    All right.  And so this report was submitted

15   by Detective Schalk on May 21st and approved by you on

16   May 24th, correct?

17        A.    That's correct.

18        Q.    Okay.  So when you approved this report, did

19   you refer to any other documents as you went through

20   this report before approving it?

21        A.    I have no recollection at this time whether I

22   did or not.

23        Q.    Okay.  What would've been your typical

24   practice with a cleared open report like this in a

25   homicide investigation?  Would you usually refer to
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of WENDY ROWE, taken on June 20, 2024

137

```
 1   other documents when you went through this before
 2   approving it, or would you just look at the document
 3   itself?
 4        A.   Well, that would depend on the -- not just the
 5   case itself, but on the detectives involved, the -- the
 6   amount of time I had, you know, on several factors
 7   whether I did or not.  If -- think like I might have
 8   explained to you on Tuesday is that if they were
 9   seasoned detectives who I had, you know, reviewed
10   reports from and investigations with in the past and I
11   knew that they were thorough and their documentation was
12   good, if I wasn't aware of the case, rather than
13   spending time going through a whole case file and trying
14   to learn -- get up to speed on the case, I would just
15   review it for -- our big function in that time on
16   approving these is to make sure that for UCR, unified
17   crime reporting, purposes that the boxes are -- are
18   properly filled in, you know, the classification is
19   correct, the classification codes are correct, and then
20   that the narrative flows and it's substantiated in
21   there.  Like I said, other administrative things, you
22   know, check -- make sure that people that they have
23   named as being interviewed that there's actual
24   interviews and that there aren't interviews of people
25   that they didn't put in the boxes or identify, you know,
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 in those searchable boxes, et cetera. So depending on

2 the amount of time I have and the detectives involved

3 and other, you know, circumstances, you know, I may or

4 may not have. For the most part, if it was coming

5 through, what they would do is input this into the CRIS

6 system as submitted for approval and either they'll hand

7 it to a -- let a specific sergeant who's on duty know,

8 or we just come in and electronically we open it up and

9 see what's submitted and we go through them. We're not

10 only, you know, looking at homicide, but, you know, you

11 can come in there and there could be hundreds of cases

12 in there from misdemeanors, batteries, assaults, sexual

13 assaults. So to review every case and every file and --

14 and try to get it -- a handle on the entire

15 investigation, that was a rarity, you know. For the

16 most part, especially with very good detectives and

17 seasoned detectives like Schalk, Bogucki, and then

18 Noradin became a great detective under her tutelage, you

19 know, not being involved in the investigation whatever,

20 I -- I just perused it and -- and approved it based on,

21 you know -- unless they found some spelling errors,

22 grammar errors, or something missing, code wrong, box

23 not filled in. But these guys were very thorough and

24 one of the best teams of detectives I was ever able to

25 work with.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q.    So and that was going to be my -- so Bogucki
2  and Schalk, you viewed as being seasoned, well-versed
3  detectives, correct?
4      A.    Right.
5      Q.    Okay.  And so in that case, you wouldn't spend
6  a lot of time having, you know -- cross-referencing
7  other documents and so you would've given the report a
8  perusal and then approved it?
9      A.    More than likely, yes.  Like on this one,
10  again, I don't remember this case other than I can read
11  my name on there as approving and might have been a time
12  I approved it.  I don't remember approving it. Don't
13  remember what I did or didn't do.  Whether I did look at
14  the file -- as I sit here today, whether I did go
15  through the file, whether I did sit down and talk to
16  them about the case, whether I was aware of anything
17  prior, I -- I don't know.  I'm just telling you that
18  based on the document that I'm looking at, I did approve
19  it.  And in general, when you asked me the question
20  about what I would do to approve a report, I would say
21  it would depend on the circumstances, you know --
22  several circumstances, what I would actually do.
23      Q.    Okay.  And you indicate -- when you reviewed
24  this report, this cleared open report, in preparation
25  for today's deposition, did it cause you to have any

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of ANTHONY WAS TAKEN ON 2/9/25     Page 142 of 326

140

1    memories at all about this Sorrell murder investigation?

2        A.    Not at all, no.  Other than what I read in the

3    document, no.

4        Q.    Okay.  And so did you -- before reviewing this

5    report, did you have any memory of the Sorrell murder

6    investigation?

7        A.    Before reviewing the report now or back then?

8        Q.    I'm sorry.  Just, I mean, in preparation for

9    today's deposition, before you reviewed this report, did

10   you have any memory of the Sorrell homicide

11   investigation?

12       A.    Okay.  Before I reviewed it yesterday or

13   whatever, other than the fact that I had been named in

14   the case, which I learned from attorneys years ago, and

15   I believe I might have perused it -- one of these

16   reports years ago and I told them I don't remember this

17   at all.  I don't think I was involved with this, but I

18   don't -- I can't say that with certainty, but no, I --

19   it doesn't -- it doesn't bring any -- any memories of

20   anything.  You know, again, my testimony on anything in

21   here would be based on the document itself.

22       Q.    Okay.  So that -- and that was my -- so if you

23   -- and any testimony you give about what happened in

24   Sorrell investigation will be based on just reviewing

25   what's written in the report; is that correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.   Correct.  I mean --

2    Q.   Okay.  And then if we turn to page -- the

3 first page of this, it lists offenders and it lists

4 James Fletcher and then it lists unknown.  Do you see

5 that?

6    A.   Yes.

7    Q.   And so that's an indication that essentially

8 there was a second offender who was not charged at this

9 time, correct?

10   A.   Well, apparently was not identified either,

11 and that would be the reason why it would be -- would be

12 classified as cleared open, which is one of my

13 functions.  So like, say they put a report in and it

14 said clear closed, but I see an unknown offender or a

15 second offender or two other offenders, then it -- it

16 shouldn't be cleared closed.  It should be cleared open.

17 So yeah, that is in line with the classification.  But

18 yeah, it does show unknown, unknown with just the

19 description, so that's why it's open because there's

20 still another offender -- known offender out there, at

21 least -- at least one.  By known I mean somebody

22 identified as offender.  We don't know him yet, but we

23 know that there was at least a second offender.

24   Q.   Okay.  If you turn to the investigation

25 section, it begins with -- it begins by listing that

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   there was an interview of Terry Rogers on February 11,
2   2002.  Do you see that?  Oh, I'm sorry.  That Terry
3   Rogers was arrested on February 11th and then
4   interviewed by the reporting detectives on February
5   12th, correct?
6       A.   That's correct.
7       Q.   Okay.  Do you have any personal knowledge
8   about what occurred during the course of the interview
9   of Terry Rogers in February of 2002?
10      A.   None.  Other than what I read in the document.
11      Q.   Okay.  And Terry Rogers had been -- at that
12  time he was brought in because he'd been arrested on
13  another case, correct?
14      A.   According to the document, that's correct.
15      Q.   Okay.  And so at that time, he was facing
16  potential other criminal charges, correct?
17      A.   States -- well, two.  He was -- it states that
18  he was arrested for a criminal trespass to residence and
19  that a name check post that arrest revealed that he was
20  wanted by Cook County Sheriff's on a dangerous drugs
21  warrant.  So there was two basically reasons that, you
22  know, he was in custody.
23      Q.   Okay.  So if an individual like that -- when
24  he's being interviewed by the detectives, is there ever
25  any concern that a witness like that may provide

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   information in hopes of getting some leniency with

2   regard to their own criminal troubles?

3          MR. STEFANICH:  Objection.  Form.  Foundation.

4          THE REPORTER:  I'm sorry.  Was that an objection?

5          MR. STEFANICH:  Yep.  Objection.  Form.

6          Foundation.

7          THE REPORTER:  Thank you.

8          THE WITNESS:  Okay.  Well, if that were the case,

9          then it would've been documented as such

10         normally.  State's attorney's office would've

11         been contacted in that regards.  And then I -- I

12         -- I don't think if Terry -- if Terry Rogers was

13         holding out information based on getting some

14         kind of consideration on the cases that he was in

15         custody for, then I -- I don't believe he

16         would've talked to them.  They do have a

17         statement from him at that time.  So whether or

18         not that was in Sorrell's head, I -- I can't say.

19  BY MR. SWAMINATHAN:

20     Q.   You mean in Rogers' head?

21     A.   I mean Rogers' head.  I'm sorry.  Yes, it was

22  in Rogers' head at the time, I can't say.  By my review

23  the document, there's no indication in here or review of

24  the document that that was the case, that he had stated

25  that to them.  And there's no indication that a state's

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    attorney was called out in order to speak to Rogers, you

2    know, with that in mind.

3         **Q.   Okay.  And if there was any type of leniency**

4    **or promise that was made to Mr. Rogers, that should, of**

5    **course, be documented, correct?**

6         A.   Well, yeah.  And that would have to be via the

7    state's attorney's office because we don't have

8    discretion.  We don't have the power, you know.  We

9    can't determine that, hey -- obviously he's arrested for

10   criminal trespass to resident.  That means that there's

11   a victim of a crime.  We couldn't, you know, make a

12   determination that that crime's not going to be

13   prosecuted.  The state's attorney's office would have to

14   do that in conjunction with the victim of that crime if

15   they were ever going to do that, and I -- I'll just let

16   you know that I've never seen -- not aware of the -- the

17   -- the state's attorneys ever doing that with anybody at

18   this juncture.

19        **Q.   Well, okay.**

20        A.   Now, as far as the warrant, that is a warrant

21   and there was really nothing that can be done with that

22   regardless.  Again, this is Cook County Sheriff's.  It

23   appears that dangerous drugs would mean that probably a

24   police officer or sheriff is a complainant on that. But

25   again, there's nothing in here that LEADS -- indication

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DETECTIVE -, taken on -, 2021

 1   that that ever occurred with Rogers.

 2       **Q.   Now, in this case, it lists Rogers was**

 3   **arrested for criminal trespass, not that he'd already**

 4   **been charged or was facing prosecution, correct?**

 5       A.   Well, for the most part, being it's a

 6   misdemeanor and he was arrested by 15th District

 7   officers, that's usually on a signed complaint for the

 8   most part.

 9       **Q.   Okay.**

10       A.   Yeah.  They could catch him coming out of

11   residence, know he's not -- doesn't belong in there and

12   I don't know if this was burglary related or not, or

13   sometimes, yeah, the only thing they -- they can say

14   they can't locate the victim yet, but can verify that he

15   doesn't belong in there.  They might hold him on a

16   trespass.  But regardless, he still had a -- a warrant,

17   which would mean that he would have to go to court and

18   see a judge, you know, before anything.  You know, it's

19   not like he could be released from custody when there's

20   an active warrant.

21       **Q.   Okay.  And then if you look down near the**

22   **bottom of the page, it says, "Reporting detectives**

23   **checked ICAM arrest records."  Do you see that?**

24       A.   Yes.

25       **Q.   Okay.  So ICAM is a reference to that same**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  ICAM system we were talking about earlier, that has the
2  ability to look at -- or to pull arrest records and
3  arrest photos and so on for an individual, correct?
4      A.   Well, yeah, you can do that, but then you can
5  also use that database to try to identify somebody or
6  further identify somebody also.  Yes.
7      Q.   Okay.  And so obviously in 2002, this document
8  references the fact that they were -- they did have
9  access to and were using ICAM, correct?
10     A.   Correct.
11     Q.   Okay.  And this ICAM system that was used to
12 check for arrest records is the same ICAM system that
13 used to pull photos for photo arrays, correct?
14     A.   Correct.
15     Q.   Okay.  And then it indicates that they learned
16 that Jimmy Fletcher or James Fletcher had some prior
17 arrests, correct?
18     A.   Yeah.  Well, it says that they searched for a
19 Jimmy Fletcher, and then they learned that James
20 Fletcher, also known as Jimmy Fletcher, Eugene Brown,
21 and Arnold Dixon had a -- an IR and yes, he had several
22 arrests, including murder and armed robbery.
23     Q.   Okay.  And Mr. Rogers, according to the
24 document, had indicated that he knew Jimmy Fletcher from
25 when they lived in the area of Fulton and Latrobe and

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  that they'd spent time together in Cook County Jail and

2  Joliet Prison, correct?

3       A.   Correct.

4       Q.   Okay.  So with -- in the case of Terry Rogers,

5  he had -- basically had personal knowledge, he knew

6  Jimmy Fletcher, correct?

7       A.   According to report.

8       Q.   Okay.  And then what it indicates here is that

9  they then conducted a photo array with -- they created a

10  photo array containing James Fletcher, correct?

11      A.   Obtained a photo of James Fletcher, AKA Arnold

12  Dixon, from IDOC website.  Correct.

13      Q.   And it looks like what they've done is they

14  created a photo array of all IDOC photos, correct?

15      A.   Right.  Next sentence says, "The photo was

16  placed in an array with six other IDOC photos of male

17  Blacks with the last name of Dixon."  Correct.

18      Q.   So any understanding of why -- well, strike

19  that.  They could have -- instead of creating a photo

20  array of IDOC photos, they could have created a photo

21  array of ICAM photos, correct?

22      A.   Possibly.  But it -- it's kind of six of one,

23  half dozen the other.  Does it really matter?  I mean,

24  you're -- you're getting photos of the guy and you're

25  creating an array of like photos.  So I -- I think I

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    might have stated that earlier today that, you know, you
 2    just go with what's the easiest available or what you
 3    can do and if they were already in there and they were
 4    on the site, you know -- I don't know.  Maybe they were
 5    having trouble locating a photo of Fletcher via CPD or
 6    ICAM.  I'm not sure.  And they just went with the IDOC.
 7    I mean, it's -- it was a -- I know it is today.  I'm not
 8    sure if it is back then, but it was a open to the public
 9    website where they would have photographs of inmates.
10    So even if it wasn't public, it might have just been
11    easier for them to do that. And that's the way you can
12    do it, so -- it's kind of irrelevant, but, you know,
13    they -- there was similar photos, you know, like photos
14    that would match, you know -- they were all DOC photos,
15    so --
16        Q.   And putting aside Mr. Rogers for a second,
17    this was a 2002 investigation into a 1990 crime,
18    correct?
19        A.   Correct.
20        Q.   Okay.  And so for purposes of conducting
21    identification procedures with witnesses, do you want to
22    use photos of your suspect from 1990 around the time of
23    the crime, how they looked to the witnesses, or do you
24    want to use present photos of your suspect?
25            MR. STEFANICH:  Objection.  Form.
```



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1          THE WITNESS:  Well, I mean, again, you're --

2          probably the best way would be photos from back

3          then, if you have.  And if you --

4    BY MR. SWAMINATHAN:

5        **Q.   And do you have any information that suggests**

6    **-- oh, I'm sorry.  Okay.  Go ahead.**

7        A.   You have like photos.  Now, I don't know when

8    Fletcher went into the joint, you know, and if that

9    picture was taken when he went in there.  If he's been

10   in there for say, for example, he was in there for ten

11   years, then that photo would be close or could be close.

12   The other -- again, like when I said earlier, it depends

13   on the circumstances.  In this circumstance, Rogers is

14   telling them that he knows him.  So, you know, the --

15   it's not like an unknown individual that he saw on that

16   date of the occurrence and then he has never seen him

17   again, you know, that he has never seen before the

18   occurrence and, you know, maybe never seen after, you

19   know.  So it's not somebody he's acquainted with.  This

20   person he's acquainted with, so it's kind of irrelevant

21   at this point because he's acquainted with the

22   individual.  So in other words, if I knew somebody, you

23   know, when we were 20 years old together and I saw him

24   at 30, I'd probably still recognize him.

25       **Q.   And so in the case of Mr. Rogers, they didn't**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 152 of 326 PageID #:7122
The Deposition of ANTHONY WOODS, taken 11/09/2021

150

1   even really need to conduct a photo array.  They could

2   have just shown the photo of James Fletcher since he

3   knew the guy, right?

4       A.   They probably could have, but again, like --

5   like when they put in bold, "questioning only," they

6   were for the most part very cautious and, you know, they

7   -- for the most part, they always went above and beyond

8   what they, you know -- even though they might have been

9   able to show a single photo, they probably felt more

10  comfortable and it was a safer and a better bet to show

11  an array of photos, since one was easily available to

12  them, especially --

13      Q.   And in the case of the other eyewitnesses who

14  had not indicated that they were -- they knew or were

15  friends with Mr. Fletcher, for those witnesses, you --

16  it would be -- and they haven't indicated that they've

17  spoken to the guy or known the guy for years, for those

18  witnesses, you should try to show photos of what the

19  person looked like at the time of the crime, correct?

20           MR. STEFANICH:  Objection.  Form.

21           THE WITNESS:  Which witness in particular are you

22           talking about?  Because I believe one of the

23           other -- in my review of this report, another

24           witness had familiarity with Fletcher.  I think

25           it was the female, Sheenee -- Sheenee Friend.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   BY MR. SWAMINATHAN:
 2       Q.   So let's start with Mr. -- with Ms. Friend.
 3   Ms. Friend indicated in this report that she had seen
 4   one of the offenders several times in the neighborhood.
 5   That's what she had reported, correct?  This is on Page
 6   7 of the supp?
 7       A.   Yeah.  It says, "Friend stated that she had
 8   previously seen one of the offenders several times in
 9   the neighborhood."
10       Q.   Okay.  So she didn't indicate that she was
11   friends with or, you know, had a personal relationship
12   with James Fletcher, correct?
13       A.   It's not stated per se in here, no.  But she
14   is stating that, you know, she had seen the offender
15   several times in the neighborhood.
16       Q.   And she wasn't indicating that she knew him by
17   name or anything else, correct?  Just that she had seen
18   the guy a few times.  It was a face that she feels that
19   she'd seen in the neighborhood.  That's all that's
20   indicated here, correct?
21       A.   That's all that's indicated in the report,
22   correct.  Because she didn't name --
23       Q.   And are you indicating that under those
24   circumstances, it would've been appropriate to do just a
25   single photo viewing for her to say, oh, you know, can
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    you just confirm this is the guy?

2           MR. STEFANICH:  Objection.  Form.  Misstates his

3           prior testimony.

4           THE WITNESS:  No, I would probably do an array

5           personally and -- unless there's any other

6           circumstances that are not recorded in here that

7           were available to them or whatever.  And by

8           reading the next paragraph, it -- it shows that

9           they did show a photo array.

10   BY MR. SWAMINATHAN:

11      Q.   Yeah.  And is anything in here to indicate

12   that, since the time of the crime in 1990, between 1990

13   and 2002, she had spoken with or seen this offender

14   again?

15      A.   I -- I can't say with certainty because it

16   says, "Friend stated she had previously seen one of the

17   offenders several times in the neighborhood," and I --

18   my assumption would be that it previously means prior to

19   the shooting.

20      Q.   Yeah.

21      A.   But does it -- or, I mean, if you want to

22   mince words, does it mean previously seen them prior to

23   their interview on that date?  I don't know.

24      Q.   Okay.  And in your view, would it -- in

25   creating a photo array for Sheenee Friend, would you

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    create a photo array of what the suspect and other

2    individuals looked like at the time of the crime, or

3    would you create a photo array of what Jimmy Fletcher

4    looks like now?

5         A.   That would depend on what's available to you,

6    you know, in -- as far as photos, so --

7         Q.   And if they had photos available to them of

8    what Jimmy Fletcher looked like in 1990 and around 1990,

9    then they should have used those photos, correct?

10        A.   Well, again, you're talking about two

11   individuals, Rogers who had more of an acquaintance with

12   the guy or whatever, and then now her who both had seen.

13   So, you know, based on the report itself, I can't state

14   one way or the other.  I mean, you know, she stated she

15   had seen him in the neighborhood, so -- and I don't know

16   what was available to them.  I don't know when that

17   picture of Fletcher was actually taken, what year that

18   photo on the IDOC site was from, you know, not knowing

19   how long he's been in the joint, if he was in the joint

20   before that, and the picture from his prior

21   incarceration was in there.  So it's -- it's hard to

22   say.  I mean, in general, best practices and absent

23   real-world issues, yeah, if you could immediately get

24   one while your witness is available and sitting right

25   there in front of you and talking to you and

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
1  cooperative, yeah, you know, you could try to get the
2  earliest photo that's closer to the time of the
3  incident.  If -- again, there's real world that comes
4  into play, so -- and again, secondarily to that, they
5  both -- both of these witnesses had stated was, you
6  know, essentially not the only time that they had seen
7  this person, so --
8      Q.   So ideally you would -- if you were going to
9  show photos, you try to use photos of what the person
10 looked like close in time to the crime, fair?
11     A.   Depending on the circumstances.  Again, if --
12 if -- if a wife or a -- a neighbor who -- a guy was
13 living with him for 20 years, they grew up together and
14 then the guy committed a crime and he fled and ten years
15 later, you have him, well, do you need to go through the
16 maybe waiting days or searching through and trying to
17 find an earlier photo when -- again, it depends on the
18 circumstances.  Absent no prior knowledge of the person,
19 no prior sightings, and absent any real world issues in
20 finding a photo closer to the time of incident, the
21 availability of those photos, and having your witness
22 available when you can acquire that type of photo,
23 absent all that, yeah, sure, the -- you know, you would
24 like to get the -- a photo as close to the date of the
25 incident as possible.  But again, real world comes into
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 157 of 326 PageID #:7127
The Deposition of ANTHONY was filed: taken on Page 157 of 326
155

1  play.  And again, the other circumstances are they both

2  stated they had some acquaintance and/or contact or

3  sighting of this person on occasions, more than one

4  occasion.  So you do your best and that's all you can

5  really do.

6  **Q.   And are you aware of anything from your review**

7  **of the documents that indicates that there would've been**

8  **anything to prevent them from being able to get a photo**

9  **of what Jimmy Fletcher looked like in and around 1990 in**

10  **the time from February 12, 2002, when they interviewed**

11  **Terry Rogers, until March 7, 2002, when they interviewed**

12  **Sheenee Friend?**

13  A.   Well, again, there's nothing stated, but then

14  again, I -- I think the question assumes that the

15  picture they showed them was from right around the time

16  of the interview in 2002 when -- it doesn't state in any

17  way that picture that they're showing him could be from

18  IDOC and it could be from 2004, could be from -- I mean,

19  from 1992 or '91.  Don't know that.  You know what I

20  mean?  So but there's nothing specifically stated in

21  here that -- why they did or did not.  And maybe they

22  did.  And maybe this was the oldest photo that they can

23  find.  So there's nothing stated either way on that

24  specifically in the report.

25  **Q.   Let me show you a document I'm marking --**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  well, it's -- oops.  Showing you a document I've marked

2  as Exhibit 11.  This is City JF 4544.  This is a copy of

3  Jimmy Fletcher's rap sheet, correct?

4           (EXHIBIT 11 MARKED FOR IDENTIFICATION)

5      A.   I'm -- as soon as I can --

6      Q.   Oh.

7      A.   It's pretty small on the screen here, so --

8      Q.   Yeah.  Yeah.  I'll wait.

9      A.   It looks like -- it -- it looks like that.

10     Q.   Okay.  I'll -- and I'll just let you -- wait

11 for you get the document.  I don't want you to strain

12 your eyes.  And this indicates that -- it has that stamp

13 that we talked about earlier.  This indicates that the

14 criminal history as of the indicated date, February 12,

15 2002.  Do you see that?

16     A.   Correct.

17     Q.   So this was stamped by the identification

18 section as having been processed to send back to the

19 detective division area on February 12th, correct?

20     A.   Okay.  I'm sorry.  I --

21     Q.   No.  So I'll ask it again.  The stamp

22 indicates that the record -- strike that.  The stamp

23 indicates that the identification division sent back the

24 criminal history of James Fletcher to detective division

25 on February 12, 2002, correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DETECTIVE WAYNE CARL, taken 02/03/23

1    A.    Well, it says that contains all information as

2    of February 12th.  It doesn't specifically state when he

3    sent it, but yes, it was processed on that date.

4        Q.    And in fact, if you look at the bottom and

5    here, you can see the fax stamp, correct?  At the very

6    bottom of the page?

7        A.    Yeah, I see it now.  Sure.

8        Q.    Okay.  And so this was sent to the detective

9    division at -- on February 12, 2002 at looks like 8:48

10   p.m., correct?

11       A.    Correct.

12       Q.    Okay.  And so I think based on your earlier

13   testimony, in your experience, this would've been sent

14   back, you know, possibly same day or possibly one day

15   later.  So this would've been requested in and around

16   February 12, 2002, correct?

17       A.    I would assume so.  Yes.  If they faxed it

18   over, if they carried it over, if they sent it in the

19   mail.  Somewhere around that time.  Correct.

20       Q.    And just as you can ask the identification

21   section to send you the criminal history, they could

22   also ask the records division to send them

23   identification photos, correct?

24       A.    Correct.

25       Q.    Okay.  And this rap sheet indicates that there



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  would've been or likely would've been arrest photos of

2  Mr. Fletcher associated with each of these arrests

3  listed here, correct?

4      MR. STEFANICH:  Objection.  Form.  Foundation.

5      THE WITNESS:  Okay.  I would answer that yes with

6      the caveat that they don't -- there was times at

7      every arrest that they didn't take a photo and --

8  BY MR. SWAMINATHAN:

9      Q.    But in the routine -- oh, go ahead.

10     A.    The time in -- there was a time when, if say

11  an individual was arrested Monday, Tuesday, Wednesday,

12  Thursday, Friday of the same week when he came in there,

13  then based on the fact that he had just recently been

14  photographed, or I don't know what the time frame and

15  parameters they used, so there was times where he was

16  CB'd without being photographed.

17     Q.    Okay.  But for the most part, a person -- the

18  normal course was you take a -- you take an arrest photo

19  each time you arrest somebody, correct?

20     A.    For the greatest percentage of the time,

21  correct.

22     Q.    Okay.  And the exception you're identifying is

23  that the person had been -- if you already had so many

24  photos is the only reason you could think of that you

25  wouldn't then also be taking a photo another time,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 161 of 326 PageID #:7131
The Deposition of ANTHONY TODD, taken on 03/29/23

159

1    correct?

2        A.   Right.  And there was other times where, you

3    know, the -- the system was down and they couldn't, but

4    it's easily to find that out by checking the CBs, you

5    know.  Ordering photos by the CBs instead of the IR.

6        Q.   So in the case of Mr. Fletcher, they could

7    have certainly requested photos associated with each of

8    these CB numbers on Exhibit 11, correct?

9        A.   I'm -- I'm sorry.  I lost you here.  Could

10   have what?

11       Q.   Yeah.  They could have requested arrest photos

12   of Mr. Fletcher associated with each of these CB numbers

13   on Exhibit 11, correct?

14       A.   Yes, they -- they could have.  I don't know

15   that they didn't.  I don't know that they did.  I don't

16   know that they weren't available.  I mean, but yes, they

17   could have.

18       Q.   And barring something unusual, they would have

19   had arrest photos of Mr. Fletcher in April, August,

20   October, and November and December of 2001, correct?

21           MR. STEFANICH:  Objection.  Form and foundation.

22   BY MR. SWAMINATHAN:

23       Q.   I'm sorry.  Not 2001, of 1991.  Let me ask it

24   again.  In the normal course, you would expect that

25   given this criminal history of Mr. Fletcher, that he had

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 162 of 326 PageID #:7132
The Deposition of ANTHONY WOLAK, taken on June 25 2024
160

1    arrest photos from April, August, October, November, and
2    December of 1991, correct?
3         A.   It appears that way, yes.
4         Q.   Okay.  And so --
5         A.   All of those or few of them, but yes, you're
6    correct.
7         Q.   Okay.  So it is likely that there were arrest
8    photos of Mr. Fletcher available from the period of
9    around 1991, close in time to the shooting in this case,
10   fair?
11            MR. STEFANICH:  Form.  Foundation.  You can
12            answer.
13            THE WITNESS:  It appears that way.  Yes.
14   BY MR. SWAMINATHAN:
15        Q.   Okay.  And having looked at the closing
16   report, are you aware of any reason why Detective
17   Bogucki and Schalk could not have pulled arrest photos
18   of Mr. Fletcher from in and around 1991 to use in a
19   photo array?
20        A.   It -- it doesn't specifically state anything.
21   No.  So I'm not aware.
22        Q.   Okay.  And then --
23        A.   I can only --
24        Q.   Okay.  Go ahead.
25        A.   -- speculate.  Again.  Like I stated, don't

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    know when that IDOC photo was from.  I don't know the

2    immediacy of, you know, maybe the witness says, look, I

3    got to get out of here and my -- I got to go pick my --

4    my -- my child up in 15 minutes, and they were able to

5    get it from IDOC as opposed to ordering it from the --

6    from Ident.  I don't know.  You know, so we can -- we

7    can look back and try to dissect it, but I don't have an

8    answer for that, and again, I -- I don't know that it

9    would have made a difference anyway.

10    **Q.   And then if we look at the next section of**

11    **this closing report on Page 6, it indicates that they**

12    **located the bread truck driver, Edward Cooper, and they**

13    **had him view the same IDOC photo array, correct?**

14    A.   Well, that would have been prior to locating

15    Sheenee Friend.

16    **Q.   Correct.**

17    A.   They did -- they did speak to Cooper, and they

18    showed him a photo array.  The same one that says here

19    they stipulated that it had been shown to Rogers.

20    **Q.   So that would be the photo array consisting of**

21    **IDOC photos, correct?**

22    A.   By the reading in the report, that is correct.

23    **Q.   Okay.  And there was no -- there is nothing in**

24    **here that indicates that Mr. Cooper had ever stated that**

25    **he was familiar with or knew the perpetrator from the**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of XXXXXXXXXX, on XXXXXXXXXX

162

1   neighborhood, correct?

2       A.    Not in this report, no.

3       Q.    Okay.  And so ideally, with Mr. Cooper, you

4   would -- they would have shown him photos of what

5   Fletcher looked like close in time to the crime when

6   Mr. Cooper may or may not have seen him, correct?

7       A.    Well, again, in a perfect situation, perfect

8   world, perfect availability, that would be the best way

9   to do it, but again, sometimes you have to do what you

10  have to do.  I'm sorry.

11      Q.    And then is it -- I'm sorry.

12      A.    Again -- again, don't know when that picture

13  of Fletcher that they showed was taken -- was taken, and

14  how close he is at that time and -- to how he appeared

15  in 1990.  Don't know, so -- but I mean, in general,

16  without specific cases being considered, or specific

17  circumstances or whatever, in general, you would say

18  best -- yeah, they have a closest representation to the

19  offender when you're talking about years as he was at

20  the -- you know, as he appeared to -- on the -- on the

21  date of incident.  You would -- you would always hope

22  for that.

23      Q.    And the same -- whether they were using IDOC

24  photos or ICAM photos or any other sets of photos, the

25  goal is still the same, which is to not have a lineup

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    that suggested what we talked about earlier, correct?

2        A.   Correct.

3        Q.   And so if they did a photo array using IDOC

4    photos, they still want to try to get fillers who look

5    similar as much as possible to their suspect, correct?

6        A.   As best as possible, correct.

7        Q.   Okay.  Okay.  And the -- sorry, the closing

8    report indicated that they created a photo array

9    consisting of a photo of Jimmy Fletcher from the IDOC

10   website along with six other IDOC photos of male Blacks

11   with the last name Dixon, correct?

12       A.   Correct.  But Fletcher was incarcerated under

13   the name Dixon.

14       Q.   Correct.  And any indication of why they would

15   needed everybody to -- there was no reason they needed

16   to have everybody have the last name Dixon, correct?

17       A.   I -- I don't know.  You know, it's possible

18   that in showing the photos, they didn't want different

19   names, or if -- if they could not either redact or

20   otherwise get the names out of there.  I -- I don't

21   know.  I would be speculating.  But they -- for whatever

22   reason, they went with his name and they ran six other

23   Dixons, and then showed it to him.

24       Q.   Yeah.  In this case, there was an indication

25   from Mr. Rogers that he knew this person as Jimmy

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   Fletcher, correct?

2       A.   That's correct.

3       Q.   Okay.  So there's no particular reason why

4   they needed to pull all people with the name Dixon,

5   correct?

6       A.   Not that I can ascertain from this report.

7       Q.   And in fact, if Mr. Rogers had known Jimmy

8   Fletcher by the name Arnold Dixon, then it would be

9   problematic to include the names on the IDOC photos,

10  correct?

11      A.   No, because if they were all with the name

12  Dixon, then it's irrelevant because they're all -- there

13  is no -- anything that is going to lead you to one

14  picture because one picture says Dixon and the others

15  don't.  Here they are.

16      Q.   Well, I'm -- yeah, I'm sorry.  I may have --

17  I'm -- I don't know if I explained it clearly.  If they

18  pulled all Dixons, but they had different names, so they

19  were Arnold Dixon, Arthur Dixon, if they all had

20  different first names, then it would be problematic if

21  you showed the photo array to Mr. Rogers with the names

22  on the photos, correct?

23          MR. STEFANICH:  Objection.  Form.  Foundation.

24          THE WITNESS:  Okay.  I'm kind of lost.  But if --

25          if he gave the name Jimmy Fletcher, and then

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1          they're showing pictures of all people with
 2          various first names but the last name Dixon, that
 3          would -- in my mind, he still picks out Jimmy
 4          Fletcher.  It's not like he looked at it and --
 5          and said, no, he's not in there, because he saw
 6          it was all Dixons, and he knows it is Jimmy
 7          Fletcher, and he doesn't see a Fletcher in there.
 8          So that would indicate to me maybe a little
 9          stronger identification because even though he
10          would have saw -- seen all people with the last
11          name of Dixon, he still picked out Jimmy
12          Fletcher.
13 BY MR. SWAMINATHAN:
14      Q.   Good point.  And then do you see any
15 indication in the file about whether or not Terry
16 Rogers, who indicated that he knew Jimmy Fletcher from
17 the neighborhood and had known him for a long time, any
18 indication about whether or not he knew that Jimmy
19 Fletcher went by the name Arnold Dixon?
20      A.   I -- I don't see that indicated in the report,
21 no.
22      Q.   And if Terry Rogers knew that Jimmy Fletcher
23 went by the nickname Arnold Dixon, then it would be a
24 problem to include the names in the photo array,
25 correct?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.   If he knew first and last name, and there was

2   no other Arnold Dixons in there, correct.  I mean --

3    Q.   Okay.  And --

4    A.    -- if -- if I -- I know him as Arnold Dixon,

5   and then they show photographs, be it six people with

6   the last name of Dixon, but in the photographs he's

7   looking at, there is an Arnold Dixon, then yeah, you --

8   you might be able to argue or -- or somebody may

9   determine that that was a suggestive photo array, but

10  that is not what it -- the report indicates occurred.  It

11  appeared that he had said Jimmy Fletcher.

12       MR. SWAMINATHAN:  Okay.  All right.  Let's take a

13       look at Exhibit 12.  The -- this is the photo --

14       IDOC photo array.  Brian, you can show that one

15       to Mr. Wojcik, I just want to flag that that

16       version has some redactions on it from the

17       state's attorney, and so I pulled a different

18       version.  So I'm going to read the version that

19       I'm pulling up on my screen, the Bates stamps.

20           (EXHIBIT 12 MARKED FOR IDENTIFICATION)

21       MR. STEFANICH:  Okay.

22  BY MR. SWAMINATHAN:

23       Q.   And so this is a document I marked as Exhibit

24  12.  It's Bates stamped JNB 1563 through 1569.  And it

25  contains seven photos, and at the top of each page, it

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   says, "Illinois Department of Corrections."  Do you see
 2   that, Mr. Wojcik?
 3       A.   Yes, I do.
 4       Q.   Okay.  And I think the version that you have
 5   in front of you has a different Bates stamp.  It's
 6   slightly different, but it's a little bit clearer to
 7   read the version you are looking at.  Your version says,
 8   "CCSAO conflicts 1761 through 1767," correct?
 9       A.   Correct.
10           MR. SWAMINATHAN:  Okay.  And I'll mark that one
11           as Exhibit 13, just so that there's no -- so the
12           record is clear that we have two versions of this
13           seven-person photo array.
14              (EXHIBIT 13 MARKED FOR IDENTIFICATION)
15   BY MR. SWAMINATHAN:
16       Q.   So this appears to be the photo array
17   containing Arnold Dixon or Jimmy Fletcher, as well as
18   six additional individuals' IDOC photos, correct?
19       A.   Correct.
20       Q.   Okay.  And if you look at this photo array,
21   does it cause you any concerns in terms of whether or
22   not this was a suggestive or fair photo array?
23       A.   No, it does not.
24       Q.   Okay.  And in this photo array -- well, first
25   of all, when you typically conduct photo arrays in the
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  Chicago Police Department using ICAM photos or photos
2  from the identification section, the individual's name,
3  birth dates, height, weight, that kind of descriptive
4  information is not included when you conduct a photo
5  array, correct?
6      A.  For the most part, yes, that is correct.
7      Q.  Okay.  And in this case, the photo array did
8  include not only the individual's name, but also their
9  date of birth, weight, hair, sex, height, race, and
10 eyes, correct?
11     A.  I -- it appears on mine that the date of birth
12 is redacted, so I don't know if that was then.  I -- I -
13 - I'm assuming that that might have occurred after. I'm
14 not sure.
15     Q.  Yeah.  And look at the -- that's why I pulled
16 up this version, Exhibit 12, that's on my screen.
17     A.  Oh, okay.
18     Q.  What you have is the version produced by the
19 State's Attorney's Office to us in the litigation.  So
20 in the litigation, they typically redact the dates of
21 birth and Social Security numbers.  But if you look at
22 the version that has been produced in this case here,
23 Exhibit 12 on my screen, the dates of birth are not
24 redacted.  Do you see that?
25     A.  Okay, I see that.  Yes, I do.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.    Okay.  All right.  So in this IDOC photo

2    array, there is -- these photos in -- the photos used in

3    the photo array included a number of pieces of physical

4    descriptive information of each of the individuals,

5    including their date of birth, correct?

6    A.    Correct.

7    Q.    Okay.  And if you look at these photos,

8    Mr. Fletcher's date of birth is March 30, 1963, correct?

9    A.    Correct.

10   Q.    Okay.  And that would have made him

11   approximately 27 years old at the time of the Sorrell

12   investigation, correct?  I'm sorry, at the time of the

13   Sorrell crime, correct?

14   A.    I'd have to -- have to calculate that out,

15   Counselor, '63 to '90.  Well, but yeah, right around

16   there, you're correct.

17   Q.    I'm not good at a lot of things, but math is

18   one of my stronger suits.  Let's see.  Okay.  I'm going

19   to show you a document I have marked as Exhibit 14.

20   Okay.  This is City JF 47 to 51.  This is the original

21   supplementary report created on December 21, 1990, by

22   Detective Michael Fleming.  See that?

23        (EHXIBIT 14 MARKED FOR IDENTIFICATION)

24   A.    Okay, Counselor.

25   BY MR. SWAMINATHAN:

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q.   Okay.  So this is the original scene

2  supplementary report filled out by Detective Fleming

3  back in -- on December 21, 1990, right after this crime

4  had occurred, fair?

5     A.   That's what it appears to be, yes.

6     Q.   Okay.  And there's a wanted section here.  Do

7  you see that on Page 2?

8     A.   Yes.

9     Q.   Okay.  And the individuals who are listed as

10  wanted are male Blacks in their 20s, correct?

11     A.   That is correct.

12     Q.   Okay.  And they are both listed as having a

13  slim build, dark complexion, and one is listed as having

14  a collar-length curls, and the other is listed as having

15  black hair in a ponytail, correct?

16     A.   Correct.

17     Q.   Okay.  And Mr. -- and if you -- okay, let's

18  pull that down.  And if you go back to the closing

19  report for a moment, you see that Jimmy Fletcher is

20  identified as one of the perpetrators, and the other

21  perpetrator is identified as the individual with the

22  ponytail, correct?

23     A.   On -- on the closing -- clear -- cleared open?

24     Q.   Yeah, cleared open.

25     A.   Okay.  Okay, I'm sorry, what was the question



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 173 of 326 PageID #:7143
The Deposition of ANTHONY WEST, taken on March 18, 2024
171

```
 1   now?

 2       Q.   Yeah.   On the cleared open, it lists the

 3   offender as being Jimmy Fletcher, and then the unknown

 4   individual is the second offender, the person with the

 5   ponytail.  Do you see that?

 6           MR. STEFANICH:  I'm going to object.  Form.

 7           Foundation.

 8           THE WITNESS:  Okay.  Yeah, for Fletcher, it has

 9           black hair, long hair.  For the unknown unknown,

10           it has black hair, ponytail hair.

11   BY MR. SWAMINATHAN:

12       Q.   Okay.  And so if we go back to the original

13   scene supp in Exhibit 14, Offender number 2 is the one

14   with the ponytail.  Offender number 1 is the one with

15   the collar-length curls, correct?

16       A.   In the original, that's correct.

17       Q.   Okay.  And so it looks like they basically

18   identified Jimmy Fletcher as being Offender number 1,

19   correct?

20           MR. STEFANICH:  Objection.  Form.  Foundation.

21           THE WITNESS:  I can't say with certainty that

22           that was their intent, but if you're stating by

23           based on the hair descriptions, it doesn't say

24           collar length exactly, it says long hair.

25           Whether or not that's considered long hair or
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 174 of 326 PageID #:7144
The Deposition of ANTHONY NOBLE, taken 11/10/23

172

```
 1              not, I don't know.  And it -- the ponytail, yes,
 2              it would say -- it would be more exact to the
 3              second one, where it says black hair, ponytail on
 4              the original, on the scene supp, and it says
 5              black hair, ponytail in the unknown unknown, so -
 6              -
 7    BY MR. SWAMINATHAN:
 8         Q.   And if you look -- if we look back --
 9         A.   We can draw that inference based on that.
10         Q.   And if we look back at Exhibit 12, the photo
11    array?
12         A.   Okay.
13         Q.   We noted the date of birth for Arnold Dixon,
14    or Jimmy Fletcher, as being March 3, 1963.  So he would
15    have been in his 20s, 27 years old, at the time of the
16    Sorrell crime, correct?
17              MR. STEFANICH:  Asked and answered.
18              THE WITNESS:  Yes, that's correct.
19    BY MR. SWAMINATHAN:
20         Q.   Okay.  Then if we look at the next photo, if
21    it's somebody -- it's of somebody named Arthur Dixon.
22    You see that?
23         A.   Yes.
24         Q.   Arthur Dixon was nine years younger than Jimmy
25    Fletcher, correct?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        MR. STEFANICH:  You have to show it on your
 2        screen.
 3        THE WITNESS:  Yeah, I don't --
 4  BY MR. SWAMINATHAN:
 5     Q.   Oh, it's not on my screen?  Okay.  Sorry.
 6  Yeah, let me see here.  Okay, yeah.  This is Page number
 7  2 of Exhibit 12.  It indicates his date of birth is
 8  1972, correct?
 9     A.   Yes.
10     Q.   So anybody viewing this photo array would
11  immediately know that Arthur Dixon was 18 years old at
12  the time of the Sorrell crime, correct?
13        MR. STEFANICH:  Objection.  Form.  Foundation.
14        THE WITNESS:  Well, given that they knew ages,
15        that they saw the ages, and they sat there and
16        calculated all that out, you know, that would
17        have to have been -- that would be true.  I don't
18        -- you know --
19  BY MR. SWAMINATHAN:
20     Q.   If somebody looked at the date of birth, they
21  could calculate pretty quickly what the age of Arthur
22  Dixon was at the time of the crime, correct?
23     A.   Correct.
24     Q.   And the next individual on Page 3, Darnell
25  Dixon, his date of birth is 1971, so he would've been
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    approximately 19 years old at the time of the crime,

2    correct?

3        A.   Approximately, correct.

4        Q.   Okay.  And the next individual, Devon Dixon,

5    anybody looking at that photo could see the date of

6    birth and immediately recognize that he was

7    approximately 16 at the time of the Sorrell murder,

8    correct?

9        MR. STEFANICH:  Objection.  Form.  Foundation.

10       THE WITNESS:  Approximately, correct.

11   BY MR. SWAMINATHAN:

12       Q.   And then if you look at Page 5, Otis Dixon,

13   Otis Dixon is identified as being born in 1964, so he

14   would have been around the same age as Jimmy Fletcher,

15   about 26 years old at the time of the crime, correct?

16       MR. STEFANICH:  Hold on one second.

17       THE WITNESS:  Okay.  I'm sorry.  Otis Dixon?

18   BY MR. SWAMINATHAN:

19       Q.   Yes.

20       A.   Born in '64.

21       Q.   Uh-huh.

22       A.   Right.

23       Q.   So he was close in age to Mr. Fletcher, fair?

24       A.   Correct.

25       Q.   Okay.  In the case of Mr. Otis Dixon, though,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  he appears to be bald or very nearly bald, correct?

2      A.   Well, no, he's just got short, tight hair, but

3  the -- doesn't -- I wouldn't call him bald, but he has

4  short --

5      Q.   You said short -- did you say short, tight

6  hair?

7      A.   Yeah, I wouldn't call him bald.  He's got

8  hair.

9      Q.   Okay.  And then picture number -- and then

10 number 6 is Jarone Dixon, and he was born in 19 -- his

11 date of birth is listed on the photo array itself as

12 being 1982.  So he was about 8 years old at the time of

13 the crime, correct?

14     A.   Correct.

15     Q.   Okay.  And then if you look at Frederick

16 Dixon, his date of birth is listed in the photo array as

17 being 1972, so he would've been approximately 18 at the

18 time of the Sorrell crime, correct?

19     A.   Correct.

20     Q.   So other than Mr. Fletcher, there was only one

21 other individual in this photo array who was in their

22 20s at the time of this crime, correct?

23     A.   I didn't memorialize all those ages, but I

24 will accept that.  I'm sorry.

25     Q.   Okay.  And does that cause you any concern

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    that they created a photo array in which there was only

2    one other individual who was in his 20s like Mr.

3    Fletcher?

4        A.    No.  I mean, you have to look at the photo

5    array itself and the characteristics and then make a

6    judgment on whether or not it's a fair photo array.  I

7    mean, some people are in their 30s and they look like

8    they're 50.  Some people are 50 and they look like

9    they're in their 30s.  So this would have to be a -- you

10   know, again, looking at it, I don't think there's

11   anything wrong when you just look at the faces, the

12   frontals, and the profiles.  And the hair and that can

13   change over time, regardless, you know, so you -- you

14   know, you're talking years later, so a guy can have --

15   be -- you know, have tight hair back then and -- and

16   curls now.  He could have longer hair back then and be

17   bald now.  But if you just look at the pictures

18   themselves, I think it's a -- I don't think it's --

19   there's anything wrong with that photo -- the photo

20   array itself.  And again, you're getting back to

21   splitting hairs when you have people that knew the

22   individual, you know, especially Rogers, where you

23   probably could have just shown them a -- a straight up

24   one-on-one photo because of the past, the acquaintance.

25       Q.    That's not true of Mr. Cooper, though, is it?

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.    I'm sorry?

2      **Q.    That's not true of Mr. Cooper, though, is it?**

3      A.    Oh, I'm just saying in that regards with him,

4  you know.  But regardless, if -- if -- if just looking

5  at the physical characteristics, the faces and that, and

6  the quality of the photos, you know, et cetera, et

7  cetera, I don't think there's any glaring issues with

8  it, you know, given the -- the passage of time.  Now,

9  had --

10     **Q.    And you have an understanding that Mr. --**

11     A.    -- had this been -- had this been the day

12  after, you know, where somebody said he was bald and now

13  you're showing -- you're putting people with corn rows

14  in there, or collar-length hair, the day after the

15  incident, then you could say, well, those are obviously

16  not your guys.  So, you know, if -- you know, if you

17  have a 30-picture photo array, and ten of them have

18  that, well, you still may be good by the numbers, you

19  know?  So every one of these has to be judged

20  individually and based on circumstances and based on

21  your witnesses, you have to view that, you know?

22     **Q.    Does it cause you any concern that one of the**

23  **photos used in this photo array was of somebody who was**

24  **8 years old at the time of the crime?**

25     A.    No, because, again, look at the faces, look at

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  the -- the -- the photographs themselves to determine,

2  you know, whether or not it's a bad photo array.

3       Q.  Okay.  So you could -- and by that standard,

4  you could have a photo array where everybody looks

5  pretty similar to your perpetrator, at the bottom of

6  every page you could write "this is not the guy," right?

7  Because if the photos look pretty similar, it's okay,

8  right?

9       A.  I -- I'm sorry, you lost me there with that.

10      Q.  Yeah.  What if all these photos look very

11  similar to Mr. Fletcher, almost twins of Mr. Fletcher,

12  but on every one of the other photos at the bottom of

13  the page, it said, "This is not the guy."  That would be

14  a fair photo array according to you, right?  Because the

15  photos all look similar, correct?

16          MR. STEFANICH:  Misstates his testimony.

17          THE WITNESS:  I'm -- I'm -- I'm not understanding

18          what you mean by it's written under "This is not

19          the guy."

20  BY MR. SWAMINATHAN:

21      Q.  Yeah.  If I -- each -- if each of these

22  photos, instead of having a date of birth that indicated

23  the person was 8 years old, instead of that, it just

24  said, "This is not the perpetrator," what if it had said

25  that?  Would that be problematic?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 181 of 326 PageID #:7151
The Deposition of ANTHONY WORD, taken March 22, 2023

179

```
 1          MR. STEFANICH:  Objection.  Form.
 2          THE WITNESS:  You mean somebody just happened to
 3          write on there this is not the perpetrator?
 4   BY MR. SWAMINATHAN:
 5      Q.   Yeah.  What if Bogucki and Schalk wrote on
 6   every one of the photos other than Jimmy Fletcher, they
 7   wrote, on the bottom of the page, "This is not the
 8   perpetrator."  Would that be okay?
 9      A.   And they're all the same, you mean?  Okay.
10   Like on here, every one of them says "Illinois
11   Department of Corrections."  So if all of them say that,
12   then it's even.  There's no difference in -- as far as -
13   -
14      Q.   No, I said other than Jimmy Fletcher.  I said
15   if every other photo other than Jimmy Fletcher says,
16   "This is not the guy" --
17      A.   Hold on.  Let me finish, Counselor.  Let me
18   finish.  So in regards to what you're stating, if every
19   one of them had the exact same verbiage, and if -- like,
20   in this one, they all say -- if -- if, for example, I
21   showed an array, and one of them had Illinois Department
22   of Corrections, and the other ones had nothing, then
23   that might be bad because the one handing the witness
24   may see -- may be, this guy's been in a joint.  It's
25   from DOC.  It's -- that guy's a criminal.  Okay.  Yeah,
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  it's him.  If everything is in balance, whether -- to

2  me, it doesn't matter what you have on there, if you

3  have a -- a picture --

4       Q.   No, but you're not answering my question.

5  Focus on my question.  So my question is picture number

6  one, the picture --

7       A.   I'm trying to -- the question -- to me, it's

8  irrelevant if you have a picture of a tree on every one,

9  and it's the same tree, it's irrelevant because it's a

10 balance, so --

11      Q.   But you -- but you're wasting your time

12 because you're not answering my question, so we'll do it

13 again.  But I mean, I want to get you out of here

14 sooner, so let's try it again.  Picture number 1 is

15 Jimmy Fletcher.  Picture number 2 through 7 are these

16 other individuals.  And on Pictures 2 through 7, it --

17 on the bottom of the page, it says, "This is not the

18 perpetrator."  Is that a fair photo array?

19      A.   Oh, and Dixon's doesn't say that?

20      Q.   Yeah, Dixon's does not say that.

21      A.   Okay.  Well, no, then it's not because, again,

22 they're not all the same.

23      Q.   But why isn't that a fair photo array --

24      A.   I just --

25      Q.   -- if their pictures all look similar?

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.    What's that?

2    Q.    Why isn't that a fair photo because their

3  pictures all look similar?

4    A.    Well, that is now you're -- you're telling

5  your -- you're telling your witness this is not the

6  offender.  You used the word perpetrator, but this is

7  not the offender.

8    Q.    Uh-huh.

9    A.    So there's a difference there.

10   Q.    And in your view, showing somebody a photo of

11 somebody who was 8 years old at the time of the crime,

12 that's not the same as saying, "This is not the

13 offender"?

14       MR. STEFANICH:  Objection.  Form.  Misstates his

15       testimony.

16       THE WITNESS:  Did the witness see that and did

17       the witness calculate that?  Again, I don't know

18       that. I don't know that they showed it to him and

19       he saw the date of birth.  I don't know that he

20       calculated that. There's no indication in here.

21       And if he took the one out that was 8-years-old,

22       you still have, what, four other fillers in

23       there, you know?  You know, it's not like you're

24       down to then two other people that are -- or only

25       one other person that's possible.  You still have

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1          other possibilities.
 2   BY MR. SWAMINATHAN:
 3        Q.   Do you agree that the date of birth --
 4        A.   There's no indication either way whether or
 5   not they covered that up or he saw that or he was able
 6   to read that or did they fold the paper?  Did they cover
 7   that?  I don't know.  I mean --
 8        Q.   Do you agree that the -- that information, the
 9   date of birth and other information, should have been
10   covered or hidden when the witnesses viewed the photo
11   array?
12        MR. STEFANICH:  Objection.  Form.  Foundation.
13        You can answer.
14        THE WITNESS:  Best practices and not knowing
15        whether they did that or not, or whether the
16        witnesses saw that or not, again, you have
17        somebody who was an acquaintance with him, so I -
18        - I think that's irrelevant in that case.
19        Another one where she saw him in the neighborhood
20        several times, somebody can try to question her
21        further and argue whether or not any of that was
22        relevant, whether she saw that or was able to
23        ascertain that or not.  And again, I don't know.
24        I mean, best practice, best -- best scenario by
25        the book, yeah, you would like to eliminate any
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 185 of 326 PageID #:7155
The Deposition of ANTHONY was filed under Seal Page 185 of 326
183

1              other things that are different in -- in that
2              picture.  I mean, one -- you know, again, they
3              have different names, different DOC numbers, but
4              yes, you know, perfect?  Perfection?  Yes.
5     BY MR. SWAMINATHAN:
6         **Q.   Best practice by the book, you'd be conducting**
7     **a photo array where the person saw photos without a**
8     **bunch of identifying information, fair?**
9         A.   Correct to the extent that, again, if he was
10    the only one with identifiers, then it -- he would stand
11    out.  If there are identifiers that somebody can read
12    and ascertain and -- you know, and if that was shown to
13    him as a difference, and then they can eliminate some of
14    the other people in there based on those demographics, I
15    mean, they're all male Blacks, you know, the height and
16    weight doesn't really matter much because of the time
17    difference.  So the only thing that somebody can argue
18    there in reality is the date of birth.  Now, whether or
19    not that was seen by a witness that didn't know them
20    prior, I -- I don't know.  It doesn't state one way or
21    the other in the report, so I can't speak for that.
22        **Q.   So we've already talked about the --**
23        A.   So -- had no knowledge of the person, and
24    you're giving them a chance to peruse everything on
25    there on every -- on every one of these and they're

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 186 of 326 PageID #:7156
The Deposition of ANTHONY VILLARDITA, taken on 04/09/2024
184

1   calculating ages and stuff, you know, yeah, you can say

2   that, you can argue that.  But again, if you have 30

3   pictures and three of them are guys that were too young,

4   it's kind of -- the array's still good because you still

5   have other fillers that -- many fillers that are -- are

6   still appropriate, or -- or, you know, somebody can't

7   argue are inappropriate, rather.  So --

8         Q.    If you had been --

9         A.    -- look at the circumstances, and based on the

10  circumstances of my viewing of this, I -- I think

11  physically, it's a good photo spread just by the

12  appearances of the individuals in there, and not knowing

13  whether or not the one witness that didn't have any

14  acquaintance with them was able to look at dates of

15  birth and eliminate one or two guys here based on their

16  date of birth from this photo spread.  I -- you know, I

17  still think it's a good, you know, fit by the physical

18  characteristics and all that.  And even if you eliminate

19  one or two based on date of birth, it's still a good

20  photo array.

21        Q.    I'll represent to you that Jerome Bogucki has

22  testified under oath that he did leave this physical

23  information and date of birth information on the photos

24  that he showed Mr. Cooper.  Does that cause you any

25  concern?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 187 of 326 PageID #:7157
The Deposition of ANTHONY was taken on 05/25 Page 187 of 326
185

1      A.   Well, I mean, again, no.  Like I said, I don't

2  know whether the witness saw that, you know.  I mean,

3  did he say that the witness saw that and calculated it

4  and eliminate two guys out of this array?  And again,

5  that would be for the one witness that didn't have

6  acquaintance with him, that it would be more of a factor

7  or more of a concern or --

8      **Q.   So under that same logic, you agree that he**

9  **could simply write at the bottom of Pages 2 through 7,**

10 **"This is not the offender," because it's possible the**

11 **witness didn't look at the bottom of the page, fair?**

12         MR. STEFANICH:  Objection.  Form.  Misstates his

13         testimony.

14         MR. SWAMINATHAN:  That doesn't misstate his

15         testimony.

16 BY MR. SWAMINATHAN:

17     **Q.   Go ahead.**

18         MR. STEFANICH:  It does.  And it also -- yeah.

19         Objection.  Form.  Misstates his testimony.

20         THE WITNESS:  Well then you would have one photo

21         that is specifically easily determined.  I mean,

22         that's where you're basically telling him, this

23         is not the guy, this is not the guy, this is not

24         the guy, this is not the guy, this is not the

25         guy.  And the one photo that doesn't have it,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              well, that must be the guy. Well, first off, you
 2              are conflating out of a six-person array, that by
 3              five dates of birth, five people were eliminated,
 4              and that's not the case in this array.
 5    BY MR. SWAMINATHAN:
 6         Q.   Are you aware of anything that prevented them
 7    from going on the IDOC website and pulling photos of
 8    other individuals who were also around the age of 26 and
 9    27 years old?
10         A.   I'm not sure if they could have searched that
11    IDOC by that age parameter, but yeah, I mean, again, you
12    -- I mean, yeah, you could just keep filtering through
13    and look for people to have closer dates of birth, sure,
14    they could have done that.
15         Q.   And ideally, if you were conducting a photo
16    array in which the witnesses were telling you that the
17    perpetrator was in their 20s, you try to have a photo
18    array with people in their 20s, right?
19              MR. STEFANICH:  Objection.  Form.
20              THE WITNESS:  Well, if you're in proximity to the
21              time, yes.  So you don't -- in this case, 20s in
22              1990 would be 32 in 2002.  So if it's in 1990
23              that you're investigating it, then yeah, you want
24              to get people close in age, and not necessarily
25              by number. It's by appearance more than number,
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 189 of 326 PageID #:7159
The Deposition of ANTHONY WADE, taken on March 22, 2023

187

```
 1              because again, when you get gender, race, there's
 2              a -- a -- there's African American individuals
 3              that you would think are Puerto Rican or
 4              Hispanic.  There's Hispanic individuals that
 5              people would think are African American, you
 6              know? There's White individuals that appear to be
 7              Hispanic, you know?  There's -- so you have to go
 8              by the -- not necessarily the age, but the
 9              appearance of the photo itself.  You know, I
10              could put all guys that are 20 in there and I
11              could find four 20-year-olds that look like
12              they're 40.  Next to a 20-year-old, it looks like
13              he's 15, and that would be suggestive.
14    BY MR. SWAMINATHAN:
15         Q.   And then last question, just so I understand
16    your testimony.  It's your testimony under oath that,
17    including a picture of an 8 -- of somebody who was 8
18    years old at the time of the crime is -- does not make a
19    lineup suggestive when it's in a photo array with the
20    suspect who was 27 years old at the time of the crime?
21         A.   Well, if the 8-year-old --
22              MR. STEFANICH:  Objection.  Form.  Incomplete
23              hypothetical.
24              THE WITNESS:  If the 8-year-old appears to be 27
25              in this photograph, that's fine.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    BY MR. SWAMINATHAN:

2        Q.    Okay.  So --

3        A.    The age doesn't dictate, you know, the

4    appearance of that individual, or it doesn't make it a

5    good lineup in itself because I have all 27-year-olds in

6    there.  It doesn't necessarily make it a good lineup.

7        Q.    Let go to page -- let's go back to the closing

8    report, Exhibit -- cleared open report, which is Exhibit

9    10.

10       A.    Yes.

11       Q.    It documents an interview of Terry Rogers with

12   ASA Jennifer Walker [sic].  You had no participation in

13   any ASA interviews or handwritten statements, correct?

14       A.    Not that's reflected in here and not that I

15   recall.  I don't believe I did it all.

16       Q.    And then did you participate in any interviews

17   of Jimmy Fletcher?

18       A.    Did not.  Not that's reflected in here.  Not

19   that I can recall at all.

20       Q.    Did you participate in any interviews of

21   Sheenee Friend?

22       A.    Not that's reflected in the document.  Not

23   that I recall at all.

24       Q.    And did you participate in any interviews of

25   Emmett Wade?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     A.   Not that's reflected in the document here and
2  not that I can recall at all.
3     Q.   Okay.  All right.  Let's take a look at
4  Exhibit 15, which is City JF 153 to 158.
5          (EXHIBIT 15 MARKED FOR IDENTIFICATION)
6     A.   The lineup report, Counsel?
7  BY MR. SWAMINATHAN:
8     Q.   You got it, yeah.
9     A.   Yes.
10     Q.   Okay.  You -- sorry.  This lineup report was
11  one of the documents you reviewed in preparation for
12  today's deposition, correct?
13     A.   That's correct.
14     Q.   Okay.  And this lineup report was submitted --
15  who were the reporting detectives on this lineup report?
16     A.   It was submitted by Detective Schalk, and
17  here's a -- it's a report of Detective Schalk, Bogucki,
18  and Noradin and -- let me just see who was -- it shows
19  Bogucki and Schalk is conducting the lineup, so it
20  doesn't appear, based on the report, that Noradin
21  conducted the lineup, but he is listed as a reporting
22  officer at the end of the narrative.
23     Q.   Okay.  And then the lineup photos were taken -
24  - in this case were taken by Detective Schalk himself,
25  right?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 192 of 326 PageID #:7162
The Deposition of MILTON MATHIS, taken on June 22, 2023
190

1     A.    That's what it says.  Yes, that's correct.

2     Q.    Okay.  And so sometimes the detectives would

3 conduct the lineup photos themselves instead of calling

4 in an evidence technician, correct?

5     A.    That's correct, yes.

6     Q.    Okay.  And you approved this report on May 24,

7 2002, correct?

8     A.    Correct.

9     Q.    Okay.  And at the time you approved this

10 report, would you have reviewed photos of the lineup

11 itself?

12     A.    Not that I recall and it's not my normal

13 practice.  I don't know that I ever have reviewed the

14 photos of a lineup prior to proving a lineup report.

15 Most of the time we don't have them available because

16 they were -- especially back then, they were just done

17 on regular film, so you'd have to send the film down and

18 you would have to have had it developed and then

19 requested those photos.  But I don't recall ever doing

20 that and it's not reflected in this document that I did

21 it here and I don't recall having done that here.

22     Q.    And did you review -- or strike that.  Did you

23 have any involvement in the conduct of the lineup that's

24 documented here?

25     A.    It's not documented here and I don't recall

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  that I did.

2  Q.  And did you have any involvement in the photo

3  arrays that we discussed earlier that were conducted in

4  the Sorrell murder investigation?

5  A.  No.  It is not reflected in the document and

6  not that I recall at all.

7  Q.  Okay.  If we go back to the cleared open

8  report for a moment.  With regard to the photo array of

9  Edward Cooper that we had talked about earlier on Page

10  6, Bogucki and Schalk's and Noradin's cleared open

11  report indicates that Mr. Cooper made a -- he identified

12  Jim Fletcher, but said he could not be positive of his

13  identification, correct?

14  A.  Right.  The sentence reads that, "At the time,

15  Cooper picked out the photo of James Fletcher and stated

16  that he looked similar to one of the offenders." Next

17  sentence is, "He could not be positive of his

18  identification."

19  Q.  Okay.  And that would be what we talked about

20  earlier, but that would generally be considered a

21  tentative identification, correct?

22  A.  Yes.  One of the -- the usual term that

23  detectives or even state's attorneys would sometimes

24  use, call it a tentative ID.  Yeah.

25  Q.  Okay.  And then on the lineup report, it

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    indicates that Mr. Cooper and Ms. Friend viewed the
 2    lineup and both positively identified James Fletcher,
 3    correct?
 4        A.   Going back to that, but that's what I recall
 5    having read.  I'll just double-check that.  It says --
 6    okay.  "Present at the lineup was an attorney for
 7    Fletcher and" -- yeah.  "Sheenee Friend and Edward
 8    Cooper each viewed the lineup.  They both positively
 9    identified Subject number 2, James Fletcher, as one of
10    the offenders who robbed Edward Cooper and shot Willie
11    Sorrell."
12        Q.   No indication that either of them was
13    tentative about their identification, correct?
14        A.   None at all, no.
15        Q.   And no indication, on the other hand, that I -
16    - there -- is there any indication --
17        A.   I'm surprised that they both positively
18    identified him.
19        Q.   Okay.  And is there any indication in this
20    report about their level of confidence in their
21    identification?
22        A.   Positive identification.
23        Q.   And positive identification, does that -- does
24    positive identification always mean -- well, strike
25    that.  If either of them had indicated any uncertainty
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 195 of 326 PageID #:7165
The Deposition of ANTHONY WILLIAMS, taken on June 27, 2023
193

1  about their identification, is that something that

2  should have been documented?

3      A.   Well, it would've been stated like they --

4  Bogucki and Schalk and/or Noradin did earlier, where

5  they said it was similar or couldn't be positive or

6  tentative.  When they documented positive, that means a

7  positive identification, meaning that both Friend and

8  Cooper stated that that was the offender -- one of the

9  offenders who robbed Cooper and shot Willie Sorrell.

10         MR. SWAMINATHAN:  Okay.  Now, let's take a look

11         at Exhibit 16.  This is the lineup photos, Brian.

12             (EXHIBIT 16 MARKED FOR IDENTIFICATION)

13  BY MR. SWAMINATHAN:

14      Q.   Showing you a document I've marked Exhibit 16.

15  This is City JF 4566 through -- 4566, 4569, 4577, and

16  4578.

17      A.   Got it, Counselor.

18      Q.   Okay.  Is that in front of you?

19      A.   Yes.

20      Q.   All right.  This appears to be the photos of

21  the lineup that was taken, correct?

22      A.   That's correct.

23      Q.   Okay.  And in this lineup, it appears Jimmy

24  Fletcher, his hands are handcuffed behind his back,

25  correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 196 of 326 PageID #:7166
The Deposition of ANTHONY... was ... taken on ... Page 196 of 326

194

1    A.    No, it doesn't appear that.  I mean, I don't
2 see any handcuffs.  No.
3    **Q.    Can you tell one way or the other?**
4    A.    I don't see handcuffs.  His hands are behind
5 his back, and that's when the photograph was taken.
6 Doesn't necessarily mean that his hands were positioned
7 that way either during the actual lineup.
8    **Q.    And --**
9    A.    This is not the lineup.  This is a photo of
10 the lineup.
11    **Q.    Okay.  And so, if during the lineup, his hands**
12 **were handcuffed behind his back, that would be a**
13 **problem, correct?**
14    A.    Correct.
15    **Q.    Okay.  And --**
16    A.    If -- unless everybody else was handcuffed
17 behind their back.
18    **Q.    Right.  Okay.  And in this photo array, do you**
19 **see anybody else with long hair other than Mr. Fletcher?**
20    A.    Well, I can't tell on the guy in position 1
21 whether he's got long hair or not.  It's -- it's hard to
22 tell on that one.  Position 3 does have some longer
23 hair, however, the -- the number 2 being our Fletcher,
24 he does have his hair in kind of like a braided-type --
25 somewhat braids.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 197 of 326 PageID #:7167
The Deposition of ANTHONY WOJCIK, taken on 05/09/2022

195

1    Q.   And in this picture, Mr. Fletcher doesn't have

2    any laces in his shoes, correct?

3    A.   That's -- it looks that way to me.  Correct.

4    Q.   And that's commonly the case with individuals

5    who are coming over from Illinois Department of

6    Corrections, correct?

7    A.   Well, yeah, either corrections or maybe from

8    the lockup.  The -- our lockup wouldn't allow strings in

9    there either, so --

10        MR. SWAMINATHAN:  Yep.  Okay.  We can put that

11        one down.  All right.  Why don't we take a five-

12        minute break?  We're getting close toward the end

13        here.

14        THE REPORTER:  All right.  We're off the record.

15            (OFF THE RECORD)

16        THE REPORTER:  Back on record.

17        MR. SWAMINATHAN:  All right.  I am showing you a

18        document I've marked as Exhibit 17.  It's City JF

19        191 to 198.  This is the photos -- a series of

20        photos, Brian.

21            (EXHIBIT 17 MARKED FOR IDENTIFICATION)

22        MR. STEFANICH:  Okay.  We got it.

23  BY MR. SWAMINATHAN:

24    Q.   Okay.  Mr. Wojcik, do you have that in front

25    of you?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1      A.    Yes.

2      Q.    Okay.  The first page says, "From" -- it says,

3  "To Graphic Arts, 11th and State, from" -- looks like

4  "650."  Do you see that?

5      A.    Yes.

6      Q.    Okay.  And 650, is that a reference to a

7  particular unit of the department?

8      A.    That'd be Area 5, Violent Crimes -- or Area 5.

9      Q.    You said Area 5, Violent Crimes?

10      A.    Well, I believe 650 is just Area 5 in general,

11  but I think it used to be 651, 652 to designate the two,

12  but 650 would be Area 5, the --

13      Q.    Okay.

14      A.    Yeah.

15      Q.    Okay.  And then the next set of pages are a

16  series of what look like arrest photos, correct?

17      A.    Well, 193 doesn't appear to be an arrest

18  photo.  Possibly --

19      Q.    You said 193?

20      A.    Sorry.  192.

21      Q.    192 is not an arrest.  So that looks like a

22  Polaroid photo sort of, right?

23      A.    Some kind of photo taken, non-arrest.  It

24  could have been an interview room or a hallway, just by

25  the wall behind --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q.    And do you know who that individual is?

2      A.    I have no idea.

3      Q.    Okay.  And then 193 through -- the photos on

4  193, 194, 195, and 197, what do those look like to you?

5      A.    7.  Well, some of them might only have, like,

6  half.  Some of them don't have a head.  They all appear

7  to be copies or partial -- or in some instances, partial

8  copies of arrest CB photos from --

9      Q.    And then -- so what is the scenario or

10  circumstance in which the detective division would be

11  sending photos like this to the graphic arts section?

12      A.    Sending them to Graphic Arts?

13      Q.    Yeah.  That's what it says on Page 1, right?

14  That this is from the detective division to Graphic

15  Arts?

16      A.    Yeah.  I don't know that -- that that is --

17  this being sent to Graphic Arts.  I mean, the first page

18  does state, "To Graphic Arts, 11th and State, from 650."

19  And then it looks like there might have been a some

20  yellow -- I don't know if it's an envelope or something

21  that that might have been on.  It's hard to tell.  It's

22  very light on my copy.

23      Q.    Yeah.  It could -- it's possible it's just out

24  of place or something else, so I don't want to suggest

25  that we know that for sure, but maybe --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 200 of 326 PageID #:7170
The Deposition of ANTHONY WEST, taken 12/06/2021

198

1    A.  I -- I -- I believe that it's out of place.  I

2  believe that that is not -- these were not sent to

3  Graphic Arts.

4    **Q.  Okay.  And so let me -- maybe a better**

5  **question is, what is the role of Graphic Arts or to what**

6  **extent do detectives interact with the graphic arts**

7  **section in the course of a homicide investigation?**

8    A.  Well, that would be the section within Ident

9  to get photographs.  You know, they would -- they would

10  assist you in developing the photographs, you know.  So

11  if you sent the request in for color photographs, they

12  would pull the film, develop the -- the photos, and send

13  them to you, or like I said before, if you did it on an

14  emergency basis and they called somebody in, the guy

15  would come and pull the film and develop black and white

16  photos for you.  So that would be a -- it -- it would --

17  used to be right down the hall from the records section

18  of Ident.  So it's a -- it's a -- it's Ident.  It's a

19  section of Ident that would deal with us getting

20  photographs for, you know, IR photos, et cetera.

21    **Q.  Okay.  So you talked several times during this**

22  **deposition about the identification section.  The**

23  **Graphic Arts is basically a group within the**

24  **identification section, correct?**

25    A.  Correct.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 201 of 326 PageID #:7171
The Deposition of ANTHONY WOJCIK, taken on 11/05/21
199

```
1          Q.    And it's the group within the identification
2    section from which you can get photos generated,
3    correct?
4          A.    Correct.
5          Q.    And typically, when they generate photos for
6    you, they're generating photos like the CB photos or
7    arrest photos on 193, correct?
8          A.    Correct.
9          Q.    The photo on 192, is that the type of photo
10   you --
11         A.    I'm sorry.  Unless you're -- it's an emergency
12   and you can go which -- then you can only get a black
13   and white copy.
14         Q.    Okay.  And the photo on 192, is that the type
15   of photo that Graphic Arts usually sends?
16         A.    Not that I'm aware of.  I wouldn't say that.
17         Q.    Okay.  Graphic Arts sends photos, arrest
18   photos or CB photos, correct?
19         A.    Correct.  That's --
20         Q.    Okay.  You can take that down.  Okay.  I want
21   to ask you about -- I -- I'm close to being done.  I
22   want to ask you about some leftover subjects, but I do
23   have to ask you.  At the time you left the Chicago
24   Police Department, when you retired -- you indicated
25   that you did retire, correct?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    A.   That's correct.

2    Q.   Okay.  And it was just short -- a little bit

3  short of 30 years, correct?

4    A.   A little bit shy of 30, but probably seven or

5  eight months beyond my full career service date, which

6  would be --

7    Q.   What does that mean, your full career service

8  date?

9    A.   Well, we can retire with full career service,

10  full pension at 29 years and one day.  So, you know, if

11  you stay beyond that, essentially, you're just staying

12  to -- to stay because there's no -- you know, you're not

13  gaining any benefit, you know, other than a few more

14  dollars above what your pension would pay you, you know,

15  for sitting at home.  So -- and that can happen at 29

16  years and a day.  And I retired -- which would've been -

17  - for me, would've been 14 October of '14.  And I

18  retired -- well, was it '14 or -- yeah, '14.  Or '15,

19  rather.  But anyway, I retired in May of the following

20  year, May of 2016.

21    Q.   When you retired, were you facing -- oh, go

22  ahead.

23    A.   About 29 years and about seven months.

24    Q.   Okay.  And you're collecting a full pension,

25  then, correct?

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 203 of 326 PageID #:7173
The Deposition of ANTHONY WOJCIK, taken on 11/09/2023

201

```
 1       A.    Correct.
 2       Q.    Okay.  Are you collecting any other pensions
 3  other than from the Chicago Police Department?
 4            MR. STEFANICH:  Objection.  Form.  I'm going to
 5            instruct the witness not to answer.  Actually,
 6            can we just go off the record for a minute?
 7            MR. SWAMINATHAN:  Yeah.
 8            THE REPORTER:  Off the record.
 9               (OFF THE RECORD)
10            THE REPORTER:  Back on record.
11  BY MR. SWAMINATHAN:
12       Q.    Mr. Wojcik, my question is whether you were
13  collecting any other pensions.
14            MR. STEFANICH:  I'm going to object.  We're not
15            asserting an inability-to-pay defense, so that
16            question is irrelevant, then, to this lawsuit.
17            And I don't know if that's where you're going
18            with these questions or not, but we're not
19            asserting that defense.
20            MR. SWAMINATHAN:  Okay.  I'm not intending to go
21            into the full punitive damages discovery, with
22            the understanding that we are putting off any
23            such discovery until after summary judgment to
24            the extent it becomes relevant, but I am just
25            specifically asking about whether he's collecting
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of ANTHONY WOJCIK, taken on June 21, 2023

```
 1            any other pensions only to understand a little
 2            bit about his further employment, if any.
 3            MR. STEFANICH:  Okay.  With that understanding,
 4            I'll allow him to answer the pending question.
 5            MR. SWAMINATHAN:  Okay.
 6            THE WITNESS:  Can you repeat --
 7            MR. SWAMINATHAN:  Go ahead.
 8            THE WITNESS:  Repeat the question one more time,
 9            please.
10  BY MR. SWAMINATHAN:
11       Q.   Yes.  Are you collecting any pensions other
12  than from the Chicago Police Department?
13       A.   No.
14       Q.   Okay.  That's what I thought it was.  Okay.
15  When you left the Chicago Police Department, when you
16  retired in 2016, were you facing any pending
17  investigations?
18       A.   No.
19       Q.   And when you left the police department in
20  2016, were there any investigations going on into your
21  conduct?
22       A.   No.
23       Q.   Okay.  When you -- have you had any prior
24  instances in which you had sustained findings against
25  you in the form of a complaint register or otherwise?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1          MR. STEFANICH:  Objection to form. Foundation.
 2          You can answer if you know.
 3          THE WITNESS:  Once.
 4   BY MR. SWAMINATHAN:
 5     Q.    You said you had one sustained finding?
 6     A.    Correct.
 7     Q.    I can't hear you very well.
 8     A.    Yes.  Correct, one.
 9     Q.    Okay.
10     A.    One sustained, correct.
11     Q.    And when was that approximately?
12     A.    I don't recall the year exactly.  When I was
13   working in 14th District or thereafter.  It was
14   regarding a -- an incident in 14th District before I was
15   detective.  And sometime thereafter, it was a -- the
16   complaint was sustained and I was reprimanded.
17     Q.    Okay.  And what was the reprimand that you
18   received?
19     A.    Just a reprimand.  Just a "don't do it again"
20   reprimand.
21     Q.    This was this around 1988?  Was it an
22   operations or personnel violation?
23     A.    I'm not sure what you mean by operations or
24   personnel violation.  It was in regards to the
25   generation of a lost-and-found case report.  We had
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  recovered a weapon, firearm off the street from the

2  leader of a gang.  He had asked us to protect his

3  anonymity.  In doing so, we prepared a proper report for

4  that weapon turn-in, which is on a lost-and-found, but

5  they found that, because I didn't name him as having

6  turned over the weapon and the location was not

7  accurate, that I had prepared a false official report.

8  But they remember --

9       Q.   And your -- go ahead

10      A.   -- stating essentially that we understand what

11 you were doing and that you were protecting the

12 anonymity of an informant, not just his anonymity, but

13 his personal safety at his request.  And then we had a -

14 - so that's why we left his name off.  And we had to

15 change the location because it -- had we pinpointed the

16 location that the weapon was turned over, being at Haas

17 Park in the 14th District, it would've identified that

18 it came from somebody in the Latin Lovers street gang.

19 So we changed -- we didn't put his name on the report as

20 having turned it in and we did not use the correct

21 address for the weapon turned in.  And weapon was turned

22 in, properly inventoried, so basically they concluded

23 that, although they understood what we were trying to

24 do, nonetheless, it was a false official report because

25 we had intentionally left his name off and used a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Kentuckiana
COURT REPORTERS

1    different location.  So therefore, they reprimanded,

2    which is no suspension or anything like that.  It's just

3    a reprimand, basically, don't -- you shouldn't have done

4    this.  Don't do it again.

5        Q.   And so the finding eventually was, despite the

6    circumstances, that it was a false official report,

7    correct?

8        A.   That's correct.

9        Q.   And that was a Rule 14 violation?

10       A.   I'm not sure if they deemed it Rule 14, but if

11   that's what it was, it should be reflected in the

12   documents for that.  I don't recall it specifically if

13   it was Rule 14 or not, but a false official report.

14   Correct.

15       Q.   Okay.  And then who else was part of that CR

16   other than yourself?

17       A.   It was my partner at that time, Detective

18   Vergara.  Hector Vergara.

19       Q.   And you said you got a reprimand, meaning you

20   didn't have any suspension or loss of pay, correct?

21       A.   That's correct.

22       Q.   Okay.  And then did you have -- were you part

23   of a sustained CR finding related to the failure to pay

24   parking tickets in and around 1991?

25       A.   Was not -- I brought records in indicating --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    I don't recall if I indicated that it was not my vehicle

2    or whether that they were paid, but I supplied records

3    to the department and that was not sustained because

4    that was not true.

5        Q.    And then in and around 1994, did you receive

6    any suspension related to a charge related to a -- an

7    incident involving physical abuse in an ex-girlfriend's

8    home?

9        A.    In the end, no.  An investigation -- a

10   preliminary -- or the investigation was first conducted,

11   and with a recommendation from then OPS, at the time,

12   that -- it was a sustained finding on their part.

13   However, I went to court.  There was a summons obtained

14   by the alleged victim.  I went to court and I also

15   provided documentation negating a lot of the

16   allegations, that being canceled checks for the

17   apartment, et cetera, showing that I was the actual

18   renter of the apartment, and also evidence that as --

19   part of the allegation was that the door was forced.  I

20   had keys to the place, whereas the -- my ex-girlfriend

21   at the time did not have keys.  She acknowledged that

22   she did not have keys, which indicated -- and court

23   testimony later that indicated that the door was forced

24   in the night prior to my arrival.  So I had supplied

25   documents negating the sustained allegation, and in

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    addition -- so the suspension was held off.  And then I

2    went to the review board for a hearing, and it was a

3    unanimous determination of not sustained by the review

4    board.  So that case, in the end, was not sustained.

5        Q.    So you originally got a sustained finding and

6    were -- the recommended discipline was five days

7    suspension, correct?

8        A.    I don't -- I don't recall exactly.  It's --

9    five days sounds probably right.  I -- I -- it's been a

10   long time, but there was a recommendation for a

11   suspension.  And in that time, I not only -- I did not

12   overrule the order, but I either grieved it, grieved the

13   finding, and then was summoned to court -- or I was

14   summoned to court prior to the suspension, and then I

15   also asked for the board hearing, review board hearing,

16   which I did go for the hearing again.  In the end, it

17   wasn't -- unanimously, the board not sustained the

18   finding when they saw all the evidence.

19       Q.    Showing you a document I will mark as -- let

20   me mark it first.  Showing you a document I've marked as

21   Exhibit 18.  It's RFC -- let's see.  This is CR number

22   18 -- CR211634.  This is the version -- this version is

23   Bates stamped RFC Abrego 3305 through 3490. There's a

24   version from the Fletcher file, but I had pulled this

25   one first, so I'm just using this version.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of MICHAEL ABREGO, taken 2/6/25

208

```
 1              (EXHIBIT 18 MARKED FOR IDENTIFICATION)
 2        A.   I have some that says RFC Abrego 003313.
 3   BY MR. SWAMINATHAN:
 4        Q.   Yeah.  So you might have -- when I sent it
 5   over to you all, I had sent over a -- the fewer number
 6   of pages that I intend to actually focus on, but I --
 7   I'm using as the exhibit the full CR.  I have it up on
 8   my screen.  If you need me to send you the full version,
 9   you can look at it.  But why don't we start on my screen
10   because I'm not going to spend a lot of time on the
11   details here?
12        A.   Sure.
13        Q.   The --
14        A.   Let me just look.
15        Q.   The document that you have is -- begins on
16   3313, correct?
17        A.   That's correct.
18        Q.   Okay.  And so that was the original finding
19   from the chief administrator of the Office of
20   Professional Standards, OPS, dated November 16, 1994,
21   reaching a sustained file -- sustained finding against
22   you for a violation of Rule 8, correct?
23        A.   Correct.  That's what it says on here, and I'm
24   assuming that this was the original one.  So it appears
25   that --
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DWIGHT JONES, taken on 05/06/25

1   Q.   And the conclusion in this report was that --

2   you go to the last page, 3318 -- or second to last page.

3   A.   Okay.

4   Q.   It indicates you had a sustained finding for a

5   violation of Rule 8 for disrespect or maltreatment of

6   any person while on or off duty, in that -- on Saturday,

7   27 August '94, at approximately 0800 hours at 6148 North

8   McVicker.  "Forced an entry to Rinda Tucker's apartment

9   and struck Peter Zefkiles," Z-E-F-K- I-L-E-S, "about the

10  head and face with his hands and/or an unidentified

11  object."  That was the finding -- that was the original

12  finding by OPS, correct?

13  A.   Correct.  They sustained Allegation 1 and not

14  sustained Allegation 2, and I don't even know what day

15  that was at the time.

16  Q.   I think that related to property damage,

17  correct?

18  A.   I'm not sure.  I -- I don't -- I'd have to --

19  but anyway, yes, it was back in 1994, the finding back

20  in November of 1994.

21  Q.   Okay.  And in that case, you denied that you

22  had struck Mr. Zefkiles with any unidentified object or

23  other object other than your fist, correct?

24  A.   That's correct.

25  Q.   And you denied that you had forced entry into

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    the home, correct?

2        A.    That's correct.

3        Q.    And you denied that you had instigated or

4    initiated any physical confrontation with Mr. Zefkiles,

5    correct?

6        A.    That's correct.

7        Q.    In other words, you stated during the course

8    of that investigation that you had only struck

9    Mr. Zefkiles in an act of self-defense, correct?

10       A.    That's correct.

11       Q.    Okay.  And is that all true?

12       A.    Yes, it is.

13       Q.    Okay.  And so it's your testimony to this day

14   that you did not initiate any confrontation with

15   Mr. Zefkiles, correct?

16       A.    That's correct.

17       Q.    And how did you enter the home that day?

18       A.    The doors were open.  I mean, I haven't read

19   through this file in years, but when I got to the

20   apartment, the -- I had keys.  Again, I was the renter

21   of that apartment.  So I entered the outer main entrance

22   door to that building.  I don't recall if that main door

23   was open or I had to use my key.  Normally, I would go

24   into that foyer.  This apartment would've been the

25   garden apartment, going downstairs -- the basement or

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1    garden apartment.  So the door entering that apartment

 2    would normally be locked, which I had a key for.

 3    However, I found the door lock broken and the door was

 4    not locked.  It was unlocked.  There was damage to the -

 5    - to the locks -- lock or locks on the door.  So that

 6    right away, obviously a police officer, red flag.  Now,

 7    you go down a few stairs and there would've been a

 8    second door to enter that apartment, which would

 9    normally be wide open because the outer door would be

10    locked.  Well, that door was closed, not locked --

11    either not locked or I used my key to get in there, and

12    that's when I walked in.  I was concerned for Ms. Tucker

13    and her daughter, which is the reason I was going there.

14    I would go there on my days off.  If I was off Saturday,

15    even though we were no longer seeing one another, I

16    would go and take her daughter, who I'd, you know, grown

17    fond of to breakfast on Saturday mornings was kind of

18    like a -- not a tradition, whatever, but something I

19    would do that, you know, we both enjoy.  So I -- I walk

20    in and now I'm worried about what's going on with the

21    broken door, et cetera, et cetera.  I call out for -- I

22    check Amanda's room, the daughter.  Not in the bed.  And

23    then I call out for Rinda, which is the -- Ms. Tucker's

24    first name. Then Mr. Zedfiles -- Zefkiles comes running

25    out of the bedroom pretty much running right into me.
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  And my, you know, automatic response was I just struck

2  him.  You know, guy comes flying out, you know, running

3  right into me.  I -- I hit him.  And he continued

4  running out.  And I waited there, didn't leave.

5  Eventually, police did come.  And I was still there, did

6  not leave. And I gave the responding sergeant the keys

7  and I showed him that I had keys, turned them over to

8  him. And when they asked Ms. Tucker, she did not have

9  keys. And then later, at trial, it came out that --

10 indicated that because she had lost her keys the night

11 prior that, you know, they had to jimmy the locks in

12 order to get in there.  So I did not damage any door.  I

13 struck him once in what I would call self-defense.  It

14 was a reactive strike.  And that was that.  That was it.

15      Q.   Did you strike him with any kind of hard

16 object, like a metal pipe?

17      A.   Nope, did not.

18      Q.   And the conclusion of the OPS investigators

19 originally was, "The evidence collected in this case

20 constitutes a preponderance in favor of the physical

21 abuse allegation against Detective Wojcik.  His account

22 of Zefkiles flying out of the bedroom and apparently

23 attacking him is not credible."  That was the original

24 finding of OPS, correct?

25      A.   That's what it says, sir.  Correct.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   And then I'm showing you on my screen the

2    subsequent report from the detective division

3    headquarters dated December 7, 1994.  And in that case,

4    the acting chief of the detective division, James

5    Maurer.  Is that a name familiar to you?

6    A.   Yes.

7    Q.   Okay.  And he indicated that an additional

8    fact, which must be taken into account, is that

9    Detective Wojcik has had no disciplinary action

10   administered to him for the past five years.  Detective

11   Wojcik is a diligent, conscientious, hardworking

12   detective who's performed consistently and tenaciously

13   for his superiors throughout the years.  And ultimately,

14   Mr. Maurer's statement at the end was that, "Given the

15   aforementioned facts of this investigation, although I

16   wholeheartedly agree that this allegation must be

17   classified as sustained, the disciplinary action is far

18   too harsh.  I recommend the more reasonable and fair

19   disciplinary action to be taken against Detective Wojcik

20   via suspension of a period of two days with options."

21   See that?

22   A.   Yes, I do.

23   Q.   Okay.  So he reduced the suspension from five

24   days to two days, correct?

25   A.   That's what he recommended, yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       Q.   And the chief of the detective division also

2  agreed that the allegations against you were -- should

3  remain sustained, correct?

4       A.   Well, he was the acting chief.  I don't see

5  where Ruckrich, the deputy superintendent of bureau -- I

6  don't see a signature there.  This appears to be the

7  review by Maurer that he forwarded to Ruckrich, but I

8  don't see the approval signature from Ruckrich on the

9  document that you're showing me anywhere.

10      Q.   Okay.  And then there was a -- on November --

11 I'm showing you now Page RC Arego 3309.  And this is

12 November 20, 1997 and November 26, 1997 as well.  And

13 this is from Investigator Michael Goldston.  And he --

14 this was this was after your submission of some canceled

15 checks and some other information, as well as the trial

16 transcript in which the criminal charges against you

17 were discharged, correct?

18      A.   Correct.

19      Q.   Okay.  And after the criminal charges against

20 you where you were discharged, Investigator Goldston,

21 with the approval of OPS Supervisor John Buchanan,

22 determined that after a review of the documentation

23 submitted by the accused, the undersigned concluded that

24 there's no basis to reverse the original sustained

25 finding of a Rule 8 violation, correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1    A.    That's what it states, correct.

 2    Q.    Okay.  So the finding was that remained,

 3 unquote -- the finding "remain unchanged from the

 4 original summary report dated October 27, 1994," which

 5 found that you had -- that your that your version of

 6 events had not been credible, correct?

 7         MR. STEFANICH:  Objection.  Form.

 8         THE WITNESS:  Well, that's what they -- I don't

 9         recall the exact words that are in the report

10         there, but that's -- they sustained it in '94: I

11         submitted the additional documentation obviously

12         here after court, canceled checks, the court

13         transcript, and whatever else I put in there, or

14         a letter, probably.  I don't know what the letter

15         from Woodridge Department of Public Aid that

16         might have been something acknowledging that I

17         was paying for the apartment to Public Aid for

18         Mrs. Tucker.  So yeah, what her -- what their

19         verbiage was originally, we have to go back in

20         there.  But he's -- he maintained that he was

21         still sustaining the -- the allegation, even

22         though I turned in additional --

23 BY MR. SWAMINATHAN:

24    Q.    And then in the -- go ahead.

25    A.    Go ahead, I'm sorry.  Even though I turned in

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    additional documents and evidence.

2        Q.   And what does it mean to have -- by the way to

3    have a suspension with options?  What does that mean?

4        A.   Well, that would mean, okay, I could take a

5    two day suspension or stay -- you know, not go into work

6    and lose two days' worth of pay.  Or if I had comp time

7    on the books, meaning like it's instead of overtime, I

8    had comp time, I could surrender two days' worth of comp

9    time and still go to work.  So I would lose two days'

10   worth of pay essentially one way or the other, whether I

11   stayed home or I just reduced my comp time by two days'

12   worth of pay.

13       Q.   And then subsequent to these -- to the

14   original finding of the subsequent conclusion in 1997,

15   you then subsequently appealed this further, correct?

16       A.   Either during while this was all going on, I

17   grieved it.  And that led to a hearing in front of the

18   review board.  And again, I went to that review board

19   and as a final arbiter.  And it was unanimous, once I

20   was able to speak, I provided them with all the

21   evidence, they had the file.  Obviously they had

22   reviewed that.  And I presented them with the new

23   evidence.  And, you know, they had an option of talking

24   to other people, whatever they do, I don't know.  But I

25   went in there, and the review board unanimously not

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 219 of 326 PageID #:7189
The Deposition of ANTHONY WOJCIK, taken on June 21, 2023
217

1  sustained it across the board.

2      Q.   But then essentially the disciplinary and

3  sustained finding went away entirely after you aggrieved

4  it and went to that hear, correct?

5      A.   Yeah.  That should -- I don't understand why

6  that's not reflected in this file.  It should have gone.

7  And it should have shown that it was not sustained.  And

8  it was.  I went to the review board.

9      Q.   All right.  Could you put that one to the

10  side?  Did you have any involvement in the investigation

11  into the shooting of Laquan McDonald?

12      A.   Yes.

13      Q.   Okay.  And what was your role in that

14  investigation?

15      A.   Well, on the date of incident, I was contacted

16  by the area.  I arrived at the scene for a short amount

17  of time.  And subsequent to that short amount of time at

18  the scene, the only part I played in it on that night

19  going into the following morning was attempting to

20  locate next to kin for Laquan McDonald.  I had nothing

21  more to do with that investigation until sometime later

22  when I was approached by Sergeant Gallagher, who was a

23  sergeant on the case.  And he had informed me that he

24  had heard that 26th Street was subpoenaing people in

25  there for interviews regarding the case, and that it

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  appeared that that was being done unbeknownst to people

2  who were charged with the investigation, being us, the

3  area. At Area Central at the time. So I spoke to the

4  commander and informed him of that. He, I guess,

5  verified that. And at that time, he told me to tell

6  everybody involved in the investigation to stand down

7  because there was an outside the department

8  investigation being conducted without knowledge of the

9  department or participation of the department, including

10  IAD was not involved in that. It was the -- I believe

11  the U.S. attorney, the state's attorney that were

12  bringing people to 26th Street for interviews and grand

13  jury, et cetera, et cetera. So he told me to let the

14  individuals involved know to stand down and not do

15  anything more, not do any more investigation, not submit

16  any more paper or anything. And my next involvement was

17  when, months later or sometime later, corp counsel had

18  requested a meeting via area essentials commander

19  regarding the case, and I along with others were asked

20  by the commander then to attend that meeting. I came in

21  the date of the meeting with -- along with others. And

22  at that time, the commander told me that from downtown,

23  being the superintendent's office, I was not to be part

24  of the meeting, which I wasn't. However, after the

25  meeting, he called us in, and then I was told to oversee

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 221 of 326 PageID #:7191
The Deposition of ANTHONY WOJCIK, taken on June 22, 2021

219

1  the documentation of the incident.  And also, we were

2  ordered to document the incident at that time because I

3  had protested and said, wait a minute, up until now

4  based on an investigation being going outside the

5  department and outside knowledge of those who were

6  working on the case, you properly told us to stand down

7  and not to submit paper because let's this -- let this

8  investigation be concluded one way or the other, and

9  then paper would be submitted.  Now, because corp

10  counsel walked in the door and said that they had

11  received demand letters from attorneys, no lawsuit being

12  filed, just demand letters, now we're being told to

13  submit paper?  I said that's not proper.  The proper

14  thing was to do to stand down and not submit any reports

15  or anything or do any further investigation because U.S.

16  attorney and the state's attorneys are investigating

17  this absent of department.  How now because corp counsel

18  got some demand letters can we be told to put paper in?

19  It's not consistent.  You know? And then he says, well,

20  you're being ordered to put the paper in.  And I asked

21  him by who?  And he told me.  I forgot who the -- I

22  believe was the deputy superintendent, not sure.  And I

23  thought at that time that the person he named may -- I

24  might recall his name while we're talking here, was

25  somebody who had retired and was coming back as a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   consultant.  I said, well, he can't order us because

 2   he's not, you know, considered law enforcement or

 3   acting.  And I was mistaken.  He says, no, he's still a

 4   boss, a police department member, and you're being

 5   ordered to submit the paper. So I was ordered to oversee

 6   the documentation, and that's what I did.  But again, I

 7   did not participate much in the scene investigation.

 8   Matter of fact, the morning -- I got there, I don't know

 9   what time I was notified, I got there late, maybe 11:00

10   -- between 11:00 and midnight on the night of incident.

11   And the next morning -- and I had been off prior to that

12   because of a surgery or whatever.  So I had to go the

13   next morning to get a scan done.  And I don't recall if

14   it was my neck surgery.  I believe it was -- I had

15   throat surgery, whatever, and the scan was in regards to

16   that.  So I really wasn't on the clock yet.  I was going

17   to be returning from either time on the medical or days

18   off, I don't recall.  And the next morning, I had to be

19   at 6:30 or 6:00 at the hospital.  So I went in only

20   because they called and I wasn't aware that -- you know,

21   when they call, you go, because I didn't aware that the

22   -- anybody else had been called or not, so -- but my

23   involvement was minimal at that night. And then it

24   wasn't until I had contact from a sergeant involved and

25   I spoke to the commander, and he said to inform
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 223 of 326 PageID #:7193
The Deposition of ANTHONY WOJCIK, taken on 12/06/23
221

 1  everybody to stand down.  And then my next involvement

 2  was when the corp counsel had requested a meeting.  I

 3  was requested to be there.  And then I was told not to

 4  be -- the day of the meeting not to go in there.  But

 5  then after the meeting, was told to oversee and ordered

 6  to work with those involved on the third watch and

 7  getting the reports in.

 8      **Q.   During the course of that -- the Laquan**

 9  **McDonald investigation, did you at any point have**

10  **possession of three GPRs, general progress reports,**

11  **containing detectives' notes of civilian witness**

12  **statements?**

13      A.   Yes.

14      **Q.   And did you at any point dispose of**

15  **approximately three GPRs containing detectives' notes of**

16  **civilian witness statements?**

17          MR. STEFANICH:  Objection.  Form.

18          THE WITNESS:  Well, they were damaged beyond. You

19          couldn't even -- you know.  They were soaked with

20          coffee.  And disposing of them was kind of it was

21          like a moot point because they were already

22          destroyed.  But did I scrape them up off the --

23          off the desk and drop them in the garbage?  Yes.

24  BY MR. SWAMINATHAN:

25      **Q.   Okay.  And so who spilled -- so the reason**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1   you're saying you destroyed those reports is because
 2   they were -- they had coffee spilled on them?
 3          MR. STEFANICH:  Objection.  Form.  Misstates his
 4          testimony.
 5          THE WITNESS:  Correct.  Again, I said I was
 6          charged with getting a report in and we were
 7          ordered to get it in quickly.  And now after
 8          standing -- told to stand down, we were ordered
 9          to immediately get it in, which is -- there was
10          other things that could have been done in my
11          review, or should have been done, which we - -
12          again, nothing was being done because we were --
13          they were told to stand down and not do anything
14          on it.  But then we were being ordered to put the
15          paper in, and almost on an immediate basis
16          nonetheless.  So I was assisting detectives and
17          the sergeant involved on getting the reports in,
18          and I was typing up portions of the report off of
19          GPRs while I was -- sorry.
20   BY MR. SWAMINATHAN:
21          Q.   Go ahead.
22          A.   In doing so, I had typed up information from
23   those GPRs.  And I don't know if we got called out on
24   another case or I had run out to lunch.  When I came
25   back, there was spilled coffee, and it had saturated and
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   destroyed some of those GPRs.  Some had coffee on it, I
2   was able to preserve those, pat them off, pat the coffee
3   off of them and preserve them.  And those are to this
4   day part of the file.  The ones that I couldn't do
5   anything more because the ink had been run and they were
6   pretty much attached to the desk, or lack of a better
7   word, they were just saturated.  I couldn't even peel
8   them up, pick them up, or whatever.  I then took those
9   and put them right into the garbage.
10         Q.   Who spilled the coffee on those reports?
11         A.   I have no idea.  That -- that -- I came back
12  to the office, and that's the way I found the -- my
13  desk.  The coffee was -- cup was, whatever, knocked
14  over, spilled over, whatever.  And the documents that
15  were laying on my desk were saturated.
16         Q.   And so this was on the documents had been on
17  your desk, correct?
18         A.   The documents and also the mouse for the
19  computer was damaged because of the coffee.
20         Q.   And who else used that desk other than
21  yourself?
22         A.   Well, it's in my office, my desk, the door's
23  open.  It's always utilized by people, you know, because
24  of, again, availability of computers. Sometimes they'll
25  just sit witnesses in there because there's no other

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

224

```
1   space available to house them.  So the cleanup people go
2   in and out.  So I have no idea who knocked the coffee
3   cup over.  And --
4        Q.   Was it your coffee?
5        A.   I believe so.  If I remember right, I had a
6   cup of coffee there at the time.  And -- and came back,
7   and that was it.
8        Q.   Was -- did anybody ever fess up to being the
9   person who spilled your coffee?
10       A.   I never conducted an investigation.  And
11  people were aware that were there that night.  I never
12  questioned anybody.  The assumption being somebody, if
13  they did it with knowledge, they would've stood the
14  coffee cup back up and tried to preserve whatever they
15  could.  They wouldn't have just walked away.  So I'm --
16  my assumption is that somebody incidentally, or it could
17  have been even me when I was putting my coat on going
18  out the door, and I might have swung the coat and
19  knocked it over, don't know.  But my -- my belief is
20  that if somebody knew it, again, it could have been me,
21  that they would have, you know, addressed it
22  immediately.
23       Q.   Okay.  And your testimony is that -- so the --
24  that you didn't keep the GPRs that had coffee spilled on
25  them because they were unusable, correct?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 227 of 326 PageID #:7197
The Deposition of ANTHONY WOJCIK, taken 11/03/23

225

 1          MR. STEFANICH:  Objection.  Form.  Misstates his
 2          testimony.
 3          THE WITNESS:  Because they were damaged and there
 4          was no -- the ink had run.  You couldn't read
 5          them any longer.  The paper was saturated beyond
 6          being able to peel it off or pat it dry.  And
 7          again, like I said, other GPRs that were out
 8          there had coffee on them that I was able to blot
 9          the coffee off and preserve them, and those are
10          in the file.
11     BY MR. SWAMINATHAN:
12          **Q.   And so how many reports -- how many GPRs was**
13     **it ultimately that you threw away because the ink had**
14     **run and you couldn't use them?**
15          A.   Well, I had already -- okay, when you're
16     saying couldn't use them, I had already used them.  I
17     had already typed up the information from those GPRs
18     into the report.  So the GPRs in effect, what was on
19     those GPRs, was already transferred into the report
20     draft.  So I did use them already.  I utilized them to -
21     - to their capacity of being able to type up what those
22     detectives who took those GPRs were told by the
23     witnesses.  So I used them.  Now, they were beyond
24     preservation.  When I -- I had no other -- you know,
25     there was nothing I could do to save them, and those

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 228 of 326 PageID #:7198

The Deposition of ANTHONY was filed under seal. Page 228 of 326

226

1  three of them were disposed of.  And the remaining ones

2  that I could preserve, that were also covered with

3  coffee, I did.  And those are to this day part of the

4  file.

5       Q.   So it was three reports that you couldn't

6  salvage, correct?

7       A.   That is -- to my recollection, that is

8  correct.

9       Q.   Okay.  And did you then rewrite those three

10  reports?

11       A.   I then wrote them because the commander had

12  told us, make sure there's all the GPRs are in there,

13  but not only for that reason.  I did recreate those

14  GPRs, but I documented on there, clear as day, with

15  circles, that they were duplicate GPRs prepared by me.

16  So it's thoroughly documented and it's specified on

17  those particular GP that they are duplicates.  And it's

18  my name, my star number circled to designate that they

19  were duplicated.  That they were not the original GPR.

20       Q.   Did you -- is it your testimony, if I think I

21  just heard you say that your commander ordered you to

22  recreate or rewrite those GPRs?

23       A.   That's it.  I said early on, when we were told

24  to get the paper done, he says to make sure that all

25  GPRs are part of the file.  So I would've done this

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    anyway.  It's not just that.  I'm just saying that's a

2    part of it, where I didn't -- not, you know, and just

3    say, well, the hell with the GPR and -- and just put a

4    notation in the supp or a GPR on file saying the file

5    damaged.  I specifically, and probably would've done it

6    regardless of what he had said or not, but -- and again,

7    on there it's specific, circled, duplicate. "These are

8    duplicate GPR prepared by Wojcik."  So -- you know.

9          Q.   After you recreated the GPRs, did you show

10   them to the detectives who had written the original GPRs

11   to confirm their accuracy?

12         A.   Yes.

13         Q.   When did you do that?

14         A.   I don't know exactly.  It was sometime post,

15   obviously, that incident, but prior to interviews that

16   were later conducted by the FBI.  The FBI then at some

17   point was going to come in and, because they were

18   conducting an investigation, they requested to speak to

19   anybody and everybody who had anything to do with the

20   case via just on the scene or assisting in any fashion.

21   So I was charged with setting those interviews up,

22   making the detectives available, letting the FBI know

23   when to come in, and let the detectives know.  And then

24   have the detectives review any documents that may have

25   regarded their participation.  So sometime after --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  after the GPRs were soiled, before the FBI, I did speak

2  to the detectives and they did review it.  And they --

3  they did acknowledge that the case report and the GPR

4  reflected what those witnesses told them.

5       Q.   And how did you -- how do you -- how do they -

6  - or how do you make them available for them for review?

7  You sent them a copy?

8       A.   I believe I sat down with them at the area and

9  they looked at the report and the GPRs.  Just like any

10  other officer that was going to be interviewed by the

11  FBI, they had requested -- the FBI requested that.

12  Pretty much, you know, so that they're prepared when the

13  FBI interviews them, to let them review what they had

14  done.  So these officers or detectives had reviewed the

15  GPRs and the -- and the supp report in preparation for

16  interview with the FBI.  And at that time in, you know,

17  I -- I didn't specifically say, hey, is -- is this the

18  same as what you signed?  Because I knew it was what was

19  on the GPR because I typed up the supp off the GPR.  So

20  I don't recall specifically asking them, hey, is this

21  accurate?  Because I knew it was because what I had

22  typed in the supp was from the GPR, and the GPR that I

23  duplicated was the same information that would've been

24  on the GPR because I was then pulling it off the supp.

25       Q.   So are you -- I want to be clear, are you



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  saying you did ask them to confirm that the information

2  was accurate or you did not?

3       A.   I -- I don't recall if I did exactly or not,

4  but I know that there -- they -- let's put it this way,

5  when they looked at those documents, being the duplicate

6  GPRs and the supp report, in no way were they alarmed or

7  alerted or said, hey, man, I don't remember this.  No.

8  And my assumption, because I didn't hear anything

9  otherwise from the FBI, is that they would've told them

10  that specifically, no, this is what was said based on

11  the -- the duplicate, or this is what we were told.  So

12  at no point did anybody ever -- you know. And -- and I

13  know it was not a problem because what's in the supp is

14  what's in the GPR, and then what's on the duplicate GPR

15  is what was in the supp.  So I -- I know it was the

16  same.

17       Q.   When you were rewriting or recreating those

18  GPR, did you get them on the phone or get them in your

19  office to make sure that, as you were rewriting it, it

20  was accurate?

21       A.   I don't recall specifically that I did that.

22  But why?  Because I know it was accurate and that -- and

23  again, people on the floor saw.  I wrote right on there

24  this is a duplicate GPR prepared by me.  So why would I

25  need them to know it was accurate when it was taken

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 232 of 326 PageID #:7202
The Deposition of ANTHONY WEDO, taken on 11/30/23

230

1 right off their GPR?

2     Q.   How long -- was it within the first hours or

3 days after you recreated it that you informed them that

4 you had recreated their GPRs?

5     A.   I don't recall exactly when I first alerted

6 them or not.  I do recall that prior to the FBI coming

7 in, they were aware and they reviewed those documents.

8     Q.   In fact, if the FBI had not been coming in to

9 conduct an --

10     A.   And that I explained what had occurred and why

11 I had duplicated the GPR.

12     Q.   If the FBI had not come in to conduct an

13 investigation, would they have learned that you had

14 recreated their GPRs?

15       MR. STEFANICH:  Objection.  Form.  Foundation.

16       THE WITNESS:  I'm assuming at some point they

17       would have.

18 BY MR. SWAMINATHAN:

19     Q.   When you went to them with that information,

20 it was just before the FBI was coming in to interview

21 them, correct?

22     A.   I don't recall exactly.  What do you mean by

23 just before?  Minutes before?  Days before?  Weeks

24 before?  I don't know.  I know it was after -- I was

25 then charged with setting up the interviews with the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   FBI. And I was setting them up -- prior to the

2   interviews with the FBI, then I did meet with the

3   officers. And they were informed of it and they did

4   review it. When exactly, I couldn't tell you.

5   **Q. If the FBI had not been coming in to**

6   **conducting an investigation, would you have informed**

7   **those detectives that you'd rewritten their GPRs?**

8   A. Yeah, I don't see -- probably would have. I

9   mean, on the other hand, what -- what -- in my eyes were

10   it is what's was on their GPRs. So if it became a -- a

11   concern or whatever, then yeah. But would I have said

12   that? Probably. Probably. And if I remember

13   correctly, post submission of the report and prior to

14   the FBI, I believe I had some surgery done or something,

15   and I was off for a while. So that may have led to some

16   of the -- again, I don't know exactly when I -- I sat

17   down with them. But I think there was a time where I

18   was off in the interim on -- on -- for some surgery.

19   **Q. The GPRs that you rewrote for them, those**

20   **three GPRs, were GPRs containing their notes of their**

21   **conversations with witnesses to the shooting, correct?**

22   A. Incorrect. Because I don't --

23   **Q. Then please clarify for me.**

24   A. The -- I don't recall specifically what those

25   individuals saw or didn't see. But they were people

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    that they had interviewed.

2         Q.    Okay.  So they were GPRs of those who had

3    heard this incident?

4         A.    Those that had heard shots or saw something.  I

5    don't recall exactly.  But yes, they were somebody that

6    were interviewed the night of incident as a --

7         Q.    As a witness.

8         A.    -- of some sort, be it circumstantial or

9    eyewitness.  I don't know.  I don't recall.

10        Q.    The interviews that were documented in those

11   GPRs, did you participate in any of those interviews?

12        A.    No.  Because I did not return to the area that

13   night at all to -- I was not present in the area.  I did

14   not participate in those interviews.

15        Q.    And so did you -- why didn't you have the

16   detectives be the ones to recreate their reports of

17   their own interviews?

18        A.    Because, again, we were ordered on short

19   notice to complete the file.  And matter of fact, I

20   recall that it was late on the last night.  And we had

21   even tried to extend that date because we just could not

22   get it done in a time frame after the corp counsel's

23   meeting.  The time frame we were given, we could not

24   complete it.  Again, there's other things going on.  You

25   know, other investigations coming in. But we could not

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   complete it. We asked for a short extension, and I was
2   told to -- it was like either Sunday night, which would
3   be like Monday morning, I was -- I drove the file down
4   there because they wanted -- I was ordered to get that
5   entire file in in short notice, which included, like I
6   said, the duplicate GPRs. So whether or not, I don't
7   recall if those detectives were available in that short
8   time or not. And apparently they were not. Because if
9   they were sitting there when that happened, I'm sure I
10  would have told them, hey, can you do me a favor? I --
11  you know, your GPRs got wrecked. Can you guys re-
12  scribble them down? But again, I wouldn't have just
13  them scribble it down. It would have been a notation
14  that those were duplicated. So because of the time
15  constraints, we were told to get the entire file to, at
16  that time he was, then -- I believe he was commander.
17  He was the commander at Area Central when the incident
18  occurred, and then he became I believe deputy chief. I
19  had to run it down to his office. That would be Gene
20  Roy, Gene Roy's office. And it was, like, a 3:00 in the
21  morning on Monday morning because I was told it must be
22  in by -- when we come in Monday, you must have the file,
23  not just the supps, the complete investigative file, so
24  that they can forward it. And my understanding was that
25  was corp counsel that they wanted to get it for, not a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1  criminal investigative body, but, you know, corp counsel
 2  was demanding it, which I thought was improper, because
 3  of corp counsel having received demand letters from
 4  civil attorneys that we were now, when we were told to
 5  stand down, we were now being forced to hurry up and get
 6  the file completed so corp counsel could have it, you
 7  know, for whatever reason they -- they wanted to have
 8  it.  I thought that was improper.  But nonetheless, I
 9  did as I -- we were told to do.  And we completed that
10  file and in short order, assembled it, and I took it
11  down and -- and brought it to the -- I believe he was
12  then deputy chief, I don't believe he was chief at the
13  time.  But to Gene Roy's office downtown.
14          MR. SWAMINATHAN:  Let's take a look at Exhibit
15          18.  What is it?  Exhibit 19.  Sorry.  This is
16          City NF -- City JF 6600 through 6640.
17              (EXHIBIT 19 MARKED FOR IDENTIFICATION)
18          MR. STEFANICH:  He's got it.
19          MR. SWAMINATHAN:  He got it?  Okay.
20  BY MR. SWAMINATHAN:
21      Q.  Let's turn to page -- this is the summary
22  report of the -- of investigation from the City of
23  Chicago Office of Inspector General, case number
24  15-0564, Lieutenant Anthony Wojcik, dated December 29,
25  2017.  Have you seen this document before, sir?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.   I wouldn't know.  How would I know?  I --

2      **Q.   You don't know if -- you don't know if you've**

3  **ever seen this OIG report?**

4      A.   I have never received anything from the OIG.

5  This document you're showing me has no cover page, nor

6  does it have a signature page on who authored this.  I

7  don't even know if this is an official document.  I was

8  in a post-conviction hearing where another attorney

9  threw something similar to this at me and inferred that

10  this was an official OIG summary again.  Where's the

11  cover page?  Where is the authentic -- authentication

12  that this is an OIG document?  She inferred at that time

13  that it was on the internet and that's where she got it

14  from.  I -- I'm not --

15      **Q.   This is produced to me by the Chicago Police**

16  **Department.**

17      A.   Number one -- number one, looking at the

18  document in front of me, that is not an official

19  document as far as I'm concerned.  And it's got probably

20  -- let's see.  It says 2 of 37, so 37 pages that I would

21  have to analyze and I have nothing to compare it to.  So

22  the -- the document I was shown at a post-conviction

23  hearing, which I was -- was inferred was on the internet

24  and asked about, how would I know if this is the exact

25  same or not?  I don't even know who authored this.  I

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    know --

2        Q.   I'm not asking you about some post-conviction

3    hearing.

4        A.   You asked me about this --

5        Q.   Focus on my question.  Focus on my question.

6    Have you reviewed this document before?

7        A.   No.

8          MR. STEFANICH:  I think he -- I think he's trying

9          to answer the question.

10         MR. SWAMINATHAN:  No, he's not.  He --

11   BY MR. SWAMINATHAN:

12       Q.   No, but let's focus on my question.  Have you

13   --

14       A.   What is -- this -- no, I have not reviewed

15   this document because I don't know if I -- if -- if I

16   saw something that was similar to this in the past, how

17   would I know it's this document?

18       Q.   Okay.  Let's try a different question.  Have

19   you -- are you aware that the Office of the Inspector

20   General conducted an investigation into your conduct

21   related to the Laquan McDonald shooting, correct?

22       A.   I am aware that they subpoenaed me for an

23   interview.  And I --

24       Q.   And did you agree to -- did you --

25       A.   I -- I never sat for an interview.  I was

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 239 of 326 PageID #:7209
The Deposition of ANTHONY WOJCIK, taken on June 21, 2023
237

1  never contacted, nor was my attorney by the Office of

2  Inspector General to tell of any results of any findings

3  of anything that they had concluded or not concluded.  I

4  don't know if they were subpoenaing me as a witness.  I

5  was no longer with the department when I got that

6  subpoena.

7       Q.   So let --

8       A.   So how can -- for the administrative process

9  where their -- the extent of what they can do is

10  discipline an officer, I was no longer an officer. They

11  had subpoenaed me and I ended up never sitting for that

12  interview.  So whether or not they drew conclusions or

13  not, they never contacted us.  I am not going to answer

14  questions with something that somebody told me they got

15  off the internet and there's no --

16       **Q.   No, no.  We're going to go through and we're**

17  **going to answer the questions.  But let's talk about --**

18  **let -- but let's talk about your testimony.  So --**

19       A.   And who -- I -- I'd like to know who authored

20  this.

21       **Q.   The Office of the Inspector General.**

22       A.   Who --

23       **Q.   This is a document produced to me, not by --**

24  **not from the internet.  This is not a document that I**

25  **found or created.  This is the document produced to me**



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  by the City of Chicago.  Those Bates stamps on the

2  bottom of the document were produced to me as a -- from

3  the City of Chicago, okay?

4       A.   Okay.  And where did the City of Chicago get

5  it from?  There's nobody to state that.  It's not signed

6  off by -- I don't see a signature page from the

7  Inspector General, nor any of his designees.  I don't

8  see a cover page.

9       Q.   So let me ask you.  This document, Exhibit 19,

10 is it yours testimony that this is not the Office of

11 Inspector General's summary report?  Or is your --

12      A.   I have no idea.

13      Q.   -- testimony that you don't know?

14      A.   I have no idea.  I don't know.

15      Q.   Okay.  Fair.  Okay.  Fair.  Now, next

16 question.  Did you come to learn anything about what the

17 findings were of the Office of the Inspector General

18 with regard its invest -- with regard to its

19 investigation into your conduct?

20      A.   Specifically, no.  But there was a point in

21 time where, at a post-conviction hearing in a petition

22 given to the judge, it referenced a, I believe, Chicago

23 Tribune article that findings were made.  I contacted my

24 attorney who had dealt with the Inspector General when

25 they were subpoenaing me.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        MR. STEFANICH:  I'm going to instruct him not to
 2        answer --
 3        THE WITNESS:  Okay.  I'm sorry.  But specifically
 4        --
 5        MR. STEFANICH:  Based on -- hold on.  Hold on.
 6        THE WITNESS:  I'm sorry.
 7        MR. STEFANICH:  I'm instructing not to answer
 8        based on any conversations you've had with your
 9        attorney.
10        THE WITNESS:  Okay.  Okay.
11        MR. STEFANICH:  To the extent --
12  BY MR. SWAMINATHAN:
13     Q.   Did you ever sit down and read any document
14  that you understood to be the findings of the Office of
15  the Inspector General?
16     A.   No, never -- never received one.  Never read
17  one.
18     Q.   Have you ever looked online to find a copy of
19  this -- you knew that there was this investigation going
20  on.  It was kind of a big deal, right?
21     A.   I -- okay.  You asked me two questions.  The
22  first question, if I ever looked online, after the
23  post-conviction hearing where an attorney stated and
24  basically inferred that she got it off the internet, I
25  went to the Inspector General's site to try to find --
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of ANTHONY WOOD, taken on 11/06/23

240

1  see if I can find this document.  It is nowhere on their
2  site.  So I did try, could not find it.  It is not on
3  their site.  And I don't know again where she would've
4  gotten it from, nor do I know where this document here
5  came from.  I've never seen an instance where there was
6  no cover page, no authentication of it, and signatures
7  of somebody signing off on that document.  And that's
8  what is being presented to me here.  And that's what was
9  -- a similar type thing was presented to me in the past
10  in the post-conviction hearing.

11      **Q.   Okay.  So when you indicated that the Officer**
12  **of the Inspector General tried to get you to sit for an**
13  **interview, correct?**

14      A.   I don't know if I used the word tried to get
15  me to sit for it.  They had subpoenaed me a request and
16  -- and -- to come in.  It didn't say on a subpoena for
17  what reason, that I can recall -- recall.

18      **Q.   Yeah.  You -- then you refused to -- you were**
19  **-- you refused to comply with that subpoena, correct?**

20      A.   Incorrect.

21      **Q.   What did you do in response to that subpoena?**

22      A.   I got the subpoena.  I contacted an attorney.
23  Then we, via my attorney, in writing, told the Inspector
24  General's office I would make myself available
25  voluntarily.  No need to -- the subpoena was not



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    necessary.  If -- in fact, if the conduct of their

2    interview, I -- we asked that, okay, what is the conduct

3    of your interview going to be?  And then we asked that

4    they follow the same procedures that they would use for

5    officers.  If you want to interview me based on a police

6    admin -- administrative purposes, then for

7    administrative purposes, there is a contract, the

8    contractual way that those have to be presented meaning

9    like, how many hours could I be there?  Where would we

10   do this at?  Would I get a copy?  Would you present me

11   with documents prior so that I can review them and --

12   and give you full testimony?  Who can I have present?

13   Will I get a copy of it?  All those things that are

14   designated in the -- in the contract for police

15   officers, which they would've had to do for anybody who

16   was still an active officer.  Secondarily, there is a

17   state law, a law enforcement bill of rights, which is

18   basically essentially, by law, states how those

19   interviews and investigations are to be conducted.  So I

20   had asked that they just follow that. And fine, I'll

21   come in.  They refused.  We had -- we --

22        Q.    They insisted that you sit for a deposition

23   under oath, correct?

24        A.    What?

25        Q.    They insisted that you sit for a deposition



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   under oath, correct?

2       A.   I don't know if they'd call it a deposition.

3   They're calling in an interview.

4       Q.   And it was supposed to be under oath, correct?

5       A.   I'm assuming so.

6       Q.   Yeah.  And ultimately you refused to sit for

7   an under oath interview, correct?

8       A.   Hold on, Counsel.  You're cutting me off

9   because I said that in writing, okay?  Then they said,

10  no, we're not going to do that.  They did not describe

11  how they were going to proceed with the interview.  So

12  then I told -- in -- in conference, in writing, we then

13  sent them a thing and says, well, look, then just

14  provide me with the documents or whatever you would like

15  to ask me questions about so that I can be fully

16  prepared to give you full answers to whatever you have

17  questions about.  They refuse that.  And after that --

18  which in writing we did.  After they refused that, there

19  was no contact from them again.  There was no, hey, come

20  on in.  And I'm going to tell you, this was calculated.

21  In the six months' time that -- okay, eventually, so

22  about six months later after an inspector the special

23  prosecutors named and I -- possibly even after the

24  initial indictments where there was stating that the --

25  there was a coverup involved, and Detective March was

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 named.  But anyway, after the special prosecutor was

2 formed, only then did the Ferguson's office move to

3 enforce the subpoena.  So for six months, they didn't do

4 anything after I requested that then they just provide

5 me with documents.  We acquiesced for that and said just

6 provide me with the documents so I can be ready to give

7 you full testimony on any questions you have.  They

8 wouldn't do that. Nothing.  And we had calculated that,

9 for the six months, there was like 20 days, maybe 25

10 days or whatever, that the ball was in my court,

11 meaning, okay, once you got to subpoena on this date, it

12 took us three days to respond.  So there was three days.

13 They respond.  We respond, yeah, he'll come in

14 voluntarily. They say no.  Well, then we respond, okay,

15 send us the things.  So we counted out the days it was

16 like 20 something days in entire six months that the

17 ball was in our court.  The rest of the time was in

18 their court. They took no action.  So only then --

19     Q.   You're --

20     A.   Hold on.  Only then, after special

21 prosecutor's assigned or the buzz about the special

22 prosecutor or whatever, then he moves to enforce the

23 subpoena.  And then he wants to say that I refused?

24 Well, at that point, looking at, I retire May 2016.  I

25 think he subpoenaed me in June or July after retirement.

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    In April of 2016, that same Inspector General authored
2    the task force thing and -- and in that, he already made
3    findings that Laquan McDonald case, there was a use --
4    excessive use of force, et cetera, et cetera, et cetera.
5    He already made determination.  And then he wants to
6    interview me.  I was still willing to go in.  But again,
7    he wouldn't supply me with the documents.  He wouldn't
8    follow the - - the rights.  And then for five, six
9    months, he's sitting on it.  So at that point, when
10   special prosecutor -- taking into the effect that he had
11   already drawn conclusions prior to even contacting me
12   about the incident plus all the shenanigans about not
13   wanting to tell me the conduct of the investigation, the
14   conduct of the interview, nor supply me with documents
15   then a special prosecutor's assigned, my attorney
16   advised me just to, hey, man, I think it's best at this
17   point that you remain silent.  So when he moved to
18   enforce it, we fought that based on other factors being
19   one -- number one, I'm no longer an employee.  So how
20   can you force me to sit for an administrative interview,
21   which would have no bearing on my life in any fashion?
22   It's administrative.  I'm no longer -- you could -- you
23   can't suspend me.  You can't reprimand me.  I'm not at
24   the department.  Among other factors.  When the judge
25   ruled in their favor only then did he send a letter that

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 247 of 326 PageID #:7217
The Deposition of ANTHONY WOJCIK, taken on 11/09/23
245

1    he had advised me to exercise my right to remain silent,

2    given all those factors I just explained to you.  Only

3    then did I not go in for the interview.  So I was

4    willing more than once in writing to go in.  And he sat

5    on it, waited. You know, they want to tell us -- and he

6    -- he fired people based on poor investigations and

7    untimely shit. And I'm sorry for getting angry, but how

8    untimely was he?  He -- he waits until after I retire,

9    number one, then won't properly conduct the -- the

10   interview or investigation, or at least advise me of how

11   he was going to do it.  Then he sat on it.  And then

12   only when he got caught with his pants down and a

13   special prosecutor assigned and maybe somebody was then

14   going to wonder, well, why didn't you do your job, then

15   he tries to enforce the subpoena.

16   BY MR. SWAMINATHAN:

17        Q.    You done?

18        A.    I think so.

19        Q.    Okay.  Let's take a look at Page 32 of Exhibit

20   19.  Let me know when you're there.

21        A.    I'm there.

22        Q.    Okay.  If you look on -- there's a section

23   called Section 7, "OIG attempts to interview Wojcik." Do

24   you see that?

25        A.    Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   Okay.  In the middle of that page, it says,

2   "On December 8, 2016, the City's corporation counsel,

3   through special assistant corporation counsel, filed a

4   complaint on behalf of OIG in the Circuit Court of Cook

5   County to enforce the subpoena."  Do you dispute that

6   statement?

7    A.   Okay.  Where are you at?  I -- I'm lost here.

8    Q.   In the middle.  In -- there's a paragraph, the

9   third paragraph in Section 7.  You see that?  Begins,

10   "OIG subsequently contacted O'Brien"?

11    A.   Correct.

12    Q.   Okay.  In the middle of that paragraph,

13   there's a section that begins, "On December 8, 2016, the

14   City's corporation counsel, through special assistant

15   corporation counsel, filed the complaint on behalf of

16   OID -- OIG in the Circuit Court of Cook County to

17   enforce the subpoena."  Do you dispute that statement?

18    A.   What do you mean, do I dispute the statement?

19    Q.   That's true, right?

20    A.   First off -- first off, huh, I have no idea,

21   Counselor.  First off, I am objecting that I am

22   answering to some fricking document that I was told was

23   taken off the internet, not that is authenticated by

24   anybody.

25    Q.   No.  Let me be very clear.  You -- don't

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1   misstate the record.  This is not a document that came

2   off of the internet.  This is a document produced by the

3   City of Chicago, okay?  So --

4       A.    Produced by the City of Chicago, but authored

5   by who?

6       Q.    **This is off -- authored by the Office of the**

7   **Inspector General.  Do you dispute --**

8       A.    But -- but where are you getting that from?

9       Q.    **Yeah, I'm --**

10      A.    Where's the signature page?  Where --

11      Q.    **I'm representing to you that this is --**

12      A.    Where's the signature that you are --

13      Q.    **Okay.**

14      A.    -- certain that this was authored by the

15  Inspector General?

16      Q.    **Okay.  So you've already indicated that you**

17  **don't know whether it's authored by the Inspector**

18  **General or not.  Fine.  Now, I'm asking you about the**

19  **contents of this document.  You can tell me whether it's**

20  **true or not true.  Is it true --**

21      A.    I don't know.  I don't know the exact date.

22      Q.    **Okay.**

23      A.    I do know that after sitting on this for

24  months and after -- and a special -- a special

25  prosecutor, then he moved to enforce a subpoena.  And I

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   said that earlier, okay?  So the exact date, I don't

2   recall.  But December would be about right, because the

3   first contact with me is June or July.  And again --

4   well, no, no, no.  Let me finish.  20 -- 25 days, 26

5   days, whatever it was that the ball was in our court,

6   then this guy did nothing.  So that may be the proper

7   date, may or may not be.  But again, he waited and

8   didn't do -- take any action.  And then yes, he did try

9   to enforce the subpoena.  Whether or not that December

10  8th is correct, I couldn't tell you.

11       Q.   Okay.  And then I -- the next thing it said,

12  the last sentence of that paragraph says, "On July 6,

13  2017, the court entered judgment in favor of OIG and

14  ordered Wojcik to comply with the OIG's lawful and

15  enforceable subpoena."  Do you dispute that statement?

16       A.   Yes.

17       Q.   Okay.  In what way did you dispute it?

18       A.   Well, I dispute it, number one, because, first

19  off, I dispute it because I'm not sure the date.  And I

20  will go back to, every question you're going to ask me,

21  I'm going to preface it by I don't know whose document

22  this is.  You know?

23       Q.   I'm not asking you about the document.  I'm

24  asking you about the information --

25       A.   I'm going to preface my answers with that.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q.    Okay.

2      A.    That I am objecting to me answering to some

3    document that was found on the internet and/or produced

4    by the City, but nobody authoring -- tell me who

5    authored this or authenticating the document.  Now, in

6    that sentence, it says, "On July 6, 2017, the court

7    entered judgment in favor OIG and ordered Wojcik to

8    comply with OIG's lawful and enforceable subpoena."

9    Well, let's argue about lawful and enforceable.  I don't

10   know what the court concluded.  I have no idea whether

11   the court said this is a lawful and an enforceable

12   subpoena.  So I am not going to agree to that because I

13   don't know what the court said.  I do know and you know

14   that --

15     Q.    Okay.  Let me ask you a different question.

16     A.    I'm sorry.

17       MR. STEFANICH:  We -- we're going to take a

18       break.

19       MR. SWAMINATHAN:  I mean, it's -- we'll go

20       another two hours if we have to.  We don't have

21       to take this long, but we can -- we'll take this

22       long and this is how it's going to go.  Take a

23       break if you need.

24       THE REPORTER:  Should I take us off record? Off

25       the record.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 252 of 326 PageID #:7222
The Deposition of ANTHONY WOJCIK, taken on 05/04/22

250

```
 1              (OFF THE RECORD)
 2         THE REPORTER:  Back on record.
 3    BY MR. SWAMINATHAN:
 4         Q.   Mr. Wojcik, did the court order you to comply
 5    with the OIG subpoena?
 6         A.   That's my understanding, yes.
 7         Q.   Okay.  And did you inform the OIG through your
 8    Counsel that you would invoke your Fifth Amendment right
 9    against self-incrimination and would not appear for an
10    interview with OIG?
11         A.   I did not.
12         Q.   You did not invoke your Fifth Amendment right?
13         A.   I did not invoke my Fifth Amendment right
14    against self-incrimination.  I invoked my right to
15    remain silent.  I have nothing here to incriminate me in
16    anything.  Based on circumstances, I invoked my right to
17    remain silent, period.
18         Q.   And your Counsel wrote, "As a result of the
19    court's ruling on OIG's complaint and as a special grand
20    jury remains in session, I have advised Mr. Wojcik to
21    remain silent pursuant to the constitutional right of
22    every citizen to do so.  Mr. Wojcik has elected to
23    follow my advice and will remain silent." Is that true?
24         A.   That is true.  And again, it does not say
25    against self-incrimination.  I invoked to remain silent,
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  period.

2      Q.   And if you look in the footnote there on Page

3  40 -- the Footnote 47 at the bottom of that page?  It

4  says, "CPD records reflect that Wojcik initiated his

5  retirement on April 15, 2016, approximately one month

6  after OIG conducted its first subject interview of a CPD

7  police officer as part of its McDonald investigation."

8  Do you disagree with that statement?

9      A.   Yes.

10      Q.   In what way do you disagree with that

11  statement?

12      A.   I don't know when they begin their interviews.

13  I don't know if this is accurate.  I don't know if this

14  is -- again, where this document is from.  So I am not

15  agreeing.  I did initiate on April 15th and retired on

16  May 15th.  I have no idea if it's approximately one

17  month after OIG conducted its first subject interview of

18  CPD police officer as part of its McDonald

19  investigation.  So I do dispute that because I don't

20  have any idea when the OIG.  Had I been -- okay.  I'm

21  sorry.  That's all.  I'm disputing that.

22      Q.   Okay.  And do you -- when you retired from the

23  -- when you initiated your retirement on April 15, 2016,

24  did you have any knowledge that there was an OIG

25  investigation being conducted?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.   No.

2      Q.   And when you retired, when you initiated your

3  retirement on April 15, 2016, did you do so in any part

4  because of the existence of an OIG investigation into

5  your conduct?

6           MR. STEFANICH:  Objection.

7           THE WITNESS:  No.

8  BY MR. SWAMINATHAN:

9      Q.   And was there ever any City of -- strike that.

10 Was there ever any Chicago Police Department complaint

11 register or investigation into your conduct associated

12 with the Laquan McDonald investigation?

13          MR. STEFANICH:  Object to foundation.

14          You may answer.

15          THE WITNESS:  No.  And if there was, I would not

16          gotten my credentials because you can't retire

17          and get credentials.  If there was any open

18          investigations, be it OPS, police department,

19          IAD, et cetera, even if they are the

20          confidentials that are not supposed to be known.

21          I got my credentials because there was no --

22          there was zero investigations being conducted

23          into me at that time.  And I was not aware of any

24          ongoing investigations by the OIG regarding this

25          incident at all at that time.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of KENNETH WOJTAN-TYSZKA, taken on June 29, 2023

```
1   BY MR. SWAMINATHAN:

2        Q.    Did the Chicago Police Department in any --

3   did any division or unit or agency within the Chicago

4   Police Department ever interview with regard --

5   interview you with regard to your conduct in the Laquan

6   McDonald investigation?

7        A.    I'm sorry, repeat that question.

8        Q.    Yeah.  Did the OPS, COPA, or any other --

9   Internal Affairs, or any other disciplinary organization

10  within the Chicago Police Department ever interview you

11  regarding the Laquan McDonald investigation?

12       A.    No.

13       Q.    Okay.  Go back to page -- go back to Page 20

14  of this report.  I'm sorry, Page 19 of the report.  Yeah,

15  on Page 19, do you see a person listed whose name is

16  Robert Garcia?  I'm sorry, the first name.  The first

17  name there, Eric Gonzalez.  Do you see that name?

18       A.    Yes, I do.

19       Q.    Was one of the GPRs that you disposed of, was

20  it -- did it contain interview notes of Eric Gonzalez?

21       A.    I -- I don't recall.

22       Q.    The next name listed there is Robert Garcia --

23       A.    As I sit here -- as I sit here at this moment

24  in time, I don't recall.

25       Q.    Okay.  The second name listed there is Robert
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Garcia.  Do you see that?

2        A.    Correct.

3        Q.    And the GPRs that you disposed of, was one of

4    them an interview of a man named Robert Garcia?

5        A.    I believe it could be, but as I sit here at

6    this moment in time, I -- I don't recall with certainty.

7        Q.    And then if you look on the next page, Page 20

8    of 37, there's a section that says, "OIG interview." Do

9    you see that?

10       A.    Yes, I do.

11       Q.    Okay.  And then about halfway through that

12   paragraph, it begins, "Garcia said that he described."

13   Do you see that?

14       A.    Yes.

15       Q.    It says, "Garcia said that he described

16   McDonald's shooting as a 'execution' to CPD detectives,

17   but could not remember if he did so at the scene or at

18   Area Central."  Did you -- in the GPRs that you

19   recreated, did you include information from Mr. Garcia

20   about describing the shooting as an execution?

21            MR. STEFANICH:  Objection to form, foundation.

22            THE WITNESS:  I don't recall, again at this

23            moment in time as I sit here, whether or not one

24            of the GPRs dealt with Mr. Garcia.  I don't

25            recall anything regarding him stating it was an



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 257 of 326 PageID #:7227
The Deposition of ANTHONY WOJCIK, taken on 11/20/23

255

```
 1              execution.  If that was on the GPR and he did
 2              state that, then it would've been included.  So I
 3              don't even know if his GPR is one of them we're
 4              talking about or not.  Again, I don't remember
 5              anything about anybody stating execution.
 6      BY MR. SWAMINATHAN:
 7          Q.   Okay.  And the next sentence says, "Garcia
 8      said that the GPR of his interview, which stated that he
 9      did not see McDonald get shot, was a misrepresentation
10      of his statement, because he told detectives that he did
11      see shots fired and that they were 'unnecessary.'"  In
12      the GPR that you recreated, did you write that
13      Mr. Garcia did not see McDonald get shot?
14              MR. STEFANICH:  Objection.  Form, foundation,
15              misstates his prior testimony.
16              THE WITNESS:  Again, I don't know whether or not
17              one of the GPRs in question were related to
18              Mr. Garcia's statement or not.  So I couldn't
19              answer that question.  And I don't recall
20              anybody's -- any of the - - my recollection of
21              any of those GPRs, I don't recall specifically
22              that statement there being part of the
23      GPR.
24      BY MR. SWAMINATHAN:
25          Q.   Fair.  And the statement that Mr. Garcia told
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1　detectives that he did not see shots fired -- or strike

2　that.　The statement that Mr. Garcia did see shots fired

3　and that they were "unnecessary," did you include that

4　information in the GPR that you created?

5　　　A.　I -- I think I just --

6　　　　MR. STEFANICH:　Objection, that's been answered.

7　　　　THE WITNESS:　I just answered that question. You

8　　　　just asked me that prior question and my answer

9　　　　stands.

10　BY MR. SWAMINATHAN:

11　　　Q.　Well, I asked you if you had written in the

12　GPR that he did not see McDonald get shot.　Now I'm

13　asking you if you wrote that he did see McDonald get

14　shot.

15　　　A.　That's a whole sentence there.

16　　　Q.　And that they were unnecessary?

17　　　A.　Again, my answer would be for that whole

18　sentence there.　I don't recall if any of the GPRs in

19　question regarded Mr. Garcia.　And at this time, as I

20　sit here at this moment in time, I don't recall anybody

21　or seeing any GPR where that was stated or that was

22　written on a GPR.

23　　　Q.　Turn to Page 21 of this document.　This is

24　Section 4 that says GPRs.　It begins, "There are three

25　general progress reports that relate to the CPD

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   interviews of Gonzalez, Benitez, and Garcia.  Each of
 2   those GPRs has Lieutenant Anthony Wojcik's name and star
 3   number listed under reporting officer's signature."  Do
 4   you deny that you -- the GPR you recreated were of
 5   interviews of Gonzalez, Benitez, and Garcia?
 6        A.   I --
 7             MR. STEFANICH:  Objection.  Asked and answered.
 8             THE WITNESS:  I'm not denying it.  I don't recall
 9             at this moment in time as I'm sitting here
10             whether they did or not involve those
11             individuals.  It may have likely involved them.
12   BY MR. SWAMINATHAN:
13        Q.   Okay.
14        A.   I just don't have them in front of me and I --
15   I don't recall at this moment in time.
16        Q.   Okay.  Turn to page 28 of this document.  The
17   -- 27.
18             MR. STEFANICH:  27 or 28?
19   BY MR. SWAMINATHAN:
20        Q.   27.  You there?
21        A.   Yes.
22        Q.   Okay.  And it indicates here that Mr. Torres
23   was a CPD detective assigned to Area Central's special
24   victims unit and Wojcik was one of Torres' assist --
25   lieutenants.  Do you agree with that statement?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 260 of 326 PageID #:7230
The Deposition of ANTHONY WOJCIK, taken on June 20, 2023

258

```
 1            MR. STEFANICH:  If you can just direct us to the
 2       paragraph on --
 3  BY MR. SWAMINATHAN:
 4       Q.   Yep, second paragraph.  Was Torres a CPD
 5  detective --
 6       A.   I don't recall -- okay.  I don't recall.  And
 7  which Torres are we talking about?
 8       Q.   I don't --
 9       A.   Can you have a first name?
10       Q.   Do you recall a Detective Torres who --
11       A.   I do.  More than one.
12       Q.   Under you?  Was there one that worked in Area
13  Central's special victims unit?
14       A.   I believe he was.  I thought -- I -- I don't
15  know if he was special victims or not, or if he was on
16  the floor as a violent crimes, but -- but very possible
17  he was special victims at the time.
18       Q.   Did you work -- was there a detective named
19  Pete Torres who what -- worked as a detective on the
20  Laquan McDonald investigation?
21       A.   Correct, yes.
22       Q.   And Mr. Torres wrote one of the GPRs that you
23  disposed of and recreated, correct?
24       A.   I believe he was one of the detectives. That's
25  correct.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          Q.   Okay.  And if you turn to Page 28, at the very

2     top of that page, it says, "Torres took notes on a GPR

3     during the interview, which took less than ten minutes."

4     And you can go back to the page before, but it refers to

5     an interview of Mr. Garcia by Mr. Torres. Do you have

6     any reason to dispute that Mr. -- Detective Torres took

7     notes on a GPR of his interview of

8     Mr. Garcia?

9          A.   I wasn't there, Counselor, when he -- that

10    would've occurred.  So I'm not going to dispute if

11    Mr. Torres did in fact say this.  Again, I'm going to go

12    back to, I don't know who authored this.  I don't know

13    who might have changed what's in here, coming off the

14    internet or not.  It's not an authenticated report.  So

15    if he did say that, then I -- that's what occurred.  I

16    wasn't present.  I don't know how long it took him to

17    take notes, so I can't answer for that one, Counselor.

18         Q.   The next paragraph begins, "When shown the

19    GPR."  D you see that?

20         A.   Yes.

21         Q.   Okay.  He says -- it says, "When shown the GPR

22    related to the Garcia interview, Torres said that he

23    first saw the GPR in 2015 'when the FBI came to Area

24    Central to question CPD about the shooting.'  The FBI

25    gave him a copy of the GPR.  Prior to Torres's interview

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    by the FBI, Wojcik informed Torres via telephone that

2    Torres's original GPR 'had gotten damaged by coffee,' so

3    that Wojcik had to rewrite it and that the original was

4    destroyed."  Did you contact Mr. Torres by phone before

5    the FBI came to Area Central to question him about the

6    shooting?

7         A.    I may have.  I don't know specifically whether

8    I did or not.  But if Torres stated that, I have no

9    reason to dispute what he's saying.

10        Q.    And when Torres -- and so when you contacted

11   Torres before the FBI was coming in to question him, you

12   -- that's when you informed him that his GPR had gotten

13   damaged by coffee and you had to rewrite it, correct?

14        A.    Again, I'm not -- I can't recall whether or

15   not I did speak to him.  If he's stating that, I'm not

16   going to dispute what he's stating if in fact he did

17   state that.  I don't know.  I do know I spoke to them in

18   person.  I may have spoken to him on the phone also. So

19   I can't say one way or the other.  I'm not -- you know,

20   it's -- I don't recall.

21        Q.    And then it says -- the second to last

22   sentence is, "Wojcik told Torres that he rewrote the GPR

23   himself based off the copy -- coffee-damaged GPR." Did

24   you tell Detective Torres that you rewrote the GPR based

25   off of the coffee-damaged GPR?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.   I don't recall that, whether I did or not. And

2  again, as I told you earlier, from the GPR, typed it in

3  the supp.  So if the interpretation can be that I typed

4  up what was on the GPR, it -- it is because it was typed

5  off that GPR pre -- pre-coffee damage.

6      **Q.   So you're acknowledging now that you didn't**

7  **type -- you didn't rewrite -- recreate the GPR by**

8  **looking at the coffee version of the GPR.  You recreated**

9  **the GPR based off of your report; is that correct?**

10     A.   I --

11         MR. STEFANICH:  I'm going to object.

12         THE WITNESS:  Again, as I stated prior, the

13         report was typed up off the good, undamaged GPR.

14         It was already typed.  When I came back to the

15         office and the coffee was spilled on there, it

16         was already typed up from the GPR.  The GPR was

17         damaged beyond use, recognition.  Ink had run, et

18         cetera, et cetera.  Then and only then did I

19         recreate, duplicate the GPR from the supp, the

20         supp originally taken off the original GP -- or

21         was -- was transcribed from the original GPR.

22  BY MR. SWAMINATHAN:

23     **Q.   You look at the next paragraph, the first**

24  **sentence, "Wojcik never asked Torres to review the GPR."**

25  **Did you ever ask Torres to review the GPR?**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          A.     I believe I did.  I don't know where --

2          Q.     **And so where --**

3          A.     And I believe, as I stated earlier, part of

4     the process, when the FBI would come in, would be that I

5     would have given officers documentation so that they

6     could be prepared for the interview with the FBI.  So

7     specific recollection with Torres, I can't state.  I

8     know that in general, when -- when the interviews were

9     set up and I knew that the FBI was coming in and that,

10    okay, Officer or Detective So-and-So was going to be

11    here on third watch; you guys want to interview him.

12    He's going to be here on third watch.  Can you guys be

13    here that day?  Yes, we can.  Then I saw to it that, in

14    general, that that detective would have received and

15    reviewed any documentation or stuff regarding his

16    involvement so that he could be -- be prepared when the

17    FBI came in to be interviewed by them.  I don't recall

18    that I didn't make contact with the detective or tell

19    them what was going on or supply them or make sure that,

20    if I didn't supply them, that they had reviewed

21    documentation.  Could something have slipped the cracks?

22    Possibly.  But I don't recall that here.  I recall, like

23    I said, getting them the documentation needed so that

24    they can review it prior to FBI arrival.

25          Q.     **If Torres told the OIG that he -- that you**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

263

```
1   never asked him to review the GPR that you rewrote, is
2   Torres right or wrong, or you don't know?
3          MR. STEFANICH:  Objection.  Form and foundation.
4          THE WITNESS:  First off, you're telling me what
5          Torres told them based on a document that is not
6          authenticated by anybody.  I don't know who wrote
7          this. I don't know what Torres told them.  So I
8          am not responding to that, that that did occur
9          because I have no idea whether that occurred or
10         not.  If you're asking me if it says it in this
11         document written by who knows who or altered by
12         who knows who, I have -- it's what it says in
13         here in this piece of paper, 37-page thing that
14         you are presenting to me as some type of official
15         document, which I am again disputing.
16   BY MR. SWAMINATHAN:
17      Q.   So you're not claiming that you did in fact
18   ask Torres to review the GPR that you rewrote?
19      A.   I believe I did.
20      Q.   Okay.  And then are you claiming that --
21      A.   I know I did.  I -- as a matter of fact, wait.
22   I spoke to both detectives prior to the FBI.  They were
23   aware of the damage.  And my recollection is that the
24   reports were reviewed and the duplicated GPRs, my
25   duplication of their GPRs, were also reviewed prior to
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 266 of 326 PageID #:7236
The Deposition of ANTHONY VILLADONGA, taken on 11/04/21

264

1    the FBI coming in.  So that's my recollection, and I had

2    done that with -- not that I sat down with everybody,

3    but I saw that everybody, again, was provided with

4    documents so that they could be -- be prepared for when

5    the FBI come in there.  So if I missed Torres, I -- I --

6    you know, I don't remember that.  I don't remember not.

7    I feel that I did.  And so again, based on my

8    recollection and my remembrance, I believe I spoke to

9    both of them prior, and it does state in here that I

10   spoke to them via telephone, at minimum, about the GPR.

11   So I don't know.

12        Q.   What was the -- when was it that you spilled

13   the coffee on the GPR?  Was it in 2014, in 2015?  When

14   was it?

15        MR. STEFANICH:  Objection.  Form and foundation.

16        Misstates the testimony.

17        THE WITNESS:  It was shortly before the reports

18        were completed, submitted for approval.  Again,

19        we were on a short -- we were given a short time

20        to go from doing nothing on the case to getting

21        complete reports in and a complete file made up.

22        So it was a short duration of time.  I don't know

23        the exact date, but it's not going to be long

24        before the report was submitted and approved.

25   BY MR. SWAMINATHAN:



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

265

```
 1        Q.    Okay.  And then it says here on the same --
 2        A.    I -- I don't know.  You may check the GPRs.  I
 3   may have notated the date on there that I duplicated it.
 4   I'm not sure.  It's possible I did.
 5        Q.    And then it says -- in the same sentence, it
 6   says, "Wojcik did not inform Torres of the damage to his
 7   original GPR at the time it occurred."  Did you inform
 8   Torres of the damage to the original GPR at the time of
 9   that damage?
10        A.    The day of occurrence, you mean?
11        Q.    Yeah.  The day of the occurrence or within a
12   week of it.  Did you tell him?
13        A.    I -- I don't recall.  I -- I don't believe I
14   did.  And I don't recall specifically whether I did or
15   not at this time as I'm sitting here.
16        Q.    The next sentence says, "When asked whether he
17   found it unusual that Wojcik did not give him a chance
18   to review the GPR, Torres responded, 'Well, this was a
19   year later down the road, so I mean, I don't think -- I
20   didn't think about asking him, can I see the that GPR
21   now that, you know, at the time we were, like, like over
22   a year ago.'"  Do you -- would you say that -- would it
23   be fair to say that it was a year or more from the time
24   of the coffee spill to the time -- and you recreated the
25   report, until the time that you informed Torres and
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    others about your decision to recreate the reports?

2        A.   I don't know.  I don't recall the time frame

3    involved, so I couldn't answer that with specificity as

4    I'm sitting here today at this time.

5        Q.   Okay.  Let's take a look at Page 30.  Well, we

6    don't have to keep going through all this.  Take a look

7    at the section -- yeah, at the bottom of Page 30,

8    there's a section about Svec.  Do you know a Detective

9    Svec?

10       A.   Beth Svec, yes, I do.

11       Q.   Yep.  And Detective Beth Svec was working on

12   the Laquan McDonald investigation, correct?

13       A.   If I remember correctly, yes.  She had been --

14   some part in it, yes.  Assistance type part, I believe,

15   if I remember correctly.

16       Q.   And then it says that -- in the second

17   paragraph, it says, "A few minutes after Svec arrived at

18   the scene, she saw three people up on a semi-truck in

19   the Burger King parking lot.  Svec walked over to the

20   semi-truck, obtained contact information from the

21   individuals, and took a statement from each of them as

22   to what they had witnessed.  Svec said she took notes of

23   the interviews on GPRs.  She completed a separate GPR

24   for each of the three people."  Do you see that?

25       A.   Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q.   Do you have any reason to dispute that Beth
 2   Svec did interviews of these three individuals and took
 3   -- and wrote GPRs in those interviews?
 4             MR. STEFANICH:  Objection.  Form and foundation.
 5             You can answer.
 6             THE WITNESS:  I have no idea.  I wasn't there.  I
 7             didn't speak to her that night.  I -- again, if
 8             she stated that and I -- I believe that it did
 9             come up during the FBI that she had conducted
10             some interviews. So I have no reason to dispute
11             that, that she did.
12   BY MR. SWAMINATHAN:
13        Q.   If you look at the bottom of Page 34 --
14        A.   I would add in there, you're leaving a line
15   out that, even according to her, if those are the three
16   same people, she said -- you know, where you're talking
17   about an execution earlier and the police told them
18   whatever, according to her even, in quotes, "None of the
19   three specifically saw the shooting."
20        Q.   Yep.  If you go -- yep.  If you go down to the
21   third-to-last paragraph, it begins, "After arriving at
22   Area Centrals."
23        A.   Yes.
24        Q.   There's a sentence there that says, "Svec said
25   she handed in her GPR before she let the witnesses know
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    she was leaving."  Do you have any reason to dispute

2    that Svec handed in her GPRs?

3              MR. STEFANICH:  Objection.  Foundation.

4              THE WITNESS:  Again, I'm getting back to I don't

5              know who authored this report, who might have

6              altered this report, whether or not it's an

7              official report or not.  If Beth Svec -- Beth

8              Svec were to stand in front of me and say that

9              she handed in her GPRs before she let the

10             witnesses know she was leaving that night, I

11             wouldn't dispute it.  I have no knowledge to

12             dispute that, whether it occurred or not, but I

13             would not dispute her saying that if she said

14             that.  I would not dispute it if she said that.

15   BY MR. SWAMINATHAN:

16        Q.   And the bottom of Page 31 on the last

17   paragraph, "In September 2015, when Svec was at Area

18   Central to meet with the FBI or U.S. Attorney's Office

19   regarding the McDonald case, Wojcik told Svec that the

20   GPRs relating to her October 20, 2014 civilian witness

21   interviews had been lost."  Did you inform Detective

22   Svec that the GPRs relating to her civilian interviews

23   had been lost?

24        A.   No.

25        Q.   You never told her that her GPRs had been

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  lost?

2  A.  No.  It was time for her interview, and she

3  told me that -- I didn't find documentation, being GPRs,

4  for her in the file.  And she told me that there should

5  have been because she spoke to these people. And I said,

6  well, maybe they were lost.  Maybe they were replaced.

7  Maybe they'll be found and located back in the file.

8  And I said, just inform the FBI when you're speaking to

9  them that you did prepare GPRs that we -- you know, that

10  you are unable to review for whatever reason.  Either

11  they were lost, misfiled, will be found, or whatever.

12  So I did not approach her.  She approached me to let me

13  know that the -- the GPRs, that she had prepared GPRs.

14  Because, in setting up her interview, I didn't locate

15  any.  And then she -- when she came in for the interview

16  or at some point prior to her interview, she told me

17  that she had prepared.  So she alerted me to the fact

18  that -- stating that she had prepared GPRs.  Not in the

19  file.  So don't know if they were misfiled, lost, don't

20  know what happened to them. But I told her, well,

21  chances are they'll turn up or whatever or -- you know.

22  But I said, do let them know that you did prepare, but

23  that we -- you know, they're not available right now.

24  We don't have them right now. So --

25  Q.  Do you know what happened to Svec's GPRs for

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  those three interviews?

2      A.    I have no clue.

3      Q.    Did you ever have possession of them?

4      A.    No, I did not.

5      Q.    If you go to the next page, Page 32.  We're

6  almost done here.

7      A.    Okay.

8      Q.    On Page 33 of this document -- well, let's go

9  to Page 34, 35 first.  There's a section that begins,

10  "Wojcik's disposal of material evidence."  Do you see

11  that?

12      A.    Yes.

13      Q.    It says, "With respect to the GPRs that Curran

14  and Torres completed at Area Central the night of the

15  shooting regarding their interviews of Gonzalez, Garcia,

16  and Benitez, the evidence reflects that Wojcik disposed

17  of the original GPRs while they were in his possession."

18  You agree with that statement, correct?

19      A.    Again, I'm not sure of who the individuals

20  were.  Like I stated earlier, Gonzalez, Garcia, Benitez,

21  I believe that it probably was those names, but I can't

22  say with specificity that those are the GPRs in

23  question.  And I -- I've already told you that I did

24  dispose of those original GPRs.  Well, essentially,

25  yeah, they were in my possession because I was using

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  them to complete the supplemental report.  So yeah, with

2  the exception of positively stating it was Gonzalez,

3  Garcia, and Benitez, I'm not disputing that statement.

4      Q.    There's a -- the next sentence after this

5  parentheses, it says, "According to Curran and Torres."

6  Those are both detectives, correct?

7      A.    Correct.

8      Q.    "It was not until they were called for

9  interview by the FBI in or about September 2015 (nearly

10  a year after the original GPRs had been generated and

11  approximately six months after the CPD investigation of

12  the incident was officially closed) that Wojcik told

13  them that he had rewritten their GPRs without consulting

14  them, signed the reports with his own name, and had not

15  preserved the originals."  That's all true, correct?

16      A.    No.

17      Q.    Okay.  What part is not true?

18      A.    Well, first off, the wording is not -- is a

19  spin that's not entirely accurate.  But let's go over

20  this.  According to Torres, it was not until they were

21  called for an interview -- nearly a year after the

22  original GPRs?  I don't know the time frame, as I stated

23  earlier.  And six months?  The investigation is not --

24  was not officially closed because the investigation was

25  going -- ongoing by the U.S. Attorney's Office and the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  State's Attorney's Office. So that is false. The

2  investigation was not closed yet. We had submitted

3  paperwork, as far as we took it, under orders to do so.

4  Order court counsel purposes only after, again, having

5  been told to stand down prior to that. "Without

6  consulting them" sounds odd, but yeah, I did do it, and

7  I didn't call them that night and say, hey man, is it

8  okay if I -- or if I duplicate your GPRs? I signed the

9  reports with my own name, yes, to document the fact that

10 they were duplicates. So yes, I told you earlier I

11 signed it. I circled it, saying, "Duplicates, A.

12 Wojcik," 18 -- whatever my star was at the time, 481, I

13 believe. And "had not preserved the originals." Well,

14 that is correct. I told that to you. They were

15 destroyed. Nothing I can do.

16     Q.  **Where it says here that you -- well, strike**

17 **that.  Did you -- strike that.  It says here you**

18 **informed Curran and Torres in and about -- in or about**

19 **September 2015 about what had happened; is that true?**

20     A.  I -- again, I do not recall the time frame

21 specifically.

22     Q.  **Let's go to the next page, page 36.  The first**

23 **paragraph, "Under Wojcik's supervision, the McDonald's**

24 **investigative team lost the GPRs Detective Svec**

25 **completed at the scene of the shooting regarding her**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1   interviews of Gonzalez, Garcia, and Benitez.  Wojcik was
2   aware of the lost GPRs, as he was the person who
3   informed Svec in an in-person meeting that her reports
4   were missing and then assured her that CPD would find
5   the reports.  According to Svec, though, CPD never
6   located her GPRs, and those GPRs were not included in
7   the materials that CPD provided to OIG."  Did you ever
8   find those GPRs of Detective Svec?
9        MR. STEFANICH:  It's been asked and answered. You
10       can answer it again.
11       THE WITNESS:  Personally, I did not.
12  BY MR. SWAMINATHAN:
13       Q.   Did you ever document that her GPRs had been
14  lost?
15       A.   The time of those interviews was post us
16  submitting the report that we were ordered to.  So at
17  the time the reports were submitted and documentation
18  that we were ordered to put in was done, I wasn't aware
19  of any GPRs of Beth Svec.  After that, because of the
20  ongoing investigation, we were not submitting any
21  paperwork to do that.  However, you're stating this, it
22  was under my direction.  I told Svec to make the FBI
23  aware of it.  So it should have been documented by them
24  in the investigation that she stated she had completed
25  GPRs for witnesses that were lost or missing or
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  misfiled.  So I'm disputing the fact that they were lost

2  because I don't know where they are.  They could be

3  sitting in another file right now, just being misfiled.

4  And I don't recall assuring her that we would find the

5  reports.  I don't know how I can do that and say, hey,

6  we're going to find them, assuring her of that.  Whether

7  or not they have been located since, I don't know.  I

8  have been away from the department now for years.  The

9  file -- if somebody found them and now they're filed in

10  there, I don't know.  And -- and I have no idea what the

11  CPD provided to OIG.  I don't know how Svec can attest

12  to what the CPD included in the materials provided to

13  OIG anyway.  They're putting it in a sense, that

14  "according to Svec."  How would Svec know that?  So

15  again, I'm looking at a document that I don't know who

16  wrote it, who altered it.  And that sentence there alone

17  doesn't make sense, that how would Svec know what the

18  CPD gave the OIG?

19     **Q.  Oh, and sorry.  I missed one on Page 31.  "Svec**

20  **took Garcia to one office and Gonzalez and Benitez to**

21  **another."  Do you have any reason to dispute that the**

22  **three interviews of Svec that were lost were of Garcia,**

23  **Gonzalez, and Benitez?**

24     A.  I have no idea.  And again, my recollection is

25  I don't know the GPRs with certainty, the names of the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1   people associated with the GPRs in question.  I would
2   not dispute Svec saying that, you know, she put one in
3   one office, one in another office, and her -- personally
4   dispute that, say that if she said that, that that
5   didn't occur.
6       Q.   Okay.
7       A.   But I have no knowledge of that.  And as I sit
8   here today, I -- I have no knowledge of that at all.
9       Q.   Okay.  So you're not saying that Svec is wrong
10  when she says she interviewed Garcia, Benitez, and
11  Gonzalez, correct?
12      A.   If Svec said that, correct, I wouldn't dispute
13  it at all.
14      Q.   And so if you look at Page 36, in the middle
15  of that page, the third paragraph that says,
16  "Therefore."  Do you see that?
17      A.   On Page, I'm sorry, 36?
18      Q.   Yeah.
19      A.   Okay.
20      Q.   "Therefore, under Wojcik's watch."  Do you see
21  that?
22      A.   Yes.  Yes.  Okay.  What -- do you want me to
23  read the entire paragraph or --
24      Q.   Oh, no, no, no.  Yeah.  You can read the
25  paragraph, but I'll just ask you the question that I
```



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  have.

2      A.   Go ahead.  Ask the question.  Then I'll -- go

3  ahead.

4      Q.   Yeah, you can look at whatever you need. Yeah.

5  Page -- that paragraph says, "Therefore, under Wojcik's

6  watch, the McDonald investigative team lost or failed to

7  preserve all six of the original GPRs that documented

8  Gonzalez, Garcia, and Benitez's statements to CPD on the

9  night of the shooting and failed to document the

10 circumstances through which those reports were lost."

11 Is it your testimony that is -- that it's just a

12 coincidence that the three GPRs that got coffee spilled

13 on them related to the same interviews or interviews of

14 the same witnesses that Svec had documented in her lost

15 GPRs?

16         MR. STEFANICH:  Objection.  Form.  Misstates his

17         testimony.  You may answer.

18         THE WITNESS:  But again, I don't know who the

19         witnesses were with specificity that the GPRs in

20         question regarded.

21 BY MR. SWAMINATHAN:

22     Q.   So if Svec's GPRs were about -- oh, go ahead.

23 Go ahead.

24     A.   Whether or not this sentence states that they

25 were lost -- okay.  Hold on.  That documented it was on

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  the night of the shooting and failed to -- that if I

2  failed to preserve them on the night of the shooting, I

3  wasn't even at the area on the night of the shooting. So

4  that sentence is kind of suspicious in that, depending

5  on how you read it, are they accusing me of failing to

6  preserve all six of the original GPRs on the night of

7  the shooting? I wasn't even there. I wasn't at the

8  area. And failed to document the circumstances, that's

9  totally false. It's well documented. It's written

10 right on the GPRs that they are duplicates. So again, I

11 cannot believe this is an Inspector General's report

12 because I don't believe that they're so inept in that

13 they would make a statement, when, right on the GPR, it

14 says it's duplicated. So I document it right on that

15 GPR. So how can they say I failed to document? It's

16 ridiculous, but anyway.

17      Q.   Yeah.

18      A.   So I dispute that portion also.

19      Q.   So if it turns out that the missing GPRs of

20 Svec are for Gonzalez, Garcia, and Benitez and the

21 coffee-stained GPRs are also of Gonzalez, Garcia, and

22 Benitez, that's just a total coincidence, correct?

23      A.   Well, don't limit the coffee-stained GPRs if

24 those are, in fact, the three people, because as I

25 stated, other GPRs were also coffee-stained that I was

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   able to preserve.  So I don't know what the coincidence
2   would be then because now we --
3       Q.   The coincidence is that those were the only
4   three that couldn't be preserved.
5       A.   But hold on.  But those are not the only GPRs
6   that were coffee-stained, and the ones that I could
7   preserve are part of the file.
8       Q.   Those are -- the only ones that couldn't be
9   preserved were those three, correct?
10          MR. STEFANICH:  Objection.  Asked and answered.
11          THE WITNESS:  I am not sure because, again, I am
12          not sure -- I believe it was three that were not
13          preserved.  I am not sure if that regards
14          Gonzalez, Garcia, and Benitez.
15  BY MR. SWAMINATHAN:
16      Q.   Okay.  Could you go to the last page or the
17  bottom of Page 36?
18      A.   Sure.
19      Q.   "For Wojcik's numerous violations of CPD rules
20  and regulations."  Do you see that?
21      A.   Yes.
22      Q.   It says, "OIG recommends that CPD issue a
23  formal determination on OIG's findings and place this
24  report in Wojcik's personnel file for consideration in
25  the event Wojcik applies for reemployment with the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    city."  Did CPD ever issue a formal determination on the
 2    OIG's findings as far as you know?
 3            MR. STEFANICH:  Objection.  Foundation.  You can
 4            answer.
 5            THE WITNESS:  No, I was never informed of
 6            anything by anybody, be it the OIG, the
 7            department, anybody regarding any findings.  And
 8            that's another thing, Counselor.  If this was a
 9            report and is an authentic report by the OIG, why
10            wouldn't they have contacted my attorney or me
11            informing us of their findings?  That's a simple,
12            common courtesy, not to find out about it in some
13            document that's in the -- on the internet, or
14            when I later go to court and somebody's
15            presenting as evidence in a post-conviction a
16            Chicago Tribune article that states that.
17            Ridiculous.
18    BY MR. SWAMINATHAN:
19        Q.   No, I'm not showing you a Chicago Tribune
20    article --
21        A.   Well, hold on.  Let me finish.
22        Q.   -- or anything from the internet.
23        A.   Let me finish.
24        Q.   I'm showing you a document produced by your
25    employer, the City of Chicago, your former employer.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 282 of 326 PageID #:7252
The Deposition of MICHAEL WILLIAMS, taken on June 25, 2021

280

```
1      A.   It's not produced by them.  By produced, do
2  you mean they -- they sent it to you?  Where did they
3  get it from?
4      Q.   Oh, this is produced from the City of Chicago,
5  the Police Department.  This is your lawyers.  The
6  lawyers for the City of Chicago produced this document
7  to me.
8           MR. STEFANICH:  I'm going to object to that. It
9           misstates what happened here.
10          THE WITNESS:  Okay.  But do you know where they
11          got it from?
12          MR. STEFANICH:  There's no questions --
13  BY MR. SWAMINATHAN:
14     Q.   Ask your -- I would suggest you ask your
15  counsel if they're going to make a representation in
16  this litigation that this is a false or inauthentic
17  report.  That's what I would suggest to you.  Ask your
18  counsel if they're going to take the position that this
19  is a false, fake OIG report that they produced to me in
20  this litigation.
21          MR. STEFANICH:  I would ask that you ask the
22          deponent some questions.
23          MR. SWAMINATHAN:  I -- I'll ask you if you're
24          willing to represent anything on the record,
25          Brian, about whether this is an inauthentic and
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   fake document that was produced by the City of
 2   Chicago, or Ms. Harris.  Would either of you
 3   represent that this is a false or fake document
 4   that you -- that was produced to us in this
 5   litigation by the City?
 6   MR. STEFANICH:  Anand, you know it's not
 7   appropriate to ask other lawyers questions at
 8   depositions.
 9   MR. SWAMINATHAN:  No.  I mean, the witness wants
10   to know if this is a real or authentic document.
11   So Ms. Harris is counsel for the City of Chicago.
12   They produced this document in this litigation.
13   Are you prepared to make a representation that
14   this is a false document or fake or a doctored or
15   inauthentic document that the City of Chicago
16   produced in the litigation?
17   MR. STEFANICH:  We're objecting to you using a
18   deposition to ask attorneys questions at a
19   deposition. Yes.
20   MR. SWAMINATHAN:  Ms. Harris, will you -- are you
21   able to state anything about that?
22   MS. HARRIS:  I will represent that it is Bates
23   stamped by the City and that we did purchase this
24   document.
25   MR. SWAMINATHAN:  Okay.  Anything else?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1          MR. STEFANICH:  Yeah.  I think that's completely
 2          inappropriate to ask attorneys questions at a
 3          deposition.
 4          MR. SWAMINATHAN:  Okay.
 5          MR. STEFANICH:  I know our rules allow it, and we
 6          object.
 7          MR. SWAMINATHAN:  I'm just -- your witness is
 8          asking the question about the production of the
 9          document from the -- from his own counsel, his
10          own defense team.  I mean, you could -- you guys
11          could easily clear it up for him if he wants to
12          sort of evade the questions by suggesting that
13          this is a fake OIG report.  But if you guys don't
14          want to clear it up, that's okay.
15          MR. STEFANICH:  Okay.  Do you have any more
16          questions?
17    BY MR. SWAMINATHAN:
18        **Q.   Yeah.  The -- in this paragraph, it indicates,**
19    **"OIG further recommends that CPD, based on its findings,**
20    **rescind Wojcik's retirement identification card and**
21    **retirement star."  Did you have your retirement**
22    **identification card or retirement star rescinded?**
23          MR. STEFANICH:  It's been asked and answered. You
24          can answer again.
25          THE WITNESS:  No, I did not.  I was not informed

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1            of any findings, never, by the Inspector General
 2            or anybody else.  Nor was my retirement
 3            identification card or retirement star, whatever
 4            word they're using here, based on finding,
 5            rescinded.  And again, if I was subject to any
 6            investigation, any open investigation, period,
 7            whether it was because somebody said I -- I used
 8            a bad word in front of them or regarding the
 9            Laquan McDonald, I would've not have been -- had
10            received my retirement identification card and
11            star because I would've been under investigation,
12            as stated earlier.
13   BY MR. SWAMINATHAN:
14        Q.   And did anyone from the Chicago -- did --
15   strike that.  Did any agency or organization or division
16   of the Chicago Police Department ever conduct an
17   investigation into your conduct either before the OIG's
18   findings or based on the OIG's findings related to the
19   Laquan McDonald case?
20        A.   Ask the question one more time, Counselor.  I
21   lost you there for a second.
22        Q.   Yeah.  Did any unit or department within the
23   Chicago Police Department ever conduct any investigation
24   into your conduct related to the Laquan McDonald
25   shooting before or after the OIG recommendations?
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1        A.   So that would be an inter-department
 2   investigation, meaning non-OPS, non-IPRA, non-OIG.  No.
 3   And --
 4        Q.   No?
 5        A.   And not even those was I aware of.
 6        Q.   Okay.  So neither the internal disciplinary
 7   organizations nor the independent agencies conducted any
 8   investigations, correct?
 9        A.   Correct, that I'm aware of.  There was nothing
10   going on.
11        Q.   And you never -- and you were never
12   interviewed about it by anybody from CPD, correct?
13        A.   That is correct.
14          MR. SWAMINATHAN:  Okay.  I have no further
15          questions.
16          MR. STEFANICH:  Okay.  We'll reserve signature.
17          THE REPORTER:  Sorry.  Can you repeat that?
18          MR. STEFANICH:  Yeah.  We're going to reserve
19          signature.  No questions for me.  Reserve
20          signature.
21          THE REPORTER:  Any other follow-up?
22          MR. SWAMINATHAN:  No, I -- any of the -- I assume
23          no other counsel from the -- no other follow-up
24          from any of the counsel on the defense side.
25          THE REPORTER:  Okay.  And before I get off
```

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

285

```
 1  record, how would you like your transcript today,

 2  Mr. Swaminathan?

 3  MR. SWAMINATHAN:  None.

 4  THE REPORTER:  Sorry?

 5  MR. SWAMINATHAN:  No order from me.

 6  THE REPORTER:  Sorry?  Repeat that.

 7  MR. SWAMINATHAN:  No order from plaintiff.

 8  THE REPORTER:  Okay.  And, Mr. Stefanich, would

 9  you like to order a copy of the transcript?

10  MR. STEFANICH:  No, I don't.

11  THE REPORTER:  All right.  I'll take us off

12  record.  We are off the record at 7:02 p.m.

13      (DEPOSITION CONCLUDED AT 7:02 P.M. CT)

14

15

16

17

18

19

20

21

22

23

24

25
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                  CERTIFICATE OF DIGITAL REPORTER

 2

 3   I do hereby certify that the witness in the foregoing

 4   transcript was taken on the date, and at the time and

 5   place set out on the Title page hereof, by me after

 6   first being duly sworn to testify the truth, the whole

 7   truth, and nothing but the truth; and that the said

 8   matter was recorded digitally by me and then reduced to

 9   typewritten form under my direction, and constitutes a

10   true record of the transcript as taken, all to the best

11   of my skill and ability. I certify that I am not a

12   relative or employee of either counsel and that I am in

13   no way interested financially, directly or indirectly,

14   in this action.

15

16

17

18

19

20

21

22   CARLI GROSSMAN,

23   DIGITAL REPORTER/NOTARY

24   MY COMMISSION EXPIRES: 04/16/2028

25   SUBMITTED ON:  07/08/2024
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

## Exhibits

Exhibit 1 Wojcik 63:17,18,19 64:19

Exhibit 2_ Wojcik 67:5,6, 20

Exhibit 3_ Wojcik 76:20 78:5,6 85:8,9 86:12

Exhibit 4_ Wojcik 84:13, 16,19 100:7

Exhibit 5_ Wojcik 91:6,9, 10 112:17

Exhibit 6_ Wojcik 95:23, 24 96:5 112:16

Exhibit 7_ Wojcik 113:7,8 116:11 127:15, 16

Exhibit 8_ Wojcik 127:6,7

Exhibit 9_ Wojcik 131:8, 11

Exhibit 10_ Wojcik 135:16, 18 188:8,9

Exhibit 11_ Wojcik 156:2,4 159:8,13

Exhibit 12_ Wojcik 166:13, 20,23,24 168:16,23 172:10 173:7

Exhibit 13_ Wojcik 167:11, 14

Exhibit 14_ Wojcik 169:19

171:13

Exhibit 15_ Wojcik 189:4,5

Exhibit 16_ Wojcik 193:11, 12,14

Exhibit 17_ Wojcik 195:18, 21

Exhibit 18_ Wojcik 207:21 208:1 234:14, 15

Exhibit 19_ Wojcik 234:15, 17 238:9 245:19,20

___

0

00 85:13

003313 208:2

00:00 117:20 118:12

0800 209:7

08231415 66:8

___

1

1 63:18,19 64:19 67:22 68:2 69:3,4 171:14,18 180:14 194:20 197:13 209:13

10 135:16,18 188:9

100 40:1 46:19

10:00 16:12

10:30 132:18

10:55 9:23

11 142:1 156:2, 4 159:8,13

11:00 220:9,10

11:55 7:8 9:22, 25

11th 92:19 142:3 196:3 197:18

12 155:10 156:14,25 157:9,16 166:13,20,24 168:16,23 172:10 173:7

129 127:10

12:40 79:8

12th 142:5 156:19 157:2

13 19:5 167:11, 14

130 127:10

1320 131:23

1322 131:23

134 113:7,15, 18

135 113:7,18

13th 19:6

14 169:19,23 171:13 200:17, 18 205:9,10,13

140 135:16

1435 108:1

147 135:16

14th 203:13,14 204:17

15 31:23 161:4 187:13 189:4,5 200:18 251:5, 23 252:3

15-0564 234:24

153 189:4

1563 166:24

1569 166:24

158 189:4

15th 145:6

251:15,16

16 174:7 193:11,12,14 208:20

17 127:25 128:25 129:6 195:18,21

1761 167:8

1767 167:8

179 131:7,11 132:11

17:26 128:1

17th 128:4

18 80:21 81:23 82:7 173:11 175:17 207:21, 22 208:1 234:15 272:12

180 132:12

181 132:13

182 131:7,11 132:16 133:6

19 79:8 80:21 82:8 94:15 112:14 116:14, 21,25 117:19 118:12 124:22 174:1 175:10 234:15,17 238:9 245:20 253:14,15

190 64:10,19

191 195:19

192 196:20,21 199:9,14

1920s 22:6

193 196:17,19 197:3,4 199:7

194 197:4

195 197:4

1963 169:8 172:14

1964 174:13

197 197:4

1971 173:25

1972 173:8 175:17

198 195:19

1982 175:12

1986 19:4,5

1988 203:21

1990 21:5 112:14 128:15 148:17,22 152:12 153:8 155:9 162:15 169:21 170:3 186:22

1991 159:23 160:2,9,18 205:24

1992 155:19

1994 206:5 208:20 209:19, 20 213:3 215:4

1995 69:8 70:13,19 94:15 108:10 112:14 116:14,22,25 124:22

1997 214:12 216:14

1999 79:8 86:11

19th 117:8,9,22 118:20,22 119:17 120:2,4, 20

___

2

2 24:9 25:17 67:5,6,20,22 68:5 70:12 90:7 170:7 171:13 173:7 180:15, 16 185:9 192:9 194:23 209:14 235:20

2.0 77:19

20 10:12 31:24



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 290 of 326 PageID #:7260
The Deposition of ANTHONY WOOD, taken on June 20, 2024

288

82:8 149:23
154:13 187:10
214:12 243:9,
16 248:4
253:13 254:7
268:20

20-CV-04-768
7:15

20-year-old
187:12

20-year-olds
187:11

2000 58:21

2000s 23:8,10

2001 58:21
159:20,23

2002 19:25
20:11,21 21:4
38:1 42:6
58:15,24 59:1
62:10 63:8,12
127:25 128:25
129:6 142:2,9
146:7 148:17
152:13 155:10,
11,16 156:15,
25 157:9,16
186:22 190:7

2004 155:18

2008 23:12

2014 264:13
268:20

2015 259:23
264:13 268:17
271:9 272:19

2016 129:16
200:20 202:16,
20 243:24
244:1 246:2,13
251:5,23 252:3

2017 234:25
248:13 249:6

2024 7:7

20s 170:10
172:15 175:22
176:2 186:17,
18,21

20th 7:7

21 82:9 132:21
133:8 169:21
170:3 256:23

21st 136:15

22 69:8 70:12,
19 82:9

2373805
132:18

24 74:17 190:6

24-hour 74:14

24th 136:16

25 80:21 81:2,7
243:9 248:4

26 174:15 186:8
214:12 248:4

26th 217:24
218:12

27 80:21 81:2,7
169:11 172:15
186:9 187:20,
24 209:7 215:4
257:17,18,20

27-year-olds
188:5

28 257:16,18
259:1

29 200:10,15,23
234:24

―――――――

3

3 76:20 78:6
85:9 86:12
172:14 173:24
194:22

30 66:21 80:21
81:8 149:24
169:8 184:2
200:3,4 266:5,7

30-picture
177:17

30s 31:1 176:7,
9

31 268:16
274:19

32 186:22
245:19 270:5

33 270:8

3305 207:23

3309 214:11

3313 208:16

3318 209:2

34 267:13 270:9

3490 207:23

35 270:9

36 272:22
275:14,17
278:17

37 235:20 254:8

37-page
263:13

38 107:25

3:00 233:20

―――――――

4

4 84:13,16,19
100:7 256:24

40 187:12 251:3

40202 7:6

40s 31:1

4544 156:2

4566 193:15

4569 193:15

4577 193:15

4578 193:16

47 169:20 251:3

481 272:12

―――――――

5

5 20:4,9 21:1,7,
9 22:5 91:6,9,
10 92:18 98:17
112:17 114:18
115:3,16
174:12 196:8,9,

10,12

5' 49:6

5,500 22:20

50 49:22 176:8

51 169:20

52 96:1,5 108:1

5511 132:22
133:9

553789 68:16

581033 89:11

―――――――

6

6 95:23,24 96:5
107:25 112:16
161:11 175:10
191:10 248:12
249:6

600 60:6

603937 128:16

6148 209:7

62 76:15,21,23
82:15 90:7

63 169:15

64 174:20

65 84:25

650 196:4,6,10,
12 197:18

651 196:11

652 196:11

66 76:13,15,22,
23 81:2

6600 234:16

6640 234:16

67 81:2,7 82:16

68 81:8

69 81:23 82:7

6:00 220:19

6:30 220:19

―――――――

7

7 113:7,8
116:11 127:16
151:6 155:11
180:15,16
185:9 197:5
213:3 245:23
246:9

7' 49:5

70 82:7

700 60:6

71 82:8

710 7:5

72 82:8

73 82:9

7:02 285:12,13

―――――――

8

8 127:6,7
175:12 177:24
178:23 181:11
187:17 208:22
209:5 214:25
246:2,13

8-year-old
187:21,24

8-years-old
181:21

85 76:14,16,24

86 19:6 84:15

8:48 157:9

8th 248:10

―――――――

9

9 131:8,11

90 132:21 133:8
169:15

91 155:19

94 209:7 215:10

95 39:4 117:19



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 291 of 326 PageID #:7261
The Deposition of ANTHONY WOODS, taken on June 29, 2023
289

96 84:15

97 91:5,10 112:23

98 67:5

99 67:5,8

---

A

A-N-T-H-O-N-Y 9:17

a.m. 7:8 79:8

abilities 36:2

ability 10:19 12:12 36:11 39:20 40:25 41:22 58:16 146:2

Abrego 207:23 208:2

absent 153:22 154:18,19,23 219:17

abuse 206:7 212:21

abused 30:25

accept 32:22 175:24

access 99:14, 25 146:9

accidentally 121:15

accommodate 50:13

account 29:22 212:21 213:8

accuracy 227:11

accurate 204:7 228:21 229:2, 20,22,25 251:13 271:19

accused 214:23

accusing 277:5

acknowledge 228:3

acknowledged 206:21

acknowledging 215:16 261:6

acquaintance 153:11 155:2 176:24 182:17 184:14 185:6

acquainted 149:19,20,21

acquiesced 243:5

acquire 154:22

act 210:9

acting 37:23 213:4 214:4 220:3

action 213:9, 17,19 243:18 248:8

active 22:14 29:10 85:5 93:4,10 118:6 120:17 121:20 122:2,6 127:19 129:14 145:20 241:16

actively 87:10

actual 137:23 194:7 206:17

add 134:21 267:14

added 130:20 134:25

addition 45:17 93:5 207:1

additional 167:18 213:7 215:11,22 216:1

address 80:5 90:3 204:21

addressed 224:21

admin 241:6

administered 213:10

administrative 99:15,16,22 100:18 123:21 137:21 237:8 241:6,7 244:20, 22

administratively 21:12,24 117:12

administrator 37:11,18,23 208:19

administrators 38:1,4

admits 31:7

adult 80:9 83:22,25

adults 84:4,7

advanced 27:9 90:10

advice 18:17 250:23

advise 245:10

advised 244:16 245:1 250:20

Affairs 253:9

affected 28:23

affirm 9:8

aforementioned 213:15

African 49:10 187:2,5

afro 42:22,23 52:7,8,14,15,25 53:10,15,21 54:16,17,20,25 55:2,9,23

afros 52:9 53:2,7,16 54:18 55:1,13,18 56:1

age 49:21

173:21 174:14, 23 186:8,11,24 187:8 188:3

agencies 284:7

agency 253:3 283:15

ages 30:25 173:14,15 175:23 184:1

aggrieved 217:3

ago.' 265:22

agree 9:2 34:6 124:12,14 128:20 182:3,8 185:8 213:16 236:24 249:12 257:25 270:18

agreed 8:4 9:4 214:2

agreeing 251:15

agreement 7:25

ahead 14:4 26:20 29:1 39:23 41:5 59:7 69:2 106:21 149:6 158:9 160:24 185:17 200:22 202:7 204:9 215:24, 25 222:21 276:2,3,22,23

Aid 215:15,17

air 87:18 102:6 104:25 114:9

AKA 147:11

alarm 34:25

alarmed 229:6

alert 94:5 113:3,11,19 114:12,14,15, 22 115:1 116:3, 10,21 117:3,14 118:19 119:2,4,

11,22,24 121:11,20,23 122:6,8,17 123:1,12,13,19 124:16 127:15, 19,21,25 128:4, 9,12 129:2,5,9, 17 130:24

alerted 229:7 230:5 269:17

alerts 113:21 114:5 117:11, 25 118:6,10,16 119:12 122:6 123:10,22 129:11,20,22

aliases 68:8

alibi 27:22

allegation 206:19,25 209:13,14 212:21 213:16 215:21

allegations 206:16 214:2

alleged 206:14

altered 263:11 268:6 274:16

Amanda's 211:22

Amendment 250:8,12,13

American 187:2,5

Americans 49:10

amount 52:12 53:19 137:6 138:2 217:16, 17

analysis 22:18

analyze 235:21

Anand 7:19 281:6

and/or 155:2 193:4 209:10 249:3

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 292 of 326 PageID #:7262
The Deposition of ANTHONY WOJCIK, taken on June 29, 2021
290

angry 245:7

anonymity 204:3,12

answering 180:4,12 246:22 249:2

answers 10:20 11:13 242:16 248:25

Anthony 7:9, 11 8:25 9:3,17 136:6 234:24 257:2

anybody's 255:20

anymore 27:25

apartment 206:17,18 209:8 210:20, 21,24,25 211:1, 8 215:17

apologize 9:25

apparently 64:6 141:10 212:22 233:8

appealed 216:15

appearance 7:16 186:25 187:9 188:4

appearances 184:12

appeared 84:4 112:5 162:14, 20 166:11 218:1

appearing 7:21,22 8:17

appears 67:8, 20 69:17 77:17 78:7,16,22 82:21 87:7 88:9 96:5,8 102:21, 24 106:15,17 114:17 124:17 127:14 132:11, 12,13,16,23

133:2 144:23 160:3,13 167:16 168:11 170:5 175:1 187:24 193:20, 23 208:24 214:6

applies 278:25

approach 18:11 23:20 33:25 269:12

approached 29:9 217:22 269:12

approval 122:1 123:11, 13 133:14 138:6 214:8,21 264:18

approve 121:12 122:1 123:22 139:18, 20

approved 17:8 18:10 19:22,24 20:16 122:20 130:11 131:22 136:12,15,18 138:20 139:8, 12 190:6,9 264:24

approving 12:21,22 20:21 136:20 137:2, 16 139:11,12

approximately 23:9 169:11 174:1,3,7,10 175:17 203:11 209:7 221:15 251:5,16 271:11

April 108:1 159:19 160:1 244:1 251:5,15, 23 252:3

arbiter 216:19

area 20:4,8,25 21:7,9,12 22:5, 13,24,25 23:2

24:9 25:17 27:7,15 30:4 72:5 91:24 92:11,18 98:11, 17 110:11 114:18 115:3, 16 146:25 156:19 196:8,9, 10,12 217:16 218:3,18 228:8 232:12,13 233:17 254:18 257:23 258:12 259:23 260:5 267:22 268:17 270:14 277:3,8

areas 22:19 24:3,7 25:13 26:3 27:6

Arego 214:11

argue 56:3 166:8 182:21 183:17 184:2,7 249:9

armed 146:22

Arnold 146:21 147:11 164:8, 19 165:19,23 166:2,4,7 167:17 172:13

array 43:5 44:3 57:21,24 58:4 59:3 60:1 102:13,17 103:3,6,21 104:7,9 106:18, 20 107:4 108:11 109:21 110:3 111:19 147:9,10,14,16, 20,21,25 150:1, 11 152:4,9,25 153:1,3 160:19 161:13,18,20 163:3,8 164:21 165:24 166:9, 14 167:13,16, 20,22,24 168:5, 7 169:2,3 172:11 173:10 175:11,16,21 176:1,5,6,20 177:17,23

178:2,4,14 179:21 180:18, 23 182:11 183:7 184:20 185:4 186:2,4, 16,18 187:19 191:8 194:18

array's 184:4

arrays 37:9,16 42:9 43:16 48:20 58:14 146:13 167:25 191:3

arrest 51:14 59:12 62:6,7 65:4 66:7,12 67:8 68:5,21 69:13,17,21 70:8,9,16,17 73:8 77:9,11,18 78:7,19 85:14, 23 88:25 89:1, 14,21 92:1 93:21 101:2,11, 14 114:23 115:4,21 117:16,17 119:6 124:13, 18 128:18,21 142:19 145:23 146:2,3,12 158:1,7,18,19 159:11,19 160:1,7,17 196:16,17,21 197:8 199:7,17

arrested 62:16 66:21 69:13 73:10,12 91:22 92:16 115:24 142:3,12,18 144:9 145:3,6 158:11

arresting 68:23

arrests 86:25 87:4,5 101:7 110:14 146:17, 22 158:2

arrival 206:24 262:24

arrived 217:16 266:17

arriving 267:21

Arthur 164:19 172:21,24 173:11,21

article 238:23 279:16,20

arts 196:3 197:11,12,15, 17,18 198:3,5, 6,23 199:15,17

ASA 132:15 188:12,13

Asary 132:19

ascertain 86:8 164:6 182:23 183:12

ascertained 97:11

asks 114:19

assault 32:2 45:14 95:13

assaulted 34:16

assaults 138:12,13

assemble 63:5

assembled 234:10

asserting 201:15,19

assign 92:23

assigned 71:24 130:13 243:21 244:15 245:13 257:23

assist 114:3 198:10 257:24

assistance 72:17 266:14

assistant 246:3,14


Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

assisting 222:16 227:20

association 79:25 103:10

associations 80:2

assume 11:19 62:17 157:17 284:22

assumes 155:14

assuming 168:13 208:24 230:16 242:5

assumption 71:2 111:12 152:18 224:12, 16 229:8

assured 273:4

assuring 274:4,6

attach 69:15 114:1,2,12

attached 94:2 223:6

attacked 36:19

attacking 212:23

attempt 134:2 135:13

attempting 217:19

attempts 245:23

attend 218:20

attending 7:17

attest 274:11

attorney 44:20,25 47:7, 21 105:8 144:1 166:17 192:6 218:11 219:16 235:8 237:1 238:24 239:9, 23 240:22,23 244:15 279:10

attorney's 143:10 144:7, 13 168:19 268:18 271:25 272:1

attorney-client 18:14

attorneys 8:21 39:8 140:14 144:17 191:23 219:11,16 234:4 281:18 282:2

audio 8:8,9,10

August 79:8 159:19 160:1 209:7

authentic 235:11 279:9 281:10

authenticated 246:23 259:14 263:6

authenticating 249:5

authentication 235:11 240:6

authored 235:6,25 237:19 244:1 247:4,6,14,17 249:5 259:12 268:5

authoring 249:4

automatic 212:1

availability 89:18 154:21 162:8 223:24

avoided 54:12

aware 12:6 25:24 37:16,18 38:4,7 73:16 106:3,5 115:18 137:12 139:16 144:16 155:6 160:16,21

186:6 199:16 220:20,21 224:11 230:7 236:19,22 252:23 263:23 273:2,18,23 284:5,9

———————

B

back 18:24 22:5 23:5 24:4, 9,21 25:18,22 27:5 28:6,9,13 34:23 38:17,21, 23 50:15 58:12 60:18 61:10 64:2 65:9,15,18 69:24 72:10,12, 22 73:8,14,24 74:5,7,19 75:7, 12,25 80:3 81:23 83:22 86:24 87:1 102:8 105:6,14 107:8 114:10 115:15 117:13, 25 118:5 119:1, 14 122:7 126:13,23 129:19 135:8 140:7 148:8 149:2 156:18, 23 157:14 161:7 170:3,18 171:12 172:8, 10 176:15,16, 20 188:7 190:16 191:7 192:4 193:24 194:5,12,17 195:16 201:10 209:19 215:19 219:25 222:25 223:11 224:6, 14 248:20 250:2 253:13 259:4,12 261:14 268:4 269:7

background 18:25

backwards 62:15

bad 112:10 178:2 179:23 283:8

bag 115:6

balance 180:1, 10

bald 53:1,3,4, 16,17 55:10,11, 13,24,25 175:1, 3,7 176:17 177:12

ball 243:10,17 248:5

Band-aid 56:20 57:6,7

bangers 33:5,7

bare 119:15

barring 159:18

base 33:22

based 22:18 23:24 29:17 31:1,18 46:11 63:5 66:8 69:15 70:9 101:15 102:25 105:13 110:19 115:24 118:21 121:4 124:14,22 129:1 138:20 139:18 140:21, 24 143:13 153:13 157:12 158:13 171:23 172:9 177:20 183:14 184:9, 15,19 189:20 219:4 229:10 239:5,8 241:5 244:18 245:6 250:16 260:23, 24 261:9 263:5 264:7 282:19 283:4,18

basement 210:25

basically 26:8 46:5 62:5 65:6 73:10 80:19 81:4,5 93:14

101:10 116:24 117:2 131:13 142:21 147:5 171:17 185:22 198:23 204:22 205:3 239:24 241:18

basics 30:14

basis 31:23 59:6 65:14 74:4 198:14 214:24 222:15

Bates 166:19, 24 167:5 207:23 238:1 281:22

bathroom 58:9

batteries 138:12

bearing 244:21

beat 133:9

bed 211:22

bedroom 211:25 212:22

begin 9:12 251:12

beginning 98:9

begins 141:25 208:15 246:9, 13 254:12 256:24 259:18 267:21 270:9

behalf 8:16 246:4,15

behavior 44:17

belief 34:14 48:9 71:2,17 118:25 224:19

believed 111:25 112:6,7 117:1

believes 125:8

belong 145:11, 15



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

benefit 200:13

Benitez 257:1,
5 270:16,20
271:3 273:1
274:20,23
275:10 277:20,
22 278:14

Benitez's
276:8

bet 150:10

Beth 266:10,11
267:1 268:7
273:19

Biebel 99:12,
20,25

big 36:16 81:18
87:13 135:10
137:15 239:20

bill 241:17

bin 134:1

biologist 34:12

birth 90:2
168:3,9,11,21,
23 169:5,8
172:13 173:7,
20,25 174:6
175:11,16
178:22 181:19
182:3,9 183:18
184:15,16,19,
23 186:3,13

bit 54:12 75:6
167:6 200:2,4
202:2

black 59:6
61:19,20 62:21
104:24 107:25
170:15 171:9,
10 172:3,5
198:15 199:12

Blacks 147:17
163:10 170:10
183:15

blank 135:2,7

bless 23:2,5

blind 37:11,18,
22,25 38:4 39:4

block 39:5

blocks 102:4

blot 225:8

board 207:2,4,
15,17 216:18,
25 217:1,8

body 132:3,8,
18 234:1

Bogucki 7:11
20:18,20 92:20,
21 94:14 96:9
114:17 117:1,
17 118:3,8,19
119:10,17
121:4,14,23
124:23 132:13
134:17 136:6
138:17 139:1
160:17 179:5
184:21 189:17,
19 191:10
193:4

Bogucki's
132:17,24
133:3,6

bold 114:24
119:19 150:5

bones 119:15

book 60:3,6,7,
8,10,17,21
61:23 182:25
183:6

booking 65:5

books 59:21,
24,25 60:4
216:7

born 174:13,20
175:10

boss 220:4

bother 34:2

bothered
24:19

bottom 80:18,
23 130:1,2
131:18 145:22
157:4,6 178:5,
12 179:7

180:17 185:9,
11 238:2 251:3
266:7 267:13
268:16 278:17

box 66:2 80:4
124:8,19
138:22

boxes 65:19
73:19 137:17,
25 138:1

braided-type
194:24

braids 194:25

bread 161:12

break 11:21,23
58:9 71:8
126:10,11,12,
14 195:12
249:18,23

breakfast
211:17

Brian 7:22
13:22 64:10
67:12 76:12
84:13 95:25
113:13 131:7
135:17 166:14
193:11 195:20
280:25

Brian's 76:14

briefly 10:9
13:19

bright 41:8

bring 102:6,7
105:6 115:13
140:19

bringing
218:12

broken 211:3,
21

brought
142:12 205:25
234:11

Brown 146:20

Buchanan
214:21

build 170:13

building
210:22

bulk 26:5

bunch 35:8
52:2,9 183:8

bureau 214:5

Burger 266:19

burglary
145:12

business 70:6
71:22

busy 25:17
72:16

buzz 36:16
243:21

———————

C

calculate
169:14 173:21
181:17

calculated
173:16 181:20
185:3 242:20
243:8

calculating
184:1

call 14:23,24
22:9 25:25
69:18 85:12
90:13 92:10
105:9 106:18
115:15 175:3,7
191:24 211:21,
23 212:13
220:21 242:2
272:7

called 27:15
28:3 69:11
85:16 90:13,20,
21 111:14
114:5 144:1
198:14 218:25
220:20,22
222:23 245:23
271:8,21

build 170:13

calling 14:7
99:3 190:3
242:3

calls 15:18
18:13 24:18
25:15

cancel 92:16
129:9

canceled
129:7 206:16
214:14 215:12

cancellation
91:13,14

candidate
25:10

candidates
27:7

capability
63:12

capacity
117:24 225:21

capitalized
95:18

caps 76:16
78:23 79:1
94:21

capture 117:15

car 49:8 72:1
105:14 115:18

card 282:20,22
283:3,10

care 26:15

career 200:5,7,
9

careful 36:10

Carli 7:3 8:4

carried 157:18

carry 65:21
66:2 74:12

carrying 76:5

case 7:14,24
14:2 15:20,24
16:25 17:21
18:8,12 20:7,
12,16,22 21:5,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 295 of 326 PageID #:7265
The Deposition of ANTHONY WOJCIK, taken 05/03/22
293

11,13 22:2,5,7,
11,15 23:1,6,
13,15,21 24:1,
3,8,9,10,13,19,
24 25:2,4,5,6,
10 26:1,21,22,
23 27:14 29:9,
19 30:3 34:2
37:12,14 41:2,
3,10,16,20,24
42:4 44:21
46:9,12 53:19
58:20,21 66:7
68:7 69:1,3
72:14 82:11
85:18 92:17
95:2,20 96:12,
24 97:2,6,14
98:4,16,19
99:4,24 105:22
106:6,24
114:23 115:11
124:12 128:20
129:21 135:10
137:5,12,13,14
138:13 139:5,
10,16 140:14
142:13 143:8,
24 145:2 147:4
149:25 150:13
159:6 160:9
163:24 168:7,
22 174:25
182:18 186:4,
21 189:24
195:4 203:25
207:4 209:21
212:19 213:3
217:23,25
218:19 219:6
222:24 227:20
228:3 234:23
244:3 264:20
268:19 283:19

cases 22:2,8,
18 23:3,20,22,
25 24:4 25:9,
11,16,18,20,24
26:3,16,25
27:6,8 28:21
29:9 30:24
38:15 46:10
73:15 138:11
143:14 162:16

catch 145:10

catching
117:24

caught 124:4
245:12

cautious 95:17
150:6

caveat 158:6

CB 59:7 65:4
66:20,24 70:9,
10 159:8,12
197:8 199:6,18

CB'D 158:16

CBS 159:4,5

CCSAO 167:8

central 65:5
218:3 233:17
254:18 259:24
260:5 268:18
270:14

Central's
257:23 258:13

Centrals
267:22

certainty 17:6
87:11 118:8
132:23 140:18
152:15 171:21
254:6 274:25

cetera 39:9
47:23,24 53:20
73:13,15 77:16
81:3 87:21
114:10,11
138:1 177:6,7
198:20 206:17
211:21 218:13
244:4 252:19
261:18

challenge
105:8

challenges
37:8

chance 31:24
126:25 183:24
265:17

chances
269:21

change 30:16
37:9,25 38:3
53:13 108:21
124:10 176:13
204:15

changed 53:22
108:19 109:9
204:19 259:13

characteristic
s 55:5 176:5
177:5 184:18

charge 206:6

charged 37:13
141:8 145:4
218:2 222:6
227:21 230:25

charges 24:21
41:16 142:16
214:16,19

charging
21:20

check 8:20
22:12 87:19
93:4 95:7
98:21,24 100:6,
25 101:6,9
110:11 115:22
116:15 123:21
137:22 142:19
146:12 211:22
265:2

checked 66:2
95:10 101:4
114:8 124:8
145:23

checking
159:4

checks 206:16
214:15 215:12

Chicago 7:12,
13,21,23 8:17,
18 9:23 19:1,15
64:20 79:6
93:9,15 168:1
199:23 201:3
202:12,15
234:23 235:15

238:1,3,4,22
247:3,4 252:10
253:2,3,10
279:16,19,25
280:4,6 281:2,
11,15 283:14,
16,23

chief 26:22
208:19 213:4
214:1,4 233:18
234:12

child 161:4

circled 226:18
227:7 272:11

circles 226:15

Circuit 246:4,
16

circumstance
30:6 39:2,11
104:18 149:13
197:10

circumstance
s 38:14 39:19
41:6 46:10,11
61:11 138:3
139:21,22
149:13 151:24
152:6 154:11,
18 155:1
162:17 177:20
184:9,10 205:6
250:16 276:10
277:8

circumstantial
232:8

citizen 250:22

city 7:12,13
8:17 22:19
37:21 64:10,19
67:5 76:13,15
84:15 91:4,10
93:9 96:5 113:7
131:7,11
135:16 156:2
169:20 189:4
193:15 195:18
234:16,22
238:1,3,4
247:3,4 249:4
252:9 279:1,25

280:4,6 281:1,
5,11,15,23

City's 246:2,14

civil 37:1 234:4

civilian 50:25
56:10 117:23
118:11,20
221:11,16
268:20,22

civilians 71:22
74:15 99:23
117:12,22
119:14

claiming
263:17,20

clarified 44:24

clarify 9:20,23
36:23 231:23

classification
92:3,8 94:10
134:22 137:18,
19 141:17

classified
141:12 213:17

cleanup 224:1

clear 58:3 98:6
141:14 167:12
170:23 226:14
228:25 246:25
282:11,14

cleared 98:6
136:1,2,24
139:24 141:12,
16 170:23,24
171:2 188:8
191:7,10

clearer 167:6

clearing 91:22

click 88:24
89:25 90:11

Clinton 66:8
67:2 82:13
98:11 101:1,5,
16,21,23
102:18,20
103:5,15
106:22 107:23,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 296 of 326 PageID #:7266
The Deposition of ANTHONY WOJCIK, taken on June 20, 2023
294

25 108:3,7,8 110:3

Clinton's 98:10 108:2

clock 220:16

close 38:20 74:6 149:11 154:10,24 160:9 162:5,14 174:23 186:24 195:12 199:21

closed 21:11, 17,24 141:14, 16 211:10 271:12,24 272:2

closer 38:21 154:2,20 186:13

closest 47:5 162:18

closing 12:20, 23 16:21 17:7, 20 18:9 97:24 98:6 135:17,24 160:15 161:11 163:7 170:18, 23 188:7

clothes 28:13, 14 50:25 105:11

clothing 56:10 105:2

clue 270:2

coat 224:17,18

Cobbs 82:14

Cobra 60:10,13

Cobras 60:9

code 138:22

codes 137:19

coffee 221:20 222:2,25 223:1, 2,10,13,19 224:2,4,6,9,14, 24 225:8,9 226:3 260:2,13 261:8,15

264:13 265:24 276:12

coffee-damaged 260:23,25

coffee-stained 277:21,23,25 278:6

coincidence 276:12 277:22 278:1,3

cold 20:7,12,22 22:2,7,15 23:1, 6,13,15 24:1,3, 7,13 25:2,4,5, 10 26:21 29:9 98:16,18,19

collar 171:24

collar-length 170:14 171:15 177:14

colleague 25:7

collected 212:19

collecting 200:24 201:2, 13,25 202:11

color 59:6 65:12,17 66:23 67:1 198:11

colors 105:14

combine 83:21

combined 83:17

comfortable 150:10

commander 26:1 61:18 65:22 218:4,18, 20,22 220:25 226:11,21 233:16,17

commanders 25:23

committed 104:16 154:14

common 56:23 279:12

commonality 84:10

commonly 195:4

comp 216:6,8, 11

compare 235:21

compilation 106:17

complainant 144:24

complaint 145:7 202:25 203:16 246:4, 15 250:19 252:10

complete 17:2 232:19,24 233:1,23 264:21 271:1

completed 234:6,9 264:18 266:23 270:14 272:25 273:24

completely 282:1

complexion 170:13

comply 240:19 248:14 249:8 250:4

computer 73:9 92:14,15 93:3 95:7 223:19

computerized 73:21 77:6 89:9

computers 87:12,16 223:24

concern 39:6, 12 142:25 175:25 177:22 184:25 185:7 231:11

concerned 211:12 235:19

concerns 29:22 38:11 39:20 40:25 41:22 167:21

concluded 204:22 214:23 219:8 237:3 249:10 285:13

conclusion 27:1 209:1 212:18 216:14

conclusions 237:12 244:11

conclusive 27:13

concrete 125:6

conditions 12:3

conduct 36:2 150:1 167:25 168:4 190:3,23 202:21 230:9, 12 236:20 238:19 241:1,2 244:13,14 245:9 252:5,11 253:5 283:16, 17,23,24

conducted 58:4 101:22 104:19 147:9 189:21 191:3 206:10 218:8 224:10 227:16 236:20 241:19 251:6,17,25 252:22 267:9 284:7

conducting 38:9 103:18 148:20 183:6 186:15 189:19 227:18 231:6

conference 242:12

confidence

192:20

confident 44:6,18,22

confidentials 252:20

confirm 152:1 227:11 229:1

confirms 41:14

conflating 186:2

conflicts 167:8

confrontation 210:4,14

confused 29:2 52:23 54:6

conjunction 144:14

connect 89:24

conscientious 213:11

consideration 143:14 278:24

considered 48:18 162:16 171:25 191:20 220:2

consistent 219:19

consistently 213:12

consisting 161:20 163:9

console 87:17

constitutes 212:20

constitutional 250:21

constraints 233:15

consultant 220:1

consulting 271:13 272:6



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 297 of 326 PageID #:7267
The Deposition of ANTHONY WOOD, taken 05/15/2024

295

contact 22:12
24:12 61:18
65:23 91:24
92:18,22 155:2
220:24 242:19
248:3 260:4
262:18 266:20

contacted
93:12 143:11
217:15 237:1,
13 238:23
240:22 246:10
260:10 279:10

contacting
244:11

contents
247:19

continue 11:3

continued
212:3

continuous
82:4

contract
241:7,14

contractual
241:8

convened 7:8

conversation
14:18 15:22

conversations
13:21,23 14:1,
15,16 15:23
231:21 239:8

conversing
35:3

Cook 142:20
144:22 147:1
246:4,16

Cooper 97:6,9,
10,16,21 98:12
101:22 102:20
103:5,9,15
106:13,22
108:2 111:25
112:5,7,18
113:1 116:25
161:12,17,24
162:3,6 176:25

177:2 184:24
191:9,11,15
192:1,8,10
193:8,9

cooperative
27:17,18 112:5
154:1

COPA 253:8

copied 26:4

copies 22:23
23:1 66:25
67:1,2 70:4
77:9 197:7,8

copy 16:24
17:2 68:25
69:21 73:16,20
74:13 75:6 88:8
130:2,6,23
131:2 156:2
197:22 199:13
228:7 239:18
241:10,13
259:25 260:23
285:9

corn 177:13

corner 80:19

corp 218:17
219:9,17 221:2
232:22 233:25
234:1,3,6

corporation
246:2,3,14,15

correct 8:23
10:14 12:24
15:12 17:11,15
19:5,7 20:1,2,5,
19 23:10,14,18
38:1,2 43:5,6,
10,11,16,17
45:8,9 46:9,16
47:17 51:5 55:6
57:12,16,23,24
58:17 61:3,4
62:9,23 64:22
66:9,10 68:4,5,
6,9,10,14,18,19
69:9,21,22,25
70:1,13,14,17,
18 71:10,13,17
77:24 78:21,22

79:8,9 82:2,14
83:3,11 85:9
88:7 93:17
94:12,13,15,16
96:6,7,9,10,13,
14 97:16,17,21
98:13,23 101:2
103:7,22
104:19 106:10,
11,14 107:1,3,5
109:8 110:5
112:14,15,20
116:8,12,13,22,
23 117:4
118:22 119:6
120:5,8 122:23,
24 123:3,8,14
124:15,17
127:16,17,19,
20,22,23 128:1,
2,5,6,9,10,18,
19,22,24 129:2,
3,22 130:3,11,
20,21 131:1,14,
15 133:4,14
134:9,10,23,24
135:4,22,23,25
136:1,9,10,12,
13,16,17
137:19 139:3
140:25 141:1,9
142:5,6,13,14,
16 144:5 145:4
146:3,9,10,13,
14,17 147:2,3,
6,10,12,14,17,
21 148:18,19
150:19 151:5,
12,17,20,22
153:9 156:3,16,
19,25 157:5,10,
11,16,19,23,24
158:3,19,21
159:1,8,13,20
160:2,6 161:13,
16,21,22 162:1,
6 163:1,2,5,6,
11,12,14,16
164:1,2,5,10,22
165:25 166:2
167:8,9,18,19
168:5,6,10
169:5,6,8,9,12,
13,16 170:10,
11,15,16,22
171:15,16,19

172:16,18,25
173:8,12,22,23
174:2,3,8,10,
15,24 175:1,13,
14,18,19,22
178:15 183:9
188:13 189:12,
13 190:1,4,5,7,
8 191:13,21
192:3,13
193:21,22,25
194:13,14
195:2,3,6
196:16 198:24,
25 199:3,4,7,8,
18,19,25 200:1,
3,25 201:1
203:6,8,10
204:20 205:7,8,
14,20,21 207:7
208:16,17,22,
23 209:12,13,
17,23,24 210:1,
2,5,6,9,10,15,
16 212:24,25
213:24 214:3,
17,18,25 215:1,
6 216:15 217:4
222:5 223:17
224:25 226:6,8
230:21 231:21
236:21 240:13,
19 241:23
242:1,4,7
246:11 248:10
254:2 258:21,
23,25 260:13
261:9 266:12
270:18 271:6,7,
15 272:14
275:11,12
277:22 278:9
284:8,9,12,13

corrections
167:1 179:11,
22 195:6,7

correctly 27:4
43:8 51:17
54:24 116:8
121:17 122:21
231:13 266:13,
15

corroborated
31:5

counsel 7:18
8:22 9:12 13:17
14:18 15:10
16:7,8,14,23
18:22 189:6
218:17 219:10,
17 221:2
233:25 234:1,3,
6 242:8 246:2,
3,14,15 250:8,
18 272:4
280:15,18
281:11 282:9
284:23,24

counsel's
18:17 232:22

Counselor
169:15,24
179:17 193:17
246:21 259:9,
17 279:8
283:20

counted
243:15

counting
81:14,20

county 59:23
142:20 144:22
147:1 246:5,16

couple 10:4,21
17:14 76:17,18
133:12

court 7:4,5,14
9:20 10:19
11:13 41:16
69:15 102:11
105:10 145:17
206:13,14,22
207:13,14
215:12 243:10,
17,18 246:4,16
248:5,13 249:6,
10,11,13 250:4
272:4 279:14

court's 250:19

courtesy
279:12

cover 182:6
235:5,11 238:8
240:6

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 298 of 326 PageID #:7268
The Deposition of ANTHONY WOJCIK, taken on June 29, 2021
296

covered 182:5, 10 226:2

covering 56:21

coverup 242:25

CPD 148:5 251:4,6,18 254:16 256:25 257:23 258:4 259:24 271:11 273:4,5,7 274:11,12,18 276:8 278:19, 22 279:1 282:19 284:12

CR 205:15,23 207:21 208:7

CR211634 207:22

cracks 262:21

create 108:11 153:1,3

created 118:19 147:9,14,20 163:8 169:21 176:1 237:25 256:4

creating 147:19,25 152:25

credentials 252:16,17,21

credible 212:23 215:6

crime 28:22 32:1,10,12 49:13 52:13 99:17 102:4 104:16 124:25 137:17 144:11, 14 148:17,23 150:19 152:12 153:2 154:10, 14 162:5 169:13 170:3 172:16 173:12, 22 174:1,15 175:13,18,22

177:24 181:11 187:18,20

crime's 144:12

crimes 21:8,21 98:15,17 196:8, 9 258:16

criminal 13:11 37:2 68:3 70:16 84:14 142:16, 18 143:2 144:10 145:3 156:14,24 157:21 159:25 179:25 214:16, 19 234:1

CRIS 59:9 85:4 86:14,20,23 87:3 123:16 138:5

cross-referencing 139:6

crucial 40:9

CT 285:13

cup 223:13 224:3,6,14

curls 170:14 171:15 176:16

Curran 270:13 271:5 272:18

current 26:7 84:4

custody 92:9, 13,19 93:2,13 94:3 95:13 101:7 113:25 115:7 142:22 143:15 145:19

cut 51:11 75:6 80:20

cutting 11:8 58:2 242:8

_____

_____

D

damage 209:16 211:4 212:12 261:5

263:23 265:6,8, 9

damaged 221:18 223:19 225:3 227:5 260:2,13 261:17

damages 201:21

dangerous 142:20 144:23

dark 41:7 170:13

Darnell 173:24

database 62:5 84:21,22,25 85:3,11,16,17, 20 87:16 89:2, 15,20 90:5,9,24 93:7 99:3 100:18 146:5

date 19:21,22, 24 20:2 70:21, 24 71:4 90:1 112:22 118:1,4, 9 120:6,7 134:22 149:16 152:23 154:24 156:14 157:3 162:21 168:9, 11 169:5,8 172:13 173:7, 20,25 174:5 175:11,16 178:22 181:19 182:3,9 183:18 184:16,19,23 200:5,8 217:15 218:21 232:21 243:11 247:21 248:1,7,19 264:23 265:3

dated 208:20 213:3 215:4 234:24

dates 134:19 168:3,20,23 184:14 186:3, 13

daughter

211:13,16,22

day 7:7 16:8 32:17 33:5,6,7 41:9 72:6 74:8, 9,19 75:1 86:20 105:11 112:18, 21 117:3 119:24 157:14 177:11,14 200:10,16 209:14 210:13, 17 216:5 221:4 223:4 226:3,14 262:13 265:10, 11

days 10:5 52:13 62:2 72:11 133:12 154:16 207:6,9 211:14 213:20, 24 220:17 230:3,23 243:9, 10,12,15,16 248:4,5

days' 216:6,8, 9,11

daytime 70:6

deal 198:19 239:20

dealt 238:24 254:24

Debra 132:19

deceased 28:9

December 132:21 133:8 159:20 160:2 169:21 170:3 213:3 234:24 246:2,13 248:2, 9

decided 37:22

decision 32:23 266:1

deemed 205:10

default 121:15

defendant 8:25 41:17

defendants 7:24

defense 39:8 201:15,19 282:10 284:24

delay 72:6

delineated 95:1

demand 219:11,12,18 234:3

demanding 234:2

demographics 183:14

denied 209:21, 25 210:3

deny 257:4

denying 257:8

department 19:1,4,15 35:17,22 37:21, 22 38:8 64:21 93:16,20 167:1 168:1 179:11, 21 195:5 196:7 199:24 201:3 202:12,15,19 206:3 215:15 218:7,9 219:5, 17 220:4 235:16 237:5 244:24 252:10, 18 253:2,4,10 274:8 279:7 280:5 283:16, 22,23

departments 79:4

depend 137:4 139:21 153:5

depending 26:9 46:9 53:18,19 74:1,8 138:1 154:11 277:4

depends 34:9 72:8 74:22

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of ANTHONY was filed taken on June 209 2024
Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 299 of 326 PageID #:7269
297

149:12 154:17

deponent 280:22

deposition 7:9,25 10:8,10, 25 12:19 13:1, 6,18 14:8,19 15:11 16:6,10, 15 17:21,23 57:20 135:22 139:25 140:9 189:12 198:22 241:22,25 242:2 281:18, 19 282:3 285:13

depositions 10:16 281:8

deputy 214:5 219:22 233:18 234:12

describe 55:23 242:10

describing 134:5 254:20

description 102:5 105:2,12 141:19

descriptions 171:23

descriptive 168:3 169:4

deserved 23:4

designate 196:11 226:18

designated 241:14

designed 100:19

designees 238:7

desk 90:12,14, 15,16,21,24 99:3,5 100:5 114:9 221:23 223:6,13,15,17, 20,22

destroy 108:13

destroyed 221:22 222:1 223:1 260:4 272:15

details 14:11, 15 57:19 97:6 208:11

detective 20:18 21:12 22:5 24:7 25:6, 25 27:16 28:3 33:17,18 35:12 38:8 40:11,18 59:18 65:7 70:25 71:5,9 72:15 75:8,13 91:24 93:24 96:9 115:3 116:7 121:3,11 122:7 128:5,13 129:8 136:15 138:18 156:19, 24 157:8 160:16 169:22 170:2 189:16, 17,24 197:10, 14 203:15 205:17 212:21 213:2,4,9,10, 12,19 214:1 242:25 257:23 258:5,10,18,19 259:6 260:24 262:10,14,18 266:8,11 268:21 272:24 273:8

detectives 20:25 21:4,6 24:12,18 25:4, 14 26:22 30:4 33:19 35:12 40:11,18 42:7,8 43:8 44:2,5,15, 24 59:2 65:25 69:18,24 72:20 79:11,12 92:11, 12 98:10 108:11 115:11 128:25 130:17 134:6,21 135:1 136:3,5,9 137:5,9 138:2,

16,17,24 139:3 142:4,24 145:22 189:15 190:2 191:23 198:6 222:16 225:22 227:10, 22,23,24 228:2, 14 231:7 232:16 233:7 254:16 255:10 256:1 258:24 263:22 271:6

detectives' 221:11,15

determination 105:23 144:12 207:3 244:5 278:23 279:1

determine 41:18 84:8 92:24 101:13 144:9 166:9 178:1

determined 46:3 101:6 104:2 105:5 185:21 214:22

determining 50:17

develop 198:12,15

developed 190:18

developing 198:10

Devon 174:4

Dhaviella 8:16

dictate 188:3

difference 40:12 161:9 179:12 181:9 183:13,17

differences 29:19 40:12,19

differently 28:20,24 29:3 33:13 41:11

diligent 213:11

dim 78:25

direct 9:13 29:14 258:1

direction 45:5 105:1 273:22

directly 87:4

disagree 34:8 251:8,10

discharged 214:17,20

Disciple 105:13

disciplinary 213:9,17,19 217:2 253:9 284:6

discipline 207:6 237:10

discovery 201:21,23

discretion 144:8

discussed 191:3

discussion 30:19

dispatch 115:2

disposal 270:10

dispose 221:14 270:24

disposed 226:1 253:19 254:3 258:23 270:16

disposing 221:20

dispute 246:5, 17,18 247:7 248:15,17,18, 19 251:19 259:6,10 260:9, 16 267:1,10 268:1,11,12,13, 14 274:21

275:2,4,12 277:18

disputing 251:21 263:15 271:3 274:1

disrespect 209:5

dissect 161:7

distinct 51:13 56:16,17

distinctly 50:1

district 7:13,14 69:14 73:13 92:19 145:6 203:13,14 204:17

division 21:12 71:9 75:8,13 156:19,23,24 157:9,22 197:10,14 213:2,4 214:1 253:3 283:15

divisions 59:18

divorced 27:22

Dixon 146:21 147:12,17 163:11,13,16 164:4,8,12,14, 19 165:2,11,19, 23 166:4,6,7 167:17 172:13, 21,24 173:11, 22,25 174:4,12, 13,17,25 175:10,16

Dixon's 180:19,20

Dixons 163:23 164:18 165:6 166:2

DNA 22:17,21 23:20,23 24:2, 24 27:10 28:15

DNA-BASED 23:17



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 300 of 326 PageID #:7270
The Deposition of ANTHONY WZOREK, taken on June 30, 2021
298

DOC 148:14
179:25 183:3

doctor 12:13
40:3

doctored
281:14

document
46:2,20 47:10,
25 48:7 63:17
64:18,23 67:4
70:12 73:23
75:16 76:12
77:5 78:5 80:19
84:13,20 91:10
95:22 96:4
97:22 98:8
100:7 107:2,12,
15,17 109:25
110:22 113:6
127:5 128:23
131:6,11
135:15 137:2
139:18 140:3,
21 142:10,14
143:23,24
146:7,24
155:25 156:1,
11 166:23
169:19 188:22
189:1 190:20
191:5 193:14
195:18 207:19,
20 208:15
214:9 219:2
234:25 235:5,7,
12,18,19,22
236:6,15,17
237:23,24,25
238:2,9 239:13
240:1,4,7
246:22 247:1,2,
19 248:21,23
249:3,5 251:14
256:23 257:16
263:5,11,15
270:8 272:9
273:13 274:15
276:9 277:8,14,
15 279:13,24
280:6 281:1,3,
10,12,14,15,24
282:9

documentatio
n 41:13 106:16
107:21 137:11
206:15 214:22
215:11 219:1
220:6 262:5,15,
21,23 269:3
273:17

documented
45:8 46:15,22,
23 47:17 48:12
57:22 106:10,
13 107:1
108:23 111:4,
10 143:9 144:5
190:24,25
193:2,6 226:14,
16 232:10
273:23 276:7,
14,25 277:9

documenting
46:7

documents
12:25 16:21,22
17:10,14 18:3,
7,12,21 19:20
67:21,25 68:17
76:18 82:22
98:5 124:15
130:10,18,19
135:21 136:19
137:1 139:7
155:7 188:11
189:11 205:12
206:25 216:1
223:14,16,18
227:24 229:5
230:7 241:11
242:14 243:5,6
244:7,14 264:4

dollars 200:14

don 56:10

door 31:21
206:19,23
210:22 211:1,3,
5,8,9,10,21
212:12 219:10
224:18

door's 223:22

doors 210:18

dot 87:25 88:1,
2

dots 88:9,15

double 116:15

double-check
192:5

doubt 47:23
104:6

downstairs
210:25

downtown
218:22 234:13

dozen 147:23

draft 225:20

draw 172:9

drawn 244:11

drew 237:12

drive- 38:17

driver 161:12

driver's 59:12
85:21 87:21
90:2,3 115:8

driving 35:5
115:18

drop 221:23

dropping
115:7

drove 233:3

drug 101:7
110:14 112:10

drugs 142:20
144:23

dry 225:6

due 29:15

duplicate
226:15 227:7,8
229:5,11,14,24
233:6 261:19
272:8

duplicated
226:19 228:23
230:11 233:14
263:24 265:3

277:14

duplicates
226:17 272:10,
11 277:10

duplication
263:25

duration 102:7
109:23 264:22

duty 138:7
209:6

---

E

e-mail 98:8

earlier 22:7
65:11 83:14
86:11,13 99:1
100:4 112:16
127:15 146:1
148:1 149:12
154:17 156:13
157:12 163:1
191:3,9,20
193:4 248:1
261:2 262:3
267:17 270:20
271:23 272:10
283:12

earliest 154:2

early 109:17
226:23

easier 64:11
148:11

easiest 61:5,25
148:2

easily 150:11
159:4 185:21
282:11

Eastern 9:25

Edward 97:5,9,
10,16,21 98:12
101:22 107:25
161:12 191:9
192:7,10

effect 87:22
117:8,13
225:18 244:10

effects 12:11

EHXIBIT
169:23

elected 250:22

electronically
138:8

eliminate
182:25 183:13
184:15,18
185:4

eliminated
186:3

emergency
59:6 61:11
65:14,20 66:2,5
74:3 198:14
199:11

Emmett 127:22
128:4,9,14
129:1 188:25

emphases
24:1 27:5

emphasis 27:7

employee
244:19

employer
279:25

employment
202:2

end 189:22
195:12 206:9
207:4,16
213:14

ended 23:11
237:11

enforce 243:3,
22 244:18
245:15 246:5,
17 247:25
248:9

enforceable
248:15 249:8,9,
11

enforcement
59:22 220:2
241:17



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 301 of 326 PageID #:7271
The Deposition of ANTHONY WOODS, taken on June 20, 2023
299

enjoy 211:19

enter 119:11
210:17 211:8

entered 116:21
117:2 118:20,
23 127:25
129:5 210:21
248:13 249:7

entering 211:1

entire 17:12,
22,25 18:3
138:14 233:5,
15 243:16
275:23

entrance
210:21

entries 81:11,
13 83:13

entry 81:10,12,
14 209:8,25

envelope
197:20

Eric 253:17,20

ERPS 26:6

err 134:11

error 124:8

errors 138:21,
22

essentially
44:15 70:24
78:19 141:7
154:6 200:11
204:10 216:10
217:2 241:18
270:24

essentials
218:18

established
86:24

Eugene 146:20

evade 282:12

event 278:25

events 34:5
215:6

eventually
75:18 76:9
109:9 122:4,25
205:5 212:5
242:21

everybody's
32:23 41:3 57:6
82:23

evidence
13:13 22:22
24:25 26:4 27:8
28:2,15 29:14,
15 103:23
109:5 125:2
190:4 206:18
207:18 212:19
216:1,21,23
270:10,16
279:15

evolved 63:6
76:3,10 107:18
109:13,14,22,
24 113:21
114:4

ex-girlfriend
206:20

ex-girlfriend's
206:7

exact 19:21
97:2 105:4,11,
20 109:23
172:2 179:19
215:9 235:24
247:21 248:1
264:23

EXAMINATIO
N 9:13

examples
54:23

exception
158:22 271:2

exceptions
33:20 34:7

excessive
244:4

exclusively
15:11

excuse 60:11
64:13

execution
254:16,20
255:1,5 267:17

exercise 245:1

exhibit 63:17,
19 64:19 67:5,
6,20 76:20 78:5
84:13,16,19
85:8 86:12
91:6,9,10
95:23,24 96:5
100:7 112:16,
17 113:7,8
116:11 127:6,7,
15 131:8,11
135:16,18
156:2,4 159:8,
13 166:13,20,
23 167:11,14
168:16,23
169:19 171:13
172:10 173:7
188:8 189:4,5
193:11,12,14
195:18,21
207:21 208:1,7
234:14,15,17
238:9 245:19

exhibits 63:20

exist 120:24
129:17

existed 63:8
119:19

existence
252:4

existing
118:21

exoneration
13:15

expect 42:11
123:3 159:24

expectation
42:8

expectations
44:1

expected 44:5,
15

experience
157:13

expire 119:11,
24 120:15
121:4,7,10,24

expired 119:9
120:2,5,13,16
121:2,8,24
122:9,11 123:1,
2,6,8

explain 32:24
33:11 47:7
58:24 91:13

explained
38:15 39:25
96:18 137:8
164:17 230:10
245:2

explains 57:18

extend 232:21

extension
233:1

extent 183:9
198:6 201:24
237:9 239:11

extra 48:11

extreme 31:12,
14 34:18 48:24
49:9,11 61:10

eye 56:24 57:2,
3,4,6

eyes 25:21
50:6 55:16,17
156:12 168:10
231:9

eyewitness
38:6,11 232:9

eyewitnesses
52:7 150:13

eyewitnesses'
36:2

— F —

face 32:3 42:2
46:1 56:16,17,
21 151:18
209:10

faces 176:11

177:5,25

facing 142:15
145:4 200:21
202:16

fact 9:3 31:8
32:21 57:2
58:19 124:9
134:20 140:13
146:8 157:4
158:13 164:7
213:8 220:8
230:8 232:19
241:1 259:11
260:16 263:17,
21 269:17
272:9 274:1
277:24

factor 185:6

factors 137:6
244:18,24
245:2

facts 213:15

factual 32:7

fade 33:21
34:11

fades 30:9,15
31:11 32:8 34:6

fading 29:24

failed 276:6,9
277:1,2,8,15

failing 277:5

failure 205:23

fair 11:16,17,
19,20 17:18,24
18:4 20:18
27:11 47:2,12,
13 51:4 52:3
53:17 55:1,11
58:22 62:8,12
78:15 82:1
124:25 154:10
160:10 167:22
170:4 174:23
176:6 178:14
180:18,23
181:2 183:8
185:11 213:18
238:15 255:25
265:23

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 202 of 326 PageID #:7272
The Deposition of ANTHONY, WOLFE, taken on June 20, 2024

300

faithfully 10:20

fake 280:19 281:1,3,14 282:13

fall 120:8

falls 44:11 48:4

false 33:10 204:7,24 205:6, 13 272:1 277:9 280:16,19 281:3,14

familiar 40:13, 20 43:23 64:24 67:21 161:25 213:5

familiarity 103:20 150:24

family 27:15 28:3 112:9

fashion 60:4 227:20 244:21

fast 74:23

faster 72:14

fastest 61:6

father 22:10 42:1,2

favor 212:20 233:10 244:25 248:13 249:7

fax 75:12,22,25 76:7,10 157:5

faxed 75:6,7,19 157:17

FBI 99:18 227:16,22 228:1,11,13,16 229:9 230:6,8, 12,20 231:1,2, 5,14 259:23,24 260:1,5,11 262:4,6,9,17,24 263:22 264:1,5 267:9 268:18 269:8 271:9 273:22

fear 33:1

fearful 27:24

feature 56:17

features 41:10 54:14

February 69:7 70:12,19 142:1, 3,4,9 155:10 156:14,19,25 157:2,9,16

federal 29:17, 18

feel 33:8 264:7

feels 151:18

felony 44:21

felt 39:15,17 72:13 150:9

female 45:15 50:1 150:25

females 50:4

Ferguson's 243:2

fess 224:8

fewer 208:5

field 50:8 52:4

Fields 88:18

file 16:25 17:3, 6,9,12,18,23,25 18:3,20 26:2,3 73:14 76:18 96:24 97:19,23 103:8 108:14 130:7,10,18,19 131:1 133:18, 23 134:3,14 135:11 137:13 138:13 139:14, 15 165:15 207:24 208:21 210:19 216:21 217:6 223:4 225:10 226:4, 25 227:4 232:19 233:3,5, 15,22,23 234:6, 10 264:21 269:4,7,19 274:3,9 278:7,

24

filed 219:12 246:3,15 274:9

files 18:21 22:23,25 25:8 130:14

filing 73:18

fill 47:20 61:10 65:7 70:7 71:20 72:9 74:23 91:19 135:2,7,9

filled 68:22 121:7 130:16 133:13 137:18 138:23 170:2

filler 56:8 110:2

fillers 45:11 49:6 52:2,9 53:2,3,15,17 54:18,25 55:10, 11 56:1,19 105:18 107:23, 24 110:21 111:14,18,21 163:4 181:22 184:5

fills 74:22

film 61:21 190:17 198:12, 15

filtering 186:12

filters 22:22 62:22 63:4,5

final 216:19

find 17:10 23:25 24:8,25 26:5 28:7,8,10, 17 31:6 39:3 45:11 50:12 52:19 61:12,22, 23,24 62:2 63:22 67:17 95:14 97:1 105:11 117:18 133:22 154:17 155:23 159:4 187:11 239:18, 25 240:1,2 269:3 273:4,8

274:4,6 279:12

finding 154:20 203:5 205:5,23 206:12 207:5, 13,18 208:18, 21 209:4,11,12, 19 212:24 214:25 215:2,3 216:14 217:3 283:4

findings 202:24 237:2 238:17,23 239:14 244:3 278:23 279:2,7, 11 282:19 283:1,18

fine 8:12 64:12 89:14 187:25 241:20 247:18

fingerprint 68:15 69:16 79:25 91:22 92:2,7 94:9

fingerprinted 69:14 93:7 114:2

fingerprints 94:6

finish 11:1,4,9 179:17,18 248:4 279:21, 23

finished 11:8

fire 34:25 38:21

firearm 204:1

firearms 72:21

fired 104:23 245:6 255:11 256:1,2

fist 209:23

fit 184:17

five- 195:11

five-page 112:11

flag 116:6 166:15 211:6

fled 154:14

flee 61:15

Fleming 169:22 170:2

Fletcher 7:10, 20 13:11,15 66:8 67:2 78:1, 8,11,12 79:22 82:13,14,15,16, 17,18,20,21,24 83:5,7,16 84:1, 5,6,11 85:2 88:2,3,16,17,20 89:5,10,16 90:7 98:11 100:25 101:4,5,16 103:5 108:7 110:1,2,4,11,17 111:4 141:4 146:16,19,20, 24 147:6,10,11 148:5 149:8 150:2,15,24 151:12 153:3,8, 17 155:9 156:24 158:2 159:6,12,19,25 160:8,18 162:5, 13 163:9,12 164:1,8,25 165:4,7,12,16, 19,22 166:11 167:17 170:19 171:3,8,18 172:14,25 174:14,23 175:20 176:3 178:11 179:6, 14,15 180:15 188:17 191:12, 15 192:2,7,9 193:24 194:19, 23 195:1 207:24

Fletcher's 98:21 100:3 156:3 169:8

Fletchers 79:23 88:19,20, 21 110:16 111:5,6

floor 44:11 229:23 258:16



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 203 of 326 PageID #:7273
The Deposition of ANTHONY WOOD, taken on June 23, 2021

301

Florida 93:7,13

flows 137:20

flying 212:2,22

focus 18:7
24:3 180:5
208:6 236:5,12

focused 17:13
18:3

focusing 18:12

fold 182:6

follow 18:17
29:11 115:13
241:4,20 244:8
250:23

follow-up 25:7
284:21,23

fond 211:17

foot 49:7

footnote
251:2,3

force 244:2,4,
20

forced 206:19,
23 209:8,25
234:5

forensic 27:10

forever 32:4

forgot 84:24
85:11 219:21

form 14:21
15:14 19:17
21:15 29:1,25
30:17 36:4,13
64:23 65:6,12
66:1 69:12 70:7
72:1 76:9 79:16
91:19 92:15
93:23 101:18
102:1 107:6
108:15 110:6
121:6 125:1,20
143:3,5 148:25
150:20 152:2
158:4 159:21
160:11 164:23
171:6,20
173:13 174:9

179:1 181:14
182:12 185:12,
19 186:19
187:22 201:4
202:25 203:1
215:7 221:17
222:3 225:1
230:15 254:21
255:14 263:3
264:15 267:4
276:16

formal 37:7
130:10 134:8
278:23 279:1

formalized
96:22

formed 24:15
25:13 243:2

formulate
29:11

forward 26:1,2
33:15 71:5,6
233:24

forwarded
214:7

fought 244:18

found 28:6
62:3 138:21
204:5 211:3
215:5 223:12
237:25 249:3
265:17 269:7,
11 274:9

foundation
19:17 20:23
21:15 79:16
101:18 102:1
107:6 108:15
110:6 125:1
143:3,6 158:4
159:21 160:11
164:23 171:7,
20 173:13
174:9 182:12
203:1 230:15
252:13 254:21
255:14 263:3
264:15 267:4
268:3 279:3

foyer 210:24

frame 158:14
232:22,23
266:2 271:22
272:20

Frankie 35:2

frantic 28:13

Fred 68:10

Frederick
175:15

fresh 25:21
26:12

fricking 246:22

Friday 158:12

friend 48:6
132:19 150:25
151:2,3,7
152:16,25
155:12 161:15
188:21 192:1,7
193:7

friends 34:22
112:9 150:15
151:11

front 38:22
64:15 77:2
127:12 153:25
167:5 193:18
195:24 216:17
235:18 257:14
268:8 283:8

frontals 176:12

frowned 66:4

fulfilled 70:22,
24

full 31:14 34:17
62:6 126:13
200:5,7,9,10,24
201:21 208:7,8
241:12 242:16
243:7

full-on 126:14

fully 242:15

Fulton 146:25

function 21:6
100:19 121:13
130:15 134:10

137:15

functions
123:21 141:13

funny 35:9

_____

G

gaining 200:13

Gallagher
217:22

gang 33:5,7
38:16 59:18,21,
24 60:8 61:23
204:2,18

garbage
221:23 223:9

Garcia 253:16,
22 254:1,4,12,
15,19,24 255:7,
13,25 256:2,19
257:1,5 259:5,
8,22 270:15,20
271:3 273:1
274:20,22
275:10 276:8
277:20,21
278:14

Garcia's
255:18

garden 210:25
211:1

Gatewood
82:18

gathering 59:3

gave 84:5,6
114:8,15
115:22 164:25
212:6 259:25
274:18

gender 49:21
187:1

gender's 50:2

Gene 233:19,
20 234:13

general 15:20
30:14 33:19,23
34:14 35:23,25

96:6 104:4
131:13 139:19
153:22 162:15,
17 196:10
221:10 234:23
236:20 237:2,
21 238:7,17,24
239:15 240:12
244:1 247:7,15,
18 256:25
262:8,14 283:1

General's
238:11 239:25
240:24 277:11

generally 34:6
36:9 191:20

generate
199:5

generated
199:2 271:10

generating
199:6

generation
203:25

George 82:19

give 9:9 28:19
50:24 67:10
83:13 113:12
140:23 241:12
242:16 243:6
265:17

giving 27:21
50:7 120:13
183:24

glaring 177:7

glass 44:10
48:11

glasses 50:18,
19

goal 162:25

God 23:2,5

Goldston
214:13,20

Gonzalez
253:17,20
257:1,5 270:15,
20 271:2 273:1



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 304 of 326 PageID #:7274
The Deposition of ANTHONY wood, taken on June 26, 2024
302

274:20,23
275:11 276:8
277:20,21
278:14

good 7:19 10:3
25:9 56:8 73:17
90:18 99:12
137:12 138:16
165:14 169:17
177:18 184:4,
11,17,19 188:5,
6 261:13

GP 226:17
261:20

GPR 96:20
97:6 98:9
112:13 124:22
134:18 226:19
227:3,4,8
228:3,19,22,24
229:14,18,24
230:1,11 255:1,
3,8,12,23
256:4,12,21,22
257:4 259:2,7,
19,21,23,25
260:2,12,22,23,
24,25 261:2,4,
5,7,8,9,13,16,
19,21,24,25
263:1,18
264:10,13
265:7,8,18,20
266:23 267:25
277:13,15

GPRS 13:3
96:11 131:13,
22 132:5 135:1
221:10,15
222:19,23
223:1 224:24
225:7,12,17,18,
19,22 226:12,
14,15,22,25
227:9,10 228:1,
9,15 229:6
230:4,14 231:7,
10,19,20 232:2,
11 233:6,11
253:19 254:3,
18,24 255:17,
21 256:18,24
257:2 258:22
263:24,25

265:2 266:23
267:3 268:2,9,
20,22,25 269:3,
9,13,18,25
270:13,17,22,
24 271:10,13,
22 272:8,24
273:2,6,8,13,
19,25 274:25
275:1 276:7,12,
15,19,22 277:6,
10,19,21,23,25
278:5

grab 127:1

grabbing
113:13

grammar
138:22

grand 218:12
250:19

grant 22:17
23:18,20,24
29:15,17,18

graphic 196:3
197:11,12,14,
17,18 198:3,5,
6,23 199:15,17

great 138:18

greater 23:22
34:10 115:23

greatest
158:20

green-screen
87:13

green-type
100:15

grew 154:13

grieved 207:12
216:17

Grossman 7:3

ground 10:7

grounds 36:19

group 23:7
198:23 199:1

grown 211:16

guayabera
49:14,16

guess 34:9
52:23 55:20
71:7 72:19
104:14 218:4

guessing 40:2

gun 110:12,13

guy 31:20 40:1
42:1,21,23
44:10,11 45:10
46:17,18,20
47:11 48:5,10,
16 49:17 50:18,
20 51:9 53:8,22
56:25 57:3,11
61:14 66:21
72:5 87:20,22
92:18 93:10,21,
22 95:4,13
102:10 103:12
104:24 105:1,2,
7,11,13,17
106:2 114:18
115:16 121:19
125:8 147:24
150:3,17
151:18 152:1
153:12 154:12,
14 176:14
178:6,13,19
179:16 185:23,
24,25 186:1
194:20 198:14
212:2 248:6

guy's 42:17,18
45:23 179:24,
25

guys 25:16
47:5,24 49:19,
22 50:2 51:19
55:12 57:5
95:17 124:9
138:23 177:16
184:3,15 185:4
187:10 233:11
262:11,12
282:10,13

gym 104:24

—————
H
—————

Haas 130:2,6,9,
23,24 131:3
134:1,8 204:16

habit 112:10

Hail 111:7

hair 52:18,19
53:8,22,23,24
54:4,7,8,13
168:9 170:15
171:9,10,23,24,
25 172:3,5
175:2,6,8
176:12,15,16
177:14 194:19,
21,23,24

hairs 176:21

hairstyle 53:14

hairstyles
52:6

half 147:23
197:6

halfway
254:11

hall 198:17

hallway 196:24

hand 9:7 65:21
66:2 71:5 74:12
76:4 134:1
138:6 192:15
231:9

handcuffed
57:13,14,15
193:24 194:12,
16

handcuffs
194:2,4

handed 267:25
268:2,9

handing
179:23

handle 56:22
138:14

handouts 21:8

hands 61:16
193:24 194:4,6,
11 209:10

handwriting
130:1 131:16
132:5,9,10
133:3

handwritten
88:5 96:12 99:4
188:13

happen 20:13
31:16 35:4,10
49:11 93:20
120:8 122:4
200:15

happened
20:14 31:4
34:23 38:1
106:12 140:23
179:2 233:9
269:20,25
272:19 280:9

happening
37:24

happy 126:12

hard 38:13
42:18 50:12
133:10 153:21
194:21 197:21
212:15

hardworking
213:11

Harris 8:16
281:2,11,20,22

harsh 213:18

HD00 85:13

HD80 99:10

he'll 48:15
243:13

head 38:17,21
52:17 53:10,12
131:24 143:18,
20,21,22 197:6
209:10

header 133:3,6

headers 132:7
133:13



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

headings
133:19,20
134:12

headquarters
213:3

hear 35:6 40:4
203:7 217:4
229:8

heard 104:13,
17,18 112:9
217:24 226:21
232:3,4

hearing 37:5,8
38:20 207:2,15,
16 216:17
235:8,23 236:3
238:21 239:23
240:10

Hector 205:18

height 51:25
57:1 168:3,9
183:15

held 93:12
207:1

hell 227:3

hey 25:7,15,25
36:10 42:16
65:23 91:25
93:12,20,25
95:4 99:19,22
102:10 105:16
115:10,15,16
122:8,12
123:19 124:9
144:9 228:17,
20 229:7
233:10 242:19
244:16 272:7
274:5

hidden 182:10

high 34:23

highlight 69:5
89:16

highlighted
88:12 119:18

Hispanic
49:15 57:1
104:24 187:4,7

history 12:3
18:25 68:3
70:16 78:19
101:2,11
110:12 156:14,
24 157:21
159:25

hit 58:6 69:16
92:10 93:8
113:24 121:16
212:3

hold 95:9
102:11 105:9,
10 115:14
145:15 174:16
179:17 239:5
242:8 243:20
276:25 278:5
279:21

holding 143:13

home 28:12
101:22 200:15
206:8 210:1,17
216:11

homicide 19:9,
16 22:1 26:12
59:2 94:19
110:13 114:20
124:2 128:15
130:14 133:5
135:25 136:25
138:10 140:10
198:7

homicides
21:7,17,19,24
24:6 26:21

honest 132:16

hooked 87:16

hop 64:2

hope 162:21

hopes 143:1

hospital
220:19

hot 90:12,14,
15,16,21,24
99:3,5 100:5
114:9

hour 13:20

hours 70:6
71:22,24 74:4,
17 117:20
132:18 209:7
230:2 241:9
249:20

house 224:1

human 34:21
35:9 66:16 72:4
121:13 133:21

hundreds
62:11 138:11

hurry 234:5

husband
27:19,21 28:11

hypothetical
110:7 187:23

hypothetically
56:3

———————

———————

I

I-L-E-S 209:9

IAD 218:10
252:19

ICAM 58:17,22
59:8 61:12
62:5,8,12,19
63:12 77:19,23
78:17 79:11,13
84:1 85:4 86:2,
12,14,23 89:13
145:23,25
146:1,9,11,12
147:21 148:6
162:24 168:1

ID 8:20 47:6,10
54:10 57:22
191:24

idea 24:20 34:6
48:19 51:2
53:14 131:4
135:5 197:2
223:11 224:2
238:12,14
246:20 249:10
251:16,20
263:9 267:6
274:10,24

ideally 154:8
162:3 186:15

Ident 59:5 61:1,
2,7,13,18 65:4,
16,23 66:2 70:3
75:10 89:20
91:20 92:18
93:24 95:4
161:6 198:8,18,
19

identification
32:15,19,20
33:12 34:19
35:18,23 36:18
39:6,10,21,25
41:1,4,12,14,
19,21 42:13
44:1 45:2,7
46:3,14,23
47:1,2,16,20
54:12 61:3
63:19 64:20
65:2,8 67:6
68:18,22,24
69:19,20,24
70:23 71:16,18,
19 72:25 73:5,
23 75:12 76:20
84:16 91:6
95:24 101:12
103:19 104:3
105:7 106:23,
24,25 108:12
109:5,7 111:19,
22 113:8 127:7
131:8 135:18
148:21 156:4,
17,23 157:20,
23 165:9
166:20 167:14
168:2 169:23
189:5 191:13,
18,21 192:13,
21,22,23,24
193:1,7,12
195:21 198:22,
24 199:1 208:1
234:17 282:20,
22 283:3,10

identifications
34:4 36:3,12
37:2 38:6,12
39:1 40:13,19
41:23 44:18

46:1,6

identified
38:24 45:19,20,
21 47:12 54:14
88:23 91:18
95:5,8 108:4,9
110:20 141:10,
22 170:20,21
171:18 174:13
191:11 192:2,9,
18 204:17

identifiers
108:3 183:10,
11

identify 32:11
34:3 40:23
79:19 80:15
88:23 89:21
102:20 110:3
112:6 137:25
146:5,6

identifying
31:25 39:4
158:22 183:8

IDOC 59:23
101:8 147:12,
14,16,20 148:6
153:18 155:18
161:5,13,21
162:23 163:3,9,
10 164:9
166:14 167:18
169:1 186:7,11

IDS 47:14

Illinois 7:14
167:1 179:10,
21 195:5

imagine 62:15

immediacy
161:2

immediately
66:3 86:8
104:15 132:2
153:23 173:11
174:6 222:9
224:22

important
110:4 133:19
134:13



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 306 of 326 PageID #:7276
The Deposition of ANTHONY WOOD, taken on July 30, 2024

304

impossible
25:18

improper
234:2,8

in-person
14:12 16:6
273:3

inability-to-
pay 201:15

inappropriate
184:7 282:2

inauthentic
280:16,25
281:15

incarcerated
163:12

incarceration
153:21

incident 27:18,
20 31:10,13
34:23 105:21,
22 154:3,20,25
162:21 177:15
203:14 206:7
217:15 219:1,2
220:10 227:15
232:3,6 233:17
244:12 252:25
271:12

incidentally
224:16

incidents
26:18

include 130:7
164:9 165:24
168:8 254:19
256:3

included 82:13
110:2 130:25
168:4 169:3
233:5 255:2
273:6 274:12

including
106:18,22
146:22 169:5
187:17 218:9

Incomplete
110:7 187:22

incorrect
124:17,19
231:22 240:20

incriminate
250:15

independent
284:7

indicating
38:22 82:1
151:16,23
205:25

indication
44:16 75:5
83:14 93:19
124:23 125:10
130:22,23
141:7 143:23,
25 144:25
163:14,24
165:15,18
181:20 182:4
192:12,15,16,
19

indications
38:5

indictments
242:24

individual 7:23
31:7 33:24
38:19 39:11
42:4,13 43:25
49:5,13,25
52:14 66:7
68:8,13 80:9
91:20 101:14
102:8 110:23
111:16 116:11,
19 142:23
146:3 149:15,
22 158:11
170:21 171:4
173:24 174:4
175:21 176:2,
22 188:4 197:1

individual's
69:12 168:2,8

individually
41:11 177:20

individuals
40:20 45:4 49:4

62:6,21,22 78:8
82:20 88:24,25
109:19,21
153:2,11 169:4
170:9 180:16
184:12 186:8
187:2,4,6 195:4
218:14 231:25
257:11 266:21
267:2 270:19

individuals'
167:18

inept 277:12

inference
172:9

inferred 235:9,
12,23 239:24

inform 220:25
250:7 265:6,7
268:21 269:8

informant
204:12

information
13:10 24:23
26:2 72:14
73:12 79:13
86:25 87:4,6
89:1,10,17,22
90:10,12 97:1
99:3,19,24
101:2 110:4,10,
19 119:15
122:13 123:23
125:6 133:12
134:22 143:1,
13 149:5 157:1
168:4 169:4
182:8,9 183:8
184:23 214:15
222:22 225:17
228:23 229:1
230:19 248:24
254:19 256:4
266:20

informed
217:23 218:4
230:3 231:3,6
260:1,12
265:25 272:18
273:3 279:5
282:25

informing
279:11

ingrained 32:3

initial 242:24

initially 62:25
76:7 113:23
129:10

initiate 22:14
23:1 25:2
210:14 251:15

initiated 210:4
251:4,23 252:2

initiating 25:5

initiation 22:8

ink 223:5
225:4,13
261:17

inmates 148:9

input 62:7
118:4,9 120:14,
25 122:22
138:5

inputting
86:25 87:6
117:14

inquiries
84:23

inquiry 69:7
70:13,20 71:9

insisted
241:22,25

inspector
234:23 236:19
237:2,21 238:7,
11,17,24
239:15,25
240:12,23
242:22 244:1
247:7,15,17
277:11 283:1

instance 39:1
66:11 240:5

instances
75:16 197:7
202:24

instant 40:7,8

41:8

instigated
210:3

instruct 15:4
18:14 201:5
239:1

instructing
239:7

integrity 60:21

intend 208:6

intended 98:12

intending
201:20

intent 171:22

intentionally
204:25

inter-
department
284:1

interact 198:6

interdepartme
ntal 72:7 75:18

interfere 12:12

interim 231:18

internal 253:9
284:6

internet
235:13,23
237:15,24
239:24 246:23
247:2 249:3
259:14 279:13,
22

interpretation
126:8 261:3

interview 29:6,
7 97:9 125:4
128:14 129:9
142:1,8 152:23
155:16 188:11
196:24 228:16
230:20 236:23,
25 237:12
240:13 241:2,3,
5 242:3,7,11
244:6,14,20



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 307 of 326 PageID #:7277
The Deposition of ANTHONY, taken on November 8, 2023

305

245:3,10,23
250:10 251:6,
17 253:4,5,10,
20 254:4,8
255:8 259:3,5,
7,22,25 262:6,
11 269:2,14,15,
16 271:9,21

interviewed
121:22 122:11
137:23 142:4,
24 155:10,11
228:10 232:1,6
262:17 275:10
284:12

interviewing
29:13 97:16

interviews
97:10,14,21
137:24 188:13,
16,20,24
217:25 218:12
227:15,21
228:13 230:25
231:2 232:10,
11,14,17
241:19 251:12
257:1,5 262:8
266:23 267:2,3,
10 268:21,22
270:1,15 273:1,
15 274:22
276:13

inventoried
26:4 108:20
204:22

inventory
98:2,7 107:5,
19,20 109:25
130:20,25
134:9

invest 238:18

investigate
21:7

investigated
26:17

investigating
124:24 186:23
219:16

investigation

19:10,16 21:5
22:15 23:1
25:3,10 29:10
58:16,21 59:1
93:1 135:25
136:25 138:15,
19 140:1,6,11,
24 141:24
148:17 169:12
191:4 198:7
206:9,10 210:8
213:15 217:10,
14,21 218:2,6,
8,15 219:4,8,15
220:7 221:9
224:10 227:18
230:13 231:6
234:22 236:20
238:19 239:19
244:13 245:10
251:7,19,25
252:4,11,12
253:6,11
258:20 266:12
271:11,23,24
272:2 273:20,
24 283:6,11,17,
23 284:2

investigations
25:5 38:9,10
99:20 114:4
137:10 202:17,
20 232:25
241:19 245:6
252:18,22,24
284:8

investigative
16:25 17:3,9,
17,23 18:20
22:24 76:17
97:19 100:19
108:14 113:11,
19,21 114:5,12,
22 116:3,10,21
117:3,25 118:6,
10,16,19 119:4,
11,12,22 123:1,
10,11,13
124:16 127:14,
19,21,25 128:4,
9,12 129:2,4,
11,17,20,21
130:7,10,14,24,
25 233:23
234:1 272:24

276:6

Investigator
214:13,20

investigators
212:18

invoke 250:8,
12,13

invoked
250:14,16,25

involve 257:10

involved 19:9
26:8 32:1 37:6,
12,14 117:1
130:17 137:5
138:2,19
140:17 218:6,
10,14 220:24
221:6 222:17
242:25 257:11
266:3

involvement
98:4 125:6
190:23 191:2
217:10 218:16
220:23 221:1
262:16

involving
58:20 206:7

IR 63:1 65:17
66:8,13 68:13,
16 84:25 89:11
91:23 94:11
100:25 101:5,9,
14,15 114:3,12
116:16 146:21
159:5 198:20

irrelevant
148:12 149:20
164:12 180:8,9
182:18 201:16

issuance 71:4

issue 26:23
278:22 279:1

issued 69:7
70:13,20 71:8
94:14 116:20

issues 11:3
35:22 36:1

153:23 154:19
177:7

—————————

——— J ———

Jackson 17:21
58:20

jail 50:24 147:1

James 7:10,20
13:11 110:2,4
141:4 146:16,
19 147:10,11
150:2 151:12
156:24 191:15
192:2,9 213:4

January 90:7

Jarone 175:10

Jennifer
132:15 188:12

Jerome 7:10
184:21

Jerry/jerome
136:5

JF 64:10,19
67:5 76:13,15
84:15 91:4,10
95:25 96:5
113:7 127:9
131:7,11
135:16 156:2
169:20 189:4
193:15 195:18
234:16

Jim 191:12

jimmy 68:11
110:1 146:16,
19,20,24 147:6
153:3,8 155:9
156:3 163:9,25
164:7,25 165:3,
6,11,16,18,22
166:11 167:17
170:19 171:3,
18 172:14,24
174:14 179:6,
14,15 180:15
188:17 193:23
212:11

JNB 166:24

job 32:17
245:14

John 214:21

joined 19:16

joint 50:21
149:8 153:19
179:24

Joliet 147:2

Jones 92:16

Jr 7:10

judge 32:21
145:18 238:22
244:24

judged 177:19

judges 39:9

judgment
176:6 201:23
248:13 249:7

July 243:25
248:3,12 249:6

jump 51:20
72:1

jumping 51:9
81:6,18

jumps 81:18

jumpsuit
50:20,21

jumpsuits
50:24

juncture
144:18

June 7:7
243:25 248:3

juries 39:9

jurisdictions
59:22

jury 32:21
218:13 250:20

justice 37:2

justification
128:7,11

juvenile 77:8,
9,11,13,15,18



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 308 of 326 PageID #:7278
The Deposition of ANTHONY WOLFE, taken on June 28, 2023
306

78:7,14 80:8, 11,13 83:9,15, 17,20,22,24 84:6

juveniles 79:24 80:7 83:19 84:3

K

Kentuckiana 7:5

Kentucky 7:6

Kevin 130:6,9 131:3 134:1,8

key 210:23 211:2,11

keys 206:20, 21,22 210:20 212:6,7,9,10

kicking 64:7

kids 33:6

kill 61:14

killed 22:11

kin 217:20

kind 27:20 28:1 29:2 47:9 48:6 51:3 55:18 56:22 65:20 78:25 81:15 118:13 129:12 134:22 143:14 147:22 148:12 149:20 164:24 168:3 184:4 194:24 196:23 211:17 212:15 221:20 239:20 277:4

kinds 14:17 28:23 29:8 44:7 46:5 71:20 78:20

King 105:13 266:19

Kings 38:19

kits 73:1

knew 28:11 95:17 137:11 146:24 147:5 149:22 150:3, 14 151:16 161:25 163:25 165:16,18,22 166:1 173:14 176:21 224:20 228:18,21 239:19 262:9

knocked 223:13 224:2, 19

knowing 153:18 182:14 184:12

knowledge 24:11 71:14 142:7 147:5 154:18 183:23 218:8 219:5 224:13 251:24 268:11 275:7,8

L

lab 29:16,17 73:1

laces 195:2

lack 88:13 90:8 106:25 111:7, 12 113:24 223:6

language 51:1

Laquan 217:11,20 221:8 236:21 244:3 252:12 253:5,11 258:20 266:12 283:9,19,24

late 220:9 232:20

Latin 38:19 105:13 204:18

Latino 62:21

Latrobe 146:25

law 59:22 105:20 220:2 241:17,18

lawful 248:14 249:8,9,11

lawsuit 201:16 219:11

lawyering 37:1,2

lawyers 280:5, 6 281:7

laying 223:15

lead 25:1 42:13 164:13

leader 204:2

leading 37:17 50:6

LEADS 84:24 85:21 90:16 92:14 93:3,9 95:7 144:25

learn 137:14 238:16

learned 98:10 99:14 101:1 140:14 146:15, 19 230:13

leave 43:1 44:19 184:22 212:4,6

leaving 267:14 268:1,10

led 216:17 231:15

left 57:1,3,4,6 78:23 107:10 199:23 202:15, 19 204:14,25

leftover 199:22

legal 37:24 104:14

Lemoyne 60:13,14

length 171:24

leniency 143:1

144:3

letter 215:14 244:25

letters 219:11, 12,18 234:3

letting 43:12 227:22

level 52:4 53:5 192:20

license 59:13 87:21 90:2,3 115:8

licenses 85:21

lieutenant 24:15,16 65:22 234:24 257:2

lieutenants 25:23 257:25

life 244:21

light 197:22

lights 41:7,8

limit 130:16 277:23

limitations 21:19

limited 39:17

lines 43:19,24

lineup 12:21, 23 16:22 17:7, 20 37:13,15 43:2,5,10 44:3 45:3 47:4 49:3 50:5,9,18,23 51:4 54:2,3 55:3,12,13,25 56:8,12 57:21 58:1 97:24 98:6 105:18 107:14, 15,17 108:24 109:4,20 162:25 187:19 188:5,6 189:6, 10,14,15,19,21, 23 190:3,10,14, 23 191:25 192:2,6,8 193:11,21,23

194:7,9,10,11

lineups 43:15 48:20 50:13 107:11 109:3, 17

list 82:25 88:24 124:17

listed 77:14 83:9 123:12 127:18 158:3 170:9,12,13,14 175:11,16 189:21 253:15, 22,25 257:3

listing 141:25

lists 98:9 123:9 141:3,4 145:2 171:2

litigation 168:19,20 280:16,20 281:5,12,16

live 31:21 104:15,19 105:25

lived 31:21 98:11 110:11 146:25

living 154:13

load 118:5

loading 117:24 118:15 119:21

locate 115:23 145:14 217:20 269:14

located 7:5 161:12 269:7 273:6 274:7

locating 148:5 161:14

location 7:17 204:6,15,16 205:1

lock 211:3,5

locked 211:2, 4,10,11

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 309 of 326 PageID #:7279
The Deposition of ANTHONY WOOD, taken on June 29, 2021

307

locks 211:5
212:11

lockup 56:9
195:8

lockups 56:6

logic 185:8

logo 79:5

long 21:22 46:7
53:24 54:1,8,13
71:19 85:25
129:4,6 153:19
165:17 171:9,
24,25 194:19,
21 207:10
230:2 249:21,
22 259:16
264:23

long-haired
54:3

longer 33:4
52:20 118:17
176:16 194:22
211:15 225:5
237:5,10
244:19,22

looked 39:7
42:1 99:1
100:12 101:9
102:16 112:16
127:15 148:23
150:19 153:2,8
154:10 155:9
160:15 162:5
165:4 173:20
191:16 228:9
229:5 239:18,
22

lose 32:9
216:6,9

loss 60:7
205:20

lost 58:5 73:16
159:9 164:24
178:9 212:10
246:7 268:21,
23 269:1,6,11,
19 272:24
273:2,14,25
274:1,22 276:6,
10,14,25

283:21

lost-and-
found 203:25
204:4

lot 23:16 26:8
28:21 30:13
60:24 72:20
83:2 106:16
133:2 139:6
169:17 206:15
208:10 266:19

Louisville 7:6

Lovers 204:18

LTS 78:1,3,9

luck 73:17

Luna 108:1

lunch 126:14
127:1 222:24

_____

M

Madam 10:19

made 32:20
41:12,14 46:2,
22 65:22 70:15
75:17 83:24
94:3 105:23
108:22 118:14
122:16 144:4
161:9 169:10
191:11 238:23
244:2,5 264:21

mail 61:9
65:13,15 67:17
71:6 72:3,4,5,7
74:17,24 75:2,
18 76:6 157:19

main 7:6 28:8
90:19 99:10
134:10 210:21,
22

maintain
60:17,21

maintained
215:20

maintaining
134:8

make 11:3
32:15 34:13
36:2,11 39:20
40:25 41:22
54:11 56:11
57:10 68:20
69:19 73:20
80:1 81:1,15
116:16 119:10
121:20 122:2
129:13,24
133:18,20
134:2,11,13
135:10 137:16,
22 144:11
176:5 187:18
188:4,6 226:12,
24 228:6
229:19 240:24
262:18,19
273:22 274:17
277:13 280:15
281:13

makes 32:18
43:25 51:4 53:8
78:23 133:17

making 33:12
227:22

male 45:15
49:9,22 104:24
107:25 147:16
163:10 170:10
183:15

male- 50:2

maltreatment
209:5

man 25:25
30:25 34:15
105:16 127:21
229:7 244:16
254:4 272:7

Maniac 105:12

manpower
26:14 74:2

March 94:15
112:14 113:1
116:14,21,24
117:19,22
118:12 120:20
124:21 127:25
128:4,25 129:5

155:11 169:8
172:14 242:25

mark 63:17
167:10 207:19,
20

marked 63:19
64:18 67:5,6
76:20 84:13,16
91:6,10 95:24
96:5 113:6,8
127:6,7 131:8,
11 135:15,18
156:1,4 166:20,
23 167:14
169:19,23
189:5 193:12,
14 195:18,21
207:20 208:1
234:17

marking 95:22
155:25

markings 88:7

Mary 111:7

mask 45:24

master 70:4
73:8

match 56:12
91:23 98:25
148:14

matching
102:5 105:2,12

material
270:10

materials
273:7 274:12

math 169:17

matter 7:10
35:23,25 39:18
61:22 147:23
180:2 183:16
220:8 232:19
263:21

Maurer 213:5
214:7

Maurer's
213:14

Maurice 88:1

89:4,10,16 90:7

Mcclain 82:16

Mcdonald
65:16,18 98:10,
14 108:8
110:20 217:11,
20 221:9
236:21 244:3
251:7,18
252:12 253:6,
11 255:9,13
256:12,13
258:20 266:12
268:19 276:6
283:9,19,24

Mcdonald's
254:16 272:23

Mcneil 82:17

Mcvicker
209:8

meaning 18:8
193:7 205:19
216:7 241:8
243:11 284:2

means 33:10
61:2 84:3 90:11
93:14,18 101:9
144:10 152:18
193:6

meant 94:2
99:16 102:13,
14,17 104:12

meantime 87:5

medical 12:2,3
220:17

medications
12:7,10,14

meet 16:9
231:2 268:18

meeting 15:19
218:18,20,21,
24,25 221:2,4,5
232:23 273:3

meetings
13:17 15:10
16:6,14

member 27:15
28:3 38:17

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

220:4

members
20:21

memorialize
175:23

memories
28:23 30:22
33:21 34:20
40:5 140:1,19

memory 29:23
30:9,15 31:11,
12,15,17 32:4,
8,9 33:1 34:5,6,
11,17 35:4,7,13
97:15 132:12
140:5,10

mentioned
23:16 30:23
48:19 59:24
62:4 76:6

met 13:22
14:12 16:8 40:8

metal 212:16

Mexico 61:15

Michael
169:22 214:13

middle 132:4
246:1,8,12
275:14

midnight
117:21 118:24
220:10

million 35:8

mince 152:22

mind 10:22
53:9 144:2
165:3

mine 168:11

minimal
220:23

minimum
264:10

minute 195:12
201:6 219:3

minutes 16:11
32:10,12 105:3,

21,22 161:4
230:23 259:3
266:17

misdemeanor
145:6

misdemeanor
s 21:21 138:12

misfiled
269:11,19
274:1,3

misrepresenta
tion 255:9

missed 40:15
264:5 274:19

missing
123:23 133:22
138:22 273:4,
25 277:19

mission 24:5

misspoke
112:25

misstate
185:14 247:1

misstates
14:21 15:14
108:16 125:2,
20 152:2
178:16 181:14
185:12,19
222:3 225:1
255:15 264:16
276:16 280:9

mistaken
220:3

mistakenly
11:7

misunderstan
ding 54:20

moment
170:19 191:8
253:23 254:6,
23 256:20
257:9,15

momentary
40:9

Monday
158:11 233:3,

21,22

money 112:11

month 118:10
251:5,17

months 16:7
31:22,23 53:23
72:21 118:11
120:2 123:7
200:5,23
218:17 242:22
243:3,9,16
244:9 247:24
271:11,23

months'
242:21

moot 221:21

morning 7:19
10:3 217:19
220:8,11,13,18
233:3,21

mornings
211:17

Mose 88:2

mouse 223:18

move 243:2

moved 33:3
63:24 244:17
247:25

moves 243:22

multiple 60:5
79:18

murder 93:11
95:5 140:1,5
146:22 174:7
191:4

murders 22:19
23:3 26:9

myriad 28:16
32:16 48:25

———————

N

———————

named 66:8
68:8 97:16
98:11 101:4
111:3,16
127:22 137:23

140:13 172:21
219:23 242:23
243:1 254:4
258:18

names 68:12
78:20 79:11,25
82:12 83:1,2
85:23 87:25
88:10,15
115:25 116:2
163:19,20
164:9,18,20,21
165:2,24 183:3
270:21 274:25

narcotics
92:17,20

narrative
123:25 132:4,
18 133:2
137:20 189:22

narrow 22:20,
23

national 93:16

nature 34:21
35:9 66:16 72:4
133:21

NCIC 84:24
92:15 93:3,9
95:7 99:11

necessarily
31:10 39:22
51:18 60:12
80:7 109:25
117:18 186:24
187:8 188:6
194:6

neck 220:14

necklace
53:14

needed 59:23
72:13,16 76:5
94:19 163:15
164:4 262:23

negating
206:15,25

negative 57:22
103:3,16 104:8
106:24 107:13,
15,17,20,21

108:12,21,22,
23,24,25 109:6,
17,21,24
110:22,24
111:5,6,11,17,
19

negatives
109:13

neighbor
31:20 154:12

neighborhood
33:4 79:5
105:15 151:4,9,
15,19 152:17
153:15 162:1
165:17 182:19

news 37:8

NF 234:16

nickname
165:23

nicknames
68:12

night 28:12
206:24 212:10
217:18 220:10,
23 224:11
232:6,13,20
233:2 267:7
268:10 270:14
272:7 276:9
277:1,2,3,6

nods 11:12

non-arrest
196:23

non-ipra 284:2

non-oig 284:2

non-ops 284:2

nonetheless
204:24 222:16
234:8

Nora 128:16

Noradin 7:11
136:6 138:18
189:18,20
193:4

Noradin's
191:10



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 311 of 326 PageID #:7281
The Deposition of ANTHONY WOOD, taken on June 20, 2023

309

normal 70:6
71:21,24
158:18 159:24
190:12

North 108:1
209:7

Northern 7:14

notated 265:3

notation 227:4
233:13

noted 172:13

notes 18:25
221:11,15
231:20 253:20
259:2,7,17
266:22

notice 232:19
233:5

noticed 8:10
94:20

notifications
94:3

notified 92:12
113:25 220:9

notify 93:2
114:17

November
159:20 160:1
208:20 209:20
214:10,12

number 7:15
18:3 22:11 28:5
44:13,14 65:17
66:8,13 68:13
75:10 80:14,20,
25 82:10 94:11
96:1 114:3
119:16 128:15
129:21 133:20
169:3 171:13,
14,18 173:6
175:9,10 180:5,
14,15 186:25
192:9 194:23
207:21 208:5
226:18 234:23
235:17 244:19
245:9 248:18
257:3

numbers 82:4
85:14 159:8,12
168:21 177:18
183:3

numerous
31:4 278:19

———————

O

———————

O'BRIEN
246:10

oath 184:22
187:16 241:23
242:1,4,7

object 8:2 15:2
110:6 171:6
201:14 209:11,
22,23 212:16
252:13 261:11
280:8 282:6

objecting
246:21 249:2
281:17

objection
14:21 15:14
16:1,16 18:13
19:17 20:23
21:15 29:1,25
30:17 36:4,13
79:16 101:18
102:1 107:6
108:15 125:1,
20 143:3,4,5
148:25 150:20
152:2 158:4
159:21 164:23
171:20 173:13
174:9 179:1
181:14 182:12
185:12,19
186:19 187:22
201:4 203:1
215:7 221:17
222:3 225:1
230:15 252:6
254:21 255:14
256:6 257:7
263:3 264:15
267:4 268:3
276:16 278:10
279:3

obtained 98:21
101:21 147:11
206:13 266:20

obvious 44:17

occasion
25:14 26:9,16
155:4

occasions
155:3

occur 32:4
37:10 263:8
275:5

occurred 21:8
31:15 35:8
124:3 142:8
145:1 166:10
168:13 170:4
230:10 233:18
259:10,15
263:9 265:7
268:12

occurrence
149:16,18
265:10,11

occurring
31:13

occurs 22:4

October 19:5,6
159:20 160:1
200:17 215:4
268:20

odd 118:13
272:6

offender 27:23
31:6,17 42:15
43:13 49:6,9
50:11,17 55:16
91:18 111:13
141:8,14,15,20,
22,23 151:14
152:13 162:19
171:3,4,13,14,
18 181:6,7,13
185:10 193:8

offenders
112:7 141:3,15
151:4,8 152:17
191:16 192:10
193:9

offense 21:20,
21 34:20 35:5
54:4 92:9

office 14:13
143:10 144:7,
13 168:19
208:19 218:23
223:12,22
229:19 233:19,
20 234:13,23
236:19 237:1,
21 238:10,17
239:14 240:24
243:2 247:6
261:15 268:18
271:25 272:1
274:20 275:3

officer 68:23
114:19 115:2
144:24 189:22
211:6 228:10
237:10 240:11
241:16 251:7,
18 262:10

officer's 257:3

officers 7:12
56:10 71:23
74:16 77:14
102:4 103:18
104:22 105:1,
11 117:23
145:7 228:14
231:3 241:5,15
262:5

official 204:7,
24 205:6,13
235:7,10,18
263:14 268:7

officially
271:12,24

OID 246:16

OIG 235:3,4,10,
12 245:23
246:4,10,16
248:13 249:7
250:5,7,10
251:6,17,20,24
252:4,24 254:8
262:25 273:7
274:11,13,18
278:22 279:6,9
280:19 282:13,

19 283:25

OIG's 248:14
249:8 250:19
278:23 279:2
283:17,18

older 27:6
84:22 85:4,10,
11 86:1,10,13

oldest 155:22

one's 80:20

one-on-one
102:10 103:13
176:24

ongoing
252:24 271:25
273:20

online 7:3
239:18,22

oops 156:1

open 21:13,18
22:11,12,19,20
98:6 136:1,2,24
138:8 139:24
141:12,16,19
148:8 170:23,
24 171:2 188:8
191:7,10
210:18,23
211:9 223:23
252:17 283:6

operate 33:19

operation
74:15

operations
203:22,23

opportunity
17:17 39:18

opposed 37:12
69:13 161:5

opposite 32:5
54:9 55:14

OPS 206:11
208:20 209:12
212:18,24
214:21 252:18
253:8



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 312 of 326 PageID #:7282
The Deposition of ANTHONY WOJCIK, taken on June 21, 2023

310

option 216:23

options 61:11
102:19 213:20
216:3

orange 50:21

order 10:12
59:7 82:3,7
91:12,14,15,19
92:6,10,16,20,
24 93:25 94:4,
8,9,14 95:1,15
112:17,19,22
113:3 114:1
116:3 117:2,9
118:2,21
119:12,16
122:25 124:22
126:1 144:1
207:12 212:12
220:1 234:10
250:4 272:4
285:5,7,9

ordered 219:2,
20 220:5 221:5
222:7,8,14
226:21 232:18
233:4 248:14
249:7 273:16,
18

ordering 159:5
161:5

orders 113:23
117:7,11,13
118:1,6,15,17
119:2,22
120:20,23
272:3

organization
253:9 283:15

organizations
284:7

original 76:9
85:12 169:20
170:1 171:12,
16 172:4
208:18,24
209:11 212:23
214:24 215:4
216:14 226:19
227:10 260:2,3
261:20,21

265:7,8 270:17,
24 271:10,22
276:7 277:6

originally 55:8
207:5 212:19
215:19 261:20

originals
271:15 272:13

Otis 174:12,13,
17,25

Ouch 126:9

outer 210:21
211:9

overflowed
113:22

overrule
207:12

oversee
130:14 218:25
220:5 221:5

overseeing
40:11

overtime
216:7

overweight
49:24

————————
P
————————

p.m. 128:1
157:10 285:12,
13

pack 82:4

packet 82:5

pages 60:5
67:21,22 69:3
76:16 80:23
81:5,15 87:24
89:4 131:13,17,
19 132:8,9
133:1 185:9
196:15 208:6
235:20

paid 29:18
206:2

pants 245:12

paper 64:12
70:4 73:6,9,16
89:8 99:24
123:18 182:6
218:16 219:7,9,
13,18,20 220:5
222:15 225:5
226:24 263:13

papers 69:15

paperwork
272:3 273:21

paragraph
152:8 246:8,9,
12 248:12
254:12 258:2,4
259:18 261:23
266:17 267:21
268:17 272:23
275:15,23,25
276:5 282:18

parameter
129:12 186:11

parameters
158:15

parentheses
112:11 271:5

Park 204:17

parking 205:24
266:19

part 21:6 25:12
40:16 51:2
56:21 71:22
102:25 103:6
130:14 133:24
134:16,18
138:4,16 145:5,
8 150:6,7
158:17 168:6
205:15,22
206:12,19
217:18 218:23
223:4 226:3,25
227:2 251:7,18
252:3 255:22
262:3 266:14
271:17 278:7

partial 197:7

participants
45:12

participate
97:9 188:16,20,
24 220:7
232:11,14

participated
97:20

participating
21:5

participation
188:12 218:9
227:25

parties 9:2

partner 205:17

passage
30:15,21 35:19,
24 41:23 54:15
177:8

passed 27:24
28:22 48:16

passes 44:11
48:4 54:18
134:7

passing 48:11

past 39:23 87:6
134:16 137:10
176:24 213:10
236:16 240:9

pat 223:2 225:6

patrol 87:18
90:23

patrolman
114:14,17

pay 200:14
205:20,23
216:6,10,12

paying 215:17

peel 223:7
225:6

pen 57:5

pending 7:13
11:22 202:4,16

pension
200:10,14,24

pensions
201:2,13 202:1,

11

people 27:17
28:10 31:16,18
32:9,10,11 33:5
35:4 39:8 40:2,
4 43:22 46:16
47:4 50:12 51:8
53:25 54:3
62:9,15 63:1
76:8 78:20 84:7
85:20 87:19
93:20 115:24
130:16 137:22,
24 164:4 165:1,
10 166:5 176:7,
8,21 177:13
181:24 183:14
186:3,13,18,24
187:5 216:24
217:24 218:1,
12 223:23
224:1,11
229:23 231:25
245:6 266:18,
24 267:16
269:5 275:1
277:24

percent 39:4
40:1 46:19

percentage
23:22 34:10
158:20

perfect 162:7,8
183:4

Perfection
183:4

performed
213:12

period 21:22
84:1 109:4
120:22 160:8
213:20 250:17
251:1 283:6

periodically
25:13

perpetrator
124:25 161:25
170:21 178:5,
24 179:3,8
180:18 181:6
186:17

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 313 of 326 PageID #:7283
The Deposition of ANTHONY WOOD, taken on June 20, 2023

311

perpetrators
170:20

perpetuity
21:14,18 87:1
129:15

person 27:24
30:7 31:19 32:1
34:9 39:3,24
41:3,11 42:3,14
43:9,20,21
46:24,25 47:11,
12 48:9 50:6,11
51:3 52:7 53:10
54:20 70:22,23
89:22 91:25
92:12 93:2 94:3
102:5 110:20
113:25 116:6
118:20 121:21
122:14 128:3
149:20 150:19
154:7,9,18
155:3 158:17,
23 163:25
171:4 178:23
181:25 183:7,
23 209:6
219:23 224:9
253:15 260:18
273:2

person's
132:10

personal
59:14 103:20
142:7 147:5
151:11 204:13

personally
60:20 152:5
273:11 275:3

personnel
203:22,24
278:24

persons 55:18
91:18

perusal 139:8

peruse 183:24

perused
138:20 140:15

Pete 258:19

Peter 209:9

petition 238:21

phone 13:19
14:6 15:12,23
16:13 92:23
229:18 260:4,
18

photo 37:9,16
42:9,15 43:2,5,
16,22 44:3
48:20 49:2
57:21,24 58:3,
14 59:3,13,21,
24,25 60:18
63:2 66:12,18
74:3 101:17,20,
21,23,25
102:12,14,18
103:2,5,6,16,
21,22 104:7,8,
11,13 106:1,2,
20 107:4,20
108:11,25
109:19,20,21
110:3,15,23
111:18 146:13
147:9,10,11,14,
15,19,20 148:5
149:11 150:1,2,
9 151:25 152:9,
25 153:1,3,18
154:2,17,20,22,
24 155:8,22
158:7,18,25
160:19 161:1,
13,18,20 163:3,
8,9 164:21
165:24 166:9,
13,14 167:13,
16,20,22,24,25
168:4,7 169:1,3
172:10,20
173:10 174:5
175:11,16,21
176:1,4,6,19,24
177:17,23
178:2,4,14
179:15 180:18,
23 181:2,10
182:10 183:7
184:11,16,20
185:20,25
186:15,17
187:9,19 191:2,

8,15 194:9,18
196:18,22,23
199:9,14,15

photograph
107:14 109:6,
12,18 187:25
194:5

photographed
158:14,16

photographic
31:16 40:4

photographs
148:9 166:5,6
178:1 198:9,10,
11,20

photos 13:8
37:12 42:10,22
43:12,20 58:16,
22 59:3,5,7,10,
11,13,15,17,25
60:6,11 61:2
62:6,7,11,20
64:20 65:2,4,5,
9,15,17 66:3,7,
13,22,24 78:18
88:25 89:11,12
106:9,13 107:4,
16,24 108:13,
20 146:3,13
147:14,16,20,
21,24,25
148:13,14,22,
24 149:2,7
150:11,18
153:6,7,9
154:9,21
157:23 158:1,
24 159:5,7,11,
19 160:1,8,17
161:21 162:4,
24 163:4,10,18
164:9,22
166:25 167:18
168:1 169:2,7
177:6,23 178:7,
10,12,15,22
179:6 183:7
184:23 186:7
189:23 190:3,
10,14,19
193:11,20
195:19,20
196:16 197:3,8,

11 198:12,16,
20 199:2,5,6,7,
17,18

phrase 45:4

physical 27:8
45:18 49:3,24
105:17 107:11,
13,15 108:24
169:3 177:5
184:17,22
206:7 210:4
212:20

physically
45:20 184:11

pick 22:5 23:5
52:25 55:9,24
62:22 72:5 75:1
101:23 102:17,
19 111:15,16
161:3 223:8

picked 74:24
97:23 121:21
165:11 191:15

picks 53:8
165:3

picture 87:12
110:21 149:9
153:17,20
155:15,17
162:12 164:14
175:9 180:3,5,
6,8,14,15 183:2
187:17 195:1

pictures 13:8
60:5 65:24
165:1 176:17
180:16,25
181:3 184:3

piece 263:13

pieces 169:3

pinpointed
204:15

pipe 212:16

place 197:24
198:1 206:20
278:23

plaintiff 7:20
9:1 285:7

Plaintiff's 7:18

plan 29:12

play 154:4
155:1

played 217:18

playing 52:4

point 11:22
19:8 22:1 23:7
37:10 44:23
52:18 60:18
63:4 83:5,24
86:11 99:18
109:2,3 114:3
117:11 124:21
125:11 126:5
149:21 165:14
221:9,14,21
227:17 229:12
230:16 238:20
243:24 244:9,
17 269:16

pointing 69:6

points 49:4

Polaroid
196:22

police 7:12
19:1,3,15
35:17,21 38:8
56:9 64:20
79:4,6 93:15,20
144:24 168:1
199:24 201:3
202:12,15,19
211:6 212:5
220:4 235:15
241:5,14 251:7,
18 252:10,18
253:2,4,10
267:17 280:5
283:16,23

police-related
26:17

policing 79:5

policy 21:10

ponytail
170:15,22
171:5,10,14
172:1,3,5



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 314 of 326 PageID #:7284
The Deposition of ANTHONY WORD, taken on June 20, 2023

312

Pookie 60:12, 14 105:16

poor 245:6

pop 80:7

portal 109:25

portion 277:18

portions 222:18

position 19:14 194:20,22 280:18

positioned 194:6

positive 46:23 47:20,22 48:14, 18 57:22 85:24 100:11,17 108:21 191:12, 17 192:22,23, 24 193:5,6,7

positively 47:12 192:2,8, 17 271:2

possession 221:10 270:3, 17,25

possibilities 182:1

possibility 94:23

possibly 47:3 75:19 98:7 115:23 132:13, 21,22 133:8,9 147:22 157:14 196:18 242:23 262:22

post 142:19 227:14 231:13 273:15

post-conviction 13:14 235:8,22 236:2 238:21 239:23 240:10 279:15

potential 22:21

26:6 27:7 76:7 111:13 124:24 142:16

potentially 10:13

Potomac 60:13,14

pouch 72:5 74:24 75:2

pounding 48:11

pounds 44:10

power 144:8

practice 21:10 104:5 136:24 182:24 183:6 190:13

practices 153:22 182:14

pre 261:5

pre-automated 70:2

pre-coffee 261:5

pre-cris 70:1

predated 86:14 87:8 113:22 119:23

predating 117:15

preface 248:21,25

preliminarily 12:1

preliminary 206:10

preparation 13:1,18 15:11 16:5,9,14 17:23 135:21 139:24 140:8 189:11 228:15

prepare 12:18 15:19 269:9,22

prepared

204:3,7 226:15 227:8 228:12 229:24 242:16 262:6,16 264:4 269:13,17,18 281:13

preparing 14:19

preponderance 212:20

present 32:17, 19 33:14 41:16 148:24 192:6 232:13 241:10, 12 259:16

presented 39:7 216:22 240:8,9 241:8

presenting 263:14 279:15

preservation 225:24

preserve 108:13 109:20 223:2,3 224:14 225:9 226:2 276:7 277:2,6 278:1,7

preserved 271:15 272:13 278:4,9,13

preserving 109:19

pretty 73:24 77:12 89:18 102:9 156:7 173:21 178:5,7 211:25 223:6 228:12

prevent 12:4,8, 14 155:8

prevented 186:6

previous 86:25

previously 151:8 152:16, 18,22

priest 34:16

print 61:20 65:17 86:6 100:14,16 123:7

printed 63:23 86:7 100:12 120:1,3,10 123:2

printout 77:6 81:5 84:14,15 86:5,10 88:6 100:5

printouts 98:25

prior 10:15 24:15 38:3 57:20 60:22 62:16 85:4 86:25 97:12 103:11 120:16 139:17 146:16 152:3,18,22 153:20 154:18, 19 161:14 183:20 190:14 202:23 206:24 207:14 212:11 220:11 227:15 230:6 231:1,13 241:11 244:11 255:15 256:8 259:25 261:12 262:24 263:22, 25 264:9 269:16 272:5

prison 50:20 147:2

privilege 18:14

probable 95:8 114:21,23 115:1,4,21 119:5,19 121:16,18,19 123:24 124:5, 10,13,17,21 125:11,14,24 128:18,21

problem 117:6 165:24 194:13 229:13

priest 34:16

problematic 164:9,20 178:25

procedure 41:21 45:3,7 57:21 103:19 106:23 111:22

procedures 35:18,23 46:6 148:21 241:4

proceed 29:12 32:22 33:14 242:11

proceedings 7:1 13:14

process 25:8 134:5 237:8 262:4

processed 156:18 157:3

produced 168:18,22 235:15 237:23, 25 238:2 247:2, 4 249:3 279:24 280:1,4,6,19 281:1,4,12,16

production 282:8

profession 36:17 37:6

Professional 208:20

profiles 176:12

progress 96:6 131:13 221:10 256:25

progressed 52:12

promise 144:4

proper 114:15 135:11 204:3 219:13 248:6

properly 137:18 204:22 219:6 245:9



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

property 209:16

prosecuted 144:13

prosecution 145:4

prosecutor 243:1,22 244:10 245:13 247:25

prosecutor's 243:21 244:15

prosecutors 39:8 242:23

protect 204:2

protecting 204:11

protested 219:3

provide 142:25 242:14 243:4,6

provided 128:7 130:24 206:15 216:20 264:3 273:7 274:11,12

proving 190:14

proximity 186:20

public 22:9 148:8,10 215:15,17

Puerto 187:3

Pugh 82:18

pull 59:10,25 60:15,19,25 63:2,3,18 66:7, 12 73:19 78:18 79:11,13 90:9, 11 99:4 129:21 146:2,13 164:4 170:18 198:12, 15

pulled 34:25 77:18 79:8 160:17 164:18 166:17 168:15

207:24

pulling 54:10 55:15 63:1 76:15 101:10 166:19 186:7 228:24

punching 99:23 119:14

punitive 201:21

purchase 281:23

purpose 10:21

purposes 14:19 59:2 60:23 100:19 116:4 137:17 148:20 241:6,7 272:4

pursuant 250:21

put 41:18 49:9 50:1,19 51:16 54:8 57:2,5 61:8 62:9,15 67:3 71:8,15 73:14 76:11 82:25 88:6,9 90:7 91:1,19 92:4,11 93:6 95:6,14 99:5 102:5 104:4,25 110:16,21 112:19 113:2,5 114:24 118:9, 12 119:11,20, 24 120:1 121:23 122:16, 19 126:3 129:11,20 130:9,17 131:6 137:25 141:13 150:5 187:10 195:10 204:19 215:13 217:9 219:18,20 222:14 223:9 227:3 229:4 273:18 275:2

putting 34:4 35:24 53:13

54:22 60:18 62:14 76:5 96:21 99:23 124:20 128:8 148:16 177:13 201:22 224:17 274:13

_____

Q

quality 177:6

question 11:1, 4,15,16,18,19, 23 12:2 15:9 16:5 18:18 30:1 38:13 39:5 72:19 85:7 124:20 139:19 155:14 170:25 180:4,5,7,12 182:20 187:15 198:5 201:12, 16 202:4,8 236:5,9,12,18 238:16 239:22 248:20 249:15 253:7 255:17, 19 256:7,8,19 259:24 260:5, 11 270:23 275:1,25 276:2, 20 282:8 283:20

question-and-answer 10:17

questioned 224:12

questioning 94:18,21,24 95:18 113:4 114:25 119:18 123:25 124:2,6 125:16,18 126:1 150:5

questionings 117:15

questions 10:18,20 11:25 12:4,9,12,15 15:1 44:8,12 201:18 237:14, 17 239:21

242:15,17 243:7 280:12, 22 281:7,18 282:2,12,16 284:15,19

quick 126:10, 11,12,14

quickest 61:6

quickly 72:11 73:25 76:5 173:21 222:7

quotes 267:18

quoting 48:1

_____

R

R/det 136:8

race 49:21 168:9 187:1

raise 9:7 39:20 40:25

RAMIS 85:17, 18 98:21,24 99:3,11,12,15 100:1,6,9,17 101:3

ran 59:13 92:5 100:2 101:3 104:25 105:1 114:14 163:22

range 38:21

rap 67:16 68:3 156:3 157:25

rape 73:1

Rare 26:11

rarity 138:15

Ray 136:4,5

Raymond 7:11

RC 214:11

RDET 128:13

re- 233:11

re-interview 28:7 122:14

re-interviewed 97:5

re-looked 26:25

reaching 208:21

reactive 212:14

read 101:19 103:1 123:22 139:10 140:2 142:10 166:18 167:7 182:6 183:11 192:5 210:18 225:4 239:13,16 275:23,24 277:5

reading 102:25 111:11 152:8 161:22

reads 136:7 191:14

ready 127:3 243:6

real 66:5 114:8 154:3,19,25 281:10

real-world 153:23

reality 30:21 183:18

realized 99:18, 22

reason 22:4 33:11 51:9 80:14 95:21 103:9 141:11 158:24 160:16 163:15,22 164:3 211:13 221:25 226:13 234:7 240:17 259:6 260:9 267:1,10 268:1 269:10 274:21

reasonable 213:18



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

reasons 18:11
28:1 79:12,18
142:21

recall 12:17
17:25 18:23
20:8 31:9
35:14,16,20
36:6,9,15 37:19
40:21 89:2 98:3
107:18 109:12
117:10 188:15,
19,23 189:2
190:12,19,21,
25 191:6 192:4
203:12 205:12
206:1 207:8
210:22 215:9
219:24 220:13,
18 228:20
229:3,21 230:5,
6,22 231:24
232:5,9,20
233:7 240:17
248:2 253:21,
24 254:6,22,25
255:19,21
256:18,20
257:8,15 258:6,
10 260:14,20
261:1 262:17,
22 265:13,14
266:2 272:20
274:4

receipt 133:16

receive 16:24
18:21 61:9
133:25 206:5

received 16:23
21:8 22:17
75:22 110:10
131:3 203:18
219:11 234:3
235:4 239:16
262:14 283:10

receives
133:16

receiving
82:22,23

recent 17:21
66:17

recently
158:13

recognition
261:17

recognize
43:19 132:9
149:24 174:6

recollection
19:11,13,19
38:2 63:11
85:11 100:8
132:12 136:21
226:7 255:20
262:7 263:23
264:1,8 274:24

recommend
213:18

recommendati
on 206:11
207:10

recommendati
ons 283:25

recommended
207:6 213:25

recommends
278:22 282:19

record 7:2 8:21
9:16 10:9 58:7,
10,11,12 59:12
64:5 69:13,17,
21 70:3,8 80:9,
11 84:14 89:14
92:13 93:1,14
95:10 96:23
101:14 113:3
114:1 126:3,18,
21,22,23
156:22 167:12
195:14,15,16
201:6,8,9,10
247:1 249:24,
25 250:1,2
280:24 285:1,
12

recorded 8:1,
2,9 80:12 152:6

recording 8:4,
11 128:13

records 77:9,
11,14,16,18
78:7,14 83:9,
21,22,24,25

84:6 85:15,24
89:21 145:23
146:2,12
157:22 198:17
205:25 206:2
251:4

recovered
204:1

recreate
226:13,22
232:16 261:7,
19 266:1

recreated
227:9 230:3,4,
14 254:19
255:12 257:4
258:23 261:8
265:24

recreating
229:17

red 104:24
211:6

redact 163:19
168:20

redacted
168:12,24

redactions
166:16

reduced
213:23 216:11

reemployment
278:25

reexamine
26:4

reexamining
24:24 26:6

refer 136:19,25

reference 42:3
78:23 145:25
196:6

referenced
61:1 238:22

references
136:8 146:8

referencing
81:9

referred 108:8

refers 136:9
259:4

reflect 118:11
251:4

reflected 98:4
188:14,18,22
189:1 190:20
191:5 205:11
217:6 228:4

reflects 134:20
270:16

refreshes 35:7

refuse 242:17

refused
240:18,19
241:21 242:6,
18 243:23

regard 94:19
143:2 191:8
238:18 253:4,5

regarded
227:25 256:19
276:20

register
202:25 252:11

regular 29:10
190:17

regulations
278:20

reinvestigated
26:24

reinvestigatin
g 21:4

reject 123:22
124:7

relate 256:25

related 94:11
145:12 205:23
206:6 209:16
236:21 255:17
259:22 276:13
283:18,24

relating
268:20,22

relationship
31:18 103:15
104:5 151:11

released
145:19

relevant 45:6
182:22 201:24

reliability
35:13,18,22
36:1 38:11
40:12,19

reliable 41:22

remain 21:18
214:3 215:3
244:17 245:1
250:15,17,21,
23,25

remained
215:2

remaining
226:1

remains 22:11
250:20

remember
19:21 24:8
25:11 31:3,9,17
32:6,25 34:24
35:1 40:5 42:2
48:15 66:14,20
76:4 85:3,15
87:11 90:13,20
99:9,11 100:11
109:14 118:13
120:18 121:17
139:10,12,13
140:16 204:8
224:5 229:7
231:12 254:17
255:4 264:6
266:13,15

remembered
27:16

remembers
31:5

remembrance
264:8

reminded 19:2
25:15



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

reminds 77:14

remotely 8:17

removed 22:25

renew 122:6, 10,14

renter 206:18 210:20

repeat 40:15 45:4 202:6,8 253:7 284:17 285:6

rephrase 11:16

replaced 269:6

report 12:20, 21,23 16:22 18:9 41:13 67:8 68:5,21 70:9,17 77:14 79:3,7 83:9,15 96:6 98:6,7 100:4,9 120:12 135:17, 24 136:1,4,8, 12,14,18,20,24 139:7,20,24 140:5,7,9,25 141:13 147:7 150:23 151:3, 21 153:13 155:24 160:16 161:11,22 162:2 163:8 164:6 165:20 166:10 169:21 170:2,19 183:21 188:8 189:6,10,14,15, 17,20 190:6,10, 14 191:8,11,25 192:20 203:25 204:3,7,19,24 205:6,13 209:1 213:2 215:4,9 222:6,18 225:18,19 228:3,9,15 229:6 231:13 234:22 235:3 238:11 253:14 259:14 261:9, 13 264:24

265:25 268:5,6, 7 271:1 273:16 277:11 278:24 279:9 280:17, 19 282:13

reported 151:5

reporter 7:2,4 8:6,8,13,15,19 9:2,6,12,20,25 10:19 11:13 58:7,10,12 64:1,4 76:21,25 126:21,23 143:4,7 195:14, 16 201:8,10 249:24 250:2 284:17,21,25 285:4,6,8,11

Reporters 7:5

reporting 85:19 99:17 136:3,5,9 137:17 142:4 145:22 189:15, 21 257:3

reports 19:22, 25 20:2,16,17, 21 73:8 99:4,24 131:14 136:7 137:10 140:16 219:14 221:7, 10 222:1,17 223:10 225:12 226:5,10 232:16 256:25 263:24 264:17, 21 266:1 271:14 272:9 273:3,5,17 274:5 276:10

represent 7:23 184:21 280:24 281:3,22

representation 162:18 280:15 281:13

representing 7:4 247:11

reprimand 203:17,19,20 205:3,19

244:23

reprimanded 203:16 205:1

request 61:8 64:20 65:1,3,12 66:25 68:20,25 69:20,25 70:5, 7,15,21,24 71:3,4 72:1,2 74:13 75:17,19, 25 89:12 91:13, 14,19 93:15 101:12,14 115:9 118:1 121:4,11,12 122:19 127:24 198:11 204:13 240:15

requested 22:23 65:9 108:19 116:14 120:4 128:3 157:15 159:7, 11 190:19 218:18 221:2,3 227:18 228:11 243:4

requesting 66:1 69:12,17

requests 71:20

required 48:17

rescind 282:20

rescinded 282:22 283:5

research 22:20

reserve 284:16,18,19

residence 142:18 145:11

resident 144:10

resolved 24:10

resort 59:15

respect 270:13

respond

104:22 243:12, 13,14

responded 265:18

responding 104:22 212:6 263:8

response 69:25 73:24 212:1 240:21

rest 56:5 243:17

restrictions 77:15

resubmit 124:10

result 37:23 57:20 106:20 250:18

resulted 13:15 106:24 109:4 111:19

results 72:21 73:15 237:2

retire 199:25 200:9 243:24 245:8 252:16

retired 24:12, 18 129:16 199:24 200:16, 18,19,21 202:16 219:25 251:15,22 252:2

retirement 243:25 251:5, 23 252:3 282:20,21,22 283:2,3,10

return 232:12

returning 220:17

revealed 142:19

reveals 115:10

reverse 214:24

review 12:25 13:3,5,8,10,13 17:4 41:15 97:11,12 98:5 121:14 122:1 124:14 129:13 137:15 138:13 143:22,23 150:23 155:6 190:22 207:2,3, 15 214:7,22 216:18,25 217:8 222:11 227:24 228:2,6, 13 231:4 241:11 261:24, 25 262:24 263:1,18 265:18 269:10

reviewed 12:20 16:21 17:5,7,22 97:18,19,24 135:21 137:9 139:23 140:9, 12 189:11 190:10,13 216:22 228:14 230:7 236:6,14 262:15,20 263:24,25

reviewing 44:21 140:4,7, 24

reviews 134:7

revisited 27:14

rewrite 226:9, 22 260:3,13 261:7

rewriting 229:17,19

rewritten 231:7 271:13

rewrote 231:19 260:22,24 263:1,18

RFC 207:21,23 208:2

Rican 187:3



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273** Phone
**502.584.0119** Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 318 of 326 PageID #:7288
The Deposition of ANTHONY WOOD, taken on June 20, 2023
316

ridiculous
277:16 279:17

right-hand
80:18

rights 37:1
241:17 244:8

Rinda 209:8
211:23

road 122:18
265:19

robbed 192:10
193:9

robbery 101:6
110:13 146:22

Robert 253:16,
22,25 254:4

Rogers 67:17
68:8,9,10,11
92:4 93:25
94:9,14 112:1,
8,9,19 113:4
114:6,7,13
116:11 117:1,3
124:24 142:1,3,
9,11 143:12
144:1,4 145:1,2
146:23 147:4
148:16 149:13,
25 153:11
155:11 161:19
163:25 164:7,
21 165:16,22
176:22 188:11

Rogers' 112:9
143:20,21,22

Rogers's
70:16

role 198:5
217:13

roll 25:15

room 196:24
211:22

routine 158:9

rows 177:13

Roy 233:20

Roy's 233:20
234:13

Ruckrich
214:5,7,8

Rule 205:9,10,
13 208:22
209:5 214:25

ruled 244:25

rules 10:7
60:16 278:19
282:5

ruling 250:19

run 26:15
37:15,16 70:7
72:15,17 77:22
79:22 82:19
83:15 84:1,5
85:20,23 86:20
89:14 90:2,14,
15,16,23
101:13 222:24
223:5 225:4,14
233:19 261:17

running 37:13
80:16 84:10
86:16 89:13
105:2 211:24,
25 212:2,4

runs 44:9
87:18

Rutherford
98:10,14 108:8
110:20

———————

S

safe 33:8

safer 150:10

safety 204:13

salvage 226:6

sat 16:12 21:22
173:15 228:8
231:16 236:25
245:4,11 264:2

saturated
222:25 223:7,
15 225:5

Saturday
209:6 211:14,
17

save 225:25

scan 220:13,15

scanned 97:23

scenario
182:24 197:9

scene 26:11
170:1 171:13
172:4 217:16,
18 220:7
227:20 254:17
266:18 272:25

scenes 26:12

Schalk 7:11
20:18,20 92:20,
21 94:15
114:17 117:2,
17 118:3,9,19
119:10 121:5,
14,23 124:24
128:5 132:13
133:4 134:19
136:4,5,15
138:17 139:2
160:17 179:5
189:16,17,19,
24 193:4

Schalk's
132:11,14,19
133:10 191:10

scheduling
14:17

school 33:7
34:23

scientific
27:10 38:5

scientist 34:11
40:3

scrape 221:22

screamed
48:16

screen 63:17
64:11 69:5
76:14 90:1,6
100:7,14,15,16,
17 127:9 156:7
166:19 168:16,
23 173:2,5
208:8,9 213:1

screening
85:21

scribble 90:6
233:12,13

search 78:19
79:10 80:6
82:13 83:7,15,
19 84:14,21
85:8,14 86:6

searchable
80:3,4 129:23
138:1

searched 78:5
85:6 87:9
146:18 186:10

searching
17:19 78:14
85:1 154:16

seasoned
137:9 138:17
139:2

seat 38:22,23

seated 45:11,
13 50:14

secondarily
154:4 241:16

seconds 39:18
40:24

Secretary
84:23 90:15

section 61:3
65:8 68:18,22,
24 69:19,20,24
70:23 71:16,18,
19 72:25 73:5,
23 75:12 90:9
101:12 132:4,
18 133:2
141:25 156:18
157:21 161:10
168:2 170:6
197:11 198:7,8,
17,19,22,24
199:2 245:22,
23 246:9,13
254:8 256:24
266:7,8 270:9

Security
168:21

seeking
123:11

select 62:19

self-defense
210:9 212:13

self-
incrimination
250:9,14,25

semi-truck
266:18,20

send 61:10
65:3,7,8,9,13,
14,15,16,18,25
66:17,22 67:2
70:5 72:10
75:22 135:8
156:18 157:21,
22 190:17
198:12 208:8
243:15 244:25

sending 66:21
69:14,24
197:11,12

sends 199:15,
17

sense 81:16
119:10 129:24
274:13,17

sentence
147:15 191:14,
17 248:12
249:6 255:7
256:15,18
260:22 261:24
265:5,16
267:24 271:4
274:16 276:24
277:4

separate 14:15
37:4 83:25
121:6 266:23

separately
58:3

separation
83:23

separations
81:19

September



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 319 of 326 PageID #:7289
The Deposition of ANTHONY WOOD, taken on June 20, 2023
317

268:17 271:9 272:19

sequence 82:3,10

sergeant 17:8 20:3,8 22:6 23:12 27:2 33:18 40:11 42:7 65:22 99:12 120:15 121:3,10,11,17, 19,24 122:1,7, 20 123:14,17, 19 124:3 129:13 130:17 131:21 132:2 133:16 134:6,7, 21 135:3 138:7 212:6 217:22, 23 220:24 222:17

sergeant's 133:23

sergeants 90:18

series 195:19 196:16

served 116:4

service 200:5, 7,9

session 10:17 250:20

set 11:25 14:7 29:16 49:3 74:18 112:1,8 125:9 196:15 262:9

sets 162:24

setting 227:21 230:25 231:1 269:14

settle 32:14

seven-person 167:13

sex 168:9

sexual 32:2 45:14 95:12 138:12

sexually 34:15

sharp 39:24 99:21

shaved 52:17 53:10,12

shaven 53:21

she'd 151:19

Sheenee 150:25 152:25 155:12 161:15 188:21 192:7

sheet 67:16 68:3 112:12 156:3 157:25

shenanigans 244:12

sheriff 144:24

Sheriff's 142:20 144:22

shielding 27:21

shirt 49:15,18, 19 51:13,15,16

shirts 51:17

shit 245:7

shock 32:13

shoes 104:25 195:2

shoot 61:15

shooter 39:19

shooting 26:18 40:7 104:21 105:4, 15,16 152:19 160:9 217:11 231:21 236:21 254:16,20 260:6 267:19 270:15 272:25 276:9 277:1,2, 3,7 283:25

shooting.' 259:24

short 14:5,16 15:21 50:11,12

52:2,18 53:8, 22,23 54:4,8 102:7 175:2,4,5 200:2,3 217:16, 17 232:18 233:1,5,7 234:10 264:19, 22

short-haired 53:25

shorter 54:13

shortly 104:16 264:17

shot 28:19 38:16 105:13 192:10 193:9 255:9,13 256:12,14

shots 104:22 232:4 255:11 256:1,2

show 42:22 60:3,9 63:16 64:11 67:3 74:5 76:13 84:12 92:6 95:22 103:5 106:2 108:11 111:4 123:8 127:5 131:7 135:15 141:18 150:9, 10,18 152:9 154:9 155:25 166:5,14 169:19 173:1 227:9

show-up 101:17,21,25 102:3,9,12 103:2 104:11, 12,13,14,15 105:10 106:2, 16 111:14

show-ups 104:19 105:25 106:1

showed 42:10 103:2 106:13, 17 107:22 110:14,21 155:15 161:18

162:13 163:23 164:21 179:21 181:18 184:24 212:7

showing 37:12 42:23 43:11 60:8 64:18 67:4 91:9 96:4 100:4,14 102:14 112:22 113:6 131:10 155:17 156:1 163:18 165:1 177:13 181:10 193:14 195:17 206:17 207:19, 20 213:1 214:9, 11 235:5 279:19,24

shown 42:15 57:24 58:1 101:17 102:15 106:9 107:21 108:23 150:2 161:19 162:4 176:23 183:12 217:7 235:22 259:18,21

shows 152:8 189:18

shy 200:4

sic 7:5 188:12

side 67:4 76:12 91:2 113:6 131:6 217:10 284:24

sighting 155:3

sightings 154:19

sign 133:9,25

signature 119:17 120:24 126:2 133:23 214:6,8 235:6 238:6 247:10, 12 257:3 284:16,19,20

signatures 131:18 133:22 240:6

signed 98:2 145:7 228:18 238:5 271:14 272:8,11

signing 240:7

signs 133:17 134:7

silent 244:17 245:1 250:15, 17,21,23,25

similar 10:15 46:24 47:3 53:5 54:2,7 55:5 56:12 70:11 85:8 116:4 123:15 127:15 148:13 163:5 178:5,7,11,15 180:25 181:3 191:16 193:5 235:9 236:16 240:9

similarly 11:7, 18 45:22 51:24 55:7

simple 279:11

simply 185:9

single 68:13 103:21 106:2 150:9 151:25

sir 18:18 212:25 234:25

sit 52:3 63:14 73:11 87:15 97:17 118:25 123:20 139:14, 15 223:25 239:13 240:12, 15 241:22,25 242:6 244:20 253:23 254:5, 23 256:20 275:7

site 148:4 153:18 239:25 240:2,3

sitting 36:7,21 153:24 200:15 233:9 237:11



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

244:9 247:23 257:9 265:15 266:4 274:3

situation 33:13 40:22 47:9 56:19,22 162:7

six-person 186:2

skip 8:22 19:1

skipped 134:16

slightly 116:4 167:6

slim 170:13

slip 98:2

slipped 262:21

small 156:7

so-and-so 56:25 262:10

soaked 221:19

Social 168:21

soiled 228:1

solemnly 9:8

solve 24:4

solving 22:17

somebody's 50:6 279:14

sooner 180:14

Sorrell 19:9,16 58:15 59:1 128:15 133:10 135:25 140:1,5, 10,24 169:11, 13 172:16 173:12 174:7 175:18 191:4 192:11 193:9

Sorrell's 143:18

sort 14:16 21:11,13 56:20 196:22 232:8 282:12

SOS 99:11

sound 109:7

Soundex 84:23

sounds 17:13 27:3,7 104:7 132:25 133:1 207:9 272:6

source 61:6

space 224:1

speak 22:13 45:16,19,25 91:21,25 94:19 114:18 115:3, 24 129:1 144:1 161:17 183:21 216:20 227:18 228:1 260:15 267:7

speaking 24:22 116:25 269:8

special 242:22 243:1,20,21 244:10,15 245:13 246:3, 14 247:24 250:19 257:23 258:13,15,17

specific 25:11 35:14 36:20 38:14 70:8,9 87:17 88:24 91:24 95:1 111:15 138:7 162:16 227:7 262:7

specifically 14:18 35:20 36:6,15 37:19 40:21 78:13 110:14 155:20, 24 157:2 160:20 185:21 201:25 205:12 227:5 228:17, 20 229:10,21 231:24 238:20 239:3 255:21 260:7 265:14 267:19 272:21

specificity 63:7 266:3 270:22 276:19

speculate 160:25

speculating 163:21

speed 137:14

spell 9:16

spelling 138:21

spend 139:5 208:10

spending 137:13

spent 10:4 147:1

spill 265:24

spilled 221:25 222:2,25 223:10,14 224:9,24 261:15 264:12 276:12

spin 271:19

splitting 176:21

spoke 13:19 14:1,6,25 112:25 218:3 220:25 260:17 263:22 264:8, 10 269:5

spoken 116:6 150:17 152:13 260:18

spread 42:15 43:2 60:15 103:16 107:21 108:25 111:15 184:11,16

spreads 107:20

spur 35:4

stage 89:12

stairs 211:7

stamp 69:6 70:13 71:4,8,9, 15 112:23 156:12,21,22 157:5 167:5

stamped 71:2 156:17 166:24 207:23 281:23

stamping 70:22

stamps 166:19 238:1

stand 50:23 51:3 54:19 57:11 183:10 218:6,14 219:6, 14 221:1 222:8, 13 234:5 268:8 272:5

standard 178:3

Standards 208:20

standing 55:2 109:19 222:8

stands 256:9

star 131:23 226:18 257:2 272:12 282:21, 22 283:3,11

start 9:22 16:12 24:10 30:13 38:20 81:12 82:7 114:5 131:17 151:2 208:9

started 19:3 24:9 62:14 87:3 129:11

starting 7:18 82:5

state 7:16 9:15 29:16,17 36:20 39:12 45:12 73:1 75:9 76:1 84:23 90:16 103:13 105:21

110:15 111:23 122:16 153:13 155:16 157:2 160:20 183:20 196:3 197:18 238:5 241:17 255:2 260:17 262:7 264:9 281:21

state's 44:20, 24 47:7,21 143:10,25 144:7,13,17 166:17 168:19 191:23 218:11 219:16 272:1

stated 36:18 47:25 49:7,13 65:11 108:22 112:6,8 143:24 148:1 151:7,13 152:16 153:14 154:5 155:2,13, 20,23 160:25 161:24 191:15 193:3,8 210:7 239:23 255:8 256:21 260:8 261:12 262:3 267:8 270:20 271:22 273:24 277:25 283:12

statement 143:17 213:14 246:6,17,18 248:15 251:8, 11 255:10,18, 22,25 256:2 257:25 266:21 270:18 271:3 277:13

statements 188:13 221:12, 16 276:8

states 142:17 215:1 241:18 276:24 279:16

stating 125:8 151:14 171:22 179:18 204:10 242:24 254:25 255:5 260:15, 16 269:18



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

271:2 273:21

status 120:16, 17

statute 21:19, 23

stay 21:13 200:11,12 216:5

stayed 216:11

staying 200:11

Stefanich 7:22 8:7,13,14,24 9:4,19 10:1 14:21 15:2,4,7, 14,17 16:1,16 18:13 19:17 20:23 21:15 29:1,25 30:17 36:4,13 58:8 63:20,23 64:3, 13 67:10,13,15, 18 79:16 84:17 91:7 96:2 101:18 102:1 107:6 108:15 110:6 113:12, 14 125:1,20 126:16 143:3,5 148:25 150:20 152:2 158:4 159:21 160:11 164:23 166:21 171:6,20 172:17 173:1, 13 174:9,16 178:16 179:1 181:14 182:12 185:12,18 186:19 187:22 195:22 201:4, 14 202:3 203:1 215:7 221:17 222:3 225:1 230:15 234:18 236:8 239:1,5, 7,11 249:17 252:6,13 254:21 255:14 256:6 257:7,18 258:1 261:11 263:3 264:15 267:4 268:3 273:9 276:16

278:10 279:3 280:8,12,21 281:6,17 282:1, 5,15,23 284:16, 18 285:8,10

step 19:2

stipulate 8:24

stipulated 8:21 9:1,5 161:19

stood 224:13

stop 91:12,14, 15,19 92:6,10, 14,15,16,20,24 93:1,6,14,25 94:4,8,9,13 95:7,10,15 105:3 112:17, 19,22 113:3,22, 23 114:1 116:3 117:2,7,9,11, 13,25 118:2,6, 15,17,21 119:2, 11,16,22 120:20,23 122:25 124:22 126:1,3

stopped 92:5 114:7 115:17 121:21

stops 85:21 87:22 93:3

storage 26:5

straight 176:23

strain 156:11

stranger 40:22,23,24 41:4,21,25

strangers 40:14,20

street 7:6 35:6 56:7 92:5 102:3 114:7,13 121:21 204:1, 18 217:24 218:12

strike 27:3 35:16,24 42:6

47:15 103:18 132:8 147:18 156:22 190:22 192:24 212:14, 15 252:9 256:1 272:16,17 283:15

strings 195:8

stroke 117:21 118:24

stronger 53:9 54:12 165:9 169:18

struck 209:9, 22 210:8 212:1, 13

stuck 76:19

stuff 26:7 59:23 83:24 85:24 87:19,23 90:17 100:1 184:1 262:15

style 51:13

subject 33:20 34:7 98:11 105:8 124:1 192:9 251:6,17 283:5

subjected 27:9

subjects 199:22

submission 214:14 231:13

submit 121:25 123:16 124:9 218:15 219:7, 13,14 220:5

submitted 20:17,18 119:16 122:17 133:14,15 134:21 136:4, 14 138:6,9 189:14,16 214:23 215:11 219:9 264:18, 24 272:2 273:17

submitting 29:14 273:16, 20

subpoena 237:6 240:16, 19,21,22,25 243:3,11,23 245:15 246:5, 17 247:25 248:9,15 249:8, 12 250:5

subpoenaed 236:22 237:11 240:15 243:25

subpoenaing 217:24 237:4 238:25

subsequent 213:2 216:13, 14 217:17

subsequently 216:15 246:10

substantiated 137:20

suggest 42:20 197:24 280:14, 17

suggested 163:1

suggesting 49:12 282:12

suggestive 42:11,12 48:20, 21 50:16 51:4 55:15 56:13 166:9 167:22 187:13,19

suggests 149:5

suit 50:21

suits 169:18

summary 201:23 215:4 234:21 235:10 238:11

summoned 207:13,14

summons 206:13

Sunday 233:2

sunny 41:9

superintenden t 214:5 219:22

superintenden t's 218:23

superiors 213:13

supervising 23:7 26:20 33:18 42:7

supervision 272:23

supervisor 12:21,22 20:12 35:12 38:10 40:18 214:21

supp 12:23 16:21 17:7,20 96:22 97:3,5, 24,25 151:6 171:13 172:4 227:4 228:15, 19,22,24 229:6, 13,15 261:3,19, 20

supplemental 271:1

supplementar y 12:20 18:9 169:21 170:2

supplied 206:2,24

supply 244:7, 14 262:19,20

supposed 74:25 75:2 242:4 252:20

suppressed 31:2

supps 233:23

surgery 220:12,14,15 231:14,18

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

surmise 83:6

surprised 192:17

surrender 216:8

suspect 24:21 25:1 28:8 31:7 37:15 41:9 42:14 43:5,10, 13 49:16 51:13, 14 52:1,8,15,25 53:3,15,16 54:16,19,25 55:7,9,22,24,25 57:2 79:20 91:17 95:4,6,20 103:20 111:13 125:18,23 126:5 148:22, 24 153:1 163:5 187:20

suspects 29:7 36:3 40:13

suspend 244:23

suspension 205:2,20 206:6 207:1,7,11,14 213:20,23 216:3,5

suspicious 38:25 277:4

sustained 202:24 203:5, 10,16 205:23 206:3,12,25 207:3,4,5,17 208:21 209:4, 13,14 213:17 214:3,24 215:10 217:1,3, 7

sustaining 215:21

Svec 266:8,9, 10,11,17,19,22 267:2,24 268:2, 7,8,17,19,22 272:24 273:3,5, 8,19,22 274:11,

14,17,19,22 275:2,9,12 276:14 277:20

Svec's 269:25 276:22

Swaminathan 7:19,20 8:3,12 9:1,5,14 10:2 15:8 16:3,19 18:16 19:23 21:2,25 29:5 30:10 33:16 36:8,22 58:13 63:16,22,24 64:6,9,14 67:7, 12,14,16,19 76:11,23 77:1 80:17 84:12,18 91:1,8 95:25 96:3 101:24 102:22 108:5 109:1 110:25 113:5,9,13,16 125:13 126:7,9, 18,24 127:8 131:5,9 135:14, 19 143:19 149:4 151:1 152:10 158:8 159:22 160:14 165:13 166:12, 22 167:10,15 169:25 171:11 172:7,19 173:4, 19 174:11,18 178:20 179:4 182:2 183:5 185:14,16 186:5 187:14 188:1 189:7 193:10,13 195:10,17,23 201:7,11,20 202:5,7,10 203:4 208:3 215:23 221:24 222:20 225:11 230:18 234:14, 19,20 236:10, 11 239:12 245:16 249:19 250:3 252:8 253:1 255:6,24 256:10 257:12, 19 258:3

261:22 263:16 264:25 267:12 268:15 273:12 276:21 278:15 279:18 280:13, 23 281:9,20,25 282:4,7,17 283:13 284:14, 22 285:2,3,5,7

swear 9:8

swung 224:18

system 37:9 58:17 59:9 61:21 62:2,8,9, 12,19 63:12 64:7 73:18,21 77:19,23 78:17 79:13 85:4,19 86:1,10,12,13, 14 87:7,8,13 88:23 89:23 90:19 93:8,16 117:14,25 118:6,10,16 119:2,22,23 120:25 122:5,8, 22 123:7,16,17 129:17 138:6 146:1,11,12 159:3

---

T

tact 59:18 93:24

takes 87:2

taking 10:19 12:7,10,14 28:4 158:25 244:10

talk 10:22 25:14 31:9 57:19 91:17 93:22 94:1 115:11,17 124:6 125:12 139:15 237:17, 18

talked 15:19 30:23 58:19 62:5 130:8 133:11 143:16

156:13 163:1 183:22 191:9, 19 198:21

talking 28:10 34:22 37:17,20 45:15,24 58:20 65:19 100:2 117:8 146:1 150:22 153:10, 25 162:19 176:14 216:23 219:24 255:4 258:7 267:16

tall 45:10,11 49:5,7 52:1

tape 56:20

task 244:2

tattoo 56:16 57:8

taught 36:1

Taylorville 101:8

team 272:24 276:6 282:10

teams 59:19 138:24

teardrop 57:1, 3,4

teardrops 56:24 57:5

technically 60:2 104:14

technician 7:4 109:6 190:4

technology 26:7

telephone 260:1 264:10

telling 119:13 120:18 139:17 149:14 181:4,5 185:22 186:16 263:4

tells 77:10 93:19 122:12

temporarily

60:15

ten 10:12 34:1 105:21 149:10 154:14 177:17 259:3

tenaciously 213:12

tentative 47:1, 6,10,14 191:21, 24 192:13 193:6

term 191:22

terminology 102:2 103:1 104:12

terms 18:12 24:3 29:6 34:5 116:5 167:21

Terry 68:8,9,10 92:4,16 93:25 94:8,14 112:1,8 113:4 116:11 117:1,3 124:24 142:1,2,9,11 143:12 147:4 155:11 165:15, 22 188:11

testified 184:22

testify 72:20

testimony 9:9 13:6,14 14:22 15:15 108:10, 16 125:21 140:20,23 152:3 157:13 178:16 181:15 185:13,15,19 187:16 206:23 210:13 222:4 224:23 225:2 226:20 237:18 238:10,13 241:12 243:7 255:15 264:16 276:11,17

testing 27:10, 11 72:21

That'd 196:8



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 323 of 326 PageID #:7293
The Deposition of ANTHONY WOOD, taken May 23, 2024

321

there'd 87:14

thing 10:16
19:2 23:19
25:22 31:25
35:9 38:19 48:6
49:25 51:4,8
52:6 56:23
66:18 72:12
85:13 86:5
99:23 111:24
112:2 125:3
132:15 133:19
134:13 135:10,
11 145:13
183:17 219:14
240:9 242:13
244:2 248:11
263:13 279:8

things 10:21
14:17 27:3,23
28:16,23 29:8
32:16 33:23
35:9 37:7,23
40:5 48:22
49:20 51:24
76:5 78:20 82:3
90:19 100:22
108:19 109:14,
22,23,24
125:23 137:21
169:17 183:1
222:10 232:24
241:13 243:15

thinking 42:16,
18

third-to-last
267:21

thought 24:22
202:14 219:23
234:2,8 258:14

thousand
48:22

thousands
62:11,18

threw 28:13
225:13 235:9

throat 220:15

throw 50:22
74:23 105:14

Thursday
158:12

tickets 205:24

tight 175:2,5
176:15

time 7:7 9:22,
23,25 10:4,22
13:22 18:23
19:8 20:3,6,11
21:23 22:1,4,14
27:17 28:22
29:24 30:9,15,
21 31:10 32:8
33:17,21 34:7,
11 35:11,13,19,
25 40:9 41:23
42:22 45:24
49:12 52:12,20
53:19,21 54:3,
15,18 58:15,25
59:4,7 61:7
62:24 74:8,11
76:4 78:22
79:24 83:25
85:5,25 87:2,9
98:15 102:7
105:4,5,20
106:9 107:8,12
108:18 109:2,4,
23 117:6,24
118:5,12,14
119:2,14 120:3,
10,22 121:1
122:4,15 123:2
129:12 136:21
137:6,13,15
138:2 139:6,11
141:9 142:12,
15 143:17,22
147:1 148:22
150:19 152:12
153:2 154:2,6,
10,20 155:10,
15 157:19
158:10,14,19,
20,25 160:9
162:5,14
165:17 169:11,
12 172:15
173:12,22
174:1,7,15
175:12,18,22
176:13 177:8,
24 180:11

181:11 183:16
186:21 187:18,
20 190:9,15
191:14 199:23
202:8 205:17
206:11,21
207:10,11
208:10 209:15
216:6,8,9,11
217:17 218:3,5,
22 219:2,23
220:9,17 224:6
228:16 231:17
232:22,23
233:8,14,16
234:13 235:12
238:21 242:21
243:17 252:23,
25 253:24
254:6,23
256:19,20
257:9,15
258:17 264:19,
22 265:7,8,15,
21,23,24,25
266:2,4 269:2
271:22 272:12,
20 273:15,17
283:20

times 10:13,25
14:6,9 15:19
26:10,17 27:14
30:13 31:4
34:15 39:14,16
45:10 46:16
56:8 60:24
61:17 66:21
75:1 103:11
108:21 130:16
133:21 134:11
151:4,8,15,18
152:17 158:6,
15 159:2
182:20 198:21

today 7:4,7,9
10:9 12:5 13:21
16:7,8,9 52:19
107:8,9 122:11
139:14 148:1,7
266:4 275:8
285:1

today's 12:19
13:1,18 14:19
15:11 16:5,10,

14 135:21
139:25 140:9
189:12

told 12:13
93:24 97:4
140:16 218:5,
13,22,25 219:6,
12,18,21 221:3,
5 222:8,13
225:22 226:12,
23 228:4 229:9,
11 233:2,10,15,
21 234:4,9
237:14 240:23
242:12 246:22
255:10,25
260:22 261:2
262:25 263:5,7
267:17 268:19,
25 269:3,4,16,
20 270:23
271:12 272:5,
10,14 273:22

tolling 100:18

tonight 61:13

Tony 136:6

tool 115:23

tools 59:1

top 64:19 69:4
75:4 77:12,25
78:1,23 83:8
91:12 92:13
113:10 117:19
131:24 132:22
133:3,5 134:19,
23 135:2
166:25 259:2

Torres 257:22
258:4,7,10,19,
22 259:2,5,6,
11,22 260:1,4,
8,10,11,22,24
261:24,25
262:7,25 263:2,
5,7,18 264:5
265:6,8,18,25
270:14 271:5,
20 272:18

Torres' 257:24

Torres's

259:25 260:2

total 13:20
41:25 277:22

totality 52:21

totally 73:4
90:6 277:9

tough 56:18

town 115:18

tradition 89:8
211:18

traffic 92:5
115:8

trained 35:25
40:10,17 42:5

training 35:11,
14,17,21 36:9,
16,20,25 37:4,
7,17 38:4

transcribed
261:21

transcript
214:16 215:13
285:1,9

transcripts
13:5

transferred
22:2 225:19

transition
118:14 122:15

transitioning
89:8 117:7,10
120:19

trauma 32:6

traumatized
32:3,12

treated 125:17

tree 180:8,9

trespass
142:18 144:10
145:3,16

trial 13:5,11
212:9 214:15

Tribune 238:23
279:16,19



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

trier 32:21

trigger 116:5

trouble 148:5

troubles 143:2

truck 161:12

true 43:15
173:17 176:25
177:2 206:4
210:11 246:19
247:20 250:23,
24 271:15,17
272:19

trust 37:20

truth 9:9,10

truthfully 12:5,
9,16

Tucker 211:12
212:8 215:18

Tucker's 209:8
211:23

Tuesday 11:3
30:23 58:19
96:19 97:4
130:9 137:8
158:11

turn 45:5 134:6
135:3 141:2,24
234:21 256:23
257:16 259:1
269:21

turn-in 204:4

turned 204:6,
16,20,21 212:7
215:22,25

turns 277:19

tutelage
138:18

TV 37:8

twins 178:11

type 39:19
49:4,15 73:11,
22 79:13 85:8
96:19 144:3
154:22 199:9,
14 225:21
240:9 261:7

263:14 266:14

typed 96:13,20
222:22 225:17
228:19,22
261:2,3,4,13,
14,16

types 27:11
67:21 79:12

typewriter
73:11

typewritten
96:25

typical 136:23

typically 8:20
74:7,10 103:17
167:25 168:20
199:5

typing 222:18

_____

U

U.S. 218:11
219:15 268:18
271:25

UCR 99:16,25
137:16

UEW 101:6
110:12

Uh-huh 174:21
181:8

uh-huhs 11:12

ultimate 51:21

ultimately
213:13 225:13
242:6

unable 269:10

unanimous
207:3 216:19

unanimously
207:17 216:25

unbeknownst
218:1

unbiased 43:2

uncertain
46:14 55:17

uncertainty
192:25

unchanged
215:3

uncle 22:10

undamaged
261:13

underlying
28:22

undersigned
214:23

understand
11:15 12:4,9,15
51:17 55:21
58:25 130:4
134:17 187:15
202:1 204:10
217:5

understanding
21:3 27:4
30:11,14 33:20
36:24 43:7
54:24 69:11
70:18,21 78:4
86:9 88:14
111:11 118:18
122:21 147:18
177:10 178:17
201:22 202:3
233:24 250:6

understood
10:23 11:5,10,
19 204:23
239:14

unduly 56:13

unidentified
209:10,22

unified 137:16

uniform 99:17

unique 104:18

unit 20:7,12,22
22:2,7 23:6,13,
15,17 24:2,3,13
25:13 27:2
28:21 29:9
30:12 75:1
87:14 98:16,19
133:9 196:7

253:3 257:24
258:13 283:22

units 27:5

unknown 7:12
141:4,14,18
149:15 171:3,9
172:5

unlocked
211:4

unnecessary
256:3,16

unnecessary.'
255:11

unprejudiced
43:2

unquote 215:3

unreliability
38:6

unreliable
36:11

unresolved
24:5,20

unsolved 25:9

untimely
245:7,8

unusable
224:25

unusual 96:15,
24 159:18
265:17

updated 73:15
87:10 122:5

upper 132:17

usual 191:22

utilize 90:25

utilized 60:4
100:22 223:23
225:20

_____

V

validity 104:3

veering 107:10

vehicle 91:16
206:1

veracity 39:10

verbal 11:12

verbally 44:17

verbiage 95:1
97:2 179:19
215:19

Vergara
205:18

verified 218:5

verify 145:14

versa 52:16

versed 90:17

version 77:19
86:2 166:16,18
167:4,7 168:16,
18,22 207:22,
24,25 208:8
215:5 261:8

versions
167:12

versus 7:10
25:10 40:13,20

vice 52:16

victim 43:12
91:17 95:11,14,
16 98:12 102:8
144:11,14
145:14 206:14

victims 257:24
258:13,15,17

video 7:3

videoconferen
ce 7:8

view 40:24
44:3 46:1
152:24 161:13
177:21 181:10

viewed 42:9
139:2 182:10
192:1,8

viewing
151:25 173:10
184:10



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 325 of 326 PageID #:7295
The Deposition of ANTHONY WOJCIK, taken on June 25, 2024

323

violation 92:17
203:22,24
205:9 208:22
209:5 214:25

violations
278:19

violent 98:15,
17 196:8,9
258:16

voice 45:21,23
46:6

volume 25:19
26:10

voluntarily
240:25 243:14

volunteer 56:7

volunteers
56:9

―――――

**W**

W-O-J-C-I-K
9:18

Wade 127:22
128:4,9,14
129:1,9 188:25

waffling 40:1

wait 61:9 62:2
64:1 65:15 74:5
81:12 156:8,10
219:3 263:21

waited 212:4
245:5 248:7

waiting 16:12
65:20 154:16

waits 245:8

walk 33:4
211:19

walked 211:12
219:10 224:15
266:19

Walker 188:12

walking
114:13

wall 196:25

wanted 19:2
22:6 23:2,4
26:22,24 60:14
62:22 66:18
71:25 72:13
76:8 91:17,21,
25 92:24 94:18,
24 96:23
107:19 113:3
116:6 117:15,
16 124:1
125:18,23
128:8 129:14,
19 142:20
170:6,10 233:4,
25 234:7

wanting
244:13

warrant 92:1
93:5,10 95:9,12
117:16 142:21
144:20 145:16,
20

warrants
87:22 91:18
93:4 114:10

wash 28:14

wasting
180:11

watch 71:25
74:1,6 221:6
262:11,12
275:20 276:6

ways 22:16
25:1,2,24 48:23
49:1

weapon 204:1,
4,6,16,21

wear 49:19
51:15 56:20

wearing 49:14,
16,17,19 50:19,
21 52:8 57:7
104:24 105:11

website
147:12 148:9
163:10 186:7

Wednesday
158:11

weed 115:6

week 32:14
74:19 133:12
158:12 265:12

weeks 53:1
74:20 230:23

weigh 39:3,12

weight 41:18
46:3 57:1 104:4
168:3,9 183:16

well-versed
139:2

West 7:6

white 49:9 59:6
61:19,20 62:21
187:6 198:15
199:13

Whites 49:22

who'd 62:7

whoever's
134:8

wholehearted
ly 213:16

wide 211:9

wife 22:10
27:19,21
154:12

Williams 82:16

Willie 128:15
192:10 193:9

willingly
121:22

wishes 128:14

witness's 8:20
34:5 39:20

witnessed
266:22

witnesses
24:22 29:7
36:3,10 42:9
44:2 46:13
51:12 52:24
55:8,23 61:14
95:11 104:22,
23 148:21,23

150:15,18
154:5 177:21
182:10,16
186:16 223:25
225:23 228:4
231:21 267:25
268:10 273:25
276:14,19

Wojcik 7:9,12
8:25 9:3,6,15,
17 10:3 58:14
64:16 77:3
126:25 131:10
135:20 166:15
167:2 195:24
201:12 212:21
213:9,11,19
227:8 234:24
245:23 248:14
249:7 250:4,20,
22 251:4
257:24 260:1,3,
22 261:24
265:6,17
268:19 270:16
271:12 272:12
273:1 278:25

Wojcik's 257:2
270:10 272:23
275:20 276:5
278:19,24
282:20

woman 32:2
48:16

Woodridge
215:15

word 47:6
88:13 90:9
106:16 111:8,
13 113:24
133:5 181:6
223:7 240:14
283:4,8

wording
271:18

words 35:24
45:16,17,19
47:5,21 57:10
92:3 117:15
129:8 149:22
152:22 210:7
215:9

work 22:6 23:2,
17,25 24:5
26:10 61:25
74:5 138:25
216:5,9 221:6
258:18

worked 20:11,
15 23:4,23
24:6,19 25:6
29:15 75:3
258:12,19

working 19:15
20:6 22:13
23:13 24:7,9,11
29:19 30:2
71:23 72:14
74:12 92:22
98:14,15 135:9
203:13 219:6
266:11

world 36:24
37:1,24 154:3,
19,25 162:8

worried 211:20

worth 216:6,8,
10,12

would've
19:21,25 20:14
23:9,10,12
62:10 75:16,17
86:11 88:15
102:15 103:13,
16 107:24
111:9 136:23
139:7 143:9,10,
16 151:24
155:7 157:13,
15 158:1
173:25 175:17
193:3 200:16,
17 204:17
210:24 211:7
224:13 226:25
227:5 228:23
229:9 240:3
241:15 255:2
259:10 283:9,
11

wrecked
233:11

write 10:23
47:18 48:17



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04768 Document #: 184-34 Filed: 05/06/25 Page 326 of 326 PageID #:7296
The Deposition of ANTHONY WOOD, taken on June 20, 2023

324

89:11 135:2
178:6 179:3
185:9 255:12

writing 135:1
240:23 242:9,
12,18 245:4

written 61:8
69:20 75:17,19
94:23 96:9
112:14 133:4
134:18,19
140:25 178:18
227:10 256:11,
22 263:11
277:9

wrong 138:22
176:11,19
263:2 275:9

wrote 179:5,7
226:11 229:23
250:18 256:13
258:22 263:6
267:3 274:16

_____
Y
_____

year 13:24
19:12 153:17
200:20 203:12
265:19,22,23
271:10,21

years 13:21,25
15:20 22:11
24:17,23 28:5
31:8,13,24
32:19 33:3 34:1
49:22 52:19
73:2 95:12
140:14,16
149:11,23
150:17 154:13,
14 162:19
169:11 172:15,
24 173:11
174:1,15
175:12 176:14
177:24 178:23
181:11 186:9
187:18,20
200:3,10,16,23
210:19 213:10,
13 274:8

yellow 49:14,
16 51:13,15,16
104:24 197:20

yells 44:10

yes-no 12:1

yesterday
38:15 45:1
90:20 140:12

young 30:24
34:15 184:3

younger 30:25
172:24

_____
Z
_____

Z-E-F-K- 209:9

Zedfiles
211:24

Zefkiles 209:9,
22 210:4,9,15
211:24 212:22

Zoom 7:21,23
8:9 16:13



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com