# EXHIBIT 59

# Transcript of Record

## Appeal

## to

APPELLATE ___ Court of Illinois

**FIRST** **District**

**Circuit Court No.** ___ 02 CR 16669

**Trial Judge** ___ JOHN KIRBY

**Reviewing Court No.** ___ 05-3447

FILE

APPELLATE COURT
DEC 0 8 200
STEVEN M.

02cr016669/A007

PEOPLE OF THE STATE OF ILLINOIS

### VS.

ORDER ENTERED
FEB 1 5 2006
APPELLATE COURT, FIRST DISTRICT

JAMES FLETCHER

## from

# CIRCUIT COURT

# of

# COOK COUNTY, ILLINOIS

## COUNTY DEPARTMENT, CRIMINAL DIVISION

REPORT OF PROCEEDINGS ONLY..
VOLUME SIX OF SEVEN VOLUMES

**DOROTHY BROWN,**
**Clerk of the Circuit Court**

Per ___ DB/JF
**Deputy**

(Rev. 1/17/01) CCCR (_

**EXHIBIT V**

Fletcher 001655

```
 1    STATE OF ILLINOIS )
                        )
 2    COUNTY OF C O O K )

 3              IN THE CIRCUIT COURT OF COOK COUNTY
                COUNTY DEPARTMENT-CRIMINAL DIVISION
 4
      THE PEOPLE OF THE    )
 5    STATE OF ILLINOIS    )
                           )
 6         -VS-            )    No. 02 16669
                           )
 7    JAMES FLETCHER       )

 8              REPORT OF PROCEEDINGS in the above-entitled

 9    cause taken before the Hon. JOHN P. KIRBY,

10    Judge of said court, on June 16, 2005.

11         PRESENT:

12              HON. RICHARD A. DEVINE,
                    State's Attorney of Cook County, by
13              MS. AIDAN O'CONNOR,
                    Assistant State's Attorney,
14                  representing the People;

15              MR. REGINALD HILL and MR. JOSEPH SALTIEL,
                    Private Attorneys,
16                  Jenner & Block,
                    representing the Defendant.
17

18    Victoria A. Ondriska
      Official Court Reporter
19    #084-001457

20

21

22

23

24
```

FILED
CR-526-7
OCT 25 2005
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

1  DATE:     6-16-05
   PAGES:    1-132

2

3                    I N D E X

                                        <u>PAGE</u>

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Fletcher 001657

```
1                    THE CLERK:  James Fletcher.

2                    THE COURT:  Okay.  This is the case of People

3       vs. James Fletcher.

4                    Counsels, would you please state your names?

5                    MS. O'CONNOR:  Aidan O'Connor for the People.

6                    MR. SALTIEL:  Joe Saltiel.

7                    MR. HILL:  Reginald Hill on behalf of the

8       defendant, James Fletcher.

9                    THE COURT:  This is here on the Defense motion

10      for a new trial, and a motion to dismiss the indictment

11      for failure to commence prosecution within a reasonable

12      time.

13                   Are both sides ready to proceed?

14                   MS. O'CONNOR:  Yes, Judge.

15                   MR. SALTIEL:  Yes, your Honor.

16                   THE COURT:  Okay.

17                   Counsel, you may proceed.

18                   MR. SALTIEL:  Which motion?

19                   THE COURT:  Let's do the motion to dismiss for

20      failure to commence prosecution.

21                   MR. SALTIEL:  I guess I'd like to begin to

22      just quickly re-hash some of the key dates, because one

23      of the important aspects is the fact it did take over

24      eleven years for the State to arrest James Fletcher.
```

3

Fletcher 001658

1    The incident occurred that led to his arrest

2  on December 21, '90.  Mr. Fletcher wasn't arrested for

3  this crime until April of 2002.

4    Now, the standard for a motion to dismiss for

5  failure to commence prosecution in a reasonable time, it

6  is a two-part test as dictated in People v. Lawson.

7  First, that the defendant -- the delay caused the

8  defendant actual prejudice.  And that, second, the delay

9  was unreasonable.

10    And I'd like to point out to the Court that in

11  the case People v. Gulley (phonetic), the court in there

12  stated that the length of delay in that case which was

13  only 51 months causes a great suspicion and the

14  presumption that the delay was prejudicial.  And that

15  was only a 51 month delay.  And here we are looking at a

16  eleven year delay until arrest, and over fourteen years

17  until trial.

18    There are two main areas where the delay

19  caused the defendant prejudice.  The first was with

20  respect to the defendant's ability to put on an alibi

21  defense.

22    At trial, the defendant called Miss Sanders as

23  an alibi witness.  Miss Sanders testified that she met

24  the defendant in Memphis, around, or the week before

4

Fletcher 001659

1    Christmas.  And this, of course, the incident which he
2    was arrested for occurred in Chicago.  So if he was in
3    Memphis, obviously, he couldn't have committed the crime
4    in Chicago.

5          However, Miss Sanders was not able to remember
6    the exact date because of the length of time that
7    transpired.

8          And this is a noteworthy point, because as in
9    the case I previously mentioned, People v. Gulley, the
10   court in that case stated that an alibi witness should
11   not be expected to remember an uneventful day -- in that
12   case that was four years ago -- to negate the evidence
13   from the State.  Here she was being asked to remember an
14   incident that was almost fifteen years ago to the exact
15   date.

16         Now, not only could she not remember the exact
17   date, she couldn't remember the name of the hotel.  This
18   is significant, because if she was able to remember the
19   name of the hotel, we could have gotten documentary
20   evidence to support the alibi.  Even after fifteen
21   years, if she was able to remember the name of the
22   hotel, it was highly unlikely the hotel will have any
23   evidence verifying his presence at the hotel after
24   fifteen years.

Fletcher 001660

1          The second aspect where Mr. Fletcher was

2     prejudiced was with respect to Terry Rogers.  Terry

3     Rogers was one of the witnesses at the 1990 incident,

4     and was also one of the people that identified

5     Mr. Fletcher to the police.  And if it wasn't for

6     Mr. Rogers' identification, Mr. Fletcher would have

7     never been arrested.  And I think at one time the Court

8     even commented itself that Terry Rogers was a key player

9     in this investigation.

10          Not only was he one of the key witnesses, but

11    he appears to have been a potential suspect at one time.

12    In 1995, another one of the witnesses told the police

13    that he suspected Mr. Rogers was involved in the

14    incident, and that was the reason why they sought to

15    question Mr. Rogers about the incident.  And they

16    couldn't find Mr. Rogers until he was arrested in 2002

17    for suspicion of arson.  It was at this time in '02 that

18    Terry Rogers had changed his story, because originally,

19    1990, he didn't say he knew Mr. Fletcher.  All he said

20    was that he heard one suspect say to the other suspect,

21    "Come on, Fletcher, let's go."

22          But in 2002, after being arrested for arson

23    and the police come to interview him, you know, he all

24    of a sudden changes his story.  Now his story is, "Yeah,

6

Fletcher 001661

1    I knew Jimmy Fletcher.  You know, I knew him from the

2    neighborhood.  We served time together, you know.  This

3    was a guy you are looking for for this 1990 incident."

4            So not only is Mr. Rogers a key witness, but

5    he's also a potential suspect, and we were denied to

6    present that opportunity to present that to the jury

7    because he wasn't there.

8            Also Mr. Rogers' statements were used against

9    Mr. Fletcher at trial.  We were unable to cross-examine

10   Mr. Rogers because he wasn't there.  And this was a

11   violation of Mr. Fletcher's 6th Amendment right.

12           As you recall Mr. Rogers' statement, when he

13   identified Fletcher in 1990, that came in at trial, and

14   again when he identified the defendant by the name of

15   James Fletcher in '02.  Both those statements came in at

16   trial.  Now, because he wasn't there, we were unable,

17   you know, to cross-examine him and the credibility of

18   the statements.

19           So those are the two areas where we believe

20   that Mr. Fletcher was prejudiced at trial because of the

21   delay.

22           Now, the delay on the part of the State is not

23   reasonable.  All of the witnesses were available earlier

24   on.  They could have proceeded earlier on.  There was no

7

Fletcher 001662

1    new evidence gathered after 1990, other than the fact

2    that one of the witnesses changed his name.

3              THE COURT:  I'm sorry?

4              MR. SALTIEL:  I'm sorry.  He changed his

5    statement to the police.  That was the only difference

6    from the information they had in '90.

7              Mr. Fletcher's whereabouts had been known

8    since '90.  In '90 he was on parole.  And then from

9    approximately '91 to '92 on, he's been in the custody of

10   the Illinois Department of Corrections.  So his

11   whereabouts have been known.

12             The other witnesses' whereabouts have been

13   known.  Terry Rogers' whereabouts were known because he

14   was in and out of prison and in and out of trouble up

15   through '95.  He went missing for approximately seven

16   years.  But in 2002, he was again available, because he

17   was arrested and he served some jail time as well.  And

18   it was after his release from his last jail sentence

19   that the State was unable to find him and bring him to

20   trial.

21             So for those two reasons, we believe that the

22   State, that the Court should grant our motion to

23   dismiss.

24             THE COURT:  Okay.

8

Fletcher 001663

1            State, your response?

2            MS. O'CONNOR:  Yes, Judge.

3            In response, our first response is that we

4     believe that the subject of this motion is, should be

5     part of a pre-trial motion as opposed to a post-trial

6     motion.  The statute says that it should be filed before

7     trial.

8            So we would object to it on that basis.

9            But in addition --

10           THE COURT:  What statute are you referring to?

11           MS. O'CONNOR:  Motion to dismiss under Chapter

12    725, I think it is -- I'm sorry.  I don't have my

13    statute book with me.  I should have.  It's -- I think

14    it's 725 114 -- 5, but I'll look it up to make sure.

15           It's 725 ILCS 5/114 -- 1, motion to dismiss

16    charge, which is sub-section under Article 114 which is

17    pre-trial motions.  And that section, Judge, indicates

18    that such a motion to dismiss should be filed pre-trial.

19           And what the statute does is it lists and

20    enumerates several bases under which such a motion can

21    be filed.  This one isn't one of those bases.  Because

22    this one falls under the general category of the due

23    process violation.

24           That's what the defendant is alleging.  He is

9

Fletcher 001664

```
1   not alleging one of the enumerated paragraphs.  But
2   this motion to dismiss falls under that sub-section, and
3   the case law that Counsel refers to refers to, and all
4   other cases that discuss the issue of a motion to
5   dismiss based on due process due to delay in charging
6   falls under that section, Judge.
7              So that would be our first argument.
8              If the Court is going to consider their motion
9   anyway, we have several arguments that we believe show
10  that they don't have a basis for, or the Court would not
11  have a basis for granting their motion.
12             And first of all, the overriding concept of
13  due process is to allow the defendant to prepare a
14  defense to a charge.  But there are several other
15  concepts that have to be considered in the realm of what
16  is a reasonable delay.  And Mr. Saltiel already referred
17  to the Lawson case that sets out that two-step process,
18  and then the balancing the Court has to take into
19  consideration.
20             In addition to that two-step process and the
21  balancing is the seriousness of the crime.  And I think
22  that all courts would say that murder would be the most
23  serious crime heard in state courts.
24             The cases that Counsel refers to, Gulley, that
```

10

Fletcher 001665

1    he relies on in his motion is a narcotics case wherein
2    the defendant was a known offender from Day One.  It was
3    an undercover narcotics operation.  The seriousness of
4    that crime couldn't compare to the seriousness of a
5    murder crime.  And the statute of limitations here in
6    Illinois doesn't exist for the crime of murder.  The
7    crime of murder can be brought at any time.

8              And we suggest to this Court, and the cases do
9    discuss statutes of limitations, that the fact that the
10   legislature has provided for no statute of limitations
11   for the crime of murder could certainly mitigate towards
12   the fact that the crime is so serious that charges can
13   be brought at any time.

14             But in looking at the overall process the
15   Court needs to go through in determining whether due
16   process has been violated, it is our position that the
17   Court also has to look at the investigation itself.  And
18   was there bad faith?  Was there foot dragging on the
19   part of law enforcement?

20             And we submit in this case, contrary to
21   Mr. Saltiel's argument, there is not one scintilla of
22   evidence that this defendant could have been identified
23   or arrested or charged prior to 2002.  He says that the
24   police knew the identity of the shooter in this case,

11

1    the defendant, prior to 2002, and that's totally
2    inaccurate.   The only information they have that would
3    have helped lead to an identification was the last name
4    of the defendant, and that was Fletcher.

5           And to say that because one witness said that
6    a man named Fletcher was involved in the case should
7    have allowed the police to identify him and arrest him
8    and charge him is ridiculous.   Fletcher is a common
9    name.   They didn't even have an address.   It was a
10   passing reference made by a witness who said that he
11   didn't know who had committed this crime.

12          In 2005 when the police were assigned to
13   re-investigate this case and review --

14          THE COURT:  2005?

15          MS. O'CONNOR:  What?  I meant 1995.  I'm a
16   decade ahead of myself.

17          In 1995, when Detective Bogucki and Shalk were
18   taking a second look at some old murder cases, including
19   this one, all they still had to go on was the name
20   Fletcher.   And they had found another case of someone I
21   believe named Clinton Fletcher who they got a photo of
22   and found that he had been living in that area and
23   showed it to Mr. Cooper who indicated that that wasn't
24   the killer in this case.

12

**Fletcher 001667**

1          That, of course, didn't come out at trial,

2    because non-identifications of a possible suspect could

3    not be admissible in this trial.  So that did not come

4    out during the trial.

5          However, all the police reports and the

6    discovery that was tendered to Counsel, certainly they

7    were aware of that.

8          So as of 1995, all they still had was the bare

9    fact of the last name of Fletcher.

10         Now, it's true that during the 90's, the

11   defendant was incarcerated.  First, during the 90's, I

12   believe, incarcerated under the name Arnold Dixon.  He

13   had before this murder been incarcerated under the name

14   of James Fletcher.  Because he had been convicted of

15   murder -- released -- this crime was committed by the

16   defendant, he was not caught, and then he was arrested

17   for and convicted of an armed robbery charge.

18         So during the 90's, he was incarcerated, and

19   still is incarcerated for the armed robbery that he was

20   sentenced to twenty-five years under the name Arnold

21   Dixon.  It was prior to the murder that is now the

22   subject of this post-trial motion.  The murder prior to

23   this, he had been convicted under the name of James

24   Fletcher.  So he was actually out of prison from that

13

Fletcher 001668

1    murder when he committed this murder, and then

2    subsequently went into custody under the name of Arnold

3    Dixon.

4          So even though he was in the custody of the

5    Illinois Department of Corrections, there is not one,

6    there was not one shred of evidence that would have led

7    the detectives in any way to find that man in prison

8    until the man named Terry Rogers was arrested in 2002

9    and at that time decided to tell the police more

10   information that he had about this 1990 murder.  And

11   that it is then that the police became aware of this

12   James Fletcher, did their investigation, got photos,

13   went to the prison, conducted lineups, and he was

14   charged within a very short time of receiving the

15   information from Mr. Rogers.

16         And I mean, I don't know how they in good

17   faith can tell this Court that the police had any

18   information with which they could have charged this

19   defendant prior to 2002.  I mean, they not only didn't

20   have probable cause to arrest him for this case, but

21   they didn't even have any investigatory leads that would

22   have led to this James Fletcher prior to 2002.

23         In their motion under Paragraph 20, they say

24   the State elicited testimony at trial that the name

14

Fletcher 001669

1    Fletcher and James Fletcher came up in the course of the
2    investigation, and that the source of this information
3    was Terry Rogers, who after fourteen years and due to
4    the State's delay was not available at trial.

5          I don't understand the connection of the
6    second sentence to the first sentence here.  But I think
7    that it's misleading, because the name James Fletcher
8    was not known to the police until 2002.  If they're
9    trying to say it was known before that, they're
10   absolutely wrong, and they have no basis with which to
11   make that statement to this Court.

12         In Paragraph 23 they talk about an eyewitness
13   being dead in the Gulley case and compare that to
14   Mr. Rogers not being present at the trial.  And we did
15   attempt to find Mr. Rogers and perhaps use him as a
16   witness in this case.  But nothing prevented them from
17   doing the same thing, Judge.  He wasn't dead, that
18   anyone knows of.  If they thought he was such a key
19   witness to their defense, no one was stopping them from
20   finding him, either.

21         And I don't think that they can complain we
22   didn't call a witness.  We called the witnesses we have
23   and that we want to call.  If they thought he could help
24   them, they should have called him.  Our calling him was

                              15

**Fletcher 001670**

1    not a violation of this defendant's due process rights.

2         They say in that same paragraph the State

3    elicited testify at trial that a witness identified

4    Mr. Fletcher by name in connection to the event, but due

5    to the delay he was not available.  Well, they're wrong

6    again.  The State never elicited such testimony.

7         And it's curious that in that paragraph when

8    they refer to the State elicited testimony, they don't

9    refer to a page in the transcript that would support

10   that assertion.  That's because there is no such page in

11   the transcript, because that testimony never was

12   elicited.  So that statement is a falsehood.

13        The concept of a defendant not being able to

14   remember where he was and to prepare for an alibi is one

15   of the considerations.  But the courts have held,

16   including the Lawson case that they have cited, has held

17   that the assertion of inability to recall is

18   insufficient to show actual and substantial prejudice.

19        But even if they were able to show actual and

20   substantial prejudice, Judge, it's still a balancing

21   process, and the reasonableness of the delay is to be

22   judged against the substantial prejudice.

23        And in this case a man was killed and there

24   were no leads.  And, you know, I mean, there is not in

16

Fletcher 001671

1    the record, nothing in the discovery, nothing in the

2    trial testimony to indicate that anyone ever had any

3    clue as to the identity of who the shooter was until

4    Terry Rogers was arrested in 2002 and gave that

5    information to the police.  So the reasonableness of the

6    delay is certainly explained.

7         The testimony of the defendant's wife, ex-wife

8    about being in or near Memphis and being at a hotel on

9    various occasions, they say the records would have

10   established an alibi.  But my recollection of her

11   testimony was that she met the defendant at a motel and

12   then he followed her back to where she was staying.  So

13   meeting someone in a hotel isn't going to mean there is

14   records of that person being in a hotel.

15        But even so, inability by the witness to

16   recall is insufficient to show actual and substantial

17   prejudice.

18        I think the bottom line in this issue, Judge

19   -- and again, we would submit that this was, is not a

20   timely issue at this time.  But that if it were a timely

21   issue, it still should be denied, because in the overall

22   reasonableness and in the interest of justice, the fact

23   that it was a murder, the fact that the police did

24   follow up any leads that they had, there was no bad

Fletcher 001672

1    faith, there was no foot dragging on any law enforcement

2    agency's part, that this motion should be denied.

3              THE COURT:  Defense, you have the last word.

4              And would you please address the issue of the

5    availability of Mr. Rogers or the unavailability?

6              MR. SALTIEL:  In what respect, your Honor?

7              THE COURT:  Why was he, is he, or why -- you

8    conclude he is unavailable.  Under what basis?  There is

9    a legal definition pursuant to case law of availability.

10   And the Gulley case, you cited one of the arresting

11   officers was dead, therefore he is unavailable.

12             In this particular case, you continue to use

13   the phrase, "Mr. Rogers was unavailable."  Please inform

14   the Court why or how.

15             MR. SALTIEL:  Okay.

16             I guess our first response is to the timing of

17   the motion to dismiss.

18             Actually, this was a motion that was filed

19   pre-trial.  And at that time I believe the ruling by the

20   Court was there was no prejudice shown.  At the time

21   there was no alibi witness.  An alibi witness was

22   discovered later, and at that time Mr. Rogers was

23   available.  We didn't know until trial exactly what the

24   testimony of the alibi witness was going to be, and we

18

Fletcher 001673

```
 1    didn't know until trial that Mr. Rogers was going to be
 2    unavailable.
 3              THE COURT:  Can I stop you?
 4              You said that this motion had been heard
 5    earlier?
 6              MR. SALTIEL:  It was filed with the Court
 7    earlier in front of Judge Garcia.
 8              MS. O'CONNOR:  I don't have a copy of a
 9    motion.
10              MR. SALTIEL:  It's in the court file.
11              THE COURT:  Could you give me one minute,
12    please?
13              MR. SALTIEL:  Sure.
14              THE COURT:  I have a motion dated here
15    September 30, 2002, Motion to Dismiss for Failure to
16    Commence Prosecution Within a Reasonable Time.  That was
17    filed on behalf of Mr. Fletcher by Joseph Kennelly of
18    the Public Defender's Office.
19              MS. O'CONNOR:  I don't think that motion was
20    ever heard, Judge, was it?
21              THE COURT:  I don't know.
22              MR. SALTIEL:  I know the State did file a
23    response in that.  And it was my understanding in
24    talking to Mr. Kennelly that the judge did hear the
```

19

Fletcher 001674

1    motion, and he denied it because they were unable to

2    show prejudice at that time.

3          THE COURT:  You're right, Counsel.  On

4    November 7, '02, it states here that Defense motion to

5    dismiss arguments were heard, motion denied, and State

6    tendered additional discovery.

7          Okay.

8          MR. SALTIEL:  One of the points that the State

9    brought up in her response was that the police couldn't

10   have found Mr. Fletcher until 2002.

11         This does not seem to be the case.  In 1990

12   they had the name Fletcher.  Whether that was the first

13   name, last name, they weren't sure.  But they had the

14   name Fletcher in '90.

15         Now, in 1990, the defendant James Fletcher was

16   on parole in the Austin District which is where this

17   incident occurred.  Now, it would seem very logical they

18   would be able to investigate people on parole with the

19   name Fletcher who lived in the area.  He wasn't running

20   from the police.  He would have been available to ask

21   him.

22         In fact, the witnesses at the time were shown

23   photos.  We don't know photos of who.  But you would

24   assume if they had the name Fletcher and they had people

Fletcher 001675

1    on parole in the area with the name Fletcher, those

2    possibly could have been the photos they showed.

3            So if they were doing this with some of the

4    witnesses, none of them identify him.

5            Furthermore, in 1995 they were able to come up

6    with another suspect and put together a photo array.

7    Just based on that basis, given the fact that

8    Mr. Fletcher was on parole in the Austin District, and

9    afterward he was in custody of the Illinois Department

10   of Corrections, true, under an alias of Arnold Dixon,

11   but they also had the name of James Fletcher associated

12   with that name, they should have been able to find him

13   if they were looking for him.

14           Now, as to the point of the statute of

15   limitations and the seriousness of the crime, this is a

16   serious crime, and that's why the delay is even more

17   harmful, because we are talking about a murder case.

18   The defendant was not able to properly put on the

19   defense that he would have been able to put on had this

20   case been brought, you know, ten years ago.

21           And I think the point of the statute of

22   limitations doesn't really apply there, because I think

23   the point of the statute of limitations is for people

24   who are hiding out, evading law enforcement or cases

21

Fletcher 001676

1    where they discovered new evidence.  The statute of the
2    limitations or lack of for the murder statute, I don't
3    know for sure, but it shouldn't be the case it is for
4    the State to take as long as they want to bring a case.
5    Because that would put people at prejudice forever, that
6    they could wait for no reason to bring a case for twenty
7    years.  After so much time, a person's ability to defend
8    themselves against a serious charge is going to
9    deteriorate, as it has in this case.

10            Now, with respect to Paragraph 20 of our
11   motion, I just wanted to point out the point about the
12   testimony that was elicited at trial of Fletcher and
13   James Fletcher.  The point of that paragraph is that
14   that information came from Terry Rogers, and we were
15   unavailable to cross-examine Terry Rogers.  And that's
16   why him being unavailable is significant.  Because he
17   was the source of that information and we couldn't
18   cross-examine him.

19            And I think she also mentioned Paragraph 23,
20   the State did elicit testimony that Mr. Fletcher, that
21   the police had the name Fletcher, and that during the
22   course of the investigation a witness gave the police
23   the name James Fletcher.  And although the cites are not
24   in this brief, I know I cited it in the motion to, for a

22

Fletcher 001677

1    new trial, and I could provide those cites for you if

2    you'd like.

3              And in addition, from that information being

4    elicited through the testimony of witnesses, it was also

5    a point the State made in her closing as well.

6              Now, as far as the availability of Terry

7    Rogers, our basis for him being unavailable is the fact

8    that our investigators have been trying to locate him in

9    the Chicagoland area and were unsuccessful.  We came to

10   the understanding that the police were also looking for

11   him.  He was, there was an open arrest warrant out for

12   him for another incident that they were looking for him.

13             And I believe that this State had tried to

14   subpoena him, and then at one point learned he may be in

15   Mississippi somewhere, but the exact whereabouts were

16   unknown.  But they were trying to work with the

17   authorities to try to locate Mr. Rogers.

18             And even if, you know, him being out of state,

19   even if we were to locate a current address for him that

20   is correct, there is no reason to believe that we would

21   be able to force him to come to Illinois to be a witness

22   in this case.  It's more likely that the State with its

23   resources would be the party that probably could do

24   that, if anybody, at this time.

Fletcher 001678

1          Now, to go back to our position that we were,
2     that the defendant was caused prejudice with the alibi
3     testimony.  Her inability to remember the exact date is
4     significant, and I don't think Lawson applies to this
5     specific scenario.  In Lawson and cases like Lawson the
6     inability to remember was just in general.  They just
7     couldn't remember anything.  They didn't have a specific
8     alibi witness in mind.  They were just, "I can't
9     remember anything."

10         Whereas in Gulley, which is more on point, it
11    was specifically an alibi testimony, alibi witness who
12    they couldn't remember the specific date.  And I think
13    this situation is more analogous to that, that we did
14    have a specific alibi witness who testified that
15    Mr. Fletcher was out of the area in Memphis at the time.
16    The problem was she just couldn't remember the exact
17    date, only the general time frame.  And after, you know,
18    fifteen years, who could remember the exact date?

19         THE COURT:  But when you read Gulley, if you
20    look at Gulley under that issue of defense alibi on Page
21    3 of that opinion, it says to perfect an alibi, the
22    defendant and his witness would be required to recall an
23    uneventful two days back four years to negate the
24    evidence presented by the State.  Presuming a

24

Fletcher 001679

1    defendant's innocence, it would take some unusual

2    activity on the two relevant days to call attention to

3    them to cause them to be recalled by the defendant or

4    any of his alibi witnesses.

5           Didn't the alibi witness testify she recalled

6    these days because it was at that time that her and

7    Mr. Fletcher were breaking up, were ending their

8    marriage and she had left?

9           MR. SALTIEL:  She did testify that she

10   remembered these -- I'll say meetings with the defendant

11   at that time.  And part of the problem is that there was

12   more than one meeting.  I believe there was testimony to

13   an earlier meeting, and although we didn't probe it, I

14   believe there were later meetings.  There were actually

15   several meetings.  She remembers the meetings because of

16   the break-up at the time.

17          But the fact there was more than one meeting

18   and the fact there was fifteen years difference in her,

19   you know, when she tried to recall which day was was

20   what, could be very difficult to recall the specific

21   day.  She was able to give us a leeway of a couple of

22   days.

23          But when it comes to an alibi defense, you

24   know, I believe, you know, to be successful you have to

25

Fletcher 001680

1     be very specific.  You can't just say it was either this

2     day or that.  Probably have to be a certain day to be

3     successful.

4              And -- well, and also that robbed us of the

5     possibility of corroborating it with written documentary

6     evidence which we might be able to get if this had been

7     brought earlier.

8              So not only would the alibi defense, was her

9     inability to recall, but also our inability to discovery

10    documentary evidence and other evidence that would have

11    helped corroborate our alibi.

12             And with Mr. Rogers, this was a person who is

13    a key witness who was unavailable.  He was a person who

14    was actually a potential suspect as well, which may have

15    had an effect on the jury learning there was another

16    suspect and this potential suspect is a person that

17    identified Mr. Fletcher.

18             And also the fact that in Roger's statements

19    were used against him at trial.

20             All of this caused Mr. Fletcher prejudice.

21             And for those reasons we believe you should

22    grant our motion to dismiss.

23             THE COURT:  In regards to the motion to

24    dismiss the indictment, the Defense has brought out the

26

Fletcher 001681

1    fact that the motion to dismiss the indictment for

2    failure to commence prosecution was heard by Judge

3    Garcia, filed on September 30, '02.  It was heard by

4    Judge Garcia on November 7, '02, and dismissed because

5    there was no prejudice shown.

6          After the trial, the Defense right at the

7    conclusion of the trial filed a new motion to dismiss,

8    and now their argument is basically they have

9    established through the testimony that there was actual

10   prejudice.

11         In regards to the procedure that Lawson and

12   Gulley established for actual prejudice, I'll first

13   state that it seems obvious now that the first motion to

14   dismiss was properly filed in time.

15         The second motion here was after trial.  I'll

16   consider that a motion based on due process.

17         In regard to the Lawson test, it states that

18   the first step of the test, the defendant must come

19   forward with a clear showing of actual and substantial

20   prejudice resulting from the complaint of delay by the

21   State.  And they state that 51 months delay in Nichols

22   was considered great suspicion and a presumption that

23   the delay was prejudicial.

24         And in regard to the prejudicial aspect of

27

**Fletcher 001682**

1    that, I believe there's basically two aspects to the

2    Defense argument.  One is that they were not able to

3    perfect an alibi defense, and, two, that a witness was

4    unavailable.

5           As I pointed out earlier, in Gulley the

6    unavailability of a witness was based on a death of a

7    witness.

8           I also asked the Defense a question in regards

9    to whether or not this was an uneventful period of time

10   based on the defendant's wife's testimony that she

11   remembers specifically the day, for lack of a better

12   term, their marriage broke up.  But the Defense has

13   argued that even though it was the same time period, it

14   wasn't specifically the day in question.

15          So in regards to the prejudice shown, I

16   believe there was prejudice shown based on the delay.  I

17   don't believe there was prejudice shown based on the

18   unavailability.

19          And I'm saying this, my reading of case law

20   with regards to the unavailability of witnesses is he

21   could not been brought forward for any purpose.

22   Deceased, incompetency, statements like that.

23          In this particular case, both sides had an

24   opportunity to bring in any other witnesses they wanted.

Fletcher 001683

1    The fact that Mr. Rogers could not be found, I don't

2    believe that fits the criteria for determining a witness

3    is unavailable.

4           It should also be pointed out that even though

5    the State tried to find him and the Defense tried to

6    find him, there were no continuances from either side,

7    that I recall, specifically asking that he was a

8    necessary witness for trial. And neither side asked for

9    a continuance solely to bring in Mr. Rogers as a

10    witness.

11           Go ahead.

12           MR. SALTIEL: I believe that is incorrect. I

13    remember specifically that the State had Friend and

14    Cooper ready to go and asked a continuance specifically

15    for the reason of bringing in Rogers.

16           THE COURT: And after that they decided to go

17    without. The Defense never asked. That is their

18    decision. That was their decision to go without him.

19    The Defense never asked, nor did anyone file a motion

20    here to be tendered or submitted to another jurisdiction

21    of a necessary witness in a criminal matter.

22           Therefore, it is this Court's opinion, humble

23    opinion, that Mr. Rogers does not fit the criteria of

24    unavailability pursuant to case law.

29

Fletcher 001684

1          Having said that, I now must move in regard to

2     the second element of the test, and that is -- and both

3     sides argued basically the Lawson test.  I mean by that,

4     what I mean by that, after the first element is normally

5     shown, the burden shifts to the State.

6          I'm shifting that burden to the State to show

7     the reasonableness, if not the necessity for the delay.

8          In this particular case, a lot of the

9     arguments being brought forward today are not

10    necessarily part of the trial transcript.  These are

11    pre-trial or pre-trial issues, or pre-trial events, and

12    basically most of it is an event that occurred before

13    2002.

14          I'll briefly go through those.

15          This event occurred in 1990.  After a police

16    investigation, from what I can tell, they had the name

17    Fletcher.

18          In 1995, this incident, this armed robbery

19    murder was considered a cold case.  It was

20    re-investigated by two detectives.  And they then -- and

21    this is the first time the Court has become aware -- the

22    name Clinton Fletcher came up.  And they followed that

23    lead, interviewed Mr. Cooper, the eyewitness, again who

24    did not identify him as the participant.

Fletcher 001685

1           In 1995, that was the issue or the facts

2    before the Court.

3           In 2002, at the time that this Mr. Rogers was

4    arrested, he gave statements to the police implicating

5    Mr. Fletcher as the individual involved.

6           What occurs at that time is that, from what I

7    can understand, there is a police investigation, once

8    again concentrating on Mr. Fletcher.  During the course

9    of that investigation, sufficient evidence was

10   established to charge him.

11          I believe it's important in these particular

12   matters in regards to Gulley and even Lawson that you're

13   dealing with a suppressed indictment, which means that

14   the State knew who the defendant was from the beginning

15   of the incident and that they did not charge that

16   individual.  I believe in Gulley it was a 51 month delay

17   that the indictment was handed down.  The State had

18   asked to have it suppressed for the secrecy of the

19   continuing investigation.  The Court said that is a

20   valid reason, but 51 months is too long.

21          So in regard to the reasonableness of the

22   delay and the necessity for the delay, I don't feel that

23   the State could have, based on the information they had

24   in '90 or '95, arrested or charged Mr. Fletcher in 2002

31

Fletcher 001686

1    when that information was made available at that time
2    they had the information needed to arrest the
3    Mr. Fletcher, and that is what they did, after there was
4    a photo array and a lineup.

5              So in regards to the second prong of that
6    test, I believe there was a reasonableness and a
7    necessity for the delay.

8              And with the reasonableness of that delay, the
9    Court now moves to the third factor had in Lawson.  I
10   must make a determination based on the balancing of the
11   interest of the defendant and the public.

12             The factors the Court should consider are the
13   length of delay and the seriousness of the crime.

14             In this particular case the length of the
15   delay was substantial, from 1990 to 2002.  However, the
16   delay that I would say could be attributable to the
17   State did not occur until after 2002 when there was
18   sufficient evidence to establish probable cause for the
19   arrest of Mr. Fletcher.

20             Therefore, I believe the delay -- I'm sorry.
21   I believe the State, the delay here, even though lengthy
22   was reasonable.  You cannot arrest somebody without
23   probable cause.  That is the law in the State of
24   Illinois.  They did not have the probable cause to begin

32

1    with.

2              And the final aspect is the seriousness of the

3    crime.

4              In regards to the seriousness of the crime,

5    this is a crime that occurred on the streets of Chicago

6    in the middle of the day, from what I recall.  From what

7    I know, this was an armed robbery murder.

8              Therefore, I believe that based on the Lawson

9    factors, the test that the Court enunciated, and based

10   on Gulley, that the motion to dismiss the indictment for

11   failure to commence prosecution within a reasonable time

12   will be denied.

13             Now, that leaves us with the motion for a new

14   trial.

15             It's broken down into four parts.  You want to

16   take them one at a time or all four together?

17             MR. SALTIEL:  However the Court would prefer.

18             THE COURT:  I think there are four specific

19   issues.  I think it might be better to do them one at a

20   time, because you'll get a response to each one.

21             State, do you understand that?

22             MS. O'CONNOR:  I do.

23             THE COURT:  The first issue is labeled:  The

24   Court erred by allowing witnesses to testify about

33

Fletcher 001688

1    information obtained from out-of-court statements made

2    by Terry Rogers.

3              MR. SALTIEL:  We have previously just

4    discussed at, the time of the incident in December of

5    '90, Terry Rogers gave a statement to the police saying

6    that he heard one of the suspects say to the other

7    suspect, "Come on, Fletcher, let's go," and in essence

8    identifying Fletcher as one of the suspects.

9              And then in 2002, during a police

10   interrogation, he identified Mr. Fletcher by name, "The

11   guy you are looking for for the '90 incident is Jimmy

12   Fletcher.  He came up to me and told me what happened.

13   I had known him before the incident, and he's the guy

14   you are looking for for this."

15             Now, these two statements, the first one, you

16   know, is double hearsay, and the last one is just

17   hearsay.  That's an issue.  And we believe it was in

18   error for those statements to come in on the hearsay

19   grounds.

20             However, I think the more serious violation

21   here, and the more serious error was the 6th Amendment

22   violation of Mr. Fletcher's right.

23             6th Amendment is very clear.  You have the

24   right to cross-examine those who bring evidence against

34

1    you.  In this case, Mr. Fletcher was not able to

2    cross-examine Terry Rogers.  And I think this goes

3    exactly on point to what the U.S. Supreme Court had

4    decided in the Crawford case, and that statements made

5    by declarants in a police interview are testimonial and

6    inadmissible if the defendant has not had an opportunity

7    to cross-examine that declarant.

8            In this case Mr. Fletcher never had an

9    opportunity to cross-examine Mr. Rogers.  Now, the

10   problem that arises with this is that Mr. Rogers has a

11   lot of credibility issues.  He has a tremendously long

12   rap sheet, over fifty arrests, I believe; I think five

13   or six felony convictions in there.  He has a long

14   criminal history.

15           Not only does he have that background, but he

16   appears to have been at one point a suspect in the case,

17   and the police went to interview him because they

18   thought he might have been involved.  And only at that

19   time does he identify James Fletcher as, "No, don't look

20   at me, go look for James Fletcher."  Paraphrasing, of

21   course.

22           In addition, no one else can corroborate his

23   1990 statement.  He said he heard one suspect yell to

24   the other suspect "Fletcher."  We heard from the --

35

Fletcher 001690

```
1              THE COURT:  But you are not saying that
2    detective testified to that entire statement, are you?
3              MR. SALTIEL:  No, no.  What I'm addressing, if
4    Mr. Rogers were available, these are credibility issues
5    we could have attacked him to attack the credibility of
6    Mr. Rogers.  That would have been the point of calling
7    him.
8              You know, the 1990 statement that he
9    supposedly heard, no one else heard that.  You have
10   testimony from the other two witnesses who presumably
11   are closer to the suspect than Mr. Rogers never heard
12   any such statement.
13             All these issues go to Mr. Rogers'
14   credibility, and this is something we would have been
15   able to bring out at trial and the jury would have been
16   able to consider.
17             Now, what happened at trial is Mr. Rogers, of
18   course, didn't testify, and the police or the
19   detectives, what they testified to is that at one point
20   they have the name Fletcher, and later one one of the
21   witnesses had given them the name James Fletcher.
22             Now, the problem with the evidence coming in
23   that way is now there's this inference that the police
24   had a reason to be looking for this guy, that they were
```

36

**Fletcher 001691**

1 looking for this guy for fifteen years.  They had the

2 name.  You know, it was, you know, he was running away

3 from the police, or whatever it was.  He was unavailable

4 to the police to stand trial.

5    Also, it brings credibility to that

6 identification.  Essentially, it was an identification

7 coming through the police officer.  But because it came

8 through -- excuse me.  Because it came through the

9 detectives, we were unable to attack it.  The detective

10 has no credibility issues.  He just says, "We're looking

11 for a guy named Fletcher," and the jury believes that,

12 and they have no reason to doubt it.

13    So, you know, if those statements came from

14 Mr. Rogers, you have all these credibility issues with

15 Mr. Rogers as it brings into doubt the statements he's

16 giving in court.

17    And because these statements came in, I think

18 the Crawford case is very clear that that was a

19 violation of Mr. Fletcher's 6th Amendment right, and

20 therefore we ask for on that basis alone a new trial.

21    THE COURT:  But in the Crawford case, wasn't

22 that a case where an officer testified to the specifics

23 concerning a statement .

24    I recall Detective Bogucki, didn't he testify

37

```
 1      that he interviewed a witness, and then began looking

 2      for somebody?  He never testified to the substance of

 3      that witness's statement.

 4              MR. SALTIEL:  But the substance of the

 5      statement was the identification of Fletcher, and that

 6      was brought out through his testimony.

 7              THE COURT:  But what I'm saying, didn't

 8      Crawford specifically address a detective getting up on

 9      the stand and testifying to the entirety or almost the

10      entire substance of an individual's statement?  Not in

11      regard to what is admissible as the detective can

12      testify, "I talked to somebody," and, "After talking to

13      that individual, what did you do next in the course of

14      your investigation."  I think there is a line there.

15              I'm trying to ask you, are you saying that

16      Crawford dealt with this particular type of case, or did

17      Crawford deal with a specific statement made by an

18      officer?

19              MR. SALTIEL:  The distinction I was trying to

20      make with Crawford is that I believe when the Court

21      ruled that at this, at trial they were sort of taking it

22      as a hearsay issue.  And how do you make that, you know,

23      clean up the problems with hearsay but still allow the

24      officer to give information that he discovered during
```

38

Fletcher 001693

```
1    the course of the information?  I think Crawford
2    specifically differentiates the hearsay issue by
3    addressing the 6th Amendment issue directly and saying
4    any statements that were, any testimonial statements
5    given by someone cannot be used against that person
6    unless that person has a right to cross-examine them.
7              And in this case, Mr. Fletcher never had that
8    right.  He never had that opportunity.
9              THE COURT:  Okay.  All right.
10             State, your response to issue No. 1?
11             MS. O'CONNOR:  Judge, my response is never
12   once was any type of hearsay statement elicited on the
13   part of any single witness in this trial with regards to
14   what Terry Rogers may have said at any time during this
15   investigation.  Clearly, that's obvious from the
16   transcript.
17             And I would direct the Court's attention to
18   Detective Bogucki's transcript as the Defense did in
19   their motion between Page 180 and 186 on February 23,
20   2005 when Detective Bogucki was testifying.  It's a
21   classic testimony under the course of investigation
22   theory that the Court has already mentioned.
23             And that's well established in Illinois that
24   that is permissible, that a detective can say he talked
```

39

Fletcher 001694

Case: 1:21-cv-05881 Document #: 28-22 Filed: 04/04/22 Page 42 of 135 PageID #:1220

1    to someone, and after talking to that person he was then

2    looking for another person as a suspect.  No defense

3    attorney or defendant likes that case law in Illinois.

4    They hate it.  But it's the state of the law in

5    Illinois, and therefore the Court must follow it.

6           And that's why this Court did allow that

7    testimony.

8           And never once was a hearsay statement

9    requested of the detective or elicited or suggested in

10   any way.  Does the jury draw any conclusions?  We don't

11   know.  We didn't ask the jury if they did.

12          But whether they do or not is really

13   irrelevant, because the current state of the case law in

14   Illinois law is under course of investigation this type

15   of testimony comes in.

16          This Court actually struck some of the

17   testimony that was elicited from Bogucki even though it

18   didn't elicit a hearsay statement of Terry Rogers, and

19   we objected to that.  But that was the Court's ruling.

20          So our position is that this Court erred on

21   the side of fairness to this defendant, but did follow

22   the basic concept under the cases that stands for the

23   concept of course of police investigation.

24          Crawford doesn't apply because never were any

Fletcher 001695

1    hearsay statements presented to this jury.  Crawford

2    only applies to hearsay.  There was no hearsay.

3            That's the bottom line.

4            That's my response.

5            THE COURT:  Defense, you have the final say.

6            MR. SALTIEL:  At first, as to the point as to

7    the effect on the jury, I think it did have a very

8    profound effect on the jury.  Because not only did this

9    information come through the detective's testimony, it

10   was something argued by the State in its opening and its

11   closing.  This was a point they reiterated to the jury,

12   that the police had this name, they were looking for

13   this person.

14           Now, as far as to the specifics of the

15   statement itself and the course of the investigation

16   theory, the statement in 2002 by Mr. Rogers was

17   essentially an identification.  The detective testified

18   at trial, he was provided, he was provided the name of

19   Fletcher by one of the witnesses.  That is the statement

20   itself.  And the fact that it comes in, that he doesn't

21   say, "Someone specifically told me it was Fletcher,"

22   shouldn't cure, shouldn't cure the issue on the right to

23   cross-examine on a defect.

24           Specifically, what this leads us to is that

41

1    any time you want to avoid being able to cross-examine

2    someone, you just remove, you know, where that statement

3    came from and you apply this information.  That may

4    protect the hearsay issue, I believe, the course of the

5    investigation theory.  It does not protect the 6th

6    Amendment problems.  I think that is what Crawford was

7    getting at, and I think that Crawford is going to trump

8    an Illinois case, since it's a constitutional issue, and

9    this was a case that was recently decided by the Supreme

10   Court.

11           Just in short, I think, you know, the

12   statements that the detective said Fletcher, and, you

13   know, they had the information of Fletcher, and James

14   Fletcher cannot be taken as any other way as being

15   testimony that came from Terry Rogers.  There was no

16   other source for it.  It was his statement given to the

17   police during an interrogation.

18           And so those statements were improper to come

19   because Mr. Fletcher never had the opportunity to

20   cross-examine him.

21           THE COURT:  In regards to the issue of

22   Detective Bogucki and the limited testimony that this

23   Court allowed in, I believe it was my ruling that he was

24   not to get into any substance of Mr. Rogers' statements

42

Fletcher 001697

1    to him or to any other officer, be it back in 1990,
2    1995, or 2002.

3            The detective, I believe, testified what
4    happened during the course of this investigation, that
5    in 1990, or 1995 the police were looking for a man by
6    the name of Fletcher.  In 2002 they were looking for a
7    man by the name of James Fletcher.  That was after the
8    State elicited testimony establishing the course of his
9    investigation.

10           Now, the Defense argues that there was a
11   statement of identification.  A statement of
12   identification is that the defendant is, that a witness
13   identifies the defendant as the person that perpetrated
14   a crime.  The officer never testified to that.  He never
15   testified that Mr. Rogers identified Mr. Fletcher as the
16   shooter in this case or as the participant in the armed
17   robbery.  That testimony never came out.  I believe the
18   Court in my best efforts attempted to limit any
19   potential problem with this issue.

20           And in regards to Crawford vs. Washington, in
21   this Court's reading of that case, the U.S. Supreme
22   Court struck down where an officer gets on the stand and
23   basically testifies to the events that were given to him
24   by a third party.

43

**Fletcher 001698**

1         That wasn't the case here.  Officer, or
2    Detective Bogucki did not testify to this substance of
3    what Mr. Rogers may or may not have told him.  He
4    testified limiting that after a conversation with a
5    witness he was looking, or the police were looking for
6    an individual named Fletcher, and later by the name of
7    James Fletcher.

8         I think the Defense says that the inference is
9    that Mr. Rogers identified him as the shooter.  But that
10   wasn't the testimony.

11        And I can't tell as a judge if that had or had
12   not had a profound effect on the jury.  I can't say that
13   the statement by Officer or Detective Bogucki that they
14   were looking for Fletcher impacted the jury's decision,
15   or that they were looking for James Fletcher impacted
16   the jury's decision.

17        What I can say is that in regards to the
18   testimony of Detective Bogucki, this Court was adamant
19   we were going to stay within the confines of the
20   Illinois case laws that say that the officer can testify
21   to his course of conduct, and I was not going to allow
22   this officer or any officer to testify as to statements
23   made by a third party to him to get in substantive
24   evidence.

Fletcher 001699

1          Therefore, I believe the Court was correct in
2     following the Illinois law and the tenets established in
3     Crawford vs. Washington.

4          Therefore, in regards to the first issue, your
5     motion based on that will be denied.

6          Now we have the second issue, the Court erred
7     by not allowing (inaudible) Gordon to rebut the State's
8     witness, Detective Bogucki.

9          MR. SALTIEL:  At the time the defendant was
10    arrested April 2002, he was brought to court.  He was
11    arrested.  He had a preliminary hearing, and there was
12    an issue came up over his representation.

13         At that time the defendant identified the name
14    of a private attorney, but because she was not present
15    at the time, the judge asked the public defender to
16    represent him, which they did.  And at that time, they
17    entered their demand for trial, and they conducted their
18    preliminary examination.

19         After that point, the next day, there was an
20    in-person lineup.  And the judge at the preliminary
21    examination specifically requested the State inform the
22    public defender when and where that lineup would be.

23         Now, at this lineup that occurred two days
24    later on April 20, 2002, the attorney representing

45

Fletcher 001700

1     Mr. Fletcher at that time, a Miss Gordon, came to defend

2     him during the course of the lineup, and at that time

3     she was not allowed into the witness viewing room.

4             THE COURT:  Can I -- at that particular point

5     in time -- these are some facts that were not presented

6     at trial -- was there an appearance filed on her behalf?

7             MR. SALTIEL:  No.  The public defender filed

8     the appearance at the time, because she was not

9     available to come to court that day, so the judge asked

10    that the public defender file the appearance.

11            THE COURT:  So the appearance of record was

12    from the Public Defender's Office?

13            MR. SALTIEL:  Yes.

14            THE COURT:  Go ahead.

15            MR. SALTIEL:  So she came, identified herself

16    as Mr. Fletcher's attorney and was there to represent

17    her during the course of the lineup.

18            During the course of the lineup she was not

19    allowed into the witness viewing room.  She was put in

20    the room with the suspect, so she was not allowed to see

21    the interaction between the police and the witnesses and

22    not allowed to view the procedures of the identification

23    process.

24            We believe at that time that Mr. Fletcher had

Fletcher 001701

1    a right to have his attorney present at the lineup

2    because the adversarial process had begun, because there

3    was an appearance made, and because there was a trial

4    demand made, and the fact that the attorney was not

5    allowed into the witness viewing room at the time is a

6    violation of his rights.

7    Now, prior to trial, we did -- we did file a

8    motion on this issue, and the motion was withdrawn, with

9    the understanding that the facts that occurred that day

10    we would be allowed to argue.

11    MS. O'CONNOR:  I object to that statement,

12    Judge.

13    THE COURT:  Overruled.

14    MS. O'CONNOR:  That's not in any records of

15    testimony.

16    THE COURT:  I believe there were discussions

17    that the facts concerning the lineup would be admissible

18    at trial.

19    Go ahead.

20    MR. SALTIEL:  At trial, Detective Bogucki made

21    the statement that people, that the accused person -- or

22    excuse me, attorneys for the accused persons are never

23    allowed into the viewing room during the lineup

24    procedure.

47

**Fletcher 001702**

1    Now, we believe that that was an incredible

2    statement.  We believe that there are instances where

3    the attorney would be allowed into a viewing room,

4    specifically in the case where the adversarial process

5    had begun, and we believe that this was such a case.

6    Now, to rebut this statement at trial, we

7    tried to elicit testimony from Miss Gordon, the

8    attorney, at the time that she should have been allowed

9    into the witness room, and that attorneys are allowed

10   into the witness room if the adversarial process had

11   begun, and, of course, she was not allowed to testify in

12   that regard to rebut the detective's earlier testimony.

13   We believe it was improper to strike her testimony and

14   her testimony should have been allowed.

15   So for that reason we'd ask the Court to grant

16   our motion for a new trial.

17   MS. O'CONNOR:  Judge, our response is that

18   such testimony by an attorney would be inadmissible at a

19   trial.

20   Testimony about whether an adversarial process

21   had begun and whether she should have been allowed into

22   the viewing room with the witnesses isn't an appropriate

23   subject for a trier of fact to consider.  That is a

24   subject of a pre-trial motion and totally irrelevant to

48

Fletcher 001703

1    the fact-finder in determining guilt or not guilt.  That

2    was our main argument with regard to this portion of

3    this post-trial motion.

4              If this issue had been heard before trial, the

5    main issue would have been had the adversarial process

6    begun, and Counsel states that it had.  We, of course,

7    would state that it had not begun.

8              But that is a factual issue that has to be

9    determined, and that is an issue of law, not an issue of

10   fact for a jury.  He made a statement that with regards

11   to it had been determined somehow that all these issues

12   would be brought out at trial, and that is absolutely

13   incorrect.  There never was such an agreement, because

14   that would go against the way such issues are to be

15   decided, and this Court certainly would not have allowed

16   that, nor would we have agreed to it.

17             And I'm not really sure if I should even

18   address whether the adversarial process had begun,

19   because I don't believe that this part of this motion

20   for a new trial -- I mean, I think it should be stricken

21   as inappropriate at this time.

22             But I'll address it if you want me to.

23             THE COURT:  You may.

24             MS. O'CONNOR:  There is case law on this

49

**Fletcher 001704**

1    issue, as you know, Judge, in the Clarence Hayes

2    (phonetic) case, cited at 139 Ill.2d, 89, there is a

3    long discussion as to when a person's 6th Amendment

4    right to counsel attaches.  And obviously, it's only

5    after adversarial judicial preliminary criminal

6    proceedings have initiated which by way of a formal

7    charge, preliminary hearing, indictment, information, or

8    arraignment.

9          Counsel cites the Kirby case in his post-trial

10   motion.  And that case, the Kirby case is cited in

11   Hayes.

12         In this case, none of those adversarial

13   proceedings had been initiated.  The fact that he was

14   brought in front of a judge doesn't mean the adversarial

15   proceedings had begun or that a court told the state's

16   attorney to notify the assistant public defender that

17   his client was going to be standing in a lineup.  That

18   doesn't mean the adversarial process had begun.

19         In fact, this investigation was, the police

20   were in the middle of the investigation.  They were

21   bringing the eyewitnesses to look at the lineup.  No

22   charges had been approved.  There was no preliminary

23   hearing.  It wasn't even determined yet if charges had

24   been filed, so --

50

Fletcher 001705

```
1                    THE COURT:  So why were they in front of a

2         Judge on April 18?

3                    MS. O'CONNOR:  Because a warrant had been

4         issued.  And he was brought, apparently, to a judge

5         because he had been arrested on a warrant.

6                    THE COURT:  So he was brought in from the

7         Illinois Department of Corrections and a judge in this

8         building --

9                    MS. O'CONNOR:  Does the court file reflect

10        that he was in front of a judge on the date that you

11        just mentioned?

12                   THE COURT:  The first entry in my common law

13        record is June 27, 2002.

14                   MR. SALTIEL:  He was before a judge on April

15        18th, and we do have the transcript.

16                   THE COURT:  May I see that?

17                   MR. SALTIEL:  I'm not sure if I have them with

18        me, though.

19                   THE COURT:  I might ask the Defense at this

20        time, you state on April 18th, a preliminary examination

21        against Mr. Fletcher was filed?

22                   MR. SALTIEL:  It was.

23                   THE COURT:  Is that the execution of the

24        arrest warrant?
```

51

Fletcher 001706

1          MR. SALTIEL:  It was an appearance -- well,

2     there was an appearance, notice of representation, and

3     demand for trial filed by the state's attorney on 4-18.

4          THE COURT:  On 4-18?

5          MS. O'CONNOR:  It was in front of Judge

6     Sheehan.

7          And Judge, what it was, basically was for bond

8     purposes.  No bond order was issued.  And the defendant

9     was remanded to Cook County Jail so the police could

10    conduct the lineups.

11         I don't know what Counsel means by preliminary

12    examination.  I'm not aware of that as any type of legal

13    proceedings.  There was no preliminary hearing.  There

14    never was a preliminary hearing in this case.  There was

15    no evidence taken at that time.  He was simply appearing

16    there so he could be remanded to the jail so the police

17    could conduct the lineups, because they couldn't do it

18    at the Illinois Department of Corrections.

19         THE COURT:  And either side, on April 18, '02,

20    did Judge Sheehan find probable cause to detain on the

21    charge before the court?

22         MS. O'CONNOR:  Judge, I don't have a

23    transcript of that date.

24         MR. SALTIEL:  I don't have a transcript with

52

Fletcher 001707

1    me.

2                    MS. O'CONNOR:  Could it be reflected on the

3    municipal file?

4                    THE COURT:  There is not a municipal file on

5    here because of the indictment, and because he came from

6    IDOC.

7                    MS. O'CONNOR:  Well, I would submit even if

8    there was a finding of probable cause to detain, that

9    that doesn't click in the 6th Amendment right to

10   counsel.  Because it's when there is adversarial

11   judicial criminal hearings.

12                   And the Kirby case lists those legal

13   proceedings, Judge, and it clearly does not include a

14   Gerstein-type situation hearing.  It's formal charge,

15   preliminary hearing, indictment, information, or

16   arraignment.  And the defendant clearly was in custody

17   on a twenty-five year sentence where he was in custody

18   anyway.

19                   I don't believe that that -- in fact, I would

20   submit that there wasn't a finding of probable cause to

21   detain because he was under a twenty-five year sentence

22   with release not in the near future, and this procedure

23   was on the warrant, so he can could be remanded to the

24   Cook County Jail, and that is what my file reflects.  It

53

Fletcher 001708

1    says no bond, remand to Cook County Jail.

2              But if there was a finding of probable cause

3    to detain, Judge, again, we submit that that is not the

4    type of adversarial proceeding that would initiate the

5    6th Amendment right to counsel.  He hasn't been charged.

6    The investigation was still in progress.  And in that

7    situation, the attorney doesn't have a right to be with

8    the witnesses in the viewing room.

9              And I mean, I don't think Detective Bogucki

10   had to allow her to sit in with the defendant either.

11   He could have denied her total access to any part of

12   that lineup.

13             THE COURT:  Defense?

14             MS. O'CONNOR:  Judge, I just wanted to state

15   that this attorney was allowed to testify about with

16   happened at that police station, and their motion says

17   that she wasn't, that she wasn't allowed to rebut

18   Detective Bogucki.

19             But again, that is not the province of the

20   jury.  That issue isn't one that a jury could consider,

21   or even be confronted with.

22             THE COURT:  The issue of illegality of a

23   lineup or the suggestiveness?

24             MS. O'CONNOR:  The fact that the attorney

54

1    wasn't allowed to be in the viewing room.

2            Certainly, you can always argue suggestiveness

3    based on the makeup of it.

4            But these legal issues are not issues for a

5    jury to decide.

6            THE COURT:   Okay.

7            Defense?

8            MR. SALTIEL:   I think one of the points at

9    trial that Miss Gordon was attempting to make is that

10   she did not -- she believed that the lineup was

11   suggestive.

12           And not only that she believed that the lineup

13   was suggestive, it was a statement by the detective that

14   the police procedure was legal, and that statement was

15   out there.   And that we should have been given the

16   opportunity to rebut that statement, that that procedure

17   was proper.

18           Because, clearly, we didn't think it was

19   proper.   And once that statement was out there, you

20   know, it was out there in front of the jury, and we

21   should have been given an opportunity to rebut that.

22           THE COURT:   Well, here's what I'm going to do

23   with this issue, unfortunately.   I don't know what

24   Paragraph 10 means in regards to the statement filed a

55

Fletcher 001710

1    preliminary examination on April 18, 2002.  And in

2    regards to the statements of Detective Bogucki, that

3    attorneys for accused persons are never allowed to the

4    witness viewing room during a (inaudible) lineup.

5              Do you have that specific statement on Page

6    210, February 23rd, handy?

7              MR. SALTIEL:  I can get that for you, I

8    believe.

9              MR. HILL:  Your Honor, would it be helpful for

10   us to get the transcript over here?

11             THE COURT:  That's what I'm sort of geared

12   towards.

13             MS. O'CONNOR:  What are you asking for?  A

14   statement of who?

15             THE COURT:  Bogucki, in his testimony that

16   attorneys are never allowed in there.

17             MS. O'CONNOR:  Is that -- is that on

18   cross-examination asked by the defense attorney?

19             THE COURT:  I don't know.  I have a question

20   mark here, 2-23-05, Page 210.

21             MR. SALTIEL:  This was a question asked by the

22   State.  And the question they asked was, "Are attorneys

23   ever allowed in the area where the witnesses are viewing

24   the lineup"?

56

Fletcher 001711

```
 1              Answer:  Not in Area 5.  They are not.
 2              THE COURT:  Okay.
 3              MS. O'CONNOR:  That was on re-direct.
 4              THE COURT:  That was on re-direct, right.
 5              MS. O'CONNOR:  That was on re-direct.
 6              THE COURT:  Okay.
 7              MS. O'CONNOR:  And I think we objected to
 8    Counsel asking Bogucki the questions, the legality about
 9    it.
10              THE COURT:  The Court's position is that there
11    was a motion to exclude the lineup identification that
12    was later withdrawn.  During the course of the pre-trial
13    or, before this Court.
14              I believe that does not prevent the Defense
15    from arguing that the lineups were improper, unfair, and
16    suggestive, in the sense that only -- let's say out of
17    five people only one individual was wearing a white
18    shirt.  I believe that that was the basis for Miss
19    Gordon's testimony.  Not to render a legal opinion as to
20    whether or not it was a legal lineup.
21              I believe we even had a sidebar at that time,
22    and this Court said she can testify to what she observed
23    and her conclusion that it was suggestive.  He was the
24    only one with a certain kind of hair, the only one that
```

Fletcher 001712

1    was over six foot, that's her opinion.  Okay?  Even

2    though she is an attorney.

3           Her conclusion, legal conclusion that the

4    lineup was unfair was not admissible.  And I think this

5    Court was able to stick to that procedure.

6           However, before I make my final ruling on

7    this, I would like to see the April 18, 2002 transcript.

8           I'm assuming it's not too lengthy?

9           MR. SALTIEL:  Four or five pages.

10          THE COURT:  Could you call over and have them

11   FAX it over here?

12          MR. SALTIEL:  If you call over -- if you give

13   us a number?

14                        (Whereupon the above-entitled

15                         cause was passed and later

16                         recalled, after which the

17                         following proceedings were

18                         had:)

19          THE CLERK:  James Fletcher.

20          THE COURT:  Both sides had an opportunity to

21   look at the transcript dated April 18, 2004?

22          MS. O'CONNOR:  Yes.

23          MR. SALTIEL:  Yes.

24          THE COURT:  All right.

58

1          Defense, your argument is based on the

2     transcript?

3          MR. SALTIEL:  First -- and before I get to the

4     transcript, I just wanted to address a point that was

5     raised by the State in respect to the Hayes case when

6     the right to counsel attaches.

7          I do not believe the Hayes case, the facts in

8     there are directly on point in the event that Counsel

9     gave of when the right attaches were merely examples of

10    instances where the right to counsel to attach would

11    start.  I don't believe that was an exclusive list.

12         I believe the standard is still that when

13    adversarial proceedings have begun, that's when the

14    right to counsel attaches.

15         Now, I think in this case, you can't just look

16    at one hearing.  You have to look at what the State was

17    doing.  The State was proceeding against Mr. Fletcher

18    starting in February.  February is when they did the

19    identification for Mr. Rogers.

20         Then they got a subsequent identification or

21    an attempt to identify from Mr. Cooper.  Then they

22    proceeded to talk to Mr. Fletcher after interviewing

23    Mr. Fletcher.  Then they talk to Miss Friend and got an

24    identification from Miss Friend.  And then they went to

Fletcher 001714

```
1    seek an arrest warrant.  And they had done this all
2    prior to April of '02.

3            And the reason why I think this case is a
4    little bit different than the case law at hand is that
5    we do have a little bit of gray area, because he was
6    already incarcerated by the Illinois Department of
7    Corrections.  So they could delay doing certain things
8    because he wasn't going anywhere, and he was available
9    the entire time.

10           I think clearly at that time the State had
11   interviewed all the witnesses, had identifications at
12   that time, and decided to pursue an arrest warrant.
13   They decided to pursue Mr. Fletcher for murder, and at
14   that time, adversarial proceedings had begun.

15           And at the April 18th hearing, at that time
16   not only did the public defender enter an appearance,
17   but that's when the clock started ticking for his demand
18   for trial.

19           There is not many more things that can go on
20   to show that the State was proceeding against
21   Mr. Fletcher.

22           THE COURT:  Counsel, I don't believe there was
23   a demand for trial on April 18.

24           MR. SALTIEL:  I believe that was filed with
```

60

**Fletcher 001715**

1      the appearance, and I also I believe that was when the

2      issue of the speedy trial came up, prior to this trial,

3      they were calculating from that date.

4              THE COURT:  State, your response?

5              MS. O'CONNOR:  My response is, Judge, that as

6      case law does say that the government has had to have

7      committed itself to prosecution for the adversarial

8      level to require the assistance of counsel under the 6th

9      Amendment.

10             And the case law also is clear under, and that

11     the government commitment to prosecution is talked about

12     in the Kirby case, and the case, the Hayes case,

13     Clarence Hayes cited at 139 Ill.2d, 89, and the

14     Appellate Court case of Illinois by the name of Jose

15     Costilla, C-o-s-t-i-l-l-a, cited at 240 Ill.App.3d, 72,

16     both stand for the proposition that obtaining an arrest

17     warrant does not start the 6th Amendment right to

18     counsel, that that does not rise to the level of

19     adversarial proceedings requiring an attorney to be

20     present.

21             In this case, Judge, it's maybe you could say

22     slightly different than other cases.  But it's not

23     really different.  The only difference is the custodial

24     situation of the defendant.  An arrest warrant is

61

Fletcher 001716

1    obtained. And the case law is clear that that is not

2    enough to kick in the right.

3              The reason the defendant was brought to Branch

4    66 was -- and I think that the transcript bears this out

5    -- is that it was merely for what you might call

6    housekeeping or administrative purposes, so that his

7    incarceration could be transferred to Cook County, so

8    that the police could run the lineups. If he hadn't

9    been in custody and he had been arrested on a warrant,

10   he wouldn't have had to go to Cook County Jail, because

11   the lineups, he could have gone straight to the police

12   station where the lineups could have been conducted.

13             But in this situation, the people from IDOC

14   could not bring him to Area 5 and stay there with him

15   for lineups. They had to bring him there. He had to go

16   to court and then transferred to Cook County.

17             And the transcript, clearly no facts of the

18   case are brought to the attention of the Court. There

19   is no Gerstein hearing. There is no type of judicial

20   proceedings other than to transfer his custody.

21             He was already under a sentence. He was

22   already in custody.

23             I know Judge Sheehan said there was no bond in

24   this case. But really that has no effect on it, because

62

**Fletcher 001717**

1    he was under a sentence of IDOC anyway.

2          So, you know, he couldn't have been released

3    from jail whether Judge Sheehan said no bond or not.

4          This clearly wasn't a Gerstein hearing. And

5    our position is that, again, it was housekeeping, slash,

6    administrative so that his custodial situation could

7    allow for the lineups.

8          Under the case law, arrest warrants aren't

9    enough to kick in the adversarial proceeding.

10         So we would submit that that 6th Amendment

11   right had not kicked in, and there was no violation of

12   his rights by conducting a lineup without allowing an

13   attorney to go in.

14         And the attorney that filed the appearance on

15   April 18 was the Public Defender. They did file an

16   appearance.  There was a demand for a preliminary

17   hearing.

18         But really, that is a hollow demand, Judge,

19   because the defendant hadn't been charged.  There was no

20   preliminary complaint filed.  There were no charges

21   approved.  There was nothing to be heard.  The case was

22   still in the midst of investigation.

23         And it was only after the investigation was

24   complete and that charges were approved would any type

63

**Fletcher 001718**

1    of adversarial process begin.  And that hasn't clearly

2    -- clearly, that hadn't begun.

3              So that is our position, Judge.

4              THE COURT:  One moment.

5              Defense, I'll give you a response.

6              MR. SALTIEL:  Judge, to verify some factual

7    issues, I believe the arrest warrant was issued in

8    March, and actually executed on April 18, and no -- to

9    explain the terminology used in the motion of

10   preliminary examination, I believe that came from what I

11   guess is titled a Complaint for Preliminary Examination

12   was filed by the State on April 18 where he was charged

13   with the offense of first degree murder.

14             As far as the case law is concerned, our

15   argument isn't that he was arrested and therefore the

16   6th Amendment right had attached.  I think you have to

17   look at the totality of the State's conduct in this case

18   in they had been investigating him for some time and

19   already had some identifiers, and they were proceeding

20   against him at the time of the in-person lineup.  And at

21   that time is when the 6th Amendment right to counsel had

22   attached.

23             THE COURT:  Okay.

24             In regards to the issue Number 2, concerning

64

Fletcher 001719

1     the testimony of Attorney J. Cunnion Gordon, there are a

2     few issues here.  I'll try to address them one by one.

3            First issue is whether or not his 6th

4     Amendment right to an attorney started or was initiated

5     on April 18.

6            It's true, I think the facts bear out that on

7     April 18, detectives from the Chicago Police Department

8     had James Fletcher transferred from the Illinois

9     Department of Corrections into Cook County Jail to

10    establish -- or the procedure at that time was to go

11    before a judge and the Department of Corrections would

12    transfer him or that person to the Cook County Jail upon

13    the judge's order.

14           On this particular date, April 18, 2004,

15    Mr. Fletcher appeared in court in Judge Sheehan's

16    courtroom for the purposes of being transferred to Cook

17    County Jail, and the further purpose to stand in a

18    lineup, as elicited on Page 2 of that transcript.

19           At that time the public defender in the

20    courtroom, Mr. Bernie Sarley, represented him, or filed

21    an appearance on his behalf.  The judge remanded

22    Mr. Fletcher to Cook County Jail.

23           At that time Mr. Sarley informed the Court

24    that Mr. Fletcher was represented by a private attorney

Fletcher 001720

1    who was out of town, and he asked for a continuance for

2    the lineup. The judge informed him that he did not have

3    the authority to do that, and he further stated on Page

4    3, "At this time, sir, you have made of record that he

5    has contacted private counsel. I understand she is out

6    of town. I suggest before the lineup is conducted you

7    notify her."

8           At that time state's attorney said, "We'll do

9    that, Judge."

10          It was established her appearance was not on

11    file, and that was correct. Mr. Sarley said, "We'll

12    accept the appointment. We'll ask the Court to file our

13    appearance," and that was granted, and the state's

14    attorney informed the public defender in open court of

15    the time and date of the lineup. And I think said it

16    would happen to, on Saturday.

17          The facts presented in the motion established

18    that the lineup was conducted on April 20, '02.

19          So the issue was whether that appearance

20    before Judge Sheehan constituted an adversarial

21    procedure.

22          Now, Defense argues that the procedure against

23    the defendant in regards to this case began prior to

24    that. But I think the case law we're talking about

Fletcher 001721

1     legal proceedings, not investigation.  Not the

2     investigation.  And by that I mean the interview of

3     witnesses, the showing of photo arrays, whatever else

4     entails any specific investigation.  At that time in

5     front of Judge Sheehan I don't believe the Government

6     had made a commitment to prosecution.  The only thing

7     the Government had was through the police agency made a

8     commitment to further an investigation.

9              And when you look at going over to the case

10    cited by the Defense, People vs. Michael Swift, 91

11    Ill.App.3d, 361 on Page 4 of that opinion it stated that

12    the Supreme Court has held that a pre-trial (inaudible)

13    conducted after a suspect has been indicted is a

14    critical stage in a criminal prosecution at which the

15    6th Amendment (inaudible) the accused to the presence of

16    counsel.

17             It's my reading of the case law that at the

18    time Mr. Fletcher appeared his right to counsel had not

19    been invoked.

20             However, as the Defense mentioned, in the

21    totality of the circumstances the Court did appoint him

22    an attorney, and that cannot be denied based on the

23    transcript presented today, and that attorney was an

24    attorney from the Public Defender's Office.  Mr. Bernie

Fletcher 001722

1    Sarley at that time accepted appointment and was given

2    information concerning a lineup.

3           At the same time, information was given to the

4    Court that the defendant has a private attorney.

5           Now, two days later, on April 20, during the

6    course of that lineup the private attorney appeared at

7    the police station, and she was given the opportunity to

8    observe the lineup.  She was not given the opportunity

9    to watch the witnesses' identification.

10          In regard to that issue, I believe she was

11   given the opportunity to, that was necessary.

12          First off, I don't believe that 6th Amendment

13   right had started or had kicked in, and I also believe

14   as a matter of record she was not the attorney of record

15   at that time.

16          Now, she had two days or one day to file an

17   appearance.  However, even though she did not file an

18   appearance, I believe the detective had a duty to allow

19   her to observe the lineup, and that she did.  And she

20   testified to that, that she was in the viewing room,

21   that she was able to view the individuals presented in

22   the lineup, that she was able to testify to the

23   procedures of the lineup.

24          That's the reason I understand that the

68

**Fletcher 001723**

```
1    Defense called her, to establish their theory that the
2    lineup was suggestive, unfair, and improper.  Not that
3    it was illegal.
4         I believe that the questions asked in regard
5    to Detective Bogucki on direct examination was whether
6    or not it was illegal, which is not his theory, or his,
7    (inaudible), should not be the basis of his testimony.
8    That legality is up to the Court.
9         The fact is that Miss Gordon, Miss Gordon was
10   able to testify to how she observed the lineup, the
11   people involved in the lineup, the clothing of the
12   individuals in the lineup, the discrepancy in size, the
13   potential age, and the discrepancy in hairstyle.  All of
14   that facts were argued by the Defense in their closing
15   argument to establish that even an eyewitness to this
16   lineup, that eyewitness established that it was
17   suggestive.  That anyone -- basically anyone would have
18   picked out Mr. Fletcher.
19        In regard to the testimony presented to the
20   Court or presented to the jury, I don't feel that the
21   jury latched on, if you use the proper term, to this
22   conclusion by either Bogucki or the conclusion that the
23   Court would not allow Miss Gordon of the legality of
24   this.
```

69

**Fletcher 001724**

1          So in regards to the complete issue before me,

2    I don't believe the 6th Amendment right had attached.  I

3    believe, though, the Court did appoint an attorney.

4    That attorney did not, the Public Defender's Office did

5    not show up for the lineup.  An attorney did show up for

6    the lineup.  The detective allowed that attorney to

7    observe the lineup.

8          Based on -- not the witnesses aspect of the

9    lineup, but the lineup that the defendant showed in, I

10   believe that is sufficient, because the attorney is

11   there, and at that time no 6th Amendment right had

12   attached, but the detective did allow her to observe it.

13         She then came into court and testified what

14   she observed which led the Defense to argue their theory

15   that the lineup was suggestive.

16         Based on issue No. 3, the motion will be

17   denied.

18         I'm sorry.  Number 2.

19         For the record, what I'm going to do is put

20   the transcript of the proceedings into the court file

21   for further review.

22         Now, we move on to No. 3.  This involves some

23   attachments.

24         So, Defense, you may begin your argument.

70

1           Let me know when you are referring to one of

2    the attachments.

3           MR. SALTIEL:  Issue No. 3 has to do with the

4    testimony of Miss Friend, who was one of the witnesses

5    in 1990.

6           At trial she identified Mr. Fletcher as one of

7    the suspects from the '90 incident.  During

8    cross-examination and trial, Miss Friend was asked about

9    her pre-trial identification of the suspect in March of

10   2002.  In March of 2002, Miss Friend was arrested for a

11   parole violation.  During that arrest, detectives

12   investigating the 1990 incident questioned her,

13   presented her with a photo array in which she identified

14   Mr. Fletcher.

15          Now, during the trial, at cross-examination

16   Defense Counsel had asked Miss Friend whether she had

17   been released after identifying Mr. Fletcher in March of

18   2002.  I believe her testimony was no, that she was not

19   released, and she was, she went back to jail for a

20   parole violation where she's been since.

21          Now, that --

22          THE COURT:  Did she testify where she's been

23   since?

24          MR. SALTIEL:  I --

71

**Fletcher 001726**

1          THE COURT:  Or was that the inference that you
2     felt was made to the jury?

3          MR. SALTIEL:  I don't believe she said that in
4     her testimony.  All she said in her testimony was that
5     she went back to jail.

6          I believe that the inference to the jury, and
7     I believe this was a statement, a point that the State
8     relied on later in her closing that she had no reason to
9     lie because she had been back in jail, or as you recall,
10    when she testified she was in her Cook County wardrobe,
11    not in regular street clothes.

12         So I think there is an inference she's been in
13    jail since this.  We were unable to verify her statement
14    at this time whether she had been sent back to jail.
15    The rap sheet that was provided by the State's
16    Attorney's Office that we had didn't indicate any arrest
17    in March.

18         And I believe that -- I believe Exhibit C
19    shows the rap sheet that we were provided prior to trial
20    which does not show any activity in March of 2002.

21         Now, the difficulty with this is, and,
22    actually, it's still unclear whether she went back to
23    jail after that arrest, because the complete rap sheet
24    appears to indicate there was no time served after that

72

Fletcher 001727

1    arrest.

2          But so we were -- even with a complete rap

3    sheet, it didn't seem to indicate that she was sent

4    back. So it seemed to be that she had told a lie on the

5    stand of her going back to jail for the parole

6    violation.

7          The other problem with this is that we know

8    that she hasn't been in jail continually since this

9    arrest because of the trouble that the State had in

10    bringing her as a witness to trial. They couldn't find

11    her. They would have arrested her. She would, you

12    know, tell her parole officer or something, all sorts of

13    stories going around. .

14          But for one reason or another, they don't find

15    her until February of '05. When they found her, they

16    arrested her, and put her in jail.

17          Now, we couldn't use that, or to impeach her

18    with that information was subject to another ruling that

19    the Court had made at trial that if we were to bring up

20    any of those incidents where there was difficulty with

21    her appearing in court, that the State would have been

22    allowed to bring up what is highly prejudicial

23    accusations by Miss Friend and helps substantiate

24    allegations that her life was threatened.

Fletcher 001728

1          And that posed us with a problem.  Without the
2    proper information to impeach her on her March 15, '02
3    incident whether she was arrested or not or whether she
4    was sent back to jail for, sent back to jail for the
5    parole violation left us with that problem, because no
6    other way to impeach her with her criminal history other
7    than to rely on her subsequent evading of the State.
8    And because of the ruling and the prejudicial nature of
9    what would happen if we tried to impeach her with that
10   information, we chose not to.

11         So the only thing we could have relied on is
12   information regarding her March 2002 arrest, which we
13   didn't have at that time.  And that was information we
14   believed that the State should have provided to us.

15         Now, this also became a problem, because the
16   State in its closing argument specifically referenced
17   that the credibility of these witnesses was good, there
18   was no reason to lie, and that they did come here on
19   their own free will.  And we believe that was simply
20   incorrect based on the circumstances regarding Miss
21   Friend.

22         And to reiterate the last point, which I think
23   I shall -- not only did the State have the difficulty of
24   bringing her to trial, they had to in fact arrest her

74

1    and place her in custody to insure her testimony at

2    trial.  And that clearly implicates that she wasn't

3    there on her own free will, and there is clearly issues

4    about her credibility, that even though we didn't bring

5    out at trial, the State clearly knew that when they were

6    making their statements that she was there, she had no

7    reason to lie, she was there on her own free will.

8            For those reasons, we would ask that you grant

9    us our motion for a new trial.

10           THE COURT:  Hold on, Counsel.

11           You addressed Exhibit No. C, which is a

12   two-page criminal history of Miss Friend.

13        .  But on Exhibit F, there's a second -- I think

14   you referred to as an updated or completed rap sheet.

15           MR. SALTIEL:  It was a more up-to-date rap

16   sheet.

17           THE COURT:  Did you receive both of those

18   prior to trial?

19           MR. SALTIEL:  No, Exhibit F was received after

20   trial.

21           I had made a request of the State to update,

22   because we were -- because we were, I guess perplexed at

23   her testimony and wanted to verify what was going on.  I

24   asked for an updated rap sheet, and that was provided

75

Fletcher 001730

```
 1       after the conclusion of the trial.

 2                 THE COURT:  Okay.

 3                 In regards to her having to be arrested and

 4       brought into court, you had knowledge of that?

 5                 MR. SALTIEL:  Yes.

 6                 THE COURT:  And you cross-examined her on

 7       that?

 8                 MR. SALTIEL:  No.  And that was the issue

 9       where you ruled that if we cross-examined her on that,

10       the State would be allowed to --

11                 THE COURT:  Well, I think my ruling was you

12       could bring that out, that she had been arrested, and

13       the State would bring out, "Why did you not come to

14       court"?

15                 State, your response?

16                 MS. O'CONNOR:  With regards to that last

17       issue, Judge, I think that, you know, Counsel made a

18       tactical decision not to question her refusal to come to

19       court and her having to be arrested, because he's aware

20       of the reasons that she didn't come to court, and those

21       were brought up during some pre-trial hearings and

22       motions with regards to threats made to her and her

23       family.  And that is his decision.

24                 And it certainly would be -- he'd be opening
```

76

**Fletcher 001731**

1      the door once he started telling having her say how she

2      had been arrested in order to testify.  So I think

3      that's a proper ruling.

4             I mean, that's -- once you open the door, I

5      think we certainly should have been justified in asking

6      her why she didn't come to court after being subpoenaed.

7             So we agree with the Court's ruling on that.

8             With regard to all the other issues, Counsel

9      states that he didn't have an updated rap sheet.  And I

10     was looking through my file, and, Judge, I don't know

11     when the last rap sheet was tendered prior to trial.  I

12     can't -- I actually, I don't have a transcript of every

13     court date.  I couldn't find a record of when the last

14     rap sheet for Miss Friend was tendered to Counsel.

15            They said they had one, but that it didn't

16     include a March of '02 arrest.  So I'm not going sit

17     here and say I gave them an updated one every time the

18     case was up.  This case had been pending for some time.

19     I found receipts, signed receipts for discovery

20     indicating they received Shenay Friend's rap sheet at a

21     prior date.  I think it was when perhaps Cathy Dillon

22     was on the case.

23            But I would submit that discovery is an

24     ongoing process, and if they wanted an updated rap sheet

77

1    -- I mean, they asked for one after trial.  They could

2    have asked for one before.  I understand it's our

3    obligation to keep discovery current.  But -- and I

4    simply cannot tell the Court if I tendered them anything

5    on Shenay Friend prior to trial.  I know that her

6    history of arrests on this case was known to them for

7    not appearing in court.

8              But I would submit that regarding the March of

9    '02 arrest, they say it's not on their rap sheet that

10   they have for her.  But it's tendered in discovery in

11   the detective supplemental police report, and I'll read

12   from Page 6 of a nine-page supplemental police report,

13   submitted by Detectives Shalk and Bogucki on May --

14   submitted to the police department by them on May 21,

15   '02, and approved May 24, '02.  It indicates -- and this

16   is part of their history of their investigation -- says

17   on 7 March, '02, at 6:40, Shenay Friend was arrested on

18   a parole violation warrant.  She was subsequently

19   interviewed by detectives on 8 March, '02, at 1645

20   hours.  She then related the following in summary.  Then

21   it gives a summary of what she told the police.

22             So certainly, they were aware that she had

23   been arrested on a parole violation warrant.  So, you

24   know, if it wasn't on their rap sheet, you know, it's --

78

Fletcher 001733

1      what does it matter?  They knew about it.

2              So I don't think that they can complain that

3      they didn't know about it when it was tendered in

4      discovery.

5              And her direct examination during the trial,

6      she, on Page 131, she told about her prior convictions,

7      one for PCS in '03, and one for PCS with intent to

8      deliver in 1998.  Those were her two prior convictions.

9      Nothing was withheld about her criminal history, Judge.

10             And their main contention seems to be this

11     parole violation.  And I don't know how they can claim

12     they didn't know about it when it's in black and white

13     in the supplemental police report.  That is how the

14     detectives talked to her, because she was arrested.

15     Clearly, you know, everyone knew about it.  So I don't

16     think it's a discovery violation.

17             And when she answered on cross-examination

18     about they said to her something in the nature of,

19     "Well, once you were identified in a photo array they

20     let you go, didn't they"?  She was like, "No, I went

21     back to prison."  That addresses No. 15, the State

22     didn't provide any evidence to indicate she was sent

23     back to jail for parole violation.  Well, her testimony

24     is evidence.

79

1           And you know what?  A criminal history is

2   always to be tendered for felony convictions so a person

3   can be impeached.  And a city rap sheet does not

4   generally, and also includes parole violations and when

5   someone went back.  I mean, in fact, they hardly ever

6   indicate someone went back to prison on a parole

7   violation, because that is not a new conviction.  That

8   is not something that would impeach her credibility, a

9   finding that she went back on a parole violation.

10          They could have investigated this parole

11  violation from Day 1.  It was in the reports.  I'll say

12  no more about that.

13          On No. 16, Counsel says the State argued she

14  had no reason to lie about her identification and she

15  didn't make any deals.  If any deals were made with

16  witnesses, they would have been disclosed.  I mean, I as

17  an officer of the court, you know, tell the Court that

18  no deals were made with her.  I mean, they would have

19  been disclosed.  That clearly would have been a Brady

20  violation if deals were made.  They weren't.

21          And my argument that she had no reason to lie

22  is certainly a reasonable inference from the evidence.

23  She didn't know the defendant.  She didn't know the guy

24  that got killed.  You know, there's basically an

80

1       unbiased witness, Judge, with no deals ever having been

2       made.

3               So my argument that she had no reason to lie

4       is not prejudicial to anyone, nor was it error to allow

5       the State to argue that in opening close or rebuttal.

6               In Paragraph 16, Counsel states the State

7       specifically reiterated Miss Friend's testimony that she

8       had been in custody ever since March of '02. And I cite

9       Page 72.

10              If you look at that transcript, there is no

11      such statement by Miss Friend that she had been in

12      custody ever since March of '02. That is another

13      misstatement by the defendant. It's inaccurate, and it

14      is untruthful that they would tell the Court that Miss

15      Friend said that. She never said that.

16              If they want to infer that from the testimony,

17      they can infer it.

18              But there is no evidence that the jury

19      inferred it, and it was never told this jury by Miss

20      Friend that she had been in custody since March of '02.

21              Did she come out in jail clothes? Yes, she

22      did. But no one said they were prison clothes she had

23      been wearing since March of '02.

24              Again, Counsel could have asked her, "Why are

81

**Fletcher 001736**

1    you in Cook County Jail uniform"? And she would have

2    said, "Because I got arrested for not coming to court to

3    testify." But they chose not to do that. Again, a

4    tactical decision.

5            So Page 16 is inaccurate. It's not justified

6    by the transcript.

7            Paragraph 17, the State indicated to the jury

8    Miss Friend had no motive to lie. Yes, we did. And

9    implied she did came to court on her own free will. Who

10   implied that? We never said that. It was not argued as

11   a reasonable inference. Again, inaccurate,

12   mis-statement of the argument. Their interpretation,

13   free and easy interpretation that is inaccurate.

14           Repeated that argument four times? Where?

15   Show me.

16           They cite Page -- transcript on closing

17   argument, 72 to 74. I don't see it. I read all those

18   pages. It never says that.

19           Was she released from custody after she

20   testified? Eventually, yes, she was. Because she came

21   and she did what she needed to do so that she wouldn't

22   be in contempt of court. And she only did that because

23   she was locked up. Because if she wasn't locked up, she

24   wouldn't have been here to testify.

82

Fletcher 001737

1          But Counsel again chose not to question her

2     about that.

3          Was she told she'd be released if she

4     testified?  No.  There is no evidence of that.

5     Absolutely none.  No deal.  Nothing.

6          Because the State chose to ask the Court to

7     dismiss the petition for contempt after she testified,

8     does that mean a deal was made with her and she was

9     promised she would go home if she testified?  No.  Was

10    she ever said, "You'll go home if you testify in a

11    certain way"?  No.  She simply was asked to come in and

12    tell the truth.

13         In fact, prior to this trial, Judge, you know,

14    I was prepared to have state's attorneys come in here

15    and testify to what she said at the Grand Jury.  I

16    didn't even know what she was going to say.  If I needed

17    to impeach her with prior Grand Jury testimony and a

18    handwritten statement, I would have.  I didn't know what

19    she was going to say.  All I knew, she was going to

20    testify.

21         Basically, they are saying that we suborned

22    perjury in this.

23         And Paragraph 17 in the middle on Page 7, the

24    State knew Miss Friend had incentives to give inaccurate

Fletcher 001738

```
 1    testimony.  Where did they get that?  That is an
 2    accusation that is totally unsupported, totally without
 3    good faith, and it's wrong.  Who gave her incentives to
 4    give inaccurate testimony, knowing it was perjured
 5    testimony?  How can they assert that without having any
 6    proof?  It's totally unsupported.
 7             Now, they didn't address today what is Page,
 8    Paragraph 19, and I don't know if they're standing on
 9    their written paragraph or if I'm just supposed to
10    ignore that, or if they are -- I don't know.
11             But since it's there, I guess I'll address
12    that.
13             We submit that there was no blown trial demand
14    in this case.  There was talk of the term running, and
15    in December there was an agreement, basically, between
16    the parties as to where we were on the term, and we were
17    getting close to the end of 120 days.
18             In fact, we filed a motion to extend the term.
19    But then we never asked for that extension.  I mean, we
20    didn't proceed -- we didn't pursue that any further.
21    Because in December, on December 14, 2004, we did answer
22    ready, and at that time it was approximately Day 116
23    over 120, and the Defense went by-agreement to February
24    7 for trial.
```

84

1            And their reasons for that are on the record,

2    and it's clear it was by-agreement. If they're saying

3    it wasn't now, then, you know, I mean, the court record

4    bears out that that was a by-agreement date, and as I

5    put on the record in February about the additional

6    twenty-one days, when there's a by-agreement date during

7    the last, when you're that close to the end of the term

8    and there's a by-agreement date under the statute 1035

9    you get an additional twenty-one days.

10           So that on February 7 when they once again

11    started their demand and the case went to 2-22, that is

12    an additional fifteen days.

13           Even if we were at Day 120 over 120 on

14    December 14, we still wouldn't have been at the end of

15    the term on February 22 because of the additional

16    twenty-one days.

17           So I think this Paragraph 19 is unsupported,

18    and they never filed a motion to dismiss based on speedy

19    trial prior to trial, which if they firmly believe that

20    the demand, that the term had run, they certainly would

21    have filed such a motion prior to this trial, which they

22    didn't do.  Which indicates that they don't really

23    believe that, Judge.

24           And we don't believe that.  And I think the

85

Fletcher 001740

1    trial record supports the defendant's right to a speedy

2    trial wasn't violated.

3             I have nothing more to respond to Paragraph 3

4    or Section 3.

5             THE COURT:  Defense, once again, you have the

6    last word.

7             MR. SALTIEL:  With respect to this last

8    paragraph, 19, we weren't arguing and we are not arguing

9    there was a violation of the speedy trial statute.

10            The argument in Paragraph 19 is that the State

11   was fully aware of the difficulties in getting Miss

12   Friend to trial because they'd have to get an extra

13   twenty-one days to do the trial just specifically to go

14   out and find Miss Friend, that she was not willing to

15   show up and testify at trial.

16            And I think the State makes my point very

17   clearly that she was not a trustworthy witness.  The

18   State didn't even know what was going to come out of her

19   mouth.

20            MS. O'CONNOR:  Judge, I'm really sorry.  Can I

21   add one argument before he gets into his response?

22            THE COURT:  Go ahead.

23            MS. O'CONNOR:  With regards to their

24   allegations that we committed a discovery violation with

86

Fletcher 001741

1    regards to Miss Friend's going back to prison, even

2    though it's in the report, they interviewed her and took

3    copious notes on an interview that they had with her.

4    Their investigator interviewed her and apparently had

5    the opportunity to question her about anything and

6    everything that they wanted to talk to her about.

7              So that was another opportunity they had that

8    they could have inquired into that parole issue.

9              THE COURT:  When did this occur?

10             MR. SALTIEL:  Your Honor -- because this

11   brings up a very good point, as we did interview her and

12   we specifically asked her about the March 2002 incident,

13   and she indicated to us that she was released that

14   (inaudible.)  That's why her statements at trial were

15   such a surprise.  Not all the statements we asked her

16   were in the notes, and that part was not in the notes.

17   That was something she said to us verbally.  We didn't

18   record everything.  That's why we couldn't impeach her

19   with that.

20             The issue is we didn't know about her arrest,

21   the issue about what happened afterward.

22             And to be quite honest, right now, I'm not

23   sure whether she went back to jail or not.  We still

24   don't know for sure, you know, based on the rap sheet

87

Fletcher 001742

| | |
|---|---|
| 1 | which I guess the State is saying wouldn't indicate |
| 2 | whether she went back to jail or not. You can't tell. |
| 3 | We should have been entitled to that information, |
| 4 | because it dealt very crucially with their credibility. |
| 5 | If she identifies Mr. Fletcher being arrested for a |
| 6 | parole violation and then is released, that has serious |
| 7 | consequences to her credibility before a jury. Even |
| 8 | though she wasn't offered a deal, there is some |
| 9 | inference that she received preferential treatment. |
| 10 | If she went back to jail, there is no |
| 11 | inference. But we don't know that for sure. I'm not |
| 12 | sure if we still know that. That is information we |
| 13 | should have had prior to trial, especially concerning |
| 14 | that Miss Friend had given us different information. |
| 15 | MS. O'CONNOR: To answer your question, Judge, |
| 16 | the notes that we were tendered very late in the game, |
| 17 | in fact, weren't tendered until I asked for them, maybe |
| 18 | like the day of trial, they are only dated March 24, |
| 19 | with no year. |
| 20 | But the FAX date is October 29, '04 where it |
| 21 | was FAX'ed to Jenner and Block by their investigator. |
| 22 | So -- and there is nothing on there about her responding |
| 23 | to any questions about her parole violation. Which of |
| 24 | course, since trial, if Counsel really wanted to know, |

88

Fletcher 001743

1    he certainly could have found out.

2              THE COURT:  Go ahead, Defense.

3              MR. SALTIEL:  With respect to those notes,

4    clearly they weren't given to the State on the eve of

5    trial.  If they were sent to her this October, that was

6    three months prior to trial.

7              MS. O'CONNOR:  They weren't sent to me in

8    October, Judge.

9              MR. SALTIEL:  This was an issue of one of the

10   pre-trial hearing dates, and I'm --

11             THE COURT:  Okay.

12             MR. SALTIEL:  Because they were tendered and

13   it was discussed and tendered shortly thereafter that

14   meeting, and it was clearly before December.  They had

15   at least several months.

16             With respect to the statements made during the

17   closing, it's very clear in the transcript that the

18   State argued, and I believe the motion is correct, at

19   least four times she stated that Miss Friend had no

20   reason to lie.

21             And that is on Pages 72 through 74.  She

22   repeated that over and over.  You know, she came here to

23   tell you the truth.  She has no motive to lie.  She did

24   repeat this.  It's clearly in the transcript.

89

Fletcher 001744

```
 1              And the problem with that is given the history
 2    of Miss Friend and the difficulties she had coming to
 3    court, we think that that is, those were improper
 4    statements.
 5              But the biggest problem for us is we were
 6    unable to impeach her about her arrest after the March
 7    15th identification of Mr. Fletcher, because we were
 8    never privy to that information.
 9              THE COURT:  Let me ask you.  Did you receive
10    the nine-page sup that said she had was arrested on
11    March 7, '02, for a parole violation warrant?
12              MR. SALTIEL:  Yes.
13              THE COURT:  And the updated rap sheet you
14    received afterwards -- are you saying that the Chicago
15    Police criminal history reports deal with parole
16    violations?
17              MR. SALTIEL:  Your Honor, I will admit, I'm
18    not an expert on what the Chicago histories --
19              THE COURT:  Well, the updated rap sheet that
20    you do have, does it --
21              MR. SALTIEL:  It usually lists whether there
22    was convictions and court dispositions.
23              THE COURT:  Right.
24              But it mentions a sentence of Illinois
```

90

**Fletcher 001745**

1    Department of Corrections time, but the parole

2    violations I don't believe are part of an updated rap

3    sheet.

4              And I'm looking at both ones that were

5    tendered on Miss Friend, and it doesn't establish one

6    way or the other a parole violation and the result of a

7    parole violation.

8              So if you had received that document, are you

9    saying that your cross-examination of her would have

10   been based on that document?

11             MR. SALTIEL:  No.  What I'm saying, we should

12   have received that information to indicate whether she

13   had or had not, because I think it's directly relevant

14   to this case.

15             THE COURT:  Where would that information come

16   from?

17             I'm sort of confused here.  You had an

18   individual Miss Friend testify in court that she gave a

19   statement on March 2.  You had information that she had

20   been arrested on a parole violation.

21             Your investigator interviewed her with another

22   party present?

23             MR. SALTIEL:  There were several.

24             THE COURT:  That could have been addressed by

91

Fletcher 001746

1    way of impeachment based on an oral statement.

2              MR. SALTIEL:   The issue with that oral

3    statement is the person who was, it was given to was

4    counsel of record, me.  And there was no other third

5    party to verify it.

6              THE COURT:   All right.

7              In regards to issue No. 3 -- and this is now

8    the the testimony of Miss Friend -- she testified as to

9    a photo array, and a, and that she was released from

10   custody after identifying Mr. Fletcher.

11             The issue that the Defense brings out is that

12   they did not know the result of the parole violation.

13             I believe Paragraph 15 says the State did not

14   produce any evidence to indicate that Miss Friend was

15   sent back to jail for a parole violation.

16             Well, there was evidence presented.  That

17   would be the testimony of Miss Friend.  The inference

18   that the jury could or could not have drawn -- and I

19   don't see the inference that Miss Friend was in custody

20   from March of '02 until the trial date.  I don't see

21   that.  I didn't see it in the transcript.  I don't see

22   see it here.  I believe she testified, and I believe she

23   was subject to intense cross-examination.

24             In regards to the statements that Miss Friend

92

Fletcher 001747

1    had no motive to lie in closing arguments, that is a

2    logical inference that the State drew because it was

3    implied that she came to court of her own free will.

4            Now, that's an issue that both sides had

5    knowledge of, and I believe, again, this case was around

6    for some time, and the State at one time made an offer,

7    asked the Court for a ruling or an offer of proof in

8    regards to that particular line of questioning of her

9    reasons for not coming to court. I believe it was

10   presented to the Court in front of Counsel and on the

11   record the date and the specific allegations that Miss

12   Friend's was making or made to potential or threatening

13   -- not potential but threatening events in her life.

14           Thereafter, the State made a motion. The

15   Defense wanted to bring out the fact that she was here

16   pursuant to a warrant. I said, that would be fine. I

17   believe the Court's ruling was, "But that opens the door

18   to the testimony of Miss Friend of why she wouldn't be

19   here."

20           I believe at one point the Defense argues that

21   that would have been unsubstantiated threats against

22   Miss Friend. Again, the testimony of an individual

23   before the court is evidence. And I believe it was a

24   specific trial strategy not to get those alleged

93

**Fletcher 001748**

threats, one way or the other, in front of the Court.

In regards to the issue of this discovery violation, the discovery principles as established in Brady vs. Maryland is to give all information to both sides. There is a continuing discovery demand, back and forth.

Now, here, we have -- and it's been the Defense argument that the issue was not that they didn't know about the arrest, and not that they didn't know about the violation of parole warrant, because that's on Page 6 of the supplemental report, the issue becomes whether or not she went back.

And my thing is, the Defense is arguing if they had the rap sheet that is part of the exhibit, I believe Exhibit F, they would have been able to use that for cross-examination. That document doesn't establish one way or the other whether or not she went back.

As a matter of fact, it just says an arrest on a warrant for that date. I believe in March of '02, it shows it's a warrant.

So the information was definitely given to the Defense that specific document was not updated. I don't feel that that is a violation of Brady.

However, I do have to say that both sides had

1    a tremendous amount of opportunity to investigate all
2    issues here.  And the fact that Miss Friend, all of her
3    -- let's say everything in her life was before this
4    Court.  Her arrest warrant for parole violations.  She
5    testified that she had been convicted twice for
6    possession in '03, possession with intent in '98.  The
7    Defense had the opportunity and has, as he mentioned
8    today, had the opportunity to interview Miss Friend
9    numerous times prior to trial.

10        Lastly, in regards to the issue here of
11   whether or not she received any preferential treatment
12   or the inaccurate testimony or perjured testimony, what
13   both sides had was a reluctant witness in the sense that
14   she didn't really want to come to court, but when she
15   came to court she testified.

16        The Defense had the opportunity to impeach her
17   based on prior statements made to the Grand Jury which
18   there was no impeachment on that, based on statements
19   made to any of their investigators.  So there was plenty
20   of material and opportunity to cross-examine Miss
21   Friend.

22        Now, I don't believe either side as they sit
23   here now can tell us what happened to her after she gave
24   that identification.  But it was her testimony that

95

Fletcher 001750

1    there were no deals. I believe on cross-examination

2    they asked, "Did you get to go home"? She said, "No, I

3    had to go back for my parole violation." That was her

4    testimony. Nothing in the tendered document established

5    that that was not true. And I mean, nothing in her

6    criminal rap sheet, even the one that was not updated

7    doesn't say that that is true or not true. So that was

8    her testimony.

9            The other thing, I believe a report was

10    tendered in the course of discovery that there was a

11    parole violation warrant. Both sides had opportunity to

12    subpoena the Illinois Department of Corrections. This

13    case was around a long time. Demand went all the way to

14    116, plus fifteen days. It was on this call for I

15    believe three years.

16            Therefore, I don't feel that there was a

17    violation of Brady. That fact that she was arrested on

18    a violation of problem warrant was tendered in plenty of

19    time. It's no doubt that the updated rap sheet was not.

20    But even if the updated rap sheet doesn't get into that

21    fact, what happened to her on a VOP warrant, now, the

22    fact that Mr. Fletcher was not able to verify or impeach

23    Miss Friend's statements regarding her parole violation,

24    I believe they could have.

96

Fletcher 001751

1          And the Court erred by ruling that if

2   Mr. Fletcher attempted to impeach Miss Friend due to her

3   failure to appear the State would be allowed to elicit

4   testimony and regard to understand substantiated threat.

5   I never heard the substance of those threats from Miss

6   Friend, because it was after my ruling the Defense

7   decided not to cross-examine her anymore.  Again, that

8   is more trial strategy than anything else at this time.

9          In regards to Paragraph 19, I believe the

10  Court was proper in making their rulings on this 120 day

11  speedy trial demand.  As I think both sides realized

12  this case has been around, the term was running, the

13  demand was running, there were motions filed,

14  continuances filed, and demands filed, and I believe the

15  prior rulings by the Court were proper.

16         In regards to closing arguments, the facts,

17  the argument by the State was not improper, and I do not

18  go along with all the Defense arguments that certain

19  inferences were made.

20         The one that the Court does not see at all as

21  the inference that Miss Friend had been in custody from

22  March of '02 until the trial date.

23         Having said that, I don't feel the State has

24  met their burden on this issue --

97

**Fletcher 001752**

```
 1                  MS. O'CONNOR:  The State?

 2                  THE COURT:  I'm sorry.  I'm sorry.  What did I

 3      say?

 4                  MS. O'CONNOR:  You said you felt the State

 5      hasn't.

 6                  THE COURT:  I'm sorry.  The Defense had not

 7      met their burden in this regards.

 8                  Therefore on Count 3, motion will be denied.

 9                  Count 4.  I believe I don't need to look at --

10      we're on issue Number 4.

11                  MR. SALTIEL:  Your Honor, it was our position

12      that the jury's verdict was against the manifest weight

13      of the evidence.

14                  First off, there was no physical evidence that

15      was presented at trial.  The only evidence that was

16      presented was the eyewitness identification of two

17      witnesses.

18                  As is often quoted, it seems to be the term of

19      art, reliability is the lynchpin of the identification

20      testimony, and I don't think either of these witnesses

21      were reliable.

22                  First with Mr. Cooper, looking at his

23      description of the events and the descriptions of the

24      suspects at the time, he gives a very vague and general
```

Fletcher 001753

1    description. The general height, general weight, he
2    gives an estimate of age, but no real physical
3    characteristics other than that one of the suspects had
4    collar length curl and the other suspect had a ponytail.
5    Other than that, there was no other physical description
6    given by Mr. Cooper.

7           In fact, after he was shown a photo array by
8    the detectives, he testified that he could not be
9    completely sure based on that photo array.

10          He then saw an in-person lineup, and after the
11   in-person lineup he stated to our investigator that he
12   could only be 75 percent sure of his identification at
13   that time because it's been too long since the incident,
14   and that was in 2004, September, a few months prior to
15   trial.

16          Now, the other eyewitness, Miss Friend, was
17   unable to give any description of one of the suspects,
18   and even I believe stated she couldn't identify the
19   other suspect if she had to. She was only able to give
20   a very limited description of Mr. Fletcher, and that
21   description was essentially that the suspect had dark
22   clothing on, and that, and the suspect was carrying a
23   black skull hat. There was no physical description, any
24   features, any general height, weight, given by Miss

99

**Fletcher 001754**

1    Friend.

2            Miss Friend obviously had a lot of memory

3    problems about the issue.  In fact, her memory was so

4    bad at trial she didn't even get her age right.  She

5    testified under oath she was eighteen when this

6    occurred.  According to her date of birth, she was

7    sixteen.  It's a minor fact, but it illustrates that

8    this happened a long time ago and her memory was not the

9    best.

10           Looking at the witnesses' testimony

11   individually, there are a lot of issues that deal with

12   reliability of these witnesses.  It gets even worse when

13   you match them up next to each other.  Their

14   descriptions, the description of the suspect --

15   Mr. Cooper said they're wearing baseball caps.  Miss

16   Friend said they're wearing black skull caps.  Then a

17   third witness, Mr. Wade (phonetic) said hoodies.

18           Three different witness; three different

19   descriptions.

20           As far as the hair, which was the only aspect

21   that Mr. Cooper really gave any relevant description of,

22   that the suspect had collar length curl and the other a

23   pony tail.  Miss Friend said you couldn't see the hair

24   because it was under the skull caps.

Fletcher 001755

1         There is a lot of inconsistencies here. Not

2    only were there inconsistencies between the witnesses'

3    identification testimony, but their descriptions of the

4    event at the time were inconsistent. There were some

5    minor things where they got -- they were inconsistent

6    about things like the weather. One said cold. The

7    other said it wasn't cold. Things like that.

8         But the primary issue had to deal with the

9    events leading to the robbery. You had testimony from

10    Mr. Cooper who said he made his delivery. He was coming

11    back to his bread truck with the trays in his hand. At

12    that time Miss Friend approached him to ask him for

13    money. Mr. Cooper stated that he didn't give her any

14    money because he had the bread trays in his hand, so he

15    was going to his truck to put the bread trays back, and

16    that's when the suspect approached him, hit him, and the

17    suspect went into the van at that time.

18         According to Mr. Cooper, Miss Friend was never

19    in the van or the truck, and she never received money

20    from Mr. Cooper.

21         Yet Miss Friend gives a different side of the

22    story. She said she was talking to Mr. Cooper inside

23    the truck, not outside. She said that Cooper had

24    already given her money and that she was getting off the

Fletcher 001756

```
1    truck when she bumped into one of the suspects, and then

2    the suspects went on into the truck to commence the

3    robbery.

4                You have two different witnesses; two

5    different stories of what happened.

6                Given the inconsistencies not only in the

7    description of the event, but in the identifications of

8    witnesses, there is too many inconsistencies to believe

9    that these witnesses were reliable.

10               And I believe the case cited to you was an

11   Illinois case of People vs. McCarthy where they likewise

12   found too many inconsistencies in the witnesses'

13   testimony to conclude that the jury was correct in

14   finding there was, that they were guilty beyond a

15   reasonable doubt.

16               Now, on top of the inconsistencies between the

17   eyewitnesses, you also, the Court should also consider

18   that there was a pre-trial suggestive photo array and a

19   pre-trial suggestive lineup, and that the

20   identifications that happened pre-trial didn't happen

21   for eleven years after the incident, and that the

22   in-court identifications happened over fourteen years

23   after an incident.

24               In other words, there is no identifications
```

102

**Fletcher 001757**

1    made by anybody in the first eleven years since that

2    incident occurred.

3            Now, you take all this together, the

4    inconsistencies in the testimony, their lack of

5    descriptions, and the length of time, all this suggests

6    that their identifications are not reliable and cannot

7    uphold the jury's verdict.

8            In the two cases I wanted to direct your

9    attention to in the brief, with regard to the length of

10   time, the first was the (inaudible) case, the U.S.

11   Supreme Court case.  In that case they stated a seven

12   month period from the incident to the time of the

13   identification was a very long time indicating

14   unreliability.  And that's seven months.  And in this

15   case, you know, we have a time span of over ten years.

16           In the Cassell (phonetic) case was also

17   another case, an Illinois case, where they found that

18   the reliability of the identification was insufficient.

19   In that case the witness had made a pre-trial

20   identification three years after the incident, and the

21   in-court identification didn't come until six years.

22           And even with those two cases, they were

23   substantially a shorter amount of time.

24           Here we have almost double that, or much more


                              103

Fletcher 001758

```
 1    time, and there is no way to believe that witnesses can

 2    give a reliable identification after eleven years or

 3    fourteen years, especially when you look at how

 4    inconsistent this statements were.  And their testimony

 5    was to the Court.

 6              Because these witnesses were unreliable, we

 7    ask that you grant our motion for a new trial.

 8              MS. O'CONNOR:  In response, Judge, starting

 9    with Paragraph 21, complaint of no physical evidence,

10    there wasn't any.  But there is no requirement there has

11    to be physical evidence for someone to be found guilty.

12    So we'd ask you to discount that complaint.

13              And a revolver was used in this case.  There

14    are no cartridge cases to be found.  The bullets get

15    shot out of a gun and they are hardly ever recovered

16    unless they're recovered in the body of the dead person,

17    which it was in this case.

18              Because the other bullets that were shot

19    weren't recovered doesn't mean they weren't shot.

20    Bullets travel long distances.  They lodge inside

21    buildings, cars, what-have-you.  Only with a

22    semi-automatic you often find firearm evidence.

23              All the discrepancies Counsel alleges that

24    came up between Mr. Cooper and Miss Friend and that they
```

104

Fletcher 001759

1    were of such a magnitude that this Court should vacate

2    the jury's finding, we would submit that if there were

3    discrepancies, they were not of great magnitude.  They

4    were simply discrepancies that showed these were human

5    beings that told the truth and did not say they were

6    mirror images, because a human being views something,

7    and everyone's viewing of something is bound to be

8    slightly different than the viewing and remembrance of

9    another human being.  And differences simply explain

10   that, Judge, that these are human beings, as we said in

11   our arguments.  They're not robots.

12            The jury found they were credible.  The jury

13   had no problem finding this defendant guilty.  They were

14   not deliberating for a lengthy period of time.

15            And the identification, there is no evidence

16   they were suggestive.  Counsel says they were

17   suggestive.  Well, where is the evidence of that?  You

18   know, the pictures are in evidence of the lineup, the

19   pictures of the photo array.  The jury obviously didn't

20   find that.

21            But again, that is not an issue for a jury,

22   and this Court saw them, though, and it would be an

23   issue for the Court to decide.  And I think the Court

24   would find there is no suggestivity in these

105

1    identification procedures.

2           But 28, Paragraph 28 makes a statement that

3    identification over ten years old should not suffice as

4    a matter of law.  But what law is that?  Where is that

5    principle that says that?  Where is that?  The cases he

6    cites talk about suggestive lineups.  There was no

7    suggestive lineup in this case.

8           The time between the crime and the

9    identification is a negative factor.  It's a factor to

10   be considered among many factors.  And he fails to list

11   the other factors that were instructed to the jury and

12   the circumstances of identification instructions.

13          So certainly the jury was apprised that they

14   can consider that length of time and they decided that

15   it did not negate the identification of these two

16   people.  And as this Court knows, the case law says an

17   identification of one person is enough to convict a

18   defendant of the crime he's charged with.  That it can

19   be, I should say.

20          In this case there were two people that

21   identified him.  And the jury again had no trouble

22   finding their testimony reliable, and there is nothing

23   in the record to indicate that it wasn't reliable, and

24   nothing to indicate that this Court should find the jury

106

**Fletcher 001761**

1     was out of line and that their verdict was against the

2     manifest weight of the evidence.

3          You denied the Defense motion for acquittal at

4     the close of the State's case based on the evidence you

5     heard, and we would ask the Court to reiterate that

6     finding.

7          Nothing further.

8          MR. SALTIEL:  As to the witnesses'

9     inconsistencies, I believe in this case it wasn't just a

10    few minor inconsistencies.  They re-told two different

11    occurrences.  And if they can't get that right, how can

12    we rely on their identification testimony?  And how can

13    we rely on it that it's eleven years after the fact?

14         Granted, there is no case out there that says

15    it's been ten years, it's a per se exclusion that you

16    cannot identify someone at that time.  It's a factor to

17    consider.

18         And the other factors are to look at the

19    length of time that the witness has to view, and the

20    descriptions of the event, and here there is no

21    indication that these people could be reliable because

22    they didn't give any details.  They gave very vague,

23    general descriptions, and their descriptions of the

24    events that happened contradicted each other.  And that

107

**Fletcher 001762**

1    doesn't indicate any reliability of these witnesses.

2              Now, as far as the point with the lineups,

3    it's not that -- we're not arguing in this motion per se

4    they were impermissibly suggested as a violation of the

5    due process rights.  But we are saying just in general

6    is that they were suggestive.

7              And I think they were.  You had Mr. Fletcher

8    who is the only person in both lineups.  That is an

9    indication that it was suggestive.  Anybody who saw the

10   first lineup and sees the second lineup with only one

11   person in common, that is a suggestion right there.  Who

12   do I pick out?  Well, the same guy in the last one,

13   because everyone else is different.

14             You look at the photo array.  There were huge

15   age discrepancies with most of the people in the lineup.

16   Some of them weren't old enough to be out on the streets

17   at that time.  They were nine, ten years old.  Now, a

18   lineup that includes those type of people obviously

19   cannot be completely unsuggestive.

20             And there were also physical descriptions that

21   were impaired in both the photo array and the in-person

22   lineup which were obvious from looking at the pictures.

23             So we put to the Court that the photo array

24   and the in-person lineup were suggestive.

108

**Fletcher 001763**

1           And with the length of time, although I guess

2      the converse can be said to the State, that I don't

3      think there is any case out there that says that, you

4      know, identifications are good no matter how long they

5      are, in fact there, there is a very unique circumstances

6      that we have to deal with.  All we can deal with are the

7      cases that are there, and most of these cases that come

8      up, we're talking about a year or two year maximum

9      delay.

10          The one case we were able to find was a three

11     year delay between the out-of-court identification and

12     six year in-court, and they clearly found that was too

13     long.  In this case we are talking about a delay much

14     greater than that.

15          Given the fact that these witnesses' testimony

16     were inconsistent and unreliable, we find that the

17     evidence was against the manifest, or against the jury's

18     verdict, and we'd ask that you grant us our motion for a

19     new trial.

20          THE COURT:  Okay.

21          The Court's review of issue Number 4, that the

22     verdict was against the manifest weight of the evidence,

23     in Paragraphs 20 through 30, and Counsel's argument

24     today, it became obvious to the Court that each and

Fletcher 001764

1    every one of these arguments was presented meticulously
2    to the jury.

3              Just going over some of them, it was brought
4    out there was no weapon.  It was brought out about
5    Mr. Cooper's involvement.  It was brought out the photo
6    array.  It was brought out the lineup.  And even in
7    Paragraph 26, it establishes that the Defense impeached
8    Miss Friend.

9              So what we have here is the testimony of two
10   eyewitnesses, and there are cases that say eyewitnesses
11   testimony may be inherently or is inherently reliable.

12             There is also cases that say a single finger
13   ID could be sufficient depending on the facts of the
14   case.  And the facts of this case, when Counsel
15   describes the inconsistencies, I believe you have to
16   look at the entirety of the testimony.

17             Mr. Cooper was honest.  He said that he was
18   only 75 percent sure, and that was brought out.

19             Miss Friend testified what she saw, and that
20   she identified the defendant.

21             Both these individuals made identifications.
22   The conclusion in Paragraph 25 that they were only made
23   after a suggestive photo array and suggestive lineup,
24   again, that fact was once again meticulously argued to

110

Fletcher 001765

1    the jury, every specific incident.  It was even brought

2    out the defendant at the time of this incident had some

3    unique physical characteristics that were never

4    identified by anybody.

5            In looking at the entirety of their testimony,

6    I believe that the jury listened to their testimony,

7    weighed all of the arguments that I listened to once

8    again, all of the inconsistencies, all of the facts

9    before it, and decided that they had received

10   information of proof beyond a reasonable doubt.

11           Lastly, in regards to the proximate cause and

12   felony murder theory, I believe the State and the

13   Defense argued that once already.  And I believe I ruled

14   that felony murder did apply.

15           Now, the Defense is basically asking this

16   Court to overrule the jury verdict that was found after

17   testimony at trial.

18           I listened to the arguments here today.  I

19   understand that there were inconsistencies, that there

20   was a length of time beforehand.  But I'm not going to

21   decide as a matter of law this case should be dismissed

22   here today.  The jury's verdict was -- I believe we had

23   a reliable jury that took their notes, listened and

24   weighed the testimony of the evidence, listened and

111

Fletcher 001766

1    weighed the testimony and the arguments of counsel, and

2    I do not believe that the facts presented here in the

3    motion or at trial would allow me to dismiss their

4    decision for a finding of guilty.

5           Therefore, on People's Exhibit No., I mean

6    argument Number 4, the motion will be denied.

7           That leaves us with the last issue, reversible

8    error.

9           MR. SALTIEL:  You are -- there are actually

10   multiple issues raised.  For the time being, we are

11   going to stand on our arguments in the papers, except

12   for one of the issues I would like to address briefly.

13          THE COURT:  Go ahead.

14          MR. SALTIEL:  And that is the State's, the

15   closing argument made by the State, which is Paragraph

16   C.

17          I believe there is two issues with the -- we

18   have two issues with the State's closing argument and

19   why we believe it is improper.

20          You know, first, there were -- we believe

21   there were several arguments that were made by the State

22   that were not supported by the evidence, both in their

23   regular closing and in their rebuttal.

24          I'm aware that the Court did give instructions

112

Fletcher 001767

1    to the jury about that, that they are the trier of the

2    fact, they heard the evidence, they should pay attention

3    to that, over our objection. But we still think that

4    that had a prejudicial effect on the jury.

5          More importantly is that the State essentially

6    sandbagged us on our, their closing. They didn't really

7    give a closing argument. They gave a cookie cutter, any

8    murder case, plug in the facts, nothing special, for

9    their closing. They waited for us, and then they gave

10    their real closing in rebuttal.

11          Not only did they raise facts that were not

12    presented in evidence before the jury, they were raising

13    arguments we never raised in our closing.

14          And it's clear from the case law that, at

15    least in the one cases we cite for you, in that case,

16    rebuttal argument in that case constituted reversible

17    error because it was not based on evidence nor was it

18    invited by comments by the Defense.

19          And I think this is a similar case. There

20    were statements made by the State in its rebuttal

21    specifically that weren't supported by the evidence,

22    such as I believe at one point the State made the

23    argument that the eyewitnesses are reliable because, you

24    know, listen to their description on the hair and nose,

113

Fletcher 001768

1     physical description that they gave.  Well, they never
2     gave those physical descriptions.  So that was one
3     example.

4           The other, not only were there factual
5     problems, I think there were responses, or the State
6     essentially responded to arguments that we never made in
7     our closing argument.

8           In particular, I think what happened is that
9     we had made several arguments in our motion for a
10    directed verdict that was not presented in front of the
11    jury.  What the State did is they made a rebuttal
12    assuming that we had given those arguments to the jury.
13    And although issues we raised on the motion for a
14    directed verdict were not made to the jury, never
15    presented to the jury, then all of a sudden the State is
16    now arguing these issues never raised and they had no
17    idea about.

18          Based on this, we believe that the State's
19    closing argument was improper, and that alone
20    constitutes grounds to give us a new trial.

21          MS. O'CONNOR:  Judge, in response to that last
22    argument, I don't know what statements he's saying are
23    improper that were made during closing argument.  It's
24    sort of hard to respond to the argument.

114

**Fletcher 001769**

1    But it's our position that everything said in

2    rebuttal argument was rebuttal to what the Defense

3    brought up in their argument.

4    I don't know what sandbagged, how we

5    sandbagged them. If they wanted to object at that time,

6    they could have. I know Mr. Hill objected at one point

7    on Page 69. There's possibly a couple of other

8    objections. But there weren't many objections. So I

9    don't really know what they're saying was improper.

10   The Court made whatever rulings on their

11   objections at the time. I don't think the Court thought

12   the arguments were improper. And we submit that they

13   were based on the evidence.

14   I don't recall -- and I think Counsel is

15   incorrect in telling the jury that we told -- Counsel is

16   incorrect in telling the Court that we told the jury

17   that the witnesses gave any descriptions to the police

18   that they did not give. Certainly, if they objected to

19   that and the Court said the jury heard the evidence,

20   they can rely on their own recollection and notes. That

21   is an instruction to the jury that the arguments is all

22   that is, is just arguments, and they are to rely on the

23   evidence, and that the arguments are not evidence.

24   If there was any mis-statement made, I believe

115

Fletcher 001770

```
1    that that instructions would certainly cure any mistakes
2    and mis-statements of the evidence.
3              But I don't recall any wholesale mis-statement
4    of the evidence, or wholesale sandbagging, or wholesale
5    argument that was not in response to their closing
6    argument.
7              Paragraph E, they say the Court erred in
8    prohibiting testimony from (inaudible.)  That would be
9    asking for an opinion of these witnesses.  It would be
10   impermissible and irrelevant in this case.
11             Certainly, if the Defense wanted to argue that
12   Rogers may have been involved in the incident and they
13   thought, and the Court thought that was a reasonable
14   inference therefrom, they could have.  But to ask an
15   opinion of a lay person and even from a detective
16   whether someone may have been involved in the case would
17   be an impermissible conclusion to allow them to make.
18   There is no such thing as, you know, an expert in the
19   field of suspicion.
20             In Paragraph G, they allege that the State
21   violated their client's right to due process, relied on
22   testimony from Mr. Cooper that, assuming it knew to be
23   false, and allowing such testimony to go unrebutted --
24   once again, an allegation that the State suborned
```

116

**Fletcher 001771**

1    perjury in this incident and nothing to back it up.  No
2    good faith basis whatsoever for such a statement.

3              Mr. Cooper is a man that came in and said he
4    was 75 percent sure of his identification.  What it is
5    that they're saying he said that we knew to be false, I
6    don't know.

7              They say Cooper said he was shooting in a
8    certain direction when the State knew he had been
9    arrested for shooting the van.  He was arrested for
10   possession of a gun, not for shooting Mr. Wade's van.

11             So once again, they're incorrect making
12   allegations that are false in this motion.  And we
13   object to that.

14             There was never any determination as to who
15   shot that van.  Mr. Wade thought it was Mr. Cooper.  But
16   you know, that is a lay person's guess.  There were two
17   men shooting, and certainly from the diagrams that were
18   used in this case and the photographs, it was clear that
19   it was only the defendant's bullet that could have
20   killed this victim, Judge.

21             And once again, he was not arrested for
22   shooting Mr. Wade's van.  He was arrested for unlawful
23   use of a weapon.

24             The State argued in its rebuttal,

117

**Fletcher 001772**

```
 1    Mr. Fletcher, that he was not supposed to have a gun on
 2    that truck.  We submit that the Court ruled correctly in
 3    all the areas that are listed in Paragraph 5.  That we
 4    had extensive arguments on all these issues, and we'd
 5    ask this Court to concur in its prior rulings.
 6              THE COURT:  Okay.
 7              Defense, your last word.
 8              MR. SALTIEL:  Well, at least according to the
 9    arrest sheet, Mr. Cooper was arrested for more than just
10    unlawful possession of a weapon.  He was also arrested
11    for aggravated assault against Mr. Wade.  So we believe
12    that statement is incorrect.
13              Mr. Cooper only remembered being arrested for
14    unlawful possession of a gun.  There is a distinction
15    there.
16              There were several arguments that the State
17    raised in its closing argument that were not raised in
18    the Defense's close.
19              First of all, there is this argument -- and a
20    lot of these came from the motion of a directed verdict,
21    you know, Mr. Cooper could have been responsible for
22    shooting the victim, it could have been his bullet.
23    That was not something we argued to the, to the jury
24    during close.
```

118

Fletcher 001773

1           There was also the felony murder theory which

2    we argued on our motion for a directed verdict.  That

3    was something she argued in her rebuttal.  We never

4    presented that to the jury.  We never made those

5    arguments.

6           And also this issue about why Cooper,

7    Mr. Cooper lied.  He never stated why he lied.  There

8    was only that he had lied.  And that was his only

9    testimony.  He lied to save his job, was something that

10   came out of the police reports.  There was no direct

11   evidence of this.

12          None of these issues were raised, not only in

13   the Defense's closing statements, they weren't made in

14   the State's, what you call them, first closing

15   statements.

16               THE COURT:  Opening close.

17               MR. SALTIEL:  Opening close.

18          They also made other statements in the

19   beginning of their close such as they went through this

20   elaborate statement that Mr. Fletcher had a plan and

21   motive.  There was no evidence of that presented at

22   trial.  They made him out to be someone when there was

23   no testimony to support those statements.

24          We think, you know, all of these statements

119

```
1    you know, taken together, were improper for the State to
2    be making in its close.  They were in fact saving their
3    close for the rebuttal argument. · That was something
4    improper and they shouldn't have done.
5              As far as the other issues listed in Number 5,
6    for now, the Defense will rest on its positions, on
7    those positions, unless the Court would like to hear any
8    specific argument.
9              THE COURT:  No.  No thanks.  I have looked it
10   over.
11             Going to the last issue before the Court,
12   Number 5, that the Court made other reversible errors, I
13   believe we have addressed this issue, that the Court
14   erred in denied Mr. Fletcher's motion to dismiss the
15 ·  indictment for failure to commence this action within a
16   reasonable time, so I won't address that.  That has been
17   addressed the second part of that is that Mr. , it goes
18   on to say Mr. Rogers who is a central figure in the
19   police investigation and a one time suspect until he
20   identified Mr. Fletcher was not present at trial.
21   Mr. Rogers was available prior to 1995 and again in
22   2002, but was unavailable at Mr. Fletcher's trial in
23   2005.  Mr. Rogers is the key witness from the police
24   investigation because he originally led the police to
```

Fletcher 001775

1    Mr. Fletcher.  And Mr. Rogers only identified

2    Mr. Fletcher after the police went to question him about

3    his alleged involvement in the 1990 incident.

4              Furthermore, Mr. Rogers has friends, was

5    friends with Mr. Cooper and Miss Friend.

6              In light of Mr. Rogers' role, Mr. Fletcher

7    could not have had a fair trial without the opportunity

8    to cross-examine Mr. Rogers.

9              This has been a recurring theme in regards to

10   the Defense.  However, the Court does not dictate who

11   the witnesses are going to be.  That is a strategy by

12   the State and the Defense how they want to present their

13   case.

14             The fact that Mr. Rogers did not come in to

15   court and testify, I cannot decide based on that,

16   because there was never any legal argument by either

17   side that Mr. Rogers was unavailable and that we needed

18   any service of process to bring him in.

19             I have addressed this issue before in regard

20   to there had been motions by the State in attempting to

21   locate him.  The State decided after there was a demand

22   for trial to proceed without Mr. Rogers.  At that time

23   the Defense had the opportunity to continue with their

24   demand, ask for a continuance, or to proceed to trial.

121

**Fletcher 001776**

1    The decision to proceed to trial knowing that Mr. Rogers
2    wasn't going to be present was a Defense tactical
3    decision.

4         Therefore, for the Defense to tell, ask the
5    Court now, it wasn't a fair trial without him, this
6    Court was never asked to continue the case to bring in
7    Mr. Rogers, was never asked to issue any warrant for
8    Mr. Rogers.

9         Therefore, the last thing I have to say in
10   regard to Mr. Rogers is that this Court does not dictate
11   what witnesses should be presented to prove the State's
12   case or to prove the Defense case.

13        I'm moving on to Paragraph B, that the Court
14   erred in stating that it would have allowed Officer
15   Martin to testify about Mr. Rogers' bad acts in regards
16   to 1990.  I believe the issue at that time was that the
17   Defense had Officer Martin who made an arrest or was
18   familiar with Mr. Fletcher in 1990, and they wanted to
19   call him to testify that of his physical character.

20        And a sidebar, at a motion, the State
21   presented or argued that they would then be able to
22   question what were the circumstances surrounding the
23   contact with Officer Martin and Mr. Fletcher.  The
24   identification would not come in in a vacuum.  The

122

**Fletcher 001777**

1    Court's ruling was if Officer Martin testifies, the
2    State would be able to cross him in regards to what
3    specifically those contacts were.

4          In regards to the last part of that Paragraph,
5    that Mr. Martin would have been a, Officer Martin would
6    have been a non-biased witness who could have affirmed
7    that their witness did not match the witnesses'
8    description of the suspects, and he would anticipate a
9    witness' description to include a reference to
10   Mr. Fletcher's large lips, Officer Martin if he were
11   able to testify could not testify to what somebody else
12   would have or would not have done.

13         So that particular part of the paragraph would
14   not make any sense here.

15         Going on to Paragraph 3, the crux -- not the
16   crux, but the argument that was elicited was it was
17   improper arguments in a closing statement.  In regard to
18   the closing statement, the opening close by the State,
19   the close by Defense and then the rebuttal by the State,
20   in rebuttal argument the State has the opportunity to
21   rebut any evidence, any arguments or inferences.  And I
22   believe that there are inferences, aspects here are the
23   inferences that were brought out at trial.

24         And I recall specifically the Defense argued

123

**Fletcher 001778**

1     quite clearly and credibly and persuasively their point

2     of view.  It was a lengthy argument.  I can't remember

3     how many pages.  But it basically again went over every

4     aspect of the case, every inconsistency, every reason

5     that the jury should not believe the State or their

6     witnesses.

7              I don't believe that there was any improper

8     arguments in the rebuttal, and I think I have to say

9     that was because of the thorough nature of the Defense

10    arguments.  As a cliche, they left no stone unturned.

11    And I think the State was able to get into a lot of

12    those arguments because of the length of it and the

13    inferences.

14             But the Defense presented in the Court's

15    opinion a detailed analysis of each and every witness

16    from the time this investigation basically began to the

17    trial.  And the State had an opportunity to rebut or

18    argue against those inferences.

19             I don't believe this was an issue of the

20    State's sandbagging.  I believe the rebuttal was proper.

21             With regard to Paragraph D, the Court erred by

22    prohibiting Mr. Fletcher from questioning Mr. Wade about

23    statements and behavior of the police when the police

24    questioned Mr. Wade about the incident, it goes on to

124

**Fletcher 001779**

1    say during his investigation, Mr. Fletcher learned that

2    the police made statements to Mr. Wade that implicated

3    Mr. Fletcher in this incident prior to the police

4    showing Mr. Wade a photo array.

5         I'm a little concerned here, because

6    Mr. Fletcher according to this, performed some of his

7    own investigation. But I believe that the Defense or

8    the State can only question if there is a good faith

9    basis that they would have an ability to prove that up.

10   That statement by Mr. Fletcher, I don't believe the

11   Defense could have questioned him, if they were going to

12   prove it up. But you can't question somebody knowing

13   that you are not going to prove up the part of that

14   question. I believe that the issue was brought out at

15   trial in regards to Mr. Wade. I listened to both

16   arguments, and I ruled in regards to what I thought was

17   the proper decision.

18        In regards to Paragraph E, again, we go into

19   the issue of Mr. Rogers. I think I have addressed that

20   in regards to this Court doesn't control who the parties

21   decide to call as witnesses in a given case.

22        In regards to the Court's ruling on closing

23   statements or closing arguments, I believe the decisions

24   by the Court and the rulings were proper and the remarks

125

**Fletcher 001780**

1    proper.  Therefore I will not address anything further

2    on F.

3              And in regards to the State's decision to

4    argue Mr. Cooper's actions on that day that they knew to

5    be false, I don't see that.  I believe, again, there's

6    logical inferences both ways that were argued.

7              And thereafter in regards to the entirety of

8    the Sub 5, motion for a new trial will be denied.

9              That leaves us, Counsel, with the pre-sentence

10   investigation.

11             Have both sides had an opportunity to review

12   that document?

13             MS. O'CONNOR:  I have, Judge.

14             MR. HILL:  I have not.

15             THE COURT:  You don't have the PSI?

16             MR. HILL:  No.

17             THE COURT:  Well it's been filed.

18             MS. O'CONNOR:  On March 21.

19             THE COURT:  I'll give you a copy, and we'll

20   take some time and go over it with your client.

21             My question is when you are done with it, are

22   there any changes, deletions, or additions prior to

23   starting?

24             MS. O'CONNOR:  I definitely have an issue I

126

Fletcher 001781

```
 1    need to bring up.

 2              The pre-sentence investigation --

 3              THE COURT:  Hold on.  He doesn't have a copy.

 4    He'll have to take a look at the copy.

 5              MS. O'CONNOR:  Is there only a blue-backed

 6    copy in the court file?

 7              THE COURT:  Yeah, that's all I see.

 8              MS. O'CONNOR:  Which indicates the second copy

 9    --

10              THE COURT:  Well, there was a second copy

11    handed out.

12              I don't necessarily put that on the record.

13    But having said that, we'll be able to get a copy.

14              I'm sorry.  No.

15              Counsel, it's in here.

16              MS. O'CONNOR:  Does the Court anticipate

17    proceeding to sentencing?

18              THE COURT:  Are both sides ready today?

19              MR. HILL:  We're not ready.

20              MR. SALTIEL:  Our position, there are some

21    issues with his background and length of time we'd like

22    to investigate for sentencing.

23              THE COURT:  All right.

24              It's pretty late, too.
```

127

Fletcher 001782

```
 1            What date are we looking for?

 2            Can we address your issue?

 3            MS. O'CONNOR:  I hope so.

 4            THE COURT:  Let's try to do that before we

 5    proceed for the day, so you can put notes on that

 6    whatever the State is going to bring out at this time.

 7            MS. O'CONNOR:  What I notice about the PSI,

 8    the rap sheet, the Chicago, I should say, the Chicago

 9    criminal history by CPD is on the new, on their new

10    format, which I believe is part of the CHRIS system, by

11    the Chicago Police Department in this case earlier on

12    which this case first was indicted are under the old

13    format, and that was tendered to Counsel.

14            Now, the problem is that the defendant's

15    murder conviction from 1980 is not reflected on the new

16    version of the rap sheet.  And I certainly don't know

17    why that would be.  It's on the old version.

18            And I can show the Court what I'm talking

19    about.

20            THE COURT:  That's okay.

21            MS. O'CONNOR:  But I would ask leave to make

22    this a part, the old version a part of the PSI.

23            THE COURT:  I'll let you make copies.

24            MS. O'CONNOR:  They have a copy of it.
```

Fletcher 001783

```
1                    THE COURT:  All right.

2                    If you have a copy, I'll make it part of the

3       PSI.

4                    Is there any other material that you're going

5       to be tendering at the sentencing hearing in regards to

6       his prior background?

7                    MS. O'CONNOR:  Any other material --

8                    THE COURT:  Certified copies.

9                    MS. O'CONNOR:  Oh, I do have certified copies,

10      Judge.

11                   THE COURT:  Have you made a copy for the

12      Defense?

13                   MS. O'CONNOR:  I don't know if they have

14      copies of those or not.

15                   THE COURT:  Let's do this.

16                   I'll give you a couple of weeks to get

17      everything together in regards to the certified copies.

18                   Defense, I'll give you as much time as you

19      need to investigate that, and we'll set it down for

20      sentencing at an agreeable date.

21                   MR. SALTIEL:  Your Honor, just to clarify,

22      we'd like to request that the State provide us with

23      whatever documents they're going to us, if they're going

24      to attach the criminal history, just in case there is --
```

129

Fletcher 001784

1          THE COURT:  Well, he does have the criminal

2     history now.  They have the old system, the old, I'll

3     called a rap sheet --

4          MS. O'CONNOR:  That was tendered with the

5     discovery.

6          MR. HILL:  I don't know what she's talking

7     about.  I'd appreciate if she can just get a copy of

8     what she is talking about.  It seems to be simple

9     enough.

10          THE COURT:  So you are tendering a --

11          MS. O'CONNOR:  Judge, I -- it's the old

12     version of the Chicago criminal history prior to the

13     CHRIS system.  This is the rap sheet tendered with

14     discovery.

15          But I'll make a copy and tender it to Counsel

16     again.

17          MR. HILL:  Thank you.

18          THE COURT:  And then, you also make copies of

19     the certified convictions?

20          MS. O'CONNOR:  Yes.

21          I can show them to them right now, if they

22     want to see them.

23          THE COURT:  Yeah.  But I think they want to

24     investigate the whole matter and I'll give them time to

130

1    do that.

2              MR. SALTIEL:  What date are you looking for?

3              THE COURT:  Whatever date you want.

4              In the meantime, tender any discovery, all

5    discovery should be tendered back and forth.

6              MS. O'CONNOR:  I'll FAX those to their office

7    when I go back to my office.

8              THE COURT:  What date are we looking for?

9              MS. O'CONNOR:  I'm here every day.

10             THE COURT:  So am I.

11             Counsels, what's a good day for you?

12             MR. SALTIEL:  I think sometime in the last

13   week of July.

14             THE COURT:  How is the 29th -- or, I'm sorry.

15   The 28th.

16             MR. HILL:  Looks like the 28th is fine.

17             THE COURT:  By-agreement, 7-28-05, for

18   sentencing.

19             The PSI is tendered.  State will tender

20   additional discovery.

21             What I'd like to you do also is tender each

22   other, if there is going to be witnesses, a list of

23   witnesses for the sentencing hearing.

24             Thank you.

Fletcher 001786

```
 1                              (Whereupon the above-entitled
 2                               cause was continued to
 3                               7-28-05.)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Fletcher 001787

```
1    STATE OF ILLINOIS )
                       ) SS.
2    COUNTY OF COOK    )

3

4              I, VICTORIA A. ONDRISKA, Official Court

5    Reporter, do hereby certify that the foregoing Report of

6    Proceedings was reported by me, and is a true and

7    accurate transcript of my shorthand notes so taken.

8

9

10                        Victoria A. Ondriska

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

133

Fletcher 001788