# EXHIBIT 75

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Arnold DIXON, | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 11 C 5851 |
| | ) | |
| Randy PFISTER,[1] | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| Respondent. | ) | |

### MEMORANDUM OPINION AND ORDER

On February 25, 2005, a Cook County jury convicted Petitioner Arnold Dixon (AKA "James Fletcher") of the first-degree murder of Willie Sorrell. Dixon has exhausted his state appeals and now seeks a writ of *habeas corpus* from this court pursuant to 28 U.S.C. § 2254. Dixon seeks relief on the grounds that (1) the introduction of testimonial hearsay at his trial violated the Sixth Amendment's Confrontation Clause; (2) unreliable inculpatory eyewitness identifications were admitted at trial in violation of his due process rights; (3) he was deprived of his right to counsel at a police line-up in violation of the Sixth and Fourteenth Amendments; (4) his trial counsel was constitutionally ineffective for failing to litigate a motion to suppress the eyewitness identifications; and (5) his appellate counsel was constitutionally ineffective for failing to raise issues (3) and (4) on direct appeal. For the following reasons, Dixon's petition is granted.

---

[1] During the pendency of this case, Randy Pfister replaced Marcus Hardy as Petitioner's custodian at the Stateville Correctional Center. Pfister has been substituted as the proper Respondent. *See* FED. R. CIV. P. 25(d).

IND DEF 000095

## FACTUAL BACKGROUND[2]

The case against Petitioner emerged from an incident that took place on December 21, 1990 in Chicago. On that afternoon, multiple armed men stole money from a delivery-truck driver who, in turn, retrieved his own gun and chased the robbers down the street. The robbers and the driver all exchanged gunfire, and a stray bullet struck and killed a bystander named Willie Sorrell. None of the robbers was apprehended at the scene, but police officers spoke to four eyewitnesses: (1) Edward Cooper, the driver; (2) Sheenee Friend, an eyewitness to the robbery; (3) Emmett Wade, an eyewitness to the chase; and (4) Terry Rogers, who had joined Cooper in chasing the robbers. Although none of the witnesses identified the robbers at the scene, Terry Rogers told a police officer that he heard one robber call the other "Fletcher."

Five years later, in 1995, Detectives Jerome Bogucki and Raymond Schalk began investigating the incident. The detectives did not speak to Rogers until 2002. In a 2002 interview, Rogers told Detectives Bogucki and Schalk that one of the robbers was named "Jimmie Fletcher." Petitioner's name is "James Fletcher."[3] The detectives then, by their own account, showed Rogers a photo array from which Rogers identified a photo of Petitioner. The detectives showed this photo array to the three other eyewitnesses: Cooper, Friend, and Wade. Cooper and Friend

---

[2]     On direct appeal, the Appellate Court of Illinois briefly summarized the in-court testimony of four of the nine witnesses called at trial. (*People v. Fletcher*, No. 1-05-3447 (Ill. App. Ct. 1st Dis. Mar. 23, 2007)). On post-conviction review, the court incorporated this summary verbatim. (*See People v. Fletcher*, No. 1-09-1250 (Ill. App. Ct. 1st Dist. Nov. 4, 2010), Ex. I to St. Ct. R.) The facts asserted in these summaries are presumed accurate unless rebutted "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Because the summary is far from comprehensive, however, the court incorporates additional facts from the record as relevant. *See Edmonson v. Harrington*, No. 09-CV-2073, 2013 WL 2178320, at *1 (N.D. Ill. May 20, 2013); *see also Hoglund v. Superintendent*, No. 3:16-CV-313-PPS-MGG, 2018 WL 4006399, at *1 (N.D. Ind. Aug. 22, 2018) (finding that "the Indiana Supreme Court's summary description of the evidence was accurate but incomplete" and supplementing it with additional information derived from the trial transcript).

[3]     The court has been unable to discern why Petitioner was tried under a different name than he now assumes in this petition.

2

IND DEF 000096

identified Petitioner, but Wade did not. The detectives arrested Petitioner, assembled a police line-up, and presented it to Cooper and Friend, both of whom again identified Petitioner.

Petitioner was tried for first-degree murder in the Circuit Court of Cook County on February 22–25, 2005. The state called Cooper, Friend, Wade, and Detective Bogucki to testify. Although the accounts of Cooper and Friend conflicted in myriad ways, both witnesses affirmed that they recognized Petitioner to be one of the robbers. Rogers—the detectives' original lead to Petitioner based on Rogers' statement to police officers at the scene of the robbery—did not testify. Detective Bogucki, however, testified that a 1990 police report stated that an unspecified witness had "provided the name of Fletcher," and that only after speaking to Rogers in 2002 did the detectives "attempt[ ] to locate James Fletcher." Petitioner then called several witnesses who testified that his appearance in December 1990 did not match the testifying witnesses' descriptions of any of the robbers, and one witness who placed Petitioner outside Illinois in late December 1990. The jury found Petitioner guilty, and the court sentenced him to natural life in prison.

Two significant developments have occurred since Petitioner's conviction. First, Detective Bogucki was accused of using "coercive tactics" to procure false identifications in a murder investigation. In 2012, a federal jury found Detective Bogucki liable for that conduct and awarded damages in the amount of $25 million. *See Jimenez v. City of Chicago* (*Jimenez III*), 732 F.3d 710, 712 (7th Cir. 2013). Additionally, Cooper, Friend, and Wade have prepared affidavits supplementing their testimony at trial. Cooper now avers that he told detectives that he "did not exactly recognize anyone in the [photo array]," and both Friend and Cooper recall Detectives Bogucki and Schalk guiding them to identify Petitioner's photo from the array.

The court attempts to incorporate all relevant facts and allegations here, giving appropriate deference to the state court's findings as mandated by 28 U.S.C. § 2254(e)(1).

I.      **The Robbery**

IND DEF 000097

On December 21, 1990, between 1:00 and 1:30 P.M., Edward Cooper drove a Holsum Bread truck to an Uncle Remus Restaurant located at 5615 West Madison Street in Chicago to make a delivery. (Trial Tr. Vol. III at 55–56, Ex. S to State Ct. R. [28].) Once parked, Cooper took loaves of bread into the restaurant and then returned to his truck with empty bread trays in hand. (*Id.* at 56.) Outside of the restaurant, Cooper encountered a woman named Sheenee Friend. (*Id.*) Cooper testified that he was acquainted with Friend because he knew her parents. (*Id.* at 57.) Friend, similarly, testified at trial that she knew Cooper as a friend of her father. (*Id.* at 133.) In earlier testimony before a grand jury, however, Friend stated that she met Cooper in approximately 1989, when he made bread deliveries to a grocery store at which she was employed. (Common L. Suppl. R. at PageID #:1643, Ex. Y to State Ct. R.) And a police report prepared by Detective Raymond Schalk on March 8, 2002, which was not introduced at trial, reflects that Friend stated she had dated Cooper. (*Id.* at PageID #:1657.)

At trial, Friend and Cooper both described their December 21, 1990 encounter; their accounts differed on several details.[4] Cooper recalled that as he was leaving the restaurant, Friend approached and asked him for change to use at a nearby laundromat and that, although Cooper had change in his pocket, but he asked Friend to wait while he put his bread trays away in his truck. (Trial Tr. Vol. III at 57.) Cooper then, according to his testimony, walked toward his truck and opened its side door, but was stopped by the robbers before he could enter or give Friend any money. (*Id.*) Friend, in contrast, recalled that although she was coming from a laundromat, she asked Cooper for money to give to her daughter. (*Id.* at 134.) Friend did not specify where her daughter was, or why she needed money. (*Id.*) According to Friend's testimony at trial, she then entered Cooper's truck with Cooper and, while the two were inside, received the

---

[4]     To the extent that this assessment of Cooper and Friend's testimony differs from the state court's finding on collateral review that the witnesses testified "consistently and credibly," (*see* Postconviction Suppl. R. at PageID #:1781, Ex. AA to State Ct. R.), this court holds that the presumption of that finding's correctness is rebutted by clear and convincing evidence. *See also* Discussion, *infra*, at Part IV.

4

IND DEF 000098

money she had requested from Cooper. (*Id.* at 134–35.) In a signed statement prepared prior to trial (but not mentioned at trial), Friend averred that she actually encountered Cooper already in his truck, entered through its side door, and spoke with him for "about 20 minutes." (Common L. Suppl. R. at PageID #:1635–36.) And before a grand jury, Friend testified that she asked Cooper for money in order to buy shoes for her daughter. (*Id.* at PageID #:1646.)

Cooper and Friend both testified at trial that they were accosted by two men. Again, however, their accounts of the events differed. Cooper testified that just after he opened the side door of his truck, before he could enter, a man stuck an object into Cooper's back and asked, "You know what this is?" to which Cooper responded, "Yeah." (Trial Tr. Vol. III at 57–58.) According to Cooper, this man ordered Cooper to step into the truck, and Cooper complied, followed by that man and another one, both of whom were carrying revolvers. (*Id.* at 58–59.) Friend testified, in contrast, that when the two men approached, she and Cooper were already in the truck. (*Id.* at 135.) According to Friend, she was about to leave the truck when one of the men grabbed her arm and said, "What the fuck you think you're doing?" (*Id.*) Friend said, "Let me go" and pulled her arm away, then exited the truck. (*Id.* at 135.) The two men then entered the truck and closed the door. (*Id.* at 138.) Friend said she did not see whether the men were armed when they entered the truck. (*Id.* at 136.)

Cooper testified that once inside the truck, one of the gunmen leaned on the dashboard while the other pointed a gun at Cooper's side. (Trial Tr. Vol. III at 59–60.) The first man then pointed his own gun at Cooper and demanded money. (*Id.* at 58.) Cooper removed cash from his left pocket and handed it over, while the other gunman reached into Cooper's right pocket and pulled out additional money. (*Id.*) According to a private investigator who spoke to Cooper in

IND DEF 000099

2004, however,[5] Cooper recalled only one of the robbers carrying a gun. (Postconviction Suppl. Common L.R. at PageID #:1919.)

In total, Cooper testified that about $334 was taken from him. (Trial Tr. Vol. III at 61.) Cooper told the armed men that the rest of the money was in a safe in the truck. (Id. at 61–62.) They asked Cooper to open it, but he told them that he was not able to do so because he did not have a key, and volunteered that the men could instead take the truck. (Id.) Friend testified that she was able to see part of this interaction through the truck's windows. (Id. at 137.) Specifically, she saw the man who had earlier grabbed her putting his hands in Cooper's pockets while the other man pointed a gun at Cooper. (Id. at 137–38.) Cooper testified that after the gunmen took the money from his pocket, they spoke for "30 more seconds or so before leaving." (Id. at 62.) Friend testified that the men were in the truck for ten to fifteen minutes in total. (Id. at 138.)

Cooper testified that, as the two gunmen were leaving the truck, one of them turned around, and as he did so, Cooper pulled out a gun he himself had at his side.[6] (Trial Tr. Vol. III at 63.) Without saying who fired the first shot, Cooper testified that he and the two men shot at each other. (Id.) Friend's order of events was clearer; she testified that she saw the two men jump out of the front side door of the truck, with Cooper following them, and that Cooper then pulled out a gun and fired at the robbers, who both fired back. (Id. at 139, 156.) Both gunmen then ran northwest on Madison Street. (Id. at 63–64.)

At around 1:20 P.M., Emmett Wade was sitting in a van parked on Madison Street, facing east. (Trial Tr. Vol. III at 109–10.) Wade heard someone scream, looked up, and saw a Holsum Bread truck driver (presumably Cooper) running in Wade's direction with a gun. (Id. at 110.) Wade saw Cooper fire his gun at least once. (Id. at 111.) The bullet hit Wade's windshield and

---

[5]     Jim Zarnick, a private investigator, spoke to Cooper by telephone on September 23 and 28, and provided a report of these conversations to Petitioner's trial counsel. (Postconviction Suppl. Common L.R. at PageID #:1919.)

[6]     Cooper did not specify where, exactly, he had kept this gun, whether in the truck or on his person.

IND DEF 000100

ricocheted upward. (*Id.*) Wade briefly ducked down in his car, then exited to see multiple people wearing hoodies running westbound. (*Id.* at 112.) Wade heard gunshots from behind him and then saw a man (presumably, the victim, Willie Sorrell) walk out of a liquor store and fall. (*Id.*) Friend testified that she saw Sorrell walk out of the liquor store and fall after being hit by a bullet. (*Id.* at 142.) Friend testified that, at that moment, the robbers were firing in the direction of the liquor store, whereas Cooper was not. (*Id.*)

At some point during the chase, Cooper testified, he encountered a man he knew named Terry Rogers. (Trial Tr. Vol. III at 65.) According to Cooper, Rogers proceeded to join Cooper in chasing the gunmen down Madison Street. (*Id.*) Cooper further testified that the gunmen eventually ran into an abandoned building and Cooper stopped chasing them. (*Id.* at 65–66.) Cooper then walked to a store on Wallace Avenue and Madison Street and left his gun with a person there, purportedly because his employer did not permit him to carry a weapon. (*Id.* at 67–68.) Returning to his truck, Cooper saw the victim lying on the ground. (*Id.* at 66.) At trial, Cooper testified that he knew he was not the one who shot Sorrell, because Cooper "was facing the opposite way" and was "about 20 feet in front of [Sorrell] and [Sorrell] was behind Cooper." (*Id.* at 104.)

Cooper spoke to police officers at the scene. He initially told the officers that he did not have a gun, but went on to admit that he did, in fact, discharge a firearm approximately five times. (Trial Tr. Vol. III at 99–100.) After revealing he had a gun, the officers placed Cooper under arrest for "having an unregistered weapon and shooting in the city limits." (*Id.* at 106.) Cooper did not realize he had been arrested, he testified, until he later received notice of a court date. (*Id.* at 100, 106.) While speaking to officers at the scene, Cooper could not recall any distinguishing characteristics of either gunman. (*Id.* at 101.)

Friend also spoke to at least one police officer at the scene (she did not recall how many) but did not testify to what, if anything, she told the officers. (Trial Tr. Vol. III at 164–65.) Wade

7

IND DEF 000101

went to the police station that evening, as well, but did not recall telling police officers that he might be able to identify the suspects. (*Id.* at 129.)

## II.    The Investigation

Five years later, in March 1995, Detectives Jerome Bogucki and Raymond Schalk began investigating the murder of Willie Sorrell. (Trial Tr. Vol. III at 177, 181.) Bogucki testified that he and Schalk reviewed a case report prepared by the 15th District Office and a supplementary report prepared by another detective. (*Id.* at 178–79.) The supplemental report, prepared by detective Michael Fleming on December 21, 1990, states that two perpetrators both had a "[s]lim build," dark complexion, and were wearing blue jeans. (Postconviction Suppl. Common L.R. at PageID #:1824, Ex. BB to State Ct. R.) The supplemental report further states that the first individual had "[c]ollar length curls," and was wearing a dark "starter coat" and a "[b]lack baseball cap," and that the second individual had black hair tied into a ponytail and was wearing a dark "starter jacket" and a "[d]ark cap." (*Id.*) The report does not specify how Detective Fleming learned this information, but records statements covering other topics from Cooper, Wade, and Rogers. (*Id.*) The section summarizing Rogers' statement, pertinently, includes the following passage: "While they were running he heard one of the men call the other to hurry up and he called him by the name FLETCHER." (*Id.* at PageID #:1826.) At trial, Bogucki testified that, "[f]rom reading [these] reports, it became obvious to myself and my partner that a subject named Terry Rogers needed to be talked to." (Trial Tr. Vol. III. at 180.)

Later in 1995, detectives interviewed Cooper regarding the incident. (Trial Tr. Vol. III at 70–71.) The detectives brought photos and asked Cooper whether he recognized a person who robbed him in any of the photos. (*Id.* at 92.) At trial, Cooper averred that Petitioner was not in any of these photos, and that during the 1995 interview he "discussed with [the detectives] somebody else." (*Id.* at 92, 103.) No witness at trial identified this other individual, but a police report not entered at trial reflects that the "somebody else" Cooper referred to was named "Fletcher Clinton." (Postconviction Suppl. Common L.R. at PageID #:1893.) The report further

IND DEF 000102

states that Cooper "went on to say that he believed that Terry ROGERS had set him up. He stated that he was friends of ROGERS' family. He had heard that ROGERS had a bad drug habit and would do almost anything for money (he has a 5 page sheet). It should be noted that ROGERS was the one who claimed that one of the offenders called the other 'Fletcher.'" (Id.) None of this information about Terry Rogers was presented to the jury at trial, but defense counsel referenced this report in Petitioner's motion for a new trial. (See Trial Common L.R. at 158, Ex. X to State Ct. R.)

Seven years passed. Then, on February 11, 2002, Terry Rogers was arrested for criminal trespass. (Postconviction Suppl. Common L.R. at PageID #:1840.) Detectives Bogucki and Schalk re-interviewed Rogers in custody the following day and asked him about the 1990 incident. (Trial Tr. Vol. III at 181–82.) During the interview, Terry Rogers told detectives that one of the robbers from the 1990 incident was named "Jimmie Fletcher," prompting them to prepare a photo array that included Petitioner's photo.[7] (Postconviction Suppl. Common L.R. at PageID #:1840–41.) Rogers then identified a photo of Petitioner. (Id.) A police report prepared by Detective Schalk following this interview reflects that the detectives also asked Rogers "about the discrepancies between what [Rogers] was telling [them] and what he had told detectives on the day of the murder."[8] (Id. at PageID #:1840.) Rogers responded "that he did not remember what he had said in 1990." (Id.)

Later that day, on February 12, 2002, Bogucki and Schalk interviewed Cooper in his home. (Trial Tr. Vol. III at 71, 186.) During this interview, Bogucki and Schalk showed Cooper the same photo array they had shown Rogers. (Id. at 186.) Cooper testified that the detectives asked "do

---

[7]     For reasons not clear from the trial record, Bogucki testified that this photo array was prepared using the name "Dixon." (Trial Tr. Vol. III at 199.)

[8]     Specifically, in 1990, Rogers did not tell investigators that he had talked with one of the robbers prior to the robbery, but in 2002, Rogers told detectives that before robbing the bread truck, Jimmie Fletcher, whom Rogers knew, had asked Rogers about buying drugs. (Id. at PageID #:1826, 1840.)

IND DEF 000103

[you] see in the photo, do [you] see anybody that robbed [you]." (*Id.* at 71–72.) Bogucki testified that they simply asked Cooper whether he recognized anyone in the photos, and that Cooper picked out a photo of Petitioner. (*Id.* at 186.) According to Bogucki, Cooper said "it looks like one of the offenders that shot at him and robbed him, but [Cooper] couldn't be positive." (*Id.* at 187.) At trial in 2005, Cooper acknowledged that during the 2002 interview he told detectives he was not sure that Petitioner's photo depicted one of the individuals who had robbed him, but Cooper nevertheless testified at trial that he was "100 percent sure of who the suspect was" from the photo. (*Id.* at 93.)

On March 7, 2002, Sheenee Friend was arrested on a parole violation warrant. (Postconviction Suppl. Common L.R. at PageID #:1840–41; Trial Tr. Vol. III at 158.) The next day, Bogucki and Schalk met with Friend and showed her the same photo array they had shown Cooper.[9] (Trial Tr. Vol. III at 156, 158, 187.) According to Friend, the detectives asked her to "identify the guys that killed that old man." (*Id.*) According to Bogucki, however, Friend was only asked to "see if she recognized anyone." (*Id.* at 188.) Friend testified that the detectives did not tell her that they already had a suspect for the shooting. (*Id.* at 163.) Friend identified a photo of Petitioner. (*Id.* at 145, 188.)

On March 12, 2002, the detectives visited Emmett Wade in his home. (Postconviction Suppl. Common L.R. at PageID #:1840–41; Trial Tr. Vol. III at 124.) They showed Wade a series of photographs and asked if he could identify anyone who was on Madison Street on December

---

9        At trial, Friend testified that the meeting in which she was shown a photo array took place in April 2002. On cross-examination, defense counsel asked, "I believe you testified that April of 2002 you were shown a photo array; is that correct?" (Trial Tr. Vol. III at 156.) The trial judge sustained an objection, incorrectly recalling, "I believe it was February of '02." (*Id.*) Friend then corrected her testimony to February 2002. (*Id.*) Detective Bogucki would later testify that this interview actually took place on March 8, 2002. (*Id.* at 187.) The March date is corroborated by a police report prepared by Detective Schalk. (Postconviction Suppl. Common L.R. at PageID #:1840-41.)

IND DEF 000104

21, 1990. (Trial Tr. Vol. III at 125.) Wade testified that the detectives informed him they already had a suspect. (*Id.*) Wade told the detectives, however, that he could not identify anyone. (*Id.*)

On March 21, 2002, Bogucki obtained an arrest warrant for Petitioner. (*Id.* at 188.) Approximately one month later, on April 18, 2002, Petitioner was arrested. (Postconviction Suppl. Common L.R. at PageID #:1829.) The next day, Bogucki and Schalk assembled a police line-up that included Petitioner and four other individuals, none of whom had been included in the previously-used photo-array. (Trial Tr. Vol. III at 189, 211.) At the time, Petitioner had braids in his hair that went past the nape of his neck. (Trial Tr. Vol IV at 82.) None of the other participants had braids or hair of a similar length. (*Id.*)

Petitioner's father had hired Attorney Jacqueline Gordon to represent Petitioner. On the day of the line-up, Gordon arrived at the police station, but was prevented from seeing Petitioner for approximately thirty minutes. (Trial Tr. Vol. IV at 68, 71.) Gordon was ultimately permitted to stand in the same room as Petitioner during the line-up identification, but not to see or enter the separate "witness room" where Cooper and Friend viewed the line-up. (*Id.* at 73–74, 189.) Meanwhile, Cooper was asked whether he recognized any of the individuals from the December 21, 1990 shooting, and identified Petitioner. (Trial Tr. Vol. III at 73.) Friend, too, was asked if she recognized "anyone from the shooting on Madison from 1990," and identified Petitioner. (*Id.* at 145.)

On May 9, 2002, Terry Rogers testified before an Illinois grand jury. (Postconviction Suppl. Common L.R. at PageID #:1885.) Rogers testified that he knew both Petitioner and Cooper. (*Id.* at PageID #:1888.) He recalled that on December 21, 1990, as Cooper was delivering bread, "Jimmy Fletcher upped the gun from his backside and there was some gunfire exchanged. Edward Cooper ran to his truck and got his gun," then chased Petitioner and another man, with whom Rogers was not familiar. (*Id.*) Rogers stated, however, that he did not immediately realize that someone had been shot. (*Id.* at PageID #: 1889–90.) In his September 2004 conversation

11

IND DEF 000105

with a detective hired by the defense, Cooper told the detective that he was only "75 percent sure" who the robber was.   (Trial Tr. Vol. III at 98, 99.)

## PROCEDURAL HISTORY

### I.    Pre-Trial

On April 18, 2002, Petitioner filed a formal trial demand under the Illinois Speedy Trial statute, 725 ILCS 5/103-5(b).  (Postconviction Suppl. Common L.R. at PageID #:1829.)   On September 30, 2002, Petitioner moved to dismiss the indictment for failure to commence prosecution within a reasonable time. (Trial Common L.R. at 41.) On January 10, 2003, Petitioner moved to suppress the photograph and line-up identifications, arguing that the detectives' conduct in securing them was "unnecessarily conducive to mistaken identification."  (*Id.* at 57–58.)  The record does not reflect how, if at all, the trial court ruled on these motions.

On November 10, 2003, Petitioner again moved to suppress all pre-trial identifications, and additionally to bar in-court identification testimony by Cooper and Friend.  (Postconviction Suppl. Common L.R. at PageID #:1864.)  Petitioner's counsel later withdrew this motion.  (*See* Trial Tr. Vol. VI at 47, 57, Ex. V to State Ct. R.)

### II.    Trial

Petitioner's trial began on February 23, 2005.  (*See* Trial Tr. Vol. III.)  He was tried under the name James Fletcher.  During the state's opening statement, a prosecutor asserted that sometime after the robbery, detectives "knew from the reports that they were looking for a man named Fletcher." (Trial Tr. Vol. III at 27.)  Defense counsel objected that this statement violated the Sixth Amendment's Confrontation Clause, proffering that the name "Fletcher" was only supplied to law enforcement by Terry Rogers, a non-testifying witness.  (*Id.* at 27–28.)  After receiving assurances from the prosecution that they would not go into "anything that Rogers said," the trial court overruled defense counsel's objection.  (*Id.*)  The prosecution then added to their opening statement that, after performing follow-up interviews of unspecified witnesses in 2002, detectives knew "they were looking for a suspect named James Fletcher." (*Id.* at 29.)

12

IND DEF 000106

A.     **Prosecution Case in Chief**

The prosecution first called Edward Cooper. Cooper described the events of December 21, 1990, beginning with his arrival at the restaurant. On direct examination, Cooper identified Petitioner as the gunman who pointed a gun at Cooper's side and reached into Cooper's pocket to remove money. (Trial Tr. Vol. III at 58, 60–61.) Cooper acknowledged that Petitioner, at trial, appeared "stockier" than he had in 1990, and had a different hairstyle. (*Id.* at 68.) On December 21, 1990, Cooper testified, Petitioner had a collar length "Jheri curl" that Cooper could see coming out of the back of a baseball cap the robber was wearing.[10] (*Id.* at 69.) According to Cooper, Petitioner was also wearing a starter jacket and dark-colored pants, and appeared to be "like 5 feet 8 to 5 feet 9, about 6 feet" tall and "around 160 to 170 pounds." (*Id.*) Cooper testified that the other gunman was "about five-eight to five-ten," 150 to 160 pounds, was also wearing a starter jacket and a baseball cap, and had a ponytail. (*Id.* at 70.) Both gunmen, Cooper testified, appeared to be in their late 20s or early 30s. (*Id.*) Petitioner was in his late 20s in 1990.

On cross-examination, Cooper was asked whether it was "possible that someone else did this." (Trial Tr. Vol. III at 101.) Before Cooper could answer, the state raised an unspecified objection, which the court sustained. After Cooper testified that during the 1995 interview he discussed "somebody else" with detectives, the prosecution raised another unspecified objection, which the court again sustained. (*Id.* at 93.)

The prosecution's second witness was Emmett Wade. Wade described what he was able to see of the chase and of Sorrell's fatal injury. He testified that he saw individuals running west on Madison Street, that these individuals were wearing hoodies, that he did not see any of them carrying guns, and that he initially thought there were three of them but could not be sure. (Trial Tr. Vol. III at 113, 119–20, 122.) Wade did not identify Petitioner as any of these individuals, and

---

[10]     On re-direct examination, Cooper explained that getting a Jheri curl involves treating hair with a chemical that causes hair to "curl up." (Trial Tr. Vol III at 102-03.)

IND DEF 000107

testified that he could not say whether Petitioner was in the vicinity of the shooting on December 21, 1990. (*Id.* at 120, 126.) He further testified that, based on the relative positions of Sorrell and Cooper, it was not possible that the bullet that struck Sorrell was fired by Cooper. (*Id.* at 119.) Regarding the photo array shown to Wade in March 2002, defense counsel asked on cross-examination whether the detectives had told Wade which one of the photographs matched their current suspect, but the court sustained an unspecified objection before Wade could answer. (*Id.* at 125–26.)

The third witness was Sheenee Friend. Friend described the events of December 21, 1990 from her perspective, beginning with the moment she ran into Edward Cooper. Friend identified Petitioner as the gunman who grabbed her before entering Cooper's truck, and who searched through Cooper's pockets in his truck. (Trial Tr. Vol. III at 136–38.) She further testified that she had never seen this man prior to December 21, 1990. (*Id.* at 136.) On December 21, 1990, according to Friend, Petitioner was wearing a black "skullcap" and a black jacket. (*Id.* at 150.) Friend could not recall what kind of pants Petitioner was wearing, or how old he appeared; she did not see his hair, nor did she recall anything about the other gunman's appearance. (*Id.* at 150–52.) Friend did say that, as Petitioner appeared at trial, he was older and "much bigger" than he had been in 1990. (*Id.* at 149–50.)

On cross-examination, defense counsel sought to ask Friend whether she had initially told a detective, on December 21, 1990, that she did not know whether Cooper had a gun. (*Id.* at 165.) The prosecution raised an objection, arguing at sidebar that because defense counsel's basis for the question was in a non-testifying detective's police report, defense counsel could not "prove it up." (*Id.* at 165–66.) The court did not expressly sustain the objection, instead observing that the witness had not testified that the officer she had spoken to was in fact a detective. (*Id.* at 168–69.) Friend thereafter testified that she spoke to a detective, but defense counsel never renewed the impeachment effort. Friend further testified that she had "[n]o doubt at all" that her identification was accurate. (*Id.* at 175.)

14

IND DEF 000108

The prosecution's final witness was Detective Jerome Bogucki. During Bogucki's direct examination, defense counsel twice objected on hearsay grounds to testimony that in 1995, Bogucki learned from two 1990 reports prepared by non-testifying officers that "[t]here were two male Black offenders wanted" and "[o]ne of the witnesses had provided a name of Fletcher." (Trial Tr. Vol. III at 179–80.) The prosecution responded that the statements were only being offered to show "the course of this investigation," and the court overruled the objections. (*Id.*) Bogucki further testified that, in 2002, he showed a photo array to Terry Rogers, and defense counsel raised another objection. (*Id.* at 182.) In sidebar, defense counsel noted that Rogers was not available to testify and argued that it was "a violation of the Sixth Amendment right to cross-examine for this type of testimony to be elicited." (*Id.* at 183.) Defense further proffered that Rogers had made inconsistent statements to police officers, documented in police reports, that the defense would not be able to use for impeachment without Rogers testifying. (*Id.*) The court sustained the defense's objection and issued a limiting instruction to the jury to disregard Bogucki's testimony that Rogers had examined photos. (*Id.* at 185.) Bogucki nevertheless was permitted to testify that the next step in his investigation was to "attempt[ ] to locate James Fletcher." (*Id.* at 186.)

On cross-examination, defense counsel asked Bogucki whether the name of the suspect that he learned of in 1995 was a full name, and Bogucki acknowledged that it was only a "first or last name." (*Id.* at 198.) Defense counsel also elicited testimony that Friend told Bogucki in 2002 that she had seen Petitioner prior to December 21, 1990 "in the neighborhood," contradicting Friend's earlier testimony that she had never seen Petitioner before. (Trial Tr. Vol. III at 136, 204.)

On re-direct examination, the prosecution asked Bogucki what name he was made "aware of" in 1995 in connection with Willie Sorrell's murder, and defense counsel objected that it was asked and answered. (*Id.* at 205–06.) The court overruled the objection, and Bogucki answered "Fletcher." (*Id.* at 206.) The prosecution then asked "[a]t the time you assembled that photo array, what was the name of that person that you wanted in connection with the murder of Willie Sorrell,"

IND DEF 000109

and Bogucki answered "James Fletcher." (*Id.* at 207.) The prosecution then asked why Bogucki used the last name "Dixon" to create the photo array; counsel for the defense objected on hearsay grounds, and the court sustained the objection. (*Id.* at 207.)

## B.     Defense Case in Chief

Petitioner first called his father, James Fletcher Sr.    Fletcher Sr. could not recall whether he saw Petitioner on December 21, 1990, but he testified that he saw Petitioner three times per week in 1990, and that he has never seen his son with collar-length hair or curls of any kind. (Trial Tr. Vol. IV at 10, 20-23, Ex. T to R.) Through Mr. Fletcher, Sr., defense counsel introduced a photo of petitioner taken in October 1990. (*Id.* at 8.) Fletcher Sr. testified that this photo, in which Petitioner has short hair, accurately reflected Petitioner's appearance in December 1990. (*Id.* at 11.) On cross-examination, Fletcher Sr. testified that in 1990 Petitioner weighed between 170 and 180 pounds, and was between 5'10" and 6' tall. (*Id.* at 17.) He further testified that Petitioner had gained "a couple of pounds" since 1990. (*Id.* at 18.)

Petitioner next called Deborah Sanders, his ex-wife, to whom he was married in 1990. (*Id.* at 31.) Sanders testified that in the Fall of 1990, Petitioner weighed between 175 and 180 pounds, and that his hairstyle was a "bald fade"—that is, a style in which the hair is "cut off on the sides and the back" with "maybe about an inch or two on the top." (*Id.* at 31-32.) Shown the already-entered photo of Petitioner from October 1990, Sanders testified that the sides of Petitioner's hair in the photo were slightly longer than that typical of a bald fade. (*Id.* at 32–33.) Sanders further testified that she left her relationship with Petitioner in November 1990, but nevertheless saw Petitioner three times in December 1990, the first two times in Memphis, Tennessee, and a third time in Indianola, Mississippi. (*Id.* at 35–36.)[11] She averred that during the third meeting, which

---

[11]     The prosecution called one rebuttal witness in an effort to impeach Sanders: George Murtaugh, a felony trial investigator with the Cook County State's Attorney's Office. Sanders told Murtaugh that she met with Petitioner in Mississippi on December 12, 1990, and that she saw Petitioner around Christmas that year in Memphis. (Trial Tr. Vol. V at 29, 33.)

IND DEF 000110

was shortly before Christmas, Petitioner "still had the fade" and his hair was "[s]haved real low" in the back. (*Id.* at 38.)

Petitioner's only other witnesses were Raymond Schalk, Bogucki's partner, and Jacqueline Gordon. Schalk confirmed that in March 2002, Friend said she had seen Petitioner prior to December 21, 1990. (*Id.* at 64.) Gordon, the lawyer who represented Petitioner at the police line-up in 2002, described her observations in the police station the day of Petitioner's line-up. (*Id.* at 66.) The court sustained multiple objections to what it deemed improper legal opinions Gordon offered about her right to be present in the witness room. (*See id.* at 72, 74–80, 86.)

## C.    Miscellaneous Objections and Argument

Following the close of evidence, defense counsel renewed its objection to the introduction of hearsay evidence. (Trial Tr. Vol. V at 19, Ex. U to State Ct. R.) Specifically, defense counsel asked that the judge instruct the jury to disregard Detective Bogucki's testimony that in 1995 he knew he was looking for someone named "James Fletcher,"[12] and insisted that the prosecution should be barred from commenting on this evidence in its closing argument. (*Id.* at 20.) The prosecution argued that this was not hearsay, contending that "[i]t's been the state of the law that course of police investigation allows the type of questioning that was done in this case." (*Id.* at 21.) Defense counsel responded by stressing the Constitutional implications of the court's holding—in the defense's view, Bogucki's testimony left the "distinct impression" that a non-testifying witness implicated Petitioner, thus triggering Petitioner's right to cross-examine that witness. (*Id.* at 23.) The court disagreed, finding that Bogucki's testimony that he reviewed

---

[12]    In making this argument, defense attorneys characterized the evidence as reflecting that Bogucki and Schalk learned the name "James Fletcher" in 1995. This court notes that there was in fact no testimony that Bogucki or Schalk learned the first name "James" until 2002. In fact, in 1995, detectives were considering another individual, Fletcher Clinton, as a suspect and it was Fletcher Clinton's photo, not Petitioner's, that was included in the 1995 photo array shown to Cooper. (Postconviction Suppl. Common L.R. at PageID #:1893.) In a later hearing, the prosecution expressly stated that "the name James Fletcher was not known to the police until 2002." (Trial Tr. Vol. VI at 15.)

IND DEF 000111

reports, and then subsequently attempted to locate someone named "James Fletcher," did not constitute an out-of-court statement, and thus was not hearsay. (*Id.* at 21, 23.)

Defense counsel made an offer of proof, for the record, that Terry Rogers was the detectives' sole basis in 1995 and 2002 for looking for a man named "James Fletcher." (*Id.* at 26.) Specifically, the defense proffered, Rogers gave the name "Fletcher" during a police interview in 1990, then elaborated that the full name was "James Fletcher" after being arrested in 2002. (*Id.*) Defense counsel asserted that it could call two witnesses who would corroborate these facts—Detective Gilger and Detective Fleming—and that both Bogucki and Schalk would testify to it as well. (*Id.* at 27.)

The prosecution's closing argument highlighted that "in 1995 [Detectives Bogucki and Schalk] were looking for someone by the name of James Fletcher," and that the detectives relied on this information to assemble their photo array. (*Id.* at 46.) The defense argued in closing that because there was "no evidence of where that name came from" the jury "can't give that testimony weight and credence." (*Id.* at 66.) While the jury was deliberating, defense counsel moved for dismissal for failure of the state to commence prosecution in a reasonable time, arguing that the 12-year delay caused Petitioner "severe[ ] prejudice." (*Id.* at 101–02.) The court denied the directed verdict motion but did not render an immediate decision on the speedy trial motion.

On February 25, 2005, after deliberating for less than two hours, the jury found Petitioner guilty of first-degree murder. (*Id.* at 96, 102.) The court entered judgment on the verdict and dismissed the jury. (*Id.* at 105.) Defense counsel moved for judgment notwithstanding the verdict; the court denied that motion but entered a briefing schedule on a motion for a new trial. (*Id.* at 106.)

## III. Post-Trial

Petitioner's motion for a new trial, filed on May 2, 2005, raised four principal arguments: (1) that the court erred by allowing witnesses to testify about information obtained from out-of-court statements made by Terry Rogers; (2) that the court erred by not permitting attorney

IND DEF 000112

Jacqueline Gordon to testify that the state's failure admit her to the witness viewing room was improper; (3) that reversible errors emerged from the state's mischaracterizations of testimony by Sheenee Friend that bore on her credibility; and (4) that the jury's verdict was against the weight of the evidence. (Trial Common L.R. at 156–57, 159, 161, 164.) Additionally, Petitioner argued (5) that the state failed to commence prosecution within a reasonable time; (6) that the court erred in ruling that the state was entitled to elicit evidence of Petitioner's prior bad acts from a defense rebuttal witness; (7) that the prosecution's closing argument lacked proper foundation; (8) that the court erred by prohibiting the defense from cross-examining Emmett Wade about the conduct of detectives relative to the 2002 photo array; (9) that the court erred by prohibiting the defense from eliciting testimony from Edward Cooper and Detective Bogucki that Rogers may have been involved in the 1990 incident; (10) that the court erred by preventing the defense from elaborating further on the burden of proof during its closing argument; and (11) that the State violated Petitioner's right to due process by offering what Petitioner claims to b, false testimony from Cooper about the direction in which shots were fired. (Id. at 169–72.) Thereafter, Petitioner filed a motion to dismiss for failure to commence prosecution within a reasonable time. (Id. at 226.)

On June 16, 2005, the court held a hearing on Petitioner's motions to dismiss for failure to commence a timely prosecution and for a new trial. (Trial Tr. Vol VI at 3, Ex. V to State Ct. R.) Regarding the motion to dismiss for failure to commence timely prosecution, the court found that the twelve-year delay in prosecuting Petitioner had caused him prejudice, but that the delay was justified by the state's inability to learn Petitioner's identity prior to 2002. (Id. at 31–32.) Accordingly, the court denied this motion. (Id. at 33.) The court then heard argument on Petitioner's motion for a new trial, ultimately denying that motion as well. (Id. at 126.) With regard to Petitioner's argument about counsel's presence at the police line-up, specifically, the court held that his right to counsel had not yet attached on April 20, 2002. (Id. at 67.)

Petitioner thereafter filed an Amended Motion for New Trial. (Trial Common L. Suppl. R. at PageID #:7.) This motion raised six arguments: (1) Petitioner was denied his Sixth Amendment

IND DEF 000113

right of confrontation when the state presented evidence that the police, after speaking with witnesses, were looking for a person named "Fletcher";[13] (2) defense counsel was ineffective in failing to request an instruction limiting the testimony that detectives were looking for a person named "Fletcher"; (3) Petitioner was denied due process because the line-ups presented to Cooper and Friend were suggestive; (4) counsel was ineffective in failing to proceed on a motion to suppress the identifications; and (5) counsel was ineffective in failing to present prior contradictory statements by Cooper and Friend  (*Id.* at PageID #:7, 10, 16, 18.)  On September 7, 2005, following a hearing, the court denied Petitioner's motion from the bench.  (Trial Tr. Vol. VII at 44, Ex. W to State Ct. R.)

## IV.    Direct Appeal

On appeal to the Illinois Appellate Court, Petitioner repeated his ineffective assistance arguments and asserted, further, that the identifications made by Cooper and Friend were not sufficiently reliable to support a conviction.[14]  (Appellant's Br., No. 05-3447, Ex. B to State Ct. R.)  On March 23, 2007, the Appellate Court of Illinois issued a decision rejecting these arguments and affirming Petitioner's conviction.  (Rule 23 Order on Direct Appeal, Ex. A to State Ct. R.)  With regard to Cooper and Friend's reliability, the court stated that both witnesses testified to "similar accounts of the shooting" and referenced both witnesses' stated certainty of their identification, concluding that "any rational trier of fact could have found [Petitioner] guilty of murder beyond a reasonable doubt."  (*Id.* at 6.)  With regard to Petitioner's Confrontation Clause claim, the court wrote only, "Defendant's contention is without merit, as the detective's testimony was admitted only to show the investigative steps taken by him," citing *People v. Simms*, 143 Ill. 2d 154, 174, 572 N.E.2d 947, 955 (1991).  (*Id.* at 6–7.)  The court addressed the ineffective assistance of

---

[13]    Petitioner's argument on this point incorporated objections to both (a) the state's opening statement, which alleged that after speaking to witnesses, detectives looked for someone named "Fletcher," and to (b) Detective Bogucki's testimony that an unspecified witness had provided the name "Fletcher."

[14]    *See* note 12, *supra*.

IND DEF 000114

counsel claims piecemeal. With regard to the claim based on counsel's failure to request a limiting instruction, the court found that a limiting instruction had, in fact, been given, and that any error was not prejudicial. (*Id.* at 7.) With regard to the claim based on counsel's failure to impeach, the court found that Petitioner had failed to show a reasonable probability that this failure altered the outcome of the trial. (*Id.* at 8.)

Petitioner filed a petition for rehearing, but the appellate court denied it on May 18, 2007. (Order Denying Rehr'g on Direct Appeal, Ex. F to State Ct. R.) Petitioner then filed a petition for leave to appeal, which the Illinois Supreme Court denied on September 26, 2007. (Order Denying Direct Appeal PLA, Ex. H to State Ct. R.) Petitioner also sought a writ of certiorari to the United States Supreme Court, which was denied on April 14, 2008. *Fletcher v. Illinois*, 552 U.S. 1312 (2008).

## V.    State Postconviction Petition

To avoid procedural default, Petitioner must have given the state courts a "full and fair opportunity" to hear federal constitutional claims through "one complete round" of review. It is undisputed that Petitioner has done so with respect to the claim that is dispositive in this case, beginning with direct appeal. The court notes that he aggressively pursued post-conviction relief in the state courts, as well, filing a petition for such relief under 725 ILCS 5/122-1 on October 7, 2007. (Report of Postconviction Proceedings at PageID #:1719, Ex. AA to State Ct. R.) This petition raised two principal arguments: (1) that Petitioner was denied the effective assistance of appellate counsel in violation of the Sixth and Fourteenth Amendments; and (2) that Illinois Pattern Instruction 3.15, which directs jurors to weigh an eyewitness's certainty in evaluating their testimony, is unconstitutional. (*Id.* at PageID #:1719–69.) The state courts viewed the petition expansively as raising a challenge to the sufficiency of the evidence, the propriety of the prosecution's closing, other evidentiary rulings, and Petitioner's speedy trial rights. (*Id.* at PageID #:1772.) The court also understood Petitioner's ineffective assistance claims as identifying numerous allegedly erroneous pre-trial and trial rulings. (*Id.* at PageID #:1781–82.)

IND DEF 000115

On December 30, 2008, the Circuit Court of Cook County denied the petition, finding it frivolous and patently without merit. (Report of Postconviction Proceedings at PageID #:1797.) The court concluded that Petitioner's sufficiency of evidence challenges, and his challenges to the admission of statements of non-testifying witness, were barred by *res judicata*. (*Id.* at PageID #:1777.) The court found several other arguments waived and rejected the remaining claims on the merits. (*Id.* at PageID #:1777–98.) On January 28, 2009, Petitioner moved through counsel for reconsideration of his petition, contesting the court's finding that he had waived the argument regarding his right to counsel at the police line-up. (*Id.* at PageID #:1803–05.) The court denied Petitioner's motion for reconsideration on April 28, 2009, finding that Petitioner's right to counsel had not yet attached at the time of the line-up. (*Id.* at PageID #:1814.)

Petitioner appealed the denial of this petition (*id.* at PageID #:1818), arguing (1) that he had stated the gist of a claim that he was denied his right to counsel at the April 20, 2002 line-up; and (2) that he had stated the gist of a claim that he had received ineffective assistance of trial and appellate counsel. (Pet'r's Opening Br. on Postconviction App., Ex. J to State Ct. R.) On November 4, 2010, the Appellate Court affirmed the circuit court's holding. (Rule 23 Order on Postconviction Appeal, Ex. I to State Ct. R.) The court concluded Petitioner's right-to-counsel claim was waived by appellate counsel's failure to raise it on direct appeal, and that his remaining's ineffective assistance of counsel claims were not supported by any arguable legal basis. (*Id.* at 8.)

Petitioner sought rehearing, but that motion was denied, as was his petition for leave to appeal to the Illinois Supreme Court. (Petition Rehr'g, Ex. M to State Ct. R.; Order on Petition Rehr'g, Ex. N to State Ct. R; Order Denying Postconviction PLA, Ex. P to State Ct. R.)

## VI. Initial Federal Postconviction Proceedings

On August 24, 2011, Petitioner applied for a writ of habeas corpus in this court. (Pet. [1].) Concurrent with his Petition, Petitioner filed a request that this court hold it in abeyance, asserting that he had obtained "newly discovered [exculpatory] evidence," and intended to file a successive

22

IND DEF 000116

petition for post-conviction relief in state court. (Abeyance Req. [5].) Petitioner has since filed five items of "newly discovered evidence": (1) an affidavit of Edward Cooper; (2) an affidavit of Sheenee Friend; (3) a supplemental affidavit of Sheenee Friend; (4) an affidavit of Emmett Wade; and (5) an affidavit of James Fletcher, Sr.

The Cooper affidavit is dated June 2, 2011. (Cooper Aff., Ex. 2 to Mot. Stay [45].) In it, Cooper states that when he was interviewed and shown a photo array in 1995, he believed he could still identify the offenders. (*Id.* at 1.) Cooper told detectives during the 1995 interview "that Terry Rogers had a bad drug habit and would do almost anything for money." (*Id.*) Furthermore, Cooper states that when he was shown a second photo array in 2002, he "told the detectives that the robbery had happened more than 12 years ago and [he] did not exactly recognize anyone in the pictures." (*Id.*) Cooper affirms, however, that at trial he was "75% sure" Petitioner was the man who robbed him. (*Id.*) He also states that he is "willing to testify in this cause, if call[ed]." (*Id.* at 2.)

The Friend affidavit is dated August 26, 2011. (Friend Aff., Ex. 3 to Mot. Stay [45].) In it, Friend asserts that when shown the photo array in 2002, she "pointed at one picture" that was not that of Petitioner. (*Id.* at 2.) According to Friend's 2011 account of the incident, after she pointed to the photo of the other man:

> The police then pointed at a photo of a different man on that page and said something like, "That's right, This is the one." They said he was "Fletcher" and told me Terry Rogers knew Fletcher and they planned the robbery together. I marked or initialed the photo that the police pointed out to me.

(*Id.* at 2.) Friend also asserts that at the police line-up, the detectives "told me to pick out who did the shooting, and I picked out the man police pointed out to me weeks earlier in the group of photos." (*Id.*)

Friend's supplemental affidavit is dated April 5, 2012. (Friend Suppl. Aff., Ex. 4 to Mot. Stay [45].) In this supplemental affidavit, Friend explains that "[a]fter talking to [Petitioner's]

IND DEF 000117

attorney, [she] realized that [she] knew additional facts that were relevant to Fletcher's case." (*Id.*)
Specifically, Friend states:

> As I previously said, when the police showed the photos, they told me that Fletcher
> was the one that I should pick. They told me that Terry Rogers told them it was
> Fletcher who did it. They also told me that Fletcher was a really bad guy, and he
> was in jail for a robbery. They said his background was messed up, and he [sic]
> violent background. I thought he was a bad guy based on what they told me. They
> said that the dude who did the crime with Fletcher had gone south to Mississippi.

(*Id.*) Additionally, in connection with the line-up identification, Friend writes, "I knew who to pick
because it was the same guy that the police pointed out before." (*Id.*) And with regard to her in-
court testimony, Friend states, "The police had a warrant for my arrest just so I would testify. I
didn't go to court at first because I didn't want to testify. After I testified, they let me go." (*Id.*) "I
honestly don't remember what the guy really looked like who did the robbery in December of
1990. All I remember about him was he was a big guy. I couldn't see the face because he
snatched me back through the truck." (*Id.*) Like Cooper, Friend is willing to testify to these
statements at an evidentiary hearing. (*Id.*)

Wade's affidavit is dated March 17, 2012. (Wade Aff., Ex. 1 to Mot. Stay [45].) He
describes his 2002 interview as follows:

> The guy with the bald head showed me one picture. He said "this is the guy we
> have in custody. He is a bad guy. We want to keep him off the street." They let
> me know he was in jail and they didn't want him to get out. They said if he got
> convicted on this case he would be in for life. The lady attorney agreed that he
> was a bad guy and that he did this type of thing. They seemed confident that the
> man in the picture was the man who committed that crime. I was not confident,
> and I told them that I would not say it was him.

(*Id.* at 2–3.) According to Wade's affidavit, the officers said, "they had a woman in custody who
saw everything that would identify the man." (*Id.* at 3.) And when Wade asked who the man in
the picture was, the officers said, "Fletcher." (*Id.*) Wade's affidavit also describes the day he
testified in trial. He attests that he saw a woman crying, and that Cooper told him that Cooper
"wasn't sure who did it." (*Id.* at 4.) Like Cooper and Friend, Wade is willing to testify to these
facts at an evidentiary hearing. (*Id.* at 7.)

24

IND DEF 000118

Fletcher Sr., Petitioner's father, describes in his affidavit his efforts to find and procure testimony from Cooper, Friend, and Wade. (Fletcher Sr. Aff., Ex. 1 to Reply Supp. Mot. Stay [50].) He also affirms that he is willing to testify at an evidentiary hearing. (*Id.* at 3.)

## VII.  Successive State Postconviction Petition

In December 2012, Petitioner filed a motion for leave to file a successive postconviction petition in the Circuit Court of Cook County. *See People v. Fletcher*, 2016 IL App (1st) 132459-U, ¶ 15.[15] He attached the five affidavits described above. *Id.* ¶ 16. Additionally, Petitioner cited two cases whose holdings Petitioner alleged, "constitute[d] 'newly discovered' evidence that Detectives Bogucki and Schalk engaged in a pattern and practice of coercing false identifications": *Warfield v. City of Chicago* and *Jimenez v. City of Chicago*. *Id.* ¶ 20.

In *Warfield*, several bystanders to a police shooting, who were detained following the shooting, sued the City of Chicago as well as Detectives Bogucki and Schalk for unlawful detention and excessive force under 42 U.S.C. § 1983, and for the state law torts of false imprisonment, intentional infliction of emotional distress, and intrusion. *Warfield v. City of Chicago* (*Warfield I*), 565 F. Supp. 2d 948, 962 (N.D. Ill. 2008). The evidence presented at trial "established that Schalk and Bogucki had 'overall responsibility for the entire investigation,'" and that the other detectives were reporting the results of their investigation to them. *Warfield v. City of Chicago* (*Warfield II*), 679 F. Supp. 2d 876, 893 (N.D. Ill. 2010) (quoting trial transcripts). The jury returned a verdict in favor of the plaintiffs against both Bogucki and Schalk, finding (according to the trial court's characterization) that "the alleged violations occurred under [Bogucki and Schalk]'s direction or with their knowledge and consent." *Id.* To this court's knowledge, *Warfield* did not involve witness tampering or false identifications.

*Jimenez*'s relevance is more apparent. It emerged from the wrongful conviction of Thaddeus Jimenez for a murder that Detectives Bogucki and Schalk investigated in the early

---

[15]  The court is not aware whether this motion was filed *pro se* or through counsel.

IND DEF 000119

1990s. *Jimenez v. City of Chicago* (*Jimenez I*), 830 F. Supp. 2d 432, 436 (N.D. Ill. 2011).
Jimenez, who was fifteen years old at the time of his conviction, served sixteen years in prison
for a crime he did not commit. *Jimenez v. City of Chicago* (*Jimenez II*), 877 F. Supp. 2d 649, 653
(N.D. Ill. 2012) (order on motions for new trial and judgment as a matter of law), *aff'd* 732 F.3d
710 (7th Cir. 2013). After being exonerated, Jimenez sued the City of Chicago, as well as
Detectives Bogucki and Schalk, asserting denial of due process, failure to intervene, and
conspiracy claims under Section 1983, and state law claims for malicious prosecution, intentional
infliction of emotional distress, conspiracy, respondeat superior, and indemnification. *Jimenez I*,
830 F. Supp. 2d at 436.

Prior to trial, on the defendants' motion for summary judgment, the district court found no
evidence "that Schalk was aware of any exculpatory and impeachment evidence that [Jimenez]
contends the police concealed," and granted summary judgment in Schalk's favor on the due
process claim and the Section 1983 failure-to-intervene and conspiracy claims. *Id.* at 452.
Additionally, the court granted partial summary judgment in favor of all defendants as to two
factual allegations relevant to Jimenez's due process claims. *Id.* The court declined to grant
summary judgment in Schalk's favor on the malicious prosecution, intentional infliction of
emotional distress, and state law conspiracy claims, however, determining that "a reasonable jury
could find that [Schalk] was involved in the continuation of the case even as more evidence arose
that Jimenez [was innocent]." *Id.*

Subsequently, the City of Chicago voluntarily agreed to entry of judgment against it in the
event that either of the individual defendants were found liable at trial. Am. Stipulation and Waiver
of Requirement of Proof, Ex. A to Motion for Entry of Parties' Stipulation, *Jimenez v. City of
Chicago*, No. 09-cv-08081 (N.D. Ill. Dec. 19, 2011), ECF No. 199-1. Perhaps because of this
stipulation, Bogucki was the only defendant who proceeded to a jury trial. The jury returned a
verdict in favor of Jimenez on his claims for violation of due process, conspiracy to violate due
process, and malicious prosecution, Jury Instr., *Jimenez v. City of Chicago*, No. 09-cv-08081

IND DEF 000120

(N.D. Ill. Dec. 19, 2011), ECF No. 287, awarding him $25 million in compensatory damages. *Jimenez III*, 732 F.3d at 712.

On appeal, the Seventh Circuit characterized the facts of the case, read in the light most favorable to the Jimenez, as showing:

> Detective Bogucki investigated the murder. Bogucki used coercive tactics to convince Tueffel and Phil Torres to falsely identify Jimenez as the shooter. Bogucki also tainted the testimony of other witnesses. For example, he arranged for Elder to see a picture of Morro's corpse next to a picture of Jimenez before she was shown a line-up and identified Jimenez as the shooter. Bogucki also knew that Jimenez owned a blue and white Duke University jacket, so he planted with the witnesses the idea that the shooter was wearing that color and style of jacket.

*Jimenez III*, 732 F.3d at 713. The Seventh Circuit affirmed the finding of liability. *Id.* at 723.

Relying on these cases and materials, Petitioner argued in the Circuit Court of Cook County that he was entitled to file a successive postconviction petition based on a claim of actual innocence or, in the alternative, on claims that he was denied due process, that the state committed a violation under *Brady v. Maryland*, 373 U.S. 83 (1963), and that he was denied the effective assistance of counsel. *Fletcher*, 2016 IL App (1st) 132459-U, ¶ 34. The state courts denied Petitioner's request, finding that Petitioner's evidence did not qualify as "newly discovered," and that the ineffective assistance claim could not support a finding in his favor under the state's "cause-and-prejudice" test. *Id.* ¶¶ 41, 44, 46.

## VIII. Later Federal Postconviction Proceedings

Meanwhile, in this court, Respondent filed an Answer to the Petition on April 4, 2012. (Answer [27].) The Answer does not address Petitioner's "newly discovered evidence," none of which was discussed in the original Petition, and some of which had yet to be filed at the time of Respondent's submission. (*Id.*) The deadline for Petitioner to file a Reply has long passed, and neither party has submitted supplemental briefing discussing the relevance of these materials to Petitioner's arguments.

IND DEF 000121

## DISCUSSION

This ruling addresses only those arguments raised in the parties' original briefing, without considering the affidavits of Cooper, Friend, and Wade, or the troubling allegations against Detective Bogucki. Because the court finds ample grounds to grant the Petition on the original state court record, further fact-finding is not necessary at this stage.

In order to obtain relief under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Petitioner must establish that "he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A federal court may not grant an application for the writ unless the petitioner has exhausted all available state court remedies. 28 U.S.C. § 2254(b)(1)(A). A petitioner has exhausted state court remedies when the petitioner has given the state courts a "full and fair opportunity" to hear federal constitutional claims through "one complete round" of proceedings, including discretionary review. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). If he has exhausted his state remedies, a petitioner can prevail only if he can demonstrate that the state court's decision as to one of his claims was either (a) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (b) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28. U.S.C. § 2254(d). In evaluating Petitioner's claims, this court must "presume[ ] to be correct" any factual determinations made by the state court, unless the petitioner rebuts the presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). As to each claim, the relevant state court decision is that which most recently addressed it on the merits. *Weaver v. Nicholson*, 892 F.3d 878, 883 (7th Cir.), *cert. denied*, 139 S. Ct. 649 (2018).

A right is "clearly established" if set forth in the "holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). To constitute an unreasonable application of that law, a state court's ruling must

IND DEF 000122

have been "objectively unreasonable, not merely wrong; even clear error will not suffice." *Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728 (2017) (quoting *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015)). Put differently, "a *habeas* petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods v. Donald*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

Petitioner presses five grounds on which, he argues, he is being held unlawfully: (1) that he was deprived of confrontation rights in violation of the Sixth Amendment; (2) that he was inculpated by eyewitness identifications that violated due process; (3) that he was deprived of his right to counsel at a police line-up in violation of the Sixth and Fourteenth Amendments; (4) that he was denied the effective assistance of trial counsel in violation of the Sixth Amendment; and (5) that he was denied the effective assistance of appellate counsel in violation of the Sixth Amendment. For the reasons stated herein, the court concludes that Petitioner was denied his Sixth Amendment right to confront witnesses against him at trial, that the state court unreasonably applied *Crawford v. Washington* in rejecting Petitioner's claim on direct appeal, and that the error had a substantial influence on the jury's guilty verdict. 541 U.S. 36 (2004).

I.      **The Confrontation Clause**

The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The "main and essential purpose" of this guarantee, the Supreme Court has stated, "is to secure for the opponent the opportunity of cross-examination." *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986); *see also Davis v. Alaska*, 415 U.S. 308, 315–17 (1974) (describing cross-examination as "the principal means by which the believability of a witness and the truth of his testimony are tested"). Cognizant of this purpose, the Court held in *Crawford v. Washington* that the Confrontation Clause bars prosecutors from introducing hearsay statements

29

IND DEF 000123

that are testimonial in nature unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine him or her. 541 U.S. at 53, 59. To appreciate the scope of this rule, it is essential to understand the Court's definitions of two terms: "testimonial" and "hearsay."

The Supreme Court has not endorsed a precise test for determining whether a statement is testimonial, instead prescribing that the determination should be guided by "the abuses at which the Confrontation Clause was directed." *Id.* at 68. In *Crawford*, the Court held that the term "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* Subsequently, in *Davis v. Washington*, the Court explained an exception for police questioning in an emergency. 547 U.S. 813, 822 (2006). Following *Davis*, a statement made in response to police interrogation is testimonial when "the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.*

The Confrontation Clause's definition of "hearsay" does not directly follow that prescribed by the Federal Rules of Evidence (or the Illinois Rules of Evidence, for that matter). The *Crawford* Court was clear that the Sixth Amendment's protections exist independent of "the vagaries of the rules of evidence." 541 U.S. at 61. Nevertheless, the rules serve as helpful context. *See Jones v. Basinger*, 635 F.3d 1030, 1041 (7th Cir. 2011). Both the federal and Illinois rules of evidence state that, in order to qualify as hearsay, a statement must be offered "to prove the truth of the matter asserted." FED. R. EVID. 801(c); ILL. R. EVID. 801(c). In *Crawford*, the Court held that the Confrontation Clause incorporates this requirement, noting that "[t]he Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." 541 U.S. at 59 n.9. Applying *Crawford* on *habeas* review, courts thus consider "whether the prosecution offered [a] statement for the purpose of establishing the truth of its contents." *Jones*, 635 F.3d at 1042 (citing *United States v. Mancillas*, 580 F.2d 1301, 1309 (7th Cir. 1978)). This is an objective test that considers the "actual use" of evidence at trial, "based on

IND DEF 000124

all of the circumstances attendant to the offer of a particular statement into evidence." *Jones*, 635 F.3d at 1042 n.2.[16]

The statement at issue here was one made by Terry Rogers to Detective Michael Fleming on December 21, 1990. Rogers told Detective Fleming that, as the robbers were fleeing, he heard one call the other "Fletcher"; Fleming then wrote Rogers' statement into a police report. Years later, this report found its way to Detective Bogucki, who at trial relayed Rogers' statement to the jury. Specifically, Bogucki testified that from reading police reports, he learned that "[o]ne of the witnesses had provided a name of Fletcher." (Trial Tr. Vol. III at 179–80.) Defense counsel objected on hearsay grounds, but the objection was overruled. Respondent concedes that Rogers' statement was testimonial, and that Petitioner had no prior opportunity to cross-examine Rogers. (Answer [27] at 13.)

The last state court to address Petitioner's Confrontation Clause claim on the merits—the Appellate Court of Illinois—held that the admission of Rogers' statement did not violate the Confrontation Clause because it was offered only to show the steps of the detectives' investigation. This court concludes, first, that this conclusion—which constitutes a factual determination—has been rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Thereafter, the court turns to the questions whether the state court's decision constituted an "unreasonable application" of "clearly established Federal law," 28 U.S.C. § 2254(d), and whether this error should be excused under the harmless error doctrine.

II. **The State Court's Factual Determination**

The state court determined that Detective Bogucki's testimony "was admitted only to show the investigative steps taken by him." (Rule 23 Order on Direct Appeal at 6–7.) On federal habeas

---

[16]     Although the Supreme Court did not articulate the contours of this test in *Crawford*, the Seventh Circuit holds, and Respondent concedes, that this is the proper inquiry on *habeas* review. (Answer [27] at 13 ("Answering that question does not involve a subjective inquiry into the prosecutor's motives, however; instead, the Court focuses on objective circumstances to determine the 'actual use' of the evidence at trial" (quoting *Jones*, 635 F.3d at 1042 n.2).))

IND DEF 000125

review, determining the purpose for which a statement was put before a jury is "generally a question of fact, not law." *Jones*, 635 F.3d at 1042. Under AEDPA, this determination is therefore "presumed to be correct" unless rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Even under this strict standard, however, the state court's determination does not withstand scrutiny. The trial record confirms that Terry Rogers' statement was indeed offered as substantive proof of Petitioner's guilt.

Use of "the 'course of investigation' gambit is so often abused and/or misunderstood that it is an evidentiary and constitutional minefield." *Carter v. Douma*, 796 F.3d 726, 736 (7th Cir. 2015). Courts properly treat statements heard by an officer during the course of his or her investigation as non-hearsay when offered "only to show the effect [they] had on the police." *Id.* (citing *United States v. Eberhart*, 434 F.3d 935, 939 (7th Cir. 2006)). Such statements are admissible, for example, "when brief and essential to 'bridge gaps in the trial testimony' that might significantly confuse or mislead jurors." *United States v. Walker*, 673 F.3d 649, 657–58 (7th Cir. 2012) (quoting *Jones*, 635 F.3d at 1046). Yet, "[a]side from those limited details necessary to show 'that the evidence [found] is actually relevant,' the details of an investigation are generally 'of only minimal consequence to the determination of the action.'" *Jones*, 635 F.3d at 1045 (first quoting *United States v. Tanner*, 628 F.3d 890, 903 n.5 (7th Cir. 2010), then quoting *Mancillas*, 580 F.2d at 1310). "To convict a defendant, after all, the prosecution does not need to prove its reasons for investigating him." *Carter*, 796 F.3d 736 (citing *Mancillas*, 580 F.2d at 1310). Thus, "the probative value of a tip on which an investigation was based is 'marginal, at best,' absent perhaps a (relevant) allegation of police impropriety." *Jones*, 635 F.3d at 1045 (quoting *United States v. Lovelace*, 123 F.3d 650, 653 (7th Cir. 1997)).

In *Jones v. Basinger*, the Seventh Circuit considered the same issue presented here: whether there was convincing evidence to rebut the state court's determination that an out-of-court statement was offered only to show the course of the investigation. 635 F.3d at 1044. *Jones* centered on the testimony of two police detectives who relayed a tip provided by a non-testifying

IND DEF 000126

informant identifying the defendant as a leader in the commission of a robbery and multiple murders. *Id.* at 1036–38. The tip—which itself involved an extensive second-hand account of an accomplice—served as the detectives' initial basis to suspect the defendant's involvement in the criminal activity, later corroborated at trial by another participant in the robbery and murders. *Id.* Despite multiple objections from the defense, the trial court admitted the testimony "for the limited purpose of showing course of investigation." *Id.* at 1036 (quoting the trial court transcript). The defendant was convicted and, after exhausting his state appeals, filed a *habeas* petition in the District Court for the Southern District of Indiana. The District Court denied the petition, and the defendant appealed.

Reviewing the petition *de novo*, the Seventh Circuit considered whether the state court's factual determination—that the informant's statement was "offered not for its truth, but for a permissible non-hearsay purpose"—was rebutted by clear and convincing evidence. *Id.* at 1042. The panel concluded that the trial court transcript "show[ed] beyond reasonable dispute that [the informant's] statement was offered for the purpose of showing its truth, and that the trial court actually allowed its use to prove its truth." *Id.* In reaching this conclusion, the court deemed significant that "the prosecution was allowed to go to some lengths to convince the jury that [the informant] was a credible source of evidence," reasoning that the informant's credibility "mattered only if his statement was in fact inadmissible hearsay." *Id.* at 1043. Specifically, the court noted that the prosecution had highlighted consistencies between the informant's tip and the testimony of another witness and asked a police officer whether the informant had requested a reward. *Id.* Coupled with the prosecution's admission, in sidebar, that it wished to use the statement as "independent evidence" of the defendant's guilt, the Seventh Circuit held that the defendant had "easily carried his burden to show that the state court's conclusions . . . were erroneous." *Id.* at 1042–43.

The facts in *Jones* are not identical to those here. As Respondent notes, unlike in *Jones*, here the tip's substance was not conveyed in detail, and the government's efforts to bolster the

33

informant's credibility were not so egregious. But viewed as a whole, the trial transcript displays a clear strategy to introduce Rogers to the jury as a competent eyewitness, then tie key inculpatory evidence to his name, while effectively shielding him from cross-examination. The state first introduced Rogers to the jury during opening statements, identifying Rogers as an eyewitness at the scene who personally chased the robbers. (Trial Tr. Vol. III at 25.) During Edward Cooper's direct examination, the state elicited testimony to that effect, and added that Cooper actually knew Rogers. (*Id.* at 65.) Cooper's testimony established that Rogers was a witness with firsthand knowledge of the robbers' appearance, whose identity detectives and another witness knew, thus bolstering Rogers' credibility as a source. *See United States v. Glover*, 755 F.3d 811, 816 (7th Cir. 2014) (describing "the extent of firsthand observation" as one of five primary factors considered when evaluating the credibility of an informant's tip).

Thereafter, the state took steps to tie key information learned about the robber's identity to Rogers. Detective Bogucki, immediately after testifying that "[o]ne of the witnesses had provided a name of Fletcher," stated that "it became obvious to myself and my partner that a subject named Terry Rogers needed to be talked to." (Trial Tr. Vol. III at 180.) Then, after Detective Bogucki testified to locating Rogers in 2002, he stated that he showed Rogers the photo array that included Petitioner's photo. (*Id.* at 182.)[17] Just after this interview, Detective Bogucki testified, detectives "attempted to locate James Fletcher." (*Id.* at 186.) These two developments were the only evidence at trial tying the robbery to Petitioner by name, and Bogucki's description of the course of investigation created the impression that Rogers was a credible source of evidence of Petitioner's guilt. The prosecution resisted requests from defense counsel to strike Rogers' statement from the record, and the trial judge refused to issue a limiting instruction. The

---

[17]     Asked in sidebar what contextual purpose testimony about the photo array could serve, the state answered, curtly, "Just bringing out the interview . . . [i]n the course of his investigation." (*Id.* at 184.) The trial court acknowledged the "clear implication" that the prosecution was "going to talk to him, interview Mr. Rogers," and struck the testimony that a photo array was presented to Rogers. (*Id.* at 185.) The court declined to give a limiting instruction, however, regarding testimony that detectives interviewed Rogers. (*Id.*)

34

IND DEF 000128

prosecution went on to remind jurors of Rogers' 1995 statement in closing argument. Indeed, the prosecuting attorney actually overstated the statement's specificity, stating that "in 1995 [Detectives Bogucki and Schalk] were looking for someone by the name of James Fletcher." (Trial Tr. Vol. V at 46.)

Respondent now concedes that "the introduction of [Rogers'] statement was not necessary for a relevant purpose," but nevertheless argues that the state appellate court was reasonable to conclude that it was offered to "place police investigative steps in context" and "provide a surplus of narrative color." (Answer [27] at 14.) Respondent attempts to distinguish this case from *Jones* by stressing the lack of detail in Terry Rogers' tip compared to that of the informant in *Jones*. But *Jones* cannot be read as blessing the admission of hearsay so long as it lacks detail. *Compare Richardson v. Griffin*, 866 F.3d 836, 840 (7th Cir. 2017) (holding that an out-of-court statement identifying a shooter by first name, relayed by a police officer at trial, was inadmissible). In considering whether the state appellate court's evaluation amounted to an unreasonable application of federal law, the *Jones* court wrote that testimony about the initiation of a criminal investigation should have been limited to "bare-boned statement that the police acted 'on information from Jeffrey Lewis.'" 635 F.3d at 1047. Particularly in light of the significance of the hearsay evidence in this case—purported identification of the offender in a years-old crime— the admission of Rogers' statement is not excusable simply due to its brevity.

In at least one key respect, moreover, the use of the statement here is even more obviously improper than that in *Jones*. In *Jones*, the prosecution provided an intelligible reason for introducing the tip as context: namely, that it needed to rebut the defendant's contention that the police had actually explored other avenues for evidence and found nothing. *Jones*, 635 F.3d at 1036. Here, in contrast, neither the prosecutor nor the trial court ever articulated how a "surplus of narrative color" might have aided the jury's comprehension of events. (*See* Answer [27] at 14.) Absent the inclusion of Terry Rogers, the narrative would have been straightforward: three witnesses saw a robbery, detectives used background information to assemble a photo-array, two

IND DEF 000129

Case: 1:11-cv-05851 Document #: 92 Filed: 10/25/19 Page 36 of 42 PageID #:2265

eyewitnesses identified Petitioner in that photo-array, and again at a line-up. Nothing in the trial record suggested that Petitioner might challenge the detectives' reason for including him in a photo-array. Accordingly, the court can imagine no other permissible purpose Rogers' statement might have served.

Respondent fails to identify a case in which an out-of-court statement elicited in similar circumstances was deemed admissible non-hearsay under *Crawford*, and this court is not aware of any. Rogers' statement was plainly introduced as substantive evidence of Petitioner's guilt, and Petitioner has met his burden of rebutting the state court's contrary determination by clear and convincing evidence.

## III. The State Court's Application of Clearly Established Federal Law

Under AEDPA, this court may not grant habeas relief unless a constitutional violation resulted from a state court decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A right is "clearly established" if set forth in the "holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). To constitute a decision is contrary to, or based on an unreasonable application of federal law, a state court ruling must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Shoop v. Hill*, 139 S. Ct. 504, 506 (2019) (quoting *Richter*, 562 U.S. at 103).

### A. Clearly Established Law

*Crawford v. Washington* established that a court may not admit testimonial second-hand statements in a criminal trial unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant, excepting instances where the statements are offered for purposes other than the truth of the matter asserted. 541 U.S. at 59, 59 n.9 (2004); *see also Jones*, 635 F.3d at 1043–44. *Crawford* admitted of no exception for testimony offered to explain

IND DEF 000130

the course of an officer's investigation; such testimony, to the extent it is constitutionally permissible, must fall under *Crawford*'s express carve-out for testimony offered "for purposes other than establishing the truth of the matter asserted." *Id.*

Given the narrow circumstances in which the context of a police investigation is necessary or relevant, the admission of out-of-court statements "on the theory they are being offered to explain 'the course of the investigation' . . . runs a substantial risk of violating . . . the Confrontation rights of the defendant under the Sixth Amendment" as articulated in *Crawford*. *Carter*, 796 F.3d at 736. As the Seventh Circuit cautioned just months after the Court's decision in *Crawford*, "[a]llowing agents to narrate the course of their investigations, and thus spread before juries damning information that is not subject to cross-examination . . . would eviscerate the constitutional right to confront and cross-examine one's accusers." *See United States v. Silva*, 380 F.3d 1018, 1020 (7th Cir. 2004) (citing *Crawford*, 541 U.S. 36 (2004)); *see also Walker*, 673 F.3d at 658 (finding, on direct appeal, that the government's "asserted needs to provide 'context' and relate the 'course of the investigation'" were employed to "disguise a ploy" to admit inculpatory out-of-court statements for the truth of the matter asserted, and therefore ran afoul of *Crawford*).

**B.    Application**

In *Jones v. Basinger*, the Seventh Circuit affirmed that the "course of investigation" gambit, when applied without adequately scrutinizing the purpose for which the statement is offered, constitutes an unreasonable application of the rule announced in *Crawford*. *Jones*, 635 F.3d at 1044–48. In *Jones*, the relevant state court had cited *Crawford*, but in the panel's view, had failed to adequately consider factors that bore on the purpose for which a statement was being used. *Id.* at 1047–48. Specifically, the state court did not acknowledge that the statement was "[un]necessary to bridge an otherwise-inexplicable gap in the trial testimony or to prevent the jury from being confused about some material issue," and "failed to appreciate" that the prosecution's "stated reasons for allowing [the] statement into evidence [made] sense only if the statement was considered for the truth of its contents." *Id.* Thus, the Seventh Circuit concluded, the state court

IND DEF 000131

had "applied a 'course of investigation' exception to Jones' case so excessively broad as to allow the admission of testimonial hearsay whenever a defendant attempts to challenge the strength of the evidence or the veracity of the prosecution's witnesses against him." *Id.* at 1045.

As discussed, *supra*, the last court to address Petitioner's confrontation claim was the Appellate Court of Illinois, which ruled on Petitioner's direct appeal on March 23, 2007. In rejecting Petitioner's confrontation claim, the appellate court devoted just one sentence to explaining its reasoning: "Defendant's contention is without merit, as the detective's testimony was admitted only to show the investigative steps taken by him. *See People v. Simms*, 143 Ill.2d 154, 174 (1991)." (Rule 23 Direct Order on Appeal at 6–7.)

*Crawford* was decided March 8, 2004, three years before the state appellate court ruled. Yet the state court did not cite *Crawford* or any post-*Crawford* case law. Rather, it cited only *People v. Simms*, an Illinois Supreme Court decision that preceded *Crawford* by thirteen years. 143 Ill. 2d at 174, 572 N.E.2d at 955. In *Simms*, a defendant argued "that he was deprived of his right to confront witnesses against him when the trial court permitted a police officer to testify at the first stage of [a] sentencing hearing that the defendant's brother told the police that the defendant admitted killing the victim." *Id.* at 954. The court held that this statement was offered "not for the truth of what [the declarant] said, but to explain to the jury why [the officer] continued to question the defendant after the defendant offered a plausible explanation for the wound on his leg." *Id.* The court then listed a host of other circumstances in which a police officer may permissibly relay the investigative process:

> This court has held that a police officer may recount the steps taken in the investigation of a crime, and may describe the events leading up to the defendant's arrest, where such testimony is necessary and important to fully explain the State's case to the trier of fact. We have also held that a police officer may testify about his conversations with others, such as victims or witnesses, when such testimony is not offered to prove the truth of the matter asserted by the other, but is used to show the investigative steps taken by the officer. Testimony describing the progress of the investigation is admissible even if it suggests that a nontestifying witness implicated the defendant.

*Id.* at 954–55.

IND DEF 000132

As a threshold issue, it is unclear to this court that the rules articulated in *Simms* involved either the Sixth Amendment's Confrontation Clause or the Illinois State Constitution's guarantee of the right "to be confronted with the witnesses against him or her." ILL. CONST. art. VIII. *Simms'* analysis of this issue makes no mention of the Sixth Amendment or the United States Constitution, and does not cite precedent from the United States Supreme Court. *Simms*, 143 Ill.2d at 173–74, 572 N.E.2d at 954–55. Rather, *Simms* involved a hearsay challenge to testimony admitted during a sentencing hearing—a context in which the Sixth Amendment's Confrontation Clause does not apply. *See United States v. Ghiassi*, 729 F.3d 690, 695 (7th Cir. 2013); *Davis v. Greer*, 13 F.3d 1134, 1139 (7th Cir. 1994) (explaining that any alleged violation of the hearsay rule during sentencing is a matter of state law, and therefore outside the scope of habeas review, because the Sixth Amendment's Confrontation Clause does not apply at sentencing). Moreover, some of the cases cited in *Simms* apply the Illinois Rules of Evidence, which the Supreme Court has held do not control Confrontation Clause issues. *Crawford*, 541 U.S. at 61 ("Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence . . . ."). For this reason alone, using *Simms* to dispose of Petitioner's constitutional claim may have been contrary to clearly established federal law.

The rules articulated in *Simms* granted Illinois courts broad license to admit testimonial hearsay under a "course of investigation" gambit that far exceeds the carve-out contemplated by *Crawford*. For example, *Simms* permitted the admission of testimony whenever it is "necessary and important to fully explain the State's case," with no stated exceptions for circumstances in which the actual purpose of offering such testimony is to provide substantive proof of the accused's guilt. *Simms*, 143 Ill.2d at 173, 572 N.E.2d at 954–55.

Because the state appellate court devoted only one sentence to explaining its denial of Petitioner's confrontation claim, this court has no way of discerning on which rule the state appellate court relied. This court concludes, however, that the state court was not reasonably

IND DEF 000133

applying *Crawford*. The court did not cite *Crawford*, nor did it address any factors bearing on the actual purpose served by Rogers' statement at trial. This "failure to apply *Crawford* to the facts of this case was 'so lacking in justification' as to constitute an 'error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Jones*, 635 F.3d at 1051 (quoting *Richter*, 562 U.S. at 103). The state court's decision therefore constitutes an unreasonable application of clearly established federal law.

## IV. Harmless Error

To obtain relief in a federal *habeas corpus* proceeding for a state trial court error, a petitioner must establish that the error resulted in "actual prejudice." *Davis v. Ayala*, 135 S. Ct. 2187, 2197 (2015) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 622 (1993)). A federal district court may grant such relief only if it has "grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *Ayala*, 135 S. Ct. at 2198 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)). This requires "more than a reasonable possibility that the error was harmful." *Richardson*, 866 F.3d at 845 (quoting *Ayala*, 135 S. Ct. at 2198).

When considering whether the erroneous admission of a testimonial hearsay statement amounted to harmful error, the Seventh Circuit analyzes the strength of the prosecution's case. *See, e.g.*, *Jensen v. Clements*, 800 F.3d 892, 906 (7th Cir. 2015) (considering whether the remaining evidence was "subject to more than one interpretation" absent the statement's admission). For example, one panel considered whether there was other "physical evidence," such as "blood, ballistics evidence, [or] DNA," linking a petitioner to a crime. *Jones*, 635 F.3d at 1054. When a statement is corroborated by testifying witnesses, panels have considered whether the witnesses were credible. *E.g. Jensen*, 800 F.3d at 907; *Jones*, 635 F.3d at 1054. And when a statement is corroborated by an eyewitness identification, the Seventh Circuit has considered whether that identification was made under reliable circumstances. *See Richardson*, 866 F.3d at

IND DEF 000134

845 (citing "serious problems" with a corroborating eyewitness statement in rendering a finding of actual prejudice).

At Petitioner's trial, there was no physical evidence linking him to the crime, and the only testifying witnesses to identify him as one of the robbers were Cooper and Friend. There were, moreover, serious issues undermining Cooper and Friend's credibility. The first, and most obvious issue was the length of time separating the robbery from the witnesses' identifications. Well over a decade passed before the witnesses were presented with photo-arrays containing Petitioner's photo. Second, at trial, the reliability of both identifications was called into question. Cooper admitted to telling Bogucki that he was not sure the photo he picked actually depicted the man who robbed him, and Friend acknowledged that she was under arrest at the time detectives approached her requesting her help.

By the time Cooper and Friend testified at trial, more than fourteen years had passed since the incident, and the two witnesses' accounts of the robbery conflicted in significant respects. Cooper and Friend met with detectives multiple times prior to trial, but they could not agree on where they were immediately prior to the robbery, how long the robbers were in Cooper's truck, or even what Petitioner looked like on the day of the robbery. These issues leave the court with "grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict.'" *See Ayala*, 135 S. Ct. at 2197 (quoting *O'Neal*, 513 U.S. at 436). Under *Ayala*, therefore, relief is proper.

Finally, although not addressed here, the allegations rendered in the recent affidavits of Cooper, Friend, and Wade are highly troubling, particularly in light of the misconduct for which Detective Schalk was charged and Detective Bogucki was found liable in *Jimenez v. City of Chicago*. The court suspects that these materials could plausibly substantiate Petitioner's second claim: that the use of Cooper and Friend's identifications to convict Petitioner violated rights guaranteed by the Due Process Clause. If Petitioner's claims lacked merit on the original record, the court would be inclined to order supplemental briefing on these materials and hold an

41

IND DEF 000135

evidentiary hearing to test the assertions made therein in evaluating Petitioner's Due Process

Claim. But Petitioner's Confrontation Clause claim renders these steps unnecessary.

## CONCLUSION

Because Petitioner has met all the requirements for issuance of a writ of *habeas corpus*

under AEDPA, this court orders that the state either initiate proceedings to retry Petitioner within

120 days, or release him from custody immediately. The Petition [1] is granted.

ENTER:


Dated: October 25, 2019

REBECCA R. PALLMEYER
United States District Judge

IND DEF 000136